**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**                                                    **NO. 20-mj-03061-KAR**

**JOHN MICHAEL RATHBUN,**

**Defendant.**

GOVERNMENT'S MOTION TO STAY AND OBJECTION TO
MAGISTRATE JUDGE'S PRE-TRIAL RELEASE ORDER

The United States of America, by and through its counsel, Andrew E. Lelling, United States

Attorney for the District of Massachusetts and Steven H. Breslow, Assistant United States

Attorney (the "Government"), respectfully objects pursuant to Rule 59(a) of the Federal Rules of

Criminal Procedure to the April 15, 2020 Order of the Magistrate Judge denying the Government's

Motion for Detention, and moves for a stay of release pending consideration of this Objection.

The Government also respectfully requests oral argument and an expedited review.

1.       Preliminary Statement

On April 15, 2020, the defendant was arrested and charged with violating two sub-sections

of the arson statute, 18 U.S.C. §§ 844(d) and 844(i), after he placed a firebomb outside Ruth's

House, a Jewish-sponsored assisted living facility on April 2, 2020.  D.1 (Complaint).  Later that

day, the Magistrate Judge conducted a detention hearing, which was required because the

defendant's crime is a "felony that is not otherwise a crime of violence that . . . involves the

possession or use of a firearm or destructive device."  18 U.S.C. § 3142(f)(1)(E).   After the

hearing, the Magistrate Judge released the defendant to his home, where he had been living at the

time of his offense and which is located only a few minutes' drive from Ruth's House.  Because

the Magistrate Judge's release order (and any other combination of conditions) will not reasonably assure the safety of any other person and the community, it should be reversed and the defendant should be remanded into custody.[1]

      2.      <u>Factual and Procedural History</u>

      a.      <u>The Defendant's Criminal Conduct</u>

According to the Affidavit of FBI Special Agent Ryan Mcgonigle in support of the Criminal Complaint, D.1-1, in March 2020, the FBI identified a white supremacist organization (the "Organization") that operated over the Internet on a social media platform ("Platform 1"). On Platform 1, Organization users promoted mass killings directed against religious, racial, and ethnic minorities; discussed plans to engage in these crimes themselves; posted about the use of various explosive and incendiary devices; and identified targets, such as mosques and synagogues. On or about March 4, 2020, one such user ("User 1") specified two choices for mass killings, including "that jew nursing home in longmeadow massachusetts."

The FBI subsequently discovered that the Organization operated over the Internet on another social media platform ("Platform 2"). The Organization's Platform 2 forum included a Calendar in which users could create events that listed the dates, times, and locations; invite other users to attend the event; and communicate concerning the event. The Calendar listed the following for April 3, 2020: "jew killing day." The Calendar entry for "jew killing day" was created by a particular user ("User 2"), who the FBI believes is likely the same individual as User 1. The calendar entry listed the location as "Jew Nursery Home" (without a specifying address),

---

[1] The release order has not yet been docketed. The Government is filing this motion without the benefit of a transcript of the detention hearing, since the Government is requesting an expeditious review of the Magistrate Judge's decision.

contained the message "FUCK JEWS," and was accepted by six other users.

At approximately 10:00 a.m. on April 2, 2020 (*i.e.*, the day before "jew killing day"), the Longmeadow Police Department discovered a homemade incendiary device placed at the entrance of Ruth's House. The device was located within feet of a widely used pedestrian walkway along Converse Street, which is a very busy main road in Longmeadow, and approximately 50 yards from the Ruth's House facility. Ruth's House is located within one square mile of several other Jewish facilities, including three Jewish temples, a Jewish private school, and a Jewish Community Center.

The incendiary device consisted of a five-gallon plastic Scepter gas canister, filled with liquid believed to be flammable gasoline, with burnt paper (later identified as a Christian religious pamphlet) placed in the nozzle of the canister. A portion of the pamphlet was charred and appeared to have been lit on fire in an attempt to ignite the gas. The LPD observed what appeared to be blood stains on both the canister handle and on the pamphlet, and transferred these items to the Massachusetts State Police Crime Laboratory, which matched the DNA on both blood stains to Rathbun, whose DNA had been collected based upon his prior arrests and/or convictions.

> b. The Search of the Defendant's Residence

On April 15, 2020, the FBI and local police executed search warrants for the defendant's residence (which he occupied with his parents and daughter), three vehicles located at the residence, and the defendant's person. Rathbun's hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb. The FBI found a large plastic gas can on the Residence porch, and agents located other gas cans in a shed at the Residence.

Rathbun waived his *Miranda* rights, both orally and in writing, and agreed to speak with the agents. Rathbun stated, among other things:

i.      He routinely gets up at approximately 6:00 a.m., and drives on Converse Street past the Jewish school in Longmeadow on his way to a methadone clinic. When asked whether he was familiar with Ruth's House (which is also on Converse Street located a short distance from the school), he stated that he did not know what else was on the street.

ii.     Rathbun initially stated that he last used drugs approximately one month ago, but later in the interview he admitted that he used drugs, approximately two weeks ago, and further in the interview, admitted that he had used a small amount of drugs the night before.

iii.    When asked about an incident at the Quality Inn in Chicopee on March 3, 2020, Rathbun stated that, "I was out of my mind" on Xanax, pot, dope, and alcohol, and admitted that he had stayed in the room with a prostitute and had damaged a screen in the hotel room.

iv.     When asked about his employment, he stated he had left his job as a solar panel installer on good terms, but later admitted, when confronted, that he had left because his supervisor had accused him of stealing copper wire.

v.      When asked about the gas cans found at the Residence, Rathbun stated the can on the porch contained a 50-50 mix of gasoline and another substance, which he used for a leafblower, and the cans in the shed contained gasoline, which he used for a lawnmower.

vi.     Rathbun denied any involvement or interest in anti-Semitism or white supremacy, any use of Platform 1, and any involvement with the

firebomb.

vii.    When agents presented him with photographs of the bloodstained Christian pamphlet that had been used to light the incendiary device at Ruth's House and informed him that his DNA matched the blood, Rathbun's demeanor visibly changed, and a short while later, he stated that he did not know what he was going to do and that he wanted to cry.

The FBI's investigation is ongoing.  The FBI has not had an opportunity to review the computer equipment seized at the residence, or obtain further results from the Crime Laboratory concerning DNA of Rathbun taken during the search.

c.    The Defendant's Offense

On April 15, 2020, federal agents arrested the defendant during the execution of the search warrants, and he was charged by Criminal Complaint with violating two separate subsections of 18 U.S.C. § 844.

First, the Complaint charged that the defendant did transport and receive, in interstate or foreign commerce, an explosive with the knowledge and intent that it will be used to kill, injure, and intimidate any individual and unlawfully to damage and destroy any building, vehicle, and other real or personal property, in violation of 18 U.S.C. § 844(d).  Ordinary violations of this subsection are punishable by up to ten years in prison.  *Id.*

Second, the Complaint charged that the defendant did attempt to damage and destroy, by means of fire and an explosive, any building, vehicle, and other real and personal property used in interstate and foreign commerce and in any activity affecting interstate and foreign commerce, in violation of 18 U.S.C. § 844(i).  Ordinary violations of this subsection are punishable by a minimum mandatory of five years, and a maximum of twenty years, in prison.  *Id.*

        d.       The Detention Hearing

Later on April 15, 2020, the Magistrate Judge held a detention hearing pursuant to 18 U.S.C. § 3142(f)(1)(E).  The Probation Officer orally recommended detention, based upon the defendant's offense, criminal history, and personal history, including his habitual drug use.[2]  After lengthy argument by counsel for the Government and the defense, the Magistrate Judge released the defendant back to his residence, ordered him not to leave the residence except for medical purposes (including visiting the methadone clinic), directed the Probation Officer to conduct random FaceTime contacts with the defendant through his mother's cell phone to determine that the defendant was home, cautioned the defendant that the Magistrate Judge would keep an arrest warrant in abeyance in case the defendant failed to remain at home as ordered, and established other standard conditions of release.

The Government objected, contending that the release order amounted to little more than a personal recognizance release to his home with the condition that he remain there, that virtually all residents are currently under stay-at-home orders due to the COVID-19 virus, and that the Magistrate Judge would not have ordered the defendant's release on such minimal conditions prior to the COVID-19 pandemic.  The Magistrate Judge explained that the Government presented a very close case for detention based upon dangerousness, and conceded that the COVID-19 pandemic was a factor in its consideration, but stated that she would nonetheless be releasing the defendant that evening.

3.      Legal Standard

Under the Bail Reform Act of 1984, pretrial detention is required if the Court finds that

---

[2] The Probation Officer was unable to provide a written report to the Court and parties, but orally recited her findings and recommendation.

"no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  The judicial officer must find either (1) by clear and convincing evidence, that the defendant is a danger to the community or (2) by a preponderance of the evidence, that the defendant poses a risk of flight.  18 U.S.C. § 3142(f).

Title 18, United States Code, Section 3142(g) outlines factors permitted to be considered by the judicial officer in determining whether to order pre-trial detention:

> [I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the judicial officer shall] take into account the available information concerning–
>
> (1)     The nature and circumstances of the offense charged . . .;
>
> (2)     the weight of the evidence against the person;
>
> (3)     the history and characteristics of the person, including
>
> > (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole or on other release pending trial, sentencing, appeal, or completion of a sentence for an offense under Federal, State, or local law; and
>
> (4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

At the detention hearing, "the rules concerning admissibility of evidence in criminal trials

do not apply to the presentation and consideration of information . . . ."  18 U.S.C. § 3142(f).

      4.      The Defendant Should Be Detained

The defendant should be detained because he is both a risk of flight and a danger to the community, and all of the Section 3142(g) factors strongly favor detention.

      a.      The Offense Is Grave

The "nature and circumstances of the offense charged," including the involvement of a "explosive or destructive device" weigh heavily in favor of detention.  18 U.S.C. § 3142(g)(1). Here, the defendant (during the COVID-19 pandemic, which is causing enormous damage to elderly people), placed a homemade firebomb consisting of five gallons of gasoline at the entrance to an assisted living facility, within feet of a commonly used pedestrian walkway and a busy thoroughfare (Converse Street) in the heart of Longmeadow.  The firebomb was lit, but fortunately failed to detonate when the pamphlet failed to burn into the gas canister.

      b.      The Evidence Is Powerful

The "weight of the evidence" is extremely strong and weighs heavily in favor of detention. 18 U.S.C. § 3142(g)(2).  The defendant's DNA was found in bloodstains on both the gas canister and the pamphlet; the defendant lives just a few minutes' drive from Ruth's House; the defendant was arrested with numerous visible cuts on his hands in varying degrees of freshness; the defendant admitted routinely traveling along Converse Street in the mornings on his way to a methadone clinic; and the defendant's home contained several gas canisters filled with gasoline or a gasoline mixture.  Further, the defendant lied to agents repeatedly about his own drug use and his separation from work for theft, and so his denials of involvement in the far more serious charged offenses should be viewed skeptically.  In other words, "[d]efendant has a proclivity not to be truthful." *United States v. Hernandez-Albino*, Crim. No. 07-126 (DRD), 2008 WL 11385396, *7 (D.P.R.

8

Jan. 25, 2008).

c.      The Defendant's Personal History Is Deeply Troubling

The defendant's "history and characteristics" also favor detention. 18 U.S.C. § 3142(g)(3). First, the defendant's character and mental health are questionable, since he has suffered from longstanding drug use (about which he lied to agents) and recently engaged in a bizarre incident at a Chicopee motel in which he admitted that he was "out of my mind" on a variety of drugs. The defendant does have strong family ties, as he lives with his parents and daughter, but these ties were not so close to prevent him from committing the instant offense. His employment history is checkered, as he was apparently fired recently for theft. His past conduct and criminal history include numerous CWOFs for felony offenses, including assault and battery and violations of restraining orders. According to his own statements to the Probation Officer, he has a serious drug abuse problem involving heroin, cocaine, marijuana, and he used drugs as recently as the night before his arrest and in the period surrounding the charged offense. Moreover, "at the time of the current offense or arrest, the [defendant] was on probation," 18 U.S.C. § 3142(g)(3)(B), thus indicating that he is likely to fail to comply with the Court's release restrictions.

d.      The Defendant's Release Endangers the Community

The defendant's release to his home, located just a few minutes' drive from where he placed the firebomb at Ruth's House, highlights "the nature and seriousness of the danger to any person or the community that would be posed by [his] release." 18 U.S.C. § 3142(g)(4). Notably, the release order does not require electronic monitoring and is entirely unsecured, even by a personal recognizance bond, although the Government contends that these measures would not suffice in any event. Indeed, the release order effectively places the defendant back into the exact same circumstances under which he had been living at the time he committed this offense.

e.    The COVID-19 Pandemic Is Not a Basis for Release.

Lastly, the Magistrate Judge's decision appears to have been greatly influenced by the ongoing COVID-19 pandemic. This concern, while entirely laudable, is not a basis for release and should not outweigh the overwhelming balance of the Section 3142(g) factors in favor of detention.[3] The Hampden County House of Correction, where the defendant would be detained, has established precautionary measures to help prevent the transmission of COVID-19.[4]

These measures include:

    i.    requiring all staff and inmates to wear masks;

    ii.    screening every employee before their shift and sending anyone with symptoms home until they are cleared by medical staff;

    iii.    suspending all visits until with exceptions only for clergy or attorneys;

    iv.    quarantining all new arrivals for up to 14 days;

    v.    isolating inmates who show symptoms of COVID-19;

    vi.    suspending property pick-ups until further notice; and

    vii.    discontinuing community service and inmates programs until further notice.

---

[3] In addition to dangerousness, the defendant also poses a risk of flight. The severity of punishment is a factor this Court must consider in assessing the defendant's risk of flight. *United States v. Castiello,* 878 F.2d 554 (1st Cir. 1989). Given the weight of the evidence amassed against him, the statutorily mandated incarceration period for violations of 18 U.S.C. § 844(i), and the defendant's advisory guidelines range, the defendant may well view flight as his only option to avoid a lengthy federal prison sentence.

[4] *See, e.g.,* http://hcsdma; https://www.gazettenet.com/Local-sheriffs-give-COVID-19-updates-33654853; and https://www.gazettenet.com/How-local-jails-are-handling-the-coronavirus-33275007.

To date, as the Magistrate Judge recognized during the detention hearing, there are no positive cases among inmates at the Hampden County House of Correction. The Government is unaware of any indication from Hampden County House of Correction staff that at this time that the facility, even in light of the Covid-19 pandemic, is or would be unable to provide adequate medical care for the defendant.

5.      Conclusion

For the preceding reasons, the Government respectfully requests that the defendant be detained pending his trial.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      */s/ Steven H. Breslow*
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:      */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  April 16, 2020

11