**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-CR-30018-MGM** |
| **JOHN MICHAEL RATHBUN,** | |
| **Defendant.** | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*
TO EXCLUDE RELEVANT AND ADMISSIBLE EVIDENCE

The United States of America, by and through its counsel, Andrew E. Lelling, United States Attorney for the District of Massachusetts, Steven H. Breslow, Assistant United States Attorney, and Risa Berkower, Trial Attorney, United States Department of Justice (the "Government"), respectfully opposes defendant's motions *in limine* to exclude relevant, admissible evidence pertaining to the link between the defendant and the homemade incendiary device in this case (D.75), the observations and reactions of the victims in this case (D.76), the manner in which the defendant was identified as the perpetrator in this case (D.78), and the defendant's voluntary statements to law enforcement agents (D.81).

Because these motions ask the Court to exclude evidence that is readily admissible under Fed. R. Evid. 401, 402, and 403 and that is necessary for the jury to understand and properly evaluate the defendant's guilt of the charged offenses, they should all be denied.

1.    Background

    a.    The defendant's charges

On June 23, 2020, a Grand Jury charged the defendant with one count of Attempt to Transport and Receive, and Transportation and Receipt of, an Explosive in violation of 18 U.S.C.

§§ 844(d) and 2, and one count of Attempt to Damage and Destroy Buildings, Vehicles, and Real and Personal Property by Fire and Explosive in violation of 18 U.S.C. §§ 844(i) and 2.  These charges were based upon the defendant's April 2, 2020 placement of a homemade incendiary device at the entrance of Jewish Geriatric Services Lifecare, Inc. ("JGS"), a non-profit organization located at 770 Converse Street in Longmeadow, Massachusetts.  The Grand Jury also charged the defendant in a Special Finding that he intentionally selected JGS, its property, its employees, and its residents as the object of the charged offenses because of the actual and perceived race, religion, national origin, and ethnicity of any person, pursuant to U.S.S.G. § 3A1.1(a).

On October 15, 2020, a Grand Jury returned a Superseding Indictment that added one count of False Statements in violation of 18 U.S.C. § 1001(a)(2).  This charge was based on the defendant's voluntary, *Mirandized* interview with a Special Agent of the Federal Bureau of Investigation ("FBI") on April 15, 2020, in which he stated that (1) he was not familiar with the location where the incendiary device had been placed; (2) he had not left his house for two weeks due to the COVID-19 pandemic; and (3) he only used the Internet to search for work, to use a dating website, and to view pornography.

        b.     <u>JGS</u>

JGS's stated mission is to improve the physical, spiritual, and emotional health of individuals and families by providing a comprehensive range of health, education, and social services guided by Jewish traditions and values.  The JGS Longmeadow campus consisted of several different facilities, all of which provide health care and housing to elderly people of all faiths.  Among these facilities, Genesis House provided more than 100 rentals of affordable, federally subsidized housing for seniors.  JGS maintains the grounds on its campus for use by the residents of its facilities.

JGS is located within one square mile of several other Jewish facilities, including three Jewish temples, a Jewish private school, and a Jewish Community Center, and an approximately five minute drive from the defendant's home in East Longmeadow, where the defendant has lived for almost his entire life.

### c.    The discovery of the incendiary device

On the morning of April 2, 2020, a concerned citizen in Longmeadow called 911 after observing a suspicious object near the JGS entrance, approximately fifty yards from the nearest building, Genesis House.[1]  When the Longmeadow Police and Fire Departments responded they found a yellow diesel fuel can with a paper wick, consisting of a Christian proselytizing pamphlet, stuffed into the neck of the can.  The officers smelled the odor of gasoline from the can and saw that the paper wick was charred, indicating that someone had tried to ignite the wick and the gasoline inside the can.  At this point, the investigators had no suspects.

However, the officers also observed what appeared to be bloody fingerprint stains on both the paper wick and the diesel can's handle.  The LPD sent these bloodstains sent to the Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") for analysis.  The MSP Crime Lab first confirmed that the stains were human blood, then developed a DNA profile from the bloodstains, and next submitted this profile into the CODIS database[2] for comparison to known DNA profiles on file in the system.  The CODIS database matched the DNA from the bloodstains

---

[1] The affidavit in support of the defendant's Criminal Complaint mistakenly called this building Ruth's House, which is another building on the JGS campus. As set forth below, the defendant's grandmother lived at Genesis House from 2003 to 2010.

[2] CODIS, which is the acronym for the Combined DNA Index System, is a national database of DNA profiles that is maintained by the FBI.  Created pursuant to an act of Congress, DNA samples must meet minimum collection standards in order to be included in the system.

on both the wick and the canister to the defendant's DNA, which had been collected based upon his arrest and conviction for a prior, unrelated crime.

Based on the CODIS match, the FBI obtained search warrants for the defendant's home (which he shared with his parents), his person, his cellular telephone, electronic devices found inside his house, and the vehicles registered to his home address. The search warrant for his person authorized the collection of a buccal swab from the defendant, in order to develop a complete DNA profile from him for further comparison to the DNA taken from the bloody fingerprints found at the crime scene.

        d.        <u>The search of the defendant's home and his interview with law enforcement</u>

On April 15, 2020, law enforcement officers executed these search warrants at the defendant's home. When the officers first arrived, they directed everyone inside the house to come outside in order to secure the house for the search. During this process, the officers met the defendant, his parents, and the defendant's adult daughter, all of whom lived in the house. The defendant first came outside wearing only boxer shorts, so an FBI agent went inside to get him more clothing.

The officers did not have an arrest warrant for the defendant. Once the defendant had dressed and put on a mask, FBI Special Agent Ryan McGonigle and Longmeadow Police Department ("LPD") Officer Pamela Chapin asked him if he would be willing to speak to them. Although the defendant was not in custody, Special Agent McGonigle advised the defendant of his *Miranda* rights out of an abundance of caution. The defendant waived his rights orally and in writing.

After that, the defendant spoke to Special Agent McGonigle and Officer Chapin off and on for a period of approximately three to four hours, as the search warrant progressed in the

background.  During this time, the defendant was not handcuffed, and he moved freely around his backyard and between the backyard and his porch.  He smoked cigarettes, kicked a soccer ball around his yard, was offered bathroom breaks, and was asked on several occasions if he was comfortable or needed anything.  The defendant said several times that he wanted to talk to the officers to "figure this out."  At one point, when Officer Chapin walked a short distance away from the defendant, he called to her and asked if she were going to come back to talk to him because "we were having great conversation."

At the outset of their interaction with the defendant, Special Agent McGonigle and Officer Chapin noticed that his hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb, which they photographed.   The defendant explained that his hands bled because he picked at them.

As they talked, the officers asked the defendant questions related to the placement of the incendiary device at the JGS entrance on Converse Street.  When asked if he was familiar with the location where the device was placed, the defendant admitted that he routinely drove on Converse Street past the Jewish school in Longmeadow to go to a methadone clinic, but he claimed to be unfamiliar with the Jewish nursing home complex where the device was found.  The defendant maintained this assertion even after agents showed him a map of the area with an "x" marking the location where the device was placed – the driveway entrance to the JGS complex on Converse Street.  When asked about his whereabouts on the day of the offense, the defendant claimed that he had not left his house for the past two weeks because of the COVID-19 pandemic.  When asked about his Internet use (because the agents were investigating the defendant's ties to a white supremacist group on social media that had targeted a Jewish nursing home in Longmeadow and identified April 3, 2020 as "jew killing day"), the defendant claimed he only used the Internet to

search for work, to use a dating website, and to view pornography.  When asked about religion, the defendant disclaimed any personal interest in religion, but he stated that his mother was active in a local church and distributed Christian proselytizing pamphlets to potential converts.

At one point during their conversation, the officers told the defendant that his blood had been found on the device at JGS, and they showed him photographs of the yellow diesel can.  The defendant could not explain how his blood got there, asserted that he did not had never owned a yellow fuel can, and suggested that someone may have tried to frame him.

Toward the end of the interview, the officers showed the defendant photographs of the charred religious pamphlet that contained the blood stains that the MSP Crime Lab had linked to the defendant.  When the defendant saw these photographs, his demeanor changed.  Prior to seeing these pictures, the defendant had been engaging with them, and repeatedly said he wanted to continue talking to the officers to "figure this out."  After seeing these photos, the defendant sat down on the porch, became visibly upset, put his head in his hands, and said that he thought he was going to cry.  He then ended the interview.

After the interview, Special Agent McGonigle informed a federal prosecutor about the defendant's statements and other evidence obtained during the execution of the search warrants, such as the condition of the defendant's hands and a voluntary interview with the defendant's mother, and the prosecutor authorized the arrest of the defendant.  Only then did Special Agent McGonigle place the defendant under arrest.

Special Agent McGonigle later documented the interview in a written FD-302 report.  That report, as well as the contemporaneous handwritten notes taken by Officer Chapin, have since been provided to the defense in discovery.  No audio recording of the interview was made, nor did FBI

policy require any such recording under these circumstances.[3]

  e.  The defendant's DNA match

Pursuant to the search warrant, on April 15, 2020, officers took a buccal swab from the defendant. The MSP Crime Lab developed a full DNA profile for the defendant from the swab. On April 28, 2020, the MSP Crime Lab compared this full DNA profile to the bloodstains on both the fuel can and the pamphlet, and concluded the defendant's DNA was a 1-in-568 octillion match to each.[4]

  f.  Additional evidence obtained from the defendant's mother and through search warrants

Also during the search of the defendant's house, officers conducted a voluntary interview with his mother. In particular, the officers showed her photographs of the charred religious papers that were stuffed into the neck of the incendiary device. She stated that she printed her own religious pamphlets to distribute to the public, but that she did not recognize the pamphlet that was found in the device. In the kitchen, agents located a different pamphlet designed to help guide Christians in converting Jewish persons to Christianity.

Agents conducted an on-site, physical search of his mother's car and located numerous copies of other proselytization materials inside, but they left his mother's car for the family to use because they had no basis to believe the defendant had driven it on April 2, 2020, particularly in

---

[3] FBI policy does not require agents to record voluntary, non-custodial interviews. Since 2014, FBI policy has required that statements made by persons in FBI custody must be recorded following arrest when the arrestee is in a place of detention with suitable recording equipment. FBI policy does not allow the use of FBI-issued cell phones or personally owned equipment for such recordings.

[4] One octillion is a number that contains 27 zeros, and is written as 1,000,000,000,000,000,000,000,000,000.

light of the defendant's insistence that he had not left his house in the past two weeks.  Instead, the FBI towed the defendant's van for a forensic search of its contents.

Pursuant to the warrants, agents also seized the defendant's cell phone and his mother's laptop computer.  A subsequent forensic examination of the defendant's cell phone as well as cell site location information for that phone established that the defendant had in fact left his home in his mother's car during the early morning hours of April 2, 2020 leading up to the discovery of the incendiary device - contrary to the defendant's claim that he had not left his house in the past two weeks.

Moreover, on August 13, 2020, during a telephone call from the defendant to his mother that was recorded by the Hampden County Jail, his mother informed the defendant that the FBI had returned his van and stated, "I suspect that if they gave the van back, there was nothing there." The defendant replied, "No, there is nothing there.  Because these idiots didn't know I didn't even take the van.  They now know, but they didn't when they took it."[5]

The forensic examination of the defendant's cell phone, along with a subsequent search warrant for Facebook, also revealed that the defendant had created numerous alias Facebook accounts, primarily to locate and/or contact his ex-wife, Sarah, who had obtained restraining orders against him - contrary to the defendant's claim that only used the Internet to search for work, access pornography, and use a dating app.  During a recorded jail call on July 30, 2020, the defendant told his mother, "The Sara shit is gonna be huge.  I'm telling you, it's big, I'm telling you.  We, we not being able to talk to her is not good.  It's not.  It's not.  You know how I made 20 different accounts with Sara, because I wanted to see her, yeah?  Well all that-- all that's gonna

---

[5] The Government first obtained copies of recorded jail calls made by the defendant on October 14, 2020, and produced them to the defense that same day.

play into that.  They wanna see all those accounts, because now they think some of those accounts, why couldn't, I could be—you understand what I'm saying?"

g.    The identification of the proselytizing pamphlet and its ties to the defendant's family

The charred paper wick consisted of several pages of Christian proselytizing material that appeared to have been torn from a pamphlet containing other pages.  The Government recently determined that pages were taken from a pamphlet entitled *Steps to Peace with God*, which is published and distributed by Billy Graham Evangelical Association ("BGEA"), based in Charlotte, North Carolina.

According to BGEA witnesses, BGEA publishes and distributes this pamphlet for use in counseling individuals who are seeking to establish a relationship with God and commit to the Christian faith.  The physical pamphlets are manufactured in South Carolina.  In the spring of 2019, BGEA held a series of events in the Springfield area as part of the organization's Northeast Tour, culminating in a large event at the Big E Festival in West Springfield on May 25, 2019.  During the runup to the Big E event, BGEA hired several local pastors, including the pastor of the defendant's parents' church, Heritage Baptist Church ("HBC"), as paid contractors to conduct outreach and to help host a series of kick-off events, including events at an Agawam church and the Basketball Hall of Fame.  BGEA staff distributed copies of the *Steps to Peace with God* pamphlet during several events designed to recruit counselors for the Big E event.  At the Big E event, the defendant's parents registered for a T-shirt giveaway and provided their contact information, including their home address (where the defendant also lived) and e-mail address.  From June 19, 2019 to April 15, 2019, BGEA e-mail or mailed to their home a series of twenty-three prayer letters and other religious materials.

9

According to the defendant's parents' pastor, the pastor served as a paid coordinator for the Springfield area events, and he attended the events at the Agawam church, the Basketball Hall of Fame, and the Big E.  The defendant's mother volunteered as the pastor's secretary and worked with him to plan the BGEA Northeast Tour.  Among other things, the defendant's mother (and father) helped the pastor contact local church organizations and mailed flyers advertising the kick-off events to community members.  The defendant's mother also attended, at least, the events at the Basketball Hall of Fame and the Big E.  The defendant's parents' pastor recognized the *Steps to Peace with God* pamphlet as part of the Northeast Tour materials distributed by BGEA.[6]

According to a forensic examination of the defendant's mother's laptop, it contained a Save the Date flyer for the BGEA kickoff event at the Hall of Fame on March 5, 2019 and a list of religious community contacts entitled "HBC Meeting for Franklin Graham 2-21-19."

According to the defendant's eighteen-year-old daughter, who lived with the defendant and his parents at their East Longmeadow home, the *Steps to Peace with God* pamphlet looked very familiar and appeared very similar to those that she had seen at HBC.  She recognized one section of the pamphlet, which she believed she had seen in other pamphlets either in her house or at her family's church, but she did not specifically recognize the entire pamphlet.  The defendant's mother frequently took pamphlets and other religious material from church or religious events and gave them to both the defendant and her.  The defendant's mother frequently tried to get the defendant involved in church because she believed that the defendant needed to find God.

### h.    Ties between JGS, Genesis House, and the defendant's family

As set forth above, during his interview on April 15, 2020, the defendant claimed to be

---

[6] The pastor also thought that he might have kept some of these pamphlets at his church, although he could not locate any at the time of his FBI interview in September 2020.

unfamiliar with JGS even though the driveway entrance is plainly marked with a large sign, its campus is located an approximately five-minute drive from the defendant's home, and the defendant admitted routinely driving down the street where it is located. The defendant maintained this ignorance even after Special Agent McGonigle showed him a map with an "x" marking the spot by the JGS driveway entrance on the street where the device was placed.

However, according to representatives of Carr Property Management ("Carr PM"), which manages Genesis House for JGS, the defendant's mother has been a longtime employee of Carr PM (previously as a comptroller and currently as a part-time accountant) and the defendant's maternal grandmother lived at Genesis House from approximately the mid-2000s until her death in 2010. Moreover, in a recorded jail call with his mother on July 25, 2020, after his mother informed him that the Government had subpoenaed her work records and his grandmother's residence records at Genesis House, the defendant acknowledged, "Now remember, her - where she lived was right on that side, too, where the bomb was placed."

### i. The defendant's alibi defense

On August 28, 2020, the defendant filed a Notice of Alibi (D.52) pursuant to Fed. R. Crim. P. 12.1(a)(2). Through this Notice, the defendant asserted that he did not commit the charged crimes because he was not present at the scene of the crime at the time the charged offenses occurred. Based on this Notice, the Government anticipates that the defendant will assert at trial, though jury addresses, cross-examination of Government witnesses, and possibly through defense witnesses, that the Government has not proven the defendant's identity as the person who built and placed the incendiary device outside of JGS. The defense has based its alibi upon the fact that at 4:51 a.m., a Longmeadow Police Department cruiser departed the JGS campus and its camera did not depict the device at the location where it was later detected by a neighbor at approximately

8:30 a.m.

However, cell site location information for the defendant's phone indicated that: (1) at 4:34 a.m., his telephone connected to a tower located near his home, an approximately five-minute drive from JGS; and (2) at approximately 5:01 a.m., his telephone next connected to a tower located on the West side of the Forest Park bridge connecting to Springfield, also an approximately five-minute drive from JGS.

In a recorded jail call with his mother on May 8, 2020, the defendant initially denied placing the gas canister at JGS, but when his mother reminded him that he had told her he had been dumpster diving that morning, the defendant replied, "Oh my God, this is freaking me out. [] I don't know, I'm freaking out. I don't' know. I didn't place this here [] But what if I did and I don't remember?" Later in the call, the defendant again denied placing the gas canister or trying to hurt anyone, but added "I can't remember shit, because of the drugs I was taking."

Moreover, in another recorded jail call with his mother on May 14, 2020, the defendant admitted that he always drives from his house to Springfield along Converse Street, and was in fact on Converse Street on April 2:

> Defendant: I don't remember the fucking day at all. But apparently I was up all night and day. We just got to pray to God that between 4:30 a.m and 8:00 a.m. that I wasn't anywhere near Converse Street. If I was, then we have a serious problem. Cause if I, if I, if I drove by Converse Street, I know I was in your car, too, it doesn't matter, but if I drove down Converse Street between 4:30 a.m. and 8:30 a.m., I'm probably going to wind up going to jail for all this.

***    ***    ***

Defendant:  So if I, if I, if I was in the location between 4:30 a.m. and 8:30, if I drove by Converse Street, if I drove by Ruth's House, *which I think I did, probably did, cause that's the only way to get from the fucking highway to home*, I have to sit in here for this whole entire thing and go through trial and put it in the judge's hands.

Defendant's mother:  Yeah, but you didn't go to the clinic that day.

Defendant:  It doesn't matter, it doesn't matter.  I was going - it doesn't matter, it doesn't matter.  *Where I was driving, no matter what, I always go that way*.  It doesn't matter.  It doesn't matter.

***    ***    ***

Defendant's mother:  So what I should pray specifically, is that from 4:30 to 8:30 -

Defendant:  - That I wasn't on Converse Street, *but I'm telling you I was.  I know I was.  Because the only way that I get from my house to every place that I go to get drugs is go straight to the highway down fucking Converse Street*.  []  You're not listening to me.  You're not listening to the words coming out of my mouth.  Every person I call to go meet to get drugs *I drive from our house, down Converse Street, on to the highway*.  So, I don't know, so I'm just praying that from 4:30 to 8:30 that hopefully I didn't.  But I don't, I don't know, *I think I did*.  So then from there, what's gonna happen is, when they do see that I did, they're going to start getting video.  And they're going to go to the neighbors, cause they already did go

13

to the neighbors, and get the video from people who have video cameras on Converse Street in front of Ruth's House, and *they can get video of me driving down Ruth's, down Converse Street, on top of the phone, on top of the blood.* It's just gonna be wonderful.

j.      Observations by JGS's residents

On April 2, 2020, after being notified about the incendiary device by the Longmeadow Police Department, FBI agents also responded to the crime scene at JGS.   While the agents were at the site, they encountered a JGS resident who had come outside to smoke a cigarette. This resident said that he lives on the JGS campus and he routinely walks outside to take cigarette breaks, approximately four times per day.  His habitual path takes him down the sidewalk at the edge of the JGS campus to the JGS entrance sign, where he stops to smoke.  This sign is located in close proximity to the location where the incendiary device was placed.  This resident also told the FBI that on the morning of April 2, 2020, he had observed a yellow fuel can placed on the ground.  He had not seen the can when he had smoked the previous night.

According to a letter from a JGS director submitted in connection with the defendant's detention hearing, "John Rathbun's violent attempt to ignite an explosive device in front of Ruth's House has instilled shock and additional fear in the minds and hearts of our residents, staff, and their families.  It has added a huge additional burden of concern to the people both living here and working here, leaving us feeling hated, vulnerable and insecure. We fear that his act could embolden others to do similar acts of copycat hatred.  Our staffs, already under tremendous mental stress, now fear for their lives as they come to work. Our residents, already fighting for their lives against COVID-19, now are in fear of their lives." The Government expects to solicit similar testimony from staff or residents of JGS as part of its proof that the defendant committed Count

14

One by using an explosive with the knowledge and intent to "intimidate any individual."    18 U.S.C. § 844(d).

     2.     <u>Applicable Law</u>

     a.     <u>Admissible evidence under Fed. R. Evid. 401 and 403</u>

The Federal Rules of Evidence allow for broad admissibility of relevant evidence at Federal trials.  As the First Circuit has explained, "[g]enerally, all relevant evidence is admissible." *United States v. Flemmi*, 402 F.3d 79, 86 (1st Cir. 2005) (citing Fed. R. Evid. 402 ("Relevant evidence is admissible.")).  Evidence is relevant if "it has <u>any tendency</u> to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a) (emphasis added).

This standard is broad, and evidence that provides background information, or which provides context to explain the Government's theory of the case, is relevant, admissible evidence. *Flemmi*, 402 F.3d at 87 (citing *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.")).

That the evidence is circumstantial is irrelevant in this analysis; indeed, "the government's proof may lie <u>entirely</u> in circumstantial evidence." *United States v. Keene*, 341 F.3d 78, 83 (1st Cir. 2003) (emphasis in original) (quotation marks omitted); *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994) ("The law is long since settled that the prosecution may prove its case without direct evidence of a defendant's guilty knowledge so long as the array of circumstantial evidence possesses sufficient persuasive power.").

In addition, this broad view of relevance means that evidence "that pertains to a chain of events forming the context . . . and set-up of the crime, helping it to complete the story of the crime

on trial" is admissible, even if that evidence does <u>not</u> directly establish an element of the charged offenses.  *United States v. Charles*, 456 F.3d 249, 257 (1st Cir. 2006) (quotation marks omitted); *Flemmi*, 402 F.3d at 87 (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.")); *see United States v. Page*, 521 F.3d 101, 106-07 (1st Cir. 2008) (affirming trial court's admission of evidence used to establish background and context).

Where evidence otherwise satisfies the Rules of Evidence, relevant evidence may be excluded if only it if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, or wasting time.  *United States v Soto*, 799 F.3d 68, 91 (1st Cir. 2015) ("Rule 403 . . . allows a court to exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.") (quotation marks omitted); *see Flemmi*, 402 F.3d at 87; Fed. R. Evid. 403.

When assessing the admissibility of prejudicial evidence, Rule 403 shields a defendant "against <u>unfair</u> prejudice, not against <u>all</u> prejudice."  *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir. 2008) (emphasis in original) (quotation marks omitted).  This is because "all evidence is meant to be prejudicial; it is only <u>unfair</u> prejudice which must be avoided."  *United States v. Almeida*, 748 F.3d 41, 51 (1st Cir. 2014) (emphasis in original) (quotation marks omitted).  "The term 'unfair prejudice' usually refers to evidence that invites the jury to render a verdict on an improper emotional basis."  *Almeida*, 748 F.3d at 51 (quotation marks omitted).  In line with this approach to admissibility, as the First Circuit has recognized more than once, "'Rule 403 tilts the balance in favor of admission.'"  *Whitney,* 524 F.3d at 141 (quoting *United States v. Rivera*, 83

16

F.3d 542, 545 (1st Cir. 1996)).

          b.          <u>Admissibility of a defendant's statements</u>

The Federal Rules of Evidence clearly permit the Government to introduce the defendant's own statements against him in its case in chief. Fed. R. Evid. 801(d)(2)(A); *United States v. Aviles-Colon*, 536 F.3d 1, 23 (1st Cir. 2008) ("Under this rule [801(d)(2)(A)], an out-of-court statement is not hearsay if it is offered against the party and it is the party's own statement.").

At the same time, a criminal defendant may seek to suppress his statements if they were made in violation of his constitutional rights. The Fifth Amendment to the U.S. Constitution guarantees an individual the right to be free from compelled self-incrimination. U.S. Const. Amend. V. This right attaches if a defendant is subjected to custodial interrogation; in such circumstances, *Miranda* warnings safeguard the defendant's Fifth Amendment rights. *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010); *see New York v. Quarles*, 467 U.S. 649, 654 (1984) ("The Fifth Amendment itself does not prohibit all incriminating admissions; [a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.") (quotation marks omitted).

Where a defendant makes statements to law enforcement officers but is not in custody, his statements will be suppressed only if they were coerced. *United States v. Swan*, 842 F.3d 28, 33-34 (1st Cir. 2016) (affirming denial of suppression motion where defendant's statements were not custodial or coerced); *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011) (same).

Beyond the Fifth Amendment's privilege against compelled self-incrimination, there is no separate due process right that governs a defendant's non-custodial statements to law enforcement officers. As the defense concedes in its motion *in limine*, "no federal court has yet held that a failure to record interrogation violates the due process clause." D.81, at 1.

3.        The Defendant's Motions Should Be Denied

a.        Evidence concerning the origins of the *Steps to Peace with God* pamphlet and its ties to the defendant's family is highly relevant, not unfairly prejudicial, and should be admitted

The defendant moves to exclude evidence concerning the BGEA *Steps to Peace with God* pamphlet and its connection to the Rathbun family on the ground that this evidence is irrelevant, unfairly prejudicial, and aims to inflame the jury by painting the entire Rathbun family as anti-Semitic.  To the contrary, this evidence is highly relevant because it provides circumstantial evidence concerning a crucial question in this case, which the defendant has squarely put in issue by raising an alibi defense:  his identity as the perpetrator of the charged offenses.  This evidence will also provide necessary context and background information that explains this causal chain, sheds light on the defendant's motive, and risks no undue prejudice to the defendant since the pamphlet itself has no anti-Semitic content.  Therefore, the defendant's motion should be denied and the Government's corresponding motion to admit this evidence, D.79, should be granted.[7]

By noticing an alibi defense, the defendant has placed the identity of the person who placed the incendiary device at JGS into dispute as a central issue in this case.  Far from seeking to improperly inflame the jury with improper inferences about the Rathbun family's beliefs, the evidence at issue provides a circumstantial link that tends to disprove the defendant's alibi defense and, instead, tends to identify him as the perpetrator.  The evidence the Government anticipates introducing, detailed above, will explain where the wick in the incendiary device came from, the

---

[7] Many of the same grounds for denying this motion also justify granting the *Government's Motion in Limine to Admit Evidence Under Rule 401* (D. 79), and the Government incorporates by reference the facts and arguments in that motion to this Opposition.

intended purpose for which the *Steps to Peace with God* pamphlet is used, the distribution of the pamphlet at BGEA events in the Springfield area, the involvement of the defendant's parents in those events, the possession of similar religious material by the defendant's mother in the defendant's home and in her car (which the defendant used during the early morning hours of April 2), the frequent provision of such religious material by the defendant's mother to the defendant, and the connections between the defendant's family (and the defendant himself) to JGS and Genesis House.

All of this evidence, taken together, establishes a link between the defendant and the incendiary device that far exceeds the Rule 401's minimal threshold ("any tendency to make a fact more or less probable") to prove the defendant's identity as the person who assembled and placed the device at JGS. Given the defendant's alibi defense, this evidence is necessary to provide a basis for the jury to determine why the defendant's bloodstains wound up on the pamphlet (and the fuel can in which the pamphlet was inserted), as well as the context necessary for the jury to understand those connections. This evidence therefore meets the Rule 401(a) standard of relevant evidence, and should be found admissible.

This evidence also helps establish the defendant's motive, which is charged separately in the indictment's Special Finding. The Government's proposed evidence will explain the significance of the wick's pamphlet pages, which BGEA intends for use in counseling individuals to become Christian. It will also explain that the defendant, who has a longstanding heroin addiction, was regularly given proselytizing materials by his mother and encouraged to find God. Here, by using pages torn from *Steps to Peace with God* to build an incendiary device, placing that device outside a Jewish facility, and lighting the pamphlet on fire, the defendant expressed profound antipathy about religious practice, both Christian and Jewish.

At the same time, there is no undue prejudice to the defendant from this evidence, as none of it involves extrinsic bad acts by the defendant or anyone else that could risk improperly inflaming the jury. Contrary to the defendant's assertion, none of this evidence seeks to impugn the defendant's parents or their religious beliefs in any way. Rather, the Government's evidence at trial will indicate that the defendant's parents were deeply concerned about the defendant's life struggles and genuinely believed that he could find salvation in God. In this context, the proffered evidence provides an important explanation of how the defendant (who is admittedly not religious) ended up possessing the *Steps to Peace with God* pamphlet and his subsequent misuse of the pamphlet as a wick on the incendiary device.

The defendant has cited no authority that calls for the exclusion of such probative and unprejudicial evidence.[8] Far from risking inflaming or confusing the jury, the evidence at issue here evidence will allow the jury to understand the chain of events that led up to the commission of this crime, the totality of the circumstantial evidence that establishes the defendant as the perpetrator and his anti-religious motive.

Moreover, this evidence confronts a number of defenses that the Government anticipates that the defense may assert at trial in addition to his alibi defense, including that: (1) the defendant had no personal connection to the wick/pamphlet, the fuel can, or to JGS; (2) his blood was on the

---

[8] The cases cited in the defendant's motion addressed instances where the proffered evidence introduced irrelevant references to a domestic terrorist attack that killed 169 people, and where relevance of the proffered evidence was based upon improper assumptions about the defendant's country of origin. *United States v. Fulmer*, 108 F.3d 1486 (1st Cir. 1997) (holding, in threats case entirely unconnected to Oklahoma City bombing, that references to that incident risked unduly inflaming the jury); *United States v. Rodriguez Cortes*, 949 F.2d 532, 541 (1st Cir. 1991) ("We are more disturbed by the assumption underlying the court's second asserted ground for relevance. In admitting the evidence, the trial court relied on generalizations about natives of Colombia.").

wick/pamphlet and the fuel can because he handled these items while he was employed doing odd jobs such as trash removal; (3) he was framed by some other individual who assembled and placed the device after he handled its components; (4) he was not religious and did not engage in proselytizing generally or seeking to convert Jews in particular; and (5) the Government has not established any evidence that the defendant had access to these materials or motive to use them in an incendiary device placed at JGS.

Given these anticipated defenses, evidence that explains the origin of the paper wick, the complete content and purpose of the *Steps to Peace with God* pamphlet, its distribution and use in the Springfield area during the BGEA Northeast Tour and the involvement of the defendants' parents in the BGEA Northeast Tour, the possession of similar religious material by the defendant's mother, the provision of such religious material by the defendant's mother to the defendant, and the connection between the defendant's family and JGS, is all highly relevant evidence that will be necessary to rebut these arguments from the defense, and to provide the jury with a complete picture of the chain of events that led up to this crime.

Finally, to the extent that the Government must prove an interstate nexus for Count 2, which charges a violation of 18 U.S.C. § 844(d), the manufacture of the *Steps to Peace with God* pamphlet in South Carolina and its subsequent distribution in Massachusetts by the BGEA provide proof of an element of the charged offenses.

In sum, the evidence the defendant seeks to exclude far exceeds the minimal Rule 401(a) threshold of "any tendency" to prove facts of consequence in this case — in particular, the essential questions of the defendant's identity as the perpetrator of this crime and the motive charged in the Special Finding— and because it will be necessary to provide the jury with essential context and background, to prove the interstate nexus of this offense, and to rebut likely arguments by the

defense that would otherwise mislead the jury.  The Court should find this evidence relevant and admissible under Rules 401(a), 402, and 403, and the defendant's motion to exclude it should be denied.

>   b.   Evidence concerning the identification of the defendant as a suspect in this case should be admitted

The defendant moves to exclude evidence concerning the manner in which law enforcement first identified him as a suspect in this case.  Specifically, the defendant seeks to exclude evidence concerning the fact that the bloodstains on the incendiary device matched his DNA profile in CODIS, that the Government then sought a search warrant for his home, and that a magistrate judge found probable cause for such a warrant.  Because granting the defendant's motion would withhold evidence that is necessary for the jury to understand the Government's overall presentation of evidence, the motion should be denied.

Evidence of the CODIS match and the subsequent search of the defendant's home is relevant and necessary background information that will place the Government's evidence into context and make it comprehensible to the jury.  As described above, when law enforcement officers first found the incendiary device at JGS, they had no suspects.  It was the DNA taken from the bloodstains on the device—and only that evidence—that led to the defendant's identification as a suspect.  This, in turn, led to an authorized search of the defendant's house, electronic devices, vehicles, and person, including the collection of a buccal swab.  That search led to still more relevant evidence:  a DNA match of 1 in 568 octillion between the defendant and the bloodstains on the incendiary device; evidence from the defendant's cell phone that he was out of the house, driving his mother's car at the time the device was placed at JGS; proselytizing materials found in that car; proselytizing materials directed at converting Jewish persons found in the defendant's

kitchen; and evidence on his mother's laptop connecting her to BGEA events at which the *Steps to Peace with God* pamphlet were distributed.

In addition, during the time that agents were at the defendant's house to execute the search warrant, the defendant engaged in a voluntary interview with the FBI during which he made the false statements that are now charged in Count 3 of the Superseding Indictment. Evidence that explains why law enforcement agents suspected the defendant to be the perpetrator, how they obtained much of the evidence the Government will offer in its case in chief, and the circumstances under which they interviewed the defendant provides necessary background and context to explain the Government's case in chief.

There is no undue prejudice to the defendant from the Government's introduction of this evidence. With regard to the CODIS database match, the Government intends only to reference the fact that the DNA from the bloodstains found on the device was compared to DNA samples on file in a national database - without any reference to the fact that the defendant's DNA existed in the database due to a prior crime. Similarly, with respect to the search warrant, the Government does not intend to introduce any evidence about the magistrate judge's approval of the warrant or raise any inference that the issuance of the warrant should influence the jury's fact finding in this case.

Given that the presentation of this evidence will be straightforward, limited, and introduced only to explain how law enforcement came to suspect the defendant of these crimes and then found relevant evidence at his house, this evidence is readily admissible under Rules 401, 402, and 403, and the defendant's motion should be denied.

c.     Evidence of JGS's residents' observations and reactions should be admitted

The defendant's motion to exclude evidence from JGS residents concerning their

23

observations of the incendiary device and their reactions to it should be denied. The defendant asserts that this evidence is irrelevant and risks unfairly inflaming the jury. Because this evidence is directly relevant to one of the elements of the charged offenses and does not risk undue prejudice to the defendant, his motion should be denied.

Count One in the Superseding Indictment charges the defendant with violating 18 U.S.C. § 844(d). That statute criminalizes using explosives "with the knowledge and intent that it would be used to kill, injure, <u>or intimidate any individual</u> or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d) (emphasis added).

One of the means by which the government may prove this charge is by establishing that the defendant acted with the knowledge and intent to "intimidate any individual." Courts routinely hold that, while not determinative, a victim's reaction to intimidation or a threat is relevant, admissible evidence that the jury may consider in assessing this element, even where an objective, reasonable person standard applies to assess the threat. *See, e.g.*, *United States v. Fulmer*, 108 F.3d 1486, 1500 (1st Cir. 1997) (holding, in § 115(a) prosecution for threatening a federal agent, that "although the proper standard is what a person making the statement should have reasonably foreseen, we find that evidence of the recipient's reactions is relevant to that inquiry"); *United States v. Whiffen*, 121 F.3d 18, 22-23 (1st Cir. 1997) (affirming § 875(c) interstate threats conviction, and noting, in assessing the sufficiency of the evidence, that "evidence regarding the reaction of the listeners is not conclusive, but it does suggest that at least these individuals perceived the statements to be threats").

Other Circuits also permit this type of evidence in prosecutions for threats and intimidation. As the Sixth Circuit has observed, for purposes of establishing intimidation, many circuits "have long permitted some consideration of a victim's perceptions and state of mind" where a

24

defendant's intent to intimidate is assessed "on an objective, reasonable-person standard." *United States v. Wooten*, 689 F.3d 570, 577-78 (6th Cir. 2012) (noting that bank teller's subjective reaction is relevant to proving intimidation element of bank robbery under 18 U.S.C. § 2113(a)); *United States v. Magelby*, 241 F.3d 1306, 1314-15 (10th Cir. 2001) (holding, in cross-burning case, that the court "properly instructed the jury that it could consider the [victims'] reactions when deciding" whether the defendant's actions were intended to threaten them); *United States v. Davis*, 635 F.3d 1222, 1226 (D.C. Cir. 2011) (reviewing a district court's application of the sentencing enhancement for brandishing a dangerous weapon and indicating that the victim's perception "may be relevant to th[e] inquiry but is never controlling of the outcome" (alteration in original) (internal quotation marks omitted)); *United States v. Milbourn*, 600 F.3d 808, 810-811 (7th Cir. 2010) (explaining in cross-burning case that a jury "may consider the victims' reactions as an indication of threatening intent" because it is "admissible as proof that a threat was made"); *United States v. Cunningham*, 110 Fed. Appx. 238, 242 (3d Cir. 2004) (unpublished opinion) ("Admittedly, the intimidation inquiry [under 18 U.S.C. § 2113(a)] is objective, not subjective, focusing on whether an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts. That said, asking [the teller] about her state of mind (*i.e.*, whether she was afraid) was at least minimally probative of whether a reasonable person in her position also would be afraid." (citation and internal quotation marks omitted); *United States v. Alaboud*, 347 F.3d 1293, 1298 (11th Cir. 2003) (citing supporting precedent from other circuits and holding that, even though an objective standard applies to the determination whether a defendant transmitted a threat to injure another in violation of 18 U.S.C. § 875(c), testimony concerning a victim's personal belief that the defendant's words were a threat was "relevant in the inquiry of whether a reasonable person would perceive the statements as a threat"); *United States v. Muhammad*, 64 Fed.Appx.

629, 630 (9th Cir. 2003) (unpublished opinion) ("We have consistently upheld the admission of teller testimony [concerning his subjective reaction to a defendant's conduct] as circumstantial evidence that, when combined with other evidence like a demand note, could allow a jury to infer objective intimidation [under 18 U.S.C. § 2113(a) ]."); *United States v. Hartbarger*, 148 F.3d 777, 782-785 (7th Cir. 1998), *overruled in part on other grounds by United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003) (en banc) (trial court appropriately instructed the jury that "while a victim's reaction to a cross burning is not conclusive evidence of the defendant's intent, it may be considered nonetheless as some evidence of his intent"); *United States v. Smith*, 131 F.3d 685, 689 (7th Cir. 1997) (evaluating jury instructions on intimidation under 18 U.S.C. § 2113(a), and concluding that "the teller's testimony that she in fact feared bodily harm to herself or someone else in the bank if she did not comply with Smith's demands can be considered in determining whether Smith's actions would have produced the fear of bodily harm in a reasonable person"); *United States v. J.H.H.*, 22 F.3d 821, 826-827 (8th Cir. 1994) ("Evidence showing the reaction of the victim of a threat is admissible as proof that a threat was made."); *United States v. Walker*, 835 F.2d 983, 987 (2d Cir. 1987) (noting, in the context of a forcible assault of a probation officer, that although "[t]he proper standard for determining whether the requisite degree of force was displayed ... is an objective one, *i.e.*, whether the defendant's behavior would reasonably have inspired fear in a reasonable person ... the victim's subjective state of mind is not irrelevant to determining whether the amount of force threatened or displayed was sufficient to make fear reasonable" (citation omitted));; *but see United States v. Jennings*, 439 F.3d 604, 611 (9th Cir. 2006) (concluding, for purposes of U.S.S.G. § 2B3.1(b)(2)(F) that "an examination into the subjective reaction of one specific teller is ... inappropriate" because it risks "creat[ing] a windfall for defendants who fortuitously selected to victimize a bank teller with an unusually thick skin").

26

Here, the Government anticipates offering two types of testimony from JGS residents: that of a percipient witness who observed the yellow fuel can on the ground outside JGS's entrance, and testimony from residents describing their reactions to the device. Both types of evidence are highly relevant. First, the resident who saw the fuel can on the ground can provide first-hand knowledge of facts that will be at issue at trial, including the placement of the can, its appearance, and the time at which it was observed on the ground outside JGS. Second, while not determinative, testimony concerning the residents' reaction to the device is relevant evidence of intimidation. *See, e.g., Fulmer*, 108 F.3d at 1500.

The Government anticipates introducing only a few witnesses to testify briefly about this topic; such evidence will not be unduly cumulative. While it is possible that these witnesses may be sympathetic, elderly people, this is not *unfairly* prejudicial to the defendant: indeed, it was the defendant who targeted an eldercare facility at the height of a pandemic.

Given that victim reaction testimony is relevant and admissible, the defendant cannot now use the vulnerability of the very individuals he targeted for intimidation as a shield against evidence of the extent to which this crime actually intimidated them. *Cf. United States v. Souza*, 749 F.3d 74 (1st Cir. 2014) (affirming admission of evidence under Rule 403 that the defendant, charged with structuring, had "defrauded an elderly, vulnerable man" because the "evidence of how [the defendant] obtained the funds provided important additional information with which to evaluate his intent"). The evidence is admissible, and the defendant's motion should be denied.

      d.      <u>The defendant's voluntary interview, as well as officers' observations of the defendant during that interview, should be admitted</u>

Finally, the defendant's motion to exclude his voluntary statements to the FBI should be denied. The defendant does not contest that he was not in custody at the time he made the

statements, nor does he claim that his statements to the agents were involuntary in any way. Rather, he asserts — citing no case law, and recognizing that none exists — that the fact that the agents did not electronically record their meeting with the defendant now requires the exclusion of his statements from evidence at trial, because the absence of a recording violated his substantive due process rights. Because there is no factual or legal basis upon which to exclude these statements, and because his statements are necessary evidence to prove the false statements count in the Superseding Indictment, this motion should be denied.

When law enforcement agents interviewed the defendant on April 15, 2020, they did so in full compliance with his Fifth Amendment rights. At the outset of the meeting, out of an abundance of caution, the agents read him his *Miranda* rights, and he waived them in writing. The subsequent interview took place at the defendant's house, where he roamed freely around his backyard and porch and talked off-and-on to agents. He smoked cigarettes, kicked a soccer ball around his yard, and expressed his desire to talk to the agents several times, even calling back one officer to continue talking to him after she walked a short distance away from him. Later on, after the agents showed him photographs of his bloody fingerprints on the incendiary device, the defendant said he was done talking, and the interview promptly ended. The defendant himself does not claim that any of this took place in violation of his Fifth Amendment rights: he neither alleges an improper custodial interrogation, nor that he made coerced statements during a non-custodial interview. Thus, because this interview took place entirely within the well-established boundaries of the Fifth Amendment — which even the defendant does not dispute — his motion to exclude these statements should be denied.

The defendant's claim that the agents could have electronically recorded his interview does not impact this conclusion. FBI policy does not require the recording of non-custodial, voluntary

interviews, and under the circumstances of this interview, where the defendant roamed around his yard as he talked on-and-off over a period of several hours, requiring such a recording would impose an unnecessary and impracticable burden on law enforcement officers.  Indeed, none of the authority cited by the defendant even suggests that a due process violation would exist under these circumstances.

Rather, the case law cited by the defendant addresses recordings of custodial interrogations, not voluntary non-custodial interviews.  *See United States v. Torres-Galindo*, 206 F.3d 136, 144 (1st Cir. 2000) (custodial interrogations); *United States v. Cook*, 3:10-cr-522 (N.D. Ohio) (Sept. 8, 2011) (expressing concern with absence of recording in "closed interrogation room"); *Commonwealth v. DiGiambattista*, 442 Mass. 423, 425 (2004) (custodial interrogations); *Stephan v. State*, 711 P.2d 1156, 1160 (Alaska 1985) (requiring recording of custodial interrogations only on state constitutional grounds).  All of these cases also pre-date the FBI's 2014 policy change concerning the recordings of custodial interrogations, and, even prior to that policy change, *Torres-Galindo* (the only First Circuit case cited) rejected the defendant's argument that a failure to record a custodial confession violated the defendant's rights.  206 F.3d at 144 & n. 3.

Here, there was simply nothing improper about the manner in which the defendant's interview was conducted, let alone a violation of his due process rights.  At the same time, the defendant's interview is direct evidence necessary to prove the false statements charge (Count Three) well as evidence of the defendant's consciousness of guilt for the arson charges (Counts One and Two).  It is a "well-settled principle that false exculpatory statements are evidence — often strong evidence — of guilt." *United States v. Davis*, 909 F.3d 9, 19 (1st Cir. 2018) (quoting *Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010) and citing *United States v. Ridolfi*, 768 F.3d 57, 63 (1st Cir. 2014) (discussing how probative value of defendant's false statements to

police following arrest supported conviction)).

For these reasons, defendant's motion to exclude evidence of that interview (Doc. 81) should be denied.

4.      Conclusion

For the foregoing reasons, the Government respectfully requests that Court deny the defendant's Motion *In Limine* to Preclude Testimony Regarding the Billy Graham Evangelical Association Pamphlet (D.75), Motion *In Limine* to Preclude Introduction of Reaction Testimony (D.76), Motion *In Limine* to Preclude the Government's Elicitation of Details Regarding Probable Cause to Search Rathbun's Home and Interview Him (D.78), and Motion *In Limine* to Exclude Statements and Observations from Defendant's Unrecorded Encounter with Agents (D.81).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Steven H. Breslow*
        STEVEN H. BRESLOW
        (NY2915247)
        Assistant U.S. Attorney
        300 State Street, Suite 230
        Springfield, MA 01105
        413-785-0330
        steve.breslow@usdoj.gov

By:     */s/ Risa Berkower*
        RISA BERKOWER
        (NY4536538)
        Trial Attorney
        Civil Rights Division
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Washington, D.C. 20530
        202-305-0150
        Risa.Berkower@usdoj.gov

**Certificate of Service**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:    */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  October 19, 2020