**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

  **v.**

**JOHN MICHAEL RATHBUN,**

      **Defendant.**

**No. 20-CR-30018-MGM**

GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT
RELEVANT CONTEXT EVIDENCE

The United States of America, by and through its counsel, Andrew E. Lelling, United States Attorney for the District of Massachusetts, Steven H. Breslow and Neil Desroches, Assistant United States Attorneys, and Risa Berkower, Trial Attorney, United States Department of Justice (the "Government"), respectfully moves this Court *in limine* to find admissible, under Fed. R. Evid. 401(a), 402, 403, and 404, relevant evidence concerning the defendant's mental state on April 2, 2020, the date on which the defendant placed a homemade incendiary device at the entrance to Jewish Geriatric Services Lifecare, Inc. ("JGS"), and in the time period leading up to that date.

This evidence is admissible to because it provides necessary context that explains the story of the charged crimes and helps establish the defendant's motive and intent, all purposes for which the First Circuit permits the introduction of such evidence. For the reasons given below, because this evidence is relevant, otherwise admissible, and not unduly prejudicial, this motion should be granted.

1.    Background

    a.    The defendant's charges

On June 23, 2020, a Grand Jury charged the defendant with two offenses related to the placement of an incendiary device at the entrance to Jewish Geriatric Services Lifecare, Inc. ("JGS"), a non-profit organization located at 770 Converse Street in Longmeadow, Massachusetts. The first count charged the defendant with Attempt to Transport and Receive, and Transportation and Receipt of, an Explosive in violation of 18 U.S.C. §§ 844(d) and 2, and the second count charged him with Attempt to Damage and Destroy Buildings, Vehicles, and Real and Personal Property by Fire and Explosive in violation of 18 U.S.C. §§ 844(i) and 2.

The Grand Jury also charged in a Special Finding that the defendant intentionally selected JGS, its property, its employees, and its residents as the object of the charged offenses because of the actual and perceived race, religion, national origin, and ethnicity of any person, pursuant to U.S.S.G. § 3A1.1(a).  Under the relevant Sentencing Guideline provision, the Government must prove this allegation beyond a reasonable doubt to the trier of fact.  U.S.S.G. § 3A1.1(a).

On October 15, 2020, the Grand Jury returned a Superseding Indictment that added a third count, which charges the defendant with making false statements to the FBI, in violation of 18 U.S.C. § 1001.  That charge arises from false self-exculpatory statements the defendant made during an April 15, 2020 voluntary interview with the FBI concerning the placement of the incendiary device at JGS.

    b.    JGS

JGS's stated mission is to improve the physical, spiritual, and emotional health of individuals and families by providing a comprehensive range of health, education, and social services guided by Jewish traditions and values.  The JGS Longmeadow campus consists of several

different facilities, all of which provide health care and housing to elderly people of all faiths. One of those facilities, Genesis House, provides more than 100 rentals of affordable, federally subsidized housing for seniors.

The JGS campus is located within one square mile of several other Jewish facilities, including three Jewish temples, a Jewish private school, and a Jewish Community Center, and is an approximately five-minute drive from the defendant's home in East Longmeadow.

c.     The discovery of the incendiary device

On the morning of April 2, 2020, a concerned citizen in Longmeadow called 911 after observing a suspicious object near the JGS entrance, approximately fifty yards from the nearest building, Genesis House.[1]  When the Longmeadow Police and Fire Departments responded they located a yellow diesel fuel can with a paper wick stuffed into the neck of the can. The officers smelled the odor of gasoline from the can and saw that the paper wick was charred, indicating that someone had tried to ignite the wick and the gasoline inside the can.

When officers removed the paper wick, they discovered that the paper that had been used was a Christian proselytizing pamphlet. The officers collected the device as evidence and identified bloody fingerprint stains on the paper wick and on the handle of the diesel can. The Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") examined the DNA on both the wick and the can and identified a database match to the defendant's DNA, which had been previously collected based upon an unrelated crime.

d.     The search of the defendant's home; the defendant's interview; and the defendant's DNA match

---

[1] The affidavit in support of the defendant's Criminal Complaint mistakenly identified this building as Ruth's House.

On April 15, 2020, law enforcement officers executed search warrants at the defendant's home, where they met the defendant and his parents.    The officers observed that the defendant's hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb.

The defendant waived his *Miranda* rights and agreed to an interview.  At the outset of their interaction with the defendant, FBI Special Agent Ryan McGonigle and Longmeadow Police Department Officer Pam Chaplin noticed that his hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb, which they photographed.   The defendant explained that his hands bled because he picked at them.

As they talked, the officers asked the defendant questions related to the placement of the incendiary device at the JGS entrance on Converse Street.  When asked if he was familiar with the location where the device was placed, the defendant admitted that he routinely drove on Converse Street past the Jewish school in Longmeadow to go to a methadone clinic, but he claimed to be unfamiliar with the Jewish nursing home complex where the device was found.  The defendant maintained this assertion even after agents showed him a map of the area with an "x" marking the location where the device was placed – the driveway entrance to the JGS complex on Converse Street.  When asked about his whereabouts on the day of the offense, the defendant claimed that he had not left his house for the past two weeks because of the COVID-19 pandemic.  When asked about his Internet use (because the agents were investigating the defendant's ties to a white supremacist group on social media that had targeted a Jewish nursing home in Longmeadow and identified April 3, 2020 as "jew killing day"), the defendant claimed he only used the Internet to search for work, to use a dating website, and to view pornography.  When asked about religion, the defendant disclaimed any personal interest in religion, but he stated that his mother was active

4

in a local church and distributed Christian proselytizing pamphlets to potential converts.

The defendant admitted to the officers that his drug of choice is heroin, but he made several false statements concerning his drug use during the interview. He initially stated that he last used drugs approximately one month ago. Later in the interview, he admitted that he used drugs, including cocaine, approximately two weeks ago. Finally, in answer to the officers' request, the defendant agreed to take a drug test, but he admitted that he would test positive because he had used a small amount of drugs the previous night.

When asked about his employment, the defendant stated he had recently left his job as a solar panel installer on good terms. However, he later admitted, when confronted, that he had left because his supervisor had accused him of stealing copper wire.

At one point during their conversation, the officers told the defendant that his blood had been found on the device at JGS, and they showed him photographs of the yellow diesel can. The defendant could not explain how his blood got there, asserted that he had never owned a yellow fuel can, and suggested that someone may have tried to frame him.

Toward the end of the interview, the officers showed the defendant photographs of the charred religious pamphlet that contained the blood stains that the MSP Crime Lab had linked to the defendant. When the defendant saw these photographs, his demeanor changed. Prior to seeing these pictures, the defendant had been engaging with them, and he repeatedly said he wanted to continue talking to the officers to "figure this out." After seeing these photos, the defendant sat down on the porch, became visibly upset, put his head in his hands, and said that he thought he was going to cry. He then ended the interview.

Pursuant to a warrant, officers obtained a buccal swab from the defendant. On April 8, 2020, the MSP Crime Lab compared the defendant's buccal swab with the bloodstains on both the

5

fuel can and the pamphlet, and concluded the defendant's DNA was a 1-in-568 octillion match to each.[2]

Agents also seized the defendant's cell phone and his mother's laptop computer. A forensic examination of the defendant's cell phone, including voicemail and text messages, and cell site location records for the defendant's cell phone, revealed that - contrary to the defendant's claim that he had not left his house for two weeks before the fire - the defendant had left his home and drove around the Springfield area in his mother's car during the early morning hours of April 2, 2020 leading up to the discovery of the incendiary device. As set forth below, the defense has raised an alibi defense, and is expected to base this alibi in part upon this evidence.

e.    The defendant's state of mind in the weeks prior to the crime

According to the defendant's adult daughter (with whom he lived), in the weeks prior to April 2, the defendant was isolated, depressed, unemployed, estranged from her, and quarreling with his mother. The defendant's mother, who is very religious, frequently took pamphlets and other religious material from church or religious events and gave them to both the defendant and to the defendant's adult daughter. The defendant's mother also tried to get the defendant involved in the family's church because she believed that the defendant needed to find God. According to the Rathbuns' pastor, the defendant had been a model parishioner in his youth but had succumbed to drug addiction and had forsaken their church, in spite of the pastor's efforts to contact him.

In addition, in the time since the defendant's arrest, the defendant has made significant admissions concerning his state of mind at the time of the crime, and in the weeks leading up to it. In a recorded jail call with his mother on May 8, 2020, the defendant initially denied placing the

---

[2]  One octillion is a number that contains 27 zeros, and is written as 1,000,000,000,000,000,000,000,000,000.

gas canister at JGS, but when his mother reminded him that he had told her he had been dumpster diving that morning, the defendant replied, "Oh my God, this is freaking me out. [] I don't know, I'm freaking out. I don't' know. I didn't place this here [] But what if I did and I don't remember?" Later in the call, the defendant again denied placing the gas canister or trying to hurt anyone, but added "I can't remember shit, because of the drugs I was taking."

In another recorded jail call with his mother on May 2, 2020, the defendant's mother acknowledged that, in the time before this crime, the defendant had been struggling in life. In the call, she told him, in an apparent reference to his drug usage, "this is like a time out, things were kind of going out of control with you, so" and the defendant acknowledged, "OK, alright." The defendant's mother continued, "And so know you're going to get better and move forward," and the defendant acknowledged, "OK."

Finally, in another recorded jail call with his mother on May 14, 2020, the defendant admitted that he had, in fact, driven down Converse Street past JGS at the time of the crime because that was the route he always took to go purchase drugs:

> Defendant: I don't remember the fucking day at all. But apparently I was up all night and day. We just got to pray to God that between 4:30 a.m and 8:00 a.m. that I wasn't anywhere near Converse Street. If I was, then we have a serious problem. Cause if I, if I, if I drove by Converse Street, I know I was in your car, too, it doesn't matter, but if I drove down Converse Street between 4:30 a.m. and 8:30 a.m., I'm probably going to wind up going to jail for all this.
>
> ***    ***    ***
>
> Defendant: So if I, if I, if I was in the location between 4:30 a.m.

7

and 8:30, if I drove by Converse Street, if I drove by Ruth's House, *which I think I did, probably did, cause that's the only way to get from the fucking highway to home*, I have to sit in here for this whole entire thing and go through trial and put it in the judge's hands.

Defendant's mother: Yeah, but you didn't go to the clinic that day.

Defendant: It doesn't matter, it doesn't matter. I was going - it doesn't matter, it doesn't matter. *Where I was driving, no matter what, I always go that way*. It doesn't matter. It doesn't matter.

***     ***     ***

Defendant's mother: So what I should pray specifically, is that from 4:30 to 8:30 -

Defendant: - That I wasn't on Converse Street, *but I'm telling you I was. I know I was. Because the only way that I get from my house to every place that I go to get drugs is go straight to the highway down fucking Converse Street.* [] You're not listening to me. You're not listening to the words coming out of my mouth. Every person I call to go meet to get drugs *I drive from our house, down Converse Street, on to the highway*. So, I don't know, so I'm just praying that from 4:30 to 8:30 that hopefully I didn't. But I don't, I don't know, *I think I did*. So then from there, what's gonna happen is, when they do see that I did, they're going to start getting video. And they're going to go to the neighbors, cause they already did go to the neighbors, and get the video from people who have video

8

cameras on Converse Street in front of Ruth's House, and *they can*

*get video of me driving down Ruth's, down Converse Street, on top*

*of the phone, on top of the blood.*  It's just gonna be wonderful.

      f.     <u>Ties between JGS, Genesis House, and the defendant's family</u>

As set forth above, during his interview on April 15, 2020, the defendant claimed to be unfamiliar with JGS even though the JGS campus is located approximately a five-minute drive from the defendant's home, is situated on a street that the defendant admitted to driving down routinely in his daily life, and even after FBI agents showed him a map with an "x" marking the spot along the street where the device was placed.  This self-serving assertion is belied both by jail calls (including, among others, the May 14, 2020 call in which he discusses the location with familiarity) and by additional evidence tying the defendant's family to JGS and Genesis House.

According to representatives of Carr Property Management ("Carr PM"), which manages Genesis House for JGS, the defendant's mother has been a longtime employee of Carr PM (previously as a comptroller and currently as a part-time accountant).  Additionally, according to Carr PM records, the defendant's maternal grandmother, Sheila Tipton ("Tipton") lived at Genesis House from approximately 2003 until in 2010, when she died.  According to the defendant's mother, she and the defendant visited Tipton at Genesis House on more than one occasion.

      g.     <u>The defendant's alibi defense</u>

On August 28, 2020, the defendant filed a Notice of Alibi (D.52) pursuant to Fed. R. Crim. P. 12.1(a)(2).  Through this Notice, the defendant asserted that he did not commit the charged crimes because he was not present at the scene of the crime at the time the charged offenses occurred.  Based on this Notice, the Government anticipates that the defendant will assert at trial, though jury addresses, cross-examination of Government witnesses, and possibly through defense

9

witnesses, that the Government has not proven the defendant's identity as the person who built and placed the incendiary device outside of JGS.  It is the Government's understanding that the defendant will assert that he was not present when the device was placed at JGS, because he was in a different location buying drugs.

       2.      <u>Evidence of the defendant's state of life and of mind at the time of this offense, and in the weeks leading up to it, should be admitted</u>.

The defendant's state of life and of mind – struggling with drug addiction, unemployed, depressed, living in his parents home, and having rejected his church – is directly relevant to his motive and intent in placing an incendiary device, featuring a Christian religious pamphlet as its wick, at the entrance of the Jewish-sponsored facility where his grandmother once lived.  Because this evidence provides crucial context that will allow the jury to assess whether the defendant had the intent to commit the charged crimes, as well as the specific intent and motive required by the Superseding Indictment's Special Finding, this evidence is relevant and admissible under Fed. R. Evid. 401, 402, 403, and 404.

"Generally, all relevant evidence is admissible" at Federal trials.  *United States v. Flemmi*, 402 F.3d 79, 86 (1st Cir. 2005) (citing Fed. R. Evid. 402 ("Relevant evidence is admissible.")).  Evidence is relevant if "it has <u>any tendency</u> to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a) (emphasis added).  The First Circuit has explained that this standard is broad, and evidence that provides background information, or which provides context to explain the Government's theory of the case, is relevant, admissible evidence.  *Flemmi*, 402 F.3d at 87 (citing *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and

dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.")).

That the evidence is circumstantial is irrelevant in this analysis; indeed, "the government's proof may lie *entirely* in circumstantial evidence." *United States v. Keene*, 341 F.3d 78, 83 (1st Cir. 2003) (quotation marks omitted); *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994) ("The law is long since settled that the prosecution may prove its case without direct evidence of a defendant's guilty knowledge so long as the array of circumstantial evidence possesses sufficient persuasive power.").

This broad view of relevance means that evidence "that pertains to a chain of events forming the context . . . and set-up of the crime, helping it to complete the story of the crime on trial" is admissible, even if that evidence does <u>not</u> directly establish an element of the charged offenses. *United States v. Charles*, 456 F.3d 249, 257 (1st Cir. 2006) (quotation marks omitted); *Flemmi*, 402 F.3d at 87 (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.")); *see United States v. Page*, 521 F.3d 101, 106-07 (1st Cir. 2008) (affirming trial court's admission of evidence used to establish background and context).

In line with this, evidence of a defendant's other "bad acts," which is governed by Fed. R. Evid. 404(b), has "special relevance" that allows for its admission when "introduced 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" *United States v. Sabean*, 885 F.3d 27, 36 (1st Cir. 2018) (quoting *United States v. Goyner*, 761 F.3d 157, 163 (1st Cir. 2014)). The First Circuit has recognized that "[s]uch evidence may be particularly helpful when an actor's state of mind is at issue 'and the only means of ascertaining

11

that mental state is by drawing inferences from conduct.'" *Id*. (quoting *United States v. Huddleston*, 485 U.S. 681, 685 (1988)).  In sum, "evidence of other criminal acts [is] admissible . . . when [it is] so blended or connected with the one on trial as that proof of one incidentally involves the other; *or explains the circumstances thereof.*"  *United States v. Dworken*, 855 F.2d 12, 27 (1st Cir. 1988) (quotation marks omitted, emphasis in original).

Where other acts evidence is probative of intent and motive, the evidence is admissible so long as it is not unfairly prejudicial.  *Huddleston*, 485 U.S. at. 688 ("If offered for [] a proper purpose, the evidence is subject only to the general strictures limiting admissibility such as Rules 402 and 403.").  "[E]vidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial."  *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013) (quotation marks omitted).  Moreover, "'Rule 403 does not ensure that trials—even criminal trials—will be antiseptic affairs.'"  *Goyner*, 761 F.3d at 164 (quoting *Mehanna*, 735 F.3d at 64).  Rather, when other acts evidence is relevant for a proper purpose (such as intent and motive), the risk of unfair prejudice may be sufficiently mitigated by a trial court's limiting instructions—even where the evidence may well produce strong emotional reactions by the jury.  *See, e.g., Sabean*, 885 F.3d at 36-37 (affirming admission of evidence of defendant's prior sexual abuse to prove motive and intent, and finding trial court properly avoided unfair prejudice through a limiting instruction); *Goyner*, 761 F.3d at 164 (same).

It is of no moment whether the other acts evidence provides circumstantial (rather than direct) evidence of a defendant's intent or motive.  "Criminal defendants rarely shout their nefarious intentions from the rooftops. *Sabean*, 885 F.3d at 37.  Because of this, the Government may—and often must—establish intent and motive through circumstantial evidence, including other acts evidence.  *Id*. ("Circumstantial evidence can suffice to forge such a link, and this jury

12

had the right to infer motive or absence of mistake based on common-sense inferences drawn from evidence of the attendant circumstances.").

Here, the Government seeks to introduce evidence concerning the defendant's recent heavy drug, job loss, depression, and rejection of his family's church, for the permitted purpose of "complet[ing] the story of the crime on trial by proving its immediate context of happenings near in time and place." *Sabean*, 885 F.3d 27, 36.

This evidence will explain the defendant's state of mind in the time immediately prior to the crime, and thereby give a window into his motive and intent on the morning of April 2, 2020. This evidence will allow the jury to see this crime in full context: rather than an inexplicable act, the jury will see that the defendant was at a low point in his life, struggling with addiction, and resistant to his family's (and his pastor's) efforts to help him regain his footing. Instead of accepting their help, he committed this anti-religious act at JGS, a location that is significant to multiple generations of his family. Given the probative value of this evidence to establish the defendant's motive and intent, it is properly admissible under Rule 404(b).

This evidence is also necessary to help rebut certain inaccurate inferences that the defendant's alibi defense will otherwise create. The Government expects that the defendant will assert that he did not place the incendiary device at JGS because he was in a different location buying drugs. While the Government does not dispute that the defendant sought to purchase drugs shortly after he placed the device at JGS, this is simply not the entire story. Rather, on the morning of April 2, 2020, the defendant was in the midst of a period of heavy drug use, and he was isolated, depressed, unemployed, estranged from his daughter, quarreling with his mother, and resisting efforts by his family and pastor to give him help.

Indeed, as the defendant has since acknowledged on jail calls, "things were kind of going

out of control" in his life in the lead-up to this crime, so much so that his own memory is faulty "because of the drugs [he] was taking." This complete picture of the defendant's mental state at the time of the crime, especially as it informs his motive and intent to commit the charged offenses, is crucial to give the jury an accurate picture of the circumstances of this offense—especially where the defendant himself will be using the fact of his drug addiction as the centerpiece of his defense.

Finally, there is no risk of *unfair* prejudice here. A jury instruction will adequately protect the defendant from such prejudice, while still allowing the jury to see the entire set of relevant evidence. While evidence of prior drug use could tempt the jury to misuse this evidence, the First Circuit has found limiting instructions adequate to avoid this concern in cases involving far more inflammatory "other acts" evidence. *See, e.g., Sabean*, 885 F.3d at 36-37 (limiting instruction avoided unfair prejudice from evidence that defendant sexually abused his own daughter); *Goyner*, 761 F.3d at 164 (limiting instruction avoided unfair prejudice from allegations that defendant sexually abused fifteen-year-old coworker). Thus, the Government's motion should be granted.

3.      Conclusion

For the foregoing reasons, the Government respectfully requests that Court rule *in limine* that the evidence outlined in this motion is relevant and admissible under Fed. R. Evid. 401(a), 402, 403, and 404.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Steven H. Breslow*
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney

14

300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov


By:     */s/Neil Desroches*
        NEIL DESROCHES
        (MA661357)
        Assistant U.S. Attorney
        300 State Street, Suite 230
        Springfield, MA 01105
        413-785-0398
        neil.desroches@usdoj.gov


By:     */s/ Risa Berkower*
        RISA BERKOWER
        (NY4536538)
        Trial Attorney
        Civil Rights Division
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Washington, D.C. 20530
        202-305-0150
        Risa.Berkower@usdoj.gov


**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:     */s/ Steven H. Breslow*
        STEVEN H. BRESLOW
        Assistant U.S. Attorney


Dated:  October 27, 2020

15