**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-CR-30018-MGM** |
| **JOHN MICHAEL RATHBUN,** | |
| **Defendant.** | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF
FROM MISJOINDER AND/OR SEVERANCE OF COUNT THREE

The United States of America, by and through its counsel, Andrew E. Lelling, United States

Attorney for the District of Massachusetts, Steven H. Breslow, Assistant United States Attorney,

Neil Desroches, Assistant United States Attorney, and Risa Berkower, Trial Attorney, United

States Department of Justice (the "Government"), respectfully opposes defendant's Motion for

Relief from Misjoinder and/or Severance of Count Three (D.90).  Because all of the counts in the

Superseding Indictment are properly joined, and because there is no prejudice that warrants the

severance of Count Three, the defendant's motion should be denied.

    1.    Background

        a.    Discovery of an incendiary device outside Jewish Geriatric Services[1]

On the morning of April 2, 2020, a concerned citizen in Longmeadow, Massachusetts

called 911 after observing a suspicious object near the entrance to Jewish Geriatric Services (JGS),

---

[1] Jewish Geriatric Services is a Jewish-sponsored non-profit organization located at 770
Converse Street in Longmeadow, Massachusetts.  The JGS Longmeadow campus consists of
several facilities that provide health care and housing to elderly people of all faiths.

approximately fifty yards from the nearest building, Genesis House.[2]  When the Longmeadow Police and Fire Departments responded, they found a yellow diesel fuel can with a paper wick, consisting of a Christian proselytizing pamphlet, stuffed into the neck of the can.  The officers smelled the odor of gasoline from the can and saw that the paper wick was charred, indicating that someone had tried to ignite the wick and the gasoline inside the can.  At this point, the investigators had no suspects.

However, the officers also observed what appeared to be bloody fingerprint stains on both the paper wick and the diesel can's handle.  The LPD sent these bloodstains to the Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") for analysis.  The MSP Crime Lab first confirmed that the stains were human blood, then developed a DNA profile from the bloodstains, and next submitted this profile into the CODIS database[3] for comparison to known DNA profiles on file in the system.  The CODIS database matched the DNA from the bloodstains on both the wick and the canister to the defendant's DNA, which had been collected based upon his arrest and conviction for a prior, unrelated crime.

Based on the CODIS match, the FBI obtained search warrants for the defendant's home (which he shared with his parents), his person, his cellular telephone, electronic devices found inside his house, and the vehicles registered to his home address.  The search warrant for his person authorized the collection of a buccal swab from the defendant, in order to develop a complete DNA

---

[2] The affidavit in support of the defendant's Criminal Complaint mistakenly called this building Ruth's House, which is another building on the JGS campus. As set forth below, the defendant's grandmother lived at Genesis House from 2003 to 2010.

[3] CODIS, which is the acronym for the Combined DNA Index System, is a national database of DNA profiles that is maintained by the FBI.  Created pursuant to an act of Congress, DNA samples must meet minimum collection standards in order to be included in the system.

profile from him for further comparison to the DNA taken from the bloody fingerprints found at the crime scene.

              b.       <u>The search of the defendant's home and his interview with law enforcement</u>

On April 15, 2020, law enforcement officers executed these search warrants at the defendant's home. When the officers first arrived, they directed everyone inside the house to come outside in order to secure the house for the search. During this process, the officers met the defendant, his parents, and the defendant's adult daughter, all of whom lived in the house. The defendant first came outside wearing only boxer shorts, so an FBI agent went inside to get him more clothing.

The officers did not have an arrest warrant for the defendant. Once the defendant had dressed and put on a mask, FBI Special Agent Ryan McGonigle and Longmeadow Police Department ("LPD") Officer Pamela Chaplin asked him if he would be willing to speak to them. Although the defendant was not in custody, Special Agent McGonigle advised the defendant of his *Miranda* rights out of an abundance of caution. The defendant waived his rights orally and in writing.

After that, the defendant spoke to Special Agent McGonigle and Officer Chaplin off and on for a period of approximately three to four hours, as the search warrant progressed in the background. During this time, the defendant was not handcuffed, and he moved freely around his backyard and between the backyard and his porch. He smoked cigarettes, kicked a soccer ball around his yard, was offered bathroom breaks, and was asked on several occasions if he was comfortable or needed anything. The defendant said several times that he wanted to talk to the officers to "figure this out." At one point, when Officer Chaplin walked a short distance away from the defendant, he called to her and asked if she were going to come back to talk to him

because "we were having great conversation."

At the outset of their interaction with the defendant, Special Agent McGonigle and Officer Chaplin noticed that his hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb, which they photographed.   The defendant explained that his hands bled because he picked at them.

As they talked, the officers asked the defendant questions related to the placement of the incendiary device at the JGS entrance on Converse Street.  When asked if he was familiar with the location where the device was placed, the defendant admitted that he routinely drove on Converse Street past the Jewish school in Longmeadow to go to a methadone clinic, but he claimed to be unfamiliar with the Jewish nursing home complex where the device was found.  The defendant maintained this assertion even after agents showed him a map of the area with an "x" marking the location where the device was placed – the driveway entrance to the JGS complex on Converse Street.  When asked about his whereabouts on the day of the offense, the defendant claimed that he had not left his house for the past two weeks because of the COVID-19 pandemic.  When asked about his Internet use (because the agents were investigating the defendant's ties to a white supremacist group on social media that had targeted a Jewish nursing home in Longmeadow and identified April 3, 2020 as "jew killing day"), the defendant claimed he only used the Internet to search for work, to use a dating website, and to view pornography.  When asked about religion, the defendant disclaimed any personal interest in religion, but he stated that his mother was active in a local church and distributed Christian proselytizing pamphlets to potential converts.

At one point during their conversation, the officers told the defendant that his blood had been found on the device at JGS, and they showed him photographs of the yellow diesel can. The defendant could not explain how his blood got there, asserted that he did not had never owned a

yellow fuel can, and suggested that someone may have tried to frame him.

Toward the end of the interview, the officers showed the defendant photographs of the charred religious pamphlet that contained the blood stains that the MSP Crime Lab had linked to the defendant. When the defendant saw these photographs, his demeanor changed. Prior to seeing these pictures, the defendant had been engaging with them, and repeatedly said he wanted to continue talking to the officers to "figure this out." After seeing these photos, the defendant sat down on the porch, became visibly upset, put his head in his hands, and said that he thought he was going to cry. He then ended the interview.

> c.      The defendant's DNA match

Pursuant to the search warrant, on April 15, 2020, officers took a buccal swab from the defendant. The MSP Crime Lab developed a full DNA profile for the defendant from the swab. On April 28, 2020, the MSP Crime Lab compared this full DNA profile to the bloodstains on both the fuel can and the pamphlet, and concluded the defendant's DNA was a 1-in-568 octillion match to each.[4]

> d.      Additional evidence obtained from the defendant's mother and through
>          search warrants

Also during the search of the defendant's house, officers conducted a voluntary interview with his mother. In particular, the officers showed her photographs of the charred religious papers that were stuffed into the neck of the incendiary device. She stated that she printed her own religious pamphlets to distribute to the public, but that she did not recognize the pamphlet that was found in the device. In the kitchen, agents located a different pamphlet designed to help guide

---

[4]   One octillion is a number that contains 27 zeros, and is written as 1,000,000,000,000,000,000,000,000,000.

Christians in converting Jewish persons to Christianity.

Agents conducted an on-site, physical search of his mother's car and located numerous copies of other proselytization materials inside, but they left his mother's car for the family to use because they had no basis to believe the defendant had driven it on April 2, 2020, particularly in light of the defendant's insistence that he had not left his house in the past two weeks. Instead, the FBI towed the defendant's van for a forensic search of its contents.

Pursuant to the warrants, agents also seized the defendant's cell phone and his mother's laptop computer. A subsequent forensic examination of the defendant's cell phone as well as cell site location information for that phone established that the defendant had in fact left his home in his mother's car during the early morning hours of April 2, 2020 leading up to the discovery of the incendiary device - contrary to the defendant's claim that he had not left his house in the past two weeks.

Moreover, on August 13, 2020, during a telephone call from the defendant to his mother that was recorded by the Hampden County Jail, his mother informed the defendant that the FBI had returned his van and stated, "I suspect that if they gave the van back, there was nothing there." The defendant replied, "No, there is nothing there. Because these idiots didn't know I didn't even take the van. They now know, but they didn't when they took it."[5]

The forensic examination of the defendant's cell phone, along with a subsequent search warrant for Facebook, also revealed that the defendant had created numerous alias Facebook accounts, primarily to locate and/or contact his ex-wife, Sarah, who had obtained restraining orders against him. During a recorded jail call on July 30, 2020, the defendant told his mother, "The Sara

---

[5] The Government first obtained copies of recorded jail calls made by the defendant on October 14, 2020, and produced them to the defense that same day.

shit is gonna be huge. I'm telling you, it's big, I'm telling you. We, we not being able to talk to her is not good. It's not. It's not. You know how I made 20 different accounts with Sara, because I wanted to see her, yeah? Well all that-- all that's gonna play into that. They wanna see all those accounts, because now they think some of those accounts, why couldn't, I could be—you understand what I'm saying?"

            e.        <u>The identification of the proselytizing pamphlet and its ties to the defendant's family</u>

The charred paper wick consisted of several pages of Christian proselytizing material that appeared to have been torn from a pamphlet containing other pages. The Government recently determined that pages were taken from a pamphlet entitled *Steps to Peace with God*, which is published and distributed by Billy Graham Evangelical Association ("BGEA"), based in Charlotte, North Carolina.

According to BGEA witnesses, BGEA publishes and distributes this pamphlet for use in counseling individuals who are seeking to establish a relationship with God and commit to the Christian faith. The physical pamphlets are manufactured in South Carolina. In the spring of 2019, BGEA held a series of events in the Springfield area as part of the organization's Northeast Tour, culminating in a large event at the Big E Festival in West Springfield on May 25, 2019. During the runup to the Big E event, BGEA hired several local pastors, including the pastor of the defendant's parents' church, Heritage Baptist Church ("HBC"), as paid contractors to conduct outreach and to help host a series of kick-off events, including events at an Agawam church and the Basketball Hall of Fame. BGEA staff distributed copies of the *Steps to Peace with God* pamphlet during several events designed to recruit counselors for the Big E event. At the Big E event, the defendant's parents registered for a T-shirt giveaway and provided their contact

information, including their home address (where the defendant also lived) and e-mail address. From June 19, 2019 to April 15, 2019, BGEA e-mail or mailed to their home a series of twenty-three prayer letters and other religious materials.

According to the defendant's parents' pastor, the pastor served as a paid coordinator for the Springfield area events, and he attended the events at the Agawam church, the Basketball Hall of Fame, and the Big E. The defendant's mother volunteered as the pastor's secretary and worked with him to plan the BGEA Northeast Tour. Among other things, the defendant's mother (and father) helped the pastor contact local church organizations and mailed flyers advertising the kick-off events to community members. The defendant's mother also attended, at least, the events at the Basketball Hall of Fame and the Big E. The defendant's parents' pastor recognized the *Steps to Peace with God* pamphlet as part of the Northeast Tour materials distributed by BGEA.[6]

According to a forensic examination of the defendant's mother's laptop, it contained a Save the Date flyer for the BGEA kickoff event at the Hall of Fame on March 5, 2019 and a list of religious community contacts entitled "HBC Meeting for Franklin Graham 2-21-19."

According to the defendant's eighteen-year-old daughter, who lived with the defendant and his parents at their East Longmeadow home, the *Steps to Peace with God* pamphlet looked very familiar and appeared very similar to those that she had seen at HBC. She recognized one section of the pamphlet, which she believed she had seen in other pamphlets either in her house or at her family's church, but she did not specifically recognize the entire pamphlet. The defendant's mother frequently took pamphlets and other religious material from church or religious events and gave them to both the defendant and her. The defendant's mother frequently tried to get the

---

[6] The pastor also thought that he might have kept some of these pamphlets at his church, although he could not locate any at the time of his FBI interview in September 2020.

defendant involved in church because she believed that the defendant needed to find God.

f.    Ties between JGS, Genesis House, and the defendant's family

As set forth above, during his interview on April 15, 2020, the defendant claimed to be unfamiliar with JGS even though the driveway entrance is plainly marked with a large sign, its campus is located an approximately five-minute drive from the defendant's home, and the defendant admitted routinely driving down the street where it is located. The defendant maintained this ignorance even after Special Agent McGonigle showed him a map with an "x" marking the spot by the JGS driveway entrance on the street where the device was placed.

However, according to representatives of Carr Property Management ("Carr PM"), which manages Genesis House for JGS, the defendant's mother has been a longtime employee of Carr PM (previously as a comptroller and currently as a part-time accountant) and the defendant's maternal grandmother lived at Genesis House from approximately the mid-2000s until her death in 2010. Moreover, in a recorded jail call with his mother on July 25, 2020, after his mother informed him that the Government had subpoenaed her work records and his grandmother's residence records at Genesis House, the defendant acknowledged, "Now remember, her - where she lived was right on that side, too, where the bomb was placed."

g.    The defendant's alibi defense

On August 28, 2020, the defendant filed a Notice of Alibi (D.52) pursuant to Fed. R. Crim. P. 12.1(a)(2). Through this Notice, the defendant asserted that he did not commit the charged crimes because he was not present at the scene of the crime at the time the charged offenses occurred. Based on this Notice, the Government anticipates that the defendant will assert at trial, though jury addresses, cross-examination of Government witnesses, and possibly through defense witnesses, that the Government has not proven the defendant's identity as the person who built

and placed the incendiary device outside of JGS.  The defense has based its alibi upon the fact that at 4:51 a.m., a Longmeadow Police Department cruiser departed the JGS campus and its camera did not depict the device at the location where it was later detected by a neighbor at approximately 8:30 a.m.

However, cell site location information for the defendant's phone indicated that:  (1) at 4:34 a.m., his telephone connected to a tower located near his home, an approximately five-minute drive from JGS; and (2) at approximately 5:01 a.m., his telephone next connected to a tower located on the West side of the Forest Park bridge connecting to Springfield, also an approximately five-minute drive from JGS.

In a recorded jail call with his mother on May 8, 2020, the defendant initially denied placing the gas canister at JGS, but when his mother reminded him that he had told her he had been dumpster diving that morning, the defendant replied, "Oh my God, this is freaking me out. [] I don't know, I'm freaking out.  I don't' know.  I didn't place this here [] But what if I did and I don't remember?"  Later in the call, the defendant again denied placing the gas canister or trying to hurt anyone, but added "I can't remember shit, because of the drugs I was taking."

Moreover, in another recorded jail call with his mother on May 14, 2020, the defendant admitted that he always drives from his house to Springfield along Converse Street, *and was in fact on Converse Street at the time of the crime (emphasis added)*:

> Defendant:  I don't remember the fucking day at all.  But apparently
> I was up all night and day.  We just got to pray to God that between
> 4:30 a.m and 8:00 a.m. that I wasn't anywhere near Converse Street.
> If I was, then we have a serious problem.  Cause if I, if I, if I drove
> by Converse Street, I know I was in your car, too, it doesn't matter,

but if I drove down Converse Street between 4:30 a.m. and 8:30 a.m., I'm probably going to wind up going to jail for all this.

*** *** ***

Defendant: So if I, if I, if I was in the location between 4:30 a.m. and 8:30, if I drove by Converse Street, if I drove by Ruth's House, *which I think I did, probably did, cause that's the only way to get from the fucking highway to home*, I have to sit in here for this whole entire thing and go through trial and put it in the judge's hands.

Defendant's mother: Yeah, but you didn't go to the clinic that day.

Defendant: It doesn't matter, it doesn't matter. I was going - it doesn't matter, it doesn't matter. *Where I was driving, no matter what, I always go that way*. It doesn't matter. It doesn't matter.

*** *** ***

Defendant's mother: So what I should pray specifically, is that from 4:30 to 8:30 -

Defendant: - That I wasn't on Converse Street, *but I'm telling you I was. I know I was. Because the only way that I get from my house to every place that I go to get drugs is go straight to the highway down fucking Converse Street*. [] You're not listening to me. You're not listening to the words coming out of my mouth. Every person I call to go meet to get drugs *I drive from our house, down Converse Street, on to the highway*. So, I don't know, so I'm just praying that from 4:30 to 8:30 that hopefully I didn't. But I don't, I

11

don't know, *I think I did.*  So then from there, what's gonna happen is, when they do see that I did, they're going to start getting video. And they're going to go to the neighbors, cause they already did go to the neighbors, and get the video from people who have video cameras on Converse Street in front of Ruth's House, and *they can get video of me driving down Ruth's, down Converse Street, on top of the phone, on top of the blood.*  It's just gonna be wonderful.

h.    The defendant's charges

The defendant faces trial on a three-count Superseding Indictment.  Counts 1 and 2 allege violations of 18 U.S.C. §§ 844(d) and 844(i), and arise from the placement of the homemade incendiary device outside JGS on April 2, 2020.   Count 3 charges him with a violation of 18 U.S.C. 1001 for making false statements to the FBI about the April 2, 2020 placement of the device.

Specifically, Count 3 alleges that the defendant made three material false statements to the FBI during his interview:  that (1) he was not familiar with the location on Converse Street where the homemade incendiary device was placed; (2) he had not left his house in the past two weeks because of the COVID-19 pandemic; and (3) he only used the Internet to search for work, to use a dating application called Bumble, and to view pornography.  The charge further alleges that, in fact, the defendant knew these statements were false in that (1) he was familiar with the location where the device was placed; (2) he had left his house during the early morning hours of April 2, 2020; and (3) he used the Internet to create numerous Facebook accounts in the names of aliases.

The Superseding Indictment also charges the defendant in a Special Finding that he intentionally selected JGS, its property, its employees, and its residents as the object of the charged

offenses because of the actual and perceived race, religion, national origin, and ethnicity of any person, pursuant to U.S.S.G. § 3A1.1(a).

      2.      The Defendant's Motion Should Be Denied

The defendant asks the Court to sever Count 3 both under Fed. R. Crim. P. 8(a) and under Fed. R. Crim. P. 14(a). Because all three counts in the Superseding Indictment are properly joined, and because a trial on all three counts creates no prejudice to the defendant that warrants a severance, the defendant's motion should be denied.

      a.      Count 3 is properly joined in the Superseding Indictment under Fed. R. Crim. P. 8(a)

Federal Rule of Criminal Procedure 8(a) allows for a defendant to be charged with multiple offenses in the same indictment if the crimes "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). This rule "creates a generous presumption in favor of joinder." *United States v. Sabean*, 885 F.3d 27, 42 (1st Cir. 2018) (quotation marks omitted).

To satisfy the Rule, "[t]he two sets of charges need not be identical, and 'we assess similarity in terms of how the government saw its case at the time of the indictment.'" *United States v. Monteiro*, 871 F.3d 99, 107 (1st Cir. 2017) (quoting *United States v. Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006)); *see Sabean*, 885 F.3d at 43 (finding proper joinder of tax evasion and drug distribution charges where "the government reasonably could have anticipated when it secured the indictment that the disposition of all the charges would hinge on common factual issues").

"[T]emporal and factual commonality weighs heavily in favor of allowing joinder." *Sabean*, 885 F.3d at 43. Similarly, "joinder is proper if it 'allows the jury to see the complete set of facts about the alleged criminal enterprise.'" *Monteiro*, 871 F.3d at 107 (quoting 1A Charles

Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 143 (4th ed. 2016)).  Thus, where common evidence proves the charges at issue, joinder is proper.  *Id*. ("Hence, we also consider the extent of common evidence among the charged offenses." (quotation marks omitted)).

The First Circuit has held that obstruction arising from an effort to avoid prosecution for arson is properly joined in one indictment.  In *United States v. Stackpole*, 811 F.2d 689, 693 (1st Cir. 1987), the defendant was charged with a conspiracy to commit arson, and a separate conspiracy "to obstruct prosecution for that arson."  The Court rejected the defendant's contention that the separate conspiracies were insufficiently connected to satisfy Rule 8(a).  Rather, the Court explained:

> In this case, the joined counts charge two distinct conspiracies, one to commit arson and the other to obstruct prosecution for that arson. While the arson and obstruction of justice activities were sufficiently separable to constitute two conspiracies, they were, nonetheless "connected together" and part of "a common scheme or plan." The second conspiracy was formed to protect the first from prosecution.

*Stackpole*, 811 F.2d at 693.  Accordingly, where an indictment alleges obstruction of an investigation, charges arising from that obstruction are properly joined with the underlying criminal conduct under investigation.  *Id*.; *see United States v. Berardi*, 675 F.2d 894, 900-01 (7th Cir. 1982) (allowing joinder of obstruction with extortion and mail fraud charges, where obstruction count arose from investigation into the extortion and mail fraud).

Here, Count 3 is properly joined in the Superseding Indictment for the same reasons articulated in *Stackpole*.  Count 3 charges the defendant with making false statements to the FBI to protect himself from prosecution for the arson offenses at JGS.  During the time that law enforcement officers executed a search warrant at his house, the defendant spoke voluntarily with the FBI over a period of several hours to "figure this out."  During that time, he made false, self-exculpatory statements that negated his own involvement in the underlying crimes.  He said that

he was unfamiliar with the location where the device was placed, despite being shown a map with an "x" marking the spot where the device was placed, and he asserted that he had not left the house in two weeks due to the pandemic, thereby denying that he had been out of the house at the time when the device was placed.

All of these self-serving, falsely exculpatory statements are belied by evidence obtained from the defendant's cell phone, area cell towers, and his jail calls to his mother, which establish both the falsity of these statements and that the defendant committed the underlying arson offenses. This evidence shows that, far from being at home in the early morning hours of April 2, 2020, the defendant was out of the house, driving past JGS (which he knew well, from his grandmother having lived there), in his mother's car. As in *Stackpole*, the defendant's false statements are connected to the arsons because he made those false statements during his voluntary interview to avoid prosecution from the underlying arson offenses. As such, these charges are properly joined.

Moreover, evidence concerning the defendant's false statements is highly relevant to proving the arson offense and disproving the defendant's alibi defense, as the defendant himself has acknowledged that his false statements may have led to the FBI losing important evidence. Because the defendant told the FBI that he had not left home in two weeks, let alone that he had left in his mother's car on the morning of the offense, the agents executing the search warrant at his house did not impound his mother's car to search for evidence; instead, the defendant's own van was seized.

In an August 13, 2020 jail call to his mother, the defendant noted the significance of this fact. As they discussed the return of his van from the FBI, the defendant confirmed that the agents could not have found any evidence inside the van, because the FBI had not known he had actually driven his mother's car on the morning of the offense: "No, there is nothing there. Because these

15

idiots didn't know I didn't even take the van.  They now know, but they didn't when they took it."

Because Count 3 alleges false statements made by the defendant to undermine his prosecution for

the arson offenses—an effort the defendant himself recognized may have been at least partly

successful—Count 3 is properly joined in the Superseding Indictment.

        b.        <u>Count 3 should not be severed under Fed. R. Crim. P. 14(a)</u>

Where counts in an indictment are properly joined, Federal Rule of Criminal Procedure

14(a) still permits a trial court to sever the counts if a trial on both offenses "appears to prejudice

a defendant."  Fed. R. Crim. P. 14(a).  However, the First Circuit has cautioned, "[g]arden variety

prejudice . . . will not, in and of itself, warrant severance," because "[s]ome prejudice results in

almost every trial in which the court tries more than one offense together." *United States v.

Richardson*, 515 F.3d 74, 81 (1st Cir. 2008).  Rather, this Rule warrants severance only where the

prejudice from a trial on both charges will deprive the defendant of a fair trial.[7]  *Id.*

The First Circuit has recognized three circumstances that could create such prejudice.  The

first is where a defendant becomes "embarrassed or confounded in presenting separate defenses"

to the joined charges.  *Id.*  The defendant does not allege any such circumstance here.

The second is where "proof that the defendant is guilty of one offense may be used to

convict him of a second offense, <u>even though such proof would be inadmissible in a second trial

for the second offense</u>."  *Id.* (emphasis added).  This circumstance only warrants a severance where

---

[7] Despite this higher threshold for prejudice that would necessitate a severance, the defendant's motion advances arguments primarily based on Fed. R. Evid. 403 and 404.  Because the First Circuit has clearly articulated the limited circumstances under which Rule 14(a) severance is appropriate, this opposition addresses that body of law.  Regardless, for the same reasons that the defendant's motion fails to show prejudice warranting a severance under that body of law, these same arguments also negate any finding of unfair prejudice under Rules 403 and 404 due to the joinder of Count 3.

the proof for each of the charges does not overlap.  *See id*. at 82; *United States v. Randazzo*, 80 F.3d 623, 628 (1st Cir. 1996) (holding food adulteration charges and tax fraud charges should have been severed because "looking to the important evidence, the shrimp [adulteration] and tax counts in this case seem to revolve around quite different facts") (emphasis omitted).

Where the same evidence would be admissible in both trials if the charges were severed, severance is not warranted.  *Sabean*, 885 F.3d at 43 (holding that because the allegedly prejudicial evidence "[was] relevant to all of the charges laid in the indictment," that evidence did not provide a basis for severance); *Richardson*, 515 F.3d at 82 ("When such spillover serves as the ground for a defendant's severance motion, this Court has repeatedly refused to overrule a denial of severance if substantially the same evidence would have been admitted in separate trials.").

In *Stackpole*, the First Circuit expressly rejected the risk of such spillover prejudice between an arson charge and a charge arising from the defendant's obstruction of the investigation into the arson.  As the Court explained:

> Were the counts severed, substantially the same evidence would have been admitted in both resulting trials.  In a trial on the arson and related charges, the obstruction of justice acts would have been admissable to show consciousness of guilt. *See United States v. O'Connell*, 703 F.2d 645, 649 (1st Cir.1983). And in a trial on the obstruction of justice counts, the arson activities would have been admissible to show motive.

*Stackpole*, 811 F.2d at 694.

Here, the same evidence that proves the falsity of the defendant's self-exculpatory statements to the FBI as charged in Count 3 will also establish the arson offenses charged in Counts 1 and 2.  Evidence that shows the defendant was familiar with the location where the device was placed (outside his grandmother's former home at Genesis House) and that he drove past that location on the morning of the offense is probative of both his involvement in placing the incendiary device, and that he later lied about his actions to the FBI.

And, of course, as in *Stackpole*, in a stand-alone prosecution of the arson offenses, the defendant's false statements would be admissible in the Government's case-in-chief as consciousness of guilt, while in a prosecution for only the false statements, evidence that the defendant placed the incendiary device at JGS would be admissible to show his motive to lie. Given this wholly overlapping evidence, there is no improper "spillover" prejudice that warrants a severance. *See Sabean*, 885 F.3d at 43; *Richardson*, 515 F.3d at 82; *Stackpole*, 811 F.2d at 694.

The final circumstance that could warrant a severance under Rule 14(a) occurs where a defendant asserts that he wants to testify in his own defense, but also that he wants to do so selectively, concerning only some of the charged crimes. *Richardson*, 515 F.3d at 81 (recognizing the defendant "may wish to testify in his own behalf on one of the offense but not on another, forcing him to choose the unwanted alternative of testify as to both or testifying as to neither"). To establish a severance for this reason, the defendant must meet a heavy burden. *Id.* This is because, as the First Circuit has explained,

> [O]bvious considerations of judicial economy support trying all related counts against the same defendant at one time. And while the courts zealously guard a defendant's Fifth Amendment right not to testify at all, the case law is less protective of a defendant's right to testify selectively, addressing some issues while withholding testimony on others that are related. . . . The Fifth Amendment protects the defendant's right to choose whether to testify. It does not assure that the testimony will only benefit the defendant.

*United States v. Alosa*, 14 F.3d 693, 695, 696 (1st Cir. 1994).

Accordingly, to warrant a severance on this basis, the defendant "must make a threshold showing that he has salient testimony to give anent one count and an articulable need to refrain from giving testimony on the other(s)." *United States v. Fenton*, 367 F.3d 14, 22 (1st Cir. 2004). "Carrying the first part of this burden typically requires that the defendant furnish the trial court with a particularized offer of proof limning the testimony that he proposes to give and indicating

18

how it would further his defense." *Id.* This means the defendant must specifically articulate what testimony he would give that would exculpate him if the severance were granted. *United States v. Scivola*, 766 F.2d 37, 43 (1st Cir. 1985).

"[E]mpty rhetoric is insufficient to mandate severance on the basis of a perceived need to testify. Were the law otherwise, severance would be available to a defendant virtually on demand." *Id.* (citation and quotation marks omitted). Few defendants meet this substantial burden. *See, e.g.*, *Richardson*, 515 F.3d at 81 (affirming denial of severance on this basis); *Fenton*, 367 F.3d at 22 (same); *Alosa*, 14 F.3d at 695-96 (same); *United States v. Tracy*, 989 F.2d 1279, 1283-84 (1st Cir. 1993) (same); *Scivola*, 766 F.2d at 43 (same); *but see United States v. Jordan*, 112 F.3d 14, 17 & n.2 (1st Cir. 1997) (finding defendant's *Cheek* "good faith" defense to tax fraud charge warranted severance under specific facts at issue in the case, including government's joinder of those charges after the court excluded tax fraud evidence under Rule 403).

Here, the defendant's vague declarations about his defense to Count 3 do not clear this high bar. At most, the defendant asserts that he may want to testify because he questions the credibility of the government's witnesses who will testify about his false statements because there is no audio recording of his voluntary interview. This neither provides the level of specificity required by Rule 14(a) and case law, nor does it overcome the serious considerations of judicial economy that strongly favor a joined trial. *See Fenton*, 367 F.3d at 22 (affirming denial of severance where, "[a]part from his bald assertion of innocence as to the pipe bomb charges and an unparticularized claim that the government's witnesses were not credible, his motion offered no hint as to the specific information that his testimony would convey"). The defendant's motion should be denied.

3.     Conclusion

For the foregoing reasons, the Government respectfully requests that Court deny the

defendant's Motion for Relief from Misjoinder and/or Severance of Count Three (D.90).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Steven H. Breslow
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov

By:    /s/Neil Desroches
NEIL DESROCHES
(MA661357)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0398
neil.desroches@usdoj.gov

By:    /s/ Risa Berkower
RISA BERKOWER
(NY4536538)
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-305-0150
Risa.Berkower@usdoj.gov

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:   */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  October 27, 2020