**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-CR-30018-MGM** |
| **JOHN MICHAEL RATHBUN,** | |
| **Defendant.** | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
EXPLOSIVE DEVICE TESTIMONY AND REQUEST FOR DAUBERT HEARING

The United States of America, by and through its counsel, Andrew E. Lelling, United States Attorney for the District of Massachusetts, Steven H. Breslow, Assistant United States Attorney, Neil Desroches, Assistant United States Attorney, and Risa Berkower, Trial Attorney, United States Department of Justice (the "Government"), respectfully opposes defendant's Motion to Exclude Explosive Device Testimony and Request for *Daubert* Hearing (D.83). Because the Government's proposed expert testimony more than meets the *Daubert* and Fed. R. Evid. 702 requirements of reliability and relevancy, the defendant's motion should be denied, without an evidentiary hearing.

1.    Background

     a.    Relevant facts

On the morning of April 2, 2020, a concerned citizen in Longmeadow, Massachusetts called 911 after observing a suspicious object near the entrance to Jewish Geriatric Services

(JGS),[1] approximately fifty yards from the nearest building, Genesis House.[2]   When the Longmeadow Police and Fire Departments responded they found a yellow diesel fuel can with a paper wick, consisting of a Christian proselytizing pamphlet, stuffed into the neck of the can.  The officers smelled the odor of gasoline from the can and saw that the paper wick was charred, indicating that someone had tried to ignite the wick and the gasoline inside the can.

The device was sitting in a small grassy area next to a tree, several feet away from a pedestrian sidewalk that extends past the entrance to JGS.  Officers photographed the device as they found it at the scene, to document where it had been placed.  They then collected the device as evidence.

Back at the LPD station, officers removed the liquid from inside the device and sent it to the Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") for chemical analysis.  That analysis confirmed the liquid was gasoline.

Officers also found what appeared to be bloody fingerprint stains on both the paper wick and the diesel can's handle.  The LPD sent these bloodstains to the MSP Crime Lab for DNA analysis.  That analysis confirmed the blood stains to be the defendant's blood, as his DNA was a 1-in-568 octillion match to each of the stains.[3]

---

[1] Jewish Geriatric Services is a Jewish-sponsored non-profit organization located at 770 Converse Street in Longmeadow, Massachusetts.  The JGS Longmeadow campus consists of several facilities that provide health care and housing to elderly people of all faiths.

[2] The affidavit in support of the defendant's Criminal Complaint mistakenly called this building Ruth's House, which is another building on the JGS campus. As set forth below, the defendant's grandmother lived at Genesis House from 2003 to 2010.

[3] One octillion is a number that contains 27 zeros, and is written as 1,000,000,000,000,000,000,000,000,000.

Subsequent investigation identified evidence that provides a circumstantial link between the defendant and the Christian proselytizing pamphlet that was used as the wick in the device, as well as evidence that the defendant placed the device at JGS as an anti-religious act. This investigation also revealed that the defendant made false statements to the FBI about his involvement in the offense during a voluntary interview on April 15, 2020.

b.       The defendant's charges

The defendant faces trial on a three-count Superseding Indictment. Counts One and Two allege violations of 18 U.S.C. §§ 844(d) and 844(i), and arise from the placement of the homemade incendiary device outside JGS on April 2, 2020. Count Three charges him with a violation of 18 U.S.C. 1001 for making false statements to the FBI about the April 2, 2020 placement of the device. The Superseding Indictment also charges the defendant in a Special Finding that he intentionally selected JGS, its property, its employees, and its residents as the object of the charged offenses because of the actual and perceived race, religion, national origin, and ethnicity of any person, pursuant to U.S.S.G. § 3A1.1(a).

To prove Count One, a violation of 18 U.S.C. § 844(d), the Government must establish beyond a reasonable doubt that the defendant received an "explosive" in interstate commerce, "with the knowledge or intent that it will be used to kill, injure, or intimidate any individually or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d).

To prove Count Two, a violation of 18 U.S.C. § 844(i), the Government must prove beyond a reasonable doubt that the defendant used "fire or an explosive" to damage or destroy (or attempt to damage or destroy) "any building, vehicle, or other real or personal property" used in interstate commerce. 18 U.S.C. § 844(i).

For purposes of both of these statutes, the term "explosive" is defined in 18 U.S.C. § 844(j):

> the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j). The statutory provision 18 U.S.C. § 232(5) that is referenced in this definition further provides:

> The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

As the statutory text and its incorporated definitions make clear, the Government must present evidence that proves the device at JGS meets these definitions in order to convict the defendant of the crimes charged in Counts One and Two.

> c.   Expert testimony about the device

On September 30, 2020 the FBI's Explosives Unit in Quantico, Virginia examined the evidence pertaining to the device collected at JGS. Supervisory Special Agent Bomb Technician ("SSABT") Christopher Rigopoulos, an Explosives and Hazardous Device Examiner in that Unit, conducted the examination and wrote a written report documenting his examination and

conclusions. As detailed below, SSABT Rigopoulos, who is highly qualified in the field of explosives, concluded that the device at JGS was an improvised incendiary device ("IID") as that term is understood in his field, and that the placement of this device outside of JGS was consistent with its use as a weapon.

1.      SSABT Rigopoulos's Qualifications and Expertise

SSABT Rigopoulos has worked in the field of hazardous materials and explosives since 1983. His extensive experience and training in this field are detailed in his CV, which is attached as Exhibit 1. SSABT Rigopoulos joined the FBI as a Special Agent in 1997. Prior to that, from 1983 to 1997, he served as a Gunnery Sergeant in the U.S. Marine Corps Reserve- Delta Company. In that position, he supervised a platoon of Marines in explosive breaching operations and landmine warfare tactics. This included a tour in Operation Desert Storm as a Staff Sergeant Platoon Guide, during which he supervised a demolition team in combat explosive breaching and infantry operations. During this time period he also worked as a Fire Captain in Knoxville, Tennessee, where he served on a regional hazardous materials response team.

After joining the FBI, he became a Special Agent Bomb Technician in 1999. In that position, he handled investigations into improvised explosive devices and conducted operations to safely dismantle such devices. He also taught state, county, and local law enforcement officers how to conduct post-blast investigation and to conduct render-safe procedures for these devices.

Since 2006, SSABT Rigopoulos has been a Supervisory Special Agent Bomb Technician in the FBI's Explosives Laboratory in Quantico, Virginia, where he serves as an Explosives and Hazardous Device Examiner. In that role, he performs forensic examinations on evidence submitted to the Explosives Unit to identify bomb components and to reconstruct explosives devices. He advises FBI evidence response teams at bombing crime scenes for the preservation

and collection of physical evidence.  He provides written reports and expert testimony regarding the results of explosives and hazardous device analyses.  He also conducts research and testing of explosives and explosive evidence.  He serves as the program manager for advanced FBI Post Blast Investigator Schools, which provide training programs for law enforcement personnel involved with explosives investigations.  He also conducts this training for other FBI agents and for police investigators within the United States and abroad.

As part of his work, SSABT Rigopoulos routinely deploys within the United States and internationally to provide technical assistance, investigative support, and post-blast assessments at crime scenes.  His CV includes a list of twenty-three Major Case Crime Scenes on which he has worked.  In the past four years, he has testified twice in federal court as an expert in explosives and hazardous devices.  His extensive training and hands-on experience in the field of explosives is further detailed in his CV.

2.    SSABT Rigopoulos's expert opinion

SSABT Rigopoulos assessed the evidence from the JGS scene on September 30, 2020.  As documented in his written report, the examination included a visual examination of the fuel cannister taken from JGS and the charred paper wick, which were transported from FBI in Massachusetts to his laboratory at Quantico for this purpose.  He did not conduct a new chemical analysis of the liquid inside the fuel can, but instead relied on the MSP Crime Lab's chemical analysis finding that liquid to be gasoline.   He also reviewed photographs of the crime scene, the placement of the device at the scene, and close-up photographs of the fuel cannister and the paper wick.  Based on this examination, his review of references, and drawing on his extensive training and experience in explosives, SSABT Rigopoulos reached two conclusions.

First, SSABT Rigopoulos found that the device placed outside of JGS was an IID.  This is

6

because in the field of explosives, as the report explains, the term IID refers to devices that contain (1) an ignitable material, (2) a fuzing system, and (3) sometimes a container. Here, because the device at JGS consisted of gasoline (an ignitable material), a fuzing system (the paper wick), and a container (the fuel cannister), the device meets that definition. *See* Ex. 2 at 2. Because the device contained these three components, SSABT Rigopoulos concluded that, if ignited properly, the resulting fire from this type of device could cause property damage, injuries, and even death to those around it. *Id*. at 2. He would also testify that, if ignited properly, the device may explode. While the likelihood of an explosion is low due to the design of this device (versus the high likelihood of a fire), the chemical properties of gasoline mean that an explosion is possible. If SSABT Rigopoulos were to testify, he would state that these conclusions are based on his training, his experience, his knowledge of the combustible properties of gasoline, his knowledge of how fires are ignited and explosions occur, and his knowledge of how IIDs with these three components function, including IIDs of this particular design.

Second, SSABT Rigopoulos concluded that an IID of this type was a destructive device that could be used as a weapon. *Id*. If SSABT Rigopoulos were to testify, he would state that he based this conclusion on his examination of the device as well as the photographs taken at the crime scene: specifically, the placement of the device in proximity to a pedestrian sidewalk, the street, and other property. Based on his training and experience in assessing crime scenes, his examination of the device-related evidence, and the photographs showing the device was placed next to a sidewalk, he concluded that the otherwise mundane items that comprised the device (a fuel cannister, paper, and gasoline) had been weaponized.

SSABT Rigopoulos did not re-create the device found at JGS to conduct an independent experiment on it. If called to testify, he would explain that he made this choice because he has

seen this type of device before, it was comprised of components common to other devices he is familiar with, and he knows the chemical properties of these components. Accordingly, the device at JGS did not present SSABT Rigopoulos with a novel question that such an experiment could answer, nor would such an experiment aid him in his assessment of the device placed at JGS. Rather, he was able to draw conclusions about the device at JGS by applying his extensive training, experience, and familiarity with similar devices to his examination of the physical evidence collected at JGS.

    2.    Applicable Law

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony in Federal trials. The Rule permits any witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony so long as "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is found reliable. Fed. R. Evid. 702.

Starting with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993), the Supreme Court has explained Rule 702's standard for admissibility. The purpose of the Rule "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). This assessment varies depending on the facts and circumstances of each case, and the type of expert testimony offered. *Kumho Tire Co.*, 526 U.S. at 153 ("we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

In *Daubert*, the Court identified several factors that can be relevant to this inquiry. For cases like *Daubert*, where purely scientific testimony is at issue, this inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid and [on] whether

that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93 (noting that for scientific testimony, questions of whether a scientific method has been tested, whether the theory or technique has been subjected to peer review and publication, the technique or theory's known rate for error and the existence of standards controlling the technique's operation, and the acceptance of the technique or theory in the community are relevant).

However, as the Court has since clarified, while the factors identified in *Daubert* for testing scientific testimony <u>may</u> assist a trial court in making this determination, they will not apply—and therefore do not govern—in every case. *Kumho Tire Co.*, 526 U.S. at 150 ("*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'").

This is because "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. (quotation marks omitted). Because the necessary inquiry will vary depending on the type of expert at issue, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," rather than requiring use of the *Daubert* factors in every case. *Id*. at 152; *see id*. at 150 ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.").

A trial court's gatekeeping function over the reliability of expert testimony is served when the court "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Expert testimony that applies the

9

expert's own training and experience to facts and data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," is admissible, even if those underlying facts or data themselves are not admissible into evidence. *United States v. Corey*, 207 F.3d 84, 89 (1st Cir. 2000) (permitting expert testimony about interstate nexus of firearm from experienced ATF agent who relied on "materials commonly consulted by firearms experts" to form his opinion); *see* Fed. R. Evid. 703 (allowing experts to rely on non-admissible facts and data to form opinions "if of a type reasonably relied upon by experts in the particular field").

A court ensures that expert testimony is relevant when "the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). Where the subject of the testimony is probative evidence in the case and "is likely outside the knowledge of the average layman," it meets this standard of relevance. *United States v. Pena-Santo*, 809 F.3d 686, 694 (1st Cir. 2015) (affirming admission of expert testimony concerning "the nature of narcotics trafficking by vessels"). A wide range of expert testimony achieves this goal in Federal criminal prosecutions. *See, e.g.*, *id.* (collecting cases) ("This court has approved the admission of expert testimony regarding the operation of criminal schemes and activities in drug trafficking cases, finding such testimony relevant and helpful to juries in understanding some obscure or complex aspect of the crime.").

Finally, so long as an expert's testimony meets this threshold standard of reliability and relevancy, the testimony should be admitted, because a trial court's gatekeeping function does not ask the court to determine whether the expert's opinion is accurate. The First Circuit has explained this distinction:

> As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 (internal

quotation marks omitted), it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies, *see id.* at 596, 113 S.Ct. 2786. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche*, 161 F.3d at 85.  So long as an expert's opinion is reliable and relevant, it is reserved for the jury how much weight to give it.

3. <u>SSABT Rigopoulos is qualified to testify as an explosives expert, his expert testimony about the device at JGS is reliable and relevant, and no evidentiary hearing is necessary</u>

Here, SSABT Rigopoulos's expert testimony satisfies all of the Rule 702 criteria for admissibility.  His extensive training and experience over a decades-long career in the field of explosives, and in particular his fourteen years of experience as a hazardous device examiner in the FBI's Explosives Unit at Quantico renders him amply qualified to testify both as an expert about explosives, and to provide an expert opinion about the device placed outside JGS.  This is further supported by his qualification as an expert in two recent Federal criminal proceedings.

SSABT Rigopoulos's opinions about the device are based on a thorough and reliable examination of the device.  He examined the individual fuel cannister and the paper pamphlets, he reviewed additional photographs of those items, he considered the MSP Crime Lab's assessment that the liquid inside the fuel cannister was gasoline, he studied photographs of the assembled device as it was first found at JGS, and he applied his decades of training and experience to those pieces of evidence.  His rationale for choosing not to create a replica device to undertake experiments on it is also soundly based on his training and experience: given his knowledge of how IIDs work, his knowledge of IIDs designed similarly to the one at issue here, and his

11

understanding of the chemical properties of the relevant components, he determined that such an experiment would not help him assess the device placed at JGS.

Given SSABT Rigopoulos's expertise, the manner in which he undertook his assessment of this device, and his familiarity with explosive devices generally and with devices similar to the one at issue in this case, there is no question that his testimony at trial would "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. As such, his expert opinion more than meets the reliability threshold for admissibility here.

This expert testimony will also be helpful to the jury. Count One in the Superseding Indictment requires the Government to establish beyond a reasonable doubt that the defendant received an "explosive" in interstate commerce, "with the knowledge or intent that it will be used to kill, injure, or intimidate any individually or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d). Count Two requires the Government to prove beyond a reasonable doubt that the defendant used "fire or an explosive" to damage or destroy (or attempt to damage or destroy) property in interstate commerce. 18 U.S.C. § 844(i).

SSABT Rigopoulos's testimony will explain that the device placed outside JGS had the components of an improvised incendiary device, and that if it had been properly ignited (rather than unsuccessfully so, as the charred wick shows) it would have caught fire and possibly exploded. Understanding how an improvised incendiary device works, and how this particular device would behave if properly lit is highly relevant to determine whether the defendant's acts violated the statute — both with regard to his use of fire or an explosive, and with regard to his intent "to kill, injure, or intimidate any individual" or to damage or destroy the surrounding

property.  Indeed, to properly assess these statutory requirements concerning fire and explosives, the jury *should* be permitted to hear evidence that will allow it to make an educated assessment of whether the device at JGS matches up to those definitions.  Accordingly, this testimony more than meets the relevancy requirement for admissibility.

At the same time, this expert testimony remains within permissible evidentiary boundaries, and does not improperly encroach on the jury's fact finding on the ultimate issue of guilt.  While Rule 704(b) does prohibit an expert in a criminal case from opining "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged," this Rule still allows expert testimony that draws conclusions about "predicate facts from which a jury might infer such intent."  *United States v. Henry*, 848 F.3d 1, 11 (1st Cir. 2017) (allowing, in narcotics possession with intent to distribute case, expert testimony that "these drugs were packaged for sale"); *see Pena-Santo*, 809 F.3d at 695 (finding that expert testimony that "merely provided facts from which the jury could infer culpable intent" did not infringe on the jury's fact-finding function).

And, of course, Federal Rule of Evidence 704(a) expressly states that "an opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Indeed, Rule 704(a) "allows the expert witness to offer his or her factual conclusion in order to aid the jury" in answering such questions.  *Nieves-Villanueva v. Soto-Rivera*, 133 F.2d 92, 100 (1st Cir. 1997); *see United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020) ("[W]e note that expert testimony addressing an ultimate issue is no longer categorically inadmissible. Although the common law barred such testimony, Rule 704(a) was designed specifically to abolish the 'ultimate issue' rule. Rule 704(a) provides that otherwise admissible opinion testimony is not objectionable just because it embraces an ultimate issue.") (citation and quotation marks omitted).

13

Here, SSABT Rigopoulos's opinion will provide the exact type of factual conclusions that Rule 704(a) permits experts to provide. His testimony about the incendiary and/or explosive properties of the device placed at JGS, and the fact that the placement of such a device near a pedestrian walkway is consistent with its use as a weapon, falls squarely within the permitted boundaries for expert testimony. His testimony should be admitted.

Moreover, this testimony is crucial to rebut anticipated defense arguments. The Government anticipates that the defense will posit — through jury addresses, cross-examination, and possibly defense witnesses — that the device placed at JGS was poorly designed, does not meet the statutory definition of "fire" and "explosives," and could not have caused any actual harm or damage under any circumstance. SSABT Rigopoulos's expert testimony is necessary to show that, in fact, the design of this device meant that, if properly lit, the device would have caused a fire and possibly an explosion. His testimony will serve the precise purpose for which expert testimony is allowed: it will ensure the jury can properly assess both the Government's and the defense's theory of the case, in a way that the jury would not be equipped to do otherwise.

Finally, given SSABT Rigopoulos's clear qualifications, the reliability of his work and opinions in this case, and the relevance of his opinions to the jury's assessment of the evidence, no evidentiary hearing is necessary here. SSABT Rigopoulos's expert testimony is admissible under Fed. R. Evid. 703, and the defendant's motion should be denied in its entirety.

4.      Conclusion

For the foregoing reasons, the Government respectfully requests that Court deny the defendant's Motion to Exclude Explosive Device Testimony and Request for *Daubert* Hearing (D.83).

Respectfully submitted,

14

ANDREW E. LELLING
United States Attorney

By:  */s/ Steven H. Breslow*
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov


By:  */s/ Risa Berkower*
RISA BERKOWER
(NY4536538)
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-305-0150
Risa.Berkower@usdoj.gov


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:  */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  October 27, 2020

15