**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-CR-30018-MGM** |
| **JOHN MICHAEL RATHBUN,** | |
| **Defendant.** | |

GOVERNMENT'S MOTIONS *IN LIMINE*
TO ALLOW RELEVANT AND ADMISSIBLE EVIDENCE

The United States of America, by and through its counsel, Andrew E. Lelling, United States

Attorney for the District of Massachusetts, Neil L. Desroches, Assistant United States Attorney,

Steven H. Breslow, Assistant United States Attorney, and Risa Berkower, Trial Attorney, United

States Department of Justice (the "Government"), respectfully moves this Court to allow evidence

showing that the DNA present in the bloodstains found on the device in this case was compared to

samples in the CODIS database[1] and matched the defendant's DNA. This is admissible evidence

showing when—and how—the defendant was first identified as the perpetrator in this case,

provides context to other, admissible evidence, and is necessary to avoid misleading the jury about

the manner in which the defendant became a suspect.[2]  Because this evidence is admissible under

---

[1] CODIS, which is the acronym for the Combined DNA Index System, is a national database of DNA profiles that is maintained by the FBI.  Created pursuant to an act of Congress, DNA samples must meet minimum collection standards in order to be included in the system.

[2] The defendant filed a motion *in limine* seeking to exclude evidence on October 13, 2020 (Dkt. No. 78).  In his motion, the defendant argued primarily that evidence regarding the issuance of a search warrant, such as the CODIS match, "invoke[d] the imprimatur of a judicial finding of probable cause" and was, therefore "irrelevant, prejudicial and must be excluded"  *Id.* at 1.  The Court allowed this motion on October 23, 2020 (Dkt. No. 97) and held:

> consistent with the court's ruling in open court i.e., the Government is allowed to say it conducted a search pursuant to a valid search warrant, but may not discuss probable cause or a magistrate's finding, or provide a narration of the investigation leading up to the obtaining of the search warrant."

Fed. R. Evid. 401, 402, and 403 and necessary for the jury to understand and properly evaluate the defendant's guilt of the charged offenses, the Government asks the Court to allow its motion.

1.      Background

a.      The defendant's charges

On June 23, 2020, a Grand Jury charged the defendant with one count of Attempt to Transport and Receive, and Transportation and Receipt of, an Explosive in violation of 18 U.S.C. §§ 844(d) and 2 ("Count One"), and one count of Attempt to Damage and Destroy Buildings, Vehicles, and Real and Personal Property by Fire and Explosive in violation of 18 U.S.C. §§ 844(i) ("Count Two").  These charges were based upon the defendant's April 2, 2020 placement of a homemade incendiary device at the entrance of Jewish Geriatric Services Lifecare, Inc. ("JGS"), located at 770 Converse Street in Longmeadow, Massachusetts.  On October 15, 2020, a Grand Jury returned a Superseding Indictment that added one count of False Statements ("Count Three") in violation of 18 U.S.C. § 1001(a)(2).  The matter proceeded to trial on November 9, 2020.  On November 23, 2020, the jury found the defendant guilty of Count Three but failed to reach a verdict on Counts One and Two.  The Court declared a mistrial and has set a re-trial on those counts for January 25, 2021.

b.      Relevant Facts

On the morning of April 2, 2020, a concerned citizen in Longmeadow called 911 after

---

*Id.*

Although the harm cited by the defendant in his motion was the "imprimatur of a judicial finding of probable cause" (Dkt. No. 78 at 1), the defendant also sought to exclude evidence concerning the manner in which law enforcement first identified him as a suspect in this case, specifically that the bloodstains on the incendiary device matched his DNA profile in CODIS.  This harm, however, does not result from evidence regarding the CODIS database match alone.  Rather, it arises only when it is offered along with evidence that a judge deemed this evidence sufficient to support a finding of probable cause.  The Government does not seek to introduce this evidence in such a manner, but instead for the reasons described *infra* and therefore, the defendant will not be prejudiced by the "imprimatur of a judicial finding of probable cause."

observing a suspicious object near the JGS driveway entrance. When the Longmeadow Police Department ("LPD") and Fire Department responded they found a yellow diesel fuel can with a paper wick, consisting of a Christian proselytizing pamphlet, stuffed into the neck of the can. At this point, the investigators had no suspects.

The officers also observed what appeared to be bloody fingerprint stains on both the paper wick and the handle of the diesel can. The LPD sent these bloodstains to the Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") for analysis. The MSP Crime Lab first confirmed that the stains were human blood, then developed a DNA profile from the bloodstains, and next submitted this profile into the CODIS database for comparison to known DNA profiles on file in the system. The CODIS database matched the DNA from the bloodstains on both the wick and the canister to the defendant's DNA, which had been collected based upon his arrest and conviction for a prior, unrelated crime.

This preliminary DNA match was the first time the defendant was identified as a suspect in this case. Based on the match, the FBI obtained search warrants for the defendant's home, his person, his cellular telephone, electronic devices found inside his house, and the vehicles registered to his home address. The search warrant also authorized the collection of a buccal swab from the defendant, in order to develop a complete DNA profile from him for further comparison to the DNA taken from the bloody fingerprints found at the crime scene.

On April 15, 2020, law enforcement officers executed these search warrants at the defendant's home. While at the defendant's house to execute these warrants, FBI Special Agent ("SA") Ryan McGonigle and LPD Officer Pamela Chapin asked the defendant if he would be willing to speak to them. Although the defendant was not in custody, Special Agent McGonigle advised the defendant of his *Miranda* rights out of an abundance of caution. The defendant waived

his rights orally and in writing.

At the outset of their interaction with the defendant, Special Agent McGonigle and Officer Chapin noticed that his hands had numerous cuts or wounds in various states of freshness, including an open wound on his right thumb, which they photographed. The defendant explained that his hands bled because he picked at them. At one point during their conversation, relying on the results of the CODIS analysis, the investigators told the defendant that his blood had been found on the device at JGS and showed him photographs of the yellow diesel can. The defendant could not explain how his blood got there, asserted that he did not had never owned a yellow fuel can, and suggested that someone may have tried to frame him.

Pursuant to the search warrant, officers then took a buccal swab from the defendant. The MSP Crime Lab developed a full DNA profile for the defendant from the swab. On April 28, 2020, the MSP Crime Lab compared this full DNA profile to the bloodstains on both the fuel can and the pamphlet, and concluded the defendant's DNA was a 1-in-568 octillion match to each.[3]

Ever since the defendant's arrest, including at the first trial in this case, the defendant has insisted that he did not commit this crime, claimed that the FBI treated him unfairly from the get-go, and argued that the Government rushed to pin this crime on him without conducting a full investigation. As noted above, in his April 15, 2020 FBI interview, the defendant initially suggested that someone had framed him. At trial, when the defendant testified and he was asked

---

[3] In the interim time since the first trial, the Government directed the MSP Crime Lab, which conducted the initial DNA analysis in this case, to conduct further testing on two additional swabs of possible DNA that were taken from the device found at JGS, but which had not previously been tested for DNA. One of these swabs was for handler DNA on the yellow cannister's handle and nozzle. The second was from another red-brown stain found on the Christian pamphlet. The results of this new analysis were complete on December 18, 2020. No DNA at all was found in the swab of the cannister's handle and nozzle. The defendant's DNA, a 1 in 568.2 octillion match, was found in the swab of the red-brown stain taken from the pamphlet. This report was disclosed to the defense the same day it was completed, December 18, 2020.

his testimony was inconsistent with his statements during the April 15, 2020 FBI interview, the

defendant responded six different times by blaming the stress of having the FBI execute warrants

at his house.  *See, e.g.*, Tr. Trans. Nov. 19, 2020, at ("I could not remember that morning again

why my blood was on that gas canister.  It was an extremely stressful morning having the FBI at

my house throwing my parents and me outside trying to figure this out.").  Then, at closing

argument, defense counsel argued that the Government had rushed to judgment against his client:

> There's other issues that simply don't square well with the government's theory and the
> idea that this case was well investigated.  Let's look at the forensic evidence here. . . . I
> kind of understand that there was this rush to—you know, it's blood.  We're going to get
> DNA on that.  But this thought that they didn't look for anything else, they didn't look for
> someone else's DNA on some other part of the can, I think that's something you've got to
> consider here about whether we would have gotten a more fulsome explanation or a more
> fulsome description of actually what went on here forensically.

Tr. Trans. Nov. 20, 2020, at 36:25-37:3, 37:25-38:7.  In sum, from the time the FBI first made

contact with the defendant on April 15, 2020 through defense counsel's final argument to the jury,

the defense has asserted that the Government misidentified the defendant as the perpetrator at the

outset of this case, and has unfairly pursued him ever since.

    2.    <u>Applicable Law</u>

The Federal Rules of Evidence allow for broad admissibility of relevant evidence at Federal

trials.  As the First Circuit has explained, "[g]enerally, all relevant evidence is admissible."  *United*

*States v. Flemmi*, 402 F.3d 79, 86 (1st Cir. 2005) (citing Fed. R. Evid. 402 ("Relevant evidence is

admissible.")).  Evidence is relevant if "it has *any tendency* to make a fact more or less probable

than it would be without the evidence." Fed. R. Evid. 401(a) (emphasis added).

This standard is broad, and evidence that provides background information, or which

provides context to explain the Government's theory of the case, is relevant, admissible evidence.

*Flemmi*, 402 F.3d at 87 (citing *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To

be relevant, evidence need only tend to prove the Government's case, and evidence that adds context and dimension to the Government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.")).

In addition, this broad view of relevance means that evidence "that pertains to a chain of events forming the context . . . and set-up of the crime, helping it to complete the story of the crime on trial" is admissible, even if that evidence does not directly establish an element of the charged offenses. *United States v. Charles*, 456 F.3d 249, 257 (1st Cir. 2006) (quotation marks omitted); *Flemmi*, 402 F.3d at 87 (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.")); *see United States v. Page*, 521 F.3d 101, 106-07 (1st Cir. 2008) (affirming trial court's admission of evidence used to establish background and context).

Where evidence otherwise satisfies the Rules of Evidence, relevant evidence may be excluded if only it if its probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, or wasting time. *United States v Soto*, 799 F.3d 68, 91 (1st Cir. 2015) ("Rule 403 . . . allows a court to exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.") (quotation marks omitted); *see Flemmi*, 402 F.3d at 87; Fed. R. Evid. 403.

When assessing the admissibility of prejudicial evidence, Rule 403 shields a defendant "against *unfair* prejudice, not against *all* prejudice." *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir. 2008) (emphasis in original) (quotation marks omitted). This is because "all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *United States v.*

*Almeida*, 748 F.3d 41, 51 (1st Cir. 2014) (emphasis in original) (quotation marks omitted). "The term 'unfair prejudice' usually refers to evidence that invites the jury to render a verdict on an improper emotional basis." *Almeida*, 748 F.3d at 51 (quotation marks omitted). In line with this approach to admissibility, as the First Circuit has recognized more than once, "'Rule 403 tilts the balance in favor of admission.'" *Whitney,* 524 F.3d at 141 (quoting *United States v. Rivera*, 83 F.3d 542, 545 (1st Cir. 1996)).

Courts have approved of the admission of CODIS search results at trial to explain how the investigation came to focus on the defendant where, as in this case, the substantive DNA evidence later used against the defendant was not based on the CODIS match, but on a direct comparison of a court-ordered DNA sample. *See United States v. Acevedo*, No. CRIM. 12-10120-GAO, 2014 WL 1326544, at *5 (D. Mass. Mar. 28, 2014) *citing Nock v. Roden,* No. 10–10158–RGS, 2011 WL 679845, at *11 (D.Mass. Jan.31, 2011) (Boal, M.J.) *aff'd,* 2011 WL 675042 (Feb. 18, 2011). *See also United States v. Aquart,* 912 F.3d 1, 28 (2d Cir. 2018), <u>cert. denied,</u> 140 S. Ct. 511 (2019).

3.      <u>Evidence concerning the initial DNA identification of the defendant as a suspect in this case should be admitted</u>

Evidence of the CODIS match and the subsequent search of the defendant's home is relevant and necessary background information that will place the Government's evidence into context, make it comprehensible to the jury, and will avoid misleading the jury about the investigative methods by which the FBI came to identify the defendant as a suspect. As described *supra*, when law enforcement officers first found the incendiary device at JGS, they had no suspects. It was the DNA taken from the bloodstains on the device—and only that evidence—that led to the defendant's identification as a suspect. This, in turn, led to an authorized search of the defendant's house, electronic devices, vehicles, and person, including the collection of a buccal swab. That search led to still more relevant evidence: a DNA match of 1 in 568 octillion between

the defendant and the bloodstains on the incendiary device; confirmation that no other DNA evidence was found on the yellow cannister's handle or nozzle; evidence from the defendant's cell phone that he was out of the house, driving his mother's car at the time the device was placed at JGS; proselytizing materials found in that car; proselytizing materials directed at converting Jewish persons found in the defendant's kitchen; and evidence on his mother's laptop connecting her to BGEA events at which the *Steps to Peace with God* pamphlet were distributed.

In addition, during the time that agents were at the defendant's house to execute the search warrant, the defendant engaged in a voluntary interview with the FBI during which he made several false statements that are strongly indicative of consciousness of guilt. Evidence that explains why law enforcement agents suspected the defendant to be the perpetrator, how they obtained much of the evidence the Government will offer in its case in chief, and the circumstances under which they interviewed the defendant provides necessary background and context to explain the investigation in this case and the Government's case in chief. This evidence is also necessary to rebut any inference from the defense (as was advanced during the first trial) that the investigation in this case mistakenly focused on the defendant from its outset.

Furthermore, without this evidence, the jury will hear that the match between the DNA found on the device and the defendant's DNA occurred only as a result of the analysis of the buccal sample taken from the defendant on April 15, 2020. Consequently, the jury will be misled to believe that a match was not made until *after* SA McGonigle told the defendant that the defendant's blood had been found on the device and the wick. This will, in turn, leave the jury to wonder how SA McGonigle's statement was true when the evidence they have heard suggests that the match had not been made yet and, as a result, will likely mislead the jury to believe that SA McGonigle lied to the defendant. Therefore, excluding this evidence will have a prejudicial effect on SA

8

McGonigle's credibility and the Government's case against the defendant—especially where, as here, the defense has already asserted that the FBI treated the defendant unfairly on April 15, 2020 when it executed the warrants at his home and interviewed him.

On the other hand, there is no undue prejudice to the defendant from the Government's introduction of this evidence. With regard to the CODIS database match, the Government intends only to reference the fact that the DNA from the bloodstains found on the device was compared to DNA samples on file in a national database - *without* any reference to the fact that the defendant's DNA existed in the database due to a prior crime or that the results supported a finding of probable cause by a Magistrate Judge.

Given that the presentation of this evidence will be straightforward, limited, and introduced only to explain how law enforcement came to suspect the defendant of these crimes, provide context to statements made by SA McGonigle to the defendant, and led to additional relevant evidence, this evidence is readily admissible under Rules 401, 402, and 403. It is further necessary to avoid misleading the jury that the Government's focus on the defendant as the perpetrator on April 15, 2020 was somehow improper, or the consequence of a shoddy investigation. Accordingly, for all these reasons, this evidence should be admitted..

4.      Conclusion

For the foregoing reasons, the Government respectfully requests that Court allow its Motion *In Limine* to Allow Relevant and Admissible Evidence.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      */s/  Neil L. Desroches*
         NEIL L. DESROCHES
         (MA66357)
         Assistant U.S. Attorney
         300 State Street, Suite 230
         Springfield, MA 01105
         413-785-0394
         neil.desroches@usdoj.gov


By:      */s/ Steven H. Breslow*
         STEVEN H. BRESLOW
         (NY2915247)
         Assistant U.S. Attorney
         300 State Street, Suite 230
         Springfield, MA 01105
         413-785-0330
         steve.breslow@usdoj.gov


By:      */s/ Risa Berkower*
         RISA BERKOWER
         (NY4536538)
         Trial Attorney
         Civil Rights Division
         U.S. Department of Justice
         950 Pennsylvania Avenue NW
         Washington, D.C. 20530
         202-305-0150
         Risa.Berkower@usdoj.gov

10

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:     */s/ Neil L. Desroches*
        NEIL L. DESROCHES
        Assistant U.S. Attorney

Dated:  December 28, 2020