**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**JOHN MICHAEL RATHBUN,**

**Defendant.**

**No. 20-CR-30018-MGM**

GOVERNMENT'S SUPPLEMENTAL MOTION *IN LIMINE*
TO ADMIT RELEVANT CONTEXT EVIDENCE

The United States of America, by and through its counsel, Andrew E. Lelling, United States

Attorney for the District of Massachusetts, Steven H. Breslow and Neil Desroches, Assistant

United States Attorneys, and Risa Berkower, Trial Attorney, United States Department of Justice

(the "Government"), respectfully moves this Court *in limine* to find admissible, under Fed. R.

Evid. 401(a), 402, 403, and 404, newly developed evidence concerning the defendant's mental

state on April 2, 2020 and in the time-period leading up to that date.

This motion supplements the Government's prior motion *in limine* to admit such evidence

(D.103), which the Court granted prior to the first trial in this case (D.115). As detailed below,

the Government now seeks to admit additional evidence uncovered by the FBI in light of the

defendant's November 19, 2020 trial testimony. This evidence provides necessary context that

explains the charged crimes, helps establish the defendant's intent, and is necessary to avoid

misleading the jury about the defendant's mental state at the time of the charged offenses. Because

this evidence is relevant, otherwise admissible, not unduly prejudicial, and will avoid misleading

the jury, this motion should be granted.

A.    Facts

1.    Procedural history

Prior to the first trial in this case, the Government filed a motion *in limine* to introduce certain evidence concerning the defendant's life circumstances at the time of this crime for purposes of proving his mental state. (D.103). The Court permitted the Government to introduce such evidence. (D.115). Based on this ruling, the Government introduced in its case in chief some evidence of the defendant's drug usage, job loss, depression, and interpersonal conflict with his family in the months and weeks leading up to the placement of the homemade incendiary device at JGS on April 2, 2020.

Also prior to the first trial, the Government filed a motion *in limine* concerning two instances of erratic and volatile behavior by the defendant in March 2020. (D.80). In the first incident, in late March 2020, the defendant smashed a friend's car with a baseball bat without provocation. In the other incident, on March 3, 2020, during a drug-fueled evening with a woman at a Chicopee motel, the defendant called the police to report that three men had broken into his work van; when the police arrived, they found no signs of forced entry into the van, and the defendant could not provide logical answers to the officers' questions.

When the Government filed that motion, it understood these incidents to be isolated prior acts and did not seek to offer them in its case in chief. Rather, the Government sought a ruling *in limine* allowing the Government to introduce those episodes if the defendant were to assert at trial either that he was a law-abiding citizen or that there was no explanation for him to have placed the incendiary device in this case. (D.80). The Court reserved ruling on this motion until trial (D.97), and the Government did not revisit introducing these episodes.

2

2.    The defendant's trial testimony and defense closing arguments

The defendant testified at trial on November 19, 2020.  During his testimony, he provided substantial additional information concerning his heavy drug use throughout his life and specifically from March 2020 through his arrest on April 15, 2020.  The defendant began abusing prescription medication in his mid-teens and turned to heroin at age eighteen.  November 19, 2020 Transcript, at 65:20-24; 67:3-8.[1]  In recent years and up to his arrest, he took Methadone to treat his heroin addiction, but despite this he still abused crack cocaine, Xanax (benzodiazepine or "benzos"), and sometimes heroin.  *Id.* at 67:23 to 68:8; 72:3-24.  In his most recent job as a solar panel installer he abused these drugs even while at work, although he claimed "not excessively," and he would then binge on these drugs after the work day and during the weekends following his paydays.  *Id.* at 73:4-20.

The defendant admitted that at times he has been "out of his mind" from using drugs.  *Id.* at 73:21-74:17.  These episodes occurred when he "was using a lot drugs. . . . [and] was very high," including times when he uses "an excessive amount of everything, benzos, crack, heroin."  *Id.* at 73:21-74:17.  He acknowledged that this occurred in March 2020 during the Chicopee motel incident, and that this had happened to him "multiple times" when abusing drugs.[2]  *Id.* at 74:13-17.

---

[1] The Government's citations to pages and lines of trial transcripts will be noted as Page:Line-Page:Line.

[2] The details of the Chicopee motel incident were not discussed at trial, but the incident was referenced in Special Agent Ryan McGonigle's direct testimony as a recent occasion where, during his FBI interview, the defendant described himself as out of his mind on a mixture of drugs. During the defendant's testimony, defense counsel then asked him additional questions about what he meant when he described himself to SA McGonigle as "out of his mind on drugs," without relaying the underlying facts of the motel incident.

The defendant testified that he also engaged in heavy drug use during March and April of 2020 – *i.e.*, the period leading up to the placement of the device on April 2, 2020.  In early March 2020, the defendant was fired from his job for coming to work noticeably high and for driving the company car so recklessly that bystanders called his employer's corporate office to report him.  *Id.* at 75:5-16.  Despite being at a low point of his life, he did not make any effort to address his drug addiction.  *Id.* at 75:17-24.

On the evening of April 1, 2020, the defendant bought crack, then went home and used it consistently throughout the night.  *Id.* at 78:23-79:17.  He had no memory of anything he did that night except for visiting websites on his phone as he continued to smoke crack.  *Id.* at 84:12-19.  Around 4:30 a.m., the defendant started to run out of crack, so he contacted a dealer in Springfield and started driving to the dealer's house.  *Id.* at 85:13-86:4.  When he could not reach that dealer, he started contacting other dealers in the area - "the same thing [he's] done probably a hundred times."  *Id.* at 91:9-21.  After he obtained more drugs that morning, he returned home.  *Id.* at 95:19-24.  His usual practice when he bought crack was to use some in his car, then drive home and continue to use.  *Id.* at 79:15-17.

The defendant continued using drugs in this way through the time of his arrest on April 15; in the days leading up to that date, he had "[been] on drugs for the past couple days, not getting sleep."  *Id.* at 152:4-9.

The defendant also testified about the components of the homemade incendiary device found at JGS.  He admitted that he possessed the yellow fuel cannister used in the device.  He stated that in late March 2020, he had done a residential trash removal job in Chicopee with his friend Chris, and that the yellow cannister had been one of the trash items they removed.  The defendant said that he later illegally dumped the trash from that job in a dumpster, including the

yellow cannister, and that he was "100 percent sure" that it was during this job that his blood got onto the yellow cannister. *Id.* at 103:24-105:15.

However, despite being asked by his lawyer to explain "how did your blood get on that can and that pamphlet," the defendant provided no explanation at any time during his testimony for how his blood got onto the wick of the device. *Id.* at 103:24-25.

At closing argument, defense counsel argued that there was no explanation of why the defendant would place an incendiary device outside of JGS as he made his way to Springfield on April 2:

> Where is the why? Why would John Rathbun do this? The government is technically correct[,] motive is not an element of the offense, but people do not do things out of thin air. They simply don't. I think that is something that you can and should take into account. Why? Have they shown you the why? I think about as close as they got is he was arguing with his mom over cigarettes and food. How does that end up in I want to put a fuel can on this property next to a tree? If there was a whisper of a hint of a why, you would have heard it. You would have heard it. There is none because John Rathbun didn't do this. . . How do you get to intent without the why? . . . If you knew the why—if there was a why, you would know the intent, this is why he wanted to do these things. Without that, there's no intent there and the government fails.

Transcript, November 20, 2020 at 45:20-46:20.

Rather, the defense argued, "[w]hat we do know is that he was searching for drugs." *Id.* at 35:23. According to the defense, when the FBI interviewed the defendant, "[w]hat they found was a functioning addict at one of the low points in his life vehemently denying having anything to do with this as he does today." *Id.* at 41:2-4.

        3.      <u>Current procedural posture</u>

After closing arguments and the Court's legal instructions, the case was submitted to the jury. The jury convicted the defendant of Count 3 in the Superseding Indictment, which charged

him with making false statements to the FBI about his whereabouts at the time of the crime. However, the jury could not reach a verdict on Counts 1, 2, and part of Count 3 in the Superseding Indictment, and on November 23, 2020 the Court declared a mistrial on those counts. Re-trial on these Counts has been set for January 25, 2021.

### 4. Additional FBI investigation

In anticipation of the re-trial, the FBI conducted additional investigation into the information provided by the defendant during his testimony. That investigation now provides a far clearer picture of the defendant's heavy drug use in March and April 2020, including the impact that this drug use had on his mental state.

As detailed below, this evidence shows that throughout March 2020, on the very day of April 2, 2020, and until the date of his arrest, the defendant was in a persistent cycle of abusing crack while also taking Methadone, Xanax, and some heroin. According to witnesses who observed him during this time, when he used drugs during this period he experienced hallucinations and engaged in erratic, volatile behavior. Taken together with the defendant's trial testimony and information previously known to the government, these facts provide a far more accurate and complete picture of the defendant's state of mind and life circumstances at the time of this crime.

### a. Early March 2020: The defendant's job loss and Chicopee motel incident

From October 2019 through March 4, 2020, the defendant worked for All Energy Solar ("AES"), installing solar panels on the roofs of customers' homes. During this six-month period, the defendant's co-workers noticed a change in his behavior that worsened over time.

In December 2019, the defendant was caught stealing a gift from another employee at the company's holiday party; when confronted, he vehemently denied the theft until he was informed

he had been caught on camera.  On another occasion, the defendant's supervisor found empty bottles of alcohol in an AES work vehicle after the defendant drove it.  When the supervisor confronted the defendant, he denied that the bottles were his, even though he was the only person who had driven the vehicle.

By March 2020, the defendant had reported to work noticeably intoxicated on several occasions and, as a result, had been prohibited from working on customers' roofs on those days. He also had made comments to co-workers several times at work that he had stayed awake all night partying the night before.

On March 3, 2020, the defendant reported to work noticeably intoxicated and, out of concern for his safety and the safety of others, was ordered by his team leader to sit in the company's truck while other employees completed their work on a customer's roof.  After returning to the truck (which the defendant had driven that morning), he opened a can of beer, drank it, and discarded the empty can on the customer's lawn.  Later in the day, the defendant agreed to drive the work truck and its attached trailer back to AES before returning home.  Instead of doing so, he disappeared for several hours.

During that time period, four separate callers contacted AES's corporate headquarters in Minnesota to report dangerous driving by the defendant's truck.  The first caller reported the truck speeding at 50 mph through an area where children were waiting for a school bus, and also nearly hitting the caller's vehicle.  The second caller reported the truck cutting off other vehicles and that the driver appeared to be having trouble controlling the vehicle and trailer on I-91.  The third caller observed the truck run two red lights, drive into oncoming traffic, and nearly flip the trailer near a bridge.  The fourth caller reported seeing the truck leave a marijuana dispensary and then engage in extreme tailgating behind the caller's vehicle.

When the defendant finally returned the work truck to the AES office, a supervisor asked him about his whereabouts for the past several hours. The defendant denied doing anything wrong with the truck, said he had not been driving dangerously or breaking any traffic laws, and claimed that on the way to the AES offices he had merely stopped at Home Depot, got lunch, and took a nap. When confronted with the calls about his driving, he continued to deny doing anything wrong. The defendant agreed to return to AES the following day to further address the incident.

That night, the defendant checked into the Quality Inn in Chicopee with a female companion. They proceeded to use crack cocaine, powder cocaine and Xanax together in the hotel room. Despite this drug use, the woman remembered the incident because of the defendant's erratic behavior throughout the night. The defendant told the woman that he had not slept for several days. After a time in the room, he became convinced that someone was trying to break into his van, which was parked outside, and he pulled out the room's window screen to get a better view. The woman looked outside and saw that no one was near the van; she then understood that the defendant was hallucinating. The woman explained to the FBI that, based on her personal experience with mixing cocaine with Xanax, as well as being around others who do so, she knows that mixing these drugs can be especially potent and can lead to hallucinations, paranoia, and memory loss. The defendant told the woman that he was going to call the police about men breaking into his van. She asked him not to do so because they had a stash of drugs in the room and she knew he was hallucinating about the break-in. The defendant nonetheless insisted on calling 911. When the police arrived, they found no signs of any forced entry into the van, and the defendant could not provide them with logical answers about the incident. After the police left, the defendant suddenly left the motel, alone, in the middle of the night and did not return. Following this incident, the woman told the FBI she met up with the defendant two other times in

8

March 2020 to use drugs with him.

The next day, the defendant returned to AES to meet with two supervisors. He told them that the previous day he had taken some medication that he should not have taken. He admitted he had stopped at a marijuana dispensary with the company truck, but he otherwise admitted no wrongdoing. AES fired him at the end of this meeting.

     b.   Late March 2020: Chicopee residential trash removal job, baseball bat incident, and MSP traffic stop

Based on the defendant's testimony, the FBI identified "Chris," whom the defendant testified had worked with him on a residential trash clean out job in late March, to be Chris Murray, an acquaintance of the defendant's. Murray confirmed that, around March 20, 2020, he did do a trash removal job with the defendant. He also provided more information about the job, the yellow fuel cannister later found at JGS, and his observations of the defendant. The defendant told Murray, who also has a history of drug abuse, that he had been staying awake for four or five days straight. They used the defendant's work van for the job, since Murray did not have a driver's license. The trash they removed was a mix of household items, but not construction items that could be sold for scrap. There was no loose paper trash to remove.[3] The trash was very dirty, and the defendant wore work gloves, but Murray did not have any. Some of the items for removal were in good condition, including two snow sleds, a child's scooter, and a yellow diesel fuel cannister. Murray asked the defendant if he could keep these items and the defendant agreed, so Murray put them (including the yellow cannister) into the front passenger seat of the work van,

---

[3] The FBI showed Murray the *Steps to Peace with God* tract used as a wick in device found at JGS. Murray did not recognize this item from the trash removal job, said that he did not remember removing any paper trash during the job, and insisted that if there had been any paper, it would have been contained in boxes or trash bags rather than loose.

rather than in the back of the van with the trash.  The van was so filled with trash that the rear doors did not close properly, and some trash was piled on the roof of the van.

Immediately after receiving payment for the job, the defendant drove himself and Murray directly to a location to buy crack.  Afterward, in an empty parking lot in Springfield, they dumped the trash from the roof of the van and some of the trash from back of the defendant's van (enough to allow the rear doors to close); they did not dump all of the trash they removed.  The defendant paid Murray $30 for his work, with a promise of an additional $20 in the future, and then dropped Murray off at home.  When Murray got out of the van, he accidentally left the yellow fuel cannister behind in the front passenger area of the defendant's van because his hands were full carrying the two sleds and the scooter.  Sometime after this, the defendant offered Murray, through a mutual friend named Glenn Milliken,[4] another job that would be in the middle of the night and would require Murray to wear dark clothing.  Murray declined this offer.

A day or two later, on March 21, 2020, Murray drove with Milliken to the defendant's house at 20 Lori Lane.  The defendant owed Milliken some money, and the two of them also had been in a dispute over a woman.  Murray sat in the car as Milliken knocked on the Rathbuns' front door.  Sheila Rathbun answered and said the defendant was unavailable.  Milliken returned to the car.  As he and Murray started to drive away, the defendant ran out of his house with a baseball bat and started smashing Milliken's car with the bat.  Milliken got out of the car and confronted the defendant.  Sheila Rathbun ran outside and stepped in between the defendant and Milliken to stop the incident.  Murray pulled Milliken away, and they left in Milliken's car.

Murray told the FBI that he has a personal history of drug abuse but had been sober for ten

---

[4] The defendant testified that Milliken is a friend and fellow addict with whom he uses drugs.  November 19, 2020 Transcript, at 187:19-22.

months at the time of the clean-up job.  Previously, he would stay awake for days at a time to use cocaine and other drugs, during which he would hallucinate and engage in irrational and sometimes violent behavior over trivial matters.  Based on his observations of the defendant on the day of the trash removal job and a day or two later with Milliken, Murray believed that the defendant was experiencing similar symptoms when he ran out of his house to attack Milliken's car with the bat.

Two days after this incident, on March 23, 2020, multiple motorists called 911 to report the defendant for erratic operation of his car.  An MSP Trooper spotted the defendant's car, saw him drive over the fog line into the rumble strip area several times, and initiated a traffic stop.  The defendant was crying and upset.  He claimed that he had lost his job that day, was being blamed for problems at work, and referred to the current situation, which the Trooper understood to be the COVID-19 pandemic.  The Trooper issued him a verbal warning, and advised him to collect himself and be on his way.[5]

d.    Early to mid-April 2020: the defendant's continued heavy drug at the time of the crime and through the time of his arrest

The defendant testified that on the night of April 1, 2020 he purchased crack cocaine and used it consistently throughout the night into the early morning hours of April 2, 2020 without sleeping.  After 4:30 a.m. on April 2, he started driving to Springfield to buy more crack.  He then spent several hours in Springfield buying drugs, after which he returned home to use them.

A review of the defendant's cell phone confirms that his drug use continued through April 2.  Several hours after the device was found at JGS, the defendant used his cell phone to take a photograph of what appears to be crack cocaine, Xanax, and drug paraphernalia.  He then sent this

---

[5] The Trooper did not observe the defendant to be intoxicated.

photograph to the woman from the Chicopee motel incident and to Glenn Milliken.

After April 2, the defendant continued this cycle of heavy drug use through the date of his arrest. As he explained in his testimony, when the FBI came to his house on April 15, 2020, he had "[been] on drugs for the past couple days, not getting sleep." November 19, 2020 Transcript at 152:4-9.

After the defendant was arrested, he made significant admissions concerning the effect of his drug use on his state of mind at the time of the crime. In a recorded jail call with his mother on May 8, 2020, the defendant initially denied placing the gas canister at JGS, but when his mother reminded him that he had told her he had been dumpster diving that morning, the defendant replied, "Oh my God, this is freaking me out. [] I don't know, I'm freaking out. I don't know. I didn't place this here [] *But what if I did and I don't remember?*" Later in the call, the defendant again denied placing the gas canister or trying to hurt anyone, but added "*I can't remember shit, because of the drugs I was taking.*" (Emphasis added).

In two other recorded jail calls with his mother on May 2 and July 10, 2020, the defendant and his mother acknowledged that, in period before this crime, the defendant's behavior had been out of control. In the May 2, 2020 call, the defendant's mother told him, in an apparent reference to his drug usage, "this is like a time out, things were kind of going out of control with you, so" and the defendant acknowledged, "OK, alright." The defendant's mother continued, "And so know you're going to get better and move forward," and the defendant acknowledged, "OK." In the July 10, 2020 call, the defendant admitted that he had been out of control due to his drug use during the March 3, 2020 Chicopee motel incident. "I was messed up on drugs and out of control, but there was no violence" during that incident, he explained to his mother.

Finally, in another recorded jail call with his mother on May 14, 2020, the defendant admitted that he had, in fact, driven down Converse Street past JGS at the time of the crime, but he did not remember the drive because he had been so high:

> Defendant: *I don't remember the fucking day at all. But apparently I was up all night and day. We just got to pray to God that between 4:30 a.m. and 8:00 a.m. that I wasn't anywhere near Converse Street. If I was, then we have a serious problem.* Cause if I, if I, if I drove by Converse Street, I know I was in your car, too, it doesn't matter, but if I drove down Converse Street between 4:30 a.m. and 8:30 a.m., I'm probably going to wind up going to jail for all this.
>       \*\*\*    \*\*\*    \*\*\*
> Defendant: So if I, if I, if I was in the location between 4:30 a.m. and 8:30, if I drove by Converse Street, if I drove by Ruth's House, *which I think I did, probably did, cause that's the only way to get from the fucking highway to home*, I have to sit in here for this whole entire thing and go through trial and put it in the judge's hands.
>
> Defendant's mother: Yeah, but you didn't go to the clinic that day.
>
> Defendant: It doesn't matter, it doesn't matter. I was going - it doesn't matter, it doesn't matter. *Where I was driving, no matter what, I always go that way.* It doesn't matter. It doesn't matter.
>       \*\*\*    \*\*\*    \*\*\*
> Defendant's mother: So what I should pray specifically, is that from 4:30 to 8:30 –
>
> Defendant: - That I wasn't on Converse Street, *but I'm telling you I was. I know I was. Because the only way that I get from my house to every place that I go to get drugs is go straight to the highway down fucking Converse Street.* [] *You're not listening to me. You're not listening to the words coming out of my mouth. Every person I call to go meet to get drugs I drive from our house, down Converse Street, on to the highway. So, I don't know, so I'm just praying that from 4:30 to 8:30 that hopefully I didn't. But I don't, I don't know, I think I did.* So then from there, what's gonna happen is, when they do see that I did, they're going to start getting video. And they're going to go to the neighbors, cause they already did go to the neighbors, and get the video from people who have video cameras on Converse Street in front of Ruth's House, and they can get video of me driving down Ruth's, down Converse Street, on top of the phone, on top of the blood. It's just gonna be wonderful.

(Emphasis added).

13

B.      Evidence of the impact of the defendant's recent heavy drug use on his mental state should be admitted to provide an accurate picture of the defendant's state of mind and to avoid misleading the jury that there is no explanation for his actions.

The new evidence concerning the defendant's state of mind in March and April 2020– that he was in the midst of a cycle of heavy cocaine, Xanax, and opiate abuse, during which he experienced hallucinations and engaged in unprovoked violent behavior – is directly relevant to the charges in this case, and is necessary and admissible here.

By the defendant's own admission in his November 19, 2020 trial testimony, consuming a large quantity of drugs can cause him to be "out of his mind," and he engaged in an all-night binge of crack cocaine in the hours leading up to this crime.  The newly developed evidence of the actual impact of these drugs on the defendant's mental state in March 2020, and the extent to which the defendant was abusing these drugs in March and April 2020, provides crucial context that will allow the jury to understand the defendant's state of mind and to assess his intent on April 2.  As such, this evidence is relevant and admissible under Fed. R. Evid. 401, 402, 403, and 404.

This evidence is also necessary to avoid misleading the jury by providing an incomplete and inaccurate picture of the defendant's mental state at the time of this crime, and to rebut any claim by the defense (as was advanced in the first trial) that there is no explanation whatsoever as to why the defendant placed the device at JGS.

"Generally, all relevant evidence is admissible" at Federal trials.  *United States v. Flemmi*, 402 F.3d 79, 86 (1st Cir. 2005) (citing Fed. R. Evid. 402 ("Relevant evidence is admissible.")).  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a) (emphasis added).  The First Circuit has explained that this standard is broad, and evidence that provides background information, or which provides

14

context to explain the Government's theory of the case, is relevant, admissible evidence. *Flemmi*, 402 F.3d at 87 (citing *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.")).

That the evidence is circumstantial is irrelevant in this analysis because "the government's proof may lie *entirely* in circumstantial evidence." *United States v. Keene*, 341 F.3d 78, 83 (1st Cir. 2003) (quotation marks omitted); *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir. 1994) ("The law is long since settled that the prosecution may prove its case without direct evidence of a defendant's guilty knowledge so long as the array of circumstantial evidence possesses sufficient persuasive power.").

This broad view of relevance means that evidence "that pertains to a chain of events forming the context . . . and set-up of the crime, helping it to complete the story of the crime on trial" is admissible, even if that evidence does <u>not</u> directly establish an element of the charged offenses. *United States v. Charles*, 456 F.3d 249, 257 (1st Cir. 2006) (quotation marks omitted); *Flemmi*, 402 F.3d at 87 (citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.")); *see United States v. Page*, 521 F.3d 101, 106-07 (1st Cir. 2008) (affirming trial court's admission of evidence used to establish background and context).

In line with this, evidence of a defendant's other "bad acts," which is governed by Fed. R. Evid. 404(b), has "special relevance" that allows for its admission when "introduced 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and

15

place.'" *United States v. Sabean*, 885 F.3d 27, 36 (1st Cir. 2018) (quoting *United States v. Gonyer*, 761 F.3d 157, 163 (1st Cir. 2014)).  The First Circuit has recognized that "[s]uch evidence may be particularly helpful when an actor's state of mind is at issue 'and the only means of ascertaining that mental state is by drawing inferences from conduct.'" *Id*. (quoting *United States v. Huddleston*, 485 U.S. 681, 685 (1988)).  In sum, "evidence of other criminal acts [is] admissible . . . when [it is] so blended or connected with the one on trial as that proof of one incidentally involves the other; *or explains the circumstances thereof.*"  *United States v. Dworken*, 855 F.2d 12, 27 (1st Cir. 1988) (quotation marks omitted, emphasis in original).

Where other acts evidence is probative of intent, the evidence is admissible so long as it is not unfairly prejudicial.  *Huddleston*, 485 U.S. at. 688 ("If offered for [] a proper purpose, the evidence is subject only to the general strictures limiting admissibility such as Rules 402 and 403.").  "[E]vidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial."  *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013) (quotation marks omitted).

Moreover, "'Rule 403 does not ensure that trials — even criminal trials — will be antiseptic affairs.'" *Gonyer*, 761 F.3d at 164 (quoting *Mehanna*, 735 F.3d at 64).  Rather, when other acts evidence is relevant for a proper purpose (such as intent), the risk of unfair prejudice may be sufficiently mitigated by a trial court's limiting instructions — even where the evidence may well produce strong emotional reactions by the jury.  *See, e.g., Sabean*, 885 F.3d at 36-37 (affirming admission of evidence of defendant's prior sexual abuse to prove motive and intent, and finding trial court properly avoided unfair prejudice through a limiting instruction); *Gonyer*, 761 F.3d at 164 (same).

It is of no moment whether the other acts evidence provides circumstantial (rather than

direct) evidence of a defendant's intent. "Criminal defendants rarely shout their nefarious intentions from the rooftops." *Sabean*, 885 F.3d at 37. Because of this, the Government may — and often must — establish intent through circumstantial evidence, including other acts evidence. *Id*. ("Circumstantial evidence can suffice to forge such a link, and this jury had the right to infer motive or absence of mistake based on common-sense inferences drawn from evidence of the attendant circumstances.").

Here, the Government seeks to introduce evidence concerning the substantial impact of the defendant's ongoing heavy drug use throughout March and April 2020 on his mental state for the permitted purpose of "complet[ing] the story of the crime on trial by proving its immediate context of happenings near in time and place." *Sabean*, 885 F.3d 27, 36. By the defendant's own admission at trial, he became "out of his mind" on drugs and "out of control" during the Chicopee motel incident in early March, when he mixed cocaine and other drugs; and his female companion now confirms that he was hallucinating when he insisted to local police that he observed men breaking into his work van. Later that month, he attacked his friend's car with a baseball bat without provocation after smoking crack and staying awake for several days.

The defendant admitted at trial that heavy drug usage has put him "out of his mind" "multiple times" in his life, and that he was in the midst of an all-night crack binge in the hours leading up to this crime. This binge continued throughout the following day, when he sent two fellow drug users a photograph he took of a fresh supply of crack and Xanax. And, as he testified, he continued to engage in this cycle of continuous heavy drug use without sleeping until his arrest on April 15.

This new evidence about the defendant's state of mind in March and April 2020 will give the jury a window into his intent on the morning of April 2, 2020. This evidence will allow the

jury to see this crime in full context: the defendant was at a low point in his life and was engaged in rampant substance abuse that impacted how he perceived and reacted to the events around him. Given the probative value of this evidence to explain the charged offenses and establish the defendant's mental state and intent, it is properly admissible under Rule 404(b).

This evidence is also necessary to help rebut inaccurate inferences that the defendant's alibi defense will otherwise create. The Government expects that at the re-trial the defendant will again assert that he did not place the incendiary device at JGS because on the morning of April 2 he had a single-minded focus on buying drugs, and — as defense counsel argued at his first trial — there is no explanation for why the defendant would have placed a firebomb at JGS as he made his way to do so.

While the Government does not dispute that the defendant purchased drugs shortly after he placed the device at JGS, this is simply not the entire story. Rather, on the morning of April 2, 2020, the defendant was in the midst of a prolonged drug binge that substantially affected his mental state. In the preceding weeks, he had been so high that he experienced hallucinations and engaged in unprovoked violence. Indeed, as the defendant has since acknowledged on jail calls, "things were kind of going out of control" in his life in the lead-up to this crime, so much so that his own memory is faulty "because of the drugs [he] was taking."

This complete picture of the defendant's mental state at the time of the crime, especially as it informs his intent to commit the charged offenses, is crucial to give the jury an accurate picture of the circumstances of this offense and to avoid misleading the jury about the role the defendant's substance abuse played in this offense. This is particularly important where the defendant himself will likely again use his drug addiction as the centerpiece of his defense.

Finally, there is no risk of *unfair* prejudice here. A jury instruction will adequately protect

the defendant from any such prejudice from this evidence, while still allowing the jury to see the entire set of relevant evidence. While evidence of prior drug use could tempt the jury to misuse this evidence, the defendant's alibi defense indicates he will again put his drug use at issue. Moreover, the First Circuit has found limiting instructions adequate to avoid this concern in cases involving far more inflammatory "other acts" evidence. *See, e.g., Sabean*, 885 F.3d at 36-37 (limiting instruction avoided unfair prejudice from evidence that defendant sexually abused his own daughter); *Gonyer*, 761 F.3d at 164 (limiting instruction avoided unfair prejudice from allegations that defendant sexually abused fifteen-year-old coworker). Thus, the Government's motion should be granted.

C. Conclusion

For the foregoing reasons, the Government respectfully requests that Court rule *in limine* that the evidence outlined in this motion is relevant and admissible under Fed. R. Evid. 401(a), 402, 403, and 404.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Neil L. Desroches*
       NEIL L. DESROCHES
       (MA66357)
       Assistant U.S. Attorney
       300 State Street, Suite 230
       Springfield, MA 01105
       413-785-0394
       neil.desroches@usdoj.gov

By:    */s/ Steven H. Breslow*
       STEVEN H. BRESLOW
       (NY2915247)
       Assistant U.S. Attorney
       300 State Street, Suite 230
       Springfield, MA 01105

19

413-785-0330
steve.breslow@usdoj.gov

By:   */s/ Risa Berkower*
RISA BERKOWER
(NY4536538)
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-305-0150
Risa.Berkower@usdoj.gov

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:   */s/ Risa Berkower*
RISA BERKOWER
Trial Attorney

Dated:  December 28, 2020