**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 20-CR-30018-MGM** |
| **JOHN MICHAEL RATHBUN,** | |
| **Defendant.** | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE
EXPERT TESTIMONY AND REQUEST FOR DAUBERT HEARING

The United States of America, by and through its counsel, Andrew E. Lelling, United States

Attorney for the District of Massachusetts, Neil Desroches and Steven H. Breslow, Assistant

United States Attorneys, and Risa Berkower, Trial Attorney, United States Department of Justice

(the "Government"), respectfully opposes defendant's Motion to Exclude Expert Testimony and

Request for *Daubert* Hearing (D.231) (the "Motion").

In the Motion, the defense seeks to exclude testimony of Daniel Marshall at the re-trial,

currently scheduled for January 25, 2021. Marshall is an employee of Scepter Manufacturing LLC

("Scepter"), who provided crucial testimony as a fact witness for the Government in the first trial,

largely without any objection from the defense. At the re-trial, the Government anticipates calling

Mr. Marshall again for the same purpose; however, because he possesses technical knowledge that

qualifies him to testify as both a fact and expert witness, the Government included him in its

December 18, 2020 supplemental expert disclosure and identified a few additional areas about

which he may testify (D. 224). Because Marshall will largely provide the same fact witness

testimony that he gave at the first trial, and because any expert testimony he may provide exceeds

the *Daubert* and Fed. R. Evid. 702 requirements of reliability and relevance, the Motion should be

denied without an evidentiary hearing.

    1.       <u>Background</u>

        a.      <u>Relevant facts</u>

On the morning of April 2, 2020, a concerned citizen in Longmeadow, Massachusetts called 911 after observing a suspicious object near the entrance to Jewish Geriatric Services (JGS). When the Longmeadow Police and Fire Departments responded, they found a partially-filled yellow Scepter diesel fuel can with a paper wick, consisting of a Christian proselytizing pamphlet, stuffed into the neck of the can. The officers smelled the odor of gasoline from the can and saw that the paper wick was charred, indicating that someone had tried to ignite the wick and the gasoline inside the can. Officers photographed the device at the scene and then collected it as evidence. Labeling on the cannister indicated it was manufactured by Scepter Manufacturing, LLC (Scepter).

Back at the LPD station, officers removed the liquid from inside the device and sent it to the Massachusetts State Police Crime Laboratory (the "MSP Crime Lab") for chemical analysis. That analysis confirmed the liquid was gasoline.

The MSP Crime Lab confirmed that what appeared to be two bloody fingerprint stains on the paper wick were, in fact, the defendant's bloodstains, and that his DNA was a 1-in-568 octillion match to each of the stains. The FBI also identified evidence that provides a circumstantial link between the defendant's family and the religious pamphlet of which the paper wick was comprised.

Strong evidence also connects the defendant to Scepter's fuel can. In recorded jail calls and in testimony at the first trial in this case, the defendant admitted that — contrary to his assertion to the FBI he had never seen the yellow fuel cannister found at JGS and could not have gotten blood on it while working at someone's home — he actually had possessed that same cannister

after removing it from someone's home in late March 2020 during a residential clean-up job in Chicopee. Another expected government witness, who did not testify at the first trial, has confirmed that he and the defendant removed the yellow cannister from that job site. This witness also told the FBI that when he and the defendant left each other at the end of the work day, the cannister remained in the front compartment of the defendant's work van.

In addition to confirming the defendant's DNA on both the cannister and the wick, the MSP Crime Lab crime lab swabbed those parts of the cannister's handle and spout to test for possible touch DNA belonging to other individuals, but found no other DNA on those parts of the can.

      b.    <u>The explosives charges against the defendant</u>

Counts One and Two of the Superseding Indictment charge the defendant with violating 18 U.S.C. §§ 844(d) and 844(i), and arise from the placement of the homemade incendiary device outside JGS on April 2, 2020.

To prove Count One, a violation of 18 U.S.C. § 844(d), the Government must establish beyond a reasonable doubt that the defendant received an "explosive" in interstate commerce, "with the knowledge or intent that it will be used to kill, injure, or intimidate any individually or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d).

To prove Count Two, a violation of 18 U.S.C. § 844(i), the Government must prove beyond a reasonable doubt that the defendant attempted to use "fire or an explosive" to damage or destroy "any building, vehicle, or other real or personal property" used in interstate commerce. 18 U.S.C. § 844(i).

For purposes of both of these statutes, the term "explosive" is defined in 18 U.S.C. § 844(j):

> the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

18 U.S.C. § 844(j).  The statutory provision 18 U.S.C. § 232(5) that is referenced in this definition further provides:

> The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

As the statutory text and its incorporated definitions make clear, the Government must present evidence that proves the device at JGS meets these definitions in order to convict the defendant of the crimes charged in Counts One and Two.

These charges were tried to a jury in November 2020.  On November 23, 2020, the jury deadlocked on Counts 1 and 2 and the Court declared a mistrial.  Re-trial on these counts is now set for January 25, 2021.

        c.        <u>Marshall's testimony at the first trial and the defendant's Rule 29 argument</u>

At the first trial, Marshall testified that he has a bachelor's degree in mechanical engineering and has worked on the engineering and product development teams at Scepter for the

4

last three years.  November 17, 2020 Transcript ("Tr.") at page 75, lines 6-15 (hereinafter cited as "Nov. 17 Tr. page:line – line").  Marshall explained that as a member of Scepter's product development team, his job is to develop fuel cannisters that are safe for consumers to use.  *Id*. at 175:22-176:1.  In developing fuel cannisters, the safety features on the cannisters are of "paramount" concern, because "the reality is [that] what it's going to used for is holding a very potentially flammable or explosive material."  *Id*. at 176:23-177:5.

Marshall explained that because the safety of Scepter's products is a crucial consideration in its product development, he is familiar with the safety features of the company's fuel cans. There are five categories of safety features in a Scepter cannister: (1) the construction of the container itself; (2) the warning labels on the cannisters, (3) the construction of the spout to prevent emissions from leaking out of the cannister (a federal regulatory requirement since 2009); (4) the construction of the spout to automatically close and "child lock" when not in use, and (5) a flame mitigation device ("FMD").  *Id*. at 178:21-179:18.

Marshall participated in Scepter's development of the FMD in 2018.  Marshall explained that fuel is always giving off highly flammable fumes.  *Id*. at 179:21-180:12.  Prior to the development of the FMD, if fuel fumes outside of a fuel cannister were exposed to a spark or flame and caught fire, there was a risk that the fire could travel back into the can and cause a larger fire or explosion inside the cannister.  The FMD prevents the flame from traveling back into the can to cause such a larger fire or explosion.  *Id*. at 180:7-20.  Marshall explained that all fuel cannisters are safe if used properly, but these safety features help make them safer in instances of misuse.  *Id*. at 180:10-12.

Marshall also examined the fuel cannister found at JGS.  He identified it as a Scepter product that was manufactured in Oklahoma in January 2017.  When this can was manufactured,

it contained all of the safety features he had described except for the FMD, because Scepter had not yet developed the FMD. However, Marshall observed that the spout on the cannister found at JGS was not the spout that Scepter manufactured and sold with the cannister. Instead, the spout found on the device at JGS was an old Rubbermaid brand spout that contained no safety features at all — it was essentially just an open hole into the can. *Id*. at 185:15-188:6. Marshall explained that the Scepter spout sold with the cannister had an auto-close, child-lock feature that sealed the cannister's opening when it was not in active use, so that fuel fumes could not escape. *Id*. at 187:8-188:6. By contrast, the spout found on the cannister at JGS contained no safety features at all, let alone any that would prevent the release of fuel fumes, or the introduction of a source of ignition into the cannister at any point in time. *Id*. at 188:4-6.

Defense counsel did not object to Marshall's direct testimony other than to one question concerning the development process for the FMD. On cross-examination, defense counsel asked Marshall only three questions, none of which addressed the safety features of Scepter cannisters generally or the cannister found at JGS.

At the conclusion of the Government's case in chief, the defendant moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. Defense counsel's argument concerning Counts 1 and 2 focused on the sufficiency of the evidence to establish that the device outside of JGS was an explosive as defined under 18 U.S.C. § 844 or in 18 U.S.C. § 232(5):

> There is insufficient evidence from which any reasonable juror could conclude that the device left in front of the tree was an explosive as required for both Counts 1 and 2. There's been no evidence to indicate that this can would, as it sat on Converse Street, constitute an explosive as defined by the statute, either in 844, 18 U.S.C. [§] 844 or in 18 U.S.C. [§] 232(5). It meets none of the definitions.

Nov. 18, 2020 Trial Tr. at 75:15-23.

In response to this, the Government relied on Marshall's testimony. The Government noted

that the cannister had been sold with a spout that included safety features, but that the device found

at JGS had a different spout that lacked any safety features.  *Id*. at 79:21-80:11.  The Government

argued that the absence of that spout — and its replacement with an old, open spout through which

gasoline fumes could easily escape and any spark or flame could enter — supported the conclusion

that the device at JGS met the statutory definition of an "explosive."  The Court denied the

defendant's Rule 29 motion.  *Id*. at 85:21-86:5.

> d.    The Government's supplemental expert notice

On December 18, 2020, in anticipation of the re-trial in this case, the Government filed its

notice of expert testimony, supplementing its prior expert notice (D.224).  The notice expressly

stated that "[t]he Government is providing these disclosures even though it believes that some of

the individuals identified as experts herein will actually be providing lay opinion testimony that

falls outside the purview of Fed. R. Crim. Pro. 16 and Fed. R. Evid. 701 and 702."

The Government included Marshall in its supplemental expert notice.  In the description of

his testimony, the Government identified the same areas of factual testimony to which Marshall

testified in the first trial, principally without objection.  In addition, based on Marshall's technical

knowledge of the design and safety features of Scepter fuel cannisters, the Government included

a few additional areas of possible testimony in the expert notice.  These include: (1) a description

of the safety testing that Scepter conducts and, to the extent relevant, the applicable industry

standards for those safety features; (2) Marshall's review of fuel cannisters that have failed; and,

(3) in the context of explaining the dangers of misusing a fuel cannister in a fashion that could

cause a large fire or explosion, a more fulsome description of the development of Scepter's FMD.

Despite lodging no objection during the first trial to any of Marshall's testimony other than

the history of the FMD, the defendant now objects to him testifying to anything more than

identifying the fuel cannister as a Scepter product that traveled in interstate commerce. Because Marshall will testify primarily as a non-expert fact witness concerning areas that are vital to the Government's ability to establish an essential element of Counts 1 and 2 — that the device left at JGS was an "explosive"—and because any expert testimony Marshall will provide will meet the standards of *Daubert* and Fed. R. Evid. 702, 703, and 704, the Motion should be denied. Moreover, because Marshall already testified at the first trial, there is no need for an evidentiary hearing.

2.      Mr. Marshall's testimony concerning the design of Scepter cannisters, the safety features included in such cannisters, and the risk of bypassing those safety features is highly relevant and admissible non-expert testimony.

The first part of the Motion seeks to exclude any testimony by Marshall concerning "design decisions made in Scepter fuel cannisters, the impact of federal safety requirements on Scepter product design, and Scepter's research and development efforts to design an FMD" on the ground that such testimony would be "manifestly irrelevant to the jury's inquiry and decision." Motion, at 3. Because this mischaracterizes the scope and purpose of Marshall's testimony about these topics, and because his anticipated testimony concerning the design of Scepter cannisters, the cannisters' safety features, and the dangers of bypassing these features and misusing these cannisters is vital to the jury's determination of whether the device at JGS was an "explosive," the defendant's motion should be denied.

As in the first trial, the Government anticipates Marshall, as a member of Scepter's engineering and product development team, will testify about the design of Scepter fuel cannisters, including their safety features. Marshall will explain the dangers inherent to storing fuel and how the cannisters' safety features mitigate those risks. To give context to this explanation, Marshall

will, as before, briefly explain the federal regulations that shape these safety features — for instance, the warning labels on the cannisters and the 2009 federal requirement that all spouts must prevent fuel fumes from leaching out of the cannisters into the surrounding environment.  Also in this context, Marshall will explain the dangers of bypassing the cannisters' safety features, such as by using a fuel cannister with an outdated, pre-2009 spout.  All of this testimony is highly relevant to the jury's determination of whether the improvise device found at JGS — a Scepter cannister with a pre-2009 Rubbermaid spout that contained no safety features at all, with charred paper stuffed into the spout — meets the statutory definition of an explosive.

Similarly, an explanation of the FMD is relevant to the jury's assessment of the device found at JGS.  Marshall will testify about the FMD to explain a long-standing risk of *misusing* fuel cannisters:  introducing a flame near a cannister can ignite fuel fumes that have drifted outside of the cannister, and that fire can then quickly travel into the cannister to create a larger fire or explosion.  The fuel cannister industry has, for years, tried to find a way to combat this danger of *misuse*; the FMD was a breakthrough that drastically reduced such a risk by preventing any such flame from traveling back into the cannister.  While it is true that the FMD post-dates the manufacture of the cannister found at JGS, the Government offers Mr. Marshall's testimony about the FMD technology simply to illustrate the serious dangers of *misusing* a fuel cannister by lighting an open flame nearby:  for a cannister that does not contain an FMD — as this one did not — introducing a spark or flame outside of the can could ignite the nearby fumes and start a fire that then easily travels back into the can and causes a larger fire or explosion.  Significantly, this testimony will help the jury understand the danger of exactly what the defendant is charged with doing:  setting fire to paper stuffed into an open spout of a fuel cannister that lacks the safety features to prevent: (1) gasoline fumes from drifting outside the cannister and catching on fire; and

(2) the resulting flame from traveling back into the cannister, where it might cause a larger fire or explosion.  Because this example will illustrate, by comparison, the serious risk of fire and/or explosion presented by the device the defendant placed at JGS, this testimony is highly relevant and should be admitted.

       3.      <u>Marshall is highly qualified to testify about the risk of fire or explosion through improperly used Scepter fuel cannisters, and such testimony is both relevant and admissible.</u>

The second part of the Motion seeks to exclude, under *Daubert* and Federal Rule of Evidence 702, any testimony by Marshall concerning "the risk of fire and explosion of fuel cannisters, and specifically as to the cannister recovered from JGS."  Motion at 2.  This again mischaracterizes Marshall's proposed testimony.

As detailed in the Government's supplemental expert notice, rather than calling Marshall to give general testimony about "the risk of fire and explosion of fuel cannisters," his testimony will be specifically tied to his explanation of Scepter's products (including the cannister used in the device at JGS), their safety features, the dangers those safety features are designed to mitigate, and the risks of misusing the company's products through bypassing those safety features.  Each of these topics is highly relevant to the jury's assessment of the device found at JGS as an "explosive."

Moreover, while the Government submits that such testimony is similar to the factual testimony provided largely without objection by Marshall at the first trial, to the extent the Court determines it would be expert testimony, Marshall's background, training, and work on Scepter's engineering and product development team surpass the standards required to qualify him to testify as an expert on these topics.

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony in

Federal trials. The Rule permits any witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony so long as "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is found reliable. Fed. R. Evid. 702.

Starting with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 570 (1993), the Supreme Court has explained Rule 702's standard for admissibility. The purpose of the Rule "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). This assessment varies depending on the facts and circumstances of each case, and the type of expert testimony offered. *Kumho Tire Co.*, 526 U.S. at 153 (stating "we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

In *Daubert*, the Court identified several factors that can be relevant to this inquiry. For cases like *Daubert*, where purely scientific testimony is at issue, this inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid and [on] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93 (noting that for scientific testimony, questions of whether a scientific method has been tested, whether the theory or technique has been subjected to peer review and publication, the technique or theory's known rate for error and the existence of standards controlling the technique's operation, and the acceptance of the technique or theory in the community are relevant).

However, as the Court has since clarified, while the factors identified in *Daubert* for testing scientific testimony may assist a trial court in making this determination, they will not apply — and therefore do not govern — in every case. *Kumho Tire Co.*, 526 U.S. at 150 (stating "*Daubert*

11

makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'").

This is because "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. (quotation marks omitted). Because the necessary inquiry will vary depending on the type of expert at issue, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," rather than requiring use of the *Daubert* factors in every case. *Id*. at 152. As the Supreme Court put it, "[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue." *Id*. at 150.

A trial court's gatekeeping function over the reliability of expert testimony is served when the court "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Expert testimony that applies the expert's own training and experience to facts and data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," is admissible, even if those underlying facts or data themselves are not admissible into evidence. *United States v. Corey*, 207 F.3d 84, 89 (1st Cir. 2000) (permitting expert testimony about interstate nexus of firearm from experienced ATF agent who relied on "materials commonly consulted by firearms experts" to form his opinion); *see* Fed. R. Evid. 703 (allowing experts to rely on non-admissible facts and data to form opinions "if of a type reasonably relied upon by experts in the particular field").

A court ensures that expert testimony is relevant when "the expert's proposed opinion, if

admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). Where the subject of the testimony is probative evidence in the case and "is likely outside the knowledge of the average layman," it meets this standard of relevance. *United States v. Pena-Santo*, 809 F.3d 686, 694 (1st Cir. 2015) (affirming admission of expert testimony concerning "the nature of narcotics trafficking by vessels"). A wide range of expert testimony achieves this goal in Federal criminal prosecutions. *See, e.g.*, *id.* (collecting cases) ("This court has approved the admission of expert testimony regarding the operation of criminal schemes and activities in drug trafficking cases, finding such testimony relevant and helpful to juries in understanding some obscure or complex aspect of the crime.").

Finally, so long as an expert's testimony meets this threshold standard of reliability and relevancy, the testimony should be admitted, because a trial court's gatekeeping function does not ask the court to determine whether the expert's opinion is accurate. *Ruiz-Troche*, 161 F.3d at 85. So long as an expert's opinion is reliable and relevant, it is reserved for the jury how much weight to give it.

Here, in light of Marshall's testimony at the last trial, which prompted only a single objection, the Government respectfully submits that the areas of anticipated testimony to which the defendant now objects under Rule 702 constitute relevant, non-expert testimony. Regardless, even if the Court were to find that Marshall's testimony draws upon such technical experience as to qualify as expert testimony under Rule 702, his testimony would satisfy, and exceed, *Daubert's* standards.

The Government anticipates calling Marshall as a witness to talk about the fuel cannisters that Scepter manufactures, the safety features of those cannisters, the dangers those safety features

guard against, and the potential harm from misusing the cannisters and/or bypassing their safety features. These are topics about which Marshall is uniquely qualified to testify. He has an undergraduate degree in mechanical engineering and is the holder of 17 patents, including one concerning a liquid dispensing spout nozzle. He has worked on Scepter's engineering and product development team for fuel cannisters for three years. This included work on the FMD, which addressed a long-standing danger inherent to the *misuse* of a fuel cannister. Based on his background, training in mechanical engineering, and years of experience on Scepter's engineering and product development team, he has a deep understanding of these topics and is uniquely qualified to testify to them. And, because the device found at JGS was a Scepter product, Marshall is further qualified to discuss the safety features of that particular cannister, the absence of the safety features as it was found at JGS, and the resulting risks created by use of the cannister in that condition. This testimony is highly relevant to the jury's assessment of whether the device at JGS was an "explosive," and Marshall is uniquely qualified to provide the jury with this information.

Contrary to the defense argument, it is irrelevant that Marshall is not a chemist. There is no requirement under *Daubert* or Rule 702 that an expert have specific educational degrees to qualify as an expert. Indeed, the case law anticipates experts of all types, including experts who provide the jury with technical information that the expert has developed through hands-on experience. As someone who works on developing Scepter's products, Marshall's testimony about those exact same products provides that type of testimony. This evidence is relevant, will be helpful to the jury, and he is highly qualified to provide it here.

In addition, Marshall's testimony is crucial to rebut anticipated defense arguments. The Government anticipates that the defense will again argue — at the very least on a Rule 29 motion, if not also through jury addresses, cross-examination, and possibly defense witnesses — that the

14

device placed at JGS does not meet the statutory definition of "fire" and "explosives," and could not have caused any actual harm or damage under any circumstance.  Just as in the first trial, the Government offers Marshall's testimony to explain to the jury the risks of using a fuel cannister in the fashion it was deployed at JGS.  This testimony is necessary to rebut contrary defense arguments and to avoid misleading the jury into thinking that there was no actual risk of fire or explosion here.

Finally, no evidentiary hearing is needed because the Court has already received Marshall's testimony during the prior trial.  His anticipated testimony at the re-trial will be closely resemble his initial testimony, which was admitted with almost no objection by the defense.  To the extent there are a few additional areas to which he may now testify — such as a more fulsome description of the FMD, as an example of the risks of misusing a fuel cannister by bringing it in close proximity to an open flame — there is already a sufficient record on which the Court may rule.

The Government respectfully submits that Marshall's testimony about the risks of fire and/or explosion when a fuel cannister is misused without its safety features is not expert testimony.  However, should the Court find it to be such, Marshall is qualified to provide this testimony, and the Court should admit it and deny the Motion.

4.    Conclusion

For the foregoing reasons, the Government respectfully requests that Court deny the defendant's Motion to Exclude Testimony and Request for *Daubert* Hearing (D.231).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Neil L. Desroches*
NEIL DESROCHES

15

                                        (MA66357)
                                        Assistant U.S. Attorney
                                        300 State Street, Suite 230
                                        Springfield, MA 01105
                                        413-785-0394
                                        Neil.desroches@usdoj.gov


                        By:     */s/ Steven H. Breslow*
                                STEVEN H. BRESLOW
                                (NY2915247)
                                Assistant U.S. Attorney
                                300 State Street, Suite 230
                                Springfield, MA 01105
                                413-785-0330
                                Steve.breslow@usdoj.gov


                        By:     */s/ Risa Berkower*
                                RISA BERKOWER
                                (NY4536538)
                                Trial Attorney
                                Civil Rights Division
                                U.S. Department of Justice
                                950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
                                202-305-0150
                                Risa.Berkower@usdoj.gov


## Certificate of Service

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

                        By:     */s/ Steven H. Breslow*
                                STEVEN H. BRESLOW
                                Assistant U.S. Attorney


Dated:  January 11, 2021