**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | **Criminal No. 20-30018-MGM (S-1)** |
| JOHN MICHAEL RATHBUN, | |
| **Defendant.** | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE

The United States of America, by and through its counsel, Andrew E. Lelling, United States Attorney for the District of Massachusetts, Steven H. Breslow and Neil Desroches, Assistant United States Attorneys (the "Government"), respectfully opposes the defendant's Motion For Release From Custody (D.194) and Motion For A Release Hearing (D.252).

As set forth below, on April 17, 2020, the Court correctly detained the defendant pending trial, and the following circumstances warrant the defendant's continued detention:

(1) the defendant has now been convicted by a jury and is awaiting sentencing, and thus faces a far heavier burden than he failed to meet prior to his trial;

(2) the defendant is still facing trial for two highly serious and dangerous offenses, and therefore with respect to these charges he is in the same position as he was when the Court initially detained him, with no additional mitigating circumstances;

(3) the trial confirmed the Court's initial concerns that weighed in favor of his pre-trial detention, primarily that the defendant is a longtime substance abuser (opiates, heroin, crack, powder cocaine, and Xanax) who was spiraling out of control by the time he committed the alleged offenses on April 2, 2020;

(4) the defendant has committed several significant disciplinary violations while

detained at the Hampden County Jail and House of Correction (the "Hampden Jail"), underscoring his inability to control his conduct if released; and

(5) the defendant's family ties remain insufficient and particularly do not establish that he does not pose, by clear and convincing evidence, a danger to the community; and

(6) the defendant has tested negative for COVID-19, the Hampden Jail has implemented extraordinary safeguards to prevent the spread of COVID-19, the defendant has no health factors that make him particularly vulnerable to COVID-19, and the infection rates at the Hampden Jail are substantially the same as in the general public.

The defense arguments – that the Government will not likely obtain a guilty verdict due to its asserted lack of motive; that the re-trial may not take place until after March 29, 2021; that the defendant faces greater health risks at the Hampden Jail than in the public; and that the Government did not develop evidence of anti-Semitism or white supremacy – fail to satisfy *the defendant's heavy burden* to establish by clear and convincing pose a danger to the safety of any other person or the community.  18 U.S.C. § 3143(a).

1.    The Court Correctly Ordered the Defendant's Pre-Trial Detention

On April 17, 2020, this Court ordered the defendant detained pending his trial.  (D.12-13). As the Court explained on April 17, 2020,[1] the defendant had to be detained for several reasons:

---

[1] The Government has not ordered the transcript of this hearing, and the Court's docket entry simply states that the Court ordered detention for the reasons set forth in open court.  D.13. The Government is reciting the Court's basis for pre-trial detention based upon its memory of the hearing and on the Government's brief and arguments to the Court on that day.  Notably, the Court did ***not*** base its decision on the factual allegations in the defendant's Complaint concerning anti-Semitism and white supremacy.

(1) the seriousness and dangerousness of the alleged offense, which involved the placement and attempted detonation of a homemade incendiary device at the entrance to a Jewish-sponsored elder care facility at the height of the pandemic, within feet of a busy sidewalk; (2) the powerful weight of the Government's evidence, including the defendant's DNA found on the gasoline canister and the Christian proselytizing pamphlet that formed the device; and (3) the defendant's extremely worrisome personal history and circumstances, including his prior criminal history, his admitted longtime substance abuse and recent unpredictable behavior, and his commission of the alleged crime while on state probation.

Moreover, the passage of time has not presented any mitigating circumstances warranting the defendant's release.  Indeed, on September 29, 2020, in the context of denying the defendant's motion for reconsideration of the court's decision granting the Government's motion for excludable delay, the defense raised several challenges to the Government's evidence, but the Court ruled that "Defendant has not shown a changed circumstance that warrants his release before trial."  D.68.

2.    The Defendant Now Faces A Much Heavier Burden for Pre-Sentence Release

Under the Bail Reform Act of 1984, pre-*trial* detention is required if the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  The court must find either (1) by clear and convincing evidence, that the defendant is a danger to the community or (2) by a preponderance of the evidence, that the defendant poses a risk of flight.  18 U.S.C. § 3142(f).

To obtain pre-*sentence* detention, by contrast, the defendant faces a far heavier burden, since the presumption shifts from favoring release to favoring detention:

> Release or detention pending sentence.--(1) Except as provided in paragraph (2), the judicial officer *shall order* that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment,[2] *be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community* if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

18 U.S.C. § 3143(a).

The defendant, therefore, bears the burden to demonstrate that he should be released pursuant to these requirements. *See United States v. Bayko*, 774 F.2d 516, 520 (1st Cir. 1985). Further, a defendant "having been found guilty beyond a reasonable doubt at trial of felony crimes . . . has no substantive constitutional right to bail pending sentencing," and the Bail Reform Act of 1984 "creates no general expectation of post-verdict liberty. To the contrary, it establishes a presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 317, 319 (2nd Cir. 2004); *see United States v. Colon–Munoz*, 292 F.3d 18, 20 (1st Cir. 2002) (stating "[u]nder the Bail Reform Act of 1984, there is no presumption in favor of release pending appeal.").

As one court observed:

> [T]he legislative history includes two important findings upon which 18 U.S.C. § 3143 was based:
>
> 1. Once guilt of a crime has been established in a court of law, there is no reason to favor release pending imposition of sentence or

---

[2] Here, the defendant's Guideline contains a cross-reference, U.S.S.G. § 2B1.1(c)(2), that specifically pertains to arson and requires that the defendant be sentenced pursuant to the higher Guideline of §2K1.4: "If the offense involved arson, or property damage by use of explosives, apply §2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above." U.S.S.G. § 2B1.1(c)(2). That cross-reference yields an advisory sentencing Guidelines range of 63-78 months. *See* Exhibit 1 attached hereto.

appeal.  The conviction, ... is presumably correct in law.

2.  (R)elease of a criminal defendant into the community after conviction may undermine the deterrent effect of the criminal law, especially in those situations where an appeal of the conviction may drag on for many months or even years.

*United States v. Ross*, 730 F. Supp. 355, 356 (D. Kan. 1990).

Title 18, United States Code, Section 3142(g) outlines factors permitted to be considered by the judicial officer in determining whether to order pre-trial detention:

[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the judicial officer shall] take into account the available information concerning–

(1)    The nature and circumstances of the offense charged . . .;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including

(A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)    whether, at the time of the current offense or arrest, the person was on probation, on parole or on other release pending trial, sentencing, appeal, or completion of a sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . .

18 U.S.C. § 3142(g).

At a detention hearing, "the rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information . . . ."  18 U.S.C. § 3142(f).  Here,

the defendant should continue to be detained because he cannot establish that he is neither a risk of flight and a danger to the community, and all of the Section 3142(g) factors strongly favor detention.

> 3.       The Defendant Is Still Facing Trial on Two Serious, Dangerous Crimes

On October 15, 2020, the Grand Jury charged the defendant in a Superseding Indictment with three offenses related to the April 2, 2020 placement of a homemade incendiary device at the entrance to Jewish Geriatric Services Lifecare, Inc. ("JGS"), a non-profit organization located at 770 Converse Street in Longmeadow, Massachusetts. D.82. The first count charged the defendant with Attempt to Transport and Receive, and Transportation and Receipt of, an Explosive in violation of 18 U.S.C. §§ 844(d) and 2; the second count charged him with Attempt to Damage and Destroy Buildings, Vehicles, and Real and Personal Property by Fire and Explosive in violation of 18 U.S.C. §§ 844(i) and 2; and the third count charged him with False Statements To A Federal Official in violation of 18 U.S.C. § 1001. *Id.*

On November 18, 2020, at the close of the Government's case, the Court rejected the defendant's Rule 29 motion for a judgment of acquittal. D.185. On November 23, 2020, the jury convicted the defendant of that part of Count Three that alleged the defendant falsely stated that he had not left his house in the past two weeks because of the COVID-19 pandemic. D.192, 218. The jury deadlocked on the remaining two counts and the first alleged false statement in Count Three, and the Court declared a mistrial as to the remainder of the Superseding Indictment. *Id.* On November 25, 2020, the Court scheduled the defendant's re-trial for January 5, 2020, and on December 15, 2020, the Court rescheduled the re-trial until January 25, 2020. D.196, 222.

Because the defendant is still facing prosecution on these two serious and dangerous offenses, which formed the basis of the Complaint that was pending when the defendant first

6

sought pre-trial release (D.1), the Court's detention order should stand.

Further, the defendant now faces even less incentive to conform his behavior to ensure the safety of the community by, among other things, avoiding substance abuse. "The risk he now faces is much enhanced over that which he faced prior to trial or even prior to sentencing. He had, prior to trial, some level of belief that he would prevail at trial." *United States v. Kennedy*, 603 F.Supp. 936, 939 (D. Me. 1985). Now convicted, and still facing two even more serious charges, the defendant is more likely than ever to spiral out of control again.

4.    The Trial Confirmed The Court's Pre-trial Justifications For Detention

The trial confirmed that the Court correctly ordered the defendant detained. First, the trial established the seriousness of the offense and the weight of the Government's evidence, 18 U.S.C. §§ 3142(g)(1)-(2), in spite of the jury's inability to reach a unanimous verdict on Counts One and Two. The trial established that: (1) the homemade incendiary device was placed outside JGS on April 2; (2) the defendant's DNA was found on *both* pieces of the device (the fuel canister and the Christian proselytizing pamphlet); (3) the defendant had driven down Converse Street, right past JGS, on the morning the device was placed; (4) the device could have ignited and/or exploded; and (4) the device posed a very real danger to individuals and property alike.

Thus, the trial established (at least by probable cause) that the defendant – at the height of the COVID-19 pandemic, which was causing enormous harm to elder care facilities – placed a homemade firebomb  within feet of a commonly used pedestrian walkway and a busy thoroughfare in the heart of Longmeadow. The firebomb was lit, but fortunately failed to detonate when the pamphlet failed to burn into the gas canister.

Further, the trial established that the defendant lied to agents repeatedly – about his whereabouts on April 2, his own drug use, and his separation from work for theft – and so his

denials of involvement in the far more serious charged offenses should be viewed skeptically. In other words, "[d]efendant has a proclivity not to be truthful." *United States v. Hernandez-Albino*, Crim. No. 07-126 (DRD), 2008 WL 11385396, *7 (D.P.R. Jan. 25, 2008).

Second, the trial confirmed the defendant's extremely worrisome personal history and circumstances, 18 U.S.C. 3142(g)(3), since it established: (1) the defendant has suffered from substance abuse for nearly two decades, starting in his mid-teens and proceeding right up to April 2; (2) in the months and weeks prior to April 2, the defendant had been spiraling downward and was out of control; and (3) the defendant's life was highly unstable and marked by unemployment, depression, angry fights with his mother and daughter, and late-night forays to search for drugs in spite of the pandemic raging outside his home.

Indeed, even the defendant's mother conceded at trial that she was so concerned about the defendant's uncontrolled spiral that in a recorded conversation with him on May 2, 2020, she considered his pre-trial detention to be appropriate – in her own testimony, "we had concerns of his struggles and we thought a timeout was good." Transcript of Trial, November 19, 2020, at 30; *see id.* at 51 ("because he is in in jail, that it would help with his drug addiction.").

According to the defendant's own admissions at trial, he has a serious drug abuse problem involving heroin, cocaine, and other substances, and he used drugs as recently as the night before his arrest and in the period surrounding the charged offense. The defendant's longstanding drug use (about which he lied to agents) caused him, shortly before his arrest, to engage in a bizarre incident at a Chicopee motel in which he admitted that he was "out of my mind" on a variety of drugs. Moreover, on March 3, 2019 – a scant month before the defendant placed the device at JGS – the defendant was fired from his employment at All Energy Solar after he arrived at work intoxicated, was removed from a roof due to his condition, and drove dangerously in a work

vehicle.

His past conduct and criminal history include numerous CWOFs for felony offenses, including assault and battery and violations of restraining orders.  Moreover, "at the time of the current offense or arrest, the [defendant] was on probation," 18 U.S.C. § 3142(g)(3)(B), further indicating that he is likely to fail to comply with the Court's release restrictions.

For all of these reasons, the defendant's personal history and circumstances warrant continued detention.

> 5.      The Defendant's Disciplinary Violations at The Hampden Jail

The defendant's failure to abide by the rules at the Hampden Jail underscore the risk that the defendant poses if released.  First, on April 26, 2018, during a prior period of incarceration based upon the defendant's violation of the Abuse Prevention Act, the defendant tested positive for Suboxone.

During his current period of pre-trial detention, the defendant committed several other disciplinary violations.  On May 5, 2020, the defendant engaged in a fistfight with another inmate, and both were placed in Restrictive Housing.  On July 28, 2020,  correctional officers discovered that the defendant was attempting to make an alcoholic brew by fermenting apples in his toilet. . If the defendant is able to obtain illicit substances in jail, then he is even more likely to do so if released, with an ensuing risk to the community.

> 6.      The Defendant's Family Ties Are Insufficient To Justify His Release

The Government expects that the defense will seek to base its claim for release on the defendant's family ties, particularly the support of his parents.  See D.252 at 2 (noting that the defense has been consulting with the Probation Department regarding a potential release to his home).  Notably, his parents' support has failed to prevent him from committing his prior crimes,

continuing to abuse substances (even while living under their roof), and committing the offense in Count Three (as well as the alleged offenses in Counts One and Two).

The defendant's family ties are simply insufficient to establish, by clear and convincing evidence, that he does not pose a danger to the community. *See United States v. DiMauro*, 614 F.Supp. 461, 464 (D. Mass. 1985) (stating even though the defendant had appeared before the district court whenever requested to do so, was a long-time resident of the area approximately five miles from his childhood home and family, had significant family contacts with that area, his parents were willing to place bail liens on their real property to secure his release pending appeal, he had no record of felony convictions except that presently under appeal, he had previously satisfied a two-year probation, and had employment available to him as a roofer, the defendant failed to establish by clear and convincing evidence that he would not flee or pose a danger to the community if released pending appeal of his conviction).

7.      The Defendant's Release Endangers the Community

The defendant's release to his home, located just a few minutes' drive from where he placed the firebomb at Ruth's House, highlights "the nature and seriousness of the danger to any person or the community that would be posed by [his] release." 18 U.S.C. § 3142(g)(4). Notably, the release sought by the defendant effectively places the defendant back into the exact same circumstances under which he had been living at the time he committed this offense.

8.      The COVID-19 Pandemic Is Not a Basis for Release.

Lastly, the ongoing COVID-19 pandemic is not a basis for release and should not outweigh the overwhelming balance of the Section 3142(g) factors in favor of detention.[3]  The Hampden

---

[3] In addition to dangerousness, the defendant also poses a risk of flight.  The severity of punishment is a factor this Court must consider in assessing the defendant's risk of flight. *United States v. Castillo,* 878 F.2d 554 (1st Cir. 1989).  Given the weight of the evidence amassed against

County Jail and House of Correction (the "Jail"), where the defendant is detained, has established precautionary measures to help prevent the transmission of COVID-19, recently tested the defendant for COVID-19 and determined he was negative, and the defendant has "no co-morbidities that put [him] at increased risk of COVID-19 complications." Exhibit 1 (Affidavit of Sheriff Nick Cocci dated November 24, 2020) attached hereto. The Jail's precautionary measures include:

a.    requiring all staff and inmates to wear masks;

b.    screening every employee before their shift and sending anyone with symptoms home until they are cleared by medical staff;

c.    suspending all visits until with exceptions only for clergy or attorneys;

d.    quarantining all new arrivals for up to 14 days;

e.    isolating inmates who show symptoms of COVID-19;

f.    suspending property pick-ups until further notice; and

g.    discontinuing community service and inmate programs until further notice.

The Government is unaware of any indication from Hampden County House of Correction staff that at this time that the facility, even in light of the Covid-19 pandemic, is or would be unable to provide adequate medical care for the defendant - nor has the defense advanced any facts that would support this contention.

9.    Conclusion

For the preceding reasons, the Government respectfully requests that the defendant continue

---

him, the statutorily mandated incarceration period for violations of 18 U.S.C. § 844(i), and the defendant's advisory guidelines range, the defendant may well view flight as his only option to avoid a lengthy federal prison sentence.

to be detained pending his trial.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Steven H. Breslow*
STEVEN H. BRESLOW
(NY2915247)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
steve.breslow@usdoj.gov

By:    */s/ Neil L. Desroches*
NEIL L. DESROCHES
(MA661357)
Assistant U.S. Attorney
300 State Street, Suite 230
Springfield, MA 01105
(413) 785-0398
neil.desroches@usdoj.gov

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By:    */s/ Steven H. Breslow*
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated:  January 20, 2021

## AFFIDAVIT OF SHERIFF NICHOLAS COCCHI

I, Sheriff Nicholas Cocchi, Sheriff of Hampden County on oath depose and state as follows:

1.      I am the duly elected Sheriff of Hampden County in the Commonwealth of Massachusetts.

2.      At present, Massachusetts is operating under a State of Emergency regarding COVID-19.  In conjunction with the Governor's proclamation, the Hampden County Sheriff's Department ("HCSD") has been taking strong, proactive steps at all our facilities to ensure our work and living environments are safe for all employees and our justice involved population.

3.      Currently the population of our facilities is well below maximum capacity, allowing us plenty of space to house individuals and maintain social distancing practices.

## COVID-19  TESTING  LUDLOW FACILITY

4.  The HCSD is currently undergoing facility wide testing of staff and inmates.

## FACTS PERTINENT TO JOHN RATHBUN

5.  I have been advised by medical staff that upon review of Mr. Rathbun's medical record, there are no co –morbidities that put Mr. Rathbun at increased risk of COVID-19 complications.

6.  Mr. Rathbun has been tested for COVID-19 today and has tested negative.

## QUARRANTINE HOUSING UNITS

7.  While housed in the COVID positive quarantine housing unit, individuals are placed in a cell with no cellmate. They are served meals on Styrofoam trays with disposable utensils to avoid cross contamination. They are restricted to their cells and are only allowed out to use the shower and phones one at a time. After use of the showers and

1

phones, they are disinfected with Virex 256. Those who are housed in the quarantine pod are assessed daily by nursing staff. They have their temperatures checked and complete a COVID-19 screening to assess their current symptoms. The staff who work in this quarantine housing unit wear the appropriate personal protective equipment (PPE) to include an isolation mask or KN95 mask and gloves. They wear eye shields and gowns when close contact is necessary.

8. With input from our medical team under the leadership of Dr. Thomas Lincoln, and our Infectious Disease Nurse Stephanie Burgess, and in accordance with guidelines from the Department of Public Health (DPH), and the Center for Disease Control (CDC), the following precautionary measures, designed to limit access to our facilities and to reduce possible exposure to COVID-19, have been put into effect and will remain so until further notice:

## PRECAUTIONARY MEASURES TO PREVENT SPREAD OF VIRUS

### MASKS

a. Masks must be worn at all times by all staff and inmates unless the inmate is in the cell or staff members are in their offices alone.

### HOUSING

b. In order to avoid potential spread of the virus, every new arrival to our facility spends a total of 28 days in housing units separate from the general population and are screened daily for COVID-19 symptoms or concerns.

c. We have instituted aggressive testing policies and individuals in our custody are tested regularly.

d. To date, no one who has tested COVID-19 positive has had to be hospitalized.

2

e. Medical care is available seven days a week, 24 hours a day and COVID screening takes place daily.

## CLEANING AND SANITIZATION EFFORTS

f. All facilities have undergone a thorough deep-cleaning and these efforts continue daily on all three shifts at all locations. Efforts are focused not only on general access locations, but specific attention is given to areas such as door handles, countertops, light fixtures, and all other commonly used surfaces. All cells are deep cleaned and sanitized and no one is allowed to occupy the cell for 24 hours after this process is completed.

g. The Department has installed additional hand-sanitizing stations throughout all locations. Inmates have unlimited access to bars of soap and have been educated on proper hand-washing and personal hygiene techniques. Signage has been posted throughout our facilities with this information to keep these ideas fresh on everyone's mind.

h. The Department is ensuring it is well stocked with medical masks, gloves, gowns and protective eyewear for staff and our jail and house of corrections populations when necessary. Cleaning supplies remain at sufficient levels while an inventory for all needs is conducted and updated daily.

i. All transportation vehicles are sanitized after each use, and the interior of every department vehicle has been sanitized.

## VISITING POLICY CHANGES

i. All general public visitation has been suspended at all Hampden County facilities. No tours are allowed. Access to telephones has

3

been expanded to offset the temporary loss of visits, and our population now receives 2 hours of free phone calls per week. Our population also receives 3 free envelopes per week to send letters to their loved ones. Additionally, we are providing video visitation for some of our population. We are currently working on expanding the technology and infrastructure with the goal of providing this option to everyone as soon as possible.

j. Attorney visits are non-contact only. Attorneys are screened by our staff and are required to wear a mask before entering any facility.

k. In an effort to reduce attorney visits where possible, we have developed a system whereby attorneys can send emails to specific staff members in order to set up specific times for phone calls with their clients.

l. There will be no property pick-ups until further notice. The regular 30 day time limit to pick up property will be extended. Individuals will be able to pick up property within 60 days from the time property pick up resumes.

m. All volunteer visits of any type have been suspended

## PROGRAMMING

n. All programming, via outside vendors/volunteers, at all locations has been suspended until further notice. However, trained Sheriff's department staff continue to provide programs

4

while ensuring social distancing is being practiced.  Examples of programming include but are not limited to:

o.  Victim Impact, Relapse Prevention Strategies, Parenting Skills, Life Skills, Anger Management, High Risk Offender Engagements, Relationships and Family, Cognitive Thinking, Peer to Peer led groups, Domestic Violence, Self Help Strategies, Violence Prevention, Dialectical Behavioral Therapy Groups, Release Planning, Creative Writing, Healthy Communication, Understanding Grief, and Mindfulness

p.  Counseling and treatment for substance abuse and mental illness continues.

q.  The Inmate Work Release Program has been suspended until further notice.

## SCREENING/MEDICAL

r.  Medication Assisted Treatment (MAT) will continue for eligible inmates per Department policy.

s.  There has been no disruption of routine medical care for the population

t.  All mental health screening, referrals, evaluations and support continue without interruption.

u.  We are currently using telemedicine to connect our population to outside medical consultations when necessary.

v.  The Evaluation and Stabilization Unit (ESU) remains open and

5

fully operational for mental health treatment and support.

w. Day Reporting participants continue to reside at home or in a program on day reporting status.

x. We have implemented enhanced screening processes at our Intake/Discharge Department to help detect potential signs of COVID-19. Our medical department, led by Doctor Thomas Lincoln and Infectious Disease Nurse Stephanie Burgess, have worked closely with our staff to train them to recognize concerning signs and symptoms. Inmates presenting with symptoms of COVID-19 are immediately referred to additional medical screening.

y. If, after medical screening, there is a concern that the patient is exhibiting signs and or symptoms indicative of potential infection by COVID-19 virus, those individuals are placed in single cells in a specialized medical quarantine area for further monitoring and observation.

z. We have thoroughly educated our staff, as well as our inmates, on Massachusetts (DPH) and (CDC) guidelines in this regard. All staff were required to participate in a mandatory training that addresses the issue of prevention and spread of COVID-19. These trainings have been offered electronically to all staff.

aa. Employees coming to work are asked a specific set of questions regarding their well-being upon arrival and questions about recent travel by them or their household members. In addition,

6

medical staff takes employee and staff body temperatures to screen for fever prior to their entrance into the facilities.

bb. Employees have been educated that if they are sick with a fever or have flu-like symptoms such as cough, sore throat, or shortness of breath, they should not report to work and they are instructed to contact their supervisor to report symptoms and to consult their doctor.

cc. If an employee is sent home with concerning symptoms, they must follow a medical screening process in order to return to work. Employees who have family members who have travelled to high risk areas, or are exhibiting signs and symptoms of the virus have been asked to stay at home until they are medically cleared to return to work.

dd. Our inmate population have also been educated with regard to recognizing symptoms of COVID-19 and have been encouraged to request health care services if symptoms present.

ee. Our medical staff is conducting in person screening of our population in all areas that have had no outside exposure to the virus.

ff. We have set up a COVID-19 mailbox as a platform to receive and respond to all employee and staff inquiries on safety, health, and disease prevention.

## EMERGENCY MANAGEMENT PREPARATIONS

7

gg. We have created a Command Response Team to help focus on our continued preparedness and readiness to deal with this pandemic. The team is in constant communication with federal, state, and local health care authorities as well as other resources. This team allows us to have a centralized command to oversee and coordinate a Department-wide safe and effective response.

hh. The Command Response Team and the Sheriff and his Superintendent have daily telephone conferences with the Medical and Health Services Team, the department's Health and Safety Officer, and department's staff from Human Resources, Housing Unit Directors, Food Services, Transportation, Warehouse and Supplies, Purchasing, Information Systems and Technology, Standards, Compliance, and Legal.

ii. Two department staff members report to the regional MEMA Command Center in Agawam Massachusetts on a daily basis to provide assistance and obtain updates and critical supplies.

9. I recognize that this virus has a mind of its own, and this pandemic is like nothing most of us have seen in our lifetimes. Things are constantly evolving, and I know we will be faced with new challenges each day and the way in which we respond to those challenges will always be with the health and safety of our population, staff, and the citizens of Hampden County in mind.

10. Hampden County Sheriff's Department will continue to monitor this crisis in partnership with our federal, state, and local partners focusing on best practices in

8

health care and corrections for the health and safety of all who work or reside in our facilities.

The facts recited herein are based upon my personal knowledge.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24th

DAY OF *November* 2020.

Nicholas Cocchi
Hampden County Sheriff

9