UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )              20cr30018-MGM
     vs                   )
                          )              June 11, 2021
Jonathan Rathbun         )
_____)


**EXCERPT** OF TRIAL HELD BEFORE

THE HONORABLE MARK G. MASTROIANNI


APPEARANCES:


On behalf of the government:  Steven H. Breslow and Neil Desroches, Assistant United States Attorneys, 300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq. and Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

INDEX

Witness:                                                          Page:


Direct examination by Attorney Watkins                              3

Cross-examination by Attorney Breslow                             74



Exhibit No.          Description                              Page


2    Bank statement from Bank of America                     55

**(Excerpt from 6-11-21 trial testimony.)**

**(The jury entered at 12:31.)**

THE COURT:  Okay.  Everyone can be seated.

Was everyone able to follow all of my instructions specifically not talking to each other about the case, all the instructions?

Okay.  Affirmative answer from all the members of the jury.  They remain fair and impartial.

ATTORNEY WATKINS:  Your Honor, the defense calls John Rathbun.

THE CLERK:  Mr. Rathbun, raise your right hand.

**John Rathbun (sworn)**

**DIRECT EXAMINATION**

Q.    (By Attorney Watkins) Mr. Rathbun, can you please introduce yourself to the jury and spell your last name?

A.    Good morning.  My name is John Rathbun; last name R-a-t-h-b-u-n.

Q.    Mr. Rathbun, how old are you?

A.    I am 38.

Q.    Where do you currently live?

A.    Right now I'm at Opportunity House in Springfield.

Q.    What is Opportunity House?

A.    Opportunity House is a drug and alcohol rehabilitation program, sort of like a halfway house.

Q.   Before you were at Opportunity House, were you in jail?

A.   I was for one year in jail.

Q.   I want to turn -- where were you born?

A.   I was born in Springfield, Massachusetts.

Q.   And where were you living?  Where was your family living when you were born?

A.   We were living in Springfield when I was born.

Q.   Did you move to East Longmeadow at some point?

A.   Yes, we did.  When I was in about the fifth or sixth grade, we moved to East Longmeadow.

Q.   Describe your childhood.

A.   I had a good childhood.  I was brought up right. Like my mom had stated, I was born on Saturday, in church on Sunday type of thing.  I was raised right and wrong.  I had a good upbringing.

Q.   Where did you start elementary school?

A.   I was -- first I went to a Christian school.  I went to I believe it was called Baptist Christian Academy.

Q.   And where was Baptist Christian Academy located?

A.   That was in East Longmeadow, Massachusetts.

Q.   And what grade do you attend the Christian school?

A.   Up until fifth grade I was in Christian school.

Q.   Where did you begin school when you left the Baptist school?

A.    Well, we moved to East Longmeadow from Springfield so then I went to Birchland Park Middle School.

Q.    Were there difficulties in the transition?

A.    Yes.  There was very -- it was very difficult for me. In East Longmeadow by the sixth grade everybody has their clicks and their friends and I was the new guy so it was difficult for me to make friends.  It was difficult for me to find my place.

Q.    Did you nevertheless continue to practice Saturday/Sunday church going?

A.    When I was in Birchland, sixth grade you're saying?

Q.    I'm sorry?

A.    Are you asking when I was in Birchland --

Q.    Yes.

A.    -- when I was in sixth grade?

      I was still involved in church but maybe not as much as I was earlier.  I'd go to Wednesday night youth group.

Q.    Where did you go to high school?

A.    I went to East Longmeadow High School.

Q.    And by then, what was your church life like?

A.    I pretty much have stopped going to church by then when I was in high school.

Q.    Why was that?

A.    I had started using drugs at that time and I just had a real disinterest in going to church.  I felt bad that I

was living the life that I was living and then trying to go to church and be this holly person when I wasn't.

Q. I'm going to slow down a little bit there.

First when you went to high school, living at 20 Lori Lane?

A. Yes.

Q. And who was living there at that time?

A. At that time it was me, my brother Paul, and my mom and my dad.

Q. Did you consider yourself a Christian family?

A. We did.

Q. And that was all of you, your parents and your brother?

A. Yes.

Q. You were the -- were you older or younger than your brother Paul?

A. I was the older brother.

Q. We're starting to talk about school. How was high school for you?

A. High school was I mean difficult also. I'm more of a learner by doing. I don't really do well with books, booksmarts. Plus it was also when I started my drug use.

Q. What kind of student were you in high school?

A. I was not a good student in high school.

Q. Did you discover romance while you were in high

school?

ATTORNEY BRESLOW:  Your Honor, may we be heard?

(Sidebar conference.)

ATTORNEY BRESLOW:  So I'm not objecting to the question but in the last trial Mr. Watkins elicited testimony that a particular woman, Mary Diaz, the mother of Natalie Rathbun who was in court just the other day, had premarital teenage sex with the defendant and that she, like him, ended up addicted to heroin.

I'm asking the court to direct counsel not to elicit testimony concerning the name Mary Diaz and her drug addiction and even the fact that she and he engaged in premarital sex.  None of this is relevant and it's extremely unfair to her.

THE COURT:  Can you stay away from use of names?

ATTORNEY WATKINS:  Yes.

ATTORNEY BRESLOW:  Additionally there's no reason for him to elicit testimony that she herself had a heroin addiction.  It's just not relevant.

THE COURT:  Fair enough, but I mean you can ask general questions of were you hanging around with people who also used without mentioning her name.

ATTORNEY BRESLOW:  That's fine.

THE COURT:  Okay.

(End of sidebar conference.)

Q.    (By Attorney Watkins) Did you discover romance while you were in high school?

A.    I did.

Q.    Did you also discover drugs while you were in high school?

A.    I did.

Q.    Let's talk about the drug issue first.

When did you begin using illegal drugs?

A.    Probably about seventh or eighth grade.

Q.    And how did you come to start to using illegal drugs?

A.    I started to with marijuana when I was in seventh or eighth grade and alcohol.

Q.    Was there a point at which your substance abuse escalated, you found new drugs?

A.    Yes.

Q.    How old were you then?

A.    That was in high school.  I was probably 16 at the time.

Q.    And what happened then?  How did your drug use develop?

A.    Well, my father was prescribed oxycontin.  He had a severe back injury and over the years he had built up from, you know, 20s to 40s to 80 milligram pills, and I didn't know what they were at the time but I know he took medication for pain so I starting taking them.

Q.    Were you taking them for pain?

A.    No, sir.

Q.    Why were you taking them?

A.    For pleasure.

Q.    How did they make you feel?

A.    Great.

Q.    Did your father know that you were using his pain medication?

A.    Eventually, yes.

Q.    When say eventually, tell us about that.  How did that come about?

A.    So at first he didn't notice because he was still taking the prescribed amount but as his habit grew too, he would take more than what was prescribed.  So plus what I was taking, he would run out of his prescription.  Every two weeks he would run out on that you know Monday or Tuesday.

Q.    So was it the case that you had both become addicted to pain medication?

A.    Yes, sir.

Q.    Did your father, for example, continue to take pain medications?

A.    He did.

Q.    And did the two of you discuss your addiction to pain medication?

A.   We did.

Q.   Going to romance, did you develop a relationship in high school?

A.   I did.

Q.   And without saying the name of the person with whom you developed the relationship with, was sex involved?

A.   Yes, sir.

Q.   And we heard from Natalie, your daughter.  Is your daughter Natalie the result of this relationship you had in high school?

A.   Yes.  That's my beautiful daughter Natalie.

Q.   How old were you when Natalie was born?

A.   I believe I was 17.

Q.   And were you still in high school?

A.   By then I had dropped out.

Q.   What were you doing once you dropped out of high school?

A.   I went to work so I could provide for Natalie.

Q.   And at that point were you struggling with substance abuse issues?

A.   I was, yes, sir.

Q.   Which issue was it at that time when you were 17?

A.   I was still doing pills at that time.

Q.   And when you say dope, what are you referring to specifically?

A.   Oxycontin, pills.

Q.   Oh, you said pills?  Oxycontin pills?

A.   Yes, I said that.  I was still on pills.

Q.   And how long when Natalie was born, how long had you been taking Oxycontins?

A.   From start to when she was born?  I mean, I think it was about three, four years.

Q.   And during that same time did you begin hanging out with a particular kind of crowd?

A.   I did.  Again when I was in Birchland in the eighth grade, I became friends with I guess you call them the "bad" crowd.  You know, the ones who'd skip school and did drugs.

Q.   Was Natalie's mother likewise in that circle of people that were with the bad crowd?

A.   She was.

Q.   Before you left school to go to work, how were you doing in school?

A.   Not good.

Q.   Did you leave voluntarily or were you asked to leave?

A.   I was asked to leave.

Q.   And how long before Natalie was born was that?

A.   That was right when Natalie was born.

Q.   Once Natalie was born, did you and her mother live together?

A.   We did.  She moved in with me, yes.

Q.   And when you say she moved in with you, she actually moved into Lori lane?

A.   That is correct.

Q.   So who was living in Lori Lane at that time when Natalie was born?

A.   So it was me, my baby's mother, Natalie, my mother, my father, and Paul my brother.

Q.   What kind of work were you doing?

A.   I was doing at the time I started a tree working job.

Q.   Going back to your faith life, at that point were you involved with the church?

A.   No.  At this time I wasn't involved at all with church.

Q.   Why not?

A.   I mean the life I was living, I had a baby out of wedlock.  I was addicted to drugs.  I just felt like a hypocrite going to church.

Q.   Since your exit from the church back then, how often have you resumed your faith going to church?  Well, just more generally, what has your relationship with your faith and church been since then?

A.   My faith itself I do pray still but I would only go to church maybe Easter Sunday or very rarely when my mom really wanted me to go there for a special event or

something.

Q. Were there periods of time when you started attending church more regularly ever in your life after that?

A. There were a couple of times when I got sober for two or three years that I was involved with church more, yes.

Q. And in those periods which church would you attend?

A. Heritage Baptist Church.

Q. When was the last time that you had that kind of period of sobriety where you regularly attended church?

A. It's been a good 10, 15 years, maybe more.

Q. So at age 20, how would you describe your substance abuse?

A. That's when it got bad. My father got off the pain medication and he got cleaned. He went to Brattleboro Retreat but I was still using and that's when I was introduced to heroin.

Q. Were you using both Oxycontin and heroin in your early 20s?

A. At first a little bit but not really. Pills are very expensive on the street.

Q. Since that time in the early 20s, have you ever been able to concur your substance abuse issues?

A. Like I said, the most I've had clean time from 20 to 38 now is probably two or three years.

Q. In recent years what are your drugs of choice?

A.    So heroin, cocaine, crack cocaine, benzodiazepines, like Xanax and alcohol.

Q.    How has your addiction impacted your overall physical health?

A.    It's definitely done its damage.  I was -- I started -- when I first used heroin, I was sniffing it but then eventually I started to use needles and it's caused severe problems with my veins.  My health has definitely been affected.

Q.    What about relationships over the years, how has your substance abuse impacted that?

A.    I have ruined multiple relationships both with women and in jobs.  I've just -- it's kind of an ongoing cycle.

Q.    Natalie has always lived with you and your family?

A.    Yeah.  Yes, sir.

Q.    There have been periods of time where -- long periods of time where you've moved out of 20 Lori Lane?

A.    Yes.

Q.    Did Natalie stay at 20 Lori Lane when you moved out?

A.    Yes, that is correct.  That's where she felt most comfortable and I didn't want to move her from that.

Q.    What about her mother?  Would she be spending time with her mother in her childhood?

A.    She would.  Her and her mom have had a tough relationship though over the years.  It was -- she

wouldn't go over there at all some times and then she would once in a while.

ATTORNEY BRESLOW:  May we be heard?

THE COURT:  Let's just move on from this.

Q.  (By Attorney Watkins) Do you think your substance abuse disorder has affected your relationship with your daughter?

A.  Unfortunately it has severely.

Q.  When you say that, what do you mean?

A.  I mean as a dad I, you know, I would be there for volleyball games and I would be there for her but I probably would be under the influence.  You know, I was more of a friend probably than a dad to her, you know, and it has hurt our relationship severely.

Q.  You talked about the program you're in.  Do you get counseling through that program?

A.  I have three different counselors that I get counseling from.

Q.  Do you also get medication for your substance abuse?

A.  I do.

Q.  And what medication do you get for your substance abuse?

A.  I'm on Methadone.

Q.  How long have you been on Methadone?

A.  I've been on Methadone now for about three years.

I'm in the process of tapering down and getting off of it.

Q.   What is the purpose of taking Methadone?

A.   So taking Methadone it helps you to be able to get stable and not having to try to get drugs every day so that you're not sick.  Methadone just makes it so that you're able to still function and start to put your life back to together.

Q.   You described a lot of drugs that you've taken in recent years.  Does Methadone help you with the cravings for those drugs?

A.   It does, yes, sir.

Q.   Or is it more specifically to a particular drug?

A.   It's more designed specifically for heroin or pills withdrawal.  That's what it's designed for.

Q.   And when you take Methadone, does that work to stop your craving for heroin?

A.   Yes, it does.

Q.   Over the years that you've been taking Methadone, do you still do heroin?

A.   Sometimes, yes.  Yes, you still can.  I still fight the demeans of my addiction, yes.

Q.   So I want to move forward to 2017 about four years ago.

     Did you move into your -- back into your parents' house at 20 Lori Lane?

A.    Yes, I did.

Q.    And was that the result of one of the relationships that had gone sour because of your substance abuse?

A.    That is correct.

Q.    So how old were you in 2017 when you moved back into your home?

A.    I was probably in my late 20s.

Q.    In 2017?

A.    No, early 30s.  I'm sorry, I'm not good with math.

Q.    And this was in the home you grew up in?

A.    2017, yeah, I was in my 30s.  I'm sorry, could you repeat the question?

Q.    I was asking, so in your 30s you were moving back into the home that you had grown up in?

A.    Unfortunately, yes.

Q.    What were you doing during this period of time when you moved back into your parents' home in 2017?

A.    I was still working.  I had jobs that I would do and I still had a serious drug problem.

Q.    Let's talk about the work you were doing first.  Were you self-employed or employed by companies?

A.    I have a self --

        ATTORNEY BRESLOW:  Your Honor, may we be heard?

(Sidebar conference.)

        ATTORNEY BRESLOW:  So this is the first

objection that I'm going to be making.  It's been about maybe 25 --

ATTORNEY WATKINS:  Hold on.

Thank you.

ATTORNEY BRESLOW:  This is the first objection that I'm making formally based on relevance.  It been about 25 minutes or so and we've heard about his birth, his elementary, his middle school, his high school, and some of the background is appropriate but I think this exceeds that.  It's just too much biography.

I think frankly that Mr. Watkins is attempting to use the defendant's biography to establish some connection with the jury that's not relevant to this trial, and so I would just ask Mr. Watkins to move on.

ATTORNEY WATKINS:  I'm moving right along.

THE COURT:  All right.  You do need to start moving closer to the points.  I mean, I think you can -- it's fair to develop the historical information absolutely and you can develop a little more, but let's just keep going.

ATTORNEY WATKINS:  Thank you.

(End of sidebar conference.)

Q.   (By Attorney Watkins) So moving back into your home, I think you were about to tell us the kind of jobs you were working during that period?

A.    Yes, sir.  I've always had a business, JMR Construction, which I'm self-employed with to do side jobs and clean out jobs and stuff, but I've also worked for companies during that time also.

Q.    So what kind of skills do you have that you use in your work?

A.    I went to electrical school.  I did my four years for electrician.  I've probably been doing that for a good six, seven years.  I also have a carpentry background, a maintenance background.  Anything soup to nuts in a house I can pretty much do.

Q.    During this period of time, talking now 2017 up to recent times, were you also struggling with addiction?

A.    I was, absolutely.

Q.    And what drugs were you doing when you returned back to your parents' house in 2017?

A.    Not so much heroin, maybe once in a while heroin but more turned into a cocaine habit.

Q.    And were there other drugs of those drugs of choice you mentioned that you were doing?

A.    Yes, sir, the benzos, Xanax, alcohol.

Q.    While you were doing particularly heroin or Methadone, how were you able to work?

A.    I'm a functioning addict.  I try not to use too much during the day.  I try to keep it on the lower side so I

can still work.

Q.   Did you have long-term employment during any time during that period of 2017 to present?

A.   No.  The most permanent job I had was maybe a year.

Q.   I want to fast forward now to February of 2019 about two years ago.

Did you go to work installing solar panels?

A.   I did.  I worked for All Energy Solar in Chicopee.

Q.   And when did you start working for All Energy?

A.   I'd say early 2019.

Q.   And did you actually work for them for two discrete time periods?

A.   I did.  I worked for them for about eight or nine months, and then a friend of mine started an electrical business and I helped him get that started but it fell apart.  He was a very poor manager.  He was very bad with time management on the jobs so I went back to All Energy.

Q.   You were able to -- they took you back obviously at All Energy?

A.   Yes, they did.

Q.   When was that?

A.   That was early 2020.

Q.   Talk to us about your drug use during this period, the two times you were working for All Energy Solar and then the break in between.

A.    My drug use was still pretty, pretty there.  I was starting to use crack cocaine a lot, alcohol, heroin once in a while.

Q.    Over the 18 years or more that you've struggled with substance abuse, is it a steady kind of abuse or does your abuse go up and down in some ways?

A.    It definitely goes up and down.  A lot of it depends on how much money I have, what's going on in my life at the time.

Q.    So if you have a good job, you're doing a lot of drugs?

A.    Yeah, but it depends.  So like I would work for All Energy and I would get paid every two weeks, so that weekend when I got paid Friday, Saturday, and Sunday, I would splurge.  I would go to the casino, blow a lot of money, buy a lot of drugs.

Q.    And what about during the week while you're working with All Energy Solar, would you do drugs during the week?

A.    I would.  I still would but not as much because financially it didn't work out and also I still had a conscience.  I mean, I was up on roofs.  I really didn't want to be too messed up on top of roofs.

Q.    Did you like the work -- describe the work you were doing for All Energy Solar.

A.    So I would be up on the roof installing the tracks

and installing the panels and, yes, I enjoyed the work a lot. I enjoyed it.

Q. Did it pay pretty well?

A. It paid pretty well, yes, sir.

Q. Did you have any kind of remorse about your substance abuse during this period of time?

A. I definitely had some depression. You know, I mean it's just a never-ending cycle of, you know, continuing to use drugs, continuing to lose jobs, continuing to lose relationships, very depressed.

Q. And did you try to get any kind of treatment during this period of time?

A. No.

Q. Why not?

A. I still enjoyed using. My addiction is very strong. It's very difficult to make the choice to get clean and stay clean and be into it and put time into it and do everything you can to stay clean.

Q. How long have you been clean now?

A. I've been clean over about 14 months now. I feel good.

Q. I want to turn now to a time early in 2020, around the time the pandemic started.

Was there a change in the level of your drug use during that period of time?

A.    I was -- yeah, I mean, again I was still using crack cocaine more frequently and not really as much heroin but alcohol.

Q.    Did your drug use begin to interfere with your work --

A.    It did.

Q.    -- at All Energy Solar?

A.    It absolutely did.  At All Energy it got more frequent.  I would take -- started taking Xanax too which is not good.  Every time I'd take Xanax, it leads to car accidents and not good stuff.

Q.    And so what happened at All Energy Solar that you ended up losing that job?

A.    So one day I had taken a couple of Xanax at work during the day and I had to drive the company truck home, and on the way home I was driving very erratically going up on curves, running red lights, and so I had a bunch of people call into the company and say that I was driving erratically.

Q.    When you got back to the All Energy Solar office, who did you see there?

A.    I saw the branch manger.  His name is Alfie.  He was here earlier.

Q.    And tell us about the discussion that you had with him at the end of the day.

A.    So he came out and, first of all, he asked where I was because from the time of -- the job was only half an hour away and I was gone for three hours and so he asked where I had been.  I told him I had fallen asleep in my car and he said you look, you look like a mess.

Well, first he told me about the phone calls and then he said look a mess.  And I said, I'm fine.  There's nothing wrong.  You want to smell my breath?  That was about the exchange.

Q.    Did you deny that you had been using drugs?

A.    I did at that time.  I did not admit to him that I had used drugs.

Q.    And why was that?  Why did you deny that to him?

A.    I enjoyed the job.  It's an embarrassing thing.  It's not something you just come out and brag about or talk about or admit to something.  It's a hard thing to do.

Q.    Notwithstanding your denial that you were doing drugs, did you expect that you were going to keep that job?

A.    By the way Alfie talked to me that day, I did not think I was going to have a job anymore.

Q.    So as a result of that, what did you do that day?

A.    So as a result of that I took my tools out of the back of the truck, put them in my car, and was on my way.

Q.    What did you do that night?

A.    That night I rented a hotel room, got a good massive amount of drugs and invited Dana to come with me.

Q.    How did you know Dana Graham at that point?

A.    I met her through a mutual friend of mine.  His name is Glenn Miliken.

Q.    What kind of drugs were you using?

A.    That night I used heroin, powder cocaine, crack cocaine, alcohol, and benzos.

Q.    Why did you go to the hotel to start using drugs after you just lost your job?

A.    That's what I do, just to numb the pain.  I don't want to accept the reality of, you know, me messing up again; losing another job because of my substance abuse so I just wanted to get messed up as possible.

Q.    How long did you party for that night?

A.    All night.  From you know six, 7 o'clock on to the early morning.

Q.    We've heard and you heard testimony about the police being called.  Do you recall that?

A.    I do.

Q.    Is that accurate what happened?

A.    Yes, for the most part.  Yes, it is accurate.

Q.    What were you feeling while those events were going on?

A.    I'm sorry?

Q.   What were you experiencing?  What was going through your mind when you called the police?

A.   I thought there was somebody breaking into my car.

Q.   And did you go out and talk to the police?

A.   I did go out and talk to the police, yes.

Q.   When you went out there, how many police were there?

A.   There must have been six, seven cruisers.

Q.   And we heard the police officer.  Do you remember talking to him?

A.   I do remember talking to him, yes.

Q.   What did you do after the police -- you were done talking to the police?

A.   I just went back up to my room and continued to use.

Q.   Was Dana Graham still there?

A.   She was.

Q.   Did you go back to All Energy Solar at some point after that?

A.   I did.  The next day I went back in and talked to Alfie the branch manager and Chris Myerhoff.  He's my immediate supervisor, and I just laid it on the table and was honest with them and told them what happened.

Q.   Did you tell them that you had been using drugs?

A.   I did.  I told them that I was using -- I took a couple of benzos that day, Xanax, is what I told them.

Q.   Why did you think it was important to tell them that?

A.   They were very good to me.  It's just the right thing to do.  It was the -- you know, you got to admit to your wrongs when you do something wrong like that.

Q.   So you were living at 20 Lori Lane on March 3rd, right?

A.   Correct.

Q.   So after the partying, after you went to AES Solar, what were your plans as you were sitting at 20 Lori Lane?

A.   I really didn't have much plans.  I was very depressed.  Just like I said, the same cycle over and over again.

Q.   Were you contemplating suicide?

A.   I was not contemplating suicide, no.

Q.   Were you contemplating doing violence?

A.   No, absolutely not.

Q.   Did you consider getting help to address your drug addiction?

A.   I did not.

Q.   Were you particularly proud of where your life was at that point?

A.   I was far from proud.

Q.   Now, is this the first time in your life that you've been at this kind of situation where drugs had brought you so low?

A.   Absolutely not.

Q.   How many times over your course of 18 years that your drug use had gotten to this point?

A.   I can't even count.  A lot.

Q.   So this was not a particularly new experience you were feeling?

A.   No, sir.

Q.   We have heard about arguments with Natalie and your mother.  Were these specific to this period of time?  I'm talking about from March to April of 2020.

A.   They were.  I was very agitated.

Q.   More so than unusual?

A.   Yes, sir.

Q.   And why was that?

A.   Between my drug use, losing another job, where my life was at this point at 37 years old, still living at my parents' house.  My relationship with my daughter was not good.  I was unemployed.  It was very sad and depressing.

Q.   The pandemic was underway by the time you lost your job at All Energy?

A.   Yes, sir.  The pandemic was just kind of starting, yes.

Q.   Were you trying to look for work during that period of time?

A.   After my job at All Energy I did look for more work, yes.

Q.    I'm sorry?

A.    After my job at All Energy when I got fired, I did look for work after, yes.

Q.    Talking about the arguments that you had, were these physical arguments you would have with your mother and your father or your daughter?

A.    No, never.

Q.    Would you make up afterwards after these arguments?

A.    We would.

Q.    Were you happy about seeing Natalie have to testify here in court?

A.    No.  That was very difficult for me.  The same thing with my mother, it broke my heart.

        ATTORNEY BRESLOW:  Your Honor, objection; move to strike.

        THE COURT:  Sustained; move strike  That is completely stricken, the answer and the question.

Q.    (By Attorney Watkins) Did you continue to use drugs during this period?

A.    I did.

Q.    You talked about some of the odd jobs you did.  Was there a longer term job that you did during this period of time?

A.    Kind of.  It was a couple weeks.  My buddy had a place in Palmer he was renovating.  He gave me a little

Case 3:20-cr-30018-MGM    Document 353    Filed 11/22/21    Page 30 of 120

30

bit of electrical work and carpentry work.

Q.   And how long did that last for?

A.   Just a couple of weeks.  This is when the pandemic was getting bad.  We would listen to it during lunchtime on the news and stuff and that's pretty much he just called the job off.  Let's go home to our families and stuff.

Q.   The money you were making from that job, where would it go?

A.   To food, gas, and drugs.

Q.   What kinds of other activities were you doing during this time as the pandemic started to grow?

A.   I started -- I was doing clean out jobs, dumpster diving, stuff like that.

Q.   Let's talk about dumpster diving.

     What do you mean in this context, dumpster diving?

A.   So say Home Depot or Costco or electronic stores, I would go dumpster diving for anything good that was in there, scrape metal, anything.

Q.   And what was the purpose of dumpster diving?

A.   Pretty much to make money and also when you use cocaine or crack, you're energetic.  It gives me something to do.

Q.   And you started to talk about clean outs.  Describe what you mean by a clean out?

A.   So a clean out is I'd get in touch with a customer on one of my different apps or website and I ask them what they have.  They will take pictures of their back yard or whatever they have for trash that needs to be removed. I'll give them an estimate and they decide if they want it or not.

Q.   Were you able to get a fair amount of work doing clean outs?

A.   I did.

Q.   Over the course of your entire lifetime, how many clean out jobs have you gotten?

ATTORNEY BRESLOW:  Objection, Your Honor, to the preface over the course of the entire lifetime.

THE COURT:  Overruled.

THE WITNESS:  Twenty to 30 maybe.

Q.   (By Attorney Watkins) And how was it that you could be successful in getting a lot of these clean out jobs?

THE COURT:  We're going to take a break for lunch.  The lunch is here for jurors and then, Attorney Watkins, you're going to be directed to move into areas of more relevance to the crimes at bar here.  All right?

ATTORNEY WATKINS:  Yes.

THE CLERK:  All rise.

THE COURT:  All right.  Lunch is here.  Do not discuss this case with each other and all the other

instructions apply.  All right, everyone, thank you.

**(The jury left the courtroom at 1:11.)**

THE COURT:  All set.  So two o'clock.

**(A recess was taken at 1:12 until 2:02.)**

THE COURT:  Did everyone follow my instructions not to talk to each other or anyone about the case, as well as all the other instructions?  All right.

Affirmative answer by every juror; they remain fair and impartial.  Okay.  You can continue.

ATTORNEY WATKINS:  Thank you, Your Honor.

Q.  (By Attorney Watkins)  John, I want to talk about the early morning of April 2nd.  First, I want to start from the night before April 1st.

Were you using drugs starting on the night of April 1st?

A.  I was.

Q.  And what kind of drugs were you using?

A.  I was using crack --

THE CLERK:  Sorry.  The volume was off.

THE WITNESS:  Could you repeat the questions again?

Q.  (By Attorney Watkins) What drugs were you using on the night of April 1st?

A.  I was using cocaine, crack cocaine.

Q.  And any other drugs that night?

A.    I don't believe so.

Q.    What time do you start using cocaine, crack cocaine on April 1st?

A.    It was in the late evening.

Q.    And typically when you're using crack cocaine, how does it work?  Do you use it all at one time or is it a different method?

A.    I usually take a hit maybe every 20 minutes, half hour.

Q.    Do you ever save some crack cocaine for later or does it get consumed?

A.    It all gets consumed but like I said, I'll take a hit every half hour or so.

Q.    Where did you get that crack cocaine on April 1st?

A.    I believe Devin Austin.

Q.    And how much did you have?

A.    That night I probably had a 40 piece.

Q.    I want to go to what's been previously admitted as Exhibit 52.  I'm going to go through -- I'm going to blow this up so we can see it a little bit.

      Are you able to see Exhibit 52 up on your screen?

A.    No.

Q.    Now what do you recognize --

          THE CLERK:  There it is.

          THE WITNESS:  Now I can.

ATTORNEY WATKINS:  I'm sorry.

THE CLERK:  Is it for everyone?

ATTORNEY WATKINS:  Yes.

Q.   (By Attorney Watkins) John, what do you recognize this to be?

A.   I believe that's my outgoing calls on April 2nd in the late evening.

Q.   Does it also -- well, we're talking about April 2nd now.  Do you see the time here?

A.   I do see the time, April 2nd, 12:08 a.m.

Q.   Does this also include some web searching activities you did?

A.   There is some, yep.  Yes, sir.  There's some cookies there, log entries, call logs, searched items.

Q.   So what were you doing during this period of time while you're on your phone?

A.   So I was high on crack cocaine and I was searching through my phone playing with stuff.

Q.   When you say searching through your phone, what kinds of things were you doing on your phone?

A.   I look at -- I play on Facebook.  I look on HomeDepot app; look at tools.  I search for jobs.

Q.   Were you doing -- and where were you while you're doing all of this?

A.   I was at home.

Q.   When you say at home, were you in your living room or someplace else?

A.   I was in my bedroom at 20 Lori Lane.

Q.   I see here a searched item for HomeDepot.  What are you doing searching for a HomeDepot in the middle of the night?

A.   Again, when you're high on crack cocaine, you're very go, go, busy so I'm looking at tools.  I'm looking at prices of materials for maybe a job coming up.  Just, you know, staying busy.

Q.   There are entries here now for PeopleReady from the web history.  I'm looking now at line 23.  What is PeopleReady?

A.   PeopleReady is a temp agency that I've done some work for.

Q.   And what was your purpose of searching on PeopleReady?

A.   Again I'm looking for jobs, small jobs, big -- I mean, permanent job, any kind of work.

Q.   Open skilled trade positions, what is that search for?

A.   Again that's through PeopleReady.  They have a department called the skills trades department where they have a lot of construction jobs, electrical jobs, solar jobs.

Q.    And again what is your purpose for this particular site, this skills trade position?

A.    Again, I'm looking for jobs.  I mean, we're getting to one o'clock in the morning.  I'm high on crack cocaine. I'm very go, go, go.

Q.    Here is a web search -- your web history for apprentice electrician needed in Springfield, Massachusetts.  Do you recall what that was for?

A.    Yep, again that's just for more work.  That was probably a Craig's list ad possibly or on PeopleReady, one of the two, something like that.

Q.    Let's move forward a little bit here.

      Directing your attention here to line 351, what time in the morning?  Can you see there?

A.    That was 1:15 or 1:14:34 a.m.

Q.    And what does that indicate now that you've had a chance to look through these records?  Does that indicate an outgoing instant message?

A.    That is correct.

Q.    And what is the instant message?

A.    It's supposed to say dude but it says "Did, my man I'm loaded with" it says shut but it's supposed be "shit" -- pardon my French -- "and just need a 40 of hard.  Give you 60.  Now I'm killing it out here."

Q.    First, do you know who this instant message was

directed to?

A.    Yes, I do.

Q.    Who was it directed to?

A.    That was to Devin Austin.

Q.    And who was Devin Austin?  How do you know Devin Austin?

A.    He's a friend of mine/dealer.

Q.    Do you get drugs from Devin Austin?

A.    I do.

Q.    What does it mean to get a 40 hard and give you 60 now?

A.    I probably owed him money.  So I'd probably give him 60 bucks, 20 towards what I owe him and then 40 for the hard.

Q.    What did you owe him money for do you think?

A.    Past drugs.

Q.    You also write that now "I'm killing it out here?"

A.    Yes, sir.

Q.    Where were you writing from when you were sending that message?

A.    I was probably out doing dumpster diving I'm guessing.

Q.    I'm talking now we're at 1:14 in the morning.  When you say "I'm killing it out here," are you actually outside or are you at your home?

A.    No, I was still at home at this time, I'm sorry.  I read that wrong.  Yes, at 1:14 I was still at home so that was --

Q.    Why are you telling him "I'm killing it out here?"

A.    Just to make him think that I'm, you know, doing stuff to get money; just to like sound good.

Q.    Have you and Devin had disagreements about how much owed for your drugs?

A.    We have.

Q.    Are there times when he will refuse to sell drugs to you because you don't have the money?

A.    There have been times.

Q.    You've looked through these records and are there -- were you at some point also searching for pornography?

A.    Yes, I was.

Q.    Were you searching through Craigslist for jobs?

A.    Yes, I was.

Q.    Were there other temporary job sites that you were looking for?

A.    Yes.

Q.    Were you searching at all that night about Jewish Geriatric Services?

A.    Absolutely not.

Q.    Was there anything in there about how to make a bomb?

A.    Absolutely not.

Q.    You were talking about doing crack cocaine on that night, on April 2nd in the early morning hours of April 2nd?

A.    Yes, sir.

Q.    We heard the testimony about Chicopee, were you only doing crack cocaine in Chicopee?

A.    No.  Chicopee I used a couple different substances.

Q.    Looking through those text messages now, does that give you -- does that remind you about that particular morning on April 2nd?

A.    It does.

Q.    And is that how you're able to know now that you were doing crack cocaine?

A.    That's correct.

Q.    How were you -- given what you can see on the text messages, how were you feeling that morning?

A.    I mean, I was high on crack and I must have ran out at some point.

Q.    Were you angry at the world --

A.    No.

Q.    -- the morning of April 2nd?

A.    No, I was not.

Q.    Going back to Exhibit 52 again.  Fast forward here to -- there it is -- line 457 here.  What is the time on that particular instant message?

A.   4:32:59 a.m.

Q.   This is at line 457 of Exhibit 32.  This is another
--

ATTORNEY BRESLOW:  52, Your Honor.

ATTORNEY WATKINS:  What did I say?  I'm sorry.
This is Exhibit 52, line 457.

THE COURT:  Thank you.

Q.   (By Attorney Watkins) And what is that message?
Well, first who's that message to?

A.   This is me and Devin Austin.

Q.   And what are saying here?

A.   I said "Dude, I got a hundred in cash sitting in
front of me.  Does it last time I said if you want to do
it, it's fine.  If not, whatever.  All I need is a 40
piece.  I'm right around the corner from you.  If you
don't want to do it, that's fine but another hour or two
it ain't going to matter.  But you should do it because I
got licks I'm trying to do but nobody wants to do them
with me."

Q.   I want to break all of that down, but first what was
it that you were trying to get across to Devin Austin in
this message?

A.   Pretty much that I needed drugs, needed more crack.

Q.   So the first part is "Dude, I got a hundred dollars
in cash sitting in front of me."  Was that true?

A.   That was not true.  It was in the form of a check.

Q.   And why were you saying, "Dude, I got a hundred dollars in cash sitting in front of me" if it wasn't true?

A.   I mean, it pretty was true to me.  I had a check that I could cash when the bank opened in the morning.

Q.   When you said, "I'm right around the corner from you so if you don't" -- I'm right around the corner from you," were you indeed right around the corner from him at that point in time?

A.   I don't believe so, no.

Q.   Why did you tell him that?

A.   Just to put pressure on him to, you know, sell me drugs.

Q.   Then you go to say, "In another hour or two but it ain't going to matter."  What was the point of sending that to Devin Austin?

A.   I meant that I would go somewhere else or to somebody else to get drugs.

Q.   Did it mean you were going to go do something to end the world or commit suicide?

A.   No, sir.

Q.   Did you get a response from Devin Austin?

A.   I don't believe so, no.

Q.   Going down to line 462 of Exhibit 52, another text message.  Who is this to?

A.    Again this is to Devin.

Q.    And you write -- what do you write in that message to him?

A.    I said, "Do you just put it in your mailbox.  I'll be".

Q.    Why did you write him put it in the mailbox?  What's the point of that?

A.    I was just trying to make it easier for him, just to throw it in his mailbox and I'll grab it out of the mailbox.

Q.    What kind of procedure, if any, does he have on selling drugs and people coming over to his house to buy drugs?

A.    Most people can't.  I can because I deal with him a lot but it was 4:38 in the morning.  I was just trying to make it easy on him so I just had him throw it in his mailbox.

Q.    Did you get a response to this message from Devin Austin immediately?

A.    No.

Q.    Did you leave your house to go up to 90 El Paso Street?

A.    Yes, I did.

Q.    When you left to go up to 90 El Paso Street, had you gotten any kind of response from Devin at all?

A.    I did not.

Q.    So why were you going up there if he hadn't responded to any of your texts about drugs?

A.    Because I knew that either he would respond or that there's somewhere else in that area in the projects that I could get crack elsewhere.

Q.    So you took your mother's car?

A.    I did.

Q.    Why did you take your mother's car?

A.    My van is big and bulky and it eats a lot of gas and I don't like driving it around the hood.  It's very big and bulky.

Q.    Had you told your mom you were going to be taking the car?

A.    I did.

Q.    How did you know you were going to take that car that morning?

A.    I knew that I would run out of crack eventually and need to go out the night before.

Q.    When you talked about a check that you had, that was money that had been deposited in the Bank of America?

A.    That's correct.

Q.    So what was it your hope about that money that had been deposited in the Bank of America?

A.    It was supposed to clear that morning.

Q.    So had you really kind of planned all along that you were going to be going to get drugs that morning?

A.    Correct, and I would be in that area for a while.

Q.    How did you drive to 90 El Paso Street?

A.    What route did I take?  You want me to explain the route I took?

Okay.  So I left my house in East Longmeadow, Lori Lane.  I drove down Converse Street; got to Route 5; took a right, and got on 91 north.

Q.    On the way to 90 El Paso Street before 5 o'clock in the morning, did you stop at the Jewish Geriatric Services?

A.    I absolutely did not.

Q.    Did you get out of your car and put a fuel container there?

A.    I absolutely did not.

Q.    Did you try to light it on fire once it was there?

A.    No, sir, I did not.

Q.    I want to go next to 5 o'clock in the morning.  This is going to be line -- you know what, we can go to the other exhibit at this point.

I'm showing you page 12 of Government's Exhibit 41 and highlighted a particular line from your phone that says "knock, knock, knock."  Did you send that text message?

A.    I did.

Q.    And do you recognize the number that's going to?

A.    That's Devin Austin's number.

Q.    So why where you sending this message?

A.    To let him know that I was close by.

Q.    And where do you think you sent that message from?

A.    I believe it's as I got off the exit, the St. James exit on 291.

Q.    How do you know that for sure?

A.    It's something that I normally do when I get in contact with him because that's the route I always take. I usually get in contact with him as I'm getting off the exit.

Q.    Let me go to the next page of Exhibit 41.  This is actually the previous page I guess, page 13 of Exhibit 41.

      Have you seen this before?

A.    I have.

Q.    And we now know -- you know what this depicts, right?

A.    Yes, sir.

Q.    I want to -- before I start asking you questions about it, I want to find out from you -- you've talked already about your whereabouts and things you were doing on a particular occasion in the early morning of April 2nd.  How are you able to talk about a time now over a year ago?

A.    Well, for one I've been off drugs for awhile now so my memory is starting to get a lot clearer.  Number two, I was able to look at phone calls and text messages of what I was doing that night and it helps me out remember what happened.

Q.    But to be clear, can you say for certainty where you were every minute of that morning?

A.    For the most part I can.

Q.    The exact spot or what you were doing at any given moment?

A.    For the most part, yeah.

Q.    So I want to -- well, looking at this map and having looked at it and the title here is pretty broad, it's from 5:05 a.m. until 8:25 a.m.

      Having looked at this, reviewed the places your phone and therefore you were at, what is your conclusion about what it is that you were doing up there?

A.    So during the time of 5:05 a.m. to 8:25 a.m. I was in the area of Devin's house, which is in the blue square that says 90, in that whole area that whole time.

Q.    And is this consistent with other times that you've gone seeking drugs?

A.    Yes, sir.

Q.    And how is it?  Tell us about what happens when you're looking for drugs.

A.   It's the same thing.  If I can't get a hold of Devin, I'll go over to the projects, see if anybody is out or awake.  I have other people too in that same area that I can call also to get drugs.

Q.   Do you know people in other parts of the city that also deal drugs?

A.   I do, yes.

Q.   So why is it this particular part of the city that you're on this morning on April 2nd?

A.   There's a few reasons.  Number one, it's very convenient and easy to get drugs there.  Number two, I was waiting for the Bank of America to open so I could get my hundred bucks.

Q.   And again looking at this and knowing what area you are in and having seen the calls and texts you made, what is it that you're trying to do?  What is it that you're up here this morning on April 2nd to do?

A.   I am up there trying to find drugs, period.

Q.   I'm going to go back to Exhibit 52 and look at line 484.

     I'm going to try to -- do you see this text message that starts, "yeah, I've been sitting."

A.   Yes, sir.

Q.   Do you see what the time associated with that is?

A.   5:34:39 a.m.

Q.    And what does that -- first, who's that message to?

A.    Again, this is Devin.  I think it was a Facebook message.

Q.    And so what does that message say?

A.    It says, "Yeah, I've been sitting at your house since 5:15.  Please come to the door as soon as possible.  I just need a 40 and I'll be on my way.  You will get plenty of bread later.  I got licks, lots of licks today.  I'm not trying to bother you.  I just need a 40.  I'll trust me please.  I'll go away.  Just put it in the mailbox. Yeah, I got cash I'll put it in right."

Q.    Let's break that one down again.

When you talk about trusting me, "I just need a 40 and I'll be on my way," why are you saying all those things?

A.    I'm trying to get him to give me drugs.

Q.    Were you actually right in front of his house?

A.    At this time I think I was around the corner.

Q.    And why were you around the corner rather than in front of his house?

A.    I didn't want to be sitting right in front of his house to do a drug deal at this hour of the morning.

Q.    Now again, how do you remember so clearly now exactly what you were doing on April 2nd in the morning?

A.    Again, after going over these call logs, going over

text messages, having some clean time, getting out of the fog of drugs, I can remember and I can match the text messages and calls I made and Facebook messages I did that morning.

Q.   Do you think having looked at this did you get drugs from Devin Austin that morning?

A.   I believe at some point, yes, I did.

Q.   Are you a hundred percent sure that you got it from Devin as opposed to someone else?

A.   I'm not 100 percent sure but I did get drugs.  I just don't know from who.

Q.   I'm looking at next line 491.  This is an outgoing phone call and what time is this at?

A.   This is at 6:04:52 a.m.

Q.   That phone number has a person's name associated with it?

A.   That is correct.

Q.   And whose name is that?

A.   That is Gabe.

Q.   Who is Gabe?

A.   Gabe is a friend of mine; somebody else I get drugs off of also.

Q.   I'm sorry, he's what?

A.   He's a friend of mine and somebody who I get drugs off of also.

Q.   Why are you -- what does it mean that you're trying to call Gabe at 6:04 in the morning?

A.   It means I'm looking for more drugs.  Even if I was able to get drugs from Devin or somebody else over there, it wouldn't have been much so I'm looking for more drugs still.

Q.   At line 493 at 6:09 in the morning, who are you trying to call there?

A.   Again, that's Devin Austin.

Q.   So you're talking to both Gabe and Devin at the same time at 6:09?

A.   That is correct.

Q.   Now, there is a gap in your calling records here up until 7:06.  Did you go down to Longmeadow to the Jewish Geriatric Services during that period of time?

A.   No, I did not.

Q.   How can you be so sure?

A.   I would have absolutely no reason.  I was completely focused on getting drugs.  I had absolutely no reason to turn around and go to Longmeadow at all.  There's zero reason.  I was looking for drugs.  I wanted more drugs.

Q.   Well, you may have already gotten drugs that morning I think you told us.

A.   It's not enough.  There's never enough.

Q.   The next entry is 494.  Do you see this call?

A.    I do.

Q.    What time is that at?

A.    6:51:32 a.m.

Q.    And let's see.  Let's go with the next line, which is 495 also that same time, correct?

A.    Correct.

Q.    What does this entry indicate?

A.    This is either a Facebook message or a Facebook phone call from me or to Devin Austin or vice versa.  I'm not sure.

Q.    So Devin calls you three times here but you don't answer the phone?

A.    That's correct.

Q.    You were trying to get drugs from Devin Austin.  Why aren't you answering phone?

A.    I think I had already got drugs from him and he was either looking for money or wanted to know when I was going to pay him what I owe him or something so I just ignored them.

Q.    Do you know for sure that that's what was going on that morning or are you simply thinking about it in your ordinary relationship with him?

A.    I mean, that's my -- that's definitely what I think. I mean, that's my educated guess because I would have already gotten drugs from him by then.  I mean, I'd have

no reason to ignore him.

Q.   So jumping ahead here to 7:06, you make a call back to Devin Austin?

A.   Yes, sir.

Q.   And he doesn't pick up?

A.   Correct.

Q.   Between that time that you were talking with Devin about drugs, trying to get Gabe's attention about drugs, and coming back here to get Devin's attention about drugs again, did you go down to Longmeadow, the Jewish Geriatric Services?

A.   No, sir, I did not.

Q.   Was Devin Austin in some kind of conspiracy with you to place a fuel container at Jewish Geriatric Services?

A.   Absolutely not.

Q.   Looking at Government's Exhibit 41 again.  Do you see calls here to about 7:25 in the morning?  Do you see those?

A.   Yes, sir.

Q.   And then here, 7:45 here?

A.   Yes, sir.

Q.   At 8:10, maybe a little further away from Devin's house, 8:10 in the morning here, what were you doing during these periods of time when your cell phone is going off cell towers in the East Springfield area?

A.   Again, I'm looking for drugs.  I could be dumpster diving because I was high on crack, but the main purpose to going to this area is drugs.

Q.   You talked about a hundred dollar check that you had and going to the Bank of America.  Did you eventually get a hundred dollars from the Bank of America?

A.   I did.

ATTORNEY WATKINS:  This is a brand new exhibit but agreed upon by the government.  And it's not that one.

Q.   (By Attorney Watkins)  Showing you what's been marked as Defendant's Exhibit 2, this is -- what is this?

A.   This looks like a bank statement from Bank of America.

Q.   Does it have your name and address on it?

A.   It does.

Q.   What does it -- does it indicate a deposit here?

A.   It does.  It indicates a deposit of a hundred dollars and then a withdrawal of a hundred dollars.

Q.   And does this exhibit also indicate when the cash withdrawal was made?

A.   On April 2, 2020.

Q.   And going back to Exhibit 52, you were doing searches for Bank of America all of that morning on April 2nd; is that correct?

A.   That is correct.  I wanted to know what time it

opened or the closest one, which I knew was in that area.

Q.   Based upon that, the things you saw there, do you think you bought more drugs down in the East Springfield area?

A.   Absolutely, yes.

Q.   Can you say here with certainty today who it was that you bought the drugs from while you were there?

A.   I can't one hundred percent say for sure but it could have been multiple people.  I know a lot of people down there.

Q.   I'm going to go back to Exhibit 41 one more time here.  Actually I'm not.

There is another text message to Gabe saying, "It's been a fricken crazy day."  What did you mean when you were sending that text message to Gabe saying it's been a fricken crazy day?

A.   That's kind of just -- I mean, I was high on crack.  It's something that I normally say.  It's nothing special.

ATTORNEY WATKINS:  Your Honor, I realize just now that I did not formally introduce --

THE CLERK:  Exhibit 2.

ATTORNEY WATKINS:  -- Exhibit 2.

ATTORNEY BRESLOW:  No objection.

THE COURT:  No objection, that's admitted.

ATTORNEY WATKINS:  I apologize.

**(Defendant's Exhibit 2 was admitted.)**

Q.    (By Attorney Watkins) When did you get back home to 20 Lori Lane?

A.    I want to say mid-morning, eleven, twelve-ish maybe.

Q.    Had you received some messages and texts from your mother?

A.    I did.

Q.    Why didn't you respond?  Why didn't you go back home?

A.    I was seeking drugs.  My main focus was getting drugs.

Q.    Were people annoyed with you when you got back that morning?

A.    Definitely.  My dad was upset with me, yes.

Q.    Did you tell your parents, listen, I was just out buying drugs all morning?

A.    No, I did not.

Q.    Why didn't you tell your parents you were out buying drugs that morning and that's why you were late?

A.    Again, I don't want to be honest about my drug addiction.  It's embarrassing.  I don't want my parents to worry more about me.

Q.    So just as a chalk, not as an exhibit here, I'm putting up on the screen a calendar of April where you see April 2nd, when you testified you were out searching for drugs?

A.    That is correct.

Q.    And then on April 15th, what happened?

A.    On April 15th my house was raided by the Joint Terrorism Task Force of the FBI.

Q.    And in the intervening time here, the time between when you're out searching for drugs, did your ability and effort to obtain drugs stay the same or how did that go in the coming two weeks?  Did you continue to seek drugs?

A.    It was -- this was during the pandemic.  I did try to get drugs.  I didn't really have much money.  People weren't really coming out so in that two weeks, I mean, I might have used once or twice.

Q.    To use once or twice, did you have to go out to someone to get it or was there some other manner by which you would get drugs?

A.    I do have somebody that will drop off.

Q.    We saw your bank account there.  It looked like a hundred dollars came in and a hundred dollars went out.  Did you have a lot of money at that time?

A.    I did not.

Q.    Going to September -- April 15th, what was the first thing that you woke up to in the morning on April 15th?

A.    I woke up in my underwear to a gun, an AR-15, in my face.

Q.    And what happened after that?

A.    I was pulled out of the house.  I was thrown up against the side of my house on the outside with a gun pointed at the back of my head.

Q.    After you went outside, what -- well, what were you observing going on outside?

A.    Like my mom had stated earlier, there was probably 20 agents, multiple vehicles everywhere.  They had a big huge like FBI truck in my driveway.  And then after they pulled me out, they pulled my daughter out and she was thrown up against the house next to me and the look on her face I'll never forget it.

Q.    And what were you thinking?

A.    I couldn't -- I had no idea.  I was thinking maybe it had something to do with my drug use with one of the people I see or something.  That was the only thing I could come up with that morning what was going on.

Q.    So once you were escorted outside of the house, did you immediately start talking with agents or did something else happen?

A.    No, not at first.  I kept asking like what's going on?  Why are you here?  And they wouldn't answer the question.  First, they did Mirandize me.

Q.    I want to go even before that.  Was there -- were you kept away from everyone else for a period of time?

A.    Correct.  Once they cleared the house, my daughter

and my family went to the front yard and I was brought into the back yard.

Q.    Was there somebody with you in the back yard?

A.    There was somebody with me at all times.

Q.    Was it either Agent McGonigle or Detective Chaplin at that point?

A.    At that point, no.

Q.    Who was it, somebody you know?

A.    No.

Q.    What were they doing while they were with you?

A.    They were just standing over me.  I was in the back. I was allowed to sit down on my back deck and he was just standing next to me.

Q.    And did that person have a weapon?

A.    Oh, yes, absolutely.

Q.    And what was that person doing with the weapon?

A.    By then it was just sitting on their -- across their arms.

Q.    So describe just generally the scene over the next three or four hours while you were there at your house.

A.    I was freaking out.  I was scared.  It was very emotional.  I was confused.  It was a day I'll never forget.

Q.    Sergeant McGonigle was the one asking most of the questions?

A.   Correct.

Q.   Was Detective Chaplin also asking questions sometimes?

A.   Correct.

Q.   One of the questions that was asked was about your knowledge of the area?

A.   Correct.

Q.   Tell us that conversation.

A.   They asked me if on Converse Street if I was familiar with Jewish places and I said, yes, I was familiar with the Yeshiva School there right on Converse Street.  But other than that, I mean I drive down that every day.  I'm focused on driving.  I'm not really looking at every sign on the side of the road.

Q.   And did they start at some point asking you about a specific location?

A.   Correct.

Q.   What was the specific location?

A.   They were referring to it as Ruth's House.

Q.   Did they also refer to it as a nursing home?

A.   Sometimes.

Q.   And did you know where either of those things were?

A.   At the time that morning I was still -- remember I'm very confused.  I'm extremely upset and agitated.  I could not remember, no.

Q.   Did you understand that Genesis House was also part of Ruth's House when they asked you about Ruth's House?

A.   I did not know that, no.

Q.   Agent McGonigle showed you the map.  Was that helpful at all to you to figure out what it was they were talking about?

A.   No.

Q.   When you saw this map, what did you say to them? What did you ask them?

A.   I mean, I didn't do much of the talking.  They did more of the talking but I asked like what the X was about and what the heck is Ruth's House Road or whatever that is.  I didn't know anything about that.

Q.   Did there come a time when you understood that they were actually talking about Genesis House rather than Ruth's House?

A.   No.

Q.   Not during the meeting now but -- or not during the interview and the search there, but later on did you discover actually what they meant to say was Genesis House?

A.   Correct, yes.

Q.   How did you learn about that?

A.   Through talking with you guys going over all the paperwork, all the summons and everything.

Q.    And did at some point you realize that was where your grandmother lived?

A.    Yes.

Q.    But did you know that?  Did you know that Genesis House was associated with Ruth's House and therefore your grandmother lived there?

A.    I did not, no.  We always called it grandma's house.

Q.    When was the last time that you went over to your grandmother's house?

A.    2007 maybe.

Q.    So 13 years ago?

A.    Yeah, at least.

Q.    And what would it be that you would go over to her house for?

A.    Like sometimes she needed help once in a while with moving something or we would go there to pick her up to bring her to go over my mom's sister Mary's house for Christmas.

Q.    Agent McGonigle asked you where you were on April 2nd of 2020?

A.    He did.

Q.    And what was your response to that question?

A.    I believe I told him I was home.

Q.    Did he show you any kind of calendar like this?

A.    No, sir.

Q.    So when you were trying to scan your mind, how was it you were thinking -- how were you trying to answer that question?

A.    So I remember they came on the 15th and I mean the first of the month, so I figured two weeks.  You know what I mean?

Q.    And this particular -- when you went to search for drugs on April 2nd, that was within the first couple of days of April?

A.    Correct.

Q.    Why didn't you tell, yeah, I was out on April 2nd?

A.    That morning was extremely stressful.  It was extremely emotional.  It was -- I'll never -- I mean, I still have trauma from it.  I mean, I could not put things together that morning.  I was just trying to figure out why they were there and how to get myself out of whatever was going on.

Q.    Did they allow you to look through your cell phone to take a look at what your activities had been for the previous two weeks?

A.    No.

Q.    Were you completely open with them about your drug and substance abuse problems?

A.    So at first I wasn't, no.  Again, it's embarrassing. It's not something I want to broadcast or talk to people

about.

Q.    When you were questioned -- when Agent McGonigle questioned about where were you on April 2nd or did you leave the house on April 2nd and your answer I haven't been out of the house in two weeks, was it your intention to mislead him?

A.    Absolutely not, and what I did say was about two weeks.

Q.    If you had those cell phone records that you have now, would you answer that question differently?

A.    A hundred percent, yes.

Q.    You were asked about the yellow gas can.  What did you answer about the yellow gas can?

A.    On the morning when they interviewed me?

Q.    Yes.

A.    I told them that I'd have no reason to have a yellow gas can because it's dieseal and I've never had a yellow gas can.

Q.    Did you -- what was the first question?  How was the question phrased to you?

A.    Have you ever had a yellow gas can?

Q.    Did they ask you first whether you owned a yellow gas can?

A.    Yes.

Q.    Then later asked if you ever touched a yellow gas

can?

A.    Yes.

Q.    So you did have a yellow gas can for a little while, is that true?

A.    It is true.

        ATTORNEY BRESLOW:  Your Honor, I've been relatively patient but I'm going to object to the leading.

        THE COURT:  Okay.  They are leading, so.

        ATTORNEY WATKINS:  Sorry?

        THE COURT:  Leading questions.

        ATTORNEY WATKINS:  I was just trying to change the subject.

Q.    (By Attorney Watkins) So tell us how was it that you came in contact with a yellow fuel canister?

A.    So during my -- I did a clean out job for a couple in Chicopee and they had a whole bunch of trash and stuff in their back yard.  They had flashing, aluminum siding, deck stuff, fence stuff, fencing, tires, all kinds of stuff.

Q.    And how did you get this particular job?

A.    From one of my apps in my phone.

Q.    So did you go out there once or twice?  How many time did you go over to the home?

A.    This was a two-day job.

Q.    Did you go out at a different time -- you may have

told me this.  Did you see the trash by a picture or did you have to go out there?

A.  They took pictures of what they had in their back yard.

Q.  Once you and the homeowners had agreed on a price for it, did you go out there to do the job?

A.  I did.

Q.  And did you enlist somebody else to do the job with you.

A.  I did.  My friend got me in contact with somebody else that helped me, yes.

Q.  And what is his name?

A.  I can't remember his name off hand, I'm sorry.

Q.  Let's see.

A.  Hold on.

Q.  I can put up something in a minute.  Well, so you contacted somebody.  This person that helps you there, how did you meet up with him?  How did you get his name?

A.  Like I said, I met him through a friend of mine Glenn.  I really didn't know him that well.  This was the only time I've used it to help me do this job.

Q.  And when you arrived, what did you see?

A.  So I arrived at the job.  I backed my truck in the driveway.  I opened up the gates and they had a back yard full of trash.

Q.   And you're being a contractor yourself, could you generally get an idea of what the trash came from?

A.   Yeah, it looked like they had maybe a pool at one point that had a deck around it.  They had a lot of pressure treated wood that was old and really wet.  They had a staircase.  They had flashing that looked like from when the deck was up against the house.  Like I said, they had tires, all kinds of just household debris.

Q.   Was there also metal items in there?

A.   Yes, there was.

Q.   Describe the metal items.

A.   Like I said, there was flashing which goes up against the house between the deck.  There was fence posts.  There was fencing.  There was tires with the rims still in them.  I think there was a metal tricycle bike thing.

Q.   Was there also a yellow fuel container?

A.   There was.

Q.   At some point did you cut yourself up at this site?

A.   I did, yes.

Q.   And what happened that you ended up being cut?

A.   The metal flashing -- I had gloves on actually at the time.  The metal flashing cut right through my glove and cut my hand, sliced my hand.

Q.   Now, do you generally struggle with your hands?  Do you have problems with your hands?

A.    Yeah, I have eczema cirrhosis, plaque cirrhosis. When I work, my hands become extremely dry, extremely cracked, and very bad.

Q.    So would it have necessarily been this piece of metal causing the blood or do you sometimes have other bleeding?

A.    It also due to dry skin.  It wouldn't take much to puncture and cause a cut.

Q.    Were you wearing gloves while you were doing that clean out?

A.    Yes.

Q.    So how was it that this piece metal cut through your gloves?

A.    It was just with a piece of flashing.  It's like razor sharp flashing against the house.  It's silver in color.

Q.    So what did you do with the trash that you took from this location?

A.    So the trash that I took from this location I illegally dumped in it a dumpster on Converse Street.

Q.    I'm sorry, you loaded up the van with the trash, did you say?

A.    Correct.  I loaded up the van with the trash and I dumped it at a dumpster on Converse Street.

Q.    Did you immediately dump it that day or was it in your van?

A.   No, I left it my van for awhile.  Again, this was kind of during the pandemic so I really didn't want to go out too much; go out as little as possible.

Q.   The partner, the person that you had taken, the helper that you had with you, did he talk about taking some of the items?

A.   Yes.  Yes, he did.  He asked me if he could have -- I think there were a couple plastic sleds and he took the bike thing, the little scooter bike.

THE COURT:  Hold on one second.

A JUROR:  Can I have a break?

THE COURT:  Sure.  We're going to take a ten-minute break.

THE CLERK:  All rise.

THE COURT:  Do not discuss the case during this short break and follow all the other instructions that I have given you consistently.  Thank you.

ATTORNEY BRESLOW:  Your Honor, how long?

THE COURT:  I imagine ten minutes.

**(A recess was taken at 2:57 until 3:09.)**

THE COURT:  You can be seated.  Was everyone able to follow my instructions, including not talking to each other about the case?  Did you follow all the other instructions I always give?

Thank you.  Affirmative answers from all the jurors.

They remain fair and impartial.  All right.

ATTORNEY WATKINS:  Madam clerk, I have one exhibit that should go to the parties and the witness.

Q.   (By Attorney Watkins)  Mr. Rathbun, when we were talking about the clean out, before the clean out -- before we broke, you were having difficulty remembering the name of the person who was helping there.

A.   That is correct.

Q.   Is there -- do you think there are any documents -- had you reviewed a document about this person?

A.   I have.

Q.   Would seeing a document help to refresh your recollection who that was?

A.   It would.

Q.   Okay.  I'm putting up on the screen then --

ATTORNEY DESROCHES:  This shouldn't be displayed.

ATTORNEY WATKINS:  I'm sorry.  It should go off.

Q.   (By Attorney Watkins)  Did that refresh your recollection about --

A.   Yes.

Q.   And who was it that helped you with the clean out?

A.   Chris Murray.

THE COURT:  Can we go on the WisperTech?

(Sidebar conference.)

THE COURT:  Attorney Desroches, you noticed right away that went up.  Are you requesting that I give the jury any type of instruction if they saw anything or read anything and that it was not intended to be displayed to them?  That it should be completely disregard?  How do you want to handle that?

(Attorney Breslow entered the courtroom.)

ATTORNEY DESROCHES:  I think it's appropriate to include that it was intended to be shown just to the defendant to refresh his recollection, and that they should draw no inference from anything they may have seen.

THE COURT:  All right.  So that document is not coming into evidence?

ATTORNEY DESROCHES:  It is not.

THE COURT:  Thank you.

(End of sidebar discussion.)

THE COURT:  Ladies and gentlemen, as you just saw, a document was displayed on the screen accidentally. As you know, during the trial we have been careful trying to display documents to the jury or just for the attorneys.

What exactly was displayed now should not have been. If you saw anything in that document, if you started to

read it, if you got through a sentence or two or picked up words, if it was momentarily long enough to maybe read a little bit of it, completely disregard what you might have seen.  Completely and totally disregard anything you might have seen.  Draw no inference from anything you might have seen or anything about the circumstances under which you saw it.

You know very well that there are many documents that have been displayed for attorneys and court only that you have not been able to see and you can't draw any inference for any of those documents throughout the trial as to why am I seeing this one and not that one.  No inference, one way or another, about a document that hasn't been shown to you.  Disregard anything and any thoughts about it.

ATTORNEY WATKINS:  Thank you.

Q.   (By Attorney Watkins)  So that does refresh your recollection of who it was that helped you with the clean up?

A.   Yes.

Q.   What's his name?

A.   Chris Murray.

Q.   Now the two of you, were you able to get all of the trash inside the truck?  Was there other trash?  You got all the trash inside the truck?

A.   It took two days but, yes.

Q.   All inside of the truck or were there things on top as well?

A.   There were things on top as well.

Q.   These items that you collected from this house, where did they go first?

A.   The stuff on top of the roof, there was fencing and a couple of mattresses.  Probably within a block of where we did the job, there was a parking lot and the stuff on my roof wasn't tied down or anything and I kind of just did a bunch of turns in the parking lot and that's where most of the stuff came off on my roof.

     The other stuff I kept at my house in my car for about a week like I said and somewhere on -- there's a house on Converse Street that was being remodeled and I dumped the rest of the stuff in there.

Q.   Were these legal dumping sites either of those?

A.   No, they're not.

Q.   Why are you dumping illegally?

A.   It's the only way to make real good enough money to make it worthwhile.

Q.   Is that the reason you're able to get contracts for doing clean up?

A.   Yes.

Q.   Are you proud of that, the way that you're getting contracts to do clean outs?

A.    No.  I'm not proud of it at all.

Q.    On April 15th Agent McGonigle asked you to think about all the places you had been.  How come you didn't think of this?  How come you didn't tell him about this?

A.    That morning I was extremely stressed out.  I was extremely scared.  I was -- I just couldn't focus that morning.  I couldn't get beyond that the Joint Terrorism Task Force was at my house and I was being accused of what I was being accused of.  I couldn't -- I just couldn't put it together that morning.

      I mean, also realize I was in a drug haze pretty much so my memory wasn't that great but I just couldn't figure it out that morning.  I couldn't.

Q.    Putting up in front of you Government Exhibit 7, I'm going to ask you, did you have something against Jewish Geriatric Services?

A.    No, I do not.

Q.    Anything against Ruth's House?

A.    No, I do not.

Q.    Genesis House?  Somebody you didn't like there?

A.    Absolutely not.

Q.    Anybody on Converse Street?

A.    No, sir.

Q.    Did you want to inflict harm on people on April 2nd?

A.    No, I don't want to harm anyone.

Q.    Were you angry at the world on April 2nd?

A.    No, I was not.

Q.    Did you want to destroy property?

A.    No, I did not.

Q.    Were you trying to intimidate anybody?

A.    Absolutely not.

Q.    The morning of April 2nd did you stop at Jewish Geriatric Services, get out of your car, put a fuel container with gas in it --

A.    I absolutely --

Q.    -- put a wick in the spout and try to light it on fire?

A.    I absolutely did not.  No, sir.

        ATTORNEY WATKINS:  That's all I have, Your Honor.

        THE COURT:  All right.  Thank you.

**CROSS-EXAMINATION**

Q.    (By Attorney Breslow)  Good afternoon, Mr. Rathbun.

A.    Good afternoon, sir.

Q.    I'm going to ask you yes or no questions.  Do you understand that?

A.    I do.

Q.    First let's talk about the canister.  Actually -- well, let's talk about the canister first.

        ATTORNEY BRESLOW:  Can we display PX-14 to the

entire courtroom?

Q.   (By Attorney Breslow)  When this canister was discovered, your blood was on it, right?

A.   Yes.

Q.   When the LPD found this outside the Jewish nursing home complex, your blood was on the handle, yes?

A.   Yes.

Q.   And your blood was on this canister because you handled it, correct?

A.   Yes.

Q.   Now on April 15, 2020 just 13 days later Special Agent McGonigle asked you about this canister, didn't he?

A.   He did.

Q.   He asked you first if you had ever had a yellow gas canister, correct?

A.   Correct.

Q.   And then he asked you if you had ever -- first he asked you had ever -- do you currently have a gas canister and you said no, correct?

A.   Can you be more specific?

Q.   Sure.  He first asked you do you currently have a yellow gas canister?

A.   He did ask me that.

Q.   And you said no?

A.   No.

Q.   Then he asked you, well, have you ever had a yellow gas canister?

A.   That's correct.

Q.   And you said no?

A.   No.

Q.   Then he asked you have you ever seen a yellow gas canister and when he did, he showed you these pictures, PX-72 pages 3 and 4, correct?

A.   Yes, he did.

Q.   And again for the third time now you said no?

A.   Correct.

Q.   But that was false, correct?

A.   Yes.

          ATTORNEY BRESLOW:  I like to play PX-93 from 5:13 to 5:29.

          THE COURT:  And what is that?

          ATTORNEY BRESLOW:  It's one of the recorded calls concerning the defendant's possession of the yellow gas canister.

          THE COURT:  What's the question?  There needs to be a question preceding.

          ATTORNEY BRESLOW:  I'm going to play the call and then pose the question.

          THE COURT:  Is there an objection to that?

          ATTORNEY WATKINS:  Yes, Your Honor.  There needs

to be question.

THE COURT:  I think it needs to be in the reverse.

ATTORNEY BRESLOW:  Okay.

Q.   (By Attorney Breslow)  So the question is, the question is, twelve days later -- twelve days after you three times denied having anything to do with a yellow gas canister and that gas canister in particular you spoke with your mother, right?

A.   Are we going to play the tape first?

Q.   I think the judge wants me to ask you a question or two about it.

A.   Okay.

Q.   Did you hear the question?

A.   Can you repeat it again, please?

Q.   Sure.

So twelve days after April 15th, on April 27th, you had a conversation with your mother concerning the very gas canister that you three times denied any knowledge of?

A.   That's correct.

Q.   And you stated "just them knowing, I mean the FBI doesn't know yet but maybe they will eventually.  Just them knowing that I had possession of the yellow -- I don't care, I'm saying on this phone -- that I had

possession of that yellow gas container is very big.  Do you understand?  That's very big and very bad."  Did you say those words?

A.   I did.

Q.   So you admitted to your mother twelve days after denying to Special Agent McGonigle that you actually had possessed that gas canister?

A.   At that point I had seen paperwork.

Q.   That was just a question, yes or no.

A.   Yes, I did.

Q.   And not only that, you acknowledged to your mother that it would be very big and very bad when the FBI found out, correct?

A.   That's what I said.

ATTORNEY BRESLOW:  I'd like to display PX-l1 to the courtroom and request permission to provide PX-1, the canister to the defendant?

THE COURT:  Okay.  So what's PX-11?  Okay. That's PX-11 on the screen, and there's a gas canister.

ATTORNEY BRESLOW:  May I approach?

THE COURT:  Yes.

Q.   (By Attorney Breslow) This gas canister in front of you, the one that is depicted in PX-11, that's the gas canister that you possessed?

A.   That is correct.

Q.   That's the gas canister with your blood on the handle, correct?

A.   That is correct.

Q.   And the gas canister has warnings on its side, doesn't it?

A.   I believe so.

Q.   Well, take a look.  It's right in front of you.  I think I've positioned the warnings so you can see it.

A.   Yep.

Q.   Okay.  So the first warning says "Petroleum fuel, extremely flammable," doesn't it?

A.   It does.

Q.   The second warning says "dieseal fuel, danger," correct?

A.   That is correct.

Q.   The third warning of the canister that you had in your hands says harmful -- well, the fourth warning I'll say "vapors may cause flash fire," correct?

A.   It says, "vapors can explode when ignited."

Q.   Yeah, that's another one.

        ATTORNEY BRESLOW:  If we can just blow this up, Ms McKenna, so we can see it all clearly?  Thank you.

Q.   (By Attorney Breslow)  So one warning says "vapors may cause flash fire," correct?

A.   Yes.

Q.   And it says, "Do not use this container for gasoline or other flammable liquids," right?

A.   Yes, sir.

Q.   And then I think you were reading the next warning. Can you read that out loud?

A.   "Vapors can exploded when ignited."

Q.   "By a spark or flame source many feet away?"

A.   That's correct.

Q.   And the warnings continue, correct?

A.   Correct.

Q.   Now Special Agent McGonigle asked you how your blood could have ended up on this gas canister, right?

A.   Yes, he did.

Q.   And you stated it was not possible, correct?

A.   I could not recall that.

Q.   That's not my question.

A.   No, I could not.

Q.   My question is --

ATTORNEY WATKINS:  He should be allowed to answer.

THE COURT:  Is there a need -- any further inspection of the gas can?

ATTORNEY BRESLOW:  No.  I'll take it down.

THE COURT:  Okay.

Q.   (By Attorney Breslow)  Mr. Rathbun, you understand

that I'm asking yes or no questions, right?

A.    I understand.

Q.    And you understand that Mr. Watkins will be able to ask you on redirect questions that explain your answers on cross, right?

ATTORNEY WATKINS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Go ahead and ask the question.

ATTORNEY BRESLOW:  Sure.

Q.    (By Attorney Breslow) You told Special Agent McGonigle that it was not possible, correct?

A.    That morning that's what I said, yes.

Q.    And Special Agent McGonigle even asked you is it possible that your blood could have gotten on this canister when working at somebody else's house, right?

A.    Again, I could not recall.  That is correct.

ATTORNEY BRESLOW:  Your Honor, I'm just asking a simple yes or no question.

THE COURT:  All right.

Can you answer yes or no?

THE WITNESS:  Yes.

Q.    (By Attorney Breslow) You again told him it was impossible, correct?

A.    I did.

Q.   All right.  Now let's talk about tracts.

Your mother keeps tracts in your house, correct?

A.   Yes, she does.

Q.   You know what tracts are?

A.   I do.

Q.   You know that she keeps those tracts in her purse?

A.   Yes, sir.

Q.   You know that she keeps them in the cup holder of her car?

A.   I don't know that.

Q.   You don't know that?

A.   Not offhand, no.

Q.   So your testimony is you don't know that your mother keeps tracts in the cup holder of her car?

A.   I should have said she does not always keep them in the cup holder of her car.

Q.   Okay.  So you know your mother does?

A.   Sometimes, yes.

Q.   Okay.  And you drove that same car, your mother's car, on April 2nd, correct?

A.   That is correct.

Q.   Now let's talk about the tract that was part of the device on April 2nd.

ATTORNEY BRESLOW:  Your Honor, may I provide PX-3 to the defendant?

THE COURT:  Yes.  Any objection?

ATTORNEY WATKINS:  No.

Q.   (By Attorney Breslow)  When this device was discovered on April 2nd, it had your blood not just on the canister but on a tract that was stuffed inside it, correct?

A.   Correct.

Q.   And your blood was not just on one page of the canister, was it?

A.   I don't know, was it?

THE COURT:  One page of the canister or tract?

ATTORNEY BRESLOW:  The tract.

THE COURT:  Okay.

Q.   (By Attorney Breslow)  So I'd like to display PX-16. If we can zoom in on the middle?

So your blood was on these two pages, right?

A.   It's on one page I believe, sir.

Q.   Okay.  And a little bit on the left do you not see it?  Shall we zoom it in?

A.   Sure.

THE COURT:  Is this piece of evidence in the plastic envelope that you handed up?

ATTORNEY BRESLOW:  Your Honor, the testimony concerning PX-3 was that it was sent to the lab that they cut out --

ATTORNEY WATKINS:  I'm going to object.

ATTORNEY BRESLOW:  Well, I'm asking --

THE COURT:  No, I was just asking is what is on the screen in the plastic folded envelope on the witness stand?

ATTORNEY BRESLOW:  So what's on the screen are -- this is --

THE COURT:  We're going to have to go on WisperTech.

(Sidebar conference.)

ATTORNEY BRESLOW:  So what's on the screen and what will be on the screen are the pages of this tract that is in PX-3 as they were found on April 2nd.  And so Your Honor may recall that the Longmeadow Police provided the pages of the pamphlet to the State Police where they cut out the portions of the blood and tested it.

THE COURT:  What's in front of the witness is not exactly what's in the photograph?

ATTORNEY BRESLOW:  With the cut outs, correct.

THE COURT:  Okay.  I just didn't understand that.  Very good.  Okay.

(End sidebar discussion.)

Q.  (By Attorney Breslow) So, Mr. Rathbun, your blood was on both of these pages, correct?

A.  I only see it on the right side, sir.

Q.    Okay.

A.    I can clearly see blood on the right side.

Q.    Okay.  So let's turn to PX-18 and zoom in on the center in the middle.  Your blood is on the right page there?

A.    That's what it appears.

Q.    And let's zoom to PX-19 and zoom in just in the area below the 3.  That's your blood too?

A.    Yes, sir.

Q.    And on PX-20 your blood was on two different spots there by Pray and there near the purple gloved hand at the bottom, correct?

A.    I see, yes.

Q.    Now, Mr. Watkins asked you a lot of questions about your faith and church, correct?

A.    He did.

Q.    I'm only going to ask you a few.  It just sounds like from your testimony when you're sober and clean you can embrace your faith, right?

A.    I also do when I'm using though.  I'm still praying. I always pray.

Q.    Okay.  So for approximately how many years have you been getting drugs in the Springfield area?

A.    Fifteen.

Q.    And about -- I think you testified that about three

of those years you were traveling to Springfield to get Methadone?

A.   No, that's just this time on Methadone.  I've been on Methadone for three years this time.  I've been on Methadone and Suboxone before also.

Q.   That's fine.  So it sounds like you've traveled from your house down Converse Street frequently throughout 15 years either to buy drugs or to get Methadone and other treatment?

A.   Correct.

Q.   Okay.  So let's talk about where the device was placed.  I'd like to display PX-9.

So this device was placed just a few feet from the sidewalk off of Converse Street, right?

A.   That's what I've been told.

Q.   Well, you see it there, right?

A.   That's what the picture depicts.

Q.   Okay.  And it was placed just a few yards from Converse Street according to the photograph, right?

A.   According to the photograph.

Q.   Right.  And so you drove back and forth past this spot every time you went from your home to Springfield to buy drugs, correct?

A.   Correct.

Q.   And you drove back and forth past this spot every

time you went to get treatment, right?

A.    Correct.

Q.    In fact, you drove back and forth past this spot any time you wanted to get to I-91, right?

A.    Yeah.   There's another way I go sometimes too.

Q.    Okay.   But primarily this is the way right past this spot?

A.    The most part, yes.

Q.    Now your house is only a mile and a half away from this spot, right?

A.    If that's what you -- if that's what the measurement is, yes.

Q.    I mean, we're talking approximately.   It's not that far away, right?

A.    It's not, no.

Q.    And you could drive it in about five minutes?   Again, I don't want to be specific about the actual minute time from your house to this spot but that's about it, right?

A.    Yeah.   I guess, yeah.

Q.    Okay.   And I'd like to display PX-26 to the entire courtroom.

      So this spot is also visible to you as you drive up and down Converse Street, right?

A.    When I'm driving down Converse Street, sir, I'm focused on driving.

Q.    Right.  I understand that and that's great.  But it's also visible to you, isn't it, as you drive back and forth?

A.    There's lots of things visible, sir.

Q.    Right.  Including this spot?

A.    Sure.  Yes.

Q.    And the closest building to the device is that white building there, right?  (Indicating)

A.    I mean, by this picture that's all I can see, yeah.

Q.    Okay.  And that is actually part of your grandma's complex, right?

A.    I guess it is, yes.

Q.    And you visited your grandmother when she lived at these buildings, right?

A.    Yes.  Fourteen years ago, yes.

Q.    Fourteen years ago but nonetheless you did, right?

A.    Fourteen years ago, yes, sir.

Q.    Yes.  But not just 14 years ago, you visited her for several years while she was there, right?

A.    I did not go there that often.  I'd say in a year I went there two or three times.

Q.    Okay.  And she lived there -- so you went there two or three times in a year and she lived there -- if she lived there say four times, (sic) that would be 8 to 12 times, right?

A.    I was also in my drug days during that time so I mean it could have been less one year.

Q.    Okay.  So if it's less one year, we're still talking about seven or eleven times, right?

A.    Correct.  Fourteen years ago, yes.

Q.    Right.  That's a fair estimate of the number of times that you actually drove onto this campus and saw your grandma?

A.    Correct.

Q.    And this road, Ruth's House Road, is one way to access the apartments, right?

A.    It is, but I would do a U-turn.

Q.    You would do a U-turn?

A.    Correct.

Q.    Every time you would do a U-turn?

A.    Every time.

Q.    Okay.  I want to show you PX-23.

      Every time you drove back and forth from I-91 you passed this very spot, correct?  (Indicating)

A.    That is correct.

Q.    And I realize that you're doing the right thing by keeping your eyes on the road, but that sign clearly says Ruth's House, doesn't it?

A.    That's what the sign says, yes.

Q.    It says it on that part and it also says it on the

opposite side of the sign too, right?

A.   I don't know if it says it on the other side, sir.  I can't see that.

ATTORNEY BRESLOW:  One moment.  Can we zoom in?

Q.   (By Attorney Breslow) I'm showing you PX-27.  Do you see that the other side also says in just the same way Ruth's House?

A.   Yes, sir, it does.

Q.   Now on the morning of April 2nd -- if we can put up PX-23 again?  -- on the morning of April 2nd you drove right past this spot, didn't you?

A.   Yes, I did, sir.

Q.   On the morning of April 2nd you drove your mother's car right past this spot, didn't you?

A.   That is correct, sir.

Q.   So let's focus on this period of time when the device was placed.

There was a lot of questions between you and Mr. Watkins about this period of time leading up to April 2nd, right?

A.   Yes, sir.

Q.   So I'd like to focus on the month from March 3rd to April 2nd.  Okay?

A.   Sure.

Q.   Now, you testified on direct examination that you

were even more agitated than usual during this period of time, right?

A.   I was.

Q.   And you were in part because you were using a lot of crack and powder cocaine, right?

A.   Amongst other things, yes.

Q.   Right.  And those other things they make you agitated, right?

A.   Correct.

Q.   Especially crack, right?

A.   Sure.

Q.   Makes you go, go, go, right?

A.   Yes.

Q.   And when you got that go, go, go feeling, you have to do something, right?

A.   No.  I have to keep moving; keep going, yes.

Q.   So my point is did you not testify on direct examination that when you're using crack you get so much energy you have to do something?

A.   I have to, correct, yes.  Absolutely.  That's why I dumpster dive.

Q.   So I'm just asking simply yes or no questions, Mr. Rathbun.  And what I'd like you to do if you can't answer them, just ask me to rephrase the question.

         ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.

Q.    (By Attorney Breslow) I want to talk about two specific windows of time between 4:51 a.m. and 8:30 a.m., okay?

A.    Sure.

Q.    So the first window of time is between 4:51 and 5:01 a.m.  That's a ten-minute window of time, right?

A.    Yes.

Q.    Okay.  So at 4:34 a.m. you called Devin Austin from around the vicinity of your home, correct?

A.    Yes, sir.

Q.    And at 5:01 a.m. you called Devin Austin again, right?

A.    I believe so.  Yes, sir.

Q.    But between 4:34 a.m. and 5:01 a.m. you had left your house and driven down Converse Street to get on I-91, right?

A.    That is correct, sir.

Q.    So at some point before 5:01 a.m. you drove right by where the device was placed, right?

A.    That is correct.  Yes, sir.

Q.    And by 5:01 you were somewhere on I-91, somewhere in that cell coverage area that we looked at driving to Devin Austin's house?

A.    That's correct.  Yes, sir.

Q.    Now the second window of time is between 6:09 and 7:06 a.m., right?

A.    Okay.

Q.    At 6:09 you called Devin Austin, correct?

A.    I believe so.

Q.    You called him -- and you had called him and messaged him repeatedly before then, right?

A.    I believe so, yes.

Q.    Even when you were at your house, right?

A.    Yes, sir.

Q.    And you testified on direct that you were repeatedly contacting him because you had run out of crack cocaine, right?

A.    Yes, sir.

Q.    You had been using crack cocaine from some point on the night of April 1st through midnight and ultimately you were running out, correct?

A.    Yes, sir.

Q.    And, in fact, I think you testified on direct that you knew you were going to run out of crack cocaine, right?

A.    I always do.

Q.    Right.  You always do.

      Nobody in the throes of that kind of an addition can feel like they can get enough, right?

A.    Yeah.  Yes, sir.

Q.    So getting back to April 1st, you knew before bedtime that you were going to need to get into a car and go up to Springfield, right?

A.    That is correct, sir.

Q.    And you borrowed your mother's car, right?

A.    Yes, sir.

Q.    You asked her for permission?

A.    Yes, sir.

Q.    And you told her that you wanted to borrow her car because you had a job that morning, right?

A.    That is correct.

Q.    And that was completely false, correct?

A.    It wasn't.  I still had things I was doing.  I mean, dumpster diving is still a job.

Q.    Okay.

A.    I wasn't completely honest with her.

Q.    Okay.

A.    But, yes, I was dumpster diving.

Q.    I want to ask you to take a look at your testimony. Let me ask you a few questions first.

      On November 19, 2020, Mr. Rathbun, did you provide sworn testimony concerning this case?

A.    I couldn't hear you.

Q.    I'm sorry.  Let me push this up here.

On November 19, 2020, did you provide sworn testimony concerning this case or this subject matter?

A.    I don't understand what you're -- I don't understand.

Q.    I'll ask it again.

On November 19, 2020 -- so we're in June now.  Just last November, did you provide sworn testimony concerning the general subject matter that you've been testifying about all day today?

A.    At the last trial I did, yes.

Q.    Okay.

ATTORNEY BRESLOW:  So, Your Honor, may we go to WisperTech for just a moment?

THE COURT:  Sure.

(Sidebar conference.)

ATTORNEY BRESLOW:  I'm not sure what to do.

THE COURT:  So, Attorney Watkins, are you telling me you didn't instruct your client not to mention that?  Is it as big a surprise to you?

ATTORNEY WATKINS:  It is a surprise to me.  I didn't think that that would be the way this would be set up.

THE COURT:  Okay.

ATTORNEY WATKINS:  It really was a surprise.

THE COURT:  I'm not -- I'm just a little surprised and so I'm asking if you're surprised as well

because now we need -- you know, I'm going to give an instruction but -- I'm going to give an instruction.  So do you have any suggestions?

ATTORNEY BRESLOW:  Well, I'd like a moment to think about the instruction before I speak again because this, as Your Honor saw, I took pains to ask simple questions.

THE COURT:  Right, and I did notice members of the jurors start to look around and then look at me.

ATTORNEY BRESLOW:  Right.  Let me consult with Mr. Desroches.

THE COURT:  Okay.

ATTORNEY WATKINS:  I'll think about it.

THE COURT:  Attorney Watkins, also I don't know if you might find -- maybe if I say we are taking a break, perhaps you can speak to your client for a moment as well.

ATTORNEY WATKINS:  If that is agreeable with the government, I certainly can.

THE COURT:  What do you think?

ATTORNEY BRESLOW:  That's fine so long as Mr. Watkins just discusses this issue and not anything else.

THE COURT:  Of course, it goes without saying.  Attorney Watkins knows that.  I don't even need to say it.

ATTORNEY BRESLOW:  Okay.

THE COURT:  All right.

ATTORNEY BRESLOW:  So maybe five or ten minutes.

THE COURT:  Yeah.  Let me check with my clerk here.

(End of sidebar conference.)

THE COURT:  I apologize, I need to get you out to have a discussion with the attorneys.  We are going to -- this is not going to be long.  Okay.  So five minutes.

The same instructions apply as always apply.  Do not talk to each other about anything to do with this case.

**(The jury left the courtroom at 3:45.)**

THE COURT:  Mr. Rathbun, can you please step down?

THE WITNESS:  Yes, sir.

THE COURT:  Attorney Watkins, I'll allow you to enter a private conference room.

Do you have anything else to say?  We can say disregard making any inferences one way or another, or get into more details saying oftentimes trials start but they don't finish and there needs to be a new trial.  There's a whole lot of things you can potentially be thinking about.

ATTORNEY WATKINS:  Yes.  I think probably more generic is better.  I don't think anything of getting granular about it.

THE COURT:  Okay.  Fair enough.

Government agree, generic?

ATTORNEY BRESLOW:  I agree.

(Short pause in the proceeding.)

THE COURT:  All right.  Let the record reflect that I have allowed the attorney defense team -- actually I want to make a record, the defense team I allowed a private moment to speak with Mr. Rathbun about not mentioning -- that we're going to take pains not to mention that the prior -- we can refer to it as a prior proceeding.

ATTORNEY WATKINS:  That's what I thought we were going to -- the question was -- I don't think Mr. Breslow meant it to be, but the question he was trying to load it up with a lot of sworn testimony and things of that nature and I think it just went over Mr. Rathbun's head.  But if we can just agree on the signal that you've touched upon previously.

THE COURT:  Prior proceeding.  Prior proceeding.

THE DEFENDANT:  Prior proceeding?

THE COURT:  Prior proceeding.  Everyone get that?  Prior proceeding means testified at the prior trial.

ATTORNEY BRESLOW:  Right.

THE DEFENDANT:  Yes, sir.

**(The jury entered at 3:49.)**

THE COURT:  You can be seated.

Was everyone able to follow my instructions?  That was a very short break, but was everyone able to follow my instructions?

Affirmative answers from all jurors.  They remain fair and impartial.

Okay.  Ladies and gentlemen, you heard right before I let you go, let you take that short break that the witness, Mr. Rathbun, mentioned the word "trial" in one of his answers.

You should completely disregard that reference and the use of that term.  Completely disregard it.  You should not speculate as to what he meant; what proceeding he was talking about or referring to.

You shouldn't speculate one way or the other about what it might mean.  You should just wipe it out of your mind.  You shouldn't even think for one second about what it meant or what he meant or what he was talking about.  Understand?

Affirmative answers from everyone.  All right.

ATTORNEY BRESLOW:  Thank you, Your Honor.  I think I'd just like to back up a moment so we can reorient ourselves.

Q.   (By Attorney Breslow)  So, Mr. Rathbun, on April 1st,

the night of April 1st, you asked your mother to borrow her car, right?

A.    Yes, sir.

Q.    And you asked your mother to borrow her car because you said to her that you needed it for a job, right?

A.    That is correct, sir.

Q.    And, in fact, on the night of April 1st you had crack cocaine in your room, right?

A.    Yes, sir.

Q.    And you knew that you were going to run out of crack cocaine even before April 1st left, correct?

A.    Correct, sir.

Q.    So you knew that you were going to need her car to go to Springfield to find drugs, right?

A.    Yes, sir.

Q.    So you didn't have a job to do that morning, right?

A.    I mean, I called dumpster diving -- I was dumpster diving.  So I mean, it's not really a job but, yeah.

Q.    Well, let's be clear.  From 5:05 to 8:25 in the morning you weren't dumpster diving, were you?

A.    I was, yeah.

Q.    You were?

A.    I did do some dumpster diving in there, yes.

Q.    So you weren't solely trying to get crack, to purchase crack from somebody?

A.    That's what I do.  After I smoke crack, I go dumpster diving.

Q.    But it's very a specific question.

What were you doing from 5:05 to 8:25 in the morning?

A.    Getting drugs, dumpster diving.

Q.    And dumpster diving?

A.    Yes, sir.

Q.    So do you remember providing sworn testimony in a prior proceeding on November 19, 2020?

A.    I do.

Q.    And before testifying then did you take an oath to tell the truth, just like you did this morning?

A.    I did.

Q.    And before testifying -- or I should say after you started testifying did Mr. Watkins ask you, "So what were you doing up there at all these different times from 5:05 to 8:25 in the morning?"

And did you not say "solely trying to get crack, purchase crack from somebody?"

A.    Yeah, that's what I said.

Q.    Okay.  So that's different from what you testified to just a moment ago, correct?

A.    That is correct.

Q.    Right.

So getting back to this statement that you made to

your mother, you told your mother that you wanted to borrow her car because you had a job to do that morning, right?

A.    That is correct.  Yes, sir.

Q.    And really, really you used her car solely to try to get drugs, right?

A.    Yes, but I also did dumpster dive.

Q.    That's it.  Mr. Watkins will have an opportunity to redirect you and have you explain yourself.

    I want to focus again on something you said earlier to the jury about the morning of April 15th.  Did you tell the jury that on the morning of April 15th you woke up to an AR-15?  You woke up to a gun pointing in your face?

A.    Yes.

Q.    And then did you testify to this jury that you were walked outside into the back yard and an agent kept a gun pointed at the back of your head?

A.    That is not what I said.  I was pulled outside and I was placed up against my house on the porch with a gun placed at the back of my head.

Q.    Okay.  Right.  So that's clear.  That's your testimony today, right?

A.    Yes, sir.

Q.    So I want to focus again on your testimony in the prior proceeding.  And did Mr. Watkins ask you what was

the first thing you noticed when the FBI came to your house?

And did you answer, "It was about 7:30 in the morning.  I was in bed sleeping and I heard rustling in the front door, so I opened up my door.  I came out and there was a man with a rifle in front of me and an FBI vest on and he told me to come out?"

A.    Yes, sir.

Q.    Were you asked that question and did you give that answer?

A.    It's the same thing, yes, sir.

Q.    Were you asked that question and did you give that answer?

A.    Yes, sir.

Q.    Okay.  I'd like to focus on the second window of time and display PX-41 page 13.

So do you remember being shown this document --

A.    Yes, sir.

Q.    -- on direct testimony?

A.    Yes, sir.

Q.    If we could focus on this period of time from 6:09 to 7:06 a.m.

So at 6:09 you called Devin Austin, right?

A.    I believe so.  That's what it says.

Q.    And you called Devin Austin because you were looking

for drugs from him, right?

A.    Correct.

Q.    Now, you had called him repeatedly, right --

A.    Yes, sir.

Q.    -- the night beforehand?

A.    Yes.

Q.    And you had messaged him repeatedly, correct?

A.    That is correct, sir.

Q.    And from 6:09 to 7:06 your cell phone had completely no activity at all, correct?

A.    That is correct.

Q.    So you weren't texting with anybody, right?

A.    No, I was not.

Q.    You weren't calling anybody, right?

A.    That's not what -- that's correct.

Q.    Right.  You actually received three calls from Devin Austin replying to you concerning your call about drugs, right?

A.    I don't know what he was calling me about but, yeah, I can speculate.

Q.    Let's think about that, Mr. Rathbun.  He's not your friend, is he?

A.    Yes, he is actually.

Q.    He is your friend?

A.    He is.

Q.   So do you get together with him for coffee in the morning?

A.   We don't get together for coffee, but we do things other than drugs together, yes.

Q.   Okay.  But we're talking 6:09 a.m.

A.   Correct.

Q.   You've been texting him since -- you've been texting or calling him since 4:34 in the morning?

A.   That is correct, sir.

Q.   And you hadn't been calling him to talk about the weather, right?

A.   Obviously not, sir.

Q.   You're not catching up, right?

A.   No.

Q.   No.  You're calling him because you need drugs?

A.   That is correct, sir.

Q.   And that's why he's calling you after you left this last call at 6:09, right?

A.   Yes, sir.

Q.   Okay.  So did you return his call or pick it up in the first place when he first called at approximately 6:52 a.m.?

     That's not on the screen.  Let me put it up for you so that there's no confusion.

     So if we can go to I think it's page 14 and focus on

the bottom?

So, Mr. Rathbun, you spent the morning trying to get drugs from Devin Austin, correct?

A.    Yes, sir.

Q.    Now by 6:09 you hadn't gotten drugs from him and so you left another phone call, correct?

A.    I guess so, yeah.  I'm not quite sure a hundred percent but I believe so.

Q.    You don't remember now?

A.    Well, I do not remember specifically if I had gotten drugs from him yet or not, no.

Q.    Do you remember when Mr. Watkins asked you -- I think he asked you, you don't remember every moment of this period of time, do you?

A.    I do not remember every single minute, no.

Q.    But I'm just asking you, do you remember him asking you that question --

A.    I believe so.

Q.    -- on direct examination?

A.    I believe so.

Q.    He said, do you remember or you don't remember every moment of that morning, and do you remember your answer?

A.    I don't.

Q.    You don't even remember your answer to him?

A.    I have a very bad memory, sir.

Q.    Okay.  Okay.  You answered for the most part and then Mr. Watkins asked you another question very similar.  He said, do you remember where you were for this period of time and you said?

A.    Absolutely I do.

Q.    Absolutely.  You said, I think for the most part but now your answer is absolutely I do?

A.    I do.

Q.    Even though you just testified that you have a bad memory?

A.    Correct, but I knew the area that I was in.

Q.    Okay.

A.    Very clear.

Q.    So you know generally the area that you were in, but sitting here you don't really have a memory of the specific blocks you went to?

A.    I don't understand the specific.

Q.    Well, you don't even know who you got drugs from that morning?

A.    Correct.  It could have been a handful people.  I could have gotten drugs from all of them.

Q.    Right.  Right.  Or one of them?

A.    Correct.

Q.    Or two of them?

A.    Absolutely.  Yes, sir.

Q.   You have no memory sitting here of who you got drugs from, if it were one person or two, or even when?

A.   No, it was definitely two people I got drugs from.

Q.   So now it's two people?

A.   Yes, sir.

Q.   And now you remember their names?

A.   I do.

Q.   So you just testified a moment ago that you don't remember who you got drugs from but now you're testifying that you do?

A.   Yes, sir.

Q.   So in the space of the minute and a half that we have been talking, your memory has come back?

A.   Yes, sir.

Q.   Okay.  These three audio calls that you received from Devin Austin at 6:52 a.m., you didn't pick up, did you?

A.   No, I did not.

Q.   And so after the first audio call that you missed, you didn't call him back, correct?

A.   I did not.

Q.   And Devin left another audio call for you or he attempted to call you and you didn't pick up then either, did you?

A.   No, I did not.

Q.   But your testimony was, I think, that as of 6:09 you

really, really needed crack cocaine from Devin Austin, right?

A.    I believe so, yes, sir.

Q.    Well -- and yet you didn't call him back after the first missed audio call or the second, right?

A.    That's correct.

Q.    And then Devin Austin left a third one, correct?

A.    Yes, he did.

Q.    And you didn't pick that up either?

A.    No, I did not.

Q.    Right.  Now, you have no memory whatsoever of why you missed those calls?  What you were doing?  Or even where you were?

A.    That's not true.

Q.    That's not true?

A.    No, sir.  It's not.

Q.    Your memory has just come back to you?

A.    My memory for that event I remember, yes.

Q.    For which event?

A.    For the event you're talking about, what I was doing during these three calls.

Q.    And I'd like to focus on PX-52 now.  Mr. Watkins asked you about this.

        THE COURT:  Hang on one second, please.

    Go ahead.

ATTORNEY BRESLOW:  If we can focus on PX-52 page 38, line 590?  If we can focus on the entry to -- the text message to Gabe?  I might not be on the right page.

If we can focus on the text to Gabe in which the defendant states that he had had a fricken crazy day.

Q.   (By Attorney Breslow)  Okay.  So by this point we are out of that second window of time, aren't we, Mr. Rathbun?

A.   I don't understand.  What second window of time?

Q.   Let me make it clear.  I'm sorry, if I wasn't perhaps.

From 6:09 to 7:06 your cell phone had absolutely no activity, correct?

A.   That is correct.

Q.   So from 6:09 to 7:06 there's no digital record of what you were doing, correct?

A.   Correct.

Q.   And there's no digital record of where you were, correct?

A.   Yes, sir.

Q.   And you hadn't sent text messages or emails, right?

A.   Correct.

Q.   And your testimony now is as of your last contact at 6:09 a.m. you still hadn't gotten drugs from Devin Austin; is that right?

A.   Correct.

Q.    Okay.  And so from 6:09 to 7:06 that's the second window of time that I'm discussing.

A.    Okay.

Q.    Right?

A.    Okay.

Q.    Okay.  So my question is shortly after that you sent a text message to Gabe and you said "fricken crazy day," correct?

A.    Yes, sir.  Something I commonly say.

Q.    Something you commonly say?

A.    Yeah.

Q.    What are licks?

A.    Licks could be dumpster diving, going through dumpsters.

Q.    What else?

A.    That's it.

Q.    Okay.  When you say likes could be dumpster diving, what really you mean to say is licks are dumpster diving --

A.    Correct.

Q.    -- and nothing else?

A.    Correct.

Q.    Nothing else at all?

A.    No.  I believe so.

Q.    So your mind is very clear today, correct?

A.    It's clearer than it usually is, yes.

Q.    Okay.  And I'll just ask you one final time, licks has no other meaning to you, correct?

A.    I don't believe so.  I might have testified last time something else, sir.

Q.    Yeah.  Let's go there.

Did you testify that licks could also mean breaking into cars?

A.    If that's what I said, then that's what I said, yes.

Q.    I don't want you to -- I really don't want you to guess so let me just give you your testimony.

A.    I'm not guessing.  If that's what you told me I said, so that's what I said, sir.

THE COURT:  You can examine the transcript for yourself to read it in full context to make sure that you're comfortable.  All right, sir?

THE WITNESS:  Sure.

ATTORNEY BRESLOW:  Exactly.  That's what I want you to do.

THE COURT:  Go ahead.

ATTORNEY BRESLOW:  What I'd like to do is display it to only the court, counsel, and the witness, Your Honor, so not to the jury.

THE CLERK:  Yeah.

Q.    (By Attorney Breslow)  So we're looking at your sworn

under oath testimony from your prior proceeding.

THE COURT:  Read that to yourself, sir.

THE WITNESS:  I am.  Thank you, sir.
Okay.

THE COURT:  You can take it down.

ATTORNEY BRESLOW:  So -- no, I just need to ask him a question from it.

THE COURT:  All right.

Q.   (By Attorney Breslow) So the first question is -- I'm not asking you this question, Mr. Watkins is, right?

A.   I don't know who asked this question, sir.  It doesn't say on there anywhere.

Q.   I can find another place.  Let's just move up.
Do you see that this is part of your direct examination where Mr. Watkins is asking these questions?

A.   I do now, yes.

Q.   So did Mr. Watkins ask you this question:  "You mentioned about getting licks.  What are licks?"

A.   Licks could be --

Q.   No.  Did he ask you that question?

A.   Yes.

Q.   And did you answer, "Licks could be a couple things. Going dumpster diving and getting stuff out of there, possibly stealing, going into people's cars possibly." Did you say that?

A.    Yes, I did.

Q.    Okay.  Mr. Rathbun, I want to ask you some questions about the state of your life in the weeks leading up to April 2nd.

A.    Sure.

THE COURT:  Let me just tell the parties and for the jury's benefit, I've been notified that there is a matter that I'm going to have to attend to at 4:15 or thereabouts, which means we're going to have to stop this proceeding for me to handle what developed this afternoon and is coming into the court.  Okay?

ATTORNEY BRESLOW:  Well, 4:15, that's in a few minutes.

THE COURT:  We might be able to push it to 4:20, but that's going to be about it.

ATTORNEY BRESLOW:  I'm about to start a completely new topic.  Maybe it makes sense to end?

THE COURT:  Yeah, I think so.  Okay.

THE CLERK:  All rise.

THE COURT:  All right.  Ladies and gentlemen, now obviously I had told you that I thought we were going to be completely finished by this afternoon.  That's clearly not true.  I think we're very close, but I certainly don't want any party to feel that they're rushed.

So we will be back Monday.  All right?  During the weekend, did not talk to each other.  Do not talk to anyone about the case; no access to media; no social media; no internet; no research about the case.  All the same instructions apply.  All right.  See you Monday morning.

**(The jury left the courtroom at 4:12.)**

THE COURT:  Christina, can we have identification by juror number and name just to talk about an issue for next week?

ATTORNEY BRESLOW:  Should we leave?

THE COURT:  No.  Stay.

(Sidebar conference.)

THE COURT:  I am at sidebar with Ms. XXXX.  Juror number?

THE CLERK:  Six.

THE COURT:  Juror No. 6, seat?  Can someone help me out?

A JUROR:  Six, seat four.

THE COURT:  Thank you.  This juror has informed me, and I want to let the parties know, that her daughter has a graduation scheduled for Tuesday morning and so she's bringing that to my attention.  Although she will think about it this weekend, she may ask to be attending the graduation which I think is a valid reason for not

continuing the jury service.  She informs me that she will tell me of her decision about whether or not to remain or to go to the graduation on Monday.  All right.

ATTORNEY DESROCHES:  Yes, thank you.

THE COURT:  I'll see you Monday.

**(The juror left sidebar discussion.)**

THE COURT:  So anything else?

ATTORNEY DESROCHES:  I would like the record to be clear that cross-examination has begun and sequestration would preclude counsel from speaking to the defendant about his testimony.

THE COURT:  Well, I mean that's an interesting area.  Certainly it doesn't prohibit counsel from talking to his client about the case.

I mean, counsel can't review what's been testified to as a way to come back and then correct things I understand, but it doesn't prohibit counsel from consulting with his client over the weekend.  But I do agree the sequestration order limits, to some extent, what can be talked about.

Attorney Watkins, can you check your comfort level with the sequestration order and your interactions with your client over the weekend?

ATTORNEY WATKINS:  It's difficult obviously.  We can talk with him about the case, but I think the court is

quite correct that the difference is whether we are trying to correct testimony here or not.

I will tell the court I think it's appropriate that I might suggest to Mr. Rathbun that he review his prior testimony in the prior trial.

ATTORNEY BRESLOW:  Well, if that's the limit of the conference, there's no objection to that.  He certainly should do that.

THE COURT:  And I think that's a fair thing for Attorney Watkins to say and provide the transcript.  I also do think it's fair for Attorney Watkins to be able to discuss with his client other areas of this case but not things that have been asked to correct testimony.

It's a very gray area and it's one in which I am entirely comfortable relying upon the good faith and ethical obligations of Attorney Watkins.

ATTORNEY BRESLOW:  Well, so I have known Mr. Watkins a long time and am very confident that Mr. Watkins will do the right thing.

The difficulty, Your Honor, is that it's hard for me to conceive when we are at this point in the trial in the middle of the defendant's cross-examination where all the witness testimony has been given in the government's direct case and this is the final witness, it's hard to imagine what Mr. Watkins could talk to Mr. Rathbun about

that wouldn't affect in some way his testimony, even if Mr. Watkins intends for it not to be so.

So it strikes me that there should be just a very clear line and that line is -- Mr. Watkins has actually made a very prudent suggestion that he review his prior trial testimony. I think that's appropriate and I don't think there should be any more conversation about the case. He can say how he's doing, that's fine. But concerning the case, it's hard to imagine any part of the case that would not impact in some way his testimony.

THE COURT: Do you want to be heard?

ATTORNEY WATKINS: I think as the court has identified, we are all trying to get around what are the limits. Certainly on redirect if Mr. Rathbun's testimony were to change significantly, I think Breslow would be right to cross-examine him vigorously or maybe recross at that point.

THE COURT: Well, you certainly could expect a question about the over weekend did you speak with your attorney about the case? It's also a tactical consideration to try to stay away from that, although there's an instruction that says you expect an attorney to talk to his client.

ATTORNEY WATKINS: At some level, Your Honor, the case is what it is. We are on the homestretch here.

Mr. Rathbun has testified.

THE COURT:  Well, there is a sequestration order and I will reluctantly instruct you, Attorney Watkins, not to speak to your client about any matters that could be -- that are affected or that would be generated by his direct or cross-examination of the testimony given so far.  All right?

ATTORNEY WATKINS:  Yes.

THE COURT:  Okay.

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY BRESLOW:  Good afternoon, Your Honor.

THE COURT:  That instruction applies to the defense team.

ATTORNEY O'NEILL-GREENBERG:  Yes.

ATTORNEY BRESLOW:  Your Honor, just for the record, Special Agent McGonigle, our case agent, has continued to be sequestered even though the government's case has closed.

THE COURT:  It's quite a different situation.  All right.  We'll see you on Monday.

**(Court concluded at 4:21.)**

---------------

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )

          I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.

(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)

/s/ Alice Moran                       November 20, 2021
Alice Moran, RMR, RPR
Federal Official Court Reporter