UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )         20cr30018-MGM
      vs                  )
                          )         June 14, 2021
Jonathan Rathbun         )
_____)



**EXCERPT** OF TRIAL HELD BEFORE THE

HONORABLE MARK G. MASTROIANNI




APPEARANCES:


On behalf of the government:  Steven H. Breslow and Neil
Desroches, Assistant United States Attorneys, 300 State
Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq. and
Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor,
Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

INDEX


Witness:                                                    Page:


**John Rathbun**


Cont'd cross-examination by Attorney Breslow              17

Redirect examination by Attorney Watkins                 105

Recross-examination by Attorney Breslow                  127




Exhibit No.          Description                         Page


132        March 22nd email                              67

123        Photograph                                    83

**(Court commenced at 9:13.)**

**(The defendant is present.)**

THE CLERK:  Court is now in session.  The matter before the court is criminal case 20-30018, the United States of America versus John Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY BRESLOW:  Steven Breslow for the United States.  Good morning, Your Honor.

THE COURT:  Good morning.

ATTORNEY DESROCHES:  Good morning.  Neil Desroches for the United States.  We will be joined by Megan McKenna.

THE COURT:  Okay.

ATTORNEY WATKINS:  Good morning, Your Honor.  Tim Watkins, Federal Defender Office, on behalf of John Rathbun who is with us today in court.

ATTORNEY O'NEIL-GREENBERG:  Good morning, Your Honor.  Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Okay.  Very good.

I'm just asking that the juror who had the graduation issue come in.  I am told that she's resolved it but we need to make a record.

ATTORNEY BRESLOW:  Okay.  Your Honor, while we

have a moment or two, there are just two issues --

(The juror entered the courtroom.)

THE COURT:  Spoke too soon.

Okay.  Good morning.  How are you doing?

A JUROR:  I'm doing good.

THE COURT:  Okay.

(Discussion held off the record.)

THE COURT:  The weather has postponed the graduation so it's not an issue.  All right.  Thank you.

(The juror left the courtroom.)

THE COURT:  All right.  Go ahead, Attorney Breslow.

ATTORNEY BRESLOW:  So the first issue is in the cross-examination I've just informed Mr. Watkins that we will be playing one paragraph basically of a transcript. It's one of those transcripts that we did not jointly present to you earlier in the first trial when you were considering the completeness arguments, and so this is just a simple paragraph.  It's just the defendant speaking.

I think Your Honor has the paper copies of the entire transcript.  It's PX-91-2 and I can direct Your Honor to the particular lines, and with Your Honor's permission we will play PX-91.

THE COURT:  Is there a dispute somewhere about

this?

ATTORNEY BRESLOW:  Mr. Watkins is going to object.

THE COURT:  On completeness grounds?

ATTORNEY BRESLOW:  I don't know.  If it's completeness grounds, we can work it out.

THE COURT:  I have PX-91-2 in front of me.  What pages are you talking about?

ATTORNEY BRESLOW:  So it's page 4, line 17 to 23.

THE COURT:  Page 17?

ATTORNEY BRESLOW:  Yeah, page 4 lines 17 to 23.  It starts "I'd like, I'd actually like you to."

THE COURT:  I'm sorry, PX-92-2 --

ATTORNEY BRESLOW:  PX-91-2.  I believe it's on April 21st.  We can play the recording.

THE COURT:  Okay.  Work with me here.  PX-91-2 page 4 line 17 for me starts "has a dumpster in front of it.  I'd actually like to go."

ATTORNEY BRESLOW:  That's where we'd start actually.

THE COURT:  What is this call?  Is this his mother?

ATTORNEY BRESLOW:  All of these calls are the defendant and his mother.

THE COURT:  All right.  Okay.

ATTORNEY BRESLOW:  This is relevant to two points.  The defendant testified on Friday, he testified that he had dropped the -- he had taken the trash from that trashout back home to his house, kept it in his house for a week, and then dumped it somewhere on Converse Street and so this is relevant to that.

It's also relevant to his familiarity with the place where the device was actually placed, which is Ruth's House, that Ruth's House entrance.

THE COURT:  All right.

ATTORNEY WATKINS:  Judge, the problem here is the confusion of the issue that's going to happen if this goes in.

Just to place this in context, this call was on April 21st.  I'll back up.  The court will remember a couple of things.  One is that Judge Robertson initially released Mr. Rathbun when he was brought in before her.  That was on April 15th on that Wednesday.  The government objected and so Mr. Rathbun was out of custody essentially for three days from Wednesday until Friday.  That's when the court revoked the release order and put him in jail and we're hearing a conversation now from the following Tuesday about these different things.

My concern --

THE COURT:  So he's in jail obviously?

ATTORNEY WATKINS:  He was in jail at this point.

THE COURT:  At this call.  All right.

ATTORNEY WATKINS:  For this call he's in jail. He has been in jail for --

THE COURT:  Okay.

ATTORNEY WATKINS:  -- five days, four or five days at that point.

So the gist of the entire call is to try to -- having discussed at some length in the initial proceedings talking about what the government's allegation was here and my speaking with Mr. Rathbun about what the allegations were and hearing in court on really some pretty ferocious litigation within those first few days. We had a long probable cause hearing before Magistrate Judge Robertson and then the proceedings in here.

Now to bring up a full flavor of all of that, I would have to go through a fairly intensive cross-examination -- I'm sorry, redirect of Mr. Rathbun.

The difficulty here also is that I've been prohibited.  I can't talk to Mr. Rathbun obviously about this particular issue and anything that I might ask him and so I would be caught at trying to flounder around a little bit on here.  But I think without the context and being able to talk to the jury, there was a period of time

when Mr. Rathbun was out of custody and that's what you don't understand that when he's talking to his mother about things that they've already discussed while he was out of custody and it gets incredibly confusing.

THE COURT: How does his being out of custody affect the limited portion that the government wants to play though about where the dumpster was? The familiarity with Converse Street? The familiarity with Ruth's House? How does his being in custody affect that?

ATTORNEY WATKINS: How does being in custody -- it's not being in custody, it's being out of custody right on April 15th he learns exactly what the allegations are. He goes down there and as we heard that is his way of getting home.

He does, I'm sure as any of us would do, some self-help down there and go down there and try to figure out exactly what it is that the government is saying that he did here.

THE COURT: Okay. So he's doing his own -- this little visit was from his own investigation --

ATTORNEY WATKINS: Correct.

THE COURT: -- to kind of put it roughly?

ATTORNEY WATKINS: Correct. It's not on the tape that that's true, but I certainly would have to bring that out, and it's clear that what's going on.

If the court reads the entire transcript, that brings it much more into focus and that's another reason why this is going to spin out of control with other kinds of issues as he's going through the transcript talking with his mother about exactly what happened.

It is clear, it is clear that they've already spoken in the past about these issues and that they're following up on things that happened, talked about them before, his self-help and his mother's efforts to assist him.

So how to get all this out in front of the jury without explaining to them that for a portion of time Mr. Rathbun was out of custody but then he was in custody opens up a whole different number of issues and the jury has got to speculate, well, gee, he was out of custody. Did he do something else that got him back into custody? And, of course, we know that that's not the case.

So it's fraught with all kinds of extraneous issues here for a very, very minor point that the government is trying to make here.

THE COURT:  Okay.

ATTORNEY WATKINS:  And indeed it's a point that they hope to expound upon and use I think as somewhat of a misleading manner here; that Mr. Rathbun knew that area much better on April 15th when he visited than he actually did.

ATTORNEY BRESLOW:  May I respond, Your Honor?

THE COURT:  Of course.

ATTORNEY BRESLOW:  Okay.  So, first of all, I think Mr. Watkins did a very good job in a very short period of time explaining what is actually quite simple. That Mr. Rathbun gained the knowledge that he's talking about in this paragraph from a visit that he made prior to April 21st.

I think he's -- I don't really see the need for him to coach his client on this where he's already discussed in open court with his client what the actual explanation is.  But if Your Honor wants, if Mr. Watkins feels that it's appropriate to sit down with him for five minutes or so, we don't have a problem with breaking the sequestration for that limited purpose.

THE COURT:  So you agree essentially this was during this period where he was released where he visited or where he was talking about -- he was back incarcerated when he made this phone call obviously.

ATTORNEY BRESLOW:  Right.

THE COURT:  But is reflecting back on a time before he became incarcerated?

ATTORNEY BRESLOW:  Right.  So, well, I don't agree but clearly that's what Mr. Rathbun will testify to and it's perfectly appropriate.  We are going to offer it

for that purpose and Mr. Watkins can easily redirect as he just explained to Your Honor.  I don't think it's confusing at all.

Secondly, in terms of the in and out of custody, I want to be really clear about this, throughout our entire case-in-chief we avoided any notion that the defendant was in custody.

THE COURT:  Right.

ATTORNEY BRESLOW:  We referred to these as recorded calls.  We redacted anything relating to jail, and for reasons I guess only known to the defense they elected to introduce the notion that Mr. Rathbun had been in jail and had been in jail for a significant period of time.

What they didn't introduce and what is not clear to the jury is when the defendant was in custody, and so there is no need for Mr. Watkins to introduce on redirect that he had been locked up on April 15th and then released and then locked up again some time prior to April 21st. That's not relevant.  That's not relevant and so the jury doesn't know when he was locked up.  We are not intending to -- initially.

They don't know about a release and so Mr. Watkins can easily say on redirect if the defendant is testifying about this point that at some point prior to April 21st,

between April 15th and April 21st, he visited the location and his knowledge of the location is based on that and not a prior knowledge as the government would be arguing. It's actually a pretty simple point and I think Mr. Watkins and Mr. Rathbun will be able to explain it perfectly well without confusing the jury.

THE COURT:  What about the rest of this for context where he talks about, yeah, "Ruth's House.  I wouldn't dump there.  I would never dump there.  It's right in front.  Everyone would see it.  Someone else could have taken the gas can and put it there."  That kind of thing for completeness?

ATTORNEY BRESLOW:  Right.  So that's the second issue.  Assuming it's admissible, and it clearly is, the defense has the opportunity to review the transcript and identify portions that it wants to introduce on redirect and I doubt the government will have much objection to that.

THE COURT:  Have you considered an alternative B, which is a completeness reading?

ATTORNEY WATKINS:  Yes, Your Honor, but then as the court will see there's little pieces of it that shouldn't come in that are not having anything to do with anything.  There's comments, you know, there's swears. There's all kinds of things that are best left out of here

and therein lies the problem.  I would have to now work through the call myself to try to figure out what needs to be redacted and what didn't.

We are very close to end of the trial.  If the court -- if the government really thinks that they need this one last piece there, then I will certainly try to go through both the transcript and the phone call with Mr. Rathbun to try to do the best we can to redact.  Let's bring in those other completeness matters.  But, boy, in the scheme of things, one wonders whether life is too short at the end of this trial to be going down this particular rabbit hole.

ATTORNEY BRESLOW:  Well, it's 30 seconds of conversation, Your Honor, and it's directly related to issues that have been raised by the defense in Mr. Rathbun's direct examination.

THE COURT:  I mean, there's gold nuggets in here for the defense.

ATTORNEY WATKINS:  It's true, and part of me just says let's play the whole phone call and just throw the thing up there, but.

THE COURT:  There's also some talk on page 7 about, you know, the dumpster he went to and it's between new houses.  That's the last dumpster.  He doesn't think he went to the dumpster at Ruth's House.  I swear -- and

then he's talking about another dumpster, and then he says "I swear that's the last place I went to dump. I think that's where I threw the gas container."

ATTORNEY WATKINS: So I guess that's where we are. We'll play the whole phone call and let the chips falls.

THE COURT: What's the whole phone call?

ATTORNEY BRESLOW: Your Honor, what we'd like to do, assuming Your Honor believes that this is relevant and admissible, we'd like to sit down with Mr. Watkins and determine what the scope of completeness is as far as he's concerned and then we will make a decision about that.

THE COURT: I think it's -- I mean, I can see some relevance. Okay. So you've convinced me I do see some relevance. Attorney Watkins has convinced me that putting it into context of in jail/out of jail, things like that, frankly may be more prejudicial and outweigh the degree of relevance that I find.

Just looking at this from a potential benefit and I don't know if I -- I don't want to overstep what I'm supposed to be doing, but looking at this for usefulness to both parties, there seems be useful portions for both parties if this was played.

ATTORNEY BRESLOW: I believe again I wasn't present for the first trial, but I believe that's -- I

can't recall exactly why ultimately the government didn't offer this and it may have been on an inability to agree on completeness.

THE COURT: Maybe. So do you want -- I mean, I can give you -- I can tell you right now, I'm inclined not to allow it if the defendant is standing by its objection of it's too complicated and prejudicial to explain the in jail/out of jail and too complicated to put it into context.

Although I think it's relevant, Attorney Breslow. I don't think it's such a big deal that the government hasn't been able to address this from different angles. I don't think you're extremely harmed by that so that would be my ruling.

I'll give the parties a second if you want to talk about an agreement. But if defense, if you're not going to agree as to some type of completeness playing, I'm going to deny the government's request. If you want to reconsider and talk to them for five minutes, you have five minutes.

ATTORNEY WATKINS: Thank you, Your Honor.

THE COURT: You're going to take the five minutes?

ATTORNEY WATKINS: Yeah, I think so.

THE COURT: Okay.

(Short pause in the proceeding.)

ATTORNEY BRESLOW:  I think it's likely clear we don't want to delay further.  We will just -- I think it's going to be likely we are not going to be able to agree so we will just proceed.

THE COURT:  All right.

**(The jury entered at 9:32.)**

THE CLERK:  All rise for the jury.

THE COURT:  You can be seated.

Good morning.  I hope you enjoyed your drive in in the thunder and lightning.

All right.  So over the weekend was everyone able to follow my instructions not to talk to anyone about this case including each other if you happened to see each other or, I don't know, bump into each other?  Not to talk to anyone including each other?  Not to investigate this case?  Not to allow yourself to be exposed to any media, if there were any?  To do no research on the case?  Nothing to do with the internet or social media, blogging, actively blogging, saying things or reading anything about the case?  Was everyone able to follow all those instructions.

THE JURY:  (Yes.)

THE COURT:  Okay.  Affirmative response from every juror.  They remain fair and impartial and we will

continue with the cross-examine.  All right.  Very good.

ATTORNEY BRESLOW:  Thank you, Your Honor.

**John Rathbun**

**CONT'D CROSS-EXAMINATION**

Q.   (By Attorney Breslow) Good morning, Mr. Rathbun.

A.   Good morning.

Good morning.

Q.   Once again, just like on Friday I'm going to ask you yes or no questions.  Okay?

A.   Yes, sir.

Q.   And you'll have an opportunity to explain your answers.

ATTORNEY WATKINS:  Objection, Your Honor.

THE COURT:  Sustained.  I don't think we need the instructions again.  We've had them.  Mr. Rathbun has had them.

ATTORNEY BRESLOW:  Does he need to be re-sworn?

THE CLERK:  He remains under oath.

THE COURT:  Generally when there's a weekend break we reissue the oath.

THE CLERK:  Okay.  We can do that.

Mr. Rathbun.

**John Rathbun (Sworn)**

THE COURT:  Ladies and gentlemen, generally when there's a weekend break, whoever happens to be the witness

on the stand, we reissue the oath because of the weekend. If it's just day to day, we don't reissue the oath.

One other thing I wanted to tell you, when you were back in the hallway waiting to come in just now, or if at any time when you're waiting to come in, if you happen to hear through the doors any of the discussions that I'm having with the lawyers in here, you should -- I don't know, can you hear it?

You can't. Okay. I was going to tell you if you heard anything, to completely disregard and don't speculate what you might be hearing but if you couldn't really hear it, then fine. All right.

ATTORNEY BRESLOW: Okay. Great.

Q.   (By Attorney Breslow)  So when we left off on Friday, do you remember we talked about two windows of time on April 2nd?

A.   Yes.

Q.   And the first one was between two telephone calls to Devin Austin; do you remember that?

A.   I do.

Q.   The first at 4:34 a.m. from the area around your home and the second was at 5:01 a.m. when you were traveling on I-91; do you remember that?

A.   I do.

Q.   Okay. And the second window was a 57-minute window

of time from 6:09 to 7:06 a.m.; do you remember that?

A.   Yes, sir.

Q.   Okay.  So I want to give you a preview of where we are going to be going this morning.  This morning I'll be asking you a fair amount of questions about some of the statements that you've made concerning this case.  Okay?

A.   Yes, sir.

Q.   But before we go there, please tell the jury on November 23, 2020 were you convicted in federal court?

A.   I don't believe so.  Could you broaden that a little?

Q.   I'm sorry?

A.   Could you broaden that a little?  I don't quite understand.

Q.   After a prior proceeding --

A.   Yes.

Q.   -- were you convicted in federal court?

        THE COURT:  Please name the exact charge.

        THE WITNESS:  Yeah, I don't understand.

        ATTORNEY BRESLOW:  Okay.  That will be easier.

Q.   (By Attorney Breslow) Was that conviction for knowingly and willfully making a materially false, fictitious, and fraudulent statement to a federal official?

A.   Yes.

Q.   Okay.  Now let's talk about some of the other

statements you've made.

First, do you remember your testimony on Friday about your mom keeping tracts in the front seat cup holder of her car?

A.   I believe so.

Q.   So, first, do you remember I asked you does your mom keep tracts in the cup holder of her car and do you remember your answer?

A.   I don't recall my answer.

Q.   You said, "no."  Do you remember that?

A.   I do now, yes.

Q.   Okay.  And then you testified that your mom sometimes keeps tracts in the cup holder, right?

A.   That's correct.

Q.   But you said not always, right?

A.   Correct.

Q.   So is that still your testimony?

A.   Yes.  She sometimes keeps tracts in the cup holder of the car, yes.

ATTORNEY BRESLOW:  So I'd like to display for the court, counsel, and the witness only PX-123 page 144 lines 14 to 20.

I don't think it's on counsel's monitor yet.

THE CLERK:  It's not.  What are you using?

MS. McKENNA:  HDMI-1.

THE CLERK:  There it is.

ATTORNEY BRESLOW:  If we can just expand this screen to cover 14 to 20?

Thank you.

Q.   (By Attorney Breslow)  Mr. Rathbun, in a prior proceeding when you were sworn under oath, just like you the oath you took now, were you asked this question and did you give these answers?

A.   Yes, sir.

Q.   "And you heard that Natalie said your mom always keeps one in the front seat cup holder."  Do you remember her testifying to that?

A.   That's what she testified to.

Q.   No.  No.  I'm sorry.  What I'm going to do is just -- what I'm going to do is I'm just going to read the whole question and answer and then I'm going to ask you a final question at the end.

So just to be clear, these are not my questions. These are the questions that I'm reading from what's in front of you on the screen.  Okay?

A.   Sure.

Q.   Is that clear?

All right.  So in the prior proceeding were you asked "And you heard that Natalie said your mom always keeps one in the front seat cup holder; do you remember her

testifying to that?

"Answer:  I do remember that.

"Question:  That's true, right, she does keep one in the cup holder?

"Answer:  She does."

Mr. Rathbun, the question I have for you is did I read that right?

A.    Yes, you did.

Q.    Okay.  Now do you remember Mr. Watkins asking you about how you lost your job at All Energy Solar?

A.    I do.

Q.    You testified I believe that there were two meetings with your bosses; is that right?

A.    Yeah, I think so, yeah.

Q.    And the first meeting took place on March 3rd, correct?

A.    Correct.

Q.    All right.  And I think you stated that one of your bosses was Alfie?

A.    He's the general manager and then Chris is my manager, but, yes.

Q.    Chris Myerhoff?

A.    Correct.

Q.    And this meeting was with both of them, right?

A.    Correct.

Q.    So before then on March 3rd your drug use had caused you to drive dangerously in a company truck; is that right?

A.    That's correct.

Q.    And you drove so dangerously that Alfie and Chris received many complaints about your driving, right?

A.    That's correct.

Q.    And they called you and they told you to come in right away, right?

A.    Yes, sir.

Q.    I think you said you were about half an hour away; is that right?

A.    Correct.

Q.    You came in like three hours late, right?

A.    Correct.

Q.    And that's in part because you were still using drugs, right?

A.    Correct.

Q.    So when you finally showed up, Alfie asked you were you under the influence?  Were you intoxicated, right?

A.    That's correct.

Q.    And you said no?

A.    Yes, I did.

Q.    And then Alfie asked you were you driving dangerously, right?

A.   I don't recall that question, no.

Q.   He asked you about the complaints?  That's why he called you in, right?

A.   Yes.

Q.   And the complaints were for you driving dangerously?

A.   Correct.

Q.   So he asked you about these complaints, yes?

A.   No.  I do not recall him asking me about that, no. He said there was complaints that were called in.  That was it.

Q.   Okay.  And you told him that you had not driven dangerously?

A.   Correct.

Q.   I'm sorry?

A.   Yes.

Q.   And that was false too, right?

A.   Correct.

Q.   Now, you didn't tell Alfie and Chris the truth because you liked your job, right, and you wanted to keep it?

A.   Yes.  I'm ashamed of my drug use.  It's not something I like to be honest about.

Q.   Mr. Rathbun, that's not the question I asked.

        ATTORNEY WATKINS:  Objection.

        THE COURT:  Sustained.  Next question please.

ATTORNEY BRESLOW:  I'd like to display for the entire courtroom PX-52 page 28 line 457.  If you can just focus on line 457.

Q.   (By Attorney Breslow)  Take a look at that, Mr. Rathbun.  Just read it to yourself.

A.   I've read this many times.

Q.   Okay.  Do you remember Mr. Watkins asking you several questions about this very text message?

A.   I believe he did, yes.

Q.   This is a text message that you sent to Devin Austin on April 2nd at 4:32 a.m., right?

A.   Correct.

ATTORNEY BRESLOW:  So if we can just blow up -- if we can zoom back out and then blow up the message?

Q.   (By Attorney Breslow)  All right.  You texted "Dude, I got a hundred in cash sitting in front of me," right?

A.   That's correct.

Q.   But you did not have a hundred in cash sitting in front of you, right?

A.   That is correct.  I did not.

Q.   You did not tell Devin the truth because you wanted him to give you drugs, right?

A.   Correct.  I didn't tell him the truth, correct.  What did you say?  I'm sorry, can you repeat what you said?

THE COURT:  He said because you wanted him to

give you drugs; is that right?

THE WITNESS:  Correct, yes.

ATTORNEY BRESLOW Right.

Q.   (By Attorney Breslow)  And in that same text you said "I'm right around the corner from you," right?

A.   I did say that, yes.

Q.   That was also false, right?

A.   That is correct.

Q.   Because you were still at your home in Longmeadow, right?

A.   Yes, I believe so.

Q.   And you did not tell Devin the truth here also because I believe you testified on Friday when Mr. Watkins asked you questions about this that you wanted to pressure him into giving you drugs, correct?

A.   Right.

Q.   And that was false too?

A.   That I wanted to pressure him into giving me drugs?

Q.   No, that's true.  I understand that you're saying that's true.  The statement why you said it?

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.

ATTORNEY BRESLOW:  I think I should ask a better question, Your Honor.

THE COURT:  Sure.

Q.    (By Attorney Breslow)  So the statement that you were right around the corner from him at 90 El Paso Street, that was false also?

A.    Correct.

ATTORNEY BRESLOW:  Now, if we can display PX-52 page 30, line 44 to the entire courtroom?

Q.    (By Attorney Breslow)  Do you remember Mr. Watkins asking you on direct examination --

ATTORNEY BRESLOW:  Oh, I'm sorry, we need the jury monitors.  Thank you.

Q.    (By Attorney Breslow)  Do you remember Mr. Watkins asking you questions on direct examination on Friday about this text also?

A.    Yes.

Q.    Okay.  So if we can just -- this was sent on April 2nd a little later at 5:34 a.m., right?

A.    That is correct.

Q.    Okay.  At some point on the fourth line you said "trust me please and I'll go away."  Right?  Do you see that there?  "I just need" --

A.    I'm just reading prior to it.

Q.    Yeah, read the whole thing and tell us when you're done.

A.    Yes, I did say that.

Q.    Okay.

A.   I said, "trust me please and I'll go away."

Q.   Right.  So you and Devin had known each other for awhile, right?

A.   That is correct.

Q.   You testified that he was one of your drug suppliers?

A.   Slash friend, yes.

Q.   Right.  And you also testified that he was a friend?

A.   Yes.

Q.   And here you're telling him trust me please, correct?

A.   Correct.

Q.   It's fair to say that Devin didn't always trust you, right?

A.   Yeah.  Yeah.

Q.   Now let's focus on a new topic.

I want to focus on your life and your mental state in the period leading up to April 2nd.  Okay?

A.   Sure.

Q.   So we're shifting topics to that.

Your marriage had ended in divorce, right?

A.   Yes.

Q.   And I think you testified in part your relationships, including with women, failed because of drug use; is that right?

A.   Amongst other things, yes.

Q.   Right.  And so you had to move back out of your house

into your childhood home, right?

A.    I did.

Q.    And you were living with your mom and dad, right?

A.    Yes, I was and my daughter and my dog.

Q.    Right.  And your teenage daughter Natalie and your dog, right?

A.    That's correct.

Q.    So in January you got into such a big argument with your daughter that she had stopped talking to you entirely, right?

A.    I don't think it was just that argument.  It was, you know, little arguments leading up to that.  It wasn't just a one, you know, big huge argument, but arguments leading up to that that made it so I had to give her some space, yes.

Q.    Okay.  And you upset your daughter so badly through these --

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.

Q.    (By Attorney Breslow)  Okay.  Well, you talked about giving your daughter some space, right?

A.    Uh-huh.  Yes.  Sorry.

Q.    She didn't want to talk with you anymore and you were living right next to each other on that second floor?

A.    She needed some space from me, yes.

Q.    Right.  And so your mother moved you out of your bedroom down to the first floor, right?

A.    It was a mutual agreement.

Q.    Okay.  It's a mutual agreement between you and your mother?

A.    Correct.

Q.    But that's what your mother wanted you to do, right?

A.    And also I thought it was best for Natalie also.

Q.    Okay.  So you weren't just fighting with your daughter though, right?

A.    I'd have small arguments with my mother too sometimes, yes.  I was using drugs at this time.

Q.    Right.  I'm not asking about the drugs.  I'm just asking right now about the arguments.  Okay.  Okay?

A.    Sure.

Q.    So you were fighting with your mother a lot, right?

A.    Once or twice a week.

Q.    Right.  And in those fights you swore at her, right?

A.    I would sometimes, yes, swear at her.

Q.    And you would shout and scream at her, right?

A.    Yeah, I would say so.

Q.    And for your mom's part, she didn't swear back at you?  She tried to keep her calm, right?

A.    That is correct.

Q.    But you week after week would shout and scream and

swear at her?

A.   Again, I was using drugs but, yes.

Q.   And these arguments sometimes they had to do with your mom just forgetting to get you cigarettes, right?

A.   Yes, sir.

Q.   And sometimes all it took was your mom forgetting to bring back a grocery or two that you wanted, right?

A.   Absolutely.  I was very agitated at that time, yes.

Q.   Yeah.  Yeah.  You testified that on direct that during this period of time you were getting more and more agitated, right?

A.   That's correct.

Q.   And you were getting so agitated that little things like cigarettes or a missed grocery would set you off, right?

A.   I wouldn't say set me off.  But, yes, they would cause an argument.

Q.   Not just an argument though, but like a screaming, shouting, swearing argument?

A.   It was an argument.

Q.   Right?

A.   Correct, an argument.

Q.   That was the kind of argument?

A.   I said, yes.  It was an argument, yes.

Q.   Okay.  And I think you testified when Mr. Watkins

asked you you were not seeking any treatment at all, right?

A.    I was on Methadone.  I was getting counseling at the Methadone clinic but other than that, no, I did not receive any treatment.

Q.    Okay.  You were abusing a wide range of drugs it's fair to say?

A.    That's fair to say.

Q.    And that included heroin?

A.    Yes.

Q.    Crack?

A.    Yes.

Q.    Powder cocaine?

A.    Yes.

Q.    Benzos?

A.    Yes.

Q.    Xanax?

A.    The same thing.

Q.    Okay.  Alcohol?

A.    Yes.

Q.    And sometimes you were taking many of these drugs together, right?

A.    Correct.

Q.    Now, one month before April 2nd -- I want to return to March 3rd -- you had gotten so high on drugs that in

your own words you were out of your mind, right?

A.   That's what I said, yes.

Q.   Well, that was true, right?  Your description of yourself?

A.   I had used a lot of drugs that night, yes.

Q.   And this was at the Quality Inn with Dana Graham?

A.   Correct.

Q.   You had gotten so high you thought people were breaking into your van?

A.   I had used a lot of drugs that night, yes.

Q.   And you became so suspicious that you actually went downstairs to check out the people in the van, right?

A.   That is correct.

Q.   And Dana told you there was nobody in the van, right?

A.   She did.

Q.   But you were certain that there were people in your van?

A.   That's what I thought at the time, sir.

Q.   Right.  And you were so certain you decided to call the police?

A.   That's what I did.

Q.   Even though you and Dana were high, right?

A.   Right.

Q.   And even though the room was filled with drugs, right?

A.    Yes.

Q.    And all those drugs that we just talked about they were all there in that room?  You were using heroin, right?

A.    Correct.

Q.    Crack?

A.    Yes.

Q.    There was powder?

A.    Yes.

Q.    And benzos for you?

A.    Yes.

Q.    And alcohol?

A.    Yes.

Q.    So Dana told you don't call the police because they might come to the room and find all these drugs, right?

A.    Yes.

Q.    But you decided, you decided to call the police anyway?

A.    Yes, I did.

Q.    Because you were so convinced there were people in your van?

A.    That is correct.

Q.    And that was a conscious decision you made, wasn't it?

A.    Correct.

Q.    You called the police and you told the police there were two or three people in your van, right?

A.    That's what I said.

Q.    You told them they were stealing something.  They were moving around.  They were screwdriving something.  You could see them very clearly, right?

A.    That's what I said.

Q.    And I think you testified on Friday that in response to your call of a van break in in the parking lot of the Quality Inn in Chicopee, six or seven police cars showed up?

A.    Correct.

Q.    And is that still your testimony that six or seven police cars showed up for your call?

A.    Yes.

Q.    Okay.  When the police came to the motel, you got out on your balcony and you shouted down to the officer there's people in the van, right?

A.    I don't recall if I did that, sir.

Q.    You don't remember?

A.    I don't remember doing that exact thing that you're saying.

Q.    Okay.  Well, let's break it down.

      Do you remember the police arriving?

A.    Yes.

Q.   Do you remember you coming out onto that balcony or sort of outdoor space outside your hotel room that was overlooking the parking lot?

A.   It was a window.

Q.   A window.  Okay.

Do you remember leaning out the window and talking to the police?

A.   I do.  I do.

Q.   Do you remember telling them there's people in the car?

A.   I might have said that.  I don't recall right now.

Q.   Okay.  Do you remember the officer telling you that there was no one in the van?

A.   Eventually when I came down, yes.

Q.   All right.  So eventually you came down to the parking lot, right?

A.   Yes, sir.

Q.   You were only in your boxers, right?

A.   That's correct.

Q.   The officer was about 10 or 15 feet away from you, right?

A.   Yes.

Q.   And your van wasn't that far away either?

A.   Correct.

Q.   And you told the officer there's people in the van,

right?

A.    That's what I said.  Yes, sir.

Q.    And the officer -- it was just one officer, right?

A.    There was a couple.  There was one talking to me but there were a couple next to him.

Q.    Okay.  And the officer was talking with you and he told you there was no one in the van, right?

A.    That's what he told me.

Q.    But you were convinced even then that there were?

A.    At that time, yes.  I had used a lot of drugs that night, correct.

Q.    So can you tell the jury now were there or were there not people in your van?

A.    There was not anybody in my van.  I was very high.  I used a lot of drugs that night.

Q.    And March 3rd it's fair to say was not the only time you had gotten so high like that, right?

A.    That night is very rare.  I mean, it happens.  But that night especially after being fired from my job, I really was in a bad down place.

Q.    Right.  Right.  You were -- I mean, it's fair to say you were -- your life was basically spiraling down at that point, right?

          ATTORNEY WATKINS:  Objection.

          THE COURT:  Overruled.

THE WITNESS:  Yeah, I'd say so.

Q.   (By Attorney Breslow) And it's fair to say also by this point that things were going out of control with you, right?

A.   I don't know if I'd use out of control.  I mean, I was still coherent.  I was still able to drive.  I was still able to go on my phone looking for jobs I mean.

Q.   Okay.  Actually let's just focus on that for a moment.

That night all those things applied, right?  You were coherent?  You could use your phone?  You could call 911?  You could talk back and forth with the police, right?

A.   I mean for the most part, yeah.

Q.   I mean, you were seeing people who weren't in your van but, otherwise, you knew what you were doing that night, right?

A.   For the most part.  I mean, again I was under the influence so.

Q.   Right.  But you knew when you picked up the phone for example that you were picking up the phone, right?

A.   Correct.

Q.   You knew when you called 911, that you were calling 911?

A.   I did.

Q.   And you knew that when you were talking to the

police, you were actually talking to the police, right?

A.   Oh, yes.

Q.   You made the decision, good or not, to call the police and come to your hotel room even though there were drugs all over it, right?

A.   Yes.  At that time I wasn't worried about the drugs. I thought somebody was breaking into my car.

Q.   You were so suspicious about the people in your car that you made the conscience decision to weigh those risks and decide I'm going call the police about these people in my car and not worry at the time about the drugs in my room?

A.   Correct.

ATTORNEY BRESLOW:  Okay.  Can we put up solely for the court, counsel, and the witness PX-94 page 5, line 16 to 22?

Q.   (By Attorney Breslow)  I'm just going to ask you very plainly once again, Mr. Rathbun, at this point in your life things were going out of control with you, weren't they?

A.   Yes.

Q.   On March 3rd all the way up through when the FBI came to your door on April 15th, right?

A.   No, because with the COVID going on, I mean I used for -- I didn't use for like a week and then I used

and then I didn't use so I was.

Q.   You were on and off for you?

A.   Yes.

Q.   Okay.  Now I'd like to focus now on three other statements that you've made in this case to Special Agent Ryan McGonigle of the FBI on April 15th.  Okay?

A.   Sure.

Q.   All right.  So the first concerns the canister, have you possessed or seen the gas canister?  The second that I want to cover with you is where you were on April 2nd; and the third is if you were familiar with the crime scene, that place outside the Ruth's House -- that place on Ruth's House road.  Okay?

A.   Sure.

Q.   All right.  So before we get into these statements, I want to focus a little bit on the background.

     You agreed to talk to Special Agent McGonigle and another police officer, right, Pam Chaplin?

A.   I did.

Q.   And before the interview they provided *Miranda* warnings to you, right?

A.   They did.

Q.   That was both orally -- they read them aloud and then they gave you a form to sign, right?

A.   They did.

Q.   And you understood your rights?

A.   I did.

Q.   And you agreed to waive them?

A.   I did.

Q.   You signed the *Miranda* form?

A.   I did.

Q.   And you agreed to speak with the officers?

A.   Correct.  The FBI was at my house.  I wanted to figure out what was going on, sir.

Q.   Okay.  That wasn't my question.

My question was, you agreed to speak with the officers, right?

A.   To figure out what was going on, sir, yes.

Q.   Again, I'm just asking you a yes or no question.

ATTORNEY WATKINS:  Objection.

THE COURT:  Objection sustained.

Q.   (By Attorney Breslow)  Special Agent McGonigle asked you about your drug use, right?

A.   He did.

Q.   He asked you when you last used drugs, yes?

A.   Yes.

Q.   And you told him about a month ago, correct?

A.   I did.

Q.   And that was false?

A.   Correct.  Again, drug use is embarrassing.  It's not

something I want to divulge very often.  It's just not something I like talking about.

THE COURT:  Mr. Rathbun, Attorney Breslow is trying to ask you questions that only require a yes or no answer.  All right?  That does not give you the room to try to go into a longer explanation on every question.

I mean, once in a while I understand you need to explain a little.  But for the most part when you're being asked yes or no questions, try to just keep it to yes or no.

THE WITNESS:  I apologize, Your Honor.

THE COURT:  Okay.

Q.  (By Attorney Breslow)  Let's follow up on that.  So it sounds like what you're saying is if I'm embarrassed about something like my drug use, I'm going to lie about it, right?

A.  I'm going to withhold, yes.  Absolutely.

Q.  Well, not just withhold, let me not use the word lie.  You will say something that you know to be false?

A.  Yes.

Q.  So in this case Special Agent McGonigle specifically asked you when the last time you used drugs was, right?

A.  He did.

Q.  And you didn't just withhold; you affirmatively told him something that was untrue?

A.    I did.

Q.    And that was untrue because you knew you had used drugs more recently than a month ago, right?

A.    Correct.

Q.    And you told him a false statement because you were embarrassed?

A.    Absolutely.

Q.    Is that your testimony?

A.    Yes, sir.

Q.    And you next told him when this topic came up that you used drugs about two weeks ago, right?

A.    I did.

Q.    And two weeks ago -- about two weeks ago, that was April 2nd, wasn't it?

A.    Correct.

Q.    And that was the night that you started using drugs on April 1st.  You knew you were going to run out.  You asked to borrow your mom's car and you left in the early morning to go to Springfield to find Devin Austin?

A.    Correct.

Q.    And you had remembered that at that time you were talking to Special Agent McGonigle, right?

A.    Yes.

Q.    But you didn't tell him about that when he asked you the first time?

A.    Correct.

Q.    And this statement also was false, correct?

A.    Correct.

Q.    Because you knew you had used drugs more recently than that?

A.    That is correct.

Q.    In fact, you had used drugs just the night prior, right, on April 14th going into the 15th?

A.    That is correct.

Q.    And you finally admitted this, right?

A.    I did.

Q.    But only when Special Agent McGonigle told you or asked you if you would take a drug test, right?

A.    Correct.

Q.    And it was only then when you were confronted with an actual test of your honesty did you say, look, I'm going to test positive, right?

A.    Yes.

Q.    Now do you remember Mr. Watkins asking you about your mental state during your interview on April 15th?

A.    Yes.

Q.    This was just on Friday?

A.    Okay.

Q.    And I think you testified to this jury that you were in a drug haze that morning; is that right?

A.   The morning I was interviewed, sir?

Q.   Right.  I realize we're talking about some different times frames so let me be really clear about it.

I'm not focusing you on your testimony on Friday when Mr. Watkins was asking you questions.

A.   Okay.

Q.   And he was asking you questions about the morning of April 15th.  Okay?

A.   Okay.

Q.   And you told this jury that on the morning of April 15th you were in a drug haze, right?

A.   If that's what I said.

Q.   Well, did you say if that's what I said?

A.   Yes.

Q.   So you testified just on Friday -- that's what I'm asking you about.

A.   Okay.

Q.   Do you not remember or do you remember what you said on Friday?

A.   I did say I was in a drug haze.

Q.   Okay.  So you told Special Agent McGonigle when he asked about your level of impairment that you were not impaired; isn't that right?

A.   That is what I said.

Q.   Okay.  So I just want to be clear because we are

talking about two different time frames.

On April 15th you told Special Agent McGonigle, no, I'm not impaired, right?

A.   That is correct.

Q.   And then just on Friday you testified to this jury that in fact you were impaired?

A.   That is correct what I said.

Q.   Okay.  And you also testified on Friday that that morning you felt confused or you were confused; is that right?

A.   I was under extreme stress that morning.

Q.   That's not my question.

A.   It was hard to recall things.

Q.   That was not my question.  I'll ask it again.

You testified on Friday with this jury that you were confused, correct?

A.   Absolutely.

Q.   And did you tell Special Agent McGonigle that you were confused at any point?

A.   I don't recall.

Q.   Well, think about it for a minute because it would be natural to do so if you were confused, so just think about it and --

A.   I don't recall.

Q.   You don't remember?

A.    No.

Q.    In fact, you never told him you were confused, right?

A.    I don't recall.

          ATTORNEY BRESLOW:  Okay.  I'm going to ask that we display PX-123 page 152, lines 23 to 34 only to the court, counsel, and the witness at this point.

Q.    (By Attorney Breslow)  Can you read those lines? It's line 23 to 34?

A.    I do.

Q.    All right.  I mean, 23 to 24 sorry.

      So does that help you remember that you never said you were confused?

A.    I guess I didn't, correct.

Q.    You also testified -- just to be clear, and it's probably my question and not your answers, you never told Special Agent McGonigle on April 15th that you were confused, right?

A.    Correct.

Q.    So you could have obviously?

A.    Been confused?

Q.    No.  No.  You could have told him you were confused?

A.    Yeah, I could have told him.

Q.    But you didn't?

A.    Correct.

Q.    And you could have told him you were in a drug haze?

A.    Say the question again.

Q.    Sure.  I'll slow it down.

You could have told him you were in a drug haze, right?

A.    Correct.

Q.    But instead you told him you were not impaired?

A.    That is correct.

Q.    All right.  And now you also testified to this jury that you were freaking out, right?

A.    Correct.

Q.    And in part were you freaking out because the agents had woken you up at gunpoint with a gun pointed at your head?

A.    Absolutely.

Q.    Okay.  And then they marched you out of your home at gunpoint from your bedroom?

A.    That's correct.

ATTORNEY BRESLOW:  May I have a moment, Your Honor?

Q.    (By Attorney Breslow)  I'll display once again only to you, your counsel, and the court.

THE COURT:  We don't have it.

THE CLERK:  Here it goes.

THE COURT:  There we go.

ATTORNEY BRESLOW:  Okay.

Q.    (By Attorney Breslow) All right.  So I'd like to focus on lines 17 to 23.

A.    Yes.

Q.    So take a moment to read it and then I'm going to ask you a pretty simple question.

A.    Go ahead.

Q.    Okay.  So just let me read this and then I'm going to ask you the question.

Were you asked in a prior proceeding when you swore the same oath that you did today, "when was the first" -- "what was the first thing you noticed when the FBI came to your house?"  Was that question asked of you?

A.    Correct.

Q.    Did you give this answer:  "It was about 7:30 in the morning.  I was in bed sleeping and I heard rustling in the front door.  So I opened up my door.  I came out and there was a man with a rifle in front of me and an FBI vest on and he told me to come out?"

A.    That is correct.

Q.    Okay.  Now, we can take that down.

You did not tell Special Agent McGonigle you were freaking out, right?

A.    I think it was pretty obvious.

Q.    Okay.  But that's not my question.  I'll ask it again.

You did not tell Special Agent McGonigle that you were freaking out?

A.    I didn't.

Q.    You didn't, right?

A.    I did not.

Q.    And you did not ask for time to calm down?

A.    I had time.  There was breaks in between his questioning.  He was making a phone calls --

Q.    Okay.

A.    -- and such.

Q.    Right.  So he gave you breaks?

A.    There was breaks, yes.

Q.    But it's not like you were asking for breaks.  He was doing other things.  He was allowing you some time, right?

A.    Yes.

Q.    Okay.  And during those breaks you kicked around a soccer ball?

A.    That's correct.

Q.    Spent some time with your dog Tucker?

A.    Yes, I did.

Q.    Smoked cigarettes?

A.    Correct.

Q.    And wandered around the back yard?

    And the interview it took place over like a three or four hour period of time, right?

A.   Correct.

Q.   And throughout that period of time there were breaks that allowed you to sort of just be with yourself?

A.   Yes.

Q.   Okay.  And you testified to this jury that you were scared during the interview; is that right?

A.   It was an extremely stressful morning, yes.  I was scared, yes.

Q.   Okay.  But you didn't tell Special Agent McGonigle that you were stressed or scared, did you?

A.   That's kind of embarrassing.  It's not something I wanted to say as a man.  You don't really tell people that you're scared; you're embarrassed.

Q.   But you understood that Special Agent McGonigle wanted to make sure that you were aware enough to be able to answer his questions truthfully, right?

A.   Correct.

        ATTORNEY WATKINS:  Objection.

        THE WITNESS:  I'm sorry.

        THE COURT:  Overruled.

Q.   (By Attorney Breslow)  Your answer was correct?

A.   Correct.

Q.   And you even joked around for a little bit with Pat Carnahan, the agent who came and testified last week?

A.   I did.

Q.    And you joked around with Pam Chaplin, right, also?

A.    I believe so, yes.

Q.    Now did you also testify to this jury that your mind was not clear because of what you were accused of?

A.    I don't understand the question.  My mind was?

Q.    Sure.  I guess on Friday didn't you tell the jury that one of the reasons you were in an unsettled state of mind was because of what you were accused of?

A.    Yeah.  Yes.

Q.    Do you remember that testimony on Friday?

A.    I do.

Q.    Okay.  But this was a three or four hour on and off interview, right?

A.    Yes.

Q.    And Special Agent McGonigle didn't accuse you of anything until the very end; isn't that right?

A.    I believe so, yes.

Q.    Right.  You wanted to know why they were there, correct?

A.    I did.

Q.    You asked them why they were there, right?

A.    Multiple times.

Q.    And Special Agent McGonigle said we'll get to it but I have these questions that I want to go over first, right?

A.   That is correct.

Q.   And so not in the first hour, not in the second hour, really not until the interview pretty much ended did Special Agent McGonigle tell you why they were there, right?

A.   It wasn't at the very end but, yes, it was within the last hour, yes.

Q.   Right.  Well, you only realized what the crime was when Special Agent McGonigle showed you the pamphlet, that religious tract that had your blood on it, right?

A.   Yes.

Q.   And you only realized that they were there for that -- let me put it this way.

Special Agent McGonigle didn't tell you what you were accused of until he showed you those pamphlet pages, right?

A.   I believe he showed me the gas can first.

Q.   The gas can first.  But he didn't tell you what the gas can was at that point?

A.   No.  He just said that my blood was on this gas can.

Q.   Exactly.  Right.

And so later towards the very end of the interview when he showed you the tract and said your blood was on it and told you that that tract was part of a firebomb outside the Jewish nursing home, that was the first time

you -- that Special Agent McGonigle told you what the crime was, correct?

A.   Correct.

Q.   So when you testified to this jury that your mind was not clear because of what you were being accused of, that doesn't apply until the very end of the interview, right?

A.   It wasn't the very end but it was within the last hour.

Q.   Okay.  So let's focus on these three interview topics that we talked about just a little while ago.  Remember I said there were three we were going to talk about?

A.   Yes.

Q.   So the first topic that I want to talk about is your possession of the gas canister.

     So Special Agent McGonigle asked you had you ever had a yellow canister, right?

A.   Yes, he did.

Q.   And your answer was?

A.   No.

Q.   And then he asked you, well, have you ever seen a yellow container and your answer was?

A.   No.

Q.   And then Special Agent McGonigle said, well, your blood had gotten on a yellow container.  How could that be possible, right?

A.    I could not recall that morning what was going on; that is correct.

Q.    So actually that answer is nonresponsive.  I'm just going to move to strike it.

I only asked you --

THE COURT:  So who made the objection?  It's your objection?

ATTORNEY BRESLOW:  Yes.

THE COURT:  Okay.  Overruled.  Just move on.

ATTORNEY BRESLOW:  Okay.

Q.    (By Attorney Breslow)  You told Special Agent McGonigle there was no possible way that your blood could have gotten on a yellow fuel container?

A.    That's what I told him that morning, yes.

Q.    All of my questions are going to be about this morning, that morning.  Okay?

A.    Got it.

Q.    Got it.

So Special Agent McGonigle asked you specifically could your blood have gotten on this yellow container when you were working at someone's home, right?

A.    Yes, he did.

Q.    Now, you had done a job you testified just a few weeks earlier at somebody else's home?

A.    That is correct, sir.

Q.   And Special Agent McGonigle said to you is it possible that your blood could have gotten on the yellow gas container in that fashion, right?

A.   He did ask me and again I could not recall that morning, sir.

Q.   Okay.  But that's not what you said to Special Agent McGonigle, right?  You didn't say you couldn't recall?

A.   Correct.

Q.   You said it was not possible, right?

A.   That is what is said.

Q.   Now you testified with Mr. Watkins and I think just now that you didn't remember -- you didn't recall possessing the gas canister on April 15th; is that right?

A.   It was an extremely stressful morning, sir.  I could not put together how my blood got on that that morning, no.

Q.   Okay.  So we understand your testimony that it was an extremely stressful morning, Mr. Rathbun.

     The question that I'm asking you is you never told Special Agent McGonigle that you couldn't remember, right?

A.   I did not.

Q.   And you never told him, look, it was -- this is an extremely stressful morning.  I need time to think about it, right?

A.   I didn't think I needed to.  It was very obvious how I was.  I was shaking.

Q.   I'm just asking you a simple question.

A.   And I'm trying to answer it, sir.

Q.   Well, I'll ask it again.

Did you tell Special Agent McGonigle that you were experiencing such a stressful morning?  No, right?

A.   I didn't need to, sir.

Q.   That's not my question.

A.   It was obvious.

Q.   Did you tell Special Agent McGonigle that you were stressed?

A.   No, I did not.

Q.   Did you tell him you were confused?

A.   I did not.

Q.   Did you tell him you couldn't remember?

A.   I didn't need to, sir.

Q.   Did you tell him you couldn't remember?

A.   I did not.

Q.   Did you tell him that you were in a drug haze?

A.   I did not.

Q.   Okay.  So I want to focus now on what you told the jury with Mr. Watkins about you -- about how you got your blood on that yellow canister.

You testified on Friday that it involved a trash out

in Chicopee?

A.   That's correct, sir.

Q.   And it sounded like you had a pretty good memory of that job, right?

A.   I remember the job, yes.

Q.   Right.  I mean you remember it pretty well, right?

A.   I remember the job, yes.

Q.   Okay.  Well, you remembered it was at a house in Chicopee, right?

A.   That is correct.

Q.   You testified that the clients were a couple, right?

A.   It was a couple, correct.

Q.   Not just one person but a man and a woman, right?

A.   Yes.

Q.   And you testified that you did the job with a man named Chris Murray?

A.   That is correct.

Q.   And I think you testified that you didn't know Chris Murray directly but somebody had introduced you?

A.   Correct.  A friend of my introduced me to him.

Q.   It's fair to say that you didn't have any lengthy dealings with him until this trash out?

A.   That is correct.

Q.   All right.  And you had a pretty good memory about what the trash included, didn't you?

A.    Yes.

Q.    You said metal?

A.    There was a bunch of stuff, yes.

Q.    You said it involved metal?

A.    It involved metal.

Q.    It involved a pool deck?

A.    It did.

Q.    There were some sleds I think you testified?

A.    There were some sleds.

Q.    And, of course, you testified that there was a yellow container?

A.    There was a yellow container.

Q.    And you testified that you cut your hand on the metal, right?

A.    That is correct.

Q.    And the cut was so deep that it penetrated your glove, right?

A.    That is correct.

Q.    And that's how, you told this jury, your blood got on the container?

A.    That is exactly how my blood got on that container absolutely.

Q.    And that happened at the couple's house, right?

A.    That is correct.

Q.    When you were handling the metal?

A.    That is correct.

Q.    And it's fair to say that that took all day, that job?

A.    No, it didn't take all day.  It took a couple hours.

Q.    Okay.  You filled your van both inside and on the top you said?

A.    I did.

Q.    You even remember that some trash was spilling over in a parking lot, right?

A.    I, yeah, purposefully did that, yes.

Q.    And I think you testified to the jury that you thought it was a two-day job, right?

A.    It was a two-day job.

Q.    And you remember then that you didn't come back that second day?

A.    I did come back the second day.  I don't understand.

Q.    Do you have a specific memory of coming back that second day?

A.    Yes.

Q.    The Chicopee job was at the middle or the end of March, right?

A.    Correct.

Q.    And do you remember the exact date?

A.    I do not.

Q.    Okay.  And that's fair.  It was a long time ago.

And is it fair to say that this job stands out for you because you didn't have a lot of other work around that period of time?

A.    No, sir.  It stands out for me because I'm on trial for the gas can I touched.

Q.    Uh-huh.  It's fair to say that you didn't have another job like this with Chris Murray at a couple's house where there was sleds and pool decking?

A.    That is correct.

Q.    So this was really a unique job in that way, right?

A.    No.  I do clean outs all the time.  It was my first time working with Chris.  That's about the only thing unique to it.

Q.    Right.  What was unique about this -- that's what I was asking.

That was unique about this was you were working with Chris in Chicopee at a house that involved pool decking and metal and sleds, right?

A.    That's correct.

Q.    There's no other job that you did with Chris in Chicopee that involved that material, right?

A.    That is correct.

Q.    And you testified that you don't remember the exact date of the job, do you?

A.    Not the exact date, no.

Q.    That's okay.

I'm going to display PX-142 to only the court, counsel, and the witness.

Mr. Rathbun I'm just going to ask you to take a look at this.  Don't testify; don't say anything.  There's no question, but I want you to focus on -- if we can blow up the first line?

I'd like you -- the second line.

I'd like you to focus on your call log and who you were calling on the first line and then your instant message and who you were instant messaging with or calling with on line 2.  Do you see that?

A.    Yes, sir.

Q.    Okay.  And the date there is March 22nd, right?

A.    That is correct, sir.

Q.    And then I'd like to zoom back out of this and just focus on the other entries on March 22nd that involve Home Advisor.  Do you see those?

A.    I do.

Q.    Okay.  And does that help you remember that the job was around March 22nd or you first got involved in talking about the job on March 22nd?

A.    I could have done it sooner.  I could have talked to Chris after the job.  It doesn't really tell me for sure that I did the job around then, no.

Q.    Okay.  Well, take a look --

ATTORNEY BRESLOW:  If we can display that one more time just for the court, counsel, and the witness?  Is there a second page on that?  And a third page?  And if you can continue, and a fourth?

Q.    (By Attorney Breslow)  Do you see those entries, Mr. Rathbun?

A.    Yes, sir.

Q.    Can we continue?

And I'd like to focus you on page 55 and 56 -- I mean, item 55 and 56 of page -- let me get the page from Ms. McKenna for the record.

Okay.  We'll clarify that after.

Can you look at the email that you sent on page 55 and the instant message that you received on page 56?

A.    I see that, yes.

Q.    Okay.  Can we just blow up the last two columns for Mr. Rathbun and the court and counsel?

Does that help you remember that this job was around March 22nd or so?

A.    Yes, I guess.  Yes.

Q.    Okay.  Does this help you remember that the homeowner had that email address MTAY3553@gmail.com?

ATTORNEY WATKINS:  Objection, Your Honor.

THE COURT:  The objection?

ATTORNEY WATKINS:  May we be heard at sidebar?

THE COURT:  All right.

(Sidebar conference.)

ATTORNEY WATKINS:  Thank you, Your Honor.

THE COURT:  Your client's participation at sidebars -- he doesn't have a headset.  He usually does. Do you know if he's waiving listening to this portion?

ATTORNEY WATKINS:  I would like him to listen to it if possible.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Your Honor, if you can just speak up a little?  I can't hear all that well.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Thanks.

THE COURT:  Okay.  Go ahead, Attorney Watkins.

ATTORNEY WATKINS:  Your Honor, Mr. Breslow characterized his question as this being a text from the homeowner.  As we've heard testimony before, this is actually one of Mr. Rathbun's drug suppliers that is sending here and so he has set up a false premise for this particular question.  This text was not actually from the homeowner.  It's from one of his drug dealers.

THE COURT:  Okay.

ATTORNEY BRESLOW:  If the court reporter could read back the question, what I was asking about was the

email, not the text.  I know who Gabe is and I'm virtually certain that I was asking question about the email and not the text.

ATTORNEY WATKINS:  You've got both things up on the screen.

ATTORNEY BRESLOW:  I'll take that down and just focus on --

THE COURT:  Fair enough.  Objection sustained and I'll tell the jury to disregard it.  You can certainly go here but let's put the correct --

ATTORNEY BRESLOW:  If we can get the question read back?

THE COURT:  Okay.

(End of sidebar discussion.)

(Question read aloud.)

THE COURT:  Okay.  The objection is overruled.  The question is only regarding the email.

Can you answer that question?

THE WITNESS:  Yes, sir.  I do not recall whose email this is, sir.

Q.   (By Attorney Breslow)  Okay.  Maybe I missed something, but did you answer the question that I had asked previously before we had the sidebar?

A.   No.

Q.   Let me just display something else to you.  All

right?

So you remember that the trash out took place around this period of time, right?

A.    I believe so, yes.

Q.    So let's take a look at PX-132 now just to the court, counsel, and the witness.

So can you read it to yourself?  Just read that to yourself and let me know when you're done.

A.    Yes.

Q.    So this is an email from John Rathbun at Johnrathbun78@gmail.com, right?

A.    That is correct.

Q.    And that's your email address?

A.    Yes, sir.

Q.    And it's dated March 22nd, right?

A.    Yes, it is.

Q.    And the subject is job?

A.    Yes.

Q.    And this is the email that's referenced -- well, the email is sent by you to MTAY3553@gmail.com, right?

A.    Yes.

Q.    So if you can just read the text to yourself and let me know when you're done.

A.    I'm good, sir.

Q.    Okay.  So does this help you remember that that's the

homeowner?

A.    I did do a job, correct, yes.

Q.    Right.  But what I'm asking is, is this the email --
does this help you remember now that you've seen it that
this is the email concerning the trash out?

A.    This is the email concerning one of my trash jobs,
yes.

Q.    But I'm asking about the Chicopee one in particular.

A.    I don't know for sure if this is in regards to the
Chicopee one, sir.

Q.    Okay.  I'm going to -- but it is an email concerning
a trash out that you did around this period of time?

A.    It is, yes, sir.

Q.    Okay. All right.

        ATTORNEY BRESLOW:  So I'd like to offer this
into evidence now.

        ATTORNEY WATKINS:  No objection.

        THE COURT:  No objection, that will be
allowed.

        THE CLERK:  What's the number?

        ATTORNEY BRESLOW:  132.

        THE CLERK:  PX-132.

**(Exhibit PX-132 admitted.)**

Q.    (By Attorney Breslow)  Mr. Rathbun, do you remember
--

ATTORNEY BRESLOW:  We can publish it to the entire jury.

THE CLERK:  Okay.

Q.   (By Attorney Breslow)  So, Mr. Rathbun, you weren't fully licensed, were you, on March 22, 2020?

A.   A license how, sir?  I don't understand.

Q.   Sorry?

A.   Licensed how?

Q.   I thought you testified -- maybe I'm misremembering, but I thought you testified with Mr. Watkins that you had various licenses at some point, no?

ATTORNEY WATKINS:  Objection.

ATTORNEY BRESLOW:  I'll withdraw the question if I'm not remembering it right.

Q.   (By Attorney Breslow) So let me ask you this.  To do trash outs you don't have to be licensed?

A.   No, you do not.

Q.   Right.  And on March 22nd at this point in your life you weren't licensed as a home contractor, were you?

A.   No, sir.

Q.   All right.  And your business, it was more like what we would call a D/B/A, doing business as?

A.   Yes.

Q.   It wasn't incorporated or anything like that?

A.   Correct.

Q.   And your business didn't have a license either, right?

A.   Correct.

Q.   So when you said you're fully licensed, that's not true, is it?

A.   That is correct.

Q.   Okay.  And it's fair to say that you made that untrue statement to the homeowner because you wanted to get the job, right?

A.   Absolutely.

ATTORNEY BRESLOW:  Okay.  Your Honor, may I have a moment?

THE COURT:  Sure.

Q.   (By Attorney Breslow)  All right.  Mr. Rathbun, you testified on direct and I think on cross-examination about this period from April 2nd to April 15th, right?

A.   Uh-huh.

Q.   And so --

A.   Yes.

Q.   I don't want to mischaracterize your testimony and so I think I'll just ask you in this one instance this open-ended question about your drug use during this period of time.  What do you remember about using drugs from April 2nd to April 15th?

A.   It was not my normal drug use.  This was during the

pandemic again so I might have used once or twice.

Q.    Okay.  And by use, are you referring to heroin?

A.    Like I said, I did scrape the bag -- no, that was April 1st.  I could have used heroin during that time, yes.

Q.    Okay.  But you don't remember using any other drugs from April 2nd to April 15th?

A.    There might have been some crack cocaine in there too.  I'm not a hundred percent sure, but those are the drugs I usually use.

Q.    Right.  Heroin or crack.  But what I'm asking you is do you have a specific memory of using crack from April 2nd to April 15th?

A.    I don't.  I just know it was during the pandemic and I was at home and I wasn't able to get drugs.

Q.    Right.  Okay.  But with respect to scraping the bottom of the bag, do you remember telling Special Agent McGonigle finally that when he asked you about the drug test you said you might have scraped the bottom of the bag and you would test positive?

A.    I did.

Q.    And just so it's clear to the jury, when you say scrape the bottom of the bag, are you referring to heroin?

A.    Correct.

Q.    Okay.  So you had heroin during that period of time,

April 2nd to April 15th?

A.    I believe that was April 1st.

Q.    So again, let's clarify.

Do you remember Special Agent McGonigle asking you about your drug use?

A.    I do.

Q.    And you remember first saying a month ago?

A.    Yes.

Q.    Then two weeks ago?

A.    Correct.

Q.    And then do you remember him offering for you to take a drug test?

A.    Yes.

Q.    And you said to him, do you remember, I'm going to test positive?  I scraped the bottom of the bag last night?

A.    Correct.

Q.    Okay.  So that phrase, that refers to April 15th the night before, correct?

A.    Correct.

Q.    Okay.  And so you clearly had heroin during that period of time?

A.    Correct.

Q.    Did you have any crack?

A.    I can't recall for sure.  I might have done a push on

my stem possibly.

Q.   I'm sorry?

A.   I might have done a push.  It's when you scrape the crack pipe kind of.

Q.   So just so that's clear, is that when you're trying to get the residue out of a crack pipe?

A.   Yes.

Q.   And do you re-smoke it or something like that?

A.   Correct.

Q.   And that's called a push?

A.   Correct.

Q.   But other than that, you didn't have any crack during that period of time?

A.   Correct.

          ATTORNEY BRESLOW:  Okay.  One moment, Your Honor.

          THE COURT:  Uh-huh.

Q.   (By Attorney Breslow)  As compared to the period from April 2nd to April 15th where you just had that residue, on April 1st you had crack, right?

A.   Correct.

Q.   A decent amount of it because you smoked it all the way through?

A.   Yes.

Q.   And that was what you were going to look for on April

2nd, right?

A.    Correct.

Q.    And I think you testified with Mr. Watkins that you have eczema psoriasis; is that right?

A.    I'm sorry, I couldn't hear you.

Q.    Sure.  I think you testified to Mr. Watkins that you have eczema psoriasis?

A.    Correct.

Q.    And could you just tell the jury a little bit about that and how it affects your hands?

A.    So when I work, only when I'm working my hands get very dry and very cracked and the psoriasis makes it even worse.

Q.    Okay.  So is it fair to say that your hands, your fingers, they're going to be more vulnerable to cuts than like an ordinary person's hands who doesn't have that condition?

A.    I mean, there's a lot of calluses too so actually the skin is kind of hard and thick and so it would take something serious to cut it.

Q.    Depending upon where the calluses are?

A.    Yeah.

Q.    Right.  Okay.

       But otherwise if there aren't calluses, it would be more vulnerable to, you know, a cut or a scrape, right?

A.    It would.

Q.    Okay.  You might bleed a little more easily?

A.    Right like now, yes.

Q.    Okay.  Did you say like now?

A.    Yes, because I haven't worked in awhile so my hands are pretty soft and smooth.

Q.    Okay.  You weren't working every day in that period from March 3rd to April 2nd, right?

A.    From March?

Q.    From March 3rd when you got fired --

A.    Yes.

Q.    -- to April 2nd when you went out looking for drugs the night -- this is the night that we are all talking about.

A.    I was working.

Q.    No, but you weren't working all that much?  You weren't working every day?

A.    No.

Q.    You were spending a lot of time at home?

A.    I was spending some time at home, yes.

Q.    In your room?

A.    Yes.

Q.    By yourself?

A.    Yes.

            ATTORNEY BRESLOW:  Okay.  I'd like to display

PX-14 side by side with PX-71 page 3.  If we can zoom in on Mr. Rathbun's thumb?  Okay.

Actually if we can just take that down for a moment?

Q.   (By Attorney Breslow)  Mr. Rathbun, again if you can just explain to us a little bit more about using crack. So there's a pipe, right?

A.   Yes.

Q.   You have a pipe and you have a lighter, right?

A.   Yes.

Q.   And could you just tell the jury -- if it's not too difficult for you given that you're in recovery -- could you tell the jury a little bit about like what you actually do to smoke crack?

A.   You just put crack in the pipe and smoke it.

Q.   Okay.  So you put the crack in a pipe and then you just light it with your lighter?

A.   Correct.

Q.   And approximately how often do you have to -- like is the crack like a cigarette where it just stays burned and you can just smoke it or do you have to keep lighting it?

A.   It's not like a cigarette but you don't have to light it that much, usually once or twice.

Q.   Once or twice?

A.   Yes.

Q.    Do you have to refill the pipe?

A.    Yeah, every half hour or so.

Q.    Okay.  So just so I'm clear, let's say you have enough crack to last like four or five hours.  You are lighting it once or twice every half hour or so?

A.    Yeah.

Q.    Okay.  And do you remember how -- withdrawn.

I want to display PX-14 side by side with PX-71 and we can zoom in on the thumb.

Mr. Rathbun, that's the condition of your thumb on the morning the agents showed up, right, on April 15th?

A.    That is correct.

Q.    Do you see there's that circle-like scab on your thumb?

A.    It's -- yeah, that's --

Q.    I'm just asking can you see it?

A.    Yes.

Q.    Do you see it?

A.    I see it.

Q.    Okay.  And do you see there's a little blood coming off to the right like some older blood?

A.    That's from me picking it, yes.

Q.    So you were picking that scab?

A.    Yes.

Q.    Okay.  And so that's -- I want to focus back on April

1st to April 2nd.  You were using crack that night, right?

A.   Yes.

Q.   And actually you used so much of it that you ran out by the morning, by like the early morning hours, right?

A.   Yes.

Q.   So around 4:30 you ran out?

A.   Correct.

Q.   And that's when you started calling and texting Devin?

A.   Correct.

Q.   Okay.  When did you start using crack that night? Was it --

A.   Probably about 12:10.

Q.   Midnight?

A.   Yeah.

Q.   So you were using crack pretty much from midnight until 4:30?

A.   Pretty much.

Q.   And tell the jury what hand do you use when you light up your crack pipe?

A.   Well, I have a blow torch.  It's one of those little pop -- you know, your pop lighters.

Q.   What hand do you use?

A.   Right hand.

          ATTORNEY BRESLOW:  Okay.  Can I display -- Your

Honor, may I have a moment?  Thanks.

If we can take down the monitors?

Thanks.

Q.    (By Attorney Breslow)  You use a lighter, don't you, Mr. Rathbun, to smoke crack?

A.    It's a blow torch, sir.

Q.    A blow torch and not a lighter?

A.    No.  It's a little pop lighter, yes.

Q.    Sorry?

A.    Yes.  It's a pop, like you push the button.

Q.    Okay.  So a blow torch and not a lighter?

A.    Correct.

Q.    I'm going to display -- I'd like to display PX-123 page 181, lines 21 to 23.

Before we do that, I'm going to show you PX-109 just for counsel and the witness please.

Mr. Rathbun, do you recognize the items there?

A.    I do.

Q.    And does one of them include a lighter?

A.    There is a lighter there, sir.

Q.    And a chapstick there as well?

A.    There is a chapstick.

Q.    And there is little packages of -- well, to the right there's Xanax, those three pills?

A.    Yes.

Q.    And in the middle there's a lighter -- not a lighter, a crack pipe?

A.    That's correct.

Q.    And then you recognize the items in the bag, right, the little baggies that are wrapped up with rubber bands?

A.    Yes.

Q.    And what are they?

A.    That's heroin.

Q.    That's heroin.  Okay.

        And you recognize the chapstick, right?

A.    Yes.

Q.    And you recognize the table?

A.    I do.

Q.    So you sent that text message -- you sent that picture to Dana Graham on April 3rd, right?

A.    I believe so.

        ATTORNEY BRESLOW:  Okay.  I'm going to offer this into evidence at this point.

        ATTORNEY WATKINS:  Objection, Your Honor.

(Sidebar conference.)

        THE COURT:  Go ahead.

        ATTORNEY WATKINS:  Objection on relevance and also prejudice.

        ATTORNEY BRESLOW:  I'll take the prejudice first.  Mr. Rathbun testified I believe on direct --

THE COURT:  Prejudice isn't going to do it right now after all the testimony about the drug use.

ATTORNEY WATKINS:  This is on April 3rd after the event.

ATTORNEY BRESLOW:  It's on April 3rd.  He testified that he recognizes all the items in the picture, including the table.  These are all the -- these are some of the drugs that he uses.  He sent this he acknowledges on April 3rd to Dana Graham and this is relevant to the device that he uses to smoke crack.

THE COURT:  So the government is arguing that he got the blister on his thumb from using the lighter and that's what's making his thumb bleed?

ATTORNEY BRESLOW:  Exactly, and there's prior testimony on this, Your Honor, that I will be using to impeach him with later, but this is directly relevant to what he's just testified that he used a blow torch and not a lighter, a blow torch and not a lighter.

THE COURT:  I mean, the blow torch may be somewhere else.  It doesn't necessarily have to be there.

ATTORNEY BRESLOW:  He can explain it.

THE COURT:  What do you say, Attorney Watkins?

ATTORNEY WATKINS:  That's correct, that would be the answer to it and why this is misleading and unduly prejudicial.

ATTORNEY BRESLOW:  He can clarify that on redirect.

Your Honor, let me impeach him first and then return to this.

THE COURT:  Well, I think this theory regarding the blister on his hand being caused by a lighter because he smokes so much crack, I understand.

If the defense is going to object -- I mean, again we're back in a situation where here's more information about drug use all day all along so much you got blisters from lighters.  I mean, this goes directly to his mental state but the defense is objecting.  The objection is sustained.

ATTORNEY BRESLOW:  Your Honor, I'd like to revisit this after I impeach him.

THE COURT:  No.  You're going to move on.  Okay?

ATTORNEY BRESLOW:  Okay.

(End of sidebar conference.)

Q.   (By Attorney Breslow)  Mr. Rathbun, please take a look at PX-123 page 181, lines 21 to 23 which I'm displaying only to the court, counsel, and the witness.

Actually can we back up to the prior page and just the prior page for a moment?

Okay.  So, Mr. Rathbun, just take a look at this page for a moment and tell me when you're done reading.

A.    Okay.

Q.    So this page refers to your activities smoking crack on April 2nd, right, April 1st to 2nd?

A.    Correct.

Q.    If we can go forward and to the third page 181?

Okay.  If we can blow up lines 21 through lines 23?

In a prior proceeding when you were sworn under oath, just as you are now, were you asked this question "Can I ask you when you were smoking crack what hand were you using your lighter in?"

Were you asked that question?

A.    I was.

Q.    Did you give this answer:  "What hand do I use my lighter in?  My right hand."

A.    I was.

Q.    Okay.  So, Mr. Rathbun, you were using your lighter to smoke crack on April 1st through the early morning hours of April 2nd, right?

A.    I call the blow torch a lighter too.

ATTORNEY BRESLOW:  Okay.  Your Honor, I renew my offer.

THE COURT:  Attorney Watkins?

ATTORNEY WATKINS:  I still object, Your Honor.

THE COURT:  All right.  I will reverse my decision.  The photograph is admitted.

**(Exhibit PX-123 admitted.)**

Q.    (By Attorney Breslow) I'd like to display this now to the entire courtroom including the jury.

Mr. Rathbun, you took that picture, correct?

A.    Yes.

Q.    You sent it on April 3rd to Dana Graham, correct?

A.    Yes.

Q.    That picture depicts your crack pipe, correct?

A.    It does.

Q.    Your Xanax?

A.    It does.

Q.    Your heroin?

A.    It does.

Q.    And, Mr. Rathbun, your lighter?

A.    That is a lighter I use, correct.

Q.    Okay.  And that is your lighter?

A.    That is a lighter that I use.

Q.    To smoke crack?

A.    No.  That's not the lighter I use to smoke crack, sir.

Q.    Okay.  Is your testimony now that you do not use a lighter to smoke crack?  Is that what you're testifying to this jury?

A.    Sometimes I use both, but most of the time I use a blow torch, which I call a lighter.

Q.    Okay.  So just so we're clear, this is not a blow torch, right?

A.    It's not.

Q.    This object in green?

A.    My blow torch is not in the picture, no.

Q.    Right.  So this green lighter, that's a regular spark lighter where you have to run your finger along rough metal edges, a circular disk with rough metal edges, right, to spark the lighter?

A.    I wouldn't call them rough metal edges.  There's a safety on it.  It's not that rough.

Q.    So your testimony now is that this lighter is somehow different from the lighters that are commonly available?

A.    No.  It's the same as any other.

Q.    Is this a common lighter, Mr. Rathbun?

A.    Yeah.

Q.    Okay.  And this is your lighter, right?

A.    That is a lighter, one of them that I use.  Correct.

Q.    And this lighter is about three inches from your crack pipe; is that correct?

A.    It's also two inches from my marijuana that I use.

Q.    Okay.  But I'm asking you is it about three inches from your crack pipe?

A.    It is.

Q.    All right.  We'll move on.

Let's talk about a second topic in the interview which is where you were on April 2nd.

A.    Yes, sir.

Q.    Now, Special Agent McGonigle asked you where you were on April 2nd, correct?

A.    He did.

Q.    He didn't tell you why at that point, right?

A.    I don't believe so, no.

Q.    Right.  So in terms of the accusation that you testified he made to you later, he didn't tell you the significance of April 2nd at the time he asked you this question, right?

A.    I don't believe so, no.

Q.    And you told him you had not left the house in, according to your words on direct exam, about two weeks, right?

A.    Correct.

Q.    And two weeks before April 15th is April 1st?

A.    That is correct.

Q.    Okay.  And you were out of the house on April 2nd, right?

A.    I was.

Q.    So you were out of the house two weeks before April 15th, right?

A.    Correct.

Q.    And you had left the house sometime after 4:34 in the morning, right?

A.    I did.

Q.    And you're in your mother's car and you drove right down Converse Street soon after that, right?

A.    That's the direction to get to the highway, yes.

Q.    And you did not tell Special Agent McGonigle you were out of the house on April 2nd, did you?

A.    I could not recall that morning, sir.

Q.    It's just --

A.    No.

Q.    Sir, I'm just asking you a simple question.

            ATTORNEY WATKINS:  Objection.

            THE COURT:  Overruled.

            ATTORNEY BRESLOW:  I'll ask it again.

Q.    (By Attorney Breslow)  You did not tell Special Agent McGonigle that you were out of the house on April 2nd, did you?

A.    I did not.

Q.    You did not tell Special Agent McGonigle that you were driving your mother's car on April 2nd, did you?

A.    He didn't ask, sir.

Q.    Right.  He didn't ask you if you were driving your mother's car, that's correct.  He did ask you, however, which car you drive, right?

A.   He did not ask me which car I drove.  No, he did not.

Q.   Your testimony is he did not ask you which car you drove?

A.   No.  That morning on April 2nd he did not.

Q.   No, forgive me.  Let me make sure the question is clear.

When Special Agent McGonigle interviewed you on April 15th, he asked you which car was yours?  Which car you drove, right?

A.   Correct.

Q.   Not on April 2nd but which car you drove?

A.   Yes, in general, yes, which car is mine that I use, yes.

Q.   And you said I use the van?

A.   That's correct.

Q.   That's my car; that's the one I drive?

A.   That's the one that I use, yes.

Q.   That was false, right?

A.   I use my car.  It is the car that I use.  He didn't ask me about April 2nd.

Q.   No, I'm not talking about April 2nd.  Let me be clear.

You don't just use the van, do you?

A.   No.

Q.   In fact, you used your mother's car on April 2nd,

right?

A.   That's what I did, yes.

Q.   And not just on April 2nd, you used your mother's car a lot, right?

A.   I wouldn't say a lot but, yeah, I use her car more than mine for gas mileage.

Q.   Right.  You use her car more than yours?

A.   I wouldn't say that, no.

Q.   No?  About even?

A.   Yeah.

Q.   About even.

So when Special Agent McGonigle asked you which car do you use, which car do you drive, you told him part of the story, right?  It was true that you use your van?

A.   It is.

Q.   But you left out the other half of the story which is your mother's car, right?

A.   I didn't believe it was necessary.  He didn't -- no, correct.

Q.   Well, the FBI agent is asking you a pretty specific question, right?

A.   Which car I use, correct.

Q.   Right.  Just so it's clear and I'm going to move on after this.

You told him about the car that you use half the

time, your van, and you didn't tell him about the car you use the other half of the time, your mother's car, right?

A.    I believe his question was which car was mine and I told him that the van was mine.

Q.    Okay.  So now your testimony is which car was mine?

A.    Which is the blue van.

Q.    Okay.  And I'd like to display PX-102-2, page 6.

Before we do, your car was towed -- your van was towed by the FBI that day, right?

A.    That is correct.

Q.    They didn't tow your mother's car, right?

A.    That is correct.

ATTORNEY BRESLOW:  And if we can display PX-102-2, the transcript, page 6 and focus on lines 8 to 16 to the entire courtroom.  It's already in evidence.

Q.    (By Attorney Breslow)  So just so we are clear, the female is your mother, right?

A.    That is correct.

Q.    And John is you, right?

A.    Yes, sir.

Q.    And so when she says "I suspect if they gave the van back, there was nothing there," she's referring to your van, right?

A.    That is correct.

Q.    And the "they" is the FBI, right?

A.   That is correct.

Q.   And given it back is the return of your vehicle after it was forensically searched, right?

A.   Correct.

Q.   And you said no, there's nothing, right?

A.   That is what I said.

Q.   On April 2nd you didn't drive your van, right?

A.   I did not on April 2nd.

Q.   Okay.  And then you said "because these idiots they didn't know, they didn't know I didn't even take the van."  That's what you said, right?

A.   That's correct.  That's a true statement they did not know.

Q.   What's that?

A.   They didn't know.

Q.   Okay.  Was it your testimony -- was it your testimony or is it now that you never left the house at night between April 2nd and April 15, 2020?

A.   No.

Q.   You did leave the house between April 2nd and April 15, 2020 at night?

A.   Yes.  I believe I could have, yes.

Q.   Okay.  Do you have a memory of it?

A.   I can't recall.

          ATTORNEY BRESLOW:  Okay.  So I'd like to show

PX-53 to -- can I confirm, madam clerk, is this in evidence PX-53?  I believe it is.  I just want to confirm before we display it to the jury.

THE CLERK:  Yes.

ATTORNEY BRESLOW:  Okay.  So if we can just display PX-53?

Q.   (By Attorney Breslow)  Mr. Rathbun, you sent these text messages to Glenn Miliken, right?

A.   It looks like it, yes.

Q.   You're the texter in red?

A.   I am the texter in red.

Q.   And shortly after midnight on April 3rd you texted "call me to meet?"

A.   Yes.

Q.   And Mr. Miliken responded "where?"

A.   It looks like that, yes.

Q.   And you texted "few spots?"

A.   That is what I said.

Q.   Then you said "Been doin it alone past three night. I'm leaving soon?"

A.   That is what I said to him.

Q.   So you were leaving your house soon, right, on April 3rd after midnight?

A.   This particular text was a lie.  No, I was lying to him when I said that.

Q.   Okay.  So you were lying to your friend Glenn Miliken?

A.   Yes.  I was trying to sound better and cooler than, you know, just trying to sound good.

Q.   I'm just going to use your phrase lie.

Your testimony is that you were lying to your friend just to sound cooler?

A.   Yes.

Q.   Okay.  Let's focus on the third topic of your interview on April 15th.

Special Agent McGonigle asked you whether you were familiar with the Jewish nursing home on Converse Street, right?

A.   He did.

Q.   And you said you were not, right?

A.   I was not.

ATTORNEY BRESLOW:  If we can display PX-134 page 1 -- actually 135, please.

No, I think it's probably --

THE DEFENDANT:  Your Honor, could we take a break, sir?

ATTORNEY BRESLOW:  Absolutely.

THE COURT:  You need a break?

THE DEFENDANT:  Yeah.

THE COURT:  Sure.  It's a good time.  All right.

So do not discuss this case.  The same instructions apply.  Every single instruction that I've given you still applies.  Do not discuss the case with each other or anyone else.  Don't try to access on the internet or social media information about this case.

This will be our morning break so we will do about 15 minutes or so.  I don't know if there's coffee or not.

**(The jury left the courtroom at 11:05.)**

THE COURT:  Okay.

ATTORNEY BRESLOW:  I have very few questions left.

THE COURT:  Okay.  Fifteen minutes or so for the break and then we'll see how long recross is.  I expect we are going to be going right into the closings.  Okay?  I mean, unless the recross is another hour or so and then we might have to take another break.

ATTORNEY WATKINS:  Are you talking about redirect?

THE COURT:  I'm sorry, yes.

ATTORNEY WATKINS:  I anticipate just a half an hour at most.

THE COURT:  We will see how it is, but we might just move right into closings we might.  If we need a break, we need a break.

ATTORNEY WATKINS:  Thank you.

**(A recess was taken at 11:06 until 11:27.)**

THE COURT:  Everyone can be seated.

THE COURT:  All right.  I understand there was no coffee for this break, right?  So if there is a revolt, I don't know, I think I might have to support it.

(Laughter.)

THE COURT:  So was everyone able to follow my instructions not to talk to each other about the case and not to violate the instructions in any of the other ways?

All right.  I see affirmative answers from everyone. The jury remains fair and impartial.

While we're talking, sometimes we get an odor in the courtroom that smells a little bit like gas.  Has anyone noticed that?  I see someone shaking their head.  You have your mask on but I see at least one juror noticed it.

If any point you're uncomfortable or it makes you feel sick in any way, just tell me.  We have been in touch with maintenance.  So when that smell comes in the building, it happens from time to time, they flush and run -- do something with the fresh air intake and so we are in contact with the building maintenance right now and we'll let you know.

If it becomes an issue where you just don't like the odor, just tell me and we will take a break.  Okay? That's happened before.

Q.    (By Attorney Breslow)  All right.  Good morning again, Mr. Rathbun.

A.    Good morning, Mr. Breslow.

Q.    So we're almost done.  I have just a few topics to cover and then we should be done.

A.    Hold you to it.

Q.    Sorry?

A.    Hold you to it.

(Laughter)

Q.    (By Attorney Breslow) I want to focus you again on the three topics that Special Agent McGonigle talked to you about, the canister, April 2nd, and the location of Ruth's House Road and Converse Street.

A.    Sure.

Q.    So with respect to the location, Special Agent McGonigle asked you if you were familiar with the Jewish nursing home on Converse Street, right?

A.    He did.

Q.    And you said you were not, right?

A.    That is what I said.

        ATTORNEY BRESLOW:  And so if we can put up PX-134 -- 133 rather to the entire courtroom and focus on the description of stop 3.

Q.    (By Attorney Breslow)  So as you've driven back and forth -- could we have it on the witness table too?

A.    I don't have it either.

There we go.

Q.    Okay.  So as you've driven back and forth on Converse Street you've noticed the city buses, haven't you?

A.    Yeah.  Yes.

Q.    And you know the city buses they have those marques that are kind of like digital lighting on their sides and front and back?

A.    Yes.

Q.    And they say the stops that are coming up, right?

A.    I believe so, sir.

Q.    And the city bus marque for the nursing home says Jewish home, right?

A.    I don't know personally, but I believe that's what it says.

Q.    Right.  I mean, I'm asking about your personal knowledge, not to just read from the screen.

You've seen these buses all the time on Converse Street as you've driven, right?

A.    Not all the time.  I've seen buses though, yes.

Q.    Okay.  So when you're behind a bus, you can see what it says on the marque in the rear, right?

A.    There isn't one in the rear, no, not that I can recall.

Q.    Okay.  So when you're on the side of the bus, you can

see what it says on the side, right?

A.   Very rarely on the side of the bus.  There's only one lane on Converse Street.

ATTORNEY BRESLOW:  Okay.  If we can display 104-1?

Q.   (By Attorney Breslow)  So in all of your time driving up and down Converse Street, you've noticed this campus, this huge campus on the right, right?

A.   I mean, it's hard to see from Converse Street because there's a lot of trees.  So I mean, no, I did not know it was as big as it was.

Q.   Well, you've been there before?

A.   I have been to where my grandmother lived.

Q.   Right.

A.   Down at Brownstone.  I have not been to the rest.

Q.   Right.  But you've driven by the rest, correct?

A.   Again, it's hard to see from the street with all the trees.  I did not know how big a campus it was until this trial, sir.

ATTORNEY BRESLOW:  May we blow up the circular entranceway?

Q.   (By Attorney Breslow)  So are you seeing what I'm seeing now, Mr. Rathbun?

A.   I am.

Q.   There are no trees by that entranceway, are there?

A.   Correct.

Q.   In fact, all the trees have cleared out, don't they?

A.   For that little entrance, yes.

Q.   Well, you call it a little entrance.  It's a two-lane horseshoe, isn't it.  It's a full horseshoe, isn't it?

A.   I believe it's single lane; one lane going in.  I'm not positive, but.

Q.   No, I described that poorly.

It's a full horseshoe going back approximately one block into the nursing home area, right?

A.   I don't know if it's a block but, yes, it is a horseshoe.

Q.   Okay.  And so it's not just a small entrance; it's a dual entrance, right?

A.   That I don't know.

Q.   Well, when I say dual, I mean there's two entrances that join in a horseshoe.

A.   I'm not sure if it's a one way or two entrances, sir.  I see two entrances, but I don't know if it's a one way or not.  I don't recall.

Q.   But we're describing -- we're talking about the same thing, right?  A horseshoe-shaped road with two open spots on Converse Street?

A.   That is correct.

Q.   And the clearing -- the trees have all been cleared

out, right?

A.   In that area, yes, sir.

Q.   And behind it there's a relatively large parking lot, right?

A.   In the picture, sir, behind where?

Q.   So if you go back towards the nursing home building itself away from Converse Street, there's actually four parking areas, like four separate lanes, right?

A.   There is.

Q.   Okay.  And then behind that is a pretty enormous building, right?

A.   I mean, it's a building.

Q.   Well, it's much larger than a residence, right?

        ATTORNEY WATKINS:  I'm going to object, Your Honor?

        THE COURT:  Overruled.

        THE WITNESS:  Yes.  It's bigger than a residential house, correct.

        ATTORNEY BRESLOW:  So if you can zoom in on that building?

Q.   (By Attorney Breslow)  Is it your testimony here that that's not a large building?

A.   I said it is larger than a residential property, sir.

Q.   Right.  It's larger than a house.  I mean, it's --

A.   I don't think it's funny.

Q.    You can probably fit 50 houses in there, right?

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.  We can move on.

ATTORNEY BRESLOW:  Okay.  Moving on.

If we can move on PX-23?

Q.    (By Attorney Breslow)  Now Special Agent McGonigle specifically asked you about Ruth's House, right?

A.    Yes.

Q.    And he showed you a map that corresponded to this picture, right?

A.    Yeah, it was a map.

Q.    We've seen the map and that map corresponds to this intersection where the X is drawn, right?

A.    That is correct.

Q.    And you've driven back and forth on Converse Street countless times, right?

A.    I have.

Q.    Past this sign, right?

A.    Correct.

Q.    And is it your testimony that you have never read this sign in all of your drivings?

A.    No.  Again, I'm focused on driving.  I wouldn't say that I never read it.  But again I'm focused on driving when I am driving, but I probably have seen the sign.  Yes.

Q.    Okay.  Let's go back to --

ATTORNEY BRESLOW:  This is the last topic, Your Honor.  Just a few more questions.  I want to go back to the canister for a moment.  If we can put up PX-14 and I think if we can put up the full photograph of the canister, maybe PX-11?  Right.

Q.    (By Attorney Breslow)  So Special Agent McGonigle asked you several questions about this canister and you denied possessing it, right?

A.    I did at the time, yes.

Q.    Okay.  And then just a short while later you had a conversation with your mother about this very canister, didn't you?

A.    Along with my attorneys, yes.

Q.    Okay.  So I want to be really clear.  I'm focusing on your conversation with your mother, not your attorneys, and I don't want you to say anything in court about your conversation with your attorneys because they're privileged.  Okay?

A.    Sure.

Q.    Okay.  So just focusing on your conversation with your mother, you had a conversation with your mother about this very canister that you denied possessing to Special Agent McGonigle, right?

A.    Yes.

Q.   Okay.  So this is the last exhibit that I'll play.
Hold on one moment.

ATTORNEY BRESLOW:  Your Honor, I just need one moment to orient to the actual video -- the audio.

Your Honor, this is my oversight, not Ms. Mckenna's. We just need a moment.

THE COURT:  All right.  Understood.

Ladies and gentlemen, it feels like -- well, I sense that that odor is gone.  I don't know if you can feel the air, the cold air kind of it's become colder in here and you actually feel it.  They are moving the air out of the courtroom and venting it out the roof so that's what's going on.

ATTORNEY BRESLOW:  We are almost there.

A JUROR:  Is this is for all of us?  If not, the screen should be turned around.

ATTORNEY BRESLOW:  This is already in evidence but I'll turn it around.

THE COURT:  Thank you.  You might have a future in this.

Q.   (By Attorney Breslow) All right.  Mr. Rathbun, I just want to play a short audio and then ask you one or two questions about it.

A.   Yes, sir.  Absolutely.

(Audio playing.)

Q.    (By Attorney Breslow)  Okay.  That's your voice, right?

A.    Yes, sir.

Q.    You told your mother what you didn't tell Special Agent McGonigle and that is that you had possession of the yellow gas container?

A.    That is correct.  That was some time after my interview with Agent McGonigle.

Q.    Right.  That was actually on April 27, 2020.  I'm just displaying the cover page to the courtroom and to you.

A.    Correct.  That was after I spoke with my attorney and been going through paperwork.

Q.    I'm just asking you the date.  You can explain on redirect.  Okay?

        THE COURT:  Is there a question?

Q.    (By Attorney Breslow)  Yeah.  That was on April 27th, right?

A.    That's what I'm being told.  I don't know.

Q.    That's just --

A.    Oh, okay.  I'm sorry, yes.

Q.    That was just 12 days after your interview, right?

A.    That's correct.

Q.    And I really don't want you to say anything at least on cross-examination about your conversation with the

attorney, but let me ask you these questions.  Your testimony is that your memory got better over time because you had an opportunity to review the messages in your phone, right, the data on your phone?

A.    Correct.

Q.    And based on that, you remember -- you remembered on April 27th that you were possessing the gas container?

A.    That is correct.

Q.    Okay.  And your testimony is that unless or before you had an opportunity to review the data in your phone, you didn't remember it, right?

A.    That is correct, sir.

Q.    And because you reviewed the data in your phone, you suddenly remembered that you possessed the gas container?

A.    Not suddenly.  I remembered, yes.

Q.    Well, not suddenly.  I mean that was the reason, right?

A.    Correct.

Q.    Data on your phone somehow caused you to remember that you possessed this yellow gas container?

A.    Along with coming out of my drugs.  I didn't use drugs for quite a few weeks there so that also helped.

ATTORNEY BRESLOW:  All right.  I have no further questions.

THE COURT:  Attorney Watkins.

ATTORNEY WATKINS:  May I get my computer screens?

THE CLERK:  HDMI-1?

ATTORNEY WATKINS:  That's correct.

**REDIRECT EXAMINATION**

Q.   (By Attorney Watkins) John, I want to talk first about when the agents came to search your house on April 15th.  What did you think the agents were there for?

A.   I thought it had something to do with my drug interactions; yeah, had to do with my drug issue.

Q.   Now why did you think that?

A.   Because it was the only thing I could think of why the FBI would be at my house at that time.

Q.   And when the agents came to get you out of your bedroom, how long had you been asleep that night?

A.   I don't know, maybe eight hours or so.

Q.   And the night before you had done some amount of drugs?

A.   I did.

Q.   I want to talk a little bit about that period of time.  Your drug use diminished I think is what you told us, right?

A.   Correct.

Q.   Now on prior occasions in your life you've tapered off drugs and even stopped drugs, right?

A.    That is correct.

Q.    And what is that process?  What is that process like for you as you start to taper off or finish drugs?  What is your mind feeling like?

A.    It's difficult but my mind is saying, you know, sick and tired of doing this; sick and tired of losing relationships, jobs.  It's time to get it together.  I'm almost 40 years old.

Q.    When you stopped doing drugs or diminish doing drugs, is it like a switch?  Are you all of a sudden clear?

A.    No.

Q.    So tell us a little bit more about that, what is it like as you're tapering off your drug use?

A.    It takes time to become clear again, to remember things.  You know, I've been using for 15 years on and off.  It's not just going to go away like that.  It takes time.

Q.    Does it take hours to get a clearer head?

A.    No.

Q.    Does it take days to get a clearer head?

A.    It takes more than days.

Q.    Weeks to get a clearer head?

A.    Yes, sir.

Q.    As you continue to be sober, does indeed your mind become clearer?

A.    It does.

Q.    So when you talked about being hazy and confused when the agents showed up that morning, what were some of the things that were making you hazed and confused?

A.    Number one, I just had woken up.  Again, I had a gun in my face.  It was, it was a morning to remember.

Q.    Now, what was your feeling throughout these three or four hours in the morning?  Was it a happy exchange back and forth between you and the agents?

A.    Not the whole time.  No, definitely not.

Q.    Was there ever a point where you feel relaxed and under control?

A.    I did.  There was a point I did.

Q.    But the agents were there --

A.    They were.

Q.    -- during the entire time?

A.    Correct.

Q.    Were you always talking with them during this three and four hours?

A.    Not the whole time, no, sir.

Q.    So what would happen?  What would break up those three and four hours that you were talking with the agents?

A.    He'd have to go make a phone call; maybe check on some evidence that they had taken out of my house; talk to

his colleagues.

Q.    And so when those things would happen, then the agents would come back and pick up the conversation again?

A.    Correct.

Q.    Did they tell you everything right at the beginning or what is it a longer drawn out process?

A.    No, it was very drawn out.  It was very long.

Q.    You talked about -- well, you didn't tell Agent McGonigle and Detective Chaplin about your drug use immediately?

A.    I did not, no.

Q.    And I think what you've told us is that you didn't really like to talk about it, right?

A.    Yes, sir.  It's embarrassing.  It just makes me feel like crap.  It's not something I like to talk about.

Q.    And is that just to the agents or is that a general feeling you have?

A.    That's a general feeling I have.

Q.    Have you lied about your drug use before to people?

A.    I absolutely have.

Q.    Have you lied to relatives before?

A.    I absolutely have.

Q.    Have you lied to loved ones before?

A.    Unfortunately I have, yes.

Q.    Have you lied to employers before about your drug

use?

A.    I have.

Q.    Have you minimized your drug use to those people who know about your drug use?

A.    I have.

Q.    To loved ones?

A.    Yes.

Q.    To people?  To employers?

A.    Yes.

Q.    You've testified in some detail today about your drug use in the past and on Friday.  Are you holding anything back from the jurors today?

A.    No, I am not.

Q.    Why are you so forthright to the jurors when you didn't want to talk to Agent McGonigle about your drug use?

A.    Because this is the truth.  That morning with Agent McGonigle, I just didn't completely remember everything that was going on and now with how long it's been, going over so much paperwork, talking with my lawyers, again Facebook messages, text messages, phone, I put it together.

Q.    I'm putting up before you and this can go to everybody, this is a chalk.  It's not evidence.

      Putting up this calendar of April that points out

when the event was and then the later search was.  Do you see that there?

A.    Yes, sir.

Q.    So on the 15th, which is in red, what was the question that Agent McGonigle asked you about April 2nd?

A.    Can you be more exact?

Q.    What was the question -- when he asked you the question, what was the question he posed to you?  Was it where were you on April 2nd?

A.    Yes.

Q.    And what was your answer to that question?

A.    I believe I told him I was at home.

Q.    And did you talk about how long you had been at home?

A.    I did not, no.  Well, I might have.  I might have said that I was home all night.

Q.    To the question where were you on April 2nd, did you describe how long you had been at your home?

A.    No.

Q.    To the question of where you were on April 2nd, did you describe a number of weeks that you had been at home?

A.    Yes.

Q.    And what was your answer?  Your exact answer to Agent McGonigle when he asked about where were you on April 2nd?

A.    I told him that I had been home for the past two weeks about.

Q.    And did you say exactly two weeks?

A.    I said about two weeks.

Q.    Did he have a calendar like this in front of you as you were doing that?

A.    No, sir.

Q.    And did he go through the phone with you, your phone to see if you can reconstruct where you were on April 2nd?

A.    No, sir.

Q.    Did you intend to mislead Agent McGonigle when you told him that you hadn't been out of the house in a couple of weeks?

A.    Absolutely not.  I wanted to come to the conclusion and find out what was going on and why they were there.

Q.    Now we've heard that you were convicted.  You were found guilty of lying to him about that?

A.    I was.

Q.    And is that something that you intend to appeal?

ATTORNEY BRESLOW:  Your Honor, may we approach or approach via WispherTech?

THE COURT:  Yes.

(Sidebar conference.)

ATTORNEY BRESLOW:  Your Honor, I just want to be clear.  We did not elicit any testimony on cross-examination about the false statement for which he was convicted that took place on April 15th or was

directed to Special Agent McGonigle.  Mr. Watkins has now established that, but I just want to be clear we discussed this conviction very generally so as to avoid that exact inference.

THE COURT:  Okay.  That's correct.  That's a correct statement.

ATTORNEY BRESLOW:  Okay.

THE COURT:  You don't need to respond, Attorney Watkins, but anything you want to put on the record?

ATTORNEY WATKINS:  No.

THE COURT:  Okay.

(End of sidebar conference.)

THE CLERK:  Just for the record, it seems as if the defendant is having issues with WhisperTech.  I'm just giving him a new set of headsets.

THE COURT:  Thanks.

THE DEFENDANT:  Thank you.

THE CLERK:  You're welcome.

Q.   (By Attorney Watkins) And do you intend to appeal and have that decision reviewed?

A.   I'm sorry, can you?

Q.   You were found guilty?

A.   Yes.

Q.   And is that a decision you intend to appeal and have reviewed?

A.    Yes.

Q.    Mr. Breslow showed you the bus schedule from -- he showed you a bus schedule?

A.    He did.

Q.    Have you ever taken that bus that ends at the Jewish nursing home?

A.    I've never taken that bus, sir.  No.

Q.    Have you ever gotten off at the Jewish home?

A.    No, sir.

Q.    Do you see that particular bus or any bus?  Do you know the bus routes of the busses that go down Converse Street?

A.    I do not.

Q.    Do you know if there are any other busses besides this Jewish home bus that goes down Converse Street?

A.    I do not.

Q.    I want to talk about the yellow fuel canister that we've been talking about all through this trial.

      You obtained that from the clean out, right?

A.    That is correct.

Q.    And who was with you doing the clean out?

A.    Chris Murray.

Q.    And you testified I think that you touched the fuel canister there, right?

A.    That is correct.

Q.   Now, there are a couple of times actually that you touched the fuel canister.  It was not just at the site of the clean out, correct?

A.   Correct.

Q.   What other times would you have touched that fuel canister?

A.   When I was throwing it out in the dumpster.

Q.   And how long after this as best you can remember did you get rid of the junk in your van?

A.   It was probably about a week.

Q.   We've been shown that handle where your bloodstain appears.  Are you sure that it had to have been at the clean out rather than when you put it into a dumpster later?

A.   No, it could have been either one.

Q.   You were wearing gloves while you were doing the clean out?

A.   I was.

Q.   Were you wearing gloves when you put the --

ATTORNEY BRESLOW:  Objection to the leading.

THE COURT:  Sustained.

Q.   (By Attorney Watkins)  What, if anything, did you wear on your hands when you were taking the items to a dumpster?

A.   I did not have gloves on.

Q.   How do you know you did not have gloves on?

A.   It's not something I normally do when I'm throwing stuff out.  I'm trying to be quick and just throw it out and go.  I'm not thinking about putting on gloves.

Q.   When you did the clean out, did you have discussions with Chris Murray about that yellow fuel container?

A.   I did.

Q.   Did he want the yellow fuel container?

A.   Yes.  He asked me if he could keep it.  He was interested in keeping it because he said it was in such good shape and his boss at his job just had theirs stolen and so he wanted to keep it.

ATTORNEY BRESLOW:  Your Honor, just a hearsay objection.

THE COURT:  Well, do you want to be heard on this?

ATTORNEY WATKINS:  No.

THE COURT:  Sustained.  It's hearsay.

Do you want to rephrase?  That's stricken.  The answer is stricken.  The complete answer is stricken; erased your memory, from your notes.

Attorney Watkins, if you want to rephrase on this issue to work within the hearsay rules, go right ahead.

ATTORNEY WATKINS:  Thank you.

Q.   (By Attorney Watkins) My question was did you have

discussions, without saying exactly the nature of the discussions, did you have discussions with Chris Murray about that gas container?

A.    Yes, I did.

Q.    Did he take the gas container?

A.    No, he did not.

Q.    While on this subject I want to address Mr. Breslow's termed effort about lighters, can you tell us how many lighters that you own?

A.    Five or six.

Q.    And do you have different lighters for different things?

A.    I do.

Q.    What kind of lighter do you use when you're smoking crack cocaine?

A.    I use both the blow torch and the hand lighter.

Q.    What lighter do you use when you're smoking marijuana?

A.    That I only use the regular lighter.

Q.    What do you use when you smoke cigarettes?

A.    I use both the blow torch and the regular lighter.

Q.    So it's true you use a regular lighter all the time no question about that, right?

A.    Correct.

Q.    We heard phone calls with your mother a little bit

but I want to back up and ask you in the days following your arrest by the FBI, did you start making efforts to figure out where that gas can might have been?

A.   I absolutely did.

Q.   And is that something that -- and who helped you with that?

A.   My attorneys did and my mother.

Q.   Why were you enlisting your mother to help you?

A.   Maybe she had a better memory of it than I was and plus I was in jail and she was out.  She could do more than I could.

Q.   So some of these conversations we heard you're talking with your mother about the evidence, right?

A.   Correct, sir.

Q.   You were put in jail at the beginning of this case; is that true?

A.   This is true, sir.

Q.   And we heard a number of phone calls with your mother and those are between you and her while you're at the jail?

A.   That is correct, sir.

Q.   During that period of time that we heard both right after between April 15th and April 22nd -- 27th and on into the summer, what was going on in regard to your case?

A.   I had many, many hearings.  I had many lawyer

meetings.  I had many talks with my mom.  I had a lot of, a lot of stuff going on.

Q.   Without talking specifically about what you and I talked about, were you learning what it was the government was saying about this incident?

A.   Yes.  I had a lot of paperwork that was mailed to me in court -- in jail I mean.  I'm sorry.

Q.   And were there also conversations -- did we have conversations?

A.   Yes, sir, we did.

Q.   You knew those calls were being recorded with your mother?

A.   I did.

Q.   Why did you discuss the case with your mother on the phone?

A.   To help me to help solve the case to figure out how the hell my blood got on that.

Q.   During that time, those initial weeks while you were in jail, how were you feeling about the case?

A.   I was extremely anxious.  I was worried.  I was scared I was going to wind up going to jail for something I had nothing to do with.

Q.   And in regard to the very big and very bad comment that you made about the fuel canister, was that true?  Was it very big and very bad?

A.    It was.  It's true.

Q.    In that same conversation did you tell your mother I'm innocent of this but I'm going to be found guilty just --

ATTORNEY BRESLOW:  Objection, Your Honor.

THE WITNESS:  Yes.

THE COURT:  Sustained.

ATTORNEY BRESLOW:  Move to strike.

THE COURT:  Sustained.  That's stricken, the form of the question, that's stricken.

Q.    (By Attorney Watkins)  Did you tell your --

ATTORNEY BRESLOW:  I'm sorry, Your Honor.  May we be heard?

THE COURT:  Yes.

(Sidebar conference.)

ATTORNEY BRESLOW:  That objection is concerning on several different levels.  First, it's leading.  But more importantly, and I want to be really clear about this, these recordings were offered into evidence only after a lengthy rule of completeness discussions with Mr. Watkins, and for Mr. Watkins to exceed that ruling is extremely improper.

I want to have this sidebar conversation because I want Mr. Watkins to know that if he's going to be asking -- that he should not be asking any more questions like

that beyond the scope of what the parties have agreed to be introduced in these recordings.

THE COURT:  So let me just understand this.  The portions of the tapes that were played that would have included that last reference by Attorney Watkins, those were all subject to what would be admissible, an agreement between the parties; is that what you're telling me?

ATTORNEY BRESLOW:  Yes.  The government offers --

THE COURT:  Okay.

ATTORNEY BRESLOW:  -- the particular sections, those particular portions, they were all negotiated with through with defense counsel, Mr. Watkins in particular, and there was another -- there was an argument or an appearance before the court where you made certain rulings, but exactly that's right.  Nothing beyond those portions is in evidence --

THE COURT:  Okay.

ATTORNEY BRESLOW:  -- and Mr. Watkins knows it.

THE COURT:  I'm just trying to make clear that that was an agreement between the parties as to how much of those tapes is played and how much -- and what isn't played; is that correct?

ATTORNEY WATKINS:  At the last trial we did go

through the transcripts and we agreed what could be played and what could be excised on the direct examination when the government put them in, that's correct.

ATTORNEY BRESLOW: No.

THE COURT: Because, because -- yeah, well, the issue would be I mean there may have been a completeness argument when it was introduced by the government but it wasn't made at that time. So it seems like Attorney Breslow is raising the issue of what he believes is a breach of the agreement between the defense and the prosecution regarding this area.

ATTORNEY BRESLOW: That's exactly right. I want to be clear. I'm not asking for sanctions. I'm not asking for any relief. I just want it to be very clear that Mr. Watkins should not do that again.

THE COURT: So what's the story with this, Attorney Watkins? Where are we going and what do you want to put on the record about this?

ATTORNEY WATKINS: I'm all done, Your Honor. That was the only question I'm going to ask. That particular statement appears the minute before he talks about the very big and very bad.

ATTORNEY BRESLOW: Right. And if Mr. Watkins --

THE COURT: I sustained the ruling on leading questions. Now, there's a whole another -- there's like a

Pandora's box here.  That's all sorts of completeness arguments and other arguments to make, but if you agreed with Attorney Breslow that this was subject to a previous agreement, that ends it right there.

ATTORNEY BRESLOW:  It was, Your Honor.  This was all carefully negotiated with defense counsel and the only portions of the recordings that we agreed the jury would hear are the ones that were presented at the first trial and to a lesser extent here now.

THE COURT:  Is that -- do you agree with that, Mr. Watkins?

ATTORNEY WATKINS:  But the tenor and the subject of cross-examination changed that as Mr. Breslow starts talking about consciousness of guilt.

ATTORNEY BRESLOW:  Those arguments were made at the first trial as well, Your Honor.

THE COURT:  I agree.  The spirit was the same, essentially the tone and these issues are very similar at the trial.  Based upon -- I'm not hearing any claim that there was not such an agreement so there clearly was an agreement between the parties.  I ruled that -- I sustained the government's objection.  I instructed the jury to disregard it.  I'm going to leave it at that.

ATTORNEY BRESLOW:  We're not asking for anything further, Your Honor.

THE COURT:  Okay.

(End of sidebar conference.)

Q.   (By Attorney Watkins)  Mr. Rathbun, we also heard a telephone call between you and your mother about the search of your van versus the search of your mother's car.

A.   Yes, sir.

Q.   When you called the FBI idiots, were you crowing that you put one over on them?

A.   Could you say that again?

ATTORNEY BRESLOW:  Objection to leading, Your Honor.

THE COURT:  It is leading.  I'll overrule that and allow the question to stand.  I don't think Mr. Rathbun -- I think he needs it re-asked.

Q.   (By Attorney Watkins) When you were calling the FBI idiots, were you trying to cover up the crime?

A.   Absolutely not.  No, sir.

Q.   Why did you call the FBI agents idiots in that call?

A.   I mean, we didn't have the greatest relationship so, you know, again this is during the time trying to figure out stuff; very agitated.  I was out of line by saying that, but we don't have the greatest relationship I'll say.

Q.   When you say we don't have the greatest relationship, who are you talking about?

A.    The FBI, sir.

Q.    I'm going to go next to the time on the morning of April 2nd.  You've seen the exhibit on quite a number of occasions during trial?

A.    Yes.

Q.    This is Exhibit 41, page 13.

You testified on direct examination and also on cross-examination about what you were doing in this area from the period of time 5:05 to 8:25; do you recall that?

A.    I do.

Q.    One of the things that came up was talking about licks.  Can you explain one more time what licks are?

A.    Licks could be dumpster diving, breaking into cars.

Q.    Could it be other things?

A.    Not really.  I mean, anything having to do with stealing I guess is a lick.

Q.    So the other day when you said it was just dumpster diving, what were you thinking?

A.    I misremembered and again I'm trying to sound better than I really am, but it's just the truth.  The truth is licks are breaking into cars or dumpster diving or some type of stealing.

Q.    In previous testimony have you also told the jury that you were dumpster diving that morning?

A.    I did.

Q.   Were you dumpster diving that morning?

A.   I was.

Q.   Again, do you know what you were doing every single moment of that morning?

A.   I do not.

Q.   Mr. Breslow asked that you exact question.  Why did you answer it differently when Mr. Breslow asked you if you knew what you were doing every single minute of the morning?

A.   Every single minute of the morning, I can't recall every single minute, no.

Q.   And what has helped you to recall generally and sometimes more specifically what it is you were doing that morning?

A.   Again my call logs, my text messages, my Facebook messages, Facebook calls.  I've gone over numerous, numerous papers having to do with this what I've been accused of.

Q.   From Exhibit 52, and this is line 457 -- let me get the time again on this.  This is the text message I believe, instant message to Devin Austin.  Do you see that before you?

A.   I do.

Q.   And what is the time on that?

A.   4:32:59 a.m.

Q.   When you were sending that message to Devin Austin, were you simultaneously putting together a firebomb?

A.   No, sir, I was not.

Q.   Were you thinking about getting back at JGS somehow?

A.   Absolutely not.

ATTORNEY BRESLOW:  Your Honor, just objection to the leading.

THE COURT:  Overruled on this point.

Q.   (By Attorney Watkins) At the time you were sending this message to Devin Austin, were you doing anything to prepare for leaving a fuel container at JGS?

A.   I was not.  My sole purpose that morning was to get more drugs.  That's it.

Q.   When you sent this text message at 4:32 in the morning, were you angry at the world?

ATTORNEY BRESLOW:  Asked and answered on direct, Your Honor, and leading.

THE COURT:  Overruled.

THE WITNESS:  I was not mad at the world, no.

ATTORNEY WATKINS:  I have nothing further, Your Honor.

ATTORNEY BRESLOW:  If we can keep that up on the screen?

**RECROSS-EXAMINATION**

Q.   (By Attorney Breslow)   Just a few questions, Mr. Rathbun.

     You just testified that your sole purpose was to get drugs that morning?

A.   Yes.

Q.   And you were so intent on getting drugs that if you got the drugs, you were going to use at least some of them up in Springfield, right?

A.   I can't hear you.  Say that again.

Q.   I'm sorry.  You were so intent on using drugs that if you got the drugs, you were going to use at least some of them up in Springfield, right?

A.   Correct.

Q.   And you were looking for crack in particular, right?

A.   Correct.

Q.   So you brought your lighter or your blow torch with you, correct?

A.   Yes.

          ATTORNEY BRESLOW:  Okay.  No further questions.

          THE COURT:  Anything?

          ATTORNEY WATKINS:  No, Your Honor.

          THE COURT:  Okay.  You can step down, sir.

(End of excerpt.)

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )


          I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)


/s/ Alice Moran                    November 20, 2021
Alice Moran, RMR, RPR
Federal Official Court Reporter