1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )          20cr30018-MGM
     vs                   )
                          )          June 14, 2021
John Michael Rathbun      )
_____)



**EXCERPT** OF TRIAL HELD BEFORE THE

HONORABLE MARK G. MASTROIANNI




APPEARANCES:


On behalf of the government:  Steven H. Breslow and Neil Desroches, Assistant United States Attorneys, 300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq. and Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

INDEX

Witness:                                                    Page:




**Horace Williamson**


Direct examination by Attorney Desroches                      4

Cross-examination by Attorney Watkins                        20

Redirect examination by Attorney Desroches                   27




Exhibit No.            Description                    Page


None

**(Excerpt from 6-14-21.)**

**(The jury entered at 1:17.)**

THE COURT:  All right.  Ladies and gentlemen, was everyone able to follow my instructions not to talk to each other about this case, and were you able to comply with all of my other instructions that I given you routinely?

THE JURY:  (Yes.)

THE COURT:  All right.  Affirmative answer by everyone; the jury remains fair and impartial.

All right.  Government, please call the rebuttal witness.

ATTORNEY DESROCHES:  Yes.  Thank you, Your Honor.

The government calls Horace Williamson.

THE CLERK:  Sir, please raise your right hand.

**Horace Williamson (sworn)**

THE CLERK:  Thank you.  You can take off your mask.

ATTORNEY DESROCHES:  May I proceed now, Your Honor?

THE COURT:  Yes.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   How you doing?

Q.   Good.

Can you please introduce yourself to the jury and for the record spell your last name?

A.   Horace Williamson, W-i-l-l-i-a-m-s-o-n.

Q.   And, Mr. Williamson, where do you reside?  Where do you reside?  Where do you live?

A.   21 Dillon Street, Chicopee, Mass.

Q.   For how long have you lived there?

A.   Almost two years.

Q.   When did you move into that address?

A.   Before Christmas in 2019.

Q.   Before Christmas in 2019?

A.   Yes.

Q.   And did you know the owner of that house before you moved into it?

A.   Yes.

Q.   Who was the owner?

A.   My boss.

Q.   Did you make an agreement with your boss when you moved into that house?

A.   Yes.

Q.   What was that agreement?

A.   Rent to own.

Q.   So you were going to rent the house from him until you eventually owned it?

A.   Yeah.

Q.   What was the condition of the house before you moved in?

A.   It was under construction.

Q.   Did you yourself become involved in that construction?

A.   Yes.

Q.   What types of things did you do?

A.   I helped remove rugs, floors, walls.

Q.   So I'm going to talk just about the condition of the house before you moved in.

     How many floors is this house?

A.   A basement, an upstairs, downstairs.

Q.   So it's a two-story with a basement?

A.   Yes.

Q.   So going from the top of the house down to the bottom, can you describe for the jury what the top of that house -- what was inside the rooms in the top of the house, the second floor?

A.   Well, the second floor had rugs and like a, like a stage that they had for kids so we had to tear that down, and then the ground floor was where the living room is and

everything else.

Q.   I'm going to stop you so just the record is clear.

Just on that second floor you said there was a stage that the kids played on; is that right?

A.   Yes.

Q.   Were there any other belongings that the previous owner had left behind in the second floor?

A.   No.

Q.   So now you moved onto the first floor.  Can you describe the layout of the first floor?

A.   You got the living room and then the kitchen, then you got a hallway, then you got the two bedrooms and a back room and then you got a bathroom.

Q.   Now just drawing your attention to each particular room, what was the state of the kitchen before you moved in?

A.   A lot of appliances, the floors ripped up, the walls were scraped down.

Q.   Were there any personal belongings of the previous owner in the kitchen?

A.   No.

Q.   So there --

A.   Just for his materials he used to work on the house.

Q.   So you said the tools and things like that?

A.   Yes.

Q.   Now going on to the bedrooms, were there any personal belongings in the bedrooms on the first floor?

A.   Yes.  His son used to live there until someone moved in and he was staying back in the back room.

Q.   What types of things were in that room?

A.   He had blankets, clothes.  That's it.

Q.   So were there any other personal items on the first floor of this house?

A.   No.

Q.   What was in the basement when you moved in?

A.   A lot of his father's old stuff and a lot of kids' stuff that they had.

Q.   So now just referring back to the second floor, were there any fuel cans on the second floor?

A.   No.

Q.   Were there any religious papers on the second floor?

A.   No.

Q.   On the first floor, were there any fuel cans on the first floor?

A.   No.

Q.   Were there any religious papers on the first floor?

A.   No.

Q.   Drawing your attention to the basement, were there papers of any sort in the basement?

A.   Yes.

Q.    What types of papers were in the basement?

A.    Kids' school stuff, books.

Q.    And what did you do with those items that you found in the basement?

A.    We threw them in the trash for when our trash people came.

Q.    Do did you put them out for curbside pickup?

A.    Yes.

Q.    And what did you do with the items in the basement that were not yours that belonged to the owner?

A.    I asked permission if he wanted them or not.  He said no, I could throw them out.  So whatever was heavy, I put outside to the pile that we already have outside from the pool, deck, and everything else.

Q.    We'll get to the outside.  But the things that you said were heavy, you put outside in a pile?

A.    Yes.

Q.    And what did you do with the items that were not heavy?

A.    What do you mean?

Q.    So if you didn't put them in the side yard, what did you do with them?

A.    We put them out to the trash.  We put them in trash bags and put them outside.

Q.    Did that include anything that could fit in a trash

bag?

A.    Yes.

Q.    So now let's talk about the outside of the house. What was the condition of the yard when you moved in?

A.    A lot of messy yard, like a junk yard.

Q.    And did you become involved in cleaning that up?

A.    Yes.

Q.    What type of items specifically were in the back yard?

A.    Well, everything we threw from upstairs like the platform that they had in the kids' room, we threw all that out.  The rug we threw out the window and we moved all that to one side.  Then the decking and the pool, lining and everything else, we moved over there and that was it.

Q.    So there was decking and a pool that was back there?

A.    Yep.

Q.    And did you rip that up or had that been ripped up prior to your being there?

A.    They were already ripped down, but I just moved it over there out of the way.

Q.    So where did you move that stuff?  Where did you move that stuff to?

A.    On the like half driveway back patio looking --

Q.    Was there a pile of things there?

A.    Yes.

Q.    And who made that pile of things?

A.    Me and the old owner.

Q.    So were you aware of everything that was in that pile?

A.    Yes.

Q.    Was there a yellow gas can in that pile?

A.    No.

Q.    Were any religious papers in that pile?

A.    No.

Q.    Were there any papers of any sort in that pile?

A.    If it was, they were probably all wet.

Q.    Why was that?

A.    Because the snow, the snow and rain.

Q.    Were there any barrels in the yard?

A.    Yep.

Q.    What were in those barrels?

A.    Old leaves, a rake, broken rakes, broken toys, bats, whatever.

Q.    Did you have to do anything with those barrels when you moved in?

A.    No, just move them around where I could put more stuff in the area.

Q.    Was there any water in those barrels?

A.    Yes.

11

Q.   What did you do with the water?

A.   We popped holes in the bottom where they can drain out.

Q.   So you had to drain the barrels?

A.   Yes.

Q.   Was there any sort of smell that came from those barrels?

A.   Yes.

Q.   Can you describe that smell?

A.   Like wet grass and wet leaves, dog crap.

Q.   So is there a shed on your property?

A.   Yes.

Q.   And what was inside of the shed?

A.   Lawn materials, pool materials.

Q.   Were there any gas cans in there?

A.   Yes.

Q.   Were there any yellow gas cans?

A.   No.

Q.   And do you work with gas engines?

A.   Yes, I do.

Q.   And what type of work do you do with gas engines?

A.   A dieseal mechanic, automotive.

Q.   Would you have noticed if there were a yellow gas can in there?

A.   Yes.

Q.   Why is that?

A.   Because the gas can is something I would have used.

Q.   So you would have kept it?

A.   Yes.

Q.   So at some point did you make a decision to have this pile that you made removed?

A.   Yes.

Q.   And who do you live with at that house?

A.   My girlfriend, Melissa Taylor.

Q.   Melissa Taylor you said?

A.   Yes.

Q.   Do you have any children who live there with you as well?

A.   Yes, three sons.

Q.   I'm sorry?

A.   Her three sons.

Q.   What are their ages?

A.   Seven, 13 and 19.

Q.   So when you decided to move the junk, what did you and Melissa do first?

A.   Well, she posted ads.

Q.   Do you recall if she posted an ad on Home Advisor?

A.   Yes.

Q.   And did you yourself see any responses to that ad?

A.   Yes, when she let me know someone emailed her back.

Q.   And did you review the response?

A.   Not quite as like thorough but I quickly glimpsed at it.

Q.   What is Melissa's email address?

A.   MTAY3553@gmail.com.

        ATTORNEY DESROCHES:  If I can have PX-132?  It is in evidence.  I'm sorry, madam clerk, if our table can have that?

Q.   (By Attorney Desroches)  Mr. Williamson, is there anything displayed on your screen?

A.   Yes.

Q.   Do you recognize what that is?  Drawing your attention to the receiver of this email, do you see who that was to?

A.   Yeah, to my girlfriend.

Q.   So that's your girlfriend's email address?

A.   Yes.

Q.   Did you review this email as you were making decisions in who to hire to remove that pile of junk?

A.   I glimpsed at it.  I wouldn't like really pay attention.  I trust her to make a decision.

Q.   So at some point did you decide to hire somebody based on this email?

A.   Yes.

Q.   And can you describe what you did when you decided to

hire that person?

A.   I asked him what the price was before I made a decision.

Q.   And did you agree upon a price?

A.   Yes.

Q.   Ultimately did you agree that that person who sent that email would come to your house and remove that pile?

A.   Yes.

Q.   Did that person show up at your house?

A.   Yes.

Q.   And when that person showed up, did you have an opportunity to see that person?

A.   Yes.

        ATTORNEY DESROCHES:  Your Honor, at this point I think by agreement ask the defendant to lower his mask for the witness?

        THE COURT:  Yes.

        THE DEFENDANT:  (Indicating.)

Q.   (By Attorney Desroches) Mr. Williamson, do you recognize the person who showed up at your house in this courtroom today?

A.   Yes.

Q.   Can you please point to that person and describe something he's wearing for the record?

A.   He's wearing a pink shirt.

ATTORNEY DESROCHES:  Your Honor, may the record reflect he has identified the defendant?

THE COURT:  All right.  The record will reflect identification has been made of the defendant by a description and the direction where the witness looked when making the identification.

Q.   (By Attorney Desroches)  So approximately how long after that email did the defendant show up at your house?

A.   Within that week, by the weekend.

Q.   And was he with anybody when he showed up?

A.   He had a coworker, a partner.

Q.   What did that person look like?

A.   A short, skinny kid with a landscaping hat.

Q.   You said a landscaping hat?

A.   Yeah.

Q.   So at the time the defendant showed up at your home, what types of items were in that pile that you had created?

A.   All the wood, all the pool stuff, lining, all the decking, a couple barrels, the little kids' skids and toys and stuff.

Q.   So you said little kids' skids, what do you mean by that?

A.   Like sleds and stuff.

Q.   Sleds you said?

A.    Little plastic stuff.

Q.    Did you speak to the defendant when he arrived at your house?

A.    Yes.

Q.    What did you tell him to do?

A.    I showed him where he had to take the stuff from and that was it.

Q.    Did you give him any special instructions regarding the shed?

A.    I didn't say nothing about the shed.

Q.    Did you ask him to remove anything from the shed?

A.    No.

Q.    So we're clear, did you see the defendant ever go into that shed?

A.    No.

Q.    He did not go into the shed?

A.    No.

Q.    So did the defendant and his coworker began removing trash from that pile?

A.    Yes.

Q.    Did you yourself help him do that?

A.    I helped move stuff to the pile.

Q.    Did you help the defendant move anything that was bulky from the pile?

A.    Not into his van, no.

Q. What were you doing as they did this work?

A. I was standing on my patio.

Q. Were you watching them?

A. Yes.

Q. Why were you watching them?

A. To make sure they take the right stuff.

Q. The right stuff you said?

A. Yes.

Q. Were there items that he was not supposed to take?

A. Yeah, I had a grill over there.

Q. You said a grill?

A. Yes.

Q. And for how long were they working removing that pile?

A. Almost four hours.

Q. What were they doing with it when they moved it from the pile?  You said there was a van?

A. Yep.

Q. Where did they put it in the van?

A. On the roof and inside the van.

Q. At any point did you see them handle a yellow gas can?

A. No.

Q. At any time did you see them handle any papers?

A. No.

Q.   At any point did you see them enter the shed?

A.   No.

Q.   Did you -- did they actually finish removing all the trash that day?

A.   No.

Q.   Did you talk to the defendant about this?

A.   Yes.

Q.   And what did you say to him?

A.   I asked him is he going to come back and finish and he said yes.

Q.   He said he was going to come back and finish?

A.   Yes.

Q.   Now, while the defendant was working did you ever observe him cut himself?

A.   No.

Q.   Did you ever observe blood on him?

A.   No.

Q.   You said that you had agreed upon a payment.  What were the -- how were you going to pay the defendant?

A.   Cash.

Q.   At some point at the end of the day, did you in fact pay him?

A.   Yes.

Q.   Can you describe what happened when you paid him? How did you go about paying him?

A.    I had my girlfriend go get the rest of the money and then once she got back, I gave him an envelope with the cash in it.

Q.    Did you put the cash in his hand?

A.    Yes.

Q.    When you did that, did you observe any blood on his hand?

A.    No.

ATTORNEY DESROCHES:  May I have PX-13 please?

Q.    (By Attorney Desroches)  Mr. Williamson, at any point at your time -- at your house while you were doing the work and cleaning it up, did you ever see a gas can like this?

A.    No.

ATTORNEY DESROCHES:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q.    (By Attorney Desroches)  Mr. Williamson, I'm just going to place PX-4 on the stand before you.

Do you recognize -- did you see anything like PX-4 at your house at any time when you were there?

A.    No.

Q.    Sorry, just so the record is clear, can you say that again?

A.    No.

Q.   And just one more question, when you gave the defendant that envelope of cash, do you remember what hand you put it in?

A.   No, I don't.

ATTORNEY DESROCHES:  Thank you.  No further questions.

THE COURT:  Attorney Watkins.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Good afternoon, Mr. Williamson.

A.   How you doing?

Q.   So you were first interviewed by the FBI on January 19th of 2021?

A.   I suppose, yes.

Q.   Sorry?

A.   I suppose.  I guess.

Q.   Was it January of this year?

A.   I'm not sure.

Q.   It was many months after the two men came to do the clean out?

A.   Yes.

Q.   You have to answer out loud.

A.   Yes.

Q.   And if I understand it was more than two years after you first moved into that house, right?

A.   Yes.

Q.    In December of 2019, did you move in right away or was there a lot of work that had to be done even before you could move in?

A.    I don't know.  I was helping fix everything in the house so we were in there by Christmas, so.

Q.    I'm sorry?

A.    We were in there by Christmas.

Q.    You were actually living there on an overnight basis?

A.    Yes.

Q.    But the house was under construction --

A.    Yes.

Q.    -- even then, right?

A.    Yes.

Q.    It was already kind of dilapidated, right?  It's an old house?

A.    Yes.

Q.    And even at that point there was a lot of waste as whoever was your boss was trying to renovate even before you got in there, right?

A.    Yes.

Q.    So things were going out into the yard from the renovation he was doing, right?

A.    Yes.

Q.    And these are things that were already in the side yard from when your boss was trying to clean the place up,

right?

A.    Yes.

Q.    And some of those items -- so some of the items that were in the side yard they might have been out there for a year and a half before April of 2020?

A.    No, he had previous attenants. (sic)

Q.    I'm sorry?

A.    He had a previous attenants.  (sic)

Q.    Previous tenants?

A.    Yep.

Q.    But as I think you're saying is those tenants had moved out by December of 2019?

A.    No, they were out before probably October.  I'm not sure of the right date.

Q.    So the house had set empty for a couple of months before you went in there, right?

A.    Yes.

Q.    And that was the time when your boss at least started to take trash and items out of there, right?

A.    Yes.

Q.    And again things would go into the side yard and that's where they would stay until they were disposed of, right?

A.    Not really because he was bringing stuff to our job to dump them in our dumpster.

Q.   Part of the items that were there were a deck and a pool, right?

A.   Yes.

Q.   The remnants from a deck and a pool, right?  I mean, this had already been destroyed at that point by the time you moved in?

A.   It was knocked down.  I just helped move it into a pile.

Q.   So it was all in pieces, right?

A.   Yes.

Q.   This deck and pool it actually had been attached to the house at some point, right?

A.   No, it was on the other side of the house.

Q.   But it actually had a connection to the house.  You could actually -- not a connection.  It was up against the house, this pool?

A.   No.  It was on other side towards the shed.

Q.   So this was a standalone pool and deck --

A.   Yes.

Q.   -- that had steps up to it, right?

A.   Yes.

Q.   And so that was part of the -- a lot of the trash that ended up in the side yard that you needed people to remove, right?

A.   Yes.

Q.    And so lots of wood but also lots of flashing involved with the pool itself, right?

A.    Yes.

Q.    You have to answer out loud.

A.    I said yes.

Q.    Okay.  And so this is plastic but there are also metal pieces involved with the pool itself?

A.    Yes.

Q.    And so those were the things that were out in the side yard that you needed to get rid of, right?

A.    Yes.

Q.    By April or March of 2020 that pile had been sitting out there for already some eight months, right?

A.    Probably.

Q.    And you talked about it had been all there and snowed on during the winter and lots of mud, everything.  It had been sitting there for quite awhile, right?

A.    Yes.

Q.    And it wasn't organized in any particular way, right? In other words, it wasn't boxes stacked up and lumber stacked up?  It was all just a big mesh, a big pile there, right?

A.    Yeah.

Q.    And in addition to the wood and the pool pieces, there were sleds and scooters there as well?

A.   Yes.

Q.   Children's toys, things of that nature?

A.   Yes.

Q.   And all kinds of -- and actually boxes full of other things?  Just closed up boxes were sitting out there, right?

A.   Yeah, boxes full of broken plates.

Q.   Broken items, right?  And there were many boxes again not stacked up but they're just out there along with the rest of the trash, right?

A.   Yes.

Q.   In your January 19, 2021 interview you described the folks coming up there in a white painter's van?

A.   I don't remember the color but you're probably right.

Q.   I'm sorry?

A.   I don't remember the color but you're probably right. It could have been white.

Q.   Would it help if you took a look at something to remind you whether you described it as a white painter's van?

A.   If you have something, sure.

Q.   I'm sorry?

A.   If you have something, sure.

          ATTORNEY WATKINS:  May I share this with just the witness please?

THE COURT: Yes.

Q. (By Attorney Watkins) I want you to read to yourself just this third paragraph starting with Williamson's girlfriend and moving just about halfway down if you can tell me what it says about the van that they came in?

A. Read where?

ATTORNEY BRESLOW: Objection, Your Honor.

ATTORNEY WATKINS: I'm sorry?

ATTORNEY BRESLOW: I think Mr. Watkins has asked the witness to read the report.

ATTORNEY WATKINS: Yes.

THE COURT: To refresh his memory.

ATTORNEY WATKINS: Yes.

Q. (By Attorney Watkins) Read it to yourself and see if you can identify what color the van that the folks showed up in.

A. Okay.

Q. Do you now know? Does that help you remember what you told the FBI back in January?

A. Sure. It sounds right I guess. I'm not definitely sure. It's been a while.

Q. What did you tell the FBI about the color of the van that the --

A. It had been a while since.

Q. I'm sorry?

A.    It had been awhile.

Q.    No, I understand that.  But what color did you tell the FBI?

A.    Right there it says white.

Q.    A white painter's van?

A.    Okay.

Q.    What price did you agree on to have the trash removed?

A.    I don't remember.

Q.    Again the interview would have been nine months after the actual clean out was done, right?

A.    Yes, sir.

Q.    And then you were re-interviewed this past week, right?  You continued to be interviewed?

A.    Yes, sir.

        ATTORNEY WATKINS:  That's all I have.

        ATTORNEY DESROCHES:  I just have two questions, Your Honor.

**REDIRECT EXAMINATION**

Q.    (By Attorney Desroches)  Mr. Williamson, are you color blind in anyway?

A.    No.

Q.    Did you see the defendant carry or his coworker carry a gas can of any color whatsoever?

        ATTORNEY WATKINS:  I'm going to object, Your

Honor.  It's beyond the scope.

THE COURT:  Sustained.

ATTORNEY DESROCHES:  No further questions.

THE COURT:  All right.  Thank you, sir.  You're all set.  You can step down.  Thank you very much.

ATTORNEY DESROCHES:  Your Honor, the government rests.

THE COURT:  All right.  The government rests its rebuttal case.

All right.  Defense?

ATTORNEY WATKINS:  No more witnesses.  Thank you.

THE COURT:  No more witnesses.

(End of excerpt.)

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )


        I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)



/s/ Alice Moran                        November 24, 2021
Alice Moran, RMR, RPR
Federal Official Court Reporter