UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

United States of America  )
                          )          20cr30018-MGM
    vs                    )
                          )          June 1, 2021
John Michael Rathbun      )
_____)          Day 1


**REDACTED** JURY SELECTION HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:

On behalf of the government:  Neil L. Desroches, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105.

Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.

On behalf of the defendant: Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
alice.moran@verizon.net

INDEX

Witness:                                                    Page:

None

Exhibit No.              Description                    Page

None

**(Trial commenced at 9:37.)**

**(The defendant is present.)**

CLERK RIVERA:  The matter before the court is criminal case 20-30018, the United States of America versus John Michael Rathbun.

Counsel, I'm going to ask you to identify yourselves for the record starting with the government please?

ATTORNEY DESROCHES:  Good morning, Your Honor. Neil Desroches on behalf of the United States.

ATTORNEY BRESLOW:  Good morning, Your Honor. Steven Breslow for the United States and with us at counsel table is Megan McKenna, legal assistant.

THE COURT:  Okay.

ATTORNEY WATKINS:  Tim Watkins, Federal Public Defender Office on behalf of John Rathbun who is here with us in court today.

ATTORNEY O'NEILL-GREENBERG:  Forest O'Neill-Greenberg also for Mr. Rathbun.  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Good morning.  All right.

To make the record, let me just ask the clerk, we are broadcasting this on Zoom; is that correct?

CLERK RIVERA:  That is correct, Your Honor.

THE COURT:  So there is public access through Zoom and there's also public access, and please correct

me, through a television and audio viewing in a public area of this courthouse; is that correct?

CLERK RIVERA:  That is correct.

THE COURT:  Okay.  You can be seated.

Okay.  Good morning, ladies and gentlemen.  I want to confirm that the potential jurors in each location can hear me and see me?  If you can hear me and see me, can you raise your hands?

Do you see any hands?

CLERK RIVERA:  No.

THE COURT:  I am neither seen nor heard.

Good morning, ladies and gentlemen.  The first thing I want to do is confirm that everyone in both of the rooms where the potential jurors are seated can see and hear me.  If you can see and hear me, please raise your hand.

POTENTIAL JURORS:  (Indicating.)

THE COURT:  Okay.  I see hands being raised. I'm waiving back at you in the courtroom.  How about in the other room, in the jury assembly room?  In the jury assembly room, can you see and hear me?  Raise your hand.

No.  Okay.  Is that Jim or Mike?

CLERK RIVERA:  That is Jim.

THE COURT:  Okay.  There are jurors in a different room as well and we're trying to get a connection to that room so we need one more minute.

CLERK RIVERA:  Try it again.

THE COURT:  All right.  The jurors in the jury assembly room, if you can see and hear me, please raise your hand.

POTENTIAL JURORS:  (Indicating.)

THE COURT:  Very good.  All right.  In the courtroom, can you can still see and hear me?  Okay. Great.  If at any time you lose the audio connection, raise your hand if you lose the audio connection.

All right.  Good morning, everyone, and thank you for being here.  My name is Mark Mastroianni, and I am the judge who will preside over this session of the United States District Court for the District of Massachusetts. It's a pleasure to welcome you on behalf of all the members of the court as potential members of the jury.

Let me start off by telling you what kind of case this is.  I'm sure many of you are curious and you will need to know a little bit about the case to move forward this morning with this process.

This is a criminal case.  There is one defendant who is here in the courtroom with his attorneys.  He is charged with two federal crimes or counts of crimes. Those of you who are chosen as jurors will be told later what the precise charges are and what the government has to prove beyond a reasonable doubt in its case against the

defendant who is presumed to be innocent.

The very, very general overview of this case -- and I stress very general overview that I'm giving you right now -- is that, as I said, this is a criminal case. There is one defendant. That person's name is John Rathbun. In April of last year, a five-gallon fuel canister that was not completely filled and had a partially burned religious pamphlet in its nozzle, in the nozzle of the canister, was found on Converse Street in Longmeadow, Massachusetts in the area of the Jewish Geriatric Services Lifecare Center, known as JGS.

This case is about that event and the government's allegations that the defendant placed or was involved in the placement of that fuel canister. The defendant denies the allegations. Those of you who are chosen as jurors will be told later about the specific details about that event and the laws the government alleges were broken.

I again stress to you that is my -- that is the court's general overview only to give you a little sense of the case so that I can ask you more questions about your ability to serve as a fair and impartial juror as we move forward.

If anything you hear during the trial, if you are chosen as jurors and the case unfolds, differs from that very general summary that I gave you, it is what you hear

at trial that controls all facts of this case.

You watched a DVD video this morning that explains some of the process we will be going through and what is expected of you if you are selected to serve on the jury. I will not repeat everything you saw and heard this morning but will stress a few things.

In both civil and criminal cases verdicts are rendered by a jury composed of ordinary citizens. The founders of our nation believed that the right to a jury was so important that they put it in the Constitution and the Bill of Rights. Jurors have always been composed of ordinary citizens, each of whom brings their individual perspective and life experience to the table. What is truly important is that you take your responsibility seriously and that you exercise your authority to the best of your abilities.

This jury is fundamental to our system of justice. It is both an obligation of citizenship and an honor and privilege to serve. If you are selected to serve, I hope that you will exercise your duties responsibly, solemnly, and in accordance with the law.

You should not, however, assume that your service will be burdensome. Many jurors find that it is an interesting and rewarding experience. When I talk to jurors and I do at the conclusion at the end of each case,

jurors generally always tell me how rewarding it was and how they enjoyed seeing and participating in the system of justice.

Now certainly I know that many people are here a little concerned about the service and thinking that this will be burdensome, but the overall reaction from people after they serve is one that they find that this process, learning about the process, and being involved in this is an experience that they are glad they had.

Now many of you are probably nervous about the possible commitment of time that may be required of you if you are selected and so we'll talk about that.

I anticipate that jury selection will take the rest of today and then we have another day of jury selection tomorrow.  The trial itself will not begin until Monday of next week.  The trial will begin Monday of next week.

The lawyers expect this case will take approximately that one week to try making it go through the end of next week.  However, it is possible, it's always possible that a trial can go longer or shorter.  So our plan right now is jury selection today and tomorrow, start the trial on Monday, and the trial goes through Friday.

Now once the case is completed and you are deliberating as jurors, jurors have as long as you need to deliberate to reach your verdict.

The court will be in session for full days. We start at nine o'clock or as close thereto as we can and we break at 4:30. There's generally a mid-morning break around eleven o'clock, a coffee break. That's a shorter break and then a lunch break, which is usually closer to an hour at one o'clock is when we take that.

Once the case is given to the jury for deliberations, you will deliberate from 9:00 to 4:30 each day and you will have lunch brought into you during that deliberation process.

Now, before we proceed any further I'll take a moment to address the situation regarding COVID-19 and the health risks posed by it and the steps we must all take for everyone's safety.

Earlier today you watched a video made by our chief judge and a team of medical professionals from Tufts Medical Center.

Now this video was actually made last fall and described a number of steps the court had taken to ensure that we could proceed with trials in a safe and healthy manner. However, in the last recent weeks, including just this last weekend, federal and state guidance has been updated and some of the measures discussed in the video have been adjusted to bring our court's response in line with current conditions and current health safety protocol

recommendations.

As you know, many of the measures that have previously been used to protect the public health during the pandemic are in the process of being phased out as the rate of vaccination has increased. Most, if not all, attorneys and court staff present in the courthouse during this trial are fully vaccinated and I expect that many and perhaps most of you are fully vaccinated.

While the public health threat posed by COVID-19 has decreased, things are not yet back to normal and we are continuing to use many of the modifications to the setup of the courtroom, procedures, and protocols that we put in place during the last year.

So this trial is really the first trial that is taking place since there was a reduction in the COVID-19 protocols and a general opening up of public areas.

We, however, are still requiring that masks be worn in the public areas in the courthouse unless there is a physical barrier in place. While we no longer require 6 feet of social distancing, we are continuing to limit the number of people in spaces and increase the spacing between people.

Additionally the courthouse is equipped with a heating ventilation and air conditioning system which fully exchanges the air in this courtroom and the

courthouse regularly.

We will not be asking anyone about their vaccination status or taking temperatures in the morning, but you should not come to court if you are feeling sick or in the previous 14 days you have been in close contact with someone who has tested positive for COVID-19 or you yourself have tested positive for COVID-19.

Now, ladies and gentlemen, the parties in this case have a right to a jury that is fair and impartial, one that is not biased or prejudiced one way or the other. You will hear the words fairly and impartially throughout this jury selection process so it is important that each of you understands what I mean by the phrase.

To serve fairly and impartially as a juror means to hear the evidence in this case and decide its outcome without bias in favor of or prejudice against either side, any witness, or any material matter.

It means to base any verdict in this case on the evidence presented during the course of the trial as well as the law as I give it to you and not on anything you may have heard or read or experienced outside of the courtroom.

The lawyers will have an opportunity to challenge a number of prospective jurors. With some of these challenges, the lawyers do not have to give a reason.

With some challenges, the court must approve after considering the reasons given by the lawyers.

When the lawyers are both satisfied with the jury or they have run out of their challenges, we will have our jury. We are going to impanel 14 jurors. Two of those jurors will end up serving as alternate jurors. That way if something prevents one or two of the jurors from completing their service, we would not have to start the trial all over again.

During the trial all jurors will attend together. At the end of the trial, when the time has come to deliberate, only two jurors will deliberate and vote. If you are not chosen to sit on this jury, do not think it reflects upon you personally or your ability to be a good juror. This certainly is not a scientific process or a merit-selection process and so you should not be in the least concerned if for some reason you are not chosen.

Now each of you should have a pen and a notebook.

I'm just confirming that we still have a connection to each courtroom.

So each of you should have a pen and notebook. If anyone does not, please raise your hand so the clerk in that room with you can get you a pen and notebook.

All right. I see that they have been handed out.

All right. Now I've already described the case with

a little bit of detail for you.  I'm going to then -- now I'm going to introduce the lawyers to see whether any of you know them or have a connection with them.

I will then list the possible witnesses to see if anyone knows or has heard of these witnesses.  I will then ask some additional questions regarding issues that could prevent or be an issue with someone being able to serve on a jury.

Now, you have a notebook because each question I ask will be numbered and I will tell the number as I ask the question.  For each corresponding number in your notebook you should be writing down one, two, three as I ask the questions.  When I ask those questions, you should write down your response or any concern or any answer you have to that particular question making sure your answer corresponds to the number of each question.  That will help streamline the process.

Now, your answers must be under oath.  In other words, you must swear that your answers are truthful.  It is very important that you give truthful responses.  The purpose of these questions and our conversation with you is to determine if you can serve as fair and impartial jurors in this case.

Having told you the importance of the truthfulness of your responses and that you will be under oath, we will

now swear in the jury pool.

CLERK RIVERA:  Jurors, are you able to hear me?  This is for all potential jurors.  Can you please raise your right hand?

**(Potential jury pool sworn.)**

CLERK RIVERA:  Everyone can just nod their heads please.  Okay.

THE COURT:  All right.  So, ladies and gentlemen, generally the process will be I'm going to ask you these questions now.  We are going to go through that.  Then each person is brought up to the courtroom individually and each person will come into the courtroom one at a time and we will talk very briefly about some of the answers and some particular questions that you took notes on so bring your notebook.

The next process will be that a number of jurors then will be brought into the courtroom and actually fill in the jury box.  They will take seats in the jury box.

Those people who sit in the jury box will then be asked questions.  They could be follow up to the questions that I asked you.  They could have things to do with the questions I asked you, or they could be on a new topic.  You will be asked those questions by the lawyers from each side.

Now, this process is certainly not designed to make

15

anyone feel uncomfortable or to invade anyone's privacy. And if at any time you do feel uncomfortable, you should just raise your hand in the courtroom and I will speak to you privately at sidebar away from anyone else so I can address your concern.

It's through this process that the lawyers then go through the selection of who each side would like or thinks would be a fair juror. That is the process we are going to use.

So to start with, we will start with those questions that I told you about.

Now, this is Question No. 1. All right. So in the notebook this is Question No. 1 and it has to do with hardship. Anyone who serves on the jury will, of course, be inconvenienced to some extent. However, the jury trial in this case will not last multiple weeks or even months like some trials do. I told you what we expect for this trial and how long it would last.

Having explained that, if anyone will have a serious or extraordinary hardship, whether that's family, personally related or work related, a serious or extraordinary hardship by serving on a jury for that length of time, please make a note of that and we can discuss it further.

Question No. 2 has to do with disability. Do you

have a physical disability, or are you otherwise disabled in a way that would make serving as a member of the jury difficult or impossible or might interfere with your ability to concentrate and serve as a juror because of the disability?

Question No. 3:  Do you have any serious health concerns related to COVID-19 or any other serious health concerns that might make serving as a member of the jury difficult or impossible for you, or would that health condition interfere with your ability to concentrate during the trial if you were selected as a juror?

Question No. 4:  Question No. 4 is do you have any difficulty understanding, reading, or speaking English?

All right.  Now I want to ask you if you know any of parties involved and so I need the parties to introduce themselves.  I want to make sure that they're going to be visible to you, number one, and that you can hear them.

So I'm going to ask the government to introduce themselves first to you.  I'll ask our clerk just to confirm that you are getting the video and audio down to your room.  All right.

Government.

ATTORNEY DESROCHES:  Thank you.

Good morning.  My name is Neil Desroches.  I'm an assistant United States attorney here in Springfield, and

together with my colleagues I represent the United States.

ATTORNEY BRESLOW:  Good morning.  My name is Steven Breslow and I'm also an assistant United States attorney.

MS. McKENNA:  Good morning.  My name is Megan McKenna.  I'm a legal assistant for the United States.

THE COURT:  Thank you.

For the defense?

ATTORNEY WATKINS:  Good morning, jurors.  My name is Tim Watkins.  I'm an assistant federal public defender.  I work mostly in the Springfield area and sometimes in Worcester, and I live in Easthampton, Massachusetts.

ATTORNEY O'NEILL-GREENBERG:  Hi.  Good morning.  My name is Forest O'Neill-Greenberg.  I'm also from the Federal Defender's Office in Boston down here in Springfield for this case, and with me and with Attorney Watkins is John Rathbun.

THE DEFENDANT:  Good morning.  My name is John Rathbun.

ATTORNEY O'NEILL-GREENBERG:  Thanks.

THE COURT:  All right.  Ladies and gentlemen, those are the participants in the trial.  You'll obviously see them closer when you come into the courtroom for the

first time to talk to me about your answers.  If seeing everyone sitting at the table closer you recognize them then because you can actually see them closer in the same room, you can just simply let me know that at that point.

Question No. 5 is do you know either the defendant or any of the attorneys?  Know them in any way personally or professionally?

The next question is Question No. 6.  I'm going to read you a list of witnesses and ask you if you've heard of them.  Do you think you know; do you think you might have a family member who knows them; do you think you might have a professional relationship or any type of knowledge of the following witnesses?

Now to the parties, I'm not sure I have the address or the town at least generically for each witness.  So as I go through, if I need to have filled in where that witness is from I'll ask if you know.  If you can just supplement the information, if you have it.

All right.  So I'm going to go through this list of witnesses and the list of witnesses is fairly long.  However, from my experience it is generally not even close to all of the witnesses that I list that are actually called as witnesses during the trial.  It could be, but usually the people who are called are much shorter than the actual list.

The first witness -- now again this is Question No. 6 if you know them.  The first witness is a person named Jessee Dabrae from the Longmeadow Police Department; then Sheila Rathbun from East Longmeadow, Mass; Jeffrey Rathbun from East Longmeadow; Alicia Hutton from the Federal Defender's Office in Boston; Brooke Gottlibe from the Federal Defender's Office in Boston; Tiffany Thomas from the Federal Defender's Office in Boston; Agent Ryan Burke from the FBI; Agent Ryan McGonigle from the FBI; Agent Christopher Rigopoulos, FBI; Agent Dustin Wong, FBI; Agent Eric Mastroianni, FBI.

I'll let everyone know that Eric Mastroianni from the FBI, as far as I know and he knows, we are not related. There is a chance we are very distantly related.  I have only met him a few times and it's through my work here in the federal court, and so there is no connection between -- if it would matter to you in any way -- there is no known relationship between Eric Mastroianni and myself if that would be important for you to know.

Eric Mastroianni is an FBI agent; Derek Boucher, FBI agent; Patrick Carnahan, an FBI agent; Alfred Alschuler. Does anyone know where he's from?

ATTORNEY BRESLOW:  He works at All Energy Solar, Your Honor, based out of Chicopee.

THE COURT:  Thank you.  Barry Berman.

ATTORNEY BRESLOW:  Affiliated with JGS, Your Honor.

THE COURT:  Okay.  Kathryn Bowser from the Massachusetts State Police; Chris Carr, and Chris Carr, Jr.

ATTORNEY BRESLOW:  They're related to Carr Properties.

THE COURT:  Is that in Longmeadow?

ATTORNEY BRESLOW:  In the Springfield area.

THE COURT:  In the Springfield area.  Okay. Pamela Chaplin from the Longmeadow Police Department; Ryan Czepiel.  Did I pronounce that, right?

ATTORNEY BRESLOW:  That would be Czepiel, Your Honor.

THE COURT:  Thank you.  Ryan Czepiel from the Massachusetts State Police; Alana Darby from the Mass. State Police; John Drugan from the Mass. State Police; a person named Sarah Drake.  If anyone knows where Ms. Drake is from?

ATTORNEY BRESLOW:  I would just say the Springfield area, Your Honor.

THE COURT:  All right.  Regina Ellis.

ATTORNEY BRESLOW:  Longmeadow.

THE COURT:  Susan Goldsmith.

ATTORNEY BRESLOW:  Affiliated with JGS.

THE COURT:  Dana Graham.

ATTORNEY BRESLOW:  The Springfield area.

THE COURT:  Bob Hill.

ATTORNEY BRESLOW:  Affiliated with the Billy Graham Evangelical Association in North Carolina.

THE COURT:  Raisa Illina.

ATTORNEY BRESLOW:  Longmeadow, Your Honor.

THE COURT:  Kristen Koch from the FBI, Agent Kristen Koch; Rochel Kosofsky.

ATTORNEY BRESLOW:  Longmeadow.

THE COURT:  And Chaim -- is that pronounced correctly?  -- Kosofsky?

ATTORNEY BRESLOW:  It's pronounced Chaim and also Longmeadow.

THE COURT:  All right.  Nancy Krue from the Mass. State Police; Robert Lee.

ATTORNEY BRESLOW:  Springfield area, Your Honor.

THE COURT:  Megan Little from the Mass. State Police; Daniel Marshall.

ATTORNEY BRESLOW:  Affiliated with Scepter, Your Honor.  It's a company in the midwest.

THE COURT:  All right.  Gabe Martinez.

ATTORNEY BRESLOW:  The Springfield area.

THE COURT:  Michael Mazza.

ATTORNEY BRESLOW:  That's a state trooper, Your

Honor.

THE COURT:  I'm sorry, you're right.  A Massachusetts State Police, Michael Mazza.  Chris Meyerhoff.

ATTORNEY BRESLOW:  Also affiliated with All Energy Solar.

THE COURT:  All right.  Glenn Miliken.

ATTORNEY BRESLOW:  The Springfield area.

THE COURT:  Chris Murray.

ATTORNEY BRESLOW:  The Springfield area, Your Honor.

THE COURT:  And from the Massachusetts State Police Erica Nadeau, and then Kyle Phillips.

ATTORNEY BRESLOW:  Also affiliated with All Energy Solar.

THE COURT:  Brianna Randolf is from the Massachusetts State Police, and then Natalie Rathbun.

ATTORNEY BRESLOW:  The Springfield area, Your Honor.

THE COURT:  Paul Rathbun.  Did I repeat that? Paul Rathbun, Springfield area?

ATTORNEY BRESLOW:  Yes.

THE COURT:  Steven Rhodes.

ATTORNEY BRESLOW:  Also with the Billy Graham Evangelical Association, Your Honor.

THE COURT:  Curtis Rowe.

ATTORNEY BRESLOW:  The Springfield area affiliated with the Heritage Baptist Church.

THE COURT:  Sydney Senior from the Massachusetts State Police, and then Mary Jacobs Sherry.

ATTORNEY BRESLOW:  Affiliated with Carr Properties and a building at JGS.

THE COURT:  Sarah Thompson from the Mass. State Police, and then Horace Williamson.

ATTORNEY BRESLOW:  The Springfield area, Your Honor.

THE COURT:  All right.  Thank you.  And then we have Michael Nothe from the Longmeadow Fire Department; Gary Fontaine from the Longmeadow Police Department; Gerry Mascata from the Longmeadow Fire Department; Przemyslaw Szura from the Chicopee Police Department; and Pamela Chaplin -- I think I repeated that -- from the Longmeadow Police Department.  Those are the potential witnesses.

Now we move to Question No. 7.  Question No. 7 is have you heard, read, or know anything about this case?

All right.  Now Question No. 8 is a question that may be asked to you of the attorneys when the attorneys are asking you questions, but I want to highlight it for you so you can think about it.  Question 8 would be what news sources do you read, listen to, or watch regularly?

Question No. 9, similarly these questions may be things people will ask you about.  What social media sites or apps do you regularly use, visit, interact with, or get information from?  That's Question 9.

Question 10:  If you are selected to serve as a juror, the court will instruct you to avoid all media coverage including avoiding social media related to the case.

You are not to do your own internet searches about the case if selected as a juror.  You are not to post anything or look for anything on social media.  You are not to read anything or listen to any news broadcast or pay any attention to any social media or internet information about this case.

You cannot Google the case, anybody about the case.  You can't do internet searches about any aspect of the crimes charged, about any aspects of law enforcement or crime solving.

You cannot blog about the case.  You cannot have any interaction with tweeting about the case or post any comments on social media.

The question is, do you have any reservations or concerns about your ability or willingness to follow that instruction, or would you be able to follow that instruction?  That was Question 10.

Basically if you could leave social media alone, stay away from it and the internet as it relates to anything to do with this trial during the course of the trial. When the trial is over you can, of course, do whatever you would like on social media regarding the issues.

All right. Now Question 11: Do you have any feelings about the criminal justice system that might interfere with or affect your ability to serve as a fair and impartial juror in this case? That's No. 11, and it may be asked of you when you come up for more questioning.

Question No. 12: Do you have any feelings or beliefs about the government, whether positive or negative, that might interfere with or affect your ability to serve as a fair and impartial juror in this case?

Question 13: If you have previously served as a juror in a criminal, civil, state or federal case, or as a member of a grand jury in state or federal court, number one, I want to know and the other attorneys will want to know if you've had that prior service. And is there anything about that prior service that would affect your ability to serve as a fair and impartial juror in this case?

Now Question 14. Question 14 starts with you understanding that the indictment in this case is simply a charge against the defendant. The fact that a defendant

has been charged with a crime is not evidence that the person is guilty of that crime.

A defendant is presumed to be innocent and the government has the burden of proving a defendant's guilt beyond a reasonable doubt.  The law never imposes on a defendant any duty to call any witnesses or to produce any evidence because the burden of proof is always on the government.

Now, is there anyone who does not accept this basic principle regarding the presumption of innocence and the government's burden of proof?  So that Question 14 is whether or not you accept that principle and that will be something that the attorneys may discuss with you when you come up.

Question 15 starts with the principle that a defendant has a constitutional right not to testify in this case.  No inference of guilt or anything else may be drawn from the fact that a defendant does not testify. For you to draw such an inference would be wrong.  Indeed, it would be a violation of your oath as a juror.

Is there anyone who does not accept this basic constitutional principle regarding a defendant's right not to testify and who would actually hold it against the defendant if he did not testify?  So if there's anyone who just does not accept that principle, you need to make a

note of it in 15.

Question 16:  The principle is that you must decide this case solely on the evidence presented in this courtroom.  As part of this requirement if you are chosen as a juror, you must avoid any media coverage related to this case whether in print, on the radio, on television, or on the internet in any way.

Is there anyone does not accept that principle of deciding this case only on the evidence that you hear in the courtroom?

So the question is, could you make your decision on this case based upon what is only in the courtroom?  Or would you base it on something else, evidence that is not presented in the trial?  Could you follow the rule that you can only base any verdict on what's presented only in the courtroom?

Question 17:  The principle is as a juror you must follow the law as I provide it to you in deciding this case.  You must put aside any notions about what you thought the law requires or what you think the law should require, and you must follow only the instructions as the court gives them to you about the law.

Are you unwilling or unable to apply the law as I give it to you?  So Question 17 is, do you accept the principle that you have to follow the law as the court

instructs you on it and not based on what you think the law should be?

Question 18.  Question 18:  Do you have any personal beliefs that might interfere with or affect your ability to serve as a fair and impartial juror in this case and to render a fair verdict?

Now I don't need to know your exact personal beliefs unless those beliefs could somehow interfere with your ability to follow the law as I instruct you on this case, but if you have any personal beliefs that would interfere with your ability to be fair and impartial, you need to make a note for yourself in Question 18.

Question 19.  Question 19:  Have you or any member of your immediate family or anyone you are close with been a victim of a crime, been accused of committing a crime, or charged with committing a crime or otherwise had contact, any type of contact, with the criminal justice system?

We want to know if you have.  And if so, do you feel that you, your family member, your friend was treated fairly or unfairly by the criminal justice system?  That was Question 19.

Question 20:  Do you have any feelings or beliefs about law enforcement officials, whether positive or negative, that might cause you to believe or disbelieve a person just because that person is a law enforcement

official?  That was Question 20.

Question 21 is strong feelings about the FBI.  Do you have any strong feelings, positive or negative, about anyone in the FBI that might cause you to either believe or disbelieve that person simply because of their connection with the FBI?  That's 21.

Question 22:  Have you, a family member, or a close friend ever had any legal dispute with the federal government or any agency of the government including the FBI, the Federal Bureau of Investigation?  That's 22.

Question 23:  Have you, a family member, or a close friend ever had any legal dispute with any law enforcement agency, including local law enforcement agency, city and town police departments?  That's 23.

Question 24:  Have you or anyone close to you ever had any education, training, or experience in the law, legal field, or criminal justice?  That's 24.

Now 25:  Have you or anyone close to you ever had any education, training, or experience in hazardous materials, handling of hazardous materials, firefighting, or explosives, explosive compounds or devices or materials?  That's 25.

Question 26 is have you had any experience with or have any understanding of expert evidence or expert testimony in any field?  That's 26.

Moving on to 27:  Have you or anyone close to you ever had any education, training, or experience in forensic sciences including, but not limited to, DNA, DNA testing, and analysis?  That's 27.

Now 28 is have you, a family member, or a close friend ever suffered from a drug addiction?

Moving to Question 29.  Have you, a family member, or a close friend ever been arrested for the possession or distribution of illegal drugs?

Now moving to 30.  Question 30 is do you have strong feelings about criminal laws that make the possession of narcotics illegal?

Question 31:  Do you or anyone close to you have any connection with the Jewish Geriatric Services Lifecare Facility known as JGS, which is located in Longmeadow, Mass.? That's Question 31 if you have any type of connection to that facility.

Number 32:  Do you have strong feelings about religion or about people who are religious?  That's 32.

Number 33 is do you have strong feelings about the Jewish faith or people who are Jewish?  Also, do you have strong feelings about the Christian faith or people who are Christian?  That's 33.

Question 34 is do you have strong feelings about people who proselytize?  That is, who speak to others or

hand out reading materials to inform that person about a religion and to try to convince that person to think about participating in that religion that the person is speaking about.

All right.  So thank you for your attention.  Soon, in a few minutes, we're going to call -- we're going to start the process of individually talking to each of you.

So the clerks that are working in the rooms with you will bring people up into the courtroom individually.  It will just be you in the courtroom with myself, our staff, and the attorneys, everyone you saw on the video.

We'll talk specifically about your answers to some of the questions, remembering that some of the other answers to your questions will be talked to you about the attorneys when you are actually seated and they're doing a process where there is a group of you together in this courtroom.

All right.  We are going to start that next process of individuals.  Now, ladies and gentlemen, while people are coming up for their -- as part of the process of being individually talked to or spoken to in groups, as you remain in the room where you are now do not start talking about this case.  Do not talk to each other about anything that has -- anything at all to do with why you are here.

Don't talk about anything that I told you; anything

you learned about the case; anything I told you about the law.  Talk about anything else but nothing related to this case.  Thank you.

(Short pause in the proceeding.)

THE COURT:  For the record, during the individual voir dire process the video will continue to be streamed publicly over Zoom but the audio is not because it's individual voir as if it was at a sidebar.

ATTORNEY WATKINS:  May I ask where the jurors are going to stand when they come in here?  There's a little bit of a problem about hearing.

THE COURT:  Right.

CLERK HEALY:  We can them stand right next to that microphone.

THE COURT:  That works.

(The potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 1, XXX XXX.  Mr. XXX, if you'd come around here and stand right in front of the microphone?

THE COURT:  We're trying to make the microphone work and then allow everyone to see you.

Thank you, sir.  Mr. XXX, thank you for being here.

Mr. XXX, I asked you several questions in the attorney-conducted voir.  Let me ask you, did you take the oath downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  And I asked you if you knew any of the parties involved.  Now that you're closer, if you look at the tables, do you know any of the defendants (sic) or the defendant Mr. Rathbun?

POTENTIAL JUROR:  No, I don't think so.

THE COURT:  Very good.  Did you have any answers to any of the questions that I asked you one through fourteen?

POTENTIAL JUROR:  I think it was Number 11.

THE COURT:  Strong feelings about the criminal justice system?

POTENTIAL JUROR:  No, I thought it was -- was there a reason, the reason was my grandson used to work there.

THE COURT:  Used to work where?

POTENTIAL JUROR:  At the Jewish Community Center, the dietary department.

THE COURT:  How long ago was that?

POTENTIAL JUROR:  About a year ago.  He quit.

THE COURT:  And did you ever go see him there?

POTENTIAL JUROR:  Yeah.  I used to drop him off there every day.

THE COURT:  Okay.  Would you go on the campus?

POTENTIAL JUROR:  Oh, yes.

THE COURT:  All right.  So you knew the building he worked at?

POTENTIAL JUROR:  Yes.

THE COURT:  Did you ever go into the facility beyond dropping him off?

POTENTIAL JUROR:  I went -- yes, I dropped him off in there.  When he first applied for a job there, I went with him.

THE COURT:  Okay.  So you know the layout of the campus?

POTENTIAL JUROR:  Yes, just the front hall room and where they -- where he got hired from.

THE COURT:  Okay.  So now, that campus has many buildings on it; is that right?

POTENTIAL JUROR:  Well, he was in the dietary right at the main room, right at the main entrance where you drive in.

THE COURT:  Where you drive in?

POTENTIAL JUROR:  Yes.

THE COURT:  Did you ever talk -- you said this was who?

POTENTIAL JUROR:  My grandson.

THE COURT:  Did you ever talk with him about the facility?  What the facility did?  Anything about the goal of the facility?

POTENTIAL JUROR:  Well, I mean I used to ask how was your day and --

THE COURT:  Sure.

POTENTIAL JUROR:  -- he used to tell me if somebody past away that he had feelings for because he knew them.  He would bring them their dinner.

THE COURT:  All right.  Okay.  Do you think this information that you have about that facility -- and, by the way, does he still work there?

POTENTIAL JUROR:  No.  He doesn't work there anymore.

THE COURT:  Okay.  The information you got about the facility, do you think in any way that would cause you to be -- to think positively or negatively about the facility, or might it interfere with your ability to be a fair juror in this case?

POTENTIAL JUROR:  Well, I remember when this happened and I said, you know, I said my grandson could have been in there because I did hear about it.

THE COURT:  All right.  Now, the next question -- anything else that you wrote down?

POTENTIAL JUROR:  No.  The only other thing I remember is talking about flammables and things like that. I worked -- I retired from the railroad and we used to have classes for hazardous waste and HAZMAT stuff every

year we had to do, but that's the only other one.

THE COURT:  Now, was that the only question -- the only answers to any of the longer list of questions that I asked, the two you just brought to my attention?

POTENTIAL JUROR:  Did you ask -- I just put yes or no on most of them.  But you asked about -- did you ask about anybody I knew in law enforcement and everything?  My nephew is a sergeant.

THE COURT:  Where?

POTENTIAL JUROR:  In the Springfield Police Department and his wife is a sergeant in the police department, so that's my nephew.

THE COURT:  Okay.  And you're close to them?

POTENTIAL JUROR:  Yes.

THE COURT:  Does the fact that they are police officers, do you think you would tend to believe them more just -- would you believe police officers more just because they are police officers because you have relatives in the police department?  Would that affect you?

POTENTIAL JUROR:  Well, yeah, they're close family and so, you know, we do talk.  I also have a close friend that works here.  He retired from the police department that works here.

THE COURT:  But the fact that you have relatives

in the police department, would you be able to hear testimony of police officers and judge that testimony the same as you would judge any others?  That is, hear what they have to say and then decide if you believe them or accept their testimony?

POTENTIAL JUROR:  I would try to the best of my ability.  I would try, but I do have feelings for them.

THE COURT:  All right.  No other answers that you have?

POTENTIAL JUROR:  No.

THE COURT:  Thank you, sir.

POTENTIAL JUROR:  Okay.  Thank you.

(Potential juror left the courtroom.)

THE COURT:  Go ahead for the defense.

ATTORNEY WATKINS:  Judge, before we go to the next juror, Juror No. 1 mentioned when this first happened, when he heard about this happening, of course, apparently he did not answer yes to your question about have you heard or read anything about this case.  I'd would ask that the court perhaps to inquire about what he had heard about the case?

THE COURT:  No.  If there's any for cause challenge that you want to make now, otherwise if this juror survives any for cause challenge now, that would be brought up during attorney-conducted voir dire.

ATTORNEY WATKINS:  I'm sorry, you have to remind me on the procedures.  So we should make for cause?

THE COURT:  If you have a for cause challenge, you can make it now.  If the juror should survive a for cause challenge now, you can ask them whatever you want.  You're not limited in any way when you do the attorney-conducted voir dire.

ATTORNEY WATKINS:  Well, I would make a for cause challenge now given two paths.  First was the failure of the juror to mention that he had heard something about the case notwithstanding your question to him.

More particularly, the fact that he had a grandson that was working there.  That was one of the very first things that he said unsolicited was my grandson could have been there at that time.  So I think that would be enough for that juror to be excused for cause.

THE COURT:  All right.  Government?

ATTORNEY DESROCHES:  Thank you, Your Honor.

I would suggest it's premature at this point to exercise a challenge for cause on that basis.  I believe follow up by the attorneys is appropriate.

At this stage I would suggest challenges for cause be just limited to the very obvious challenges such as hardship, but we do have this whole system in place to

allow attorneys to follow up and get precisely the type of answers that Attorney Watkins is only speculating about now.

THE COURT:  Fair enough.  I think -- okay.  I think it's a very good challenge, but you're right maybe it can be informed some more through a follow up.

I'm concerned myself regarding that what he said, but I think Attorney Desroches's suggestion is a good one.  We will keep for cause challenges to -- I think it's helpful to identify things like this, but at this point I will defer ruling on the for cause challenge until that area is developed a little more.  All right.  So this juror survives.

Next?

(Potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, we have Juror No. 2, Mr. XXX.  Mr. XXX, if you would head over towards that microphone where it says Seat No. 13?  Thank you.

THE COURT:  Hi, Mr. XXX.  Thanks for being here.

POTENTIAL JUROR:  Good morning.

THE COURT:  Good morning.  Mr. XXX, did you take your oath when it was administered over the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Thank you.

And one of the questions was do you know any of the participants?  You were looking at them over a video screen.  Now that you're in the room with them, can you please take a look at the government's table and then the defendant's table.  Do you know any of the participants, the lawyers, or the defendant?

POTENTIAL JUROR:  No, I don't.

THE COURT:  All right.  Sir, did you answer in any way that we need to talk about relative to the first 17 questions that I asked?

POTENTIAL JUROR:  Hardship, no; disability, no; difficulty with English, no; do I know anybody?  No; witnesses, no.

Yes, one, do I accept all the principles?  Victim of a crime; personal beliefs, no; law enforcement, no; any legal disputes, no.  No, attorney.

Arrested, I was a long time ago in the early '70s arrested in a drug case.

THE COURT:  What happened?

POTENTIAL JUROR:  I was only about 20.  I'm 68 now, 67, so '73 or '4.

THE COURT:  Do you know what happened with the case?

POTENTIAL JUROR:  I was convicted.  I went to jail, yes.

THE COURT:  For how long?

POTENTIAL JUROR:  I was in five months or so.

THE COURT:  All right.  And what was the drug?

POTENTIAL JUROR:  Well, I was selling marijuana personally, but that's not what I got caught for.  I met some people who knew each other -- I got them together for speed and LSD.

THE COURT:  That was the drug?

POTENTIAL JUROR:  Yes.  It was a federal case.

THE COURT:  It was a federal case and it was a conviction for speed and LSD?

POTENTIAL JUROR:  Correct.

THE COURT:  It had to do with distribution or possession or sale?

POTENTIAL JUROR:  I know the federal agents came -- were the ones we were selling to or they were selling it to.  I got the people together.  I was like a broker.

THE COURT:  All right.  I understand.  You said you served five months.  Where did you serve it?

POTENTIAL JUROR:  It was Springfield for ten days and then Greenfield the remainder of the sentence.

THE COURT:  Very good.  Anything else, sir?

POTENTIAL JUROR:  I'm a recovering addict about 17 years so that's no big deal.

THE COURT:  All right.  Well, it's a big deal.

It's great that you're --

POTENTIAL JUROR:  It's good I mean.

THE COURT:  -- in recovery for 17 years.

POTENTIAL JUROR:  I'm totally done with all of that.

THE COURT:  That is a big deal.

POTENTIAL JUROR:  It is a big deal to have done it, yes.  Thank you.

THE COURT:  All right.  Very good.  Thank you.

POTENTIAL JUROR:  All right.

THE COURT:  You're all set.  Just wait out the door.

(The potential juror left the courtroom.)

ATTORNEY WATKINS:  Judge, strictly a procedural question, I'm wondering given how far away the juror is and the fact that we're all immunized, perhaps we can take the masks off for this portion of the proceeding so that the jurors are able to see us and we're able to see the full face of the jury.

THE COURT:  Right.  No, I'm not going to allow that.  It's a very understandable suggestion.  There are no protocols or procedures that have been developed yet so we're doing the best we can.  I appreciate -- I do appreciate the suggestion, but I'm not going to do that.

ATTORNEY BRESLOW:  Just one thing, Your Honor.

Is it possible to put the microphone in front of the witness?  I'm finding it a little hard to hear.  I think particularly because he's answering you.

THE COURT:  Right, or if we can get them in the jury box.  We will bring them in the jury box.

ATTORNEY BRESLOW:  Or if they can sit behind it.

CLERK RIVERA:  Does that look better?  Or they can stand.

Next, any for cause challenge at this point of Mr. XXX?

ATTORNEY DESROCHES:  Not at this point.

ATTORNEY WATKINS:  No.

THE COURT:  No for cause by either.

(Potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 3, XXX XXX.  Go up to the microphone.

THE COURT:  Hi, Ms. XXX.

POTENTIAL JUROR:  Hi.

THE COURT:  Thank you for being here.

POTENTIAL JUROR:  No problem.

THE COURT:  All right.  Ms. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  Okay.  And now that you're in the room and you can see the government's table and the

government attorneys and the defense table, defense attorneys and the defendant, do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  Did you have any answers to my first -- we're talking about the first 17 questions regarding hardship and disability and knowing people and health, were there any responses that we need to talk about?

POTENTIAL JUROR:  Nope.

THE COURT:  Everything was fine?  All right. Did you have any answers for the questions after that, that would be Questions 18 to the end?

POTENTIAL JUROR:  Let's see.  You talked about people who have had to be in the court system.  My sister's ex-boyfriend and my other sister took my uncle to court at one point back when I was 17.  I'm 34 now. You're all welcome.

My brother-in-law is in law school following in his mother's footsteps.  My aunt had a drug issue back in the '90s.  That's it.

THE COURT:  Were you involved with your aunt's drug issue in the sense of working with her to get through it or anything like that?

POTENTIAL JUROR:  No, I was very little.  My mom would go over there and drop off food and stuff, but just

to visit.

THE COURT:  All right.  Thank you.  All set.
(Potential juror left the courtroom).

THE COURT:  Any for cause?

ATTORNEY DESROCHES:  Nothing, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from us.

THE COURT:  All right.  Thank you.  No for
cause.  The court noted no issue either with this juror.
(Potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 4, XXX XXX.

THE COURT:  Ms. XXX, thanks for being here.  We
just need the microphone to amplify your voice.

Did you take your oath as a juror when you were
downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  And now that you're in court and you
can see the defense table -- the defense table is over
here -- the prosecution table is there, do you know anyone
including the defendant?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  And for the first 17
questions I asked, did you have any yes answers or
anything about your ability to serve?  Whether or not
there's a hardship?  Whether you have a disability?
Whether you know any witnesses, those questions?

POTENTIAL JUROR:  In terms of number one, I don't remember the exact wording but it was regarding a serious hardship.

THE COURT:  Right.

POTENTIAL JUROR:  I have two small children, five and one, one of whom has special needs.  Both of whom are home sick right now.  The one with special needs next week in particular has three different evaluations and appointments to manage his condition.  In addition, they're both usually at day care which closes at 4:45 is their time slot.  I'm a half hour away and I am the primary caregiver.  So that was from one through seventeen.

THE COURT:  So it's a busy week with outside appointments regarding the special needs conditions that your son is working with?

POTENTIAL JUROR:  Uh-huh.

THE COURT:  Working on?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  There's no one else that can go with him or take him?

POTENTIAL JUROR:  My partner is an hourly employee who works outside of the day care hours in general which is why with my more flexible schedule it falls to me.

THE COURT:  All right.  Would serving as a juror cause you to have to reschedule those appointments?

POTENTIAL JUROR:  They would.  And due to the pandemic, we've already been on wait lists for these evaluations because the offices were closed.  So the wait list were already months long and so this would be putting him back on the list. Sorry.

THE COURT:  Okay.  Anything else of those first group of questions that I asked you about?

POTENTIAL JUROR:  In the first 17, no.

THE COURT:  All right.  Thank you.  Could you just wait right outside the same doors that you came in?

(Potential juror left the courtroom.)

THE COURT:  All right.  Any objection to dismissing this juror based upon the hardship that she described?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  The juror is dismissed; excused.

(Potential juror entered the courtroom.)

CLERK HEALY:  This is Juror No. 5, XXX XXX.  Mr. XXX, if you can go up to where the microphone is?

THE COURT:  Mr. XXX, thanks for being here.

POTENTIAL JUROR:  You're welcome.

THE COURT:  Perfect.  Mr. XXX, did you take your oath as a juror over the video?

POTENTIAL JUROR:  I did.

THE COURT:  Okay.  Now that you're in court, I'll just ask you to take a look around and tell me do you recognize any of the prosecutors?  That's the prosecutor table directly in front of you.  Defense, the defendant himself, and the defense lawyers are at the other table.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  And for the questions I asked you, I asked you to take notes, the first 17 questions, one through 17 about hardship and disability, one through 17 if you know any witnesses, what were your responses to any of those?  Anything that we should talk about?

POTENTIAL JUROR:  No.

THE COURT:  There was not.  All right.  Very good.  Thank you.

(Potential juror left the courtroom.)

THE COURT:  Any challenges for cause?

ATTORNEY DESROCHES:  Not from the government.

THE COURT:  I agree at this point there's no issue.

ATTORNEY O'NEILL-GREENBERG:  None from

defense.

THE COURT:  Cleared.

(Potential juror entered the courtroom.)

CLERK HEALY:  We have Juror No. 6, XXX XXX.  Ms. XXX, please step up to the microphone by the bench.

POTENTIAL JUROR:  Sure.

THE COURT:  Hi, Ms. XXX.  Thank you for being here.

POTENTIAL JUROR:  Thank you.

THE COURT:  Ms. XXX, did you take your oath as a juror over the video?

POTENTIAL JUROR:  I did.

THE COURT:  Now that we are in the courtroom, I'll ask you to take a look around.  We have the U.S. attorney's office, the prosecutors at one table and the defense at the other table including the defendant, Mr. Rathbun.  Do you know anyone?

POTENTIAL JUROR:  I don't think so.

THE COURT:  Okay.  For the questions I asked you, the first section was questions one through 17 that have to do with knowing any witnesses, disability, hardship, those types of questions.  Do you have any answers that we need to talk about for those questions?

POTENTIAL JUROR:  None.

THE COURT:  There was none at all.  All right.

Very good.  Thank you.  Right back out the same door you came in.

POTENTIAL JUROR:  That's it?

THE COURT:  That's it for now.  There will be another part that happens next.

(Potential juror left the courtroom.)

THE COURT:  I note no issue on that, at least that first part.  Any issues?

ATTORNEY BRESLOW:  Your Honor, I just want to put on the record so the defense is aware, I live in Northampton.  I live on a street that intersects with Elm Street.  I don't recognize her either, but I just wanted the court and primarily the defense to be aware that I believe she is in my neighborhood somewhere.  I do not know her.

THE COURT:  Do you know her address?  Do you live on Elm Street?

POTENTIAL JUROR:  No.  I live on a street that intersects Elm Street, and so I would say she's probably in like a five-block radius of where I live.  I don't recognize her and she looked directly at me.  I don't think she knows who I am.

THE COURT:  All right.  Thank you.  The defense has this information and does it make a difference?

ATTORNEY WATKINS:  Elm Street is Route 9;

Case 3:20-cr-30018-MGM    Document 374    Filed 06/08/22    Page 51 of 259

51


everybody knows somebody on Elm street.

THE COURT:  Okay.  No issues.  This juror can stay.

(Potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 7, XXX XXX.

THE COURT:  All right.  Hi, Ms. XXX.  Thanks for coming in.

POTENTIAL JUROR:  Good morning.  How are you?

THE COURT:  Good.  Thank you.

Ms. XXX, first of all, did you take your oath as a juror when we gave it over the video?

POTENTIAL JUROR:  Yes.

THE COURT:  And now you're in court and you can see people, that's the prosecutor's table.  Across the room is the defense table and the defendant sitting at the end.  Do you know anyone?

POTENTIAL JUROR:  No, I can't say that I do.

THE COURT:  All right.  Now, I asked you a group of questions and so for the first 17 questions, the ones about disability, hardship, do you know any witnesses, et cetera, do you have any answers to those first grouping of questions that we need to talk about?

POTENTIAL JUROR:  The only thing I have is wearing a mask all day is a problem for me.  I'm very

claustrophobic.  That's about it.

My father was a deputy chief of police so I might be very biased on that side.  My father-in-law also was a police officer and so I would be on the law enforcement side.

THE COURT:  All right.  We can develop that issue and perhaps ask you more questions about it during the next process, part of the process.

As to the mask, so we will be in court for periods of time but you're required to wear the mask in the building.  You're certainly welcome to leave the building now to go out front and get some fresh air if you would like.

I guess I need some more information about how you would manage wearing the mask and how big of a problem it would be for you?

POTENTIAL JUROR:  It's not good.  I can hardly wear it going shopping.  It restricts my breathing.

THE COURT:  What's the maximum amount of time you can keep it on for?

POTENTIAL JUROR:  Maybe 45 minutes, if that.

THE COURT:  And how long do you take it off for before you would be able put it on again more another 45 minutes?

POTENTIAL JUROR:  I never put it back on.  Where I work I don't have to wear it.  I'm just there by myself.

THE COURT:  I see.  So you wear it generally at the grocery store or something?

POTENTIAL JUROR:  Yeah.

THE COURT:  Okay.  Does it bother you to the level that do you think it might interfere with your listening and paying attention?

POTENTIAL JUROR:  Yes, because I would have a hard time breathing.

THE COURT:  Is it a problem for you right now?

POTENTIAL JUROR:  Pretty much.

THE COURT:  Okay.  Thank you.

POTENTIAL JUROR:  Okay.

(Potential juror left the courtroom.)

THE COURT:  All right.  Any objections based upon the issue with the breathing and what she described with the mask?  Any issue with excusing the juror?

ATTORNEY DESROCHES:  Not from the government.

ATTORNEY WATKINS:  Not from the defendant.

THE COURT:  All right.  Excused.

ATTORNEY WATKINS:  We have another procedural question.

THE COURT:  Yes.

ATTORNEY WATKINS:  The court asked whether they've answered yes to questions one through 17.  I'm trying to figure out how we, as attorneys, are going to

know if they positively answered any of other questions so that we can follow up later.

THE COURT:  Well, we can give you the questions.  I don't know if you already have them.  We can give you the questions and you can ask as part of the attorney-conducted voir dire.

ATTORNEY WATKINS:  The court has asked those questions already and I think asked the jurors to remember whether they did or not, but we only have ten minutes for 18 jurors.  We would have to guess at some point whether a particular juror answered affirmative to any of those questions.

THE COURT:  Well, if I open this up to more questions, you know, the questions after 17 was meant to highlight issues, ideas so that you can then pick them up with individual voir dire and give the juror time to start thinking about these concepts was the reasoning.

You know, this was, this was to -- this was actually modeled and it was very helpful on the defense version of how this could be conducted to make it smooth and efficient, and so I -- do you have these questions?  Do the parties have it?

ATTORNEY WATKINS:  We have them from the last time.

THE COURT:  They might be different.  They might

be numbered differently.

ATTORNEY WATKINS:  But I think you did hit all the same questions.  So we have the questions, but I think the challenge is going to be the blindness going in not knowing -- for example, the government may want to know if somebody had a beef with the FBI, right, which is one of the questions beyond Question 17 to follow up on that.  By the same token, we might have a similar question as to some of the others.

THE COURT:  Well, that brings us back to the individual voir or attorney-conducted voir dire.

ATTORNEY WATKINS:  I think perhaps if we can just ask for Questions 18 beyond which questions they answered and that way we will know that there's something to follow up on.

THE COURT:  And just keep moving if they say yes or no and whatever it would be.  I'll ask and we'll see how that works if that might be helpful.

ATTORNEY WATKINS:  Thank you.

THE COURT:  Okay.

ATTORNEY BRESLOW:  If we're going to do that, does it make any sense to recall the witnesses -- the jurors who've come in?

THE COURT:  No.  I mean, it does make some degree of sense but I'm not going to do it.

So we'll take care of this by giving you -- Maggie, make sure they have the questions.  We're going to give you the questions so you will know them and you can work this in.

It's only a limited number that haven't been asked this question and so it would be easier to work it in when you ask did anyone answer yes to 18 through whatever. Everyone going forward will be asked that question.

Go ahead, next one.

CLERK HEALY:  I'm sorry, Your Honor.  After all the conversation, was she excused for cause or not?

THE COURT:  That was XXX XXX with the mask, the mask issue, yes, excused.  Any objection by the defense?

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  Any objection by the government?

ATTORNEY BRESLOW:  No, Your Honor.

(Potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, we have Juror No. 8, XXX XXX.

XXX, you can go up to the microphone that's right there on the clerk's bench.

THE COURT:  All right.  Hi, Ms. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Now that you're in the courtroom, you can look around.  Do you know anyone at the U.S. attorney's table or at the defense table including the defendant Mr. Rathbun?  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Very good.

Now, the first group of questions I asked you was one through 17 which had to do with hardship and disability and knowing any witnesses.  Did you answer yes to any of those questions or put any answer that we need to talk about?

POTENTIAL JUROR:  To a couple of them.

THE COURT:  Go ahead.

POTENTIAL JUROR:  To seven, I saw it on the news.

THE COURT:  Okay.

POTENTIAL JUROR:  I watch the news regularly.

THE COURT:  What news broadcasts do you recall that you saw?

POTENTIAL JUROR:  You know, just the regular 22, 40 news, you know, when it happened.

THE COURT:  Okay.  So when you --

POTENTIAL JUROR:  Did I follow it?  No, but I heard.

THE COURT:  You saw a news broadcast of it when it occurred?

POTENTIAL JUROR:  Yes.

THE COURT:  So that would be back close to the date of the event?

POTENTIAL JUROR:  Right.

THE COURT:  And you heard the reporting on it?

POTENTIAL JUROR:  What?

THE COURT:  You heard the reporting on it?

POTENTIAL JUROR:  Yes.

THE COURT:  Did you ever hear if anyone was ever charged with a crime?

POTENTIAL JUROR:  I don't remember, no.

THE COURT:  You don't remember hearing that?

POTENTIAL JUROR:  No.

THE COURT:  And since hearing it initially, did you ever hear any follow up about it from that day you first heard it reported?

POTENTIAL JUROR:  Not that I recall.

THE COURT:  All right.  Anything else?

POTENTIAL JUROR:  Through what number, 17?

THE COURT:  One through 17.

POTENTIAL JUROR:  Yeah.  No, I don't.

THE COURT:  Now about the other questions?  How about 18 to the end, did you answer yes or put anything

down to talk about in one through 18 -- one through 18 through the end?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  Do you think hearing about this case on the news initially as you did would in some way interfere with your ability to listen to all the evidence in court and make a decision only based upon what you hear in court?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Thank you.  You're all set.

(The potential juror left the courtroom.)

THE COURT:  Any issues from the parties?

ATTORNEY DESROCHES:  Not from the government. Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  All right.  This juror is fine to stay.

(The potential juror left the courtroom.)

CLERK HEALY:  Your Honor, we have Juror No. 9, XXX XXX.  Mr. XXX, you can go up to that microphone on the corner of the clerk's bench.

POTENTIAL JUROR:  All right.  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Mr. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  Now that you're in court, we have the prosecutor at the U.S. attorney's table and the defense table, including Mr. Rathbun sitting at the end of the table.  Do you recognize anyone?

POTENTIAL JUROR:  Nope.

THE COURT:  All right.  Sir, Questions 1 through 17 that I asked you had to do with disability and hardship and knowing jurors (sic).  For Questions 1 through 17, did you take any notes?

POTENTIAL JUROR:  I had no issues with those.

THE COURT:  No issues with Questions 1 through 17.

Questions 18 through the end, those concepts and principles that I talked to you about, did you have any issues with those that you wrote down?

POTENTIAL JUROR:  No issues.

THE COURT:  Thank you.  You're all set.  Right out that same door you came in.

POTENTIAL JUROR:  Okay.

(The potential juror left the courtroom.)

THE COURT:  Any challenge for cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY WATKINS:  No, Your Honor.  But I would note that we are statistically blessed with four employees of Smith & Wesson in this jury pool of 32 people.  It might be appropriate to ask each one of them whether they know the other jurors here.  I know it is a large company, but I think that bears looking into.

THE COURT:  That's a good point.  Is that something you can bring up during panel?

ATTORNEY WATKINS:  Again, the court has limited us to ten minutes.

THE COURT:  All right.  I'll give you a few extra seconds to bring up that issue.

I'll take two minutes and be right back.

**(A recess was taken at 11:11 until 11:13.)**

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 10, XXX XXX.  Mr. XXX, you can stand up right next to the microphone on the edge of the clerk's bench.

THE COURT:  Mr. XXX, thanks for being here.

POTENTIAL JUROR:  Good afternoon, Your Honor.

THE COURT:  Mr. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, I did.

THE COURT: Okay. Mr. XXX, now you're in the court, do you recognize anyone at the prosecutor's table, the U.S. attorney's office, or at the defense table including Mr. Rathbun sitting at the end?

POTENTIAL JUROR: No, sir.

THE COURT: All right. And the questions I asked you, one through 17 that had to do with disability, hardship, and knowing other witnesses, did you answer any of those questions that we need to talk about?

POTENTIAL JUROR: Yes. I answered no for all of them. The only thing is there's only one hardship is one and number two, is the air system is a little bad, and my back and knees. I got the fusion at L-4 and L-5 so that will make me uncomfortable. I got to get up and get down and it keeps taking me through a numb stage right now. Besides that everything else --

THE COURT: What causes the problem?

POTENTIAL JUROR: I have a fusion at L-4/L-5.

THE COURT: Okay. But what about the building is causing you an issue?

POTENTIAL JUROR: I guess it's the air and the heat combined, you know, the air system, the infiltration. I don't know, just with your air system there I couldn't take it and had to get in your sun dome out there.

THE COURT: So you thought it was too cold.

POTENTIAL JUROR:  Yes.  Yes, with the mixture of what you got going on.  Yes.

THE COURT:  All right.  Now, how uncomfortable are you?

POTENTIAL JUROR:  I'm very uncomfortable out there.  I don't know if it's just -- the air in here is good, but out there, that's not good out there.

THE COURT:  So if you were serving as a juror in this room --

POTENTIAL JUROR:  This seems to be comfortable, but I have my sweater on also.  I had to put it back on.

THE COURT:  All right.  And you certainly could bring a heavier sweater if you wanted to.  It does get cool in here.  I would say it's more likely to be cool than it is warm especially because we just try to keep the doors open and keep it circulating.  Do you experience pain?

POTENTIAL JUROR:  Yes, sir.  Yes, sir.  Are your seats padded?

THE COURT:  The ones in the back are padded; the ones in the front aren't.

POTENTIAL JUROR:  A better padding would be good.

THE COURT:  So we can make sure wherever you are seated that you get -- because of your back issues that

you get a padded seat that would be more comfortable.

POTENTIAL JUROR:  Sounds good.  Thank you, sir.

THE COURT:  Okay.  Would that take care of it?  I want to make sure --

POTENTIAL JUROR:  Yes.

THE COURT:  -- you're able to concentrate on what you're hearing and not worrying about pain that you're experiencing.

POTENTIAL JUROR:  The only thing I would ask is am I able to like move around or stand up if need be?

THE COURT:  You can stand up and you will see that I do it.  During the trial I stand up and listen to a lot of the trial standing up because my back gets sore from sitting.

POTENTIAL JUROR:  Okay.  So you understand.

THE COURT:  I don't think I understand as good as you do.  But, yes, I stand up during the trial and everyone is invited to do it.  I tell all the jurors they can.

POTENTIAL JUROR:  Yes.

THE COURT:  Any other issues?

POTENTIAL JUROR:  That's it.  That's it.

THE COURT:  So I asked a group of other questions, so Questions 18 to the end were questions about basic principles in the trial and some other more direct

questions about how you might feel and whether or not you could be fair and impartial in this case. Do you feel answering any of those questions?

POTENTIAL JUROR: All of them was no. From 18 down everything was no. I don't have any hard feelings in any kind of way.

THE COURT: All right. Okay. Thank you very much.

POTENTIAL JUROR: Yes, sir. Thank you.

(The potential juror left the courtroom.)

THE COURT: Okay. Any for cause challenges?

ATTORNEY DESROCHES: No from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG: Not from the defense.

THE COURT: All right. At this point this potential juror is cleared.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, we have Juror No. 11, XXX XXX. Mr. XXX, if you would go up to the microphone right where the clerk is?

THE COURT: Sir, thank you for being here.

POTENTIAL JUROR: How are you doing?

THE COURT: Sir, did you take your oath when you were downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Now that you're in court, can you please look over the prosecution, the government's table as I'm pointing to you, and the defense table as I'm pointing to you on the other side of the room including the defendant.  Do you recognize anyone?

POTENTIAL JUROR:  No.  I don't recognize anyone.

THE COURT:  Very good.  Now, I asked you questions.  The first sections of Questions 1 through 17 had to do with hardship and disability and things like knowing witnesses.  Did you answer yes to any of those questions one through 17?

POTENTIAL JUROR:  I answered yes to one --

THE COURT:  Okay.

POTENTIAL JUROR:  -- which would be a work-related hardship.  I work with behaviorally challenged kids and I actually am responsible for collecting data on one because we are working on his IEP, which is an individual plan that will go for him.

I don't know if you know anything about behavioral challenged kids, most of them always have an individual plan with goals and things like that.  So I am responsible for collecting data and making sure that we are achieving his goals and so on and so forth.  So for me it's really important to be there.

THE COURT:  So what's happening this week relative to your developing the IEP?

POTENTIAL JUROR:  We actually have a meeting later this week as far as I know and I am continually getting his data; making sure he's hitting his goals; making sure he is being responsible for his diabetes and so on and so forth.

THE COURT:  Well, the jury selection is today and tomorrow and so your participation will be today and then the trial doesn't start until Monday.

So knowing that, could arrangements be made for anyone else?  First of all, I don't know if you need to be focusing if there's anything exactly happening with the IEP next week, which is when the trial is going to take place, if you could make arrangements for another individual to guide the student?

POTENTIAL JUROR:  We are getting near the end of the school year and a lot of people are taking time off so we're becoming pretty short staffed at the same time.  It's really one of those things where it's bad timing.  Essentially for me it's I have to do this and we are short staffed and so it's more better -- it's easier for me to be there and it would be easer for my company to have us there instead of trying to find more coverage and lack of coverage.

THE COURT:  Now do you work for a private company or for the school system?

POTENTIAL JUROR:  A private company called New England Adolescent Research Institution.

THE COURT:  Do the students come to your facility or do you go to the school?

POTENTIAL JUROR:  We have them come to our facility.

THE COURT:  So for any specific student, that student would be at your facility which is staffed by how many people a day?

POTENTIAL JUROR:  Give or take about, including teachers and interventionists, I would say maybe anywhere about 30.  There's about ten of us as interventionists. There's eight teachers, actually about eleven interventionists, eight teachers, the admins, so almost 30.

THE COURT:  All right.  Are the students that come assigned to any specific worker or caseworker that are assigned to specific students?

POTENTIAL JUROR:  I'm assigned to a specific group.  So each one person has a specific set of group and so I would be assigned for four kids in my group.

THE COURT:  And it's just you that's assigned to those four kids?

POTENTIAL JUROR:  The one -- so it would be me. There would be a potential to cover that, but one of the kids I am assigned to specifically as a one to one.  I am an interventionist and a one to one.  So it would be a little hard to spread that.

THE COURT:  All right.  Any other yes answer on the one through 17 part?

POTENTIAL JUROR:  No.

THE COURT:  How about any responses for the 18 to the end of the questions that talks about principles that would need to be followed?

POTENTIAL JUROR:  18 to the end?  I said yes to 24 and 34.

THE COURT:  For educational and law enforcement field.

POTENTIAL JUROR:  Yes.  My aunt was a district attorney.

THE COURT:  Okay.  And where, locally?

POTENTIAL JUROR:  I believe around here actually.

THE COURT:  The state system?

POTENTIAL JUROR:  Massachusetts.

THE COURT:  Okay.  And you said the other answer was what?

POTENTIAL JUROR:  It's 34.

THE COURT:  Strong feelings about people who proselytize?

POTENTIAL JUROR:  Sorry, 32.

THE COURT:  Thirty-two, strong religious feelings.  What are your answers?

POTENTIAL JUROR:  Yes and yes.

THE COURT:  All right.  Very good.  Okay.  Thank you, sir.

POTENTIAL JUROR:  Thank you.

THE COURT:  Right through those same set of doors.

(The potential juror left the courtroom.)

THE COURT:  Any challenges for cause to that juror, which was juror number -- one more time?

CLERK RIVERA:  Eleven.

THE COURT:  Juror No. 11.  Okay.  Mr. XXX for cause challenges?

ATTORNEY DESROCHES:  Your Honor, the only thing I think at this point that comes close would be the hardship issue, noting that time away from work is what caused a hardship and him being able to return.  Otherwise, there's no challenge from the government.

THE COURT:  All right.  Defense?

ATTORNEY O'NEILL-GREENBERG:  Nothing from the defense.

THE COURT: Okay. The juror can stay. I didn't see -- the issue that came up was certainly an issue, but the description of it seemed to be one that he could work around with his employer. Like the parties, I'm not seeing it rising to the level for cause so he can stay at this point.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror No. 12, XXX XXX. Ms. XXX, if you can go up to the microphone right over next to the clerk.

THE COURT: All right. Hello, Ms. XXX.

POTENTIAL JUROR: Good morning.

THE COURT: Ms. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR: I did.

THE COURT: Okay. Now that we are in court we have -- I am pointing for you -- the prosecution table directly in front of you and then across the room the defense table with Mr. Rathbun sitting at the end of the table. Do you recognize anyone?

POTENTIAL JUROR: No.

THE COURT: All right. I asked you questions. The questions were broken down. First one through 17 talked about hardship and disability and knowing witnesses. Did you answer yes to anything on one through

17?

POTENTIAL JUROR:  Yes to 16 and 17.

THE COURT:  Okay.  Sixteen had to do with deciding the case solely on the evidence presented in the courtroom, avoiding media type coverage.  So what was your answer on that?

POTENTIAL JUROR:  Yes.

THE COURT:  You would be able to do that?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  And 17 was following the law, did you also indicate you would be able to follow the law as I gave it to you as the court instructs you?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Anything else that you made note of?

POTENTIAL JUROR:  Excuse me?

THE COURT:  Anything else that you made note of?

POTENTIAL JUROR:  I did make note that we have vacation plans for June 15th so I don't know if that will be over by then.

THE COURT:  June 15th is that next week or the week after?  The week after.  Does that fall on a Monday?

POTENTIAL JUROR:  It's a Tuesday.

CLERK RIVERA:  Tuesday.

THE COURT:  You have vacation plans being

tickets are bought and you're going, places are rented?

POTENTIAL JUROR:  Yes.

THE COURT:  What else is a vacation, right?

POTENTIAL JUROR:  Right.

THE COURT:  Yeah.  I'm not sure.  It might -- I doubt it, but it might and we probably -- we cannot change that.  I'm concerned with that.  So you said the 15th.

POTENTIAL JUROR:  Yes.

THE COURT:  Can we make a record on the calendar when that would be?  That is not next week which is the week --

CLERK RIVERA:  That is the following week, which is a Tuesday.

THE COURT:  It's the following week Tuesday that you're leaving.  You're leaving Tuesday morning so you would only be available Monday of that week following?

POTENTIAL JUROR:  Uh-huh.

THE COURT:  All right.  Okay.  Thank you.  You're all set.  I'll ask you to wait outside the front door while I discuss it with the attorneys.

POTENTIAL JUROR:  Okay.

(The potential juror left the courtroom.)

THE COURT:  All right.  Any objection to excusing the juror because of her vacation plans?  It's really out of an abundance of caution.

ATTORNEY DESROCHES:  Not from the government, Your Honor.  I would note that it's pretty likely I think that we will need the jury on the 15th if nothing more than deliberations.

ATTORNEY O'NEILL-GREENBERG:  No objection.

THE COURT:  Excused.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, we have Juror No. 13, Mr. XXX.  If you'd go up to the microphone at the edge of the clerk's bench.  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Good morning, sir.

THE COURT:  Mr. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Okay.  Now that we're in court, I'm going to direct you where to look.  We have the prosecution table over there in front of you.  We have the defense table including Mr. Rathbun who's seating at the end over there on the other side of the courtroom.  Just do you know anyone?

POTENTIAL JUROR:  No, sir.

THE COURT:  I asked you a group of questions. Questions one through 17 had to do with disability and hardship and if you know people and some other issues.

For questions one through 17, did you write any responses that we need to talk about?

POTENTIAL JUROR:  No, nothing exciting.

THE COURT:  All right.  How about did you write any responses for questions 18 to the end that we need to talk about?

POTENTIAL JUROR:  I put fairly for 19.  I honestly don't remember what the question was.

THE COURT:  It was have you or any member of your immediate family or anyone you are close to been a victim of a crime, accused of a crime, involved in the criminal justice system?

POTENTIAL JUROR:  My son is a convicted felon.

THE COURT:  All right.  And how long did that process go on?

POTENTIAL JUROR:  I would say it was roughly '04 when it was completed.

THE COURT:  When it was completed?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  And did you pay close attention to that process as it unfolded?  In other words, were you going to court with your son?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Were you involved with the lawyers and the preparation of the case?

POTENTIAL JUROR:  Well, no.  I was a victim.  So it kind of got weird.  It was my son not wanting to get punished but what he did deserved it, but you know being a victim was kind of a weird process for me.

THE COURT:  It sounds like that would be difficult.  So there was a prosecution.  You were the named victim.  Your son was the named defendant?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Was there a trial?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Al right.

POTENTIAL JUROR:  He pleaded guilty.

THE COURT:  He pled guilty?

POTENTIAL JUROR:  Yes.  I misunderstood the question.

THE COURT:  No problem.  And was he sentenced?

POTENTIAL JUROR:  Yes.  He was sentenced to two and a half and spent a year.

THE COURT:  Okay.  And did being involved in that process -- I mean under those circumstances you were a victim and it was a family member that was involved and so it's fairly complicated so you experienced the criminal justice system --

POTENTIAL JUROR:  Yes, sir.

THE COURT:  -- both as a victim, as a witness,

and with a family member.  Does that affect how you view the system?  In other words, do you feel negatively or positive towards either side?  Do you think that experience would interfere with your ability to be completely fair to both sides?

POTENTIAL JUROR:  I don't think it would interfere with my ability to be fair.

THE COURT:  To both sides?

POTENTIAL JUROR:  To both sides.  My opinion of the courts and the system and the process I'm guessing were the same coming out as were going in.  I had no experience going in and so it was a little hard to say what the opinion was before that.  But, you know, it seemed like from what I saw that, you know, the process was fair.  It worked.

THE COURT:  All right. Any other answers to any of the questions at all, any of them from one to the very end?

POTENTIAL JUROR:  To eight I had a yes and I wrote my brother's name down.  I think that had to do with addiction.

THE COURT:  That question was about a drug addiction.

POTENTIAL JUROR:  Yes.  I lost a brother to addiction.

THE COURT:  How long ago was that?

POTENTIAL JUROR:  Approximately four years ago.

THE COURT:  Sorry to hear that.

POTENTIAL JUROR:  Thanks, sir.

THE COURT:  All right.  Any other answers to questions?

POTENTIAL JUROR:  No.

THE COURT:  Thank you.  You can just wait right outside those doors.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any challenge for cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  None from defense.  Okay.  The court finds this juror may remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 14, XXX XXX.  Mr. XXX, if you would go up to the microphone up to the clerk's bench.  Thank you.

THE COURT:  Good morning.  Sir, did you take your oath when you were downstairs as a juror?

POTENTIAL JUROR:  Yes.

THE COURT:  Now that you're in court and you can

see people better, I'm going to direct you where to look. We have the prosecution table right in front of you, and we have the defense table on the other side of the room. Mr. Rathbun is seated at the end. Do you recognize anyone?

POTENTIAL JUROR: No.

THE COURT: All right. In my questions, I asked you questions. Did you have any answers to Questions 1 through 17 that I talked about disability and hardship?

POTENTIAL JUROR: Yes, I have the number four.

THE COURT: Four?

POTENTIAL JUROR: Also I understand 95 percent. If you asked me if it's 100 percent in another situation, I'm not sure. I can't read everything.

THE COURT: You have --

POTENTIAL JUROR: I understand most of the people talking to you. Writing problems, I have problems. Normally I use an electronic translator.

THE COURT: So what is your -- are you fluent in what?

POTENTIAL JUROR: Portuguese. I am American too.

THE COURT: So you speak Portuguese and you speak English?

POTENTIAL JUROR: Yes.

THE COURT:  And which language are you more comfortable with?

POTENTIAL JUROR:  Well, Portuguese of course.

THE COURT:  During the day conducting your business and going about your life what --

POTENTIAL JUROR:  I use English.

THE COURT:  You use English?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Well, I guess I have to ask you, are you comfortable enough in English that you -- this trial is conducted in English.  You have to pick up -- you don't want to miss anything.

POTENTIAL JUROR:  Yes.

THE COURT:  Are you able to pick up everything in English?

POTENTIAL JUROR:  Most of everything.  Probably some technical words that I will have to do some research about it.  Probably one hundred percent of the words I don't know, but I can't tell.  Maybe 95 percent of the words I will understand and I understand the context of what we are talking about.  But, like I said, small details probably I will have trouble to understand.

THE COURT:  So if there was a word that was used, a technical word that was used or for some reason some phrase that you didn't understand, would you be

comfortable with just raising your hand to ask for some clarification?

POTENTIAL JUROR:  Yes.

THE COURT:  You would be comfortable doing that?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  Very good.  Any other issues?

POTENTIAL JUROR:  Other issues is -- can you repeat 17 please?

THE COURT:  Sure.  Seventeen was that you must follow the law as the court gives it to you.  You can't apply what you think the law should be or what you want the law to be.

POTENTIAL JUROR:  I'm sorry.  Seventeen was following the law.  I think is the eleven which was the length.

THE COURT:  Strong feelings about the criminal justice system?

POTENTIAL JUROR:  It was not that one.  I think something about some laws you have I don't believe on, so.

THE COURT:  All right.

POTENTIAL JUROR:  I think it was that and the following one related to it.

THE COURT:  Let me ask you, the indictment itself is just a charge against the defendant.  It is not evidence that the defendant is guilty of anything.

POTENTIAL JUROR:  Okay.

THE COURT:  The defendant has a constitutional right not to testify.  You can't infer any guilt if he chooses not to testify --

POTENTIAL JUROR:  That's fine.

THE COURT:  -- because he's presumed innocent.  You must decide the evidence solely based upon what you hear in the courtroom, not from anything else you hear.  You must follow the law as I give it to you, not any laws that you think should apply.

POTENTIAL JUROR:  Okay.  Can I interrupt you?

THE COURT:  You can.

POTENTIAL JUROR:  When I thought about it, it was more that I don't agree with some sentences.  I can be specific about it.  I don't agree with the death penalty.  I don't agree with prison for life, so I don't know if that --

THE COURT:  So that's more concerned with the criminal justice system?

POTENTIAL JUROR:  Okay.

THE COURT:  So you disagree with the death penalty and long criminal sentences?

POTENTIAL JUROR:  Prison for life specifically.

THE COURT:  All right.  Yeah, I'm not sure that question was kind of -- that was part of how you feel

about law enforcement I think.

POTENTIAL JUROR:  Okay.  Everything is else okay.

THE COURT:  The rest of the questions to all the very last question?

POTENTIAL JUROR:  Yes.

THE COURT:  Very good.  Okay.  Thank you.

POTENTIAL JUROR:  So I have the wait outside?

THE COURT:  Yes.

(The potential juror left the courtroom.)

THE COURT:  What juror was he?

CLERK RIVERA:  Fourteen.

THE COURT:  On Juror 14, any challenges for cause?

ATTORNEY DESROCHES:  Your Honor, the government would challenge.  Just noting the fact that although the juror said that he generally proceeds in English, this case I think will involve a significant amount of technical testimony and documentation that's entered into evidence.

I had some trouble understanding his answers I think primarily because of the mask because I believe he said he had trouble reading English.

So because there will be several witnesses testifying about things that I think are technical in nature not

necessarily in everyone's every day experience, the government has concerns about his ability to understand.

THE COURT:  Defendant?

ATTORNEY O'NEILL-GREENBERG:  I think we're okay. We don't have any challenge.  I think if he needs definitions for technical terms, he's comfortable asking for it.

THE COURT:  The challenge for cause is denied. You clearly could tell that English is perhaps his second language, although he says he uses it to get him through the day on a daily basis.

He appeared -- he was not uncomfortable at all when I asked him, well, can you can raise your hand if you're missing something and he was clearly -- he was animated in the way he answered absolutely he will let us know if he needs something explained.

I agree with you, his speech and it didn't help with the mask.  It didn't help with the mask, but speaking of -- you can tell the accent.  You can tell that he also speaks another language and so it was a little difficult to understand him but not impossible.  He appeared to be very thoughtful, listened to the questions, gave good answers, and was conversational.  I do not feel that his language issue in this case is an impediment to him serving as a juror so he is cleared.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 15, XXX XXX.  Mr. XXX, if you would go up to the microphone at the corner of the clerk's bench?

THE COURT:  Hi, Mr. XXX.  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did, yes.

THE COURT:  Okay.  And I'm going to direct you where to look.  We have the prosecution's table right there in front of you.  On the other side of the room we have the defense with the defendant sitting at the end.  I'm just asking you if you know them, if you know or recognize anyone?

POTENTIAL JUROR:  I don't recognize any of them.

THE COURT:  All right.  Now I asked you questions.  Questions 1 through 17 dealt with hardship and disability and witnesses.

So to start with one through 17, did you have any answers to those questions?

POTENTIAL JUROR:  For Question Number 6 I had yes and Question Number 7 I had yes.

THE COURT:  So who did you know?  Question Number 6 if you knew any witnesses?

POTENTIAL JUROR:  Yes.

THE COURT:  Do you recall who?

POTENTIAL JUROR:  Patrick Carnahan.  He's an FBI agent.

THE COURT:  Patrick Carnahan.  How well do you know Mr. Carnahan?

POTENTIAL JUROR:  He lives in my neighborhood. His kids go to school with my kids.

THE COURT:  All right.  Do you talk to him on a weekly basis?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  And is it -- do you know if it's likely that Mr. Carnahan would testify?

ATTORNEY DESROCHES:  It is, Your Honor.

THE COURT:  All right.  Now if Mr. Carnahan testified based on upon him living near as you just explained, would you tend to view Mr. Carnahan's testimony either more favorably or less favorably just because he knew him?

POTENTIAL JUROR:  No.

THE COURT:  Would you be able to treat him like you treat another witness?  That is, not make any determination until you hear what that person has to say and how they say it?

POTENTIAL JUROR:  Yeah.

THE COURT:  You would be able to?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Do you think that if, if you heard all this case and when it came time to deliberate you did not think the government had proved its case -- in other words, Mr. Carnahan's side didn't prove their case -- would you feel uncomfortable at all rendering that verdict in favor of the defendant because you know Mr. Carnahan?

POTENTIAL JUROR:  No.

THE COURT:  Excuse me?

POTENTIAL JUROR:  I would not.

THE COURT:  You would not feel uncomfortable at all?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Any other yes answers to questions?

POTENTIAL JUROR:  Number 7, yes.

THE COURT:  Okay.  What did you hear about the case?

POTENTIAL JUROR:  I heard about the case and the story.  I live in Longmeadow the day it happened.

THE COURT:  All right.  So you heard about it the day that it happened.  Was it newspaper or TV or a combination?

POTENTIAL JUROR:  It was the TV.  I heard it on the news.

THE COURT:  Did you follow it anymore after that?

POTENTIAL JUROR:  No, I didn't.  Just only what I heard all the news.  I didn't seek it out.

THE COURT:  So that initial report?

POTENTIAL JUROR:  Just that the initial report, yes.

THE COURT:  Okay.  And did hearing that initial report affect you in a way that you would have a problem being fair and impartial listening to the evidence?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And you could follow the instruction that you only make your decision based upon the evidence that comes into the court, not on what you might hear.  There's no way of telling if what you heard was the complete story, the accurate story, or had all the details.  Would you be able to make your decision based only upon what you hear in court?

POTENTIAL JUROR:  Based on the facts, yes.

THE COURT:  Any other answers to any of the questions at all?

POTENTIAL JUROR:  Number 8, all the news stories.

THE COURT:  So you heard about it.  You told us about that.  Okay.  Anything else?

POTENTIAL JUROR:  No, that was it.

THE COURT:  All right.  That was it through the end of the questioning 18 through 30 something as well?

POTENTIAL JUROR:  Correct.

THE COURT:  Very good.  Thank you.  Could you wait outside the doors?

POTENTIAL JUROR:  Yes.

(The potential juror left the courtroom.)

THE COURT:  For cause challenges?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  The court clears that juror which was -- what number was he?

CLERK RIVERA:  Fifteen.

THE COURT:  Fifteen is cleared.  All right.  Next?

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 16, XXX XXX.  Ms. XXX, if you could step over to the microphone at the corner of the clerk's bench.  Thank you.

THE COURT:  Sorry, the number?

CLERK RIVERA:  Sixteen.

THE COURT:  All right.  Hi.  Thanks for coming in.

POTENTIAL JUROR:  Hi.

THE COURT:  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes, on Zoom.

THE COURT:  On Zoom.  Well, not technically Zoom but on the audio-video feed you took your oath as a juror?

POTENTIAL JUROR:  Yeah.  Yeah.

THE COURT:  So I'm going to direct you where to look.  We have at the prosecutor's table directly in front of you.  The defense table is over on the other side of the room.  Mr. Rathbun is seated at the end of the table. I'm just asking if you know or recognize anyone?

POTENTIAL JUROR:  No, I don't believe so.

THE COURT:  All right.  Now I asked you a group of questions.  Questions 1 through 17 was the first group. Did you have any responses to one through 17 that we need to talk about?

POTENTIAL JUROR:  One through 17?

THE COURT:  Then we will move on to the next group.

POTENTIAL JUROR:  My only one is concerning the first question about hardship.

THE COURT:  Uh-huh.

POTENTIAL JUROR:  I'm not sure if it's extraordinary hardship especially these days, but I have a

teenager, a mildly autistic teenager trying to complete school these next two weeks and it is hard that I'm not there to help.  He's at home.  His dad is there too.  So like I said, it's a relative hardship.  Maybe there's others.

THE COURT:  So you and the child's father generally assist in the -- is it kind of online education?

POTENTIAL JUROR:  When it's online education like that, he has to be home all day.  We kind of tag team to help, you know, help him not fall asleep and complete assignments and stuff like that.  Because it's the last two weeks of school, it's a little bit of work, you know.

THE COURT:  So you would be there, well, the rest of this week?

POTENTIAL JUROR:  Yeah.

THE COURT:  But then next week, you would be out of the loop.  Your husband can take over, is that what happens?

POTENTIAL JUROR:  I'm sorry.  I don't understand the question.

THE COURT:  The trial starts Monday.

POTENTIAL JUROR:  Right.

THE COURT:  So you would be home tomorrow and then Thursday and Friday.  But the week of the trial, are you satisfied that his needs could be taken care of by you

said his dad is there with him?

POTENTIAL JUROR:  I think the week of the trial will be easier because it will be the last week of school and most of the assignments will probably be done.

THE COURT:  Okay.

POTENTIAL JUROR:  This week is -- I think this week is more of an issue so.

THE COURT:  Okay.  And you will be there for most of that except for today.

POTENTIAL JUROR:  All right.  That's a relief.

THE COURT:  Okay.  Anything else?  Any other answers to questions?

POTENTIAL JUROR:  One through 18 you mean?

THE COURT:  One through 18 and then if not, go on the others and tell me the others.

POTENTIAL JUROR:  Well, I have one concern, number 34 about people who proselytize.

THE COURT:  Okay.  Is that something that you have strong feelings about?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Very good.  I'm not going to ask you about those feelings right now but you've identified that's an issue.  Any other responses?

POTENTIAL JUROR:  Not truly, no.

THE COURT:  Okay.  Very good.  You can wait

right outside that door.

(The potential juror left the courtroom.)

THE COURT:  All right.  Challenges for cause?

ATTORNEY DESROCHES:  Your Honor, there's no challenge for cause.  But I would just point out that I think she would have to be called back this week and so I'm not sure that she understands that there's additional time this week that she would have to be present.

THE COURT:  Well, how long would she be called back this week for?

ATTORNEY DESROCHES:  If using last time as a measure, I think she would have to probably come back Thursday for the attorney-conducted voir dire or tomorrow afternoon for the attorney-conducted voir dire.

THE COURT:  We're going to try to do attorney-conducted voir today so we'll see how it goes.

ATTORNEY DESROCHES:  Okay.

ATTORNEY O'NEILL-GREENBERG:  Nothing from the defense.

THE COURT:  Okay.  That juror stays.

Maggie, is that twelve?

LAW CLERK:  Thirteen.

THE COURT:  Okay.

(A potential juror entered the courtroom.)

CLERK HEALY:  This is Juror No. 17, XXX XXX.

Mr. XXX, if you can go up to the microphone on the corner of the clerk's bench?

THE COURT: Hi, Mr. XXX.

POTENTIAL JUROR: How you doing?

THE COURT: Good. Did you take your oath as a juror downstairs?

POTENTIAL JUROR: I did.

THE COURT: All right. Now I'm going to direct you where to look. We have the prosecutors sitting in front of you. On the other side of the room the defense table with Mr. Rathbun who's seated on the end of the table, and I'm just pointing you to the direction to see if you know anyone?

POTENTIAL JUROR: I do not.

THE COURT: You do not. All right.

Now I asked you a group of questions and I asked you to take notes. For the first group of questions, one through 17, did you respond in any way that we need to talk about your answers?

POTENTIAL JUROR: For Number 3 I do have ADHD and so it is hard for me to focus. Number 1, traveling is kind of an issue.

THE COURT: Why is that?

POTENTIAL JUROR: I'm from Pittsfield and going back and forth 40 miles each way. If we here for a week

or longer, it would be tough --

THE COURT:  Yeah.

POTENTIAL JUROR:  -- but doable.

THE COURT:  Once the trial starts, you will be here --

POTENTIAL JUROR:  Right.

THE COURT:  -- for more than a week.  That is a tough drive.  I understand.

Your ADHD, I need to know how that would affect your ability to sit through the trial?  Do you take medication for it?

POTENTIAL JUROR:  I did for a while.  I'm not currently on any medications for it.  My choice not to do it.  That's all.

THE COURT:  Okay.  And how much of a problem is it for your daily affairs?

POTENTIAL JUROR:  Sitting still for long periods of time can be difficult.  I get fidgety.

THE COURT:  How long is a long period?

POTENTIAL JUROR:  More than two, three hours I feel anxious.

THE COURT:  Well, during this trial you're able to stand up.  I stand up myself during the trial and listen to the testimony standing up.  We take breaks.  I mean, I don't imagine it's going to be longer than a

two-hour stretch before we take a break, walk around, have a coffee.  Do whatever.  Would that help?

POTENTIAL JUROR:  That would be fine.

THE COURT:  Okay.  Very good.  Any other answers to any of the questions including all the questions to the end?

POTENTIAL JUROR:  Not to my knowledge, no.

THE COURT:  Very good.  Thank you, sir.  You can go right out that door.

POTENTIAL JUROR:  Okay.

(The potential juror left the courtroom.)

THE COURT:  Who's next?

CLERK RIVERA:  Juror No. 17.

THE COURT:  Seventeen.

Any for cause challenges for the last one, 16?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

THE COURT:  I'm sorry.  Who was the last juror number?

ATTORNEY BRESLOW:  Seventeen.

THE COURT:  All right.  No for cause challenges from either side.  All right.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  I agree there was no for cause reason to challenge.  That juror stays.

We are going to go through three more individuals and then we'll take a five- or ten-minute break for you and then we'll come back and keep going.  All right?

ATTORNEY O'NEILL-GREENBERG:  Thank you.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 18, XXX XXX.  Ms. XXX, if you would step up to the microphone that's on the corner of the clerk's bench?

THE COURT:  Hi, Ms. XXX.  Did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Very good.  I'll direct you to the prosecution's table.  I just want you to look at the people and see if you know them.  The prosecution's table is right in front of you.  The defense table and Mr. Rathbun is seated at the very end.  I'm just asking if you know anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And I asked you questions, so let's break the questions down.  Questions 1 through 17 was the first section.  Can we go through your answers to one through 17?  Did you answer yes or write down anything that you need to discuss with the court?

POTENTIAL JUROR:  Number 6, the witness Paul Rathbun.  I knew a Paul Rathbun in Pittsfield but not

here.

THE COURT:  In Pittsfield?

POTENTIAL JUROR:  Pittsfield.

THE COURT:  Does anyone happen to know if there might be a Pittsfield connection?

The answer is no, so that's a nonissue.  Anything else?

POTENTIAL JUROR:  No.

THE COURT:  How about for Questions 18 through the end, was there anything you wrote down that you needed to talk about your response?

POTENTIAL JUROR:  My Christian faith, and then you said something about passing out tracts or something.

THE COURT:  Right.

POTENTIAL JUROR:  I do it once in a while like because I'm a born-again Christian, and once in a while if I feel like I want to get a tract out like, I don't know, in the mail or a friend or something like that I do.

THE COURT:  All right.

POTENTIAL JUROR:  But that's it.

THE COURT:  All right.  So those are issues you brought to our attention.  You might be asked more about that in the next step of this process.

POTENTIAL JUROR:  Okay.

THE COURT:  Thank you.

POTENTIAL JUROR:  You're welcome.

THE COURT:  You can wait outside those doors.

(The potential juror left the courtroom.)

THE COURT:  Any challenges for cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  All right.  That juror is cleared and may remain.

The next one is?

CLERK RIVERA:  Number 19.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, Juror No. 19, XXX XXX. Mr. XXX, if you would approach the microphone on the corner of the clerk's bench?  Thank you.

THE COURT:  Okay.  Sir, Mr. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  And if you look at the prosecution table I'm pointing to, that's the prosecution team.  On the other table is the defense team and Mr. Rathbun is seated at the end.  I just point that out to you to see if you know anyone.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Now I asked you a group

of questions.  We will start with Questions 1 through 17.
Did you take notes and write down any responses that we
need to talk about for one through 17.

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Okay.  Tell me.

POTENTIAL JUROR:  I do know a little bit of
actually the case.  I saw it on the news.

THE COURT:  Okay.

POTENTIAL JUROR:  And on the radio too.

THE COURT:  When in time did you hear about it?

POTENTIAL JUROR:  A couple of months ago if I
remember correctly.

THE COURT:  All right.  And did you hear details
about the story or did you just hear it mentioned?

POTENTIAL JUROR:  Pretty much just a brief, like
of brief of it.  Just very brief.

THE COURT:  Is it a story that you went out of
your way to follow?

POTENTIAL JUROR:  No.

THE COURT:  In other words, you tried to get
information about it?

POTENTIAL JUROR:  No, just heard about it and
then pretty much after that.

THE COURT:  So this is something that happened
to come on the news and you were watching the news?

POTENTIAL JUROR:  Yes.

THE COURT:  Do you remember if it was TV, radio, or newspaper?

POTENTIAL JUROR:  It was TV, and then I'd go to work early and I also heard it on the news too.

THE COURT:  Okay.  But did you ever follow up and do your own looking into it?

POTENTIAL JUROR:  No, not at all, sir.

THE COURT:  Did it just happen once?

POTENTIAL JUROR:  Yeah, pretty much.  Again, I watch the news constantly and a lot of stories are usually just -- it's like something I just usually listen to.

THE COURT:  So hearing it on the news about this case, did that happen once or --

POTENTIAL JUROR:  Once.

THE COURT:  -- multiple times on multiple different days?

POTENTIAL JUROR:  Just once.

THE COURT:  Just once?

POTENTIAL JUROR:  Once.

THE COURT:  And in relation to today's date, you said it was a couple weeks ago?

POTENTIAL JUROR:  No, a couple of months ago.

THE COURT:  A couple months ago.

All right.  Now, the rule that you have to follow and

my question to you is can you follow this, you have to make a determination if you're a juror in this case based only upon the evidence you hear in the courtroom.

POTENTIAL JUROR:  Yes.

THE COURT:  You have to put out of your mind and not consider at all anything you might have heard on a news story or heard anywhere else about the case.  Would you be able to do that?

POTENTIAL JUROR:  Yes, Your Honor.

THE COURT:  Okay.  Is anything that you heard on the news story, did it affect you in any way that you think interferes with your ability to be fair in this case?

POTENTIAL JUROR:  Not at all, Your Honor.

THE COURT:  All right.  Did you answer yes or write down anything that we need to talk about?

POTENTIAL JUROR:  No, Your Honor.

THE COURT:  Or any of the questions at all?

POTENTIAL JUROR:  Like nothing really contradicting, Your Honor.

THE COURT:  Okay.  Very good.  Thank you.

POTENTIAL JUROR:  Thank you.

THE COURT:  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT:  That was 19, right?

CLERK RIVERA:  Yes.

THE COURT:  Okay.  Any for cause challenges for Mr. XXX, No. 19?

ATTORNEY DESROCHES:  No, for cause challenge for the government, Your Honor.  I just have an issue I foresee coming down the road.  I'm concerned that a juror may have heard a story about a mistrial.

THE COURT:  Who?

ATTORNEY DESROCHES:  A juror may have heard the potential and we would not really be able to address that in the context of the attorney-conducted voir.  That would risk I would suggest kind of tainting the entire pool.  So I think if someone does report they've heard, it's delicate because you don't want to suggest that there was this previous trial, but I think it's important that we know whether or not the story that the perspective juror heard related to the hung jury.

THE COURT:  So the other jurors who have come up and mentioned it, remember the charging, the original event.  This is the first jury who said more recently.  I specifically didn't want to ask him.  Are you suggesting you would like me to ask him what he heard?

ATTORNEY DESROCHES:  I think it would be important to know so we don't step in it later.

THE COURT:  Okay.  Not a bad idea.

Any objection to that by the defense?

ATTORNEY O'NEILL-GREENBERG:  To the inquiring, no.

THE COURT:  Okay.  You can bring him back in.

(Last potential juror re-entered the courtroom.)

CLERK HEALY:  You can go right back up to the microphone.  Thanks.

THE COURT:  All right.  Sir, we wanted to just follow up with you and ask you, can you tell us what you heard in this news story?  What was the news story about?  What do you remember about it?

POTENTIAL JUROR:  Just pretty much just the very basic of like the church itself and that's about it.  Like the whole event pretty much.

THE COURT:  All right.  The whole event of what?

POTENTIAL JUROR:  To be honest with you, sir, like very little on the case even as you said yourself.  It's kind of being passed in my mind a little bit, sir.

THE COURT:  So you remember hearing something about a container?

POTENTIAL JUROR:  The container next to the church and then being lit, sir.

THE COURT:  Did you hear anything about the charges or anything about the court system or anything that happened in court to do with the case?

POTENTIAL JUROR:  No, sir.  Just pretty much the bare necessity and then it moved onto the next story, sir.

THE COURT:  Very good.  Thank you.

POTENTIAL JUROR:  Yeah.

(The potential juror left the courtroom.)

THE COURT:  All right.  Any for cause challenge now?

ATTORNEY DESROCHES:  Not from the government.  Thank you.

ATTORNEY WATKINS:  Judge, for clarification, I believe he is talking about a completely different case because I happen to represent that defendant too.  There was a church arson about two months ago -- well, at the beginning of the year, New Years eve.  That was a case where at least according to allegations there was a container left near a church which indeed burned down the church.  I have a feeling he's getting cases mixed up.

THE COURT:  And do you have a suggestion for it?  I mean, do you think clarity will come as the case moves along?

ATTORNEY WATKINS:  I think so.

THE COURT:  So there's no objection?

ATTORNEY WATKINS:  I can't see it.

THE COURT:  Very good.  Thank you.  This juror is cleared.  So this is our last one from the hallway?

CLERK RIVERA:  Yes.

THE COURT:  And it is 21?

CLERK RIVERA:  Twenty.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 20, XXX XXX.  Ms. XXX, if you would go up to the microphone right next to the clerk's bench.  Thank you.

THE COURT:  Hi, Ms. XXX.

POTENTIAL JUROR:  Hi.

THE COURT:  Ms. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  All right.  And now, just to see if you recognize anyone, I'm going to point you to the prosecution's table right there kind of in front of you. On the other side of the room is the defense table and Mr. Rathbun is seated at the very end.  Do you recognize any of the people, attorneys, or Mr. Rathbun?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And from the questions that I asked you, to start with Questions 1 through 17 did you write down any notes of responses that we need to talk about?

POTENTIAL JUROR:  I did.

THE COURT:  All right.  Go right ahead.

POTENTIAL JUROR:  So have I ever been involved in a criminal case?

THE COURT:  Okay.

POTENTIAL JUROR:  I have.

THE COURT:  Tell me a little bit about that.

POTENTIAL JUROR:  It was 28 years ago.  I was 18.

THE COURT:  How long ago?

POTENTIAL JUROR:  Twenty-eight years ago.

THE COURT:  Okay.  What was the case?

POTENTIAL JUROR:  There was a raid at my sister's house and I was there so I was arrested.  The charges were dropped.

THE COURT:  What were you charged with?

POTENTIAL JUROR:  Possession of crack cocaine I believe.

THE COURT:  But it was dropped?

POTENTIAL JUROR:  Yeah.

THE COURT:  Okay.  Anything else?

POTENTIAL JUROR:  And I currently have a misdemeanor for a DUI.

THE COURT:  What year was that?

POTENTIAL JUROR:  About four years ago.

THE COURT:  Is there any probation still with that or is it completely finished?

POTENTIAL JUROR:  It's still pending because of COVID and all of that.

THE COURT:  Right.  So you have a court date?

POTENTIAL JUROR:  I do.

THE COURT:  What court?

POTENTIAL JUROR:  Springfield.

THE COURT:  When is your next court date?

POTENTIAL JUROR:  June something, but I don't have to be present.  It's like June 23rd for a pretrial.

THE COURT:  Okay.  So you have open OUI misdemeanor case?

POTENTIAL JUROR:  Uh-huh.

THE COURT:  All right.  Now either of those experiences, do they leave you with a feeling that you would have a hard time being fair to either side?

POTENTIAL JUROR:  No.

THE COURT:  So the old experience of having that charge dropped, did you actually go to court before it got dropped?

POTENTIAL JUROR:  I did, yes.  I went to court several times.  It went on for like two years before the charges were dismissed.

THE COURT:  And for this misdemeanor currently, I imagine during COVID you haven't really gone court.  Have you participated in hearings over Zoom?

POTENTIAL JUROR:  No.

THE COURT:  Really?

POTENTIAL JUROR:  I have not, no.

THE COURT:  All right.  Well, the bottom line question is, is your involvement in either of those situations, does it leave you with feeling either positive or negative towards one of the sides?  Does it affect your ability to be completely fair?

POTENTIAL JUROR:  No.

THE COURT:  To everyone, you can be fair to everyone?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Okay.  Any other questions that you put responses to?

POTENTIAL JUROR:  No.

THE COURT:  How about Questions 18 through the end, so all of the questions, did you write anything down?

POTENTIAL JUROR:  No.  Everything else on here was pretty much no.

THE COURT:  Okay.

POTENTIAL JUROR:  Other than that one.

THE COURT:  Okay.  Thank you.

POTENTIAL JUROR:  Thank you.

THE COURT:  You can go right outside that door.

(The potential juror left the courtroom.)

THE COURT:  Any for cause challenges?

ATTORNEY DESROCHES:  Not from the government at this time, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  None.

THE COURT:  All right.  I agree.  That juror is cleared to remain on the panel.

Ms. Healy, we done with the hallway group?

CLERK HEALY:  Yes, there are people sitting in the hallway but I think they're just people who are eating or have eaten.

THE COURT:  How many did we clear, 18 or so?

LAW CLERK:  Seventeen.

CLERK HEALY:  Seventeen, Your Honor.

THE COURT:  We are going to take probably ten minutes for everyone who's been in the courtroom for awhile to use the restrooms.

CLERK HEALY:  Let me clear the area to make sure those jurors are back to where they need to be.

THE COURT:  All right.  So I do expect doing the attorney-conducted voir this afternoon because we don't have that many more jurors to get through today.  All right?

ATTORNEY WATKINS:  Is this our lunch break then?

THE COURT:  No.  This is just ten minutes.

ATTORNEY WATKINS:  Okay.  Then we will break at

one again?

THE COURT:  We'll break at one or maybe a little bit after.  I want to see if we can get through the rest of the people which we have like --

ATTORNEY O'NEILL-GREENBERG:  Thirteen I think.

THE COURT:  Thirteen left.  So we'll see.  This is not lunch; this is ten minutes.

CLERK RIVERA:  All rise.

**(A recess was taken at 12:12 until 12:34.)**

THE COURT:  Okay.  Number 21.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. XXX XXX.  XXX, if you would go to the microphone at the side of the clerk's bench.

THE COURT:  Okay.  Mr. XXX, did you take your oath downstairs on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Very good.  Okay.  Just to see if you know anyone, the prosecution is seated in front of you.  The defendant's table is over to your left with Mr. Rathbun seated at the end.  Just do you know anyone or recognize them now that you're in the room?

POTENTIAL JUROR:  I do not recognize anyone.

THE COURT:  Okay.  And I asked you some questions downstairs over the video.  To begin with the

first portion, one through 17, did you answer yes or fill in any information that we need to talk about relative to those questions?

POTENTIAL JUROR:  I did answer yes, but I believe the way you phrased the question called for that. For example, Question No. 10 I took as can I leave social media alone --

THE COURT:  Right.

POTENTIAL JUROR:  -- for a few days and the answer is yes.

THE COURT:  You are correct.  So were there any answers you wrote that require further discussion in the one through 17?

POTENTIAL JUROR:  No.

THE COURT:  All right.  How about from Question 18 to the very end of the questioning, anything that you wrote down, notes, that would be something that should be talked about more?

POTENTIAL JUROR:  Probably not, but the last question 34 about proselytizers, I would say maybe I have a bias against proselytizers.

THE COURT:  That's a practice that you don't care for?

POTENTIAL JUROR:  Correct.

THE COURT:  Okay.

POTENTIAL JUROR:  Not that I would -- I would judge a person who engaged in that thinking that he's not making a good decision about the use of his time or the fact that he's trying to influence other people's thoughts in a way that's somewhat extreme I would say.

THE COURT:  Okay.

POTENTIAL JUROR:  I would have that bias.

THE COURT:  What we want to do at this point is just identify issues that we might want to take up later and talk to you more about.  So, very good.  Thank you. You can wait outside those doors.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any for cause challenge?

ATTORNEY DESROCHES:  Not from the government.

ATTORNEY O'NEILL-GREENBERG:  Nothing from defense.

THE COURT:  All right.  That juror is cleared, Mr. XXX.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 22, XXX XXX.  Mr. XXX, if you would go right up to the microphone on the left hand side of the clerk's bench.  Thank you.

THE COURT:  All right.  Sir, Juror No. 22, Mr. XXX, did you take the juror oath downstairs on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  And I just want you to look around the courtroom and see if you know anyone.  The prosecution table is in front of you and the defense table is over on the other side of the room to the left, and Mr. Rathbun is at the end.  Do you recognize anyone?

POTENTIAL JUROR:  I don't believe so.

THE COURT:  Okay.  In the questions I asked you in the first section was Questions 1 through 17.  Did you make notes regarding any of your responses that we need to talk about more?

POTENTIAL JUROR:  Well, you asked a few different questions.  So you asked what local channels, local news Chicopee so 22, 40.

THE COURT:  All right.

POTENTIAL JUROR:  Multi-media stuff, I'm just on Facebook.

THE COURT:  Did you hear anything about this case in the media?

POTENTIAL JUROR:  You mentioned that back in April, I don't remember anything about it from the general things but it doesn't mean that once details are brought up that it won't spark something.  I can't say yes or no to that.

THE COURT:  You understand if it did spark

something in your memory, you would have to decide this case only from what you hear in court --

POTENTIAL JUROR:  Yes.

THE COURT:  -- and put out your mind any media coverage you might have heard?

POTENTIAL JUROR:  Correct.

THE COURT:  Could you do that?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Any other responses about issues that we should talk about?

POTENTIAL JUROR:  I made a comment on 12 that I'm a government employee.  I work at Westover Air Reserve Base.

THE COURT:  What do you do there?

POTENTIAL JUROR:  And also in dealing with the --

THE COURT:  What do you do at Westover?

POTENTIAL JUROR:  Currently I work in the communications squadron, in IT.  I work on infrastructure, network switches, routing, stuff like that.

THE COURT:  So as a government employee, would that affect your ability to be fair to both sides?  Would you --

POTENTIAL JUROR:  No.

THE COURT:  -- feel more aligned with the

government in this case?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  Go ahead.

POTENTIAL JUROR:  The only other thing when you were mentioning about law enforcement and stuff like that, I don't have any direct contacts with any of the agencies that you mentioned.  Because I'm the administrator on the IT systems and stuff like that there, I have worked with our office in special investigations, OSI, and our JAG where they need us to pull logs off and things like that off our computer system or search file systems.

THE COURT:  All right.  Can you think of any scenario because of your involvement in law enforcement in those aspects that you just described, any chance that that might cause you to be less than fair to the defendant?

POTENTIAL JUROR:  I can't think of any.

THE COURT:  Would you be able to judge law enforcement witnesses the same way you would judge any other witnesses?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  Any answers between Questions 18 and the very last question that we need to talk about or any need more clarification, so from 18 to 34?

POTENTIAL JUROR:  No, I don't believe so.

THE COURT: Okay. Very good. Thank you. You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT: Any for cause?

ATTORNEY DESROCHES: No challenge for the government, Your Honor.

THE COURT: For the defense?

ATTORNEY O'NEILL-GREENBERG: No challenge.

THE COURT: I agree no issues. That juror will remain, Mr. XXX.

The next one on the list is 23, is that correct?

CLERK RIVERA: Yes.

THE COURT: But 23 was excused. It was brought to the court's attention that 23 indicated a knowledge or familiarity with either the defendant or the defendant's family, and so that juror has been excused already upon me getting that information. That juror is not going to be coming in. Does each side understand that?

ATTORNEY DESROCHES: Yes, Your Honor. We flagged that issue as well.

ATTORNEY WATKINS: Mr. Rathbun has confirmed also that he knows that particular juror.

THE COURT: So that juror has been taken out and will not even be brought in the courtroom.

Any objection to doing it that way?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY WATKINS:  No, Your Honor.

THE COURT:  All right.  So we're going to 24.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror 24, XXX XXX.  If you would go up to the microphone to the left of the clerk's bench.  Thank you.

THE COURT:  Hi.

POTENTIAL JUROR:  Hi.

THE COURT:  Thank you for being here.  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  Okay.  Now, I asked you if you knew anyone involved in this case and you were looking at the video.  So here in court in front of you is the prosecution table; to the left is the defense table with Mr. Rathbun seated there, do you know anyone or recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Okay.

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  I asked you a series of questions.  For questions -- we will start with one through 17.  Did you write down any of your answers,

anything that we need to talk about?

POTENTIAL JUROR:  I wrote down but I don't know that there's anything I need to talk about.  No.

THE COURT:  So no hardship?  No reasons why you can't be fair and impartial?

POTENTIAL JUROR:  No.

THE COURT:  Now for Questions 18 through 34 to the end, did you write down any responses to those types of questions that talked about the principles of the trial and some other things?  Any responses that you want to notify the court about?

POTENTIAL JUROR:  Just my own responses but I don't think they would matter.

THE COURT:  Like what?

POTENTIAL JUROR:  Like I believe you asked something about criminal justice, do I know anybody in the criminal justice, things like that and I do.

THE COURT:  Who do you know in the criminal justice?

POTENTIAL JUROR:  My son.

THE COURT:  What's his involvement?

POTENTIAL JUROR:  Not much.  He's going to school for criminal justice.

THE COURT:  He's going to school for justice.  Okay.

POTENTIAL JUROR:  Yeah, so really that's it.  I don't really have anything.

THE COURT:  All right.  Thank you.

POTENTIAL JUROR:  Okay.  Thank you.

THE COURT:  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT:  For cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  I agree that juror is cleared to remain and we can go to the next.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 25, XXX XXX.  Ms. XXX, if you can step up to the microphone to the left of the clerk's bench?

THE COURT:  Hi, Ms. XXX.

POTENTIAL JUROR:  Hi.

THE COURT:  Ms. XXX, did you take your oath downstairs over the video?

POTENTIAL JUROR:  I did.

THE COURT:  And I asked you if you knew anyone involved in the case but you were looking over video and so here in court in front of you is the prosecution table.

To the left is the defense table.  Mr. Rathbun is seated at the end.  Do you recognize anyone, know anybody?

POTENTIAL JUROR:  No, I don't.

THE COURT:  Okay.  All right.  I asked you a series of questions.  Start with the questions of 1 through 17, did you take any notes regarding issues that we should be discussing that you want to bring to the court's attention?

POTENTIAL JUROR:  I did have a few.  I was a victim of a criminal act many years ago.

THE COURT:  How long ago?

POTENTIAL JUROR:  It started when I was child. I actually brought my case to court when I was about -- when I was in my twenties.

THE COURT:  When you say you brought your case to court, was there a trial on a certain issue?

POTENTIAL JUROR:  Yes.

THE COURT:  Was it a criminal trial?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  Did you testify?

POTENTIAL JUROR:  Yes.

THE COURT:  How long did the trial last?

POTENTIAL JUROR:  Not long.

THE COURT:  Was it in Springfield or where was the trial?

POTENTIAL JUROR:  Springfield.

THE COURT:  Superior or district court?

POTENTIAL JUROR:  Probably just district court.

THE COURT:  All right.  I need to assess whether or not that involvement with the system affected how you feel about the criminal justice system in a way that might not make you fair to one or both sides.  So can you tell me a little bit about that?

POTENTIAL JUROR:  As far as?

THE COURT:  Well, you are familiar with how the system works.  You're familiar with what the defense does and what defense attorneys do, and you're familiar with what prosecutors do  Being through the system like that, do you have any feelings about the system and how it works negative or positive?

POTENTIAL JUROR:  No, not really either way.  Everybody has their part and does their job.

THE COURT:  Based upon your experience, did you think that the criminal justice system worked fairly?

POTENTIAL JUROR:  Honestly in my opinion for what I went through, nope.  I feel that more could have been done in my case but --

THE COURT:  All right.

POTENTIAL JUROR:  -- that's just me.

THE COURT:  And what was -- I'm very sorry to ask private questions, what was the nature of the charges that were at issue?

POTENTIAL JUROR:  I was a victim of sexual abuse and rape.

THE COURT:  Okay.  And what was the outcome of the trial?

POTENTIAL JUROR:  He was eventually put in prison but not for very long.

THE COURT:  I see.  All right.  Did you work with and interact with police officers during the presentation and preparation of the case?

POTENTIAL JUROR:  No, just a liaison.

THE COURT:  A liaison?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  Well, one of the most important things that I ask of jurors is if they have an ability to be completely fair and completely impartial, completely fair to either side.  All right.

Now if you've had a life experience such as yours, which was -- you were very involved in an emotional traumatic I would say experience in the criminal justice system.  Does that affect how you feel about being a juror that hears a criminal case and is being asked to render a verdict?  Can you do it fairly?

POTENTIAL JUROR:  I think I can.

THE COURT:  All right.

POTENTIAL JUROR:  I think I can.

THE COURT:  All right.  Okay.  Do you have any other issues that you want to talk about?

POTENTIAL JUROR:  The only other one is you had asked about being a Christian, I am.  Other than that, I don't think so.

THE COURT:  All right.  Okay.  During the next portion of the jury selection the attorneys get to ask questions.  So all the seats around you we will fill with jurors and the attorneys start a discussion, and sometimes it's a group discussion about issues and who can be fair and who knows a police officer?  Who's heard about this case?  You know, different types of things that might raise an issue about the ability to be fair.

Now certainly your experience with the criminal justice system might raise an issue in the attorney's minds where they want to ask you some questions.

I don't want to put you in a situation that would be uncomfortable for you.  Would you rather in this more private setting have the attorneys ask you questions regarding your prior involvement with the criminal justice system, or if that came up do it amongst many other people?

POTENTIAL JUROR:  I'd rather have it private.

THE COURT:  All right.  Then why don't you -- Christina, can we make this juror comfortable in a seat? I just want to make sure the microphone picks you up.

Now to the attorneys, only on the issue that was raised regarding prior contact with the criminal justice system on that particular charge.  I will not allow that to be inquired of during a panel-conducted voir dire process.  I will let the government go first to fill in any information you would like to ask about that.

ATTORNEY DESROCHES:  Thank you, Your Honor.

Good afternoon, Ms. XXX.

POTENTIAL JUROR:  Hi.

ATTORNEY DESROCHES:  First, I'm sorry to hear about your experience that brought you into the criminal justice system.

You indicated that you understood the system and that everyone has their job or has their role.  Can you maybe expand that on a little bit and explain what you mean by that?

POTENTIAL JUROR:  I was young when I was going through it so I am understanding as much as I can from that age.  I understand what the attorneys need to do as far as either prosecuting or defending the case on either side.

I understand the judge's job as far as making a clear decision; the jury's need to be able to deliberate and find out all the evidence and all the facts in the case and to make a correct judgment.

I mean, I've had experience with liaisons. I've had experience with grand juries. Those are the things that I understand as far as coming in and what I've come in contact with.

ATTORNEY DESROCHES: Do you think anyone that you met with that process treated you as a victim unfairly?

POTENTIAL JUROR: Oh, yes.

ATTORNEY DESROCHES: Who do you think that was?

POTENTIAL JUROR: I was in the ninth grade when I brought my case to the district courts. The district attorney very clearly told me that what happened to me was my fault. He told me my case was a waste of time and he dismissed it.

ATTORNEY DESROCHES: So you feel like the DA did not treat you fairly obviously?

POTENTIAL JUROR: Yeah.

ATTORNEY DESROCHES: Just to be clear, it's understandable. Do you feel -- the case was ultimately then brought to a trial you said?

POTENTIAL JUROR: A new district attorney found

my case eventually and many years later called me and contacted me and reopened it.

ATTORNEY DESROCHES:  So at the trial do you think that you were treated any better by the parties?

POTENTIAL JUROR:  It was improved, yes.

ATTORNEY DESROCHES:  May I have one moment?

THE COURT:  What year was it tried?

POTENTIAL JUROR:  My initial bringing the court case when I was in the ninth grade --

THE COURT:  No, when it was initially tried and went to court.  You said ultimately it was kind of revived and went back to court.

POTENTIAL JUROR:  Yeah, I don't remember.  I have the paperwork at home.  It was probably about four or five years later so early college years.  After '89, so somewhere in early '90s.

THE COURT:  Okay.

ATTORNEY DESROCHES:  If I may have one final question?

So this is obviously a very traumatic experience for you.  Despite all that, do you still think you set those feelings aside and be a fair and impartial juror in this case?

POTENTIAL JUROR:  I feel that I can try to do that, yeah.

ATTORNEY DESROCHES:  Thank you.

ATTORNEY O'NEILL-GREENBERG:  Hi.

POTENTIAL JUROR:  Hi.

ATTORNEY O'NEILL-GREENBERG:  First of all, again so sorry for your experience and thank you for sharing it with us.  I know it's an awkward situation.

POTENTIAL JUROR:  Yes.

ATTORNEY O'NEILL-GREENBERG:  And I really appreciate when you say you'd tried because I understand that that I think for anyone that's difficult, but what are you concerned about when you say you would try?  Is there something specifically you're worried would make it difficult for you?

POTENTIAL JUROR:  To be completely honest being in a courtroom is a little uncomfortable for me, but I just -- I think being able to focus on what I need to be listening for and remaining with the facts and the evidence being presented I should be able to do that.

ATTORNEY O'NEILL-GREENBERG:  Are you worried that -- is the last time you were in a courthouse when you were testifying?

POTENTIAL JUROR:  Uh-huh.

ATTORNEY O'NEILL-GREENBERG:  Are you worried that sort of your experience or your PTSD from that, the stress from that might outweigh your efforts to sort of

focus on what you're trying to do or sort of weigh more heavily on you?

POTENTIAL JUROR:  Somewhat.  It was -- it is a stressful thing being back in a courthouse.

ATTORNEY O'NEILL-GREENBERG:  Okay.

POTENTIAL JUROR:  But I think I should be able to.  I am hoping I should be able to put that aside.

ATTORNEY O'NEILL-GREENBERG:  Okay.  And just as far as you're comfortability, is it going to be -- even if you could intellectually put it aside, is it something that just makes you feel physically uncomfortable and be distracting to you just sort being here and having those memories?

POTENTIAL JUROR:  I can't really say definitely one way or another.  I can say it's definitely a possibility.  It's been a while since I've been in a courtroom and so being back in one is a little unnerving since my first day kind of like come back in here.

ATTORNEY O'NEILL-GREENBERG:  I understand.

POTENTIAL JUROR:  It's been awhile but still.

ATTORNEY O'NEILL-GREENBERG:  That makes sense.  Thank you so much.

POTENTIAL JUROR:  Uh-huh.

THE COURT:  All right.  So, ma'am, there is -- do you have any concern regarding the concepts of

innocent, presumed innocent, and the government has the burden of proof?

POTENTIAL JUROR:  No.

THE COURT:  No problem with those concepts?

POTENTIAL JUROR:  No.

THE COURT:  You would have no problem upholding those concepts?

POTENTIAL JUROR:  No.

THE COURT:  Do you have any negative feelings right off the bat because there is a defendant here, Mr. Rathbun, who's charged with a crime?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Now, for you it sounds like just the courtroom setting, the atmosphere, the judge's bench, the tables for the lawyers, the seats for the jurors are just all emotional triggers for a traumatic event you went through.

No one can answer this except you, I don't want those emotional triggers to be distracting for you.  In other words, to take away from the necessity of you concentrating closely to what happens at trial, listening to people, listening to the questions, listening to the answers.

Now, what do you think about that?  What do you think -- you're human.  I certainly don't expect you to say, no,

I feel fine and comfortable in a courtroom.  Of course not.  I understand everything you're telling me.

My question to you is will it be upsetting or to a degree distracts you from paying attention to what you have to do as a juror?

POTENTIAL JUROR:  I can't guarantee that it won't, but I know myself and I know that I am able to compartmentalize and do the best I can as far as doing what's needed and asked of me.  I do it all the time.  But, yes, there are things that can trigger and you just never know what they are.  Dealing with kids who've gone through similar situations, unfortunately sometimes you just never know what they may be.  I can't, I can't give a guarantee as a definite one way or another and I feel bad about that, but I know that I'd do the best I can.

THE COURT:  All right.  I don't know that there would be discussion of things that might trigger anything similar to your situation.

POTENTIAL JUROR:  Probably not.

THE COURT:  All right.  Any follow up on that?

ATTORNEY DESROCHES:  No.  Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No.  Thank you.

THE COURT:  All right.  Thank you.  You can just wait outside the doors.

POTENTIAL JUROR:  I'm sorry?

THE COURT:  You can just wait outside those doors.

(The potential juror left the courtroom.)

THE COURT:  Any challenge for cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY WATKINS:  Just a moment, Your Honor?

THE COURT:  Sure.

ATTORNEY O'NEILL-GREENBERG:  No challenge for now.

THE COURT:  No challenge.  All right.  The court has no issue with this juror either and the juror is cleared at least at this stage and can remain.

Now I just want to articulate -- and I know you're not going to but I just want to make a record that that particular issue that we just did the individual voir on is off limits at the panel-conducted voir.  Each side understand?

ATTORNEY DESROCHES:  Yes, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  All right.

(A potential juror entered the courtroom.)

CLERK MACKLER:  Juror No. 26, XXX XXX.  Step up to the microphone to the left.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Mr. XXX, did you take the oath when you came in on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Very good.  I asked you if you knew any of the parties but now that you're in court, I'll ask you to look at the prosecution table in front of you.  The defense table to your left and the defendant is seated at the end of the table.  Do you recognize them?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  I asked you a series of questions.  Did you write any responses to Questions 1 through 17 that we should be talking about that you want to bring to the court's attention.

POTENTIAL JUROR:  I said no on all those.

THE COURT:  Now about Questions 18 through 34 to the end where I talked more about principles of law?  Any issues regarding any of those?  Any of the things I brought up, did you take any notes on any of those?

POTENTIAL JUROR:  I wrote down everything, but there's nothing specifically that I put down.

THE COURT:  All right.  Okay.  Sir, you actually listed employer as Smith & Wesson, correct?

POTENTIAL JUROR:  Yes.

THE COURT:  And have you seen in the pool today other employees from Smith & Wesson?

POTENTIAL JUROR:  Yes.

THE COURT:  Do you know them?

POTENTIAL JUROR:  I recognize one of them.

THE COURT:  All right.  Do you work with that other person?

POTENTIAL JUROR:  No.

THE COURT:  So far today you've recognized one other person from Smith & Wesson?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  But you don't know him or you just recognize him.  You don't know him?

POTENTIAL JUROR:  I talk to him occasionally but I don't really work with him.

THE COURT:  Okay.  Would it be a problem do you think you would be feel uncomfortable at all if you happened to be on a jury with that person?

POTENTIAL JUROR:  Not at all.

THE COURT:  Okay.  And you would be instructed that you can't talk about the case.  You couldn't talk about the case with any other jurors unless you're in the jury deliberation room.  Would you be all right with that?

POTENTIAL JUROR:  Yes.  We work two different shifts so we don't even talk to each other anyway.

THE COURT:  Okay.  On that issue, are there any other questions regarding that issue of the same employer for other individuals in the pool?

ATTORNEY DESROCHES:  I would just ask the juror's name, the other employee's name.

POTENTIAL JUROR:  XXX XXX.

THE COURT:  The next person.  Okay.  You just saw him in the hallway?

POTENTIAL JUROR:  (Indicating.)

THE COURT:  Okay.  Very good.  Hang on one second.

Defense, did you have any questions on that issue?

ATTORNEY O'NEILL-GREENBERG:  Just that if there was a situation where you and your colleagues were all trying to make a group decision together, you had one view and one of your colleagues or another worker at Smith & Wesson had a different view, would that be an issue for you?

POTENTIAL JUROR:  No.  We always disagree anyway.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you.

THE COURT:  Thank you.  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT:  Any challenges for that Juror 26,

Mr. XXX?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  I see no issues.  That juror is cleared and can continue.  All right.  Now Juror No. 27 Mr. XXX.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, Juror No. 27, XXX XXX.

CLERK RIVERA:  You can step right over here, sir.

THE COURT:  Right there.  Mr. XXX, did you take the oath as a juror when you were downstairs on the video?

POTENTIAL JUROR:  Yes, I did, sir.

THE COURT:  Okay.  I asked you if you knew anybody but it was over video.  So now in court can you look forward at the prosecution table, and to the far left is the defense table with Mr. Rathbun seated at the end. I'm just going to ask you if you know or recognize anyone?

POTENTIAL JUROR:  No, I don't.

THE COURT:  And on the questions that I asked you, the first set of questions, one through 17, did you write down any questions to any of those questions or write down any information that we need to discuss?

POTENTIAL JUROR:  I wrote down answers to everything.

THE COURT:  Okay.  Any answer that might effect your ability to be fair and impartial or serve as a juror in this case?

POTENTIAL JUROR:  No.

THE COURT:  All right.  The next set of questions was Questions 18 through 34.  We talked about principles of law and I asked some other questions about religion and things like that.  Any of your answers, did you write down anything that might affect your ability to be fair and impartial so that we can talk about it?

POTENTIAL JUROR:  Nothing will affect that.

THE COURT:  And you are employed at Smith & Wesson, correct?

POTENTIAL JUROR:  That is correct.

THE COURT:  And have you seen other people that are also employed at Smith & Wesson today here for jury service?

POTENTIAL JUROR:  I have, Your Honor.

THE COURT:  How many?

POTENTIAL JUROR:  Two so far that I've recognized.

THE COURT:  Okay.  So would the fact that -- you can't talk about this case with anyone including

coworkers. So I just want to let you know that. I think you already know that.

Would the fact that -- let's say we got to the situation where coworkers, you were on the jury with a coworker. Would you feel awkward if you and your coworker disagreed about things, or would you tend to be looking to your coworker for support on your position about what you thought about the case? How would that work?

POTENTIAL JUROR: We work different shifts. I work in -- I manage my own department and so I don't think we even see each other from that point.

THE COURT: So if you were actually on a jury with another one or multiple Smith & Wesson's employees, would you feel self-conscious after the case was over going back if there was disagreements in the jury room that you had with that coworker juror?

POTENTIAL JUROR: No.

THE COURT: You wouldn't?

POTENTIAL JUROR: No.

THE COURT: Okay. On that question, do you want to ask a question?

ATTORNEY DESROCHES: Mr. XXX, just to be clear, you said that you're a manager at Smith & Wesson?

POTENTIAL JUROR: Correct.

ATTORNEY DESROCHES: Do you have any authority

over the other jurors that you've seen today?

POTENTIAL JUROR:  None.

ATTORNEY DESROCHES:  Thank you.

THE COURT:  Defense?

ATTORNEY O'NEILL-GREENBERG:  No.  We're good. Thank you.

THE COURT:  All right.  Thank you, sir.  You can wait outside the door.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any challenges to that Juror 27, Mr. XXX?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  The court sees none either.  That juror is cleared to remain.

Next?

(A potential juror entered the courtroom.)

CLERK HEALY:  This is Juror No. 28, XXX XXX. You can go right up to the microphone over near the clerk. Okay?

POTENTIAL JUROR:  Yes, ma'am.

CLERK HEALY:  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hi.

THE COURT:  Mr. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Okay.  I also asked you if you recognized anyone but it was over video, and so here in court I'll ask you to look over -- I'll give you some direction.  This is the prosecutors' table.  Over to the left is the defense and Mr. Rathbun the defendant is seated at the end.  I'm just asking if you recognize anyone?

POTENTIAL JUROR:  No.  No, sir.

THE COURT:  Okay.  So I asked you a group of questions and to begin with, numbers one through 17 did you write down any answers to any of those questions?

POTENTIAL JUROR:  I only wrote down yes or no.

THE COURT:  Any issue that might affect your ability to be fair and impartial from those questions?

POTENTIAL JUROR:  No, sir.

THE COURT:  Now the next group of questions were Questions 18 through 34.  Was there anything that you wrote down that might in any way affect your ability to be fair and impartial based upon your answers to those questions?

POTENTIAL JUROR:  No, sir.

THE COURT:  All right.  Very good.  Okay.  Can you wait outside the door?

POTENTIAL JUROR:  Yes, sir.

(The potential juror left the courtroom.)

THE COURT:  Any challenges?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  I see no issue.  This juror can remain, 28, Mr. XXX.

Next juror?

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, Juror No. 29, XXX XXX. Mr. XXX, you can step forward to the microphone on the left side of the clerk's bench.  Thanks.

THE COURT:  Good afternoon.

POTENTIAL JUROR:  Hi.

THE COURT:  Sir, did you take your juror oath downstairs on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Very good.  And I also asked you if you recognized anyone but it was video and so right now I'm going to direct you, that's the prosecution's table

right in front of you.  The defense is over here to the left.

POTENTIAL JUROR:  I didn't hear their names because the audio wasn't very well.

THE COURT:  I'll ask them to reintroduce themselves.

POTENTIAL JUROR:  My wife is a paralegal right down the street.

THE COURT:  I want you to look to see if you recognize anyone.

Can you reintroduce yourselves?

ATTORNEY WATKINS:  Sure.  I'm Tim Watkins.  I'm an assistant federal defender.

ATTORNEY O'NEILL-GREENBERG:  Hi.  I'm Forest O'Neill-Greenberg.  I'm also an assistant federal defender.

POTENTIAL JUROR:  And my name is John Rathbun.

THE COURT:  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  So I asked you a series of questions.  To begin with, Questions 1 through 17, did you write down any responses that we need to talk about?

POTENTIAL JUROR:  On two, I don't have my medical record but frequently use the men's room like every 45 minutes to an hour.  Even at work they got me

down to a point where they know I got to go.  I just hate to -- like I've already gone eight or nine times today.

THE COURT:  Just generally, would you say you can sit comfortably for about 45 minutes?

POTENTIAL JUROR:  Within the hour, I'm really panic in about an hour.

THE COURT:  Okay.  We have no problem working around any time you or anyone else wants to take a break for whatever reason.  They raise their hands.

POTENTIAL JUROR:  It would be frequent I can tell you that much.

THE COURT:  We take breaks, and I don't -- I mean, we can work with that.  I'm just asking you if you would be comfortable serving?

POTENTIAL JUROR:  The way I have to go constantly, even at work I mean... And then the name, the Chicopee police you gave was Sawa, he married my next-door neighbor.  I know him.  Plus my father-in-law was a Chicopee cop.

ATTORNEY BRESLOW:  I believe the officer's name is Szura, S-z-u-r-a.

POTENTIAL JUROR:  I heard Sawa.

THE COURT:  Do you know the person now that the name has been corrected?

POTENTIAL JUROR:  I thought it was Sawa.  An my

father-in-law was a retired Chicopee cop.

THE COURT:  All right.  What else do you have for your responses?

POTENTIAL JUROR:  You asked if we had any family or friends that worked in any of the businesses, my wife's cousin.  She was a forensic lab -- she ran a lab for a couple years for the State Police up in Boston.

THE COURT:  Did you know much about her job or what she did?

POTENTIAL JUROR:  Only on occasion that she did a lot of court stuff and she was hoping to do more forensic stuff but she did a lot of court.

THE COURT:  When was the last time you talked to her about her job?

POTENTIAL JUROR:  Probably about a year or so.  She moved.  She doesn't work there anymore, but the question was do we know anybody.

THE COURT:  All right.  So the fact that you had a relative that was involved in some type of forensic testing, do you think that would interfere with your ability to be fair and impartial?  Would you tend to believe more someone who does forensic testing or believe less someone that does that?

POTENTIAL JUROR:  I would probably believe more.

THE COURT:  Would you be able to treat someone

who does forensic testing as fair as you would treat any other witness or would you treat them differently?

POTENTIAL JUROR:  Probably the same towards forensic.

THE COURT:  All right.  So if a forensic witness testified in a way that you had trouble believing, would you -- could you discredit their testimony or would you just simply follow their testimony because they are --

POTENTIAL JUROR:  I would probably follow the testimony.

THE COURT:  Just because they are a forensic --

POTENTIAL JUROR:  Yes.

THE COURT:  All right.

POTENTIAL JUROR:  Then I have -- I wrote down a yes on Questions 24 and 25.  I don't remember which those were but.

THE COURT:  Twenty-four was about education or experience in the criminal justice field.

POTENTIAL JUROR:  I did some police training when I was in the Coast Guard, and then was the other one HAZMAT?

THE COURT:  Right.

POTENTIAL JUROR:  I had that in construction. Plus in the military I did HAZMAT training and even where I work now, we still have every year we got to read up on

it and stuff.

THE COURT:  All right.  Okay.  Thank you.  Any other issues?

POTENTIAL JUROR:  That's it.

THE COURT:  All right.  Could you wait outside the door please?

(The potential juror left the courtroom.)

THE COURT:  Any challenges for cause?  He's also a Smith & Wesson employee which I didn't ask about.  We can bring him back in and ask, but at this point I thought it might be useful to ask if there's for cause challenges?

ATTORNEY DESROCHES:  The government does not have a challenge at this point, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  We would have a cause challenge.  I think he clearly said that based on his relationships with other people, with family members working in forensic that if he heard testimony from a forensic witness he would believe their testimony just because of his other relationship with the forensic witnesses and so I think that's --

THE COURT:  He did say that.

ATTORNEY O'NEILL-GREENBERG:  Yes.

ATTORNEY DESROCHES:  Yes, Your Honor.  The government's position isn't that those questions don't cause some concern, but I think we can elaborate on them.

I would also note that the forensic evidence in this case is -- well, at least the last time it wasn't necessarily challenged and so at this point the government is not exercising a challenge and would object.

THE COURT: All right. I'll bring him back in and we can ask him questions about Smith & Wesson. I mean, quite frankly, this juror had impressed me as someone who is looking to just find an answer to get him out the door. He just doesn't seem interested in being here quite frankly.

ATTORNEY O'NEILL-GREENBERG: We have plenty of jurors who want to be here and are hoping to be here that someone who is not invested and is biased, we don't need to go any further.

THE COURT: Well, if the government wants to inquire further, I understand your position. We will ask him some more questions about Smith & Wesson.

ATTORNEY DESROCHES: Your Honor, it is -- I think it was apparent to everyone. A better use for everyone's time, we can dismiss this juror.

THE COURT: Very good. The juror is excused.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror No. 30, XXX XXX. You can go right up to the left-hand side where the microphone is. Thank you.

THE COURT:  Thanks, Ms. XXX.  Did you take your juror oath downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  Great.  And I also asked you if you knew anybody but you were looking at the video.  So I'll point out there's a prosecution table in front of you.  To the left --

POTENTIAL JUROR:  I don't know.

THE COURT:  To the left is the defendant.  That's Mr. Rathbun and his lawyers.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  Great.  I asked you questions and anything on Questions 1 through 17 that you wrote down responses that might affect your ability to be fair?

POTENTIAL JUROR:  No.

THE COURT:  How about Questions 18 through 34, did you write down any responses that would affect your fairness?

POTENTIAL JUROR:  No.

THE COURT:  No?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Thank you.  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT: Causes? Challenge for cause?

ATTORNEY DESROCHES: Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG: Not from the defense.

THE COURT: The court sees no issue. The juror may remain.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror No. 31, XXX XXX. Mr. XXX, if you would approach the clerk's bench on the left-hand side where the microphone is.

THE COURT: Hi, sir. Thank you for being here.

Sir, did you take your oath as a juror downstairs on the video?

POTENTIAL JUROR: Yes.

THE COURT: Okay. And I also asked you if you recognized anyone. It was over video and so I'm going to direct you that's the prosecution table in front of you. The defense table is to your left, and Mr. Rathbun is at the end. Do you recognize anyone?

POTENTIAL JUROR: No, I don't.

THE COURT: Okay. I asked you questions. Did you take notes on anything on Questions 1 through 17? Did you write down anything that might affect your ability to be fair that we should talk about?

POTENTIAL JUROR:  No.

THE COURT:  For questions now 18 through 34, the same thing.  Did you write down any responses to those questions or statements that might affect your ability to be fair?

POTENTIAL JUROR:  For 34 I had a maybe.

THE COURT:  Okay.  Let me see, 34.  So you have feelings about people who proselytize?

POTENTIAL JUROR:  I just -- you know, I don't like it when people try to convince me of something on a one-sided way.

THE COURT:  So it's something you just don't care for?

POTENTIAL JUROR:  Yes.

THE COURT:  Fair enough.  We might talk about that later during the next step.  So thank you for identifying that.

POTENTIAL JUROR:  Sure.

THE COURT:  All right.  You're all set.  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT:  Any challenge?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the

defense.

THE COURT: The court sees no reason to challenge at this point. The juror is cleared for the next step.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror No. 32, XXX XXX. Ms. XXX, if you would approach the clerk's bench on the left-hand side where the microphone is. Thank you.

THE COURT: Hi.

POTENTIAL JUROR: Hi there.

THE COURT: Did you take your oath as a juror downstairs?

POTENTIAL JUROR: Yes, in the other courtroom.

THE COURT: Great. Okay. Thank you.

And I asked you if you recognized anyone but now you're in court and so I'll ask you to look, that's the prosecution table in front of you. The defense table is over to the left with Mr. Rathbun seated at the end. Just looking at them, do you recognize anyone?

POTENTIAL JUROR: No.

THE COURT: Okay. And on the questions I asked you, Questions 1 through 17, did you have any answers that might raise issues regarding your ability to be fair on Questions 1 through 17?

POTENTIAL JUROR: Nope.

THE COURT:  How about Questions 18 through 34, any answers that might affect your ability to be fair?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Thank you very much. You can wait outside that door.

POTENTIAL JUROR:  Okay.  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Not from the defense.

THE COURT:  I see no challenge issue at this point either.  The juror may remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 33, XXX XXX.  Mr. XXX, if you would go to the left-hand side of the clerk's bench where the microphone is?

THE COURT:  Hello, sir.

POTENTIAL JUROR:  Hello.

THE COURT:  Sir, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  I asked you if you recognize anyone but now that you're here in court, that's the prosecution

table in front of you.  Defense is to the left and Mr. Rathbun is seated at the very end.  Do you recognize anyone?

POTENTIAL JUROR:  I do not.

THE COURT:  Okay.  So on my questions, did you have responses to any of Questions 1 through 17 that might affect your ability to be fair?

POTENTIAL JUROR:  The witnesses for the Longmeadow Fire Department, I believe it was Mike Nothe you mentioned.

THE COURT:  Okay.  I think I probably pronounced his name wrong.  I might have said Nauth. (phonetic).

POTENTIAL JUROR:  I'm a very good friend of his. I've worked with him for years.

THE COURT:  You've worked with him?

POTENTIAL JUROR:  With him.

THE COURT:  You're an EMT; is that correct?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  All right.  So as an EMT, you respond to calls often I imagine with State Police and local police?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Do you work in certain areas, the Longmeadow area?

POTENTIAL JUROR:  The majority Springfield and

Holyoke.

THE COURT:  All right.  Now because of your involvement with enforcement through your job, would you be able to treat law enforcement witnesses like any other witness or would you tend to just believe law enforcement witnesses just because they are law enforcement?

POTENTIAL JUROR:  No.  Everybody is equal.

THE COURT:  Okay.  Now how about the police officer named Nothe or Nauth?  However it's pronounced.  If that individual testified, would you be able to treat that witness because you know him you said a little better, would you be able to treat that witness like any other witness?

POTENTIAL JUROR:  Yes, of course.

THE COURT:  So if that officer testified and you found something he said not believable or not credible, would you have a problem drawing that conclusion about him because you know him?

POTENTIAL JUROR:  No.  If it didn't make sense, it doesn't make sense, sir.

THE COURT:  Okay.  Did you write down any other answers of one through 17?

POTENTIAL JUROR:  Other than that, the HAZMAT training and things like that, I've been through numerous classes over the years and all that stuff, things from

working.

THE COURT:  Did you get certification?

POTENTIAL JUROR:  I have a couple of different FEMA certifications through my job that I've acquired over the years just for hazardous material response and scene situation and handling.

THE COURT:  So have you been trained on explosive devices?

POTENTIAL JUROR:  I've gone to a few, like, incident to terrorist bombing classes and things like that for the responders to go and set of triage and seeing stability, not to destroy crime scenes and things like while responding to emergency.

THE COURT:  Have you been trained with the handling of gasoline?

POTENTIAL JUROR:  No.  Not that I'm aware of, no.

THE COURT:  Okay.  So your training is more of what type of devices?

POTENTIAL JUROR:  Like IUDs, thinks like that. Any sort of situations we may respond into to preserve the scene and still being able to extricate patients and remain neutral per se.

THE COURT:  Okay.  So in this case you may hear some testimony regarding what would be termed as an

explosive or an incendiary device.  You may hear testimony about gasoline and a gasoline container.  You would have to consider and reach a verdict in this case based only, only, only upon what you hear in this courtroom, which means putting out of your mind any training, experience that you may have, what you think things should be regarding certain materials, what you think the information is and base it only upon the evidence that comes in court.

POTENTIAL JUROR:  Yes.

THE COURT:  Would you be able to do that?

POTENTIAL JUROR:  Yes, sir.

THE COURT:  Okay.  Any other responses to any of the questions at all?

POTENTIAL JUROR:  No, sir.

THE COURT:  All right.  Very good.  Thank you. Could you wait outside the door?

(The potential juror left the courtroom.)

THE COURT:  All right.  Challenges?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  All right.  The court sees no issue either.  This juror can remain.

Next 34.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 34, XXX XXX.  Mr. XXX, if you would approach the clerk's bench on the left-hand side where the microphone is?

THE COURT:  Mr. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Pardon?

THE COURT:  Did you take your oath as a juror downstairs over the video?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  And downstairs I asked you if you recognized anyone but now you're in court an so I will ask you to look.  The prosecution table is in front of you.  The defense table is to the far left and Mr. Rathbun is seated at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And I asked you a group of questions.  So to start, Questions 1 through 17, did you take any notes about anything that raised an issue about your ability to be fair and your notes for questions one through 17?

POTENTIAL JUROR:  Not really.  I do have a hearing issue, especially in a room like this where you get the echo.

THE COURT:  Did it help when I moved closer to

the microphone to amplify?  Did it help your ability to hear?

POTENTIAL JUROR:  Somewhat.  It's still an issue I mean that I have.

THE COURT:  All right.  We have headphones.  I don't know if you have a hearing aid or amplification, but we have -- I'll ask the clerk just to confirm, we have a device that you can wear that would assist your hearing. It would amplify a headphone type situation to make it help.

POTENTIAL JUROR:  It's not so much the amplification, it's the tone.

THE COURT:  Okay.  Well, if you were selected, we have an aid that you can experiment with.  We can take a few minutes to see if that works better for you.  Are you able to hear and pick up what I'm saying right now without any problem?

POTENTIAL JUROR:  Yeah, so long as I'm looking at you.  I mean, it helps to look at a person when you see their lips kind of.

THE COURT:  Well, witnesses in this case will testify behind the screen.  Like I'm behind the screen, they will testify behind the screen.  So the witnesses will not have a mask on but the attorneys will have masks on at many points.  Do you think that might affect your

ability to hear?

POTENTIAL JUROR:  Yeah.  I mean, I just retired and at work I was having a hard time with people with masks on and understanding what they were saying and stuff.  Just what?  What?  What?  I eventually get it, but.

THE COURT:  Do you wear anything to help your hearing?

POTENTIAL JUROR:  No.

THE COURT:  All right.

POTENTIAL JUROR:  I just neglected to get it.

THE COURT:  I'm just wondering if the device we have might make that -- if we tested out the device and it didn't help you, sure, I understand.  But let's go to the next questions.  Do you have any answer to other questions?

POTENTIAL JUROR:  Well, I don't know if this has anything to do with it, my brother works for the district court in Hampshire County in Northampton.  He's head of the probation department over there.

THE COURT:  All right.  Well, would that affect your ability to be fair and impartial in this case?

POTENTIAL JUROR:  No.

THE COURT:  Do you think his position would make you favor or disfavor the prosecution?

POTENTIAL JUROR:  No, I don't think so.

THE COURT:  Would it make you feel different about the defendant in this case?

POTENTIAL JUROR:  No.

THE COURT:  Any other issues?

POTENTIAL JUROR:  We had a planned vacation.

THE COURT:  When?

POTENTIAL JUROR:  We were leaving on Friday and I wasn't going to be until Monday night or Tuesday morning, and I did hear you say that this case starts on Monday.

THE COURT:  But you won't be here?

POTENTIAL JUROR:  Well...

THE COURT:  Where are you going to be?

POTENTIAL JUROR:  Burlington, Vermont.

THE COURT:  Okay.  All right.  That's a planned vacation?  It's been planned?

POTENTIAL JUROR:  Yes, it's been planned.

THE COURT:  Okay.

POTENTIAL JUROR:  Other than that, I don't have anything.

THE COURT:  Okay.  Thank you.  Could you wait outside the door?

POTENTIAL JUROR:  Yes.  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any challenge for frankly the vacation issue?

ATTORNEY DESROCHES:  Yes, Your Honor.  I think the government is concerned.  The vacation plans combined with the hearing issue, I'm concerned that he would be able to be a fair and impartial juror.

ATTORNEY O'NEILL-GREENBERG:  We have the same concerns.

THE COURT:  I do as well and so the juror is excused primarily -- for the record primarily because of the vacation issue.  On the hearing issue, I'm certainly happy to try using court-assisted hearing devices.  It was pretty obvious he was having trouble, but the reason he's being excused is he has a vacation.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 35, XXX XXX.  Mr. XXX, walk up to the microphone on the left-hand side of the clerk's bench.

THE COURT:  All right.  Mr. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, Your Honor.

THE COURT:  And I asked you if you recognize anybody but it was over video and so I'll direct you, that's the prosecution table.  Over to the far left is the defense and Mr. Rathbun is seated at the end.  Just look

if you recognize anyone?

POTENTIAL JUROR:  I don't know anyone in this room.

THE COURT:  Very good.  I asked you questions.

POTENTIAL JUROR:  Yes.

THE COURT:  Now for Questions 1 through 17 did you write down any responses that raised the issue of your ability to be fair and impartial?

POTENTIAL JUROR:  With all honesty, you went so fast I had a hard time keeping up.  I can look at them a little bit.  Unfortunately my eyes aren't the best.

Let's see.  I got a disability a little bit of one. It just bothers me.  I got a colostomy and it leaks a lot, and it's going to be a big deal if it leaks here.

THE COURT:  Okay.

POTENTIAL JUROR:  It hasn't leaked since last Tuesday, but it's just something I've got to deal with.

THE COURT:  Does it leak regularly?

POTENTIAL JUROR:  Excuse me?

THE COURT:  Is it a regular issue that you have to deal with?

POTENTIAL JUROR:  Yeah.  I've had this for like ten years.  I've had surgery ten years ago.  I lost most of my gastrointestins and so it's with me for life.

THE COURT:  But the leak, the problem with it

leaking is something that happens with regularity?

POTENTIAL JUROR: It can. It doesn't all the time but it leaked last Tuesday because I went with some friends to Hampden Beach. I can get around a little bit like that, but it still leaks just sitting in the truck, you know. So it bothers me enough that I only had one sandwich all morning. I'm not going to eat again until I leave this building.

THE COURT: So you're so concerned about it that you take special precaution when you're out like you would be here?

POTENTIAL JUROR: Yes. I do have a pack that I can bring with me with extra -- what do you call it? I got to slow down here -- with extra equipment and everything. Although it does have a pair of scissors in the pack, that's the only problem.

THE COURT: Let me ask you this, having a condition like that requires you to pay a lot of attention to it. We need you to focus on the trial. Would your condition and your concern as to whether or not you might have to attend to your condition, do you think that would distract you from your ability to concentrate on the trial?

POTENTIAL JUROR: It could a little. I want to be absolutely true. I want to be absolutely completely

truthful to you.  I probably could do it but I'd rather not because I'm thinking of the people here that if it leaked or something, it may lead a trail right to the bathroom or something and I don't want to do that to your courtroom for any reason.

THE COURT:  Well, I certainly don't want to put you in a situation where you might feel self-conscious either about a situation like that.

Did you respond to any of my other questions?

POTENTIAL JUROR:  For what it means to the court, I am a born-again Christian and so I'm very pro-Isreial and the Jewish faith.  I look at them like brothers and sisters in the faith.  I don't know if that's a pro or con, but I am.  That's about all I can think of right this minute.

THE COURT:  Now it says that you have -- that you collect disability.  Is the disability what you just explained to me your medical condition?

POTENTIAL JUROR:  That and I deal with severe depression with a side order -- that's how I put it -- a side order of suicidal thoughts from time to time.

THE COURT:  And how are you doing with that now? Are you suffering through any specific things right now?

POTENTIAL JUROR:  I've pretty well defeated the suicidal thoughts, but I do go into depression from time

to time.

THE COURT:  Okay.  Now, your faith, you heard briefly some facts about this case regarding a container that was left in the general area of the Jewish Geriatric Facility on Converse Street in Longmeadow.

Would that affect just the location and that it was near a facility named the Jewish Geriatric Facility, might that affect how you feel about this case?

POTENTIAL JUROR:  I would take it more serious than normal because anti-semitism has become such a huge thing nowadays.  They are people.  They have every right that you or I do or anyone else does.  It doesn't matter what their faith is or their background is.

THE COURT:  So would you assume a anti-semitic component to the case just because of the location?

POTENTIAL JUROR:  I'll say, yes.

THE COURT:  Okay.

POTENTIAL JUROR:  Yes.  Yes.

THE COURT:  Okay.  Okay.  Did you answer to any other questions?

POTENTIAL JUROR:  Excuse me?

THE COURT:  Any other answers to question that we need to talk about?

POTENTIAL JUROR:  Not that I can think of, sir.

THE COURT:  Thank you.  Can you just wait

outside the door?

POTENTIAL JUROR: Yes.

(The potential juror left the courtroom.)

THE COURT: For the government?

ATTORNEY DESROCHES: Your Honor, the government would challenge this juror for cause for two primary reasons. First, it sounds as though he will be distracted through this jury. He indicated he didn't eat today.

THE COURT: Yes. His medical condition is concerning to the court as well.

ATTORNEY DESROCHES: And lastly, Your Honor, his last answer regarding an assumption of a motive based on the placement of a device at a Jewish nursing home I think would potentially bear on his ability to be impartial in this case.

THE COURT: All right.

ATTORNEY O'NEILL-GREENBERG: We have the exact same issue.

THE COURT: I agree. The challenge is allowed. The joint challenge is allowed. The juror is excused.

(A potential juror entered the courtroom.)

CLERK HEALY: Juror No. 36, XXX XXX. If you would walk up to the clerk's bench on the left-hand side to the microphone.

THE COURT: Sir, Mr. XXX, did you take your

juror oath downstairs on the video?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  And we asked you if you recognize anybody.  Of course, that was over video and so I'll point you to the prosecution table in front of you.  To the left is the defense.  Mr. Rathbun is seated at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  From the questions I asked you, Questions 1 through 17, did you write down any notes that might affect your ability to be fair?

POTENTIAL JUROR:  No.

THE COURT:  How about Questions 18 through 34, was your responses that you wrote down in your notes anything that might affect your ability to be fair?

POTENTIAL JUROR:  I don't really remember the questions but probably not.

THE COURT:  But you didn't take any notes regarding that?

POTENTIAL JUROR:  I wrote down my answers but I don't remember what the questions were.

THE COURT:  Okay.  So were any of your answers something that triggered in your mind something to do with your ability to be fair?

POTENTIAL JUROR:  No.

THE COURT:  No?  Okay.  All right.  Thank you.  Can you wait outside the door?

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  Not from the government.  Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  None from the defense.

THE COURT:  I agree.  That juror can remain; cleared.

So that's it.  We got them.  Let me just think about lunch.  We can take a lunch right now.  We have enough to do two panel voir dires after lunch.  The question becomes the exercise of peremptories because it will likely be short and we'll need a few more for tomorrow.

The question is do the people who clear today who are cleared, do we bring them back tomorrow afternoon for a very short period of time to go through exercise of peremptories?  Or, as we did the last time, our peremptories exercised essentionally on paper with your memory and notes from jurors?  So think about that.

I guess the only person who doesn't recall is Attorney Breslow, but that's how we did it the last time.  Think about that at lunch.

I'm trying to think of convenience of a group of

jurors who we'll ask to come back tomorrow afternoon for a very short period of time, some of which have a pretty good drive. Talk about it. Okay? We will see you at 2:30.

CLERK RIVERA: All rise.

**(A recess was taken at 1:43 until 2:36.)**

CLERK RIVERA: The court resumes in the case of criminal matter 20-30018, the United States of America versus John Michael Rathbun. You may be seated.

THE COURT: Back on the record. I've been thinking about options for going forward this afternoon and here's what I propose. I actually think -- I mean, I'm not taking credit for thinking of this. Look all around you. Those are the people that thought about this, but it does make sense.

So today we'll go forward and we'll now do two rounds of attorney-conducted voir dire. After each round, you would be exercising your for cause challenges. After we are finished with those two rounds, all jurors that remain we bring in. We fill our jury box and you exercise peremptories and we keep refilling those peremptory spots until we run out of jurors for today, and that will tell us how many jurors we need to bring in for tomorrow.

I'm looking at everyone thinking about it.

ATTORNEY BRESLOW: I'm sorry, Your Honor. Could

you repeat that?

THE COURT:  Which part?

ATTORNEY BRESLOW:  The latter part.

THE COURT:  So after we go through the for cause challenges from our two rounds of attorney-conducted voir dire, we then have a pool of jurors that have survived for cause.  So whatever number that's left here in the courtroom, we bring them all in.  We fill the jury box, and we let you start exercising peremptory challenges.

There will be some jurors left.  So however many peremptories are exercised, we'll fill them with whatever jurors we have in the back and we do that until we run out of jurors today.  Maybe we get a jury.  I don't know, but that tells us how many people we need to bring in for tomorrow to try to fill how many empty spots there would be.

Any thoughts that anyone wants to make?

ATTORNEY DESROCHES:  Your Honor, I think that seems to be reasonable.  I think it is reasonable.  In fact, it would function the same way as if we just keep the jurors around.  So that's a good utilization of the jurors' time, and I think qualifies as reasonable.

THE COURT:  Thank you for referring to me as reasonable.

Does the defense see any glaring problem with it?

ATTORNEY O'NEILL-GREENBERG:  The only issue we have is that I think if we were both to exercise all of our peremptories, we still wouldn't have enough jurors. We'd have to go until tomorrow.  So being able to exercise our peremptories in an intelligent and meaningful fashion, it is only meaningful if we can see who is left from that pool and we're not going to be able to do that until we clear everybody here tomorrow.  So if we're exercising today, we don't really have that full concept of what we're looking at as far as who our jury is going to be.

THE COURT:  Yeah.  I understand your point.  I understand your point in a perfect world, but I think the process is a fair process.  You're guaranteed a fair process, not a perfect process with availability of jurors.

ATTORNEY O'NEILL-GREENBERG:  I guess I thought we could have a perfect world in a sense because tomorrow once we get through whatever the amount we need to have the new jurors and clear them, I would image that we could exercise our peremptories of everyone that's been cleared on paper so that the people from today that are going to come back, we will let them know to show up on Monday but they don't have to be back here tomorrow.  But then you will have a full picture of everyone to exercise a peremptory.

THE COURT: I must say that's true. Your proposal is true working it out on paper would do the same thing.

I am going to go with my suggestion of we're just going to do peremptories today and see how many spaces we end up having left. I think you should formally object if you feel strongly about it so we can make a record for it. Do you formally object?

ATTORNEY O'NEILL-GREENBERG: Yes. Can you note our objection?

THE COURT: Absolutely.

ATTORNEY O'NEILL-GREENBERG: Thank you.

THE COURT: Thank you.

ATTORNEY WATKINS: Judge, while we're on the subject of housekeeping matters, I made a couple of observations as the today has gone along.

The first is the jury list name is very short in my experience for the number of people that would have been called in for today. I don't know why that is. I guess my question is how many jurors were actually summoned into court today, and were there a higher percentage of people who were called off at the last minute or simply did not show up?

THE COURT: Yeah, I think it was that. I don't have the numbers for you, but the clerk can give you the

numbers.  I think I'm looking to the clerk for confirmation, we had a number of people who didn't show up and people who were screened out because of health problems, health issues.

ATTORNEY WATKINS:  That was going to be my second question, so that is something that the court did as per the prior procedural order that you reviewed the health -- answers to the health questions and screened people out?

THE COURT:  I did not review the health questions today.  I reviewed health questions but not today.  That would have been people who reported health problems when they arrived here today.

ATTORNEY WATKINS:  I see.

THE COURT:  I want to make sure I'm giving you the correct information; is that correct?  Do we have the number of people -- I'll ask the clerk, is the number of people who came here this morning reported health problems and therefore left?

CLERK HEALY:  So 52 were called in.  Fifty-two jurors were called in.  Thirteen did not report because of responses to the COVID health questionnaire.  We had three no shows, and we had two people that were excused for other reasons.

THE COURT:  And those 13 for the COVID

healthcare would have been 13 reviewed by the court?

CLERK MACKLER:  Thirteen reviewed by the jury administrator.

THE COURT:  By the jury administrator first, and they didn't make it past that?

CLERK MACKLER:  Those people presented health concerns that the court came up with that --

THE COURT:  -- that were automatic excusals.

CLERK MACKLER:  Correct.  Correct.  They presented with health symptoms that would prevent or they also came in contact with people with COVID-19 within the past 14 days or also were told to quarantine within the past 14 days.

THE COURT:  All right.  Just for the record, this is Ms. Healy the clerk here in Springfield and James Mackler the jury administrator from Boston.  I have no problem you making the record.  If you want to make a record further, absolutely, Attorney Watkins.

ATTORNEY WATKINS:  Yes, Your Honor.  Again, they are observations and it's always difficult in this kind of context.

I do note that we only have two persons of color actual black, African-Americans here today.  Some smattering of Hispanic and perhaps people that may -- I don't know, it's simply all of us can make different kinds

of judgments, and that does seem to me for this jurisdiction to be low.

Also what was perhaps most striking to me is reviewing the addresses in the jury list. There was no one from Holyoke whatsoever, which I think in the court's experience and certainly in mine here is very, very unusual and indicates something in and of itself.

Holyoke being I believe a second largest city that we draw from here in the Western division, and that gives me pause to think that perhaps people calling in ill or having some other kind of excuse are disproportionately represented in the lower-middle class socioeconomically and perhaps also in diversity.

So these are my concerns without knowing the entire jury pool. Of course, it's very, very difficult to make those kinds of judgments, and again it's by in large trying to observe people as they come in here.

So those are the reasons for my questions, and I believe Mr. Mackler and Ms. Healy have answered the questions. There would be data on that, the jurors that were actually requested to be here in court and the ones that were excused by the administrator. The no shows I guess we never will know why or perhaps we can't know why at this point they did not show up. The two otherwise excused, I'm a little unsure how we get the information on

that.

THE COURT:  The two otherwise excused, what does that mean?

CLERK MACKLER:  I'll have to speak with Mike Zamorski.  He spoke with them this morning.

THE COURT:  You mean there were people who came to the door and had informed the court staff.

CLERK MACKLER:  They phoned over the weekend or might have been phoned this morning and Mike got the voice mail and the juror left a voice mail saying they weren't going to be able to come in.

THE COURT:  Okay.  So if you can follow up so we make a record of that?

CLERK MACKLER:  Yes.

THE COURT:  Let me just say, I would ask that, Mr. Mackler, that any paperwork or data regarding this, regarding how many went out, how many responded, the issues that Attorney Watkins has just raised, any paperwork that captures all that data be preserved so that Attorney Watkins could request it and I would authorize that he be able to review that as well.

CLERK MACKLER:  Okay.  Absolutely.

THE COURT:  Thank you.

ATTORNEY WATKINS:  Thank you, Your Honor.  Thank you, Mr. Mackler and Ms. Healy.

THE COURT:  All right.  So very good.  Let's fill up the box for our first round of attorney conducted voir dire.

Now the question to each attorney is, if you want to conduct the attorney-conducted voir dire without a mask you can do it from behind the first witness stand.  If you want to have your mask on, you can just pull the podium up and move it to the center of the floor.

(Potential jurors entered the courtroom.)

CLERK MACKLER:  Juror No. 1, you'll want to walk up straight through and to the left.

THE COURT:  Does everyone have their juror number, a card with your number on it?  Okay.

So I'm going to through this quick to make a record of where you are seated by jury number so we have a record of all this. Okay?

Okay.  Seat No. 1, down there closest to the television, Seat No. 1 is Juror No. 1.

Seat No. 2 is Juror No. 2.

Seat No. 3 is Juror No. 3.

Seat No. 4 is Juror No. 5.

Seat No. 5 is Juror No. 6.

Seat No. 6 is Juror 8.

Seat No. 7 is Juror 9.

Seat No. 8 is Juror 10.

Seat No. 9 is Juror 11.

Seat No. 10 is Juror 13.

Number 11 is Juror 14.

Seat No. 12 is Juror 15.

Seat No. 13 is Juror 16.

Seat No. 14 is Juror 17.

Seat No. 15 is Juror 18.

Okay.  All right.  So, ladies and gentlemen, what happens at this point -- other than seeing if I can keep track of the numbers like that -- some of you were actually blocking your seat numbers right behind you so I can't even see them.

So here's what's going to happen.  This is a process called attorney-conducted voir dire.  So it should be obvious to you at this point that it's very important in any trial, criminal or civil, that the parties involved in the trial should get to know as much as they can about the potential juror because it's each side's right to play an active role in selecting the jury and the jurors that each side wants to sit on this case.  That's their right of both sides, both prosecution and the defendant.

So to help with that process and to build on me already asking you some questions and bringing you in and following up with a little bit on questions, the attorneys now will ask questions of this group.  They will bring up

topics and invite a conversation between the group or they may call upon people individually to answer questions.

Now these are professionals. These attorneys have done this before. This is not being done to embarrass or call out anyone and should not even come close to that level.

If anyone feels uncomfortable of any question that is asked of them or with the process, simply raise your hand. I'll bring you over to sidebar. I'll discuss it with you, and I will do everything I can to make the situation better. But that's what happens next, each side gets a certain amount of time to talk to you and raise issues that may be important for each side to consider when choosing a jury. All right.

Who's going first? The government?

ATTORNEY DESROCHES: Thank you.

So good afternoon, everyone. To remind you, my name is Neil Desroches and I represent the United States. My colleague Steven Breslow and Megan McKenna also represent the United States.

As Judge Mastroianni just said, we all here want to just talk a few minutes to get to know you better because this is an important right that every American has, the right to a trial by their peers. And we don't know our peers if we don't know anything about them, and so this is

part of that process.

Please, as also the judge said, don't feel picked on if we are asking you a question. We are just really trying to get people to talk so we can figure out whether this is the right case for them because not every case is the right case for every potential juror.

THE COURT: Can everyone hear okay? Okay.

ATTORNEY DESROCHES: So we are just trying to get a sense of that. So it's important that you be honest and candid with your answers. I'm going to test it right now. By a show of hands, how many of you were happy when you the summons for jury duty today?

All right. So this is a good start. At least you're open and honest.

We know that a juror can be in a position in life that's not necessarily how you want to be spending today. There's a million other things, I'm sure, on your mind and so we will do our best to use your time responsibly as we can and to not waste any of it.

So let's get started. As I said, the trial by a jury of your peers is one of the most important rights that every American has but also is the right to be presumed innocent until proven guilty.

Will any of you be unable to follow the judge's instruction that the defendant remains innocent until the

government proves him guilty?  So everyone, just to be clear, everyone can follow that instruction?

Now sometimes people have preconceived notions that when they get called to jury duty that if we're here, the defendant must have done something wrong.  Even if that is what you thought when you first arrived today, now that you've been instructed by the judge and you've learned a little bit more about jury duty, will you hold the government to its proof, to its burden of proof beyond a reasonable doubt that the defendant is guilty at the end of this trial?

I see no one saying no to that, right?  This is not getting a conversation started.  Let's get the ball rolling.

Let's talk about drugs and alcohol.  During this case you may hear some evidence and testimony about drug use and alcohol use.  How many of you have known people in your lives or possibly been yourself involved in substance abuse?  All right.

So now we're starting to see some positive response.  So let me start asking specific jurors questions.

So Juror No. 16 in Seat 13, you raised your hand, right?

POTENTIAL JUROR:  Yes, I did.

ATTORNEY DESROCHES:  So when you say that -- and

I'm not going to pry into the relationship, but you've known people in your life who have been involved in substance abuse; is that right?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  Can you describe, just general speaking, what kind of substance abuse that was?

POTENTIAL JUROR:  Well, I have had friends and coworkers die because they have an addiction, one to cocaine and one to alcohol.  I --

ATTORNEY DESROCHES:  I'm sorry, I interrupted. Can you finish?

POTENTIAL JUROR:  I mean, that's really it, friends and coworkers.

ATTORNEY DESROCHES:  So now knowing that you had this sort of experience, if you hear testimony that a particular person may have also suffered from substance abuse, would you be able to be a fair and impartial juror and weigh the testimony of that particular witness as you would any other witness?

POTENTIAL JUROR:  I would hope so.

ATTORNEY DESROCHES:  Do you believe that substance abuse or voluntary substance abuse and intoxication, either by drugs or alcohol, can excuse someone from the consequences of their actions?

POTENTIAL JUROR:  It depends on the actions.

ATTORNEY DESROCHES:  But you think it's possible that that could excuse someone from the consequences of their actions?

POTENTIAL JUROR:  I would have to know more about the circumstances.

ATTORNEY DESROCHES:  That's fair.

Does anyone think that across the board it could excuse someone from the consequence of their actions?

So you said that you would want to know some more about the circumstances.  What types of -- I'm sorry, let me give you an example.

So if a person voluntarily drank alcohol and then got into a fight, started a fight and punched someone at a bar, let's say, would that person be excused from the consequences because they are drunk?

POTENTIAL JUROR:  In my opinion, no.

ATTORNEY DESROCHES:  Does anyone disagree with that?

Okay.  So thank you.

Turning now to Juror 2 in Seat No. 2, you raised your hand as well knowing someone that had suffered from substance abuse; is that correct?

POTENTIAL JUROR:  Right.

ATTORNEY DESROCHES:  Now do you think that substance use can excuse the consequences of action, kind

of like we were just talking minute?

POTENTIAL JUROR:  Substance use?  No.

ATTORNEY DESROCHES:  Do you think addiction can be an excuse for consequences of someone's action?

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  Now you hesitated there, is there something?

POTENTIAL JUROR:  No.  Well, I mean, I'm a recovering alcoholic of 17 years.  I know I changed my life around.  But if I did something when I was drunk, you know, or stoned or something, you know, I shouldn't be excused.

ATTORNEY DESROCHES:  Have you worked with others who have been addicted as well?

POTENTIAL JUROR:  Yes.  I work in the mental health field.

ATTORNEY DESROCHES:  Do you see this type of problem of substance abuse regularly?

POTENTIAL JUROR:  You mean like criminal action?

ATTORNEY DESROCHES:  Sure.  Someone commits a crime while they're under the influence of drugs.

POTENTIAL JUROR:  I don't see that much, no.

ATTORNEY DESROCHES:  If that were the case, do you think that person should be excused from the consequences of their action?

POTENTIAL JUROR:  Just because they are on drugs?

ATTORNEY DESROCHES:  Correct.

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  Does anybody disagree with that?  It seems like we've got some agreement here.

So now opening it up to the group now, has anyone had any experience at work or at home where they've had to decide whether or not someone was telling the truth?  I imagine at home there's probably a lot of that so let's focus on work then.  So has anyone at work --

POTENTIAL JUROR:  I didn't quite hear a few words.  I don't know exactly what you said.

ATTORNEY DESROCHES:  Sure.  Has anyone while at work had the occasion to determine whether or not someone was telling the truth?

POTENTIAL JUROR:  You mean coworkers?

ATTORNEY DESROCHES:  Anyone, coworkers or anyone that you encounter professionally?  So is there -- can I get a raise of hands to get this?

All right.  So Juror No. 17 in Seat 14, you raised your hand.  Can you describe the circumstances that at work you had to determine whether or not someone was telling the truth?

POTENTIAL JUROR:  I had a situation where people

lied about their capabilities when they should have been fully knowledgeable about what they were supposed to do.

ATTORNEY DESROCHES:  What did you do to figure out they were lying?  How did you know they were lying?

POTENTIAL JUROR:  Well, in my circumstance it's pretty obvious.  I'm a mechanic so when it didn't work, it didn't work you know.

ATTORNEY DESROCHES:  That's a good way to do it.

So now, do you understand that in this case you may be called upon to determine whether someone is telling the truth as part of your assessment of the evidence in this case?

POTENTIAL JUROR:  I do.

ATTORNEY DESROCHES:  Do you have any doubts on your ability to do that?

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  Has anyone else had the opportunity at work to determine whether or not someone was telling the truth?

Yes, Seat 5.  I don't have your juror number.  It's 6 for the record.

POTENTIAL JUROR:  Yeah.  I teach at UMass and just about every class I have to determine if someone is telling the truth about being absent, whether they turned

in a paper, plagiarism.

ATTORNEY DESROCHES:  You said it could be in terms of plagiarism?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  What steps have you taken to determine whether or not that person is telling you the truth?

POTENTIAL JUROR:  Usually I meet with the student; usually it results in a confession.

ATTORNEY DESROCHES:  So you heard the question I just asked, do you understand that you may be asked to assess someone's credibility in this case?

POTENTIAL JUROR:  I do.

ATTORNEY DESROCHES:  Do you think you will have any trouble determining whether or not someone is being truthful?

POTENTIAL JUROR:  I would hope not.

ATTORNEY DESROCHES:  Do you have any reservation about that?

POTENTIAL JUROR:  I mean in so far as we're all human and we're apt to make errors.  Right?  I mean, I believe in that.  I believe I have my own subjective point of view and so, you know, with all qualifiers of embodied humanity, yes.

ATTORNEY DESROCHES:  That cannot be escaped.

Do any of the jurors here have any concerns about their ability to assess someone's truthfulness if they're testifying?

Sorry, I'm shuffling the papers.

So evidence may be direct or circumstantial. Direct evidence would come from an eyewitness or a recording of an event.

Circumstantial evidence is a fact from which you can infer other factors or evidence is accurate. The judge is going to instruct you that you may convict on only circumstantial evidence if it proves beyond a reasonable doubt the defendant's guilt.

Would anyone insist that there be an eyewitness or a video recording of a crime in order to return a guilty verdict?

POTENTIAL JUROR:  Can you repeat?

ATTORNEY DESROCHES:  Sure.  Just for the record so we can be clear, you're Juror No. 14 in Seat 11, correct?

POTENTIAL JUROR:  Uh-huh.

ATTORNEY DESROCHES:  So direct evidence may be a recording, a surveillance camera of someone committing a crime.  However, if there is no video recording and there's circumstantial evidence that this crime was committed by a particular person, would you be able to

convict on just that circumstantial evidence?

POTENTIAL JUROR:  I think so.

ATTORNEY DESROCHES:  What thoughts do you have about that?

POTENTIAL JUROR:  Well, in the case --

COURT REPORTER:  Could you repeat that please?

POTENTIAL JUROR:  Well, is it a question if I see a person commit the crime if I'm able to decide if he's guilty or not on that?

ATTORNEY DESROCHES:  So that would be an example of direct evidence if you saw a person committing the crime.

POTENTIAL JUROR:  Yes.  What you are asking if I don't have that, what other evidence you have?

ATTORNEY DESROCHES:  Circumstantial evidence is evidence from which you can infer other facts.  For example, there could be technical records showing a location of something.  Do you have any concerns that you would be able to convict on just that circumstantial evidence?

POTENTIAL JUROR:  No, I would have no concerns if you have other proof to prove the person is there.

ATTORNEY DESROCHES:  Does anybody have any concerns that circumstantial evidence alone would not be sufficient in their mind to convict?

Juror No. 11 in Seat No. 9, Mr. XXX.  You indicated earlier when the judge asked that your aunt works in the district attorney's office.  Do you know what kind of role does she play in the office?

POTENTIAL JUROR:  I honestly don't know.  It's been a little bit since we've talked, but last I knew she was an assistant with everything.

ATTORNEY DESROCHES:  An assistant DA?

POTENTIAL JUROR:  Maybe a DA.  I know she's a lawyer on some cases but other than that, that's as much as I know.  When I was with her and talking to her, we never really talked about work especially when we you do it.  It's probably as stressful as much as what I do. I don't necessarily always want to talk about work when I'm not at work.

ATTORNEY DESROCHES:  So even though she's at the DA's office, it's not something that influences your view on things?

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  You also indicated that you have some strong feelings about religion.  I think a lot of people answered questions about that, and so let's open it up to the group.

First, you indicated you had strong feelings.  Can you indicate what the feelings are?

POTENTIAL JUROR:  Towards any religion or just a particular one?

ATTORNEY DESROCHES:  You were asked -- thank you for asking me to clarify because it was a problem.

You were asked questions about proselytizing and you indicated that you generally have negative feelings about that.  Can you describe what you mean by that?

POTENTIAL JUROR:  It's mostly because of just one particular religion.  I don't want to necessarily say which ones.  I'm not trying to -- you can pick up on what I'm talking about.  You know, just the ones that come to your door asking if you believe or if you pray for some particular thing or anything like that.  It's really not my forte of knocking on my door.

If I want to believe in a religion, I will seek that religion.  I will go find someone in a church or a mosque or any particular place of worship.  I do not believe that it needs to be left on my door or knocked on my door or anything like that.

ATTORNEY DESROCHES:  So does anyone agree with what Juror No. 11 just said?

All right.  So there's a few hands here.  I'm sorry, you're quicker than I am.  Can you raise your hand so I can get your information?

Okay.  So Juror No. 15 in Seat 12, you indicated that

you agree with Mr. XXX; is that right?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  Now with those feelings that you have about wanting to be left alone in your religion affect your ability to listen to the testimony from someone who may have different religious view points than you?

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  So you would be able to remain impartial even though someone's religion background may be different from yours?

POTENTIAL JUROR:  Correct.

ATTORNEY DESROCHES:  Juror No. 18 in Seat 15, Ms. XXX; is that right?

POTENTIAL JUROR:  Uh-huh.

ATTORNEY DESROCHES:  Do you -- how do you feel about that?

POTENTIAL JUROR:  I feel like my religion is my religion and I wouldn't go force it on anybody.  And I believe that if someone -- I could sit here and decide guilty or not guilty not against any religion or the person on trial.  I would be even with all the other people.

ATTORNEY DESROCHES:  Just so I'm understanding, your religion would not affect your ability to --

POTENTIAL JUROR:  That is right.

ATTORNEY DESROCHES:  -- find someone not guilty or guilty?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  Would it affect your ability to assess someone's testimony?

POTENTIAL JUROR:  No.

ATTORNEY DESROCHES:  Sometimes people have trouble particularly sitting in judgment of a person even though that's what we're asking, but would that matter to you?

POTENTIAL JUROR:  No.

THE COURT:  Mr. Desroches, you're going to have to wrap up.

ATTORNEY DESROCHES:  Yes, thank you.

So just to wrap up, I hope we can do that in this time.  Does anyone have strong feelings about the criminal justice system in general?  We've seen a lot of -- some social unrest.  Does anyone feel like the criminal justice system is not fair?

POTENTIAL JUROR:  Yeah, it's hard to --

ATTORNEY DESROCHES:  So the record is clear, Juror No. 6 in Seat 5, you're showing hesitation?

POTENTIAL JUROR:  In the wake of George Floyd it's really hard not to have these feelings.

ATTORNEY DESROCHES:  I think everyone can understand that it's unusual times and not good times.

POTENTIAL JUROR:  Right.

ATTORNEY DESROCHES:  Do you think that those viewpoints that you have would affect your ability to be unfair in this case?

POTENTIAL JUROR:  I don't think so.  But, you know, again I would say it's hard for I would say most of us.  I mean, for many people.

ATTORNEY DESROCHES:  So does anyone agree with Juror No. 6?

Yes?  For the record I'm speaking to Juror No. 16 in Seat 13 and I will wrap up.  So can you describe what your feeling?

POTENTIAL JUROR:  I agree with that because I think that in light of recent events, I'm taking a closer look at everything that goes on.  I'm very glad we have a criminal justice system, but someone else also mentioned we're all human and each one of is more prejudiced than we think we are.  So, you know, as fair as it can be I hope.

ATTORNEY DESROCHES:  Does anyone have any feelings?  I think we can all agree that this is something that we can do much better on as a system, but does anyone have concerns that their feelings, one way or another, can get in the way of being fair and impartial jurors?

POTENTIAL JUROR:  I have a question.

ATTORNEY DESROCHES:  Yes.

POTENTIAL JUROR:  I don't know what the penalty for this crime committed or not committed.  We don't know yet, but it depends on the penalty.  I probably will not be impartial if the crime conduct to prison for life, for example.

ATTORNEY DESROCHES:  So it sounds like you would consider the penalty in your deliberations; is that right?

POTENTIAL JUROR:  I consider the penalties.  I also consider penalties for life or the death penalty because we can be committing a mistake to sentence somebody who's innocent and we have in the past.

ATTORNEY DESROCHES:  But it sounds like that you would --

POTENTIAL JUROR:  If I don't have a way to repair that stuff -- so a death sentence, so I don't believe in that if I don't have a way to repair the person who was convicted.

ATTORNEY DESROCHES:  Okay.  I think I understand.  It sounds like you've got something that you would be thinking about in deliberations; is that right?

POTENTIAL JUROR:  If the case can lead to death penalty, yes.

THE COURT:  I have to wrap you up, Attorney

Desroches.

So on the penalty issue, you will be instructed at the end of the case, like all jurors are instructed, that you are not to consider the potential penalty.

Jurors are not told the potential penalty before any trial starts, and they're specifically told that during your deliberations you should not speculate about what the penalty might be or might not be. You should not speculate about what the penalty should be. The penalty is something that's completely and entirely left up to statute and to the court.

So it's either written into the statute or the court makes a determination, but it is not something that jurors are allowed to consider during their deliberations because it brings into the equation the deliberation issues of sympathy and emotion and human feelings about penalizing someone and the pain and trauma associating with that penalty. You make your decision as to guilt or innocence based only on the evidence in the case, not what consequences may flow. What consequences may flow is the court's role.

All right. So the question to you, to everyone is understanding that, could you serve as fair and impartial jurors knowing that you will not know the penalty beforehand, the potential penalty, and that you will be

told that you cannot consider the potential penalty?

Can you be or would you be fair and impartial jurors under those circumstances?  Raise your hand if you could be.  If you could be knowing that?

Did you raise your hand, sir?

A JUROR:  Yes.

THE COURT:  Okay.  Thank you.  Did everyone get note of the jurors with hands raised?

ATTORNEY DESROCHES:  Yes, thank you.

THE COURT:  Thank you very much.

ATTORNEY DESROCHES:  Thank you.

THE COURT:  Can I have the time?

So to the defense, that was well over the time that I allowed.  It was 19 minutes so you have up to 19 minutes.

ATTORNEY O'NEILL-GREENBERG:  Okay.

Good morning or good afternoon, everybody.  My name is Forest O'Neill-Greenberg.  I'm with Tim Watkins and our client John.

The first thing I want to ask you all about has to do with drug use, which you're going to learn to a certain degree is a big part of this case.  You're all going to learn that John at the time the incident happened on April 2, 2020 John had a serious drug problem, substance abuse disorder with crack cocaine and heroin.

So talking about hard drugs, what I want to know from all of you is that some folks believe that using hard drugs, just in and of itself, makes someone more likely to behave violently or just by using hard drugs commit a violent act.

So from a show of hands, how many people agree with that?  Okay.

POTENTIAL JUROR:  Can you repeat one more time so I understand the question?

ATTORNEY O'NEILL-GREENBERG:  Yes.  Do you think that just in and of itself using hard drugs makes you more likely, just from hard drugs, to commit violent -- behave violently or commit violent acts?  Okay.

POTENTIAL JUROR:  Question.

ATTORNEY O'NEILL-GREENBERG:  Yes.

POTENTIAL JUROR:  I'm sorry.  Do you mean, do you mean if that wasn't your nature already?

ATTORNEY O'NEILL-GREENBERG:  Yes.  Let's say a neutral person just give them hard drugs, would that fact alone make them more likely to commit a violent act?  That's what I'm trying to ask.  I'll start with you.

POTENTIAL JUROR:  Probably not much more likely if it wasn't in their nature but certainly more likely with the drugs.

ATTORNEY O'NEILL-GREENBERG:  You're in Seat No.

14, you're Juror 17 -- Seat 13.

POTENTIAL JUROR:  I'm 16.

ATTORNEY O'NEILL-GREENBERG:  So you think if you were neutral and you weren't going to act that way otherwise, the drugs alone would not make them commit a violent act; is what you said?  Am I understanding you?

POTENTIAL JUROR:  Well, no.  I mean, you asked if they would be more likely without the drugs and I say yes, that doesn't mean they would be likely but they would more likely.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Who else agrees with that?  Tell me you're in Seat -- Juror No. 18 in Seat 15, what do you think?

POTENTIAL JUROR:  I think they would be more likely if they were taking the drugs.

ATTORNEY O'NEILL-GREENBERG:  More likely to commit violent acts?

POTENTIAL JUROR:  Uh-huh.

ATTORNEY O'NEILL-GREENBERG:  Why do you think that?  What influences that?

POTENTIAL JUROR:  I feel like maybe a drug does something to their mind and it causes them to do that. And if they weren't on drugs, maybe they wouldn't, you know, commit a crime more with drugs, you know.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

Juror in Seat No. 2, I saw your raise your hand.  I think you also agree with that statement.

POTENTIAL JUROR:  If you're smoking crack cocaine, I've seen that people lose their balance of their mind in ways that they normally wouldn't act.  I've witnessed that.

ATTORNEY O'NEILL-GREENBERG:  When you say lose the balance of their mind, do you specifically mean commit violent acts or other kinds of behavior?

POTENTIAL JUROR:  Just do things in general they wouldn't normally do.

ATTORNEY O'NEILL-GREENBERG:  What about committing, specifically committing violent crimes or violent acts?

POTENTIAL JUROR:  Would they -- that I'm not certain of.

ATTORNEY O'NEILL-GREENBERG:  I'm sorry?

POTENTIAL JUROR:  That I'm not certain of if it would make you be violent.  I mean, I think what I've seen is if you do a little bit, maybe not.  But if you're doing it consistently in a way, it might.

ATTORNEY O'NEILL-GREENBERG:  Who else agrees -- well, who agrees with just using hard drugs themselves, without anything else, would make someone more likely to commit violent acts?

Juror No. 13, what do you think?

POTENTIAL JUROR:  I don't necessarily think using drugs would, but it is a mind-altering substance. That's the whole purpose behind taking it.

THE COURT:  I think Seat No. 1 was raising their hand.

ATTORNEY O'NEILL-GREENBERG:  Yes, thank you.

Seat No. 1, what do you think?  You're Juror No. 1 in Seat No. 1.

POTENTIAL JUROR:  I just think that if you're using hard drugs, it's going to cost you money.  And if you need the money, you're going to do whatever you can to get the money to get the drugs, and you're probably not going to be holding down a job.  So it goes hand in hand.

ATTORNEY O'NEILL-GREENBERG:  A good distinction there I think.

POTENTIAL JUROR:  Well, I'm just saying you're going to have to come up with money for the drugs and how are you going to get the money to pay for the drugs?  If you're addicted, then it's an ongoing thing and you're always going to need it and sooner or later you're going to run out money.  You have to find somewhere to get it.

ATTORNEY O'NEILL-GREENBERG:  Right.  So money might be the motivating factor.

POTENTIAL JUROR:  Yeah.  If you want something,

then how else are you going to get it?

ATTORNEY O'NEILL-GREENBERG:  Thank you for that. Juror Number, let's see, Juror Number or Seat No. 6, Juror No. 8, what do you think about that connection between just using hard drugs and committing violent acts, or what do you think?

POTENTIAL JUROR:  I think that alters the person's mind.  Whether they're responsible for the act or not, it escalates their behavior.

ATTORNEY O'NEILL-GREENBERG:  Do you think that just using hard drugs would necessarily make that person more likely to commit violent acts, specifically violent acts?

POTENTIAL JUROR:  It could go either way.  I think that drugs affect people different ways and so some people it may escalate; other people may go to a different behavior.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you. Juror No. 3 in Seat No. 3, you're a nurse.  What do you think about this?

POTENTIAL JUROR:  Okay.  So drugs can alter people's mentality and it can alter their behavior, but there has to be something underlying in the person to cause the drugs to cause them to do the behavior they do or influenced by the drugs.

ATTORNEY O'NEILL-GREENBERG:  And Juror No. 11 in Seat No. 9 -- I think I started with you, didn't I?

POTENTIAL JUROR:  I think so.  No, I asked you to repeat the question.  That's all.

ATTORNEY O'NEILL-GREENBERG:  Juror No. 10 in Seat No. 8, what's your opinion on this?

POTENTIAL JUROR:  Well, my opinion, 15 years ago I was an addict.  I'd tell you, it can take you into different directions.  It doesn't do it to all people. Some people it can make you want more and more, like the other juror was saying in order to get the money to get the high.  Some people, like the other juror was saying, you can do a little and it will do nothing to do it.  It doesn't happen only to drugs.  It can be the alcohol or it can just be someone who just hates.  Period.  It doesn't have to come from the drugs; it doesn't have to come from the alcohol; it could be in general.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you for sharing that.  Thank you, Juror No. 2, and everyone who shared their personal experiences about this.  We appreciate it.

Juror No. 15 in Seat 12, what do you think?

POTENTIAL JUROR:  My thoughts are to start every decision we make in life is going to lead something.  A bad decision going down the path of drugs and alcohol,

there's going to be consequences.  We may be prepared for it and we may not be prepared for.

ATTORNEY O'NEILL-GREENBERG:  So do you think those consequences that you're going to have to be responsible for no matter what, do you think that someone who just uses hard drugs they're going to be -- whether or not we're going to hold them responsible for their action, they're going to be more likely to commit violent crimes or violent behavior?

POTENTIAL JUROR:  There's some correlation but again I think it's one to be varying.  I don't think it's always going to be the extreme.  But I think it goes back to entering into my decision and we may not know what the outcomes are going to be.  It could be extreme; could not be extreme.

ATTORNEY O'NEILL-GREENBERG:  So I think what I hear you saying is it does sort of depend on the person. I mean, they're going to be culpable for action but it depends on who they are, what type of behavior they exhibit; is that right?

POTENTIAL JUROR:  Exactly.

ATTORNEY O'NEILL-GREENBERG:  Speaking of culpability, if you were to be instructed by the court that intoxication, voluntary intoxication, whether it's drugs or alcohol, can actually prevent somebody from

forming the intent that's required to commit a crime so that you could actually factor in someone's intoxication into whether or not they could form the intent to commit the crime, would everyone be able to follow that instruction?  Also, was that a really confusing question?

POTENTIAL JUROR:  A little.

ATTORNEY O'NEILL-GREENBERG:  Okay.  So using the prosecution's example if someone was to get very, very intoxicated and then hit somebody.  If you were instructed that you could take into account that intoxication could prevent someone from -- that person, that type of person forming the intent necessary which would be like I want to hit this person because they're so intoxicated, the intoxication would prevent them from forming that necessary intent to commit the crime, that would be the intent to hit someone, would you be able to take that instruction into account and follow that?  Did that help at all?

POTENTIAL JUROR:  So ignore the intoxication?

ATTORNEY O'NEILL-GREENBERG:  Not ignore the intoxication but factor in the fact that if the court told you this, that intoxication can prevent that person if you find they're intoxicated from forming the intent necessary in their head to commit the crime, that you can take that into account in deciding whether someone was guilty or not

guilty of the crime.  Would everyone be able to follow that instruction?  Hopefully a clearer instruction than I just gave an example.

Juror in Seat No. 7, I saw you sort of shaking your head.  What do you think?

POTENTIAL JUROR:  So if I'm being instructed to believe that the actions of somebody should be negated because they were of not sound mind to -- what was the word?  Intent -- to develop an intent for this?

ATTORNEY O'NEILL-GREENBERG:  Yes.

POTENTIAL JUROR:  I would need to be provided with at least some sort of the evidence to prove that they were -- that is a justifiable thing.

ATTORNEY O'NEILL-GREENBERG:  Yes.  The court will --

POTENTIAL JUROR:  So if there's some documentation saying that somebody is impaired and can't make a judgment of that sort or intent thoroughly, I would need at least some evidence of that.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Yes, you have to consider whether or not that person actually is intoxicated or not, but you would be able to follow the instruction that if you found from the evidence --

POTENTIAL JUROR:  If there's enough evidence to state that that instruction is viable.

ATTORNEY O'NEILL-GREENBERG: Yes. Exactly, then you can follow that instruction?

POTENTIAL JUROR: Yes.

ATTORNEY O'NEILL-GREENBERG: Okay.

POTENTIAL JUROR: If there's some doctor saying, hey, somebody is impaired enough that they can't ever make their own decision at all, that they would need somebody I guess like a healthcare proxy or something to that extent, they would need somebody who can speak for them.

ATTORNEY O'NEILL-GREENBERG: That makes sense. Could other kinds of evidence also do that for you like if you had evidence that someone had been using, I'm just making this up, a massive amount -- drinking a massive amount of alcohol.

POTENTIAL JUROR: Like I said, you would need some sort of expert who can tell me that, yes, drinking that amount makes it so you can't make your own decision.

ATTORNEY O'NEILL-GREENBERG: Okay. And if you didn't have an expert, would there be other kinds of evidence that you think you might be able to use?

POTENTIAL JUROR: Not really. It would just be somebody who is experienced in the field of that would be the only way to --

ATTORNEY O'NEILL-GREENBERG: Okay.

POTENTIAL JUROR: -- inform me.

ATTORNEY O'NEILL-GREENBERG:  Does anyone else disagree with that or agree with that?

Let me jump back to some questions you were asked by the prosecution about presumption of innocence.  When you all came and got your jury summons and came into this courthouse today and sat through the first part of the voir dire with the lawyers and the judge, you were introduced to John, how many folks here heard what he was charged with or looked at him and thought, well, he must have done something wrong to get to where he is right now?  Did anyone have that sort of feeling at any point?  No?

POTENTIAL JUROR:  You asked two questions.  The first question, yes, I've heard of this story.  I'm familiar with it.

ATTORNEY O'NEILL-GREENBERG:  Not did you hear the story, but just by hearing someone is charged with a federal crime and we're impaneling on a federal case for the trial that's about to happen, so in this case Mr. Rathbun must be here because he did something wrong.  Just by the fact that here we are starting a trial, did anyone feel like that?  No?

Juror No. 12, did you feel like that?  Or Juror No. 15?

POTENTIAL JUROR:  No, I did not feel that.

ATTORNEY O'NEILL-GREENBERG:  Juror No. 1 in Seat

1, did you have any feelings like that?

POTENTIAL JUROR:  Well, I did read it in the paper when it happened.  I was telling the judge earlier that my grandson worked there.  He did work there and I was nervous.  I'm saying, well, if something did happen, he could have been killed or burned or trapped and he had nothing to do with it.  He would have been like an innocent victim to something like a hate crime or something.

ATTORNEY O'NEILL-GREENBERG:  Do you think that your personal connection with your grandson having worked there before might make it so you're thinking about that?

POTENTIAL JUROR:  Well, I did talk to him about it and stuff.  He doesn't work there anymore but he did and I said it could happen to anybody.

ATTORNEY O'NEILL-GREENBERG:  You think that's something that's going to be going through your mind while you're hearing the evidence in this case?

POTENTIAL JUROR:  Well, I mean, I did think about it when I heard that this was the case.  I said, well, I usually dropped him -- he used to live at my house.  I used to drop off him and pick him up.  When I heard about that, it did affect me a little bit.  I'm saying the kid's just going to work and just trying to make money.  Luckily nothing happened so, but it made me

think you're never safe anywhere.  You don't know what's going to happen.

ATTORNEY O'NEILL-GREENBERG:  Sure.  Thank you for that.

How am I doing on time?

Who here thinks that if you use drugs or hard drugs and alcohol that you're more likely to lie about your behavior or not be completely truthful about things?

I'll start with Juror No. 10, what do you think?

POTENTIAL JUROR:  I'm Juror 17.

ATTORNEY O'NEILL-GREENBERG:  I'm sorry.  Seat 14, Juror No. 17, tell me what you think.

POTENTIAL JUROR:  What was the question?  I believe it's easy to do.  I mean, your mind is impaired.  You tend to forget details, especially details you don't want to remember or want other people to know about.  It makes it a lot easier to lie.

ATTORNEY O'NEILL-GREENBERG:  Sure.

Juror No. 5 in Seat 4, I think you raised your hand too.  What do you think?

POTENTIAL JUROR:  I think when the grips of addiction grab a hold of somebody, they're capable of anything to get money.  I don't know about the violent act part of it but usually theft.  Usually I think it's more of a theft type thing when the addiction grabs a hold.

ATTORNEY O'NEILL-GREENBERG:  Okay.  And what about when somebody takes steps to act to get sober, do you think that has any bearing on how they can remember events and how it affects their memory and their ability to tell the truth?

Yes, juror in Seat No. 8?

POTENTIAL JUROR:  Sometimes you remember; sometimes you don't want to remember.  That's just it.  Some things you don't.

For instance, one of my cases was I used to work hard all week five, six days a week.  On pay day I'd get paid.  By six, seven o'clock at night I'm ashamed of myself because I don't have anything to show for me working from six to seven days.  So you try -- I tried to forget.  I tried, but forgetting is not helping.  Reality sinks in so you've got to reap what you sow.

ATTORNEY O'NEILL-GREENBERG:  And when you're talking about this, I think you're talking from your own personal experience in the past when you were still sort of in the throes of the addiction; is that right?

POTENTIAL JUROR:  Right.

ATTORNEY O'NEILL-GREENBERG:  Do you also think that when someone then becomes sober, they have a different perspective on their behavior and what actually happened?

POTENTIAL JUROR:  Well, yes.  There is a big difference because back then -- the difference is I wasn't who I wanted to be.  And then now I look back and I'm ashamed of that person, who I was.  You understand what I'm saying?

ATTORNEY O'NEILL-GREENBERG:  Sure.

POTENTIAL JUROR:  It's something that you don't want to face and something that you don't want to live.  It's, like I said, it's hell.

ATTORNEY O'NEILL-GREENBERG:  That makes sense.  Thank you for sharing.

POTENTIAL JUROR:  I hate for where I was, but I'm thankful for where I am because I shouldn't ought to be here.

THE COURT:  We are going to wrap up now.

ATTORNEY O'NEILL-GREENBERG:  I just wanted to clarify for Juror No. 11 in Seat No. 9, do you agree with that?  Do you think there's a change once someone is sober to have a different ability to reflect on themselves on where they are?

POTENTIAL JUROR:  I think when you're doing really hard drugs and I've had friends who are great people that went down that road, the only way to actually redeem yourself is face what you did and own up to what you did wrong.  Whether you can remember it or whether you

can't, you have to.  If you need help, you have to get help.  It's a slippery road.

If you're addicted, that's a terrible thing.  It's really hard.  You're not like that and you're watching your best friends be that way, and you're telling them today that you're making a horrible choice just going down the worse road.  It's great when you finally see them and they actually do that, they got help, and you're by their side every day making sure they're doing good.

But if you can't face that and you take ownership of that life and you continue to live that life, they continue to just steal, borrow money with no intent of ever getting it back, then there is no redemption because you're just that far gone.  You're just going to continue to do that same behavior over and over again.

There are behavioral cycles like that and they're rough.  They're very rough and hard to watch a person continually worsen their life when all you want for that person is to get help, and it's great when they do.  But it's hard when they don't and it's hard to watch, and I've walked away from so many people that got addicted and who couldn't stop.  They're not criminals.  The ones that did get help, they owned up to what they did.  They're able to fix their life.

So it's -- you know, you got to face it.  You got to

own it.  It's your life.  It's not somebody -- nobody else is responsible for you but yourself.  If you do something wrong, it's you.  It's not his fault; not his fault.  It's your fault.  Own it.  You know, what I'm saying?  It's your mistake.  It's your life.  Own your life; own your mistakes.

ATTORNEY O'NEILL-GREENBERG:  Definitely.  Thank you very much for that perspective.

THE COURT:  We're going to wrap up.

Government, the extra time that the defense used will be -- the next round you will be given additional time.

ATTORNEY BRESLOW:  I'm sorry, Your Honor?

THE COURT:  In the next round you will be given additional time to make up for -- the defense went four minutes longer than --

ATTORNEY BRESLOW:  I see.

THE COURT:  -- than 19 minutes and so I'll make that up with the follow up round.

ATTORNEY BRESLOW:  Okay.

ATTORNEY O'NEILL-GREENBERG:  Sorry.

THE COURT:  That's okay.

So WhisperTech.  This next step in the process is the attorneys discussing with me issues with challenges to jurors.  We do that through these devises so you will not be able to hear us our discussions.  All right?

So the court will have some background noise.  I'll be communicating with the lawyers through this, and that's what we'll be doing.

CLERK RIVERA:  I just want the parties to be mindful that you have to -- when you're whispering into WhisperTech, you have to push the button and keep it as close as possible.  Otherwise it will not pick up the whispering.  You can literally whisper and press this and it will -- you can hear me.  Just keep it close to you.

(Sidebar discussion)

THE COURT:  Can the government hear me?  Can the government hear me?

Can the government -- if you can hear me, raise your hand.

ATTORNEY DESROCHES:  Your Honor, I can hear.  Attorney Breslow is having trouble though.

THE COURT:  Can the defense table, all three at the defense table can you all hear me?

ATTORNEY WATKINS:  Yes, I'm able to hear you.

THE COURT:  Yes, Attorney Watkins and Attorney Greenberg.

THE COURT:  Can you hear me?

Government table?  Neil, do you hear me?  To Attorneys Breslow and Desroches, you're good?

Okay.  All right.  Government, I'm asking for the

government to exercise for cause challenge first.

ATTORNEY DESROCHES:  Your Honor, may we have just a few moments to consult?

THE COURT:  Sure.  Sure.  Okay.

All right.  Is the government ready to proceed?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  Is the defense ready to proceed?

ATTORNEY WATKINS:  Yes, we are.

THE COURT:  Okay.  Go ahead, government.

ATTORNEY DESROCHES:  Your Honor, the government would challenge for cause Juror No. 14 in Seat 11.

THE COURT:  I'm just trying to identify.  That is the gentleman in the reddish shirt very close to the clerk's table?

ATTORNEY DESROCHES:  Your Honor, he's in a black shirt right in front of the jury box closest to counsel table.

THE COURT:  Thank you for that.  Okay.  Yes, I got it.  All right.  That is the gentleman who speaks both Portuguese and English, correct?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  Okay.  Defense, did you want to be heard on that?

ATTORNEY WATKINS:  Your Honor, I don't know the basis of the government's cause or challenge.  I assume

it's because of his talk about wanting to know what the sentence was. Of course, the government did not ask and the court instructed him that the sentence was not to be a consideration. The government did not follow up after that. I don't see any reason. He has said he can follow the court's instructions. There's no reason on that basis to excuse him.

THE COURT: Well, actually please correct me if I'm mistaken, but I asked the entire panel if they would be able to follow the instruction that you should not consider the punishment and the entire panel raised their hand that, yes, they would be able to follow except that juror. He did not raise his hand indicating that he could follow it. Am I mistaken about that?

ATTORNEY WATKINS: It was a short period of time. I thought he did, but I was trying to assess the whole panel.

THE COURT: I was looking right at him because of knowing that, I wanted to look at him and my memory is he did not raise his hand indicating he couldn't follow that instruction. Is that the government's recollection?

ATTORNEY DESROCHES: Yes, Your Honor. I think he made in no uncertain terms that he would not be able to follow that instruction. Not only did he not raise his hand, he turned his body away and crossed his arms

indicating that he would not.

THE COURT:  I agree.

ATTORNEY WATKINS:  I defer to everybody else's observations.  I didn't see that.

THE COURT:  I will allow that for cause challenge.

Government?

ATTORNEY DESROCHES:  Your Honor, that is all the government has at this point.

THE COURT:  That's your only for cause challenge?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  All right.  That's the only one you want to exercise.  No going back after the defense goes.

ATTORNEY DESROCHES:  That's correct, Your Honor, yes.

THE COURT:  Okay.  Very good.  Defense?

ATTORNEY O'NEILL-GREENBERG:  We have one, Juror No. 1 in Seat 1 who talked to us in his row and then again when we impaneled about his grandson.

THE COURT:  Can you get it closer to your mouth?  I can barely hear.

ATTORNEY O'NEILL-GREENBERG:  How his grandson worked there.

THE COURT:  I get it.  Okay.  Let's hear what

the government says about that.

ATTORNEY DESROCHES:  Your Honor, I think I heard Juror No. 1 was his grandson worked there.  Your Honor, he never indicated that that would affect his ability to be impartial.  I think it's something that made him aware of what happened, but he never said that it would affect his ability as a juror.

THE COURT:  Okay.  I took away from his responses is his heightened awareness, his sensitively, and the emotional cord that was stricken by the event itself.  He seems like very a rational, thoughtful, nice person, but by body language, demeanor, and tone and how it was obvious that event affected him, I looked at him when he was explaining with his grandson.  I believe the defense has raised a good point.  I will allow the challenge for cause.

   Any others?

ATTORNEY O'NEILL-GREENBERG:  That's all we have.

THE COURT:  Okay.  Very good.

(End of sidebar discussion.)

CLERK RIVERA:  Juror No. 1 in Seat No. 1, please stand up.  And Juror No. 14 in Seat 11, please stand.  You two are excused.  You can walk right out of the courtroom.

THE COURT:  Thank you very much to each of you

for the time you spent today and for your willingness to serve as jurors. Thank you.

Ms. Healy.

CLERK HEALY: Yes, judge.

(Discussion held off the record.)

THE COURT: All right. Everyone is going to stand and Ms. Healy is going to take you to another room. You're going to see a lot of rooms today.

We have another panel who's going to sit through this process. We will keep doing that. So the jurors are going to follow Ms. Healy. We are going to have another panel of jurors come in and go through the possess that you just went through and we will continue to do that until we have our jury.

(The potential jurors left the courtroom.)

THE COURT: So we're going to bring the next panel in and the government has extended time. It will have -- well, no, four extra minutes so 14 minutes because we gave ten.

ATTORNEY BRESLOW: Your Honor, could I just have a few minutes to use the restroom?

THE COURT: Sure. Why doesn't everyone take a few minutes?

Attorney Desroches, the government will have an extra four minutes. So we will say fourteen and ten, although

you've seen how I hold you to it.  I mean, generally some of this has been -- actually it's been very good.  So if you're on a point, I'm not going to stop something in the middle.  But for starters, fourteen and ten.  All right?

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

THE COURT:  I'll step off for a second and be right back.

**(A recess was taken at 3:53 until 357.)**

THE COURT:  Hello, everyone.  The next step in this process is called attorney-conducted voir dire.  So each side in a case, a civil case or a criminal case, each side has the right to participate in the selection of who will serve on a jury to hear their case, who that party thinks can be fair and impartial.

The only way that can happen is if the parties get to know a little bit about each person.  So we started that process already.  You've been through that process today.  You all came into the court separately.  That started the process, and so now here THE attorneys are going to engage you in a conversation.

They're going to start a conversation between all of you and them, or they might ask each individuals questions based upon what they know about you or because they're interested in your answer to a certain type of question.

Now these attorneys have done this before.  No one will try to embarrass you or ask any questions that will make you feel uncomfortable.  If I sense that is happening, I will stop it.  If you ever feel uncomfortable with any questions, just simply raise your hand to me and I'll call you over here to sidebar and we will resolve the issue.

So each side gets a chance to make that presentation to you, and it's through that presentation that we will move on to the next step of the selection of who ultimately will serve on the jury.  All right?  Okay.

ATTORNEY BRESLOW:  So as the judge said, what we're trying to do here is figure out if this is the right fit for you, and it's very important that you be as candid and as truthful as possible.

So at the very beginning I'd like to ask this simple question:  Who here was excited when they got their jury summons?

Okay.  Who here was not excited when they got their jury summons?

All right.  Why not?

POTENTIAL JUROR:  I work for a really small company and we're going to be quite bit behind if I have to be here for a week.

ATTORNEY BRESLOW:  And you?

POTENTIAL JUROR:  I work nights and stay at home with my kids during the day.

ATTORNEY BRESLOW:  And you?

POTENTIAL JUROR:  I just -- it's crazy.  I work in lending and so mortgages are crazy right now.

ATTORNEY BRESLOW:  Who here feels that they can sit in judgment of another person?

POTENTIAL JUROR:  I think that was the most troubling thing about getting the summons was knowing I would have to or could potentially have to judge someone else.  I'm very uncomfortable with that.  I've served on two juries before and that's always the worse part.  I come away with a bad feeling having to judge somebody.

ATTORNEY BRESLOW:  Right.  Well, that's exactly it.  It's not potentially.  That's exactly what you will be having have to do.

POTENTIAL JUROR:  If I'm selected.

ATTORNEY BRESLOW:  Who here -- I asked this question, who here feels comfortable sitting in judgment of somebody and nobody raised their hands.

Let me ask it a different way.  Who here feels that they can at the end of the trial render a fair and impartial verdict based on all the evidence even if that requires a guilty verdict?

The people who feel concerned about sitting in

judgment of another person, can you just raise your hand again? I think that was almost everybody.

Okay. I can't see your juror numbers, but in Seat 6, what was your concern about sitting in judgment of another person?

POTENTIAL JUROR: I guess for me it's like you had said, I'm not too fond of trying to make judgments on somebody else and their actions. It's something that -- I have never sat on a jury before, but it's not something I'm comfortable with.

ATTORNEY BRESLOW: Sir, in Seat 7, what's your concern?

POTENTIAL JUROR: It's hard to judge somebody. Just, you need to know everything and even at that point it's hard to really know a person to actually judge him.

ATTORNEY BRESLOW: Who else raised their hand? It was pretty much everybody. I'll just go down the row. Seat 8, and then we'll get to you. Yes?

POTENTIAL JUROR: I kind of feel the same thing, not trying to judge someone without all the facts and information. It's, you know, it's hard to do without all the facts. So until I hear all that or see all that, then I can really have a hard time with it.

ATTORNEY BRESLOW: So one of the things that the judge will instruct you is not to make any judgment or

deliberate until the end of the trial when you will have at least all the evidence that he's presented.

You, ma'am, what was your concern?

POTENTIAL JUROR:  Just like always worried if it was the right decision.  So I would feel like I'll still be thinking about that after and I will keep questioning myself.

ATTORNEY BRESLOW:  Okay.  So a related question is you may be asked to judge the credibility of many, if not all, of the witnesses who will come and testify before you.  They take the stand.  They swear to tell the truth and you will have the opportunity to see and hear them yourselves.

Who feels that they can make that call as to whether a witness is telling the truth about an important piece of the trial?  Who here feels comfortable making that decision?

Well, let me ask it a different way.  If you're forced to judge the credibility of a witness, meaning whether they're telling you the truth or not, what would you look for?  What kind of things would you look for to help you in that decision?

Juror number -- the person in Seat 9, you, sir?

POTENTIAL JUROR:  I would say if they can repeat the same thing twice; if they tell the truth twice.

ATTORNEY BRESLOW:  I'm sorry, can you say that again?

POTENTIAL JUROR:  If they're able to tell the truth twice because some people can tell the truth only one time and lie the next time.  If they can tell the truth twice, then --

ATTORNEY BRESLOW:  Okay.

POTENTIAL JUROR:  -- that's credibility.

ATTORNEY BRESLOW:  I think I understand that.

What if somebody has not told the truth about some things, subject A or subject B, and then you have to judge whether they're telling the truth about subject C?

POTENTIAL JUROR:  Exactly what I'm saying.  If subject C is kind of hard because they lied once and told the truth once, it will be kind of hard to decide.

ATTORNEY BRESLOW:  Okay.  So who else agrees with this juror in Seat No. 9 if somebody has not stated the truth on other occasions earlier, that it would be hard to believe them the second time around when they're asked another question?

Okay.  So in this case the government is not required to prove motive.  Motive is why somebody commits a crime. Who here feels that they will be able to return a fair verdict even if the government does not prove why they did what they did, so long as the government does prove that

they did what they did?

Yes, can you share your thoughts on that?

POTENTIAL JUROR:  Well, if I understood the question right, it's making your judgment on the facts and the evidence and not necessarily concerning ourselves with why that act, why things happened.

ATTORNEY BRESLOW:  Okay.  So who else feels that so long as the government can prove that a person did what they did and that they had the intent to do what they did, that the reason why if it's not proven or if it's unknowable doesn't matter?

Who feels that they would need the reason why even if the court tells you that it's not an element of the crime?

Yes.  Can you explain?

POTENTIAL JUROR:  I would want to kind of look for that.  I want to know a little bit more behind the actions, the behaviors to why it is somebody might have done what they've done.  Even if all the facts are there, considering that I don't know the person themselves, why they did something helps my decision making.

ATTORNEY BRESLOW:  Right.  So even if after the trial is done and all of the facts that are presented are before you and the answer as to why is still not proven or provided, can you still find your way to finding a guilty verdict if the government has proved everything else,

meaning all the other elements of the crime and the intent to do this thing?

POTENTIAL JUROR:  It would be challenging, but I probably could.

ATTORNEY BRESLOW:  Okay.  I'd like to talk about drugs and alcohol use now.  Who here has been affected personally, either directly by themselves or through a family member or friend or neighbor, by a serious substance abuse problem or alcohol?

Okay.  Who here has not?  I'm just curious.  Who has basically not had a personal experience with substance abuse or alcohol in your family or among their friends?  Okay.

For those of you who answered yes, who here feels that someone who abuses substances like illegal drugs or alcohol is excused from what they do when they're under the influence?

Nobody.

Who here believes that people who engage in substance abuse would commit crimes or acts that are out of character or that would simply not make any sense at all?

Yes, could you explain?

POTENTIAL JUROR:  I feel if you're under the influence of drugs or alcohol, it does alter your mind state and I think you're more likely to do something you

wouldn't normally do.  Absolutely.

ATTORNEY BRESLOW:  And do you agree with that in Seat 3?

POTENTIAL JUROR:  Yes, I do.

ATTORNEY BRESLOW:  Who disagrees with that?  Who feels that that just doesn't make sense?

So everybody generally agrees that if someone is under the influence of a substance, be it a drug or alcohol or some combination thereof, that they might engage in acts that would otherwise just make no sense at all?

So the judge will tell you that there's two types of evidence, direct evidence and evidence that's called circumstantial evidence.  So direct evidence is like when a witness says I saw somebody do it or there's a videotape showing somebody doing the crime.

Circumstantial evidence is when there are just circumstances that surround the crime that people could infer, you have to use your judgment and reason to conclude that the person did the crime.

So I realize this is a little abstract, but is there anybody here who would require an eyewitness or a videotape before concluding that somebody did a crime?

Yes?

POTENTIAL JUROR:  I don't know if I'm

understanding what you're saying.

ATTORNEY BRESLOW:  What is your juror number?

POTENTIAL JUROR:  Twenty-four.

ATTORNEY BRESLOW:  Okay.  Yes, can you explain?

POTENTIAL JUROR:  Like I said, I'm not sure if I understand what you're saying, but I would think that you would need some kind of proof, an eyewitness, something before you could commit somebody with a crime.

ATTORNEY BRESLOW:  Right.  So some kind of proof, but not necessarily direct proof.  So, for example, let's say somebody walked in right now and they came in and they were covered in -- they were dripping wet.  They were just sopping wet shaking off an umbrella.  That is circumstantial evidence from which a reasonable person might infer that it's raining outside even though nobody is looking outside to see that it's raining.

So do you feel that you could use your good judgment and common sense to make that kind of conclusion, or would you require somebody to look outside and see the rain?

POTENTIAL JUROR:  I could make that conclusion because it really doesn't mean too much.  It's only rain.

ATTORNEY BRESLOW:  I see.

POTENTIAL JUROR:  If I have to make a decision for someone's life, if it's altering their life, I would -- I'm not sure.

ATTORNEY BRESLOW:  Okay.

POTENTIAL JUROR:  I would almost think I would need more.

ATTORNEY BRESLOW:  I think I understand what you're saying.  You're saying for a very serious decision, maybe like the one that you might be engaging in here, you're going to want more than just circumstantial evidence?  You're going to want direct, eyewitness, or videotape proof?

POTENTIAL JUROR:  I don't know.

ATTORNEY BRESLOW:  Does anybody else feel that way?

Yes?  Do you want to explain?

POTENTIAL JUROR:  I think the point about the consequence of the decision is important to me.  If it's deciding whether or not it's raining outside, that's a whole different thing than deciding what happens with the rest of somebody's life.  If it's going to affect somebody's life in a meaningful way or a significant way, I think the standard of proof for me would be quite high.

ATTORNEY BRESLOW:  Okay.  And I understand that completely.  Would it change your mind if the judge told you that circumstantial evidence, the evidence of somebody coming in with the wet umbrella soaking wet is exactly the same as direct evidence, looking outside and seeing the

rain?  Would that change your mind, or would you still want that direct evidence before rendering, for example, a guilty verdict here?

POTENTIAL JUROR:  I think I'd still want more evidence.  And the judge saying that inferences are as good as direct evidence, I would have a problem with that.

ATTORNEY BRESLOW:  Okay.

POTENTIAL JUROR:  I don't know how I would accept that.

ATTORNEY BRESLOW:  That's good to hear.  Who else would have a problem with that?  So that's in Seat No. 1.  You're juror number?

POTENTIAL JUROR:  Yes, sir.

ATTORNEY BRESLOW:  Sorry?

POTENTIAL JUROR:  Yes.

ATTORNEY BRESLOW:  You're juror number?

POTENTIAL JUROR:  Twenty-five.

ATTORNEY BRESLOW:  Everybody else though would follow the judge's instruction on this point?

Yes?

POTENTIAL JUROR:  Well, I think I would look for -- I mean, if it's one piece of circumstantial evidence, that's not as good as one piece of direct evidence it seems to me.  So I would be looking maybe for a little more examples of circumstantial evidence.

ATTORNEY BRESLOW:  Okay.  Just one other question, one other subject, maybe a few questions about it.

As you heard from the judge, this case involves the placement of a device that consisted of a Christian religious pamphlet that was put into a fuel canister that had fuel in it and the religious pamphlet was charred or lit on fire and this all took place outside of a Jewish nursing home complex.

Does anybody have any particular religious feelings one way or another about proselytizing for Christianity or Judaism or just religion generally that would interfere with your ability to hear this kind of evidence?

No?  Okay.

Your Honor, one moment?

THE COURT:  Yeah, your timing is perfect, Attorney Breslow.

ATTORNEY BRESLOW:  That's it.

THE COURT:  Perfect.  Okay.

ATTORNEY O'NEILL-GREENBERG:  Hi, everyone.  Good afternoon.  I know it's been a long time morning. I'm Forest O'Neill-Greenberg.  Attorney Tim Watkins and then John Rathbun is our client.

I want to start off having hopefully a discussion about hard drug use, and I want to talk about that because

one of the issues in this case is going to be about John having a substance use disorder.  He has a substance use disorder for heroin and cocaine.

And so, speaking generally, now about people who use hard drugs, one thing that I want to talk to you guys about is whether you think -- because some folks think that using hard drugs makes a person just by the fact that they used the hard drugs makes them more likely to commit a violent crime or violent acts?  And I don't mean dramatic or weird or totally strange behavior, or problems with interpersonal relationships, I mean violent crimes.

So just by a show of hands, who would agree that folks who use hard drugs in and of itself is more -- makes them more likely that they would commit violent crimes just by a show of hands?

Okay.  Thank you.  Juror No. 19 in Seat No. 1, tell me why you agree with that?

POTENTIAL JUROR:  From personal experience -- from seeing people just go a little bit crazy.  High school days, people who've taken -- do things that I never thought they would do.

ATTORNEY O'NEILL-GREENBERG:  Who else agrees with -- thank you for breaking the ice.  Who else agrees with Juror No. 19?

Yes?  The juror is Seat No. 5, so Juror No. 24, can

you tell me what you think?

POTENTIAL JUROR:  I think -- are you comparing that to a person who is not doing alcohol and drugs?  Are they more likely than somebody who is sober, is that what your comparison is?  If that is your comparison, then I would say yes also.  That somebody who is on hard drugs, an alcoholic, if they are absolutely high on that or stoned on that I would say yes.

ATTORNEY O'NEILL-GREENBERG:  Yes?

POTENTIAL JUROR:  That they are more likely to commit a crime than somebody who is sober in my mind, but.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you for that.

POTENTIAL JUROR:  From experience, absolutely.  No my own personal experience but family members.

ATTORNEY O'NEILL-GREENBERG:  And in your experience with those family members, the use of the hard drugs in and of itself made them more likely to commit crimes or more likely to commit violent acts against others?

POTENTIAL JUROR:  I would say crimes, not violent but crimes because many of them do not have the money to support that habit.  So I find or I have found personally, I'm not speaking in a broad, that they do

commit crimes even within their own families to come up with any type of money to feed their habit.  That's how I feel about it.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  Thank you for sharing.  I know that's personal.  Thank you for that.

Do you think it also makes them more like -- sorry, if I'm just sort of honing in on it, but more likely not just commit crimes but specifically violent crimes or is it all one in and of itself the same?

POTENTIAL JUROR:  That's hard.  I can't -- I don't know.  I can't say if someone is going to commit a violent crime because they do -- because they're addicted to any substance.  I don't know that.  I'm answering the more likely than a sober person, that was what I thought the question was.  But I don't know about violent crimes. I don't want to say that.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you. I appreciate that honest answer.

Juror in Seat No. 10, so Juror No. 30, what do you think?

POTENTIAL JUROR:  I don't think everybody commits bad crimes while on drugs or not.  Sometimes they just steal stuff from people and try to sell it to get money for drugs.  So I don't think they do a violent crime

all the time.  It could end up one time becoming a violent crime.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  Thanks for that.

Yes, Juror No. 28?

POTENTIAL JUROR:  You take Ted Bundy and Jeffrey Dahmer, I don't think those guys were on drugs but they did the evil deeds though.  So I don't think you have to have on drugs to do evil deeds.  Those are two examples.

ATTORNEY O'NEILL-GREENBERG:  Yeah.  Yes, two very good examples.  Thank you.

Juror No. 36 in Seat 14, what do you think?  Do you think that just by using hard drugs, it makes a person more likely to commit a violent crime or what do you think?

POTENTIAL JUROR:  I wouldn't say a violent crime, no.

ATTORNEY O'NEILL-GREENBERG:  And Juror No. 12 -- no, Juror No. 32 in Seat 12, do you think there's a connection between using hard drugs and committing a violent crime?

POTENTIAL JUROR:  It depends on the person.  Like different drugs affect different people in different ways.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you

for that.

I think I want to switch over now to another topic and something the prosecution already asked everybody a few questions about. I'm going to ask another question too, and that is when you all came in for jury duty today and you came into the federal courthouse and here we are impaneling on a federal crime case, which obviously is serious. You were introduced to John as the person being charged with these federal crimes.

At that point did any of you think or feel just, well, for him to have gotten to this point in this federal courthouse and being charged with a federal crime, there's lawyers, there's a judge, for him to get here that he must have done something wrong? Did anyone have that feeling? Can I just by show of hands?

Juror No. 33 in Seat 13, tell me what you felt?

POTENTIAL JUROR: Obviously there was enough evidence to get him arrested and to be charged with these crimes. So there had to have been enough evidence to start this process for him to be here right now unfortunately.

ATTORNEY O'NEILL-GREENBERG: And do you think you would then need to hear something from him or have evidence be shown to you from him to sort of show you that he is not guilty?

POTENTIAL JUROR:  Like whatever the evidence is they present, if it's from him, if they can prove it's from him and it's his, then I would agree with their findings.

ATTORNEY O'NEILL-GREENBERG:  Would you also want to hear from him and have him tell you?

POTENTIAL JUROR:  His opinion, yeah, of course.

ATTORNEY O'NEILL-GREENBERG:  Do you think he would need that before you could make a decision?

POTENTIAL JUROR:  No.  Well, I mean, of course, I'd want to hear his side of the story.  But if it can be proven it's all his like items and he put the thing wherever it was placed or wherever, I'd lean more towards guilty I guess is the word just because of all the evidence collected.

ATTORNEY O'NEILL-GREENBERG:  So he would need to show you something to make you change your mind?

POTENTIAL JUROR:  Yes.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Juror in Seat 5, do you agree with that too?

POTENTIAL JUROR:  Yeah, I do.

ATTORNEY O'NEILL-GREENBERG:  That Mr. Rathbun would have to show you some evidence to make you change your mind to find him not guilty?

POTENTIAL JUROR:  That's why we're at a trial

for him to be able to show his evidence so, yes.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  I appreciate that.

Did anyone else raise their hand that I missed with that?  No.  Okay.

All right.  I'm good.  Thank you guys very much.  I really appreciate it.

THE COURT:  All right.  What happens next is I'm going to discuss with the attorneys -- each attorney has a right to challenge certain jurors as part of the selection process.  I'm going to discuss that with each attorney.  We discuss it privately using these headsets so you can't hear us talking.  We will put on some background noise so you will not hear us talking.  That's going to be happening for the next five or so minutes.  All right?

(Sidebar discussion.)

THE COURT:  Each side is ready?  Government, are you ready?  Government, are you ready?

ATTORNEY BRESLOW:  I can't hear you all that well, judge.

THE COURT:  Defense, are you ready?

ATTORNEY O'NEILL-GREENBERG:  Yes, we are ready.

THE COURT:  Okay.  I'm going to have the defense go first with the exercise of challenges.

ATTORNEY O'NEILL-GREENBERG: Okay. We are going to exercise a challenge for cause for Juror No. 24 in Seat 5 and Juror No. 33 in Seat 13. Both of them indicated that they would -- they're starting this case assuming that Mr. Rathbun is guilty to a certain extent. They would need to see evidence come from him to convince them otherwise. I think Juror No. 33 indicated he wants Mr. Rathbun to testify. Both of them clearly --

THE COURT: Let me just interrupt you. One of the jurors, 33, is the gentleman wearing I think it's a red checkered shirt with sunglasses hanging out of his pocket?

ATTORNEY O'NEILL-GREENBERG: Yes.

THE COURT: Okay. And the other juror that you're talking about, Juror No. 24, is the woman in the last row closest to the door on my side of the courtroom wearing a white sweater/sweatshirt type?

ATTORNEY O'NEILL-GREENBERG: Yes.

THE COURT: Okay. All right. I understand your point.

Government?

ATTORNEY BRESLOW: Can you hear me okay?

THE COURT: Yes.

ATTORNEY BRESLOW: We would disagree with respect to the Juror No. 33 who's in Seat 13. I believe

he said --

THE COURT:  Hold on.

ATTORNEY BRESLOW:  We would object to the challenge to Juror No. 33 who's in Seat 13.  I believe there was a miscommunication between defense counsel and this juror initially when she asked would you want something from John and I think he then started talking about evidence that would have been from him or tied him to the particular crime.

He did say, I think words to the effect of, that he would want the defendant's testimony, but I don't believe that he is insisting on a defense case.  I think that could be clarified with follow up by the court.  I just think there was some confusion concerning this colloquy with the defense and the juror about what the law is and whether he could follow it.  I think if Your Honor explains to him what the law is, he would state that he would follow it.

THE COURT:  Is there any objection to Juror No. 24?

ATTORNEY BRESLOW:  No.

THE COURT:  That was a no?

ATTORNEY BRESLOW:  Yes.  No, Your Honor, that's correct.

THE COURT:  Thank you.  Okay.  As to Juror No.

24, Seat 5 the for cause challenge is allowed.

As to Juror No. 33, Seat 13, that challenge is also allowed.  I reviewed this juror's responses to the questions and did take him to be fully understanding that he was saying that he would expect to hear the defense version.

Now this is after the court had included an instruction about that, about the burden of proof, about the presumption of innocence, about the defendant not being required to put on any evidence or to testify.

Juror No. 33 in Seat 13 based upon his employment status, his demeanor, his way of talking, has impressed me as a very intelligent and thoughtful alert person and I just took him to say that he would be looking for -- even if it's slightly under these circumstances -- to hear what the defendant had to say about it and listen to his version.

I'm not satisfied he should be sitting as a juror.  I agree with the defense.  So that challenge will be allowed, and now we will turn to the government's challenges.

ATTORNEY BRESLOW:  Yes, Your Honor.  We are challenging Jurors No. 19, 21, and 25 all for the same reason.  Namely, that they cannot follow the court's instructions.

This came up in the context of the discussion about circumstantial and direct evidence. I believe each of them indicated that even if the court instructed them that circumstantial evidence was equivalent to direct evidence, they would want more in a case that had gravity to it, something other than just whether it was raining out, and each of them indicated that they would want direct proof.

THE COURT: Okay. Let's go through them one at a time. So for Juror No. 19 in Seat 1, that's the seat closest to the television in the last row; is that correct?

ATTORNEY BRESLOW: That's correct.

THE COURT: Okay. Can you -- I'm having trouble recalling his answer exactly. Can you just give me a little more on what he said?

ATTORNEY BRESLOW: I'd like to, judge, but I can't. My sense is that -- my recollection is that all three of these witnesses indicated that they would want something more than circumstantial evidence even if --

THE COURT: Let's talk about Juror No. 21 in Seat 3.

ATTORNEY BRESLOW: I believe 21 specifically said he could not follow that instruction.

THE COURT: I agree with you. He did say that.

As to Juror No. 21 in Seat 3, does the defense have anything to say?

ATTORNEY O'NEILL-GREENBERG:  Sorry.  One second.

Sorry, I was just trying to remember who said what. I think for Number 21 he could make the distinction between circumstantial and direct evidence.  I don't think he was saying that if he got an instruction from the Court explaining how you can and you should view circumstantial evidence, I felt like he was talking more about the quality of the circumstantial evidence than the fact that he wouldn't be able to make a decision on circumstantial evidence.

THE COURT:  Okay.  My memory and observations of another juror who just appears to be very thoughtful, Juror 21 in Seat 3 seemed to me to clearly both verbalize through his words and reactions and tone that he would not accept or could not allow himself to accept that ruling on circumstantial evidence, and that the gravity of convicting someone of a crime would need more.

He just simply impressed me as someone who would not be able to follow that intellectually.  He certainly has intellectual capacity, but he was making the decision that he could not follow that instruction.  I will allow the striking for cause of that juror, number 21 in Seat 3.

Now how about Juror 25 in Seat 6?  That is the juror

who is seated closest to the television but in the second row.

ATTORNEY BRESLOW:  Your Honor, my recollection is that after Juror No. 21 indicated as he did, I asked if anybody else agreed and jurors numbered 19 and 25 raised their hand and said they agreed or indicated they agreed.

THE COURT:  Okay.  Attorney Breslow, I agree at the starting point with your concern with those two jurors, but as opposed to Juror No. 21 which challenge I just allowed, I did not see the firmness and articulation of the position that an instruction would be disregarded or that they could not convict only on circumstantial evidence.  They each seem uncomfortable with that, but not to extent of the juror whose challenge I allowed Juror No. 21.  So I am not going to allow the challenge for cause of 19 or 25.

(End of sidebar discussion.)

CLERK RIVERA:  Will the following jurors please stand up?

Juror No. 21 in Seat Number 3, Juror No. 24 in Seat No. 5, and Juror No. 33 in Seat 13, you three are now excused.

THE COURT:  And to each of you, thank you so much for your time and your commitment and your willingness to serve as jurors.

Ms. Healy.

(Discussion held off the record.)

(Potential jurors entered the courtroom.)

CLERK HEALY:  Juror No. 10 in Seat 7; Juror No. 11 in Seat 8; Juror No. 13 in Seat 9; Juror No. 15 in Seat 10; Juror No. 16 in Seat 11; Juror No. 17 in Seat 12. You're going right here for now.  Grab a seat right there.

I just want to confirm before we go forward.  We have Juror 2 in Seat 1; Juror 3 in Seat 2; Juror 5 in Seat 3.

THE COURT:  Hold on.  I just want to make sure.

CLERK RIVERA:  Start over.

THE COURT:  Why don't we just start over?

CLERK HEALY:  Two; three.

THE COURT:  Wait.  I need juror number and seat number.  Let's start from the beginning.

CLERK HEALY:  Juror No. 2, Seat 1.

THE COURT:  Okay.

CLERK HEALY:  Juror No. 3 in Seat 2.

THE COURT:  Got it.

CLERK HEALY:  Juror No. 5 in Seat 3; Juror 6 in Seat 4.

POTENTIAL JUROR:  Seat 5.

CLERK HEALY:  Juror 9 in Seat 6.

POTENTIAL JUROR:  Juror 10 in 7.

POTENTIAL JUROR:  Juror 11 in 8.

POTENTIAL JUROR:  Juror 13 in 9.

POTENTIAL JUROR:  Juror 15 in Seat 10.

CLERK HEALY:  Juror No. 16 in Seat 11.

POTENTIAL JUROR:  Juror 17 in Seat 12.

THE COURT:  Thank you very much.

(Sidebar discussion.)

THE COURT:  Can the parties hear?

ATTORNEY BRESLOW:  Yes, Judge.

THE COURT:  To the defense table.  Defense?

ATTORNEY WATKINS:  Sorry, Your Honor.  We were still caucusing and are still caucusing.  Did the government make their challenges?

THE COURT:  Let the caucusing continue.

ATTORNEY WATKINS:  Okay.

THE COURT:  All right.  To the parties, the government has six challenges.  The defendant has ten.  We are following the protocol.  Can each side hear me?

All right?  The defense does not have their headphones in.

Just me check if everyone can hear me?  All right. Everyone can hear me; everyone has their headphones in.  I have been talking here to myself.  It's been very lonely getting no response but I guess it's something I'm used to.

Okay.  The government has six challenges; the

defendant has ten.  I am following the protocol as laid out in document 304, the supplemental procedural order on page 3 specifically paragraphs 2 and 3.

First will be the government as the party with the burden challenge first.  You will exercise all the challenge it wishes to exercise on this initial group of twelve.

The defense will go second exercising all of the challenges it wishes to exercise on jurors in the same group.  The set of challenges first by the government and the second by the defense will constitute one round.  Now remember there is no back striking that will be allowed.  All right?

Government.

ATTORNEY DESROCHES:  Your Honor, the government exercises peremptory challenges on Juror No. 2 in Seat 1, XXX XXX, and Juror No. 16 in Seat 11, XXX XXX.

THE COURT:  All right.  I'm sorry to repeat.  Juror No. 2 in Seat 1 and Juror No. 16 in Seat 11?

ATTORNEY DESROCHES:  That's correct, Your Honor.

THE COURT:  All right.  Defense?

ATTORNEY WATKINS:  We will challenge Juror No. 5 in Seat 4.

THE COURT:  Hold on.  I have Juror No. 5 in Seat 3.

ATTORNEY WATKINS:  That's correct.  Juror No. 5 in Seat 3, I'm sorry; Juror No. 8 in Seat 5; Juror No. 9 in Seat 6; Juror No. 15 in Seat 10.  Just one moment. Juror number -- stand by.  Juror No. 11 in Seat 8.

THE COURT:  The defense you have used five.  The defense has challenged Jurors 5, 8, 9, 11, and 15; is that correct?

ATTORNEY WATKINS:  That's correct.

THE COURT:  Okay.

(End of sidebar discussion.)

CLERK RIVERA:  Will the following jurors please stand up?  Juror No. 2 in Seat 1; Juror No. 5 in Seat 3; Juror No. 8 in Seat 5; Juror No. 9 in Seat 6; Juror No. 11 in Seat 8; Juror No. 15 in Seat 10; and Juror No. 16 in Seat 11.  The following jurors are now excused.

THE COURT:  Ladies and gentlemen, thank you so much for your time and for being here all day and your willingness to participate in this system.  Thank you so much.

CLERK HEALY:  The following jurors please step forward.  Juror No. 18, please take Seat 1; Juror No. 19, please take Seat 3; Juror No. 20, please take Seat 5; Juror No. 22, please take Seat 6; Juror No. 25, please take Seat 8; Juror No. 26, please take Seat 10; and Juror No. 27, please take Seat 11.

(Sidebar discussion.)

THE COURT:  All right.  Can everyone hear me?  Yes.  Okay.

This is round two.  The defendant has five remaining; the government has four remaining, and in this round two the defendant goes first.

ATTORNEY WATKINS:  Juror number --

THE COURT:  I can't hear you.

ATTORNEY WATKINS:  Hold on one second.  Juror No. 18 in Seat 1; Juror No. 22 in Seat 6.

THE COURT:  Attorney Watkins, could you hold the microphone closer to your mouth?

ATTORNEY WATKINS:  Yes.  The first challenge was Juror 18 in Seat 1; the second challenge was Juror 22 in Seat 6.  Our last challenge for this round will be Juror No. 27 in Seat 11.

THE COURT:  Okay.  To confirm the defense challenges are Juror 18 in Seat 1; Juror 22 in Seat 6; Juror 27 in Seat 11; is that correct?

ATTORNEY WATKINS:  Yes.

THE COURT:  Okay.  Government?

ATTORNEY DESROCHES:  Your Honor, the government challenges Juror No. 20 in Seat 5, and Juror No. 25 in Seat 8.

THE COURT:  Okay.  The government's challenge is

20 in Seat 5 and 25 in Seat 8; correct?

ATTORNEY DESROCHES:  Correct, Your Honor.

THE COURT:  Okay.

(End of sidebar discussion.)

CLERK RIVERA:  Will the following jurors please stand up?  Juror No. 18 in Seat 1; Juror No. 20 in Seat 5; Juror No. 22 in Seat 6; Juror No. 8 in Seat 25.

THE COURT:  No.

CLERK RIVERA:  Juror No. 25 in Seat 8.

THE COURT:  There you go.

CLERK RIVERA:  And Juror 27 in Seat 11.  All of you are excused.

THE COURT:  Okay.  Again as I've been saying to everyone who's being excused, thank you so much for your time.  Our system of justice does not work without people's willingness to give their time and so thank you very much, everyone.

CLERK HEALY:  Judge, I'm going to seat them just so they can make up the jury.  I'm going to seat the remaining jurors.

Juror No. 28 could take Seat 1; Juror 30, Seat 5; Juror No. 31, Seat 6; Juror 32 in Seat 8; and Juror 35 in Seat 11.  Oh, I'm sorry, Juror 36.

(Sidebar conference.)

THE COURT:  All right.  To the parties, can

everyone hear me?  Yes, I have indication from each party that they hear me.

All right.  Each side, the defense and the government, each have two challenges remaining.  This is now round three and the government goes first.

ATTORNEY DESROCHES:  I'm sorry is the court ready for the government?

THE COURT:  If you're ready, do you need more time?

ATTORNEY DESROCHES:  No.  I think we are ready.

THE COURT:  Good.  The government first.

ATTORNEY DESROCHES:  The government exercises a challenge on Juror No. 32 in Seat 8.

THE COURT:  All right.  Juror No. 32, Seat 8. Is that it?

ATTORNEY DESROCHES:  It is, yes.  Thank you, Your Honor.

THE COURT:  Defense?

ATTORNEY WATKINS:  Just a moment, Your Honor. The defense challenges Juror 36 in Seat 11.

THE COURT:  The defense challenges 36 in Seat 11, correct?

ATTORNEY WATKINS:  That's correct.

(End of sidebar conference.)

CLERK RIVERA:  The following jurors, please

stand up:  Juror No. 32 in Seat 8 and Juror No. 36 in Seat 11, you two are now excused.

THE COURT:  Thank you very much to each of you. You heard me say it but thanks so much for your service.

All right.  Ladies and gentlemen of the jury, we are running out of potential jurors to continue with this process and so we are bringing more jurors in tomorrow to continue the process.

You do not have to be here tomorrow.  The trial starts on Monday at nine o'clock.  You do not have to be here tomorrow.  The clerk's office will be in touch with you if there are any developments or changes in time.

Now I want to instruct you that while you're waiting for this case to start, here are the rules that apply and these rules are going to apply throughout.  You cannot talk to anyone about this case.

You've heard very little.  In fact, nothing really accept my general summation of the case.  But you've been through a process where you've been asked questions by me, questions by the lawyers.  We have talked about certain subjects, topics that may be important in this case.

The most you can tell family and friends or anyone is that you've been selected as a juror in a criminal case and here are the particular charges.

You cannot discuss the process that was used today.

You cannot discuss anything you think about what the evidence might be.  You cannot discuss the case.  You cannot, in other words, when you're talking to a family member or a friend say do you remember whatever might have happened?  Well, I'm on that case.  You can't talk about that.  All right?

You cannot go on the internet and look anything up about this case.  You can't Google anything about this case; go on social media about this case; post anything about this case; invite any type of comments about this case, either electronically, social media, internet, whatever.  You cannot do it.

If you see any coverage about this case, news coverage, articles, TV, radio, turn it off; turn away; disregard it as soon as you realize that it's something that's talking about this case.

Do not try to investigate or learn things about the case yourself.  In other words, don't go try to look up anything that you think might be out there about this case to inform you about it.

Don't go to where you think the scene is of this case and start looking around to try to get a better sense of what this may be about.  Absolutely not.

If you happen to have become friendly and struck up conversations with each other on the jury and you happen

to see each other, who knows, between now and when the case starts, do not talk about this case even amongst yourselves.

You as jurors cannot talk to each other about this case until you start deliberating, until you start deliberating. That is the only time you can start to talk to each other about the case.

All right. So when you go home until this case starts, do not start even in your own mind trying to work this case out. You know nothing about this case so don't trying to start think it through until you start hearing the evidence. Of course, you're going to be thinking about this whole process you've been through. I absolutely expect that, but you cannot start deliberating or thinking about this case until you hear all the evidence and the evidence is closed and you are with your fellow jurors in the deliberate room. That's when deliberation begins.

Deliberation is a collaborative process between you and the other jurors. It is not a personal process where everyone deliberates in their own mind comes up with what they think. No. Deliberation is sharing your thoughts and coming to a collective decision.

So I will ask you every time you come back to court were you able to follow my instructions. And if, for

instance, something happens, you saw a news article and you turned it off quickly or someone said something to you or anything comes up, tell me about it.  We'll talk about the circumstances, what happened.  You know, how far it went and how much you heard; what you said.  We'll talk about it.  Because each time you come into the courtroom, I have to make a finding that the jury remains fair and impartial and was not affected by any type of outside influence.

Ms. Healy, am I correct nine o'clock Monday?

CLERK HEALY:  Yes.

THE COURT:  And you will let them know where they report?

CLERK HEALY:  Yes.

THE COURT:  The jurors are excused.

**(The jury pool left at 5:18.)**

THE COURT:  All right.  So we will see everyone here tomorrow morning to start again.

ATTORNEY BRESLOW:  Your Honor, may I have a housekeeping point?

THE COURT:  Sure.

ATTORNEY BRESLOW:  So my son's high school graduation is Friday, scheduled for this Friday afternoon.  There is a rain date for Monday.  Right now it looks like it will be fine on Friday but there is this possibility

that the graduation will be held on Monday, in which case I would be asking the court that we not sit either entirely on Monday or on the afternoon at the very least.

THE COURT:  What time is the graduation?

ATTORNEY BRESLOW:  It's in the afternoon.  I think three o'clock, Your Honor, two o'clock or three o'clock in the afternoon.  Right now it's scheduled for Friday.

THE COURT:  Okay.  All right.  We'll take it as it comes.  All right.  So see everyone in the morning.

ATTORNEY DESROCHES:  Thank you, Your Honor.

CLERK RIVERA:  All rise.

**(Court recessed at 5:20.)**

---------------------------

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )

           I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)


/s/ Alice Moran                        May 30, 2022
Alice Moran, RMR, RPR
Federal Official Court Reporter