UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America   )
                           )          20cr30018-MGM
     vs                    )
                           )          June 2, 2021
John Michael Rathbun       )
_____)          Day 2


          **REDACTED** JURY SELECTION HELD BEFORE THE

            HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:


On behalf of the government:  Neil L. Desroches, Assistant
United States Attorney, 300 State Street, Suite 230,
Springfield, MA 01105.

Steven H. Breslow, Assistant United States Attorney,
300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq., 51
Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor,
Boston, MA 02210.


                    Alice Moran, CSR, RPR, RMR
                  Official Federal Court Reporter
                    United States Courthouse
                  300 State Street, Room 303D
                    Springfield, MA 01105
                       (413)731-0086
                  alice.moran@verizon.net

INDEX

Witness:                                                          Page:


None


Exhibit No.              Description                    Page


None

**(Court commenced at 9:32.)**

**(The defendant is present.)**

THE CLERK:  Court resumes in the matter of Criminal Case 20-30018, the United States of America versus John Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY DESROCHES:  Good morning, Your Honor. Neil Desroches on behalf of the United States.

ATTORNEY BRESLOW:  Steven Breslow for the United States, and with us at counsel table is our legal assistant Megan McKenna.

THE COURT:  Okay.  Good morning.

ATTORNEY WATKINS:  Good morning, Your Honor. Tim Watkins, Federal Defender Office on behalf of John Rathbun.

ATTORNEY O'NEILL-GREENBERG:  Good morning, Your Honor.  Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning.

THE COURT:  Good morning.  Everyone can be seated.

All right.  Any matters to take care of?  Any issues that anyone wants to bring to my attention?

ATTORNEY WATKINS:  I'll go first, Your Honor. Yesterday during the second round of the jury voir

dire, there was talk about drug abuse as an excuse for the charges at issue and particularly there was an example of a fight that breaks out and how does a juror feel about that.

I'm quite concerned that there was a misleading statement of the law, if not a misstatement of the law. This is a specific -- both charges here are specific intent crimes and so it is quite different from the ordinary fight on the street.  And indeed there can be -- the defendant is not arguing it -- but there can be an issue of specific intent and that is something that is susceptible both to voluntary intoxication and indeed in that sense it could be something that the jury should consider, and it is not as open and shut as the government has anticipated it.

Given that background I think it's better if the government does not go down that.  I'd ask the court to instruct the government not to, and also perhaps when we reconvene on Monday the court can instruct the jurors as it does but forcefully in reference to the jury voir dire that it is the court that gives the instructions and the law and not the attorneys.

THE COURT:  Yes.  I'm happy to include an instruction, and I have an instruction that generally talks about the final instructions being the guiding

instructions that take precedent over other things that were said, especially said by me during a general overview of the case.  So I'm happy to do that.

On the issue of the appropriateness of the government's example, I recall that example.  I think it was perfectly appropriate.  I think it was actually a good use of an example in an attorney-conducted voir dire.  I think it did and brought up an issue exactly like an attorney-conducted voir dire should do.

I don't think that the government suggested that the law in the example they were giving applied to this case.  They were giving I thought a broad example of here's the issue and trying to gauge generally how the jurors would think about these things.

I don't think there was any suggestion that what they were saying would apply to this case.  Certainly there was -- you can infer that thinking about something like that might apply to this case, like all the concepts that were brought up, but it was kind of a raw concept that was thrown out there to be worked through with the jury.  I thought it was appropriately done.

Do you want to say anything?

ATTORNEY DESROCHES:  Just two things, Your Honor.  First, I would also add that it was in response to a question for an example.  It wasn't the government

simply just throwing out examples.

I would also just note on this related issue, the defendant has raised the intent and voluntary intoxication themselves which I would suggest was close to misstating the law and that was directly on a principle of law, more specifically than the government's example.  The government is concerned with getting into a voluntary intoxication scenario.

THE COURT:  Right.  I think both sides came close, but I trust that neither side needs me to tell them, well, don't try to state the law in this case.  I don't think either side did.  I think it's fair to say -- I think I've fairly summed it up.  Each side was giving raw examples of concepts.

You know, for example we came upon that concept of should you consider punishment and I thought one of the sides was going say, well, if the court instructed you and then I instructed them on -- or I told them, well, the court is going to tell you this about punishment.  That one got a little closer.

So I don't think either side did -- I didn't expect that either side was going to step over the line.  I think you both walked up to the line.  No one said, well, this is what you're going to see in this case.  It was just that; it was a broad concept.

I'm absolutely happy whenever you would like me to, I'll think about something to say to them. You know, you heard about examples and some references to the law in the those questions and that the jury should realize that the law will be given at the end of the case. All right?

ATTORNEY DESROCHES: Thank you, Your Honor.

ATTORNEY WATKINS: Your Honor, just housekeeping matters. There are a couple of pending -- well, a motion in limine that I filed -- that we filed in regard to some of the government's proposed new witnesses --

THE COURT: Okay.

ATTORNEY WATKINS: -- that needs resolution probably before, certainly before we get going next week.

THE COURT: Does the look on my face telling you that --

ATTORNEY WATKINS: I'm sure you read it several times at this point.

THE COURT: All right.

ATTORNEY WATKINS: And there are just additional kinds of housekeeping matters that are going to come up that I think are going to be germane.

THE COURT: Well, I think we are going to have some time today so let's get going. For our housekeeping matters, why don't we use the afternoon? There's a good

chance that we will have our jury selection process done by this afternoon and give us some time.

ATTORNEY WATKINS:  I think that's right.

So how many jurors does the court have?  We only have four spots that need to be filled at this point?

THE COURT:  I don't know how many.

THE CLERK:  We have 23.  We called in 30.  We lost five with the health questionnaire and two no shows.

THE COURT: All right.  Attorney Watkins, on that note, to follow up from your question yesterday, all the information you requested informally regarding how many jurors appeared and how many jurors were excused and the health questionnaire, the clerk's office prepared the documentation that you requested, and the clerk's office is happy to turn it over to you.

We have it, but I think we need -- I think there should be some formality to that, which would include a written request but the material is here.  You raised questions about health questionnaire, who called in in the morning, who was let go from the lobby and for what reasons.  You raised an issue about the representation of Holyoke, which I mean it's a random selection from whatever towns end up appearing.

Also, if you want to make a record or try to recreate

a record to have it regarding the racial make up of the jury or any other component that you feel appropriate, you can -- we can do that after the entire jury is selected just to have something on the record.  All right?

ATTORNEY WATKINS:  So if I understand the court right, I should do some kind of filing, draft a filing formally requesting that?

THE COURT:  Right.  So we have a record of what your requests are, but I'm going to allow it.  The documents are here.  I already have -- the clerk's office already produced the documents that you requested yesterday and so I can ask -- and they are going to be available for today as well, but, like anything that we do, I'd rather it be formal so we have a docket history of what was requested and what was turned over.

ATTORNEY WATKINS:  I'll draft and file something hopefully by the end of the day but perhaps tomorrow.

THE COURT:  Sure.  All right.

Anything from the government?

ATTORNEY DESROCHES:  No.  Thank you, Your Honor.

THE COURT:  All right.

ATTORNEY WATKINS:  There was one more thing.

I was having quite a bit of difficulty hearing some of the jurors particularly further away from the box yesterday.  Talking with the clerk today, I know we put an

additional -- there was an additional mic.  There are now two mics there.  If we could encourage the jurors to perhaps pass the mic when they're asked to the extent possible?  I know we have limited but anything we can do to help my poor hearing would be greatly appreciate.

THE COURT:  Understood.  We'll try to do that.

Attorney Watkins, so we can start preparing to deal with it, you said there were outstanding motions in limine.  Could you reference docket numbers for me on the motions in limine --

ATTORNEY WATKINS:  Yes.

THE COURT:  -- that are outstanding?

ATTORNEY WATKINS:  I think it's just one.

THE COURT:  It was a motion in limine regarding what, as you look for a docket number?

ATTORNEY WATKINS:  The new witnesses.  Perhaps I can get it up here.

THE COURT:  Was that Mr. Kosofsky?

ATTORNEY BRESLOW:  You ruled on that, Your Honor.

THE COURT:  I did.  Right.

ATTORNEY BRESLOW:  Yes.

ATTORNEY WATKINS:  You did rule on that, but the government has told me its intention to nevertheless call Rabbi Kosofsky.

THE COURT:  So there was a new motion or a new opposition?  Because I did rule on the motion.

ATTORNEY WATKINS:  Two different issues. There's Rabbi Kosofsky but there were new witnesses as well.

ATTORNEY BRESLOW:  I don't think there's a pending motion concerning Mr. Kosofsky.  We do intend to call him but not to elicit the reaction testimony that Your Honor precluded.

THE COURT:  Okay.

CLERK RIVERA:  I see Docket No. 231.

THE COURT:  Check Docket 231.  Can you find anything, Attorney Watkins?

ATTORNEY WATKINS:  I'm not finding it right away.  I now fear that I got everything that I actually filed.

THE COURT:  All right.  Well, we'll get going. I obviously want to make sure we took care of those.  All right.  We're checking.  There's no -- you sent us into a little bit of trying to look for outstanding warrants -- outstanding motions in limine.

So if there's not one outstanding, you're going to have to file written retraction of telling me that -- causing that look on my face of what?  I missed a motion. We will deal with it later, but when you find the number,

obviously let us know so we can take care of it today. All right.

CLERK RIVERA:  Okay.  I just got confirmation that they can now hear us.

THE COURT:  We are also broadcasting publicly to Zoom generally and a public viewing area within the courthouse.

CLERK RIVERA:  That's correct.

THE COURT:  All right.  Good morning, ladies and gentlemen.  If everyone can hear me, can you please raise your hand so I can see that it's working?  Can you hear me?  Raise your hands.  Good.  Okay.  Thank you very much.

My name is Mark Mastroianni, and I'm the judge who will preside over this session of the United States District Court for the District of Massachusetts.  It's a pleasure to welcome you on behalf of all the members of the court as potential members of the jury.

Let me start off by telling you what kind of a case this is because many of you are probably curious about that.  This is a criminal case.  There is one defendant who is here in the courtroom with his counsel.  He is charged with two federal crimes or counts.  Those of you who are chosen as jurors will be told later what the precise charges are and what the government has to prove beyond a reasonable doubt in its case against the

defendant who is presumed to be innocent.

Now, as I said, this is a criminal case. There is one defendant. His name is John Rathbun. In April of last year, a five-gallon fuel canister that was not completely filled and had a partially burned religious pamphlet in the nozzle of the canister was found on Converse Street in Longmeadow, Massachusetts in the area of the Jewish Geriatric Services Lifecare Center known as JGS.

This case is about that event and the government's allegations that the defendant placed or was involved in the placement of that fuel canister. The defendant denies the allegations. Those of you who are chosen as jurors will be told later about the specific details about that event and laws the government alleges that were broken.

Now what I just told you is a very general review of the facts of this case. I simply put together that generalization to give you some idea of what this case is about.

If you are chosen as jurors as the case unfolds and you hear testimony or evidence that differs at all from that very general review I just gave you, it is the evidence that controls. The evidence controls. What I just said does not control. What I just said, again to stress, is me trying to be overly general with you just to

tell you what kind of case this is.

Now you watched a DVD this morning that explains something of the process we will be going through this morning and what is expected of you if you are selected to serve on the jury.  I won't repeat everything you saw and heard this morning, but I will stress a few things of importance.

In both civil and criminal cases verdicts are rendered by a jury composed of ordinary citizens.  The founders of our nation believed that the right to a jury was so important that they put it in the U.S. Constitution and the Bill of Rights.

Juries have always been composed of ordinary citizens, each of whom brings their own individual perspective and life experience to the table.  What is truly important is that you take your responsibilities seriously and that you exercise your authority to the best of your ability.

The jury is fundamental to our system of justice.  It is both an obligation of citizenship and an honor and privilege to serve on a jury.  If you are selected to serve, I hope that you will exercise your duties responsibly, solemnly, and in accordance with the law.

You should not, however, assume that your service will be burdensome.  Many jurors find that it is an

interesting and rewarding experience.  I'm quite sure most, or at least many of you were not thrilled about getting notice to come as serve as a juror.  But I can tell you that every jury that I have talked to after they have completed their service has found the experience, as I said, to be very rewarding and informative and to have been a worthwhile experience to participate in and see how our system of justice works.

Now many of you are probably nervous about the possible commitment of time that might be required if you are selected and so I will talk about that.

We anticipate that jury selection could take the rest of today, but the trial itself will not begin until Monday, Monday next week.  The lawyers expect that this case will take the full week to try and so that will be next Monday through Friday, and then the jury would have the case for deliberations and deliberations would last as long as the jury needs to deliberate on that case.  So that should give you a little bit of idea of the concepts of time.

Now oftentimes cases in federal court will take multiple weeks or in fact there are cases that take months, but this case the time frame is for Monday through Friday of next week likely at a minimum and then, of course, any other time that the jury would need when

they're considering their deliberations on the case.

Now the court is in session for full days from nine o'clock in the morning until 4:30.  There will be a short mid-morning break at eleven o'clock.  This is during trial and closer to an hour break for lunch between one and two o'clock.  Once the case is given to the jury for deliberations, deliberations are nine to 4:30 every day.

Now, I'll take a moment to address COVID-19 and the health risks posed by it.  Earlier today you watched a video made by our chief judge and a team of medical professionals from Tufts Medical Center.

Now the video was made last fall.  That was last fall, and it described a number of steps the court had taken to ensure that we could proceed with trials in a safe and healthy manner.

As you likely know, in recent weeks federal and state guidance has been updated and some of the measures discussed in the video have been adjusted to bring our court's response in line with the current conditions.

As you know, many of the measures that have been previously used to protect public health during the pandemic are in the process of being phased out as the rate of vaccination has increased and the number of positive COVID tests have decreased.

Most, if not all, the attorneys and court staff

present in the courthouse during this trial are fully vaccinated and I expect that many, perhaps even most of you, are also fully vaccinated.

While the public health threat posed by COVID-19 has decreased, things are not yet back to normal and we are continuing to use many of the modifications to the set up of the courtroom, procedures, and protocols that were put in place during the last year.

We are still requiring that masks be worn in public areas in the courthouse unless there is a physical barrier in place.  While we are no longer requiring 6 feet social distancing, we are continuing to limit the number of people in spaces and increase the spacing between people.

Additionally, the courthouse is equipped with a heating ventilation and air conditioning system which fully exchanges the air in the courtroom and the courthouse regularly.

We will not be asking you about your vaccination status or taking temperatures, but you should not come to court if you are feeling sick or in the previous 14 days have been in close contact with someone who has tested positive for COVID-19 or if you have yourself tested positive for COVID-19.

Now the parties in this case have a right to a jury that is fair and impartial, one that is not biased or

prejudiced one way or the other.  You will hear the words fairly and impartially throughout this jury selection process so it is important that you understand what I mean by that phrase.

To serve fairly and impartially as a juror means to hear the evidence in this case and decide its outcome without bias in favor of or prejudice against either side, any witness, or any material matter.  It means to base any verdict in this case on the evidence presented during the course of trial, as well as the law as I give it to you, and not on anything you may have heard or read or experienced outside of the courtroom.

The lawyers will have an opportunity to challenge a number of perspective jurors.  With some of these challenges, the lawyers do not have to give a reason. With some challenges the court must approve after considering the reasons given by the lawyers.

When the lawyers are both satisfied from each side with the jury or they have run out of challenges, we will have our jury to hear this case.

We are going to impanel 14 jurors, two of those jurors will serve as alternate jurors.  That way if something prevents one or two of the jurors from completing their service, we would not have to start the trial all over again.

During the trial all jurors will attend together.  At the end of the trial when the time has come to deliberate, only 12 jurors will deliberate and vote.

If you are not chosen to sit on this jury, please do not think that it reflects upon you personally or on your ability to be a good juror.  This is absolutely not a scientific process or a merit selection process and so you should not be in the least concerned if for some reason you are not chosen.

Now each of you should have a pen and notebook or the clerk in the room will get you those.  If anyone does not have a notebook and a pen, just raise your hand.

The process will begin with me describing the case. Well, I already have.  I've given you a description of the case so you know something about it.  I will continue with this and introduce the lawyers.  We will see if anyone recognizes or knows any of the lawyers or any of the individuals involved in this case, including Mr. Rathbun.

I will then ask some additional questions regarding issues that could or might prevent someone from being able to serve on this jury.  So each question that I ask will be numbered and in your notebook you should write down any concerns raised by my questions and also note the number of the question for which you have concerns.

So I'll clearly tell you multiple times what number

question this is and you can just put a number on your notepad and write down any notes for yourself.  So please try to make clear which answers relate to which numbered question I am asking.

Your answers must be under oath.  In other words, you must swear that your answers are all truthful.  It is very important that you give truthful responses.  The purpose of these questions and our conversations with you is to determine if you can serve as a fair and impartial juror in this case.

So after we go through that process of asking the questions, each of you will come up to the court individually and we will just review the questions that I asked and what your responses were to any of those questions if they raised issues about your ability to be fair and impartial.

All right.  I will now ask the clerk to swear in the jury pool.

CLERK RIVERA:  Can all jurors please raise your right hand?

(Potential jurors sworn.)

CLERK RIVERA:  Please nod your head yes or no.

THE COURT:  All right.  We are ready to begin the process of coming up into court individually.  No, actually excuse me.  We are going go through the voir dire

questions first.  My apologies.

CLERK RIVERA:  I just want to confirm that all jurors did nod their head yes.

THE COURT:  All right.  So for the record, it has been confirmed both by the clerk and by myself who were looking at the video that the jurors did nod affirmatively to the oath.  It was on video.  It's not a perfect ability to see all the jurors, but I'll ask the jurors when each comes up individually regarding their oath.

So the voir dire questions, this is Question No. 1. Question No. 1 deals with hardship.  Anyone who serves on a jury will, of course, be inconvenienced to some extent. However, jury service in this trial will not last more than, as I described, a week for the evidence and then any time to deliberate.  As I said, this trial will not be multiple weeks or months.

So if you have any serious or extraordinary hardship based upon the time commitment and that would be personal issues, professional issues, childcare issues, scheduled vacation, your business, things like that, serious or extraordinary issues, please put a note for yourself on Question No. 1 and we'll talk about it when you come up to the courtroom.

Question No. 2 is disability.  Do you have any

disability, physical or otherwise, that would make serving as a member of the jury difficult or impossible or might otherwise interfere with your service as a juror?

Question 3:  Do you have any serious health concerns relative to COVID-19 or your susceptibility to infection with COVID-19, any health situation or health condition that makes you sensitive during this time when we're dealing with COVID-19?  You should make a note of it in Question 3 and we can discuss it.

Question No. 4:  Question No. 4 is do you have any difficulty understanding or reading English?

The next question has to do with whether or not you know any of the parties involved.  I'm going to ask you again when you come into court and you have a better opportunity to be closer to the attorneys and Mr. Rathbun to see them, but I'm going to ask the attorneys now to stand up and introduce themselves to see if you recognize the names.

The government first.

ATTORNEY DESROCHES:  Thank you.

Good morning.  My name is Neil Desroches.  I'm an assistant United States attorney here in Springfield, and I, along with my colleagues, represent the United States.

ATTORNEY BRESLOW:  Good morning.  My name is

Steven Breslow and I'm also an assistant United States attorney.

MS. McKENNA:  Good morning.  My name is Megan McKenna.  I'm a legal assistant for the United States.

THE COURT:  Thank you.

For the defense table?

ATTORNEY WATKINS:  Good morning, jurors.  My name is Tim Watkins.  I'm an assistant federal defender here in Springfield. I practice in the Springfield and sometimes Worcester area.  I live in Easthampton, Massachusetts.

ATTORNEY O'NEILL-GREENBERG:  Good morning, everybody.  My name is Forest O'Neill-Greenberg.  I'm also with the Federal Defender's Office in Boston over here for this case, and with me is John Rathbun who Tim and I represent.

THE DEFENDANT:  Good morning.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

THE COURT:  All right.  So thank you.

Ladies and gentlemen, the next question is do you know the defendant or any of the attorneys?  Do you recognize their names, either personally or do you think you have dealt with them professionally, or you might somehow know them?  One of your relatives knows them or anything like that?  As I said, I'll ask you again when

you're in the courtroom and are closer to be able to see everyone. That's Question No. 5 about knowing the attorneys.

Now Question No. 6, Question No. 6 is going to be whether you know, have heard of, whether you think you have any connection at all, through family and friends or relatives or personal connections, business or professional, with any of the possible witnesses.

I'm going to give you a list right now of the witnesses. The list is not extremely long, but in general in cases the witness list is longer than the number of witnesses that are actually called. These are all potential witnesses.

All right. The witnesses are as follows or potential witnesses as follows: Jessee Dabrea from the Longmeadow Police Department; Sheila Rathbun from East Longmeadow, Mass.; Jeffrey Rathbun from East Longmeadow, Mass.; Alicia Hutton from the Federal Defender's Office in Boston; Brooke Gottlibe from the Federal Defender's Office, Boston; Tiffany Thomas, Federal Defender's Office, Boston.

Now these are all from the FBI, all FBI agents: Ryan Burke; Ryan McGonigle; Christopher Rigopoulos; Dustin Wong; Derek Boucher; Patrick Carnahan; Eric Mastroianni. I'll note to you for Eric Mastroianni, I have no relationship that I know of or that this agent knows of.

We may be distantly related somehow.  I only meet him a few years ago but there is no connection.  There is no relationship and you shouldn't consider that in any way at all but I just wanted to point that out to you.

Now there are some individuals who I don't have a -- that are listed where they are from and so I'll just ask either side to kind insert where these individuals are from.  I'll do the best I can from memory of seeing these witnesses' list on names.  The next person is Alfred Alschuler.

ATTORNEY BRESLOW:  Alfred Alschuler, Your Honor, and he works at All Energy Solar in Chicopee.

THE COURT:  Thank you.  Barry Berman.

ATTORNEY BRESLOW:  Barry Berman is affiliated with the Jewish nursing home complex, JGS, Jewish Geriatric Services Lifecare in Longmeadow, but he is from Boston.

THE COURT:  He's from Boston.  Okay.

Kathryn Bowser from the Massachusetts State Police, and then Chris Carr and Chris Carr, Jr.

ATTORNEY BRESLOW:  Both of these people work for Carr Properties, a property management service, and they're in the Springfield area.

THE COURT:  All right.  Pamela Chaplin from the Longmeadow Police Department; Ryan Czepiel, C-z-e-p-i-e-l,

from the Mass. State Police; Alana Darby from the Mass. State Police; John Drugan from the Mass. State Police; Sarah Drake.

ATTORNEY BRESLOW:  She is from the Springfield area.

THE COURT:  Springfield area.  Regina Ellis I believe also from the Springfield area.

ATTORNEY BRESLOW:  Regina Ellis lives in Longmeadow.

THE COURT:  All right.  Susan Goldsmith.

ATTORNEY BRESLOW:  Susan Goldsmith lives in the Springfield Longmeadow area and she's affiliated with the Jewish nursing home complex.

THE COURT:  Dana Graham.

ATTORNEY BRESLOW:  Dana Graham is from the Springfield area.

THE COURT:  Bob Hill.

ATTORNEY BRESLOW:  Robert Hill is an employee with the Billy Graham Evangelical Association which is based in North Carolina.

THE COURT:  Raisa Illina.

ATTORNEY BRESLOW:  She is a resident of the Jewish nursing home complex.

THE COURT:  Kristen Koch, FBI agent; Rochel Kosofsky.  There's another Kosofsky, Chaim Kosofsky.

ATTORNEY BRESLOW:  Yes, that's pronounced exactly right, and they both live in Longmeadow.

THE COURT:  All right.  Thank you.  Nancy Krue, Mass. State Police; Robert Lee.

ATTORNEY BRESLOW:  Robert Lee is a resident of the complex.

THE COURT:  All right.  Megan Little from the Mass. State Police; Daniel Marshall.

ATTORNEY BRESLOW:  Daniel Marshall is an employee of the Scepter company which is in the midwest.

THE COURT:  Gabe Martinez.

ATTORNEY BRESLOW:  Gabe Martinez lives in the Springfield area.

THE COURT:  Michael -- there's a Michael Mazza from the Massachusetts State Police and then Chris Meyerhoff.

ATTORNEY BRESLOW:  Chris Meyerhoff also works for All Energy Solar in Chicopee.

THE COURT:  Glenn Miliken.

ATTORNEY BRESLOW:  Glenn Miliken lives in the Springfield area.

THE COURT:  Chris Murray.

ATTORNEY BRESLOW:  Chris Murray lives in the Springfield area.

THE COURT:  There is an Erica Nadeau from the

Massachusetts State Police; then Kyle Phillips.

ATTORNEY BRESLOW:  Kyle Phillips also works for All Energy Solar in Chicopee.

THE COURT:  All right.  Brianna Randolf from the Massachusetts State Police, and then Natalie Rathbun.

ATTORNEY BRESLOW:  Natalie Rathbun lives in the Springfield and East Longmeadow area.

THE COURT:  All right.  Paul Rathbun.

ATTORNEY BRESLOW:  Paul Rathbun grew up in this area and lived in Boston for awhile.

THE COURT:  All right.  Steven Rhoads.

ATTORNEY BRESLOW:  Steven Rhoads, like Robert Hill, is an employee of the Billy Graham Evangelical Association.

THE COURT:  Curtis Rowe.

ATTORNEY BRESLOW:  Curtis Rowe is the pastor of the Heritage Baptist Church in the Springfield area.

THE COURT:  All right.  Sydney Senior from the Mass. State Police and then Mary Jacobs Sherry.

ATTORNEY BRESLOW:  Mary Sherry works for Carr Properties.

THE COURT:  Sarah Thompson of the Massachusetts State Police and then Horace Williamson.

ATTORNEY BRESLOW:  Horace Williamson lives in the Springfield area.

THE COURT:  All right.  Michael Nothe.

ATTORNEY BRESLOW:  That's Nothe.  He's a firefighter with the Longmeadow Fire Department.

THE COURT:  Thank you.  Also then with the Longmeadow Fire Department is Gary Fontaine.

ATTORNEY BRESLOW:  Actually is the former chief of the Longmeadow Police Department.

THE COURT:  I'm sorry, okay.  Longmeadow Police Department is Gary Fontaine.

There is a Gerry Macsata who is a Longmeadow firefighter, and a Przemyslaw Szura from the Chicopee Police Department.

ATTORNEY BRESLOW:  He's also known as Peter.

THE COURT:  Okay.  Thank you.

And then Pamela Chaplin who I listed again.  I think I already listed her.  She's from the Longmeadow Police Department.

All right.  So those are the potential witnesses.  Make a note and we'll talk about it if you think you recognize any of those names.

All right.  We're moving to Question 7.  Question 7 is have you heard, read, or know anything about this case?  Did you see any news report or media report?  See anything on the internet, social media, anything about this case?

Question 8 is you may be asked -- just so you have a

chance to think about it and write it down, Question 8 is what news sources do you read, listen to, or watch regularly?

Question No. 9 is another thing you might be asked when you come up here or later on in the process. What social media sites or apps do you use regularly? Check regularly or perhaps get your news from? That's Question 9, social media apps that you are interacting with.

Question No. 10: If you are selected to serve as a juror, the court will instruct you to avoid all media coverage, including social media relating to this case, and tell you that you are not to do your own internet research about this case.

You would be forbidded from reading news articles about the case; from Googling the case; blogging; tweeting about the case or posting any comments; interacting in any way on social media about this case. You would not be allowed to do it.

Do you have any reservations or concerns about your willingness or ability to follow this instruction? So that's Question 10. Can you follow that instruction to stay away from any media or internet issues with the case?

Question No. 11: Do you have any feelings about the criminal justice system that might interfere with or affect your ability to serve as a fair and impartial juror

in this case?  That's Question 11.

Question 12 is feelings about the government.  Do you have any feelings or beliefs about the government, whether positive or negative, that might interfere with or affect your ability to serve as a fair and impartial juror in this case?

Question 13 now is prior jury service.  Question 13: If you have previously served as a juror in a criminal, civil, state or federal case, or as a member of the grand jury in the state or federal court, is there anything about that prior service that would affect your ability to serve as a fair and impartial juror in this case?

Moving on to Question 14.  Question 14 starts with the principle that the indictment is simply a charge against the defendant.  The fact that a defendant has been charged with a crime is not evidence that he is guilty of that crime.

A defendant is presumed to be innocent and the government has the burden of proving a defendant's guilt beyond a reasonable doubt.  The law never imposes on a defendant any duty to call any witness or produce any evidence.  The burden of proof is always on the government.  That is the principle that I want you to understand.

The question now, Question 14, is there anyone who

does not accept this basic principle regarding the presumption of innocence and the government's burden of proof?  Is there anyone who does not accept this principle?  That's Question 14.

Moving to Question 15.  The basic principle is that a defendant has a constitutional right not to testify in his case, and no inference of guilt or anything else may be drawn from the fact that a defendant does not testify. For you to draw such an inference would be wrong.  Indeed, it would be a violation of your oath as a juror.  So that is the basic principle.

Question No. 15 is, is there anyone who does not accept this basic constitutional principle regarding a defendant's right not to testify and would hold it against the defendant if he did not testify?

Now Question 16.  On Question 16 the principle is that you must decide this case solely on the evidence presented in this courtroom.

As part of this requirement if you are chosen as a juror, you must avoid any media coverage related to this case whether in print, on the radio, on television, or the internet.  Is anyone who does not accept that principle and would decide the case based on something other than the evidence presented in the case in this courtroom?

Moving to 17.  Question 17:  As a juror you must

follow the law as I provide it to you in deciding this case. You must put aside any notions about what you thought the law requires or what you think the law should require, and you should follow only my instructions to you about the law.

The question is, are you willing or unable to apply the law as I, the court, will give it to you? That's Question No. 17.

Moving to Question 18. Do you have any personal beliefs that might interfere with or affect your ability to serve as a fair and impartial juror in this case and render a fair verdict? That is 18.

Question 19, I'll give you a moment.

Moving to Question 19: Have you or any member of your immediate family or anyone you are close with been a victim of a crime? Been accused of or charged with a crime or otherwise had any contact with the criminal justice system? If so, do you feel that you, your family member, or close friend was treated fairly by the criminal justice system? So that's Question 19. Just write a note regarding any involvement you've had and then you may be asked to discuss it further.

Number 20 now. Number 20 is feelings about law enforcement. Number 20: Do you have any feelings or beliefs about law enforcement officials, whether positive

or negative, that might cause you to believe or disbelieve a person just because the person is a law enforcement official?

Moving to Question 21.  Number 21 is do you have strong feelings, positive or negative, about the FBI?

Question 22 is have you, a family member, or a close friend ever had any legal dispute with the federal government or any agency of the government including the FBI?

Question 23 is have you, a family member, or a close friend ever had any legal dispute with any law enforcement agency, including local law enforcement agencies?  That's Question 23 involvement with local law enforcement agencies.

Question 24:  Have you or anyone close to you ever had any education, training, or experience in the law, legal field, or criminal justice system?

Now to Question 25.  Have you or anyone close to you ever had any education, training, or experience in hazardous materials, firefighting, or explosives?  That is Question 25, any experience with those?

Question 26:  Have you had any experience with or had any understanding of expert evidence or expert testimony in any particular field?

Now Question 27.  Question 27 is have you or anyone

close to you ever had any education, training, or experience in forensic science including, but not limited to, DNA testing and analysis?  That's 27, experience with forensic testing or DNA.

Question 28:  Have you, a family member, or a close friend ever suffered from a drug addiction?  That's 28 regarding a drug addiction.

Question 29:  Have you, a family member, or close friend ever been arrested for the possession or distribution of illegal drugs?  That's 29.  Twenty-nine is arrested for possession or distribution of illegal drugs.

Question 30 is do you have strong feelings about criminal laws that make the possession of narcotics illegal?  That's Question 30.

Question 31 is do you or anyone close to you have any connection with the Jewish Geriatric Services Lifecare Facility in Longmeadow, Mass.?

Moving to Question 32.  Question 32 is do you have strong feelings about religion or about people who are religious?

Question 33 is do you have strong feelings about the Jewish faith or people who are Jewish?  Also do you have strong feelings about the Christian faith or people who are Christian?  That is 33.

Question 34 is do you have strong -- do you have

strong feelings about people who proselytize?  That is, people who hand out literature regarding a certain religion and attempt to educate or speak with you about you participating in a certain religion?  Do you have strong feelings about people who do that?  That's Question 34.

All right.  That concludes the questions.  Now what happens next, as I told you, each of you will be brought up individually to the courtroom to talk a little bit about your answers.  And then there's another step in the process as well where multiple people will then be brought into the courtroom and actually take seats in our jury box and will be addressed by each of the lawyers representing each side in this case who will discuss with you certain concepts, some of which I have mentioned to bring to your attention and others that I haven't mentioned.  They will engage you in a conversation and ask some questions of you to move this process along.

All right.  So we are going to begin with the individual process.  So we can begin with individually bringing people upstairs.

ATTORNEY BRESLOW:  Your Honor, may we take a moment before the jurors come?

THE COURT:  Absolutely.

Now, ladies and gentlemen, as individuals are brought

up into court, the rest of the people who remain in the room cannot talk about this case.  Do not talk about anything that I just told you.  Don't talk about the general description of the case or about any of the legal concepts that I have talked to you about.

You can talk about anything you want except anything that has or could have anything to do with this case.  You cannot discuss anything about the case.

ATTORNEY WATKINS:  Are we still broadcasting to the jury?

CLERK RIVERA:  No.

ATTORNEY WATKINS:  In regard to the individual voir dire, the jurors coming up today, I would request that the court ask Questions 7, 8, and 9 and it doesn't necessarily have to be one of each, these are have you heard, read, or know anything about this case.

As the court recalls from yesterday, it came up with some regularity and I think it probably will be better to get that out early, the same for the news.  It doesn't have to be in dept into by the court, but I think it probably should be a question that gets asked to every juror.

THE COURT:  Any problem with that, Attorney Desroches?

ATTORNEY DESROCHES:  No.  Thank you, Your

Honor.

ATTORNEY WATKINS:  One more thing.  I did not file that motion until about ten minutes ago, that motion in limine and now it should be docketed.  I double checked and apologize for that.

THE COURT:  All right.  Absolutely.  So the first break or first chance I have to take a look at it, I will.

ATTORNEY WATKINS:  I just wanted to make the government aware.  If I can print something out, I will give it to them.

CLERK RIVERA:  I got it.

ATTORNEY WATKINS:  Thank you.  That's all I have.

THE COURT:  All right.

(A potential juror entered the courtroom.)

CLERK HEALY:  This is Juror No. 37, XXX XXX. Ms. XXX, just approach the clerk on the left-hand side of the bench.

THE COURT:  Good morning, Ms. XXX.  Thank you for being here.

POTENTIAL JUROR:  Thanks.

THE COURT:  All right.  Ms. XXX, the first question is did you take your oath as a juror when you were just downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  Okay.  The next question I asked you was if you knew any of the parties but, of course, it was video so I will ask you to take a look around the courtroom.  The prosecution table is directly in front of you.  The defense table is over to your left, and Mr. Rathbun is seated at the very end.  Do you recognize any of the individuals?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  Have you heard anything about this case on the media, news, anywhere?

POTENTIAL JUROR:  I have not.

THE COURT:  You have not.

And generally what sources do you get your news from?

POTENTIAL JUROR:  I watch news on cable TV, MSNBC, CNN.  I sometimes get news from social media, instagram.

THE COURT:  How about local news?

POTENTIAL JUROR:  I don't usually watch local news.

THE COURT:  All right.  Now I asked you a series of questions.  To begin with, Questions 1 through 17.  Did you respond to any of those questions in a way that we need to talk further about?  That is regarding hardship, disability, knowing any witnesses?

POTENTIAL JUROR:  No, sir.

THE COURT:  All right.  Now, from Questions 18 through the end, 18 to 34, did you respond to any of those questions with any answers that we should talk further about?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Very well.  Thank you. You can just wait right outside that door.

POTENTIAL JUROR:  Okay.

(The potential juror left the courtroom.)

THE COURT:  Any challenges for cause?

ATTORNEY DESROCHES:  Not from the government, Your Honor. Thank you.

ATTORNEY O'NEILL-GREENBERG:  None.

THE COURT:  All right.  The court sees no issue. The juror can remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 38, XXX XXX XXX.  Mr. XXX XXX, if you would go over to the microphone on the left-hand side of the clerk's bench.

THE COURT:  Hello, sir.  Good morning.

POTENTIAL JUROR:  Good morning.

THE COURT:  Sir, the first question is did you take your oath as a juror downstairs on the video?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  And you were asked if you recognized any of the parties but, of course, you couldn't see them well and so I'll ask you to look around. Directly in front of you is the prosecution table.  To your left is the defense table and Mr. Rathbun is seated at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Have you heard about this case anywhere, seen stories on news, read anything on social media or an app or the internet?  Anything about this case?

POTENTIAL JUROR:  No actually.

THE COURT:  All right.  And what is your source of getting news, both nationally and local news?

POTENTIAL JUROR:  Admittedly I don't watch as much news as I probably should, but I get it generally from Channel 22 and Channel 40's websites for local stuff and like Google news for, you know, worldwide and other stuff.

THE COURT:  That includes all the social media type apps that you would use.

POTENTIAL JUROR:  Yes, I avoid the -- the only real social media app I go on is RedIt.  I don't really go to the news stuff.  It's mostly for hobby stuff.

THE COURT:  All right.  Now, from the questions

that I asked you, to begin with Questions 1 through 17 that talked about hardship and disability and health issues, those questions, were there any answers that we need to follow up on that we need to discuss?

POTENTIAL JUROR:  Nothing on one through 17, no.

THE COURT:  All right.  Questions 18 through 34, those questions that raised some basic principles regarding law and some other issues, any answers to those questions.

POTENTIAL JUROR:  Number 19, my father had some dealings with law enforcement.  He violated a restraining order.

THE COURT:  How long ago was that?

POTENTIAL JUROR:  Oh, goodness.  This would have been like around 1990.

THE COURT:  Okay.  Was it a local police department?

POTENTIAL JUROR:  Yes.

THE COURT:  What town?

POTENTIAL JUROR:  Agawam.

THE COURT:  All right.  The Agawam Police Department.  Did that incident cause you to become involved with and exposed to the criminal justice or court system?

POTENTIAL JUROR:  No, not really.  It was done

way outside of anything.  I was just a kid at that point.

THE COURT:  All right.  Did that experience leave you with any feelings, either positive or negative, towards law enforcement, number one, or the criminal justice system?

POTENTIAL JUROR:  Not particularly.  There wasn't -- I guess he was at that point in time in my life my father was kind of out of everything at that point and so it was more just an awareness that he was.

THE COURT:  All right.  Any other answers to those questions?

POTENTIAL JUROR:  Sorry, what number were we up to total?

THE COURT:  I asked for 18 through 34.

POTENTIAL JUROR:  Yes.  Twenty-five was related to hazardous materials.  I used to be a tractor-trailer operator and I did have some training on hazardous materials as part of my endorsement for that.

THE COURT:  Any other issues?

POTENTIAL JUROR:  A friend who had a drug addiction problem at one point.

THE COURT:  All right.  Okay.  You may be asked further questions by the attorneys to follow up on those things at a later time.  Thank you.  You can wait outside the door.

(The potential juror left the courtroom.)

THE COURT:  Any challenges?

ATTORNEY DESROCHES:  Not from the government. Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  None from the defense.

THE COURT:  All right.  The court sees no issue. This juror may remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 39, XXX XXX.  Mr. XXX, if you would walk up to the microphone on the left-hand side of the clerk's bench.

THE COURT:  Hi, Mr. XXX.  Thanks for being here.

POTENTIAL JUROR:  Good morning.

THE COURT:  Mr. XXX, did you take your oath as a juror downstairs over the video?

POTENTIAL JUROR:  I did, sir.

THE COURT:  All right.  I asked if you knew anybody but you couldn't really see them on the video. Take a look around the courtroom.  In front of you is the prosecution table.  To your left is the defense table with Mr. Rathbun seated at the end.  So the question is if you not know the names but do you recognize anyone?

POTENTIAL JUROR:  I do not recognize anyone,

sir.

THE COURT:  Okay.  Have you heard anything about this case?  Read anything about it?  Seen any news stories about it on the internet, social media, or heard anything at all about the case?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And what are your sources of news generally, both national and local news?

POTENTIAL JUROR:  Just, you know, whatever I pick up on my phone that I might read.  I generally don't -- maybe MSNBC on TV or something, but not really follow too much.

THE COURT:  Do you have any social media sites where you get your news or apps?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  And my questions, starting with Questions 1 through 17 the questions that I asked about hardship, disability, if you know anyone, questions like that, did you answer any those questions that we need to talk about?

POTENTIAL JUROR:  I had no problem with any of those, sir.

THE COURT:  Now when we got to Questions 18 through 34, some of the questions that included basic principles of law and other issues.  Did you make notes?

POTENTIAL JUROR:  Yes, 22 and 29, sir.

THE COURT:  All right.  Twenty-two is about law enforcement.  Could you just very briefly tell me what that is about?

POTENTIAL JUROR:  I had a little trouble in my past and I had trouble with some police officers, so.

THE COURT:  Okay.  How long ago was that?

POTENTIAL JUROR:  Quite a few, 30 plus years.

THE COURT:  Thirty plus years.  Okay.  So I don't want to ask too many private questions, but 30 years ago, first of all, what police department and what was the issue?

POTENTIAL JUROR:  Pittsfield, Massachusetts.  It was a simple drug possession.

THE COURT:  All right.  Of what drug?

POTENTIAL JUROR:  Cocaine.

THE COURT:  Okay.  And were you prosecuted?

POTENTIAL JUROR:  Yes.

THE COURT:  And were you found guilty?  Was there any penalty associated?

POTENTIAL JUROR:  A fine.

THE COURT:  You paid a fine?

POTENTIAL JUROR:  It was a tiny amount.

THE COURT:  Was that the only issue?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  And from that issue, did you feel -- did you develop any feelings, positive or negative, about law enforcement or the court system?

POTENTIAL JUROR:  Negative feelings about the police department.

THE COURT:  Okay.  Negative feelings about that local Pittsfield Police Department or about law enforcement?

POTENTIAL JUROR:  Well, that's the only time I've been in trouble so that's the only one I know. That's when I had a problem with them.

THE COURT:  Do you think that problem or the feelings you have about the police department regarding that older incident would affect your ability to be fair and impartial in this case?

POTENTIAL JUROR:  Yes, I do, sir.

THE COURT:  You think it would?

POTENTIAL JUROR:  Yes.

THE COURT:  Because of that experience you don't think you would be able to fairly listen to testimony of police officers?  You think you would judge them negatively?

POTENTIAL JUROR:  I do.

THE COURT:  All right.  What other response did you have?

POTENTIAL JUROR:  It was 29.  That I told you, the drug possession.

THE COURT:  All right.  So you told me about both of them.  Any others?

POTENTIAL JUROR:  No, sir.

THE COURT:  Okay.  Very good.  Thank you.  You can wait outside the door.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  Yes, Your Honor.  The government would challenge for cause based on the potential juror's response regarding his ability to be impartial when it comes police officers.  He said he would not be impartial.

THE COURT:  Okay.

ATTORNEY O'NEILL-GREENBERG:  We don't have any objection to that.

THE COURT:  All right.  For that reason I think that's a valid challenge for cause.  The juror is excused.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 40, XXX XXX.  Ms. XXX, can you go up to the microphone on the left-hand side of the clerk's desk?  Thank you.

THE COURT:  Ma'am, thanks for being here.

POTENTIAL JUROR:  Sure.

THE COURT:  Ma'am, the first question is did you take your oath as a juror when you were downstairs on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  All right.  I asked you if you knew any of the parties involved but you couldn't see them.  So if you can look, the prosecution is at the table in front of you, if you recognize anyone?  And the defense table is over to the left and Mr. Rathbun is seated at the end.  Do you recognize anyone?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  Have you heard about this case?  Do you know anything about this case?  Have you heard about it through the news, TV, social media apps, anything like that?

POTENTIAL JUROR:  No.

THE COURT:  Where do you generally get your news, national and local?

POTENTIAL JUROR:  I generally do local news.

THE COURT:  Local news, so local TV stations?

POTENTIAL JUROR:  I don't watch much TV, the newspaper.

THE COURT:  All right.  Do you get any news from social media or apps that you have that include news feed?

POTENTIAL JUROR:  Like News Break.  I don't do a lot of news.

THE COURT:  Do you have social media apps?

POTENTIAL JUROR:  Facebook.

THE COURT:  All right.  Do you get any news off Facebook?

POTENTIAL JUROR:  No.

THE COURT:  So Questions 1 through 17 talked about hardship and disability and if you know any witnesses and some other things.  Did you answer any of questions one through 17 in any way that we need to talk about?

POTENTIAL JUROR:  No.

THE COURT:  How about the rest of the questions, 18 through 34 that talked about some basic principles of law and other concepts?  Did you answer any of those questions in anyway that we should talk about or you want to inform the court?

POTENTIAL JUROR:  I'm trying to remember the questions.

THE COURT:  You can pull your notes out and we can go through it if you have a reference in your notes?

POTENTIAL JUROR:  It's just that my sister is a police officer in Fishkill.

THE COURT:  I'm sorry, where?

POTENTIAL JUROR:  In East Fishkill, New York, but no to most of the other questions there.

THE COURT:  So a police officer.  Any other questions that you had a response to?

POTENTIAL JUROR:  No.  No affiliations; no strong religious.

THE COURT:  So your sister is a police officer and so the question is, does the fact that your sister is a police officer might that affect your ability for you to be fair and impartial in this case?

POTENTIAL JUROR:  I don't believe so.

THE COURT:  All right.  Okay.  Thank you.  Could you wait outside those doors?

POTENTIAL JUROR:  Sure.

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  No challenge for the government.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  All right.  I agree no issue was raised.  The juror can remain.

ATTORNEY WATKINS:  Your Honor, with regard to this next juror, he's indicated retired.  Perhaps we can just inquire what he did.

THE COURT:  All Right.

ATTORNEY BRESLOW:  There are a number of jurors like that, Your Honor.

THE COURT:  Okay.  Try to remind me.

ATTORNEY BRESLOW:  We will.

(A potential juror entered the courtroom.)

CLERK HEALY:  Juror No. 41, XXX XXX.  Mr. XXX, if you would go up to the microphone on the left-hand side on the clerk's bench.

THE COURT:  All right.  Good morning, Mr. XXX.

POTENTIAL JUROR:  Good morning.

THE COURT:  Mr. XXX, did you take your oath as a juror over the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  Okay.  I asked you if you knew any of the parties involved but you couldn't really see them well.  So we are here in court and that is the prosecution table.  To your left is the defense, and Mr. Rathbun is seated at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Have you heard anything about this case either on the news or social media or the internet, newspaper, or anywhere like that?

POTENTIAL JUROR:  No.

THE COURT:  And where do you generally get your news, local and national news?

POTENTIAL JUROR:  National.

THE COURT:  All right.  Do you watch any local news?

POTENTIAL JUROR:  No.

THE COURT:  Do you have any social media apps, things like Facebook that you use?

POTENTIAL JUROR:  That's it.

THE COURT:  Facebook?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  And you indicated that you were retired.  What was your profession?

POTENTIAL JUROR:  Engineer for Local 98, a heavy equipment operator.

THE COURT:  The questions I asked you to begin with, Questions 1 through 17, you can look at your notes, where there any responses to Questions 1 through 17 --

POTENTIAL JUROR:  No.

THE COURT:  -- to talk about?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Now Questions 18 through 34 talked about principles of law and other concepts.  Were there any responses that you put down that would indicate we need to talk further?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  You can wait outside those

doors.

(The potential juror left the courtroom.)

THE COURT:  All right.  For Mr. XXX?

ATTORNEY DESROCHES:  No challenge from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  I agree.  The juror can remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 42, XXX XXX.  Ms. XXX, please go up to the microphone on the left-hand side of the clerk's bench. Thank you.

THE COURT:  Okay. Good morning.

POTENTIAL JUROR:  Good morning.

THE COURT:  Did you take your oath as a juror over the video?

POTENTIAL JUROR:  I did.

THE COURT:  And I asked you if you knew anyone but you really couldn't see them probably.  So that's the prosecution table in front of you.  To the left is the defense table with Mr. Rathbun at the end.  Do you recognize anyone?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  Have you heard anything about this case based upon the brief summary I gave you in the news, newspaper, TV, anything like that?

POTENTIAL JUROR:  Nothing rings a bell.

THE COURT:  Okay.  And where do you get your news generally, local and national?

POTENTIAL JUROR:  A little bit of TV and a little bit of the internet.  I listen to the radio.

THE COURT:  Okay.  Do you have any social media apps or sites that you get news from, things look Facebook or anything like that?

POTENTIAL JUROR:  No.  No.

THE COURT:  On the questions, Questions 1 through 17 that talked about hardship and disability and those types of questions, any answers that we need to talk about further?

POTENTIAL JUROR:  So I do have a scheduled vacation for June 17th for Florida.

THE COURT:  Okay.

POTENTIAL JUROR:  Which is a couple of weeks down the road.  It's a Thursday.

THE COURT:  Right.

POTENTIAL JUROR:  But one through 17 --

THE COURT:  So you're leaving not Thursday of next week, Thursday the week after?

POTENTIAL JUROR:  Correct.

THE COURT:  Okay.

POTENTIAL JUROR:  Through 17 I didn't really

have any others.

THE COURT:  How about 18 through 34 that talked about concepts and principles of law?

POTENTIAL JUROR:  The only thing that I jotted down was 24 I did used to work for criminal defense attorneys in Springfield.  It was an awful long time ago.  About 30 years ago.  Michael Jennings and Bill O'Grady, but I haven't had contact with them since.

THE COURT:  Okay.

POTENTIAL JUROR:  That was really my only association.

THE COURT:  All right.  How long did you work for them?

POTENTIAL JUROR:  I would say about five or six years right here on State Street.

THE COURT:  Did you do any trial work with them, trial preparation on any criminal cases, research, and things like that?

POTENTIAL JUROR:  No.  They both were criminal attorneys, but I didn't appear in the court with them or do anything like that.  Mostly civil stuff.

THE COURT:  I was going to ask you if you remember if you dealt with any cases that sounded similar?

POTENTIAL JUROR:  No.

THE COURT:  Did you ever go to court with them?

POTENTIAL JUROR: No.

THE COURT: Okay. Very good. Can you wait outside the door? I'm just wondering and I'm going to talk to the parties, but I think that vacation is a little too close for comfort.

Is it too close for your comfort? I don't want you -- it's probably going to be okay although I just don't want there to be any sense that you might be rushed or feel rushed. All right. Can you wait outside the door?

(The potential juror left the courtroom.)

THE COURT: Government?

ATTORNEY DESROCHES: There's no challenge, Your Honor. Just to address the scheduling issue, I'm fairly confident the jury will have returned a verdict by Thursday but I've been wrong before. I think it would early that week would be the most likely scenario.

THE COURT: I do tend to agree with your assessment.

ATTORNEY O'NEILL-GREENBERG: I think we feel the same. The only concern would be that we would spill into maybe deliberations on that Thursday. I don't think so but who knows? I know that we have a lot of it looks like jurors coming and so I don't know if we would need to take the risk of her.

THE COURT: I can't imagine it's going to go

there.  So all right.  No challenges.  I agree.  No other challenges so the juror can remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 43, XXX XXX.  Mr. XXX, if you would go up to the microphone on the left-hand side of the clerk's bench?  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Mr. XXX, did you take your oath as a juror on the video?

POTENTIAL JUROR:  Yes.

THE COURT:  I'm going to ask you to look at the production table in front of you.  The defense table is over to the left and Mr. Rathbun is seated there at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  You didn't recognize anyone's names when they introduced themselves?

POTENTIAL JUROR:  No, but I think it's Michael Nothe from the fire department there.  I worked in pretty close conjunction with some of the fire departments locally, Longmeadow fire department.

THE COURT:  That's in your job?  You're a paramedic?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  What towns do you work in regularly?

POTENTIAL JUROR:  I did five years in Northampton.  Right now I work as a medic in Springfield, National Ambulance.

THE COURT:  I see.  So out of the list, he might be one that you know?

POTENTIAL JUROR:  It may be, yeah.  The name sounded familiar and so I just figured I'd put it out there.

THE COURT:  Absolutely.  Let's put -- let me ask you this.  If you recognize him or other officers testified and you didn't know their names but you recognized that you interacted with them, would that affect how you judged their testimony?  In other words, will you feel positive towards law enforcement or negative towards law enforcement based upon your job?

POTENTIAL JUROR:  I don't think it will affect my evaluation.

THE COURT:  All right.  Have you heard anything about this case, news or anywhere?

POTENTIAL JUROR:  No.

THE COURT:  Where do you get your news, local and national?

POTENTIAL JUROR:  Honestly Facebook I guess

would be the closest thing to news source, maybe NPR too.

THE COURT:  So Facebook is the social media site that you have?

POTENTIAL JUROR:  Yeah.

THE COURT:  All right.  So Questions 1 through 17 I asked you, you already said that one police officer you knew.  Any other answers?

POTENTIAL JUROR:  No, not one through 17.

THE COURT:  So Questions 18 through 34 that talked about concepts and principles of law and things like that, any answers to bring to my attention on those?

POTENTIAL JUROR:  So 25 was a question about hazardous materials.  I'm the operations level for hazardous material through the Mass. Fire Academy.

THE COURT:  Okay.  Do those materials include explosive devices?

POTENTIAL JUROR:  No.  No.

THE COURT:  Do they include flammable devices?

POTENTIAL JUROR:  Flammable liquids, yeah.

THE COURT:  Okay.  Any other responses?

POTENTIAL JUROR:  No, I don't think so.

THE COURT:  All right.  Very good.  You can wait outside the door.

POTENTIAL JUROR:  Oh, 28, I have a family member who's addicted to drugs.

THE COURT:  Is that a current situation?

POTENTIAL JUROR:  Recently resolved, but, yeah.

THE COURT:  Okay.  And I'm sorry to ask private questions, but what was the addiction to?

POTENTIAL JUROR:  It was a polysubstance abuse and he's recently deceased.  Alcohol, cocaine, maybe a variety of stimulants.

THE COURT:  I'm sorry about that.  It sounds like a difficult situation.  Thank you for bringing it to our attention.

POTENTIAL JUROR:  Sure.

THE COURT:  Thank you.

POTENTIAL JUROR:  Thanks.

(The potential juror left the courtroom.)

THE COURT:  Any challenges?

ATTORNEY DESROCHES:  Not from the government.  Thank you.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  All right.  I agree.  There was no issue.  The juror may remain.

ATTORNEY WATKINS:  Judge, can we step back to Juror 42 which is Ms. XXX?

THE COURT:  Yes.

ATTORNEY WATKINS:  We heard something mentioned of a defense attorney but we didn't hear the name over

here.  Was the court able to get that?

THE COURT:  The attorneys that she worked for?

ATTORNEY WATKINS:  Yes.

THE COURT:  Michael Jennings and William O'Grady.

ATTORNEY WATKINS:  Thank you.

THE COURT:  So Juror No. 42 mentioned as she was leaving to one of our staff something about her knowledge or contact with a location called Ruth's Place.  Is that a location at JGS?

ATTORNEY BRESLOW:  If it's Ruth's House, Your Honor, it is.  It's a name that will be frequently mentioned in the trial.

THE COURT:  Okay.

ATTORNEY BRESLOW:  It's assisted living center.

THE COURT:  There was a specific question about whether or not the juror recognized that facility and maybe she didn't realize until she left.  Do the parties want to bring her back in and have me ask her?

ATTORNEY BRESLOW:  I think so.

ATTORNEY O'NEILL-GREENBERG:  That would be great, yes.

THE COURT:  Bring her back in?  Okay.

CLERK HEALY:  Did we address Mr. XXX?  I believe

you said no objection?

THE COURT:  Right.  He can stay.

CLERK HEALY:  Okay.

(A potential juror entered the courtroom.)

THE COURT:  We are back on the record with Juror 42, XXX XXX.  Ms. XXX, one of the staff members indicated you mentioned some connection or knowledge of a location called Ruth's Place or Ruth's House?

POTENTIAL JUROR:  Ruth's House, right, it is part of the nursing home in Longmeadow, but I'm not sure if it's the same one.

THE COURT:  Right.

POTENTIAL JUROR:  She did pass about five years ago, but.

THE COURT:  When was the last time you were at that location?

POTENTIAL JUROR:  About five years ago but we would go often to visit her.

THE COURT:  So you're familiar with the general area where Ruth's House is located?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  And if it is part of the same complex of the JGS overall complex, would that affect -- would your contact with Ruth's House affect your ability to be fair and impartial?  You've heard that

there's allegations that something was placed near that area?  Would that affect you?

POTENTIAL JUROR:  No.  I just wanted to mentioned it because of the connection, but I have no feelings either way.

THE COURT:  All right.  Thank you very much.

POTENTIAL JUROR:  Okay.

ATTORNEY O'NEILL-GREENBERG:  Can we ask, I'm sorry, who was it that was at Ruth's House?

POTENTIAL JUROR:  My mother-in-law.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

POTENTIAL JUROR:  My husband's mother.

THE COURT:  Thanks.  You're all set.

(The potential juror left the courtroom.)

THE COURT:  So any issues based upon that?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  All right.  The juror remains.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, Juror No. 44, XXX XXX. Mr. XXX, if you'd go up to the left-hand side of the clerk's bench where the microphone is?  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  How you doing?

THE COURT:  Good.  Thank you.  Did you take your oath as a juror on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  I also asked you if you know any of the parties.  Now that you can see them, the prosecution is in front of you; the defense table to the left with Mr. Rathbun.

POTENTIAL JUROR:  I do not, Your Honor.

THE COURT:  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Have you heard anything about this case on the news?

POTENTIAL JUROR:  No, Your Honor.

THE COURT:  What is your source of news?

POTENTIAL JUROR:  MSNBC and sometimes Fox.

THE COURT:  Any local news?

POTENTIAL JUROR:  Just ABC.

THE COURT:  Do you have any social media apps?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  Questions 1 through 17 regarding disability and hardship, things like that.  Did you have any responses to talk about?

POTENTIAL JUROR:  All was mostly no.

THE COURT:  All right.

POTENTIAL JUROR:  Question No. 10, can you

repeat that question please?

THE COURT: Sure. Question 10 was would you be able to follow an instruction not to engage with social media or any news agency, blogging, Googling, things like that --

POTENTIAL JUROR: Yes.

THE COURT: -- during the case?

POTENTIAL JUROR: I'm okay with that.

THE COURT: Now Questions 18 through 34 had to do with concepts and principles of law, any responses to those?

POTENTIAL JUROR: No. Question 28 and 29 I have family members, a step-brother who was convicted.

THE COURT: Of what?

POTENTIAL JUROR: Drugs.

THE COURT: How long ago?

POTENTIAL JUROR: I was maybe 14 years old at the time.

THE COURT: All right. And do you remember -- was it a possession offense or a distribution offense?

POTENTIAL JUROR: It was a raid at the home. It was a raid at the home. They took everyone that was there at the house, and I had -- my father was in Puerto Rico for a funeral and my mother lived in Massachusetts at that time. This was in Brooklyn, New York. I did not have a

guardian present and so they put me at a juvenile facility for the weekend until I had a parent come and pick me up. And they were -- everyone who was in the home got arrested. My brother went to -- my step-brother went to jail for that.

THE COURT: Did that whole experience leave you with any feelings regarding law enforcement or the court system or anything like that that might impact your ability to be fair?

POTENTIAL JUROR: No, Your Honor. I have a cousin who's a New York City police officer so, no.

THE COURT: All right. Did you have any other responses to 18 through 34?

POTENTIAL JUROR: No, Your Honor, but there was a response to Question No. 13. I did serve as a grand jury for a murder trial.

THE COURT: How long ago was that?

POTENTIAL JUROR: A couple of years ago.

THE COURT: In Springfield?

POTENTIAL JUROR: In Springfield, yeah.

THE COURT: Okay. So you were on the grand jury for how long?

POTENTIAL JUROR: It was about two and a half weeks.

THE COURT: All right. Was it a regular trial

or was it a jury trial or a grand jury?

POTENTIAL JUROR:  It was a jury trial, a murder trial.

THE COURT:  It was a jury trial?

POTENTIAL JUROR:  Correct, yes.

THE COURT:  Did you actually deliberate?

POTENTIAL JUROR:  I was not a witness.  I was actually a juror.

THE COURT:  So you deliberated and was a verdict issued on the case?

POTENTIAL JUROR:  Correct, yes.

THE COURT:  Was that experience that you were a juror, how long was the trial?

POTENTIAL JUROR:  It went for two and a half weeks.

THE COURT:  You said that.  Did that experience affect you in any way that affects your ability to be fair and impartial?

POTENTIAL JUROR:  No, Your Honor.  It does not.

THE COURT:  Thank you for telling me.  Anything else?

POTENTIAL JUROR:  That's all, Your Honor.

THE COURT:  Thank you.  You can wait outside.

POTENTIAL JUROR:  Thank you very much.

(The potential juror left the courtroom.)

THE COURT:  Any challenge?

ATTORNEY DESROCHES:  Your Honor, I don't see a challenge, just bit of a concern with having served on a prior murder jury.  He said I think a couple of years ago.  I was trying murders a little more than that ago in Hampden County.  Your Honor was also and so I'm not sure we need to clarify.  It seems like a couple years should be safe but I wanted to flag that issue.

THE COURT:  A couple of years ago should be safe, but let's bring him back in quickly and ask him the exact date.

(The potential juror entered the courtroom.)

THE COURT:  Mr. XXX, I just wanted to ask you if you can give us a date that that trial, the murder trial that you were on?

POTENTIAL JUROR:  I'm sorry, Your Honor.  I don't.

THE COURT:  You said how many years ago, do you think?

POTENTIAL JUROR:  A couple of years ago.

THE COURT:  When you say a couple, in the range of two to three or five or six?

POTENTIAL JUROR:  Two to three.  To be honest with you, I try not to remember it because of the fact that all the evidence that I witnessed during the trial, I

try not to think about it.

THE COURT: But it was two or three? We're not talking five or more years?

POTENTIAL JUROR: No, Your Honor. We are not.

THE COURT: Okay. Thank you.

POTENTIAL JUROR: Yeah.

(The potential juror left the courtroom.)

THE COURT: Any challenge?

ATTORNEY DESROCHES: No challenge.

ATTORNEY O'NEILL-GREENBERG: No challenge.

THE COURT: All right. And I see no issue. The juror may remain.

(A juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror No. 45, XXX XXX. Ms. XXX, can you please go up to the microphone on the left-hand side of the clerk's bench. Thank you.

THE COURT: Ma'am, good morning.

POTENTIAL JUROR: Good morning.

THE COURT: The first question is did you take your oath as a juror downstairs on the video?

POTENTIAL JUROR: Yes, Your Honor.

THE COURT: You were asked if you knew anyone. Now you can see people that you're in court. That is the prosecution table in front of you. The defense table is to the left and Mr. Rathbun is at the end. Do you

recognize anyone?

POTENTIAL JUROR:  I do not.

THE COURT:  All right.  Have you heard anything about this case on the news media, print, anything?

POTENTIAL JUROR:  No, I haven't.

THE COURT:  Okay.  Where do you get your news?  What's your source of news?

POTENTIAL JUROR:  Mostly NPR on the radio; CNN.

THE COURT:  Any local news?

POTENTIAL JUROR:  Occasional local stories.  I don't read any papers locally usually.

THE COURT:  All right.  Social media apps, do you get any news from social media apps such as Facebook?

POTENTIAL JUROR:  A little bit, but not -- I don't think locally as much.

THE COURT:  What would be the app or site?

POTENTIAL JUROR:  Facebook occasional stories that people have shared but nothing that I follow.

THE COURT:  All right.  On the questions that I asked you, to break them up, Questions 1 through 17, did you have any responses to discuss?

POTENTIAL JUROR:  On the first question there were a few things that I thought of.  One, that I am the select patient consultant in a high volume pediatric practice and so it would be a little bit difficult for me

to miss several days of work in a row for that reason.

My husband and I also split our childcare arrangements.  We have no additional childcare right now and so on the days that I have my children before and after school, it will be a little bit challenging.

THE COURT:  All right.  So for during the time -- during the limited time that we have, the window of time which is all of next week and perhaps spilling into the week after that, is there anyone at your work professionally that could if you called in sick or you couldn't be at work, take a vacation, that would be taking your place?

POTENTIAL JUROR:  No.  I'm the only one that does what I do there.

THE COURT:  All right.  Childcare, how many children do you have?

POTENTIAL JUROR:  I have two.

THE COURT:  Again, the same question.  Are there any alternative arrangements with family members or things like that?

POTENTIAL JUROR:  We haven't had any during the pandemic.  I would say in a pinch something could be arranged but we haven't had any others right now.

THE COURT:  During the time that you would be serving as a juror, is your husband available during that

time to kind of break schedule and have the kids full time?

POTENTIAL JUROR:  Yes.  Yeah, he would be in a pinch as well.  We have arranged our work schedules so that on the days that I am home, he is able to work a full day and vice versa.

THE COURT:  All right.  Are the kids in school?

POTENTIAL JUROR:  Yes, they're at school.

THE COURT:  All right.  Okay.  Anything else on those Questions 1 through 17?

POTENTIAL JUROR:  No.

THE COURT:  How about Questions 18 through 34, the ones that talked about concepts and principles of law?

POTENTIAL JUROR:  No.  I didn't have anything on those either.

THE COURT:  All right.  Do you think if you were called, if you were called upon to serve as a juror, which oftentimes people are and it's difficult for work, do you think you would be able to concentrate on the trial or would you be kind of focusing on your work issues and what you might be missing at work?

POTENTIAL JUROR:  I think I would feel torn to be sure, but I think it would also -- you know, I would be able to listen to what was in front of me and not be distracted by anything.  Yeah, but I think I would feel a

little bit conflicted.

THE COURT:  All right.  Okay.  Thank you.  You can wait outside.

POTENTIAL JUROR:  All right.  Thanks.

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  Your Honor, the government challenges for cause.  I'm just concerned about that last answer.  She indicated initially she would be torn but would try but would be conflicted.  I'm concerned that the realities would set in in the middle of trial and she would be distracted.

THE COURT:  Defense?

ATTORNEY O'NEILL-GREENBERG:  We don't have a challenge.  I think it seems like she has childcare.  Well, for childcare it seems that's situated.  Everyone can feel torn from work but it seems like she would be able to manage.

THE COURT:  Yeah, I think I agree with the defense.  It sounds like childcare wouldn't be easy, but it could be worked out.  And the work issue, that happens with service as a juror.  It's a window of time.  It's not an extended period.  It's a very close call quite frankly, but I'm not going to allow the challenge for cause.  She will remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Thank you.  Juror 46, XXX XXX.  Ms. XXX, if you would approach the microphone on the left-hand side of the clerk's bench?

THE COURT:  Hi, Ms. XXX.  Did you take your oath as a juror downstairs on the video?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  I asked you if you knew anybody and now you can see them in court.  The prosecution table is in front of you.  The defense table is to your left.  Mr. Rathbun is at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No, I don't.

THE COURT:  Have you heard anything about this case on the news or social media or anything like that?

POTENTIAL JUROR:  No.

THE COURT:  Where do you get your news?  What's your source for news?

POTENTIAL JUROR:  Online, Facebook mostly.

THE COURT:  All right.  I asked you some questions.  To begin with, Questions 1 through 17 that talked about disability, hardship, names of witnesses.  Did you have any responses to those questions --

POTENTIAL JUROR:  To.

THE COURT:  -- to review?

And I asked you Questions 18 through 34 that talked

about concepts and basic principles of law.  Any responses to those questions to discuss?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Very good.  Thank you. You can wait outside the door.

(The potential juror left the courtroom.)

ATTORNEY DESROCHES:  No challenge from the government.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  I see no issue.  The juror can remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 47, XXX XXX.  Mr. XXX, if you would approach the microphone on the left-hand side of the clerk's bench?  Thank you.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  How you are?

THE COURT:  Okay.  Thanks.

POTENTIAL JUROR:  Good.

THE COURT:  Mr. XXX, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes, I did.

THE COURT:  I asked you if you knew anyone.  Now you're in court and you can see them.  The prosecution table is in front of you.  The defense table with Mr.

Rathbun at the end on the left.  Do you recognize anyone?

POTENTIAL JUROR:  No, I do not.

THE COURT:  Have you heard anything about this case on the news or anywhere else?

POTENTIAL JUROR:  No, I have not.

THE COURT:  Where do you get your news?

POTENTIAL JUROR:  Local news I live in Berkshire County so there CNN pretty much.

THE COURT:  Local news station?  Radio?

POTENTIAL JUROR:  Just usually online.

THE COURT:  All right.  When you get your news online, what social media apps do you have or get your news from?

POTENTIAL JUROR:  I don't use any of that.

THE COURT:  So you just get news online?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  I asked you questions, Questions 1 through 17 that dealt with certain issues regarding things like disability and hardship.  Did you have any answers to those Questions 1 through 17 to talk about?

POTENTIAL JUROR:  No, I do not.

THE COURT:  Now Questions 18 through 34 that talked about concepts and principles of law, any responses to those to discuss further?

POTENTIAL JUROR:  Twenty-six about the expert witnesses because I've served on a jury before.  And then --

THE COURT:  When did you serve on a jury?

POTENTIAL JUROR:  It's been awhile now, but I served in Pittsfield and I've been on a grand jury as well.

THE COURT:  Okay.  In Berkshire County?

POTENTIAL JUROR:  Yes, Berkshire County.

THE COURT:  Can you give me a ballpark of when each of those might have been?

POTENTIAL JUROR:  The grand jury was when I was younger about 20 years ago or so, and the other one was probably about ten years ago or so.

THE COURT:  All right.  What type of case was it that you were a juror on?

POTENTIAL JUROR:  The one that went to trial was a sexual misconduct.  It was like a hearing to see if somebody was going to be committed I believe.

THE COURT:  All right.  And your experience with that process, both grand jury and the regular jury, did it leave you with any feelings that you think affect your ability to be fair and impartial?

POTENTIAL JUROR:  No.  I kind of enjoyed both experiences to be honest.

THE COURT:  Any other responses to the questions?

POTENTIAL JUROR:  The drug addiction, my brother went through some issues.

THE COURT:  What was the drug that was the struggle with?

POTENTIAL JUROR:  There was a few, but I think it was heroin at one point.

THE COURT:  How long ago was that?

POTENTIAL JUROR:  It's probably still ongoing.

THE COURT:  All right.  Any others?

POTENTIAL JUROR:  No.  Those are the only ones that I had any responses to.

THE COURT:  All right.  Are you close to your brother?  Do you go through the --

POTENTIAL JUROR:  I don't see him too often.

THE COURT:  Okay.  Thank you.  You can wait outside the door.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any challenges?

ATTORNEY DESROCHES:  No challenges from the government.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  I agree.  There are no issues.  The

juror can remain.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 48, XXX XXX.  Ms. XXX, if you would go up to the microphone on the left-hand side?

THE COURT:  Good morning.

POTENTIAL JUROR:  Good morning.

THE COURT:  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  All right.  And the question is we gave you the names of the parties but now you can see the parties.  The prosecution is sitting in front of you.  To the left is the defense table and Mr. Rathbun is at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Have you heard anything about this case?

POTENTIAL JUROR:  No.

THE COURT:  Did you see any news coverage about this case?

POTENTIAL JUROR:  No.

THE COURT:  Okay.  Where do you get your news?

POTENTIAL JUROR:  Social media mostly.

THE COURT:  What social media apps do you look

at?

POTENTIAL JUROR:  Facebook; Instagram.

THE COURT:  I asked you some questions.  To begin with sections 1 through 17, on those questions did you have any responses to talk about?

Check your notes.

POTENTIAL JUROR:  So, yeah, actually some of the potential witnesses I know.

THE COURT:  Who were they?

POTENTIAL JUROR:  Sarah Thompson, she's on the State Police department is my sister-in-law.  I used to work with Rochel Kosofsky when I worked for the Harold Grinspoon foundation for nine years.  I've had a lot of interaction with the Jewish community as well.

THE COURT:  Do you interaction with the complex, the JGS complex?

POTENTIAL JUROR:  My direct boss at one point was on the board there but I didn't personally have interaction there.

THE COURT:  How many years did you work for that agency?

POTENTIAL JUROR:  Nine.

THE COURT:  Nine years.  How long ago?

POTENTIAL JUROR:  Seven years ago.

THE COURT:  Okay.  Do you think your work for

that agency that had some interaction with the JGS complex would affect your ability to be fair and impartial on this case?  I've given you very few facts but you know --

POTENTIAL JUROR:  I'd like to say no, I don't think so.  I can't guarantee.

THE COURT:  All right.

POTENTIAL JUROR:  I don't think so.

THE COURT:  Now tell me about your -- you said your sister-in-law?

POTENTIAL JUROR:  Yes, Sarah Thompson.

THE COURT:  Okay.  So would the -- well, obviously if she testified, would you be inclined to not challenge her believability in your mind?  Would you tend to believe what she said because she's your sister-in-law?

POTENTIAL JUROR:  Strictly based on the fact she's my sister-in-law, no.

THE COURT:  How difficult or uncomfortable a situation would be created by you sitting as a juror and your sister-in-law is on the witness stand and perhaps if you were called upon and you thought the government didn't met their burden and you ruled against the government's side or you thought a verdict was appropriate against the government's side, would that be an uncomfortable situation for you?

POTENTIAL JUROR:  It would be uncomfortable.

THE COURT:  Would it be a problem for you?

POTENTIAL JUROR:  I don't know.  I don't know.

THE COURT:  All right.

POTENTIAL JUROR:  We have a good relationship. I've just never been in that situation and so I'm not really sure.

THE COURT:  Is this witness -- do we know if this witness is for sure testifying?

ATTORNEY DESROCHES:  It's unlikely she would testify, Your Honor.

THE COURT:  All right.  Well, okay.  Very good. Any other responses?

POTENTIAL JUROR:  I don't think so.  No.

THE COURT:  All right.  Thank you.

POTENTIAL JUROR:  Thank you.

(The potential juror left the courtroom.)

ATTORNEY BRESLOW:  Your Honor, do you recall the agency?  I couldn't quite hear what she said when she said she worked for a particular agency?

THE COURT:  Yeah, I forget the exact name.  It had to do with the Harold Grinspoon agency.

ATTORNEY BRESLOW:  Okay.

THE COURT:  The Harold Greenspoon Foundation, which I recognize and just remember from the last trial. That was a foundation that was actively involved in the

development of the entire JGS complex.

ATTORNEY DESROCHES:  Your Honor, just in terms of the witnesses, I don't expect either to testify.  The government is concerned though when asked whether or not her relationship with the jewish community or that prior experience would affect her ability to be impartial she equivocated and so there is some concern there.

THE COURT:  Defense?

ATTORNEY O'NEILL-GREENBERG:  We have the same concern.  I think even if her sister-in-law doesn't testify, she knows that her sister-in-law was involved in the case, worked on the case, and I think there's a bias there that we are uncomfortable with.

THE COURT:  Okay.  I definitely agree with both sides.  There are issues.  Those are both legitimate issues that you have raised.  I was much closer to the juror.  She was close to the bench when asked the questions.  She was looking at me.  I was observing her demeanor and facial expressions.

When I asked her about her ability to be fair and impartial, whether it would affect her, her body language, her demeanor, her tone, her affect, her eye contact with me, she really conveyed to me I felt that it would not be an issue.

Now certainly if her sister-in-law was called as a

witness, it's a totally different story.  But if the government thinks -- I mean it depends on how likely she is to be called.  If you think there's some real chance, then I will allow the challenge.

ATTORNEY DESROCHES:  Your Honor, there is a proposed stipulation which I believe we have in place regarding her testimony.  I don't recall if the name Sarah is in there or not, but this is not a contested issue and so we wouldn't be calling her.

ATTORNEY WATKINS:  We actually didn't hear the name of the sister-in-law.

ATTORNEY BRESLOW:  It was Sarah Thompson, the fingerprint examiner from the State Police.  I don't think the stipulation discusses her by name and we could redact it if it does.

ATTORNEY WATKINS:  It is exceeding unlikely. Well, I'm not the government but it seems unlikely she would testify.

THE COURT:  It seems unlikely you say?

ATTORNEY WATKINS:  It's not my case, but I wouldn't call her.

THE COURT:  All right.  You would make a fine prosecutor.  All right.  I'm not going to allow it.  I mean, certainly there's peremptories available but I'm not going to allow for cause.  The juror can remain.

Bethany, can you hold on one second?

The question would be if the parties would be satisfied in clearing and doing individual voir dire of 14 jurors which we are close to and then doing our attorney-conducted voir dire?

ATTORNEY DESROCHES:  Your Honor, I think by our calculations there needs to be a minimum of eight including the peremptories.  Of course, there's unlimited challenges for cause, but I think it would make sense to do the 14.  It's probably unlike given this pool that we would need to go through this again.

THE COURT:  I agree.  I think we need eight to clear so.

ATTORNEY WATKINS:  I think we can probably do 12, just 12 instead of 14.  We did two cause challenges total over the jury yesterday and it's far fewer people just seating two for the jury.

THE COURT:  Let's do -- we are at 12.  We have 12 now?

CLERK SOLAS:  We are at eleven.

THE COURT:  We will keep going for a few more, yeah.

All right.  To inform the parties, Juror 48, XXX XXX mentioned as she was leaving to the court staff that she did know I think the first name was Rochel Kosofsky, but

she mentioned that in court.  I heard her say that.

I just wanted to make sure that -- Attorney Watkins, you had asked for what name did she mention?  I wanted to make sure that you recalled or heard that she did mention that name as knowing that individual.

Also, Ms. Healy tells me that she knows personally Ms. XXX.  Not that that matters; that didn't come up, but just to let you know Ms. XXX is a long-time friend of Ms. Healy's from our clerk's office.  I can ask -- I mean, frankly I don't see how that would play into this, but do the parties have an issue with that?

ATTORNEY DESROCHES:  I don't see a need to inquire further about the juror's relationship with Clerk Healy.  And just for the court's information, Rochel Kosofsky will not be testifying.

THE COURT:  All right.

ATTORNEY WATKINS:  The government at least proposes to call her husband to testify here.

THE COURT:  True.

ATTORNEY WATKINS:  I think there's a close enough association there that we would be concerned about that.

THE COURT:  All right.  I asked her about the issue and she said she knew them.  I didn't see or don't recall any issue that affects her ability to be fair and

impartial.

ATTORNEY WATKINS:  It is a special case because as the court has learned, Rabbi Kosofsky and his wife without knowing the relationship between this particular juror and how she knows the wife, it's one of those issues where an issue might come up at trial in the middle of trial to point out how serious her knowledge of the couple may be.

THE COURT:  All right.  Government?

ATTORNEY DESROCHES:  I defer to the court, Your Honor.

THE COURT:  All right.  Stricken for cause.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 49, XXX XXX.  Mr. XXX, if you would approach the microphone on the left-hand side of the clerk's bench?

THE COURT:  Hello, sir.

POTENTIAL JUROR:  Hi.  How are you?

THE COURT:  Good.  Thank you.

Sir, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  All right.  And I asked you if you knew anyone.  Now you're in court so you can see them, the parties involved.  The prosecution table is in front of you.  The defense is over here to your left and Mr.

Rathbun is at the end of the table.  Do you recognize anyone?

POTENTIAL JUROR:  No, I do not.

THE COURT:  You do not.  All right.

Have you heard anything about this case from any news source?

POTENTIAL JUROR:  I think when it was initially like local news, Republican, Channel 22.

THE COURT:  How long ago might that have been?

POTENTIAL JUROR:  Whenever it first happened and to be honest, I don't remember when that was.  A year or two years ago.

THE COURT:  All right.  So you don't remember too much.  You just remember seeing something about it?

POTENTIAL JUROR:  No.

THE COURT:  Where do you get your news generally?

POTENTIAL JUROR:  Local news from the Republican, then online like New York Times.

THE COURT:  Do you have any social media apps that you get news from?

POTENTIAL JUROR:  No.

THE COURT:  All right.  I asked you questions. There was Questions 1 through 17 that talked about hardship, disability, witness names, things like that.

Any issues for one through 17 to talk about?

POTENTIAL JUROR:  No.  None of those were applicable.

THE COURT:  Questions 18 through 34 talked about concepts and principles of law and other issues.  Any of those responses to talk about?

POTENTIAL JUROR:  No.  No issue with any of those.

THE COURT:  All right.  Thank you.  Can you wait outside?

POTENTIAL JUROR:  All right.  Thank you.

(The potential juror left the courtroom.)

THE COURT:  Any challenges?

ATTORNEY DESROCHES:  Not from the government. Thank you.

ATTORNEY O'NEILL-GREENBERG:  Nothing.

THE COURT:  All right.  I agree.  No challenges. The juror may remain.

ATTORNEY BRESLOW:  Your Honor, the next three witnesses have left their occupation blank if Your Honor can inquire?

THE COURT:  I will.  Thank you.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 50, XXX XXX.  Mr. XXX, please approach the microphone on the

left-hand side of the clerk's bench.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hi.

THE COURT:  Mr. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  I asked you if you knew people.  If you knew the parties, the lawyers, and you couldn't see them but now that's the prosecution table in front of you.  To the left is the defense with Mr. Rathbun at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Okay.  Have you heard anything about this case?  Read anything in the news?  Seen anything on the news about this case?

POTENTIAL JUROR:  No.

THE COURT:  Where do you get your news?

POTENTIAL JUROR:  I don't.  Honestly the only news I get is whenever my mother tells me something.  I don't watch the news.

THE COURT:  Do you have any social media apps that have news feeds on them?

POTENTIAL JUROR:  No.

THE COURT:  All right.  I asked you some questions.  Some of them -- Questions 1 through 17 dealt

with issues like health and hardship and disability.  Did you have any answers -- you can check your notes -- to one through 17 that we need to talk about?

POTENTIAL JUROR:  No.

THE COURT:  All right.  And Questions 18 through 34 dealt with principles of law and other concepts that I explained to you.  Did have any answers to any or responses to any of those questions or concepts that I talked about?

POTENTIAL JUROR:  No.

THE COURT:  You didn't?  Okay.

And, sir, are you employed?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Have you been or what was the last job you had?

POTENTIAL JUROR:  Construction working.

THE COURT:  Okay.  How long was that for?

POTENTIAL JUROR:  For like one or two weeks.

THE COURT:  Okay.  When was that?

POTENTIAL JUROR:  Last year.

THE COURT:  Okay.  All right.  Thank you.  Can you wait outside?

(The potential juror left the courtroom.)

THE COURT:  Challenges?

ATTORNEY DESROCHES:  Not from the government.

Thank you.

ATTORNEY O'NEILL-GREENBERG:  No.  Nothing.

THE COURT:  I agree.  The juror may remain.

(A juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror No. 51, XXX XXX.  Mr. XXX, if you would approach the microphone on the left-hand side of the clerk's bench?

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Mr. XXX, did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  Okay.  I asked you if you recognized the names of the parties.  The parties are here in court. The prosecution table is in front of you.  The defense table to the left with Mr. Rathbun at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Have you heard anything about this case on the news or anywhere else?

POTENTIAL JUROR:  I tend to read MassLive so it seems familiar to me.

THE COURT:  Okay.  How familiar?  Do you remember anything?  First of all, in time when was the last time you saw something about this case on the news?

POTENTIAL JUROR:  This seems to go back away's now.  You know, a year.  I don't know.  I just seem to be aware of it.

THE COURT:  Is it a case that you followed and sought out information or did it just come to your attention because it happened to be on the news?

POTENTIAL JUROR:  I think I'm just sort of interested in news and so.

THE COURT:  Do you remember any details that you saw on the news about this case?

POTENTIAL JUROR:  I'm trying to figure out if it has a connection to -- there's been some other arson that have taken place that have had sort of racial tension in the area, and so I'm trying to tease out whether I know any more details or those are sort of bleeding together.

THE COURT:  So you're not sure if you're actually thinking about some other case or this case?

POTENTIAL JUROR:  The details about the solar employees and stuff sort of reminded me.  The Chicopee piece sort of reminded me so it's just, it's sort of floating around.

THE COURT:  Okay.  Well, let me ask you this.  The fact that you may have heard something on the news about this case, would that affect your ability to be fair and impartial?

POTENTIAL JUROR:  I think I probably could be fair and impartial.

THE COURT:  Well, I would give you an instruction that you could only make a determination in this case based upon what you heard in this courtroom and so you would have to put out of your mind any news coverage of it because that's not evidence.  That's not things that you would hear testimony under oath evaluating as a juror.  It simply would have to be disregarded and put out of your mind.  Would you be able to follow that instruction?

POTENTIAL JUROR:  I think I could.

THE COURT:  All right.  Any other responses to Questions 1 through 17?

POTENTIAL JUROR:  Number one is a big one for me.  I tend to rent the same early seasonal rental at Cape Code and it's next week and it's been paid for.

THE COURT:  It's already booked?

POTENTIAL JUROR:  It's already paid for.

THE COURT:  Paid for?

POTENTIAL JUROR:  Yes.

THE COURT:  Okay.  All set.  Can you wait outside the door please?

(The potential juror left the courtroom.)

THE COURT:  All right.  A preplanned paid

vacation, any issues with excusing the juror?

ATTORNEY DESROCHES:  Not from the government, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  Excused.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 52, XXX XXX.  Mr. XXX, if you would approach the clerk's bench on the left-hand side where the microphone is.

THE COURT:  Hello, sir.

POTENTIAL JUROR:  Hi.

THE COURT:  Sir, did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  I did.

THE COURT:  All right.  And I asked you if you recognized the names of any of the parties.  The parties are here in court.  The prosecution table is in front of you, and the defense table is over there to the left with Mr. Rathbun sitting at the end.  I'll ask if you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  Did you have responses to Questions 1 through 17 to discuss with me?

POTENTIAL JUROR:  Seventeen?  This kind of all goes together eleven through -- it kind of goes together

with that.

THE COURT:  Tell me about your feelings then.

POTENTIAL JUROR:  Well, it goes together with 21, feelings about the FBI.

THE COURT:  What are the feelings about law enforcement or the criminal justice system and the FBI?

POTENTIAL JUROR:  Not so much, but more personal experience with 21 and 22.

THE COURT:  All right.  And does that personal experience leave you with any concern that you might have a problem being fair and impartial?

POTENTIAL JUROR:  Yeah, there's no way.

THE COURT:  No way?

POTENTIAL JUROR:  No way.

THE COURT:  All right.  So you would tend to disbelieve or feel negative by anything that a law enforcement agency testified about?

POTENTIAL JUROR:  Specifically the FBI, yes.

THE COURT:  All right.  Okay.  Could you wait outside please?

POTENTIAL JUROR:  Yes.

(The potential juror left the courtroom.)

THE COURT:  All right.  Based upon that response, is there any challenge?  The response -- I was assessing the response and the demeanor of the witness

while -- of the potential juror as they were speaking and I was concerned regarding the jury's ability to be fair and impartial.  Is there any request that I go further with the questioning of the juror?

ATTORNEY DESROCHES:  There's no request.  The government would challenge for cause.  I would also note that during Your Honor's questioning that juror appeared to be reading for at least some of it and not pay attention.

THE COURT:  In other words, just not pay attention?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  You saw that over the video feed?

ATTORNEY DESROCHES:  I did.

THE COURT:  All right.

ATTORNEY O'NEILL-GREENBERG:  We don't have any objection to him being removed for cause.

THE COURT:  Okay.  For cause.

(A potential juror entered the courtroom.)

CLERK HEALY:  Your Honor, this is Juror 53, XXX XXX.  Mr. XXX, if you would approach the clerk's bench on the side where the microphone is.

THE COURT:  Hi, Mr. XXX.

POTENTIAL JUROR:  Did you take your oath as a juror when you were downstairs?

POTENTIAL JUROR:  Yes.

THE COURT:  I asked you if you recognized the names of the lawyers.  Now you're in court.  Please take a look.  The prosecution table is in front of you.  The defense table over to the left and Mr. Rathbun is at the end.  Do you recognize anyone?

POTENTIAL JUROR:  No.

THE COURT:  All right.  Have you heard anything about this case on the news or social media or anywhere?

POTENTIAL JUROR:  No.

THE COURT:  Where do you get your news?

POTENTIAL JUROR:  From my girlfriend.  I don't listen to the news.

THE COURT:  Do you have any social media apps like Facebook or anything like that?

POTENTIAL JUROR:  Maybe YouTube would be the closest.

THE COURT:  All right.  I asked questions.  Questions 1 through 17 dealt with hardship and if you knew witnesses, things like that.  Did you have any responses -- you can check your notes -- to one through 17?

POTENTIAL JUROR:  Just experience with hazardous materials.

THE COURT:  What would that experience be?

POTENTIAL JUROR:  I was a transportation

specialist in the Marine Corp for hazardous materials.

THE COURT: So what type of materials? Would that be flammable or explosive type materials? Can you just tell me?

POTENTIAL JUROR: A mix of everything. Corrosive, flammable, explosives. It was just how to package it. Like I don't really know anything about the actual materials but how to ship it.

THE COURT: You have no specialized training or education regarding the kind of make up of those materials?

POTENTIAL JUROR: No.

THE COURT: But you are trained with packaging and shipping of it?

POTENTIAL JUROR: Yes.

THE COURT: Anything else on Questions 1 through 17?

POTENTIAL JUROR: No.

THE COURT: Now Questions 18 through 34 dealt with concepts and principles of laws that I talked about Did you have any responses to those?

POTENTIAL JUROR: No.

THE COURT: All right. You presently work as a shipper?

POTENTIAL JUROR: Yes.

THE COURT:  Who is that for?

POTENTIAL JUROR:  Pelican in South Deerfield.

THE COURT:  All right.  What do they ship by the way?

POTENTIAL JURORS:  Cases of plastic materials.

THE COURT:  Thank you.  Can you wait outside?

(The potential juror left the courtroom.)

THE COURT:  All right.  Any challenges?

ATTORNEY DESROCHES:  Not from the government.

ATTORNEY O'NEILL-GREENBERG:  No challenge.

THE COURT:  I agree.  No challenging issue were raise.  The juror may remain.

(A potential juror entered the courtroom.)

CLERK RIVERA:  Your Honor, this is Juror 54, XXX XXX.  Ms. XXX, please approach the microphone on the left-hand side of the clerk's bench.

THE COURT:  Hi, Ms. XXX.

POTENTIAL JUROR:  Hello.

THE COURT:  Did you take your oath as a juror downstairs?

POTENTIAL JUROR:  I did, yes.

THE COURT:  I asked you if you recognized the names of parties.  Now I'm going to ask you to look.  The prosecution table is in front of you.  The defense table to the left with Mr. Rathbun at the end.  Do you recognize

anyone?

POTENTIAL JUROR:  No.

THE COURT:  Have you heard anything about this case in the news or anywhere?

POTENTIAL JUROR:  I mean, briefly here and there.  Nothing too in depth.

THE COURT:  Where did you hear the information? Did you see it on the news or did someone tell you?

POTENTIAL JUROR:  Probably on WWLP.  That's the news that I watch.

THE COURT:  Do you recall when was the last time you saw anything?

POTENTIAL JUROR:  It was a while.  I haven't seen anything recently.

THE COURT:  Was it a story that you actively followed because you were interested or you just happened to come across it?

POTENTIAL JUROR:  I just happened to come across it.

THE COURT:  Did you have any responses -- by the way, do you have any social media sites or apps that you have news feeds?

POTENTIAL JUROR:  I mean, I primarily use Facebook and I have the MassLive app that I look at here and there.

THE COURT: On the questions and you can check your notes, on one through 17 where there any responses to talk about further with me?

POTENTIAL JUROR: No.

THE COURT: On Questions 18 through 34 that talked about concepts and principles of law that I talked about. Any responses there to talk about with me?

POTENTIAL JUROR: No.

THE COURT: All right. Okay. Thank you. You can wait outside.

POTENTIAL JUROR: Okay.

(The potential juror left the courtroom.)

THE COURT: Challenges?

ATTORNEY DESROCHES: Not from the government.

ATTORNEY O'NEILL-GREENBERG: Not from the defendant.

THE COURT: I agree. No issue of challenge came up. The juror may remain.

All right. So that's 14.

CLERK HEALY: We have one more in the hallway. Do you want me to send her back down?

THE COURT: No. We will do it.

(A potential juror entered the courtroom.)

CLERK HEALY: Your Honor, this is Juror 55, XXX XXX. Ms. XXX, if you would approach the microphone on the

left-hand side of the clerk's bench?

THE COURT: Good morning. Did you take the oath as a juror when you were downstairs?

POTENTIAL JUROR: I did.

THE COURT: I asked you if you knew anyone. Now that you're in court, I'll ask you to look to see if you recognize anyone. The prosecution table is in front of you. To the left is a defense table with Mr. Rathbun seated at the very end. Do you recognize anyone?

POTENTIAL JUROR: I do not.

THE COURT: Have you heard anything about this case on the news or from anyone?

POTENTIAL JUROR: Just I am a teacher in Longmeadow and so I remember initially there was some talk among my coworkers.

THE COURT: Did you see any news stories or hear people talking about it?

POTENTIAL JUROR: Just I heard people. Some of my coworkers mentioned something at the Longmeadow nursing home; that something had happened. I didn't really think too much about it, but I remember it coming up. I think that's what it was.

THE COURT: All right. And if I instructed you that as a juror you can only make a decision based upon evidence that comes in the courtroom, that you hear in

this courtroom as evidence and you would have to disregard and not be affected by anything you might have heard outside the courtroom, would you be able to follow that instruction?

POTENTIAL JUROR:  Yes.

THE COURT:  And you said you teach in Longmeadow.  Is your school in the Converse Street area?

POTENTIAL JUROR:  Everything is pretty close. Converse Street is pretty long and so I'm probably within like five or ten minutes from Converse Street.

THE COURT:  Do you have any familiarity with that JGS complex on Converse Street?

POTENTIAL JUROR:  No.

THE COURT:  You don't?  Have you ever been on the complex?

POTENTIAL JUROR:  I don't think so.  I'm not even sure.  I may drive by it on my way home, but I'm not even sure if that might be the one.  I'm not sure.

THE COURT:  If during this trial I were to instruct you that you would have to avoid the area, avoid at least trying to look out and learn more about the area or visually see the area, would you be able to do that?

POTENTIAL JUROR:  Yeah, I think so.

THE COURT:  Now I asked you some questions, do you have any responses for Questions 1 through 17 -- you

can check your notes -- that we should talk about more?

POTENTIAL JUROR:  On number one just because I am a school teacher and it would be my last to next week and then I'd have like three more days.  We get out on the 16th so I would be missing my whole last week of school and that would be hard for me and hard for my kids and also hard for my staff because it is really hard to find subs right now because of COVID.  So it would leave them short.

THE COURT:  What grade do you teach?

POTENTIAL JUROR:  I teach special ed.  I'm early childhood.

THE COURT:  You teach special ed.  How big is your class?

POTENTIAL JUROR:  It's an integrated preschool class.  There are two sessions and there's about 15 kids in each class, so about 25.  I come in contact with about 25 kids.

THE COURT:  Regularly?

POTENTIAL JUROR:  Regularly.

THE COURT:  So you have the same special ed kids.

POTENTIAL JUROR:  Yeah.

THE COURT:  And are there other teachers that are familiar with those children that could come in and

take your place and that the children know?

POTENTIAL JUROR: There's staff that are available. It's just it would still be pulling from within the system, so it would leave somebody short somewhere.

THE COURT: All right. And did you have any other responses to the questions that I asked?

POTENTIAL JUROR: No.

THE COURT: Now about Questions 18 through 34 that talked about concepts of law and principles of law, any of those responses?

POTENTIAL JUROR: No.

THE COURT: Okay. Thank you. You can wait outside.

POTENTIAL JUROR: Thank you.

(The potential juror left the courtroom.)

THE COURT: Any challenge?

ATTORNEY DESROCHES: Your Honor, the government would challenge for cause just based on the concerns she has for her students. I also would note being so far down the list it's extremely unlikely she would make it onto the jury anyway.

THE COURT: I have the same concern with a special ed teacher, the familiar face not being there for the last week of school for the special ed class.

Government (sic), what's your position?

ATTORNEY O'NEILL-GREENBERG:  I think it's pretty unlikely that we ever seat her, but we don't have an objection to her being let go.

THE COURT:  I'm going to excuse her for cause, the cause being the work that she described to me being a special ed teacher.

All right.  All right.  To the parties, a juror name XXX XXX, I believe it was 44, the staff was able to look up through the jury -- some juror database regarding the date of that juror's service as a juror on a murder trial that was described and it comes up as 2011, which was -- I believe the potential juror said it was in Springfield. So that was when I was district attorney and that was when Attorney Desroches was with the office.  We don't know the name of the case if Attorney Desroches was involved.  I mean, that obviously requires us to potentially ask some more questions of that juror or we have 14.

ATTORNEY DESROCHES:  Your Honor, I can say that I was not raised to the level of trying murders in 2011. I was still trying to work my way up, trying to get recognition from superiors and so I'm pretty confident that I wouldn't have been the attorney in that case.

THE COURT:  Okay.  Any issues with the likelihood that I was district attorney at the time of

that case?

ATTORNEY O'NEILL-GREENBERG:  I don't think so.

THE COURT:  I'm just asking.

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  All right.  The juror will remain, but thank you to the staff for finding that out and providing that information.  All right.

So let's take a break.  To Ms. Healy and Ms. Rivera I guess and Mr. Mackler, what should we be thinking about for lunch breaks and all things like that?  We need -- I think everyone here needs at least a 10 to 15 minute break, and then we can go through the attorney-conducted voir dire.  So we can do a 10 to 15 minute break and do a round of attorney-conducted voir dire.  So let's be back at --

CLERK HEALY:  The lunches are actually here.  Do you want to take a longer break for lunch now and just go right to the attorney-conducted voir dire?

THE COURT:  So that would be mean we're back here in an hour.  Back at one.  Any problem with that?

ATTORNEY O'NEILL-GREENBERG:  No.

ATTORNEY DESROCHES:  No.

THE COURT:  Be back here at one.

CLERK RIVERA:  All rise.

**(A recess was taken at 11:57 until 1:10.)**

**(The defendant is present.)**

THE CLERK:  Court is back in session in the matter of Criminal Case 20-30018, the United States of America versus John Rathbun.  You may be seated.

THE COURT:  Okay.  Be seated.

All set.  We can fill the jury box.  So we are back on the record and we're going to fill the jury box to continue the process.

CLERK HEALY:  Juror No. 37 in Seat 1, please; Juror No. 38, you will follow this young lady in Seat 2; Juror No. 40, Seat 3; Juror No. 41, Seat 4; Juror No. 42 Seat 5; Juror No. 43, come around to Seat 6; Juror No. 44, Seat 7; Juror No. 45, Seat 8; Juror No. 46, Seat 9; Juror 47, Seat 10; Juror No. 49, Seat 11; Juror No. 50, Seat 12; Juror No. 53, Seat 13; and Juror No. 54, Seat 14.

THE COURT:  Hello, ladies and gentlemen.

All right.  This is the next part of the process for selecting the jury and this is what I referred to and you may recall from the video of where the attorneys will have an opportunity to talk to you, ask you questions.  They may ask you questions directly.  They may encourage a conversation and bring up topics or principles that will help give the attorneys insight as to who they think is or could serve as a fair and impartial juror on this case, and this is entirely appropriate.

This is the process working where each side, whether it's a criminal case or a civil case, quite frankly, each side has the right to find out a little bit about the jurors and participate in the selection of the jurors that will ultimately hear the case that the parties here are involved in.

So this part of the process I hope does not make anyone feel uncomfortable. It's not designed to make anyone feel uncomfortable. But as you know, you are asked questions about certain things during this process. I will stop the process if I think any question is inappropriate. If anyone feels uncomfortable or is made to feel uncomfortable, please just raise your hand and I'll have a conversation with you privately and deal with the situation.

So that's what's going to happen now. The attorneys are going to begin that process, and each side will have an opportunity and then we will move on to the next phase of the jury selection process.

All right. I believe the government goes first.

ATTORNEY DESROCHES: Thank you, Your Honor.

THE COURT: Thank you.

ATTORNEY DESROCHES: Good afternoon. To remind you all, my name is Neil Desroches. I'm an assistant United States attorney, which is a federal prosecutor. I

am joined at our table with Steve Breslow who's also an assistant United States attorney and Megan McKenna.

So as the judge just said, we all really appreciate the time that you've devoted so far today. Some of you will go on to further jury duty and others will not. But this process is really important.

As attorney, sorry, Attorney O'Neill-Greenberg asked questions and I asked questions, we're really just trying to find out if you're the right juror for this case because not every case is meant for every potential juror. So please don't take it personally. We are not trying to pick on anybody. There's no right or wrong answer to our questions. We are just trying to get at how you feel about certain things.

So, for example, how many of you were excited to get the summons for jury duty?

All right. Good. So I see we have honest people amongst this group. That's good. There's no right or wrong answer. The honest answer is the only one we're looking for.

So as we're going along if you feel like you can't answer a question the way I've asked, let me know. It's not a problem. I'll try to rephrase it.

This morning you were told by the judge that the defendant is presumed innocent until proven guilty.

That's really one of the most important things, one of the most important protections that an American citizen enjoys.  So is there anyone here not understand that the defendant as he sits here now is presumed innocent?  So you all understand that, right?

Sometimes though people will have the impression that because they're here, they must have done something wrong.  But now that you've heard the judge tell you this, you understand that until the government proves him guilty he is innocent; is that right?  Okay.

So, I'm going to ask questions in a few different ways.  Sometimes I'll be directing the questions to somebody; sometimes I'll open it up to the group.  If I direct it to you, don't feel picked on.  I'm trying to get the conversation going.

So Juror No. 37 in Seat 1, Ms. XXX, you are a teacher; is that right?

POTENTIAL JUROR:  That's true.

ATTORNEY DESROCHES:  As a teacher, I imagine that you have to deal a lot with students not being entirely honest with you?

POTENTIAL JUROR:  That's true.

ATTORNEY DESROCHES:  What are the circumstances at which you see that at work?

POTENTIAL JUROR:  If a student had not completed

their homework, if they hadn't studied for an exam, if they hadn't done their reading assignment.  I'm an English teacher, those circumstances.

ATTORNEY DESROCHES:  Did you have to confront one of those students not telling the truth?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  What are the cues that you look for in determining whether or not they're telling the truth?

POTENTIAL JUROR:  Body language usually, eye shifting, looking down, not being able to look me in the face, playing with their shirt, playing with their clothes.

ATTORNEY DESROCHES:  Would the fact that that student has told untruths during that same encounter with you also weigh in on whether or not he's telling the truth or she's telling the truth about one particular issue?

POTENTIAL JUROR:  If they had previously lied, would it make me think that they were lying again?

ATTORNEY DESROCHES:  Would it affect your assessment of their credibility?

POTENTIAL JUROR:  For me personally, no, because I try to take each student in each instance individually.

ATTORNEY DESROCHES:  So in this case you may be called upon to assess the credibility of a witness and

whether they're being truthful with you.  Do you think you would comfortable determining whether or not someone is credible?

POTENTIAL JUROR:  I think I'm a decent judge of character with the right amount of evidence and information certainly.

ATTORNEY DESROCHES:  So now I'll open it up to the rest of the group.  Does anyone else have an experience at work where they had to determine whether or not someone was being truthful with them?

I imagine for those of you who have children, it's probably an every day kind of an occurrence.  But would anyone have trouble determining whether or not a witness in this case was being completely truthful with them?

Juror No. 40 in Seat 3, Ms. XXX, do you have any concerns that you would be able to determine whether or not someone was being truthful?

POTENTIAL JUROR:  I don't think so.  It would be a blank slate from here so I wouldn't have any previous information.  I do have kids so I know that I judge it on that situation.  If they're caught in a lie or doing something, I try to trust their judgment and trust them.

ATTORNEY DESROCHES:  Sometimes people will have trouble because they feel like they're judging a person, not just an act.  Do any of you feel that you would have

trouble because you would be passing judgment on a person and not an act?

Juror No. 42 in Seat 5, do you have any concerns about that?

POTENTIAL JUROR:  No.

ATTORNEY WATKINS:  Judge, can I ask, can we start moving the mic around perhaps?  I'm going to have difficulty hearing that juror.

THE COURT:  So every juror doesn't need the microphone exactly in front of them but if you can just get a mike somewhere in the area to pick up.

POTENTIAL JUROR:  Can you ask the question again?

ATTORNEY DESROCHES:  Sure.  Do you feel you would have trouble determining someone was guilty if the government proved beyond a reasonable doubt that that person was guilty?

POTENTIAL JUROR:  If it was proven to me that that person was guilty?

ATTORNEY DESROCHES:  Right.

POTENTIAL JUROR:  No, I wouldn't have a problem with that.

ATTORNEY DESROCHES:  Would anyone in here have trouble in that circumstance?

So the judge at the end of the trial will instruct

you on the elements of the offense, and those will be the things that the government must prove beyond a reasonable doubt.  One of those things is not motive, but sometimes it's human nature just to wonder why someone did something.

So, in other words, the government does not have to prove why someone did something but they have to prove that they did it with a particular intent.

Would anyone have trouble finding someone guilty if they did not know why they did it?

Juror No. 41 in Seat 4, Mr. XXX.

POTENTIAL JUROR:  Yep.

ATTORNEY DESROCHES:  How do you feel about that? If the government did not prove to you beyond a reasonable doubt why a defendant did a particular thing, would you have trouble finding the defendant guilty if they did prove the rest of the case?

POTENTIAL JUROR:  It seems I would.

ATTORNEY DESROCHES:  You would have trouble?

POTENTIAL JUROR:  It seems if you can't prove it.  If you can't prove it?

ATTORNEY DESROCHES:  So if you did not hear evidence as to why this defendant did a particular thing, committed the crime that he's excused of doing, if the government in other ways proved that the defendant did it,

would you be able to find the defendant guilty even though you don't know exactly why he did it?

POTENTIAL JUROR:  Yes.

ATTORNEY DESROCHES:  Does anyone have any thoughts?

Juror No. 43 in Seat 6, what are your thoughts on that?

POTENTIAL JUROR:  People have -- even if I knew what someone's motive was for doing something, I wouldn't necessary understand their motive per se.  So I feel like if you can prove to me beyond a reasonable doubt that someone did something, then the motive didn't mean anything I guess.

ATTORNEY DESROCHES:  So Juror No. 38 in Seat 2, Mr. XXX XXX, do you have any feelings on that?

POTENTIAL JUROR:  I mean realistically, you know, we're not really here to figure out why and really can't necessarily know why anyone does anything.  We're here to figure out whether or not they did it and so that's sort of how I look at it.

ATTORNEY DESROCHES:  So you may hear some testimony today -- next week from witnesses who have struggled with drug addiction or have used drugs in a detrimental way in their life.  Do any of you know anyone or have any experience -- I don't want to delve too much

into that; I don't want to pry -- but with individuals that have abused substances?

So Juror No. 44 in Seat 7, can you -- again to the extent you're comfortable -- can you describe the circumstances in which you dealt with that?

POTENTIAL JUROR:  I was a child.  I was about 14 years old and my stepbrother, one of my stepbrothers --

ATTORNEY WATKINS:  Could we move the mike again? I just cannot hear.

POTENTIAL JUROR:  I was around 14 years old and I had a stepbrother who was addicted to drugs.  I would witness that.  Every time I would come home from school, I would see him just really messed up and how he stole from the family.  It was really a hurtful time for our family during that time so I have experience with that.

I also as I grew older I was involved in a rehabilitation center so I witnessed how an addiction can affect people.  I was a counselor at a time at Salvation Army at the rehab center and so I do have experience with that.

ATTORNEY DESROCHES:  Are you familiar with the effects that drugs have on people?

POTENTIAL JUROR:  Personally, no.  I never did drugs, like heavy drugs.  But I did witness how it affects a person and how it affects families as well.

ATTORNEY DESROCHES:  Do you think that someone using drugs can be -- I'm sorry, let me rephrase that question.

Do you think that use of drugs can be an excuse for someone's actions?

POTENTIAL JUROR:  No.  We all make decisions in life.  You either make the right decision or you make wrong the decision.  And if you make a wrong decision, you have to answer to those decisions that you make.  So I don't think that, no, I don't.  I don't think that drugs is an excuse is what I'm trying to say.  We all make decision in life that we have to live with.

ATTORNEY DESROCHES:  Okay.  Thank you.

Juror No. 37 in Seat 1, what do you think about that?

POTENTIAL JUROR:  I'm sorry, could you state the question?

ATTORNEY DESROCHES:  Sure.  Do you think that use of drugs can excuse someone from the consequences of their actions?

POTENTIAL JUROR:  No, I do not.  I think if somebody has done a thing, done a crime if you want to call it that, whatever, they need to experience the consequences from that regardless of if they were intoxicated or not.

ATTORNEY DESROCHES:  So now Juror No. 46 in Seat

9, do you have any thoughts about whether or not drug use can be an excuse for consequences?

POTENTIAL JUROR:  I believe using drugs is a choice and anything that results from that choice you're responsible for.

ATTORNEY DESROCHES:  Does anyone disagree with that?

So in this case you will also hear, likely hear what's called circumstances evidence.  Does anyone have an idea of what circumstantial evidence is?

An example, it's very simplistic, you're not going to hear anything this simple in the trial but just an example.  Direct evidence is seeing the mailman put a letter in your mailbox and then closing the mailbox and walking away.  That's direct evidence that the mailman delivered that letter.

Circumstantial evidence is that you go home after work one day and you open the mailbox and there's a letter with a postmark on it and a stamp.  That's circumstantial evidence that the mailman delivered that letter.  It's very simplistic.  I don't mean to oversimplify the issue because this is obviously for all of us here in a very important situation.

However, circumstantial evidence the judge will instruct you is enough if you believe that proves the

defendant's guilt beyond a reasonable doubt.  In other words, direct evidence is not necessarily required.

So would anyone insist on direct evidence such as an eyewitness or a video recording of the defendant committing the crime alleged before they would convict? Or would they be comfortable convicting on circumstantial evidence if it proved beyond a reasonable doubt the elements of the offense?

Any thoughts on that?  The juror in Seat 8, Number 45, Ms. XXX, do you have any thoughts on that?

POTENTIAL JUROR:  I guess I would have to take all of it together to really make a decision, but it seems if enough circumstantial evidence were presented.

THE COURT:  Could you raise your voice a little?

POTENTIAL JUROR:  Sorry?

THE COURT:  Just can't hear.

POTENTIAL JUROR:  Sure.  I would have to take it as a whole, but I think if there were enough circumstantial evidence presented, I would feel comfortable making a decision based on that.

ATTORNEY DESROCHES:  Does anyone disagree with that?

Yes.  So the record is clear, Juror No. 43 in Seat 6, what are your thoughts?

POTENTIAL JUROR:  There needs so much more than

just circumstantial evidence because just if the question is, like, did the mailman put the letter in the box, even if he just held the letter and the box was there if you're proving beyond any reasonable doubt, a reasonable person could say that the mailman received it and gave the letter to someone else and they put it in the box, right?

ATTORNEY DESROCHES:  So that's a fair point because it's only one piece of circumstantial evidence.

POTENTIAL JUROR:  So with more around it, there needs to be something a little more concrete.

ATTORNEY DESROCHES:  Let me offer some more.  If your neighbor saw the mail truck driving up to your mailbox and then driving away from the mailbox and you arrive home five minutes after that, would that be the type of more evidence you're looking for in order to know if it was the mailman?

POTENTIAL JUROR:  The question is did the mailman put a letter in the box?

ATTORNEY DESROCHES:  Correct.

POTENTIAL JUROR:  I guess if it comes down to like affecting someone's entire life, like did the neighbor see him put the mail in the box?  How can you see it's like beyond any reasonable doubt if there's no evidence of him actually putting it in there?

ATTORNEY DESROCHES:  So it sounds like you're

saying that you would insist on direct evidence that or --

POTENTIAL JUROR:  Yes.  Maybe, yeah.  I guess I would.

ATTORNEY DESROCHES:  Does anyone disagree with that?

THE COURT:  Attorney Desroches, wrapping up in about another minute.

ATTORNEY DESROCHES:  Let me ask one last question.

Previously you all said that you would be satisfied if there was enough circumstantial evidence, not just one shred but enough to convince you, do you -- is that still your belief after you heard what Juror No. 43 said?  Not to point you out but yes, sir?

POTENTIAL JUROR:  Well, I --

ATTORNEY DESROCHES:  Maybe we can make the record so we know who's talking.  It's Juror No. 42 in Seat 5.

POTENTIAL JUROR:  I think the thing that I heard you say was that there would be instructions from the judge that would allow us to take circumstantial evidence into play to be able to get to the point of beyond a reasonable doubt.

ATTORNEY DESROCHES:  Yes.

POTENTIAL JUROR:  I think just circumstantial

alone could lead you to conclude that it might not be beyond a reasonable doubt, but I would listen to instructions from the judge to be able to glean exactly how we break that down.

ATTORNEY DESROCHES:  Thank you for that.  That's a good clarification.  If the judge instructed you that circumstantial evidence is enough if you believed it to be, would you have any trouble following that instruction?  And that's true also Juror No. 43 of you?

POTENTIAL JUROR:  No.  If he instructed me not to -- or if the instruction said circumstantial was enough, I just wonder if like has there ever been a time when a mail truck pulled up to a mailbox?

ATTORNEY DESROCHES:  Unfortunately I think that's bringing the hypothetical out of my direct knowledge and the judge is going to yell if I answer that.  So I will leave you to ponder that.  I cannot answer that.  Thank you all very much for your time.  We do appreciate it.  Thank you.

ATTORNEY O'NEILL-GREENBERG:  Hi, everyone.  Thanks so much for being here.  My name is Forest O'Neill-Greenberg.  I'm here Tim Watkins representing our client John Rathbun.

The first thing I'd like to talk to you all about goes back to drug use because you will hear at the time of

the event a year ago in April and still Mr. Rathbun has a substance use disorder and has a history of struggling with use of hard drugs.

I'm curious what you all think because some folks believe that if an individual uses hard drugs, that use of the hard drugs alone makes that person more likely to commit a violent act or behave violently.  And I don't mean like weird behavior or erratic behavior or interpersonal problems but violent behavior.

So how many folks here just by a show of hands agree with that?  That the use of hard drugs alone makes someone more likely to commit a violent act?  Does anyone believe that, just a show of hands?

Okay.  So no one thinks that?  Okay.

How do feel about whether the use of hard drugs affects your memory or your credibility?

Can I call on Juror No. 40 in Seat 3, what do you think?

POTENTIAL JUROR:  How it affects your credibility?

ATTORNEY O'NEILL-GREENBERG:  Or your memory.

POTENTIAL JUROR:  I think that it could.  I don't have --

ATTORNEY WATKINS:  May I have her move the mic again?

THE COURT:  Sure.  That should do it.  Just place it right there.

ATTORNEY O'NEILL-GREENBERG:  I can repeat the question too.

POTENTIAL JUROR:  I don't know the history or know of anyone with a history, but I do believe it could affect your memory.  I don't think it would necessarily make you turn violent or anything, but I do think the potentially is there.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you for that.  And do you have any thoughts or feelings about if someone is in recovery and they're sober trying to recall acts or behaviors when a time they were using if their memory can be improved when they're in recovery or not?  Do you have any thoughts or feelings about that?

POTENTIAL JUROR:  I don't know if they would get everything back.  I don't know for sure.

ATTORNEY O'NEILL-GREENBERG:  It sort depends on the person maybe?

POTENTIAL JUROR:  Yeah.

ATTORNEY O'NEILL-GREENBERG:  That's fair.  Thank you.

Juror No. 41 in Seat 4, do you have any feelings about whether people who use hard drugs are more likely to commit violent acts?

POTENTIAL JUROR:  It's hard to say.  If you're on hard drugs, you might freak out and do something strange.  I don't know.  I guess the potential is there.

ATTORNEY O'NEILL-GREENBERG:  And when you say do something strange, do you mean like it could just be anything or specifically something violent or you just don't know?

POTENTIAL JUROR:  I don't know.  If they're on drugs, they could just pop off I guess.  I don't know.  I don't do hard drugs, so.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you.

POTENTIAL JUROR:  My thought would be that it could be possible to jump the next level.

ATTORNEY O'NEILL-GREENBERG:  Juror in Seat No. 5, what do you think about what juror in Seat No. 4 thinks?  Specifically just if we have a blank slate human and then we had them use hard drugs, that that alone would make them more likely to commit a violent act or not?

POTENTIAL JUROR:  Well, I don't think the act necessarily would be violent, but I do believe that someone under the influence could exhibit behavior that wouldn't be normal to their personality.  Whether it's strange acts or, you know, other type of behavioral things, but I don't necessary think that drugs equal violence.  But I do think that drugs could equal behavior

that's not acceptable --

ATTORNEY O'NEILL-GREENBERG:  Sure.

POTENTIAL JUROR:  -- in whatever range that might be, but I don't necessarily go right to violence.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you.

Juror in Seat No. 2, how do you feel about what the juror in Seat No. 5 thinks?  Do you agree or disagree?

POTENTIAL JUROR:  Yeah, I agree for the most part.  I mean to use an example from my life, I've certainly had friends that were lower in inhibitions when drinking alcohol than when not and I assume that applies to some drugs as well.  A lot would depend on what we were told probably during the case about the drugs involved obviously, but I don't have any particular information on a particular thing.  But just going by that, sure, I mean, drugs can change how people act in a moment while they're on the drugs.

ATTORNEY O'NEILL-GREENBERG:  Sure.  That makes sense.

So I think if I'm hearing you right, you don't make the connection just hard drugs equals violence but it depends on the person and what's happening?

POTENTIAL JUROR:  Yeah.

ATTORNEY O'NEILL-GREENBERG:  That's fair.  Thank you.

Juror in Seat No. 1, what do you think about this? What's your opinion?

POTENTIAL JUROR:  I think drug use is complicated.  I think people start drugs for complicated reasons and continue it for complicated reasons.  I think that when people are on drugs, they are less reliable as individuals, but it doesn't necessary equate them to being violent.

ATTORNEY O'NEILL-GREENBERG:  Thank you for that.

POTENTIAL JUROR:  I can say that.

ATTORNEY O'NEILL-GREENBERG:  Yes?

POTENTIAL JUROR:  I don't know honestly.  I don't really know what hard drugs would be, but the effects -- I have ADHD and so I'll be energetic, and back in high school I used to take medication and seen my energy and then I would stop taking it.  I hate how it made me more depressed.  So I have noted it has nothing to do with this, but it changed my mood usually like happy, super energetic without it and then I'd take it and I'm just quiet all day long.  I don't feel great so I stopped taking it.

ATTORNEY O'NEILL-GREENBERG:  Thank you so much for sharing your personal experience with us.  I appreciate that.  I think that helps a lot when you're thinking about how drugs can affect you.  It affects

everybody differently.

When I'm talking about hard drugs, I'm talking about not marijuana or alcohol but I'm thinking cocaine, heroin, Fentanyl, hard drugs.

Juror in Seat No. 6, can I get your opinion on this?

POTENTIAL JUROR:  I don't know if drugs make you more violent but definitely like lowering inhibitions.

ATTORNEY WATKINS:  Can we get the mike again?  Thank you.

POTENTIAL JUROR:  I don't know if I think drugs make people more violent.  I'd probably lean away from that.  But could they lower inhibitions?  Yeah.  Would they -- could they affect someone's memory?  For sure.  I don't necessarily think that means it affects their credibility though.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  That make sense.  I appreciate that.

Attorney Desroches when he was speaking to you a minute ago started I think talking about the presumption of innocence.  I just want to loop back to that for a minute.

Intellectually you've all been told and you all know that John sits here presumed innocent, but when you all walked into this courthouse today and you got your jury summons; you went to the federal courthouse; obviously we

are impaneling on a federal criminal case, so it's a serious matter.  How many of you just had that feeling that, well, whoever is being charged in this case, apparently it's John, he must have done something wrong to get to this point?  Did anyone have that feeling?

No?  Okay.  So everyone knew, okay, he's presumed to be innocent and everybody felt that way?  Okay.

Juror No. 2, can I pick on you one more time or Seat No. 3?

POTENTIAL JUROR:  Sure.

ATTORNEY O'NEILL-GREENBERG:  Juror No. 40, did you have that feeling or did you have any -- was there any conflict you might have felt when you knew?

POTENTIAL JUROR:  No, I don't think so.  Especially with the talk of circumstantial evidence, I don't have an opinion either way.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  Thank you so much all for your time.  I really, really appreciate it.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, so the next part of the procedure is that I have a discussion with the attorneys and it's this process where each side has the right to challenge certain jurors; that is, be involved in the selection process, and that's done through these devices.

They're called whisper devices.  Everyone wears ear plugs and the noise machine will go on in the courtroom.  You stay where you are.  You don't hear us talking, but that's the process we're going through.  So, you know, that's what we will be doing.  All right?  I'll give each side a few minutes.

(Sidebar discussion.)

THE COURT:  Okay.  Are the sides ready?  Government and defense is ready?  All right.

Okay.  This is round four.  The defendant challenges first.  Each side has one peremptory remaining.

ATTORNEY WATKINS:  I thought it was the government going first this round.

THE COURT:  Do we agree this is round four?

ATTORNEY WATKINS:  It seems so long ago.

ATTORNEY DESROCHES:  Your Honor, I think this is actually round three.

ATTORNEY O'NEILL-GREENBERG:  I think we went first the last time challenging and so I thought it was the government going first this time.

THE COURT:  Le me check with the clerks.  I think this is round four.

ATTORNEY BRESLOW:  Your Honor, I think it is round four and we led the last time.

THE COURT:  Okay.  I clearly have and I'm

entirely satisfied that this is round four.  Round one, government went first; round two, defendant went first; round three, government went first; round four which this is, the defendant goes first.

ATTORNEY WATKINS:  In that case then the defense is content.

THE COURT:  Thank you.  Government?

ATTORNEY DESROCHES:  Your Honor, the government uses a peremptory on Juror No. 37 in Seat 1, XXX XXX.

ATTORNEY WATKINS:  Judge, for the record that's going to be Seat 8, correct?

ATTORNEY DESROCHES:  She would be seated in Seat 8.

THE COURT:  Right.  That would be Seat 8.  Let me just confirm that.

Yes, I agree that would be Seat 8.

(End of sidebar discussion.)

CLERK RIVERA:  Juror No. 37 Seat 1, please stand.  You are now excused.

THE COURT:  Thank you very much for your participation.

POTENTIAL JUROR:  Thank you.

(Sidebar discussion.)

ATTORNEY DESROCHES:  Can we address one issue? We didn't challenge for cause prior to getting to the

peremptories.  The government didn't have any challenges for cause, but I just wanted the record to be clear.

THE COURT:  Okay.  Yeah, I took that as a given.  But did the defense have any for cause?

ATTORNEY O'NEILL-GREENBERG:  No, we did not.

THE COURT:  Okay.  Thank you very much for making that clear.  I should have.

All right.  So there being no for cause challenges, now we are now in round five.  Government, you have no more peremptories.  So it goes to defense who has one remaining.

ATTORNEY WATKINS:  Judge, I just want to make clear at this point also Juror No. 38 who is presently in Seat 2 for the jury is actually going to be in Seat 11, he is now seated in the jury; is that correct?

THE COURT:  Yes.  You are correct, Seat 11.

ATTORNEY WATKINS:  And so that means now Juror No. 40 who is sitting in Seat 3 is the next one up for Seat 8?

THE COURT:  That is correct.

ATTORNEY WATKINS:  Having made that clear, the defendant is content.

ATTORNEY DESROCHES:  The government is content, Your Honor.

THE COURT:  Okay.  So now we are just going to

move in now to the alternate process.

So to the parties, Seats 41 and 42 -- Jurors 41 and 42 presently in Seats 4 and 5 are the two choices for alternates. Each side has one challenge for the alternates and the government would exercise first.

ATTORNEY DESROCHES: The government is satisfied, Your Honor.

THE COURT: Thank you. Defense?

ATTORNEY WATKINS: The defense would challenge Juror 41 presently seated in Seat 4.

THE COURT: All right. We then move to consideration of the juror for the alternate presently in Seat 6, Juror 43. The defense has no challenges remaining. Government?

ATTORNEY DESROCHES: The government would exercise a peremptory on Juror 43.

THE COURT: All right. Thank you. The government having exercised their challenge means the second alternate is the juror presently in Seat 7 who is Juror 44. Do the parties agree with that?

ATTORNEY DESROCHES: Yes, Your Honor, for the government.

ATTORNEY WATKINS: That is correct, Your Honor.

(End of sidebar discussion.)

THE CLERK: The following jurors please stand

up:  Juror No. 41, Seat 4, please stand; Juror No. 43 in Seat 6; Juror No. 45 in 8; Number 46 in 9; Number 45 in 8.

POTENTIAL JUROR:  44.

THE COURT:  Okay.  You're 44.  All right.

POTENTIAL JUROR:  Sorry.

CLERK RIVERA:  You're 44 in seven.

Forty-five in 8; forty-six in 9; forty-seven in 10; forty-nine in 11; fifty in 12; fifty-three in 13, and 54 in 14.  Those jurors that are standing up are now excused.

THE COURT:  Let's go back on WisperTech.

(Sidebar discussion.)

THE COURT:  All right.  To the parties, I just want to confirm now that we have remaining after we excused the rest of the jury, we have remaining the jurors in Seat 2 and Seat 3 which become part of the sitting jury, and then we have the alternate in Seat 5 and 7.

Is that confirmed by the government?

ATTORNEY DESROCHES:  The government agrees, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Yes, we are in agreement.

THE COURT:  Okay.  All right.  Very good.  So I will give these individuals the instruction about not talking or communicating about the case and then they will

be excused until Monday.  All right?

ATTORNEY DESROCHES:  Thank you, Your Honor.

(End of sidebar conference.)

THE COURT:  All right.  Ladies and gentlemen, you are part of the jury.  All right.  This case -- by the way, the other people that will be in the jury were selected yesterday.  Today is the second day of jury selection.  So the full jury will all be here on Monday. All right?  We start Monday.

The clerk when you are leaving will give you instructions on where to go and where everyone meets and the procedure for when you arrive here.  We always try to start at nine o'clock.  It's rare that we actually start on time, but that's what we try to get -- that's what we aim for.

Here are the instructions between now and Monday. There's absolutely no communication with anyone about this case.  So the most you can tell people is that you were selected as a juror for a criminal case, and you can tell them if you remember what the charges were and any generalized information about the case.  But do not say anything to anyone that might invite a reaction from someone who says, oh, I think I know or think I heard about it or anything like that.  That's the risk.

If there is any media coverage, and I don't know that

will be, but if there is, just avoid it.  If you see it come on or hear it, whatever, avoid it.  If someone talks about it, avoid it.

Do not do anything in this case to try to get more or additional information.  Don't do any internet searches. Don't jump on Google and start looking things up that you think might be involved in this case.

Don't start looking up legal principles.  Don't look up proof beyond a reasonable doubt and look for a definition or look up -- I'm just picking out terms that we were talking about -- circumstantial evidence.  Do not do that.

Do not go on social media about the case, blog about the case, or anything like that.  Anything where you are saying anything about your involvement or trying to get some feedback or learn anything about this case.

Do not drive by and go try and to look at where you think this case occurred or any locations that might be relevant to this case.

Don't look up any old articles, if there were any about the case, any printed about the case.  Essentially avoid this completely.

Also, do not start thinking about the case, about what you think about it.  You can't think anything about this case until you hear the evidence.  Don't go home

dwelling on thinking about things that were talked about during the voir dire process, the concepts about the law. Just don't do that.

Deliberations can only start after you heard all the evidence in this case and when you are together as a group. So as a group that's the only time you can deliberate. Deliberations are not you alone trying to think about the case and sort it through. It's when you're together as a group and that obviously can't take place until you hear all the evidence.

So when you come in on Monday, I'll ask the group of jurors, you obviously included, if everyone was able to comply with my instructions. And if something happened, if someone came across a news article or heard something or whatever happened, you'll tell me about it and we will talk privately and we will deal with whatever the situation was. All right?

So no communications about this case and don't expose yourself to anything to do with this case. All right. Other than that -- and I'll give you that instruction every time you leave. So other than that, we will see you Monday morning. All right.

CLERK RIVERA: All rise for the jury.

**(The jury left the courtroom at 2:04.)**

THE COURT: Okay. Attorney Watkins, I had a

brief moment to look at the motion in limine. I don't think I need -- if each side wants to take two minutes and just highlight your points on that, that would be fine, but I really don't need more than a couple of minutes from each side. I'm very familiar with obviously the issues that are being raised.

ATTORNEY WATKINS: Judge, I don't intend to go on at really any length. There's just a little bit of frustration perhaps here. I've been trying to work with the government to figure out what exactly they're going to have these witnesses testify to. The answer I get is we know what the judge's rulings are. Look through the reports and, you know, you figure it out.

Unfortunately because of the gravity, if you will, of some of the testimony that's proposed there, I just want to make sure we have the rules of the road before the opening and before the witnesses get up there so I know --I'll be able to know when to object if the government is trying to get in things that seem to me to be fairly clearly violating some of the court's rules and the rules of evidence more generally. So that's the reason that I filed this motion.

THE COURT: Okay. Well, I certainly don't anticipate that either side in this case would be trying to kind of short circuit the ruling and get around the

ruling. But, you know, also having said that, there's no rule that makes -- that you can cite that would say I have to tell the government to preview the case for you.

What do you want to say, Attorney Breslow?

ATTORNEY BRESLOW: Well, I appreciate the opportunity also to be heard briefly so that we all understand what the rules of the road are.

One of the motions -- one of the orders on the motion in limine was a little bit terse and it concerned All Energy Solar, and so what I'd like to do is just make a proffer of what I think that witness will say.

I also want to clarify that we're not going to be asking the police officer about his decision against putting the defendant in protective custody or arresting him. We're not going to be doing that.

We're not going to be calling Dana Graham to talk about cocaine psychosis, either her own or the defendant's.

We are going to be calling each of them, the officer and Dana Graham, to talk about what the defendant said and what the defendant did, about his particular behavior, his particular actions.

I think Dana Graham will say that the defendant was hallucinating. I think that's a common phrase. It's not a medical diagnosis. He was clearly seeing people in his

143

car who were not there.  So that may be the only term that she uses that approaches the phrase cocaine psychosis, but she's not going to be talking about that at all.  We've already instructed her on that.

With respect to Alfred Alschuler, the All Energy Solar supervisor, I do want to lay out a little bit more of what I expect his testimony to be so that we can understand what the rules of the road are.

So each of these incidents took place on March 3rd. The All Energy Solar incident took place in the morning and the Chicopee motel incident took place in the afternoon.

I should state also that each of these incidents the investigating Agent, Ryan McGonigle, was aware of when he executed the search warrant and interviewed the defendant on April 15th and he spoke with the defendant about each of these incidents, the termination of his job and then in particular the details about the incident at the Chicopee motel.

The earlier trial the testimony was restricted, but Your Honor has allowed us to expand the testimony concerning the Chicopee motel based on our subsequent motion in limine.

But turning to Alfred Alschuler, what we expect him to testify is that he was Mr. Rathbun's supervisor's

supervisor and that on the morning of March 3rd he received, without specifying for the jury, serious complaints about the defendant's conduct at work. That he contacted Mr. Rathbun. That he asked Mr. Rathbun to come immediately to the office. That Mr. Rathbun was about half an hour away but he didn't show up for about four hours. That when he did show up, he clearly appeared intoxicated. That he asked -- Mr. Alschuler asked Mr. Rathbun if he was intoxicated and if he had engaged in the complainted activity, without specifying what it was, and Mr. Rathbun said no. He wasn't not intoxicated and he didn't engage in that activity.

They agreed to meet two days later. Two days later Mr. Rathbun came back and he admitted the activity that he had denied earlier, and he admitted the intoxication that he denied earlier. He essentially blamed the intoxication for causing the activity.

And so each of these witnesses I expect will be 10 or 15 minutes on direct. They're very short witnesses. They cover the same period of time, March 3rd, and they're relevant because the defendant admitted to the special agent that approximately two weeks earlier, meaning around April 2nd, he had been using drugs again.

THE COURT: When you say -- when you're using the word intoxicated, are you referring to alcohol

intoxication, an odor of alcohol when he was talking to Mr. Alschuler?

ATTORNEY BRESLOW:  So particularly with Mr. -- I'll say with Ms. Graham, Ms. Graham will explain that they were using drugs, in particular I think powder and crack cocaine and heroin and with Mr. Rathbun in addition to those Xanax.

Mr. Alschuler will say -- I think that would be his phrase, intoxication.  I don't know think he's specifically referring to the alcohol intoxication but just under the influence of some substance.

THE COURT:  Okay.

ATTORNEY BRESLOW:  He will say that when he asked Mr. Rathbun if Mr. Rathbun were intoxicated, Mr. Rathbun not only denied it but he leaned into Mr. Alshuler's face and he breathed into it -- this was during the pandemic -- and Mr. Alschuler was taken aback.  He did so, Mr. Rathbun, to establish that he wasn't drunk.  That he wasn't intoxicated from alcohol.  So that's the use of the phrase.

THE COURT:  All right.  Thank you.

Did you want to address that at all?

ATTORNEY WATKINS:  Yes, Your Honor.  I think it's good to take a step back here.  This is being admitted over the defendant's objection.

Just to be clear, these are prior acts. It's clearly governed by Rule 404. It doesn't through a wide ranging search around testimony to make Mr. Rathbun look bad. It is solely, as I understand it, for the state of mind on April 2nd. Not the state of mind at the time that Mr. Rathbun was interviewed by an FBI agent, and so I don't know what the relevance of that is and why that allows this to come in.

So when we take a step back, I still -- it is just befuddling to me how the government intends to argue this evidence at the end of the day.

THE COURT: Are you focusing more specifically on Mr. Alschuler or the hotel witness, the motel witness?

ATTORNEY WATKINS: I think both of them. It seems that, as I understand it, now Mr. Breslow is likely to argue to the jury here's what happened a month earlier on March 3rd. Here's why you can draw as an inference that what happened on April 2nd when we allege that Mr. Rathbun put it there and so I have kind of joined those two things because Mr. Breslow did.

But taking one on one, besides -- what the court ruled is the job loss could come in and there's not a problem with that. As the court will recall, Mr. Rathbun admitted that. He admitted that he was fired for drug use and particularly driving erratically. I do expect that

that will be similar testimony coming in the second trial.

Why anything else beyond that comes in?  The fact that Mr. Rathbun breathed on the person is simply kind of an ooh factor that the government intends to paint Mr. Rathbun with.  It's difficult to see how that comes in. It's difficult to see why when he changed his story within 24 or 48 hours and admitted that he had been driving when he first denied it.  I don't understand how that goes to state of mind.  I simply don't see anything beyond the fact that Mr. Rathbun was terminated because he was driving erratically and was using drugs.

THE COURT:  All right.  Okay.  I'll have a ruling out to you shortly.

ATTORNEY WATKINS:  I do want to make special mention of the hallucination testimony from Ms. Graham. That clearly is someone testifying as to somebody's else state of mind and it simply doesn't come in on an evidentiary basis.

More importantly, what the government is trying to do here is to say that Mr. Rathbun because on March 3rd he was hallucinating after using drugs, must have been hallucination on April 2nd when he placed this device here.

There's simply no -- it does not have the kind of special relevance.  It doesn't have really any kind of

probative value I would suggest, certainly not the kind of special relevance that's required of prior bad act context.

It's for all those reasons -- judge, I would just wrap it up more time. I still don't get it. I honestly am having trouble understanding how the government is going to get up at the end of the day and argue to the jury what they're supposed to take from that March 3rd incident because I simply can't, it certainly sounds like propensity all the time. That he acts crazy; he was acting crazy here. That's prohibited by Rule 404 and we continue to make that objection.

THE COURT: All right. Thank you.

What's your position on the use of the word hallucinating? Why isn't hallucinating subject to its common interpretation like the word drunk or intoxicated or high?

If the testimony is going to be -- I don't know what the testimony is going to be so this is an example I'm giving. If the testimony is two people are standing together and person number one they're both looking, they're looking to the right and one person is saying do you see those four people over there dressed in yellow shirts? And there's no one there and, you know, the person who's observing someone say that statement thinking

that there's four people standing there in yellow shirts but they're just not there, what else would a -- what other common word would be used to describe that if you were to describe what was going on?

ATTORNEY WATKINS: The court used the analogy of describing somebody as drunk. When we describe somebody as drunk, we're observing physical reactions. It's a large word that covers quite a bit of territory there.

Hallucination is getting into somebody's state of mind. I think that he was seeing something that simply wasn't there. We don't know what Mr. Rathbun was seeing out there. Nobody knows what was being seen out there. Nobody frankly knows exactly what was out there. This is a parking lot that was seen from some distance away. Perhaps the government can argue from that that he was simply reporting something that wasn't happening. She does not need to use the word hallucinate to get there.

THE COURT: So your bottom line is you don't think hallucination or hallucinating is a term that's subject to some common interpretation?

I absolutely agree with you that hallucinating can be and is subject to a medical or specialized psychiatric type of diagnosis, but I'm thinking it's also a word that has some common acceptance and understanding and you're saying no?

ATTORNEY WATKINS:  Taking it outside of the drug context if someone is -- for example, if Mr. Rathbun hadn't been on drugs that day but was doing outlandish things, some people might say he's crazy.  Why is he doing that?  We would not allow a witness to come in here to say the person is crazy just because that's quintessentially testifying to somebody's specific state of mind when they're doing that and that is not within the common -- well, it's not within the specialty of the witness.

THE COURT:  Someone might not be able to say that person is crazy, but the witness might be able to say that person was acting crazy.

ATTORNEY WATKINS:  I think acting crazy is different than hallucinating.  Hallucinating again is getting into a person's mind.  They are seeing something that is I think --

THE COURT:  I understand your point.  Okay.  So I'll issue a ruling.  All right.  Thank you.

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY WATKINS:  Your Honor, just one more housekeeping matter.  I know we're not starting until Monday.  I actually expect this trial to move quite along quite quickly along because we've all been through it before.  I just want to make sure that we are going to get a witness order within a day or so.  That tended to be a

problem the last trial and I want to make sure.

THE COURT: I think I told the parties this the last time. I'm not -- it's not my practice to require witness lists or witness orders be provided by either side. It's something that, quite frankly, boils down to the interaction between lawyers.

ATTORNEY BRESLOW: Your Honor, what I think we can do is on Friday give the defense an estimate of what we expect to be doing on Monday and on Monday give them an estimate of what we expect to be doing the next day. My recollection is that's what was done by Mr. Desroches and Ms. Berkower the last time.

THE COURT: That's fine. The parties can work that out. Please don't create a situation where the defense might be left without a witness. In the middle of the day you're done and then the defense has no witnesses. Give the defense advanced notice so we can keep going.

ATTORNEY BRESLOW: Meaning at the --

THE COURT: Whenever you're getting close to closing your case, give them enough notice so they can have a witness ready to go. I don't want to take a half a day break because the defense wasn't ready to have a witness.

ATTORNEY BRESLOW: Right. Exactly we will certainly do that. I do want to remind the court that

there is this event on Friday.  So if it's possible, I'd like to just check in with the deputy on Friday or Thursday night.

THE COURT:  Yes, that's fine.  We'll all be -- I didn't look at the weather that far.  I know it's going to be very warm today and tomorrow.  We'll see what happens.

ATTORNEY BRESLOW:  All right.

ATTORNEY DESROCHES:  Thank you.

CLERK RIVERA:  All rise.

**(Court recessed at 2:20.)**

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )


          I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)


/s/ Alice Moran                        May 30, 2022
Alice Moran, RMR, RPR
Federal Official Court Reporter