UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )           20cr30018-MGM
     vs                   )
                          )           June 7, 2021
John Michael Rathbun      )
_____ )


TRIAL HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:


On behalf of the government:  Neil L. Desroches, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105.

Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant:  Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D

Springfield, MA 01105

(413)731-0086
alice.moran@verizon.net

INDEX

Opening Statement Attorney Desroches                    55

Opening Statement Attorney Watkins                     67


Witness:                                              Page:


**Michael Nothe**

Direct examination by Attorney Desroches               76

Cross-examination by Attorney Watkins                  96

Redirect examination by Attorney Desroches            108

Recross-examination by Attorney Watkins               110


**Gary Fontaine**

Direct examination by Attorney Desroches              113

Cross-examination by Attorney Watkins                 154

Redirect examination by Attorney Desroches            158


**Alana Darby**

Direct examination by Attorney Desroches              159

Cross-examination by Attorney Watkins                 179


**Robert Hill**

Direct examination by Attorney Breslow                186

Cross-examination by Attorney O'Neill-Greenberg       215

Witness:                                                      Page:


**Steven Rhoads**

Direct examination by Attorney Breslow                         222

Cross-examination by Attorney O'Neill-Greenberg                246



| Exhibit No. | Description | Page |
|---|---|---|
| 1 (PX-7) | Photo of container | 86 |
| 2 (PX-9) | Photo of container | 87 |
| 3 (PX-10) | Photo of sidewalk and crosswalk | 89 |
| 4 (PX-104-1) | Aerial Photo of Converse Street | 91 |
| 34 | Photo of 780 Converse Street driveway | 107 |
| 5 (PX-1) | Container | 123 |
| 6 (PX-3) | Pamphlet | 125 |
| 7 (PX-11) | Photo of container | 126 |
| 8 (PX-12) | Photo of container | 128 |
| 9 (PX-13) | Photo container | 134 |
| 10 (PX-14) | Photo of handle stain | 134 |
| 11 (PX-15) | Photo of container front | 134 |
| 12 (PX-16) | Photo of pamphlet | 134 |
| 13 (PX-17) | Photo of pamphlet | 134 |
| 14 (PX-18) | Photo of pamphlet | 134 |
| 15 (PX-19) | Photo of pamphlet | 134 |
| 16 (PX-20) | Photo of pamphlet | 134 |

| Exhibit No. | Description | Page |
|---|---|---|
| 17 (PX-21) | Photo of entranceway | 138 |
| 18 (PX-22) | Photo of entranceway | 140 |
| 19 (PX-23) | Photo of entranceway | 140 |
| 20 (PX-24) | Photo of entranceway | 141 |
| 21 (PX-25) | Photo of entranceway | 141 |
| 22 (PX-26) | Photo of entranceway | 142 |
| 23 (PX-27) | Photo of entranceway | 142 |
| 24 (PX-28) | Photo of entranceway | 142 |
| 25 (PX-29) | Photo of entranceway | 143 |
| 26 (PX-30) | Photo of entranceway | 143 |
| 27 (PX-31) | Photo of entranceway | 144 |
| 28 (PX-32) | Photo of entranceway | 144 |
| 29 (PX-86) | Account Profile Report | 195 |
| 30 (PX-87) | Account Profile Report | 200 |
| 31 (PX-85) | Record of mailings | 210 |
| 32 (PX-4) | Pamphlet | 213 |
| 33 (PX-54) | Digital photo of pamphlet | 214 |
| 34 (PX-106) | Unstapled pamphlet | 245 |

**(Trial commenced at 9:12.)**

**(The defendant is present.)**

CLERK RIVERA:  The matter before the Court is Criminal Case 20-30018, the United States of America versus John Rathbun.

Counsel, can you please identify yourself for the record?

ATTORNEY DESROCHES:  Good morning, Your Honor. Neil Desroches on behalf of the United States.

ATTORNEY BRESLOW:  Good morning, Your Honor. Steven Breslow on behalf of the United States.

ATTORNEY WATKINS:  Good morning, Your Honor. Tim Watkins, Federal Defender Office on behalf of John Rathbun who's present with us in court today.

ATTORNEY O'NEILL-GREENBERG:  Good morning. Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning, everyone.

CLERK RIVERA:  You may be seated.

THE COURT:  Let's start with the miscellaneous issues that we have to take up before the jury.  All right.

Last evening I had the clerk send records or data, send documents to the parties in reference to what Attorney Watkins had filed at 315, Docket 315, motion for

reconsideration, and let me be absolutely clear about that motion for reconsideration.

The motion for reconsideration was allowed based upon the second paragraph of the motion which says, at a minimum -- at a minimum, defendant requests that the Court make immediately available the materials it had directed the clerk's office to assemble.

So that's the part of the motion -- I just want to be absolutely clear -- that's the part of the motion that was reconsidered, to give you what we had talked about in court. The balance of my motion remains the same. It was -- much of the material was well beyond and will take some looking and putting together, but I didn't want to -- I just wanted to make that clear.

So let me take you back a little. When this motion was filed -- so when we left court Friday, I didn't know, myself or my staff didn't know about any motions that were on the docket waiting to be resolved until 3 o'clock Sunday afternoon when Ms. Healy called me and just happened to be looking at a docket on a Sunday afternoon and told me about this.

So from there, several hours passed. Ms. Healy was able to take a break in her day and come down to the courthouse because that's where all the data was for day one, and then we were able to get in touch with the jury

administrator later on, more close to dinnertime, who needed to put together day two.  All that information got put together, and it resulted in a mailing to the parties.

All right.  So that takes care of the reconsideration of Docket 315.  The information was provided to you and to your staff in a way that if you did have anyone consulting with you on jury matters, that could be shared with them.  But, clearly, the order speaks for itself about not disseminating any further.

All right.  Now, the information, quite frankly, was very manageable.  It wasn't overwhelming in the amount of material that it presented.

So, Attorney Watkins, you had also filed a Docket 317 motion to stay proceedings.  In light of your reviewing the material, pursuant to the motion to reconsideration, the material that was sent last night, did you want to be heard on filing a 317 motion to stay the proceedings?

ATTORNEY WATKINS:  I do, Your Honor.  May I remove the mask or must I keep it on?

THE COURT:  You know, we're going to keep the masks.  We started the trial with the masks.  We are at this very strange time where it's changing, and we're in the middle of the change.  Stay with the mask unless you're behind the shield.

ATTORNEY WATKINS:  Thank you, Your Honor.

Reluctantly, I am pressing -- we are pressing the motion to stay, and we're asking the Court to reschedule the matter.

First, I, likewise, want to acknowledge the clerk's hard work here in getting the materials and also the Court's hard work.  I understand that this was a rapidly evolving issue.  It was first identified on Tuesday when I raised that issue, why a quarter of the jurors were being called off due to COVID-19 concerns which caused me to look into it, at first to alert the Court to it, and then for me to do a little more work on the legal issues and the statutory issue.

I will tell the Court I was vaguely familiar with it from some other cases where colleagues had done the work on it, but I had never gotten my feet quite as totally wet as in this case.

What I quickly found out from reading the statute and also consulting with an expert that I began consulting with is that this is not a quick or easy thing.  It's a very real issue, but it's also very intensive.  It is statistics intensive, and the statute bears that out and talks about the kinds of things that are needed, an affidavit concerning why a particular venire does not represent the cross-section of the community.

That is what generated my motion for discovery, if

you will, or seeking the materials.  And the Court is quite right.  It's far more than we anticipated -- certainly I anticipated -- when I asked for the materials on Tuesday and Wednesday.

Nevertheless, I think all of the materials in there are necessary to make a proper challenge here.  It is a case on either you're going to do it or you're not.  It's not a case where you can go halfway.  The statute is very, very specific and the case law is very, very specific about the kinds of things that have to be shown to identify a particular class of people, a variety of things that go into it.

That's my way of saying I was hopeful and, as the Court noted, certainly my motion for reconsideration I asked in the alternative for the kinds of materials that the Court gave us yesterday.

My hope on Friday in doing that was a last-ditch effort to be able to look into these materials with a hope that my expert would be able to tell me on kind of a *prima facie* basis do you have something here or don't you?

My last-ditch hope was that he and I would be able to look at those materials over the weekend to be able to report to the Court about whether we intended to go forward and pursue the other materials and look in much more depth at whether there is a challenge to the cross

section, a fair cross section of the community.

But as the weekend went on and the Court was not able to rule on it and, again, I understand this was an emerging motion, it was filed in the afternoon on Friday. It became clear that that was not going to be possible to do that. The Court did send, through the clerk, very late last night the materials. I glanced through them. At the same time, I think all of us are preparing for trial in the expectation that this might go forward today.

I can't tell the Court that I've done any more than a cursory look to it. I did contact the expert I've been consulting with this morning to ask if he was available today to take a look at the materials the Court has provided. And he tells me he's working on another case in the Eastern District of New York, but he will do the best he can to help me out today.

My concern is that I would be fooling the Court if I was able to tell the Court that even in a day or even in two days that I would be able to get to the bottom of it. Again, this goes back to filing the motion on Friday. I anticipated needing every bit of the weekend to get to even that triage point, that *prima facie* point.

If I try to tell the Court that coming back here, say, Wednesday that I'm going to know that we're going to be able to tell the Court one way or the other whether

we're going to pursue this or not, I feel like I would be fooling the Court and, more importantly, the jurors that we're going to be, perhaps, asking to come back on another day.

So I guess to summarize, the issue is real.  It is still very, very confusing to me.

THE COURT:  What's the issue that's real?  In court you had asked -- you had mentioned there's no one here from Holyoke and people didn't show in response to the summons.  They called the clerk's office.

ATTORNEY WATKINS:  So I used Holyoke as an example just because it's the thing that occurred to me as I was looking through the materials there.  It was not meant to be the only issue there.

As I began looking into it, it was more the general matter of what is happening when one quarter of a venire, potential venire has to be excused or called off due to COVID-19 concerns when, indeed, the percentage of cases active in Massachusetts, indeed across the country, is far, far, far below that.

So the question then becomes who are the people that are calling off, and it does have an affect on whether Mr. Rathbun is getting a fair cross section of the community.

THE COURT:  So from what I can tell from the

first day, there were four individuals who just didn't show but called in with various reasons and those reasons are included in the materials.

From the first day, there were 15 people who indicated that they were symptomatic. From the second day, there were five people who were excused for the health screen reasons and two no-shows from the second day.

And, again, that's my quick -- I'm not telling you I spent hours and hours coming to those numbers. I put those numbers together quickly. They could be subject to an accuracy check.

So based upon what's there and you have -- and if your jury consultant can be looking at this during the day, during the day tomorrow, you are not losing your right to raise this issue again if you think something comes up. I'm not going to stay the proceedings right now.

The rule, 28 U.S.C. 1867, indicates that you would be obligated to bring this issue to the Court's attention before voir dire -- and it sounds like you had a jury consultant and thought about it -- or within seven days after you discovered or could have discovered.

I'm clearly -- my ruling is clear that you have not discovered any issues. Whether or not you could discover,

maybe you could when you get new material and start looking at this and show me, but the seven days would start to run from when you could.

At this point, I do not see that you have discovered anything, particularly in light of the analysis being a stay of proceedings which needs to be supported on the ground of substantial, the word being substantial, failure to comply with the provisions of the jury selection system.

So that's my ruling. You have those preliminary materials that you asked for in the reconsideration. The bulk of the other materials I still don't find that the Court is going to be in a position to really sit down and analyze those and determine when that material will be available because some of the things are, quite frankly, very complicated. Jury wheel-related things and data production and pulling of data just will take a longer time.

I certainly, I certainly accept your thoughts that overall it's an important issue to analyze this and analyze the fairness of jury selection during the pandemic and any effects on that. But right now where we're at, given what we had talked about in court last week, what you had just kind of developed off the top of your head as we went through and with this supporting documentation,

which is the very beginnings of what you asked for, the numbers and what they show do not establish a substantial failure, and I do not find your seven days has started to -- could have started to run.

CLERK RIVERA:  Hold on one second, Judge.

The Court is directing everyone who is watching these proceedings via Zoom video to keep your devices on mute at all times, please.  If you cannot keep your device on mute, we will have to take you off of the Zoom.  Thank you.

THE COURT:  All right.  So that motion, the motion for stay of proceedings is denied without prejudice.

ATTORNEY WATKINS:  Your Honor, again, it's going to be there -- I will send those materials to my expert. I do know that he's going to request those other materials.  It may seem more daunting than it is.  These are -- many of the things I've requested are things, indeed, that the jury administrator is required or just as a general practice will have and can make them available.

I guess if nothing else, I am asking the Court to continue to try to get that kind of information.  I don't know if it needs to be an order or something else that those materials continue to be sought because my jury consultant I know right away will start to ask about those

things.

This is not a person in Western Massachusetts.  I will have to educate him about the communities here.  Part of that education is what the jurors that arrive here in the ordinary course from the Western Massachusetts -- from the Western division, and so I just know that at some point he's going to say I can't do anything with this without those other materials that you have requested.  So that's thing one.

Thing two is that the Court has scheduled all day -- to try this case all day.  And, of course, it's a trial.  We are always preparing for the next day in the evenings.  It's difficult for me to see how I'm going to be able to dive into this very, very intense thicket of statistics and the like and talk to my jury consultant while at the same time we're trying to prepare for trial.

THE COURT:  Sure.  I definitely appreciate the workload, but the information that was provided, that first level of information that you talked about last week that now we ultimately provided to you last night, it's not a thicket.  It's not a web of information that takes a very long time to get at least a feel or a very good sense of the number of people that were called, what were the health concerns, who called the clerk's office, who were no-shows, the towns that they came from.  It's not

overwhelming at all.

ATTORNEY WATKINS:  The problem is that when we talk about feel or sense, that's not enough for the statute there.  That's not enough to litigate a claim under the fair cross section.

THE COURT:  Well, your claim for a stay of proceedings is speculative at best, and so that's not enough to rise to the level.  So we're caught between this issue of you trying to get more information to bolster that, which I fully understand, but you were concerned about your rights under seven days and I just don't see that your seven days has run yet -- has started.

ATTORNEY WATKINS:  It's very unclear to me, either as a statutory or a practical issue, it's very unclear to me that one can bring this challenge while a jury has already been seated.

More to the practical issue, what if it turns out that there is an issue that the Court then has to decide in the middle of trial and then we have to send the jury home.

I understand we're all reticent about having wasted a couple of days of time for all of us and the jurors picking them, but that's going to be magnified if we get to the middle of the trial and all of a sudden have to stop and start all over again.

On top of that is I think the very real probability that this will become a nonissue even a month from now as the pandemic cases continue to go down, as vaccinations continue to go up.

We may be a month from now where there are zero people calling off for COVID-related issues, and I guess at this point, while I understand and everybody in this courtroom wants to get this case done, not the least is Mr. Rathbun who's had this hanging over him for some time, but one month of time to come back here and impanel a jury and make sure that it's a fair cross section seems to me a practical thing that the Court can do to ensure that there is the proper jury and the proper cross section.

THE COURT:  So anecdotally and without any reference to statistics, the numbers of people who were no-shows don't seem any different than pre-pandemic.  And the number of people who didn't show because of health questionnaire issues, I guess it depends upon your view of it, whether or not you consider the numbers small or whether you consider the numbers significant.  They're not large numbers because several of the no-shows were for other reasons - can't get there, no ride, death in the family, confused, I have to go to state court today, other things like that.

So my ruling remains.  The stay is denied.  I'm

ruling that there is no showing.  There is no ground to find that there's a substantial failure to comply with the provisions of the jury selection title at this point, and I've already mentioned about the seven days.

You have the information that you requested if you want to talk more about the issue or re-raise the issue, this is without prejudice after your jury consultant gets looking at that.  I realize every ruling and every possibility for it coming up again creates another complicated issue, but that's what we're going to do.

ATTORNEY WATKINS:  Judge, just on the issue of the additional information, the master jury wheel and the things that the jury administrator has, is it the Court's ruling that we are going to get that as soon as possible?

THE COURT:  No.  That's not my ruling.  I haven't taken up -- I haven't taken up that motion, that full -- I haven't taken up any parts of the motion that were beyond what we originally talked about in court, beyond what you were provided last night.

ATTORNEY WATKINS:  Thank you, Your Honor.  We will proceed accordingly.

THE COURT:  I'll be looking at that.  I obviously will be looking at that motion during the break. I don't know how I'm going to rule on the motion, but I imagine a lot of my ruling on the motion is going to be

trying to find out availability and how that is generated to keep you informed.

You can be sure that the Court is going to endeavor to be as absolutely transparent as possible with this information. It's just a question of timing. I think it's an important issue. It's just when it's going to get raised. All right.

ATTORNEY WATKINS: Thank you.

THE COURT: Okay. We have another outstanding motion. We have a motion for reconsideration of the in limine request for Rabbi Kosofsky; is that correct?

ATTORNEY WATKINS: Yes, Your Honor.

THE COURT: All right. I read the motion. I don't agree -- I don't disagree. I should say I don't disagree with the concerns you raised and your summarization of what you feel is tactical for purposes of creating some type of prejudice.

This Court has been clear in making a record for many months now regarding the anti-Semitic portion of this trial being off the table. However, I think my last ruling was sufficient for narrowing what Rabbi Kosofsky could testify about and for providing a guide to be followed by the government to stay away from that particular issue.

So I'm certainly not going to go down the road of --

the government can pick their witnesses.  I'm not going to get in the business of telling the government which witnesses they can pick, and so the motion is denied.  I assure both parties and I am very sensitive to this issue and overstepping on the issue.  All right.

ATTORNEY BRESLOW:  Your Honor, we appreciate Your Honor's consideration of all the motions in limine. We have not had an opportunity to discuss with Mr. Kosofsky the decision on the second to the last motion in limine concerning the people who walk on the sidewalk and the other Jewish institutions in the neighborhood.

I just need a brief period of time before he testifies to remind -- to inform him of the Court's limitations to make sure there's no issue when he does testify.  And consistent with Your Honor's ruling today, we do expect to ask him where do you work?  Are you familiar with the Jewish nursing home complex across the street?  And how are you familiar?  He'll say that he does do work at that complex including at Genesis House and at Ruth's House.

THE COURT:  All right.

ATTORNEY WATKINS:  Judge, I recognize the Court's ruling, and the Court's probably right.  We tiptoed around the line the last trial about how much came in.  As the Court has recognized in its motion, the simple

fact that this is a Jewish-affiliated grounds here injects a certain amount of at least question of anti-Semitism here.

Given the Court's ruling that one of the -- well, not one, the very first witness is going to be a person of the Jewish faith, I feel like I have to address that immediately in the openings. So I do want to alert the Court that I do expect to talk about anti-Semitism and white supremacy that's not going to be a part of this case, but I will do so in the opening given that this is going to come full on.

THE COURT: In other words, raise the issue that you're not going to hear evidence of?

ATTORNEY WATKINS: Exactly.

THE COURT: You're not to run with the theory that arguing that there is no evidence your client was associated and there was computer searches and everyone looked and no one could find anything, that's not what you're going to do?

ATTORNEY WATKINS: No. Exactly as the Court has said, I will definitely have to address it.

THE COURT: All right.

ATTORNEY BRESLOW: Yes, Your Honor. I just -- I wasn't part of the first trial, but I couldn't help but notice that, according to my recollection, the sole

instance of a witness raising an anti-Semitic purpose for this act was the defendant himself on cross-examination. And I'd like an instruction that he not do so if he chooses to testify again.

THE COURT:  That's fair.  Please re-raise that at the point, and I'll reconsider that at the time if Mr. Rathbun testifies.

So you're telling me you're just going to bring up the issue like flagging that this is not -- other than it happened at a certain location that you can identify with the neighborhood of the Jewish nursing home and various other buildings and residents who are Jewish, this has nothing to do with that?

ATTORNEY WATKINS:  I will also tell the jury that the government has -- well, that they're going to hear substantial evidence from the digital devices and interviews or witnesses, none of whom will talk about Mr. Rathbun -- neither the digital information, nor witnesses, no one is going to be talking about anti-Semitic biases here.

THE COURT:  Government?

ATTORNEY BRESLOW:  Your Honor, the only thing I'd like to emphasize is it wasn't just the identification of the target as a Jewish institution, but the wick itself was a Christian religious pamphlet, and those two things

in conjunction bring the case -- give the case a religious cast. They're unavoidable.

If the religious pamphlet weren't used, the cast may be weaker or dimmer. And if the religious pamphlet were used at a public school, the religious cast may be deeper, but there are two components here to the case and each are unavoidable.

THE COURT: So I don't know what you're telling me. You're telling me this is an anti-Semitic case?

ATTORNEY BRESLOW: No. I'm just stating that those are the circumstances of the case. We're not alleging -- we will not be alleging or introducing evidence that Mr. Rathbun himself had a particular -- had a particular anti-Semitic motive. We're simply not going to be doing that in any of our arguments and through any of our witnesses.

THE COURT: All right.

ATTORNEY WATKINS: Your Honor, the government wants to be half pregnant here. They're disavowing the fact that they're going on this particular theme, but that's definitely what they want the jury to be thinking and that's why they're doing it in this manner.

THE COURT: Well, I'll let you talk about what you want to talk about in your opening, but remember what I wrote in one of the last motions in limine. There is a

certain level of unavoidability of what the jury would think because, you know, we're not going to cover up the evidence. We're not going to do anything to the evidence to take off what really happened.

I mean, this was left where it was left in the type of neighborhood that it was in, the pamphlet was the pamphlet. And what are we supposed to tell the jurors? The jurors -- that's out there. That's out there, and the jurors clearly will be thinking about that. But the question is, can it be litigated? And that's where I've said, no, we have to be really careful about that. But I'll let you raise what you indicated you want to raise during your opening.

ATTORNEY WATKINS: Thank you, Your Honor.

THE COURT: Okay. So we need to bring the jurors in. We have to give preliminary instructions and then we will roll into openings.

ATTORNEY DESROCHES: There's just one more matter from the government's perspective. The government moves to sequester witnesses, excluding the case agent.

THE COURT: All right. So motion to sequester is allowed. I know there was a question regarding Ms. Rathbun.

ATTORNEY DESROCHES: Yes, Your Honor, and thank you for raising that. I didn't notice that Ms. Rathbun is

currently on this Zoom, participating in this Zoom broadcast.  She is a witness for the defendant.  We would request that she be included in that sequestration order.

THE COURT:  I believe that she was included last time as well.

ATTORNEY DESROCHES:  I believe so.  Yes, Your Honor.

ATTORNEY WATKINS:  That's fine, and we will alert her that she should not be watching this.

THE COURT:  All right.

ATTORNEY WATKINS:  Your Honor, at this time around, I am questioning why the case agent needs to be excluded from the sequestration order.

THE COURT:  Do you recall what happened at the last case?

ATTORNEY WATKINS:  I agree that, as often happens, that the case agent could stay because that person can be responsible for all kinds of things here. This is a different case.  We know what this case is about.  There's no reason.  The case agent is a particularly important witness.

THE COURT:  Who is the case agent?

ATTORNEY DESROCHES:  Special Agent Ryan McGonigle.

THE COURT:  Right.  And he is a primary witness?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  He certainly was a primary witness in the last case.

ATTORNEY DESROCHES:  I'd suggest, Your Honor, we're not -- I think just as a practical matter to exclude him from the sequestration order is necessary because we will be relying on him to bring witnesses up, to deal with any developments that happen in the courtroom.  He's our only connection to the outside.  We don't intend to exploit that order; but just so we don't step afoul of it, we would request that he be excluded from it just so we can do our jobs in here.

THE COURT:  All right.  So I remember the -- he's not allowed to sit at counsel table, and he's not allowed to sit -- he's included under the sequestration order.

You're telling me he's going to be essentially your runner back and forth to bring witnesses up so that's something that you can just deal with him outside the door.

ATTORNEY DESROCHES:  There's also the other issue of if something comes up during the trial that requires further investigation, that we need to discuss that with him.

THE COURT:  Sure.

ATTORNEY DESROCHES:  Or if the defendant were to testify in a particular way, we would need to discuss the defendant's testimony with him about things.

THE COURT:  Let me know if that situation arises.

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

ATTORNEY DESROCHES:  One more housekeeping matter.  I know the last time we had some issues with the broadcasting on Zoom when we did the openings.  I'm just not sure what we can do ahead of time to address that.

THE COURT:  Cross your fingers.

So we are broadcasting to Zoom but the courtroom is open.  The courtroom is also publicly open, but the Zoom broadcast is being made publicly as well in the building and obviously outside the building though a Zoom connect.

ATTORNEY WATKINS:  I think what we did was bring one of the mics for the opening in particular that --

THE COURT:  Right.  You put one of the mics, I think, from your table.  You stretched it and put it on the -- one of our jurors told us that's a lectern.

ATTORNEY DESROCHES:  It's a lectern.

THE COURT:  All right.  Jurors.

ATTORNEY WATKINS:  Your Honor, just another housekeeping matter.  I do expect some visuals during my opening.  I alerted Ms. Healy that I'm missing a cable here to check into the system.

THE COURT:  We have our IT person right behind you.

ATTORNEY WATKINS:  Perhaps we can just have a ten-minute break to sort these issues out before the jury comes in?

THE COURT:  Mr. Moore, you're going to need ten minutes?  I'll give you two.

ATTORNEY WATKINS:  Three and a half?  Just so I can have the cable and make sure everything is working.

THE COURT:  Tom, let me know when you get it fixed.  Okay?

ATTORNEY WATKINS:  Thank you.

THE COURT:  While we're fixing this cable, if you want to use the restroom or whatever.

**(A recess was taken at 9:45 until 10:00.)**

THE COURT:  Let's bring the jurors in.  I'm going to give the jury instructions while Tom tries to come up with a plan.  I can't let them sit out in the hall.  So bring them in and I'll give them the pre-instruction.

**(The jury entered at 10:01.)**

THE COURT:  Everyone can be seated.

CLERK RIVERA:  To the jurors, please all rise. Raise your right hand.

Do you and each of you do you solemnly swear that you will well and truly try and true deliverance make in the case now on trial and render a true verdict according to the law and the evidence?

THE JURY:  (I do.)

CLERK RIVERA:  Thank you.

THE COURT:  I observed each juror.  They are wearing masks, but I observed each juror nodding their head in affirmation of the oath.

All right.  Good morning, ladies and gentlemen.  You know, we're just on the cusp of the pandemic rules changing and the court orders changing, but they're not changed yet for our courthouse.  So people behind screens, and I have my screen and I'm up here, will speak without the mask; but we're just in this gray area where we're changing over.  So please appreciate that.  We're going to stay in effect with the protocol that we had that's a little bit relaxed, and that's probably going to phase out in the next few weeks.

Some of the technology you'll see us using at this trial was developed for this pandemic.  So those little whisper devices that we all talk into so no one has to

come close, and we're probably going to keep using those even when the pandemic is over.

So the first thing I want to talk to you about, I'm going to give you -- this morning I'm going to give you a pre-instruction about what the trial is; what your duties are; how you should evaluate evidence; what types of evidence are.  Then we're going to hear opening statements and begin evidence in the case.  But the first thing I wanted to talk to you about before each group of jurors left, this is a jury comprised of people that was selected on two days.  So this is the first time you're together as the jury.

I want to make sure that everyone was able to follow all of my instructions, and those instructions included don't allow yourself to be -- any access to the case.  If you see any media about it, don't look at it; news stories, don't look at it; radio stories, turn it off.  Don't talk to anyone about the case; don't investigate the case in any way; don't do any internet searches about the case; don't post, blog, Twitter, nothing on Facebook about the case.

Was everyone able to follow all of my instructions?  All right.  I see affirmative nods of the head from every single juror.

All right.  Now, you are the jury in this case, and I

want to talk a few minutes to tell you something about your duty as jurors and to give you some instructions.  At the end of the trial, I will give you more detailed instructions.  Those instructions will control your deliberations.

It will be your duty to decide from the evidence what the facts are.  You, and you alone, are the judges of the facts.  You will hear the evidence, decide what evidence, if any, you believe, and then apply the facts that you accept as true to the law as I give you the law.  That is how you will reach your verdict.

In doing so, you must follow that law whether you agree with it or not.  The evidence will consist of the testimony of witnesses, documents, and other things received into evidence as exhibits and any facts on which the lawyers agree or which I may instruct you to accept.

Sometimes jurors are curious about what I think, whether I think, in particular, a witness is believable or how I think the case is going or should come out.  My opinion, if I were to have one, and I do not, my opinion is not be and would not be relevant even if I had an opinion in the case.  It is your role.

I can't underestimate how important your role is. Just the first instructions I'm telling you, you are the finders of facts.  It is your role, not mine, to decide

the issues.  You should not interpret anything I may say or do during the trial as indicating what I think about a witness or what I think your verdict should be.

I have mentioned the word "evidence."  I expect that the evidence in this case will consist of testimony of witnesses, documents, and other things received into evidence as exhibits and any facts on which the lawyers might agree.  There are rules that control what you may consider as evidence.

When a lawyer asks a question or offers something as evidence and the lawyer on the other side thinks that it is not permitted by the rules, that lawyer may object.  This simply means that the lawyer is requesting that I make a decision based on a particular evidentiary rule or circumstance.  It may be necessary for me to discuss the issue with the lawyers outside of the hearing of the jury.

The Court and counsel will do all that we can to keep those conferences at a minimum.  The purpose of those conferences is usually so that I can make a decision on the rules of evidence.  We are not trying to keep things from you or just to frustrate you.  It's important that we discuss the issues outside of your ability to hear so only the evidence that you should be hearing under the rules gets to you.

So we'll -- the lawyers and I will probably be having

those conferences over those whisper systems.  So they'll put the noise on in the courtroom, and you won't hear much of that.  Before the pandemic, it was always the lawyers would come over to sidebar.  Everyone would walk over here and we'd have these meetings; and, quite frankly, the new technology makes it much quicker and easier.

So certain things are not evidence and must not be considered by you.  Statements, arguments, and questions by the lawyers are not evidence.  Objections to questions are not evidence.

Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you are instructed that some of the evidence is received for a limited purpose only, you must follow that instruction.

So as we go through that with the first couple of objections and we go through overruled, sustained, sustained, overruled, that type of thing, I'll tell you what that means for you.  Whether you need to consider it or not or for a limited purpose.  And after we do that a few times, you're not going to need me to tell you.  But if anyone does, at some point, just raise your hand.  You

know, Judge, I have a question about that last -- it was an objection.  I didn't understand, you know, what you ruled.  Should I consider it or not?  Just raise your hand.

Testimony that the Court has excluded or told you to disregard is not evidence and it must not be considered.  If I tell you to disregard evidence that actually came in, when I say disregard it, it is to the extent humanly possible wiping it from your mind and what is humanly possible is not applying it to your consideration in this case.  So if I tell you to disregard something, that is what it means.

The indictment in this case which is the formal legal document accusing the defendant of crimes is not evidence.  Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented here in this courtroom.

There are two kinds of evidence, direct and circumstantial.  Direct evidence is direct proof of a fact such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts then exists.

You are entitled to consider both direct and circumstantial evidence.  The law permits you to give

equal weight to both or to give greater weight to one or to the other.  It remains for you to decide how much weight to give any particular piece of evidence.

Now, I will give you further instructions on direct and circumstantial evidence as well as other matters at the end of the case; but at the beginning, I thought it might be helpful just to tell you about that especially considering some of the questions that were brought up during the panel voir dire process about circumstantial and direct.

Now, a particular item of evidence is sometimes received for a limited purpose only.  That is, it can only be used by you only for a particular indicated purpose and not for anything else.  But I'll tell you when that happens and I'll tell you how you are limited in considering that piece of evidence.

Now, as to credibility of witnesses, in deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe everything a witness says or only part of it or none of it.

In deciding what to believe, you may consider a number of factors including, but not limited to, the following:  The witness's ability to see or hear or know the things that the witness testifies to; the quality of

the witness's memory; the witness's manner in testifying; whether the witness has an interest in the outcome of the case; or any motive, bias, or prejudice; whether the witness is contradicted by anything the witness said or wrote before the trial; or contradicted by anything -- any other evidence that may have been introduced in the trial; how reasonable the witness testimony is when considered in the light of other evidence that you do believe.

Now, as you know, this is a criminal case.  There are three basic rules about a criminal case to keep in mind: First, the defendant is presumed innocent until proven guilty.  The indictment brought by the government against the defendant is only an accusation.  Nothing more.  It is not proof of guilt or anything else.  The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case.  The defendant has no burden to prove his innocence or to present any evidence or to testify.  Because the defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified because the defendant is presumed innocent, and the government has the burden.

Third, the government must prove the defendant's guilt beyond a reasonable doubt.  I will give you further

instructions on this point later and about what that means. Bare in mind that this burden is with respect to a criminal case and is different from the standard that's applied in a civil case if any of you have had any experience in a civil case.

Moreover, Mr. Rathbun is on trial only for the crimes charged in the indictment. He is not on trial for any other acts or conduct. In determining whether Mr. Rathbun is guilty or innocent, you are to consider only whether he has committed the offenses charged in the indictment. Even if you believe that Mr. Rathbun is guilty of some crime that is not charged in the indictment, you must find him not guilty if the evidence does not prove beyond a reasonable doubt that he committed the crimes for which he is indicted.

The question before you will be whether the government has proven Mr. Rathbun guilty beyond a reasonable doubt on each crime charged. No party is entitled to sympathy or favor. The fact that this prosecution was brought in the name of the United States does not entitle the government to any greater or lesser consideration than the defendant. The government and the individual, Mr. Rathbun here, are equal before the court.

As to a summary of the applicable law, and I do mean summary, you will be getting detailed instructions on the

law which will control at the end of the case.  So if at the end of the case you seem to think I remember at the very beginning the judge said something, well, it doesn't matter because it's not controlling.  This is just to give you a little bit of overview to get you ready to start hearing the evidence.  What I tell you at the end is more detailed, more thorough, and will control.  And I read you those instructions at the end of the case and print them out to you.  So they'll go with you to the jury room so you can follow.

The government has charged Mr. Rathbun with Count 1, transporting and receiving or attempting to transport and receive an explosive.

The government has also charged Mr. Rathbun with Count 2, damaging and destroying or attempting to damage and destroy buildings, vehicles, and real and personal property by fire and explosives.

I will give you detailed instruction on these charges at the end.  Those instructions will control your deliberations and verdict.  But in order to help you follow the evidence as I did say, I will now give you a brief summary of the elements of the offense which the government must prove beyond a reasonable doubt.

Now, again, I'm repeating myself, but this is merely a summary of the law.  I'll instruct you on the exact

elements at the close of the case.

To prove the charge of transporting and receiving or attempting to transport and receive an explosive, the government must prove beyond a reasonable doubt that, number one, the defendant transported or received or attempted to transport or receive in interstate commerce; number two, an explosive; number three, with knowledge or intent that what he was possessing was an explosive device; and, number four, with the knowledge or intent that it would be used to kill, injure, or intimidate any individual or unlawfully damage or destroy any building, vehicle, or other real or personal property.

Now, as I said, you'll have the jury instructions. So you will have in front of you the elements; and within each element, there's some terms that need to be defined. So in those instructions, you'll also have the definition to those terms and be able to follow along.

Now, for the next count, to prove the charge of damaging and destroying or attempting to damage and destroy buildings, vehicles, and real and personal property by fire and explosives, the government must prove beyond a reasonable doubt that, number one, the defendant maliciously damaged or destroyed or attempted to damage or destroy; number two, by means of fire or an explosive; number three, a building, vehicle, or other real or

personal property that was used in interstate commerce or was used in any activity that affects interstate commerce; and, number four, the defendant did so maliciously.

The meaning of specific words or phrases used above will be explained in more detail at the close of the case when I give you the final instructions on the matter.

Now, to ensure fairness, you, as jurors, must obey the following rules:  First, do not talk among yourselves about this case or about anyone involved with it until the end of the case when you can go to the jury room to decide on your verdict.  You should feel free to get to know one another and talk about other matters like the weather or your families or anything else, but not this case.

So I think I told some of the panels of jurors when we were going through the process you can't, as the jury, talk about this case while the evidence is being taken. The only time you, as jurors, can talk about this case, can talk about any of the witnesses in this case -- hey, did you believe that person or, hey, did you see that or what do you think that meant?  You can't -- in a way, it doesn't make sense; but in a way, it makes perfect sense.

While the evidence is going on, you, as jurors, cannot talk anything about the case, the evidence, testimony of people.  You just can't.  The only time you can talk about that is when your deliberations officially

begin and all of you are together in that deliberation room.

Second, do not talk with anyone else about this case or about anyone who has anything to do with it until the trial has ended and you have been discharged as jurors. "Anyone else" includes members of your family and your friends. You may tell them that you are a juror but do not tell them anything about the case until after you have been discharged.

Third, do not let anyone talk to you about the case or about anyone who has anything to do with this case. If someone should try to talk to you, please report it to myself or the clerk staff immediately.

Fourth, do not mention or discuss the case in any way including electronic form. I've already said this. You may not send emails, text messages, post anything on Facebook, Twitter, don't blog anything. Nothing similar to that.

Fifth, during the trial, do not talk with or speak to any of the parties, lawyers, or witnesses involved in this case. You should not even pass the time of day with them. I mean really, it's not even like, hi, how are you? And the lawyers all know this and they tell all the witnesses. So if they pass by you outside or in the hallway and don't even look at you, they are absolutely not being rude.

They are following the rules.

It is important not only that you do justice in this case, but that you also give the appearance of doing justice. If a person from one side of the lawsuit sees you talking to a person from the other side, even if it's a simple hello, how are you to pass the time of day, an unwarranted and unnecessary suspicion about your fairness might be aroused.

If any lawyer, party or witness does not speak to you when you pass them in the hall, as I said, it's because they've been instructed accordingly.

Sixth, do not read any news stories, articles, radio broadcasts, TV, anything about this case. Don't allow yourself to be exposed to it.

Seventh, do not do any research, such as consulting dictionaries, reference materials, Google searches, internet searches, driving by certain areas you think might be important, looking up certain items or theories that came up in this case and you think important, do not do any of that. Do not look up the law. Do not do any research on the law.

Eighth, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have had time to discuss the evidence.

Ladies and gentlemen, you, as jurors, cannot make up your mind while this case is going on. That is not the deliberation process. That would be you making up your own mind. And in addition, if you were doing that, you wouldn't have an open mind to hear all of the evidence until the case is finished. Human nature is what it is. But you have to endeavor and be aware of not making your mind up until you are deliberating with your fellow jurors in this case. That doesn't mean you're not assimilating and thinking about what you're hearing, but you're not and cannot make your mind up until the deliberation process starts and you discuss the evidence with your fellow jurors.

Now, during the course of the trial if you have a problem with anything, just raise your hand. We'll stop the proceedings, and I'll try to take care of the problem.

If you can't see a witness, if you can't hear a witness, raise your hand. If you need a glass of water, if you need a box of Kleenex because your allergies got you and you have a sneezing attack, if you need to use the restroom, if you just need to take a break, great. No big deal; just raise your hand.

Also if you want to stand up, you will see me standing up for large portions of the trial because it hurts my back to sit for long periods of time, and I just

don't like sitting. So feel free to stand up and stretch and listen to the testimony standing up. It's absolutely no big deal, and everyone in this court is used to it. Because I do it, generally, jurors often say, well, maybe I guess it's okay, and they stand up and they feel more comfortable to do that.

If you feel that you're -- it's just maybe two o'clock and you're nodding off and you just, kind of, haven't gotten your second afternoon wind yet, just raise your hand and we'll take a break. I'll let you go and, kind of, get a breath of fresh air and we'll come back in. All right?

If you need to communicate anything with me and we are not in court, you can get a note to the clerk or you can tell the clerk or any of the court staff that will be around you, and I'll bring you in and I'll talk to you.

Now, as to note taking, I am going to permit you to take notes in this case. You'll be given a notebook and a pen. The number on the cover of the notebook will be -- should be on your jury seat. You are not required to take notes. Absolutely you don't have to. Some people benefit from it. Some people don't.

If you decide to take notes, do not allow your note taking to distract you from listening carefully to the testimony that is being presented. So it's important also

that you observe and look at the witness as they're testifying in addition to listening to the witness. So if you prefer not to take notes but simply listen, please feel free to do so. But if you're good with taking notes and that helps you, go right ahead. It's just a warning of during the entire trial having your head down trying to write everything down they're saying, you're missing -- you're really missing a lot of important things that you should be looking for in the trial. So take notes to the extent they help you if you think they'll be useful for you.

Remember that not everything you write down is necessarily what was said. When you return to the jury room to discuss the case, do not assume simply because something appears in someone's notes that it necessarily is correct and took place in court. Notes are an aid to recollection, an aid to recollection and nothing more. The fact that it is written down does not mean that it is entirely accurate.

So when you have notes in the jury deliberation room, that all becomes the collective deliberation process notes. So it is your collective memory of the evidence that governs during your deliberations. So you might be speaking about a thing during your deliberations and someone says, well, I have notes about that. So you

listen to what those notes were. Someone else might have notes about that, and that's going to help you collectively decide how you should be looking at this, what's the correct or accurate view or memory of that particular issue.

Now, please take your notes to the jury room at every recess. You cannot take your notes home. You cannot take them home or anywhere else outside the courtroom. I'll have the clerk collect your notebooks at the end of each day. And I'm going to ask the clerk, the clerk may want you to just leave them on the chairs when we take breaks?

CLERK RIVERA: Yes.

THE COURT: So instead of taking them to the jury room at breaks, you'll just leave them right there on the chair.

And, listen, no one is looking at these notes. It's strictly prohibited for anyone to go near those notebooks. Those are going to be yours and it will have your number on it. When the case is over, the notes are destroyed. No one reads them before the destruction. That destruction process and shredding is overseen by the clerk of courts.

Now, we have our transcript -- our stenographer, Ms. Moran is here. As you can see, we have her as the court reporter. And jurors sometimes think that they'll

have a transcript of the trial when they go back to the jury room.  That is not true.

You will not have a transcript of the trial.  And I just need to tell you this and emphasize it up front so you don't come back and say can we see a transcript?  It's reasonable request, but you're not going to get it. There's a number of reasons for this.

Usually, there's not enough time to prepare a formal transcript.  So the court reporter prepares what is called a raw record.  That if you looked at the paper that is spinning out of her wheel, it will look like symbols and letters and numbers and a jumble of things that you don't know what they said.  So it's a raw transcript that she has to turn into a final transcript, and that's time-consuming.

So you are not going to have a transcript.  So that might affect -- well, I want you listening carefully to the case no matter what, but that might affect your decision on whether or not you want to take notes.  So keep that in mind.

The trial is going to begin.  First the government will make an opening statement which is simply an outline to help you understand the evidence as it comes in.

Next, the defendant's attorney may but does not have to make an opening statement.  Now, opening statements, as

I told you, are neither evidence nor arguments.  The purpose of opening statement is only to tell you -- to help you understand what the evidence is going to be.

Next, the government will offer evidence that it says will support the charges against the government [sic]. The government's evidence in this case will consist of testimony of witnesses and may include documents, images, and other exhibits.

After the government questions each of its witnesses, counsel for the defendant may cross-examine the witnesses.

Following the government's case, the defendant may, if he wishes, present witnesses whom the government may then cross-examine.

I remind you that the defendant is presumed innocent, and the government must prove Mr. Rathbun's guilt beyond a reasonable doubt.  Mr. Rathbun does not have to prove his innocence.

After you have heard all the evidence on both sides, the attorneys will present their closing arguments to attempt to help you understand the evidence that was presented in the light most favorable to their sides.

I just told you that the opening statements by the lawyers are not evidence, and that same thing applies to closing arguments.  Closing arguments are not evidence. They are a persuasive exercise of attorneys presenting the

case in the light most favorable to their particular sides.

I'll then give you the instructions on the law, applying law and how to begin your deliberations in reaching your verdict. After that, you will leave the courtroom. Together, you will begin your deliberations. Your deliberations will be secret. You will never have to explain your verdict to anyone.

So the trial day, we begin at 9:00 and go to 4:30. You see what happens with 9:00. Sometimes we do start closer. Today it was all about a cable, a little cable that plugs into a computer. Because the lawyers have their laptops loaded with things that they want to show on the screens, today the cable was giving us a problem. So tomorrow it will be something else.

But our normal trial day is 9:00 to 4:30. We take a break around 11:00, and then we take a lunch break from 1:00 to 2:00 and we stop around 4:30. That's not carved in stone. We can change that if we need to.

Cell phones. Do you all have your cell phones? You brought them up. Do you have them with you or did you leave them downstairs?

THE JURY: (Indicating.)

THE COURT: Okay. I signed an order that allows you to get your cell phones. So at a break, you can get

your cell phones.  The court officers downstairs should have the order.  You can keep your cell phones.  You cannot bring them into the courtroom.  So you can leave them in the jury room.  All right?

So one more time, you cannot bring them in the courtroom.  And having a cell phone with you, gives you that incentive to Google and do an internet search on everything.  It's just what we do with our cell phones.  So fight against that.  You cannot do that.  But I wanted you to have your cell phones so if you get an important call or text from family or work or something, you can have that so you have your cell phones with you.  Leave them in the jury deliberation room.

During your deliberations, you can't have them with you.  The clerk will give you a box.  Put them all in a box.  Lock them in a room.  And if someone needs to get an important message or call, you'll have to stop your deliberations, leave, because you can only deliberate with everyone in the room.  If someone leaves the room, it stops.  All right?

I want you to know that counsel and all the court personnel have worked hard during the pretrial phase of this case to ensure that the trial schedule can work smoothly, but sometimes things come up and sometimes we're going to be asking for your patience.  I will strive to

the best of my ability to keep this case on schedule.

All right.  Are the technical issues resolved?

ATTORNEY WATKINS:  We don't know yet.

THE COURT:  They are not resolved?

ATTORNEY WATKINS:  We don't know.

THE COURT:  All right.  So we don't have the cable?

I.T. PERSON:  We have the cable but it still wasn't working.

THE COURT:  All right.  Okay.  We will take five minutes.  I'm going to excuse everyone.  Hopefully, this is going to be five minutes.  I really want to get going.  So back to the jury room for a few minutes while we try to work this out.

**(The jury left at 10:37.)**

ATTORNEY DESROCHES:  I'm not sure if Your Honor was discussing the seating.

CLERK RIVERA:  I brought it to the Court's attention.

THE COURT:  Right.

CLERK RIVERA:  We will change that when they come back.

CLERK HEALY:  The jurors will be seated -- there was a mix-up waiting in the hallway, and the jurors will be seated in the seats in which they were selected.

THE COURT: Okay. Then what we will do is make a record and just go through and say that's the seat you're in for the rest of the trial. Do seat one, tell us your number so we will have the record.

ATTORNEY BRESLOW: Your Honor, has the jury actually been impaneled and sworn?

THE COURT: The jury is sworn.

ATTORNEY BRESLOW: Okay.

CLERK RIVERA: We did it this morning.

THE COURT: Yeah, we swore the jury.

**(A recess was taken until 10:46.)**

THE COURT: So on the record, all arguments or objections which were generally over at sidebar are now going to be done using WhisperTech. We will put the noise on in the courtroom. If there's some extreme circumstance you really need to come to sidebar because WhisperTech isn't doing it, just tell me over WhisperTech and I'll think about it.

**(The jury entered at 10:49.)**

THE COURT: You can be seated.

So, ladies and gentlemen, I'll ask you this every time you come in the courtroom. During that very short break, was everyone able to comply with my instructions that I had told you at the beginning of the case not to talk to anyone about the case, internet research, don't go

on your phone about the case if you had gotten your phones, and not allowed yourself to be exposed to any media coverage about the case?  Was everyone able to follow that instruction?

Okay.  Affirmative responses from all the jurors.  All right.  Very good.

Now, do we need to have a call out of juror seat number and juror number so that we have a clear record?  The jurors now have all been configured in the seats that they will have for the entire trial.  So the parties would like to make a record of seat number and juror number.

Why don't we start with Seat No. 1.  Seat No. 1, you're juror?

CLERK RIVERA:  Number 28.

THE COURT:  Seat No. 1 is 28.

Seat No. 2?

A JUROR:  Juror No. 3.

THE COURT:  All right.  Seat No. 3?

A JUROR:  Thirteen.

CLERK RIVERA:  Nineteen.

A JUROR:  Sorry, 19.

THE COURT:  All right.  Seat No. 3 is 19.  Seat No. 4?

A JUROR:  Juror No. 6.

THE COURT:  Okay.

A JUROR:  Juror No. 30.

THE COURT:  Is seat?

A JUROR:  Five.

THE COURT:  Five.  Okay.  Seat 6?

A JUROR:  Twenty-three.

A JUROR:  Seven is 15.

THE COURT:  Hold on one second.  Back to Seat 6.

CLERK RIVERA:  Juror No. 6 is --

THE COURT:  Seat 6.

A JUROR:  Twenty-three.

CLERK RIVERA:  It's 31, John.

A JUROR:  Yeah.

CLERK RIVERA:  We're not going by your badges.

A JUROR:  Oh, okay.  Yes, 31.

CLERK RIVERA:  Thirty-one.

A JUROR:  Number 10.  You want my old numbers?

CLERK RIVERA:  Yes, Number 10.

A JUROR:  Seven, 10.

THE COURT:  Seat 7, Juror 10.  Seat 8?

A JUROR:  Thirty-eight.

THE COURT:  Seat 9?

A JUROR:  Thirteen.

THE COURT:  Seat 10?

A JUROR:  Seat 10 is 26.

A JUROR:  Seat 11, No. 40.

A JUROR:  Seat 12, No. 17.

A JUROR:  Seat 13, I'm not sure.

CLERK RIVERA:  Number 42.

THE COURT:  All right.

A JUROR:  Forty-four, seat 14.

THE COURT:  Seat 14, Juror 44.  Is that what he said?

A JUROR:  Yes.

THE COURT:  Okay.  Great.

All right.  Opening statements, government.

ATTORNEY DESROCHES:  Thank you.

May I proceed, Your Honor?

THE COURT:  Yes.

**OPENING STATEMENT BY ATTORNEY DESROCHES**

ATTORNEY DESROCHES:  Simple, dangerous, and senseless.  Those three words describe the defendant's crime on April 2nd of 2020.  On that day, this man, John Rathbun, made a firebomb, placed it at the driveway entrance of a Jewish nursing home complex, lit the Christian religious pamphlet that he stuffed inside and fled.

The defendant's firebomb was simple.  He used a diesel canister, put some gas into it, and stuffed that pamphlet in with his bloody hands before he lit it.

The defendant's crime was as dangerous as it was simple. The defendant placed the device at the entrance of that nursing home as the pandemic raged. He set it down just feet from a sidewalk on a main street in Longmeadow. Then he lit that pamphlet intending to create a fiery explosion; and the defendant's simple, dangerous act was also completely senseless.

The defendant was 36 years old, had recently been fired from his job, and was living in his parent's house. As he was living in that house, he grew angrier and angrier at the world. The defendant's own daughter stopped speaking to him, and he added drugs to the mix on April 2nd of 2020 when he boiled over and intended to create an explosion at a nursing home.

Fortunately, the defendant's plan failed. The wick fizzled out before it could light the bomb. And the defendant left his own blood on the handle of the canister he used and on the pamphlet he used as a wick, all part of the trail of evidence that leads directly to him.

My name is Neil Desroches. I'm going to take a few minutes to outline the government's case against the defendant for you today.

The case consists of two charges. First, Count 1 charges the defendant with transporting or receiving an explosive with the knowledge or intent that it would be

used to injure or intimidate any individual or that it will be used to damage any real or personal property. Basically, this count charges the defendant with taking that homemade bomb to the nursing home knowing that he planned to light it on fire there.

Count 2 charges the defendant with attempting to maliciously damage or destroy by means of fire or an explosive any real or personal property used in interstate commerce. This count charges that he did, in fact, try to light that firebomb.

Over the course of this trial, the defendant -- the evidence will show that the defendant committed both of these offenses and is guilty of each beyond a reasonable doubt.

As I said, on April 2nd of 2020, the defendant placed this homemade device, a firebomb, that consisted of a diesel canister and a Christian religious pamphlet, each stained with his blood, on the grounds of Jewish Geriatric Services in Longmeadow.

Jewish Geriatric Services is known as JGS for short, because that can become difficult to say, and is actually a complex that includes several different buildings. One is a nursing home called Ruth's House. The other is a subsidized housing complex for the elderly called Genesis House.

The residents of those homes used the grounds of JGS in their everyday lives to exercise, socialize, and just go about their business.

The campus of JGS is on Converse Street in Longmeadow.  Converse Street is a busy street both in terms of cars and pedestrians and provides direct access to I-91 in Springfield.

The evidence will show that the defendant placed the device sometime between 4:52 a.m. and 8:30 a.m. when a neighbor saw it and later called 911.

After receiving the call, Longmeadow firefighters responded as they usually do.  They suited up, jumped into a fire truck and raced towards the threat.  Upon first arriving at the scene, they immediately saw that yellow fuel canister just feet from that sidewalk on Converse Street and immediately recognized the danger.

Concerned for their own safety, they did not immediately approach it and made sure innocent bystanders stayed away.  Even from the distance they were at, they could see the charred wick that was protruding from the nozzle of the gas can.  They were so concerned that it could explode, they moved their fire truck away from it.

Although there was no suspect in sight by the time the firefighters arrived, you will hear that investigators found some important clues.  First, they found blood both

on the handle of the diesel canister, as you can see here, and on the rolled-up pamphlet that had been used as a wick.

That blood would turn out to be key, as DNA analysis will later determine that the blood was left there by someone who lived just five minutes away, the defendant John Rathbun.

In fact, the chemist will tell you that the blood found on the handle of that canister and the two bloodstains on the wick or the pamphlet was a one in 568 octillion match to the defendant's blood.  That's a number with 27 zeros and 9 commas in it.

And it wasn't just the blood either.  You'll hear that investigators unrolled that pamphlet that the defendant had lit on fire and attempted to start that explosion, and it turned out it just wasn't any old piece of rolled-up paper that could be found anywhere.  It was a very particular piece of paper, a Christian religious pamphlet of the type that people sometimes hand out when they proselytize.

You will hear the defendant's mom was one of those people and that she handed out pamphlets like that on a routine basis, and that she kept pamphlets just like that in the cupholder of her car, the very same car the defendant drove that morning of April 2nd when he left

that firebomb at JGS.

Lastly, that pamphlet was published by Billy Graham. You will hear that the defendant's parents attended events hosted by Billy Graham at which that pamphlet was used. And the defendant's mother helped organize some of those events.

You will hear that, during the investigation, the FBI executed a search warrant at the defendant's home which he shared with his parents, and they interviewed the defendant there. As soon as they saw the defendant, they noticed that his hands had a number of cuts on them, which they photographed, including this one on his thumb.

Now, as you review these photographs, remember that the defendant's blood was found on the handle of the canister and on multiple pages of the pamphlet used as a wick.

Now, just like that pamphlet, the defendant had a number of connections to JGS. The defendant's grandmother used to live at Genesis House and he used to visit her there. The defendant's mother worked for the management company that provided services for Genesis House. And JGS is just a few minutes from the defendant's home where he has resided nearly all of his life.

The defendant's cell phone also provides important evidence. It'll tell you what the defendant was doing in

the early morning of April 2nd and where he was.  That cell phone evidence and other evidence, like the defendant's own words, will show you that the defendant had two separate opportunities between 8:52 [sic] and 8:30 in the morning to place that firebomb.

The first opportunity was shortly before 5:01 a.m. when the evidence will show you that the defendant was on Converse Street in the area of JGS at the time of the crime.

The defendant had a second opportunity between 6:09 a.m. and 7:06 a.m. when the defendant was still just 15 minutes away from JGS.

During each of these windows of time, the defendant had plenty of time to drive to the complex, drop and light the firebomb and then continue on.

In fact, the evidence -- the defendant's day that day was so chaotic that by 8 a.m., he was already texting that he had had a crazy day.

The evidence will also show that the defendant made false statement after false statement to the FBI.  And these false statements are evidence that the defendant was aware of his own guilt, and he tried to mislead the FBI to cover that up.

First, when the FBI asked the defendant about JGS, where he left the firebomb, he claimed to be unfamiliar

with it, even though the defendant's grandmother lived there for a number of years, even though he has visited that campus on a number of times, even though the defendant's mother is a long-time employee of the management company, and even though it's a short drive from his home and is marked with a large sign.

Second, you'll hear the defendant -- when the defendant voluntarily spoke to the FBI, he looked at pictures of the diesel can and he adamantly denied ever having seen it before and could not explain why his blood was on it.

The agent who was talking to the defendant at the time was persistent. He knew that the defendant sometimes worked odd jobs cleaning out trash from houses. So he asked him. Is it possible that maybe you touched this can when you were cleaning out a house? The defendant said that was impossible and continued to insist that he never possessed it.

That's what he told the FBI, but you will hear what he told his mother on a recorded call, that he admitted that he did possess that can. And that when the FBI found out, in his own words, it was going to be very big and very bad.

Third, when the agents spoke to the defendant, they asked him where he was on April 2nd. The defendant said

that he was home even though he knew he was out in the morning of April 2nd and even though he knew he was just a short drive away from JGS. That's what he told the FBI, that he was home. But, again, you'll hear what he told his mother.

You will hear another recorded call when he not only acknowledges that he was out of the home on April 2nd, he admits that he was, in fact, on Converse Street at the time of the crime.

After hearing these false statements, agents showed the defendant photographs of the charred religious pamphlet that we have seen and his demeanor changed. Prior to seeing these pictures, the defendant was friendly and engaging with the agents. After seeing these pictures, he changed. He sat down, looked visibly upset, put his head in his hands and said he thought he was going to cry.

Now, as you're listening to this evidence, you may find yourself asking why the defendant did this. What motivated him to place a firebomb at a Jewish nursing home using a Christian pamphlet as a wick? It's natural to wonder. But at the end of the trial, the judge will instruct you of the elements of this offense, and motive is not one of them. Instead, the evidence will show that the defendant placed this device, did so intentionally for

reasons only he knows.

Whatever those reasons may be, this act was senseless.  And in the month leading up to April 2nd, the defendant was angry and out of control.  In fact, you will hear that the defendant himself said he had been out of his mind on drugs.

The defendant's own mother described him as being out of control.  The defendant's own daughter will tell you that the defendant was out of work, fighting with his mother, and spending most of his time isolated in his room drinking before stepping out at night, despite the pandemic lockdown.  She'll tell you that even though they were living in the same house, she had stopped speaking to him entirely.

So the evidence will show that on April 2nd, the defendant was angry about his personal situation, was lashing out at others, and he was adding drugs to the mix on April 2nd when he boiled over and decided to set off a firebomb.

You will see that the firebomb was crude and that the defendant's crime took only seconds.  It was a simple, dangerous, senseless act, committed by someone acting irrationally who was angry at life.  That person was the defendant.

After you've heard all the evidence, my colleague,

Steven Breslow, and I will ask you to find the defendant guilty because at that time there will be no reasonable doubt that he is, in fact, guilty as charged.  Thank you.

THE COURT:  Thank you.

ATTORNEY WATKINS:  May we be seen at sidebar just briefly?

THE COURT:  Sure.

**(Sidebar conference.)**

ATTORNEY WATKINS:  Your Honor, I think it's appropriate to object at this point based on my motions in limine -- our motions in limine before trial concerning the 404(b) evidence.

The government quite clearly has stated here that because Mr. Rathbun -- they were going to hear evidence of him being out of control, before that he was out of control.  At this point, that's precisely what is barred by 404, and as a result, I object to the government's --

ATTORNEY DESROCHES:  Your Honor, I'm sorry.  I can't hear Attorney Watkins right now.

ATTORNEY WATKINS:  I was trying to whisper; is that better?

ATTORNEY DESROCHES:  Yes.

THE COURT:  Much better.

ATTORNEY WATKINS:  Okay.  I'll go back through it.

I'm renewing my objections to the 404 evidence. Mr. Desroches has referred to it and in quite stark terms that they are going to hear that Mr. Rathbun was out of control on prior occasions, and that he acted in conformity with that on this occasion.  He did not suggest that was state of mind going to intent but rather that he behaved in a way similar and that's what is barred by 404.

ATTORNEY DESROCHES:  Your Honor, I don't agree with the defendant's assessment.  I would suggest that the opening was well within the parameters set by the Court. Although I did say the defendant was out of control, I certainly didn't suggest this was propensity evidence.  I suggested that the defendant was angry at his personal situation, as I said, within the Court's order.

THE COURT:  Yeah, I think it was permissible under the rulings which did allow testimony that's going to shed light on the defendant's state of mind, provide context for his life at the moment or at the proximate time of the crime.  And his life included drug use, job loss, various types of strife and discontent in his life. And this is an opening statement.  This is not evidence, and I will be reemphasize that this is not evidence. Objection noted.  Thank you.

ATTORNEY DESROCHES:  Thank you, Your Honor.

**(End of sidebar conference.)**

ATTORNEY WATKINS:  Ms. Rivera, can you switch the computers over?

THE COURT:  Sure.

So, ladies and gentlemen, as I instructed you, remember opening statements are not evidence.  It's not the evidence.

ATTORNEY WATKINS:  May I, Your Honor?

THE COURT:  Absolutely.

**OPENING STATEMENT BY ATTORNEY WATKINS**

ATTORNEY WATKINS:  Good morning, jurors.

Drug addict, substance abuser, characterize it as you wish, but that was John Rathbun on April 2nd in the morning when the government claims that he stopped at Jewish Geriatric Service to inflict harm to people and property.

Recovering addict now, but on April 2nd his disorder was in full bloom.  It's undisputed.  You're going to hear references and see evidence about it from both sides throughout this trial.

Anti-Semitic?  White supremist?  Hate-filled with a bone to pick against Jewish Geriatric Services?  No. There will be no evidence of that at trial whatsoever.

You're not going to hear that from anyone anywhere during the trial that John harbored any animus against Jews or really against any religion whatsoever.  He had no

ill will against JGS. And you're not going to hear a whisper of a hint of any of it during trial, and it's not for want of looking.

You're going to see during trial that the government has taken a deep dive through Mr. Rathbun's life, both digitally and examining witnesses, interviewing witnesses. None of those witnesses, none of that will indicate animus. It will indicate nothing except a man who's been battling addiction, mostly unsuccessfully, since he was a teenager.

So if you've already gathered from the government's opening statement, the evidence surrounding John's substance abuse and complete lack of animus are two of what are going to be several inconvenient facts for the government as they try to prove their case against John, try to prove that he placed a fuel canister in this odd little spot on the campus of Jewish Geriatric Services.

But those aren't going to be the only inconvenient facts you're going to hear during trial. Through the magic of modern technology, we're going to be able to follow most of John's thoughts and nearly all of his whereabouts the morning, both before the government claims this was placed, during the period of time the government says it was placed, and throughout the morning that somebody put that fuel canister there beside that tree,

off the edge of the campus of Jewish Geriatric Services.

Our technology-assisted adventure is going to start a few hours earlier, late in the evening on April 1st into the early morning hours of April 2nd.  You're going to hear that John Rathbun was at home doing drugs, as I say, in the full bloom of his addiction.

You're going to hear that this was at the beginning of the pandemic, which we all remember -- seems a million years ago -- the beginning of the pandemic.  John, like many of us, was trying to figure out what he could do.  He is a man that likes to work and wants to contribute.  What he does is start looking for jobs that he can do.

You're going to hear that his skills are in construction, and in tough times -- namely, during the start of the pandemic and as he was losing his battle with substance abuse -- he was trying to pick up odd jobs, trash removal, clean outs, manual labor, whatever he could do.  You're going to see that in the undisputed digital evidence that the government and we are going to be showing you.  John's working on his phone, surfing the web on his phone to try to find those jobs.

You're also going to see through that digital evidence he's been cruising Home Depot for tools.  That's what he does.  He's a construction guy, loves his tools.

You're going to see that he engaged in viewing a

little bit of pornography that morning before the government says that he was hatching a plan to put this canister at Jewish Geriatric Services.

What he wasn't doing was searching for vial hate cites, watching YouTube videos about how to make bombs, how to blow up Jewish-themed and Jewish-operated sites. Not that night and not ever.

Instead, what you're going to witness as we make our way through the computer log from John's phone is John's thoughts as he turns from the Home Depot and looking for jobs to his quest to search for and find more drugs, once the drugs that he had taken the night before were wearing off.

Still at home, his parents' home, he began his quest with texts to a supplier that he has in East Springfield. You will see at 4:32 in the morning while, according to the government, John must have been manufacturing this canister, this firebomb, at 4:32, 15 minutes before the government, at least on one of its versions, said John must have left that canister there, this text goes out. Dude, I got a hundred dollars in cash sitting in front of me. All I need is a 40 piece. Here this is undisputed that this is what John was doing was texting his supplier about getting drugs.

In fact, there's going to be more undisputed digital

evidence that that is exactly what he did.  He jumped in his car, drove all the way to the other side of Springfield, and spent the rest of the morning chasing around various sources for drugs in his effort to try to get high.

I'm going to -- this is the kind of evidence that you're going to see.  I'm going to put up and circle the bottom.  That's where John's house and where JGS is.  And it's going to be undisputed -- this is going to be a government exhibit that you'll see -- from 5:05 to 8:25 that's what he was doing.  He was up, away from JGS, nowhere near JGS, nowhere near the spot where someone placed the container.

I'm going to go into that in some detail during trial.  Both the government and the defense will be asking you to look at these exhibits and draw your conclusions.  But I point that out now because this is undisputed.

And we're also going to find out during trial that while we have dozens of confirmations of where he was in his quest to score drugs, there is none, zero, confirmation that he stopped at the edge of JGS campus to do anything, let alone place a one-third full fuel container, try to light it on fire, apparently shrug his shoulders because it didn't go off, and then carry on in his way to find drugs.  There is simply not going to be

any confirmation of that whatsoever.

So as you listen to the evidence as it comes in over trial, I'm going to ask you to think about how those inconvenient facts, John's documented determination to get drugs, the complete lack of absence of evidence that he was planning a hate-filled, hate-motivated crime, the undisputed confirmation that he was far away from JGS while he was trying to score drugs, square with the government's theory that it was John who left that canister at JGS in the morning.

Now, the prosecutors have started and I expect they're going to ask you, well, don't focus on that. Turn away to these other things. One example is the octillion number that Mr. Desroches just referred to. I expect that they will put that up on the screen in all of its glory with all of its zeros. But let me tell you what, let's get that out of the way right now, that's John's blood. That's John's blood smear on that can.

You're going to hear that it's undisputed that he picked up that canister at one of the clean-out jobs that he had done a month before or a few weeks before. You will hear how he cut his hand there and bled on the canister. That's the explanation for why there's blood, and you're not going to get anybody to tell you that that blood was left while John Rathbun was placing that

container at JGS.  So while the number is impressive, mind boggling, it's just that.  It's a number.

Likewise, as you've heard the prosecutors go into already, they're going to try to develop some gotcha moments.  It will start with the FBI when the agents came two weeks after April 2nd to come and talk with him, search his home.

What you're going to hear on that search is that what they did not find.  They did not find white supremist flags.  They did not find any indicia of animus; did not find any vial kinds of materials in John Rathbun's room or in John Rathbun's house.  And he voluntarily talked with them for hours to try to get to the bottom of what had happened there.

I want you to listen carefully.  The agents are going to testify, and we'll have the opportunity to cross-examine them.  But I want you to listen to exactly what the questions were and what the answers were and put yourself in the place of Mr. Rathbun, John, as you're thinking about that testimony and whether the prosecutors gave him a fair shake as they're asking some very, very carefully, sharply-worded questions.

Another distraction, and you've already got the sense of it, is the government's attempts to tar John as an angry man that has done crazy things in the past.  There

is plenty to tar him with.  There is plenty.  John's led a difficult life.  His addiction has gotten the best of him for most of his life, and there are plenty of rocks to turn over and talk about.  And that's what the government is going to try to do here.  But as you listen to this evidence, keep in mind one of the pillars of our criminal justice system is that the law punishes people for what they do, not who they are.

Remember as you listen to that evidence that the government has to prove beyond a reasonable doubt that John had that specific intent to harm, to maim, to inflict damage and destruction at JGS.

It's not an easy case to be a juror on.  Hearing from the minute you came in here, hearing about a fuel container on a site affiliated with a faith naturally raises some concerns, maybe even alarm, as you listen to the judge give you the short summary of what this case was about.

But the oath you swore to a moment ago tells you, that's a reason that you have to hear more, that you need to hear more.  And that this is not the time, nor is it ever during the trial, to close your eyes and stop listening to the evidence.  And you're about to hear the rest of the story as we get going on trial.

We're asking now that you just listen closely to all

the evidence, free of the distractions, with focus.  We're confident that when you do, you'll deliver a just verdict. The government has simply failed to prove that John transported a fuel canister to that JGS site with the intent to inflict harm to people and property.  And that John Rathbun did not try to attempt to light a fuel canister on the property of JGS with the intent to inflict that harm.  With that, I thank you.

THE COURT:  Thank you.

All right.  Government?

ATTORNEY DESROCHES:  Thank you, Your Honor.  The government calls Michael Nothe.

THE COURT:  Does everyone have their notebooks? Okay.

ATTORNEY DESROCHES:  Your Honor, he is on his way up.  I apologize.

THE COURT:  Okay.  Tell him to stop and get some notebooks.

Okay.  To make a record, call your witness.

ATTORNEY DESROCHES:  Sure.  Thank you.  The government calls Michael Nothe.

CLERK RIVERA:  You're going to use the first witness box behind you.  Okay?  You'll remain standing to take the oath.

**Michael Nothe (Sworn)**

THE COURT: Sir, take a seat. Is there a chair? Take a seat and you can remove your mask behind the screen.

THE WITNESS: Thank you.

ATTORNEY DESROCHES: May I proceed, Your Honor?

THE COURT: Yes.

**DIRECT EXAMINATION**

Q. (By Attorney Desroches) Good morning.

A. Good morning.

Q. Could you please introduce yourself to the jury and for the record spell your last name?

A. Yes. My name is Michael Nothe; last name, N-o-t-h-e.

Q. Are you employed?

A. I am.

Q. How are you employed?

A. I'm a captain with Longmeadow Fire Department.

Q. For how long have you been employed by the Longmeadow Fire Department?

A. Ten years of employment with the last two years as captain.

Q. Can you describe for the jurors your progression through the ranks at the Longmeadow Fire Department?

A. Absolutely. I started out as a firefighter entry level in 2011; around the year 2016 was promoted to acting captain; after that, was promoted to lieutenant; and most

recently, promoted to captain.

Q.    What is your educational background?

A.    I have a Bachelor's Degree in Fire Science from Anna Maria College, as well as a Master's Degree in Public Administration from Anna Maria College.

Q.    As a captain in the fire department, do you have any special responsibilities?

A.    I do.  I'm responsible for coordinating the daily activities of the members on the group.  I am responsible for instant command at emergency scenes as well as any other tasks delegated from the chief officers of the department.

Q.    Have you received any specialized training as a firefighter?

A.    I have, yes.  I completed a three-month fire academy at Mass. Fire Academy in Stowe, Massachusetts.  As part of that, I received my HAZMAT operations level responder certification.

In addition, I've completed over 700 hours of continuing education courses related to my job through Mass. Fire Academy and National Fire Academy.

Q.    You've indicated that you had some specialized HAZMAT training.  Can you describe in a little more detail what that is?

A.    Yes.  So the HAZMAT training I received through the

Massachusetts Fire Academy, I would say, course to introduce firefighters to hazardous materials, the dangers they pose.  We were taught basic recognition of hazardous materials, as well as initial actions to take.

Q.   Have you received any training specific to flammable liquid fires?

A.   Yes, I have, as part of the fire academy and as part of ongoing continuing education.

Q.   It may sound self-explanatory, but can you explain what a flammable liquid fire is?

A.   Absolutely.  So a flammable liquid fire is a fire in which flammable liquids are burning.  These fires tend to burn hotter and more violently as opposed to fires that just contain wood or paper.

Q.   Do you have to take any special precautions as a firefighter if you're responding to a flammable liquid fire?

A.   Yes.  We put on our full turnout gear as well as respiratory protection as well as -- in order to extinguish these fires, we have to use firefighting foam in combination with traditional water to help extinguish the fire.

Q.   Why you would need foam?

A.   What foam does is it creates a barrier between the fire and the flammable liquid to help suppress the fire.

Q.    In your training and experience, have you become familiar with the term of "boiling liquid evaporating vapor explosion?"

A.    Yes, I have.

Q.    What is that?

A.    That's when there's an explosion in a container that's sealed and the liquid inside heats to a temperature where the contents inside can explode.

Q.    Do those situations require a special response from a firefighter?

A.    They do.  They require us to, kind of, take a defensive attack in firefighting.  We can't get too close to the fire due to the extremely volatile nature.

Q.    Now, drawing your attention specifically to April 2nd of 2020, were you working on that day?

A.    I was.

Q.    What was your shift?

A.    My shift was 8 a.m. that day until 8 a.m. the following morning.

Q.    At approximately 11:40, did a call come in to the fire department?

A.    Yes, it did.

Q.    What was the nature of that call?

A.    It was dispatched as a suspicious package.

Q.    Where was the location, the origin of that?

A.    The area of 780 Converse Street.

Q.    After receiving that call, what did you do?

A.    After that, I proceeded out to the apparatus bay floor, donned my firefighting turnout gear, and I climbed aboard the fire engine to proceed to the scene.

Q.    Now, specifically, when you say "turnout gear," what does that look like?

A.    That's what you traditionally see a firefighter wearing to deal with a fire event.  It's not fireproof.  It doesn't allow us to walk through fire.  It just allows us to get close to fire and other heated, dangerous elements.

Q.    You said you boarded a fire engine?

A.    Yes, I did.

Q.    What kind of fire engine was this?

A.    The fire engine I boarded has a thousand gallons of water on it.  It's got a Class B firefighting foam that could be used in the event of a flammable liquid fire, and it's got a 1500 gallon per minute pump as well as various other hand tools and whatnot.

Q.    Did any other firefighters respond with you?

A.    Yes.  Captain Zinnack was on board that fire apparatus as well, and then another member, Firefighter Clark, boarded an ambulance to respond to the scene.

Q.    Why was an ambulance necessary?

A.   It's part of our protocols.  Anytime we're dispatched for a suspicious package or a bomb threat, we are to send a fire apparatus and an ambulance in the event that if the suspicious package were or item in question were to explode and cause bodily harm to either ourselves, police officers, or bystanders.

Q.   After suiting up and boarding the fire engine, where did you go?

A.   Proceeded emergency response mode to the scene, down Williams Street to Redfern to Converse Street.

Q.   And did you go to any specific location on Converse Street?

A.   Yes, the area of 780 Converse Street, the driveway to Ruth's House Assisted Living.

Q.   When you arrived, did you make any immediate observations?

A.   Yes.  After I parked the fire engine, approximately 60 feet away from the item that was believed to be the suspicious item, I observed a yellow fuel container from a distance of approximately 30 feet away.

Q.   After making that initial observation, what, if anything, did you do?

A.   At that point, Captain Zinnack remained in the area of the item.  I was then directed to talk to a maintenance worker at the Genesis House complex to see if anyone had

been doing any landscaping or had accidentally left a gasoline container outside.

Q.   So your purpose in talking to that worker was to see if the can belonged to that worker?

A.   That's correct.  Just if they had been doing lawn mowing or weed whacking, seeing if they had left it there by mistake.

Q.   Where was that person in relation to the canister when you first observed it?

A.   That person was by D building, which once we pull up a map, I can illustrate it, but it's approximately 200 feet away from the gasoline container.

Q.   So after having that conversation with the worker, what did you do next?

A.   After that, I proceeded back towards the fire apparatus where the -- area that the gasoline container was.  This time, I approached it from a distance of about 15 feet away.

Q.   From this distance, were you able to make any additional observations?

A.   I was.  I observed what appeared to be a wick coming out of the gasoline container that had a charring pattern to it.

Q.   Why were you keeping your distance at that point?

A.   It was still unknown what was in the container or

what hazards it could pose.

Q.   After observing that there was a wick in the canister, what did you do next?

A.   After that, my index of suspicion for this being a potentially harmful container went up exponentially because it indicated that it was attempted to be burned at some point.

After that, I talked to Captain Zinnack about the possibility of initiating a response from Mass. State Police Bomb Squad or the Mass. Department Fire Services HAZMAT team to identify the contents of the container.

Q.   You said you considered calling the bomb squad because of the observations you made?

A.   That's correct.  Just unknown what was in the gasoline container at the time, unknown.  We couldn't see through the container to see if it was full, empty, anything like that.

Q.   At that point, what did you do with the fire truck?

A.   At that point, the fire truck remained approximately 60 feet away from the gasoline container.  At that time, though, I -- there was a sidewalk nearby.  I wanted to make sure that no pedestrian traffic was traveling along the sidewalk in the event that the container were to pose a hazard to those walking by.

Q.   So just drawing your attention back to the fire

truck.  Did you move it at some point during your response?

A.    I did not.

Q.    You did not move the fire truck?

A.    That's correct.

Q.    So you said you kept pedestrians away from the device?

A.    Correct.  With my -- I was standing on the sidewalk with -- essentially, keeping them away from the sidewalk with my body.  If anyone were to approach on the sidewalk, I would have guided them away.

Q.    Why did you do that?

A.    To keep them out of harm's way in the event that the fuel container were to catch on fire or something of the sort.

Q.    At some point, did you contact the Longmeadow Police Department or did someone contact the Longmeadow Police Department?

A.    Yes.  I reached out to the Longmeadow Police Department to have one of their supervisors respond to the scene.  Prior to that, a police officer was in the area but parked far away from the scene.

Q.    Did a police officer eventually approach you?

A.    Yes.  Then Acting Chief Gary Fontaine as well as, I believe, then Detective Pam Chaplin did.

Q.   Prior to the arrival of the police officers, had you, yourself, touched the can?

A.   I did not.

Q.   What was the closest you got to that canister while you were there?

A.   Approximately 15 feet away.

Q.   You said that Captain Zinnack was also on scene with you?

A.   Yes, he was.

Q.   Did you observe him at any point approach the can?

A.   He approached it from a distance of approximately 10 to 15 feet away but didn't touch it at all.

Q.   So at some point, did someone get closer than 10 to 15 feet to that can?

A.   Yes.  Deputy Chief Gerald Macsata as well then Acting Chief Gary Fontaine approached the container.

Q.   After they approached the container, what did you, yourself, do on the scene?

A.   At that point, I continued to remain vigilant of the potential of pedestrians walking on the sidewalk in the area and just kept at a safe distance from the container.

Q.   Now, if I could have -- I think we'll need our screens.  So the screens, if we could display just for the Court, counsel, and the witness.

     Mr. Nothe, on the screen in front of you will be PX-7

for identification.  Do you recognize what's depicted in this photograph?

A.   Yes.  This is the fuel container I observed on the date in question.

Q.   Is the container in the location where you first observed it?

A.   Yes, it is.

Q.   And is this a fair and accurate representation of the scene as you observed it on April 2nd of 2020?

A.   Yes, it is.

        ATTORNEY DESROCHES:  Your Honor, I'd move to introduce PX-7 into evidence.

        ATTORNEY WATKINS:  No objection.

        ATTORNEY DESROCHES:  And publish it to the jury.

        THE COURT:  All right.  No objection, that will be allowed as Government Exhibit -- we will do 1.

        CLERK RIVERA:  Okay.

        THE COURT:  Government's Exhibit 1, and it may be published.

**(Government Exhibit No. 1 admitted.)**

Q.   (By Attorney Desroches) So, Mr. Nothe, if you could just look at this photograph.  There appears to be a gray area at the bottom of the photograph?

A.   Yes.  The gray area in the middle, bottom of the photograph is newer sidewalk; and on the bottom, left,

that's older sidewalk.

Q.   So that's the sidewalk on Converse Street; is that correct?

A.   Yes, it is.

Q.   How far is the canister from that sidewalk?

A.   Approximately 5 to 7 feet.

ATTORNEY DESROCHES:  Now, if I could have the screen just for counsel, Court, and the witness?

Q.   (By Attorney Desroches) Captain Nothe, on the screen before you will be PX-9.  Do you recognize what's depicted in this photograph?

A.   Yes.  This is the same fuel container in question, same as PX-7.

Q.   So is this a fair and accurate representation of the container as you saw on the scene on April 2nd?

A.   Yes, it is.

ATTORNEY DESROCHES:  Your Honor, I'd move to introduce PX-9 into evidence and publish to the jury.

ATTORNEY WATKINS:  No objection.

THE COURT:  No objection.  That will be allowed as the Government's next exhibit and may be published.

**(Government Exhibit No. 2 admitted.)**

Q.   (By Attorney Desroches) So, Captain Nothe, drawing your attention to the spout of this container, do you see the wick that you described earlier?

A.   I do.  Where that off-white, coming up from the black, circular, twist-on area, the off-white is what I'd consider the stem of the fuel container, and then the black charred wick is just above that stem.

Q.   So that item sticking out of that nozzle is the charred wick that you saw?

A.   Yes, that's correct.

Q.   What is the -- what appears to be a street with a crosswalk in the background of this photograph?

A.   That's the entrance to 780 Converse Street, Ruth's House as well as the crosswalk adjacent to Converse Street.

ATTORNEY DESROCHES:  Now, if we could just have again the monitors for the Court, counsel, and the witness?

Q.   (By Attorney Desroches) Captain Nothe, on the screen before you is PX-10.  Do you recognize what's depicted in this photograph?

A.   I do.  This is the same area in question, the sidewalk that was in -- I'm sorry -- the crosswalk and sidewalk that was in PX-9.

Q.   Is this a fair and accurate representation of that crosswalk as it appeared on April 2nd?

A.   Yes, it is.

ATTORNEY DESROCHES:  Your Honor, I'd move to

introduce PX-10.

ATTORNEY WATKINS:  No objection.

ATTORNEY DESROCHES:  And publish it.

THE COURT:  No objection.  That can be the government's next exhibit, and it can be published.  That will be Government's Exhibit 3.

**(Government Exhibit No. 3 admitted.)**

Q.   (By Attorney Desroches) Captain Nothe, can you describe what's depicted in this photograph for the jurors?

A.   Yes.  So in this picture, PX-10, the crosswalk crosses the entrance of 780 Converse Street.  The sidewalk as it's going towards the top of the picture heads east on Converse Street.  Then the sidewalk, if I were standing in this position, the sidewalk proceeds, excuse me, westbound down Converse Street.  And in relation to this picture, if I were standing at this location, the fuel canister would have been towards my back, left-hand side.

Q.   So just so we're clear, is this the same crosswalk that appeared in the background of the photo we just saw?

A.   Yes, it is.

Q.   And the can would be essentially somewhere in the bottom -- off the bottom of this photograph; is that correct?

A.   That's correct, towards the bottom left.

ATTORNEY DESROCHES:  Thank you.  We can take that down.

Q.    (By Attorney Desroches) Captain Nothe, in your experience as a firefighter, have you had the opportunity to respond to the grounds of the Jewish Geriatric Services campus?

A.    Yes.  Multiple times a day, we are called there for either ambulance emergencies or fire alarms.

Q.    Have you become familiar with the layout of that campus as a result?

A.    Yes.

ATTORNEY DESROCHES:  If we could have PX-104?  I'm sorry just for counsel, the Court, and the witness.  Thank you, Madam Clerk.

Q.    (By Attorney Desroches) Do you recognize what's in front of you?

A.    I do.  This is an aerial shot of 780, 770 Converse Street as well as 820 through 832 Converse Street.

Q.    Now, is this a fair and accurate representation of the layout of this area on April 2nd of 2020?

A.    Yes, it is.

ATTORNEY DESROCHES:  I'd move to introduce what's marked as PX-104-1 as the next exhibit.

ATTORNEY WATKINS:  Judge, there's no objection, but I do want to make clear for the record that this is a

subpart of Exhibit 104.  There's an entire exhibit.

THE COURT:  All right.  But only this part is being introduced right now?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT:  So this becomes a stand-alone exhibit.  Without objection, it is admitted and may be published.

CLERK RIVERA:  Exhibit No. 4.

THE COURT:  This is 4.  All right.

**(Government Exhibit No. 4 admitted.)**

ATTORNEY DESROCHES:  Your Honor, I'm sorry.  Your Honor, may the witness approach the screen?  I think it may be easier for him just to be able to point to certain things.

THE COURT:  He may.

ATTORNEY DESROCHES:  Just one moment.  May we proceed?

Q.    (By Attorney Desroches) So, Captain, if you could, now that the jurors can see this or maybe, hopefully see it, can you describe, generally, what's depicted in this photograph?

A.    Yes, so --

THE COURT:  Very loud voice.

THE WITNESS:  Yes, sir.

This area up here, this is all the complex at 770

Converse Street, Jewish Nursing Home.  This building up here is 780 Converse Street, Ruth's House Assisted Living.

THE COURT:  So there's no way the record is going to get what you're saying up here.  So you're going to have to reference something on the picture to say that you're pointing to it.

THE WITNESS:  Okay.

ATTORNEY DESROCHES:  Your Honor, if I may?

THE COURT:  Whether it's a circular area, a circular driveway, the shape of a building, or I notice on one side of the street, it looks like there's just rows of residential houses.  So if you can identify where you are pointing.

THE WITNESS:  Fair enough.

ATTORNEY DESROCHES:  Your Honor, perhaps if I can just ask questions to elicit those responses?

THE COURT:  Sure.

Q.   (By Attorney Desroches) Now, Captain Nothe, drawing your attention to a building at the center of the photograph towards the top that appears to be in the shape of a cross or a "T"?

A.   Yes.

Q.   It has a gray roof.  Can you describe what that building is?

A.   Could we just put first one on to make sure?

Q.   Sure.

A.   That's 770 Converse Street, Jewish Nursing Home.

Q.   Just so we're clear, there's a picture with a light gray roof that appears to be a "T" or a cross, where the cursor is, light gray roof.  There we go.  Perfect.  It's now circled.

Can you -- it's a light gray roof at the top of this picture.  What is that building?

A.   That is part of 770 Converse Street, Jewish nursing home.  That's one wing of the nursing home.

Q.   Okay.  So now moving on in the upper, right-hand portion of this photograph there's a building that appears to be a vague shape of a "U".  Can you describe what is depicted -- what that building is?

A.   Yes.  That Ruth's House Assisted Living with a dementia unit in the basement.

Q.   Now, more towards the center of the picture is another building that's in the shape of a "T" or a cross but with a brown roof; do you recognize what that is?

A.   Yes.  That, as well, is part of 770 Converse Street, Jewish Nursing Home.  Part of that section, there's an adult daycare there.

Q.   So moving on, there appears to be a cluster of buildings in the lower, right-hand quadrant of this photograph with also tan roofs or brown roofs.  Do you

recognize what those are?

A.   I do.   Those are known as the Genesis House

apartments, 820 through 832 Converse Street.

Q.   So the scene that you responded to and that we have

seen some pictures of, is that depicted in this photograph

anywhere?

A.   Yes, it is.

Q.   Could you please point to where it is?

A.   Yes.   So it's located approximately in this area

here.   (Indicating)

Q.   So the record is clear, you're pointing to what

appears to be a road off of Converse Street which is that

main street there, correct?

A.   Yes, sir, which is the driveway to 780 Converse

Street.

Q.   You said that's the driveway to 780 Converse Street;

is that correct?

A.   Yes.

Q.   Are there any other ways into Genesis House depicted

on this photograph?

A.   Other way into Genesis House apartments, there is

another driveway right by where this crosswalk is located

in the bottom of the screen.

Q.   So for the record, it's in the bottom of the screen,

towards the right of the center, correct?

A.    Yes, correct.

Q.    Can you just trace the route that that road takes?

A.    Yes.  So starting at the crosswalk here, the driveway goes along this way, along A building, back around this way to B building, and then it stops here where you can either proceed right towards 780 Converse Street or left towards the exit.

Q.    So the route you just traced, is that a one-way?

A.    It is.

Q.    So how do you exit Genesis House if that's only a one-way?

A.    To exit Genesis House, you would have to then take a left and come out this driveway here which is shared by 780 Converse Street.

Q.    So is that also the exit by which the device you saw was placed?

A.    Yes, it is.

Q.    So, in other words, that route is an exit for Genesis House?

A.    Yes.

Q.    And it's also an exit for the other buildings; is that fair to say?

A.    Yes, it's an exit for 780 Converse Street as well.

        ATTORNEY DESROCHES:  If I may have one moment?

Q.    (By Attorney Desroches) Are you familiar -- just so

we are clear again, the main road going through the center of this photograph, what street is that?

A.    That's Converse Street.

Q.    What's the speed limit on that street?

A.    Approximately 30 to 35 miles an hour.  It's pretty heavily populated.

Q.    Thank you.  You can resume your seat.

ATTORNEY DESROCHES:  Thank you.  I have no further questions at this time.

THE COURT:  Thank you.

ATTORNEY WATKINS:  Thank you, Your Honor.  May I be seated while I question the witness?

THE COURT:  Sure.

ATTORNEY WATKINS:  I need to use the computer here if we can switch over to my computer?

**CROSS-EXAMINATION**

Q.    (By Attorney Watkins) Good morning.

A.    Good morning.

Q.    So what time did you receive the call to go over to JGS?

THE COURT:  You want to pull the microphone over a little bit?

There we go.

Q.    (By Attorney Watkins) I'm sorry.  I'm going to ask it again.

At what time did you receive the call to come over to JGS?

A.    Sometime between the hour of 11 a.m. and noontime.  I don't recall exactly, sir, without looking at the report.

Q.    If I said that the logs indicate that it was 11:40, would be that about right?

A.    Yes, sir.

Q.    And did you understand when you were called there that the fuel canister had been there for several hours?

A.    No, sir.  Upon the fire department's dispatch, we had not received that information.

Q.    Did you later learn that it had been there for several hours?

A.    After the fuel container had been removed from the scene, I was told by my deputy chief that after the fact, yes.

Q.    And did you learn that it was 8:30 in the morning that it was reported or it was reported as first being seen?

A.    No, sir.  I didn't hear an exact time frame.  I just heard from the deputy chief it had been there for a few hours.

ATTORNEY WATKINS:  Your Honor, we entered into a number of stipulations.  I think it might make sense and appropriate to read one of those into the record now.

ATTORNEY DESROCHES:  There would be no objection to that, Your Honor.

THE COURT:  All right.  Go right ahead.

ATTORNEY WATKINS:  Does the Court want to instruct?

THE COURT:  I was going to instruct after.

ATTORNEY WATKINS:  Okay.

"The parties have agreed that Regina Ellis, who lives near the location where the yellow fuel canister was placed, first observed the canister at approximately 8:30 a.m. on April 2nd of 2020."

THE COURT:  Okay.  Ladies and gentlemen, that's called a stipulation.  It's an agreement between the parties.  So it's not challenged evidence.  It is evidence you can now accept as true.

Both parties agree it is true that Regina Ellis first observed this at 8:30 a.m.  So there's likely to be other instances of what a stipulation of this -- that's what this was.  A stipulation is an agreement between the parties accepted as true because both sides agree on it. All right.

ATTORNEY WATKINS:  Thank you, Your Honor.

Q.   (By Attorney Watkins) So you arrived at the scene first before -- is it Captain Macsata?

A.   Deputy Chief Macsata, yes.  The fire engine arrived

prior to him.

Q.   And Fontaine, he was captain?

A.   Gary Fontaine was police captain but at the time was an acting chief for the police department as well.

Q.   Both of them your superiors, right?

A.   Well, the deputy fire chief, yes.  I don't report to the police chief or police captain.

Q.   The police captain outranked you at the time; is that correct?

     I'll withdraw the question.

A.   I was a lieutenant at the time, but just based on how the fire service and police service work and the chain of command, I would need to report to my deputy chief any issue or concern I had.  We don't cross agency lines, I guess, if that makes sense.

Q.   Now, to be perfectly clear, you were dispatched to a suspicious package?

A.   Yes.

Q.   It was not described to you as a bomb threat when you were dispatched there, correct?

A.   It was given as a suspicious package, correct.

Q.   And when you went there, you talked about some of the activities that you did down at the scene before Deputy Chief Macsata and Captain Fontaine arrived?

A.   I'm sorry, sir.  I missed the first part of that.  We

talked about the actions that transpired prior to that, is what you said?

Q.   Macsata and Fontaine arrived there after you did, correct?

A.   Yes, correct.

Q.   When Macsata and Fontaine arrived there, they went over to the device?

A.   That's correct, after being briefed on the situation by Captain Zinnack who was with me on the fire engine.

Q.   When you talked about the considerations of the bomb squad being called, they weren't called.  Macsata and Fontaine went over to the fuel canister, right?

A.   That's correct.  I was not the individual who had the title of incident commander.  That was Captain Zinnack.  I made a recommendation to him to contact the bomb squad, and he said let me think about it for a moment.

            ATTORNEY WATKINS:  I want to put Exhibit 104 back on the screen, and this has been admitted.  This is 104-1.

Q.   (By Attorney Watkins)  So just to be clear because it was difficult for at least me to see over there, I want to talk about a few different locations that Mr. Desroches was talking about.  Okay?

A.   Okay.

Q.   So, first, this is here.  This is the location at

which the fuel can was, correct?

A.   If you wouldn't mind moving the cursor, sir, towards the left?

Q.   That tree there?

A.   That area, yes.  It's tough to exactly depict, but approximately.

Q.   And what you told us is this is a two-way street at this point, right?

A.   Two-way driveway, yes, sir.

Q.   Two-way driveway.  And that is the way that one can get up to Ruth's House?

A.   Yes, sir.

Q.   And one cannot go this way.  That's Genesis House over that way, correct?

A.   So if one wanted to, they could access this driveway and then take a right towards 780 Converse Street.

Q.   I think what you're trying to tell us, you would have to come through this entrance here to get into Genesis House?

A.   Yes, sir, that's correct.

Q.   And to just reiterate here, this is what you're telling us is the nursing home, correct?

A.   Yes, sir.  So if you don't mind zooming back out for a moment?  The brown roof, the gray roof with cross, the white roof between those two, as well as the black roof

out back, that's all the Jewish Nursing Home.

Q.   Again, I'm about to blow this up.  This is -- all of that area is the actual nursing home, right?

A.   Correct.

Q.   Okay.

A.   Then there is another wing of the nursing home in that black roof section as well.

Q.   You told us that that's the daycare portion of the nursing home property, correct?

A.   No, sir, the brown roof area is --

Q.   The brown roof.  Okay?

A.   Brown, yes.

Q.   And the black roof area is still part of the nursing home there?

A.   Yes.

Q.   Now, between the spot here where that fuel canister was located, there is this grove of trees here, right?

A.   That's correct.

Q.   And this is also across the way from the Genesis House complex here, right?

A.   Yes.

Q.   And it's way, way, way, way far away from the Ruth's House portion up here, right?

A.   Yes, a bit of a distance.

Q.   Going, again, to this driveway around Genesis House,

this also features speed bumps in that -- on that driveway that circles around?

A.    Correct.  There's a speed bump, two speed bumps, one about halfway down that curved area and another one towards where the stop sign is that you can take a right or a left at.

Q.    I want to talk more -- let me see if I can -- again, this is a different view, this is still 104-1, here.

This is a closer-up view of that particular area where the fuel canister was found, right?

A.    Yes, sir.

Q.    I want to talk a bit about Converse Street here, which is the long road here.

That is several miles as it travels through Longmeadow?

A.    Yes.

Q.    And then it continues on into Springfield for a moment, right?

A.    No, sir, actually it crosses with Dwight Road on the eastern side which is still in Longmeadow.

Q.    East Longmeadow, towards East Longmeadow on that side, right?

A.    Yes, sir.

Q.    When we're talking about that side, I'm going to blow up that direction, that end of the road is going to -- is

from East Longmeadow?

A.    Yes, sir.

Q.    And this way goes out towards Forest Park, right?

A.    Yes, sir.

        ATTORNEY DESROCHES:  Your Honor, if we can just have -- I think we need to develop a record with the "this way" and "that way."

        THE COURT:  Right.

        ATTORNEY WATKINS:  Okay.

        THE COURT:  It's difficult to do, but do the best you can to orient your questions to the picture.

        ATTORNEY WATKINS:  Okay.  I will do that.

Q.    (By Attorney Watkins) So from the bottom right of that picture is the direction from East Longmeadow, right?

A.    Yes, sir.

Q.    And the top left here -- top left here, that is the direction that continues on into Springfield -- into Forest Park, right?

A.    Yes, sir.  If you were to take a right at the traffic lights there, it would be Springfield.

Q.    Now, along this what is the -- the speed limit along this road is 30 miles per hour in this area?

A.    If I had to estimate, I'd say somewhere in that neighborhood.

Q.    And it's a busy street?  A lot of people travel

through there, right?

A.    It is, yes.

Q.    It's the main way to get from that portion of East Longmeadow and Longmeadow?  People live along there?

A.    Yes, sir.

Q.    The car traffic is quite heavy during the day there, right?

A.    Yes, you could say that.

Q.    On this stretch of Converse Street in Longmeadow, there are actually several Jewish-operated homes and complexes there?

A.    Yes, sir.  Correct.  There's Yeshiva Academy which is more east on Converse Street, and there is the Jewish Community Center which is more west on Converse Street. The Jewish Community Center actually has no part in Longmeadow though; it's only in Springfield.

Q.    And the Jewish Community Center, a very large sign for that.  You can't miss it going down Converse Street, right?

A.    Correct.

Q.    And there is also a private school that is quite nearby that Jewish Community Center sign as well?

A.    Yes, sir.  That's a Springfield charter school that's actually in Longmeadow.

Q.    I'm going to put up Government's exhibit --

ATTORNEY WATKINS:  Well, now did you introduce 33?

ATTORNEY DESROCHES:  No.

ATTORNEY O'NEILL-GREENBERG:  Not yet.

ATTORNEY WATKINS:  This should just go to the parties.

Q.   (By Attorney Watkins) Do you see up on your screen what's been identified as Government's Exhibit 34?

A.   Yes, I do, sir.

Q.   Do you recognize what that depicts?

A.   Yes.  That's the entrance to 780 Converse Street -- sorry, entrance and exit to 780 Converse Street driveway.

Q.   Is that a fair and accurate representation of how it looked on April 2nd when you arrived?

A.   Honestly, the -- I don't know how to describe this, but I'll do my best.  The wooded area to the top left of the screen was less densely populated with trees is the best way I know how to describe it.

Q.   There was not as much foliage on it; is that what you're trying to say?

A.   Correct, sir, not as much foliage and even the treeline, this seems to be as though there are more trees there in this picture than on that date in April of 2020.

Q.   Aside from those features of it, is it a fair and accurate representation of the -- particularly the

driveway, as it existed on April 2nd?

A.    It is, yes.

ATTORNEY WATKINS:  Your Honor, I'd ask to introduce Government's Exhibit 34.

ATTORNEY DESROCHES:  No objection, Your Honor.

ATTORNEY WATKINS:  And may we publish it?

THE COURT:  That's allowed and may be published.

**(Government Exhibit No. 34 admitted.)**

Q.    (By Attorney Watkins) So, now, we are down on the ground looking at Exhibit 34 here.

A.    Uh-huh.

Q.    And, again, I'll orient you to the left side of the photograph.  About two-thirds of the way up is the tree that we were talking about?

A.    I believe so, sir.

Q.    And this is what you described as an entrance to Ruth's House and also an exit from Ruth's House?

A.    Yes, sir.

Q.    And there is this island in the middle here that you see right in the middle of the picture where it says "keep right"?

A.    Yes, sir.

Q.    And this divides the traffic going in and going out?

A.    Yes, sir.

Q.    So someone coming out of this exit here and stopping

here for some period of time, they're going to be blocking traffic, nobody can get out if they sit there for a while?

ATTORNEY DESROCHES:  Objection, Your Honor; calls for speculation.

THE COURT:  Overruled.

Q.   (By Attorney Watkins) If someone stops there for a period of time to do something, they're going to be blocking traffic there, right?

A.   They would be blocking the exit, yes.

Q.   For somebody to leave the campus at that point, they'd have to, basically, go this other side the wrong way and go around the person?

A.   Accurate, yes.

ATTORNEY WATKINS:  That's all I have, Your Honor.

ATTORNEY DESROCHES:  Can we leave that up?

**REDIRECT EXAMINATION**

Q.   (By Attorney Desroches) So, Captain, you were just asked some questions about where a vehicle -- if a vehicle would block traffic, correct?

A.   Yes, sir.

Q.   If a vehicle parked on the side of the road on Converse Street, which would be the very top or very left of this photograph, would it have any effect on traffic leaving Ruth's House Road?

A.    Leaving the driveway, it could impede traffic leaving there depending on if it was in a bad spot, if it was blocking the view of the person trying to exit Ruth's House.

ATTORNEY DESROCHES:  Can we have PX-10, please?

Q.    (By Attorney Desroches)  So I just want to be clear. If that vehicle parked on Converse Street past Ruth's Road, it wouldn't block -- it would block the exit of Ruth's Road if it were parked a little further up Converse Street?

A.    I'm sorry, sir.  Repeat that one more time.

ATTORNEY DESROCHES:  We will go with PX-10.  So we need to switch.

Q.    (By Attorney Desroches) Okay.  So now on the screen is PX-10, which has been introduced.  You can see these police cruisers parked on the side of Converse Street, correct?

A.    Yes, sir.

Q.    And those cruisers, would they block traffic like you described previously?

A.    Based on where they're parked now, it does not appear as though they're in the travel lane.  For someone exiting 780 Converse Street, it might be challenging to see oncoming traffic.

Q.    But it wouldn't block traffic; is that right?

A.   Correct.

Q.   And the last photo we just saw, I'm not sure if we can toggle, but it appears as though the sign is different in two photographs; is that right?

A.   Yes, the sign is different.  This is a more modern sign than the previous one.

Q.   So just so we're clear, we're looking at both here. Now, drawing your attention again to the left-hand portion of this photograph, that is actually -- sorry, PX-34 -- that is actually Converse Street, correct?

A.   Yes.  In that area on the far left of the screen in PX-34, that is Converse Street.

Q.   And is that shoulder consistent with the shoulder that the police cruisers are parked on in PX-10?

A.   Yes.

        ATTORNEY DESROCHES:  Thank you.  I have no further questions.

        ATTORNEY WATKINS:  Just two more if I may?

        THE COURT:  Sure.  Go ahead.

        ATTORNEY WATKINS:  I'll need my computer or that photo back up, one or the another.

**RECROSS-EXAMINATION**

Q.   (By Attorney Watkins) Looking at Government's PX-10, these cruisers that you see parked on the side of the road, that's not a parking area?  That's not designated as

a parking area, correct?

A.    Correct.  They were just there, parked there for the emergency incident.

Q.    And so there's actually not any parking on Converse Street, correct?  It's a main road?

A.    Not that I'm aware of, sir.

Q.    And, as you say, if somebody were to park near that tree, they'd actually be blocking the traffic of somebody getting out of the Ruth's House at that point, right?

A.    If they were to park in that initial location you described facing exiting 780 Converse Street at the stop sign next to the island, they would be blocking exiting traffic.

If they were parked on the shoulder, such as the police cruisers are, traffic could still get by, but just a concern that there'd be -- if someone driving by got too close to the vehicles, it could be a problem.

Q.    So these cruisers who are actually parked on the grass, that's unusual.  Private people are not allowed to park on that grass, right?

A.    That's correct.

Q.    So a civilian car that was parked on the grass, that's going to stick out to somebody; is that fair to say?

A.    I guess because, yeah, there's not normally parking

on Converse Street, marked spaces for parking on Converse Street.

ATTORNEY WATKINS:  That's all I have.

THE COURT:  All right.  Thank you.

ATTORNEY DESROCHES:  No other questions.

THE COURT:  Thank you very much, sir.

THE WITNESS:  Thank you.

THE COURT:  Next witness?

ATTORNEY DESROCHES:  The government calls Gary Fontaine.

Your Honor, if I may just inquire, with the current COVID protocols, previously we've left physical exhibits on the witness stand.  Is that how the Court would like to proceed at this point?

THE COURT:  Right.  So what exhibit is on the witness stand that you're talking about?

ATTORNEY DESROCHES:  Your Honor, the proposed exhibits will be the fuel canister and the --

THE COURT:  Right.  Okay.

CLERK RIVERA:  Mr. Fontaine, can you please raise your right hand?

**Gary Fontaine (sworn)**

THE COURT:  Thank you, sir.  You can remove your mask.

**DIRECT EXAMINATION**

Q.    (By Attorney Desroches) Good afternoon.

A.    Good afternoon.

Q.    Would you, please, introduce yourself to the jury and, for the record, spell your last name?

A.    It's Gary Fontaine.  It's F-o-n-t-a-i-n-e.

Q.    Are you currently employed?

A.    I am not.

Q.    Were you previously employed?

A.    I was.

Q.    Where were you previously employed?

A.    The Longmeadow Police Department.

Q.    When did you stop working with the Longmeadow Police Department?

A.    I retired in September.

Q.    And so you've been retired for just a few months now, six months or so?

A.    Yes, sir.

Q.    For how long had you worked for the Longmeadow Police Department?

A.    Thirty-two years.

Q.    What rank did you achieve at the department?

A.    Interim chief.

Q.    Prior to being interim chief, what was your rank?

A.    Captain.

Q.    Can you describe your progression through the ranks in the Longmeadow Police Department for the jurors?

A.    Sure.  I came on the Longmeadow Police Department in 1988 as a patrolman.  I was then a detective for approximately five years; was promoted out of the detective bureau to sergeant; was a sergeant for approximately six years; promoted to lieutenant; was a lieutenant for approximately six years, and then captain for another six; interim chief for three months.

Q.    Now, did you have any special responsibilities within the Longmeadow Police Department, specifically with the detective bureau?

A.    Yes.  I was in charge of the detective bureau.

Q.    For how long were you in charge of the detective bureau?

A.    About 12 years.

Q.    What were your responsibilities in that position?

A.    I would oversee my three detectives, their cases and whatnot and assignments and follow-ups with cases and those type of things.

Q.    Did you have any special training with crime scenes as a police officer or detective?

A.    Yes.

Q.    Can you describe what that was like?

A.    Numerous trainings on crime scene, evidence recovery,

lifting fingerprints, chain of custody with regards to evidence packaging, that type of stuff.

Q.    Did you receive any training in regards to dealing with hazardous materials?

A.    Yes.

Q.    What was that?

A.    We've had trainings through the MPTC regarding hazardous materials and those type of things and what our response should be to that.

Q.    Did that training include a response to suspicious packages?

A.    It has, yes.

Q.    Drawing your attention to April 2nd of 2020, were you interim chief at that point?

A.    I was.

Q.    Were you working on that day, April 2nd?

A.    I was.

Q.    What was your shift?

A.    Eight to four.

Q.    Did the police department receive a call at approximately 11:40 that morning?

A.    It did, yes.

Q.    Did you, yourself, respond immediately to the scene?

A.    No, I did not.

Q.    Why not?

A.    It wasn't common practice to respond to patrol calls unless there was a need for a detective response or of myself as the interim chief or the head of the detective bureau.

Q.    So it wasn't common for the chief to go to every crime scene?

A.    No.

Q.    Did Longmeadow police officers have patrolmen respond to that area?

A.    They did.

Q.    At some point, though, did you go to the scene?

A.    We did, yes.

Q.    And who were you with?

A.    I was with Officer Chaplin.

Q.    Where was the scene?

A.    On Converse Street.

Q.    Was there a particular location on Converse Street that you responded to?

A.    It was in front of the entranceway to Ruth's House and Genesis House.

Q.    When you first arrived at that scene, what did you see?

A.    There was a fire engine and some cruisers parked in the area of the entrance, maybe 20 yards from actually Converse Street, inward, towards Genesis House.

Q.    Did you see anything there that drew your attention specifically?

A.    As we arrived on scene, I could see to the left there was a yellow container on the tree belt.

Q.    You indicated previously that there was some firefighters on scene when you arrived.  Where were they in relation to the container?

A.    They were by the fire trucks and the cruisers, approximately maybe 20 yards from that yellow container.

Q.    You said 20 yards?

A.    Correct.

Q.    So after you first arrived on scene and made that initial observation, what did you do next?

A.    Actually, I think I spoke with Sergeant Wisnaskas first and he apprised me of what they had and was indicating that he was canvassing the area with -- the patrolmen were canvassing the area.  I then later spoke with Captain Macsata from the fire department.

Q.    Sergeant, I'm sorry, I may have missed his name, and I won't try to butcher it.  But the first sergeant you spoke to was a police officer, correct?

A.    That's correct, yes.

Q.    And Captain Macsata was a firefighter?

A.    Correct.

Q.    So after you had those conversations, what did you

do?

A.    Myself and Captain Macsata and Officer Chaplin went to the item itself and observed it closer.

Q.    What did you see when you observed it closer?

A.    It appeared to be a container, similar to a gas container with a nozzle, and inside the nozzle was paper that was charred on the end.

Q.    Did you have an opportunity to examine that container more closely once you got closer to it?

A.    Yes.

Q.    And what did you see when you did that?

A.    There was also a brownish stain on the handle portion of the container.

Q.    Did that -- was that noteworthy to you?

A.    I'm sorry?

Q.    Was that noteworthy to you?

A.    It was.  It actually appeared to be blood.

Q.    Is that based on your training and experience as a detective?

A.    Correct.

Q.    So after making that initial observation, what did you do?

A.    It was deemed safe so we ended up transporting it back to the station for closer examination.

Q.    You said it was deemed safe?

A.    It didn't pose -- according to the Fire Captain Macsata, that it didn't pose a hazard in its current state.

Q.    And why was that?  What was your understanding of why it was safe to transport?

A.    There was nothing to indicate that it would do anything to cause harm.

Q.    Is that because it was not currently lit?

A.    Correct.

Q.    You said you transported it back to the Longmeadow Police Station?

A.    Yes.

Q.    Did you make any observations as to whether or not there was something inside of that canister when you transported it?

A.    Yes.  There was a liquid inside of the container. Officer Chaplin actually put on her gloves, brought it to the vehicle and held it so that the liquid wouldn't splash around.

Q.    Did you have an opportunity to smell what that liquid smelled like?  Or did it have a smell?

A.    When we got in the car, you could smell it.  It smelled like gasoline.

Q.    You said that Detective Chaplin put on gloves.  Why did she do that?

A.    Like with handling of any evidence, we don't want to contaminate the items.

Q.    So when you went back to the Longmeadow Police Department, where did you take the canister?

A.    We took it to the sallyport of the police station.

Q.    What is the sallyport?

A.    It's actually an entranceway for when we have prisoners for intake with a garage.  It's just an open area that we have to -- we close it when we have prisoners in for booking processing.

Q.    When you made it to the sallyport, what did you do with the item?

A.    Took it out of the vehicle and we removed the papers that were stuffed into the nozzle.

Q.    Where did you do this?

A.    In the sallyport.

Q.    Right in the sallyport?

A.    Correct.

Q.    Did you take any precautions to ensure that the evidence would not be spoiled?

A.    We were both wearing gloves at the time.

Q.    What observations did you make when you removed the papers that were inside?

A.    We could -- at that time, we noted that it looked like religious documents of some sort.  And there was

also, you know, some of the papers were charred.  Some of it you could read it and see that it was some sort of religious pamphlet, and we also noticed another reddish mark on the paper.

Q.   At that point, did you further examine the contents of the canister?

A.   At that point, we requested fire department to come over to remove the contents into another container.

ATTORNEY DESROCHES:  Your Honor, may I approach the witness with gloves?

THE COURT:  Yes.

Q.   (By Attorney Desroches) Captain Fontaine, I just handed you some gloves.  If you can just put them on.

Do you see the gas canister that you collected on April 2nd on the witness stand with you?

A.   I do.

Q.   Could you please pick it up and display it for the jurors?

A.   (Indicating.)

Q.   Now, if you can maybe just place it down on the ledge.  I'm not sure if there's enough space there.

Detective, this item, is it in substantially the same condition as it was when you first observed it?

A.   No.

Q.   What's the difference?

A.    Appears to be dusting powder that was put on it.

Q.    You said "dusting powder."  What does that mean?

A.    It's a -- in order sometimes to look for fingerprints, they use dusting powder.  It's a process to see if any fingerprints are on the canister itself.

Q.    Did the Longmeadow Police Department dust that canister?

A.    We did not.

Q.    Did you learn that the Massachusetts State Police Crime Laboratory dusted that canister?

A.    Yes.

Q.    Is the red stain still on that canister?

A.    I do not see it, no.

Q.    Had you learned that that canister has been processed by the Massachusetts State Police Crime Lab?

A.    Yes.

Q.    Now, other than what you just described as being the differences, is the canister in substantially the same condition as it was when you found it?

A.    Less the liquid, yes, and the stuff that was in the nozzle.  The paper.

Q.    I'm sorry?

A.    The paper that was in the nozzle.

          ATTORNEY DESROCHES:  I'd now move to introduce this as the next government exhibit.

ATTORNEY WATKINS:  No objection.

THE COURT:  No objection.  That's allowed and can be introduced as evidence.  What is that number?

ATTORNEY DESROCHES:  Your Honor, I believe that's PX-3.  I'm sorry, PX-1.

THE COURT:  PX-1, but what evidence number is it getting?

CLERK RIVERA:  It's 5 for the government.

THE COURT:  All right.

**(Government Exhibit No. 5 admitted.)**

Q.   (By Attorney Desroches) Now, Detective, do you see the pamphlets that you removed from -- I'm sorry, Captain. Do you see the pamphlets that you removed from the canister that day?

A.   I do.

Q.   Can you, please, just review them for yourself before you display them?

Are the two items that you're currently holding, are they the pamphlets that you removed from the canister that day?

A.   Yes.

Q.   Are they in substantially the same condition?

A.   Appears to be some sections were cut out of the pamphlets.

Q.   Based on your training and experience, are you

familiar why there would be sections cut out of that pamphlet?

A.   Most likely, they're probably DNA processing or there was fingerprints of something for analysis later.

Q.   Are you aware whether or not that item was examined for DNA?

A.   Yes.

Q.   Do you observe the red stains that you saw that morning on that --

A.   No.

Q.   -- exhibit?

Are the cutouts in the same areas as where you saw the red stains?

A.   I believe so.  Yes.

Q.   Other than what you just described as being the difference, are those items in substantially the same condition as they were when you saw them that morning?

A.   Yes.

ATTORNEY DESROCHES:  Your Honor, I'd move to introduce this as the next exhibit, which is marked as PX-3 currently.

ATTORNEY WATKINS:  No objection.

THE COURT:  No objection.  That will be admitted.  So that was the pamphlet, and that would be 6; is that correct?

CLERK RIVERA:  That is correct.

THE COURT:  All right.

**(Government Exhibit No. 6 admitted.)**

ATTORNEY DESROCHES:  So if we could have PX-11 displayed for counsel table, the Court, and the witness?

Q.   (By Attorney Desroches) Do you recognize what this item is depicted now in PX-11 on the screen before you?

A.   Yes.

Q.   What is that?

A.   That was the container that was recovered at the Converse Street location.

Q.   When was this photograph taken?

A.   That would have been taken that same day.

Q.   Is this a fair and accurate representation of the can that you observed on that day?

A.   Yes.

ATTORNEY DESROCHES:  I'd move to introduce PX-11, Your Honor.

ATTORNEY WATKINS:  No objection.

ATTORNEY DESROCHES:  And publish.

THE COURT:  No objection.  This photograph, PX-11, the gas canister will be introduced.  And please confirm for me this is 7 for the government?

CLERK RIVERA:  Yes, Your Honor.

THE COURT:  All right.

**(Government Exhibit No. 7 admitted.)**

Q.    (By Attorney Desroches) So where was this picture taken?

A.    That is in the upstairs of the police department in the lab we call it.

ATTORNEY DESROCHES:  And may I have just the screens for the witness, counsel, and the Court?

And then, Ms. McKenna, if you can just display 13, 15, and 16 in sequence to the witness?  And can we go to 18, 19 and 20 as well?

Q.    (By Attorney Desroches) So now, Captain Fontaine, you just observed what had been marked as PX-13 through PX-20 on your screen before you.  Do you recognize what those photographs are?

A.    Yes.

Q.    Can you describe, generally speaking, what they are?

A.    They're photographs of the container as well as the paper that was pulled from its nozzle.

Q.    Were those photographs taken at the Longmeadow Police Station?

A.    Yes.

Q.    Are each and every one of those photographs fair and accurate representations of the items as they appeared at the police station when you took photographs of them?

A.    Yes.

ATTORNEY DESROCHES:  Your Honor, I would move to introduce PX-12, 13, 15, 16, 17, 18, 19, and 20 into evidence.

THE COURT:  Are they coming in as a group or are they coming in singularly?

ATTORNEY DESROCHES:  I would defer to whatever is easier to maintain for the court, Your Honor.

THE COURT:  Christina, do you want me to introduce them as a group as one number or one after another?

CLERK RIVERA:  One after another.

THE COURT:  Okay.  So can you, please, call out the number you'll be assigning to each?  So we need to put each one up on the screen and give it a separate number.

ATTORNEY DESROCHES:  If we could first have PX-12?

Q.   (By Attorney Desroches) Can you describe what PX-12 is?

A.   It's the container that we recovered from Converse Street.

Q.   This is essentially a rear view of the container?

A.   Yes.

THE COURT:  That will be number?

CLERK RIVERA:  Number 8.

THE COURT:  That's number 8.

And there was no objection to any of these, correct?

ATTORNEY WATKINS:  No objection.

THE COURT:  All right.

**(Government Exhibit No. 8 admitted.)**

Q.  (By Attorney Desroches) PX-13, can you describe what's depicted here?

A.  That is the side photo of the container that we recovered.

A JUROR:  We're not seeing any of these.

ATTORNEY DESROCHES:  I'm sorry.  May they be published?

THE COURT:  Yes.  Thank you.

Q.  (By Attorney Desroches) You said this is the side of the container?

A.  It is, and it also has the reddish mark on the handle.

ATTORNEY DESROCHES:  So, Ms. McKenna, if we can just zoom in on the handle?

Q.  (By Attorney Desroches) Is that the area you're talking about where you saw the red stain?

A.  Correct.

Q.  And can you describe what role this stain played in your investigation?

A.  It was submitted to the lab for analysis.

Q.  Thank you.

ATTORNEY DESROCHES:  If we could go back to PX-11 quickly just to publish this to the jury?

Q.   (By Attorney Desroches) So that is the other side of the canister, correct?

A.   That's correct.

Q.   It says on it, just so the record is clear, "extremely flammable diesel fuel danger," correct?

A.   That's correct.

Q.   And did the jurors see PX-12?

And, now, for the record, we're back on PX-12 just so the jury can see this.  This is the back of the can, correct?

A.   That's correct.

Q.   And PX-14.

Now, on the screen is PX-14, what is depicted here?

A.   That's the handle of that container with the reddish mark.

Q.   This is a stand-alone photograph of the stain; is that correct?

A.   I'm sorry.  I didn't hear that.

Q.   This is a stand-alone photograph of that container --

A.   Yes.

Q.   -- of the stain?

PX-15, please.

And the front of the can; is that fair to say?

A.   Yes.

Q.   And so the record is clear, it has a sticker on the front, correct?

A.   It does.

Q.   Can we have now PX-16?

What is depicted in PX-16?

A.   I'm sorry?

Q.   What is depicted in the photograph?

A.   This is the paper that was pulled out of its nozzle, and it appears to be some sort of religious pamphlet.

Q.   You indicated that there was a red stain on this pamphlet when you observed it, is it depicted in this photograph?

A.   It is.  It's somewhat in the middle of the pamphlet.

Q.   Can we zoom in on the middle of the pamphlet?

And when you observed this, what color was it?

A.   Reddish brown.

Q.   And based on your training and experience, did that color have any significance to you?

A.   It appeared to be blood, yes.

Q.   Now, other than that stain and the wrinkling and the rip that we can see in the bottom, were there any stains on this pamphlet that are not depicted in this photograph that you saw that day?

A.   No.

Q.    Now, may we have 17?

What is depicted in PX-17?

A.    This is also part of the paper that was pulled out of the nozzle of the container.

Q.    Is this the reverse side of PX-16?

A.    It is.

Q.    Can we have PX-17 -- I'm sorry, 18.

What is depicted in PX-18?

A.    This is also some of the paper that was pulled out of the nozzle with some charring on the edge.

Q.    Can you describe for the jurors, so the record is clear, where the charring appears in this photograph?

A.    On the left-hand side of the pamphlet.

Q.    Can we just zoom in on that?

Now, just to the right, there appears to be a stain on that.  Do you recognize what that -- do you recognize what that is?

A.    Yes.

Q.    Is that consistent with the red-brown stains you had seen in other places on this pamphlet?

A.    Correct.

Q.    Now go to 19.

What is depicted in PX-19?

A.    This is also paperwork that -- I think it's the reverse side of the one before.  It has char marks on it

as well.

Q.   And so the char marks are on the left of this photograph, correct?

A.   Correct.

Q.   Now, if you -- drawing your attention to paragraph number 3, it starts with "believe that Jesus Christ died," do you see any stains in that area?

A.   I do.

ATTORNEY DESROCHES:  Ms. McKenna, can you zoom in on that area?

Q.   (By Attorney Desroches) What is -- can you describe this stain?

A.   Again, it appears to be blood, a reddish-brown stain.

Q.   And is that consistent with the other stains that you saw on the canister -- I'm sorry -- on the pages of this pamphlet?

A.   Yes.

Q.   Can we have PX-20?

Now, can you describe for the record and for the jurors what PX-20 depicts?

A.   Again, this is papers that were pulled out of the nozzle of the container and charring as well as the brown-reddish stain.

ATTORNEY DESROCHES:  So, Ms. McKenna, can you just highlight on the top of that where the brown-reddish

stain is?

Q.   (By Attorney Desroches) So the record is clear, we just highlighted an area indicating "can pray," and there appears to be a red mark; is that correct?

A.   Yes.

ATTORNEY DESROCHES:  Now, Ms. McKenna, if you can just zoom out?

Q.   (By Attorney Desroches) Drawing your attention to the bottom of this page, the area between the two fingers that are holding this down, do you recognize what that is?

A.   Again, that's a brown-reddish stain, appears to be blood.

Q.   Now, other than these brown-reddish stains that you described on this pamphlet, did you observe any other staining or signs of weathering on this exhibit?

A.   No.

Q.   When you were handling the canister and photographing it, were you able -- did you smell that gas that you smelled in the cruiser?

A.   Yes.

THE COURT:  So, Attorney Desroches, relative to all the photographs you have just shown, are you moving all those photographs into evidence?

ATTORNEY DESROCHES:  I believe they are already moved into evidence, Your Honor.

THE COURT:  All right.  Are they premarked?  We just need to assign them each one a number.

ATTORNEY DESROCHES:  Yes, they're premarked with PX-numbers.

THE COURT:  Okay.

CLERK RIVERA:  So, for the record, PX-12 is Government Exhibit No. 8; PX-13 is Government Exhibit No. 9; PX-14, Government Exhibit No. 10; PX-15, Government Exhibit No. 11; PX-16, Government Exhibit No. 12; PX-17, No. 13; PX-18, No. 14; PX-19, No. 15; and PX-20, No. 16.

THE COURT:  All right.  Perfect.  Thank you.

CLERK RIVERA:  All of those are admitted?

THE COURT:  Yes.

No objection to any of them, correct, defense?

ATTORNEY WATKINS:  No objection.

THE COURT:  All right.

**(Government Exhibits 9 through 16 admitted.)**

ATTORNEY DESROCHES:  May I proceed, Your Honor?

THE COURT:  Yes.

Q.   (By Attorney Desroches) So now, Captain, after these photographs were taken, what did you do with the diesel container?

A.   Officer Chaplin placed that in a box for transport to the crime lab.

Q.   And what precautions were taken with the fuel

canister to preserve the, sort of, evidence that may be on it?

A.    The liquid that was inside in the canister, we had Captain Macsata come over with their own separate container, and it was removed from this one into that one for analysis by the fire department.

Q.    Was the canister then sealed in a box that you put it in?

A.    Was this sealed in a box?  Yes.

Q.    What did you do with the wick or -- sorry -- the pamphlet, the pages of the pamphlet that we just looked at?

A.    That was also packaged and prepared for submission to the State Police Crime Lab.

Q.    Now, were the items that you just testified about handled in accordance with your training and experience on handling evidence?

A.    Yes.

ATTORNEY DESROCHES:  Now, I would defer to the Court, but there's another series of photographs that we would introduce.  That didn't work well last time.  We can try it differently.

THE COURT:  You're going to introduce another set right now?

ATTORNEY DESROCHES:  Yes, Your Honor.

THE COURT: So just go premarked. You'll give me the premarked number, and then the clerk will convert the premarked number into the next consecutive exhibit for the government.

ATTORNEY DESROCHES: Thank you.

Can we have the screens just for counsel, the Court, and the witness?

CLERK RIVERA: Yes.

ATTORNEY DESROCHES: Ms. McKenna, can we, in sequence, display 21 to 32?

Q. (By Attorney Desroches) Captain, I'm going to refer your attention to the screen and ask you to silently review what's being displayed.

Okay. So we've just displayed PX-21 through 32. Do you recognize what those are?

A. Those are photos of the area in which this container was recovered.

Q. Are each and every one of those fair and accurate representations of that area?

A. Yes.

Q. And just so we're all clear, what area is actually depicted in those photographs?

A. That is the entranceway -- it's Converse Street and the entranceway to the Ruth's House and Genesis House.

ATTORNEY DESROCHES: Your Honor, I would move to

introduce PX-21 through 32, and we'll walk through them again with more detail for the record.

ATTORNEY WATKINS:  Your Honor, can we establish when those photographs were taken?  I understand it's fair and accurate, but we need to establish when they were taken.

THE COURT:  If this witness knows.

Q.    (By Attorney Desroches) Did you take these photographs?

A.    No.

Q.    Is it fair to say that these photographs appear to be taken in the fall?

A.    Yes.

ATTORNEY DESROCHES:  And I would, subject to that, Your Honor, move to introduce these.

ATTORNEY WATKINS:  With no objection with that caveat.

THE COURT:  No objection.  All right.  Those will be introduced.  I will leave it to the clerk to assign each a number in consecutive order for the government exhibits to correspond to the PX number on the premarked exhibit.

ATTORNEY DESROCHES:  So if we may publish to the jury?

Q.    (By Attorney Desroches)  Captain, we're just going to

walk through these photographs and ask that you explain to the jury what's depicted in them so they can understand the layout of the land.

A.   Okay.

Q.   The first, PX-21, do you recognize what's depicted in this photograph?

A.   That is the tree, the closest tree to where this container was recovered.

Q.   So was the container next to this tree when you first saw it?

A.   It was.  So looking at the picture, it was to the right of the tree.

Q.   Now, in the upper left-hand corner, there appears to be a street.  Which street is that?

A.   That is Converse Street.

ATTORNEY DESROCHES:  Can we have now PX-22?

THE COURT:  We have to go through the process. The PX-number comes up; assign the PX-number an exhibit number.

CLERK RIVERA:  PX-21 is Government Exhibit No. 17.  PX-22 is Government Exhibit No. 18.

**(Government Exhibit No. 17 is admitted.)**

ATTORNEY DESROCHES:  May I proceed?  Thank you.

Q.   (By Attorney Desroches) So now on the screen is PX-22.  Do you recognize what's depicted in this

photograph?

A.    Yes.  This is a picture looking out towards Converse Street from Genesis House.  It's the entranceway in which -- that stop sign that you see in the photo, that and the tree to the right of that is where the container would have been located.

Q.    So the stop sign that appears in the center of the screen is your point of reference, correct?

A.    Correct.

Q.    You said the tree just to the right of that is where the canister was placed?

A.    Was the tree in the first photo that you just had me describe.

Q.    So now if you were to travel from Converse Street to the right in this photograph, up that street, where would you go?

A.    You would be heading west on Converse Street, towards Route 5.

Q.    I'm sorry.  I think I was unclear.

If you were to turn onto this -- from Converse Street onto this street that's depicted in the photograph, is that the Ruth's House entrance?

A.    Correct.

Q.    So can you just --

A.    Yes.  So Converse Street runs east to west, and this

is the entranceway.  If you were to turn into it, you would be heading north on this access way to Ruth's House and Genesis House.

ATTORNEY DESROCHES:  If we could have -- I'm sorry.  If we can number this now?

CLERK RIVERA:  PX-number 22 is Government Exhibit No. 18.

**(Government Exhibit No. 18 was admitted.)**

Q.   (By Attorney Desroches) If we can have PX-23?

Can you describe what's depicted in PX-23?

A.   Yes.  This is the same entranceway to Ruth's House and Genesis House.

Q.   So Converse Street is on the left; is that correct?

A.   That is correct.

Q.   And the stop sign that you referenced previously, does that appear in this photograph?

A.   It is.  It's like right in the middle of the photograph.

ATTORNEY DESROCHES:  I think this could be numbered now, Madam Clerk.

CLERK RIVERA:  PX-23 is Government Exhibit No. 19.

**(Government Exhibit No. 19 was admitted.)**

ATTORNEY DESROCHES:  Now, if we could have 24?

CLERK RIVERA:  PX-24 is Government Exhibit

No. 20.

**(Government Exhibit No. 20 was admitted.)**

Q.    (By Attorney Desroches) Is this just a closer-up photograph of 23?

A.    Yes, it is.

ATTORNEY DESROCHES:   And if we could have now 25?

CLERK RIVERA:   PX-25 is Government Exhibit No. 21.

**(Government Exhibit No. 21 was admitted.)**

Q.    (By Attorney Desroches) Is this also just a closer-up now of the area where the device was left?

A.    Yes.

Q.    And, again, that stop sign, for the record, it just appears to the right of center in this picture, correct?

A.    That is correct.

ATTORNEY DESROCHES:   Now, if we could have PX-26?

CLERK RIVERA:   PX-26 is Government Exhibit No. 22.

Q.    (By Attorney Desroches) Is that that same stop sign in the center on this photograph?

A.    It is.

Q.    Can you describe what we're looking at in terms of those buildings on the right-hand side of this photo?

A.   This is taken from a southern point of looking north. Genesis House is on the right; and, again, that roadway is actually the entranceway from Converse Street.

Q.   So Converse Street in this photograph, to orient, would be just off the right and kind of down, correct?

A.   Correct.

ATTORNEY DESROCHES:  Madam clerk, I think we can number this one.

CLERK RIVERA:  PX-26 is Government Exhibit No. 22.

**(Government Exhibit No. 22 was admitted.)**

ATTORNEY DESROCHES:  May we have 27?

CLERK RIVERA:  PX-27 is Government Exhibit No. 23.

**(Government Exhibit No. 23 was admitted.)**

Q.   (By Attorney Desroches) Can you describe what's depicted in this exhibit?

A.   This is looking in an easterly direction.  Converse Street is to the right.  The stop sign is in the upper left corner, and the tree that the canister was left near is directly in the middle.

ATTORNEY DESROCHES:  If we could have 28?

CLERK RIVERA:  PX-28 is Government Exhibit No. 24.

**(Government Exhibit No. 24 was admitted.)**

Q.    (By Attorney Desroches) So that stop sign now is on the left side of this; is that correct?

A.    Correct.

Q.    And the tree is where the device was found?

A.    Correct.

ATTORNEY DESROCHES:  If we could have Number 29?

CLERK RIVERA:  PX-29 is Government Exhibit No. 25.

**(Government Exhibit No. 25 was admitted.)**

Q.    (By Attorney Desroches) Same stop sign, correct?

A.    That is correct.

ATTORNEY DESROCHES:  Could we have 30?

CLERK RIVERA:  PX-30 is Government Exhibit No. 26.

**(Government Exhibit No. 26 was admitted.)**

Q.    (By Attorney Desroches) Can you describe what's depicted in this photograph?

A.    This, again, is looking in an easterly direction. Converse Street is on the right. The tree and the stop sign are just off the center to the left.

Q.    So to the left of this photograph, is that what you described where Genesis House is?

A.    Correct.

ATTORNEY DESROCHES:  And 31, please?

CLERK RIVERA:  PX-31 is Government Exhibit

No. 27.

**(Government Exhibit No. 27 was admitted.)**

Q.   (By Attorney Desroches) What is depicted in this photograph?

A.   This is looking in a northerly direction.  Again, it's the stop sign.  The entranceway to Ruth's and Genesis House is on your right, and the tree where the canister was located next to is to the left side of this photo.

Q.   There appears to be an access road on the left side of the road going down; do you see that?

A.   Yes.

Q.   What does that lead to?

A.   Those are medical office buildings, I believe.

Q.   Is that also a parking lot right there?

A.   It is.

        ATTORNEY DESROCHES:  Can we have 32?

        CLERK RIVERA:  PX-32 is Government Exhibit No. 28.

**(Government Exhibit No. 28 was admitted.)**

Q.   (By Attorney Desroches) Do you recognize what's depicted here?

A.   Yes.  It is the roadway that goes to that entrance roadway.  It's an access point to Genesis House.

Q.   So did -- is this a parking lot or does it lead to a parking lot for Genesis House?

A.    This comes from the parking area of Genesis House. You would then take the left on the road in front of you to go to Converse Street where that item was located on the corner.

Q.    To orient, there's a stop sign on the very far left? It's kind of dark.

A.    Correct.

        ATTORNEY DESROCHES:  Ms. McKenna, could you just highlight that?

Q.    (By Attorney Desroches) Do you see the stop sign?

A.    Yes.

Q.    Is that the stop sign we've been looking at all morning?

A.    Yes.

Q.    So what is directly across?  There appears to be some buildings in the right-hand side of this photograph. What is that?

A.    That is the Jewish Nursing Home.

Q.    Is that the -- are those the offices that you're talking about that appeared on the left side of the road in Exhibit No. 31?

A.    There is offices down a little to the right, but in the background the building that you see is part of -- that's part of the Jewish Nursing Home.  Sorry.

        ATTORNEY DESROCHES:  Ms. McKenna, if we could go

back to the previous exhibit, which has been -- PX-31 previously.

Q.   (By Attorney Desroches)  So there appears to be an SUV parked.  Is that that same parking lot that we just saw in 32 or is there a different one?

A.   I don't believe, no, it's not.

Q.   So there are two separate parking lots?

A.   Correct.  So the Jewish Nursing Home parking lot is just up the road and maybe 50 yards from that parking lot. It's not far.

Q.   Now, thank you.  We are done with the photographs.

THE COURT:  Did that very last photograph get a number as well?

ATTORNEY DESROCHES:  That was a reference back to one.

THE COURT:  Back.  Very good.  Thank you.

Q.   (By Attorney Desroches) Captain Fontaine, I'd just like to wrap up a little bit with talking about Converse Street in the area of the Jewish Nursing Home.

Can you describe, generally speaking, Converse Street and the role it plays in Longmeadow?

A.   Converse Street is one of the main thoroughfares in Longmeadow.  It's like the conduit for East Longmeadow and Hampden to get to Route 91.  It's probably one of the most heavily traveled roads in Longmeadow next to Route 5.

There's pedestrian traffic and very heavy traffic during morning commutes and evening commutes.

Q.   Are there any shops in the area nearby the nursing home complex?

A.   On Williams Street, which runs parallel with Converse Street, approximately maybe an eighth of a mile from the location that we've been talking about is The Longmeadow Shops.

Q.   Based on your experience in Longmeadow, is it common for people to walk from the area of the nursing home to those shops?

A.   Yes.

ATTORNEY DESROCHES:  May I have one moment?

THE COURT:  Uh-huh.

ATTORNEY DESROCHES:  Thank you.  I have no further questions.

THE COURT:  All right.  Thank you.  We're going to take the lunch break.

ATTORNEY WATKINS:  I just have five minutes.

THE COURT:  All right.  Go ahead.

ATTORNEY WATKINS:  But that's lawyer time though.

THE COURT:  That's lawyer time?

ATTORNEY WATKINS:  May I get my computer?

THE COURT:  All right.  Getting the computer,

I'm worried.  We're going to take a lunch break.  So we'll be back in an hour.  Okay?

ATTORNEY BRESLOW:  Did you say an hour?

THE COURT:  Yes.

CLERK RIVERA:  Taking a lunch break now?

THE COURT:  Yeah, we'll break now.

CLERK RIVERA:  All rise for the jury.

THE COURT:  Ladies and gentlemen, all the rules apply.  Do not talk to each other about the case.  Don't talk to anyone about the case.  Don't make phone calls about the case.  Don't go on your phone, get on the internet looking anything up, post anything, read anything.  All the instructions that I've been telling you apply.  Leave your notebooks on the chair.

**(A recess was taken at 12:51.)**

THE COURT:  So we're on the record regarding motion in limine regarding the testimony of Rabbi Kosofsky.  Go ahead.  Did you want to put something on the record?

ATTORNEY WATKINS:  Yes, Your Honor.

Just after this witness, I believe the government is then going to call Rabbi Kosofsky.  I wanted to, generally, put in again my objection for the reasons that I've already stated.  I also wanted to put in the record that Rabbi Kosofsky is out in the hall.  And as the Court

is going to see, he is dressed in what I would describe, in my somewhat uninformed ways, very traditional kinds of dress. He's dressed --

THE COURT: When the jury comes in, we'll go to --

CLERK RIVERA: If the jury comes in, we'll use the WhisperTech. They're on their way.

All rise for the jury.

**(The jury entered at 1:57.)**

THE COURT: You can be seated.

**(Sidebar conference.)**

THE COURT: You can follow up.

ATTORNEY WATKINS: Yes. As I was saying, I'm objecting one more time to calling Rabbi Kosofsky here for the reasons I stated in the record.

When he comes on to testify, in addition, Your Honor, as the Court is going to see, he's dressed in what I would describe as very quintessentially religious-oriented dress. He's got a kippah, commonly known as a yamaka or skullcap on. He's got quite a long beard as is traditional with folks of the Orthodox Jewish faith. He's dressed all in black and, again, in a very traditional kind of a way. So all of that is going to be part of what the jury sees and how the jury evaluates this testimony.

In addition, the government has already elicited some features of the neighborhood from the previous two witnesses, and they certainly would be able to do that more through them and additional witnesses here.  To that extent, Rabbi Kosofsky's testimony is cumulative; and given the nature of this case, the unfair prejudice is very, very high.

It is not going to be really possible for us to effectively cross-examine this rabbi where at the same time the jury is going to be thinking in some senses that this person is a victim of the offense even though they are not and even though the government has no evidence whatsoever that Mr. Rathbun was intending to target anybody of the Jewish faith.

THE COURT:  Well, this person represents a neighbor who lives in the area.  He's a resident of that community, and I'm not going to exclude him because of his -- the way he's dressed.  His profession, he's dressed in accordance with his faith, as you've described, and I'm not going to exclude him for that.

Whether or not the government is calling him kind of as just for window dressing, for lack of a better word, if the jury infers that, they infer that.  But the government has legitimate -- has articulated legitimate reasons to call him.  The Court has addressed this in motions in

limine, and the witness will be allowed to testify.  I will not require him to change his mode of dress or appearance.

ATTORNEY WATKINS:  Your Honor, just for the record, I know we are in this unusual circumstance where everything is being recorded.  I know that Ms. Moran uses the recording for purposes of transcription, but I do also know that the video is being recorded, and perhaps we could ensure that that's going to be saved for the record as well.

THE COURT:  I have -- I can look to the clerk. I have no independent way of knowing that a Zoom recording is being made of this.  I don't know that.  So I can't confirm that, no, I can't.  I know this is a Zoom broadcast.  I don't know that one is being recorded.

CLERK RIVERA:  Yes.

THE COURT:  It is being recorded the clerk is telling me.  And how is that preserved for the defense to get it?

CLERK RIVERA:  I have it on the cloud.

THE COURT:  It's indicated to me it's being recorded.  I don't know anything about the preservation, so we'll have to follow up with the clerk's office after that about preservation.  But you've also -- you've already made a record of the physical appearance and dress

of the next witness. So we'll do the best we can.

I suggest you talk to the clerk's office, and I will notify them, the clerk, to call down to Ms. Healy just to ask her any way of preserving a video of the testimony.

CLERK RIVERA: Okay.

THE COURT: Okay.

ATTORNEY BRESLOW: Your Honor? Your Honor, I realize that Your Honor has ruled. I respect the ruling. We agree with it. I do want to note for the record that Mr. Kosofsky is wearing a dark-colored suit, not unlike Mr. Watkins' suit, Mr. Desroches' suit, and my own.

He has a small, black head covering which he always wears, and he has a beard which he always has. He did not grow the beard for the trial. He's not wearing the kippah for the trial. We're not offering this witness as window dressing.

We are offering this witness because he lives across the street, directly across the street from where the device was placed, because he is familiar with the buildings inside that campus through his work and he is very familiar with the neighborhood, the foot traffic, the vehicle traffic, and the bus traffic.

We are not going to be calling him after Mr. Fontaine because we have two other witnesses from Billy Graham who have traveled from North Carolina. We want to make sure

that they will be testifying today.  We're likely to call him tomorrow.  The witness will either be Ms. Darby and then the two Billy Graham witnesses.

There's another matter I wanted to discuss relating to his testimony, concerning the cross-examination of Mr. Nothe, but I'll wait until either the end of the day or tomorrow.

THE COURT:  All right.  Very good.  So we have a full record of Rabbi Kosofsky and his general appearance, and the Court certainly is not even considering any type of ruling that would have him change his appearance or the way he dresses on a usual basis to come and appear.

I've already made my rulings clear on the record regarding what he can testify to.  I think Attorney Watkins' objection was there's an awful lot of people living in that neighborhood and feels and has made a record that the government has picked a person that would inflame the anti-Semitic undertones of the case, but that's all on the record.

All right.  We can keep going.  So Mr. Fontaine.

**(End of sidebar conference.)**

THE COURT:  Ladies and gentlemen, let me ask, was everyone able to follow my instructions during the lunch break not to talk to each other or anyone about this case, making no phone calls and telling people about the

morning?  Didn't go on the internet?  Didn't do any research?  Didn't blog?  Didn't go on Facebook or anything?  Did everyone follow all of my instructions about the case?

All right.  Affirmative responses from all jurors. They remain fair and impartial.  Okay.

ATTORNEY WATKINS:  May I, Your Honor?  I have an exhibit that's already been admitted up on the screen. Perhaps it can go to all screens.

THE COURT:  Okay.  Is it published?  Do you want it published?

ATTORNEY WATKINS:  Yes, please.

THE COURT:  All right.  Published to all.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Good afternoon, Captain Fontaine.

A.   Good afternoon.

Q.   Up on the screen before you is Government's Exhibit 23, which -- I'm sorry it's PX-23, I think, which was admitted as Government's Exhibit 20 [sic], and that is a picture of Converse Street, correct?

A.   Yes.  To the left, yes.

Q.   Now, you described to the jury that traffic is heavy along this route because of the -- that's a main artery in Longmeadow, correct?

A.    It's one of the main arteries, yes.

Q.    So there's traffic there all day long really, right?

A.    Pretty much, yes.

Q.    And that would include rush hour, quote/unquote, say six to seven in the morning, that would be a busy area?

A.    Yeah, seven, seven to nine usually.  It's somewhere in there.

Q.    Traffic would start to be picking up around 6 o'clock and start to get very heavy after that, correct?

A.    Correct.

Q.    We see, in fact, cars going both ways here on Converse Street in this particular picture, right?

A.    Yes.

Q.    And I'm directing your attention to the left side of the photograph, over here where you see the leaves covering an area next to the sidewalk?

A.    Yes.

Q.    And you're familiar, again, with Converse Street, right?

A.    I am.

Q.    And there's no parking on this portion of Converse Street, correct?

A.    You could park.  It's not a restricted area.

Q.    And, well, if one were to -- we see these automobiles here, if one were to park here, one would be in the way of

that traffic; is that correct?

A.    There's a bike lane there and there's also room on the side there.  We actually, even during construction, were able to get two lanes down there with even a lane blocked.

Q.    And that was in a special circumstance, right?  When you're doing construction down there, were you able to get two lanes?

A.    We can fit probably four lanes of traffic.

Q.    So right now there is a bike lane and a travel lane for cars on each way; is that correct?

A.    Yes.

Q.    Is it legal to park in a bike lane --

A.    No.

Q.    -- in the city of Longmeadow?

A.    No.

Q.    So someone pulling up to the side of the road here in the bike lane would not be parking legally; is that correct?

A.    Correct.

Q.    And the area also covered by leaves, that is a grassy area that belongs to the Jewish Geriatric Services property; is that correct?

A.    I believe it's town property technically; but, yes, it's maintained by the Jewish -- I believe the nursing

home and whatnot, yes.

Q. But it's a grassy area, and that's not a place where people would be permitted to park on the grass; is that correct?

A. No. You cannot park on it.

Q. That would be -- this is a busy street, and that would be noticed if someone was parking on the grassy area?

A. Yes.

Q. Is that fair to say?

You talked about transporting the gasoline canister there. And at the time, when you transported it from JGS to the police station, it had fuel in it, it had gasoline in it, right?

A. That's correct.

Q. And you talked about the smell of the gasoline there, right?

A. Correct.

Q. Gasoline has a very distinctive, very odorous smell to it; is that fair to say?

A. Yeah.

Q. And because this is open all the time that you're traveling to the station, you're smelling the smell of gas in that car, right?

A. It wasn't really noticeable out on scene until you

actually got in a confined area of the vehicle that you could tell that there was a smell that was familiar to be gasoline, yes.

Q.   That's what I'm asking about, the confined area of the car, right?  When it's in the car?

A.   Correct.

Q.   You're smelling gas all the way there, right?

A.   When transporting it back to the station?  Yes.

Q.   Correct.

     And the gas -- sorry.  To get to the station, it's about, what, two and a half miles, five, six minutes?

A.   Correct.

Q.   And that gas smell is going to be in the car all during that time, correct?

A.   I believe we may have had the windows open.  I can't recall exactly but, yes.

          ATTORNEY WATKINS:  Thank you.

          ATTORNEY DESROCHES:  Thank you.

**REDIRECT EXAMINATION**

Q.   (By Attorney Desroches) Captain, at any point during that five-minute drive were you so overwhelmed with the smell of gasoline that you felt you were unsafely operating the vehicle?

A.   No.

Q.   Were you concerned with the level of that smell in

your car that it could be a problem for you?

A.    No, I was not.

ATTORNEY DESROCHES:  Thank you.  No further questions.

THE COURT:  All right.  Thank you very much, sir.

THE WITNESS:  Thank you.

ATTORNEY DESROCHES:  Your Honor, there are physical exhibits on the witness stand.  I'm not sure how the Court would like to handle those.

THE COURT:  You can just retrieve those.

ATTORNEY DESROCHES:  May I call the next witness?

THE COURT:  Yes.

ATTORNEY DESROCHES:  The government calls Alana Darby.

CLERK RIVERA:  Please raise your right hand.

**Alana Darby (Sworn)**

THE COURT:  Ma'am, you can remove the mask.  Thank you.

THE WITNESS:  Thanks.

**DIRECT EXAMINATION**

Q.    (By Attorney Desroches) Good afternoon.

A.    Good afternoon.

Q.    Can you please introduce yourself to the jury and,

for the record, spell your last name?

A.    My name is Alana Darby.  My last name is D-a-r-b-y.

Q.    Are you employed?

A.    Yes.

Q.    How are you employed?

A.    I am a forensic scientist II in the DNA unit at the Massachusetts State Police Crime Lab.

Q.    What is a forensic scientist II?

A.    So a forensic scientist II is after you complete your training as a forensic scientist I, you then move on to doing casework and actually processing samples.

Q.    For how long have you been employed by the Massachusetts State Police Crime Laboratory?

A.    About 12 years.

Q.    For how long were you a chemist I -- I'm sorry, a forensic scientist I?

A.    One year about.

Q.    So you've been a forensic scientist II for over a decade?

A.    Yes.

Q.    What is your educational background?

A.    I have a Bachelor's of Science in Chemistry from Merrimack College with concentration in forensics and a minor in criminology.

Q.    Presently, what is the nature of your work?

A.   So the lab receives evidence samples and does the necessary forensic DNA testing to obtain the DNA profile from those items.  We then generally compare any evidence profiles generated to any known standards that we may have in a case, make a comparison between those two, write a report outlining our findings, and then sometimes testify in court.

Q.   Does this type of work require that you undergo any sort of specialized training?

A.   Yes.

Q.   What is that training?

A.   So I attended a 17-week training academy at the Northeast Regional Forensic Institute where I was trained in population, genetics, and statistics and also DNA-typing methods.  Then I also did additional training back at my actual lab that I work in now using our protocols and procedures.

Q.   Do you participate in ongoing trainings regularly?

A.   Yes.

Q.   And how regularly do you do that?

A.   So we are required by the FBI QI standards to do at least eight hours a year.  Generally, we do end up doing more than that though.

Q.   What is a competency test?

A.   A competency test is given to an analyst at the end

of any training that they're doing.  It's a hands-on test where basically you do the protocol or procedure that you're being tested on to make sure that you can follow the procedure properly and arrive at the correct results.

Q.    Have you taken any of those tests?

A.    Yes.

Q.    What were the results of those tests?

A.    So for every DNA competency test that I have taken for the protocols and procedures in our lab, I have passed them.

Q.    What is a proficiency test?

A.    A proficiency test is very similar except it's given to an analyst every six months after their original competency test.  So, again, it's a hands-on lab test. It's given by an outside agency where we don't know the results, and we just process it like we normally would about every six months and to make sure we keep up with our training and protocols.

Q.    Approximately, how many samples have you analyzed in your time at the lab?

A.    It would be over a thousand at this point, I think.

Q.    How many times have you testified about DNA?

A.    Probably between 40 and 45.

Q.    So I'd like now to just turn to the lab itself.  Is the lab accredited?

A.    Yes.

Q.    What does it mean that the lab is accredited?

A.    So, basically, it means that an outside agency comes in and checks us against the protocols that we're using to make sure we're all following the protocols and procedures against any quality assurance standards that we are striving to meet for that specific accreditation and just making sure that we're keeping up with the quality of work.

Q.    Does the lab employ any controls as it's analyzing DNA samples?

A.    Yes.

Q.    Can you describe what those controls are?

A.    So we have two types of controls.  One is a positive control and one is a negative control.  A positive control has a known DNA profile in it.  So, basically, we test that along with our samples so we can see at the end that we got the result that's expected for that control.

      We also have what's called a negative control and that has no DNA in it, and that's also processed alongside our samples to make sure that there was no contamination during our testing.

Q.    What is DNA generally speaking?

A.    DNA stands for deoxyribonucleic acid, and it's the fundamental building blocks for all living organisms.  We

get half of our DNA from our mother and half of our DNA from our father; and with the exception of identical twins, no two people have the same DNA.

Q.   What is the process that the lab uses to analyze DNA?

A.   So we have a four-step process that we use to test all the samples coming into our lab.

Q.   And what are the -- what's the shorthand for those four steps?

A.   STR testing is --

Q.   Sure.  I can ask it a different way.  We will get to the four-step process.  Can you describe what happens to an item when it's received by your laboratory?

A.   So, generally speaking, it will go to the -- it's submitted to the evidence unit.  Then it is transported to our criminalistics unit, and they will do any necessary biological screening tests.  They look for biological fluids like blood or semen.  After they do their testing, a small sample of an item will then be sent forward for DNA for testing.

Q.   Is that item called a snippet?

A.   Yes.

Q.   So can you describe a little more specifically what a snippet is?

A.   Basically, a snippet is just a small portion of the item that we're testing.  So if we're testing swabs, it

would be a portion of those swabs, generally, or say if we're testing a pair of pants, it would just be a cutting from those pants.

Q.   So what happens when the DNA unit receives that snippet?

A.   So after DNA gets the snippet -- well, originally after criminalistics, it will go into storage to wait for DNA testing.  So then we will take the item from storage and start our four-step process.

Q.   So, now, we'll get to that four-step process.  What is the first step in that four-step process?

A.   So the first step is called extraction.  We use heat and chemicals to open up the cells that are in the sample to access the DNA that is inside of them.

Q.   So what does the result look like from that step?

A.   So when we start with a sample or a cutting of fabric, after that, we will then have a small -- what we call an extract, which is basically just a tiny amount of liquid in a tube.

Q.   What is the next step in the process?

A.   The next step would be quantitation.  We use an instrument to get an approximation of how much DNA is in each sample.

Q.   So what happens at this step if there's not enough DNA in a particular sample?

A.    So if there's not enough DNA, we would halt that sample for processing.  We know there's a certain threshold of DNA of which we expect to get a usable or reliable profile.  So if there isn't enough DNA sample at that point, we would halt testing.

Q.    Is there a difference between there being insufficient DNA and there being no DNA?

A.    Yes.  As the title kind of would imply, when there's no human DNA detected, that means we just did not detect any DNA present in that item.  And then there can also be insufficient, so just there wasn't enough DNA in that item for us to go forward.

Q.    What is the third step in this process?

A.    That's called amplification.  We use an instrument that cycles through temperatures to make millions of copies of the particular locations on the DNA that we look at.

Q.    And what is the final step in the process?

A.    That step is called detection or capillary electrophoresis and that, basically, just uses an instrument to separate the DNA fragments based on size. So the larger ones will take longer to get through the instrument, and the smaller ones can get through more quickly.

      Basically, a DNA profile is the -- it's just a

description of all of these sizes put together.  The different size fragments is what makes up the DNA profile.

Q.   What role do you play in the four-step process?

A.   So after the item has gone through the last step, which is detection, then we get -- basically, it's kind of like a graph that comes off of that instrument, and that shows us the DNA profile for whatever item we're testing.  At that point, I do the interpretation of that DNA profile and then compare it to any known standards we may have in a case.

Q.   Now, drawing your attention to the case that's before the Court today.

THE COURT:  Hold on one second, Mr. Desroches.

A JUROR:  Excuse me.  What was the name of number four?

THE WITNESS:  Detection.

A JUROR:  Retection?

THE WITNESS:  Detection.

A JUROR:  Oh, detection?

THE WITNESS:  Yes.

A JUROR:  Thank you.

ATTORNEY DESROCHES:  May I proceed?

THE COURT:  Yes.  Go right ahead.

Q.   (By Attorney Desroches) Now, drawing your attention to the case that's before the Court today, did the

Massachusetts Crime Laboratory conduct any DNA analysis on items in connection to it?

A.    Yes.

Q.    Specifically, what items did the laboratory analyze?

A.    So we tested four items for unknown samples for this case.  Item 1-1.1.1 which was a sample from stain one on a pamphlet recovered from 832 Converse Street.  Item number 1-2.1.1 which was a sample from stain two on a pamphlet collected from 832 Converse Street.  Item number 3 was -- item number 1-4.1.1 which was a sample from stain one on the handle of a diesel can recovered from the same address, and 1-4.2.1 which was a swab of the handle and nozzle area of the diesel can collected from that address.

Q.    So just to sum up, there were three samples of stains that were taken from items, correct?

A.    Yes.

Q.    Two of them came from what you described as a pamphlet?

A.    Yes.

Q.    One of them came from the handle of a diesel canister?

A.    Correct.

Q.    And the fourth sample was a swabbing; is that right?

A.    Yes.

Q.    How is it that that sample being a swabbing was

different than the stains that you received?

A.   Well, I believe all of them were swabbings, but this was a swab of an unstained area.  The goal for this type of swab is usually to collect DNA from skin cell transfer. It can be referred to as handler DNA sometimes because you're looking for, generally speaking, a person who may have handled that item.

Q.   So does the frequency and contact between the person who handled the item and the item itself, does that affect the likelihood that you'd find handler DNA on it?

A.   Yes.

Q.   How so?

A.   So if I brought in a brand new pen and used it for like five minutes and then tested that pen for DNA versus a pen that I've used every day in my office for the last year, I would expect there to be a different DNA present on those two items just because of the frequency of use and how long you've been using it over repeatedly.

Q.   So, now, staying on this topic with the swabbing from the canister, do you recall specifically which areas of the canister were swabbed?

A.   I believe it was the handle area and nozzle.

Q.   Did that sample go through all four steps of the process?

A.   It did not.

Q.   Why not?

A.   So as I talked about the second step, quantitation, when this sample got to the second step, there was no human DNA detected on that item, so we did not proceed forward.

Q.   So you previously testified that there could be insufficient DNA that would stop the process at this point or there could be no DNA.  In this case, there was no DNA found?

A.   Correct.  Our instrument did not detect any, yes.

Q.   So now turning your attention to the three other samples that your laboratory analyzed.  First starting with the sample -- what you listed as 1-1.1.1, a sample from the pamphlet, what were you able to deduce about that sample itself?

A.   So a male DNA profile was obtained from that item.

Q.   And what was the substance of the stain itself?

A.   That's something that criminalistics does, but we get the results that it was human positive.  So there was a presence of blood there.

Q.   Human blood?

A.   Yes.

Q.   Now, turning to 1-2.1.1, the second stain from the pamphlet, what was that?

A.   Criminalistics also indicated that human blood was

present on that item.

Q.    And were you able to deduce anything from the analysis of that item?

A.    Male DNA profile was obtained from that item.

Q.    Now, item 1-4.1.1 you've referred to as the sample from the stain on the diesel canister.  Were you able to deduce anything about that sample?

A.    Yes.  Criminalistics -- well, there was a male DNA profile obtained from that item as well.

Q.    Did you obtain another sample associated with this case at some point?

A.    Yes.

Q.    Was that a known sample?

A.    Yes.

Q.    Can you describe what a known sample is?

A.    So a known DNA sample is kind of what the name implies, that it is a sample that we actually know where it came from.  So, generally, that means like a sample that was taken as a swab from someone's mouth or sometimes their blood as well.  So, basically, it's just a known standard in the case where we know who the donor of that DNA is.

Q.    And in this case, who was the donor of the DNA from the known sample?

A.    John Michael Rathbun.

Q.    After you had these now remaining four samples, what did you do with them?

A.    So when the three samples get through the end of the testing and generate a DNA profile, I then compared that profile to the known standard in this case and make a comparison between the two.

Q.    Now, prior to going any further on about that comparison, regarding the three samples that were taken, two from the pamphlet and one from the canister, can you characterize the quality of those samples?

A.    So they were single-source DNA profiles obtained from those items.

Q.    Were you able to -- was there any missing information in those samples?

A.    No, there was not.

Q.    Can you describe what that tells you as an analysis that there was no missing information?

A.    So when we have a full, single-source DNA profile, that just means that we have information at every single location that we test for and that we can make a comparison at each one of those locations.

Q.    Is that always the case?  Do you always have that much information?

A.    No.

Q.    Is it rare to have that much information?

A.    For red-brown stains or bloodstains, generally they are good sources of DNA.  So you do generally expect single-source profiles from them, but a lot of DNA testing is done on other, like, clothing items or handler items like I had kind of previously explained, and those don't often provide the same results.

Q.    Would weathering affect the quality of a sample?

A.    It could, yes.

Q.    How so?

A.    So one of the things that you can notice in a DNA profile is what we call degradation.  As I said, the DNA profile when it comes off the final instrument sort of looks like a graph with peaks sort of like an EKG.

If there is degradation in a sample, what sometimes can happen is that the beginning of the profile or while you're looking at it, the left side, has a lot more information or higher peaks than the right side of the profile.  It's called the ski slope effect, and basically it just means that something degraded the DNA and wore it down.  So only the smaller pieces are still intact when some of the larger pieces were broken up.

Q.    Did you observe any signs of degradation in the three samples taken from these two pamphlets and the canister?

A.    I did not.

Q.    Now, you indicated that bloodstains typically give

you a lot of information.  Could degradation affect the amount of information you got from those bloodstains or get from bloodstains in general?

ATTORNEY WATKINS:  I'm going to object at this point, Your Honor.

THE COURT:  And the objection is?  Do you want to be heard on the WhisperTech?

ATTORNEY WATKINS:  No, Your Honor.  There's no information of degradation here.  There's nothing on which this person -- this witness can make those kinds of speculation.

THE COURT:  Well, there was no indication of degradation; am I right?

ATTORNEY DESROCHES:  That's correct, Your Honor, but I do believe the jury should -- deserves to know what that actually means, what the lack of degradation means.

THE COURT:  All right.  Objection overruled.

Q.  (By Attorney Desroches) So did you observe any degradation on the samples you tested?

A.  No.

Q.  What is it -- I lost my train, I'm sorry.  What does the lack of degradation tell you about these samples?

A.  Just that I had enough information present and the DNA was still of sufficient quality to make full comparisons to.

Q.   Now, would degradation affect blood in the same way that you've described previously?

A.   Yes.

Q.   And would an item, if it were to be left out exposed to the conditions such as rain, would that also affect your ability to obtain DNA from it?

ATTORNEY WATKINS:  I'm going to object here, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  It could.  I would expect that if, depending on the quantity of rain, it is water, it could wash away some of the sample.

Q.   (By Attorney Desroches) So, now, you indicated previously that you had these four samples, one, the known sample of John Rathbun and these three other samples taken from the items.  Were you able to compare those items at any point?

A.   Yes.

Q.   And can you describe the steps you took to compare these items?

A.   So when the items of evidence -- when I have a DNA profile from them, I compare that DNA profile to the known profile in a case.  In this case, it's fairly straightforward because it is a single-source profile that you can compare each location side by side.

Q.   Just to be clear, what is a single-source profile?

A.   That just means we identify it as coming from a single contributor, a single individual.

Q.   So were you able to form any additional conclusions after you conducted this comparison regarding these four samples?

A.   Yes.

Q.   And what were those sample -- what was that conclusion?

A.   So for item 1-1.1.1, 1-2.1.1, and 1-4.1.1, a male DNA profile was obtained from all three of those items.

Q.   And did you compare that to the known sample of John Rathbun?

A.   Yes.

Q.   And what did you learn during that comparison?

A.   John Michael Rathbun matched the DNA profile obtained from those items.

Q.   You said it matched the DNA profile?

A.   Yes.

Q.   Were you able to give any weight to that conclusion?

A.   Yes.

Q.   What was that?

A.   So the expected frequency of occurrence of that DNA profile was approximately one in 568.2 octillion unrelated individuals.

Q.    How many zeros are in an octillion?

A.    Twenty-seven.

Q.    Are you familiar with how many people are on earth?

A.    Approximately eight billion.

ATTORNEY DESROCHES:  Thank you.

Your Honor, at this time I think we can read stipulations into the record.

ATTORNEY WATKINS:  (Indicating.)

ATTORNEY DESROCHES:  "On April 2nd of 2020, officers from the Longmeadow Police Department recovered a yellow diesel fuel canister, which is marked as PX-1, and a charred paper pamphlet, marked as PX-3, from 780 Converse Street in Longmeadow, Massachusetts.

"The fuel canister contained an unidentified liquid. An officer from the Longmeadow Fire Department emptied the unidentified liquid from the fuel container and stored it in a secure location.

"On April 13th, the sample of that liquid was brought to the Massachusetts State Police Trace, Arson and Explosives Unit for analysis.

"The Massachusetts State Crime Laboratory examined the yellow fuel container for fingerprints.  No fingerprints were found on the container.

"On April 3, 2020, Longmeadow police officers brought the yellow fuel canister and charred paper pamphlet

recovered from 780 Converse Street to the Massachusetts State Police Crime Laboratory for analysis.

"Analysts from the laboratory tested two samples taken from the reddish-brown stains found on a pamphlet and one sample taken from the reddish-brown stain on the handle of the fuel can.

"Analysts at the lab determined that all three reddish-brown stains were human blood.  Analysts in the crime lab then developed a DNA profile from three bloodstains using the scientific techniques of DNA extraction, quantification, amplification, and detection.

"An analyst from the Massachusetts State Crime Lab swabbed the handle, collar, and spout of the fuel container.  Analysts then examined those swabs for the presence of DNA."

And with that, I have no further questions for this witness, Your Honor.

THE COURT:  All right.  Defense, you agree fully with that stipulation?

ATTORNEY WATKINS:  I'm sorry?

THE COURT:  You agree fully with the stipulation?

ATTORNEY WATKINS:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen, as I told you what a stipulation is, this is the same as I said.  You

can accept that as true.  Everything that was said in the stipulation is agreed between the parties.  It's not challenged by either side.  It can be accepted as true evidence.

Are we going to have -- how many stipulations are we going to have?  I'm just thinking that we should probably have copies of the stipulations go to the jury.

ATTORNEY DESROCHES:  Yes.  There are a number, Your Honor, and we would ask that they be sent back to the jury.

THE COURT:  So at the appropriate time, we'll mark the stipulations.  Both sides can agree, and they would go to the jury as well.  All right?

ATTORNEY DESROCHES:  Yes.  Thank you, Your Honor.

THE COURT:  All right.

ATTORNEY WATKINS:  May I?

THE COURT:  Go right ahead.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Good afternoon, Ms. Darby.

A.   Good afternoon.

Q.   Just to be clear, you're not trying to tell us when this bloodstain was deposited on that fuel canister, are you?

A.   No.

Q.   Are you trying to tell us when that bloodstain was deposited on those pieces of paper that were analyzed?

A.   No.

Q.   There is no test that you've done to determine how long something has been on a particular item, right?

A.   Correct.

Q.   There's no test within the Mass. State Police to do that; is that correct?

A.   Correct.

Q.   And, indeed, DNA could be present on some items for months, years, decades, right?

A.   Potentially, yes.

Q.   As to bloodstains, I think you testified those are particularly good sources for getting DNA, correct?

A.   Yes.

Q.   One of the best of all the different kinds of -- well, let me back up.

     DNA is in nucleic cells, right?

A.   Yes.

Q.   And there's all kinds of different nucleic cells. There's brain tissue; there's organ tissue; tissues of all kind, right?

A.   Yes.

Q.   And blood and bloodstains are a particularly robust source of getting DNA from, right?

A.   Yes.

Q.   And, indeed, it's so robust that some studies have said viable DNA can be present in bloodstains for several months, right?

A.   Yes.

Q.   And, indeed, studies would show that there's little variation, even under increased temperatures and humidity, as to the viability of bloodstains, right?

A.   I don't know exactly what study you're talking about. I do know it can be affected over time.

Q.   Yes.  But, I mean, you've done collections as well as analysis; is that correct?

A.   Yes.

Q.   And so you studied some of these topics, right?

A.   Yes.

Q.   Okay.  Also studies have concluded there's no significant difference found in the quality of DNA extracted even where the bloodstain was subjected to 93 percent relative humidity or temperatures in excess of 35 degrees celsius; is that consistent with what you've learned?

A.   That seems like a very specific validation that I would need to review before commenting on, I think.

Q.   I think what you told us, you can't -- you're not making any kind of conclusions about when this was

deposited, right?

A.    Correct.

Q.    Indeed, opining on DNA, when DNA is deposited, that's outside your subject of expertise you're testifying to today, right?

A.    Yes.

Q.    You're not here today to make any kind of supportable conclusion about when that DNA was deposited on that gas container or on the pamphlets, right?

A.    No.

Q.    So if someone were to say, based on your testimony today, that because there were matches at each low side, right, that that means that this blood sample was deposited within "X" number of hours?  Nobody could say that based on what you've testified to today, right?

A.    Correct.

Q.    Nobody can testify because there are so many matches and so many low sides that that means it had to have been deposited within days; you can't say that?

A.    No.

Q.    Months, you can't say months even though there were all of those low side present; is that right?

A.    I cannot speak to the length of time.

Q.    So for want of a better word, there is no ability for you to testify about freshness of this particular

bloodstain?

A.   I can only speak to the fact that there was no degradation present.

Q.   You talked about other swabs and nothing was found, any other DNA of value found on the handle of the gas container, right?

A.   Yes, no human DNA was detected.

Q.   Of course, if someone were to wear gloves, there's not going to be any DNA there, right?  It's not going to get transmitted through the gloves ordinarily, right?

A.   Correct.

Q.   Even if somebody didn't wear gloves unlike -- even if someone did not wear gloves, the way DNA is going to get transferred to a fuel container is by epithelial cells, right?  Touch DNA?

A.   Skin cells, yes.

Q.   As skin cells, right.  And that's as opposed to the bloodstains, which you testified to are a really, really good source of DNA; skin cells, not so much, right?

A.   It's usually the quantity more so that is the problem in that particular instance.

Q.   That's because in order for DNA, touch DNA, skin DNA, that has to -- skin cells have to have been rubbed off on the handle, correct?

A.   Yes.

Q.    In fact, there are a lot of people who simply do not shed or shed very few skin cells, right?

A.    Yes.  Certain people shed more than others, yes.

Q.    And skin cells themselves are very, very fragile, right?  They can be blown off.  They can be washed off.  They can be accidentally pushed off, right?

A.    Transfer can happen, yes.

Q.    So the fact that there was no other person's DNA recovered from there, you're not here trying to tell the jury that means nobody else touched it, right?

A.    Just saying that no human DNA was found on that item.

Q.    And that's all you're testifying to here today, correct?

A.    Yes.

ATTORNEY WATKINS:  Thank you.  I have nothing else, Your Honor.

THE COURT:  All right.

ATTORNEY DESROCHES:  No redirect, Your Honor. Thank you.

THE COURT:  Thank you very much.

ATTORNEY DESROCHES:  Your Honor, our next witness will be Robert Hill, and he's on his way up.

THE COURT:  Okay.

ATTORNEY WATKINS:  Judge, may we have a moment at sidebar while we're waiting for the witness?

THE COURT:  Sure.

**(Sidebar conference.)**

THE COURT:  Go ahead.

ATTORNEY WATKINS:  Yes, Your Honor, I'll let Ms. O'Neill go.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  Your Honor, we're just renewing our objection to Mr. Hill and both of the Billy Graham witnesses subject to our previous filings that their testimony has limited, if any, relevance and is outweighed by undue prejudice and confusion of the issues on 403 grounds.

THE COURT:  This is Mr. Hill, the Sceptor employee?

ATTORNEY O'NEILL-GREENBERG:  No.  Robert Hill, he is one of the record accountant people from Billy Graham.

THE COURT:  I see.  Okay.  Thank you.  All right.  And you're renewing your objection -- you're renewing your motion in limine, that issue that you raised?

ATTORNEY O'NEILL-GREENBERG:  That's correct, Your Honor.  The First Circuit requires that we object before they actually testify.

THE COURT:  Absolutely. Objection noted.  You may call him.

**(End of sidebar conference.)**

ATTORNEY BRESLOW:  Your Honor, we call Robert Hill.

THE COURT:  All right.

CLERK RIVERA:  Mr. Hill, please stand and raise your right hand.

Can you please stand?

THE WITNESS:  I'm sorry.

**Robert Hill (sworn)**

**DIRECT EXAMINATION**

Q.   (By Attorney Breslow) Good afternoon, Mr. Hill.

A.   Yes.

Q.   You can look at me.

A.   I'm sorry.

THE COURT:  You didn't know where the voice was coming from.

THE WITNESS:  Exactly.

THE COURT:  When people are wearing masks, that happens.

THE WITNESS:  It's hard to tell now.

Q.   (By Attorney Breslow) So could you state and spell your name, please?

A.   Yes.  Robert Hill, R-o-b-e-r-t, H-i-l-l.

Q.   And where do you live?

A.   I live in Fort Mills, South Carolina.

Q.   So you've traveled here recently into Massachusetts?

A.   Yes.

Q.   Have you complied with all of the Massachusetts COVID-19 travel regulations?

A.   Yes.

Q.   Where do you work?

A.   I work for the Billy Graham Evangelistic Association.

Q.   Can we call that Billy Graham for short?

A.   Yes.

Q.   Very briefly, could you tell the jury what Billy Graham is?

A.   We're an evangelistic ministry.  So we present the gospel of Jesus Christ through a variety of different means, including live events.

Q.   Okay.  Can you tell the jury, very briefly, who Billy Graham was?

A.   Yes.  Billy Graham is a preacher.  Seventy years ago he began a ministry, and he's preached all over the world to hundreds of millions of people.

Q.   Okay.  And who is his son?

A.   His son is Franklin Graham.

Q.   Tell the jury, please, what is your position at Billy Graham?

A.   I'm the director of data management and analysis.  So I help manage our databases.

Q.   Okay.  How long have you served in that position?

A.   Three and a half years.

Q.   And could you elaborate a little further for the jury what are your responsibilities?  What do you do on a day-to-day basis?

A.   Sure.  I work with our teams to help ensure data that's collected is accurate and complete; it gets into our system; it gets appropriately categorized and utilized.

Q.   And do you analyze the data for certain things?

A.   Yes.

Q.   What do you analyze the data for?

A.   So we count things, churches, spiritual inquirers. We track metrics and statistics like any large organization would.

Q.   And I'd like to focus for a moment on the term "spiritual inquirers."  Can you tell the jury what that term means for you or for Billy Graham generally?

A.   Sure.  So part of our ministry is we proclaim the gospel.  People are given an opportunity to -- we call it an invitation.  So if they come forward in response to the invitation, we call them spiritual inquirers.  So maybe they accept Christ for the first time, they're rededicating their life; they're coming forward for prayer.  So we call those kinds of decisions spiritual

inquirers.

Q.   What kind of information, generally, do you collect and keep and track for these spiritual inquirers?

A.   Names.  So first name, last name.  It might be an email address, physical address, telephone number.  It depends upon how they made the decision.

Q.   Can you elaborate how they make the decision?

A.   Sometimes the decisions are online and so we ask for limited information.  Sometimes they're in a live event and so we ask for physical addresses, where do they live and telephone number, to connect them with a local church.

Q.   Okay.  What is the name of the database that you're describing, that you're managing?

A.   Studio Enterprise.

Q.   Okay.  And you indicated that Billy Graham collects data from spiritual inquirers in a number of different ways, I think you said by telephone?

A.   Yes.

Q.   And also online?

A.   Yes.

Q.   And in person?

A.   Yes.

Q.   Okay.  What kind of information does Billy Graham keep regarding spiritual inquirers?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your

Honor.  This is asked and answered.

THE COURT:  Overruled.

Q.    (By Attorney Breslow) Can you elaborate on the kind of information that Billy Graham keeps on its spiritual inquirers?

A.    Sure.  Their demographic information, names, addresses, that sort of thing.  The date, daytime, the type of decision they may have made so we can appropriately follow-up with them.

Q.    So when you say "the date," you're talking about the date the individual accepts the invitation to receive the gospel?

A.    Yes.  So on a card, there would be a date.  In our system, there's a date.  It's called an incept date, and that's the date that the record was created in our database.

Q.    Okay.  And you said the kind of event or the kind of contact.  Can you elaborate on that for the jury, please?

A.    Sure.  So we may do live events, a festival or a celebration or a tour and so those are categorized differently.  They may call us up on the phone.  So that's categorized based on phone.  They may do it through a website.  That's categorized differently based on the method or the means they used to make the decision.

Q.    Okay.  And after a spiritual inquirer accepts the

invitation of Billy Graham, what does Billy Graham do with that information related to that particular spiritual inquirer?

A.    After we put it in the database?

Q.    Yes.

A.    So we would communicate with them based on the decision that they would make.  So we would tend to send them a letter or an email confirming their decision, asking them to do certain things.  We would send them discipleship materials and, if possible, we would try to connect them with a local church.

Q.    And all of this is to advance Billy Graham's mission?

A.    Yes.

Q.    Now, as part of your job, do you manage data collected from people who attend various live events?

A.    Yes.

Q.    And are you familiar with the particular series of live events called the "Decision America Northeast Tour" in 2019?

A.    Yes.

Q.    Did your database collect information from spiritual inquirers during that tour?

A.    Yes.

Q.    Very briefly, can you describe what that tour was?

A.    It was a series of live events throughout the

northeast, multiple states, including Massachusetts.

Q.   And, in Massachusetts, do you recall where the events, including the main event, were located?

A.   So the main event, I think it was Big E, in West Springfield.

Q.   You said the "Big E," meaning the Big E fairgrounds?

A.   Yes.

Q.   Do you recall the date that that event took place?

A.   May 25, 2019.

Q.   And in addition to that main event, were there preliminary events that members of Billy Graham also conducted in which they made contact with spiritual inquirers?

A.   Spiritual inquirers?  So they would have made contact with churches, pastors, and volunteers which come before the spiritual inquirers.

Q.   Okay.  And does your database contain information relating to that main event and the tour generally?

A.   Yes.

Q.   Now, in connection with this case, were you asked to search your database for three specific individuals? Sheila Rathbun, Jeffrey Rathbun, and John Rathbun?

A.   Yes.

Q.   Did you find records for Sheila and Jeffrey Rathbun?

A.   Yes.

Q.    Did you find records for John Rathbun?

A.    No.

ATTORNEY BRESLOW:  I'd like to display Government exhibit or PX-86 only for the Court, counsel, and the witness.

I'm not sure that it's being displayed to counsel or the witness.

Okay.  Can counsel confirm that they have that on their screen?

ATTORNEY O'NEILL-GREENBERG:  Yes, we have it.

Q.    (By Attorney Breslow) Mr. Hill, do you have that on your screen?

A.    Yes.

Q.    Okay.  So I'm showing you the first page of PX-86. Do you recognize it?

A.    Yes.

Q.    Have you -- this indicates in the top right corner that it's page one of four.  Before coming into court, have you reviewed all of the pages of this particular exhibit?

A.    Yes.

Q.    And what is it?

A.    It's called an account profile report so it contains the information that's in our database about this particular record.

Q.   Okay.  And who is the individual for this particular record?

A.   Mrs. Sheila Rathbun.

Q.   And does PX-86 contain fair and accurate copies of the information that Billy Graham collected for Sheila Rathbun?

A.   Yes.

Q.   And does it also contain records of information that was provided subsequently to that contact or to that invitation to Ms. Rathbun?

A.   Yes.

Q.   Were all these records created and maintained in the regular course of Billy Graham's business?

A.   Yes.

ATTORNEY BRESLOW:  I'd like to offer PX-86 and, if admitted, display it to the entire courtroom including the jury.

ATTORNEY O'NEILL-GREENBERG:  There's no objection.

THE COURT:  No objection.  That will be admitted.  So PX-86 turns into what number?

CLERK RIVERA:  No. 29, Government Exhibit No. 29.

THE COURT:  Very good.  That can be displayed to the jury.

**(Government Exhibit No. 29 was admitted.)**

Q.    (By Attorney Breslow) If you could take a look at the first page now of PX-86, and I'd like to zoom in on the top quarter of -- or the top fifth of the document showing the account information.

What contact information is listed for Sheila Rathbun?

A.    We have an address at 20 Lori Lane, East Longmeadow, Massachusetts.

Q.    And the telephone?

A.    We have a telephone number of 412-272-8237.

Q.    If we could zoom back out of this document?

Does the document also indicate whether Ms. Rathbun had a spouse?

A.    I'm sorry?

Q.    Well, let me focus you on the bottom third for a moment, in particular, the areas entitled "email" and "family."  Does the document indicate whether Sheila Rathbun had a spouse?

A.    Yes.

Q.    And who is that spouse?

A.    Mr. Jeffrey Rathbun.

Q.    Does the document list an email for Ms. Rathbun?

A.    Yes.

Q.    What is that email?

A.    It's SheilaR1013@hotmail.com.

Q.    Okay.  Zooming back out to the document, can you tell from the document when the information was collected from Ms. Rathbun?

A.    I know when it was added to the database.

Q.    Okay.

A.    The add date was June 3rd of 2019.

Q.    Okay.  So that's approximately a week after that May 25th event?

A.    Yes.

Q.    And does the document indicate to you by a code in what manner Ms. Rathbun provided the information to Billy Graham?

A.    Yes.  There's -- it's called a source code, and it says Decision Northeast, free shirt sign-up.

ATTORNEY BRESLOW:  Okay.  And can we blow that up?  The top quarter.  Yep.  Thank you.

Q.    (By Attorney Breslow)  So can you explain to the jury what the free shirt sign-up was relating to the Springfield area?

A.    So at the events, there's a booth where people can get free T-shirts; and in exchange for that, they fill out a card.  And so she would have filled out a card at the event in order to get a free T-shirt.

Q.    Are you referring to the same event you talked about

earlier, that live event at the Big E?

A.    Yes.

Q.    Okay.  So according to your records, Ms. Rathbun attended this live event at the Big E, signed up for a free T-shirt and provided her information to Billy Graham, which was later entered into your database?

A.    Yes.

Q.    And based upon your position as director of data management and these records, how confident are you that Ms. Rathbun did just that?

A.    Very confident.

Q.    I'd like to turn to page 3 of Government Exhibit 86. Just focusing on page 3, what does this page represent?

A.    This shows a listing of -- it says comms.  Those are communications.  So it would be a listing of mailings and emailings that were sent to the information on the account.

Q.    If we can focus on the very bottom line?

      What was the first date of communication that Billy Graham sent to Ms. Rathbun?

A.    June 19th.  It was a prayer letter.

Q.    And are you familiar, generally, with the content in these prayer letters?

A.    Yes.

Q.    Can you tell the jury what these prayer letters

generally are?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

THE COURT:  Basis for the objection?

ATTORNEY O'NEILL-GREENBERG:  Relevance.

THE COURT:  I think it has some small degree of relevance, but relevant nonetheless.

Go ahead.  You can answer.

THE WITNESS:  Okay.  We sent monthly letters out to people in our database to let them know what the ministry is doing, to ask them to pray for the activities of the ministry, and then to ask them to donate if they see fit to do so.

Q.   (By Attorney Breslow) Okay.  So this was the first outreach by Billy Graham after Ms. Rathbun signed up?

A.   Yes.

Q.   Okay.  And could we just focus on the top line?

According to your database, when was the last date that Billy Graham sent this material or any kind of material to the Rathbuns or to Mrs. Rathbun?

A.   June 2020.

Q.   Okay.  In particular, does that -- it might be a little unclear for you to read.  Does that read May 14, 2020?

A.   Yes.  The date is May 14th.  It would have been the

June prayer letter.

Q.   Right.  Okay.  Approximately how many letters or emails did Billy Graham send to Ms. Rathbun at her either home address of 20 Lori Lane or the email address according to your records?

A.   Looks like 25 or 26.

ATTORNEY BRESLOW:  Okay.  I'd like to display PX-87 now to only the Court, counsel, and the witness.

Counsel, you have that on your screen, and so do you, Mr. Hill.

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE WITNESS:  Yes.

Q.   (By Attorney Breslow)  Okay.  What is this document?  Do you recognize that?

A.   It's an account profile report for Mr. Jeffrey Rathbun.

Q.   Okay.  And, again, according to your prior testimony, Jeffrey Rathbun is the spouse of Sheila Rathbun?

A.   Yes.

Q.   And is this a fair and accurate copy of the account profile for Mr. Rathbun?

A.   Yes.

Q.   Did Billy Graham keep and maintain these records in the ordinary course of its business?

A.   Yes.

ATTORNEY BRESLOW:  I'd like to offer PX-87 and, if admitted, display to it the jury.

ATTORNEY O'NEILL-GREENBERG:  There's no objection.

THE COURT:  Thank you.  All right.  That will be admitted.  That will be what number?

CLERK RIVERA:  PX-87 is Government Exhibit No. 30.

THE COURT:  Excellent.  Thank you.  That can be published.

**(Government Exhibit No. 30 was admitted.)**

Q.   (By Attorney Breslow) Okay.  Just focusing on that brief biographical section at the top fifth, can you tell the jury, actually just above that, can you tell the jury where Mr. Rathbun's address was?

A.   It's 20 Lori Lane, East Longmeadow, Massachusetts.

Q.   And that's the same address as Sheila Rathbun?

A.   Correct.

Q.   Okay.  And the information relating to the spouse is consistent as well?

A.   Yes.

Q.   When was this information collected from Jeffrey Rathbun?

A.   The source code shows it was collected at the free T-shirt sign-up in Springfield.

Q.   Okay.  So just to be clear, on May 25th at the Big E fairgrounds at a free T-shirt booth?

A.   Correct.

Q.   The same as Sheila Rathbun?

A.   Correct.

Q.   Okay.  And how was this information collected?

A.   It was a card that was filled out.

Q.   Okay.  And I'd like you to focus -- well, before doing so, similar to the question that I posed to you about Sheila Rathbun, how confident are you, based on your position and your familiarity with the records, that Jeffrey Rathbun also attended the May 25th live event at the Big E fairgrounds and signed up for that free T-shirt?

A.   Very.

Q.   Okay.  If you could just go to page 3 for a moment?

And how does this compare to the page 3 that we previously discussed for Sheila Rathbun?

A.   It would be the same information we mail to the household.  So the letters would have been addressed to Mr. and Mrs.  We didn't send two letters.  We just mailed one letter.

ATTORNEY BRESLOW:  Okay.  So I'd like to display PX-85.  It's voluminous.  So with the Court's permission, I would just like to walk up to the witness table.

Q.   (By Attorney Breslow) I'm showing you what's been

previously marked and provided to defense counsel as PX-85. Mr. Hill, do you recognize those records?

A.    Yes.  They're copies of prayer letters.

Q.    Okay.  In fact, are they copies of all of the mailings that are listed on that comms page, page 3 in the Rathbun profile?

A.    I would have to go through all of them, but the top one is the June prayer letter.

Q.    Okay.  Have you had an opportunity to review this prior to your testimony today at some point?

A.    Yes.

Q.    Okay.  And based on that prior review, do these appear to be those mailings without paging through every single page now in court?

A.    Yes.

Q.    Okay.  And I'd like -- I notice now that we're displaying for the Court, counsel, and the witness only on the screen, the first page of PX-85.  Do you see that?

A.    Yes.

Q.    Okay.  And is PX-85 fair and accurate copies of all of the mailings and/or emailings that were sent to Sheila and Jeffrey Rathbun at 20 Lori Lane or their email addresses as listed earlier?

A.    Yes.

Q.    And were these records all created and maintained in

the regular course of Billy Graham's business?

A.    Yes.

ATTORNEY BRESLOW:  Okay.  I'd like to offer PX-85, and then, if admitted, display the first page to the jury now?

ATTORNEY O'NEILL-GREENBERG:  We have the same relevancy objection.

THE COURT:  All right.  I'll hear you on the WhisperTech.

**(Sidebar conference.)**

THE COURT:  Okay.  What is the relevance?

ATTORNEY BRESLOW:  Your Honor, can you hear me?

THE COURT:  Yes, I can.

ATTORNEY BRESLOW:  Okay.  So the first thing I'll note is that this was offered and admitted by the Court in the first trial in exactly the same way that we're offering and admitting it now.

It's relevant because it indicates that Mrs. Rathbun and Mr. Rathbun and John Rathbun, who was also living at 20 Lori Lane, received this religious material during this period of time beginning in approximately June of 2019 and running right up through and including April 2, 2020.  So it tends --

THE COURT:  Is this material going to include any of the pamphlets that were found in the cars?

ATTORNEY BRESLOW:  So you're mentioning the pamphlet in the cars.  I'll say that this material relates more directly to the pamphlet that was burned and used as the wick.  He'll testify in just a minute that that pamphlet was also published by Billy Graham, and I expect Mr. Rhoads will testify -- he's going to be our next witness -- that that pamphlet was used at the events including the Big E event in West Springfield as part of this tour that Sheila and Jeffrey Rathbun attended.

THE COURT:  Okay.  Did you want to say anything?

ATTORNEY O'NEILL-GREENBERG:  Your Honor, first of all, just to be clear, these documents have nothing to do with the pamphlets found in Ms. Rathbun's car on April 15th.

These are all mailings sent to the family that have nothing to do with the *Steps To Peace With God* pamphlet, and as per Your Honor's previous ruling on this at the first trial, which I have as order number 98, these two witnesses from Billy Graham can testify to the pamphlet distributed at the events that Sheila and Jeff were involved in.  These were all mailings that came after they filled out the card for the free T-shirt, which have nothing to do and no similarity to the *Steps to Peace With God.*  So there's no relevance here.

ATTORNEY BRESLOW:  Your Honor, if I may?

THE COURT:  You're saying that's an entry at docket 98?

ATTORNEY O'NEILL-GREENBERG:  That was your order when we filed our motion in limine objecting to these witnesses at the first trial.  Your order on it as to what they could and couldn't testify to was 98 on the docket.

THE COURT:  I'll take a look at that right now, but these were admitted in the last trial as Mr. Breslow said.

ATTORNEY O'NEILL-GREENBERG:  I think it's become clear after going through this trial once how much more irrelevant and attenuated this is from anything having to do with the connection between Sheila and the event and the *Steps to Peace With God* pamphlet.

ATTORNEY BRESLOW:  Your Honor, I'm going to -- before you go to the docket, I'm displaying page 2 of this mailing, this very first mailing.  Your Honor, Mr. Rhoads will identify the photographs as photographs as part of this northeast tour, a part of the same live event which was conducted in different cities.

Mr. Rhoads will identify the *Steps to Peace With God* pamphlet in the Manchester, New Hampshire photograph and I believe also the Bridgeport, Connecticut photograph.  And, essentially, what he will testify is that the *Steps to Peace With God* pamphlet, the very pamphlet that's depicted

in this mailing, was distributed at events in which the Rathbuns attended.

Moreover, these series of mailings tend to prove that the pamphlet that had the defendant's blood on it was possessed by him, not from the trashout as I expect he's going to testify, but through his parents who attended this event where the pamphlet was distributed.  And you can see, Your Honor, we're blowing up that middle photograph.  You can see that the document in red in the middle, at the top is another copy of the *Steps to Peace With God* pamphlet.

THE COURT:  All right.  So clear -- the government's proffer, the government's proffer is that these pamphlets or this mailing that you want to offer includes photographs from the Big E event?

ATTORNEY BRESLOW:  Yeah, not just photographs.  This mailing, among other things, contains a description of the Big E -- of the entire tour, not of the Big E event, in particular.  The photographs here are of the same events conducted in other cities as part of the tour.  And Mr. Rhoads, the second witness, will testify that he organized these events.  He was the primary organizer and that this pamphlet, the pamphlet that's at issue in our case, that it was distributed at both preliminary events and this main event where the Rathbuns attended.

THE COURT: And there's -- and you have a photograph highlighted that is a picture of that pamphlet book that was distributed during the tour, which these publications describe that tour; is that correct?

ATTORNEY BRESLOW: Yes, correct. You can see, Your Honor, that --

THE COURT: I'm looking at it right now. Okay. Objection overruled. I'll admit it.

**(End of sidebar conference.)**

THE COURT: All right. So the objection is overruled. This document will be -- objection noted for the record. The document will be allowed into evidence. We're going to take maybe a ten-minute break right now for an afternoon break.

ATTORNEY BRESLOW: All right.

CLERK RIVERA: All rise.

**(The jury left at 3:13.)**

THE COURT: The jurors have requested a bathroom break.

ATTORNEY BRESLOW: That's fine. Your Honor, may I make a suggestion concerning the bathroom breaks? It's obvious to us that the jurors are using the third-floor bathrooms, which makes sense. I think all of us, meaning both the prosecution table and the defense table including the defendant, have used that same bathroom where the

jurors are.

What I'd like to suggest is that the parties here not use that bathroom. That we just go down to the second floor to avoid any unnecessary conflict, any unnecessary contact with the jury.

THE COURT: Right. That's a good suggestion. Do the jurors use the one in the back hallway?

CLERK RIVERA: The clerk's office is trying to work something out with U.S. Marshals where we can have the courtroom locked and have one door unlocked in the back. The problem is we don't have enough staff.

THE COURT: So that's fine. For now let's have the parties use the second floor and until we clear with the marshals to give the jurors access to the back of the -- if they get access to the back of the courthouse, then that will clear that up, but for now second floor bathroom.

ATTORNEY BRESLOW: We don't have an objection to them using this floor.

THE COURT: Very good. Ten minutes or so. You can step down, sir. Thank you.

THE WITNESS: Thank you.

**(A recess was taken at 3:15 until 3:25.)**

ATTORNEY BRESLOW: Your Honor, can I just raise one housekeeping matter?

THE COURT: Yes.

ATTORNEY BRESLOW: Mr. Kosofsky has been in the courthouse since approximately 9:30 this morning. We weren't sure exactly how long things would take, and obviously there were technical delays and then other delays.

I've discussed this with Mr. Watkins and Ms. O'Neill-Greenberg. They don't have any objection. I have about five more minutes with Mr. Hill and then Mr. Rhoads, I expect, will take about 45 minutes, which will bring us relatively close to ending. Rather than start Mr. Kosofsky and have him schlep all the way back to the courthouse, with your permission and with the consent of the defense, what I'd like to do is just end after Mr. Rhoads and then call Mr. Kosofsky in the morning.

THE COURT: Okay. So Mr. Rhoads will end at about what time?

ATTORNEY BRESLOW: Maybe a little early but --

THE COURT: Okay. Fine.

ATTORNEY BRESLOW: Okay.

**(The jury entered at 3:32.)**

THE COURT: Ladies and gentlemen, was everyone able to during that short break to follow my instructions not to talk to each other about the case? Reach out to anybody? Not access phone, internet, access any media

reporting? Have you followed every instruction I have given?

Yes. The affirmative answer "yes" by every juror. They remain fair and impartial.

We're seeing if we can -- you want to adjust the monitor? We want to make sure your angle of sight of this witness is good.

Is the angle of sight okay for this witness?

A JUROR: (Indicating.)

THE COURT: All right. Very good.

ATTORNEY BRESLOW: Mr. Hill, I just want to remind you that you're still under oath as you were at the beginning.

And addressing myself to the Court, the last thing we did, Your Honor, was we offered PX-85. I don't recall if the admission was at sidebar or in the presence of the jury, but I'll offer PX-85.

THE COURT: Yes, and over objection, that is allowed.

**(Government Exhibit No. 31 was admitted.)**

Q. (By Attorney Breslow) Okay. I'd like to ask you just a very few additional questions, Mr. Hill. Are you familiar with the Billy Graham pamphlet or tract known as *Steps to Peace With God*?

A. Yes.

Q.   Please take a look at PX-4, which should be in front of you at the witness table.  Do you see that?

THE COURT:  Hold on one second.  To the clerk, the last exhibit that was offered, the pamphlet, was PX-what?

CLERK RIVERA:  Eighty-five.

THE COURT:  Becomes exhibit what?

CLERK RIVERA:  Government Exhibit No. 31.

THE COURT:  Okay.

CLERK RIVERA:  And that's admitted.

THE COURT:  That's admitted.

ATTORNEY BRESLOW:  So, Your Honor, we've admitted through this witness 85, 86, and 87.

CLERK RIVERA:  That's correct.

Q.   (By Attorney Breslow) I'd like now to turn your attention to PX-84.  Do you have that in your hands now, sir?

A.   PX-4?

Q.   PX-4, yes.

Can you just briefly take a look at every page so that you're familiar with it?

A.   Yes.

Q.   Okay.  Do you recognize it?

A.   Yes.

Q.   Can you tell the jury what is it?

A.    It's an evangelistic tract.  It goes through the gospel, and so we give it to volunteers.  We sell it so that people can witness to people and tell them about Jesus.

THE COURT:  Can everyone hear okay?

Q.    (By Attorney Breslow) If you could just lean into the mic or position the mic maybe a little bit closer to your face?

A.    Okay.

Q.    All right.  Thanks.

ATTORNEY BRESLOW:  Is that better, Your Honor?

THE COURT:  Yes.

Q.    (By Attorney Breslow) So could you please stand up and just display PX-84 -- PX-4 to the jury just so that they can see it?

All right.  And the title, sir?

A.    It's *Steps to Peace With God*.

ATTORNEY BRESLOW:  I'm going to offer this now, Your Honor.

THE COURT:  Any objection?

ATTORNEY O'NEILL-GREENBERG:  No objection.

THE COURT:  No objection.  That will be offered and the becomes what?

CLERK RIVERA:  PX-4 is Government Exhibit No. 32.

ATTORNEY BRESLOW:  Okay.

**(Government Exhibit No. 32 was admitted.)**

Q.   (By Attorney Breslow) So if you could just keep PX-4 on the table, and now I'd like to display only to the Court, counsel, and the witness, PX-54.

THE COURT:  Allowed.

ATTORNEY BRESLOW:  And counsel and the witness, can you see that?

ATTORNEY O'NEILL-GREENBERG:  Yes.  We got it.

THE WITNESS:  Yes.

Q.   (By Attorney Breslow) So if we could page through this just giving a second or two on each page.  And as you're doing that, I just want you to relate to PX-4?

A.   Uh-huh.

Q.   Okay.  What is PX-54?

A.   PX-54 are the pages within the tract itself.

Q.   Okay. And is PX-54 just, basically, a digital copy, meaning the pages photographed and in digital form exactly as the tract you're holding?

A.   Yes.

ATTORNEY BRESLOW:  Okay.  Your Honor, I'd like to offer PX-54 and, if admitted, display the first page to the jury?

THE COURT:  Any objection?

ATTORNEY O'NEILL-GREENBERG:  No objection.

THE COURT:  All right.  That will be admitted. And the number from the clerk?

CLERK RIVERA:  PX-54 is Government Exhibit No. 33.

**(Government's Exhibit No. 33 was admitted.)**

Q.   (By Attorney Breslow) Does Billy Graham sell this tract in addition to distributing it for free?

A.   Yes.

Q.   And what entity does Billy Graham use to sell the tract if you know?

A.   We have an online bookstore.  It's called Ruth's Attic.  It's a retail store.

Q.   And the entity that -- does Billy Graham contract with an outside entity to actually handle the sale if they are sold?

A.   Yes.  It's an outside company that does it for us.

Q.   Do you recall that name?

A.   CDS Global.

Q.   And does your database, which you've testified about before the break, does your database have any records relating to the sale of this tract?

A.   No.  We don't put the sales in Studio Enterprise.

Q.   Now, focusing on this tract, again, and in PX-4 in your hand, does Billy Graham print this tract in the State of Massachusetts?

A.   No.

Q.   Has it ever printed this tract in the State of Massachusetts?

A.   Not to my knowledge.

Q.   Tell the jury where does the tract -- where is the tract printed?

A.   South Carolina.

ATTORNEY BRESLOW:  I have no further questions, Your Honor.

THE COURT:  All right.  Very good.  Thank you. Go ahead.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

**CROSS-EXAMINATION**

Q.   (By Attorney O'Neill-Greenberg) Good afternoon.

A.   Hello.

Q.   You were asked some questions about the event that happened at the Big E on May 25th, 2019, the Decision America Tour.  I just want to ask some questions about that.  Okay?

A.   Uh-huh.  Yes.

Q.   So there was a booth there that gave out free T-shirts; is that right?

A.   Yes.

Q.   And if someone wanted a free T-shirt, then in exchange they would fill out a card; is that right?

A.    Yes.

Q.    And in the card, they filled out their mailing information?

A.    Yes.

Q.    Is that right?  And then exchange card for free T-shirt?

A.    Correct.

Q.    Okay.  And Sheila Rathbun and her husband Jeffrey Rathbun, they attended that event, right?

A.    Yes, based on the cards.

Q.    Okay.  And they filled out those free T-shirt cards?

A.    Yes.

Q.    Okay.  And they gave their information in exchange for, fair to say, two free T-shirts?

A.    Yes.

Q.    Okay.  And they were there as attendees to the event, right?

A.    As far as I'm aware.

Q.    They were not counselors to that event?

A.    No.

Q.    They are not volunteers?

A.    No.

Q.    They were just there to see and hear the event?

A.    Correct.

Q.    Okay.  And your organization didn't mail out that

*Steps to Peace With God* pamphlet to people who were just there to see the event, right?

A.    Correct.

Q.    Now, you were asked some questions about that mailing list that Sheila and Jeffrey were put on after they gave that card for the free T-shirt, those mailings and -- mailings and emails that are sent out to them.  The *Steps to Peace With God* pamphlet was never in any of those mailings, right?

A.    No.

Q.    And before the Big E event in May 2019, your organization did prep in the Springfield area; fair to say?

A.    Yes.

Q.    Okay.  And this was a big event.  So hundreds of churches in the area were involved in that prep, right?

A.    Yes.

Q.    And the *Steps to Peace With God* pamphlet was available online for these churches to purchase, right?

A.    Yes.

Q.    And I think you just were asked a question, churches could go online to the Ruth's Attic bookstore and order these pamphlets?

A.    Yes.

Q.    All right.  And that pamphlet was for sale in May

2019 online, right?

A.   Yes.

Q.   All the way up until currently, it's still for sale?

A.   Correct.

Q.   So any time from May 2019 until right now, someone can go online and buy packets of those pamphlets, right?

A.   Yes.

Q.   And that can be just a regular person who wants to order that, right?

A.   Yes.

Q.   Or it can be a church?

A.   Correct.

Q.   Anyone who wants it can order it?

A.   Yes.

Q.   And you're aware that churches in the Springfield area ordered packets of these pamphlets after the May 2019 Big E event, right?

A.   I was informed one church ordered packets.

Q.   That church was the Bethany Assembly of God church, right?

A.   Yes.

Q.   A church in Agawam, Mass., right?

A.   Yes.

Q.   And they ordered these pamphlets, *Steps to Peace With God* pamphlet in September of 2019?

A.    I don't know the date off the top of my head.

Q.    Does that sound correct to you?

A.    I don't know.  I'm sorry.

Q.    If I showed it to you, would help you?

A.    Sure.

        ATTORNEY O'NEILL-GREENBERG:  It might be quicker if I just approach.

        THE COURT:  Go right ahead.

        ATTORNEY O'NEILL-GREENBERG:  May I approach?

        THE COURT:  Yes.

Q.    (By Attorney O'Neill-Greenberg) I have -- COVID practice -- I'm going to hand you a document.

A.    Thank you.

        ATTORNEY BRESLOW:  Sorry.  If we could just see a copy of this --

        ATTORNEY O'NEILL-GREENBERG:  Sure.

        ATTORNEY BRESLOW:  -- before the witness is asked any questions about it?  Thank you.

Q.    (By Attorney O'Neill-Greenberg) Here you go, sir.

A.    Thank you.

Q.    Showing you a document, does that look familiar to you?

A.    Yes.

Q.    Is that -- what is that?

A.    It's the record of an order from Ruth's Attic.

Q.   And is it the Bethany Assembly of God purchasing those packets?  If I can direct your attention to the top.

A.   Yes, I assume so.  It's got a person's name on it. It doesn't say Bethany Assembly of God.  The website is Bethany Assembly of God.

Q.   Thank you.  And they ordered 25 packets; is that right?

A.   They ordered -- the packets are sold in 25 each and so --

Q.   Each packet is 25 pamphlets?

A.   Correct.

Q.   And they ordered 10 packets?

A.   That doesn't say it -- quantity 10, yes, it does. So, yes, they ordered 250 tracts.

Q.   And they did that in September 2019?

A.   Yes.

          ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you. No further questions.

          THE COURT:  All right.  Mr. Breslow?

          ATTORNEY BRESLOW:  No, nothing further, Your Honor.

          THE COURT:  Okay.  All right.  Thank you, sir.

          ATTORNEY BRESLOW:  Good afternoon, Mr. Hill.

          THE WITNESS:  Thank you.

          MR. BRESLOW:  May we call our next witness, Your

Honor?

THE COURT:  Yes.

ATTORNEY BRESLOW:  The government calls Steven Rhoads.  Your Honor, this will be our last witness for the day.

THE COURT:  All right.

ATTORNEY O'NEILL-GREENBERG:  I'm sorry, Your Honor.  May we be heard on WhisperTech just briefly?

THE COURT:  Sure.

**(Sidebar conference.)**

ATTORNEY O'NEILL-GREENBERG:  Sorry, Your Honor.  We're just required to actually object again before this witness testifies as to 403 grounds of prejudice and confusion.

THE COURT:  Of course.  That objection is noted for the record.  Overruled, but your objection is noted.  Thank you.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

**(End of sidebar conference.)**

CLERK RIVERA:  Mr. Rhoads, can you please stand and raise your right hand?

**Steven Rhoads (sworn)**

THE COURT:  Sir, you can remove your mask behind the shield.  Thank you.

**DIRECT EXAMINATION**

Q.   (By Attorney Breslow) Good afternoon.

A.   Hi.

Q.   Can you please introduce yourself to the jury.

A.   Sure.  My name is Steve Rhoads.

Q.   And can you just spell your name for the record?

A.   Yes.  S-t-e-v-e, R-h-o-a-d-s.

Q.   Mr. Rhoads, where do you live?

A.   Charlotte, North Carolina.

Q.   So you traveled here recently --

A.   Yes.

Q.   -- to attend this trial?

A.   Yes.

Q.   And prior to your traveling, have you complied with all of the Massachusetts COVID-19 regulations?

A.   I did.

Q.   Okay.  Where do you work?

A.   At the Billy Graham Evangelistic Association.

Q.   Can we call that "Billy Graham" for short?

A.   Sure.

Q.   Okay.  If you could just explain to the jury what is the Billy Graham Evangelical Association?

A.   Billy Graham Evangelistic Association is a global Christian non-profit that preaches the gospel of Jesus Christ.

Q.    And, very briefly, what does it mean to preach the gospel of Jesus Christ?

A.    It's described as that God loved the world so much that he gave his only son, Jesus, who died on the cross to save us for our sins.

Q.    And how does Billy Graham go about furthering that mission?

A.    Kind of like to say that we try to communicate that message using all available means, which means in person, on the internet, radio, television, any way that that message can be communicated.

Q.    And where is Billy Graham based?

A.    The organization is in Charlotte, North Carolina.

Q.    And Billy Graham, he's no longer living with us, correct?

A.    Correct.

Q.    Is there anybody who succeeded to Billy Graham's position?

A.    Yes.  So when Mr. Graham, who died a couple of years ago, when he started to retire, the board of our organization asked Franklin Graham, his son, to take over as the president and CEO.

Q.    Okay.  And did Franklin Graham do that?

A.    Yes.

Q.    So what role, briefly, does Franklin Graham have at

Billy Graham, the organization?

A.   Well, he's like any other CEO or president.  He runs the organization, so kind of soup to nuts.

Q.   And in the soup to nuts, is there any particular function that he plays -- you earlier talked about all available means.  Is there any particular function that he plays in terms of personal outreach to interested people?

A.   Yes.  So he would, as I mentioned, he could be on television, could be on the radio.  And then he does where my job is, he does in-person meetings where he'll preach the gospel and invite people to trust Christ.

Q.   Let's focus now on your job.  Can you tell the jury what is your job?

A.   Yeah.  So I work on the advance before Franklin Graham comes into a town.  So I would be there in the months leading up to Franklin arriving to do a big event, to work with churches and to work with Christians and to try to, as much as I can, promote and train people for the event that's getting ready to happen.

Q.   Okay.  What's the actual formal position that you have at the Billy Graham?

A.   Vice president.

Q.   Of what?

A.   Of church ministry.

Q.   Okay.  And can you tell the jury, briefly, what

generally you do to prepare the area in advance of a meeting or an attendance or appearance by Franklin Graham, himself?

A.   Well, since we want to reach everyone, we start with the people that we know, and generally that is churches or Christians in the area.  The organization has been around for 70 years.  So we, generally, have people that we know in an area and we start there, working directly with churches.  And so I would go into the town and begin with small meetings with pastors and then, kind of, build out from there.

Q.   And in your experience, how common is it for a church to have an informal network of volunteers who would help their pastor in organizing advance events for you?

A.   Well, always, any church, any nonprofit is dependent on volunteers.  So you are counting on the members of the church to be engaged in helping in the running of the church or any outreach that the church would do.

Q.   So even if an individual is not a formal volunteer for Billy Graham, they could be an informal volunteer for the church that is helping you prepare for a Billy Graham event?

A.   Yeah, it actually would probably work that they're an informal volunteer in the church.  And then, as a result of our relationship with the church, those volunteers

would come along and hopefully help us.

Q.    Right.  But they don't have to?  They don't have to --

A.    Oh, no.

Q.    -- formally sign up as a volunteer --

A.    Correct.

Q.    -- for you to help their church prepare the way for Franklin Graham?

A.    Correct.

Q.    So I'd like to focus on a particular event and that is the Decision America Northeast Tour in 2019.  Are you familiar with that tour generally?

A.    Yes.

Q.    And can you tell the jury how did you become familiar with that tour?

A.    Well, I was familiar with it from the start when it was announced that we were going to do this tour.  I've done a series of these tours over the last couple of years, and Franklin announced that he wanted to conduct a tour in the northeast so it centered in seven states.  So from the start of when that was announced, then I went to work.

Q.    Okay.  So you earlier testified that you are the vice president of church ministry.  So can you tell the jury what role you played in particular in helping organize,

plan, and promote and conduct this tour?

A.   Yes.  So I would do everything -- I would be responsible for everything that happens with the people. Picking a venue or renting a sound system isn't me.  I would be responsible for working with the churches and anybody that lives nearby, trying to communicate with them.  So I'd be responsible for the crowd, in a way, if you want to say it that way.

Q.   Okay.  The "crowd" meaning the hundreds of people?

A.   Yeah, the thousands of people that would come to an event like this.

Q.   All right.  And then the hundreds fewer who would help plan and prepare and volunteer formally or informally?

A.   It would be hundreds of volunteers and thousands of people.

Q.   Right.

A.   Yep.

Q.   Can you tell the jury briefly what was the purpose or mission of this Decision America Northeast Tour?

          ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor, relevance.

          THE COURT:  Well, I think we've gone over this. Also, it seems a little cumulative.  Sustained.

          So "objection sustained" means I agree with the

objection which means disregard the question or any answer and we're going to move on to the next question.

ATTORNEY BRESLOW:  Okay.

Q.    (By Attorney Breslow) Moving on.  Did the tour include events in Massachusetts?

A.    Did the tour what?

Q.    Did the tour, the Decision America Northeast Tour, did it include events in Massachusetts, this state?

A.    Yes.

Q.    And, in particular, was there an event in both Springfield and in West Springfield?

A.    The event that involved Franklin, the big event at the end was just in -- it was in West Springfield.

Q.    Okay.  And prior to that, was there also an event, a preliminary event in Springfield?

A.    Yes.  There would have been several events in the run-up to the one that was in West Springfield.

Q.    And when was the primary or the main event where Franklin Graham spoke in West Springfield?

A.    May 25, 2019.

Q.    And can you tell the jury now about the run-up events, the preliminary or preparatory events that you personally conducted with people here in the area prior to the May 25th main event?

A.    Sure.  There are plenty of informal meetings,

lunches, breakfasts, a lot of coffee, but we generally hold three big events for the community.  The first one would be like a kickoff or a launch event that we hold at the Basketball Hall of Fame here, and then we have a series of training events to help Christians learn how to share their faith.  That's the second thing.  And then the third would be a night of worship and prayer that we hold maybe six to eight weeks prior to the main event.  So it's kind of like a kickoff training and then prayer night.

Q.    Okay.  And who at Billy Graham was the primary organizer for all of these events?

A.    I am.

Q.    So I'd like to focus you -- I think you gave the order as the kickoff event first, then the training events, and then the prayer meeting, and then the main event?

A.    Correct.

Q.    Now, before the kickoff event, did you come to the area for any preliminary work?

A.    Yes, I did.

Q.    Can you tell the jury about that?

A.    Prior to the kickoff?

Q.    Yes.

A.    So I would have made -- I would have made several trips to the area prior to the kickoff event.  The kickoff

is, sort of, the first public launch of the thing.  So I would have -- I would have come earlier, maybe six months earlier or so to meet with pastors and Christian leaders, that kind of thing.

Q.   Okay.  So at least six months before the main event, you were here in this area meeting with local people who you thought might help you?

A.   Correct.

Q.   And, in particular, did you hire any contractors?

A.   We did.

Q.   Can you tell the jury who those contractors were?

A.   We hired two that were local.  One was a gentleman named Reggie Cole, and a second gentleman named Curtis Rowe.

Q.   I'd like to focus on Curtis Rowe.  Was he, in fact, a member of clergy?

A.   Yes, he's a pastor.

Q.   And do you recall the church where he was the pastor?

A.   I believe it's Heritage Baptist.

Q.   Heritage Baptist Church.

And with respect to these contractors but, in particular, Mr. Rowe, what did you expect them to do as contractors or what did you actually ask them to do as contractors?

A.   Well, the advantage of -- first of all, the advantage

of having a pastor working with us is the pastor has his own congregation and so that's a start.  But then if a pastor has been in the area for awhile, he knows other pastors.  So that's helpful.  We're brand new.  We don't know anybody.  So having someone that lives here that's already a church person that knows other church people is helpful.

Q.   So what did you expect Pastor Rowe to do particularly with people in his own congregation?

A.   Well, to get them -- to get them involved.  To have them turn up at the kickoff event, involve them in training because we would want his people to be counselors at the event, and basically just to involve everyone, get the whole church involved.

Q.   Okay.  And did you expect or was Pastor Rowe and his members of his congregation, were they involved in every other step of the tour, the ones that you identified?

A.   Definitely Curtis was.  I can't speak to every member of his congregation; but, yeah, I mean, Curtis would have been, and he would have been actively promoting pastors that are involved with us or actively promoting to their own congregation to get engaged.

Q.   At each of those events?

A.   Yes.

Q.   Just to be clear, sitting here, you don't remember

any particular members of Pastor Rowe's congregation back in 2019?

A.    No.

Q.    But your expectation was that Pastor Rowe would engage those members to participate in the kickoff event?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

THE WITNESS:  Yes.

ATTORNEY O'NEILL-GREENBERG:  Leading.

ATTORNEY BRESLOW:  I can rephrase.

THE COURT:  Okay.  Objection sustained.  It was leading.  So rephrase.

ATTORNEY BRESLOW:  Sure.

Q.    (By Attorney Breslow) What events did you expect Pastor Rowe to engage members of his congregation?

A.    Well, not just events, but we would hope that the members of that church would be promoting the event, meaning taking little invitations and letting people know like their friends and neighbors, that kind of thing, but then also attending the kickoff event, attending the training events, and attending the prayer meeting as well.

Q.    Okay.  Now, did Billy Graham publish and distribute religious materials as part of the Decision America Northeast Tour in 2019?

A.    Yes.

Q.   And can you generally describe the kinds of materials that Billy Graham published for this tour?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor, relevance.

THE COURT:  Well, hasn't it been gone over already?

ATTORNEY O'NEILL-GREENBERG:  I'm sorry?

THE COURT:  Hasn't this already been gone over --

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  -- by the last witness?

ATTORNEY O'NEILL-GREENBERG:  It's cumulative.

THE COURT:  I think it's cumulative.  Objection sustained.

Q.   (By Attorney Breslow) Can you tell the jury what is a tract?

A.   A tract is a small piece of literature that would have a summary of the message of salvation, God's love.

Q.   And are you familiar with a particular Billy Graham tract called *Steps to Peace With God*?

A.   Yes.

Q.   How was this tract used as part of the Decision America Northeast Tour?

A.   Well, it was used specifically in the training, the second thing I spoke about, to teach and instruct

Christians how to share their faith better.

Q.   Did you, in particular, use this tract as part of your activities in the run-up to the event at the Big E on May 25th?

A.   Yes.

Q.   Please take a look at PX-4, which is already in evidence and should be on the counsel table in front of you.

A.   Sure.

Q.   You can take it out of the folder.

A.   Okay.

Q.   You don't need --

A.   I don't need the gloves?

Q.   I mean, if you're more comfortable with gloves, you can, but --

A.   I'm fine.

Q.   -- it's not necessary.

A.   Okay.

Q.   Okay.  If you could just hold it up to the jury just so they can see what you -- that's fine.

So if you could just take a look at that, all pages so that we know you've seen the exhibit.

A.   Okay.

Q.   So what is PX-4 and how does it relate to the tour that you conducted here in West Springfield and

Springfield?

A.    So this is a copy of *Steps to Peace With God*.  It's that tract that we used in training to give to Christians who went through training so that they can get -- kind of be more proficient at sharing their faith.

Q.    And I'd like to display what's already in evidence PX-54.  If we could just run through the pages very quickly just so that you see what's on the screen in front of you.

Okay.  And is that just a digital version of PX-4, the tract that you're holding in your hand?

A.    Yes.

Q.    Okay.  So what I'd like you to do is tell the jury now how you, personally, used this tract in the run-up and in your job as promoting or managing this tour?

A.    Well, we would use it in teaching.  So the classes that we teach, the two-and-a-half, three-hour training class, one of the things that we use is this because this can be -- you can stick this in your pocket, in your briefcase or whatever and use it.

So part of the training is to teach people how to use it, which involves kind of memorizing some Bible verses and how to transition from page to page just so it's smooth and you're not reading it.  So I would teach them how to do that.

Q.    Okay.  And when you say "them," are you referring to volunteers, counselors, attendees, or some collection of that?

A.    Yeah, all of those words would apply.  I mean, people who just attend, then they probably become volunteers and maybe ultimately become counselors.

Q.    Okay.  And how -- I want to pause for a second and ask you, are you familiar with the phrase "personal witnessing"?

A.    Yes.

Q.    What is personal witnessing?

        ATTORNEY O'NEILL-GREENBERG:  Objection.

        THE COURT:  Sustained.  Please move on.

Q.    (By Attorney Breslow) What, specifically, did you ask individuals to do with respect to *Steps to Peace With God*?

A.    Well, first of all, to get familiar with it because the messaging in this book matches -- well, it's good for any Christian to know.  And so get familiar with this because it would be something that they could do after we were gone out of the area, they could use this to witness.

Q.    Okay.  And by that, what do you mean?

A.    I'm sorry?

Q.    By "witnessing," what do you mean?

A.    To describe, basically, a witness is someone that says what they've seen in a way, right?  So it's to kind

of give an account for your own personal life, what God has done in your life and this kind of helps make that case, I suppose.

Q.   Okay.  Can you talk about whether and how this tract was distributed during the Decision America Tour?

A.   Yeah, it would have been distributed at the training event, that second group of events that we held here. There were multiple nights, if I'm not mistaken.  And so we would have given this out to anybody that came to the class.  Given it out when they walked in and then we would teach our way through it.  Then they would practice how to use it as a part of that three-hour training class.

Q.   Okay.  And, again, this is in the period before the May 25th event?

A.   Yes.

Q.   Now, how many copies, generally, did you provide to people who wanted to take this document?

A.   Everyone who came to training got two of these, two copies.

Q.   Why two?

A.   Well, I don't know.  I'd love to have a good answer for you there.  I don't really know.  I mean, probably because you would expect that someone would use it, maybe walk their way through it.  In the back, there's a place where a person can write their name if they trusted Christ

as savior.  So the idea is, kind of, use this and then give it away, and two is better than one, I suppose.

Q.  Okay.  So just to be clear, the idea was that the volunteers or the people who were trained would take that, both of those copies and possibly keep one, but possibly give two away?

A.  Use it to practice and then maybe give one away.

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.  It's leading and cumulative.

THE COURT:  It's completely cumulative, and I don't know the relevance of this.  It's just -- I don't know the relevance of this.  Just please get to the point.

Q.  (By Attorney Breslow) I want to focus you on what's already in evidence as PX-85, page 2.

A.  PX-85, 2?

Q.  Right.  Now, do you recognize this page?  No, no. I'm sorry.  It's on your screen in front of you.

A.  Oh, I'm sorry.

Q.  It should be.

A.  Yep.

ATTORNEY O'NEILL-GREENBERG:  Your Honor, I object to this.  We've been through it with the last witness.

THE COURT:  What's going to be new about this,

Attorney Breslow?

ATTORNEY BRESLOW:  Your Honor, may I be heard on WispherTech?

THE COURT:  Sure.

**(Sidebar conference.)**

ATTORNEY BRESLOW:  So, Your Honor, this document was shown to the witness and he authenticated it.  And we offered it through him, but we didn't ask him a single question about it.

As we explained in the voir dire of this exhibit, I said that we would be offering testimony concerning this exhibit through Mr. Rhoads.  And then, in particular, Mr. Rhoads would identify these photographs as being part of the main events in their respective cities.

THE COURT:  But didn't the last witness testify about this?

ATTORNEY BRESLOW:  No.  The only thing he did was he identified the exhibit --

THE COURT:  All right.  You can ask him quickly. There's no way I'm going to let you continue to conduct this trial in such a broad way.  This is going to take months to try.  Completely irrelevant information about the history of this Billy Graham institute.  This about pamphlets and the availability of the pamphlets to the Rathbun family.  So please get to the point.  You can ask

the questions but just be much more focused on getting to the point.

ATTORNEY O'NEILL-GREENBERG:  Your Honor, I'm sorry.  If I can just point out of all this -- I mean, this is like advertising literature, for lack of a better word, but all of these pictures where these people are allegedly reading it, it's not the Big E event.  It's other states.  It's not even Massachusetts.  I don't know how it has any relevance to whether or not --

THE COURT:  Mr. Breslow made a representation that one -- at least one of these pictures is at the Big E.

ATTORNEY BRESLOW:  No, that's not what I said, Your Honor.  What I indicated -- they were at three different cities at the same main event in the tour that was held at the Big E.

THE COURT:  Okay.  All right.  I misunderstood what you said.  All right.  I'll let you ask very pinpointed questions as long as they keep moving to what the point is.  Okay?

ATTORNEY BRESLOW:  Yes.

THE COURT:  Go ahead.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) So the photographs, the three photographs in the top half of the page, what do they

depict?

A.    They depict counselors talking to people who have, kind of, like, made inquiry about the message that Franklin preached.

Q.    And were these taken at their respective cities, Burlington, Manchester, and Bridgeport, as part of this Decision America Tour that was held in West Springfield as well?

A.    Yes.

Q.    Were they all taken at that main event, the main event where Franklin Graham spoke?

A.    Yes.

Q.    And I want to focus you now on the photograph from Manchester, New Hampshire.

A.    Okay.

Q.    And, in particular, do you -- can you identify whether these people are holding the *Steps to Peace With God* pamphlet?

A.    Yes.

Q.    And how many tracts do you see that are the *Steps to Peace With God* tract --

          ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

          THE COURT:  Sustained.  Move on.

Q.    (By Attorney Breslow) What use did people have or how

did people use the *Steps to Peace With God* pamphlet at the main event in the Big E?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  At the Big E you said?

ATTORNEY BRESLOW:  Yes.

THE COURT:  All right.  At the Big E, you can answer that.

THE WITNESS:  Yeah, so they would have used -- that person that stands up after Franklin has given the public invitation, many times they're not -- they're a little confused and they don't really know -- they don't really know what they've done.  So the counselors are there just to give, kind of, guidance.  So they would use *Steps to Peace With God* to, kind of, reiterate the message that Franklin has preached.

Q.   (By Attorney Breslow) Okay.  So I'd like to take this down now.

Do you have PX-3, which is already in evidence, in front of you?

A.   Yes, I do.

Q.   And do you recognize it?

A.   Yes.

Q.   What is it?

A.   It looks like it's two pages out of *Steps to Peace With God*.

Q.   And how did those pages compare with the pages in PX-4 or PX-54, the printed and digital version?

A.   Well, they're partially destroyed, for one; but, second of all, since they're separated from the book, like from the staple -- the staple is taken out so they're not sequential if that makes sense.

Q.   Now, before coming to court today, did you review photographs taken by the Longmeadow Police Department that are already in evidence as PX-16, 17, 18, 19, and 20?

A.   Yes.

Q.   And if we can just display PX-16 to the Court -- to the entire courtroom, please.

And if we could just run through 16, 17, 18, and 20, I'm just going to ask you the same question regarding all of these.  If you could just look at your screen?

A.   Sure.

Q.   How do these pages compare to the *Steps to Peace With God* tract that your company publishes?

A.   Well, the same -- it's from the same tract.  It's hard to make out because they're partially destroyed, but it's from the same tract, *Steps To Peace With God*. They're just pages from that tract.

Q.   And I'd like you to take a look at PX-106.  Is that on the table in front of you?

A.   Yes.

Q.    Do you recognize that?

A.    Yes.

Q.    And what is that?

A.    Well, that's probably a full version with the pages separated of *Steps to Peace With God*.

Q.    Meaning that the tract has been unstapled?

A.    Yeah, taken a part.

Q.    Individual?

A.    Right.  It looks like it's all the pages from that.

Q.    Okay.  Now, before coming to court today, did you correspond the unstapled sheets with the sheets that are in the photographs PX-16 through 20?

A.    Yes.

Q.    And did you mark with a sticky note and a pen how those pages from the actual tract corresponded to the pages in the police photographs?

A.    Yes.

ATTORNEY BRESLOW:  Okay.  Your Honor, I'd like to offer that into evidence.

ATTORNEY O'NEILL-GREENBERG:  No objection.

THE COURT:  All right.  There's no objection.  That will be introduced.  And what exhibit number would that be?

Q.    (By Attorney Breslow) Oh, if you could -- if you could to the extent possible, if you could just stand up

and pull the pages out and just display them to the jury, the ones that you labeled with the sticky notes?

CLERK RIVERA:  For the record, that is going to be Exhibit No. 34.

**(Government Exhibit No. 34 was admitted.)**

THE COURT:  PX-what?

ATTORNEY BRESLOW:  It's 106, Your Honor.

CLERK RIVERA:  106.

THE COURT:  All right.

THE WITNESS:  So this is -- I've marked this one with PX-16 and PX-17, and --

Q.   (By Attorney Breslow) If we can just display those as the witness is talking.

A.   PX-19, PX-20.  Is there an 18 here?  Sorry.  I don't see an 18.

Q.   Right.  That's fine.

A.   Okay.

Q.   There's not.

A.   Okay.

ATTORNEY BRESLOW:  All right.  I have no further questions, Your Honor.

THE COURT:  Thank you.

ATTORNEY O'NEILL-GREENBERG:  May I?

THE COURT:  Go right ahead.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Good afternoon.

A.    Hi.

Q.    I'm going to mic myself.

So I want to talk to you about the Big E event on May 25, 2019.  I want to talk to you about the prep, the lead-up to that event.  Okay?

A.    Okay.

Q.    Okay.  So you were involved in the preparation for that event; is that correct?

A.    Yes.

Q.    And that preparation included small meetings, a training and a prayer; is that right?

A.    And a kick-off event and a large meeting.

Q.    That was all for the -- the event was the Big E --

A.    Correct.

Q.    -- event on the 25th?

A.    Right.

Q.    Okay.  You talked about the trainings or the training that was held in preparation.  That was in April of 2019, right?  Does that sound right?

A.    That sounds right.  I don't know exactly.

Q.    Okay.  Fair to say it was before May 25, 2019?

A.    Oh, yeah.  It probably would have been maybe in February and March.  April sounds a little late.

Q.    And that was at the Bethany Assembly of God church, right?

A.    Yes.

Q.    In Agawam?

A.    Yes.

Q.    Okay.  And the purpose of that was to have volunteers come to train to then apply to maybe be counselors for the Big E event, right?

A.    Yes.

Q.    Okay.  And these volunteers came from all over Western Mass., right?

A.    Correct.

Q.    Okay.  And there was hundreds of them that came for this training, right?

A.    Yes.

Q.    Okay.  And then a smaller number of those hundreds of people from all over Western Mass. then could apply to become the counselors for the Big E event?

A.    Correct.

Q.    Okay.

A.    Yep.

Q.    And at that training at the Bethany Assembly of God, each of those volunteers was given two of the *Steps to Peace With God* pamphlet, right?

A.    Yes.

Q.    And then after that training, they didn't have to give them back, correct?

A.    They did what?

Q.    They didn't have to give them back after they were done?

A.    They did not.

Q.    They could take them with them?

A.    Right.

Q.    Okay.  And you talked -- and you were there -- did you do that training at the Bethany Assembly of God?

A.    I did.

Q.    Okay.  And so you worked with people to, sort of, memorize that pamphlet so they could, sort of, internalize that message and --

A.    Right.

Q.    -- use it?

A.    Correct.

Q.    Okay.  And at the actual Big E event, these people who became counselors, they were -- they were not instructed to use the *Steps to Peace With God* pamphlet as counselors at the Big E event, right?

A.    Correct.

Q.    They weren't instructed to bring that pamphlet with them, right?

A.    That's right.

Q.   Because you wanted them to, sort of, be hands-free, just sort of internalizing and being able to connect with people and talk to them about God?

A.   Correct.

Q.   Okay.  And so you discouraged them to bring anything extra that would, sort of, weigh them down, I suppose?

A.   Yeah.  I don't really recall whether it was discouraged, whether I discouraged that, but the way you're communicate -- the way you're explaining it is right.  We would want them to internalize it.

Q.   There was one piece of or one book that you suggested all the counselors could have with them, that was the living with Christ?

A.   *Living in Christ*, correct.

Q.   *Living in Christ* book.  Okay.  But beyond that, you discouraged them from having anything else, right?

A.   Right.

Q.   Okay.  And they weren't instructed to give out the *Steps to Peace With God* pamphlet to people at the Big E event, correct?

A.   Correct.

Q.   Okay.  And just the regular attendees at the Big E event, they were not given the *Steps to Peace With God* pamphlet, right?

A.   No.

Q.    Now the *Steps to Peace With God* pamphlet that you were shown, it was create -- it wasn't created for the Big E event, right?

A.    Right.

Q.    It was created in 2017?

A.    Well, that may have been printed then.  It's been around, the message -- the messaging has been around for a long time.  I don't remember.  It goes back a long way.

Q.    That --

A.    The idea of the tract.

Q.    The idea of the tract.  That particular tract, that version of it, I guess I'll call it, that was in existence before the Decision in America Tour, right?

A.    Before the Decision America Northeast Tour.

Q.    Okay.

A.    Yes.

Q.    And then after -- and it was for sale before that Decision America Tour, right?

A.    Yeah.  We don't sell it.  We generally give it away.

Q.    I mean for sale in the bookstore?

A.    I don't understand your question.  Which bookstore?

Q.    The Ruth's Attic bookstore?

A.    Oh, yes.  Yeah, that's right.  It's for purchase on Ruth's Attic bookstore.  When we're in a town, we give it away.

Q.   Right.

A.   But if you'd want to order large quantities, yeah.

Q.   So if I was a person, before May 2019, and I wanted to buy it, I could go to Ruth's bookstore online and buy packets of it if I wanted to?

A.   Yes.

Q.   Even if I was a person or if I was a pastor in a church, right?

A.   Correct.

Q.   And then that same *Steps to Peace with God* pamphlet stayed online for sale after the Big E event, right?

A.   Correct.

Q.   And it was available for purchase, whoever wanted to buy it from that point up until -- if I wanted to go online right now, I could?

A.   It's probably there, yeah.

Q.   Thank you.

     And the pastors that you had as contractors for the Big E event, you said one of them was someone named Curtis Rowe?

A.   Correct.

Q.   Okay.  But you -- and you recall him being one of the two contractors -- local contractors you had?

A.   Yes.

Q.   In prep for the event?

A.   Uh-huh.

Q.   But you have no memory that anyone else from his congregation was involved in that preparation, right?

A.   No.   I mean, we had hundreds of churches involved, so -- and hundreds of volunteers, so, yeah, I don't recall.

Q.   Okay.   And one of the main purposes of getting these local pastors as contractors was to have them get people in their community involved, but, ideally, to get people who hadn't yet been affiliated with a church to come to the event, right?

A.   Sure, yeah.

Q.   So you were interested in how the contractors could connect you to other people who would possibly be brought into your church, right?

A.   Who could -- I'm sorry.   Say that again.

Q.   You wanted the contractors or you wanted Curtis Rowe to be able to introduce you to populations of people that hadn't yet found their own congregation or hadn't yet found their own church, right?

A.   Well, yeah, or to do that work himself.

Q.   Okay.

A.   Not necessarily introduce us, but invite people -- because they know the area, invite and let us know really who we should be working with.

Q.   Finding new people to bring into --

A.    Yes.

Q.    -- their church or your overarching church?

A.    Yes, correct.

Q.    And that's one of the reasons you chose Springfield because it was an area where there was a population of people that hadn't yet -- weren't yet involved in a church?

A.    Well, who might be vulnerable or, you know, in need of hope, that kind of thing.

Q.    And then to bring those people that weren't connected to a church into that community, right?

A.    Yes.

Q.    Okay.  Thank you.

A.    Sure.

        ATTORNEY BRESLOW:  One moment, Your Honor?

        THE COURT:  Yes.

        ATTORNEY BRESLOW:  No further questions, Your Honor.

        THE COURT:  All right.  Thank you very much, sir.

        THE WITNESS:  Sure thing.

        ATTORNEY BRESLOW:  So, Your Honor, as we had explained earlier, this is our last witness of the day.

        THE COURT:  All right.

        ATTORNEY O'NEILL-GREENBERG:  Your Honor, may we

be seen at WhisperTech sidebar?

THE COURT:  Before I excuse the jury?

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  Okay.

**(Sidebar conference.)**

ATTORNEY O'NEILL-GREENBERG:  The last time, Your Honor, after the Billy Graham -- after the last trial, you gave a limiting instruction after the *Steps to Peace With God* pamphlet was admitted and the two Billy Graham witnesses testified, limiting instruction as to the relevance of the tract, the pamphlet, the message and the content not being relevant, but only being able to use it as far as its physical connection.  So we would ask that you do that again.

THE COURT:  Do you have a copy of the instruction that I gave so I can be consistent with the instruction?

ATTORNEY O'NEILL-GREENBERG:  We can pull it up. Just one second.

THE COURT:  Okay.

ATTORNEY O'NEILL-GREENBERG:  May I approach?

ATTORNEY BRESLOW:  Your Honor, we have no objection to the instruction being offered.

THE COURT:  A little bit closer.

ATTORNEY BRESLOW:  We have no objection to you

repeating this instruction.

THE COURT:  All right.  Thank you.

Can you direct me to where on this page, 63 or 64?

ATTORNEY BRESLOW:  I think the instruction is substantially on the back page, Your Honor.  It starts at the bottom and continues.

ATTORNEY O'NEILL-GREENBERG:  I think it starts on 63, at the bottom of 63.  Sorry.

**(End of sidebar conference.)**

THE COURT:  Ladies and gentlemen, relative to the testimony that you have heard regarding what has been called tract-type materials, the purpose of these materials, the reason why they -- there's been talk about them and they have been introduced.  The purpose is for you to know where these materials came from, any individual's access or potential access to these materials, the availability when, where, or how to these types of materials, that's what they're admissible for.

There's really no relevance or admissibility for the content when you read them.  The religious message that's being delivered, that's not an issue right here.  So anything that's written inside of them is not really the issue as I said.  It's the availability.  Who had access to them, where were they, how would someone get them is why these are being talked about here.  All right?  I just

want to make sure that that's understood.  All right.  Thank you.

All right, ladies and gentlemen.  We're done for the day.  We'll see you tomorrow morning.  Obviously, the same instruction.  Don't talk to each other.  Don't talk to anyone about the case.  Don't research the case.  Don't go visit sites about the case.  Don't look up anything about the law.  No social media posting.  No Facebook.  Stay away from media accounts of the case.  All right.  See you tomorrow.

CLERK RIVERA:  All rise for the jury.

**(The jury left at 4:31.)**

THE COURT:  All right.  I just want to clear up the record.  Attorney Watkins, you had made a request or an inquiry about Zoom and was wondering whether or not Zoom records the video, and I wasn't quite sure.  But we've checked, and Zoom does not record the video.  So that's an answer to that question.

And the next issue, I suggest that the parties might want to talk to each other and the clerks.  We looked at the exhibit list from the last trial and this trial, and I don't know that -- at either trial, the exhibit lists were filled out with PX-numbers.

So we are running into the issue of we're giving numbers, Exhibits 1, 2, 3, 4, 5, but we're also referring

to them as PX-numbers.  And, you know, I'd like to cut this off, if we can, to avoid any type of confusion.  But I would note the exhibit lists don't identify anything as PX-numbers -- I don't have it in front of me right now -- but if you look at the exhibit list that was introduced for this case and the last case.

So if the parties, by agreement, want to come up with a way from here forward, whether we stay with the system we've been using or whether you want to go PX-numbers, take a few minutes and talk about that.  Look at the exhibit list, and we'll just -- whatever you'd like to do, I'm fine with it.  I don't want it to be confusing.

ATTORNEY BRESLOW:  Yes.  I'm glad you mentioned that, Your Honor.  I think defense would agree, I think it has been confusing, this new convention.  So Your Honor's order directs that the government's exhibits be labeled as PX.  And consistent with that order, in exactly the way we did it in the first trial, we have labeled our exhibits PX.

Now, there has been -- there were occasions in the earlier trial, and I think one even happened today, where the defense elected to introduce one of our own exhibits. I don't have any problem with that exhibit continuing to be called "PX."  I don't know that the jury understands "P" for prosecution, if that is even the convention.  I

would request that Your Honor discontinue the  --

THE COURT:  Go right ahead.

ATTORNEY BRESLOW:  What I was saying was we would request that Your Honor discontinue the practice of redesignating exhibits by government exhibit or defense exhibit.  All of our exhibits have been prelabeled.

We don't have any objection to the defense offering one of our exhibits in through cross-examination, and we think that it will avoid a lot of confusion on the jury's part.  I think it would also alleviate your courtroom staff from having to do this exercise.  We don't think it's necessary, and I think we agree with you that it's probably best if it's discontinued.

THE COURT:  All right.  So I'll ask that -- and I'm fine with doing that, but then we need to go back and -- well, we're making a record right now about the renumbering.  So anything that was numbered one through whatever we got up to today, would be given a PX-number instead.  So I'm happy with doing that, and I will leave it to the expertise of Ms. Rivera and Ms. Healy just to make this work for tomorrow.

Ms. Rivera will talk to you after we leave.

ATTORNEY DESROCHES:  Just to flag an issue to complicate things further, I don't believe those forms actually allow a PX to be entered into them.

CLERK RIVERA:  Yeah, they do.

ATTORNEY DESROCHES:  Oh, I told you I was going to complicate things.

THE COURT:  There you go.

CLERK RIVERA:  Have it on my screen now.

ATTORNEY DESROCHES:  I stand corrected.  Thank you.

THE COURT:  I wouldn't know.  I mean, I agree with you, but it does look like there's a spot.  And if you look at it from the last trial, yeah, in the last trial there is.  There is a spot with PXs but then there's a few where you use 1 and 2.  It's worth taking a look at these forms from the last trial, this trial.  And I agree with Attorney Breslow, and I think everyone here can try to be consistent to avoid any type of confusion.  So if you can stay for five minutes to work this out with the clerk's office, we will get a system that is less confusing.

ATTORNEY BRESLOW:  Your Honor, if we could be heard on a matter about Mr. Kosofsky?

THE COURT:  Uh-huh.

ATTORNEY BRESLOW:  Okay.  So as Your Honor knows, the defense has made three motions in limine.  Your Honor granted the first one regarding the impact testimony.

Your Honor granted the second one regarding Mr. Kosofsky should be prohibited from describing the Jewish institutions in the neighborhood, even though we thought it was directly relevant to a false statement that he made to Special Agent McGonigle.

What is, frankly, astounding to me is that after the defense moved in limine, after Your Honor ordered that that be precluded, after we instructed Mr. Kosofsky that he could not testify about this, Mr. Watkins on cross-examination of a completely irrelevant witness, the firefighter, our first witness, Mr. Nothe, asked him, "On this stretch of Converse Street in Longmeadow, there are actually several Jewish-operated homes and complexes there?"

Now, Mr. Nothe was not the witness that we were planning to introduce this testimony through because, frankly, he's not going to be as familiar with those institutions as Mr. Kosofsky would.  And then after Mr. Nothe answered, Mr. Watkins went further and said, "The Jewish Community Center, there's a very large sign for that.  You can't miss it going down Converse Street."

These were exactly the questions that we were planning to offer through Mr. Kosofsky, exactly the questions that Mr. Watkins sought to exclude, and now we have the partial testimony and I think misleading

testimony or incomplete testimony through this cross-examination.

THE COURT:  Well, I think -- well, Attorney Watkins has always said, look, you can introduce that information about the composition of that community as well as the specific buildings of that community through police, fire departments, other individuals.

Attorney Watkins was concerned with the prejudicial impact of a religious leader or a religious person in that community testifying to things like you proffered that there are a lot of pedestrian traffic of individuals who practice the Jewish faith walking up and down the sidewalks and that that has more of an emotional impact, prejudicial value coming from a rabbi in his position.

ATTORNEY BRESLOW:  So --

THE COURT:  I think that was Attorney Watkins' argument.

ATTORNEY BRESLOW:  So, actually, as to the last part, I agree.  Mr. Watkins also sought to preclude testimony of how Jewish people use Converse Street.  He did not bring that up through Mr. Nothe, but as to the first part, I disagree, and I'd like to take a look at the motion in limine and, particularly, Your Honor's order.  My sense was that Your Honor's order was very clear, that he could testify about population density.

THE COURT:  What order am I looking at?  What docket?

ATTORNEY BRESLOW:  I just have to take a look myself, Your Honor.

THE COURT:  Is it maybe 303?

CLERK RIVERA:  303.

ATTORNEY BRESLOW:  Okay.  So in the renewed motion in limine, the first thing that I'm looking at, it says the Court has limited the government to eliciting from Mr. Kosofsky's testimony --

THE COURT:  You're reading from?

ATTORNEY BRESLOW:  From his motion, the motion that he just filed over the weekend.

THE COURT:  Okay.

ATTORNEY BRESLOW:  That he's been limited to talking about population density, proximity of homes to the container, and the level of pedestrian traffic in the area.

I'll go back to the prior motion and the order, but the reason he is writing that is because he asked the Court to preclude Mr. Kosofsky from talking about the prominence of the Jewish institutions on Converse Street, and they're directly relevant to the false statement that Mr. Rathbun made to Special Agent McGonigle.

So what he's done now is introduced on

cross-examination through witnesses that we did not prepare to offer that testimony exactly the thing that he has sought to preclude Mr. Kosofsky from testifying about.

THE COURT:  That is the prominence and visibility of --

ATTORNEY BRESLOW:  Exactly.

THE COURT:  -- businesses or care facilities that bear JGS name.

ATTORNEY BRESLOW:  No, no.  The prominence or -- what we explained was that Mr. Kosofsky would talk about the prominence and visibility of other Jewish institutions on the street, including the Jewish Community Center that he elicited through the testimony of Mr. Nothe three different synagogues, a ritual bath, and his own yeshiva, which Mr. Watkins also elicited through this testimony.

THE COURT:  Okay.  So you are now asking because the door was opened for Mr. Kosofsky to be able to testify about that?

ATTORNEY BRESLOW:  Yeah.  Just to explain what the Jewish institutions are on the block, where they're located, and how visible or prominently Jewish they are. Simply because the actual circumstances of that block which Mr. Rathbun drove down every single day back and forth are relevant to the verity, the truthfulness of his

statements to Special Agent McGonigle that he was unaware of any other Jewish institution except for the yeshiva.

THE COURT:  Mr. Watkins?

ATTORNEY WATKINS:  Your Honor, I think the Court has got it exactly.  Mr. Breslow is simply confused about what the issue here is.  It's not the content of it.  It's the content of it coming through a rabbi.  We had this testimony first time around.  I have to put it in because as part of the government's case on the false statement where Mr. Rathbun is going to be -- we're going to hear evidence about Mr. Rathbun discussing, I don't know that. I know the Jewish -- I know the private school.  I pass by there.  So there are reasons why I need to get those things in.

I don't need to have to do it through a rabbi getting up there to do it.  I know the government would much rather have me do it there because all the prejudice that brings as I start cross-examining a rabbi on it.  I think it was perfectly appropriate.  I haven't opened any kind of doors.  If the government wants to elicit those particular statements, I would say it's cumulative.

If they want to do it in the same way that I did it here that here's this one place, here's this other, and here's where this big sign is there, I suppose it's completely cumulative of course.

As far as who's in a better position, the Court heard the firefighter. That firefighter knows every inch of that Converse Street. He knows every building that's there. There's nobody that knows the area any better than that firefighter. So Mr. Breslow is simply wrong when he says we have a witness who knows more about that area. He knows more about that area from a Jewish perspective, and that's what he's trying to bring here. There's nothing improper about what I did.

THE COURT: Well, the cumulative --

ATTORNEY WATKINS: I still insist on the fact that the witness that they're bringing in simply is not -- should not be allowed to testify.

THE COURT: The cumulative analysis might be better placed if the government or the defense kept putting something in. I understand cumulative could be applied of, look, it came into the case. It doesn't matter what side it came in. We're hearing it over and over, but we're not at that point yet. We haven't heard it that much.

Mr. Breslow -- Attorney Breslow does have a point. You did mention those facilities, those complexes in a very generic, passing manner, and I thought it was fine how you introduced those.

And frankly, I think -- I tend to agree with you on

this, if Rabbi Kosofsky was to identify buildings in the area in a very generic sense, like, oh, down the block there's a Jewish Community Center and this, similar to how you introduced it, that would be fine if he just made that identification in a generic passing sense.

I will say that I share with Attorney Watkins the sensitivity and really invitation to the prejudice that comes with a rabbi giving this testimony with this all -- with the whole religious background that we know about this case, and I don't have to go through it.

It just gets -- I'm being so careful and I think I've written that in a couple of motion in limines.  The balancing is -- I have to be really careful.  But Rabbi Kosofsky lives in the neighborhood, and I'm not going to prohibit him from testifying.  So with that having been said, he can identify certain buildings in the area in a generic sense.

ATTORNEY BRESLOW:  So, first of all, we appreciate the Court's concern with what it perceives to be potential prejudice.  We really do appreciate that, and at every order we've directed the witness to not testify, consistent with Your Honor's order.

So I just want to be very clear so that I understand the orders that I can convey it to -- or Your Honor's ruling right now, so that I can convey to Mr. Kosofsky.

By the way, I won't be calling him Rabbi Kosofsky.  I'll be calling him Mr. Kosofsky.

THE COURT:  Okay.

ATTORNEY BRESLOW:  And so as I understand it, I can ask Mr. Kosofsky can you describe the other Jewish institutions along Converse Street.  I expect what he would say is there's three different synagogues and a ritual bath called a mitzvah.

THE COURT:  I don't see why you would want to ask him about Jewish buildings or Jewish organizations on Converse Street.  I think you can ask him about the composition of Converse Street.

ATTORNEY BRESLOW:  Well, I'd simply be asking him the same question that Mr. Watkins asked Mr. Nothe, which was on this stretch of Converse Street in Longmeadow -- this was cross-examination, so it was a leading question -- on this stretch of Converse Street in Longmeadow, there are actually several Jewish-operated homes and complexes there.

ATTORNEY WATKINS:  And not one word about synagogues.  It's simply -- it's simply undue prejudice.  It's -- I'll leave it at that, Your Honor.

THE COURT:  All right.

ATTORNEY BRESLOW:  Your Honor, again, I don't know if Your Honor needs to hear more about this but, once

again, it's alleged that Mr. Rathbun placed this particular device containing that religious pamphlet outside a Jewish nursing home complex.  And it's Mr. Rathbun, we allege, who, when asked about the Jewish institutions on Converse Street, professed no knowledge of them except for the yeshiva, which is where Mr. Kosofsky works and the Jewish nursing home in some fashion.

THE COURT:  The question Mr. Watkins asked is there are several Jewish-operated homes and complexes.

ATTORNEY BRESLOW:  Right.  That's --

THE COURT:  And then asked about the Jewish Community Center.

ATTORNEY BRESLOW:  And his point there was there's a very large sign for that.  That was the question that Mr. Watkins asked.  You're not going to miss it on Converse Street, right?  Well, that's exactly why we wanted to offer the evidence we did because Special Agent McGonigle asked similar questions to Mr. Rathbun, and Mr. Rathbun said, I'm actually not familiar with that area.  I don't know that to be a Jewish area.  I know the Jewish school, which just happens to be Mr. Kosofsky's school.  But he professed ignorance of the Jewish Nursing Home where the device was placed or any other Jewish institution that Special Agent McGonigle mentioned.

And so the fact that they exist, the fact that they

are prominent and obviously Jewish, meaning Mr. Kosofsky will say that outside one building there is an Israeli flag, outside another building there are Hebrew letters, these are all obvious indicators of Jewish institutions that Mr. Rathbun, who has driven down that street --

THE COURT:  I know.  You've repeated that.

ATTORNEY BRESLOW:  Okay.

THE COURT:  All right.  Well, it was brought up by Attorney Watkins.  So I will allow then now Mr. Kosofsky to testify to the existence of Jewish buildings.  I don't see exactly the huge problem with -- in adding to the list of the Jewish Community Center, Yeshiva Academy, and whatever else was named during the testimony -- during the cross-examination by Attorney Watkins, the fact that there's Jewish synagogues in that area as well.

So in his description of the neighborhood, I will allow him to describe various buildings that are, kind of, in that immediate area.

ATTORNEY BRESLOW:  Okay.  Then the only question -- the only follow-up question that I would ask and it's specifically relevant to Mr. Rathbun's denial of familiarity of those institutions is how prominent or obviously Jewish are they?  And I expect he will say, well, there's Hebrew lettering on some of the buildings.

Some of the buildings have signs that say Jewish --

THE COURT:  I guess I wouldn't allow you to ask a question like how Jewish are they.

ATTORNEY BRESLOW:  No, no.

THE COURT:  But I might ask you to ask about signage and signs of the signs, how big the buildings are, how close they are to the road, things like that.

ATTORNEY BRESLOW:  Okay.  That's -- I will ask it in that fashion.

THE COURT:  All right.  Objection noted for the record.

ATTORNEY WATKINS:  We definitely will be objecting as we go along.

As the Court will remember, we filed a motion for a view last time.  We decided, ultimately, that we could do it by photographs.  I'm going to now go through Converse Street to -- unfortunately, I've driven Converse Street a number of times.  I couldn't tell where the three synagogues are and so I'm going to certainly look up that.  But if this is going to be an issue, the only reason, the only reason to talk about synagogues at this point is to inject the religious aspect into it.

THE COURT:  Well, what about Attorney --

ATTORNEY WATKINS:  Going through --

THE COURT:  Hold on.  What about Attorney

Breslow's point about Mr. Rathbun's statement of unfamiliarity with Jewish buildings and things like that?

ATTORNEY WATKINS:  I'm going to look through the statement again.  I don't recall that as being the question.  As the Court will recall, he talked about Jewish -- he talked about Ruth's House, right?  That was the problem.  He talked about Ruth's House.  Do you know where Ruth's House is?

THE COURT:  I remember that, because that's the issue -- where the grandmother stayed.

ATTORNEY WATKINS:  That's when Mr. Rathbun replies -- and I'll go through it again -- I'm not familiar with that.  I know the Jewish school down there with the big sign, right?  Which is why I wanted to elicit that and get that in.

THE COURT:  So how about I revisit this after we all get a break and a fresh look at this in the morning?  I'll revisit the entire issue in a succinct way if you can point me to specific statements.  Mr. Breslow is making a good point about if he made a statement about I don't know anything about Jewish institutions or buildings, but you're telling me that might not have been the exact statement.  So we'll get that out.  All right.

ATTORNEY WATKINS:  Thank you.

THE COURT:  We'll look at it again in the

morning.  All right.  Thank you, everyone.  Good night.

ATTORNEY WATKINS:  Thank you, Your Honor.

ATTORNEY BRESLOW:  Thank you, Your Honor, for the time.

**(Court recessed at 4:54.)**

(The certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Alice Moran                          May 30, 2022

Alice Moran, RMR, RPR

Federal Official Court Reporter