UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America    )
                            )            20cr30018-MGM
     vs                     )
                            )            June 8, 2021
John Michael Rathbun        )
_____)



TRIAL HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.




APPEARANCES:


On behalf of the government:  Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.


Neil L. Desroches, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105.

On behalf of the defendant:  Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

                              INDEX


Witness:                                          Page:


**Chaim Kosofsky**

Direct examination by Attorney Breslow            16

Cross-examination by Attorney Watkins             43


**Natalie Rathbun**

Direct examination by Attorney Breslow            47

Cross-examination by Attorney O'Neill-Greenburg   91

Redirect examination by Attorney Breslow          102

Recross-examination by Attorney O'Neill-Greenburg 103


**Alfred Alschuler**

Direct examination by Attorney Breslow            109


**Przemyslaw Peter Szura**

Direct examination by Attorney Breslow            113

Cross-examination by Attorney O'Neill-Greenberg   125

Witnesses:                                                      Page:


**Dana Graham**


Direct examination by Attorney Breslow                           127

Cross-examination by Attorney O'Neill-Greenberg                  138


**Mary Sharry**


Direct examination by Attorney Desroches                         143

Cross-examination by Attorney O'Neill-Greenberg                  157

Redirect examination by Attorney Desroches                       169

Recross-examination by Attorney O'Neill-Greenberg                176


**Patrick Carnahan**


Direct examination by Attorney Desroches                         178

Cross-examination by Attorney O'Neill-Greenberg                  188


**Dustin Wong**


Direct examination by Attorney Desroches                         194

Cross-examination by Attorney Watkins                            225

Redirect examination by Attorney Desroches                       235

| Exhibit No. | Description | Page |
|---|---|---|
| PX-133 | Bus schedule | 35 |
| PX-134 | Photo of bus | 41 |
| PX-56 | Photo | 71 |
| PX-105 | Photo | 82 |
| PX-84 | Sheila Tipton's tenant file | 155 |
| PX-73 | Photos (2) | 187 |
| PX-52 | Timeline of phone artifacts | 202 |
| PX-88 | Computer documents | 223 |

**(Court commenced at 9:04.)**

**(The defendant is present.)**

THE COURT:  Good morning.

CLERK RIVERA:  The matter before the Court is Criminal Case 20-30018, the United States of America versus John Michael Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY DESROCHES:  Good morning, Your Honor. Neil Desroches on behalf of the United States, and I will be joined shortly by Attorney Steven Breslow who just stepped out for one minute and should be back.

THE COURT:  No problem.

ATTORNEY WATKINS:  Good morning, Your Honor. Tim Watkins, Federal Public Defender Office on behalf of John Rathbun who is present in court today.

ATTORNEY O'NEILL-GREENBERG:  Good morning. Forest O'Neill-Greenberg, also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  All right.  Mr. Rathbun is present, Good morning, everyone.

I just wanted to talk quickly about the motion in limine.  I'm not sure if it was renewed or there was another one regarding Mr. Kosofsky.

The government's -- one of the government's

indication was that we're going to be introducing evidence of a statement that Mr. Rathbun made to -- a false statement made to mislead the police regarding familiarity with the Jewish institutions in that area.

Attorney Watkins, you said you weren't quite sure that's what the false statement even brought up, but it was late in the day yesterday and so we took a break.

ATTORNEY WATKINS:  That's quite correct, Your Honor.  I've gone through to review both the 302 of the statement and also the testimony of Agent McGonigle at the last trial.

It is not the subject of the false statement.  The false statement specific was that Mr. Rathbun didn't deny knowing the location of JGS.  It's clear both from the statement and the testimony that that was what Agent McGonigle was trying to get at during that period of time, was talking specifically about JGS and using landmarks along the way or Mr. Rathbun using landmarks along the way to try to figure out, at least from Mr. Rathbun's point of view what it was, which property they were talking about.

There's absolutely no discussion about temples in particular, which is what the government seems to want to get in here.

I've also looked on Google Maps to find out that the temples actually aren't on Converse Street at all.  They

are off of Converse Street.  They are not visible.  There was no discussion about the wider neighborhood off of Converse Street.  It simply is absolutely irrelevant here.  It doesn't go to Mr. Rathbun's veracity at the time that he made the statements.

THE COURT:  All right.  I got it.  You're going beyond the question --

ATTORNEY WATKINS:  I'm sorry.

THE COURT:  -- that I asked.  All revved up.  Save that morning energy for the trial.

ATTORNEY WATKINS:  All right.  Your Honor, just to -- the other thing I heard -- or looking at the statement I guess I should say, I expect the government is going to talk about people walking on the sidewalk and, particularly from this witness, perhaps people of the orthodox -- particularly of the orthodox faith walking on the sidewalk because as part of the faith on Saturdays on Shabbat, that is --

THE COURT:  I think my ruling forecloses that.

ATTORNEY WATKINS:  I think that's correct.

ATTORNEY BRESLOW:  Yes.

ATTORNEY WATKINS:  I just wanted to make sure that we're all on the same page here.

ATTORNEY BRESLOW:  On that latter point, it does.  We've instructed him not to testify about that.

On the former point, Your Honor, I'd like to approach and provide to you the pertinent parts of the testimony of Special Agent McGonigle.  I'm not sure if Mr. Watkins was referring to -- when he was referring to the statements, if he was referring to the 302 or the report of the interview; is that right?

ATTORNEY WATKINS:  Both things.  I indicated to the Court it was both the 302 and the testimony.

ATTORNEY BRESLOW:  The testimony was really what I think is most pertinent.

THE COURT:  And this is testimony from obviously the last trial?

ATTORNEY BRESLOW:  Yes.

THE COURT:  Thank you.

Attorney Watkins, did you take a look at that?

ATTORNEY WATKINS:  I did.

THE COURT:  Okay.  So page 187.

ATTORNEY BRESLOW:  186, Your Honor.

THE COURT:  186 and 187 talks about a number of different land -- referred to as landmarks and worship centers were included.  Does that change your approach on this?

ATTORNEY WATKINS:  No, Your Honor.  It's landmarks on Converse Street and, again, the context matters here.  We heard from Agent McGonigle that that's

what he was trying to do.  He was trying to get Mr. Rathbun to talk about JGS in particular and that was why there was this issue of Converse Street.

We've heard over and over about travel down Converse Street and the different things.  These temples are not on Converse Street.  If Agent McGonigle wants to say so, that's one thing.  But there's no identifying, so far as I can see, no identifying or small bits of it on the street.

Mr. Rathbun talked about the sign on the Jewish school, the private school there.  That's clearly there. There's no doubt about that, and that was the thing that he mentioned in trying to get oriented.  The fact that he did not also mention temples that were off the street, that allows the government to get into this to say that he was --

THE COURT:  Let me ask you -- hold on.  When you say "off the street," are you meaning on side streets or on Converse Street but set very far back?

ATTORNEY WATKINS:  Off side streets -- well, both.  I didn't have a chance to go out there.  According to Google Maps, at least, one of them is within the complex where this Jewish school is.  The other two are far away from Converse Street.

THE COURT:  Yeah.

ATTORNEY WATKINS:  I can put that up on Google

Maps. Again, I haven't shown that.

ATTORNEY BRESLOW: Your Honor, it is not necessary for Mr. Watkins to do that. We have confirmed with Mr. Kosofsky that they're located within a few hundred yards of Converse Street, but not specifically on Converse Street. And given that, given that specific fact, we will not be asking Mr. Kosofsky to talk about those synagogues.

THE COURT: Thank you for clarifying.

ATTORNEY BRESLOW: Mr. Watkins is, in fact, correct. I didn't realize that until we just confirmed with Mr. Kosofsky. They're very close but not specifically situated on Converse Street.

THE COURT: All right. Very good. Thank you.

ATTORNEY WATKINS: So, Your Honor, I guess now I'm wondering what's left of his testimony that we are going to hear. I'm just quite concerned again.

THE COURT: What's left is, I had a motion in limine, I live in this neighborhood, here's the population density in the neighborhood, here's the buildings that I can see around my immediate neighborhood. It's not going to include synagogues, but it can include buildings.

There's going to be no testimony regarding -- there's going to be no overt testimony regarding the religious nature of buildings or the character of the neighborhoods.

Now, I say "overt" because you can't hide the makeup of a neighborhood, and that is what it is.  All right?

ATTORNEY WATKINS:  Your Honor, I'm concerned that I'm going to have to keep on objecting as we go through the testimony.

THE COURT:  All right.

ATTORNEY WATKINS:  It sounds like it's short enough that we can do a quick voir dire to make sure.

THE COURT:  All right.  No, I think -- Mr. Kosofsky's testimony has grown a life of its own, and I don't -- and I think that's a little overplayed at this point.  Let's call him.  I think -- obviously, if something comes up, object right a way, but I'm thinking this is going to come and go without much happening.

ATTORNEY BRESLOW:  May I, Your Honor?

THE COURT:  Yes.

ATTORNEY BRESLOW:  It should be brief.  What we want to avoid, as much as Mr. Watkins, is interruptions in Mr. Kosofsky's testimony because of what he may say.  So I would like to just, once again, proffer very briefly to the Court his expected testimony so that to the extent that there are any issues --

THE COURT:  Okay.  We've been through this several times, so very briefly.

ATTORNEY BRESLOW:  Okay.  Very briefly, he will

say where he lives; what is located directly across the street, which is the Jewish nursing home complex. He'll say he's familiar with it because he, as part of his position, does work there from time to time; that he provides pastoral care there; that he brings children there from time to time on certain holidays; and that he delivers newspapers to people in Genesis House and I believe Ruth's House.

He will describe the campus and the buildings that they contain. He'll talk about the foot traffic and vehicle traffic on the road directly across the street from his house, which is the driveway entrance to Ruth's House and Genesis House.

He'll talk about the vehicular traffic on Converse Street, the foot traffic on the sidewalk. He will talk about the traffic coming in and out of the driveway. He will talk about the busses that pass on the street, as well, that's part of the vehicular traffic and the fact that they bear signs that say "Jewish Home" on their marquees.

He will say that on the morning in question he was home along with a large group of his family members who were living with him. That's it.

THE COURT: All right. Can we get the jury in?

CLERK RIVERA: Yeah.

ATTORNEY WATKINS:  Your Honor, we're also going to hear the prior bad act evidence at some point today.  I know the Court's already ruled on that, but I would like the opportunity to make the record one more time before that comes in.

ATTORNEY BRESLOW:  We'll be hearing Mr. Kosofsky, Natalie Rathbun, and then three witnesses relating to the events on March 3rd, Alfie Alschuler from All Energy Solar, and then the police officer from Chicopee, and the woman that he was with that night, Dana Graham.

THE COURT:  Okay.  Do you think we can do this over WhisperTech or it's more involved than that?

ATTORNEY WATKINS:  I'm sorry, Your Honor?

THE COURT:  Can we use WhisperTech to talk about issues you want to talk about?

ATTORNEY WATKINS:  Your Honor, just to make a complete record, it's going to be about five minutes or so.  We might be able to make it to the break.  Well, probably not, but --

THE COURT:  We'll see.  We'll see how far we make it.  Maybe we'll make it to the morning break.

ATTORNEY WATKINS:  We'll do the best we can.

THE COURT:  Okay.

ATTORNEY WATKINS:  I do expect these first two

witnesses, all of the witnesses today to be fairly quick.

THE COURT:  Right.

ATTORNEY BRESLOW:  Those four all should be relatively quick, Your Honor, with the exception of Natalie Rathbun.  You may recall her testimony.

THE COURT:  I do.

ATTORNEY DESROCHES:  Your Honor, while we wait, I just want to notify the Court and I think the defendant that Daniel Marshall, the witness on the government's witness list, is traveling from Ohio.  He cannot be here until Friday.  So just in terms of scheduling, I'm not sure how quickly we'll get through witnesses, but I just wanted to flag that for the Court for now.

THE COURT:  Is there a chance you might finish with everything and we will have to wait for him?

ATTORNEY DESROCHES:  There is a chance, yes.

THE COURT:  Okay.  We'll deal with it.

ATTORNEY DESROCHES:  Thank you.

**(The jury entered at 9:18.)**

THE COURT:  Everyone can be seated.

Okay.  Good morning, everyone.  Was everyone able to follow my instructions, the standard instructions, no talking to each other anything about the case?  No talking to anyone else about the case on the phone or in person,

your friends, family?  No looking at any media reports, radio, TV, newspaper, if there were any, no internet, no Google, blogging, Facebook, one way or another posting or reading about the case?

Was everyone able to follow no visiting the sites or legal research?  Everyone able not to do any of that?  All right.

Affirmative answers from every single member of the jury.  They remain fair and impartial.

All right.  Government, you have the next witness.

ATTORNEY BRESLOW:  Thank you.  Good morning, Your Honor.

The government calls Chaim Kosofsky.  Your Honor, may we request that the witness sit in the smaller chair, please?

THE COURT:  Sure.  That's fine.  The one that he just passed.

CLERK RIVERA:  Sir, can you please stand and raise your right hand?

THE WITNESS:  I'm not hearing you well.

CLERK RIVERA:  Can you please stand and raise your right hand?

THE WITNESS:  Okay.

**Chaim Kosofsky (Sworn)**

THE WITNESS:  I affirm.

THE CLERK:  You may be seated.

**DIRECT EXAMINATION**

Q.  (By Attorney Breslow) Good morning.  Can you please introduce yourself to the jury?

THE COURT:  Sir, excuse me.  I don't want to interrupt you before you start talking, but you can take your mask off when you're behind the Plexiglass screen.

ATTORNEY BRESLOW:  Thank you, Your Honor.

THE WITNESS:  Thank you.

Q.  (By Attorney Breslow) So, once again, can you please introduce yourself to the jury?

A.  My name is Chaim Kosofsky.

Q.  Mr. Kosofsky, could you just spell your name for the record?

A.  Sure.  C-h-a-i-m K-o-s, like Sam, o-f, like Frank, s-k-y.

Q.  So good morning.  It seemed like when you first came you had some difficulty hearing the deputy?

A.  Correct.

Q.  Are you wearing hearing aids right now?

A.  Yes, I wear hearing aids.

Q.  Okay.  So the room has some natural acoustics to it. If you have difficulty hearing, please let me know so that there's no miscommunication between you and I.

A.  Thanks.  Thanks.  It's not just about the volume.

It's more about background noise and echoes.

Q.   Yes, please let us know if, for some reason, you're missing even a word, just please let us know.  Don't be -- it's perfectly okay for you to do that.

A.   Okay.  Thanks.

Q.   All right.  Please tell the jury where do you live?

A.   I live at 795 Converse Street in Longmeadow.

Q.   Who do you currently live with?

A.   I live with my wife and one daughter.

Q.   How long have you and your family lived there?

A.   We have been at this address since August 2010.  So this summer is 11 years.

Q.   What campus is located directly across the street from your house?

A.   I live across the street from the campus of the Jewish Nursing Home.

Q.   Okay.  I'd like to focus now on your home and that Jewish Nursing Home campus.

ATTORNEY BRESLOW:  May we display PX-23 which is already in evidence to the entire courtroom?

THE COURT:  No objection -- any objection to that?

ATTORNEY WATKINS:  No, Your Honor.

THE COURT:  All right.  Go right ahead.

Q.   (By Attorney Breslow) I don't believe defense

counsel -- okay.

Counsel and the witness, can you see PX-23?

A.   Yeah.

Q.   Okay.  Great.  Do you recognize this location?

A.   Sure.

Q.   What is it?

A.   This is across from my house.  It's the entrance to Ruth's House and Wernick Adult Day, which are at the -- in the back of the campus of the Jewish Nursing Home.

Q.   Okay.  So this is one of the entrances to the Jewish Nursing Home campus?

A.   That's correct.

Q.   Now, is there a similar sign for the Jewish Nursing Home campus located elsewhere on Converse Street a short while away?

A.   Yes, actually, there are two.  This is the one in the middle.  So if you're looking straight ahead a little ways down is a sign for the entrance -- for the Jewish -- for the main entrance of the Jewish Nursing Home.  That sign -- this sign is perpendicular to this street.  That one is parallel.

Q.   Meaning so that the lettering faces out onto Converse Street?

A.   It faces straight to Converse, yes.

Q.   Okay.

A.   And the other sign, from this view, is behind at the entrance for Genesis House.

Q.   Okay.

A.   The other one is one way and it forms a horseshoe that goes around, and this is the exit.  This is the exit for the other one, and it's also the entrance for the two -- for the two facilities in the back of the campus.

Q.   And those being Ruth's House and Wernick Adult Day Care?

A.   That's correct.

Q.   Just to be clear, when you say "the other one," are you referring to another entrance?

A.   Yes.

Q.   Okay.  Now, how -- we can keep it up for a moment. How prominent or visible, if at all, are these three signs?

            ATTORNEY WATKINS:  Objection.

            THE COURT:  Overruled.

            THE WITNESS:  These three signs are visible to the street.  They're near the street.

            ATTORNEY BRESLOW:  I'd like to display PX-22 now to the entire courtroom.  It's already in evidence.

Q.   (By Attorney Breslow) Do you recognize PX-22?

A.   Yeah.

Q.   What does it depict?

A.   It's a view of my house and my neighbor's house from the campus of the Jewish Nursing Home.

Q.   Okay.  And if we can focus on the house to the right located in the middle of the picture for a moment.  If we can zoom that up?

A.   To do -- I didn't hear.  Is that a question?

Q.   I didn't have a question.  I was just directing -- I was just asking our legal assistant to make a larger zoom of a piece of this photograph.

Now, do you recognize the photograph that is zoomed up?

A.   Yes, that's my house.

Q.   That's your house.  Okay.  And immediately to the left is the sign that we just looked at?

A.   Yes.

Q.   Okay.  We can take that down.

Let's take a look at PX-28, and what is depicted here?

A.   This is also across from our house, taken across the street from our house.  The house in the center is my neighbor's house, and our house at the extreme right of the picture is the driveway, the entrance to my house, and you can see the mailbox -- our mailbox there.

Q.   So can we zoom in on the mailbox in that driveway just so that it's clear for the jury.

What we are looking -- what are we looking at right now?

A.   That's my driveway and a portion of the garage.

Q.   Okay.  I'd like to display PX-29.  It's the last of these photographs.

What is depicted here?

A.   That's our house in the center of the photograph right next to -- in the picture, it's next to the stop sign.

Q.   Now, I'd like to focus you on the tree in the foreground.  Do you see that?

A.   Yeah.

Q.   Approximately how many yards is that tree from your own home?

A.   About 25 yards or so.

Q.   Now, were you home on the morning of April 2, 2020?

A.   Yes.

Q.   Without naming names, can you tell the jury who was home with you that morning?

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.

THE WITNESS:  This was just a couple of weeks after --

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.  The question was just

who was home with you.

THE WITNESS:  At that time, I had all of my children and grandchildren with us at the house.  We have six children.  The oldest is early thirties and the youngest were two teenagers.  At the time, we had three married children.  Their wives were also with us and our grandchildren, the youngest was a newborn.  The oldest was two years old.  So we had a total of 15 people at the house, 11 adults and 4 kids -- 4 babies.

Q.   (By Attorney Breslow) Now, I'd like to focus on the Jewish Nursing Home campus across the street from your home.  Are you familiar with it?

A.   Yes.

Q.   Please tell the jury very briefly how are you familiar with it?

A.   I am a rabbi at the Yeshiva Academy, and one of my responsibilities is to do pastoral visits to people at home and in their office.  So I visit patients at the Jewish Nursing Home as needed a couple times a month.  Our -- the children in our school visit for holiday programs, such as Hanukkah, and I sometimes accompany the group.

We provide some holiday services at the different facilities within the campus of the Jewish Nursing Home such as brief services, Rosh Hashanah afternoon for the

people who find it difficult to attend synagogue.  And I also deliver a Jewish newspaper that's in the Russian language to about two dozen people who live in the Genesis apartments.  If no one's home, I leave the paper under the door.  If someone's home, I go in.  We can talk for 10 or 15 minutes, and I may also say a prayer with them at that time.

Q.    Okay.  And through the course of this work, are you familiar generally with the population in the various buildings, meaning the number of people generally who tend to occupy these buildings?

A.    Roughly.

Q.    And if you could tell the jury -- I know you're not counting them literally, but if you could tell the jury roughly approximately how many people, based on your own personal interaction with that campus, occupy the buildings that you visited including Genesis House?

A.    Genesis House has five buildings with roughly a hundred apartments.  Ruth's House in the back has, I would say, about 30 to 40 apartments for assisted living.  There's also a dementia unit, and the Jewish Nursing Home itself has about 200 beds.  There's also a new rehab center and that has probably room for 40 or 50.

Q.    Okay.  And the rehab center, is that overnight stay or day stays?

A.    Overnight or?

Q.    I'm sorry.  The rehab center that you just mentioned, do people live there or do they just come and go during the day?

A.    People are there for several weeks at a time.

Q.    Okay.

A.    For a week, two weeks.

Q.    In addition, based on your own personal interactions with the campus, is there also a day care facility?

A.    Yes, and that is located -- the access to it is through the driveway that we just looked at on the picture.

Q.    Okay.  I'd like to put that up on the screen.  It's PX-23 one more time.

      And so focusing on the sign, is the Wernick Adult Day Healthcare the institution that we just talked about?

A.    Yes.

Q.    And do you have a rough estimate based on your own personal interactions with that facility, how many people might be there on any given day?

A.    About two or three dozen.

Q.    Just to be clear, those people aren't staying overnight.  They're coming for the day and then leaving the way there would be a child day care?

A.    Correct.

Q.    Now, if we could just keep PX-23 up.

From your home, have you had the opportunity to observe the foot traffic on the sidewalk in this photograph as well as the vehicle traffic on Converse Street also in this photograph?

A.    Very much.

Q.    Okay.  So I'd like you to tell the jury what hours of the day or night have you seen people using the sidewalk?

A.    People use the sidewalk throughout the day.

Q.    And does that include the early morning?

A.    Yes, although not as frequent.

Q.    And what have you personally seen people doing using the sidewalk?

ATTORNEY BRESLOW:  Your Honor, may we go to WhisperTech for a moment?

**(Sidebar conference.)**

ATTORNEY BRESLOW:  Your Honor, this question is not, not intended to elicit anything regarding religious people walking on the sidewalk to and from synagogue.  It is intended to elicit his observations that people, you know, stroll with their kids, they run, they walk on that sidewalk.  Just to be sure that this witness doesn't stray, I'd like permission to approach and remind him of that limitation with permission of defense counsel.

THE COURT:  I'm fine with that.  What does the

defense say?

ATTORNEY BRESLOW:  Mr. Watkins can accompany me if he would like.

ATTORNEY WATKINS:  I'm -- it's interesting. I've never seen it done before.  Visually, the jury is going to see Mr. Breslow walking over and chatting with this witness in the middle of his testimony.  From a trial lawyer perspective, I'm trying to figure out how that looks.  Mr. Breslow has prepped this witness.  One would think that was already discussed.

THE COURT:  Was it already discussed with him, Attorney Breslow?

ATTORNEY BRESLOW:  Yes, it has.

THE COURT:  So why don't you lead him?

ATTORNEY BRESLOW:  Okay.

THE COURT:  Instead of approaching, just lead him.  He seems like a very intelligent person.  I'm sure he's going to remember the information.

ATTORNEY BRESLOW:  Yes, very good.  I'm just really careful about recognizing Your Honor's lines.

THE COURT:  All right.  We're all set.  Thanks.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) Mr. Kosofsky, we were just about to discuss your observations of the foot traffic along that sidewalk in PX-23.  So, generally, without

regard to anything religious, what have you seen people do on that sidewalk?

A.   People walk.  Walk their dog or their dogs.  Ride bikes, push strollers, and even pushing people in wheelchairs, taking out for fresh air.

Q.   And focusing on the people in wheelchairs, do you understand those people -- what relationship, if any, do you understand those people to have with respect to the campus that's right on the other side of that crosswalk and sidewalk?

A.   I assume it's from the --

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.

Q.   (By Attorney Breslow) Okay.  We'll move on.

In addition, have you seen people --

THE COURT:  Ladies and gentlemen, when I say "sustained," you know that that question is off limits. When I say "sustained," so any answer that might have been given before I made the ruling is stricken so that the partial answer or whatever part of the answer was given, that was just given by Mr. Kosofsky is erased from your memory, stricken.  All right?

ATTORNEY WATKINS:  Your Honor, may we be heard briefly for one moment as well before the next question?

**(Sidebar conference.)**

ATTORNEY WATKINS:  So Mr. Breslow prefaced this question with aside from religious purposes or religious activities, I forget the exact word.

THE COURT:  Yes.

ATTORNEY WATKINS:  Which is exactly, exactly what we were trying to avoid here.  Now he's suggested to the jury without the witness testifying that there are other people that are doing religious activities there.

THE COURT:  Yes.

ATTORNEY WATKINS:  I don't know what to do about that at this point.  If the Court were to say to ignore Mr. Breslow's statement, that's going to bring continued focus on this.  This is precisely the problem -- precisely the problem with the government calling this witness where they're afraid he's going to say religious-themed messages because that is who he is.  I'd ask the Court --

THE COURT:  I disagree as to the problem and how the problem was caused.  There's no indication that this witness was anything but well prepared and that he would have said something.  It seemed to me that he would not have said something.  He was instructed not to.

I clearly agree with you when noticed the prefacing of the question of nonreligious.  I thought using that was unnecessary and perhaps gratuitous.  I just didn't see the point of asking the question that way.

There is no fixing it.  I don't think it helps by me going back and talking about striking that religious portion of the question.  I think, in whole, looking at this testimony as a whole, it's not quite as problematic as you are arguing that it is because Mr. Kosofsky testified about his pastoral service on the campus and also service that has to do with schools and then just about his observations as a neighbor, someone who lives across the street.

So a question that said, you know, aside from your pastoral or religious service or where you work for the school, just like what do you notice generally would have been fine.  That's not the way it was asked.  But I think in larger context it's -- you're overly sensitized to this.  I get it.  I understand that, Attorney Watkins.  In the overall picture, I'm not happy with how the question was asked, but I don't think it had the impact that you're suggesting it had, and I don't quite know that there's a remedy available.

ATTORNEY WATKINS:  The remedy is mistrial, Your Honor, and that's what we'd move for.

THE COURT:  That question falls far, far short of justifying a mistrial request.  All right.  Move on.

ATTORNEY BRESLOW:  If I may be heard briefly?  I was attempting to lead the witness away --

THE COURT:  Go ahead.

ATTORNEY BRESLOW:  Just to confirm, I was attempting to lead the witness away from the area that Your Honor did not want us to address.  If I did that clumsily, I apologize to Mr. Watkins and the Court, but that was the purpose.

THE COURT:  Right.  Well, I do think, as I just gave an example, there would have been other ways to handle it that might have made that smoother and avoided the reaction from the defense, but I've addressed the issue.  So let's move on.

ATTORNEY BRESLOW:  Okay.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) Mr. Kosofsky, returning to the foot traffic on the sidewalk directly across from your house, I think you testified earlier that the frequency depended on the time of day; but, generally speaking, could you tell the jury, based on your own personal observations, approximately how many people use that sidewalk particularly in the morning?

A.   Particularly in the morning?

Q.   Uh-huh.

A.   Offhand, during the day, I would say about 10, 12 people an hour.  My wife and I walk in the morning at six a.m. and --

ATTORNEY WATKINS:  Objection.

THE WITNESS:  We pass people -- sorry.

THE COURT:  And the objection?  Overruled on the objection.

THE WITNESS:  And we --

ATTORNEY WATKINS:  Can we have the question, please?

THE COURT:  I don't think he was finished answering his question.

ATTORNEY WATKINS:  I thought the question was how many people came by the house was answered.

THE COURT:  I just don't think he was finished because your objection at least stopped me from hearing it.

So the answer was your wife and yourself walk at six a.m.  And you were about to say do you notice the number of people walking also in the morning?

THE WITNESS:  We pass about half a dozen people riding bikes, running, walking their dog.  Maybe six people, a few more, six to eight, six to ten.

THE COURT:  What's your route in the morning?  Which direction do you go?  Or do you go onto the grounds across the street?

THE WITNESS:  We do not cross the street.  We -- from the house, we turn left and we walk about a mile and

then we turn around and come back.

THE COURT:  And you stay on your side of the street?

THE WITNESS:  Yes.

THE COURT:  Okay.  Do you happen to note that the foot traffic is greater on your side of the street where your house is or on the other side of the street, just from your observations of living there?

THE WITNESS:  About even.

THE COURT:  About even.  All right.  Thanks.

ATTORNEY BRESLOW:  May we continue, Your Honor?

THE COURT:  Yes.

Q.   (By Attorney Breslow) So that's the foot traffic on that sidewalk.  I'd like you now to focus on the vehicular traffic on Converse Street to the left of this photograph.

What kind of vehicles use Converse Street?

A.   Obviously cars but also trucks, 18-wheelers come down this street regularly during the street especially during the daytime.

Q.   And what other vehicles in addition to cars and trucks do you see?

A.   Bicycles, but a lot -- throughout the day, ambulances, the town ambulances coming into this driveway here and go to Genesis and also the next driveway which is into the nursing home itself.

Q.   Okay.  And in addition to all of those vehicles, what about buses?

A.   The city bus comes down here, the PVTA.  And, in fact, the Jewish Nursing Home is the end of the line of the bus.

Q.   Okay.  And what hours of the day or night, based on your own personal observations, have you seen all of this traffic come back and forth on Converse Street directly across from your house?

A.   Throughout the day.  At night it's much lighter, but throughout the day.  There are times when I have to wait a few minutes to turn out of my driveway even just to turn right.  Usually, I avoid turning left.

Q.   Why is that?

A.   Because there's -- because of all the traffic that's coming by and there's no break in the traffic.

Q.   And how would you describe the traffic in the morning, say from six to eight in the morning for example?

A.   It's getting heavy.  There are trucks, like the smaller trucks going to work, not the 18-wheelers, but like company trucks that are -- a lot of them going by at this time.

Q.   Okay.  Now, I want to focus you away from the traffic on Converse Street and now just on the traffic going from Converse Street into the Jewish Nursing Home campus

through this driveway and out of the Jewish Nursing Home campus through this driveway.

Based on your perspective as the neighbor across the street, have you been able to observe that traffic, the traffic coming in and out of that driveway entrance?

A.   Definitely.

Q.   Okay.  So please tell the jury what kind of traffic comes in and out and at what hours of the day or night?

A.   This is a busy driveway.  The cars are coming in and out throughout the day and even throughout the night.  As I mentioned, ambulances are coming in several times a day but the traffic of cars that come in and out does go on throughout the night.

Q.   And throughout the early morning as well?

A.   Yes.

Q.   I'd like you to focus a moment on the buses.

And may we display only to the Court, counsel, and the witness PX-133?

Do you recognize this?

A.   Yes, this is the bus schedule.

Q.   And, in particular, is it the bus schedule for --

A.   It goes --

Q.   If you can wait just one moment, Mr. Kosofsky.

THE COURT:  I'm sorry.  Go ahead.

ATTORNEY BRESLOW:  Go ahead?

THE COURT:  Yeah.

Q.   (By Attorney Breslow) So you just testified that is the bus schedule, and I'm asking now, in particular, is this the bus schedule or the G-5 bus, the very bus that you described traveling along Converse Street and having as a destination the Jewish Nursing Home campus?

A.   Yes.

ATTORNEY BRESLOW:  Okay.  Your Honor, I'd offer this into evidence now.

THE COURT:  To the defense?

ATTORNEY WATKINS:  Relevance?

THE COURT:  Overruled.  It's allowed.

ATTORNEY BRESLOW:  So if we can display this now to the entire courtroom?

THE COURT:  Let's mark it first.  It's going in as the PX-number?

ATTORNEY BRESLOW:  Yes, PX-133, Your Honor. It's the first new exhibit of the morning.

**(Government Exhibit PX-133 admitted.)**

THE COURT:  So, ladies and gentlemen, I wanted to say a few words to you about our exhibits.  If you've noticed all the exhibits or at least most of the exhibits seems to have a reference called PX and a PX number, and then you've noticed that yesterday I would always ask the clerk, okay, what is PX-number whatever.  Just give it a

regular number.  So PX No. 5 became Exhibit No. 8.

Everyone agreed that doing it that way becomes too -- is going to be too confusing.  So we actually have an evidence exhibit witness list and sheet that keeps track of all of these exhibits that are coming in.  So we are going to go back to a format that everyone is more prepared to deal with and not cause any confusion.  So everything is going to be marked by its PX-number.

The thing was, the PX numbers were all premarked. It's the parties working together before trial to get everything organized.  So when things come into exhibits with a PX number, they might not be in sequence.  You might have PX-2, PX-3, PX-17, PX-21, and then PX-3.  So we were trying to do it in a way that would have some numerical consistency, obviously one, two, three, four, five but, you know, sometimes the best plans don't work. So I just wanted you to know that's why we switched from what we were doing.  So now you're to going to hear PX numbers, and we're going to stay with the PX-numbers as identifying exhibits.

I think you know this.  I think I might have told you, but I'll emphasize, anything that comes in with exhibits, if it comes in as an exhibit, you're getting it when you go to deliberate.  You're going to have it.  All right?

ATTORNEY BRESLOW:  Can we continue?

THE COURT:  Yes.

ATTORNEY BRESLOW:  Thank you, Your Honor.

So I'd like to zoom in for the witness and the jury on the third column in on the left.  I don't think this has been published yet.

Madam Clerk, may we please publish this to the jury now that it's in?

THE COURT:  It can be published.

ATTORNEY BRESLOW:  Oh, is it in?  Okay, great.

Q.  (By Attorney Breslow) If we can take that down and just focus on the third column from the left that's entitled "Jewish home."  Do you see that, Mr. Kosofsky?

A.  Yes.

Q.  And based on your own personal observations, does this appear to be a fair schedule of the bus traffic throughout the day?

THE COURT:  Can we hold on one second?

ATTORNEY BRESLOW:  Yes.

THE COURT:  I think the juror just broke a monitor.  So he might have to buy it.

**(Laughter)**

THE COURT:  But let's just make sure everything is working.

Are we good?  Okay.

ATTORNEY BRESLOW:  All right.  Let me just repeat the question so that it's clear.

Q.   (By Attorney Breslow) So focusing in on this column, Mr. Kosofsky, based on your own personal observations of the bus traffic, how does this compare -- how does this schedule compare with the stops that you've seen the bus make at the Jewish Nursing Home?

A.   Offhand, it looks good.

Q.   Okay.  And if we can focus on the other column entitled "Jewish home," and it's the same question, how does this compare based on your own personal observations of the bus route for this part of the schedule?

A.   It looks about right.

Q.   Okay.  And just so that it's clear, the 6:40 and the 7:15, those are stops in the morning?

A.   Yes.

ATTORNEY BRESLOW:  Okay.  I'd like to move on and I'd like to display for the Court, counsel, and the witness only PX-134, which I believe, is a four-page exhibit.

THE COURT:  All right.

Q.   (By Attorney Breslow) And if we can just page through this for a second or two just so you've seen every page of the exhibit.

All right.  Mr. Kosofsky, have you seen every page?

A.   Yes.

Q.   Do you recognize the location and the vehicle in these photographs?

A.   Yes.

Q.   And, generally, what does it depict?

A.   It's the bus waiting at the stop in front of the -- in the entrance to the Jewish Nursing Home.

Q.   Now, earlier you stated that there were three separate entrances to the Jewish Nursing Home with the one in the middle directly across the street from your house?

A.   Yes.

Q.   Which entrance is this?  Is it the one on Converse Street as you turn left away from your house, or is it the one on the right farther to Genesis House?

A.   Are you asking from standing in front of my house or from standing from the point of view of the photograph before -- across the street?

Q.   Why don't we do it just from the perspective of your house.

A.   Okay.  So looking from our house, this is to the left.

Q.   Okay.  What direction is that, just so we are clear, towards East Longmeadow or towards Springfield?

A.   It's towards West Springfield.

Q.   Okay.

A.   So this is heading west from my house.

Q.   So that's where these photographs are taken?  And are they fair and accurate photographs of the G-5 bus at that stop for the Jewish Nursing Home?

A.   Yes.

Q.   Okay.

ATTORNEY BRESLOW:  Your Honor, I'd like to offer this into evidence as well.

ATTORNEY WATKINS:  Relevance.

THE COURT:  Can you go through the pictures again?

ATTORNEY BRESLOW:  If we can just display them slowly.

THE COURT:  All right.  I think there is relevance.  I don't think we need multiple pictures.  The first picture of the bus parked, if the government wants to offer that one, that's allowed.

ATTORNEY BRESLOW:  Okay.  If we can just display that just to the Court, counsel, and the witness?

THE COURT:  Right.  That's the one you had asked Mr. Kosofsky about.

ATTORNEY BRESLOW:  Okay.  So then just to be clear, PX-134, page one and page one only is in evidence?

THE COURT:  Right.

ATTORNEY BRESLOW:  Okay.

THE COURT:  Over objection, yes.

**(Government Exhibit PX-134 admitted.)**

ATTORNEY BRESLOW:  Okay.  So if we can display that page and that page only to the entire courtroom, including the jury?

THE COURT:  Sure.

ATTORNEY BRESLOW:  If we can zoom in on the marquee that says G-5?

**(Indicating.)**

ATTORNEY BRESLOW:  Maybe take out the zoom.  Can you read the text next to G-5?

THE COURT:  It's readable.

ATTORNEY BRESLOW:  Is it readable?

THE COURT:  I think it's readable.

ATTORNEY BRESLOW:  Okay.

Q.    (By Attorney Breslow) So could you read that aloud to the jury?

A.    Jewish home via Dickinson.

Q.    And can you explain what "via Dickinson" refers to?

A.    What "via Dickinson" refers to?

Q.    Yeah.  Is Dickinson -- I'll just --

A.    Dickinson --

Q.    Is that another street nearby?

A.    Dickinson is a street that's adjacent to this entrance, a few hundred yards to the east from this --

from the view over here is -- I'm sorry -- to the west. From the view over here, it's to the right.  And Dickinson Street ends at Converse Street and it goes all the way -- about a mile and a half up to the X and past that. Dickinson goes --

Q.   That's fine.

A.   That's enough?

Q.   I'm just asking -- it's a neighboring street?

A.   It's a neighboring street, correct.

Q.   All right.  So based on your own personal observations of these buses driving up and down on Converse Street, are you able to view the marquee on the side of the bus?

A.   Yes.

Q.   What does that say?

            ATTORNEY WATKINS:  Objection.

            THE COURT:  Sustained.  We've been -- asked and answered.

            ATTORNEY BRESLOW:  Your Honor, I have no further questions.

            THE COURT:  Okay.  Very good.  Thank you.

            ATTORNEY WATKINS:  Just a couple, Your Honor. May I get my computer?

            CLERK RIVERA:  Yes.

**CROSS-EXAMINATION**

Q.    (By Attorney Watkins) Good morning, sir.

A.    Hi.

Q.    I'm about to put up Government Exhibit PX-23.  Do you see that in front of you?

A.    Yes.

Q.    In regard to the bus, as I understand it, the bus goes in the next entrance that we would see if we kept on down this street, right?

A.    Yes, that's right.

Q.    Where it stops, it stops at the nursing home portion of the campus, right?

A.    That's correct.

Q.    From there, it turns around to go back to Springfield; is that right?

A.    Yes.

Q.    So the bus never comes by this entrance at all?

A.    Right.  It could be it comes occasionally but generally, as far as I know, it ends over there.

Q.    In regard to your house which we've seen pictures of but generally the street, you have a driveway at your home?

A.    Yes.

Q.    And that's where you park your vehicles, your cars?

A.    Yes.

Q.   Do you park out on the street on Converse?

A.   No.

Q.   There's no parking on Converse Street here, right?

A.   No.

Q.   There's a bike lane on both sides that I think you told us bicycles go through, right?

A.   Yes.

Q.   And it would be illegal to park there, right?

A.   Currently, yes, once the bike lanes were put in.

Q.   And you see across the street here where there are these leaves covering a portion right next to Converse Street?

A.   Yes.

Q.   And the leaves are covering up both the bike lane and also --

ATTORNEY DESROCHES:  Your Honor, I'm sorry to interrupt but a juror is --

A JUROR:  I have a question.  Are we supposed to be seeing this?

ATTORNEY WATKINS:  I thought this was up.  This has been admitted.

THE COURT:  Yes.  You are supposed to be seeing it, so thank you for that.  So let's rewind.

ATTORNEY WATKINS:  I will rewind.  I'll be quicker this time.

Q.    (By Attorney Watkins) This is looking, looking forward to the entrance to the Jewish Nursing Home portion of the campus, right?  What you referred to as the Jewish Nursing Home?

A.    Yes.

Q.    And that's where the end of the bus route is, right?

A.    Yes.

Q.    And once the bus goes in there, it turns around to go back to Springfield?

A.    Yes.

Q.    Okay.  Now, here you see the leaves on this portion next to the sidewalk?

A.    Yes.

Q.    Those leaves are covering up both the bike lane a little bit and also a strip of grass right next to there, right?

A.    Yes.

Q.    Do cars park on that strip of grass along Converse Street or in front of the Jewish Geriatric Services?

A.    No.  Once in a while, police pull someone over, but that's occasionally.

Q.    Aside from police activity, would there be somebody pulling over onto that grass land --

A.    No.

Q.    -- portion of it?

A.   No.

Q.   Even if one were to stop in the bike lane, one would be getting in the way of all that traffic that goes back and forth on Converse Street; is that correct?

A.   It would be an obstruction.  There is room to go, but it would block it.  It would somewhat block the road.

ATTORNEY WATKINS:  I have nothing further, Your Honor.

THE COURT:  All right.  Thank you.

Anything else?

ATTORNEY BRESLOW:  One moment, Your Honor?  Nothing further, Your Honor.

Mr. Kosofsky, thank you.

THE COURT:  All right.  Thank you, sir.  You can step down.

THE WITNESS:  Okay.  Thank you.  Thanks.

ATTORNEY BRESLOW:  Your Honor, the next witness is Natalie Rathbun.

THE COURT:  All right.

Attorney Watkins.

**(Sidebar conference.)**

THE COURT:  Did you indicate that you wanted to talk to me before this witness?

ATTORNEY WATKINS:  Not before this witness, Your Honor.  This is Natalie Rathbun.  I don't believe that

she's getting into any prior bad acts here.

THE COURT:  I was just checking.  I thought this was the witness you wanted to talk to me about.

ATTORNEY WATKINS:  I think it's the witness who's coming up directly after her.

THE COURT:  Well, flag the issue so we can get back on this when it's time.  All right.  Thanks.

ATTORNEY WATKINS:  Thank you.

**(End of sidebar conference.)**

ATTORNEY BRESLOW:  Madam Clerk, should I clean this witness table for the first time?

CLERK RIVERA:  She can use the big one.

THE COURT:  The second one, the bigger one.

ATTORNEY BRESLOW:  I just wanted to know if I should be cleaning it first?

CLERK RIVERA:  I got it.  Thank you.

Ms. Rathbun, can you please stand and raise your right hand?

**Natalie Rathbun (sworn)**

CLERK RIVERA:  You can be seated.

**DIRECT EXAMINATION**

Q.    (By Attorney Breslow) Good morning.

A.    Good morning.

Q.    So, yes, you can take your mask down.

Good morning.

A.   Good morning.

Q.   How are you?

A.   I'm good.  How are you?

Q.   Good.  Could you please introduce yourself to the jury?

A.   Yes.  My name is Natalie Rathbun.

Q.   And, Ms. Rathbun, how old are you?

A.   I'm 19.

Q.   And how far have you gotten in school?

A.   I just finished my freshman year of college.

Q.   If we can just wait a minute.

THE COURT:  I'm sorry for the timing.  We're going to need to take about a ten minute break.  All right?  We're going to have you right back.  All right?  So put your mask on and you can go wait in the hall, and we'll call you right back.

CLERK RIVERA:  All rise.

THE COURT:  Ladies and gentlemen, the instructions apply, all the same instructions apply not to talk about the case, access the case on your phone, internet, anything else.  Every instruction I gave applies every time you leave the courtroom no matter how short.  Okay?

**(The jury left at 10:07.)**

THE COURT:  Okay.  A juror had requested a

bathroom rest break. So everyone can -- this will be our morning break. It'll probably stretch to 15 minutes. This will be what we would usually take as our break.

ATTORNEY BRESLOW: So we'll come back at 10:25, Your Honor?

THE COURT: That is pretty early, yes. Come back at 10:20. We are going to try to -- what do you think, Christina?

All right. Okay. So 11:25.

CLERK RIVERA: 10:25.

THE COURT: I'm sorry, 10:25. Thank you.

**(A recess was taken at 10:08 until 10:22.)**

ATTORNEY BRESLOW: Your Honor, would you like Ms. Rathbun in the witness chair before the jury comes in?

THE COURT: Sure. It doesn't really matter, but that will work.

ATTORNEY BRESLOW: I will get her right now.

**(The jury entered at 10:25.)**

THE COURT: Everyone can sit down.

During that short break, did everyone follow my instructions not to talk to each other, anyone else, research the case, internet access the case, post or read any social media about the case? Follow my instructions?

All right. Everyone answered yes, affirmatively they followed my instructions. The jury remains fair and

impartial.  All right.  Go right ahead.

ATTORNEY BRESLOW:  Okay.

Q.    (By Attorney Breslow) Good morning again.

A.    Good morning.

Q.    So could you just please just reintroduce yourself to the jury?

A.    Yep.  My name is Natalie Rathbun.

Q.    And how old are you?

A.    I'm 19 years old.

Q.    And how far have you gotten in school?

A.    I just finished my freshman year of college.

Q.    In addition to going to college, are you also working?

A.    Yes.

Q.    Without saying specifically where, could you tell the jury generally where you work or what you do?

A.    I am waitress at a restaurant in Springfield.

Q.    Who are your parents?

A.    John Rathbun and Mary Diaz.

Q.    Do you recognize John Rathbun in court?

A.    Yes.

Q.    And can you identify him briefly?

A.    Yep.  He's wearing a white shirt with a black tie.

ATTORNEY BRESLOW:  Your Honor, can the record reflect that the witness has identified the defendant?

THE COURT:  Yes.  The witness was looking clearly at the defendant and described his clothing, and there's a close enough familial relationship that identification was made, yes.

ATTORNEY BRESLOW:  Okay.

Q.   (By Attorney Breslow) Natalie, how are you feeling right now?

A.   I'm okay.  I'm feeling a little nervous.

Q.   Okay.  If you need any kind of a break because you can't think clearly or you're too nervous, just please let the Court know.

A.   Okay.  Thank you.

Q.   Can you do that?

A.   Yes.

Q.   Okay.  So you told us just now who your parents are. Who are your grandparents?

A.   Sheila and Jeff Rathbun.

Q.   And what do you call them?

A.   Nana and Popa.

Q.   And whose parents are they?

A.   John's.

Q.   And who raised you primarily?

A.   Primarily, my Nana.

Q.   Where did you grow up, specifically?  What home did you grow up in?

A.    In my grandparents' home at 20 Lori Lane.

Q.    And what town is that in?

A.    East Longmeadow.

Q.    What do you call your father?

A.    John.

Q.    Where did John grow up?

A.    In the same house at 20 Lori Lane, East Longmeadow.

Q.    And for most of your 19 years, where has John lived?

A.    The house at 20 Lori Lane.

Q.    Can you describe the relationship that you have with your grandparents?

A.    Yes.  Our relationship is very close since I have lived with them since I was younger.  So we have a very close relationship.

Q.    Now, can you describe your relationship with John, and specifically -- we'll get into some details later -- but can you describe your relationship with John in 2019 through April of 2020?

A.    During that time our relationship was kind of strained because we would get into arguments a lot, and we didn't really talk to each other that often.

Q.    From January 2020 to April 2020, where did you live?

A.    At my grandparents' house at 20 Lori Lane.

Q.    During that same period of time, where was John living?

A.    The same house, 20 Lori Lane.

Q.    I'd like to focus a little bit on your Nana, Sheila Rathbun.  Where does she work?

A.    She works at Carr Property Management.

Q.    And, generally, do you know what she does for a living?

A.    Yes, she's an accountant.

Q.    How long has she worked for Carr Property Management? You don't have to name a month or year, but approximately if you could just tell the jury for how many years of your life has Sheila worked there?

A.    Very long.  I'd say at least 15 years.

Q.    Now, are you familiar with a place called Genesis House?

A.    Yes.

Q.    Can you tell the jury how did you become familiar with Genesis House?

A.    Genesis House is where my great-grandma used to live.

Q.    Did you have a particular name for her?

A.    No, we just called her great-grandma.

Q.    Great-grandma?  Okay.

       Whose grandmother was your great-grandmother?  If you can talk about which side of your family, was it your mother's side or your father's side?

A.    My father's.

Q.    And whose mother was your great-grandmother?  Was it Jeffrey or Sheila?

A.    Sheila.

Q.    Have you ever visited Genesis House?

A.    Yes.  We visited Genesis House when I was younger.

Q.    What kind of a place is Genesis House based on your own personal memories of Genesis House?

A.    I believe it's like an elderly or retirement home.

Q.    Did your great-grandma die a long time ago?

A.    Yes.

Q.    Now, even though your great-grandmother died a long time ago, sitting here, do you still remember where Genesis House is?

A.    Yes.

Q.    Can you describe, generally, where it is located?

A.    It's located on a street in Longmeadow that I drive past very frequently.

Q.    Okay.  So I take it that it's been a long time since your -- since you've visited Genesis House?

A.    Yes.

Q.    So can you tell the jury if it's been such a long time for you to visit Genesis House, how you still know where it is?

A.    I know where it is because it's located on a popular street that I usually drive by, so I drive by it a couple

of times a week.

Q.    And what street is that?

A.    Converse Street.

Q.    Why do you drive by Genesis House a couple times a week?

        ATTORNEY O'NEILL-GREENBERG:  Objection; relevance.

        THE COURT:  Overruled.  You can answer the question.  Why do you drive by?

        THE WITNESS:  I drive past Converse Street often because that's the street you need to drive on in order to get to the highway from my house.

Q.    (By Attorney Breslow) And by "the highway," can you tell the jury what highway?

A.    91.

Q.    I'd like to focus now, Natalie, on a different topic and that is church, your family and your and John's church?

A.    Okay.

Q.    Are your grandparents, your Nana and Popa, members of a particular church?

A.    Yes.

Q.    And what is that church?

A.    Heritage Baptist Church in Springfield.

Q.    Can you tell the jury who is the pastor of that

church?

A.    Pastor Rowe.

Q.    Do you know Pastor Rowe's first name?

A.    Curtis, yes.

Q.    How often did you attend that church growing up?  And when I say "you," if you could, it's sort of the plural "you."  So that would be you, your Nana, Popa, and John?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

THE COURT:  Sustained.

Q.    (By Attorney Breslow) Okay.  Let's take it one by one.  How often did you attend that church growing up?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I attended it very frequently, at least once or twice a week.

Q.    (By Attorney Breslow) Okay.  And who did you go to church with?

A.    My Nana primarily.  Occasionally, my Popa and John.

Q.    Okay.  And so you sometimes went to church with your father, John?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

Q.    (By Attorney Breslow) Can you tell the jury approximately how frequently, if you remember, and granted

we're talking about a longer period of time, how frequently you attended church with John?

THE COURT:  Sustained.  All right.  I need a time frame in order for this to be relevant.

ATTORNEY BRESLOW:  Okay.

THE COURT:  When I said "sustained," I realize you didn't make an -- it was the objection you formerly made that I was still thinking about.

ATTORNEY O'NEILL-GREENBERG:  Yes.  Thank you.

THE COURT:  Just for the record, it was your previous objection.  There needs to be a time frame.

ATTORNEY BRESLOW:  Sure.

Q.   (By Attorney Breslow)  Let's focus on the period of 2018 to 2020.  The past several years, how frequently did you attend church with John?

A.   Not frequently.

Q.   Okay.  When, approximately, was the last time that you remember John attending church of any frequency?

A.   I would say close to about five years ago is when we would go to church together.

Q.   Now, what involvement, if any, does your Nana Sheila have with Heritage Baptist Church?

A.   She's very involved with the church.

Q.   And can you tell the jury briefly what her involvement is?

A.    Yes.

ATTORNEY O'NEILL-GREENBERG:  Objection as to basis of knowledge.

THE COURT:  Okay.

ATTORNEY O'NEILL-GREENBERG:  She hasn't been there for five years.  So I don't know what time period we're talking about.

THE COURT:  Okay.  Sustained.  If you can give me a time frame and then establish the basis of knowledge.

ATTORNEY BRESLOW:  Okay.  I think Ms. O'Neill-Greenberg mistakenly mischaracterized her testimony as Natalie not being there for five years.  I think that so --

THE COURT:  I understand.  Just I want you to re-ask the question for a basis of knowledge for her knowing the answer to that question and then a time frame of when you're talking about her grandmother's involvement.

ATTORNEY BRESLOW:  Sure.

Q.    (By Attorney Breslow) You testified just a moment ago that your grandmother was very involved in the church.  The question -- the first question is, how do you know that?

A.    I know this because we lived together.  So just in

conversation it will come up, and she'll talk a little bit about what she does at the church for work.

Q.   Okay.  And now with respect to time frame, approximately how long has your grandmother been involved in Heritage Baptist Church?

A.   Since I was born, so very long.

Q.   Okay.  Now just focusing on the same period of time, say 2018 through 2020, through April 2020 the past several years, can you tell the jury based on your own personal interactions with Sheila and your own observations at the church what Sheila's involvement in church is?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I believe she works with the finances, and she also works on the weekly bulletin.

Q.   (By Attorney Breslow) Okay.  Now based upon your time at the church, are you familiar with the kind of religious literature the church keeps on hand for its parishioners, including your family?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  And the objection is basis of knowledge?

ATTORNEY O'NEILL-GREENBERG:  Relevance and she hasn't been to church.

**(Sidebar conference.)**

THE COURT:  So on the objection, did I miss this?  Or I think one of us might have missed this.  I don't know who it was, but I'm not sure -- I'm not sure this witness said that she hasn't been to church in the last five years.  I thought she said her father, John, hadn't been to church in the last five years.  It seems this witness has a pretty consistent connection with the church.  Am I wrong?

ATTORNEY O'NEILL-GREENBERG:  Yes, she hasn't been to church since her -- since 2018, and so this is something we dealt with in the last trial.  Her -- first of all, she has no knowledge of what tracts are or are not at Heritage from 2018 to present.  She's not there.  And, second, her generalized knowledge about what Heritage Baptist does or doesn't have is irrelevant.

THE COURT:  All right.  Government?

ATTORNEY BRESLOW:  Well, Your Honor, the first thing I'll note is that from 2018 to 2020 is two years, not five.

The second thing I'll note is that I believe Ms. O'Neill-Greenberg has twice, I think perfectly innocently, mischaracterized the witness's testimony.  My recollection, and we can clarify it with Ms. Rathbun, is that she testified that John had not been to church in

approximately the last five years.  Not she, herself.

THE COURT:  So why don't you ask a clarifying question about when the last time she has been to church because I think I lost sight on this issue as well.

But aside from that, the defense's position is that there's a lack of relevance, correct?  And you were recalling for me other things from the last trial --

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  -- regarding this.  So go ahead.

ATTORNEY O'NEILL-GREENBERG:  When I said she hasn't been to church since 2018, that's her testimony from November.  But the only relevance between tracts and the Rathbuns for John's access to that tract has to do with the *Steps to Peace With God*, not Natalie's generalized knowledge about tracts or what is or is not at Heritage Baptist from 2018 earlier because she hasn't been there since.

Last trial, the government tried to go into her generalized knowledge about tracts, what's at Heritage, what tracts are meant for.  Not only is it cumulative, because Billy Graham people have already testified generally to what tracts are, she has no knowledge as to what is or is not at Heritage, and that's completely irrelevant.  It's whether John had access to one particular Billy Graham tract from that Big E event.

That's it.

THE COURT:  Well, true, but am I incorrect that it's not necessarily just from the Billy Graham event?  It would be -- is there going to be any testimony that these tracts were, perhaps, available -- I'm trying to remember the last trial -- at that church?

ATTORNEY O'NEILL-GREENBERG:  No.  There was never any evidence that that particular tract that was in the can was ever at Heritage.

THE COURT:  Okay.  That is my recollection of the testimony as well.

Is that your recollection, Attorney Breslow?

ATTORNEY BRESLOW:  So I'm going to review the prior testimony concerning 2018 on that point.  Regarding the tract, the *Steps to Peace With God* tract, you may recall that when the agents went to the church to look for that particular tract, they did not locate that particular version of the tract, but they located another version -- I think it was a version directed -- it was essentially the same tract.  It was called *Steps to Peace With God*.  It was published by Billy Graham.  It had basically the same language and much of the same visual content, but it was a slightly different version.  Mr. Rhoads, I think, testified that there were different versions of this pamphlet that -- this particular tract that Billy Graham

published.  We attempted to introduce that into evidence.

Your Honor, when I say "we," I mean Ms. Berkower and Mr. Desroches and Your Honor denied that offer.  We are going to be seeking to offer that again for the same reasons that it -- and as to the relevance, I want to start by saying that relevance is simply a tendency to prove a fact in issue.  And here, the relevance of this testimony today, as it was back then, and I expect her testimony is going to be covering the same basic grounds as she testified back then, is that it tends to prove that the defendant possessed this tract, not as he's claimed in his opening statement, at a trashout, but as we allege through Heritage Baptist Church and his mother's involvement in that church, including their attendance at the Billy Graham events.

This evidence does tend to prove that.  It is circumstantial.  It's inferential, but it's clearly relevant to the central issue in the trial.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Which is --

THE COURT:  The possession of them from the Big E event is one thing.  The possession of the specific tract -- and I'm not talking about general tracts -- the specific tract that's at issue in this case, the nozzle-type pamphlet or tract, my memory is there was no

evidence available to show that Bethany Assembly of God had them --

ATTORNEY O'NEILL-GREENBERG:  Heritage.

THE COURT:  I'm sorry.  What?

ATTORNEY O'NEILL-GREENBERG:  Heritage is their church.

THE COURT:  I'm sorry.  Heritage Church. There's no evidence to my recollection that Heritage had them.  The fact that Heritage may have had similar ones, even substantially similar, does not correct or take care of that fact that they didn't have them.  I am not going to allow admission of similar items from the church.  So I'm going to sustain the objection.

ATTORNEY WATKINS:  Judge, just before we go, just a practical matter.  Can we be alerted if the government is going to argue that the Court should change any of its rulings from the last trial?  We just didn't expect that, and we want to be ready if the government is going to reargue issues from the last trial.

THE COURT:  Okay.  The objection is sustained. We can move onto the next question, please.

ATTORNEY BRESLOW:  Your Honor?  I appreciate Your Honor's ruling.  If I didn't make this clear earlier, this exact line of questioning was admitted in the first trial for exactly the purposes that we are offering it

now.

THE COURT:  This witness is going to testify that she's familiar with tracts or pamphlets at this specific church although none of them are the same as was in the nozzle, and her testimony would further be that she really doesn't know what these tracts are.  I mean she might have seen them but really doesn't know the purpose; is that right?

ATTORNEY BRESLOW:  So I think that these are generic questions, but what they're designed to establish is her familiarity with tracts generally, explaining what they are; that in church she's read them; she's become familiar with their messages.  And later, in a few -- in just few minutes, we're going to be asking her about -- and you may recall this testimony from the trial as well -- about her mother's [sic] practice of handing out tracts, like the ones in church, to strangers; that she keeps the tracts in her purse; that she keeps the tracts in her house; and that she keeps the tracts in the cupholder of her car, the same car that the defendant drove on the morning of April 2nd.

THE COURT:  Right.  All right.  So --

ATTORNEY BRESLOW:  Moreover, I am going to ask her just to compare, generally, the tracts that she's seen in the possession of Sheila and at the church with PX-4,

and I expect she's going to say that those tracts are very similar to the ones in PX-4.

Again, this is exactly -- I think this is, if not exactly, in sum and substance what she testified about in the prior trial.

THE COURT:  Okay.  Which is not controlling here, which is useful, very useful as guidance, but not controlling.

Defense, did you want to say anything?

ATTORNEY O'NEILL-GREENBERG:  Yes.  First of all, the content of the tracts which you already instructed the jury yesterday is not relevant.  What those tracts say or what people do with them is totally irrelevant, and it's confusing, and it's overly prejudicial.

And to the extent she would testify to this generalized knowledge, which is what the government tried to get her to do last time, it's completely irrelevant. It's overly prejudicial.  Whether -- it's for the jury to decide whether a tract that's found in Sheila's car is somehow similar enough to the tract that was found in the gas can.  That's not for her to opine on.

I believe she hasn't been inside that church, '18, '19, in three years.  So it's totally irrelevant.  She hadn't been in that church for two years by the time the incident happened and the time period that's relevant.

So it's just trying to back door in more information about what tracts are generally. It just infuses this trial with, like, religiosity that's completely prejudicial.

THE COURT: Okay. There will be -- you're allowed to ask questions about her familiarity with what a tract or a pamphlet is and what she knows her grandmother to do with those types of items. This is all very generalized testimony. But you're allowed to do that, but that's about it.

ATTORNEY BRESLOW: Okay. So just so we are clear, we'll move away from the tracts that she's seen at church and directly to the tracts that she's seen her grandmother possess and --

THE COURT: There is no relevance to the substance of the tracts either that she saw in church or the substance of the tracts that she's seen her grandmother with. The only relevance is that it's a tract; it's a religious-type of book that has religious-type of communication in it. That's it. But the problem is none of them are the same as was in the gas nozzle. That's why the relevancy is fleeting, but it's minimal because it's availability to tracts, generally, that I think is the relevant thread that is holding on here.

ATTORNEY BRESLOW:  That's exactly correct, Your Honor.

THE COURT:  Okay.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow)  Ms. Rathbun, first of all, thank you for your patience.  And, secondly, I just want to clarify your testimony concerning five years before we move on to a slightly different topic.

You testified earlier that somebody had not been in church in five years.  Who was that person?  Was that you or was that John?

A.   That was me.  I am not sure about John.  I just know that I haven't been to the church in about five-ish years.

Q.   Okay.  So moving away from church, have you seen your Nana distribute tracts outside of church?

A.   Yes.

Q.   And very briefly, without getting into the specific content, can you tell the jury what a tract is?

A.   A tract is pretty much a religious pamphlet that includes scripture, and it tries to persuade people to have a relationship with God and to go to heaven.

Q.   Now, how frequently have you seen personally, with your own eyes and ears, have you seen your Nana pass out tracts?  And I'll just focus the time period on 2018 through April of 2020, so the past two and a half years or

so.

A.   Yes.

Q.   So the question is, how -- so the question is, how frequently have you seen your Nana pass out tracts?

A.   Very frequently, usually whenever we go run errands together and go to stores.

Q.   Okay.  What kinds of people does your Nana pass out tracts to?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.

Q.   (By Attorney Breslow)  Okay.  Can you elaborate on what you've seen when you just testified your Nana passes out tracts as you run errands and go to stores?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.  I don't think it needs any further description.

Q.   (By Attorney Breslow) Where have you seen your grandmother Sheila possess these tracts?

A.   Usually inside the house or in her purse or in the car.

Q.   And when you say "in the car," whose car are you talking about?

A.   My Nana's car.

Q.   And can you describe that car for the jury?

A.   Yes.  It's a dark gray RAV4.

Q.   And where, in particular, in this car have you seen your Nana possess these tracts?

A.   In the front, near the gearshift in the cupholders.

Q.   So are the tracts visible to anyone who enters the car in that position?

A.   Yes.

ATTORNEY BRESLOW:   I'd like to display PX-56 to only the Court, counsel and the witness.

Q.   (By Attorney Breslow)   Do you recognize this photograph?

A.   Yes.

Q.   And where was this photograph taken?

A.   In the living room at the house at 20 Lori Lane.

Q.   And on the table there are photographs -- two photographs.  Who's depicted in these photographs?

A.   Me and my dog on the right picture and my Nana and our dog on the left picture.

Q.   Okay.  And is this a fair and accurate photograph of your living room and the items that are inside this photograph on or about April 15, 2020?

A.   Yes.

ATTORNEY BRESLOW:   Your Honor, I'd like to offer this into evidence, and, if admitted, published to the jury.

ATTORNEY O'NEILL-GREENBERG:   No objection.

THE COURT:  All right.  No objection.  That will be admitted and can be published.

**(Government Exhibit PX-56 admitted.)**

Q.   (By Attorney Breslow) So now that the jury can see, where are you in this photograph?

A.   I'm on the right side, the right picture.

Q.   Okay.  And your nana is on the left?

A.   Yes.

Q.   All right.  Now, I'd like to zoom in on the document on the table.  How does this tract compare, generally, to the ones you've seen your Nana pass out in stores and keep in her cupholder?

A.   This is very similar to the tracts that my Nana passes out.

ATTORNEY BRESLOW:  I'd now like to publish PX-54 already in evidence to the entire courtroom.

Q.   (By Attorney Breslow)  And, Natalie, there should be on the witness table PX-4.  Do you see that?

A.   Yes.

Q.   Okay.  So can you just open that up and take a look at its pages?

ATTORNEY BRESLOW:  Your Honor, I'll just represent to the Court that PX-54 is the digital version of the document that Ms. Rathbun has in front of her.  If we can just page through that for the jury --

THE COURT:  All right.  Thank you.

ATTORNEY BRESLOW:  -- as Ms. Rathbun is reviewing the hard copy.

Q.   (By Attorney Breslow) Natalie, I'm going to ask you basically the same question that I asked about this tract as the one on the table.  How does that tract compare to ones that you've seen your Nana pass out and keep in her car?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.

ATTORNEY BRESLOW:  One moment, Your Honor?

THE COURT:  Uh-huh.

Q.   (By Attorney Breslow) Without reference to the content, how does the size and formatting appear to the -- how does that compare to the tracts that you've seen your Nana possess, distribute at stores, and keep in her cupholder?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  This is very similar to -- I'm sorry.  What was the question?

Q.   (By Attorney Breslow) How does it compare -- how does the formatting, the size, the general appearance of it -- without reference to the content -- how does that compare to the tracts that you've seen your Nana pass out at

stores and keep in the cupholders of her car?

A.    This is very similar to the format of the other tracts where it has a couple of pages, and it's pretty much the same size.

Q.    Okay.  Now, sitting here today, have you seen this particular pamphlet before this case, before you first met with the government for example?

A.    No.

Q.    Now, Natalie I'd like to focus on a different topic, which is the state of your home, what it was like for you, John, and your Nana and Pop Pop in the winter and spring of 2020.  So we're talking about from January 2020 up through April 15th, 2020.  Do you have that time frame in your mind?

A.    Yes.

Q.    Okay.  So first of all, your house at 20 Lori Lane, how large or small is it?

A.    It's fairly small.

Q.    And how many floors are there?

A.    There are two floors.

Q.    Who was living there at the time?

A.    Me, my Nana and Popa and John.

Q.    Okay.  And where was your bedroom?

A.    My bedroom was on the second floor, upstairs.

Q.    Now, at first, during this early part of this period

of time, where was John's bedroom?

A.   He was living in the second room upstairs, across the hall from my room.

Q.   Okay.  At some point during this period of time, did John move bedrooms?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q.   (By Attorney Breslow) Can you tell the jury generally why John moved bedrooms?

A.   He moved downstairs because we got into an argument during January, and it was substantial to the point where we had to move to the room downstairs so that we wouldn't be near each other.

Q.   Do you know whose decision it was to move the bedroom?

A.   It was my grandparents' decision.

Q.   Now, you testified earlier that you were raised primarily by your Nana.  What role, if any, did John have in raising you?

ATTORNEY O'NEILL-GREENBERG:  Objection.

**(Sidebar conference.)**

THE COURT:  Go ahead with the objection.

ATTORNEY O'NEILL-GREENBERG:  Time period.  So there's that; that's already been asked and answered.

That's the only thing that's relevant.  How he raised her is getting way, way, way too far into like their family dynamic which, I believe, is information that the Court has already said is not going to be able to be addressed. So I think it's irrelevant, and I think it's -- depending upon what she says -- going to be very prejudicial.

THE COURT:  Well, the ruling essentially was that there could be life testimony to put into context the kind of person, the state of mind we are dealing with at or around the time of the alleged crime.  So this does seem far removed from that.  What do you say, government?

ATTORNEY BRESLOW:  Well, it was just meant to be a context question, Your Honor.  We can move on.  I expect that, just as in the last trial, the defendant will be raising this very topic himself.

THE COURT:  He may.

ATTORNEY BRESLOW:  So I don't see the harm.

THE COURT:  Well, we don't know what the defendant is going to say, but at this point the question -- that specific question is sustained.

ATTORNEY BRESLOW:  That's fine.  We can move on.

**(End of sidebar conference.)**

THE COURT:  The objection is sustained.  That means the question is withdrawn.  Don't even consider the question.

Q.    (By Attorney Breslow) Natalie, focusing on this two-year period, say from 2018 through April of 2020, did you know whether or not your father had a substance abuse problem or was having difficulties with substances based on your own personal observations in the house?

A.    Yes.

Q.    Okay.  Over the time that you've grown up with John, but especially during this period of time, have you become familiar with how he acts, how he speaks, and how he behaves when he's using substances?

A.    Yes.

Q.    And during this particular period of time -- now, I'm going to focus on the winter through the April 15th period of 2020, how would you describe his behavior, meaning like how he was acting, what he was saying, and his mood during this period of time?

A.    Well, after the arguments, we didn't talk to each other, but I could tell, like, throughout the house that he was very agitated and very defensive and on edge. There would be a lot of arguments going on between him and my grandparents, primarily my Nana.  It was just a hostile environment.

Q.    Now, based upon your own familiarity with your father under the influence of substances, did it appear to you that he was using substances during this period of time

from January 2020 through April 15, 2020?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Could you repeat the question one more time?

Q.    (By Attorney Breslow) Sure.  I may not be able to say it exactly word for word the same, but based upon your own personal observations of John as he was when he was using drugs throughout your life, how did -- did it appear to you that John was using substances of some kind during the period from January 2020 through April 15, 2020?

A.    Yes.

Q.    And during this period of time -- this same period of time, can you tell the jury what John was doing at home, how he was spending his time?

A.    Well, after he had lost his job, usually he just spent his time in his room.  He didn't come out very often except to go to the kitchen every once in a while.  It seemed apparent that he was just sitting in his bed and watching TV.

Q.    How, if at all, was he interacting with you during this period of time?

A.    Not very frequently.  We would see each other in passing and he would try to talk to me, but I didn't really want to talk.  So I would usually ignore him.

Q.   Did you have the opportunity to observe John's interactions with his parents, Nana and Popa?

A.   Yes.

Q.   And if you can tell the jury, how was the defendant interacting with his own parents during that period of time?

A.   He was acting very disrespectful, I would say.  He was very demanding.  And, once again, he was very agitated.  And the conversation about getting a job would come up very frequently with my grandparents, specifically my Nana.  And when my Nana would ask about any updates on jobs, he would usually become very defensive about it, and it would usually lead to an argument.

Q.   So you mentioned that John lost his job at some point.  To the extent that you can estimate, do you recall approximately what month during this period of time that he lost his job?

A.   February, I believe.

Q.   Okay.  And could you, from your perspective in the house, overhear John arguing with --

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Hang on one second.  I'm just going to see if we can close the door.  There's some noise outside.  Thank you.

ATTORNEY BRESLOW:  So, Your Honor, I think Your

Honor paused the testimony because of some --

THE COURT:  Just some background noise.  We just need to close one of the doors until the background noise is gone.  Thanks.

ATTORNEY BRESLOW:  Okay.

ATTORNEY WATKINS:  Maybe pull the mic just a little bit closer.  Thank you.

Q.   (By Attorney Breslow) All right.  So just to back up a little bit, I think you testified that John had lost his job in approximately February of 2020 and that John was arguing with his parents including about the loss of employment; is that right?

A.   Yes.

Q.   Okay.  So picking up from there, from your perspective in the home, could you hear John arguing with his parents, your grandparents?

ATTORNEY O'NEILL-GREENBERG:  Objection to the leading nature.

THE COURT:  It is leading, but I suggest for this type of material, perhaps leading is appropriate.  So go ahead.  You can answer.

THE WITNESS:  Yes, I could hear most of the arguments.

Q.   (By Attorney Breslow) Okay.  So who did he argue with mostly, if he did, argue with one person over the other?

A.   It was usually my Nana.

Q.   How frequently were they arguing during this period of time?

A.   I would say maybe once a week around that time.

Q.   Okay.

A.   It was very frequently.

Q.   I'm sorry?

A.   It was frequently.

Q.   Okay.  And what kind of language did you hear John use during these arguments?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  He was usually yelling and swearing.  Yeah, he was usually yelling and swearing.

Q.   (By Attorney Breslow) Okay.  And what subjects in addition to -- what other subjects in addition to the loss of the job was John arguing about, if any?

A.   Usually, they would argue about the car situation and groceries and cigarettes.

Q.   Okay.  Could you tell the jury what the car situation was, what you mean by that?

A.   Yes.  So my Nana has a RAV4 and usually my dad would like to use the car instead of his own.  So there would be a lot of arguments because sometimes we'll leave the keys on the table and so he'll take my Nana's keys and use the

car without her permission, and it would cause arguments because sometimes she would need the car and there would be a little miscommunication.  So they would argue about him using the car too often.

Q.   Okay.  So you mentioned the car situation.  You've explained that.  You also mentioned groceries and cigarettes.  Can you explain that to the jury briefly?

A.   Yes.  My Nana will get groceries for everyone in the family.  But my dad, John, was very demanding about it. If he didn't get all of the groceries, he would usually get annoyed and angry.  And cigarettes were very important.  If we didn't get the cigarettes in time, then there would usually -- he would usually be angry and agitated once again.

Q.   I'd like to turn now to another topic which is one you mentioned briefly, and that's the family cars.  So what cars did the family have at home during this period of time?

A.   I have a red Sonata.  My Nana has the silver RAV4, and my dad has a blue truck.

     ATTORNEY BRESLOW:  Okay.  And I'd like to display now -- with the Court's permission -- to only the Court, counsel, and the witness, PX-105.  This is a multi-page exhibit.  I believe it's three pages.  So if we could display the first, second and third page

sequentially, leaving the image on for about a moment or two?

Q.    (By Attorney Breslow) Do you recognize each of the pages -- what's depicted in each of the pages of this exhibit?

A.    Yes.

Q.    And, generally, what does the first page show?

A.    That's the front of our house at 20 Lori Lane, East Longmeadow.

Q.    And the second page?

A.    That is our side deck where we enter and exit.

Q.    And the third page?

A.    That is our driveway that shows all three of our cars.

Q.    And are these fair and accurate photographs of your home and your cars on or about April 15, 2020?

A.    Yes.

        ATTORNEY BRESLOW:  Your Honor, I'd like to offer these into evidence.

        ATTORNEY O'NEILL-GREENBERG:  No objection.

        THE COURT:  No objection.  Those will be admitted.

**(Government Exhibit PX-105 admitted.)**

Q.    (By Attorney Breslow) So right now we're looking at the page showing the driveway and several cars.  Can you

just identify these cars?

A JUROR:  We are not seeing it yet.

ATTORNEY BRESLOW:  I'm sorry.  Thank you very much.  If we could publish this exhibit to the jury?  Okay.  Great.

Q.  (By Attorney Breslow) We're focusing now on page 3 of the exhibit.

Now that this photograph is up to the jury, can you just tell the jury who used which cars primarily?

A.  Yes.  John used the blue van right in the front, on the right side.  I used the red Sonata on the left side, and behind the red Sonata is the RAV4 that my Nana used.

Q.  Okay.  So that's who used these cars primarily, but I believe you just testified earlier that there were arguments between John and your Nana about his use of her car?

A.  Yes.

Q.  So I'd like to focus on that now.  How frequently, say, in a week did John use your Nana's car instead of his van?

A.  I'd say very frequently, a couple times a week.

Q.  And what time of the day or night did John use his Nana's car -- or your Nana's car?

A.  It varied, but it was usually at nights.

Q.  At night?

A.    Yes.

Q.    Okay.  And during this period of time where John was using your Nana's car at night, was he employed?

A.    I'm not sure.  I know that he would use the car frequently.  So he most likely used it when he was employed and when he wasn't employed.

Q.    Okay.  So throughout that period of time, both before he lost his job and after?

A.    Yes.

Q.    And did his frequency of using his [sic] Nana's car at night, did that maintain relatively constant both before he lost his job and after?

A.    Yes.

Q.    How did you know -- well, I want to pause for a moment on this photograph again.

      You said you lived on the second floor, in a bedroom on the second floor?

A.    Yes.

Q.    So do you see a window on the side of your house in the far right of this photograph?

A.    Yes, that's my window.

Q.    That's your bedroom window?

A.    Yes.

Q.    Okay.  And during this period of time, particularly from March of 2020 through April 15th of 2020, how were

you responding to the pandemic?

ATTORNEY O'NEILL-GREENBERG:  Objection.

ATTORNEY BRESLOW:  I can lead on it, Your Honor, if you'd like?

THE COURT:  Objection sustained.  Yeah, try a different question.

Q.   (By Attorney Breslow) Okay.  So Natalie from -- do you recall when approximately Massachusetts issued a general lockdown for people because of the COVID-19 pandemic?

ATTORNEY O'NEILL-GREENBERG:  Again, objection. I don't see the relevance.

THE COURT:  Relevance?

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  Yeah, I don't know what the relevance is.  Do you want to make a showing?

ATTORNEY BRESLOW:  On WhisperTech?

THE COURT:  Right.

ATTORNEY BRESLOW:  Yes, Your Honor.

**(Sidebar conference.)**

ATTORNEY BRESLOW:  Can you hear me?

Okay.  So, Your Honor, I believe this came up primarily on cross-examination of Natalie when the defense was attempting to suggest that she wasn't in a position to know when John was leaving the house and when he was

returning. And I believe on redirect and certainly here now on direct, I'll be asking her questions about where she was during this period of time.

I expect she'll testify in about March of 2020, after the lockdown happened, she wasn't working. She was -- she was at home, generally, for this period of time, from March 2020 through April 15th which was when the FBI searched the home. And that because of her position in the house, at that bedroom window, she was able to observe John leaving and not returning before she went to sleep. That's the proffer of her testimony.

ATTORNEY O'NEILL-GREENBERG: I think what's appropriate is just to ask her if she had any observations about when John was or wasn't in the house and how she made those observations. The rest of it seems totally irrelevant.

THE COURT: I think there is some relevance for her explaining why she would have the ability to observe. It puts it into context, full picture. I think it's fine. You can ask the questions.

ATTORNEY BRESLOW: Okay.

**(End of sidebar conference.)**

THE COURT: The objection is overruled.

Q. (By Attorney Breslow) So, Ms. Rathbun, I don't remember exactly word for word the last question, but I

think it's similar to this:  Do you recall in approximately March of 2020 that people in Massachusetts were under a general lockdown?

A.    Yes.

Q.    Okay.  And how did you adjust your behavior with respect to that lockdown from March of 2020, say, through April 15th of 2020?

A.    I stayed in my house and I didn't leave except for when I had to go to work.

Q.    Okay.  And were there many evenings during this period of time where you were not working and you were staying at home?

A.    Yes.

Q.    Okay.  And specifically relating to John and your Nana's car, what did you observe from March 2020 through April 15, 2020, from your perspective in your home?

A.    I would observe John leaving with my Nana's car very frequently during the night.

Q.    I'm sorry.  What you did say?  During the night?

A.    Yeah, during the night.

Q.    How frequently during this period of time did you observe John leaving in your Nana's car during the night?

A.    I would say it was the same as before.  So a couple times a week.

Q.    Okay.  And do you -- did you observe John on certain

occasions returning with your Nana's car?

A.   Not frequently because I wouldn't wait up for him to come back.  So I would usually go to sleep and he still wasn't back by the time I was asleep.

Q.   Okay.  And approximately when, generally, did you go to sleep without seeing John return?

A.   I'd say about eleven o'clock.

Q.   Now, I want to focus you on this photograph here, which is the third page of, I believe, PX-133.  Do you see an individual standing on your family's side porch?

A.   Yes.

Q.   Okay.  And do you remember -- does he appear to be wearing some kind of a uniform or signature letters on his shirt?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled as to that question.

Do you see what he's wearing?

THE WITNESS:  Yes.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Just for the record, I misstated the exhibit.  This is PX-105, I believe, not PX-133.  Okay.

Q.   (By Attorney Breslow) So do you remember the events of April 15, 2020?

A.   Yes.

Q.   And what happened on that morning?

A.   That morning was when the FBI came to the house with a search warrant to search the house.

Q.   Okay.  And is that one of the members of the FBI on your porch that morning?

A.   Yes.

Q.   Okay.  Now, I want to focus on the two-week period before April 15th, so approximately April 1st through April 15th.  How frequently, if at all, did your father leave the house at night with your Nana's car during this two-week period?

ATTORNEY O'NEILL-GREENBERG:  Objection.

**(Sidebar conference.)**

THE COURT:  Go ahead with the objection.

You recall -- and please correct me if my memory is mistaken as to the motion in limines, there's been quite a few, but I believe the Court has said that it's all right, that it will allow some type of context information to show Mr. Rathbun's life and what was going on at the time, drug use, not a great relationship at home, unemployment, things like that.

So, okay, having that in mind, do you agree with me that's my ruling on the motion in limine?

ATTORNEY O'NEILL-GREENBERG:  I totally agree with that, and my objection is it's already all been gone

through.  The period from January up until April 15th, the spring, March and April, Attorney Breslow has already asked about all of those things with her.

THE COURT:  That's a -- yeah, you have.  I think that's a good defense point.

ATTORNEY BRESLOW:  It is, Your Honor.  It is correct that I've asked her about this broader period of time from March through April 15, 2020, but I'm focusing her now on the two-week period of time from April 1st to April 15th.  And I expect this is going to be my last question of the examination.

This two-week period of time is specifically relevant because -- this two-week time is specifically relevant because it is this period of time that the defendant, we allege, falsely told Special Agent McGonigle that he had not left the house.  Special Agent McGonigle, I expect, will testify --

THE COURT:  I understand.  Okay.

ATTORNEY BRESLOW:  Okay.

THE COURT:  Based upon that last argument, the very last argument of the government, I'm going to allow it.

Did you want to respond to that last argument regarding --

ATTORNEY O'NEILL-GREENBERG:  I think he's

already asked Ms. Rathbun about it.

THE COURT:  He kind of did, yeah.  I don't see the focus was on -- I mean, the government's offer of proof is relative to a certain statement that they're going to allege is a false statement that could fall under the umbrella of consciousness of guilt.  I think that explanation gets them here.  So objection overruled.

**(End of sidebar conference.)**

ATTORNEY BRESLOW:  Could I ask the court reporter to read back the question?

**(Question read back.)**

THE WITNESS:  I would estimate it's the same as before, like a couple times a week.

ATTORNEY BRESLOW:  No further questions, Your Honor.

THE COURT:  Thank you.  Cross-examination, defense.

ATTORNEY O'NEILL-GREENBERG:  Thank you, Your Honor.

**CROSS-EXAMINATION**

Q.   (By Attorney O'Neill-Greenberg) Good morning.

A.   Good morning.

Q.   Ms. Rathbun, I want to start by talking to you about where your great-grandma used to live.  And you called her "great-grandma"?

A.    Yes.

Q.    And your grandma, Sheila Rathbun, that's her grandmother?

A.    Yes -- that's her mother.

Q.    That's her mother.  Sorry.  It's getting confusing.

So your great-grandmother, Sheila Rathbun's mother, she passed way in 2010; is that right?

A.    Yes.

Q.    So you were about eight years old?

A.    Yes.

Q.    Okay.  And you testified about your recollection of it being called "Genesis House."  Do you remember that?

A.    Yes.

Q.    When you were eight years old, you and your Nana Sheila would call it "going to grandma's house," right?

A.    Yes.

Q.    You never referred to it as "Genesis House"?

A.    No.

Q.    It was just where grandma lived?

A.    Yes.

Q.    Okay.  And your understanding of its title of "Genesis House" and its location is coming from this case, right?

A.    I say it came a little bit after the fact because I had driven past that frequently.  So when I got older, it

was -- I could read that it was Genesis House and not just grandma's house.  So I would say I knew it was called "Genesis House" before the case.

Q.   Okay.  And when you were visiting, just to be clear, you didn't call it "Genesis House," right?  You called it "grandma's house"?

A.   Yes.

Q.   Okay.  The -- I'll call it a pamphlet, the pamphlet that you were shown by Attorney Breslow, the red one that's called "*Steps to Peace With God*," you were shown the picture of that on April 15th, right?

A.   Yes.

Q.   Of 2020?

A.   Yes.

Q.   Okay.  And when you were shown that picture, that was the first time you'd ever seen that specific pamphlet, right?

A.   Yes.

Q.   You'd never seen it before?

A.   No.

Q.   Okay.  On April 15, 2020, that was when the FBI was at your house, right?

A.   Yes.

Q.   They showed you some other pictures, too?

A.   Yes.

Q.   They showed you a picture of a yellow, diesel can?

A.   Yes.

Q.   You'd never seen that before either, right?

A.   No.

Q.   Okay.  And you said you haven't gone to church in about five years; is that right?

A.   Yes.

Q.   Okay.  So in 2020, you weren't going to church?

A.   No.

Q.   Right?

A.   Yes.

Q.   And in 2020, your dad didn't go to church either?

A.   Yes.

Q.   Right?  Okay.  And he doesn't currently go to church?

A.   No.

Q.   Now, you talked a little bit about a fight you and your dad had in January of 2020.  I want to ask a couple of questions about that.  Okay?

A.   Okay.

Q.   So just to be clear, the argument happened January 2020; is that right?

A.   Yes.

Q.   And then after the argument, you decided you were just going to stop talking to him?

A.   Yes.

Q.   And you just, basically, kind of avoided him?

A.   Yes.

Q.   And your bedrooms had been next door on the second floor, right?

A.   Yes.

Q.   So his bedroom got moved down to the first floor?

A.   Yes.

Q.   You stayed upstairs?

A.   Yes.

Q.   So that just made it easier for you to not talk to him, right?

A.   Yes.

Q.   And just kind of ignore him?

A.   Yeah.

Q.   Just kind of block him out?

A.   Yeah, exactly.

Q.   Okay.  Now, at the end -- kind of fast forwarding, at the end of March 2020 or starting at the end of March in 2020, you and your dad started interacting a little bit again, right?

A.   Yes.

Q.   You played volleyball outside in the yard together a couple of times, right?

A.   Yes.

Q.   And you played with your dog together a couple of

times?

A.    Yes.

Q.    Tucker?

A.    Yes, Tucker, yeah.

Q.    You and your dad played in the backyard with Tucker?

A.    Yes.

Q.    And your dad was trying to get you to be a little more friendly or -- right?

A.    Yes, he wanted to engage in conversation.  I was the one who didn't really want to engage.

Q.    Okay.  So you still were kind of not ready to do that?

A.    Yes.  I was hesitant, but I still made small talk.

Q.    Okay.  He would try to -- you'd sometimes be in the kitchen together and he'd try to make you laugh or say friendly things to try to warm you up?

A.    Yes.

Q.    Okay.  So things were -- you were kind of engaging. He was trying to make efforts, but you were still kind of hesitant, right?

A.    Yes.

Q.    Now, at that time period, the spring of 2020, you were a senior in high school?

A.    Yes.

Q.    Okay.  So you were finishing up, getting ready to

graduate?

A.    Yes.

Q.    Getting ready to go to college?

A.    Yes.

Q.    And from January or January and February, were you still in-person at your high school?

A.    In January and February of 2020?

Q.    Yes.

A.    Yes.

Q.    Okay.  So starting in March of 2020, that's when you started doing -- you did online school?

A.    Yes.

Q.    Okay.  And online school because of COVID, right?

A.    Yes.

Q.    Okay.  And those were still school -- still full school days, right?

A.    Not for me just because I was a senior and it was the last semester.  So most of my classes didn't require Zoom meets.  So I usually wasn't in school during the day.

Q.    Okay.  Did you have schoolwork that you had to do during the day?

A.    Yes.

Q.    Okay.  So you didn't have to be on Zoom, but you were still --

A.    Working, yes.

Q.   -- doing your schoolwork?

A.   Yes.

Q.   And that was from 9:00 to 3:30 about, Monday through Friday?

A.   Yes.

Q.   And you did that, your schoolwork, if you did have school Zoom, in your bedroom upstairs?

A.   Yes.

Q.   And you said you were also working that entire time, right?

A.   Yes.

Q.   Okay.  Working at the same restaurant you work at now, right?

A.   Yes.

Q.   And in March and April of 2020, you were still going to work in person, right?

A.   Yes.

Q.   And you worked a few shifts a week?

A.   Yes.

Q.   And sometimes you would pick up coworker's shifts as well?

A.   Yes.

Q.   And most of your shifts were at night?

A.   Yes.

Q.   And when you would come home at night, you wouldn't

stay up to wait to see if your dad would come home or not, right?

A.    Yes.

Q.    You were, sort of, living your life and ignoring him?

A.    Yes.

Q.    Now, in that springtime, I'm going to say January through April 2020, you were asked some questions about bickering or quarreling that John and your grandma or John and his mom were having in the house?

A.    Yes.

Q.    Your grandmother or John and his mom would quarrel because she wanted him to get a job, right?

A.    Yes.

Q.    He would be cranky at her when she didn't bring home the groceries he wanted, right?

A.    Yes.

Q.    He's picky about food?

A.    Yes.

Q.    It's annoying?

A.    Yeah.

Q.    He'd be cranky about whether she bought him cigarettes, that kind of thing?

A.    Yeah.

Q.    Okay.  And the bickering, it was pretty normal between your dad and your grandma, right?

A.   It was, yeah.  It was normal.

Q.   Now, you know -- I think you testified on direct -- you're aware that your dad has struggled with addiction for awhile, right?

A.   Yes.

Q.   Kind of an ongoing, lifelong problem, correct?

A.   Yes.

Q.   And you've lived with your dad for a long time, right?

A.   Yes.

Q.   So you're aware of when he's using drugs?

A.   Yes.

Q.   And you've seen him in those periods when he's using, he gets kind of cranky and irritable?

A.   Yes.

Q.   More crabby and argumentative?

A.   Yes.

Q.   He sleeps a lot?

A.   Yes.

Q.   Kind of just sits in his bed and watches TV?

A.   Yes.

Q.   Doesn't really do much?

A.   Yes.

Q.   Seems kind of lazy for lack of a better word?

A.   Yeah.

Q.   Not really -- unmotivated, not really doing anything with himself?

A.   Yes.

Q.   And that was the pattern of behavior he was in in March and April 2020, right?

A.   Yes.

Q.   And that's a pattern, unfortunately, you've seen many times before, right?

A.   Yeah.

Q.   Now, you've known your dad your whole life.  You've never heard him say anything racist against groups of people, right?

A.   Yes.

Q.   And you've never seen him act in any way that was hateful or racist towards people, correct?

A.   Yes.

Q.   You never heard him say anything anti-Semetic, meaning hateful against Jewish people, right?

A.   Yes.

Q.   And he's never behaved in a way that was hateful or mean to Jewish people or people of any kind of religion, right?

A.   Yes.

Q.   Thank you so much.

A.   Thank you.

ATTORNEY BRESLOW:  Your Honor, may I have a moment?

THE COURT:  Sure.

ATTORNEY BRESLOW:  Just a few questions, Your Honor.

**REDIRECT EXAMINATION**

Q.   (By Attorney Breslow) So, Natalie, do you remember that on cross-examination Attorney O'Neill-Greenberg asked you questions that used the word "cranky"?

A.   Yes.

Q.   And "bickering"?

A.   Yes.

Q.   Okay.  And "normal"?

A.   Yes.

Q.   All right.  So starting with "cranky," the arguments that you overheard in your house, what kind of language did you hear the defendant use?

A.   Well, he would usually be swearing and yelling.  I would say that it would usually start off as cranky and occasionally or usually during the fights, it would escalate into more like yelling and swearing.

Q.   Okay.  And with respect to normal, how frequently did you -- did these arguments take place?

A.   I would say there would be at least one argument a week.  I mean, I wasn't there to witness all of the

arguments because I was at work, but it was often that I would hear the arguments going on downstairs.

Q.   Okay.  So on that point, I'm going to ask you one or two more questions.  The arguments that you heard, generally, where did they take place?

A.   Downstairs, usually, like, in the kitchen.

Q.   And can you explain to the jury how to get from the kitchen where the arguments took place to where you were as you heard them?

A.   Yes.  So my room is upstairs but on the staircase there's no door or anything, and the staircase leads downstairs to the living room which also leads to the kitchen.  So there's no doors on any of these walls except for in my room.  So if I open the door, I can easily hear everything that's going on downstairs in the kitchen and the living room.

ATTORNEY BRESLOW:  No further questions, Your Honor.

ATTORNEY O'NEILL-GREENBERG:  Just one.

**RECROSS-EXAMINATION**

Q.   (By Attorney O'Neill-Greenberg) When your dad and his mom would get into -- I said "bickering" -- into arguments, fights, your dad was never physically violent in those arguments with his mom, right?

A.   No, never.

THE COURT:  All right.

ATTORNEY O'NEILL-GREENBERG:  That's it.

THE COURT:  Okay.  Thank you.  You can step down.

THE WITNESS:  Thank you.

THE COURT:  Ladies and gentlemen, we need to take maybe 15 minutes.  All right.  Same instructions apply.  Don't talk to each other about the case or anyone else.  Don't access the case.  All the same instructions apply.  Thank you.

**(A recess was taken at 11:35 until 11:52.)**

THE COURT:  Okay.  On the record, the clerk reported to me that you want to highlight or just screen an issue.

ATTORNEY WATKINS:  That is correct, Your Honor. We're about to hear the three witnesses the government is calling regarding prior bad acts.  Alfie Alschuler from All Energy Solar and then the two witnesses from the Chicopee motel event.  We litigated this extensively.  I don't want to go too much into it, but I do want to put on the record because I'm concerned throughout trial we're going to be struggling with the issues that linger from the admission of this particular evidence.

As the Court knows with prior bad act evidence that it's a two-step process.  The government has to

demonstrate some kind of special relevance and then, in addition to the special relevance, has to show that it's not unduly prejudicial under 403.

Here, this evidence just simply fails both steps and particularly in regard to the Chicopee hotel -- motel event. What the First Circuit looks for for special relevance is some kind of connection or identity between the past offense and the currently charged one. This testimony from Dana Graham, in particular, and the officer, as well, says really nothing about Mr. Rathbun's motive, knowledge, anything about bomb-making experiences, intent at the time of the April 2nd issue.

In this context, the first --

THE COURT: I've read the motion. This is the same as you motioned.

ATTORNEY WATKINS: Pardon?

THE COURT: You're not arguing anything new, and I've made my ruling. So if you're going to argue something new, tell me what's new.

ATTORNEY WATKINS: Well, I just want to -- I'll jump to the end of it. Indeed, it's unclear still to this day how the government is going to argue this particular thing -- event.

As I now understand, the government's theory of this if there was some kind of motive, it's anger at the world.

That's not something that's going to come up from anything that Ms. Graham has to say or anything that the officer has to say.  To the extent that it's state of mind, the only way you get the state of mind is from propensity.  That on this occasion at the Chicopee motel, while under the influence of drugs, he acted in this way.  Therefore, on April 2nd he might have been -- when he was under the influence of drugs, he acted this way.  It's just impossible to see how the jury does not need to make a propensity-based inferential link to make that connection.

So I'm fronting this all now because I know the Court's ruled that it's going to come in, but I think where the rubber is going to hit the road is when we come to closing argument and the government mentions this particular event and how the jury is going to -- how the jury should evaluate it at that time because there simply is no cognizable link and certainly none that overcomes the 403 problem.

THE COURT:  Okay.  So that was relative to the Chicopee motel incident.  Did you want to say anything about Mr. Alschuler who's pretty much limited to just he was employed and he lost his job because of his job performance and he was intoxicated or drug use at work?  We fired him.

ATTORNEY WATKINS:  Yeah, I don't want to say

anything more about it, but it suffers from the same problem.  It is unclear what the government is going to argue in the final analysis.

THE COURT:  All right.

ATTORNEY WATKINS:  And it has slightly more relevance perhaps, but still as to state of mind, no.

THE COURT:  All right.  Well, you state your position very well and as you did in writing.  My rationale and the rulings on the motion in limine stands for the Court's analysis and basis of the rulings.  So the government may call these witnesses consistent with the motion in limine rulings.

ATTORNEY BRESLOW:  With respect to Mr. Alschuler, he's going to be the first witness.  He'll be extremely brief, and I just request permission to lead him on the point that you have permitted the limited testimony for.

THE COURT:  All right.

ATTORNEY BRESLOW:  Then we expect to call Officers Szura from the Chicopee Police Department and then Dana Graham.  Then we'll move into another series of witnesses, mainly government officials.

THE COURT:  All right.  Very good.  And I'm referring to -- I think the motion in limines that deal with this -- there could be more, quite frankly, but I

think were talking about Docket 313.  I think it's Docket 313 that dealt with that; is that correct?

ATTORNEY O'NEILL-GREENBERG:  That's what I have.

THE COURT:  Docket 313?

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  That's what I have, too.  I think many of the docket entries touched on it.  So there may be more, but 313 was really square -- squarely on it.

ATTORNEY O'NEILL-GREENBERG:  And the last one, I think so.

THE COURT:  Okay.  Very good.

ATTORNEY BRESLOW:  And our primary brief was Document 233.

THE COURT:  Very good.  Thank you.  So we can get the jury.

CLERK RIVERA:  Yeah.

ATTORNEY BRESLOW:  Your Honor, in terms of timing, I know Your Honor wants to create a lunch break for the jury.  We expect that Mr. Alschuler will be five minutes, if that, and the two others will be 15 minutes to 20 minutes each.

THE COURT:  Okay.  So that will take us -- we will probably do lunch right after.

ATTORNEY BRESLOW:  Okay.

**(The jury entered at 12:00:)**

THE COURT:  Please be seated.

All right.  During that break, of course I just need to check with you that everyone followed my instructions. If there's anything that came up, just raise your hand and, as I told you, we'll talk about it.  But was everyone able to follow my instructions not to talk about the case with each other, anyone else, look up the case, be exposed to any media about the case?  Everyone follow my instructions?

THE JURY:  (Yes.)

THE COURT:  All right.  Affirmative responses I have seen from each juror.  The jury remains fair and impartial.

Okay.  Government, next witness.

ATTORNEY BRESLOW:  Yes, Your Honor.  The government calls Alfred Alschuler.

CLERK RIVERA:  Good morning, Mr. Alschuler.  Can please stand and raise your right hand?

**Alfred Alschuler (Sworn)**

**DIRECT EXAMINATION**

Q.   (By Attorney Breslow) Okay.  Good afternoon.

A.   Hello.

Q.   Yes, you can take the mask off.

Can you introduce yourself to the jury?

A.    I'm Alfie Alschuler.  I work at All Energy Solar in Chicopee.

Q.    And how do you spell your last name?

A.    A-l-s-c-h-u-l-e-r.

Q.    Can you tell the jury what is All Energy Solar?

A.    It's a residential and commercial solar company.

Q.    And really briefly, what sort of work do you do?

A.    Various -- I do work at the warehouse and do site visits, and I also manage some of the employees.

Q.    Okay.  And does the company generally install solar panels on buildings and residences?

A.    Yes.

Q.    All right.  Are you familiar with a man named John Rathbun?

A.    Yes.

Q.    Do you recognize him in court?

A.    Yep.

Q.    Can you please point him out and describe what he's wearing?

A.    He's here wearing a white shirt.

        THE COURT:  All right.  The witness looked directly at Mr. Rathbun, pointed directly at Mr. Rathbun and described the color of the shirt he is wearing.  I find that he has been identified.

Q.    (By Attorney Breslow) How have you come to know

Mr. Rathbun?

A.   I hired him to work at the company.

Q.   And what was his job in particular?

A.   He was an installer.  So he was putting panels on the roofs.

Q.   When, approximately, did you hire him most recently?

A.   In the fall of 2019.

Q.   Who was the defendant's -- I'll call him the defendant if that's okay for clarity.

Who was the defendant's direct supervisor at All Energy Solar?

A.   Chris Meyerhoff.

Q.   Who was Chris Meyerhoff's supervisor?

A.   I was.

Q.   And your position was?

A.   At that time, it was branch manager.

Q.   I want to focus you on March 3, 2020.  Were you working that morning?

A.   Yes.

Q.   Where were you working?

A.   In the office at Chicopee.

Q.   And was Mr. Meyerhoff with you in the office?

A.   Yes.

Q.   Now, without getting into any specifics, did you receive complaints concerning the defendant's job

performance and/or substance use while at work?

A.   Yes.

Q.   Did you meet with the defendant that day?

A.   Yes.

Q.   And after that meeting, approximately two days later, what did All Energy Solar do with respect to the defendant's employment?

A.   He was fired.

         ATTORNEY BRESLOW:  No further questions, Your Honor.

         THE COURT:  All right.  Any questions?

         ATTORNEY O'NEILL-GREENBERG:  No questions.

         THE COURT:  All right.  Thank you, sir.

         ATTORNEY BRESLOW:  And next we call Peter Szura.

         ATTORNEY O'NEILL-GREENBERG:  Could we be seen at sidebar?

**(Sidebar conference.)**

         ATTORNEY O'NEILL-GREENBERG:  Objection.

         THE COURT:  Objection noted.  Overruled.  All right.

**(End of sidebar conference.)**

         CLERK RIVERA:  If you can just move to the next witness stand?

         THE WITNESS:  Okay.

         CLERK RIVERA:  Thank you.  Can you please raise

your right hand?

**Przemyslaw Peter Szura (sworn)**

**DIRECT EXAMINATION**

Q.    (By Attorney Breslow) Can you state and spell your name?

A.    Sure.  My name is --

THE COURT:  You can sit down, sir.

THE WITNESS:  I'm sorry.

THE COURT:  No problem.

THE WITNESS:  Full name is Przemyslaw Peter Szura, P-r-z-e-m-y-s-l-a-w P-e-t-e-r S-z-u-r-a.

Q.    (By Attorney Breslow) Sir, how are you employed?

A.    I am a Chicopee police officer in the city of Chicopee.

Q.    How long have you been a Chicopee police officer?

A.    I have been a police officer a little over three years now.

Q.    Before joining the Chicopee Police Department, where did you work?

A.    I worked as a security forces member in the Massachusetts Air National Guard.

Q.    And are you still a member of the Air National Guard?

A.    Yes, sir.

Q.    I want to focus on your job on March 3, 2020.  Can you tell the jury what your responsibilities were that

day?

A.   Yes.  I was assigned to the uniform patrol division on the four p.m. 'till midnight shift, and I was assigned to patrol district three that day.

Q.   Okay.  So let's take the uniform patrol division first.  Can you tell the jury, just in plain terms, what an officer does while on uniform patrol?

A.   While on uniform patrol I respond to calls for service, for emergencies.  I enforce Massachusetts general law, and I provide continuous patrol of my assigned area.

Q.   And you mentioned district three.  Can you explain to the jury briefly where district three is?

A.   In the city of Chicopee, district three covers a part of Memorial Drive, Fuller Road, Sheridan Street, Westover Road up to the Air Force Base, sir.

Q.   And are you familiar with a local business on Memorial Drive called the Quality Inn?

A.   Yes, sir.

Q.   And where does that fall with respect to district three?

A.   Quality Inn is a part of district three.  It is on Memorial Drive, right before the Chick-fil-A.

Q.   I'd like you to focus now on your own personal response to a call at the Quality Inn on March 3, 2020. Do you recall that evening?

A.   Yes, sir.

Q.   When, approximately, were you dispatched to the Quality Inn?

A.   At approximately ten p.m.

Q.   And why were you dispatched to the Quality Inn?

A.   I was dispatched to the Quality Inn for a larceny-in-progress call.  Dispatch advised me that there are men actively breaking into a van.

Q.   And have you listened to the 911 call by the complainant to the police about this break-in to the person's van?

A.   Yes, I have.

Q.   And have you reviewed a transcript of that call as well?

A.   Yes, I have.

Q.   Is the 911 call an authentic recording of that call?

A.   Yes, it is.

Q.   And is the transcript a fair and accurate transcript of that recording?

A.   Yes, it is.

ATTORNEY BRESLOW:  I'd like to display PX-125-2 to only the Court, counsel, and witness.

So with respect to -- did we just lose some screens? Can the Court, counsel, and witness all see the first page of PX-125-2?

Can we page slowly -- there's only two or three pages. Can we move through and just hold on that page for a moment to allow the witness to read that page to himself?

Q.    (By Attorney Breslow) And if you could just indicate when you're done, Officer?

A.    All set, sir.

Q.    And when you're done with the second page, if you can indicate that as well?

A.    All set, sir.

Q.    Have you listened to PX -- what's been marked for trial as PX-125-1, which is the actual 911 recording?

A.    Yes, I have.

Q.    Okay. In the recording and on this transcript, in particular page 2, the page you're looking at right now, who does the caller identify himself by name as?

A.    He identifies himself as John Rathbun.

Q.    Okay. And I think you earlier testified that this is a fair and accurate transcript of the recording, and the recording is an authentic 911 call to the police concerning this incident?

A.    Yes, it is.

        ATTORNEY BRESLOW:    All right. I offer, Your Honor, PX-125-1, which is the audio of the call, and PX-125-2, which is the transcript.

THE COURT:  Is there an objection to the audio and the transcript?

ATTORNEY O'NEILL-GREENBERG:  Yes, we have an objection.

THE COURT:  To the audio and the transcript?

ATTORNEY O'NEILL-GREENBERG:  Yes.

THE COURT:  All right.  Sustained.

ATTORNEY BRESLOW:  Sorry?

THE COURT:  Sustained.

ATTORNEY BRESLOW:  The objection to the audio and the transcript is sustained?

THE COURT:  It's sustained, yes.

ATTORNEY BRESLOW:  May we be heard?

THE COURT:  No.

ATTORNEY BRESLOW:  So I'd like to take this down then.

Q.   (By Attorney Breslow) I'd like to ask you to describe what you saw and did with respect to this call?

A.   Yes, sir.  I arrived at the Quality Inn and I observed the van matching the description.  If you're facing the Quality Inn to the far left of it, I parked my cruiser a distance away.  Safe approach, I got out of my cruiser.  I started walking towards the van and I stopped at a distance.

I waited for my backup to arrive because I did not

want to approach and clear the van by myself.  From the distance, I did not observe anyone in the van.  And while I was approaching the van, from the second floor, there was a man shouting at me.  He was shouting, "Look, look. They're in the front seat right now.  They're in the van."

     After a couple of seconds, my back-up arrived, two detectives that were working the street at the time.  One of the detectives came up to me.  We approached the vehicle tactically.  We cleared it.  We observed no one in the vehicle.  The vehicle was locked.  There was no signs of forced entry.  And while clearing the vehicle, the man continued shouting that there is people actively in the vehicle when I observed nobody, neither did the detective that cleared the vehicle with me.

     So after a quick back and forth, I asked the man to come downstairs and speak to me because I did not want to continue shouting with him to the second-story floor.

Q.   Okay.  Please continue.

A.   The male party then came downstairs, opened the side door to the hotel, and we began speaking.  He never got close to me but continued saying that there is people in the front seat of the van.  I told him there's not.  The male identified himself to me as John Rathbun.  What was unusual was -- it was early March.  It was dark at night --

THE COURT:  I'm going to stop you right there. That's beyond the scope.  So next question.

ATTORNEY BRESLOW:  Okay.  One moment, Your Honor.

Q.    (By Attorney Breslow) I think you were talking about the proximity of you to John Rathbun and then also to the vehicle.

When Mr. Rathbun came down to speak with you in the parking lot, approximately how far away was he from you?

A.    From myself, sir?

Q.    Yes.

A.    Somewhere around 10 to 15 feet, about 10 to 15 feet, sir.

Q.    Okay.  So closer than you and I are together right now?

A.    A little bit closer, yes.

Q.    Okay.  And if you could tell the jury, where was the van in relationship to the two of you?

A.    I was facing towards the hotel door, towards John, and the van was behind me.  I was facing away from the van at the time of the conversation.

Q.    Were you able to observe how he appeared to you during your interaction with him, both from the upstairs hotel area and downstairs as well?

A.    Well, from the upstairs area, he was shouting that

there is people in the van.  While from a distance and not up close, I noticed that there is no one there which was unusual behavior.

Once he came downstairs to speak to me, he continued to say it, but it was also freezing cold outside in the middle of the night in March and he was just wearing shorts, no shoes, no T-shirt, anything like that.  So I continued to tell him that there was no one in the vehicle.  And then --

ATTORNEY O'NEILL-GREENBERG:  Objection.  I think another question.

THE COURT:  Right.  So next question, please. That's just beyond the scope of the question that you had asked.

ATTORNEY BRESLOW:  Sure.

Q.   (By Attorney Breslow) So can you describe his -- were you able to observe his demeanor, meaning how he was behaving, how he was speaking?

A.   Yes, sir.

Q.   Can you tell the jury how you would describe his demeanor?

A.   I believed that he was displaying an altered state of mind.

Q.   So without --

ATTORNEY BRESLOW:  If I may, Your Honor?

Q.    (By Attorney Breslow) Without, without assuming what was inside his mind, if you could just testify as to his outward appearance, his speech, his manner?

A.    Yes, sir.  So like I previously stated, it was very cold outside, night in March, and he was just wearing shorts which was very unusual.  And then he continued to say that there was someone in the van when there was not.

I asked him a follow-up question.  I asked if there was people in van previously and then they left and they came back into the van, how come in between that time you didn't secure the van and call the police in the first place, and he could not provide me with a logical answer.

Q.    If we could pause right there.

Had he told you at some point during this interaction that the people had been in the van and they had left and then returned to the van?  Is that why you asked him about that?

A.    Yes, sir.  So I apologize.  I forgot to mention that. When we first began speaking outside, he was saying that there is -- the males are still in the vehicle.  And then he told me that they broke into the vehicle, they left, and then they came back.

Q.    And were still there as you were talking?

A.    Yes.

Q.    Okay.

A.   So my follow-up question to John was if that's the case, how come the first time they left, you didn't secure your vehicle and call the police right away.

Q.   How did he respond?

A.   I don't remember his exact words, sir, but the answer did not make sense to me so much that I documented that in my police report that his answers just were not logical. They were not making sense.

Q.   Okay.  And did you ask him for a description of the people that he thought had broken into the van and were still there?

         ATTORNEY O'NEILL-GREENBERG:  Objection.

         THE COURT:  Overruled.

         THE WITNESS:  I did, sir.

Q.   (By Attorney Breslow) And how would you describe his response?

A.   He could not provide me with one.  All he said was that they were far away.

Q.   How did he appear physically?  Did he appear steady on his feet?

A.   He was steady on his feet, sir.

Q.   Did you go into the hotel room?

A.   No, sir.

Q.   Did you conduct any kind of sobriety test for him?

A.   No, sir.

Q.    What did you do after your interaction with Mr. Rathbun?

A.    I advised him that I will do a police report in regards to the incident.  And then I went inside the hotel room -- or excuse me -- inside the hotel to speak with the clerk or manager.  They have exterior cameras at Quality Inn.  So I wanted to pull up the footage to see if, in fact, there was someone that broke into his van.  But at the time, the hotel worker told me that the cameras are down for maintenance and there's going to be no footage.

Q.    Okay.  And why did you not go into the hotel room?

A.    Sir, the call came in as a larceny call in regards to the van.  I investigated the larceny, concluded that there was none.  I checked out the van.  It appeared in order. I spoke with Mr. Rathbun outside.  I felt no need to go inside of his hotel room or further investigate.

ATTORNEY BRESLOW:  Okay.  Your Honor, may we be heard on WhisperTech?

THE COURT:  Uh-huh.

**(Sidebar conference.)**

ATTORNEY BRESLOW:  So, Your Honor, we are pretty much at the end of Officer Szura's testimony except he has already authenticated the 911 call and the transcript. This is the voice of the defendant the second witness will say, and it's direct evidence of the incident from the

defendant's own mouth.  So -- and it's not any more or less prejudicial than the testimony we've heard, and it's not cumulative.  It's a completely different and separately probative part of the evidence.

THE COURT:  No.  I think it is cumulative, and the danger of prejudice is from cumulative repetition of this.  So I think this officer's testimony fairly described and went over the areas that the motion in limine allowed him to go over.

My ruling on the transcript and the actual audio of the call itself was based clearly on cumulative nature thinking that the cumulative nature would soon mount and build to a level that I thought was prejudicial.  So that's the basis for that.

Does the defense want to say anything?

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  Okay.

**(End of sidebar conference.)**

ATTORNEY BRESLOW:  Your Honor, no further questions.

THE COURT:  Thank you.

ATTORNEY O'NEILL-GREENBERG:  Just briefly, Your Honor.

THE COURT:  Okay.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Good afternoon.

A.    Hello, ma'am.

Q.    Officer, at the end of all of this, when you were finished the investigation and you were about to leave, you told John if he saw the men come back to call the police again, right?

A.    Yes.

Q.    Okay.  That's it.  Thank you.

        THE COURT:  All right.

        ATTORNEY BRESLOW:  No redirect, Your Honor.

        THE COURT:  Thank you, sir.  You're all set.

        THE WITNESS:  Thank you.  Have a great day.

        ATTORNEY BRESLOW:  Your Honor, the next witness will be approximately the same amount of time, cover roughly the same area.  Did Your Honor want us to call the witness or stop for lunch?

        THE COURT:  We're going to call the witness. The clerk is going to just clean that one witness stand.

        ATTORNEY BRESLOW:  If both the witness boxes are clean, may we ask the witness to take the primary box?

        THE COURT:  Sure.

        ATTORNEY BRESLOW:  And, formally, Your Honor, the government calls Dana Graham.

        THE COURT:  Okay.  Ms. Graham, you can just step

into the witness box now.

**(Sidebar conference.)**

THE COURT:  To the parties, is the defense requesting or considering any type of limiting instruction after this witness as to this incident, this hotel incident?

ATTORNEY WATKINS:  No, Your Honor.  We concluded that there's simply no limiting instruction that can properly undue the damage without --

THE COURT:  That's completely dramatic effect for the record, Attorney Watkins.  Come on.  Do you want an instruction that indicates something similar to the final instructions I think as to the purpose, the purpose, the limited purpose for what it can be considered, and that Mr. Rathbun is not being charged with or there's no issue regarding this hotel incident but that it goes to whether or not the jury thinks it's important to consider his state of mind only, which a jury may or may not think was important for them.  In other words, just focusing them on the issue and distracting that focus from any possible consideration of bad act or conduct evidence.

ATTORNEY WATKINS:  At this point, we are not asking for a limiting instruction.  I would ask the Court perhaps after the testimony if we can revisit it?

THE COURT:  Sure.  Absolutely.  Okay.

ATTORNEY O'NEILL-GREENBERG:  Can we just note our continuing objection for it.  It violates 404, and it's not propensity evidence.

THE COURT:  Absolutely.  I appreciate your objection.  I've always thought the objection was well placed, but I've issued my rulings.  And I do think it's a potential area that might be appropriate for an instruction.  That's why I asked for you to consider that. All right.

**(End of sidebar conference.)**

THE COURT:  Go right ahead.

CLERK RIVERA:  Ma'am, can you please raise your right hand?

**Dana Graham (Sworn)**

**DIRECT EXAMINATION**

Q.   (By Attorney Breslow) Good afternoon.

A.   Hello.

Q.   Can you introduce yourself to the jury?

A.   My name is Dana Graham.

Q.   Could you spell your name just for the record?

A.   D-a-n-a G-r-a-h-a-m.

Q.   Ms. Graham, how old are you now?

A.   I'm 34 years old.

Q.   And where did you grow up?

A.   I grew up in Westfield, Massachusetts.

Q.    In March of 2020, where were you living?

A.    I was residing in Chicopee.

Q.    Now, do you know a man named John Rathbun?

A.    I do.

Q.    And when, approximately, did you meet John Rathbun?

A.    Right around March or April of last year.

Q.    And approximately how many times have you spent personally with John Rathbun?

A.    Less than a handful.

Q.    Do you recognize him in court?

A.    Yes.

Q.    Can you please point him out and describe briefly what he's wearing?

A.    He's wearing a white shirt and tie.

        THE COURT:  Yes, the record will reflect identification was just made by pointing directly at, looking at and identifying clothing of the defendant.

Q.    (By Attorney Breslow) Who introduced you to the defendant?

A.    A mutual friend, Glenn Miliken.

Q.    And, generally, for each of the times that you were with the defendant, what were you doing?

A.    I was using drugs.

Q.    I'd like to focus on your drug use.  Can you tell the jury when approximately, meaning what year, you first used

drugs?

A.    I started using heroin and cocaine in 2009.

Q.    And how old were you in 2009?

A.    I was around 23.

Q.    Okay.  And so that is approximately 12 years ago?

A.    (Indicating.)

Q.    Can you tell the jury over these 12 years how -- what drugs have you used?

A.    So I've used a lot of drugs.  They included cocaine, heroin, alcohol, crack cocaine, marijuana, ecstasy, acid, crystal meth.

Q.    Crystal meth.  All right.

      And have you sometimes used these drugs in combination with each other?

A.    Yes.

Q.    Okay.  And if you could, how frequently would you estimate that since 2009 you've used drugs -- these drugs either individually or in combination?  Just can you give the jury a sense of your past drug use?

A.    I've had a little bit of clean time, but I would -- I used pretty much most of the time.

Q.    Okay.  I'd like to focus on your clean time.

A.    Okay.

Q.    Can you tell the jury over these past 12 years what your periods of sobriety were, meaning like how many times

did you get clean and roughly when they took place?

A.    So I struggled a bit.  I got clean originally in the beginning of 2013.  I entered a residential treatment home in Holyoke called Gandara.  I was court mandated there for six months, but I ended up staying for about ten months because I just, you know, I liked it.  Then I graduated that program and entered what's called a three-quarter house.  It's the next step after the halfway house.  So I lived there for some time while I attended college, and it was a few months after that that I had relapsed due to -- I got my wisdom teeth removed and it just went badly from there.  So that was the first time I got clean.  I was, you know, there have been many attempts to get clean along the way --

THE COURT:  Sustained.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

THE COURT:  I saw an objection was about to be made.  This is not relevant.  Can you please focus right in on the relevant point for which this witness is called?

ATTORNEY BRESLOW:  Absolutely, Your Honor.

Your Honor, may I just be heard very briefly on WhisperTech?

**(Sidebar conference.)**

ATTORNEY BRESLOW:  So the reason why we're offering this testimony, Your Honor, is because it's

relevant to her ability to perceive and recall, and the defense knows about this. To the extent that they're cross-examining on it, we wanted to front it and provide it to the jury ahead of time.

One additional question that we're planning on asking in terms of this background, for the same basic purpose is has she committed crimes while using drugs. She'll say that she committed shoplifting. Then we'll talk about briefly her most period -- her current period of sobriety, because we think that also goes to the jury's consideration of her ability to perceive and remember, and that period of sobriety started in December of 2020 and continues to this day. After we're done with that, we're right to the events of March 3rd.

THE COURT: Okay. You're prohibited from any of your proffered questions. Please move right to the date of event right now. The jury knows that she is a drug user. So that's there. All the details and history of her drug use, those specific details are not relevant. So the jury does know that general background which kind of frames the reason or starts to frame that issue that is relevant here, the hotel room incident. So let's go right to that.

ATTORNEY BRESLOW: Your Honor, I would like to be permitted to ask her if she's currently sober and for

how long.

THE COURT: Sure.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) Ms. Graham, are you currently sober and clean?

A.   I am.

Q.   Can you tell the jury for how long you've been sober and clean, just the period of time?

A.   Today is actually my six months' sobriety date.

Q.   Okay.  So can you tell the jury how clear is your mind today?

A.   Oh, I'm very clear-minded today.

Q.   How are you feeling today?

A.   I feel good, a little nervous but, overall, I'm okay.

Q.   All right.  So I'd like to focus now on the night of March 3, 2020.  Where were you that night?

A.   I was hanging out with John in a motel.

Q.   What was the motel?

A.   Quality Inn.

Q.   Where was it located?

A.   Off of Memorial Drive in Chicopee.

Q.   Who else was with you for at least part of the night?

A.   Devin, a friend named Devin.

Q.   And do you know his friend's last name?

A.   I do not.

Q.   What relationship did you have with Devin?

ATTORNEY O'NEILL-GREENBERG:  Objection; relevance.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  He was just a mutual friend that I met through John, and I sometimes bought drugs off him.

Q.   (By Attorney Breslow) What floor was your hotel room on?

A.   The second floor.

Q.   At some point, did Devin leave you and the defendant in your hotel room?

A.   Yes.

Q.   What drugs did you use that night?

A.   I used alcohol, cocaine, heroin, crack cocaine.

Q.   And what drugs did the defendant use that night?

A.   Alcohol, coke, crack cocaine, heroin, and benzos.

Q.   Can you tell the jury what benzos are?

A.   They are an anti-anxiety medication.

Q.   And is there a brand name that you're familiar with?

A.   Yes, it's called Xanax.

Q.   What, if anything, did the defendant tell you he had been doing the past several nights?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.

Q.   (By Attorney Breslow) How did the defendant appear to

you during this evening?

A.   A little erratic and jumpy, unstable.

Q.   Did the defendant tell you what had happened to him that morning of March 3rd?

A.   He mentioned he lost his job due to drugs.

Q.   That night in the hotel room, did you observe how the defendant was behaving?

A.   Yes.

Q.   Can you tell the jury how was the defendant behaving over the course of this evening?

A.   Jumpy.  He was on edge.  Suspicious.

Q.   Do you remember how the defendant was dressed at one point?

A.   I remember at one point he was in his underwear.

Q.   And only that?

A.   Yeah.

Q.   So I'd like to focus now on a particular aspect of this evening.

A.   Okay.

Q.   Can you tell the jury what the defendant did and said at some point during this evening?

A.   Well, he had mentioned that he has been up for a couple of days and --

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.  That question and the

answer -- to the extent you heard some of the answer is stricken and not to be considered by you for any purpose. Okay.

Q.   (By Attorney Breslow) So --

THE COURT:  Ma'am, was there any incident regarding a van?  Did you know him to drive a van?

THE WITNESS:  Yes.

THE COURT:  You knew he drove a van?

THE WITNESS:  Yes.

THE COURT:  Was there some incident involving his van?

THE WITNESS:  Yes.

THE COURT:  Tell us about that.

THE WITNESS:  Okay.  John thought that there were people trying to break into his van.  I looked myself.  I didn't see anybody.  I told him that I didn't see anybody, but he persisted that he saw people trying to break into his van.  So he proceeded to call the police. I told him that wasn't a good idea but he was committed. So he called 911.

Q.   (By Attorney Breslow) And when he called 911, what did you do?

A.   I went and hid in the bathroom.

Q.   Why?

A.   Because I had drugs.  There was drugs in the hotel

room.  They were open and the police were coming.  So I didn't want to get in trouble, so I hid in the bathroom.

Q.  And what did you do with the drugs?

A.  I took them with me in the bathroom.

Q.  At some point, did you know that the police actually arrived at the hotel?

A.  Yes, I saw them arrive.

Q.  Okay.  So if you can, focusing on that period of time, tell the jury what the defendant did and said then or what happened then?

A.  He was on the phone with the operator telling them about the incident with the van and then the police showed up while he was still on the phone, and then he proceeded to go downstairs and talk to them.

Q.  Okay.

A.  That's when I went into the bathroom.

Q.  I see.  And after the defendant talked to the police, what did he do?

A.  Came back upstairs.

Q.  And, at some point, did the police leave?

A.  Yes.

Q.  Did the defendant -- well, while the defendant was telling you and the police that he was seeing people inside his van, were you able to observe his speech and his motor controls, meaning his ability to move around and

walk?

A.    While he was on the phone with the 911 operator, his speech was a little slurred, but I don't think his walking was impaired.

Q.    I just want to be clear.  I'd like there to be no confusion about this point in case there was from the earlier testimony.  When the defendant was stating to you and to the police that there were people in his van, were you able, at the same time, to look downstairs and observe the van?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE WITNESS:  Yes.

THE COURT:  Overruled.  That will stand.

Q.    (By Attorney Breslow) So tell the jury what you saw as the defendant was telling you and others that there were people inside that van.

A.    I looked myself and there was nobody in the van or around the van, and I saw the police come at that time.

Q.    Okay.  So I just have one final question and that is you earlier testified that this night you had been using a pretty substantial mixture of drugs yourself?

A.    Yes.

Q.    So with that in mind, can you tell the jury how certain are you that there was nobody in the defendant's van?

A.    I'm completely certain.

ATTORNEY BRESLOW:  No further questions, Your Honor.

THE COURT:  Go right ahead.

ATTORNEY O'NEILL-GREENBERG:  Just briefly.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Good afternoon.

A.    Good afternoon.

Q.    Congratulations on your six months of sobriety.

A.    Thank you.

Q.    That evening that you just described with you and John, fair to say that was a pretty serious drug binge?

A.    Yes.

Q.    You guys were using drugs for many hours?

A.    Yes.

Q.    And all the drugs you testified that you were using you were mixing them?  You weren't like doing one and the other?  You were --

A.    Yeah, we were doing them all at the same time pretty much.

Q.    Okay.  And at the end of the night, once the officers left, John came back up to the room?

A.    Yes.

Q.    And ultimately he went to bed?  He went to sleep?

A.    Yes.

Q.   And that night he was never physically violent, right?

A.   No.

Q.   And he never said anything hateful against Jews or any other people?

A.   No, never.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  No further questions.

THE COURT:  All right.  Thank you.

ATTORNEY BRESLOW:  No further questions for the government, Your Honor.

ATTORNEY WATKINS:  Judge, we would request an instruction at this point.

THE COURT:  All right.

ATTORNEY BRESLOW:  Could we ask the witness to step down?

THE COURT:  You're all set.  You can leave. Thank you.

All right.  Ladies and gentlemen, I had told you in the beginning instructions that there might be some evidence that you consider for a limited purpose.  This was -- you just heard two witnesses about a hotel incident.  There is no indictment.  There's no charges against Mr. Rathbun for anything to do with the hotel incident, drugs, vans, people in the van, nothing.

There's no criminal charges about that, and you should not use this evidence to draw any negative conclusions about the defendant's character or what type of person he is.

Rather, this evidence was allowed for a very limited purpose, the limited purpose of giving you some information of the defendant's life around the time of the alleged incident to give you some type of context.  Life situation, employment status, frame of mind, state of mind, general life well-being-type issues.  That's why this was allowed in.

You should draw no negative conclusions from what you heard or if you accepted information about drug use or hotels or calling police or things like that.  The limited purpose that you can consider this for is what I have explained to you.  All right.

WispherTech.

**(Sidebar conference.)**

THE COURT:  Defendant, I know your objection continues, but to the extent that I -- what I said, are you satisfied while maintaining your objection with what I said to the jury?

ATTORNEY O'NEILL-GREENBERG:  Yes, maintaining the same objection.  Thank you.  We're satisfied.

THE COURT:  All right.  Very good.  Is there any objection to that instruction by the government?

ATTORNEY BRESLOW:  No.  We're glad you offered it.

THE COURT:  Perfect.  Thank you.

**(End of sidebar conference.)**

THE COURT:  All right.  Is there a next witness we can get to?

ATTORNEY DESROCHES:  Yes, Your Honor.  We can proceed if the Court would like.

THE COURT:  I think so.  I think we're -- I don't know if lunch is here yet.

Christina, do you know if lunch is here yet?

CLERK RIVERA:  I just called down to check and I'm just waiting on a response.

THE COURT:  Yes.  You can call another witness.

Is it spaghetti and meatballs again today?

CLERK RIVERA:  It's not.  It's pizza.

THE COURT:  So we don't want it to be cold.

Oh, it's here.  So I think the jury is entitled to hot pizza.  Okay.  So we'll take a lunch right now because there's hot pizza -- not for you.

ATTORNEY DESROCHES:  I can't argue with that.

A JUROR:  Thank you, Your Honor.

THE COURT:  The same instructions.  Absolutely every single instruction is the same.  No talking about the case amongst yourselves.  Don't go to your phone.

Don't talk to anybody else.  Don't be exposed to any media.  Don't look on social media or post on social media.  It's all the same instructions.  Thank you.

**(The jury left the courtroom at 12:48.)**

THE COURT:  So two o'clock -- no, actually quarter of, 1:45.

ATTORNEY WATKINS:  Sorry?

THE COURT:  1:45.

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY WATKINS:  Thanks.

**(A recess was taken at 12:49 until 1:49.)**

THE COURT:  You can be seated.  We are just waiting for the jury to be all lined up.

**(The jury entered at 1:51.)**

THE COURT:  Everyone can be seated.

The usual question, was everyone able to comply with my instructions not to talk to each other about the case, to anyone else, not to access the case on the internet, post anything, read anything?  The entire instructions, was everyone able to follow?

Okay.  Affirmative responses from all jurors.  They remain fair and impartial.

All right.  Government.

ATTORNEY DESROCHES:  Thank you, Your Honor.  The government calls Mary Sharry.

CLERK RIVERA:  Can you please raise your right hand?

**Mary Sharry (sworn)**

ATTORNEY DESROCHES:  May I proceed, Your Honor?

THE COURT:  Yes.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) You can please remove your mask.  Good afternoon.

A.   Hi.

Q.   Could you please introduce yourself to the jury and, for the record, spell your last name?

A.   Mary Sharry, and it's S-h-a-r-r-y, just like the wine.

Q.   So if I could ask you to pull the microphone a little closer?

A.   Okay.

Q.   Sorry.  You're not the first person to have this problem with the microphone.  You can pull it closer to you if you need to.

A.   Okay.

Q.   So just -- I'm not sure if everyone heard you?

A.   It's Mary Sharry, S-h-a-r-r-y.

Q.   Mary Sharry, S-h-a-r-r-y, correct?

A.   Correct.

Q.   If at any point during the course of your testimony

you think you need some water or anything like that, or if you're having trouble keeping your voice up, please just let us know and then we can make some accommodations. Okay?

A.    Okay.

Q.    Now, Ms. Sharry, are you employed?

A.    Yes.

Q.    How are you employed?

A.    I used to work at Genesis House.

Q.    Okay.  So you used to work at Genesis House, correct?

A.    Correct.

Q.    Are you currently employed?

A.    I am.

Q.    Are you employed by Carr Properties?

A.    I am.

Q.    So for how long have you worked for Carr Properties?

A.    Since 2001.

Q.    And you said you used to work at Genesis House; is that right?

A.    Correct.

Q.    When did you start working at Genesis House?

A.    2001, about 20 years ago.

Q.    So are you still at Genesis House?

A.    No.

Q.    You have a different assignment at Carr Properties?

A.    Different location.

Q.    Can you describe what Carr Properties is for the jury?

A.    Carr Properties is a private management company.  We have different locations in New York, Connecticut, Massachusetts.

Q.    And Genesis House is one of those properties that Carr Management manages?

A.    Right.

Q.    So you said you began working in what year at Genesis House?

A.    2001.

Q.    And when did you leave Genesis House?

A.    February 2021.

Q.    When you were at Genesis House, what was your position there?

A.    I supervised the maintenance people, social workers, housekeeping, did the day-to-day operations of the campus.

Q.    What was your title?

A.    Manager, property manager.

Q.    So your responsibilities included supervising the people that you just described?

A.    Correct.

Q.    Are you familiar with someone by the name of Sheila Rathbun?

A.   Yes.

Q.   Are you familiar with someone by the name of Sheila Tipton?

A.   Yes.

Q.   And we'll get to Mrs. Rathbun and Mrs. Tipton shortly, but first I just want to talk about a few other things.  Can you describe for the jury what Genesis House is?

A.   Okay.  It's an independent living facility for 62 and over.

Q.   So 62 years -- people who are 62 years old and older?

A.   Correct.

Q.   Where is it located?

A.   It's 832 Converse Street, Longmeadow, Massachusetts.

Q.   What is the relationship between JGS and Carr Properties?

A.   They're a subcontractor.

Q.   So JGS contracts Carr Properties?

A.   Correct.

Q.   And to do what specifically?

A.   To run the campus, to run Genesis House.

Q.   Genesis House, correct?

A.   Correct.

Q.   So are there Jewish customs that are followed at Genesis House?

A.    There are.

Q.    What are those?

A.    When we have a Jewish holiday, we have to have -- we have to have kosher cooking.  We have to observe the Jewish traditions when it comes to Rosh Hashanah, Yom Kippur, Purim, those types of things.

Q.    Are there people who are of faiths other than the Jewish faith who live at Genesis House?

A.    There are.  We have Christians.  We have different faiths.

Q.    Where do the residents from Genesis House come from?

A.    All over the country.

Q.    From different states?

A.    And all over the country, all over the world truthfully.

Q.    So are there any other facilities at the JGS campus that you're aware of?

A.    Yes.

Q.    What are those facilities?

A.    There's Ruth's House, which is assisted living; Genesis House, which is independent living; the nursing home; and then there's a day care center, Wernick day care center.

Q.    Do residents of Genesis House ever relocate to one of the other facilities at JGS campus?

A.    Yes.  They can transition to those facilities.

Q.    Why would that happen?

A.    If they need assisted living or if they have to go to nursing care because they can't live independently.

Q.    So Genesis House is independent living and sometimes as --

A.    Usually the first step is independent living, which is Genesis House, and then they can go to assisted living or they can go to the nursing home.

Q.    So as the manager of Genesis House, do you work onsite?

A.    I do.

Q.    Where is your office?

A.    It's in first building, A building.

ATTORNEY O'NEILL-GREENBERG:  Objection.  Can we clarify she doesn't currently -- not currently working there.

ATTORNEY DESROCHES:  I may have used present tense.  I apologize.

THE COURT:  That's fine.

Q.    (By Attorney Desroches) Was your office at Genesis House when you worked there?

A.    Yes.

Q.    And where was your office when you worked there?

A.    It was in the first building.

Q.    Are there other apartments located in that same building where your office was?

A.    Yes.

Q.    What are the requirements -- what were the requirements when you worked there for someone to live at Genesis House?

A.    You have to be 62 and over.  You have to have a good landlord reference.  You can't have a criminal background. You have to be low income.

Q.    What is the average age of a resident of Genesis House?

A.    Now or then?

Q.    Then.

A.    Then?

Q.    When you worked there?

A.    When I worked there, I would say about 80, 82.  It changes, but then it was about 80, 82.

Q.    Just so I'm clear and the record is clear, from this point on when I'm asking about your knowledge of Genesis House, I'm asking about your knowledge at the time you worked there at Genesis House.

A.    Correct.

Q.    Okay?  So that was 2001 until 2021?

A.    Correct.

Q.    So when you worked there, did residents sign leases?

A.   They did.

Q.   Did residents pay rent?

A.   They did.

Q.   Did residents pay the full cost of the housing or was it subsidized?

A.   No, it was subsidized.

Q.   How was it subsidized?

A.   Housing Urban -- it's H-U-D, Housing Urban Development, subsidized.

Q.   So the federal government?

A.   HUD.

Q.   What was the occupancy rate of Genesis House when you worked there?

A.   Well, it varied, but during 2020 I would say it was about 80 percent -- or 2021.  I'm sorry.

Q.   How many staff worked at Genesis House when you were there?

A.   Again, it varied.  But during that time, it was two maintenance people, a social worker, and a housekeeper.

Q.   And to be clear, "during that time," you're referencing early 2020?

A.   Correct.

Q.   In your job as manager of Genesis House, did you become familiar with the grounds outside?

A.   I did.

ATTORNEY DESROCHES:  Can we have Government Exhibit 23 -- PX-23?

Madam Clerk, this is in evidence.

Q.   (By Attorney Desroches)  Ms. Sharry, I'm going to ask if you can see what's depicted on the screen in front of you?

A.   Okay.

Q.   Would a picture be easier?

A.   No, this is good.  I can see it.

Q.   So can you -- do you recognize what's depicted in PX-23?

A.   I do.

Q.   Are you familiar with the sign that appears in the lower right-hand corner of this photograph?

A.   Yes.

Q.   Can you access Genesis House from this entrance?

A.   Yes.

Q.   How far is Genesis House from this sign?

A.   About 200 feet.

ATTORNEY DESROCHES:  If we could have PX-26, please?  This is also in evidence.

Q.   (By Attorney Desroches)  So, Ms. Sharry, now on the screen before you is PX-26.  Do you recognize this photograph?

A.   Yes.

Q.   Do you recognize the building that appears in the right-hand portion of this photo?

A.   Yes.

Q.   What is that?

A.   This is Genesis, Genesis House.

Q.   So is that the building that you worked at?

A.   Yes.

Q.   How far is this building from the sign that we just looked at in the previous photograph?

A.   It isn't very far at all.

Q.   Who maintains the grounds immediately around Genesis House?

A.   My maintenance staff.

Q.   And for whom do they work?  Are they employed by Carr Properties as well?

A.   Correct.

Q.   And who maintains the grounds and the rest of the JGS campus?

A.   JGS does.

Q.   Are residents of Genesis House able to make use of the grounds of the JGS campus?

A.   They are.

Q.   And when you were manager of Genesis House, did you observe them actually doing that?

A.   Yes.

Q.   So we previously talked about a woman by the name of Sheila Rathbun.

A.   Uh-huh.

Q.   How do you know Sheila Rathbun?

A.   She works for our company, Carr Properties.

Q.   For how long have you known her?

A.   Maybe 15, 20 years.

Q.   And what does she do for Carr?

A.   She was the accountant.  She worked on a full-time basis and then she came back and she works on a part-time basis for the company.

Q.   Is she still employed by Carr Properties?

A.   I believe she is.

Q.   Do you know when she started working for Carr Properties?

A.   I think she started when I did probably, maybe 2001, 2002.

Q.   During the time that you've been the Genesis House manager or during the time you were the Genesis House manager, has Sheila Rathbun done accounting work for Genesis House?

A.   Yes.

Q.   Has her work ever brought her onsite to Genesis House?

A.   Yes.

Q.    Now, drawing your attention to Sheila Tipton.  You said you knew someone by that name, correct?

A.    I did.

Q.    How did you know Sheila Tipton?

A.    She was a resident of Genesis House.

Q.    For how long was she a resident at Genesis House?

A.    I would say five to ten years.

Q.    Five to ten years you said?

A.    Correct.

Q.    Did you have an opportunity to get to know her more than you did other residents of Genesis House?

A.    Yes, I did.

Q.    How was that?

A.    Her unit was located right next to my office.  She was also friends with my mother who was also a resident of Genesis House.

Q.    I want to draw your attention to the document that's on the witness stand in front of you.

        ATTORNEY DESROCHES:  And, Madam Clerk, in a moment, I'm going to ask for these screens to be displayed just to the Court and counsel.

        THE WITNESS:  You're talking about this one?

Q.    (By Attorney Desroches) Yes.  If you can just take a moment to look at that quickly.

A.    Okay.

Q.   Do you recognize what that is?

A.   I do.

Q.   Have you reviewed that document before being in court here today?

A.   I have.

Q.   What is it?

A.   So when we get a resident, we put together a document file for each of the residents.  This is a document file for Sheila Tipton.

Q.   That's Sheila Tipton's document file?

A.   Pardon?

Q.   That is a copy of the Sheila Tipton document -- tenant file?

A.   Correct.

          ATTORNEY DESROCHES:  Your Honor, I move to introduce PX-84.

          ATTORNEY O'NEILL-GREENBERG:  No objection.

          ATTORNEY DESROCHES:  And ask that it be published.

          THE COURT:  All right.  Without objection, that would be admitted.

**(Government's Exhibit PX-84 admitted.)**

Q.   (By Attorney Desroches) So, Ms. Sharry, can you just describe for the jury -- now that it's being displayed, just, generally speaking, what this document is and why

you would keep it?

A.   This one?

Q.   Yes, the one on the screen.  Yes.

Actually, if you can quickly look at the front page, is that the same page that you just looked at but in digital form?

A.   Yes.

Q.   Can you describe, generally, now that the jury can see, what is depicted on the first page of PX-84?

A.   Okay.  So once a year we figure out her lease based on her rent and her income, her medical expenses.  This is what we call her certification.  This was her certification done in 2008 and how much her monthly rate was going to be.

Q.   And just so the record is clear, is this the type of record that Genesis House keeps in the normal course of business?

A.   Yes.

Q.   During the time that Sheila Tipton lived at Genesis House, did she have visits from family?

A.   She did.

Q.   And did you observe Sheila Rathbun visit --

A.   Yes.

Q.   -- Sheila Tipton at Genesis House?

A.   Yes, I did.

ATTORNEY DESROCHES:  Thank you.  I have no further questions.

ATTORNEY O'NEILL-GREENBERG:  May I?

THE COURT:  Sure.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Good afternoon.

A.    Hi.

Q.    What site do you work at now for Carr Properties?

A.    I work at Brownstone Gardens in East Longmeadow.

Q.    That's another residential facility?

A.    It is, same thing.

Q.    Carr Management, the property management company you work for, it manages 19 different properties, right?

A.    Correct.

Q.    So those 19 properties include where you are now at Brownstone, right?

A.    Correct.

Q.    And Genesis House where you used to be, right?

A.    Correct.

Q.    And Genesis House, you said it was subsidized housing; is that right?

A.    Correct.

Q.    Just for folks who are 62 years or older?

A.    Uh-huh.

Q.   It's not a nursing home, correct?

A.   Say that again.

Q.   It's not a nursing home?

A.   No.

Q.   It's independent living?

A.   Correct.

Q.   And anyone can apply to live at Genesis House?

A.   Correct.

Q.   So people who are Christian can live there, right?

A.   That is correct.

Q.   People who have any faith at all can live there?

A.   That is correct.

Q.   Or someone that doesn't have any faith?

A.   That is correct.

Q.   Okay.  And you spoke a little bit about some Jewish traditions at Genesis House?

A.   Uh-huh.

Q.   In these -- there's 109 units in Genesis House; is that right?

A.   Correct.

Q.   When I say "units," I mean apartments.

A.   Yes.

Q.   In each apartment, it's just like a regular apartment, right?

A.   Correct.

Q.   It has a full kitchen, bedroom, bath?

A.   Uh-huh.

Q.   And the people who live in each unit, they don't have to follow Jewish tradition, right?

A.   They do not.

Q.   So they don't have to observe Jewish holidays, right?

A.   They do not.

Q.   They don't have to cook -- use kosher law for cooking, right?  They don't have to keep a kosher kitchen?

A.   Unless, well, you're -- those who follow kosher traditions, they keep what they call kosher houses, but they don't have to unless they follow their traditions.

Q.   So if you're living inside of your apartment at Genesis House, you can do whatever you want?

A.   Correct.

Q.   Okay.  So the holidays that Genesis House observes, that's just communally, right?

A.   Correct.

Q.   That's my point.

A.   Yes.

Q.   Now, Carr Properties has a main office, right?

A.   Correct.

Q.   And that is in East Longmeadow?

A.   True.

Q.   Different town than Longmeadow?

A.   Correct.

Q.   And the Carr Property's office is at 24 Deer Park Road?

A.   Yes.

Q.   And that's not anywhere on the JGS campus, right?

A.   Correct.

Q.   And you were asked some questions about Sheila Rathbun.  She works for Carr Property Management, right?

A.   She does.

Q.   She is there part-time currently, right?  Do you know?

A.   I don't know that personally.

Q.   Before you left, she was part-time?

A.   Yes.

Q.   As an accountant?

A.   Correct.

Q.   As the accountant for Carr Properties, you're the accountant for all --

A.   The whole company.

Q.   -- the properties you manage?

A.   Correct.

Q.   Okay.  And previously, she worked full time at Carr Properties, right?

A.   True.

Q.   As a comptroller?

A.   Well, I believe so.

Q.   Okay.  Her office has always been at 24 Deer Park Road?

A.   Correct.

Q.   In East Longmeadow?

A.   Uh-huh.

Q.   And you spoke a little bit about how Genesis -- people who are tenants at Genesis House in the independent living, they can, I guess, if life circumstances change, they can transfer to other facilities in JGS; is that right?

A.   Correct.

Q.   But they don't have to, correct?

A.   They can go to different nursing homes if they'd like.  Most of them do go to JGS.

Q.   Okay.  But there's no automatic -- someone who needs to go, unfortunately, to a nursing home who's living at Genesis and can't live independently anymore, there's no automatic transfer; their family or whoever can choose where they go to?

A.   Correct.

Q.   Or where they go to rehabilitation?

A.   Correct.

Q.   Or where they go to get adult day care?

A.   Correct.

Q.   Now, you as the site manager for Genesis House and Sheila Rathbun as the accountant for Carr Properties, you work in different departments or you worked in different departments, right?

A.   Correct.

Q.   You never worked in the same department?

A.   Correct.

Q.   And you would only physically see her about once a year; is that right?

A.   Correct.

Q.   When Carr Properties Management had their annual meeting?

A.   Yes.

Q.   And then when they had their annual meeting, everyone would get together, and every year Carr Property would have it at a different property?

A.   Yes, but I used to see her if she came to visit her mother, which is frequently.

Q.   Sure.  I guess I'm talking about work now.  Then I'll talk about another time.

A.   Okay.

Q.   So as far as --

A.   Workwise, yes, that's correct.

Q.   Workwise, you would see her once a year?

A.   Correct.

Q.   Annual meeting?

A.   Correct.

Q.   Held at whatever rotating property Carr Property has?

A.   Right.

Q.   Now, Sheila Tipton, that's Sheila Rathbun's mother, right?

A.   Correct.

Q.   And Sheila Tipton lived at Genesis House for a few years, correct?

A.   Correct.

Q.   And she lived there until 2010, right?

A.   I believe so.

Q.   That's when she passed away.  Okay.

     So that's been 11 years, right?

A.   Correct.

Q.   So are you familiar with the fact that before Sheila Tipton lived at Genesis House, over a decade ago, before she transferred there, she lived at a different Carr Property?

A.   No, I'm not aware.

Q.   You don't know that?

A.   No.

Q.   When Sheila Tipton lived at Genesis House over a decade ago, you knew her, right?

A.   Correct.

Q.   You said your office was next to her apartment?

A.   Correct.

Q.   And she was a quiet person, right?

A.   Yes.

Q.   She was private?

A.   Yes.

Q.   She kept to herself?

A.   For the most part.

Q.   She wasn't social?

ATTORNEY DESROCHES:  Objection, Your Honor.  I don't believe this question is being posed to the witness.

THE COURT:  No, overruled.

Q.   (By Attorney O'Neill-Greenberg) She didn't attend social events at Genesis House?

A.   Not frequently, no.

Q.   Okay.  And she didn't have many visitors, right?

A.   Her children, grandchildren.

Q.   It was -- she would see her daughter, Sheila Rathbun, right?

A.   Well, Sheila has sisters who would come to visit her.

Q.   First, Ms. Tipton, her daughter Sheila Tipton-Rathbun would come visit her, right?  As well as her sisters?

A.   Correct.

Q.   Okay.  And that's who you saw visiting her?

A.    Correct.

Q.    Now, could I pull up what's already in evidence?  I just want to show you a map of the campus, PX-104-1.

Okay.  Do you recognize this, Ms. Sharry, as the -- where Genesis House is located?

A.    Yes.

Q.    Okay.  And I'm just going to point -- maybe you can look, is this lower grouping of property in the bottom, right-hand corner with the light brown roofs, is that Genesis House?

A.    Yes.

Q.    Now it's blown up.  Can I zoom back out?

Now, I'm going to put my -- pretend to be a car here with my pen.  If you're driving down Converse Street, you can take -- you can turn right, enter Genesis House right here at this first entrance in the bottom, right-hand corner; is that right?

ATTORNEY WATKINS:  Sorry.

Q.    (By Attorney O'Neill-Greenberg) Correct?

A.    I have no idea where you are.

Q.    Do you see where I'm pointing?

A.    I see where you're pointing.

Q.    Put my pen right here, right here.

A.    Right.

Q.    This entrance right here?

A.    Okay.

Q.    Is that an entrance where you can turn right into Genesis House?

A.    Yes.

Q.    Okay.  And then when you turn right into Genesis House right here, there is parking all along right here?

A.    Correct.

Q.    And then these buildings -- these Genesis House buildings are lettered; is that right?

A.    Correct.

Q.    They're lettered A, B, C, D?

A.    Yes.

Q.    E?  Or just through D?

A.    No.  D.

Q.    A, B, C, D, okay.

       And your office was in Building A, right?

A.    Correct.

Q.    Ms. Sheila Tipton, Sheila Rathbun's grandmother [sic], her apartment was in Building A, correct?

A.    Correct.

Q.    So just where I'm pointing with my pen physically on the screen --

A.    Yes.

Q.    -- just right here?

A.    Correct.

Q.   That's where -- that's where Ms. Tipton lived, correct?

A.   Correct.

Q.   So you would turn in -- I'm pretending I'm driving. You would turn into this entrance to Genesis House and you could enter right from this -- where these cars are parked to get to Ms. Tipton's apartment, right?

A.   Correct.

Q.   Okay.  And there's nothing else on -- these buildings aren't labeled "Ruth's House," right?  Nothing says "Ruth's House" on these buildings?

A.   That is correct.

Q.   Nothing says "Jewish Nursing Home" on these buildings?

A.   I don't remember.  It says "Genesis House," but I'm not sure if it says "Ruth's House," or -- it could say "Grinspoon Foundation."  It says something besides "Genesis House."

Q.   I'm not -- I'm talking about the buildings themselves?

A.   Oh, the buildings?  It just says "Genesis House."

Q.   So to be clear, it does not say "Ruth's House" on those buildings?

A.   Correct.

Q.   It does not say "Jewish Nursing Home"?

A.    Correct.

Q.    This whole thing is called the Harold Grinspoon Campus, right?

A.    Correct.

Q.    I'm going to call them tenants, tenants of Genesis House, they decorate their apartments sometimes for holidays, right?

A.    Sometimes.

Q.    People put Christmas lights up for Christmas?

A.    Usually they do not but a few.

Q.    This past winter there were Christmas lights up?  If you turned right in here and you parked, you can see people's Christmas lights, right?

A.    Okay.

Q.    And there's a sign?  See this corner right here?

A.    Uh-huh.

Q.    This entrance to Genesis House, there's a sign there; is that right?

A.    Correct.

Q.    Okay.  And that sign doesn't say "Ruth's House," right?

A.    It doesn't, no.

Q.    And it doesn't say "Jewish Nursing Home," right?

A.    I don't believe so, no.

Q.    That sign actually says "Harold Grinspoon Campus"?

A.   Correct.

Q.   And the word "Jewish" doesn't appear on that sign, correct?

A.   I don't believe so.

Q.   Thank you.  You can put that down.

Now, you have never met John Rathbun, right?

A.   No.

Q.   You don't know him?  You don't know him?

A.   No.

Q.   That's it.  Thank you so much.

A.   You're welcome.

ATTORNEY DESROCHES:  I'm sorry, Ms. Sharry, not yet.

THE WITNESS:  Go ahead.

ATTORNEY DESROCHES:  I have a few questions. I'll be brief.

If I may, Your Honor?

THE COURT:  Go ahead.

**REDIRECT EXAMINATION**

Q.   (By Attorney Desroches) Ms. Sharry, you were just asked some questions about where you parked or where your office was and the parking situation at JGS.

ATTORNEY DESROCHES:  So, Madam Clerk, if we could have the screens, and if I could have PX-104-1 put up?

Q.   (By Attorney Desroches) So, Ms. Sharry, I'm going to ask Ms. McKenna first to zoom in on the Genesis House group of buildings.

So can you see the screen clearly in front of you?

A.   Yes.

Q.   And do you recognize that grouping of buildings?

A.   Yes.

Q.   And so the record is clear, you identified your office as being on the bottom portion of this photograph, right?

A.   Point to it with your pointer.

Q.   Sure.  Your office was generally in this area here, which is --

A.   Correct.

Q.   -- the bottom left, correct?

A.   Yes, correct.

ATTORNEY DESROCHES:  Ms. McKenna, can you circle that?

Q.   (By Attorney Desroches) Okay.  So when you went to work when you were working at Genesis House, where did you typically park?

A.   Right in front of the office.

Q.   So that would be right in that area that's circled now?

A.   Yes.

Q.   And when you left every day, how did you leave Genesis House?

A.   Well, it's one way, so you'd have to take a right and go around to the circle.

Q.   So I'm going to ask Ms. McKenna with the mouse to trace that circle -- the road?

A.   Yes, correct.

Q.   So we're just tracing that road that's going around. Is that the route you're describing?

A.   Yes.

        ATTORNEY DESROCHES:  Okay.  So if we can now have Exhibit No. 23 up?

Q.   (By Attorney Desroches)  Is this the exit that you would be led to by taking that road?

A.   Yes.

Q.   So that's how you would have to leave every day?

A.   Yes.

Q.   Now, if we can go back to 104-1, please.

        We talked about the bigger campus, the JGS campus a little bit earlier.  Does that include all of the buildings that appear to the right of Converse Street?

A.   Yes.  This is the living facility, the day care center, the nursing home, and Genesis House.

Q.   Now, the route that you just described taking every day when you left -- I'm going to ask Ms. McKenna to zoom

in on this area here.

So for the record, we zoomed in on the area which appears to be the north side of the Genesis House campus including some other buildings. Do you see what I'm talking about, Ms. Sharry?

A. Go ahead. Say that again.

Q. Do you recognize -- this area that's zoomed in, do you recognize that?

A. Yes.

Q. Does that include part of the route that you took every day when you left?

A. Yes.

Q. So I'm going to draw your attention to just to the right of the center of the picture. There appears to be some cars parked along the road. Do you see where the mouse is right now?

A. Uh-huh.

Q. So the record is clear, there's what appears to be a light-colored car, two dark-colored cars, and a red car; is that right?

A. Correct.

Q. Now, there's a road that appears to be just to the right of those. Do you see where the mouse is going?

A. Yes.

Q. What does that give you access to?

A.    That goes to Ruth's House, assisted living.

Q.    And now, if you go further down, if you took a left there, headed out towards the exit, there's another access road to the right.  Do you see where the mouse is?

A.    That goes to the nursing home.

Q.    So that's another parking lot?

A.    Yes.

Q.    And going further down, just before the exit, just past the last tan building in this picture, do you see where the house is?

A.    Yes.

Q.    What is in that area?

A.    What's --

Q.    Is there a parking lot in there as well?

A.    Not where that is.  I mean, that's where the smokers are.  There's a designated smoking section.

Q.    Let's talk about the designated smoking section in that area.  Can you describe that?

A.    Okay.  So about six years ago the campus went nonsmoking.  So for Genesis House and JGS, we had to designate a smoking area.  And right where that sign is, that's where the designated smoking area is.  That exit sign -- well, we say it's an exit sign.  It's also an entrance sign to Ruth's House and the nursing home, but that's where the designated smoking area is.

Q.   If we can just zoom in a little closer on that.  I'm not sure.

So, now, just drawing your attention, does that depict the area that you're talking about?

A.   Yes, that's where it is.  You had a better -- when you showed me a picture of the sign and you said, "Where's Genesis House," and I said, "200 feet," that picture was a better picture.

Q.   Can we have PX-23?

A.   So where Ruth's House sign is, right there, that is all the smoking -- designated smoking section.

Q.   So in your time as a manager of Genesis House, was it common for you to see people congregated there smoking?

A.   Many times.

Q.   And just one final area, for how long did Sheila Tipton live at Genesis House?

A.   I'd have to go through the records, but at least five to ten years.

Q.   So is it fair to say that your memory of this -- of how long she lived there is exhausted at this point?

A.   Is what?

Q.   Is exhausted?

A.   Yes.

Q.   Would reviewing the records that are in the exhibit before you, would that refresh your recollection as to how

long Ms. Tipton lived there?

A.    Yes.

Q.    Could you please just silently to yourself take a look at those records and look up when you're done?

A.    These are all her records?

Q.    What's in front of you is PX-81, correct?

A.    Correct.

Q.    Could you just please review that, and when you're done reviewing it, just look up.

A.    Okay.

Q.    So for the record, that was PX-84 that you were just looking at, correct?

A.    Correct.

Q.    Does that refresh your recollection as to how long Ms. Tipton lived at Genesis House?

A.    Okay.  So the records aren't in order.  They're all kind of messed up a little bit by years, but it looks like she was there from 2003 to 2008, but I could be wrong because, again, these records are not -- some of them are upside down and they're not in order.  But I could see records from 2003 and the last certification looks like it was 2008, and I believe that was her last certification that I did with her.  Oh, okay.  So on her last certification it says "move-in date, November 14th, 2003." So that was her move-in date.

Q.   So she lived there for approximately five years; is that correct?

A.   Correct.

ATTORNEY DESROCHES:  Thank you.  No further questions.

ATTORNEY O'NEILL-GREENBERG:  Just briefly.

**RECROSS-EXAMINATION**

Q.   (By Attorney O'Neill-Greenberg) Could I have 104-1? I just want to ask you questions on that one more time. Okay?

So if you're turning right into that first entrance to Genesis House, where you would turn right and park your car to go to work, you testified that's a one-way; is that right?

A.   Correct.

Q.   So you have to drive all the way around that loop?

A.   Correct.

Q.   You're aware that sometimes people just pull a U-ie and go back out that one-way back onto Converse, right?

A.   Well, they're not supposed to.

Q.   They're not supposed to but --

A.   Right.  There's signs posted that says "one-way."

Q.   Yes, I know they're not supposed to, but you've seen people do that?

A.   Occasionally.

Q.    If you were not driving and just were walking or you got dropped off right at the entrance, you could walk right into Building A and then come right back from Building A and leave without going all along that loop, right?

A.    Correct.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you. No further questions.

THE COURT:  All right.

ATTORNEY DESROCHES:  Nothing further.  Thank you, Your Honor.

THE COURT:  Thank you very much, ma'am.

THE WITNESS:  Okay.

THE COURT:  You're all set.

THE WITNESS:  You're welcome.

CLERK RIVERA:  Sir, can you please raise your right hand?

**Patrick Carnahan (Sworn)**

ATTORNEY DESROCHES:  Your Honor, the government calls Patrick Carnahan.  I think I forgot to do that.

May I proceed, Your Honor?

THE COURT:  Yes.

ATTORNEY DESROCHES:  Thank you.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   Good afternoon.

Q.   Could you please introduce yourself to the jurors?

A.   Patrick Carnahan.

Q.   Are you currently employed?

A.   I am not.  I am recently retired from the FBI.

Q.   You can take your mask off.

A.   I have recently retired from the FBI.

Q.   Okay.  So when did you retire from the FBI?

A.   On March 31st of 2021.

Q.   For how long had you worked for the FBI before you retired?

A.   24 years.

Q.   What was your last assignment before you retired?

A.   I worked at the Springfield resident agency of the Boston division.

Q.   For how long did you work at the Springfield resident agency?

A.   Approximately 11 years.

Q.   What was your assignment within the resident agency?

A.   I worked specifically on national security program matters.

Q.   Can you describe, generally speaking, what that is

for the jurors?

A.   Sure.   That national security programs -- the ones that I worked on specifically dealt with espionage, counter-espionage, foreign intelligence, officers who are sent to the country, things like that.

Q.   For how long did you have that specific assignment?

A.   I had that specific assignment since I came to the RA.   I was specifically brought into the RA for that purpose.   I also though, while I was there, because it was a resident agency which is a small office and I was assigned to the JTTF on that squad, I would assist the JTTF members in the fulfillment of their duties also.

Q.   What is the JTTF?

A.   Joint Terrorism Task Force.

Q.   And what do they do?

A.   They investigate threats of domestic and international terrorism.

Q.   You said you became involved in some of their investigations as well?

A.   Correct.

Q.   Drawing your attention to early 2020, did you become involved in one such investigation?

A.   I did.

Q.   At some point, did a residence in East Longmeadow become relevant to that investigation?

A.    Yes, the residence at 20 Lori Lane.

Q.    So did you learn that that residence was involved in an investigation of an incendiary device left at JGS in Longmeadow?

A.    Yes.

Q.    So how did you become involved with that particular residence in East Longmeadow?

A.    I was asked to be the search team leader on the vehicle search of that premises when the time came to search the vehicles.

Q.    What is a search team leader?

A.    It's a fancy title for basically somebody who watches the other agents search the vehicle and then documents the search on the photo log.

Q.    So what was specifically asked of you on that day?

A.    To oversee the search of the two vehicles in the driveway.  There was only two vehicles that were going to be searched by us in the driveway.

Q.    Did that search, in fact, occur?

A.    Yes.

Q.    What was the date that it occurred?

A.    I believe it was April 15th.

Q.    Of 2020?

A.    Was it '20?  Or '19?  '20, yes.  It was '20 because it was the middle of COVID.

Q.   Retirement?

A.   Retirement is, yes, taking a toll already.

Q.   So prior to executing the search warrant on April 15th, what did you do?  Where did you go first to prepare?

A.   Well, after we all arrived, we made our way up to the residence but we did not enter the residence.  There was a clear team that was going to go through the residence and clear the residence, bring the occupants out or at least see where the residents were.  And then they were going to search for any -- any trouble in the house such as maybe explosives or weapons, things like that.  I stayed outside the residence by the deck, over by the driveway where the cars were.

Q.   From that position, were you able to observe whether or not there were any residents present at that time?

A.   Yes, I was.

Q.   Specifically, what did you observe in that regard?

A.   Well, John Rathbun was brought out of the house and placed up on the deck.  And he was separated from the mother and father -- his mother and father and his daughter who were also at the residence when we entered.

Q.   You said that John Rathbun exited.  Do you see the person you've referred to as John Rathbun in this courtroom today?

A.   I do.

Q.   Could you please point to that person and identify an article of clothing?

A.   John Rathbun is in the white shirt with the black mask on at the end of the table.

ATTORNEY DESROCHES:  Your Honor, may the record reflect the witness has identified the defendant?

THE COURT:  It may so reflect, yes.

Q.   (By Attorney Desroches) So when you first observed the defendant, you said he was on the deck at the house?

A.   Correct.

Q.   And was he engaging with anyone at that point?

A.   He was engaged with the individuals who -- there was one individual, Special Agent Mike Sheehan, who is assigned to provide security with him, and I was, sort of, Mike Sheehan's backup.  So I just stayed in that area with John and Mike.

Q.   How were you dressed that day?

A.   I was dressed in raid pants and a blue FBI coat.

Q.   What are raid pants?

A.   Those are the khaki-type of pants you see in TV shows that agents will frequently wear to operations.  They're khaki pants with side pockets.

Q.   How far away from the defendant were you when you first approached him?

A.   Maybe six or seven feet.  I was relatively close to

him.

Q.    What was the defendant's demeanor when you first encountered him?

A.    When we first encountered him, he was -- I would have to say he was probably a little confused and anxious.  He had just been brought out of his residence.

Q.    What was he wearing?

A.    He was wearing seeping gear.

Q.    So after you first observed the defendant in that state, what happened next?

A.    Well, I was with him for a while.  We did get -- we offered him a change of clothes or to put some additional clothes on because it was cold that morning.  He was not dressed appropriately for being outside for an extended period.

Q.    Did agents, in fact, get him a change of clothes or additional clothes?

A.    Yes, we did.

Q.    Did he put them on?

A.    Yes.

Q.    Did the defendant's demeanor change at some point?

A.    Well, I think he became more comfortable with the fact that we were there and that the search was going on and that the search -- we would be there until the search was completed.  So at that point, I think he accepted that

and he didn't appear as anxious as he was before.

Q.   Specifically, what did you observe or what -- did you do anything to calm the defendant yourself?

A.   I engaged the defendant in light conversation, nothing specific to the search or the warrant but just engaged him in conversation about the neighborhood, about the neighbors, about life in East Longmeadow.  Those are things that you would do to distract the individual so they don't get anxious and don't get too combative.

Q.   Was there any specific neighbor that you discussed with the defendant?

A.   At one point there was neighbors a few houses over who were out in the backyard.  They were younger folks. They were doing pullups in some kind of a backyard gym.  I mentioned that to John, and he said those guys are out there working out all the time.

Q.   Was the defendant handcuffed at this point?

A.   I do not believe so, no.

Q.   Was he handcuffed -- was he not handcuffed at some point that you do remember?

A.   I don't believe -- I don't think that Mike handcuffed him.  I don't recall.

Q.   Did you do anything else to distract the defendant from the search at that point?

A.   Well, we walked around the backyard a little bit.  So

we got off the deck and he came out into the backyard area, and I escorted him around the backyard, not very far from the house, but there was a soccer ball there.  I was kicking the soccer ball around.  He kicked it around a little bit, too.

Q.   Did you kick it to each other?

A.   A few times we did, yes.

Q.   Was the defendant offered any cigarettes during this time?

A.   I do not recall.  I believe he was, but I cannot be sure of that.

Q.   Based on what you just testified to, how would you describe your interaction with the defendant once he calmed down from the initial encounter?

A.   I think he was quite cordial.  He was polite, cordial.  He engaged in light conversation.

Q.   For how long were you in his presence?

A.   On and off for approximately three hours.

Q.   At some point, though, you said that you were -- your task there was primarily to be a search team leader; is that right?

A.   Correct.

Q.   Did your attention turn to that task at some point?

A.   Yes.  At some point we were given the green light to search the two vehicles, and then we conducted the search

of the motor vehicles.

Q.    Now, drawing your attention specifically to the vehicles in the driveway that you did see, what types of vehicles were they?

A.    Excuse me?  Could you repeat that?

Q.    Sure.  Actually, let's -- if we could have PX-73 on the screens just for the witness, counsel, and the Court?

I'm going to draw your attention to what's on the screen before you.  This is, for the record, PX-73 and they are two photographs.

ATTORNEY DESROCHES:  So, Ms. McKenna, can I ask that you scroll down to the first one that's been displayed?

Q.    (By Attorney Desroches) Do you recognize what's depicted in these photographs?

A.    I do, yes.  The first photograph were the two vehicles that we were going to search in the driveway. The first was a gray SUV, and the other was a red Sonata.

Q.    So prior to going any further, you said there were two vehicles that you were going to search in the driveway.  Was there a third vehicle also?

A.    There was.  There was a utility van, but as the search team on scene, we're not going to search that. That was going to be towed to another location and searched by a different group.

Q.   So the van, itself, was going to be searched at a different location, but these two vehicles were going to be searched on scene; is that correct?

A.   Yes.

Q.   And can you describe the two vehicles that you were going to search on scene?

A.   As I said, one was a red Sonata, Hyundai.  It's the one up in the top, and then below that was a gray SUV.

Q.   So now I'd ask that the next photo be displayed.

     Do you recognize what's depicted in this photograph?

A.   Yes.  That's a box of pamphlets that were in the trunk area of the gray SUV.

Q.   Are these two photographs fair and accurate representations of the scene as you observed them on April 15, 2020, at 20 Lori Lane?

A.   Yes.

          ATTORNEY DESROCHES:  Your Honor, I would move to introduce these two photographs as Exhibit PX-73.

          ATTORNEY O'NEILL-GREENBERG:  No objection.

          THE COURT:  No objections.  That will be admitted.

**(Government's Exhibit PX-73 admitted.)**

          ATTORNEY DESROCHES:  I would first ask for page one of the exhibit.  Thank you.

Q.    (By Attorney Desroches)  So can you describe for the jurors what's depicted in this photograph?

A.    This is the gray SUV with all the doors and the trunk opened.

Q.    Was this a Toyota RAV4?

A.    Excuse me?  I couldn't hear you.

Q.    Was this vehicle a Toyota RAV4?

A.    Yes, I believe it was.

Q.    And now if we could go to the second page?

      Now, depicted on the screen is page two of Exhibit PX-73.  Can you describe what's depicted in this photograph?

A.    These are -- they're little things that you put on door nail -- or doorknobs of houses.  They're religious -- Christian religious pamphlets.

      ATTORNEY DESROCHES:  May I have one moment?

      Thank you.  I have no further questions.

      THE WITNESS:  Okay.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Good afternoon.

A.    Good afternoon.

Q.    Could we please pull up the exhibit that was just entered, PX-73?

      I just want to ask you some questions about the RAV4 search.

A.    Sure.

Q.    While it's getting pulled up, I'll ask you, so your main job that day was to supervise the people who were searching the cars; is that right?

A.    That was the primary function of me, yes.

Q.    Okay.  And when I say the two cars, I mean the red Sonata, one, and, two, the gray RAV4?

A.    Correct.

Q.    Okay.  So you're supervising the people searching the cars, and you're also photographing anything in the cars that potentially has importance?

A.    I actually didn't do the photographs.  That was a different agent.  I merely oversaw the photographs and the documentation of the photo log.  We try to, basically, keep two eyes on each thing that way -- two sets of eyes.

Q.    Just as, like, an extra level of making sure nothing gets missed; is that right?

A.    Correct.

Q.    And so you're supervising the people searching and taking pictures just to make sure nothing slips through the cracks, I suppose?

A.    That's the intent, yes.

Q.    Okay.  And you did that that day?

A.    I did.

Q.    And when you were searching the RAV4, the way you do

the search, you actually split the car up into quadrants; is that right?

A.    Correct.

Q.    And so you have the RAV4, quadrant one is the driver's area, the driver's seat, right?

A.    It could be.  It depends on how much material is in there.  You can divide them even more specifically based on how much in there.  But you could call, if you want, quadrant one is the front.  Quadrant two could be the rear seat, and then quadrant four could be -- or three could be the trunk area.

Q.    And how did you split it up for the RAV4?

A.    We usually do it in sections.  So it would have been the front, you know, passenger, driver's side, rear passenger driver's side, and then the trunk space.

Q.    So quadrant one, driver's -- front driver; quadrant two, front passenger; quadrant three, back seats?

A.    You could, sure.  I mean, any way you want to.  I mean, you could say that the front driver's area.  Then quadrant one could be the driver's seat, passenger and driver.  Then the second area could have a one and a two also.

Q.    Okay.

A.    And then the third could be just the trunk.

Q.    Okay.  For the RAV4, quadrant one was the driver's

seat area; is that right?

A.   Yes.

Q.   Okay.  And quadrant two was the passenger seat area, front passenger seat?

A.   That would be logical, yes.

Q.   And you split that up just as a way to sort of make sure everything is thoroughly searched and checked?

A.   And documented.

Q.   And documented?

A.   Right.

Q.   So that nothing goes unseen, basically?

A.   That's the goal, yes.

Q.   Okay.  And you did that for the RAV4?

A.   Yes.

Q.   And you made sure that the people -- the people you were supervising doing the search did it according to that protocol?

A.   Correct.

Q.   Okay.  And took pictures of the things that could be potentially relevant to the case?

A.   Correct.

Q.   Okay.  And the RAV4 is what you call a hatchback, right?

A.   Correct.

Q.   The trunk space that's open -- do you have the

picture in front of you?

A.   Yes, I do.

Q.   So the trunk space, it's open to the whole car, the interior of the car?

A.   Correct.

Q.   So there's no -- if I put something in the back of the trunk, and I was -- then I sat in the back passenger seat, could I reach in and grab it?

A.   Yes, as long as there wasn't some kind of a compartment over it, but, yes, you could reach it from the rear.

Q.   The area is all open to each other?

A.   Correct.

Q.   Thank you.  That's it.

A.   Okay.

        ATTORNEY DESROCHES:  No redirect.

        THE COURT:  Thank you.  You're all set, sir.

    So we'll take a ten-minute break.

    Okay.  Same instructions as always, no talking to each other or anyone else or accessing information or looking for information about the case.  Same instructions as always apply.

        CLERK RIVERA:  All rise.

**(The jury left the courtroom at 2:47.)**

        THE CLERK:  How many more witnesses?

ATTORNEY DESROCHES:  We have Dustin Wong left today.

THE COURT:  Just one more today?

CLERK RIVERA:  Is that it?

ATTORNEY DESROCHES:  Yes, I don't know how long. It's possible that we could, if the Court insists, get another witness here, but I don't know.

THE COURT:  So this one witness, how long?

ATTORNEY DESROCHES:  I think at least an hour.

THE COURT:  Oh, it's a longer witness?

ATTORNEY DESROCHES:  I think so.  The last time there was significant cross.

ATTORNEY O'NEILL-GREENBERG:  We went for about an hour the last time.

ATTORNEY WATKINS:  Last time, there was a big break where we were arguing about the exhibit.  We're not going to do that this time, right?

ATTORNEY DESROCHES:  I don't think so.

THE COURT:  All right.  So just one witness, okay.  It might be a long witness, that's fine.

ATTORNEY DESROCHES:  Okay.  Thank you.

THE COURT:  I was just thinking, we'll try to fill in until four o'clock, but if you let me off early today, you let me off early.

**(Court was in recess from 2:48 until 3:07.)**

CLERK RIVERA:  I can go get the jury now, Judge?

THE COURT:  Uh-huh.

**(The jury entered at 3:09.)**

THE COURT:  Okay.  You can sit down.

All right.  Was everyone able to follow my instructions, all the instructions of no contact, no talking about the case, no internet access, all of the instructions?  Did everyone follow?  Okay.  Everybody?

All right.  Affirmative responses from all jurors. Jurors remain fair and impartial.

ATTORNEY DESROCHES:  Your Honor, the government calls Dustin Wong.

CLERK RIVERA:  Good afternoon, sir.  Can you please raise your right hand?

**Dustin Wong (Sworn)**

CLERK RIVERA:  You may take off your mask.

THE WITNESS:  Thank you.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   Good afternoon, Your Honor.  Good afternoon.

Q.   Could you please introduce yourself to the jury and, for the record, spell your last name?

A.   My name is Dustin Wong, W-o-n-g.

Q.   Are you employed?

A.   Yes, I am.

Q.   How are you employed?

A.   I'm currently employed as an information technology specialist, forensic examiner for the Federal Bureau of Investigation.

Q.   For how long have you had that position?

A.   Since June of 2017.

Q.   What is your educational background?

A.   I received a Bachelor of Science in cyber security systems, concentrated in digital forensics.

Q.   When did you get that degree?

A.   In May of 2017.

Q.   What are your current jobs duties?

A.   My current job duties as a forensic examiner is I conduct forensic examination on digital devices, such as computers and mobile devices.

Q.   What sort of training have you participated in to be able to do this work?

A.   I received training under the FBI's Computer Analysis Response Team, otherwise known as the CART training program.

Q.   And can you describe that program in a little more detail?

A.   Yes.  So the CART program is approximately a 12-week program that specializes in different functions, such as Windows computers, Apple computers and mobile devices.

After each course, there is a written and practical exam that you must pass in order to move on to the next course.

Q.    Did you pass those tests?

A.    Yes, I did.

Q.    And what are mobile devices?  What do you include in that group of devices?

A.    Mobile devices are such as your iPhone, such as -- and Samsung phones.  Those are the most two common mobile devices.

Q.    Do you also participate in external training in your job?

A.    Yes, I do.

Q.    What is external training?

A.    I received external training from a third-party vendor called SANS Institute.  SANS Institute offers more advanced digital forensics training.

Q.    Can you, just for the record, spell the SANS Institute?

A.    S-A-N-S, SANS.

Q.    And do you receive any certifications as part of that training?

A.    Yes.  After each course there's also a written and practical exam that you must pass in order to receive that certification.

Q.    Have you received those certifications?

A.    Yes, I have.

Q.    Do you participate in ongoing trainings that are provided by the FBI?

A.    Yes, I do.

Q.    What are those?

A.    These trainings are offered quarterly.  There are about two to three courses every quarter to keep us more up to date with the latest technology tools.

Q.    Now, you said that you examined essentially three different groups of devices, first Windows machines; is that right?

A.    Correct.  Yes, Windows computers.

Q.    And the second is Macintosh?

A.    Yes.  Apple computers such as MacBooks, yep.

Q.    And the third is mobile devices, generally, correct?

A.    Correct, yes.

Q.    So I'd like to talk, first, about mobile devices.

A.    Yes.

Q.    How is it that you examine a mobile device?

A.    We use third-party software that allows us to extract data off these mobile devices.

Q.    What are artifacts?

A.    Artifacts are things that you would find within the phone.  So when we do an extraction, there are artifacts such as text messages, internet history, voicemail and

third-party messaging, and voicemails.

Q.   So, in your examination, are you actually getting the artifacts from the phone and putting it into a different format?

A.   The tool that we use extracts the data off the phone, and we create a report for investigative review.

Q.   How many cell phones have you analyzed so far in your career?

A.   Approximately, over a hundred.

Q.   Now, you said that you produced reports as part of this extraction; is that correct?

A.   That is correct, yes.

Q.   Do those reports contain metadata?

A.   Yes, they do.

Q.   What is metadata?

A.   Metadata is like on the back of a baseball card, the stats on the back of the baseball card, those are stats of the baseball card.  For a metadata, for an artifact, that would include created date and time, when, if it was incoming to the phone or outgoing to the phone, things like that.

Q.   So, for example, if a photograph was taken by a camera on a phone, would that photograph potentially contain metadata?

A.   Yes, it would.

Q.    What type of metadata would that photograph include?

A.    It can create -- it can include the date and time the photo was taken as well as where the photo was taken.

Q.    Now, drawing your attention to the case that's before the Court today, did you become involved in an investigation of an individual by the name of John Rathbun?

A.    Yes, I was.

Q.    How did you become involved in that investigation?

A.    We received a service request to our forensic laboratory, and I was the one that was assigned to the request.

Q.    Who submitted the service request?

A.    The service request was submitted by Special Agent Ryan McGonigle.

Q.    Is that how, typically, you would receive an assignment?

A.    Correct, yes.

Q.    After you received that assignment, what was the first thing that you did?

A.    I received the items -- the evidence items from our evidence control facility.

Q.    And what, specifically, were those items?

A.    It was an Apple iPhone 8 and a Dell laptop.

Q.    We'll get to the laptop later, but let's focus on the

iPhone 8 now.

What was the first thing you did with the iPhone 8 after you received it?

A.   After I received it, I followed our procedures.  I took photographs of the device and assigned it a unique lab identifier.

Q.   What is a unique lab identifier?

A.   It's how we -- it's how we identify the evidence items.

Q.   After you took those steps, what's the next step you took?

A.   After that, I proceeded to generate the extraction of the iPhone.

Q.   What does that process actually entail?

A.   Sure.  So using our third-party tools, I connect the phone to our tool and then it generates -- it pulls out the data off from the phone.

Q.   So in laymen's terms, you're basically hooking a cable up to it and downloading the information?

A.   Yes.  Correct, extracting the data.

Q.   Did you do that with the iPhone 8 that belonged to John Rathbun?

A.   Correct, I did.

Q.   What type of data did the extraction contain?

A.   It contained -- like I said, talking about the

artifacts, it contained voicemails, text messages, call logs, pictures.

Q.   Did you create a report?

A.   I did, yes.

Q.   Have you had an opportunity to review the data that you extracted from John Rathbun's phone?

A.   I did, yes.

Q.   I'm going to draw your attention to the screen in front of you and ask that it be displayed just to counsel, the witness and the Court.

So, Mr. Wong, before you will be marked PX-52 just for reference.  Do you recognize what this document is?

A.   Yes, I do.

Q.   Have you had an opportunity to review this document?

A.   Yes, I have.

Q.   What is this document?

A.   This is a timeline of the artifacts on the phone on a certain date.

Q.   What is a timeline?

A.   A timeline puts the artifacts in chronological order.

Q.   Is this a fair and accurate record that you extracted from John Rathbun's cellphone?

A.   It is, yes.

ATTORNEY DESROCHES:  Your Honor, at this point, I'd move to introduce this as PX-52.  I'll just note that

it's not yet labeled as PX-52, but it will be.

ATTORNEY WATKINS:  There's no objection.

THE COURT:  No objection by the defense.  That is admitted as PX-52?

ATTORNEY DESROCHES:  Correct.

THE COURT:  All right.

**(Government Exhibit PX-52 admitted.)**

ATTORNEY WATKINS:  May I have just a moment?

Thank you, Your Honor.

Q.   (By Attorney Desroches) So, Mr. Wrong, when did you complete this extraction report?

A.   I completed the extraction report after the extraction was completed.

Q.   To be clear, when we're looking at the timeline, that's not the entirety of the report you created, correct?

A.   Correct, yes.

Q.   So you described that this is just the artifacts in chronological order; is that right?

A.   Yes.

Q.   So I'd like to talk a little bit about what's actually contained in this report by going through some of the columns one by one.

ATTORNEY DESROCHES:  First, Ms. McKenna, can we zoom in on column labeled "type" and maybe get a few of

those rows beneath it?

THE JUROR:  Is it possible to have this turned around again?

THE COURT:  Sure, yes.  The thing is if you hear them saying something about for the attorneys' monitors only, then they're going to have to turn it away from you.

THE JUROR:  Okay.

ATTORNEY DESROCHES:  So we can't zoom on this.  I'm going to ask everyone as best they can just --

THE COURT:  How is everyone else?  Is everyone else good with being able to read it?  Are you close enough?  Okay.

Q.   (By Attorney Desroches) Okay.  So, first, I'd like to draw, Mr. Wong, your attention to the column entitled "type."  Can you describe what that is?

A.   The type is the artifact that I mentioned.  It could be, for example, call logs and text messages.

Q.   Okay.  So now we can go down this column.  The first entry, number one, is log entries.  What does that mean?

A.   Log entry is how the phone is essentially logging the data into its system into the phone.

Q.   So is that characterized as a system-generated artifact?

A.   Correct, yes.

Q.   What does that mean?

A.    System-generated artifact is essentially the system creates the artifact within the phone.

Q.    So the person who's using that phone has nothing to do with the creation of that artifact?

A.    Correct, yes.

Q.    Now, the next entry in this column is "call log."  Do you see what I'm talking about?

THE COURT:  Any chance we can get an increase in the size?  Can you zoom in a little bit but yet keep it on the screen?  So then you'll lose part of it?  So you can't really zoom without losing part of it?  Okay.

ATTORNEY DESROCHES:  I think we can zoom in just for this purpose I think to focus in on the particular columns.

Q.    (By Attorney Desroches) Now this entry, number two, is "call log."  What is call log?

A.    Call log refers to when the call was made to or from the phone.

ATTORNEY DESROCHES:  Ms. McKenna, if we can scroll down slowly?  Maybe the next page.

Q.    (By Attorney Desroches) So now looking at number 9, it says "cookies" in that same-type column.  What does that mean?

A.    Cookies are also system-generated artifacts.  When you visit a website, cookies are information that are

stored by the website.  So the cookies allows you to get to -- for the website to remember that you were on the website.

Q.   Now, drawing your attention to the box number 11, searched items.  What is a searched item?

A.   Searched items are from the -- excuse me.  Searched items is when the user of the phone is searching on, let's say on Google.com searching for whatever they're searching for.

Q.   Is this known as a user-generated artifact?

A.   Correct, yes.

Q.   And what do you mean by "user-generated artifact?"

A.   It means the user is typing the phrase that they're looking for into Google and it populates as a searched item.

Q.   So when it comes to user-generated artifacts versus system-generated artifacts, which is a better indicator of when someone is actively using a phone?

A.   User-generated artifacts.

Q.   Why is that?

A.   Because that's when the user is actively using the phone themselves.

Q.   So now the next different entry is web history.  That appears at number 13.  What is that?

A.   Web history is when you visit a -- when the user

visits a website, the phone logs that entry that they're -- the website that they're visiting.

Q.   And is that also a user-generated artifact?

A.   Correct, yes.

Q.   What are the other types of user-generated artifacts?

A.   Other user-generated artifacts are such as text messages.  When you're sending a message, that would create an artifact.

Q.   Is there another type of message that you can send that is not a text message but is a user-generated artifact?

A.   Such as third-party messaging applications, yes.

Q.   What are examples of those types of messaging applications?

A.   These third parties would include Facebook messaging, and WhatsApp.

Q.   Would those appear on the timeline?

A.   It would, yes.

        ATTORNEY DESROCHES:  Now, if we could scroll to the top of this page?  Actually, let's go to page one. Thank you.

Q.   (By Attorney Desroches) We are going to move on to the next column that I'd like to talk about and that would be direction.

        Can you describe for the jurors what direction

means?

A.    Direction is whether the artifact is coming into the phone or is outbound, it depends.  So this is most likely for call logs, whether a phone call is being sent -- being made to the phone or the user is calling someone from the phone.

Q.    So if the user was calling someone else, what direction would it appear in this timeline?

A.    That would be outgoing.

Q.    So if the user was receiving a call from someone else?

A.    Incoming.

Q.    And is the same true for messaging apps or text messages?

A.    Correct, yes.

Q.    The next column is time.  Can you describe to us what that means?

A.    The time is when the event happened.

Q.    Now, so that also includes the date, correct?

A.    Correct, yes.

Q.    There is a parenthetical in each box which is UTC minus four.  What does that mean?

A.    That's just the time zones.  So UTC minus four correlates to eastern standard time.

Q.    The next column is party.  What does party mean?

A.    Party is to who the user was communicating with.

Q.    So if it were a call, it would show the number that either called or was called by the phone, correct?

A.    Correct, yes.

Q.    And is the same true of messaging?

A.    Yes.

Q.    And lastly, the box I'd like to talk about is the description column.  What is description?

A.    Description is for call logs, the duration of the call; and for messages, the content of the message.

Q.    So in this box, if it were a web page, it would have the web address?

A.    Correct, yes.

Q.    Or if it were a call, it would be the duration of that call, correct?

A.    Correct, yes.

Q.    For the sake of completeness, just very briefly, what is source file information?

A.    Source file information is where our tool Cellebrite -- finds that information.

Q.    Now, you've said you've had an opportunity to review this report, correct?  Or this timeline?

A.    Correct, yes.

Q.    I'd like to draw your attention to the time frame beginning on midnight of April 2nd until 4:38 a.m. on

April 2nd.  Is it fair to say that the very first entry on this is 12:07 a.m. on April 2nd?

A.    Correct, yes.

Q.    Have you had an opportunity to review the activity on the defendant's phone from this 12:07 until approximately 4:38 a.m.?

A.    I have, yes.

Q.    Can you describe the activity that you saw during that time frame?

A.    The activity from -- there were multiple entries or artifacts during that time frame.

Q.    Based on your training and experience, what does that indicate to you?

A.    That means that the user was actively using the device.

Q.    During that period?

A.    Correct, yes.

Q.    Can you characterize the amount of usage during that time?

A.    So on the screen right now I see from 12 o'clock, but from 12:07 until -- sorry.  Did you say four?

Q.    4:38.

A.    4:38, there were heavy activity that was on the phone.

ATTORNEY DESROCHES:  Ms. McKenna, if you can go

to page 53?

Q.   (By Attorney Desroches) Drawing your attention from the time beginning 4:38 until 5:00 a.m. on April 2nd, have you had an opportunity to review the activity on the phone during this period?

A.   Yes, I have.

Q.   And what conclusions did you make based on your training and experience about the activity on the phone during this period?

A.   There were no activity found on the phone -- the user-generated artifacts, there were no activity.

Q.   So the phone was not used between 4:38 and 5:00 a.m.?

A.   Correct, yes.

        ATTORNEY DESROCHES:   Now, Ms. McKenna, if we can go to page 54?

Q.   (By Attorney Desroches) Drawing your attention, Mr. Wong, to the time beginning 5:17 a.m. until 6:09 a.m., have you had an opportunity to review that time frame?

A.   Yes, I have.

Q.   And were you able to draw any conclusions about the usage of the phone during that period?

A.   The usage of the phone picks back up.  There were activities on the phone.

Q.   How would you characterize the amount of activity on the phone during that period?

A.    Heavy activity.

ATTORNEY DESROCHES:  Now, Ms. McKenna, if you can go to page 5?

Q.   (By Attorney Desroches) Drawing your attention to the period of -- I'm sorry.  Just to be clear, 6:09 a.m. to 7:06 a.m., did you have an opportunity to review this period?

A.    Sorry.  From 6:09 a.m. until 7 a.m.?

Q.    To 7:06 a.m.

A.    7:06, yes, I have.

Q.    And were you able to form any conclusions about the activity on the phone during that period?

A.    Can you please scroll down towards 7 a.m.?  Thank you.

Yes.  So there was sparse activity on the phone.

Q.    You said "sparse activity"?

A.    Correct, yes.

Q.    So, specifically, I'd like to draw your attention to the entries -- the first entry on this page which is 499, for the record, it's on page 59.  That indicates some activity that occurred at 6:58 and 44 seconds; is that correct?

A.    Correct, yes.

Q.    And can you describe what this activity actually is?

A.    It was a call log from -- communicating to the person

Devin Austin.

Q.   Okay.  So this was you said a call log.  What is the direction of this call?

A.   For 499, there is no -- it doesn't say within the type.  But from 500, there was an incoming call.

Q.   Okay.  So first sticking on this call at 499, the duration is 000, correct?

A.   Correct, yes.

Q.   Are you able to determine whether this was incoming or outgoing call by looking at this?

A.   At that, no.

Q.   So now looking at five o'clock in the morning, which is the next -- I'm sorry -- 6:58 and 44 seconds, it's the same exact time, correct?

A.   Correct, yes.

Q.   So now we're looking at box 500.  What were you able to determine by looking at this row, 500?

A.   From this one, it was an incoming call from Devin Austin.

Q.   Does it indicate that it was missed?

A.   Yes, it is.

Q.   So essentially this was a missed call to John Rathbun's phone?

A.   Correct, yes.

Q.   Now, I'd like to draw your attention back up to 499,

and draw your attention to specifically the box that's the -- so you're zoomed in on that.  Even easier.

Do you see that it says from 10017?

A.    Yes, I do.

Q.    Does that indicate to you any particular direction or what happened there?

A.    It's from Devin Austin.

Q.    So this would have been a call to John Rathbun's phone, correct?

A.    Correct, yes.

Q.    And that is essentially the same Devin Austin and the same number that appears just below it that occurred at the same time, correct?

A.    Yes, that's correct.

Q.    What does that 1000 et al number that precedes Devin Austin?

A.    That is the unique identifier for that Devin Austin profile.

Q.    So what does that indicate to you?

A.    It was that specific ID was from Devin Austin.

Q.    So now just to take a step back, how would you characterize the use of the phone between 6:09 a.m. and 7:06 a.m.?

A.    There were sparse activity; there were activities from the phone.

Q.   But can you characterize the type of activity, the frequency of activity?

A.   The volume picks up; the activity picks up.

ATTORNEY DESROCHES:  I'm sorry.  Can you scroll back up, Ms. McKenna, just so we're clear?

Q.   (By Attorney Desroches) Now, we're looking at 6:09 at line 493, that is a call log, correct?

A.   Correct, yes.

Q.   And what is the direction of that call?

A.   Outgoing.

Q.   So that was a phone -- that was a call made by the Rathbun phone out, correct?

A.   Correct, yes.

Q.   You can scroll down.

And the next call log occurs at 6:52, correct?

A.   Correct, yes.

Q.   So that was between the previous call that we just looked at and this one, there were no user-generated artifacts, correct?

A.   Correct.  There were no user-generated artifacts.  I misspoke.  Sorry.

Q.   Can we scroll back up?

So the first call, the 6:09:14 that we were referring to, correct?

A.   Correct, yes.

Q.   And the next user-generated artifact was at 6:52:25; is that right?

A.   Correct, yes.

Q.   And there's another entry at 6:52 that is an incoming call.  Do you see what I'm talking about?

A.   Yes, I do.

Q.   That occurred also at 6:52; is that right?

A.   Correct, yes.

Q.   So now looking at boxes 495 and 496, what are you able to deduce about those two entries?

A.   Those were the same entries but in different artifact formats.

Q.   So these are each coming into John Rathbun's phone?

A.   Correct, yes.

Q.   And now looking at box 497 and 498, if you can just review those?

A.   Yes.

Q.   What do you see in these two entries?

A.   The same time, the same -- they're talking about that same entry which is a missed call.

Q.   And that's on 653, correct?

A.   Correct, yes.

Q.   So now the next page is 499 where we left off.  Do you see that?

A.   Yes, I do.

Q.   So is it fair to say that between the 6:09 and 7:06 a.m., the only activity on the phone was coming into the phone?

A.   Yes, correct.

Q.   And those were missed calls?

A.   Correct, yes.

Q.   So while there was activity on the phone, does that affect your conclusion regarding the -- how the user of the John Rathbun phone was using his phone?

A.   Sorry.  Could you repeat that?

Q.   Sure.  Can you -- after having just reviewed these records, can you describe the activity that was generated by the user of the John Rathbun phone?

A.   There were no activities.

Q.   The only activity was coming in?

A.   Correct, yes.

Q.   Now, following 7:06 a.m. until the rest of the day on April 2, 2020, did you have an opportunity to generally review these records?

A.   Yes, I did.

Q.   Can you describe the overall activity following 7:06?

A.   There was an incoming call --

Q.   I'm sorry.  It was a poorly-worded question.

     I'm speaking generally for the rest of the day on April 2, 2020 -- we don't need to go through each and

every entry -- generally speaking, what was the activity like?

A.    The phone starts to pick back up again, the activity.

Q.    So there were -- the periods that you said there was no activity was 5:17 a.m. to 6:09 a.m.; is that correct?

A.    Can I just double check?

Q.    Yes.

ATTORNEY DESROCHES:  So, Ms. McKenna, that's page 54.  I'm sorry.  I misspoke.  So it's page 53.

Q.    (By Attorney Desroches)  The periods were 4:38 until 5 a.m., is that correct, where you said there was no activity?

A.    Yes.  From 4:38 a.m. to 5:00, there was no activity.

Q.    And the second period of no activity was between 6:09 and 7:06 a.m., correct?

A.    Could you please scroll down?  Correct, yes.

Q.    So on this cell phone, were you also able to track voicemails?

A.    Yes, I did.

Q.    Did you include those voicemails -- I think we can take this down.

Did you include those voicemails in the report that you created?

A.    The voicemails were included, yes.

Q.    And once you completed that report that included the

voicemails, what did you do with it?

A.    The voicemails were in the overall report that I created and submitted to Special Agent Ryan McGonigle.

Q.    You indicated that you also received a laptop to review in this case; is that correct?

A.    That is correct, yes.

Q.    Can you describe how you received that laptop?

A.    Just like with the iPhone, I received it from our evidence control facility.

Q.    And what did you do with the laptop once you received it from that facility?

A.    I photographed it and I assigned it a unique identifier.

Q.    Once you did those two things, what did you do next?

A.    Typically with laptops I would pull the hard drive out of the computer.  So for this laptop I did and I created a forensic image.  Forensic image is like making a replica of, let's say, a book so that I'm replicating the data off the hard drive.

Q.    What types of data are you generally able to get from a hard drive?

A.    It would include documents that were saved on the computer, internet history, and files.

Q.    Have you had an opportunity to review any of the files that you took off of that laptop?

A.    I did, yes.

Q.    And did you notice any errors that may have occurred during the extraction process?

A.    I did not notice any errors.

Q.    I'm going to draw your attention to the screen in front of you and ask the Court to display -- for the Court and the witness.

      Mr. Wong, before you is Exhibit PX-88.  Do you recognize what that is?

A.    Yes, I do.

      ATTORNEY DESROCHES:  And, Ms. McKenna, if you could scroll through the pages of it?

Q.    (By Attorney Desroches)  Mr. Wong, do you recognize what is in front of you as PX-88?

A.    I do, yes.

Q.    What is that?

A.    There were -- these were documents that were found off the computer.

Q.    And, again, that computer was provided to you by Special Agent Ryan McGonigle?

A.    Correct, yes.

      ATTORNEY DESROCHES:  Your Honor, I'd move to introduce PX-88.

      ATTORNEY WATKINS:  Subject to our prior objection.

ATTORNEY DESROCHES:  And ask that it be published to the jury.  I'm sorry, Your Honor didn't rule.

THE COURT:  Yeah.  Why don't you clarify a little more?

ATTORNEY WATKINS:  Your Honor, this is an overall objection concerning Billy Graham kind of evidence.

THE COURT:  All right.  WhisperTech, please.

**(Sidebar conference.)**

THE COURT:  Okay.  Go ahead with -- you're going to have to fill in the objection a little more for me.

ATTORNEY WATKINS:  Your Honor, we filed a motion in limine just generally about all the Billy Graham evidence coming in.  This is simply to preserve all that.  This would be part of it, part of the motion in limine objecting to the witnesses first and then the materials coming from that.  I do expect that the Court will overrule the objection, but we did want to place it into the record.

THE COURT:  So this is a flyer from a Basketball Hall of Fame event which was held, according to the witness that was from Billy Graham, this Basketball Hall of Fame was held before the Big E event; is that correct?

ATTORNEY DESROCHES:  Yes, Your Honor.  And I can

proffer that the evidence will show that this being taken from Sheila Rathbun's computer indicates that she was actively involved in organizing this event and sending this particular flyer out.

THE COURT:  The flyer out for the Basketball Hall of fame event?

ATTORNEY DESROCHES:  Correct, Your Honor, yes. As you can see, it's a multi-page document.  The other pages include mailing labels, email addresses to which she sent these documents.  There will be additional testimony to establish that, Your Honor.

THE COURT:  Okay.  This is for the Basketball Hall of Fame event, but there's no evidence that those flyers, the tracts that we're talking about in the nozzle were connected to the Hall of Fame.  Those were connected to the Big E.

ATTORNEY DESROCHES:  Your Honor, those flyers were connected to this entire tour.

THE COURT:  Well, has there been evidence that they were available at the Hall of Fame event or just the Big E event?  I recall just the Big E event.

ATTORNEY DESROCHES:  Your Honor, my recollection of the evidence is that they were used at training events prior to that Big E event.  Furthermore, Your Honor, I would suggest this does establish additional connections

between Sheila Rathbun and Billy Graham, the publisher of that pamphlet and the other pamphlets that were in connection with the pamphlets in general.

THE COURT: The testimony was or has it already been that this was Sheila Rathbun's computer?

ATTORNEY DESROCHES: There's a stipulation that would be read later in this trial; and, furthermore, Ryan McGonigle could further establish that link, Your Honor.

THE COURT: All right. How much after this March 5th Basketball Hall of Fame event was the Big E event?

ATTORNEY DESROCHES: May 25th was the date of the Big E event, Your Honor.

THE COURT: All right. Okay.

So, Attorney Watkins, is there a specific motion in limine for this trial addressing the material that we're looking at right now for the trial?

ATTORNEY WATKINS: No. The answer is no to that. This was our original motion in limine.

THE COURT: From the first trial?

ATTORNEY WATKINS: That's correct.

THE COURT: All right. Okay. I'm satisfied there's a connection to the continuing Billy Graham events that Sheila Rathbun was involved in. That connection is important because there's been testimony regarding

availability or accessibility to a specific pamphlet, the pamphlet -- the exact pamphlet or another copy of that exact pamphlet that was in the nozzle of the gas can.

There's been testimony regarding the Big E event, the Basketball Hall of Fame event, and the build-up events in the Springfield area.  All right.  Based upon that and my rulings on motions in limine that were filed for this trial, this is consistent with my ruling to allow in and find relevant evidence of accessibility in the very broad general sense to that specific pamphlet that was in the nozzle.  So I'll admit it.

ATTORNEY DESROCHES:  Thank you.

THE COURT:  Objection overruled.

**(End of sidebar conference.)**

ATTORNEY DESROCHES:  Your Honor, I'd ask to admit it and publish it to the jury.

CLERK RIVERA:  Is it admitted?

THE COURT:  Yes.

**(Government Exhibit PX-88 admitted.)**

ATTORNEY DESROCHES:  Can everyone see it?  Is that screen -- I don't think counsel table has it, but I am more concerned about the jurors.

CLERK RIVERA:  They can see it.

ATTORNEY DESROCHES:  Ms. McKenna, can you go to -- can you just scroll down these pages?

Q.    (By Attorney Desroches) What types of documents are these that you found on that laptop?

A.    Microsoft Word documents and PDF documents.

Q.    Now we're on page, I believe, four of this document. What is this?

A.    Page four is a screenshot of the tool that I used to process the hard drive.

Q.    So what is actually -- what type of information is contained in this?

A.    It's listing the documents that were found on the computer itself.

Q.    So when it says "file system created," is that some of the metadata that you previously testified about?

A.    Correct, yes.

Q.    What does that indicate?

A.    It was indicating when the file was either downloaded onto the computer or created onto the computer.

        ATTORNEY DESROCHES:  Thank you.  I think we can take that down now.

Q.    (By Attorney Desroches)  Now, Mr. Wrong, just to be clear, you created two reports in this case, correct?

A.    Correct, yes.

Q.    What were those two reports?

A.    The Cellebrite report for the Apple iPhone 8, as well as a computer report for the laptop.

Q.   And once you completed those reports, what did you do with them?

A.   I shipped it to Special Agent Ryan McGonigle.

ATTORNEY DESROCHES:  Thank you, Mr. Wrong.  I have no further questions.

ATTORNEY WATKINS:  May I, Your Honor?

THE COURT:  Yes.

ATTORNEY WATKINS:  This is already in evidence. This is Exhibit 52.

THE COURT:  You want it visible to everyone and all the jurors?

ATTORNEY WATKINS:  I'm sorry?

THE COURT:  You want it visible to the jurors?

ATTORNEY WATKINS:  Yes, please.  It is showing to the jurors it looks like at this point.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Actually, before we get to that, good afternoon, Mr. Wong.

A.   Good afternoon.

Q.   Starting from the last first, the computer that you examined that was taken from 20 Lori Lane, part of your examination tool is called "Internet Evidence Finder"?

A.   Correct.  I used Internet Evidence Finder for the laptop.

Q.   And what does Internet Evidence Finder do?  What does

that tool do for examining a laptop?

A.    Internet Evidence Finder is an approved tool within the FBI, and it processes the forensic imagine that I was talking about earlier, and it parses out all the data from all the information on that laptop.

Q.    And, in particular, it looks at internet searches, browsers being used, correct?

A.    That's one of the features, yes.

Q.    So you can see exactly what websites had been searched for, really, the entirety of the computer's life, right?

A.    Correct.  It parses out website history activity.

Q.    So if there had been any evidence of, for example, white supremacy sites or anti-Semetic sites searched on that computer, you would have been able to see through that Internet Evidence Finder tool, correct?

A.    There can be searches if the user was searching that up, yes.

Q.    I'm sorry?

A.    There can be if the user was searching for that.

Q.    Yes, you would see artifacts.  You would see evidence of that?

A.    Correct, yes.

Q.    Now, I want to go to Exhibit 52 now which I'm showing and Mr. Desroches was talking about, this 499 line numbers

here.  This period between 6:09 -- this is actually lines 493 and 494 here.  This gap of time where there does not seem to be any kinds of activity there?

A.   There are no activities.

Q.   I'm sorry?

A.   There was an outgoing call at 6:09:14 a.m.

Q.   Now, this would also be consistent with a phone just sitting somewhere, right?  Sitting in a car, nobody using it, correct?

A.   I'm sorry.  I don't understand the question.

Q.   So you have this time as 6:09:14 until 6:51:32 which there is no activity, no web searches, no phone calls, no texts during that period of time, right?

A.   Well, at 6:09:14, there was an outgoing call to that specific number.

Q.   Then the next entry is at 6:51, right?

A.   That was a system-generated entry.

Q.   Right.  And then there's a 6:52:25 user incoming call generated entry, right?

A.   Correct, yes.

Q.   Okay.  So that period of time, that simply means that the phone is not being used, right?

A.   Well, going back to the 6:09 a.m., the phone was being used for a call, but other than that, no.

Q.   Other than that, that's correct.

And so that is consistent with simply a phone not being used, sitting in one location?

A.    The phone was not in usage.

Q.    I want to talk about cell services also with this. This is an Apple iPhone and it had a subscriber -- a phone company with it, correct?

A.    It was registered to a phone company, correct, yes.

Q.    When a phone is moving, a phone will bounce off of towers as it goes along, right?  If a call was made or a text is made?

A.    It can -- from my knowledge, the phone does connect to cell towers to the closest cell tower to pick up its signal.

Q.    Sometimes the phone companies will simply send a signal just to see where the phone is at any particular occasion; is that correct?

A.    I don't know that information.

Q.    It's not your area of expertise here?

A.    That is not, no, sorry.

Q.    I want to go now back to the beginning of this.  I am going to expand this screen a little bit and go through some of the things, specific items that were happening.  I think you've already testified about this call at 12:08:38, an outgoing call, right?

A.    Correct, yes.  There was an outgoing call.

Q.   I'm going to page two.  There is an entry for Home Depot there, and this is at 12:40 in the morning on April 2nd; is that correct?

A.   Correct, yes.

Q.   This is line 11, and you've already told us this means search items.  This means someone has typed into the browser on the phone Home Depot, right?

A.   That is correct, yes.

Q.   There continue to be those entries.

Going now to line 18, there's an entry -- and, again, this is a searched item.  It says "People Ready" and actually several entries here in the logs; is that fair to say?

A.   That is correct, yes.

Q.   And that's consistent with how browsers work.  You'll get a lot of entries for various things, and I think we've seen some of them.  The entries will be in various places in the phone, is that correct?

A.   Yes.

Q.   Over on this right side, you have a number of different locations where the data's coming from, table histories, visits, history items, things of that nature, and that helps you determine where you're going -- where that information came from, where it was located in the phone, right?

A.   Our tool will look into these databases, and that's how our tool pulls out the information.  This is where the tool is looking at.

Q.   I next want to go to page 12 of this exhibit.

Looking at lines 98 through 104 here, several searches or web history, open-skilled trade positions, People Ready, skilled trades, right?

A.   That is correct, yes.

Q.   This is -- so this is consistent with what a user is doing on the phone is making those kinds of searches at 12:44 in the morning?

A.   There were web history usage activity for that website.

Q.   Looking at 12:49, this is line 188, there's searches -- items for temp agencies all through here; is that accurate?

A.   That is correct, yes.

Q.   This is 12:55 now, Hamilton Connection Placement Specialists.  Do you see that?

A.   I do, yes.

Q.   And, again, just to go over to this web history, that's what the person using this phone was looking at at 12:56 in the morning?

A.   Sorry.  Hamilton Connections was -- are you talking about Hamilton Connections?

Q.   Yes, 12:55 and 54 seconds.

A.   Correct, yes.

Q.   At 1:37 now, we're about 40 minutes or so later here, we start to see web history indicating pornography site visits; is that fair to say?

A.   Yes.

Q.   Going now to 2:53 in the morning, again, we see Home Depot, a number of entries in the web history portion of the phone, right?

A.   For Home Depot, yes.

Q.   And so we're up to now almost three in the morning here.  Three in the morning and we've seen Home Depot, We've seen temp agencies, People Ready; is that correct?

A.   I'm sorry.  Could you repeat that?

Q.   We've gone through a number of the searches here, and anyone can do what I'm doing here which is searching for a particular word, and you can do that with your tools about searching for particular websites, any kind of information in the phone, right?

A.   I'm sorry.  Using our tools, we can.

Q.   With Cellebrite, you can make searches for particular words or particular websites, all kinds of things, right?

A.   Correct.  There is a feature for key word searching.

Q.   So, for example, if someone was looking into anti-Semetic or white supremacy, those might be key words

that you would be directed to look at?

A.   Those hits would appear if there were artifacts for that and if during investigative review that word was searched.

Q.   And that would be reported here in this timeline spreadsheet as well because it would be a web history search?

A.   It would, yes.

Q.   Continuing on there are web history about looking for an Milwaukee 18-volt lithium-ion versus a cordless combo kit; do you see that there?

A.   Yes, I do.

Q.   Now, we're at again 2:58 in the morning.

     I'm going to jump forward here a little bit.  At 4:32 -- well, actually, I wanted to go one before this.  Back at 1:14, I missed this the first time we were going around.  This is a text message, correct?

A.   It was a message.

Q.   It's a Facebook instant message or some kind of instant message?

A.   It was a message on the phone.

Q.   And it goes to a particular phone number, right?  Or a particular other user?

A.   To multiple users, correct.

Q.   And it says, "Did, man, I'm loaded with shut and just

need a 40 hard.  Give you 60 now.  I'm killin' it out here," right?

A.   That's what the message was.

Q.   At 4:32 in the morning, another instant message going out to just one person here.  No, two people -- no, one person here; is that correct?

A.   Correct, yes.

Q.   Okay.  It says, "Dude, I got 100 in cash sitting in front of me."  Then it talks about, "All I need is a 40 piece.  I'm right around the corner from you."  You see that text there?

A.   I see that text message, yes.

Q.   Again, that's at 4:32 in the morning, 59 seconds.  I think you've told us that because that's a user-generated artifact that that's the exact time for that?

A.   That's what Cellebrite -- the time that was pulled out.

Q.   I'm going to jump way ahead here.  We are at 7:53 in the morning where you see searched items again.  Bank of America, do you see that in this spreadsheet?

A.   I do, yes.

Q.   And we see more instant messages that we're going to talk about later, but here's one of them.  "What's the deal, yo."  And that seems to be someone named Gabe?

A.   Gabe.

Q.   G-a-b-e?

A.   G-a-b-e, yes.

Q.   And this fill-in of Gabe, how does that automatically get filled in?  How does that appear in this log?

A.   I'm sorry.  Can you --

Q.   We've seen other phone numbers that are just phone numbers, but this one is a particular name.  How does that particular name pop up here?

A.   That name would be pulled out from that specific artifact.  If it was from a profile, it would pick up Gabe as the first name.

Q.   And just again, the time leading up to this six o'clock hour here, we're not seeing any web history at all here, right?  This is text messages going back and forth, right?

ATTORNEY DESROCHES:  Your Honor, just for record's purpose, could we have some sort of reference point?

ATTORNEY WATKINS:  I'm sorry.  What?

ATTORNEY DESROCHES:  Just a reference point so the record will be clear.

Q.   (By Attorney Watkins) I'm looking at this area of lines 486 through 489.  These are calls and sometimes text messages?

A.   Sorry.  From which rows are you referring to?

Q.   Just take 489, you have instant message; 490, log entry; 491, call log; 492, log entries.  These are not web searches here, right?

A.   Those were call logs.

Q.   So no indication of any kinds of websites, anti-Semetic websites or white supremacist websites, bomb making, none of that there?

A.   There were no website history.

ATTORNEY WATKINS:  That's all I have, Your Honor

ATTORNEY DESROCHES:  Just a few questions, Your Honor.

THE COURT:  All right.

**REDIRECT EXAMINATION**

Q.   (By Attorney Desroches) So, Mr. Wong, you were asked some questions about the location of the phone and the phone itself could be moving or where it was located.  Do you recall those questions?

A.   Yes, I do.

Q.   Does your report or the tools that you use give you, yourself, any ability to determine where the phone was when this activity was occurring?

A.   No.  There were no known location data that I was given from the phone extraction.

ATTORNEY DESROCHES:  Thank you.  I have no further questions.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  All right.  We're going to stop for the day.

All right.  So tonight obviously, and I reference the same rules as always, but I do have to make a record of what I'm telling you.  Do not discuss this case with each other, with anyone else, family or friends.

Do not do any internet searches.  Don't go on social media to read or post anything about the case, no research about case or visiting areas you think may be relevant to the case.  No looking up legal concepts that you think are important, nothing.  Do not do anything regarding the case, and I'll check with you tomorrow morning if you were able to comply.  All right.  Thank you.

CLERK RIVERA:  All rise for the jury.

**(The jury is dismissed at 4:09)**

THE COURT:  Okay.  See you in the morning.

ATTORNEY WATKINS:  Can we start talking about the light at the end of tunnel and how we're going to end up scheduling towards the end of trial?

THE COURT:  You mean witness-wise?

ATTORNEY WATKINS:  Witness-wise.

THE COURT:  What do you think for tomorrow?  Full day of government witnesses tomorrow?

ATTORNEY DESROCHES:  Your Honor, tomorrow would be a full day.  I do think -- I raise the issue, I think it was today, regarding Dan Marshall.  He cannot be here until --

THE COURT:  That's right.

ATTORNEY DESROCHES:  So it's very possible that we have only very little to accomplish on Thursday.

THE COURT:  All right.  Because Dan Marshall just can't be here until Friday morning?

ATTORNEY DESROCHES:  Correct.  His flight also is scheduled to land Thursday night and be on the stand first thing Friday morning, but his availability just couldn't get him here.

THE COURT:  Okay.  What do you think, Attorney Watkins?

Down day on -- you'll have some witnesses on Thursday, but you don't need a full day?

ATTORNEY WATKINS:  I'm sorry?

THE COURT:  I asked the government if they'll have some witnesses for Thursday but just not a full day.

ATTORNEY DESROCHES:  I do imagine that we would go into Thursday, yes.  It's hard to know for how long we would be in here, but I think we definitely carry over into Thursday.

THE COURT:  All right.  And Mr. Marshall on Friday would be your last witness, you think?

ATTORNEY DESROCHES:  Yes.

THE COURT:  Okay.  So in other words, the defense should be prepared with witnesses for mid-morning to early -- yeah, mid-morning Friday.

All right.  So the plan will be we'll go all day tomorrow.  We'll likely go -- we'll go as far as the government's witnesses will take us on Thursday.  That may be a half day on Thursday.  So Thursday may end up being a half day.  We will call the government's last witness Friday morning, and then I'll hear you on motions.  I'll hear the defense on motions, but we should plan for the defense to have witnesses available for Friday mid-to-late morning.

ATTORNEY WATKINS:  Then does the Court anticipate having closing arguments Friday afternoon then?

THE COURT:  Boy, that's ambitious.  Your co-counsel -- although, I'm not looking at her, I see her saying no.  That would seem a real push.  I would think -- I mean, how many witnesses do you have?  If you started witnesses at eleven o'clock on Friday, are you going to go -- will you need to have Monday, too, for witnesses?

ATTORNEY WATKINS:  I don't think so.  If it's anything like the last trial, it will be done in a day.  I

think we'll get all that done in a day.

THE COURT:  I think then we should plan for Monday because if we have spare time on Friday, we can always use spare time for charging conference-type issues. All right?

ATTORNEY DESROCHES:  Yes, Your Honor.  And also just to raise the potential for rebuttal.  We're not there yet, but there's always that possibility.

THE COURT:  Right.  Okay.  All right.  So it looks like we are clearly on track, probably a little faster but, okay.  So there you go.  So defense, plan on having witnesses for Friday mid-morning.

ATTORNEY WATKINS:  Thank you, Your Honor.

ATTORNEY DESROCHES:  Thank you.

ATTORNEY BRESLOW:  Good afternoon, Your Honor.

THE COURT:  Afternoon.

**(Court recessed at 4:13.)**

(The certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)


CERTIFICATION


I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.



/s/ Alice Moran                          May 30, 2022

Alice Moran, RMR, RPR

Federal Official Court Reporter