1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America   )
                           )          20cr30018-MGM
      vs                   )
                           )          June 10, 2021
John Michael Rathbun       )
_____)



TRIAL HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:


On behalf of the government:  Neil L. Desroches, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105.

Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant:  Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

INDEX

Witness:                                                        Page:


**Ryan McGonigle**

Cont'd Direct examination by Attorney Breslow              9

Cross-examination by Attorney Watkins                    52

Redirect examination by Attorney Breslow               120


**John Drugan**

Direct examination by Attorney Desroches               128

Cross-examination by Attorney Watkins                  143

Redirect examination by Attorney Desroches             144


**Eric Mastroianni**

Direct examination by Attorney Breslow                 148

Cross-examination by Attorney Watkins                  203


**Susan Goldsmith**

Direct examination by Attorney Desroches               223

Cross-examination by Attorney O'Neill-Greenburg        228

| Exhibit No. | Description | Page |
| --- | --- | --- |
| 94 | Transcript and recording | 22 |
| 94-1 | Audio file | 22 |
| 94-2 | Transcript | 22 |
| PX-58 | Photo | 26 |
| PX-59 | Photo | 26 |
| PX-60 | Photo | 26 |
| PX-61 | Photo | 26 |
| PX-62 | Photo | 26 |
| PX-2 | Nozzle | 28 |
| PX-67 | Photo | 30 |
| PX-68 | Photo | 30 |
| PX-69 | Photo | 30 |
| PX-70 | Photo | 30 |
| PX-79 | Video | 184 |
| PX-80 | Video | 184 |
| PX-81 | Video | 184 |
| 1 | Chart | 219 |

**(Court commenced at 9:08.)**

**(The defendant is present.)**

CLERK RIVERA:  Court resumes in the matter of criminal jury trial case No. 20-30018, the United States of America versus John Michael Rathbun.

Counsel, please identify yourself for the record starting with the government.

ATTORNEY BRESLOW:  Yes.  Good morning, Your Honor.  Steven Breslow for the United States.

ATTORNEY DESROCHES:  Good morning, Your Honor.  Neil Desroches for the United States.

ATTORNEY WATKINS:  Tim Watkins, Federal Defender Office, on behalf of John Rathbun.  Good morning.

ATTORNEY O'NEILL-GREENBERG:  Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning.  Good morning, Ms. McKenna.

MS. MCKENNA:  Good morning.

ATTORNEY BRESLOW:  Your Honor, I gave out a witness schedule to the defense and to you yesterday.  We just have one slight change.  I've already informed Mr. Watkins.  We're just taking the witnesses in a slightly different order to accommodate travel.

THE COURT:  Okay.

CLERK RIVERA:  All rise for the jury.

**(The jury entered at 9:09.)**

THE COURT:  Everyone can be seated.

Good morning.  Of course I have to check, did everyone follow my instructions not to talk to each other, anyone else?  Did everyone follow my instructions not talking to anyone else or each other or looking on the internet, being exposed to media reports, research, investigating this case, looking up the law?  Did everyone stay away from doing all that and follow all of my instructions?  All right.  Thank you.

Affirmative responses from all the jurors.  The jury remains fair and impartial.

Can I get the parties on WhisperTech, please?

ATTORNEY BRESLOW:  Yes.

**(Sidebar conference.)**

THE COURT:  I'm just noting for the record and this really is for the record if this case happens to be reviewed, I did the same thing when it was tried the first time.  The case is being presented by the government through the use of a lot of leading questions on the direct exam.  I just wanted it to be noted on the record that the Court is certainly aware of that; however, there have been no objections to the way the case is being presented and that could be a tactical decision, and I

think it was the last time for the flow of the case.  But I just wanted the record to reflect that the Court is aware of that and not saying anything because of the extreme experience on both sides of this case with the attorneys.  So to the extent that it's tactical and that's the way the case wants to be tried, that's fine.  I just wanted to make a note of that.  All right?

ATTORNEY BRESLOW:  Yes, Your Honor.

ATTORNEY WATKINS:  Sorry, Your Honor.  I did not hear the first part.  It was about the government's leading?

I'm sorry, Your Honor.  My WhisperTech was not working completely.  The question was about us permitting the government to lead?

THE COURT:  No.  It really wasn't a question.  It was just a statement that I'm making for the record that the Court is aware of this trial proceeding through the use of leading direct exams as was the last trial.  I haven't interjected.  There's been a few objections, but I just wanted the record to note the Court is aware of that and recognizes it may just be the flow of the trial, the choice of the parties for how the case should be presented, a tactical consideration to allow the case to come in through leading testimony, and that I was deferring entirely to the very extensive experience of

defense counsel in making those tactical decisions.

I didn't want the court -- the record to be silent on the issue of the Court as if I was unaware of the leading nature of most of the direct exams.

ATTORNEY WATKINS:  Thank you, Your Honor.

THE COURT:  All right.

**(End of sidebar conference.)**

THE COURT:  All right.  So I'll just tell everyone, and I don't know how much this is going to affect us, I haven't quite decided what we're going to do, but we're in this transition stage with COVID-19 and pandemic protocol.  And, of course, you'll note that sometimes I'm wearing a mask, but most of the time I'm not because I have a shield and I'm distanced from all of you.

The State has put into place new protocol regimens if you went to a restaurant now or somewhere outside the courthouse.  So there's going to be a new courthouse order in our district starting on Monday, and that new protocol for everyone -- that new protocol will require masks in the courthouse, in all places in the courthouse unless you are able to show proof of a vaccination.  That is, if you have a vaccination card or a photograph of it, and you're two weeks out or whatever you need to be from your last shot, you will not be required to wear a mask and that will be starting Monday.

So you might notice that change when you come in next week just from the people at the front door, and I wanted you to know that. I haven't quite made a decision whether we're going to change or we're just going to follow through with you sitting together as a jury, sitting all day, closer than most people would generally, and then do deliberations in the same room.

It seems to me I might just hold our mask protocol until the trial is done. That's probably what I'm going to end up doing, but to the extent that you're walking around and seeing other people that you saw with a mask this week all of a sudden next week they might not have one, that will be the reason. All right.

So if there is another change about how I'm going to proceed with this trial, I'll certainly let you know. But I think we're going to finish this trial with masks just like we've been doing. All right.

Okay. Witness?

ATTORNEY BRESLOW: The government calls Ryan McGonigle again to continue his direct examination.

THE COURT: Yes.

ATTORNEY BRESLOW: Thank you.

**Ryan McGonigle (previously sworn)**

**CONT'D DIRECT EXAMINATION**

Q.    (By Attorney Breslow) Special Agent McGonigle, I just want to remind you that, as with yesterday, you're still under oath.

A.    Yes.

Q.    Now, when we left off yesterday, you were talking about the defendant's statements concerning the possession of the can, and we just heard the recorded conversation with the defendant and his mother concerning his actual possession of the can.  Do you remember that?

A.    I do.

Q.    Okay.  So I'd like to shift topics now to another part of your interview, which is drug use.

      Early on in the interview, did you ask the defendant about his drug use?

A.    Yes.

Q.    Can you tell the jury why you wanted to talk to him about this in the first place?

A.    So before we went to his house, we knew that the defendant had a history of drug abuse and we wanted to make sure that --

      ATTORNEY WATKINS:  Can you pull the mic just a little bit closer, please?

      THE WITNESS:  Sure.

Q.    (By Attorney Breslow) Maybe just start again.

A.    Sure.  Absolutely.  Prior to getting to the house, this is on the day of the search warrant, we knew that the defendant had a history of drug abuse and wanted to make sure that when he was speaking to us that he was not impaired in any way.

Q.    Okay.  So tell the jury then about your conversation with the defendant concerning his drug use?

A.    So the first thing I asked him is have you used drugs today, and he said no.  Although, he did say he had used methadone.  He said methadone does not impair him and that he has a prescription through a state program.  I said or asked him when was the last time he's used drugs.  He said that he had not used drugs in a month.

Q.    Now, based upon what the defendant later told you, was that statement true or false?

A.    The statement was false.

Q.    Can you explain why?

A.    I later asked him if we were going to find drugs in the house, and he told me no, we weren't going to find any because he used all of his drugs two weeks ago.

Q.    And what was the date that you were speaking with him?

A.    April 15th.

Q.    So two weeks ago was what date?

A.    Two weeks ago was April 1st.

Q.    So based upon what the defendant later told you, was that statement true or false?

A.    That statement was also false.

Q.    Can you explain to the jury why?

A.    Well, he may -- he may well have been using drugs two weeks ago, but that was not the last time that he had used drugs.  I asked him later in the interview, because I wanted to force the issue and see if he was telling the truth, if he would be willing to take a drug test.  And he told me he would take a drug test but that he would fail it because he had scraped the bottom of the bag which I took to mean taking drugs, scraping the bottom of a drug bag the night before.

Q.    And going back to that middle statement about two weeks ago, was that significant to you for any reason?

A.    Well, two weeks ago was approximately April 2nd, which was the specific date we had been talking to him about.

Q.    How, if at all, did the defendant's statement that he had scraped the bottom of the bag that night, meaning the night before you arrived, in the morning, affect your interview or the way you conducted your interview?

A.    So at that point, we became concerned that he maybe had not been telling us the truth about his drug use that

actual morning.  So we asked him again a series of questions to make sure that we understood whether he was impaired in any way during the interview.

Q.    Why was that important to you?

A.    Because when we're speaking with someone, we want to make sure that they are understanding our questions, that they can comprehend what they're speaking about, and that the answers they're giving are truthful and they're thought out and considered.

Q.    So can you tell the jury what you spoke -- what you asked the defendant and what he said to you?

A.    So then I repeated my questions.  You know, have you taken -- are you impaired?  You took drugs last night. Are you impaired right now?  He said, no.  I said, have you taken any drugs this morning?  He said he had taken methadone.  And I asked him again does that impair him, and he said, no, it does not impair him.

Q.    Now, based upon the defendant's demeanor, his behavior, his speech, how did he appear to you?

A.    He was not impaired.  He was capable of completing sentences.

ATTORNEY WATKINS:  Objection; asked and answered.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  He was able to complete sentences.

He was steady on his feet.  He was able to interact with numerous different people.  He was coherent.  He was asking logical questions, making logical requests of us.

Q.   (By Attorney Breslow) Now, before you interviewed the defendant, were you aware of an incident involving him on March 3rd at the Quality Inn, in Chicopee?

A.   I was.

Q.   Did you and Detective Chaplin discuss this incident with the defendant?

A.   Yes.

Q.   Tell the jury what the defendant said to you about this incident?

A.   So Detective Chaplin had initially spoken to the defendant.

ATTORNEY WATKINS:  Note our objection; renew our objection on this matter.

THE COURT:  All right.  WhisperTech, please.

**(Sidebar conference.)**

THE COURT:  Okay.  So that incident is in.  It was allowed in.  Now, what is the need to, kind of, further talk about it again from this agent?

ATTORNEY BRESLOW:  So the agent will testify very briefly about what the defendant remembered about the incident.  The agent will further testify that he asked the defendant if he still thought -- meaning two weeks

later, if he still thought there were people in the van that night.  And I expect that the agent will testify that he said yes, there were people in the van that night.  And then lastly, the agent will testify that the defendant told him -- and you may recall this from the last trial -- that he had taken a mix of drugs including Xanax, and he was out of his mind on drugs that night.

THE COURT:  You mean the night of -- the hotel night.

ATTORNEY BRESLOW:  Exactly, right.  So this was all -- this part was testified about in that brief -- that point particularly in the last trial, and we think it's directly relevant to the defendant's state of mind on or about April 2nd to -- April 1st to April 2nd because as the defendant told Special Agent McGonigle, you just heard that testimony, he had also used drugs on or about April 1st and April 2nd.  And, in fact, I fully expect that that will be an uncontested part of the defense case.

THE COURT:  Attorney Watkins.  I mean, my concern is we've already -- if you compared it to the last trial, we didn't let evidence in of what happened at the hotel, but that's in now.  So it's in.  And I don't really know that I want to go back and revisit it, but I do agree when Attorney Breslow said the testimony about what drugs he used that night did not come in from any of the hotel

testimony in this case.

Would you be objecting if I allowed him simply to testify only to the fact of what drugs he used that night at the Quality Inn but none of the detail regarding whether people in your car or do you still think people were in your van?

ATTORNEY WATKINS:  We would object, Your Honor, just to renew the general objection.  Again, Mr. Breslow is talking about state of mind in a propensity kind of a way.  This is April 15th that he's talking to this agent. I think Mr. Breslow intends to argue he was under the influence of drugs on April 15th, and therefore his -- also his statements about what happened on March 3rd are in combination relevant to what his state of mind is on April 2nd.  I still don't get that.

Quite aside from that, I think there was, I recall, that Ms. Graham, Dana Graham, did testify about all of the drugs that they used and all of the drugs that she saw John using.  So I think to the extent that the government needs that in, it would be cumulative.  That testimony has already been in as far as the incident itself from the witnesses the government called.

ATTORNEY BRESLOW:  Your Honor.

THE COURT:  I thought Dana Graham testified about what she was using.

Attorney Breslow, do you recall if her testimony was what they were using as opposed to she?

ATTORNEY BRESLOW:  Yes, I recall precisely.  I asked her two questions.  What drugs was she using and what drugs was the defendant using.  They were using the same drugs which was heroin, crack, powder, alcohol, and with respect to the defendant, the addition of benzos or Xanax.

THE COURT:  I do -- thank you very much for your memory, because now that you said that, I do remember exactly.  That was the distinction because he used the Xanax as well.

ATTORNEY BRESLOW:  Exactly.  And, Your Honor, the key part for us is not to recount the details of the incident, although we think that's relevant and important because without the defendant's admissions to this, what he had said to the defendant, Ms. Graham could be subject to at least the jury concluding that she was equally high and unable to perceive or remember accurately.

The key statement for us, Your Honor, is his admission that he had used a mix of drugs, including Xanax, and was out of his mind.  That's the key statement.

So to the extent Your Honor is concerned about reviewing the entire testimony or the entire incident, we don't have to do that.  I do think it's also relevant that

the defendant, even on April 15th, still believed that there were people in his van.  I think that's relevant to his state of mind when he is on drugs as he was on April 1st.  So those are two questions.  I can lead if Your Honor would like to just elicit those two statements.

THE COURT:  Just to comment from a trial observer standpoint, interesting, interesting point where the government is trying to make or highlight an issue or make a point that could be a potential defense regarding a state of mind issue but yet the defense is saying no, we don't want it, recognizing that it might also be propensity-type evidence.

Okay.  You will be allowed to ask him if he questioned Mr. Rathbun about the Quality Inn incident only about what drugs he was using that night, only to confirm the drugs he used.  No other questions.  No questions about does he still think people were in the van, only what you were using that night.

ATTORNEY BRESLOW:  And to elicit his admission that he was out of his mind on those drugs that night. That came in through the earlier trial.  It's what we opened on.  It's what Mr. Desroches stated in his opening statement.  We think it's highly probative to the issue of his state of mind on April 1st and 2nd.  The defense can easily cross-examine the agent on this.

The defendant, we fully expect, will be testifying giving his own perspective, and it really limits the government's ability to establish his state of mind without this admission when the defendant will be arguing quite differently in the defense case.

THE COURT:  Well, I think the government has a point, although you didn't quite articulate it this way. I think you have a good-faith basis to think that the statement about "I was out of my mind" would have been coming in given the prior rulings I made, and I think that's fair.  So, yes, very limited questions.  Did you ask him if he was using, what he was using and what he said about his level of intoxication.

ATTORNEY BRESLOW:  Or state of mind.

THE COURT:  Or state of mind, yes.

ATTORNEY BRESLOW:  Okay.  We will do that.

THE COURT:  So that's it.  All right?  So objection is overruled, well-noted.  There we go.  All right.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) Special Agent McGonigle, thank you for your patience.

Without referring to any details of the incident on March 3rd, can you tell the jury what drugs, if any, the defendant said he was using that night and how the

defendant explained to you his state of mind was on that night?

A.    So he had said that he was using a number of drugs, heroin, crack cocaine, and Xanax.  And he said that that cocktail of drugs left him out of his mind.

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.

Q.    (By Attorney Breslow) I'm sorry.  Could you just explain to the jury one more time because I think there were multiple voices talking maybe?  So I'll just ask the question again.

A.    Sure.

Q.    What did the defendant say to you about his state of mind on the night of March 3, 2020?

A.    So he said that he had taken a number of drugs, heroin, crack cocaine, and Xanax, and that he was out of his mind.

Q.    Now, did you discuss the defendant's employment with him?

A.    Yes.

Q.    What did he say?

A.    So I initially asked him just sort of as a conversation, you know, what's he doing for work.  He said that he was no longer working, that he had separated from his job because it just wasn't working out.

Q.    Now, based on what the defendant later told you, was that true or false?

A.    That was false.

Q.    What did he tell you next?

A.    I confronted him with the fact that --

THE COURT:  Excuse me one second.

I just want to remind you, ladies and gentlemen, and I've told you this before, regarding testimony admissible for a limited purpose.  All right.  This testimony regarding the hotel and use of drugs and employment status should not be considered by you for any type of conclusions of the defendant's character or choices or bad choices.  That's not what that's there for.  That is being admitted for the limited purpose, and I'll give you instructions on this at the end, for the limited purpose if you think it's appropriate.  If you think it's relevant, you may consider this evidence as it affects the defendant's state of mind and affects his ability to commit acts charged in this case knowingly, intentionally, or maliciously.

Now, those terms will be defined for you, and those are terms in the indictments in this case.  Deciding those issues would require you to assess an individual's thought process.  So the testimony you're hearing about drugs and employment from previous times, if you think it's

appropriate, it is considered only for that state of mind issue. All right. Okay.

ATTORNEY BRESLOW: Thank you, Your Honor.

May I ask the court reporter to review the last exchange, and if there is a question pending, to state that to the jury?

THE COURT: Yes. Sure.

**(Question read back.)**

Q. (By Attorney Breslow) So without telling the jury what you confronted him with, just explain to the jury what the defendant next said to you after he said -- after he gave the first explanation for why he no longer had a job?

A. He later told me that he had been fired from his job. His supervisor was accusing him of stealing but that he didn't do it. He still was separated from the job, but his boss -- he was in good terms with his boss. That's what he told me.

Q. Now, according to your investigation, was that the reason why the defendant was terminated?

ATTORNEY WATKINS: Objection.

THE COURT: Sustained.

ATTORNEY BRESLOW: I'll move on.

Q. (By Attorney Breslow) Special Agent McGonigle, have you reviewed PX-94, 94-1 and 94-2?

A.    Yes.

ATTORNEY BRESLOW:  Your Honor, assuming there's no objection with the defense, I'd like permission to play PX-94-1, a small portion of it.  PX-94 is the synchronized transcript and recording of a conversation between the defendant and his mother on May 2nd.  94-1 is the transcript and -- I'm sorry -- the audio file itself and 94-2 is the transcript.  This will be an approximately 15-second conversation.

THE COURT:  Any objection?

ATTORNEY WATKINS:  Subject to the continuing objection.

THE COURT:  Subject to the continuing objection, overruled.  This will be -- this is not in evidence yet?  So this needs to be --

ATTORNEY BRESLOW:  No.  Well, we're offering it now.

THE COURT:  Okay.  It's over objection.  It's allowed.

ATTORNEY BRESLOW:  Okay.

THE COURT:  Government Exhibit?

ATTORNEY BRESLOW:  Just to be clear, we're offering 94, 94-1, and 94-2.

THE COURT:  Allowed.  Yes.

**(Government Exhibits 94, 94-1 and 94-2 admitted.)**

ATTORNEY BRESLOW:  I'm requesting permission now to play that portion of 94 that takes place from 5:56 to 6:14?

THE COURT:  All right.  And same rules as always, if you're having trouble, and I'll ask you afterwards, just raise your hand.

ATTORNEY WATKINS:  Can we have the date of this call?

ATTORNEY BRESLOW:  Yes.  I think I said May 2, 2020.

**(Audio recording playing.)**

Q.   (By Attorney Breslow) So, now, I'd like to shift topics away from the interview and to the items that were either seized or photographed at the home that you testified about earlier generally.

ATTORNEY BRESLOW:  Your Honor, may I display PX-58 to 62 to only the Court, counsel, and the witness?

THE COURT:  Yes.

Again, ladies and gentlemen, I would stress to you that the last recording you heard also falls under the umbrella of this limited purpose testimony as it relates to things going out of control.  Again, that's only for you to consider, as I said, to the extent in what you deem appropriate when you are analyzing state of mind under the instructions, the final instructions for what the elements

of the offenses charged are.  All right.

ATTORNEY BRESLOW:  So if we could display PX-58 to 62 just leaving each exhibit up for a brief period of time so the Court, counsel, and the witness can see?  Thank you.

ATTORNEY WATKINS:  Your Honor, there would be an objection to this.

THE COURT:  All right.  To PX-61 and 60 those pictures?

**(Sidebar conference.)**

ATTORNEY WATKINS:  The objection here is relevance.  As we heard last trial, what's going to happen particularly with the yellow nozzle that's coming in, the next witness from Sceptor is going to say that that does not belong to the canister that was found at 780 Converse Street.  So there's no particular relevance to this item coming in, and it's prejudicial.

ATTORNEY BRESLOW:  Your Honor, the next witness is John Drugan who will be Mr. Desroches's witness.  So I'm going to defer to him responding to this objection.

ATTORNEY DESROCHES:  Your Honor, I think there may just be some misunderstanding.  John Drugan is a chemist that would testify about the composition of the fluid inside the gas cans found at the defendant's home.  He doesn't have any expertise in the area of nozzles.

I think defendant may be referring to Dan Marshall who is coming tomorrow. Mr. Marshall will likely testify that that nozzle was not sold with the can -- the device but would fit on it. So I do think there is relevance here especially considering the totality of circumstances, several gas cans and a component that would fit.

THE COURT: I think it is relevant that an individual would have multiple gas cans, perhaps interchangeable nozzles, I'm not sure, but those types of items -- accessibility to those types of items, whether they be yellow, red, or blue containers that hold fuel and the possession of one or more of them at one's home supports the availability of such fuel canisters for the defendant generally. So I do think it's relevant. I'm going to allow it in.

**(End of sidebar conference.)**

ATTORNEY BRESLOW: Your Honor, may we proceed?

THE COURT: Yes.

Q. (By Attorney Breslow) All right. So have you, Special Agent McGonigle, had an opportunity now to review PX-58 to 62?

A. I have.

Q. And, generally speaking, what are each of these?

A. Say that again.

Q. Generally speaking, what are each of these?

A.    I can't hear the last part of what you're saying.

Q.    Generally speaking, what are each of these?

A.    Oh, they're pictures taken on April 15th during the search warrant.

Q.    And, in particular, what do they depict generally?

A.    They depict a gas can found on the defendant's porch.

Q.    Are there other photographs that depict other fuel canisters elsewhere in the home?

A.    Yes.

Q.    For example in the shed?

A.    Yes.

ATTORNEY BRESLOW:  Your Honor, we offer PX-58 to 62 at this time.

THE COURT:  Over objection, which is noted, that is allowed.

**(Government Exhibits PX-58 through PX-62 admitted.)**

ATTORNEY BRESLOW:  Okay.  So I'd like to display PX-61 to the entire courtroom now.

Q.    (By Attorney Breslow)  So, Special Agent McGonigle, can you tell the jury what these are and where they were located?

A.    This is a gas can and a nozzle.  They were located on the defendant's side porch right where you would exit the kitchen.

ATTORNEY BRESLOW:  I'd like to return to PX-105,

page 3, for a moment.  And if we could display that side by side with PX-61?

Q.   (By Attorney Breslow)  So can you orient the jury to these two photographs and how they relate to each other?

A.   Yeah.  I actually think you can see the -- well, maybe you can't.  I was going to say I thought you could see the gas can on this but the gas can would have been right on the back right of the porch.  You actually can see it, right there.  So it's on the back right of the porch.

Q.   Okay.  So now focusing simply -- so you're referring to PX-105, page 3, that the red gas can is visible?

A.   Right.

Q.   So we can take down PX-105-3, and focusing just on PX-61 now.

     Can you describe the fuel canister by color, contents, if you can see contents, and nozzle?  Just generally, can you describe that?

A.   It's a red gas can.  It has approximately a third full of liquid and has a red nozzle on top of it.

Q.   And what is immediately to the right of it?

A.   Immediately to the right of it is another nozzle that's just lying on the porch.

Q.   What color is that?

A.   That's yellow.

ATTORNEY BRESLOW:  Your Honor, may I approach the witness with PX-2 not yet in evidence?

THE COURT:  Yes.

Q.   (By Attorney Breslow) Special Agent McGonigle, do you recognize PX-2?

A.   I do.

Q.   What is it?

A.   So this is the nozzle that is displayed in this picture here.

ATTORNEY BRESLOW:  Your Honor, we offer PX-2.

ATTORNEY WATKINS:  Subject to prior objection.

THE COURT:  Allowed.

**(Government Exhibit PX-2 admitted.)**

Q.   (By Attorney Breslow) Special Agent McGonigle, can you explain to the jury why the fuel canisters are differently colored red and yellow?

A.   Yes.  Red is used for regular gasoline.  It's meant to signify that regular gasoline is contained in it. Yellow is used to signify that diesel gasoline is contained in it.

Q.   Can you read the handwriting on the red canister in PX-61?

A.   Yes.  It says "gas."

Q.   And, now, you stated earlier that the -- in this photograph that the canister appears to be approximately

one-third full?

A.    Yes.

Q.    Can you tell the jury what steps, if any, you and other law enforcement officers took to determine the contents, the actual contents of PX-61?

A.    We took a sample of that gas can and sent it to our lab or to the State Police lab.

Q.    And what did they determine?

A.    They determined that it was gas.

Q.    Can you tell the jury why you took those steps?

A.    We know that the device placed -- the firebomb placed at the Jewish Nursing Home had gas in it, and we wanted to determine if there was gas on the premise that could have been used to potentially fill that firebomb.

Q.    Now, did you walk around the property?  You and other agents?

A.    Yes.

Q.    And were there any outbuildings or sheds?

A.    Yes.

Q.    What was it?

A.    There's a shed.

Q.    Did agents search the shed?

A.    Yes.

Q.    What did they locate?

A.    Three more red gas cans.

Q.   I'd like to display what's already in evidence now, PX-67 and 68, side by side.  And then we'll move sequentially to 69 and 70 side by side.  All right.

Focusing on PX-69 now, what does this depict?

ATTORNEY WATKINS:  There's not going to be an objection to these, Your Honor.

THE COURT:  No objection.  All right.  That can just be admitted.

ATTORNEY BRESLOW:  I'm sorry?

THE COURT:  You can admit those and display.

ATTORNEY BRESLOW:  Forgive me if the monitors are already up.

THE COURT:  Okay.

**(Government Exhibits PX-67 through PX-70 admitted.)**

Q.   (By Attorney Breslow) So what is PX-69?

A.   That's the entrance to the shed, and it has two red gas cans.

Q.   Okay.  Can we zoom in on them, please?

Can you read -- with respect to 10, can you read the first word that is part of the stamped warning labels on this?

A.   "Danger gasoline."

Q.   Was there liquid in one or both of these?

A.   Yes.

Q.   What did the FBI do, if anything, with the liquid in

these canisters?

A.   We also took a sample of it and sent it to the State Police lab.

Q.   What did the State Police determine?

A.   That there was also gasoline in the sample that we obtained.

ATTORNEY BRESLOW:  Can we zoom in on both cans for a moment?

Q.   (By Attorney Breslow)  Special Agent McGonigle, do you recall which of these canisters had gasoline?

A.   I do not.  I didn't take the sample.

Q.   How certain are you that one of them did if you don't recall the particular one?

A.   Right.  It definitely did.  We had two samples.  One was from the gas can on the porch; one was from one of these gas cans in the shed.

Q.   So focusing on these gas cans, one is labeled 10, that's to the left; and the other is labeled 11, that's to the right.  What do you notice about the nozzle access on each of these?

A.   Ten has a nozzle on it.  Eleven does not have a nozzle on it.

Q.   Let's take a look now PX-69 and 70 -- or 70 rather.

Can we just zoom in on that?

And what do you see there that's labeled with exhibit

number or search item 12?

A.   So that's also a red gas can.

Q.   And can you tell the jury whether it has a nozzle or does not?

A.   It does not.

Q.   All right.  No further questions concerning this topic.  Let's move on to another subject of your interview with the defendant.

Did you talk generally with the defendant about religion and also the tract that was placed as the wick in the device?

A.   Yes.

Q.   Okay. So let's take the first topic first, religion.

What did you and the defendant say to each other concerning religion?

A.   So I asked him if he or his family was religious.  He told me that they were Baptists.  That he is not personally religious or doesn't -- actively religious anymore, but that his mom and dad are both very involved in the church.

Q.   And, in particular, what did the defendant tell you about his family's church?

A.   He told me the name of the church was Heritage Baptist Church.  And he said that his mom -- yes, sorry, Heritage Baptist Church.

Q.   Okay.  And did you ask him for the church's address?

A.   Yeah.  In the conversation with him, I asked him about tracts from the church and asked him if the church gave out tracts.

Q.   Why did you ask him that question?

A.   Because I was interested to see if the tract that we had had come from the church.  And I asked him if his church stamped the back of the tracts, and he said they did with the church's address.  And then he recited to me the church's address.  He said, yeah, they stamp it.  It's Heritage Baptist Church, 640 Plumtree Ave., Springfield, Massachusetts.  I think that's the correct address.  I may have the address wrong.  He had the address correct.

Q.   Okay.  What did he say about his mother's religious practice or his mother's relationship to that church?

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.

Q.   (By Attorney Breslow) What, if anything, did he say about his mother's relationship to tracts or pamphlets?

A.   That she passed them out and that his parents at some point had tried to create their own tracts on their computer.

Q.   What, if anything, did he say about his mother's religious activities?

A.   She was very involved in the church.  She volunteered

her time.

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.  Any part of the answer would be stricken regarding what the mother's religious activities were.

ATTORNEY BRESLOW:  Your Honor, may we be heard briefly at sidebar?

**(Sidebar conference.)**

ATTORNEY BRESLOW:  So I'm not going to pursue this line of inquiry, but I will note that the defense is objecting.  It's hard to determine without the defense stating a basis like objection, asked and answered, objection to the form of the question, objection to relevance.  What's happening is when the defense objects and just doesn't state just a very brief purpose, it's very difficult for the questioner to know what the source of the objection is and then proceed with an appropriate question.  So what I'd ask is that for these objections, they just state a very brief reason why so that it's clear to the Court and also to counsel the basis for the objection so that when you sustain it, I understand why.

THE COURT:  Fair enough.  Sometimes staying too much in front of a jury is not the preferred way of doing it.  But that objection -- and I should note, and I'll try to make it clear as well, but that objection about the

mother's religious practices is relevance.  Her involvement in tracts is another story.  That came in, but any more on her religious --

ATTORNEY BRESLOW:  That's fine.  I'm not arguing about the actual objection, and I'm not asking Mr. Watkins to make an elaborate argument before the jury.  I am asking him just to specify the basis.  Relevance is fine.  Asked and answered, fine.  Form of the question.

THE COURT:  That's not an unfair request if you're able to do that for either side when making an objection to do so, but if either side feels that saying too much would somehow cast them in negative light in front of the jury or expose too much about your thought process, then we'll just go to WhisperTech.

**(End of sidebar conference.)**

Q.   (By Attorney Breslow) Special Agent McGonigle, while you were talking with the defendant about pamphlets, were agents searching the house?

A.   Yes.

Q.   And what did agents locate in the house?

A.   Religious pamphlets or tracts.

Q.   I'd like to display to the entire courtroom, because it is in evidence, PX-56.

Do you recognize this photograph?

A.   I do.

Q.   What is it?

A.   That's a table inside.

          ATTORNEY BRESLOW:   Can we display this to the entire courtroom?

Q.   (By Attorney Breslow)  Go ahead.

A.   This pamphlet or tract, that was located inside the defendant's living room.

          ATTORNEY BRESLOW:   Can we zoom in on it briefly?

Q.   (By Attorney Breslow)  Now, to be clear, is this tract the actual tract that was used as part of the wick in this device?

A.   No.

Q.   In addition to this tract, did the agents find other religious material or literature?

A.   Yes.

Q.   And where -- do you know the location of this room in PX-56?

A.   This is the family room.

Q.   Okay.  So without specifying what other religious material or literature was found in the home, where -- what rooms did the agents find this other material?

          ATTORNEY WATKINS:   Objection, relevance, subject to the Court's prior ruling.

          THE COURT:   Right.  I'm going to allow that as to where these pamphlets were found in the house.

ATTORNEY WATKINS:  I'm sorry.  I'm having trouble hearing.

THE COURT:  I'm sorry.  I'm going to overrule the objection and allow that in.

Q.   (By Attorney Breslow) Can you tell the jury what other rooms the agents located similar material?

A.   There's religious material in the kitchen and the basement.

Q.   Now, during the search of the defendant's home, did agents locate an exact match to the pamphlet that was used as the wick in this device?

A.   No.

ATTORNEY BRESLOW:  We can take this down.

So the record will reflect that exhibit has been removed from the screens.

Q.   (By Attorney Breslow)  Now, did the agents, when they were searching, locate anti-Semitic material?

A.   No.

Q.   Did they locate any material about how to build a firebomb?

A.   No.

Q.   And did they locate any material about white supremacy?

A.   No.

Q.   Now, at this point, had you determined the source of

the pamphlet that was used as the wick?

A.    No.

Q.    Did you later determine that the pamphlet came from a particular tract -- that the wick came from a particular tract?

A.    Yes.

Q.    And what was that?

A.    The tract was called the *Steps to Peace With God*.

Q.    And is that on counsel table in front of you in PX-4?

A.    It is.

Q.    Okay.  So if you could just hold that up to the jury so they can see it?

     So what is PX-4 and how does it relate to the wick that was part of the device?

          ATTORNEY WATKINS:  Objection; asked and answered.

          THE COURT:  I think -- I'm going to overrule, but I think you're correct.  So maybe this will be the last time we hear it, but go right ahead.

          ATTORNEY BRESLOW:  Thank you, Your Honor.

          THE WITNESS:  Can you can repeat the question?

Q.    (By Attorney Breslow) Sure.  Explain to the jury how PX-4 relates to the wick that was part of the device?

A.    So this is the outside cover and there's a couple of pages in right here, and these two pages were essentially

ripped out from here and then this is what they became.

Q.   And you're referring to PX-3?

A.   I'm referring to PX-3, the burnt exhibit in here.

Q.   Did you search the defendant's mother's laptop for any ties to this pamphlet?

A.   Yes.

Q.   And what did you find?

A.   I found that the defendant's mother was involved --

ATTORNEY WATKINS:  Objection, cumulative.

THE COURT:  Excuse me?

ATTORNEY WATKINS:  Cumulative.  Objection, cumulative.  We've heard the witnesses.

THE COURT:  Well, I'd like an offer, please.

ATTORNEY BRESLOW:  Sure.

**(Sidebar conference.)**

THE COURT:  Can everyone hear?

So I just asked for an offer because I'm not sure what the response is going to be.  The response may be favorable for the defense, and I don't know if -- Attorney Watkins, do you know what the response is going to be?

ATTORNEY WATKINS:  No.  I didn't think it was going to be favorable.

THE COURT:  Okay.  Go ahead.  What's your offer then?

ATTORNEY BRESLOW:  So I guess it will be

favorable to the government but also favorable to the defense. I'll be asking him what -- I think the question is what did you find, and his answer --

THE COURT: The question was is there anything in the computer that related to the mother's knowledge/possession of this particular pamphlet, that was the nozzle pamphlet?

ATTORNEY BRESLOW: Right. Actually, that was not the question. I wasn't asking about the mother's knowledge. I think all I was asking was -- and we can have it read back -- but all I was asking was, was there anything on the mother's laptop that related to this pamphlet. And what I expect he'll say --

THE COURT: Hold on. When you say "this pamphlet," you mean the nozzle pamphlet?

ATTORNEY BRESLOW: The tract, PX-4, part of which was ripped out and put into the nozzle as PX-3.

THE COURT: The nozzle pamphlet.

ATTORNEY BRESLOW: So what I expect he'll say is, yes, we found material relating to the Billy Graham Evangelical Association which published the tract; and, no, we did not find the actual tract in the computer.

THE COURT: Attorney Watkins?

ATTORNEY WATKINS: I guess, generally, the objection is Mr. Breslow has been quite effective using

this agent as a summary witness, summarizing testimony that we've already heard, and we've already heard about all of this.

THE COURT: Okay. I'm going to allow it in. I think it is relevant to the point that this -- it's cumulative, the connection with Billy Graham, yes; but I also think it's relevant to come in that the mother had -- there was -- this nozzle pamphlet was not on her computer. No pictures of it. No reference to it. And, honestly, I think that's the government fairly putting in all the evidence whether it's good or bad for them, but I think it's favorable to the defense.

**(End of sidebar conference.)**

ATTORNEY BRESLOW: Ms. Moran, can you please read back the last question if there is a question pending?

**(Question read back)**

Q.    (By Attorney Breslow)  Okay.  So without discussing the defendant's mother's involvement, just simply state what you located on the defendant's mother's laptop?

A.    Flyers for the Billy Graham Decision America Tour -- Northeast Decision America Tour, flyers for the preparation events, and documents related to the organization of these preparation events, contact names, mailing envelope labels.

ATTORNEY BRESLOW:  Okay.  Can we display PX-88 which is already in evidence?

Q.   (By Attorney Breslow) Focusing on page one, is this one of the flyers or the flyer that you're discussing?

A.   Yes.

ATTORNEY BRESLOW:  Okay.  And could we just see pages two and three side by side or we can do it that way if it's easier.

Pages two -- page two is up now, and then if we can scroll to page three?

Q.   (By Attorney Breslow)  Are those the materials that you were referencing?

A.   Yes.

ATTORNEY BRESLOW:  Now, can we just go to page four for a moment?  And if we could blow up the file titles that have stars next to them, just the file title?

Q.   (By Attorney Breslow) The list of names, email addresses, and religious institutions, how is that labeled on the defendant's mother's computer?

A.   The title of that document was "HBC Meeting For Franklin Graham, 2-21-19."

Q.   What do you understand HBC to mean?

A.   Heritage Baptist Church.

ATTORNEY BRESLOW:  We can take it down now. Thank you.

Q.    (By Attorney Breslow)  So, Special Agent McGonigle, tell the jury, did you locate anywhere in the defendant's mother's laptop a copy of the pamphlet that was used as the wick and is now in its full form in PX-4?

A.    No.

Q.    Special Agent McGonigle, I just wanted to ask you a few questions related to this period of time, April 2nd to April 15th.  Can you tell the jury are you familiar with the state of the COVID-19 pandemic as it related to elder care facilities during that period of time?

A.    Yes.

Q.    And can you tell the jury, generally, what that state of affairs was and, in particular, on March 10, 2020, what did Governor Baker do?

A.    So --

ATTORNEY WATKINS:  Objection.

THE COURT:  Relevance?

ATTORNEY WATKINS:  Yeah.

ATTORNEY BRESLOW:  Okay.

**(Sidebar conference.)**

ATTORNEY BRESLOW:  So I think the Court can probably take judicial notice that as previous witnesses have testified, at least Natalie Rathbun did, there was a lockdown in place in March of 2020.

The relevance to this is that, number one, there was

a lockdown and it was prohibiting people from leaving, except for essential services during this period of time.

The second is that as it related to long-term health facilities on March 11th, the state restricted all visitation. And on March 24th, as Your Honor knows, people began to die in large numbers at another elder care facility at the Holyoke Soldiers' Home.

I think both -- I think both Mr. Desroches and Mr. Watkins described this in their opening statements or elsewhere in the trial as "as the pandemic raged," and it's relevant because it goes to the -- it's an important circumstance.

Again, I think the Judge can take judicial notice of it without even the testimony that surrounds the act charged in Counts 1 and 2, the placement of a device at an elder care facility. So this wasn't an ordinary time for elder care facilities. It was a very dangerous time for elder care facilities, and this is directly relevant to the defendant's intent, including his intent or knowledge that the device would be used to intimidate any person and so that's why we are offering it.

I have, like, three simple questions for him just describing what I outlined to you.

THE COURT: Attorney Watkins, on the issue of relevance to the intent to intimidate which is an element?

ATTORNEY WATKINS:  No, I don't see it.  The relevance, I simply don't see it.  Boy, it's sure veering into -- I don't know what it's veering into.  There's no relevance.  It's prejudicial.  It's very confusing.  Maybe I'm the dumb one here, but it's confusing to me.  So I'm trying to sort through it.  If it's confusing to me, it's going to be confusing to the jury.  I think it is an effort to inject even more, kind of, unrelated issues here.

THE COURT:  I do find that it is relevant.  It's relevant in the sense of establishing that individuals were, because of the pandemic, more likely to be at their home locations in larger numbers throughout the day because it was being discouraged or prohibiting anyone leaving.

So I do see some relevance as explained by the government and that ties into they do have the -- the government has the right to try to prove their case and that intimidation factor is an element.  All right.

**(End of sidebar conference.)**

ATTORNEY BRESLOW:  Ms. Moran, was there a question pending?  And if so, could you read it back?

**(Question read back.)**

Q.   (By Attorney Breslow) So you can answer the question.

A.   Okay.  So I'll start with the March 10th, I believe

the governor had issued a state of lockdown, sort of changing pandemic rules, a number of schools closed, and, in general, changed life entirely for most people.

Q.   And on March 11th, what did the state do with respect to elder care facilities or long-term care facilities like the Jewish Nursing Home campus?

A.   So they -- I believe they completely stopped visitation entirely and changed a number of the protocols to protect the residents.

Q.   And beginning on March 24th, what, if anything, began to happen at another elder care facility in Holyoke?

ATTORNEY WATKINS:  Note my objection.

THE COURT:  Sustained.

ATTORNEY BRESLOW:  Sustained as to that?  Okay. We'll move on.

Q.   (By Attorney Breslow) Now, we're almost done with your testimony, Special Agent McGonigle.

Can you go back to the interview that you had with the defendant on April 15th and tell the jury, towards the end of the interview, did you discuss the bloody pamphlet that was used as the wick?

A.   Yes.

Q.   And did you show him anything?

A.   Yes.

Q.   What did you show him?

A.    I showed him a page of the pamphlet and asked him if he knew or ever had seen it.

Q.    So I'm going to introduce or ask that the Court display to the entire courtroom what's already in evidence as PX-72, page 8, and if we could blow up this page, meaning the actual sheets so that they're a little larger on the screen.  Thank you very much.

Okay.  Do you recognize this?

A.    Yes.

Q.    And what is that?

A.    That's one of the pages or the page of the pamphlet I showed him.

Q.    Okay.  And looking at this particular page, does there appear to be any substantial charring?

A.    No.

Q.    Does there appear to be any bloodstains?

A.    No.

Q.    Okay.  So tell the jury why you chose to show the defendant this page first?

A.    I wanted him to look at the actual tract and tell me if he had seen that tract before he understood why it was important to us.

Q.    So what did you say to the defendant when you showed him these two sheets of paper or these two pages?

A.    Have you ever seen this tract before.

Q.   And what did he say?

A.   No.

Q.   And what did you tell the defendant next?

A.   I said, well, your blood's on it.  So how is it possible that you've never seen this tract before if your blood is on it?

Q.   What did the defendant say to you?

A.   He didn't know how his blood could have gotten on it.

Q.   What then did you tell the defendant?

A.   I told him that this was a wick or this religious tract was used as a wick in an explosive device in a firebomb and that this wick with his blood on it had been stuffed into the nozzle of a gas can with his blood on it and lit on fire.

Q.   And did you tell the defendant where the device was placed?

A.   Yes.

Q.   What did you tell him?

A.   That it was placed outside that Jewish Nursing Home on Converse Street.

Q.   Now, after you explained all of this to the defendant, did you show him anything next?

A.   I showed him the pictures of the pamphlets which had visible bloodstains and charring on them.

          ATTORNEY BRESLOW:  So I'd like to display two by

two, if we can, pages five, six, and seven?  Maybe first pages five and six and then six and seven.  That's fine.

Just so the record is clear, we are just looking right now at page seven, and we've previously displayed briefly pages five and six.

Q.  (By Attorney Breslow) So did you show the defendant all three of these pages?

A.  Yes.

Q.  What, if anything, did you tell him when you showed him these pages?

A.  So what I had just said is that this is your blood on these pages, can you explain how it got there?

Q.  And when you asked if he could explain how his blood got on these pages, what did he say?

A.  He said he couldn't explain it.

Q.  How did the defendant react to seeing his blood on these pages?

A.  His demeanor changed significantly.

Q.  Can you elaborate?

A.  Yes.  Prior to this, he was kicking soccer balls around with other agents, joking around with people.  He kept telling me that he was going to -- you know, we were going go figure it out.  He was going to figure out what had happened here.  You know, that this was -- we're going to get to the bottom of this.  He joked around with

Detective Chaplin, played with his dog, generally engaging with the people at the search.

After I showed him this, his demeanor changed entirely. He became withdrawn. He sat -- he sort of stepped away from us. He sat down on the back part of his porch. He put his hands in his -- on his head and he sort of sat there without interacting with us, without interacting with anybody. And then, at one point, he said to himself he thinks he's going to cry.

Q. Did you allow him time to process this information?

A. Yes.

Q. How soon after this did the interview end?

A. We allowed him to, sort of, stew on it for some period of time, 30 seconds, a minute; tried to reengage him and shortly after that, he told us that he didn't want to talk to us anymore.

Q. And when he said that, what did you do?

A. We ended the interview.

ATTORNEY BRESLOW: Your Honor, I have no further questions.

THE COURT: All right. Whenever you're ready, Attorney Watkins.

ATTORNEY WATKINS: Can I use the lectern?

THE COURT: Sure.

ATTORNEY WATKINS: It will take me just a moment

to set up.

THE WITNESS:  Your Honor, could I go to the bathroom before we start?

THE COURT:  Sure.

THE WITNESS:  Thank you.

THE COURT:  Why don't we take a few minutes, so a 10- to 15-minute break.  Do not discuss the case with each other or with anyone else.  All the instructions apply.  Don't look at your phones to see about news or internet search, social media posts.  Okay.

**(The jury left at 10:17 until 10:34.)**

THE COURT:  You can be seated.

Did everyone follow all the instructions that I gave before leaving the courtroom?

All right.  Affirmative answers yes from all jurors. They remain fair and impartial.

ATTORNEY WATKINS:  Ms. Rivera, may I have the screens switched over?

CLERK RIVERA:  What are you using?

ATTORNEY WATKINS:  HDMI-1.

ATTORNEY BRESLOW:  Is this a new exhibit?

ATTORNEY WATKINS:  Nothing right now.  I just wanted it more generally.

CLERK RIVERA:  It's on.

ATTORNEY WATKINS:  Thank you.

**CROSS-EXAMINATION**

Q.    (By Attorney Watkins) Good morning, Agent McGonigle.

A.    Good morning.

Q.    I want to talk a little bit about search warrants first.  Search warrants are a tool in your investigations?

A.    Yes.

Q.    And you used -- you got a search warrant here for Mr. Rathbun's house?

A.    Yes.

Q.    And, in fact, you got a number of search warrants in this case, correct?

A.    Yes.

Q.    Search warrants -- there's a process for getting a search warrant, is that correct?

A.    Yes.

Q.    One must make a statement, a showing to a judge in order to get a search warrant, correct?

A.    Yes.

Q.    And that requires a statement from you, particularly, as the case agent when you want to obtain a search warrant, right?

A.    The affiant of the search warrant, yes.

Q.    And, in fact, you are a lawyer yourself.  You're trained in the law?

A.    Yes.

Q.    And you went to the FBI academy as well?

A.    Yes.

Q.    At the FBI academy, you're taught quite a bit about search warrant affidavits, right?

A.    Yes.

Q.    The FBI has very specific kinds of procedures and requirements for affidavits by case agents, right?

A.    Yes.

Q.    Because at the end of the day, what you have to do is prove to a judge that you should be able to get a search warrant in an investigation, right?

A.    Yes.

Q.    And you're required for that proof to sign your own statement under pains and penalties of perjury, correct?

A.    Yes.

Q.    And the point of all this is you have to be very, very careful about what you say to a judge when you're trying to get a judge to issue a particular warrant, correct?

A.    Yes.

Q.    And you can spend hours, if not days, sometimes on these affidavits in support of a search warrant, right?

A.    Is the, sorry, the question generally or specifically?

Q.    Just generally, yes.

A.    Yes.

Q.    Some are more complicated than others, right?

A.    Yes.

Q.    And you work, in fact, with prosecutors when you're getting ready to submit an application for a search warrant, right?

A.    Yes.

Q.    And the two of you will go over the state of the investigation and decide what gets put in the affidavit, correct?

A.    I'm sorry.  Is this a specific question or a general question?

Q.    I'm asking, yes, generally, is that true you will work with a prosecutor in order to make sure that the affidavit is full and complete for the purposes of a search warrant?

A.    Yes.

Q.    Here you got involved in the case on April 2nd on a call from the Longmeadow Police Department?

A.    Yes.

Q.    And you went over and visited the site that day or the next day?

A.    Yes.

Q.    Which was it?  Was it that day or the next day?

A.    It was that day, April --

Q.    Over the next few days, you continued, you went over to the site of the Jewish Geriatric Services several times in the following week, right?

A.    What time period are you asking about?

Q.    From April 2nd when you were first advised of the case, did you go over to Jewish Geriatric Services on more than one occasion?

A.    Certainly one occasion.  Yes, I mean, if you're asking in the week time period, it's possible that it was multiple times.  I don't -- I can't recall that.

Q.    I'm sorry?

A.    Yes, it's possible that it was multiple times in that first week.  I can't say for sure.

Q.    And you applied for the search warrant that Mr. Breslow asked about for John Rathbun's home.  You applied for that on April 11th; is that correct?

A.    I don't have any -- I can't tell you off the top of my head that's the right date.  I have no reason to believe that's incorrect.

Q.    Okay.  But you had the search warrant in hand on April 15th when you went to Mr. Rathbun's house, right?

A.    Yes.

Q.    And so when you signed this affidavit, for example, that's when you would sign under pains and penalties for perjury on a particular date, right?

A.   Yes.

ATTORNEY WATKINS:  I'm going to put up just a calendar as a chalk.  I'm not intending to introduce this as evidence.

Is there any objection to this being shown to the courtroom as a chalk?

ATTORNEY BRESLOW:  No objection.

ATTORNEY WATKINS:  May this be published?

THE COURT:  Yes.

Q.   (By Attorney Watkins) Just to orient us all, I have on April 2nd, a Thursday, that's when the JGS event happened, right?

A.   That's correct.

Q.   I'm sorry?

A.   That's correct.

Q.   Okay.  And the search here is on April 15th, right?

A.   Yes.

Q.   Somewhere between April 2nd and April 15th, you applied for a search warrant, right?

A.   Yes.

Q.   Now, in that particular search warrant, again, what you're trying to do is get the judge enough information to justify a search of Mr. Rathbun's home, right?

A.   Yes.

Q.   You're trying to be as complete and accurate as you

can to that question about whether a search warrant should issue, right?

A.    Can you rephrase that question?

Q.    You're trying to be as complete and accurate as you can?

A.    Yes.

Q.    Now, the search warrant affidavits, they typically include the law on particular crimes and then a factual section also of the search warrant application, right?

A.    Yes.

Q.    Now, here on that fact section you talked about the Jewish Nursing Home, right?

A.    In the application for the search warrant, yes.

Q.    And you talked about Ruth's House, right?

A.    Yes.

Q.    You never said anything in that application about Genesis House, did you?

A.    No.

Q.    It was Ruth's House and it was the Jewish Nursing Home that you talked about in that search warrant when you're asking the judge to make a decision about probable cause, right?

A.    Yes.

Q.    Now, going to another kind of affidavit that you would do, that would be an affidavit in support of a

complaint.  Do you know what I'm talking about when I say an affidavit in support of a complaint?

A.    I do.

Q.    Now, a complaint is a case where you have arrested somebody and then you're trying to show the magistrate judge whether you have enough evidence to arrest a person, right?

A.    Yes.

Q.    And that is the same thing, it's signed under the pains and penalties of perjury, right?

A.    Yes.

Q.    Because that's a very serious thing to arrest somebody and deprive them of their liberty.  You've got to be very, very accurate about that, correct?

A.    Yes.

Q.    And in John's case, you did file an affidavit in support of his arrest on a complaint, correct?

A.    Yes.

Q.    In that application to have John arrested, you mentioned Ruth's House, right?

A.    I believe so.

Q.    And you never mentioned Genesis House, right?

A.    I do not believe so, no.

Q.    I'm sorry?

A.    I do not believe we did that, no.

Q.    And not only did you mention Ruth's House, but you told the magistrate judge there that the fuel container had been placed 50 yards away from the Ruth's House facility, right?

A.    To be honest, I would have to review my complaint for the specific language.

Q.    You don't remember sitting here about this document that you signed under pains and penalties of perjury?

A.    I don't remember the one specific sentence that you're referring me to, no.  I'd have to review it to be sure.

        ATTORNEY WATKINS:  So this should probably just go to the witness.

Q.    (By Attorney Watkins)  I think what you're telling me is you simply can't remember the language that you used in this affidavit?

A.    Yeah.  To the extent that you want me to be specific, I would just need to review it.

Q.    I'm just trying to find out from you whether you said that the device had been placed 50 yards away from the Ruth's House facility?

A.    I think -- I believe that we did say that.  Again, the specific language I can't specifically confirm.

Q.    All right.  You did say that it was 50 yards from the Ruth's House facility, right?

A.    Yes.

Q.    And that turned out to be not correct, right?

A.    The 50 yards part or the Ruth's House part?

Q.    Well, you're telling the jury, as I understand it, that the target now was the Genesis House, right?

A.    I'm not -- I think we've told the jury that the device was placed at the entrance.

Q.    But you talked about Genesis House and the proximity to Genesis House of the fuel container, right?

A.    Yes.

Q.    And that is you didn't talk about Ruth's House here at trial about the proximity to Ruth's House; is that correct?

A.    That's correct.

Q.    So that was what you were talking about in this affidavit signed under pains and penalties of perjury, right?

A.    Sorry, can you rephrase the question?

Q.    You weren't asking about -- you were talking -- you made a statement to the judge about the proximity between the fuel container and the Ruth's House facility, right?

A.    Yes.

Q.    You said it was 50 yards away, right?

A.    Yes.

Q.    We've all learned now that that's wrong.  It's not 50

yards away from the Ruth's House facility, right?

A.    Correct.

Q.    And in the past, you've acknowledged that that was a mistake?

A.    Yes.

Q.    Now, when you applied for this affidavit, it wasn't just after the fuel canister was found?  It was a week or more; is that correct?

Well, here, you know what.  I have this up.  I will ask you to identify the date here, and again this should just be going -- I have the -- that's a different one. All right.

Do you see this in front of you, affidavit of Special Agent Ryan McGonigle in support of a criminal complaint against John Michael Rathbun?

A.    I do see that, yes.

Q.    Let's see what the date is.  Again, you can't remember the exact date here, right?  When you issued this?  When you applied for this?

A.    Yeah, I'm sorry.  Yeah, I'm not sure.  I would prefer to just look at the document and tell to be most accurate.

Q.    There it is.  It's in front of you.  Can you see it there?

A.    So I'm sorry, is this -- are you asking me about the search warrant or the complaint?

Q.    I'm asking you now about -- this is the complaint.

A.    Right.

Q.    The complaint that you made to the judge to have Mr. Rathbun arrested.  Right?

A.    Yes.

Q.    What is the date on that that you swore and subscribed to this statement?

A.    April 15, 2020.

Q.    And this is where it talks about a fuel canister being 50 yards away from Ruth's House, right?

A.    Yes.

Q.    And that is -- that's also consistent with what you said in the affidavit for a search warrant, right?

A.    Yes.

Q.    You didn't mention Genesis House; it was Ruth's House, right?

A.    Yes.

Q.    And if you had it to do all over again, you would not have put that in either of those affidavits Ruth's House -- in proximity to Ruth's House, right?

A.    No.

Q.    Because it was inaccurate?

A.    Yes.

Q.    Because as we've seen -- well, let's put it up here.
      Well, we've seen it.  You would agree with me that

Ruth's House is the facility that's way in the back of the JGS campus, right?

A. Yes.

Q. Not just 50 yards, but closer to a quarter mile away from there, right?

A. I can't say for sure.

Q. Now, that wasn't -- you swore to it and subscribed to it under pains and penalties of perjury, but you weren't trying to lie to the magistrate judge, right?

A. No.

Q. You just -- it was a mistake, right?

A. Yes.

Q. You thought it was Ruth's House, but that was wrong, right?

A. Yes.

Q. Now, you went to the campus at least once and maybe more times between the time that this was reported to you and you went to Mr. Rathbun's house, right?

A. Yes.

Q. And to do that, you traveled down Converse Street to Jewish Geriatric Services because that's the only way to get in there, correct?

A. Yes.

Q. And you went there both before you applied for the search warrant and then again before you applied for the

application for a criminal complaint, right?

A.   Yes.

Q.   And you've told the jury that you've actually gone down Converse Street for a couple of years.  You have experience because you've gone down it for a couple of years, right?

A.   Yes.

Q.   Now, this event just over a year ago at this point now, 14 months ago at this point, so it sounds like you have some personal non-related experience with driving down Converse Street?

A.   Yes.

Q.   Now, when you later understood that you'd made a mistake about the fuel canister being left with the target up Ruth's House, you explained that that was because you got the information from the Longmeadow Police Department and you thought it was Ruth's House, right?

A.   I'm sorry.  I'm not sure I've ever used the word "target."

Q.   In the application for a search warrant for John Rathbun's house, you put Ruth's House was the target of this, leaving of the fuel canister, right?

A.   I'm actually not sure of that.  If you have the document, I'd be happy to review it.

Q.   So you don't remember whether you said Ruth's House

or Genesis House?

A.   I'm sorry.  I'm not actually even sure what document you're referring me to right now.

Q.   I'm talking about your application for a search warrant.

A.   Right.

Q.   In the application for a search warrant, you identified Ruth's House.  You didn't identify Genesis House, right?

A.   Yes.

Q.   You did that, you later said, because the Longmeadow Police had told you that it was Ruth's House, right?  That all of that was Ruth's House?

A.   Yes.

Q.   Now, I want to put up -- and going back again you would drive by here independently of this case.  You knew Converse Street a little bit, right?

A.   Yes.

ATTORNEY WATKINS:  I want to put up one of the pages of Exhibit 139.  It's actually on the ELMO here.

ATTORNEY BRESLOW:  In evidence?

ATTORNEY WATKINS:  Yes.

ATTORNEY BRESLOW:  Can we identify which page?  For the record, can we just identify which page of 139 we're looking at right now?

ATTORNEY WATKINS:  You will have to tell me.

ATTORNEY O'NEILL-GREENBERG:  It doesn't have page numbers on it.

ATTORNEY WATKINS:  They didn't have page numbers on them.

THE COURT:  This is exhibit what?

ATTORNEY WATKINS:  It's 139.  It's a several-page exhibit.  They are all of the JGS Lifecare Genesis House sign here.

ATTORNEY BRESLOW:  Your Honor, we have a digital version.  If we have a moment, we can identify the page for the record.

THE COURT:  All right.  I don't think --

ATTORNEY BRESLOW:  Page four.

THE COURT:  So this is page four.  It's an up-close sign.

Q.   (By Attorney Watkins) You identified this as the JGS Lifecare Genesis House sign that you saw -- that you see when you go down Converse Street, right?

A.   Yes.

Q.   And notwithstanding the fact that you see this when you're driving on personal business down Converse Street, when the Longmeadow Police Department told you it was Ruth's House, you didn't do any more investigation to see whether it was really Genesis House, right?

A.    What's the time period we're talking about?

Q.    April 2nd is when the event happened.  April 15th is when you went and arrested John.  In that period of time, knowing that you drive by and see a sign that says Genesis House, did you investigate further about the connection -- the alleged connection of this fuel canister?

A.    I'm sorry.  Can you be more specific with what part of the question you want me to answer?

Q.    Let me put it this way.

      You've testified to the jury that you drive down Converse Street on both a personal and, since then, a professional basis because of this case, right?

A.    Yes.

Q.    You told the jury that when you drive down, you see these signs for Genesis House and Ruth's House, right?

A.    Yes.

Q.    The strong suggestion is that anybody driving down would see these signs, right, and know what's involved here, right?

A.    Yes.

Q.    But despite the fact that you had previously driven down and seen this sign that said JGS Lifecare Genesis House, you still persisted in calling it Ruth's House as the target, right?

A.    Yes.

Q.    And you continued under the premise that, well, through certainly April 15th when you went to visit John at his house armed with a search warrant, that's what you thought, you thought it was Ruth's House and that's what you wanted to ask John about, right?

A.    Yes.  That was one of the things we asked him about.

Q.    Well, you testified I think here that that is exactly what you wanted from John.  You wanted to see if he would be familiar with Ruth's House and the Jewish Nursing Home, right?

A.    Yes.

Q.    Now, we've now heard and you know the Jewish Nursing Home is a different thing.  Ruth's House is a different thing than Genesis House, right?

A.    Yes.

Q.    And now if you had to do it all over again with what you know now, you would have said Genesis House in those applications, right?

A.    I think there's a specific reason we're referring to it as --

Q.    He gets another shot at you later.

A.    I understand, but I'm afraid I may say something that I'm not supposed to say right now so --

Q.    So when you went to John's house armed with a search warrant --

ATTORNEY BRESLOW:  Your Honor, may we go to sidebar for a moment?

THE COURT:  Sure.

**(Sidebar conference.)**

ATTORNEY BRESLOW:  Your Honor, so I think I know exactly what Special Agent McGonigle is referring to.  And I think what I'd like to do is have the questions read back or printed out so we can determine exactly what the questions are and, in particular, why Special Agent McGonigle responded the way he did.

So what I am confident that he's referring to is the reference to the Jew nursing home on the holy Kaiserreich gilded server as Jew killing day.  I'm not ascribing any ill intent on behalf of Mr. Watkins, but we have a situation now where because of these questions, Special Agent McGonigle has referenced an area that the Court has determined is completely off limits.

I think what I'm going to request now is to see the past several questions leading up to this answer so that we can consider how to remedy this situation if at all.

THE COURT:  Okay.  I'm not sure we need a remedy, there needs to be remedy yet.

So, Attorney Watkins, what's going on?

ATTORNEY WATKINS:  All I was trying to do, Your Honor, is go there with the -- to get the jury to

understand that he went there with the idea of Ruth's House, not Genesis House.

What Agent McGonigle wants to do is explain why that is. I'm not going to ask him to explain. I just want the jury to understand that it was Ruth's House and not Genesis House. I'm done with this, and I think we're ready to move on to the next part.

THE COURT: Well, right, but it requires an explanation. If you're going to get him into an answer and then perhaps on redirect there would need to be an explanation, and so you've created a situation where the explanation would be an area that might be off -- because of previous rulings, off limits.

Is that a fair summary, Attorney Breslow, in your mind?

ATTORNEY BRESLOW: Yes. That's exactly the issue. You know, it's very hard to track exactly the wording of every question and every answer, but I think we're clearly in a situation that we have stumbled into due to Mr. Watkins' questions, and that's why I really do need to see these past three or four questions so that we can determine how to proceed.

THE COURT: What do you mean you need to see them? You want a printout of the -- you can approach, you can approach the steno, and she can scroll them on her

screen if you wanted to do that.

ATTORNEY BRESLOW:  I think that would work.

THE COURT:  Attorney Watkins, the defense team as well can approach.  If you want to just look at the last three questions.

ATTORNEY WATKINS:  Sure.  I mean, I know what I asked.  So I guess I'm good with that.  But, Your Honor, just to finish this out, as the Court will recall yesterday, Mr. Breslow talked about Mr. Rathbun never mentioned Genesis House to him, and they opened this line of questioning here.

THE COURT:  We'll keep talking about it after Attorney Breslow looks at the questions.  He's asked to look at the questions.

Alice, can that happen?  Okay.

(End of sidebar discussion.)

THE COURT:  Ladies and gentlemen, I'll explain to you what's going on.  There was a question by one of the attorneys that we want to review, something that was said in part of the question.

As I told you, you won't get a transcript because it doesn't just happen like that.  The stenographer is now trying, for a very short section, to convert the raw data to be able to tell the parties what the question was.

**(Sidebar discussion.)**

ATTORNEY BRESLOW:  I understand now exactly why he answered the question the way he did.

THE COURT:  Can the parties go back to their seats?

ATTORNEY BRESLOW:  Sure.

So I think the thrust of the questioning and, in particular, the one that was leading up to this was that Mr. Watkins was asking Agent McGonigle about why he was using or referring to, in part, the Jewish Nursing Home as the target in these affidavits.

And what Special Agent McGonigle was explaining was that he cannot answer that question because that question -- this is now I think what he would have said. That that question has been precluded; the answer to that question has been precluded by the Court because the answer to that question would be that a Jewish Nursing Home had been targeted as Jew killing day on April 2nd on these online platforms.

So what we are requesting is that the Court instruct the jury that there was a prior court order, and Special Agent McGonigle was answering the question appropriately, rather than giving the substantive answer starting to explain that the topic that he was being asked about has been precluded by the Court from this trial.

THE COURT:  Attorney Watkins.

ATTORNEY WATKINS:  That's not the question.  I did not ask him why.  I said he went over there with the -- he's going there to ask Mr. Rathbun about Ruth's House.  He said that he went over there to talk with him about that.  That was the only thing I was trying to get in here.

THE COURT:  What was the last question?  Was the last question, "Would you do it differently?"

ATTORNEY BRESLOW:  That's why I asked for the pages -- for the pages showing the prior questions, several of them, because this is exactly where Mr. Watkins was pushing Mr. McGonigle.

THE COURT:  Was that the last question?  Would you do it differently?

ATTORNEY WATKINS:  I don't know if that's the last question, would you do it differently.  What he would admit was saying it was 50 yards from the entrance of Ruth's House was incorrect.  That was a mistake and he would do it differently.

THE COURT:  Okay.

ATTORNEY BRESLOW:  So the questions and answers have been transcribed by Ms. Moran.  I would respectfully request that the Court review it and then issue the instruction that we have given.

There's a simple mistake here, the identification of

Genesis House as Ruth's House.  That's it.  And Mr. Watkins has asked probably two dozen questions covering this very same point without objection, but what's he's done, perhaps unintentionally, is walked Mr. McGonigle into an impossible situation.

Mr. McGonigle tried to explain that he couldn't answer, and I think the Court needs to issue a very brief instruction to the jury that there's been an area that's been precluded from the trial.  That the defense questions have caused Special Agent McGonigle to decline to answer because they've been prohibited from the Court.

THE COURT:  It doesn't seem to me that we are up to that point yet.  I'm going -- are you going any further on this, Attorney Watkins?

ATTORNEY WATKINS:  No.

THE COURT:  Okay.  Attorney Breslow, you certainly can revisit this.  And when you revisit this, I may revisit it also, but we are going to move on right now.

ATTORNEY BRESLOW:  Yes.

**(End of sidebar conference.)**

Q.    (By Attorney Watkins) Agent McGonigle, when you went over to interview Mr. Rathbun, you referred to Ruth's House and you referred to a Jewish Nursing Home, right?

A.    Yes.

Q.   You never said it was Genesis House, right, that you were looking at?

ATTORNEY BRESLOW:  Objection; asked and answered, now repetitive.

THE COURT:  Sustained; asked and answered.  Move on.

Q.   (By Attorney Watkins) During the interview with John, not talking about the affidavits now, the interview with John Rathbun, you never asked about Genesis House?

ATTORNEY BRESLOW:  Objection; asked and answered.

THE COURT:  Asked and answered.  Sustained. Move on.

Q.   (By Attorney Watkins) On April 15th, you submitted the criminal complaint again talking about Ruth's House, not talking about Genesis House?

ATTORNEY BRESLOW:  The same objection; asked and answered.

THE COURT:  All right.  Attorney Watkins, I'm not going to let this go.  We're not going to go over it one more time.  Is there something new here?

ATTORNEY WATKINS:  There is something new here, if I may?

Q.   (By Attorney Watkins) We also played a telephone call about Mr. Rathbun talking about his grandmother at Genesis

House.  Do you recall that when Mr. Breslow played that?

A.    Yes.

Q.    The date of that call was in July; is that correct?

A.    I'd have to check the dates on that.

Q.    Did there come a time at -- I think you testified there came a time in which you decided it was Genesis House rather than Ruth's House, right?

A.    Yes.

Q.    That wasn't a week after?  It wasn't two weeks after?  It wasn't a month after, right?

A.    I'm not sure when we determined that.

Q.    But at some point after a couple of months, that's what you decided or that's when Genesis House started being an issue, right?

A.    Again, I'm not sure of the time period.

Q.    But it was certainly not when you were at John Rathbun's house on April 15th, right?

A.    Yes.

          ATTORNEY WATKINS:  May I have the computer back?

Q.    (By Attorney Watkins)  I'm going to show you Exhibit 72.  This is the map that you showed Mr. Rathbun when you went over to his house in an effort to try to orient him?

          ATTORNEY BRESLOW:  Your Honor, just to note, that the exhibit is not being displayed to the jury.

          ATTORNEY WATKINS:  This has been admitted.

THE COURT: All right. So now it's displayed for the jury.

Q. (By Attorney Watkins) Do you recognize this that you testified about Exhibit 72?

First, I want to ask you a question, you said that you thought that this version was lighter than the one that you had actually taken over to John Rathbun's house?

A. Yes.

Q. Where is the original?

A. I don't have it with me right now.

Q. But you do have the original?

A. I don't know where the original is right now.

Q. When the FBI does an interview of a witness, you prepare a particular form, a 302 form, right?

A. The 302 is the written document.

Q. In conjunction with 302, there's something called a 1A?

A. Yes.

Q. There's also a 1B and 1C, but I want to talk about the 1A. What is the 1A that's attached to the 302 for?

A. That's for documents or notes or anything else that you might put in there.

Q. Things that you used during the interview that's documented in the 302 were supposed to go in the 1A, right?

A.    Yes.

Q.    So that's where the original of this map that you say is now lighter here should be, right?

A.    Yes.

Q.    You've testified previously that this version is lighter than the one you remember with John Rathbun but you have not found the original one?

A.    I have not brought it over, no.

Q.    I'm sorry?

A.    No.

Q.    I mean, these are -- you would have access?  You're the case agent.  You could go back to the original 302 and 1A to get that, right?

A.    Yes.

Q.    But this is the map that you tried to orient John Rathbun with which mentions Ruth's House Drive and Converse Street, right?

A.    Yes.

Q.    And, again, neither of you were talking about Genesis House, right?

A.    No.

Q.    And you were identifying Ruth's House as a nursing home, right?

A.    Yes.

Q.    And we now know that's an assisted living facility.

There's a nursing home next door to all of this, but that's an assisted living facility, right?

A.    Yes.

Q.    You have your -- when you go to the site of an interview or a search warrant, you have your phones, both department-issued phones and personal phones, right?

A.    Yes.

Q.    And I'm bringing up what's been introduced already as Exhibit 82.  This was not a map that you printed out and showed to Mr. Rathbun, right?

A.    Correct.

Q.    It's not a map that you brought up on your phone to try to orient him?

A.    No.

Q.    And he mentioned about a Jewish school on the street that he was familiar with.  That's actually on here, right?

A.    Yes.

Q.    It wasn't on the other map that you showed him of the corner of Ruth's House and Converse, but it's on this map that's been introduced into evidence, right?

A.    Yes.

Q.    So when you put this map into John Rathbun or showed John Rathbun, that's Exhibit 72 -- I should get that back up.

When you showed him this map, John didn't ask you to stop the interview at that point, right?

A.    No.

Q.    It wasn't at that point he became agitated, right?

A.    No.

Q.    What he said is can you get to the point of what you're doing there and asking him about, right?

A.    Yes.

Q.    I want to go back to the search warrant to search John's house.  You told the magistrate judge that you wanted to look for physical evidence at 20 Lori Lane, right?

A.    Yes.

Q.    And you also wanted to look at digital evidence that might be found at 20 Lori Lane?

A.    Yes.

Q.    And as to the physical evidence, specifically what you were wanting to find there, you told the magistrate judge were records and tangible objects pertaining to the following subjects;  White supremacy, neo-nazism, mass killing of civilians, right?  That's what you asked for?

A.    Yes, among other things, yes.

Q.    Evidence of threats or actual violence directed at individuals based upon their perceived or actual religion?

A.    Yes.

Q.    That's what you were looking for in this warrant?

A.    Yes.

Q.    And you didn't find that anywhere, any physical evidence of that at 20 Lori Lane?

A.    No.

Q.    You did find physical evidence there, just nothing of those things, right?

A.    Right.

Q.    Digital evidence.  You told the magistrate you were hoping to find research and internet searches of local knowledge, maps, and photos of the target.  You've reviewed all the digital evidence in the case.  Did you find any of that on Mr. Rathbun's phone?

A.    No.

Q.    You asked the magistrate judge to search for evidence of research and methods that could be used to start and/or accelerate fires in an attempt to find the best method to quickly engulf the intended target.  Did you find that on the digital items that you reviewed?

A.    Digital items, no.

Q.    You also told the magistrate judge that people like Mr. Rathbun frequently use computers to create and store records of their actions by communicating about them through email and instant messages.  Did you find that on the phones?

A.   No.

Q.   Did you find communications through email and instant messages about drug activity?

A.   Yes.

Q.   I want to talk about your arrival at 20 Lori Lane. What time did the search begin of 20 Lori Lane?

A.   Sometime between 7:00 and 8:00.

Q.   Now, before the search is conducted, you and the search team gather together in a separate location to talk about the tactics for the search; is that correct?

A.   Yes.

Q.   How many people were involved in the search and interview of Mr. Rathbun, altogether, on April 15th at 20 Lori Lane?

A.   I don't have an exact number for you.

Q.   Was it more than a dozen?

A.   A dozen -- I would have probably said about a dozen. I'm not sure though.

Q.   But less than two dozen it sounds like?

A.   Yes.

Q.   And we've heard that the team going in there was divided into subteams, people going to search the cars, people searching the house; there's the clear team, right?

A.   Some of those are the same people, but yes.

Q.   Talking about the clear team in particular, those are

the first persons who are going to go into a search area, right?

A.    Yes.

Q.    And their task is to make sure it's not dangerous in there, right?

A.    Yes.

Q.    And there are very specific procedures and tactics that clear teams are trained to do, right?

A.    Yes.

Q.    And there are particular weaponry and particular clothing that they're required to have, right?

A.    Can you define "clothing" for me?

Q.    I'm sorry?

A.    Can you define what you mean by "clothing"?

Q.    Bulletproof vests, insignia on them of specific things, right?

A.    Yes.

Q.    Some of the clear team have long guns, right?

A.    Yes.

Q.    And when I say "long guns," I'm talking about AR-15s, right?

A.    I don't know if they're AR-15s; they're carbines.

Q.    They have carbines.

      And going into 20 Lori Lane that day, the clear team had carbines, right?

A.   Not the entire team, no.

Q.   I'm sorry?

A.   No, not the entire team.

Q.   There were no carbines whatsoever in there?

A.   There were carbines there, yes.

Q.   Oh, in 20 Lori Lane?

A.   Yes.

Q.   Okay.  You weren't inside.  You were not part of the clear team, right?

A.   Correct.

Q.   So when these carbines are going into the house, they're at the ready for the clear team, right?

A.   No.

Q.   They're down at their side?

A.   They are always pointed in a safe direction.

Q.   Yes, but they're held.  It's not like you can hide a carbine when you go inside, correct?

A.   Correct.

Q.   Because that's how they're trained.  They are very, very hypervigilant to make sure that it's going to be safe in there, right?

A.   Correct.

Q.   And so it's those men and perhaps women -- were there men and women on the clear team?

A.   I don't recall.

Q.    I call these -- what's a carbine?  Can you describe to the jury what a carbine is?

A.    It's a long gun.  It's, for lack of a better term, an assault rifle.

Q.    And, in fact, it's at least semi-automatic.  It might be automatic, right?

A.    It is not automatic.

Q.    I'm sorry?

A.    It is not automatic.

Q.    But it's semi-automatic.  It has a large magazine attached to it, right?

A.    That's not the same thing as a semi-automatic.  That's not what a semi-automatic means.

Q.    So it is those persons on the search team that encountered the Rathbun family and escorted them out and escorted John onto the deck, right?

A.    No.

Q.    Who was it that escorted the people -- the Rathbun family out onto the deck?

A.    The Rathbun family walked out on the deck after we asked them to exit the premises.

Q.    You're going to have to move that closer.  I'm having trouble hearing you.

A.    The Rathbun family walked out onto the deck after we asked them to exit the premises.

Q.   So that was before people went in or people went in there already?

A.   Before people went into the house.

Q.   So John Rathbun -- people went in to escort him out of the residence.  That's true, isn't it?

A.   That is not the way I recall it, no.

Q.   I'm sorry?

A.   No.

Q.   All of the family came out just at the urging or the request of the officers?

A.   Yes.

Q.   No one went in there holding weapons?

A.   When are we talking about?

Q.   When you arrived to execute the search warrant and do the clear team, you're telling me that nobody went in there before?

A.   Before the --

Q.   Before the family walked out?

A.   That's correct.

Q.   And John Rathbun was the target of this particular investigation, of course.  Was John Rathbun treated differently once he got out of the house?

A.   No.

Q.   Well, he was segregated from his family; is that right?

A.    That's correct.

Q.    And he had an officer assigned to him to watch him, right?

A.    Yes.

Q.    And that officer had a handgun, right?

A.    Yes.

Q.    Everybody there had some kind of gun, right?

A.    Yes.

Q.    And that officer that was minding John Rathbun had the gun unholstered and pointed at Mr. Rathbun initially, right?

A.    I can't recall that.  I did not personally see it.

Q.    You spent three to four hours that day intermittently talking to Mr. Rathbun; is that what the testimony has been?  Is that accurate?

A.    Yes.

Q.    And that is not recorded in any way whatsoever; is that correct?

A.    There's a -- no, that's not correct.

Q.    Sorry.  I should have been more clear.  Not audio recorded, right?

A.    Correct.

Q.    Not video recorded, right?

A.    Correct.

Q.    All there was was Detective Chaplin taking notes and

you asking questions at the scene, right?

A.    Yes.

Q.    The sum total of Detective Chaplin's notes run to two-and-a-half pages for those three to four hours; is that accurate?

A.    Yes.

Q.    You later authored a summary of the interview and your memo runs to five pages for that three to four hours, right?

A.    Yes.

Q.    No audio?  No video?

         ATTORNEY BRESLOW:  Asked and answered, Your Honor.

         THE COURT:  Overruled.

         THE WITNESS:  Can you repeat the question?  I'm sorry.

Q.    (By Attorney Watkins) No audio and no video?

A.    No.

Q.    So when you tell the jury that it looked like Mr. Rathbun felt like crying or he said he felt like crying, that's not documented anywhere other than in the memo that you authored some days later?

A.    Yes.

Q.    When you authored your report, did you show that to Mr. Rathbun at any point to ensure that it was accurate?

A.    No.

Q.    Did you read back any quotes either that Detective Chaplin had made or that you had made to make sure that you accurately quoted him?

A.    Yes.

Q.    Throughout the interview, Mr. Rathbun maintained his innocence as having put that fuel container anywhere full of gas at JGS?

A.    Yes.

Q.    You arrested him at the end of the interview?

A.    Yes.

Q.    And what time was it that you made the decision to arrest him?

A.    Midday.

Q.    And a couple hours later, we were in federal court and you had the affidavit ready to show the magistrate judge about why you thought John should be arrested?

A.    Yes.

Q.    That was a ten-page affidavit, right?

A.    I don't recall how long it was.

Q.    You testified that you obtained a DNA sample pursuant to the search warrant?

A.    Yes.

Q.    But you actually asked Mr. Rathbun whether you could do that, and he agreed?

A.    Yes.

Q.    When you asked about his hands, he showed those hands to you.  He did not try to hide them behind his back, put them in his pocket, any evasive maneuvers?

A.    No.

Q.    And he talked about his drug use during those three to four hours, right?

A.    Yes.

Q.    Not at first.  He certainly minimized it, right?

A.    Yes.

Q.    And he continually asked let's see if we can figure out what's going on here, right?

A.    Yes.

Q.    During your three- to four-hour interview with him, he offered to take a lie detector test?

A.    Yes.

Q.    You told him you couldn't do it because there was nobody available given the pandemic?

A.    Yes.

Q.    I'm going to put up this chalk one more time.  Again, we're looking at this calendar of April 2, 2020, where I've marked the event, and then I've marked the search which is also the same day that you interviewed Mr. Rathbun.

      You asked the specific question, you repeat it here,

"Where were you on April 2nd?  Did you leave the house on April 2nd?"  Right?

A.    Yes.

Q.    And received the response, "I have not been out of the house in two weeks."  Right?

A.    Yes.

Q.    Twenty-four hours later, if you had executed that search warrant on the 16th, that would be an absolutely true statement, right?

            ATTORNEY BRESLOW:  Objection, Your Honor.

            THE COURT:  Overruled.

            THE WITNESS:  No.

Q.    (By Attorney Watkins) If you had gone on April 9th and said within the last two weeks, haven't gone out the week before, that certainly would have been a misstatement, right?

A.    I'm not sure what the question is.

Q.    I'm asking if this -- I'll withdraw it.

      Certainly, April 17th by that point it would have been a true statement, did you go out on April 2nd?  The response to that, I've been in the house for the last two weeks.

A.    I'm sorry.  Are you asking me to address whether he'd been out of the house in the two weeks after April 2nd?

Q.    No.  What I'm asking is you asked the question have

you been out -- where were you on April 2nd of 2020, did you leave the house?

A.   Yes.

Q.   His answer was I haven't left the house in the last two weeks, right?

A.   Right.

Q.   And you said he said exactly that, not I haven't been around -- I haven't been out of the house in around two weeks; did he say that?

A.   No.

Q.   Did he say I haven't been out the house in the last couple of weeks?

A.   No.

Q.   Your testimony is that he said it exactly, "I have not been out of the house in the last two weeks?"

A.   Yes.

Q.   But, again, no recording of that?  No video of that?

        ATTORNEY BRESLOW:  Asked and answered now.

        THE COURT:  Overruled.

        THE WITNESS:  No.

Q.   (By Attorney Watkins) As the interview went on, he did amend what he said to you.  He told you that he had actually gone on a dump run during the last two weeks, right?

A.   Can you ask the question -- there's two questions in

there.  Can you break them up?

Q.    Sure.  He later elaborated on his answer and told you that he had gone on a dump run within the last two weeks?

A.    No.  The question we asked was where was he on April 2nd.

The question that was asked was where was he on April 2nd.  He never amended that answer.

Q.    When you started -- when you interviewed him further, he did talk about his activities in the last two weeks, right?

A.    Yes.

Q.    And he talked about going to dump runs, right?

A.    Not plural.

Q.    Huh?

A.    Not plural.

Q.    A dump run?

A.    Yes.

Q.    And he did talk about going to get methadone.  He thought he had gone to get methadone in the last two weeks?

A.    Yes.

Q.    You talked of the importance of that answer particularly about the Rav4.  I want to talk about that. The Rav4 was Sheila Rathbun's car?

A.    Yes.

Q.   And that, indeed, that car was searched that day, right?

A.   Yes.

Q.   Patrick Carnahan, experienced FBI agent, and another searched that car?

A.   Yes.

Q.   Items of evidence were taken from that car, right?

A.   I'm not sure.

Q.   Items were taken and introduced at trial.  You don't know whether that happened or not?

A.   From the car?

Q.   From the Rav4?

A.   If you can direct me to what items so I can refresh my memory.

Q.   There were door knockers in the Rav4 that were introduced at trial.  Those are recovered by Patrick Carnahan, were they not?

A.   I don't believe those were ever entered into evidence.  I believe those were just pictures.

Q.   I stand corrected.  You're right.  The picture, but we did introduce the pictures of the search -- the results of the search of the Rav4, right?

A.   Sorry.  Can you rephrase the question?

Q.   So what would be left to do of the Rav4 then, at that point, would be to look for traces of John Rathbun's

blood, right?

A.    Yes.

Q.    Once you did find out that on April 2nd it was Sheila's car, did you get a search warrant to search for blood in the Rav4?

A.    I'm sorry.  What are you asking about this?

Q.    What's that?

A.    What date are you asking me?

Q.    You learned at some point that Sheila Rathbun's car had been used on April 2nd by John Rathbun?

A.    Yes.

Q.    Did you go to get the search warrant to look for blood at that point?

A.    No.

Q.    I want to put up Exhibit 60.  This has already been entered into evidence.  And 61 I think is the one I really want.

      This is Government Exhibit 61, which is the red gas can and a yellow spout.  Do you see that?

A.    I do.

Q.    You asked John Rathbun specifically about that gas can and what it contained?

A.    I did.

Q.    And he explained to you that that contained 50-to-1 mix oil to gas?

A.    Yes.

Q.    So when you said gasoline here, it's not straight gasoline.  It is gasoline mixed with two-cycle oil, right?

A.    No.

Q.    Gasoline mixed with what?

A.    There's a gas report for this specific gas that would tell us exactly what it is.

Q.    What's that?

A.    There's a gas report that the Mass. State Police produced.  I don't know exactly what it is.

Q.    But John told you that it was 50-to-1 gas for a weed whacker, right?

A.    He did say that, yes.

Q.    During the interview, you asked John Rathbun whether he or anybody in his family owned a yellow fuel canister?

A.    Yes.

Q.    He told you, no, we haven't owned a yellow fuel canister, right?

A.    Yes.

Q.    And then you asked additional questions about yellow fuel canisters, right?

A.    Yes.

Q.    You learned from the defense that John Rathbun had come into contact with a yellow fuel canister, correct?

          ATTORNEY BRESLOW:  Objection to the form of the

question.

THE COURT: Overruled.

THE WITNESS: Are you asking me about on April 15th if I learned that?

Q. (By Attorney Watkins) No. At some point after April 15th you learned that John -- from the defense, that John Rathbun had come into contact with a yellow fuel canister, right?

A. You're using the word "from the defense." I don't know what that means.

Q. Did you learn that Mr. Rathbun had come into contact with a yellow fuel canister from a clean out?

A. No, that's not how I learned it.

Q. Did you learn -- did you investigate Mr. Rathbun's possession of a yellow gas can?

A. Yes.

ATTORNEY BRESLOW: Your Honor, may we be heard?

**(Sidebar conference.)**

ATTORNEY BRESLOW: So I had objected to the form of the question initially because the question was: Did you learn from the defense that John had possessed a yellow fuel canister. I had objected to that because I thought it was vague and an improper question.

What I think Mr. Watkins is doing now is attempting to elicit hearsay testimony of the witness that

Mr. Watkins alluded to yesterday.  You may recall that in the middle of the direct examination Mr. Watkins asked the Court, if my memory is correct, to instruct the jury that the government knows of a witness who would provide testimony about how Mr. Rathbun acquired this gas container.  Your Honor denied that request and properly so.

What I expect Mr. Watkins is attempting to do here is to -- and I should say, this witness has been interviewed by the government and by the defense, and he's free to be called by either party.  I'm not going to be calling him. Mr. Watkins can.

I don't know exactly where Mr. Watkins is going, but if he's going to elicit or to attempt to elicit testimony from Special Agent McGonigle that this witness said anything about the possession of this gas can or canister at a trash out, it's entirely improper.  The witness is available and can be called by the defense if the defense wants to.

THE COURT:  I thought Attorney Watkins was referencing trial testimony from the last trial where it was learned that, well, from the defendant who said he got the yellow gas can from a clean out.

ATTORNEY BRESLOW:  The first thing I'll state is that, is that that's not how Special Agent McGonigle first

learned about possession of the gas can.  It was from the recorded call that we played.

The second thing is it's not clear because he didn't make a clear question on cross-examination.  He can lead particularly as to what he said about from the defense what he means.

Special Agent McGonigle is being asked about a prior trial testimony from the defendant.  I guess that's the -- that's the defense's call if they want to reference a prior trial involving this; but, again, I think it's completely out of bounds.

THE COURT:  We are going to take a break.

**(End of sidebar discussion.)**

THE COURT:  During the break, the same rules apply.  No talking about the case with anyone, to each other, obviously.  No using your phones to get on the internet, no social media posting, no access to media coverage.  All right.  Thank you.

**(The jury left the courtroom at 11:50.)**

THE COURT:  Agent, could you step down, please?

THE WITNESS:  Yes, sir.  Should I wait out in the hallway?

THE COURT:  Yes.

I thought it was a good time for a break.

ATTORNEY BRESLOW:  I think it's a great time for

a break.

So only Mr. Watkins knows where he's going with this, Your Honor.  Only Mr. Watkins knows what he means -- what he meant by "you learned from the defense."  So I guess I'll say to the extent that Mr. Watkins is attempting to elicit statements made by the defendant in trial, I think it's completely inappropriate.

ATTORNEY WATKINS:  I'm not trying to do that.

ATTORNEY BRESLOW:  Okay.  To the extent that he's seeking to elicit testimony from Special Agent McGonigle about a witness with whom has been interviewed by the government and by defense, that's I think inappropriate, too.

THE COURT:  I don't think that's inappropriate. I think he can ask the agent -- I don't know how I would do this, but I think you could have just said had you learned from any source that the defendant actually did have a yellow gas can in his possession at some point through a clean up?

ATTORNEY BRESLOW:  Well, I guess I've got two responses here.  The first is it's hearsay.  It's complete hearsay.  It's --

THE COURT:  No.  It will go to his state of mind.  The answer will be allowed in.

ATTORNEY BRESLOW:  Whose state of mind?

THE COURT: McGonigle's.

ATTORNEY BRESLOW: As to what?

THE COURT: That will be my ruling.

ATTORNEY BRESLOW: But --

THE COURT: That will be my ruling. How are you going to ask the question?

ATTORNEY WATKINS: I was going to ask if he had interviewed witnesses concerning what Mr. Rathbun had said.

THE COURT: Okay. That's exactly what Attorney Breslow is worried about.

ATTORNEY WATKINS: I'm not going to ask him for a statement about what the person said. I'll tell the Court as best I can, but my concern is either the jury or the government thinking that Mr. Rathbun is making this story up out of thin out air about the clean out there. I think the government doesn't have any good-faith basis to argue that or to even suggest that under cross-examination.

That's the main thing I wanted to get on the record is that there was an investigation here and that would preclude the government making those arguments or asking those questions.

ATTORNEY BRESLOW: Your Honor, I would reiterate that this is complete hearsay of a witness who is

available to testify to corroborate Mr. Watkins's story -- the defendant's story if Mr. Watkins chooses to do so.

THE COURT:  I agree.  Now I agree because you clarified for me, Mr. Watkins, how you're going to ask him.

ATTORNEY WATKINS:  Your Honor, I'm not eliciting any of the statements.  Simply whether they interviewed somebody and investigated that particular claim.  That's it.

THE COURT:  You can ask if he investigated the claim, but then where do you go with that?  Yes, I did.

ATTORNEY WATKINS:  What's that?

THE COURT:  Did you investigate the claim?  Yes, I did.  Where do you go next?

ATTORNEY WATKINS:  I go on to the next subject. Judge, I would tell the Court I'm just trying to inoculate against this idea that there's going to be argument later on that Mr. Rathbun is making this idea of getting it at clean up out of whole cloth.  What the government is telling us now is that they're not going to do it, then I withdraw it.

ATTORNEY BRESLOW:  Your Honor, Mr. Watkins is free to request the testimony of this witness.  He is free to require the testimony of this witness.  This witness has a substantial criminal history.  And according to the

witness's account, was using drugs on the day in question and has since been arrested for violations related to drug use and asked about his conduct while on drugs.  If Mr. Watkins is concerned about inoculating the jury, he can call the witness.

This is simply a backdoor effort to obtain what Mr. Watkins does not want to put through the front door by calling the witness.  It's completely inappropriate.

It might be remotely appropriate if Special Agent McGonigle had testified about the investigative step concerning this testimony, but he hasn't.  And so there's no basis for Mr. Watkins to be asking the question in the first place and to be seeking hearsay.

THE COURT:  I don't know.  I think there's a basis for asking a general question, tell me about your investigation.  Did you investigate this, that, and the other thing, including did you investigate this yellow gas can coming in Mr. Rathbun's possession through a clean out?  Did you do any investigation of that?  If the answer is yes, that's the end of it.  You can't invite hearsay after that, but I think it's fair to talk about the investigation.

ATTORNEY BRESLOW:  I guess if he can -- if the question is did you investigate -- if the question is simply did you investigate Mr. Rathbun, how Mr. Rathbun

came in possession of this gas canister and it goes no further, that's fine.  But if he seeks to elicit testimony as to the accuracy or veracity of what Mr. Rathbun has claimed at trial is completely inappropriate.  I'll remind the Court that what Mr. Rathbun did say in the interview is that it was impossible for him to have his blood get on the canister in the fashion that Mr. Watkins is now advancing to the jury.

THE COURT:  Attorney Watkins, I told you what can be asked.  You told me if McGonigle says yes, I did, you're not going to ask any more.  You just want to know did you investigate.

ATTORNEY WATKINS:  Did you investigate it and did you interview a witness?  I'm not going to ask about the substance of the witness at all.

THE COURT:  All right.  I will not permit did you talk to a witness.  I will allow you to ask if he investigated that lead of Mr. Rathbun coming into contact with the gas container because of a clean out.

ATTORNEY WATKINS:  And not interview the witness because that is hearsay?

THE COURT:  Well, when you say interview the witness, then the next question, the next logical step, I think, it creates an unfair situation of what the witness said.

ATTORNEY WATKINS:  The government doesn't want to call him.  I understand that they don't want to support Mr. Rathbun's story.  But by the same token, they should not be allowed to argue to the jury or left in the jury's mind that somehow this whole story is made up.

Based on Mr. Breslow's presentation here, I expect the argument is going to be he denied ever touching this can but then made up this crazy story about how he legitimately got his blood on it and had some --

THE COURT:  So you're saying you think it's fair game to say the agent will say, yes, I did investigate this yellow gas can from a clean out.  And you would say as a matter of fact, you talked to a person who had knowledge of whatever happened at this clean out; is that right?

ATTORNEY WATKINS:  That would be the end of it.

ATTORNEY BRESLOW:  That would also be eliciting hearsay from a witness on a point that the defendant has denied.

THE COURT:  What's the hearsay?

ATTORNEY BRESLOW:  What is the hearsay?

THE COURT:  Yes.

ATTORNEY BRESLOW:  So any question that --

THE COURT:  No.  What's the hearsay?  I question

I just asked, what's the hearsay?

ATTORNEY BRESLOW:  The question was did you interview a witness concerning -- if you can restate the question?

THE COURT:  So did you investigate this yellow gas can?  Yes, I did.  And, in fact, while investigating the yellow gas can you talked to a witness who had information about that topic?  Yes, I did.  I interviewed that witness as part of my investigation.

ATTORNEY BRESLOW:  Yes, I do think it's hearsay.

THE COURT:  Where's the hearsay?

ATTORNEY BRESLOW:  Saying information about the topics begs the question, what is the information?  Your Honor, it's just not appropriate.  This is not --

THE COURT:  Hearsay is an out-of-court statement being offered for the truth of the matter asserted.  Where is the hearsay?

ATTORNEY BRESLOW:  Well, I'll say, yes, exactly.

THE COURT:  It's not hearsay.

ATTORNEY BRESLOW:  That the witness had information about this topic.  The witness provided an account.  Whether that account is accurate or not is the subject for testimony.  That witness --

THE COURT:  But that's not hearsay.  The fact that a witness might have had an account, if there's not a word said about what the account was is not hearsay.  The fact that someone had an account and was interviewed is not hearsay.  There's no statement.  What's being offered for the truth of the matter?

ATTORNEY BRESLOW:  That the witness has information, This information, regardless of what it is.

THE COURT:  That's true.  Someone has information.  That's not hearsay.

ATTORNEY BRESLOW:  Well, I guess it depends on what Your Honor means by information.  The witness could be lying.  For example, the witness could be mistaken.

So the fact that he has information about this, it's not reliable is the point that we're trying to make.  And clearly, it's not reliable because neither party has elected to call this witness, and so to inject the witness's information in any way into the trial is not appropriate.

THE COURT:  I think it's extraordinarily appropriate and a very good defense tactic.  You have the burden.

ATTORNEY BRESLOW:  Right.  We do have the burden.  This is not about burden shifting, Your Honor.  We have the burden, and we will carry the burden through

this trial.

What we're stating is that if the defendant wants to bring this information into court, he can call the witness and require him to come and testify.  To try to elicit any testimony concerning this witness's information about this claim --

THE COURT:  No.  I see what you're saying, but it's not hearsay.  He can raise it.  He can throw as many things out there as he wants.  You have the burden of proof, but I don't see it as eliciting hearsay.

ATTORNEY BRESLOW:  So even if it's not hearsay, Your Honor, it should be excluded under Rule 403.  There's very little, if any, probative value to the fact that Special Agent McGonigle talked to a witness who provided information about a claim.  It will lead the jury to speculate because it's so generalized, and he can't offer the specific testimony because that would be hearsay, and it would be unduly prejudicial to the government here unfairly so, particularly when the witness is available to be called by the defense.

THE COURT:  You're burden shifting.  You have the burden of proof.

ATTORNEY BRESLOW:  Yes.

THE COURT:  All right.  I'm going to step off. You're going to be allowed to ask the questions that I

very narrowly described.  All right?

THE CLERK:  All rise.

**(A recess was taken at 12:03 until 12:19.)**

THE COURT:  Ladies and gentlemen, during the break, were you able to follow all my instructions not to talk to each other about the case?

Affirmative answer from the jury, they remain fair and impartial.  All right.

If I could have the attorneys on our device here?

**(Sidebar conference.)**

THE COURT:  Okay.  Relative to the potential two questions that would be asked, is it agreed -- I think we're in agreement that the first question of after you learned the defendant had acquired a yellow gas can during a trash clean out, did you conduct an investigation into that claim?

Attorney Watkins, is that question okay with you?

ATTORNEY WATKINS:  I wasn't even going to go into that detail.  I had written, you learned in November about an event where John Rathbun had come into possession of a yellow fuel canister.  A second question was --

THE COURT:  Stop with that.  How about the first question?  Is that first question objectionable to the government?

ATTORNEY BRESLOW:  I think so.  Could you read

it again, please?

ATTORNEY WATKINS:  Agent McGonigle, you learned in November about an event where John Rathbun had come into possession of a yellow fuel canister.

ATTORNEY BRESLOW:  Yes, we do object to that. This is -- the question assumes or even states that this is true and this is accurate.

THE COURT:  But he didn't learn -- it's just about whether he learned.  You're saying because you say you learned it, that it's true?

ATTORNEY BRESLOW:  Learned that, exactly.  So he could state did he learn of a claim.

THE COURT:  How about did you follow up on information?  Did you do an investigation that followed up on information you had regarding the defendant's clean out and a gas can at a clean out, yellow gas can, something like that?

ATTORNEY BRESLOW:  I think what we want to avoid is any question that infers -- assumes the accuracy of the information because as we've said, it's not reliable enough for either of the parties to be calling this witness to testify.

THE COURT:  Well, it's, in fact, true that that information -- the agent did learn that was information and it was worth investigating and the agent did look into

it.  So all of that is true.

ATTORNEY BRESLOW:  See, this is the -- when you had asked earlier about hearsay and this information, I think that's the problem that I'm having with the question is, you know, this is not -- this is not true necessarily. It's a claim.  It's a possibility.  You know, what it is not is --

THE COURT:  But it's one that the agent did talk to someone about.  He did investigate.

ATTORNEY BRESLOW:  I think that the agent did investigate, but I think what I'm objecting to is the -- any form of the question that assumes the accuracy of the information.

THE COURT:  All right.  What do you think about did you investigate -- did you investigate the area, conduct an investigation about if the defendant came into contact with the yellow gas can at a clean out?

ATTORNEY BRESLOW:  Yeah, I think if that's the sole question, did you investigate whether the defendant got a canister at a clean out or got his blood on this canister at a yellow clean out, and that's the sole question, the answer will be yes.  Again, I'm not sure under Rule 403 how any of this is probative.  I think it leads to speculating, confuse the jury, but if Your Honor believes that --

THE COURT:  I don't think it does.  I think it's good defense lawyering.  And the next question that would follow up would be, did you interview any individual or individuals, plural, regarding that?

ATTORNEY BRESLOW:  Yeah, I think that's --

THE COURT:  Attorney Watkins, will that be your next question?

ATTORNEY WATKINS:  I have it precisely as you were to able find and interview a witness who had information about that event.

ATTORNEY BRESLOW:  I wouldn't do that.  I think your questions are appropriate.

THE COURT:  I'm just going to leave you with did you interview any person regarding that.

ATTORNEY BRESLOW:  So the first question is, did you investigate whether the defendant possessed this canister at a trash out?  And the second question is, did you conduct any interviews concerning this claim?

THE COURT:  Concerning that point, yeah.

ATTORNEY BRESLOW:  The government will be fine with both of those questions.

ATTORNEY WATKINS:  So here's the -- the problem is the witness that he interviewed corroborates it, and I understand that I'm not asking to elicit that, but it's not the case that it's a claim.  That's the whole point

here is that the government -- it would be unfair for the government to argue or ignore the fact that they have a witness that corroborates how Mr. Rathbun got the can.

ATTORNEY BRESLOW:  So --

THE COURT:  But there's no way for you to get the corroboration in.  That crosses over into the hearsay and so that's where you're left.

ATTORNEY WATKINS:  And I'm not asking to elicit that.  But when the question goes in as a claim and did you investigate that, then it is just a claim and it is much stronger than that.

ATTORNEY BRESLOW:  Your Honor --

THE COURT:  I mean, I don't know that it's true or not.  A claim leaves it out there.

ATTORNEY BRESLOW:  That's exactly our point, Your Honor.  In fact, the agent conducted another interview that would suggest just the opposite.  And for the reasons that we're objecting to this line of inquiry, we didn't include that as part of the direct examination.  It's not appropriate.  It's not appropriate even for us to ask the two questions that Mr. Watkins has proposed in our case in our direct examination.

THE COURT:  I think Attorney Watkins's next step would need to be, if you're going to take it, that once you bring it up like that, if you want to fill in the

gaps, you would bring the witness yourself.  Because if you talk about trying to establish the corroboration, that's where I do see the hearsay coming in.  All right. Ready to go?

ATTORNEY BRESLOW:  Can I just confirm the questions so that there's no confusion?

THE COURT:  Go ahead.

ATTORNEY BRESLOW:  So the first question is, did you investigate whether the defendant possessed this can in connection with a clean out or a trash out?  And then secondly, did you conduct any interviews as part of that investigation?

THE COURT:  I'm satisfied those questions are fair to both sides.  All right.

ATTORNEY BRESLOW:  Thank you, Your Honor.

**(End of sidebar conference.)**

Q.   (By Attorney Watkins) Good afternoon again.

A.   Good afternoon.

Q.   Agent McGonigle, did you learn in November about a claim that John Rathbun had come into possession of a yellow fuel canister as a result of a trash clean out?

A.   Yes.

Q.   And did you interview any witnesses in connection with that claim?

A.   Yes.

Q.   I want to talk now about jail calls that were put in. We talked about a couple of them, but you've reviewed all of them yourself, the jail calls?

A.   Not every single one of them, no.

Q.   But you've listened to many of those calls?

A.   Yes.

Q.   And you've sat here while Mr. Breslow played some during your testimony, of course, right?

A.   Yes.

Q.   Mr. Rathbun was arrested on April 15th.  And I think the first of the calls we heard was from May 2nd, a couple of weeks after his arrest.  Do you recall that from today?

A.   I don't believe that's correct.

Q.   What was the date of the first call that we heard today?

A.   April 27th.

Q.   I'm sorry?

A.   April 27th.

Q.   Oh, April 27th.  And so, again, 15 -- one week and five days.  And then we heard a series of calls on through the summer, right?  July and August also?

A.   Yes.

Q.   And we hear about a variety of subjects.  Mr. Rathbun talking with his mother about a variety of subjects in those calls, right?

A.    Yes.

Q.    Now, while this is happening over time, the case was coming into court for preliminary proceedings here at the courthouse; is that correct?

A.    Yes.

Q.    I mean, you kept abreast of what was going on with the case.  You're the lead case agent, right?

A.    Yes.

Q.    And so you were aware that evidence was being turned over to the defense as part of our regular process here in court?

A.    Yes.

Q.    Mr. Breslow was asking you for evidence to turn over to me about the case, right?

A.    Yes.

Q.    And very quickly there was the issue of your statement in the complaint about Ruth's House and the proximity of the gas container to Ruth's House, correct?

          ATTORNEY BRESLOW:  Your Honor, I object to the form of the question.

          THE COURT:  I'm going to let it go.  Go ahead. Overruled.

          THE WITNESS:  Can you repeat it?  I'm sorry.

Q.    (By Attorney Watkins) You learned very early on in the case that there were issues -- I was raising issues

about your statement in the affidavit about the gas can being found in the proximity to the entrance to Ruth's House?

A.   I'm sorry.  Are you asking when I learned that?

Q.   You learned that very early on in the case after April 16th or 17th, right?

A.   I don't know when we made that discovery.

Q.   But you were in touch with Mr. Breslow in the early stages of the case, right?

A.   Yes.

Q.   And you were aware that there was litigation going on in court?

A.   Yes.

Q.   And that there was a question about where the container had been located in your description about the container, right?

A.   Yes.

Q.   And then you did ultimately realize that you had made that mistake in the affidavits, right?

A.   Yes.

Q.   And you then got information from Genesis House about these familial connections that you testified, right?

A.   Yes.

Q.   And that was in July, roughly July that you began those interviews, right?

A.    Yes.

Q.    And at least one of those calls we heard about was talking about July and grandma was in July?

THE COURT:    I'm sorry.    What's the question?

Q.    (By Attorney Watkins)    I'm sorry.    One of the calls that you heard where Mr. Rathbun talks about grandma living there, one of those was from July?

ATTORNEY BRESLOW:    Your Honor, I think this might be an inadvertent mischaracterization of the testimony.

THE COURT:    All right.    I'm just a little confused by the question.    I'm not quite following it.

ATTORNEY WATKINS:    I'm sorry.

THE COURT:    Do you want to talk about it or you just want to ask another question?

ATTORNEY WATKINS:    I'm sorry?

THE COURT:    Do you want to talk about it or do you want to just ask another question?

ATTORNEY WATKINS:    I'll just keep going on with questions.

THE COURT:    Okay.

Q.    (By Attorney Watkins) Now, since John Rathbun's arrest, you have continued to investigate the case?

A.    Yes.

Q.    You have either asked or assisted in getting search

warrants for social media, emails, phone applications?

A.    Yes.

Q.    You've interviewed three dozen witnesses perhaps?

A.    Yes.

Q.    You've searched through the texts and the calls on John Rathbun's phone as well as his mother's computer?

A.    Yes.

Q.    And you have not found any evidence of animus against any faith let alone those of the Jewish faith?

A.    There was an interview.

Q.    I'm sorry?

A.    Yes.  There was an interview where I heard something, yes.

Q.    On John's phone, that is something you testified to here in court of information on John's phone?

A.    Not on John's phone, no.

Q.    On John's phone, is there any indication of racial animus or religious animus against people of any faith?

A.    No.

Q.    No evidence of bomb building from any of those witnesses or the additional investigation?

A.    No.

Q.    From those sources, the evidence of a stated desire to inflict injury or damage to anyone connected with JGS?

          THE COURT:  From what sources?

Q.    (By Attorney Watkins) From the three dozen witnesses that you've since interviewed and the additional investigation, is there any statement by John Rathbun of a stated desire to inflict injury or damage?

A.    I'm sorry.  Could you just give me the question one more time?

Q.    In the statements that you've learned, witnesses that you've interviewed, all of John's digital items, his apps, his emails, is there anything where John has stated he wants to inflict damage or injury on Jewish Geriatric Services?

A.    No.

         ATTORNEY WATKINS:  Thank you.  That's all I have.

         THE COURT:  Attorney Breslow?

         ATTORNEY BRESLOW:  Your Honor, may I have a moment?

         THE COURT:  Uh-huh.

         ATTORNEY BRESLOW:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

Q.    (By Attorney Breslow) Special Agent McGonigle, do you recall being asked a question that caused you to hesitate and not answer fully?

A.    Yes, sir.

Q.    Did you hesitate and not answer fully because the

answer would have --

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.  I am taking the government on its good faith basis as it was previously explained to me for asking this question.

ATTORNEY BRESLOW:  Right.

Q.   (By Attorney Breslow) Did you hesitate and decline to answer the question fully because you were concerned that your answer would have violated a court order concerning evidence in this case?

A.   Yes.

Q.   I'd like to display PX-139, page 4, and PX-23 side by side.  PX-23.

Okay.  So on the left hand of the screen is PX-139, page 4, correct?

A.   Yes.

Q.   And on the right hand of the screen is PX-23?

A.   Correct.

Q.   Okay.  So where are each of these locations relative to Converse Street?

A.   So they're both on Converse Street and they're actually facing the same direction.  So the street on the left-hand side here on both of these pictures is Converse Street.

Q.   Okay.  And if we could blow up the sign on PX-139,

page 4, and just move it over.  Great.

So which sign indicates Genesis House?

A.    The sign on the left.

Q.    And which sign indicates Ruth's House?

A.    The sign on the right.

Q.    Okay.  And do each of them have a symbol of -- it looks like an object in the form of a tree, a green object in the form of a tree, it might be a candelabra that looks like a tree?

A.    Yes.

Q.    And do each of them state the same phrase "JGS Lifecare" in blue?

A.    Yes.

ATTORNEY BRESLOW:  Okay. So we can take down PX-139.  I just want to focus on PX-23.  If we could display that side-by-side with PX-26?

Q.    (By Attorney Breslow)  So concerning PX-139, the Genesis House sign, was the device placed at that entrance?

A.    No.

Q.    So now focusing your attention on PX-23 and PX-26, where was the device placed with respect to each of these pictures?

A.    So if we're looking at 23, you can see a tree as you follow on the sidewalk.  There's a tree -- the first tree

just off the sidewalk, the device was placed to the side of it. So it would be facing the person taking this picture.

In PX-26, the tree is in the foreground here. The device would have been placed just to the right of it. Of course, it's the same placement. We're just looking at it from different angles.

Q. And so approximately how far from the sign was the device placed?

A. Twenty feet maybe.

Q. Okay. And the sign indicates Ruth's House?

A. Correct.

Q. Now, focusing on page 26, is the sign on PX-23 is that just out of view if one were to continue one's gaze to the right?

ATTORNEY WATKINS: Objection, leading.

ATTORNEY BRESLOW: Okay.

THE COURT: Sustained.

Q. (By Attorney Breslow) If one were looking at PX-26 and wanted to find the sign, where would one look?

A. So this picture is literally taken on the sidewalk. So if you were considering -- if you're standing in front of this tree on the sidewalk, the picture of PX-23, it's just across the street and right on the other side of the street. So if you're looking at PX-26 here, it would be

just to your right, about 20 feet to the right.

Q.   Okay.  And now focusing you on PX-26, what is the building or -- what is the building that is immediately to the right in the background?

A.   That's Genesis House.

Q.   And how many buildings, approximately, comprise Genesis House?

A.   It's a hundred maybe.  I don't know exactly.

Q.   How many buildings?

A.   Oh, buildings --

ATTORNEY WATKINS:  Your Honor, I'm going to object.  It's beyond the scope of cross.  It's cumulative, asked and answered.

THE COURT:  I don't think it's beyond the scope.  Well, of course, a lot of this -- I mean, if I cut out how much of this trial wasn't cumulative, we would all be home and done.  So I'll let you go ahead.

ATTORNEY BRESLOW:  Thank you, Your Honor.

Q.   (By Attorney Breslow) So now with keeping these two photographs in mind, can you tell the jury why you mistakenly described Genesis House or Ruth's House as the building that was located approximately 50 yards away from where the device was found?

A.   Right, so the 50 yards was to the closest building.  That was -- the statement I was making to the Court was

that this device was found 50 yards away from the closest building. I mistakenly called the closest building Ruth's House. The closest building is Genesis House. So it's my opinion that the statement I made was true when it was made. It was trying to orient the Court more to the proximity where the device was placed to the closest building rather than informing exactly what the precise name of the building that was closest, I guess.

Q. And do you remember being asked a question or two about a map of this location, I think it was PX-72?

A. Yes.

Q. Now, does the FBI have in its official files a digital version of that map?

A. Yes.

Q. Do you remember being asked questions about whether you recorded your interview of the defendant either by audio or video?

A. I do.

Q. And do you remember being asked questions about the number of witnesses that you've interviewed?

A. I do.

Q. Okay. I think the question on cross-examination was you interviewed approximately three dozen witnesses for your investigation?

A. That's correct.

Q.    So tell the jury how many of those witness interviews did you record?

A.    None.

Q.    Tell the jury does the FBI or did the FBI on April 2, 2020, require interviews of people who are not in custody to be recorded?

A.    No.

Q.    And do you remember asking -- being asked questions about whether the defendant -- whether the defendant amended his answer to your question where were you on April 2nd?

A.    I do.

Q.    Did the defendant ever tell you at any point in the interview after he stated he had been at home that he had, in fact, left his house on the morning of April 2nd or at any time on April 2nd?

A.    No.

Q.    Okay.  So how did you learn that the defendant had used his mother's car in the early morning hours of April 2nd to drive down Converse Street?

A.    The voicemail that she had left him on his phone.

Q.    And in addition to the voicemail, was there other evidence that you learned that led to that same conclusion?

A.    The recorded calls that we had had from the defendant

and his mother.

Q.   So with respect to the recorded call, I'd like to ask -- I'm going to place the coversheet of that call on the screen in front of the entire courtroom.

Do you recall the date of when you listened to that -- of what the date of the telephone call in which the defendant admitted that he had been out of his house on April 2nd driving down Converse Street?

A.   I do not remember the exact date that the call was made.

ATTORNEY BRESLOW:  One moment, Your Honor.

Okay.  Can we put up PX-96-2 and page 14, line 9, to page 15, line 4?

Q.   (By Attorney Breslow) Is this one of the calls that you're referring to?

A.   It is.

Q.   And did you previously testify that this call was recorded on May 14, 2020?

A.   Yes.

ATTORNEY BRESLOW:  No further questions.

ATTORNEY WATKINS:  Nothing.

THE COURT:  Nothing?  All right.

Thank you, agent.  You're all set.  You can step down.

THE WITNESS:  Thanks.

THE COURT: Next witness, please?

ATTORNEY DESROCHES: Your Honor, the government calls John Drugan.

THE COURT: John Drugan?

ATTORNEY DESROCHES: Yes.

THE COURT: Do you have an estimate as to your direct exam? Is it in the half-hour range?

ATTORNEY DESROCHES: I think less than half an hour, Your Honor.

THE COURT: Okay.

CLERK RIVERA: Sir, please raise your right hand.

**John Drugan (sworn)**

ATTORNEY DESROCHES: May I proceed, Your Honor?

THE COURT: Yes, you may.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   Good afternoon.

Q.   Could you please introduce yourself to the jury and, for the record, spell your last name?

A.   My name is John E. Drugan. Last name is spelled D-r-u-g-a-n.

Q.   Are you employed?

A.   Yes.

Q.   How are you employed?

A.    I am a chemist with the State Police Crime Lab in Sudbury, Mass.

Q.    For how long have you been a chemist at the State Police Crime Lab?

A.    Thirty-six years.

Q.    And what are your current responsibilities there?

A.    Right now I'm a technical leader.  I oversee the Trace, Arson & Explosive Unit of the laboratory.

Q.    What is the Trace, Arson & Explosive Unit?

A.    It's a section of the lab that handles evidence from explosives, fires, hit and runs, paint, tape, glass.  We do serial number restorations on weapons, but certain things we'll be given evidence from scenes or materials, unknown materials, and we use a variety of different equipment to try and identity and compare.

Q.    How long have you been a part of that unit or overseeing that unit, I should say?

A.    Since 2011.

Q.    You indicated that one of your responsibilities is that you conduct examinations of samples that would be involved in a fire debris case?

A.    Yes.

Q.    What is a fire debris case?

A.    A fire debris case is a case involving a fire, but we get materials, different types of materials.  We could get

unknown liquids.  We could get carpeting, wood, things that may involve the presence of an accelerant.

Q.    What is a common example of an accelerant?

A.    An accelerant, it could be something like gasoline or kerosene or diesel fuel or -- usually, it's a liquid that's placed intentionally or unintentionally to propagate a fire.

Q.    How many fire debris samples have you analyzed?

A.    Several thousand.

Q.    Are all the cases that you've reviewed and the results that you've come upon peer-reviewed?

A.    Yes.

Q.    What does that mean?

A.    A peer review is somebody that has similar qualifications as you.  They look over your work, your data.  We have certain requirements through our accreditation that have to be met and so that a peer reviewer will review technical data, administrative, and then sign off on that.

Q.    Have you testified previously regarding the examination of fire debris?

A.    Yes.

Q.    Approximately, how many times?

A.    Approximately, a hundred times.

Q.    Generally, how do you identify flammable liquids at

your lab?

A.    Flammable liquids, it sounds kind of rudimentary, but the first step really is just an odor test, a smell. Typically ignitable liquids have a certain type of odor, and I've gotten pretty good at getting an indication based on the smell.  We have a couple of different pieces of equipment that we also use to analyze the unknown liquid.

Q.    What are those two pieces of equipment?

A.    We have a gas chromatograph flame ionization detector.  It's called a GCFID.  And we also have a gas chromatograph mass spectrometer.

Q.    Regarding that first machine, what's the abbreviation?

A.    Call it a GCFID.

Q.    A GCFID?

A.    Yes.

Q.    For how long have you been using that machine?

A.    As long as I've been a chemist.

Q.    So for over 30 years?

A.    Yeah.

Q.    And how often do you use it in your line of work?

A.    Well, for fire debris cases, that's a standard piece of equipment that's used.  So every time you process a fire debris case, that would be used.

Q.    Is that machine subject to routine maintenance?

A.    Yes.

Q.    Are there quality checks of that machine to ensure that it's working properly?

A.    Yes.

Q.    Can you just, very generally, describe what those are?

A.    We have standard mixes or reference standards that we run with the equipment, and we'll run those on a routine basis and be required to identify components within that mixture.

Also retention time has to be within a certain window.  That's where the peaks show up in the spectrum. And also, like I said, we'll run blanks which is just a routine solvent blank to ensure that there's no carryover, there's no contamination within the instrument.

Q.    Now, if that instrument were to fail in some way, those quality controls, would it continue to be used?

A.    If that instrument -- if the instrument fails, we put it out of service.

Q.    You said that there was a second instrument that you also rely upon in your identifying of flammable liquids, what is that?

A.    It's a gas chromatograph mass spectrometer.

Q.    Can we call that mass spectrometer?

A.    Yes, GCMS.

Q.    So how often do you use that machine?

A.    Again, it's used in conjunction with the GCFID.

Q.    So on a daily -- or anytime there's a fire debris case, it's common?

A.    Right.

Q.    And is that subject to the same quality controls that you described previously?

A.    Yes.

Q.    Do you use both of these machines to essentially quality control each other?

A.    Quality control each other?

Q.    Do you use them as a redundancy?

A.    Well, the first thing the GCFID, it's I guess I could call it -- we screen samples, and it gives you a fingerprint pattern or a printout characteristic of a certain type of ignitable liquid.  But it also gives you -- you don't quantitate, but it gives you an idea of the amount in a fire debris sample like a piece of wood or something.  There may be lower levels.  It allows you to -- that second step, the GCMS -- it allows you to maybe adjust parameters to account for overabundance of a sample or a lower threshold.

Q.    And you use these two machines in conjunction typically -- I should say do you use these in conjunction routinely in your line of work?

A.    Yes.

Q.    Turning your attention to this case, did you receive any items for analysis?

A.    I did.

Q.    What items did you receive?

A.    I received unknown liquid from 44 Williams Street.

Q.    I'm sorry, did you -- do you remember accurately what the items were that you received?

A.    I do.

Q.    When you say "44 Williams Street" --

A.    That was the incident location that was on my report.

Q.    Is that the address of the Longmeadow Police Department that transported the substance to you?

A.    I'm sorry.  I couldn't hear you.

        ATTORNEY WATKINS:  I won't object to some leading here.

        THE COURT:  Okay.

Q.    (By Attorney Desroches) So you may have received these from 44 Williams Street, but the samples themselves were they assigned item numbers?

A.    Yes.

Q.    And did they come from locations other than Williams Street?

A.    Yes, two of them did I believe.

        ATTORNEY DESROCHES:  May I have just one moment,

Your Honor?

Q.    (By Attorney Desroches) So, again, just so we're clear, how is it that the items you received made its way to the Trace, Arson & Explosives Unit?

A.    They were delivered by our evidence officer, Trooper Nancy Crew.

Q.    And how did they come to your laboratory?

A.    They were submitted to our evidence control unit packaged.  The first sample was sent to us on April 13th.

Q.    And when was the -- you said the "first sample."  Was there other samples that you received?

A.    Yes, two other samples.

Q.    Now, just drawing your attention to that first sample, was that sample assigned an item number?

A.    Yes.

Q.    And what was that item number?

A.    That would be item 1-1.

Q.    And did that also -- did that item number come from a law enforcement agency?

A.    Yes.

Q.    And how was it packaged when you received it?

A.    It was submitted in a glass vial within a one-quart, metal container.

Q.    And did you ultimately learn that this item 1-1 was recovered from Converse Street in Longmeadow?

A.    Yes.

Q.    And now having heard that, is 44 Williams Street the address of the law enforcement agency that sent it to you?

A.    I believe if that's it, yeah.  That was on my report, but may be an error, correct.

Q.    Just so we're clear, item 1-1 came from Converse Street in Longmeadow, correct?

A.    Yes.

Q.    So once you received item 1-1, what did you do with it?

A.    Again, it's taken out of the evidence room, scanned into my custody.  A simple olfactory test.  It smelled like gasoline.  The amount was measured in a graduated cylinder and a portion of that was added to carbon disulfide, which is a solvent that we use for extraction and preparation of usually petroleum products to introduce to the two pieces of equipment.

Q.    So as you're making this process, are you able to smell anything?

A.    It smelled like gasoline, correct.

Q.    And the steps that you just took, are those in accordance with your training and experience?

A.    Yes.

Q.    So what did you do with it after you took those steps?

A.   So after those steps, I used the two different pieces of equipment I described earlier.  Their samples were run through in addition to blank control samples and also a reference standard is run with the GCMS run.  So both pieces of equipment were used.  I got a -- the GCFID gave me an indication that it was gasoline.  The GCMS identified components consistent with gasoline.

Q.   Now, in addition to learning that it was gasoline, did you have an opportunity to visually observe this liquid?

A.   Yes.

Q.   And what observations did you make of the color of this liquid?

A.   It was a yellow color.

Q.   Does this process allow you to get information that would allow you to make a conclusion about where the fuel came from?

A.   Not where it come from, no.

Q.   We heard previously from a DNA analyst who was able to tell us that she can determine where blood came from.  Do you have anything similar to determine where gas came from or an ability to match it to other types of gas?

A.   No.

Q.   Would you be able to test two different cans of gas to determine if they were the same -- came from the same

source?

A.    No.

Q.    Did you receive two other samples of gas?

A.    Yes.

Q.    And when did you receive these two other samples of gas?

A.    It was seven days later on April 21st.

Q.    Did you receive those also from 44 Williams Street?

A.    I believe they were from Lori Lane.

Q.    So the samples came from Lori Lane, correct?

A.    Correct.

Q.    Now, drawing your attention to item 2-1, is that one of the items that you received?

A.    Yes.

Q.    Can you describe how you received item 2-1?

A.    Item 2-1 was submitted in a glass jar that was capped and put in a plastic evidence bag that was submitted in a one-gallon container.

Q.    Was that labeled in any way?

A.    I believe it was a red gas can -- from a red gas can.

Q.    Did it indicate where that red gas can was located?

A.    Say again.  I'm sorry.

Q.    Did it also indicate where the red gas can was located?

A.    Lori Lane.

Q.    And in East Longmeadow?

A.    Yes.

Q.    Did it indicate -- did item 2-1 indicate any further information regarding the gas can?

A.    It said it was open.

Q.    So it did not have a top on it?

A.    Correct.

Q.    So after you received item 2-1, what did you do with it?

A.    Again, very similar to the first set of tests I described.  I measured out the amount.  There were two layers within -- the liquid itself consisted of two layers.  The top layer was a yellow consistency, had an odor of gasoline.  The lower layer was a clear liquid, which I didn't have any testing done on it, but to me it indicated it was most likely water.

Q.    Is it common in your experience to see gasoline mixed with water?

A.    Yes.

Q.    In fact, I used the word "mixed."  Do they mix?

A.    No.

Q.    Can you describe how it appeared then?

A.    Gasoline and water don't mix, different chemical properties.  Gasoline floats on top of water.  But typically in a fire scene where you have a lot of water

being poured or other situations, you would have kind of that two layer. We have what's called a separatory funnel. It's a basic, kind of a tear-drop-shaped device, and we'll just pour the total liquid in there and it will separate the two out.

Q. So based on what you saw, would it be possible for water to have entered through a gas can if it didn't have a top on it?

A. Sure. It's possible.

Q. Did the tests you run indicate any sort of irregularities to you?

A. No.

Q. Were they conducted in accordance with your training and experience?

A. Yes.

Q. Now, turning to the second item that you received, did that receive an item number?

A. I'm sorry?

Q. Yes, I'm sorry. Let me. Did the second item you received receive an item number?

A. Yes.

Q. And what item number was it assigned?

A. That was 2-2.

Q. Did that indicate where that sample came from?

A. Yes, that was Lori Lane also.

Q.   Did it contain any further description of where it came from?

A.   I'd have to refer to my notes.  I'm sorry.

Q.   So once you received the item 2-2, what did you do with it?

A.   Very similar to what I did with the other two is an olfactory test, an observation.  I measured out the amount, and I took a portion of that sample, added carbon disulfide to it and then introduced it to the two different pieces of equipment.

Q.   Did those equipments produce any results?

A.   Yes.

Q.   What were those results?

A.   Gasoline.

Q.   Did you make any visual observations of this liquid?

A.   Yes.

Q.   What were those observations?

A.   It was a dark color, kind of a blackish, greenish dark color.

Q.   And based on your training and experience, have you seen that color from gasoline before?

A.   Yes.

Q.   And under what circumstances have you seen that color?

A.   You know, typically if you mix oil with gasoline for

use in two-stroke engines, things like that, you know, weed whackers, things like that.

Q.   So just turning to gasoline generally, you indicated that it is a flammable liquid; is that correct?

A.   Yes.

Q.   What other types of flammable liquids are there?

A.   There's a whole variety of flammable.  Flammable liquids would be anything with a flash point under 100 degrees Fahrenheit, and that would include things like home and fuel gasoline, lighter fluids, things kind of in that spectrum.

Q.   Where does gasoline fall on the spectrum of flammable liquids?

A.   It's on the far end of the -- kind of the more flammable of what we look for for ignitable liquids.

Q.   Where would diesel fuel fall in that spectrum?

A.   Diesel is on the opposite end.  It would be classified as a combustible liquid.

Q.   But less flammable than gasoline?

A.   Yes.

          ATTORNEY DESROCHES:  Thank you.  I have no further questions at this time.

          ATTORNEY WATKINS:  Very quickly.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) So you tested item 1-1 and decided that was gasoline -- concluded it was gasoline?

A.   Yes.

Q.   One of the things you talked about was an olfactory test?

A.   Yes.

Q.   Gasoline's particularly odorous, right?

A.   Yes.

Q.   Why is that?  Why is gasoline particularly odorous?

A.   It generates a lot of vapor.  And the components -- there's so many components, but it has a combined very strong odor.

Q.   Is that particularly true in an enclosed space with the gas vapors such as a car?

A.   I guess it depends on the person, too.  But if you have it in a closed area, you'd have a more concentrated smell than out in the field or something like that, I guess, if that's what your question is.

Q.   Turning now to item 2-1, 2-1, that you examined had gasoline but then that layer underneath that you said could be water; you didn't test it?

A.   Right.

Q.   Did you find any water in that 1-1 item that you analyzed?

A.   No.

Q.   As to 2-2, you talked about the two-stroke oil that would be in there that's consistent with a leaf blower?

A.   Again, I didn't -- I said that's possibly why that coloring was there.  I didn't test for two-stroke oil or, you know, but it had that kind of color to it.

Q.   And did you see that same kind of coloring in 1-1?

A.   No.

Q.   So those were two different mixtures, one gasoline, one gasoline with something else?

A.   It appeared to be two different.

          ATTORNEY WATKINS:  That's all I have.

          ATTORNEY DESROCHES:  Just one follow-up.

**REDIRECT EXAMINATION**

Q.   (By Attorney Desroches) Was it possible to compare the samples -- the two samples that you received to the first sample, the very first sample that you received?

A.   Is it possible to compare and determine?

Q.   Correct.  If they were the same?

A.   No.

          ATTORNEY DESROCHES:  Thank you.  No further questions.

          ATTORNEY BRESLOW:  Your Honor, the next witness will be Eric Mastroianni.  I expect his testimony might be an hour.  This might be a time to consider breaking for

lunch.

THE COURT:  All right.  Very good.  So let's be back here at two o'clock.

CLERK RIVERA:  All rise for the jury.

THE COURT:  Ladies and gentlemen, the same instructions.  Don't talk about the case amongst yourselves.  Don't go on social media, research anything.  The same instructions as well, they all apply.  Thank you.

**(The jury left the courtroom at 1:10.)**

THE COURT:  What do you plan for today?

ATTORNEY BRESLOW:  So Eric Mastroianni, I expect he will be approximately an hour on direct, maybe less, and then Susan Goldsmith.  Eric Mastroianni will be testifying about a portion --

THE COURT:  I don't need to know about that.  Two more witnesses for today?

ATTORNEY BRESLOW:  Two and, again, Dan Marshall on Friday.

THE COURT:  So that's it, three more witnesses?

ATTORNEY BRESLOW:  That's right.

THE COURT:  Okay.  Just because I want to tell the jury a time frame.  So we might be done early today but not super early.  Okay.

CLERK RIVERA:  Court is adjourned until two o'clock.

**(A recess was taken at 1:11 until 2:02.)**

THE COURT:  Okay.

ATTORNEY BRESLOW:  Your Honor, defense counsel and I have talked about a few government exhibits that we intend to offer as summary charts.  Do you want us to present them to you now and give you a sense of --

THE COURT:  Right now or can we wait until the end of the day or tomorrow?

ATTORNEY BRESLOW:  Well, it would be for this witness.  We'll either do it now or during his testimony.

THE COURT:  If it's all agreed, just during the testimony.

ATTORNEY BRESLOW:  Okay.  One is agreed.  I'm sorry.  I didn't hear the first part of what you said.  One is agreed to, but three others -- three or four others are not.

ATTORNEY WATKINS:  I've actually had a change of heart about the one I was going to agree on.  So they would all be disputed.

THE COURT:  So the jury is on their way in.  So we'd better get -- should we do it before the witness or just during his testimony?

ATTORNEY BRESLOW:  I think we can do it during his testimony.  If they're not admitted as summary charts,

we'll be introducing them as chalks or demonstrative aids.

THE COURT:  Okay.

**(The jury entered at 2:03.)**

THE COURT:  Everyone can be seated.  Did everyone follow my instructions during the lunch break not to talk to each other anything about the case, and as well as follow all of the other instructions that I had given?

All right.  Affirmative answers yes by all of the jurors.  They remain fair and impartial.

Okay.  Next witness.

ATTORNEY BRESLOW:  Your Honor, the government calls Special Agent Eric Mastroianni.

THE COURT:  I think I might have said this when I was reading the names of witnesses during maybe your first day here.  As far as I know, Eric Mastroianni and I have met only through this job that he has now and I have. To my information, we are not related.  Neither of us have ever traced down our great-grandfathers and great-great-grandfathers so I don't know.  So please don't infer or assume or make any conclusions based upon us having the same last name, positive or negative.  It means just nothing.

CLERK RIVERA:  Sir, please raise your right hand.

**Eric Mastroianni (sworn)**

**DIRECT EXAMINATION**

Q.    (By Attorney Breslow) Okay.  Good afternoon.

A.    Good afternoon.

Q.    Can you introduce yourself to the jury and spell your last name for the record?

A.    Sure.  My name is Eric Mastroianni.  My first name is E-r-i-c; last name, M-a-s-t-r-o-i-a-n-n-i.

Q.    How are you employed?

A.    I'm a special agent with the FBI.

Q.    How long have you been employed in that way?

A.    Approximately 17 years with the FBI.

Q.    What is your current assignment?

A.    I'm a special agent investigator with the Joint Terrorism Task Force here in Springfield.

Q.    And, very briefly, can you explain to the jury what your responsibilities are in that role?

A.    Sure.  We basically handle all investigative matters related to terrorism in Western Massachusetts.

Q.    Now, are you familiar with the FBI's investigation of a homemade incendiary device that was placed at the driveway entrance to a Jewish Nursing Home on April 2, 2020, in Longmeadow?

        ATTORNEY WATKINS:  Objection to the characterization and the leading.

THE COURT: I'm sorry. I guess I'm going to sustain it only because I guess I missed the objectionable part. Can you rephrase the question, please?

ATTORNEY BRESLOW: Sure.

Q. (By Attorney Breslow) Are you familiar with the FBI's investigation of the homemade incendiary device that is the subject of this trial?

A. Yes, I am.

Q. Now, on October 6, 2020, what did you do in connection with this investigation?

A. I assisted another special agent from our office with conducting two different drive tests, one from the location where the device was recovered to a location in Springfield, Massachusetts. And then the second one was a round-trip drive test from the location in Springfield to the facility and back.

Q. So you mentioned another special agent. Who was that?

A. Special Agent Ryan McGonigle.

Q. And tell the jury from where did you start each of these drives? Let's take the first one first and the second one second.

A. The first drive that we tested was from the Jewish Nursing Home facility in Longmeadow, the location where the device was found, and drove to 90 El Paso Street, in

Springfield, was the location.

Q.   Okay.  And why that address?

A.   That address was a residence believed to be for an associate of Mr. Rathbun.

Q.   What was his name?

A.   Devin Austin.

Q.   And that timed drive, was that a one-way or a two-way?

A.   That was one-way.

Q.   What was the start and endpoint of the second timed drive?

A.   The second drive was later.  We started and ended at 90 El Paso.  We departed that residence.  We drove to the Jewish Nursing Home facility and round trip back to 90 El Paso.

Q.   Did you take substantially the same route in both of these timed drives?

A.   Yes, we did.

Q.   Did you consider certain background information as you were determining when to go, where to go, and how to go?

A.   Yes.  There were several factors that we considered prior to conducting these two different timed drives.

Q.   So if we can display PX-83-A, which is already in evidence, to the entire courtroom?

What is this?

A.    This is I believe it's a still image taken from the Longmeadow police officer --

THE COURT:  Can we hold on one second?

CLERK RIVERA:  Looks like something is going on with the computer.

THE COURT:  The computer screen has been fixed. Thank you, Madam Clerk.

ATTORNEY BRESLOW:  Thank you, Madam Clerk.

Q.    (By Attorney Breslow) So I think the question that I was asking was what is this?

A.    Right.  This appears to be the still image taken from the Longmeadow police officer's vehicle camera the morning the device was recovered.

Q.    And where is she located right now in relation to the device that you investigated?

A.    This is that access road, Ruth's House road, just about at the intersection with Converse Street.

ATTORNEY BRESLOW:  Okay.  And if we can blow up the date and time at the center?

Q.    (By Attorney Breslow)  What was the date and time of this still footage, this photograph?

A.    April 2, 2020, at 4:51 a.m. and 44 seconds.

Q.    Have you reviewed the relevant portion of the web camera video from which this photograph was taken?

A.    I know I've seen it, yes.

Q.    And was the device visible to you at least as she drove down Ruth's House onto Converse Street and then turned left?

A.    No, the device did not appear to be in the video.

ATTORNEY BRESLOW:  I'd like to display PX-41 now already in evidence to the entire courtroom.

Q.    (By Attorney Breslow)  Have you reviewed this report by Special Agent Ryan Burke?

A.    Yes, I have.

Q.    Okay.  And is it a report that focuses on the defendant's cell site location information according to the Verizon Wireless records that were provided to the government?

A.    Yes, that's right.

Q.    Okay.  Did you review this report, in particular, before conducting your timed drives?

A.    Yes, we did review it.

Q.    Okay.  I'd like to focus on page 11.  And what does this depict?

A.    This is a summary graphic for Mr. Rathbun's device activity, specifically phone calls, the morning prior to the device being recovered.

Q.    Okay.  I'd like to shift to PX-38, which is already in evidence.  So is this, essentially, the same page just

as a stand-alone exhibit?

A.    Yes, it appears to be.

Q.    Okay.  So according to the report, how many telephone calls did the defendant place on April 2nd between 12:10 a.m. and 5:05 a.m.?

A.    Three phone calls.

        ATTORNEY BRESLOW:  Okay.  And could we just zoom in on the first two phone calls?

Q.    (By Attorney Breslow)  Okay.  And when was the first phone call?

A.    12:10 a.m. and 26 seconds.

Q.    And where was the defendant's cell phone located according to the cell site information analyzed by Special Agent Burke?

A.    It was in the purple-shaded coverage area at the bottom of the map, near the icon labeled 20, the blue icon.

Q.    What does the blue icon indicate?

A.    That indicates Mr. Rathbun's residence at 20 Lori Lane in East Longmeadow.

Q.    And the second phone call, when did that take place?

A.    At 4:34 a.m. and 34 seconds.

Q.    And what number was called?

A.    413-386-4715.

Q.    Whose number is that?

A.    That's a number that we believed to be used by Devin Austin.

Q.    Was the defendant still in this vicinity or his cell phone at least when the call was made?

A.    Yes, it's in that same purple-shaded coverage area.

        ATTORNEY BRESLOW:  If we could take down this and open up the second box?

Q.    (By Attorney Breslow)  When was the third phone call?

A.    At 5:01 a.m. and 44 seconds.

        ATTORNEY BRESLOW:  And we can take that down now.

Q.    (By Attorney Breslow) In what vicinity was the defendant's cell phone when this call was placed?

A.    Somewhere in that gray-shaded area that coincides with I-91 in Springfield.

Q.    Now, this area of the cell site location, it concerns -- there's at least five distinct I'll call them "blobs" on this map, and one of them is actually in West Springfield.  Do you see that?

A.    Yes, I do.

Q.    And then another smaller one is off to the right near Belmont Heights, away from 91?

A.    Right.

Q.    Okay.  So as you plotted your route, you and Special Agent McGonigle, with respect to these blobs, which route

did you choose to take for the timed drives?

A.   We basically took the route that coincided with I-91 as kind of the logical path to take from the nursing home facility to 90 El Paso.

Q.   And how many areas of cell site coverage just depicted in these blobs are along I-91?

A.   It appears to be two predominant blobs that are along that route.

THE COURT:  Are we referring to these as blobs?

ATTORNEY BRESLOW:  Do you have a better suggestion, Your Honor?

THE COURT:  I don't know.

ATTORNEY BRESLOW:  Gray areas?

THE COURT:  Yes.

ATTORNEY BRESLOW:  Areas of coverage?

THE COURT:  I was just wondering if "blobs" was some super technical term.

ATTORNEY BRESLOW:  Right, yes.

THE COURT:  It doesn't really seem right.  Maybe we should call them something else.

ATTORNEY BRESLOW:  I don't mean to give anybody flashbacks from the movies of the 50s.

Q.   (By Attorney Breslow)  We'll call them "areas of coverage."  How about that?  Okay?

A.   That's fair.

Q.    With respect to -- with respect to your route, how did you and Special Agent McGonigle decide to drive from 20 Lori Lane in East Longmeadow to 90 El Paso Street?

A.    I think basically we started with Google Map search just to give the logical route, and we reviewed some information that, I believe, Mr. Rathbun indicated that he's taken that route in the past.

Q.    Okay.  And are you referring, in particular, to the route from his home, down Converse Street to access I-91 through Route 5?

A.    That's right, yes.

Q.    Okay.  So there is a red box that bears the letters "CS."  Do you see that at the bottom middle of the page?

A.    Yes, I do.

Q.    What is CS?

A.    That icon depicts the crime scene location or approximately where the device was recovered the morning of April 2nd.

Q.    So with reference to this map, if you could just describe for the jury, in words, your route -- the route that you and Special Agent McGonigle took?

A.    So for the first test, we approximately started at the CS crime scene icon.  We turned right onto Converse Street.  Traveled westbound on Converse to the intersection with Route 5 in Longmeadow.  We made another

right turn to head towards I-91, went down the ramp and onto I-91 northbound. We followed that through downtown Springfield. We exited onto 291 east. Followed that up to the St. James Avenue exit and then took local roads to 90 El Paso.

Q. Okay. So do you see the top left corner of I-291 on this map?

A. Yes.

Q. So with respect to the coverage area that's closest there, can you tell the jury where I-291 is?

A. Right. It's just below the yellow box labeled "government exhibit." The start of that curvature there is the ramp to 291 East.

ATTORNEY BRESLOW: If we can blow up that area so that the jury can see it better?

Q. (By Attorney Breslow) So is the coverage area, that grayish coverage area, how is that located in relation to the I-291 off ramp?

A. The coverage area terminates just prior to getting onto that exit ramp.

Q. Okay. Now, for both of the timed drives, what day did you conduct them?

A. It was the morning of Tuesday, October 6, 2020.

Q. And who else was in the car with you?

A. Special Agent Ryan McGonigle.

Q.    How did you and Special Agent McGonigle keep the time?

A.    We kept or Special Agent McGonigle operated a timer on his cell phone.  Then we also video recorded the drive.  So we had the timer from the video camera.

Q.    Who drove?

A.    I drove.

Q.    While you drove, what was Special Agent McGonigle doing?

A.    He sat in the passenger seat and operated the video camera as well as the timer on his cell phone.

Q.    Generally speaking, how fast did you drive?

A.    We tried to keep it approximately at the speed limit the entire way.

Q.    Now, before conducting the timed drives, had you driven on Converse Street, Route 5 and I-291?

A.    Yes.  I've driven that route numerous times.

Q.    So tell the jury, based on your actual driving experience, how common, if at all, is it for drivers to greatly exceed the speed limit on those roads?

        ATTORNEY WATKINS:  Objection.

        THE COURT:  Based upon his common life experience driving?

        ATTORNEY BRESLOW:  Yes.

        ATTORNEY WATKINS:  How common is it?

ATTORNEY BRESLOW:  How common, if at all, is what I asked.

THE COURT:  Based upon his personal experience of driving history on those roads, I will allow it.  So overruled.

THE WITNESS:  I mean, based on my experience, it's very rare that anyone goes the speed limit.  It's generally five to ten miles an hour faster.

Q.   (By Attorney Breslow) So could you tell the jury if that's your personal experience on these roads, why did you and Special Agent McGonigle choose to drive the speed limit?

A.   For the purpose of this test, it was an attempt to keep the time as a conservative estimate.

Q.   So I'd like to display PX-26 already in evidence.

So with respect to the start of your timed drive, the first timed drive, the one way, can you tell the jury where your car was parked as you started the timed drive?

A.   So the first test we parked along the curve, just to the right of that evergreen tree on that entranceway.

Q.   And how long were you parked there?

A.   Before we started the timer, it was only less than a minute I think in that spot.

Q.   Now, if we can just blow up the area by the evergreen tree so the jury can see it better?

With respect to the width of this road, if you were parked there, how difficult or easy would it be for a driver behind you to pass you on the left?

A.   I mean, it's at least a two-car lane.  So I don't think there would be any obstruction as long as there wasn't a car coming from the other direction.

Q.   Tell the jury, please, what approximate time did you start the first timed drive?

A.   It was I believe 4:52 a.m. that morning.

Q.   And why did you chose 4:52 a.m. to start the timed drive?

A.   It was really an effort to establish what we could have expected to see as traffic conditions the morning the device was placed.  So we tried to pick that time the last -- well, the still image from the officer's police car last traveled past that location where we knew or we didn't believe the device had yet been placed.  So we just, basically, established the traffic conditions similar to that morning.

Q.   Now, before starting the drive, what, if anything, did you do to simulate the placement of the homemade incendiary device at the location where it was placed?

A.   We attempted to allow some reasonable amount of time to provide someone to exit the vehicle and place it at the location it was recovered.  So I used a video camera bag

from the car, exited the vehicle, walked over to the location where the device was recovered. I placed it at the base of the tree and allowed about five to seven seconds to simulate someone's timing to light the wick, and then walked back to my vehicle and departed.

Q. And how much time did it take for you to do all of that, from the moment you left the car with the camera bag that was simulating the device to the moment you reentered the car?

A. Reentered the car was about 45 seconds of that time, yeah.

Q. And how long did it take for you, in total, to leave the car, do what you did, return to the car, and then drive down Converse -- drive down Ruth's House Road and exit onto Converse Street?

A. It was about an additional 30 seconds back in the vehicle. So I think the total was 1 minute, 15 seconds for that.

Q. To be clear, did you or Special Agent McGonigle know how long it took the actual person to place this device?

A. No, we didn't.

Q. And did you know where, if at all, that person was parked?

A. No, we had no information about that.

Q. So can you tell the jury why you chose to -- why you

chose this location and to do what you did?

A.   I mean, part of it was to keep the car out of traffic on Converse Street, again, not knowing where the vehicle was at the time the device was left.  It was early in the morning and it was really just an attempt to, again, give some reasonable amount of time and location to simulate that event from when morning -- from when the device was left.

Q.   So you could have chosen to park the car right on Converse Street or in that bike lane or grassy area?

A.   Correct, anywhere along that.  We just -- again, it was more from a -- just keeping the vehicle out of traffic and not introducing an unsafe situation.

Q.   Okay.  Have you reviewed, prior to coming to court, PX-79, 80 and 81?

A.   Yes, I have.

Q.   Can you tell the jury what they are?

A.   Sure.  They're three video recordings.  The first one pertains to the one-way trip from the nursing home facility to 90 El Paso.  And then the second two videos are the combination of the round trip video recording.

ATTORNEY BRESLOW:  All right.  At this time, Your Honor, I'd like to display to only the Court, counsel, and witness PX-128-1.

Q.   (By Attorney Breslow) Special Agent Mastroianni, what

is this?

A.    This is a summary chart for a portion of the first timed drive that we did that morning.

Q.    Okay.  And this summary chart references two exhibits, PX-79 and PX-38.  You already testified about PX-38, and what is PX-79?

A.    PX-79 is the video recording of that first timed drive.

Q.    And is the underlying map, the map showing those four gray areas for the 5:01 call, is that an exact map and replica of those four gray areas in PX-38?

A.    It appears to be the same, yes.

Q.    And with respect to PX-79, does the red route on your map reflect the correct route that you took on the video, PX-79, that first timed drive that you described to us?

A.    Yes, it does.

Q.    And there are various durations of time, three durations of time, one at the start, one at point A and one at point B.  Are those fair and accurate reflections of the amount of time it took you to -- with respect to the first time, leave your car, walk to the tree, simulate the placing and lighting of the device, walk back into your car and then drive down Ruth's and onto Converse Street?

A.    Yes.  They all appear to be accurate.

Q.   Okay.  And point A, is that an accurate reflection of the amount of time it took for you to go from that red circle to point A on the timed drive that's recorded in PX-79?

ATTORNEY DESROCHES:  Your Honor, I would draw the Court's attention, there's a juror --

ATTORNEY WATKINS:  We have a question.

A JUROR:  Can we take a quick break?

THE COURT:  Sure.  Sure.  Need a break?  Okay.

CLERK RIVERA:  All rise for the jury.

THE COURT:  Do not talk about this case.  All the other instructions that I always give you apply.  All right.

**(The jury left at 2:26.)**

ATTORNEY BRESLOW:  We want to remind you that Special Agent Mastroianni is in the courtroom.

THE COURT:  Right.  It's fine with me.

ATTORNEY BRESLOW:  For argument?

THE COURT:  Chart argument?

ATTORNEY BRESLOW:  Yes.

THE COURT:  I think that's fine.  Do you have a problem?  We are talking about charts?

ATTORNEY WATKINS:  No.

THE COURT:  So we're back on the record.

ATTORNEY BRESLOW:  So the first thing I'd like

to do, Your Honor, is just -- with Ms. McKenna out, we can't operate the computer.

ATTORNEY WATKINS:  I can switch over to mine.

ATTORNEY BRESLOW:  If we could just put up, side by side, 128-1 and 129?  If you can do that, Tim?

So, Your Honor, these are relatively similar to each other and then to the other charts.  I think we have two others that we would offer into evidence, one is relating to the second drive.

So starting with these, because they progressively contain more information, 128-1, as Special Agent Mastroianni was testifying, that's basically a fair and accurate combination or summary of two very disparate exhibits.

The first is visual in that it's a geographical presentation of the area with the gray cell site area coverages, and the second is the video.  The video has two features.  It shows the route that they took, but then it also marks time.  And so it's very hard to communicate to the jury all of this accurate information without some kind of a summary chart.

We're offering it under Federal Rule of Evidence 1006, and I'll concede at the start of the argument that this is -- it's a somewhat unorthodox offer under Federal Rule 1006, but I don't think it's precluded at all, and

neither do I think these are argumentative in that they are simply factual representations of various media.

So the video itself would show the car on the route in red, and it also will show Special Agent McGonigle starting the timer. And the video itself has a timestamp in it so that you can see the video -- the time running as they're driving, and when they hit point A, they record the time.

And with respect to PX-129, it starts when they leave the parking lot at 00 and -- when they get in the car and start the drive, and it continues. At point A, they've reached that point of the cell site coverage at 4 minutes and 26 seconds. And then they actually go beyond the gray area, the last gray area of the cell site coverage for the second call, the 5:01 call, and get onto 291, and they mark the time on the video when they get onto 291 at 7 minutes and 12 seconds. So it's accurate.

It's helpful to the jury because it is a summary of these disparate records. It's -- well, in our view, it's not argumentative. We had an initial conversation with Mr. Watkins in which he agreed to allow us to offer PX-129 if we took out the words "without device placement," and it was simply a record showing the route that they took and the amount of time it took to hit certain areas in the cell site coverage. And we would make that offer here,

meaning we have a version of this where we took out the phrase that Mr. Watkins objected to.

Obviously, he's not bound by his initial decision. I understand he's reconsidered it. That's fine. But we think it's an appropriate summary chart and would offer it under that context.

And as to authority, Massachusetts Criminal Rule federal -- the Massachusetts Rules of Evidence have an analog to the federal rule. It's also 1006. I think it's virtually identical, and there's an SJC case that, I think, would closely resemble the proffer here, and that is *Commonwealth v. Bin*, B-i-n, at 480 Mass., 665. It was decided October 9, 2018.

So I could walk you through the other exhibits. If you're inclined not to offer them, I don't want to waste the Court's time. But if you are inclined to agree with us that this is fair and accurate, that it is a summary of disparate records that are already in evidence. The summary charts actually don't require that we introduce the underlying evidence, just that they be fair and accurate summaries of them. Here, they are already in evidence. We've also had an agent who is in the middle of and will soon complete his authentication of each of these, and so that's what we're disputing.

THE COURT: All right. What do you say,

Attorney Watkins?

ATTORNEY WATKINS:  Judge, I think Mr. Breslow is being quite forthright in talking about it being an unusual application of 1006.  By its very terms, it does not anticipate introduction of these kinds of exhibits.

What these are are chalks.  They're what Mr. Breslow would like the jury to believe at the end of the day.  Rule 1006 is short and very clear.  "Proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  That's the end of it there.

I mean, if we're introducing -- the exhibits underlying the data have already been introduced.  We're going to hear -- we're going to see the video of it.  This is simply not an exhibit.  It's not contemplated by Rule 1006, and it shouldn't come in.

It is these -- starting with 128 are additional difficulties.  There are added times in there.  Those are disputed as the Court may recall the last time.  I think already Agent Mastroianni has indicated, they didn't make it up, but they just estimated a certain amount of time there.  That's going to start to get confusing.  It will be confusing because we're not agreeing that it only took 45 seconds there.  So that's going to be misleading as

well.

It really is trying to demonstrate the government's theory here through these charts by layering on their view of what the evidence is.  I think you can stop at 1006 because it's simply not anticipated here.  1006, of course, we often see with summary charts, schedules in financial cases where there are huge amounts of documents, and those truly do fall within 1006.  This is not the kind of thing that needs to be summarized in some kind of form for the jury.

ATTORNEY BRESLOW:  If I may be heard briefly, Your Honor?

THE COURT:  Uh-huh.

ATTORNEY BRESLOW:  So with respect to -- with respect to their inaccuracy, they may not accurately reflect how long it took the person -- in this case, we believe it's the defendant -- to get out of a vehicle, walk away, place the device, light it and return.  And we've already elicited that testimony from Special Agent Mastroianni that, you know, he doesn't know where the person was parked or if they were even parked at all, or how long it took them to place and light the device.

These are not meant to be, and they do not -- they are not depictions of the crime.  What they are depictions of, what they are summaries of is the test, the timed

drives that he took.

So, for example, Mr. Watkins is right in that the one minute and 15 seconds is simply an estimate of what may have happened. But that's not what this chart -- and now I'm referring to PX-128-1 -- that's not what it represents.

It simply represents, in a graphical form, a video which we are going to play portions of. But that video and then the second one, the round trip of 26 minutes, they're not susceptible to being in the phrase of the rule "conveniently examined in court."

And so I do want to be clear, and I could make it more clear on direct if Your Honor thinks it was not already done so, this is not reflecting what happened on April 2nd. This is reflecting what happened on October 6th. And with respect to the time it would take to place the device and walk away, that is not in PX-129. And we did it for that very reason, because we wanted to focus, at least in this summary chart, of exactly the time that it took to drive without regard to how long it may have taken to place the device.

And like I said, we earlier had an agreement that this was appropriate with the phrase "without device placement" on the chart.

THE COURT: All right. Thank you.

Attorney Watkins, I don't see -- I mean, I do appreciate your point about looking at the rule and saying the rule doesn't look like it's quite designed for this. True.

Looking at some case law, the case law talks about this, agrees with what you said. Hey, you know, essentially there's this rule here, and no one really knows how to apply it or what it means.

I'm looking at a First Circuit case *Milkiewicz*, M-i-l-k-i-e-w-i-c-z, 470 F.3d 390, it gives a little bit of background. 470 F.3d 390 gives a little bit of background about this type of analysis.

It seems to me that it can -- a summary chart can be used. It can be introduced into evidence. It really doesn't matter if the underlying material that it's summarizing is in evidence or not. I think I will allow its use here.

ATTORNEY WATKINS: Your Honor, there's two things here. One is, I'm not objecting to a chalk in court, if the government puts that up as they go through here. But what that's doing is going back to the jury precisely --

THE COURT: Oh, okay. So that's -- your objection is actually is not to using it, but admitting it?

ATTORNEY WATKINS:  Right.  They're asking that this be admitted.  The danger here -- and this is where 1006 comes in -- is that the jury will take that as fact what's in there and no longer go back to the actual piece of evidence which in this case is the videos.

THE COURT:  Even with some type of instruction that wouldn't be appropriate, some type of instruction as to what they could consider this for, what it is and what it is not?

ATTORNEY WATKINS:  But I think the instruction would be this is the government's version of how this might have taken place.

THE COURT:  Right.

ATTORNEY WATKINS:  And then, of course, that's not an exhibit anymore.  That is the government's spin, if you will, on how this took place.  So I don't think it goes back as an exhibit.  I haven't looked at the case, but what we're doing is combining two sets of data, if you will, the video and the cell phone records.

THE COURT:  Right.  I think the rule and the cases that analyze it anticipates a streamlining of evidence that could be viewed as complex or multi-layered and kind of tries to streamline it through this summary chart.  But I get what you're taking, that's the government's version.

ATTORNEY WATKINS:  Right.

ATTORNEY BRESLOW:  So I want to be really clear here.  This is not the government's version of what happened on April 2nd.  That's not what he's testified about -- and, again, if you want to excuse Special Agent Mastroianni at this point -- that's not what he's testified about; that's not what he's going to testify about.  And, moreover, that's not what the government is going to argue in summation that this is what happened on April 2, 2020.

That is really the crux of Mr. Watkins' concern.  He said it to me before, and he's made it very explicit now with the Court.  He is saying these charts represent what might have happened on April 2nd.  That's not what we're offering them for.

We're offering them for what happened on October 6th.  And I think, Your Honor, to avoid any confusion, we would request that the Court instruct the jury that these timed drives, the information in here is in the exhibits that it summarizes.  They're labeled and noted in the summary charts, and this evidence concerns what took place on October 6, 2020.

So Special Agent Mastroianni has already appropriately informed or at least provided the background for what the government's attempting to do, which is

simply to put in evidence that is difficult -- I mean, the phrase of 1006 is "cannot be conveniently examined in court." Here I think it's extremely difficult to present this evidence without a summary chart like this.

So I've provided these to Mr. Watkins, I would say, last week. He's had more than enough opportunity to review them, to check their accuracy. The underlying exhibits are in evidence. So we're going a step further than what 1006 contemplates, and I think it's entirely appropriate for them to be admitted. And you can instruct the jury that PX-79 and PX-38 are in evidence. You can look at them yourselves, but this is the government's summary of them.

THE COURT: What do you think about an instruction taking care of this?

ATTORNEY WATKINS: But what is an exhibit doing that is the government's version? That is where the problem is. Exhibits go in as a specific factual kind of thing. This is argument. This is what the government's test is showing.

I simply -- I want to go back a little bit because I want to be sure on this. Perhaps the objection is relevance. I don't know what Mr. Breslow is talking about with this is only what happened on October 6th. Then why are we introducing it? The answer is they want -- they're

quite right he wants to argue to the jury this is why on April 2nd Mr. Rathbun could have done this thing. I think it's a little bit specious to say this has nothing to do with April 2nd because that's exactly what the government wants the jurors to do here.

We start putting in these kinds of exhibits which include facets of what the government has decided to do on their test. This goes back -- it goes back as a disputed exhibit, right? I'm looking at 128-1 now, the JGS start plus one minute and 15 seconds. Well, that one minute and 15 seconds, as I think the Court heard the last time and is going to hear it this time, what that gap should have been is going to be a hot part of the dispute here.

To have this go back here and say the defendant is free to also send its version of it, you know, I will make a chart exactly like this which has JGS start time plus, you know, 5 minutes and 53 seconds. Then all of a sudden, we have these dueling exhibits before the jury.

THE COURT: I think I got it.

ATTORNEY WATKINS: Okay.

THE COURT: Do you want to say anything else? We've got to start wrapping this up.

ATTORNEY BRESLOW: Right. Just to say that we made two versions of this, one with that period of time and one without it in anticipation of exactly what

Mr. Watkins is arguing. And so if Your Honor has some concern about that -- I don't think it's warranted, but to the extent that you do, 129 eliminates that issue.

THE COURT: I think that the most fair way to handle this for both sides is to use these as chalks without them being admitted. All right.

ATTORNEY BRESLOW: Yes.

THE COURT: Okay.

ATTORNEY WATKINS: One more preview just so we don't have to have an objection in the middle. The other two exhibits of the round-trip video, 80 and 81, is two parts. Right?

ATTORNEY BRESLOW: Those two videos, yes. The round trip was longer, and it took place on two -- it's recorded on two different digital files, PX-80 and 81. Is that what you're referring to?

ATTORNEY WATKINS: Yes.

ATTORNEY BRESLOW: So we're not going to be playing those. It would be 26 minutes of the jury watching a car drive which, frankly, is another reason why we're offering these. And so I don't know what your objection is to them.

ATTORNEY WATKINS: This particular video is made on October 6th. On that video, the lighting matters when they get back to the JGS campus. I'm going to object for

that reason.  Unlike the other video, which the whole thing is dark, and I agree on April 2nd and October 6th, the lighting conditions were exactly the same.  But as for reasons I think the Court can guess, on April 2nd, dawn was much earlier than on October 6th.  It would be our contention that if this had happened the way the government is doing it, it would have been full light out there, and that's not depicted in the video on October 6th.

THE COURT:  That might go to weight, not admissibility though.

ATTORNEY BRESLOW:  Sorry?

ATTORNEY WATKINS:  Well, certainly I would want the government to lay the foundation with the witness to say this is on October 6th.

THE COURT:  I don't think the issue you just raised goes to admissibility.  I think it goes to weight about that, the time of day issue.

ATTORNEY WATKINS:  Well, because the lighting would be such a large part of that particular theory there, I think it is very, very misleading to have the video showing this area where he goes back with a very dim light when, in fact, it would have been full light at that time.

ATTORNEY BRESLOW:  The only thing I'll say, Your

Honor, is that the witness has already stated -- he's already testified that each of these timed drives took place on October 6th.

And, secondly, the second timed drive does show different lighting conditions than the first timed drive because the first timed drive replicates or covers the period of time between 4:52 a.m. and 5:01 a.m.  And the second timed drive, the round trip, covers a separate window of time.

So Mr. Desroches mentioned in his opening that there are two windows of time.  The second window came up in the examination I believe of Special Agent Burke and possibly Special Agent Wong, and that was between 6:09 and 7:06.  It's a 57-minute window of time at a much later point in the day.  And so the lighting conditions are going to be different from the first window of time which was 4:52 a.m. until 5:01 a.m.; and, secondly, they conducted this round-trip, second timed drive to cover that exact period of time.

And so to the extent that he has a concern about the sunrise being at a different time of April 2nd, well, obviously, we weren't going to wait until April 2, 2021 to conduct this event -- to conduct these time drives.  And to the extent that there is a difference, Mr. Watkins can cross-examine Special Agent Mastroianni about it.  He can

put into evidence a calendar showing the times.  And I think the jury will clearly understand that, to the extent the lighting is different, there's a reason for it.

THE COURT:  All right.  So we have a ruling on these -- what were going to be summary charts are now going to be used as chalks.  And in anticipation, Attorney Watkins, in anticipation of your objection to the video regarding the lighting, you can make that at the specific time, but kind of the preview is that I think that goes to weight and not admissibility.  All right.

**(The jury entered at 2:56.)**

THE COURT:  All right, ladies and gentlemen. During the break, was everyone able to follow my instructions, specifically not talking to each other about the case but all the other instructions as well?

Okay.  Affirmative answers from everyone.  The jury remains fair and impartial.  We can continue.

ATTORNEY BRESLOW:  Your Honor, what we'd like to do is display PX-128-1 solely as a chalk or a demonstrative aid for the jury.

THE COURT:  Allowed.

ATTORNEY BRESLOW:  Could I ask Madam Clerk to give the monitors to the government's table?

Okay.  So can we present them to the jury?

THE COURT:  Yes.

ATTORNEY BRESLOW:  Okay.  Great.

Q.   (By Attorney Breslow) All right.  So you had been previously providing some foundation testimony concerning this exhibit without it being presented to the jury.  So now that it's on the screen, Special Agent Mastroianni, and there's been a decent time interval, I would just like you to start again at this red dot that says "JGS"?

A.   What's the -- I'm sorry.  I don't remember what the question was.

Q.   I'll ask it again.

A.   Okay.

Q.   So with respect to PX-128-1 and this dot, JGS, can you tell the jury what that signifies, that start plus one minute, 15 seconds?

A.   That represents the amount of time on our timed-drive video that I allotted to the simulation of the device placement and then when we got back in the vehicle and departed the location.

Q.   Okay.  So, in other words, at one minute and 15 seconds, your car was, basically, turning onto Converse Street in the direction of Route 5?

A.   That's right.

Q.   Then following the red route, what does point A represent?

A.   Point A is approximately the start of the cell phone

coverage area for that 5:01 a.m. phone call that was placed the morning the device was placed.

Q.   Okay.  So you were able to arrive at point A at -- you were able to arrive at point A at 5 minutes and 41 seconds after you left JGS?

A.   Yes, that's right.

Q.   Okay.  And then can you -- if you continue the route in red through the gray coverage area up to and beyond the second gray coverage area on -- near the intersection of I-291, what does that represent, point B, where it says 8 minutes and 27 seconds?

A.   Right.  So 8 minutes, 27 seconds is how long it took us in total to get to that point which is the on ramp to 219 eastbound and approximately past the last zone of coverage for that 5:01 a.m. phone call.

Q.   Just so we're clear, the starting point for the clock ticking is 00:00, right?  And what happened at that point? Where were you at that point, at the very start?

A.   At the start, we were still inside in my vehicle that was parked in that location on Ruth's House Road.

Q.   Okay.  So, in total, how much time did it take for you to leave the vehicle, walk to the spot, do what you did at the spot, return to the vehicle, and then drive all the way beyond the cell site coverage for the defendant's 5:01 call?

A.   Eight minutes and 27 seconds.

ATTORNEY BRESLOW:  If we can take a look at PX-129 now?  So, Your Honor, without objection, we're going to be displaying the summary charts that we talked about simply as demonstrative aids and not summary charts, unless there is an objection?

ATTORNEY WATKINS:  Can we just make clear to the jury that these are not exhibits?

THE COURT:  Exactly.  So what are being referred to as "chalks" that you're looking at are not evidence. They're not -- there's a distinction between what's admitted as evidence and will go back with you to the jury room.

A chalk is, as it's been referred to, a demonstrative aid, something for you to be looking at as an aid to kind of assimilate and listen to the testimony.  But it is not evidence in the case that is being admitted.  It is an aid for understanding this testimony.  All right.

ATTORNEY BRESLOW:  Thank you, Your Honor.

Q.   (By Attorney Breslow) And so what does this depict, and if you can explain how it differs from PX-128-1?

A.   Sure.  It's essentially the same graphic that was just displayed except we've removed the time that was given --

A JUROR:  Your Honor?

THE COURT:  The screens.

A JUROR:  Thank you.  They're on.

THE COURT:  They're on now?  Everything's on? All screens are working.  Okay.

Q.    (By Attorney Breslow) If you could just explain again what is PX-129 and how does it differs from PX-128-1, what we just saw?

A.    Sure.  It's essentially the same graphic we were just looking at, except in this image the time that was allotted for this device simulation placement and the exit onto Converse was removed.  So essentially it's just the drive times from the location where the device was placed to that spot that's outside of the cell coverage area on I-91, 291 on ramp.

Q.    Okay.  Each of these reference PX-79 and PX-38?

A.    That's right.

Q.    PX-79, you earlier testified, is the video of that first timed drive?

A.    That's right.

ATTORNEY BRESLOW:  So with the Court's permission now, what I'd like to do is play a portion of PX-79, not the entire video, but the portion that's depicted along this route.

Q.    (By Attorney Breslow)  And just to be clear, beyond this route -- you didn't stop at point B, did you?

A.    No, we continued on.  As I said earlier, we exited onto 291 East.  We got off at the St. James exit.  Took local roads to 90 El Paso, and that's actually where the termination was for that first timed drive.

ATTORNEY BRESLOW:  Okay.  So just so it's clear, we're not going to be playing the entire video, just from the start where they were at the Jewish Nursing home Through point B, which will take approximately seven minutes or so.  So if we could turn to PX-79.

Now, I'd like to offer in evidence PX-79, 80, and 81 if they have not already been admitted.

THE COURT:  All right.  And defense?

ATTORNEY WATKINS:  Subject to my objection.

THE COURT:  Subject to your objection, which I've heard and you've laid on the record, the objection is overruled.  They are admissible.

ATTORNEY BRESLOW:  Okay.

**(Government Exhibits PX-79, PX-80, and PX-81 admitted.)**

ATTORNEY BRESLOW:  So what I'd like to do now is play PX-79 and stop at 16 seconds into the video.

**(Video playing.)**

ATTORNEY BRESLOW:  Okay.  So I think what's happening is there's just a technical problem, Your Honor. I think the sound is lagging behind the video.  Can we just take a minute to see if we can remedy that?

THE COURT:  Sure.

ATTORNEY BRESLOW:  While Ms. MeKenna is working on this, Ms. Rivera, at certain points I'm going to be toggling between the video and the ELMO.

CLERK RIVERA:  Okay.

ATTORNEY BRESLOW:  So do I ask you?

CLERK RIVERA:  As long as you press the power button.  I showed Neil before.

ATTORNEY BRESLOW:  You showed Neil?

CLERK RIVERA:  Uh-huh.  You're in control now of your tables.

ATTORNEY BRESLOW:  I don't know if I can handle that.

If you can just play the video from 0 to 16 seconds and stop it there?

**(Video playing.)**

Q.   (By Attorney Breslow) Okay.  Special Agent Mastroianni, how many clocks do you see running at this point?

A.   I'm only -- you mean right now or at the time we did this?

Q.   In this screen right now, how many --

A.   On this screen, I see two clocks.

Q.   Right.  Okay.  So the time running in the bottom right-hand corner that reflects 16 seconds, what does that

relate to?

A.    That's the video recorder's timer, when we press play on the video recorder.

Q.    And what is Special Agent McGonigle holding in his hand?

A.    That's his cell phone timer.

Q.    And is he about to start the timer on his phone?

A.    Yes, his thumb is on the start button.

Q.    So for the duration of your timed drive, how much time back is Special Agent McGonigle's clock from what's on the video?

A.    His -- so his timer on his cell phone is 16 seconds behind what the video recording timer shows now.

ATTORNEY BRESLOW:  Okay.  So if we can continue playing and stop at 38 seconds?

**(Video playing.)**

Q.    (By Attorney Breslow) So, Special Agent Mastroianni, did you hear a voice in the latter part of this segment?

A.    Yes.

Q.    Whose was that?

A.    That was my voice.

Q.    So can you tell the jury, in case they couldn't hear it on the video -- I think it's a little faint --- what you were saying?

A.    I was just announcing that this was the approximate

location where the device was recovered that morning.

Q.   Okay.  And at 38 seconds right now, what can we see to the extent we can see anything at all?

A.   So I'm placing -- it's actually the camera bag for the video recorder.  I'm placing that on the ground in that same approximate location just to simulate the device being placed there.

Q.   Okay.  So if we could -- and why were you walking at the pace you did?

A.   Kind of the same, as I mentioned earlier, about creating a conservative estimate for this time.  It was just an average pace, no real exigency to it.  Again, just to make it a conservative determination of this time.

Q.   So you chose not to run?

A.   Correct.  We did not run.

ATTORNEY BRESLOW:  Okay.  Can you continue playing and stop at 102 on the video?

**(Video playing.)**

Q.   (By Attorney Breslow) Okay.  And now how much time has elapsed since you left the car?

A.   It was about 45 seconds total, I think.  The timer shows right now 46 seconds.

Q.   And just so it's clear for the record, can you explain what this segment depicted?

A.   Right.  So this depicted me exiting the vehicle with

the camera bag, walking over to the location where the device was recovered. I placed the bag on the ground to simulate the device placement. I gave it about five to seven seconds to allow for lighting of the wick, and then I picked the bag back up and returned to the car walking at an average pace.

Q. So can you -- you stated you walked at an average pace back to the car from --

A. That is right.

Q. -- the device.

So if you were simulating lighting a device, a homemade incendiary device on fire, why did you choose to walk and not run back?

A. Again, it was not really having all the information of what happened, and it was an attempt to create a conservative effort on this timed drive.

Q. Okay. Just to be clear, as you testified earlier, you don't know where the person was, if they drove, where they parked and what their pace to and from the device was?

A. We had no information about that.

ATTORNEY BRESLOW: And if we could continue playing and stop at one minute and 31 seconds on the video?

**(Video playing.)**

Q.    (By Attorney Breslow) Okay.  Can you explain to the jury what just happened in this segment?

A.    Again, so this is the one minute and 15 seconds that was depicted on that summary chart that we allotted to the simulation of this device placement.  So that included me exiting the vehicle, dropping the device, getting back in the car, announcing the time, and then departing to 90 El Paso Street.

Q.    And in this freeze frame at one minute and 31 seconds, where is the car right now?

A.    We're right at the intersection with Ruth's House Road and Converse Street.

Q.    And in what direction is the car about to turn?

A.    About to turn right, which is westbound.

ATTORNEY BRESLOW:  So I'd like to display now on the ELMO what is not in evidence, simply a demonstrative aid to the jury, PX-128-1.

Q.    (By Attorney Breslow)  So where in relation to PX-128-1, where are you right now?

A.    We're still located at that red dot at the bottom that's labeled JGS.

ATTORNEY BRESLOW:  Okay.  All right.  So if we could go back to the video and play until 4:25 on the video?

**(Video playing.)**

ATTORNEY BRESLOW:  Your Honor, so long as the jury can hear, I'm trying to move through this as quickly as we can.  What I'd like to do is ask questions as the video is playing; but if a juror cannot hear me, can they please indicate that to the Court?

THE COURT:  To the jury, if you have any problems hearing the questions, just raise your hand, and we will make other arrangements.

ATTORNEY BRESLOW:  So I'll let the record reflect that, during this period, we're just going to be muting the video.

THE COURT:  Fine.  Yes.  The video of the drive is playing.  You may now ask questions.

ATTORNEY BRESLOW:  Yes.  Okay.

**(Video playing.)**

Q.    (By Attorney Breslow) So, Special Agent Mastroianni, what road are you and Special Agent McGonigle on now?

A.    This is Converse Street in Longmeadow.

Q.    And how fast are you driving down Converse Street?

A.    It's approximately the speed limit which is 35 miles an hour.

Q.    Describe the traffic for the record and for the jury at this time in the morning as you're driving down Converse Street?

A.    I would say it was very light that morning, very few

cars.

Q.    And in the video, to the extent that cars are traveling in the opposite direction, we're seeing them? Are we seeing them?

A.    The cars in the other direction?

Q.    To the extent that cars are traveling past you in the opposite direction, are we seeing them in this video?

A.    Yes.

Q.    Does there appear to be any cars ahead of you?

A.    No.  No, there aren't.

Q.    And what approximate speed are you driving here on Converse Street?

A.    It remained approximately the speed limit the entire way.

Q.    We're almost at the next stopping point.

    Okay.  Special Agent Mastroianni, can you tell jury where your car is right now?

A.    We're approaching a red light at the intersection between Converse Street and Route 5 in Longmeadow.

Q.    Displaying 128-1 to the entire courtroom, where is your car in relation to this map?

A.    If you follow the point JGS along the line into that intersection right there exactly where the pen is, that's Converse Street and Route 5.

        ATTORNEY BRESLOW:  Okay.  Let's turn back to the

video and continue playing until 5:32, so about a minute.

**(Video playing.)**

Q.    (By Attorney Breslow) So can you tell the jury what road you're on right now?

A.    This is Route 5 in Longmeadow.

Q.    And how fast did you drive on Route 5?

A.    The same, approximately the speed limit the entire way.

Q.    And can you describe for the jury the state of the traffic both in the lane ahead of you as well as in the oncoming lane?

A.    Again, very light traffic, very few cars on the road.

Q.    Okay.  Can you tell the jury where you are right now?

A.    We are just about to get onto I-91 northbound.

Q.    With reference to PX-128-1, can you describe where you are having traveled down Converse Street?

A.    It's probably in that green-shaded area for Forest Park, just maybe a little bit above where that pen is.

Q.    So slightly below?

A.    Before the pen.  I would pull the pen back a little bit.

Q.    So slightly below point A?

A.    Yes, that's right.

            ATTORNEY BRESLOW:  Okay.  If we can turn to the video and play until 5:57?

**(Video playing.)**

Q.    (By Attorney Breslow) Are you on the on ramp now to I-91?

A.    Yes, that's right.

Q.    Okay.  So right now if we can just get one more second on the timer.  Okay.  All right.

So right now, where is the car?

A.    We are in that approximate location of the start for that gray-shaded cell coverage area for the 5:01 a.m. phone call.

Q.    Okay.  And just a second ago, what was displayed on Special Agent McGonigle's cell phone timer?

A.    Based on that approximation, we determined 5 minutes and 41 seconds was where the timer hit that start of the coverage area.

Q.    If we go back to PX-128-1 for a moment, what does point A reflect with respect to the video?  Can you see it?

A.    It's not on my screen.

Q.    I don't see --

A.    Now it's up.

Q.    With respect to the video, where on PX-128-1 are you?

A.    We're at that same approximate location in the video.

Q.    Point A?

A.    Point A.

ATTORNEY BRESLOW:  All right.  So if we can continue playing?

**(Video playing.)**

Q.   (By Attorney Breslow) Since you started the entire timed drive, 5 minutes and 41 seconds has elapsed?

A.   Right.  At that point A, yes.

ATTORNEY BRESLOW:  Okay.  If we can play until 8 minutes and 40 seconds?  If there's no objection from the defense, I'd request that we fast forward through this period.

THE COURT:  Any objection to fast forwarding?

ATTORNEY WATKINS:  No.

THE COURT:  All right.

ATTORNEY WATKINS:  It's not very far.

ATTORNEY BRESLOW:  If we can stop at approximately 8 minutes and 40 seconds?

Q.   (By Attorney Breslow)  What sign are you approaching right now?

A.   It's the exit sign for 291 eastbound.

Q.   And what lane are you in right now?

A.   We're in the exit lane, far right, on I-91.

Q.   Okay.  We're stopped right now at 8:40.  Where is your car at this point?

A.   We're about to exit I-91 northbound onto 291 eastbound.

Q.   Okay.  And how much time has elapsed not on the video but from when you started the timed drive, when you -- when Special Agent McGonigle started his clock and you left the car?

A.   At this point here?

Q.   Uh-huh.

A.   It's approximately 8 minutes, 26 seconds or maybe 8 minutes, 24 seconds at this point.  I think it's 16 minutes off -- or 16 seconds off.

Q.   Okay.  Right.  And if we can go to PX-128-1 now? Where is your car in relation to PX-128-1?

A.   Not quite at the point B.  It's approximately there, but just a few seconds prior to hitting that.

Q.   One or two seconds behind that?

A.   Yes.

Q.   So how fast did you drive on I-91 during the segment that we sped through?

A.   I tried to keep it again right at the speed limit, which I think is 55 going through downtown Springfield.

Q.   So, Special Agent Mastroianni, how long did it take for you to exit your car, do what you did at the entrance to the Jewish Nursing Home, get back in your car, and drive all the way through the cell coverage for the defendant's 5:01 call?

A.   Approximately 8 minutes, 27 seconds.

ATTORNEY BRESLOW:  So I'd like to display PX-129 to the entire courtroom on the ELMO.

Q.   (By Attorney Breslow)  What is this, Special Agent Mastroianni?

A.   It's the same geographical representation just showing the driving times from the location where the device was recovered through that coverage -- cell phone coverage area for the 5:01 a.m. phone call.

Q.   The only difference is it doesn't include the one minute, 15 seconds that you took to simulate the placement and lighting of the device?

A.   Yes, that's right.

Q.   Okay.  So just focusing on the pure driving time, how long did it take for you to get from departing down that driveway to the earliest point of the cell coverage for the defendant's 5:01 call?

A.   Four minutes and 26 seconds.

Q.   And how long, just focusing on the driving time, did it take for you to go through that point of cell coverage, through all of the cell coverage on I-91 and get beyond it?

A.   Approximately 7 minutes, 12 seconds.

ATTORNEY BRESLOW:  Can we display PX-130 to the entire courtroom?

Q.   (By Attorney Breslow)  So, again, this is simply a

demonstrative aid.  It's not evidence, but can you explain what evidence this is based on?  What exhibits, in particular, this chart is based on?

A.    Sure.  It's a couple of pieces of evidence.  The still image from the police officer's camera which establishes that 4:51 and 44 second time, it shows some of the cell data that we obtained from Mr. Rathbun's device for the 5:01 a.m. and 44-second phone call.  And then it displays the information we obtained from that first drive test through the cell coverage area on I-91.

Q.    Okay.  So how much time elapsed between the time that Officer DaBrea was departing JGS in PX-83-A and the time that the defendant placed his second phone call, the first to Devin Austin?

A.    It's approximately 10 minutes, 0 seconds.

Q.    Okay.  So that's a 10-minute window of time?

A.    Correct, yes.

Q.    Can you tell the jury how long it took you or how that compares to your entire timed drive?

A.    Including the --

Q.    Excluding the placement of the --

A.    Excluding the placement, it was 7 minutes, 12 seconds.  So it's approximately 2 minutes, 48 seconds less.

Q.    And with the placement of the device as you simulated

it?

A.    It added an additional minute, 15.  So that was 8 minutes, 27 seconds.  And so that's one minute, 33 seconds less than the 10-minute window.

Q.    So I want to focus on a second window of time now for your second timed drive.  What was that window of time?

A.    Later that morning, there was a gap in cell phone activity on Mr. Rathbun's device, and I believe that was from 6:09 a.m. until 7:06 a.m. on April 2nd.  And so that was the window -- 57-minute window that was the basis for why we conducted the second test.

ATTORNEY BRESLOW:  I'd like to display PX-41, page 13, which is already in evidence to the entire courtroom.  And if we can just blow up that bottom chart, the bottom box?

Q.    (By Attorney Breslow)  So is this the second window of time that you're talking about between 6:09 and 7:06 a.m.?

A.    Yes, that's right.  It establishes that window.

Q.    So I'd like to focus now on your second timed drive.

A.    Okay.

Q.    When did you start this drive?

A.    I think we started approximately 6:10 a.m. the morning of October 6th.

Q.    And why did you choose 6:10 a.m.?

A.    Same as the previous test to establish best estimate on what the traffic conditions would have been the morning of April 2nd.

Q.    And where did you start?

A.    The vicinity of 90 El Paso in Springfield.

Q.    Where did you go?

A.    We drove round trip, leaving 90 El Paso, taking local roads, pretty much the same roads in reverse, onto 291, 91.  And we traveled to the nursing home facility on Converse Street.  And then we did the return trip --

Q.    Okay.

A.    -- back to 90 El Paso.

Q.    And where did you park when you were simulating the device placement in this second window of time?

A.    I believe we parked in the first available parking spot in front of Genesis House.

ATTORNEY BRESLOW:  So I'd like to display PX-26, which is already in evidence, to the entire courtroom.

Q.    (By Attorney Breslow)  Can you describe for the jury and for the record where you parked in relation to this photograph?

A.    It was approximately the first or second parking spot where that black vehicle is seen in the image there on the screen.

Q.    Okay.  And so from where you parked, this is a

substantial difference between where you parked the first time?

A.    Yes.  It's not the same location as the first test.

Q.    Okay.  So from where you parked the second time, what did you do after you parked?

A.    We announced that we arrived.  I gave the time and said that we would be exiting the vehicle.  I took the same camera bag, walked from my vehicle over to the location and did that same exercise of simulating someone's attempt to place the device.  Picked the bag back up and returned to my vehicle.

Q.    So for this second window of time, how much time did it take for you to leave your car, walk to the device location, place the device, simulate its lighting, and return to your car?

A.    I think it was approximately a minute and 15 seconds, a minute and 20 seconds, about that.

Q.    Okay.  How much longer between the first time and second, approximately?

A.    About 35 seconds or so.

Q.    Okay.

A.    35 or 40 seconds longer.

Q.    And what was your pace as you were walking back and forth for this timed drive?

A.    It was the same attempt to keep just an average pace,

no real exigency.

Q. Did you record this as well?

A. Yes, we did.

Q. Including the round trip back?

A. Yes, we did.

Q. And did you go back to 90 El Paso?

A. We did, yes.

Q. All right. So is that timed drive recorded in two separate video files, PX-80 and 81?

A. Yes, it is.

ATTORNEY BRESLOW: All right. I'd like to display PX-131 now. This is, again, not an exhibit offered in evidence but a representation of other exhibits in evidence.

Q. (By Attorney Breslow) What exhibits does this represent?

A. It represents the route that we took for the second drive, 90 El Paso to the nursing home facility. And it represents the time for that window at the top, that summary block, just establishes the window that we were looking at, the 56 minutes, 45 seconds.

Q. So PX-41, page 13, that has that 56-minute window represented?

A. Yes, that's right.

Q. And PX-80 and 81, that is the video of your timed

drive the entire way back and forth?

A.    That's right.

Q.    Does it also record what you did when you parked at Genesis House?

A.    Yes, it does.

ATTORNEY BRESLOW:  I'm not going to be presenting those to the jury, Your Honor.

Q.    (By Attorney Breslow) Approximately how much time did it take for you to do all of that, starting at Devin Austin's house, driving that route back to the Jewish Nursing Home, placing the device, getting back to your car and returning to Devin Austin's?

A.    The total time was approximately 30 minutes, 40 seconds.

Q.    And how does that compare to the second window of time?

A.    It's approximately 26 minutes less than that window.

ATTORNEY BRESLOW:  Okay.  I have no further questions.

THE COURT:  Whenever you're ready, Attorney Watkins.

ATTORNEY WATKINS:  If I can get my screen?

CLERK RIVERA:  Yes.

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Good afternoon, Agent Mastroianni.

A.   Good afternoon.

Q.   I'm going to show you Exhibit 37 already in evidence -- sorry, it's 34.  This is Exhibit 34 already in evidence.

One of the first things that you talked about with Mr. Breslow is about whether when you parked by the evergreen tree here you would be blocking traffic going out of Jewish Geriatric Services; do you recall that?

A.   I remember the question, yes.

Q.   Can you see the traffic island that separates traffic going either way?

A.   Yes.

Q.   And so, as I understand it, you were saying that you and Agent McGonigle parked back here by this evergreen tree?

A.   It's probably about where that light -- the light area just past the shade is about where the car was, where it's bright.

Q.   So where you were parked, somebody coming down this road, a hearse, for example, would have to go around you and perhaps go into this other lane entirely, right?

A.   I don't think -- I think there was enough room from

where we were parked from what I recall.

Q.    I'm sorry?

A.    I said I believe there was enough room, from what I recall, where we were parked.

Q.    But, nevertheless, you would be parked next to the side here?  You would have to come down, go around and come through that driveway; is what you're saying?

A.    I mean, you'd have -- if they didn't want to go on that entrance road, yes, they would have to go around that way.

Q.    And whoever that was would see that there was somebody stopped there, not at the stop sign down here, but way back up here at 4:50 in the morning, right?

A.    Would someone see my vehicle there?

Q.    Yes.  Somebody would have seen your vehicle coming down there as you're stopped?

A.    I would think so.

Q.    I'm sorry?

A.    I would think so.  They would see it.

Q.    Yes.  And you had a sedan that the two of you were in, correct?  You were both in the front seat?

A.    No.  It was a silver SUV, Chevy SUV.

Q.    The camera bag, that was actually in the passenger side seat that was pulled up?

A.    Right.  You actually see me reach over and grab it

from the video -- at the very start of the video.

Q.    Now, we've heard evidence here that there was a Rav4 vehicle.  Are you familiar with a Toyota Rav4?

A.    Are you referring to the vehicle, the defendant's mom's vehicle?  Mother's vehicle?

Q.    Sheila Rathbun's vehicle, you're familiar it?

A.    Yes.

Q.    Okay.  Have you seen that vehicle?

A.    I did see it, yes.

Q.    Okay.  So that has a hatchback in the back, right?

A.    Yes, it does.

Q.    And, obviously, you had no gas in that camera bag that you were using as a prop, right?

A.    We did not put any gasoline in the camera bag.

Q.    And you didn't have any gasoline in the car whatsoever, right?

A.    Well, just the gas in our car itself, the tank of the car, right.

Q.    Gas in the interior compartment, you didn't have any gas cans --

A.    No, we did not.

Q.    -- things of that nature?

    So your timing doesn't account for someone going to the back of a car and opening up a hatchback and grabbing that can to take it over to the tree there?

A.    No, it does not.

Q.    And your timing that you allowed -- this 45 seconds going back and forth, nothing about crumpling up pieces of paper or trying to curl them into the spout there to make a wick?

A.    Well, I did allow about five to seven seconds when I dropped the bag just to simulate some attempt for lighting --

Q.    But --

A.    -- and placing the wick.

Q.    I'm right that you did not actually try to do that --

A.    No.

Q.    -- there before you -- just that five to seven seconds?

A.    No, it wasn't really the goal of that.

Q.    And while we're here, I'm going to pull up what's been identified as Exhibit 104.

      When you talked about your -- when you establish 45 seconds for going in there and dropping this off, if someone had parked over in this parking lot, did you test how long it would take for someone to get out of the Rav4, pick up the gas can, walk over there?

A.    No.

Q.    Put a wick in, light it, and then walk back there?

A.    No, we didn't test any time from that location of the

property.

Q.    And for somebody to do that, of course, they'd have to walk down the road and go into this parking lot?  It's not a long ways, but it would take time to do that?

A.    If they started there, sure.

Q.    Did you take measurements of time about how long it would take if someone parked down here and walked with a gas can all the way through here, over to that tree?  Did you calculate that as part of that 45 seconds that you did?

A.    No, we did not.

Q.    And, again, none of these places if someone had parked back here or over here, you didn't do any kinds of measurements other than on the first trip, right next to tree and the second trip, that parking lot just a little bit down?

A.    No, we did not.

Q.    You are familiar with Detective Dabrea's squad car video?

A.    I've seen it, yes.

        ATTORNEY WATKINS:  So I'm going to put that up.  It's going to be Exhibit 83.  Fast forward this right to the end -- not that far to the end.

**(Video playing.)**

Q.    (By Attorney Watkins) Okay.  We don't have the camera

shot here, but this is very similar to that screen shot that Mr. Breslow put up for you?

A.   Right.  That's right.

Q.   And then, of course, you know as we all do that now Detective Dabrea made the left turn down here and travels another 16 seconds to stop here, and we have a time for that.

ATTORNEY WATKINS:  If we can switch over to the government's computer and they can bring up 83-B?

ATTORNEY BRESLOW:  Just a moment, Your Honor.

ATTORNEY WATKINS:  And if you can blow up that timestamp there?

CLERK RIVERA:  And publish to everyone?

ATTORNEY WATKINS:  Yes.  I'm sorry.  This is already in evidence 83-B.  Can you zoom back out and -- thank you.

Q.   (By Attorney Watkins) So this is Exhibit 83-B, and are you familiar with the area now on Converse Street?

A.   I believe that's Redfern.

Q.   Redfern?

A.   Yes.

Q.   So this is the corner of Converse and Redfern looking towards the direction of --

ATTORNEY BRESLOW:  I'm sorry.  Your Honor, may I just pause for a moment and speak to Mr. Watkins and you

on WhisperTech?

**(Sidebar conference.)**

ATTORNEY BRESLOW:  I would ordinarily do this on redirect examination, but it's not possible because Mr. Watkins is using a video that has no timestamp.  The problem is I think what he's doing is making a comparison between that point on the video that we just showed and this screenshot which has a time statement, and I don't believe they're both -- I don't believe they correspond.

And so I guess what I would ask Mr. Watkins to do is just use -- if he's using the video, use the video that's in evidence that has the timestamp and then we can compare it.  But when he's playing a video that has no timestamp, it's really hard to follow, and we can't make a record.  The video with the timestamp we submitted into evidence for precisely this purpose.

THE COURT:  Any problem with using the video that's in evidence?

ATTORNEY WATKINS:  Yeah, there is, Your Honor, because I don't have it.  It's quite large.  This is what we went through the other day.  This is the exhibit that we're seeing from the last trial.  It's brand new.  This screenshot is from their video.  I'm not understanding what Mr. Breslow is worried about here.  The timestamp is on 83-B.

THE COURT:  There's a timestamp on it?  Where is the timestamp?  There's a timestamp on this right here?

ATTORNEY BRESLOW:  Yeah, that's not the problem. The problem is that he's making a comparison to a video that has no timestamp.  There's no objection to any questions regarding PX-83-B or any part of the government's evidence that has a timestamp.  I'm just saying when he's playing a video that has no timestamp, it's impossible to make a record or do an adequate redirect because we can't compare the two.

Perhaps Mr. Watkins can just display them side by side.  I'm not trying to make it difficult here.  I just really want to make sure we have a clear record.

ATTORNEY WATKINS:  This is difficult. Mr. Desroches and I agreed that I could use the other video and use this timestamp from it.  I don't understand now where the problem is.  It sounds like anything that is a problem can be taken care of on redirect.

THE COURT:  Okay.  Just proceed.  I agree. You're going to have to take care of it on redirect in some way.  It sounds like you had an agreement to use the video in the way you're using it?

ATTORNEY WATKINS:  I thought so up until just now, yeah.

ATTORNEY BRESLOW:  I don't have a problem with

him using the video at all.  It's just that if he's making a comparison to a particular point in time that's defined, I think we have to have some way of just making sure that we're talking about the same points in time.

ATTORNEY WATKINS:  Just to be clear, 83-B is from your version of the video.

ATTORNEY BRESLOW:  Right.

ATTORNEY WATKINS:  That is the comparison I'm making.

THE COURT:  Okay.  You guys don't need to talk to each other across this.  Just proceed as you're proceeding.  All right?

ATTORNEY BRESLOW:  Okay.

**(End of sidebar conference.)**

ATTORNEY WATKINS:  So if we can blow that timestamp up on there?

Q.    (By Attorney Watkins)  So you used the starting time as 4:51 and 44 seconds when you decided to do the drive test up to El Paso, right?

A.    Yes.

Q.    But we do know that Detective Dabrea took a left down the street and went as far as 4:52 before taking a right on Redfern, right?

A.    Yes, I think that's the time.  That's right.

Q.    Can we go back to the wider view?

And looking out at this picture, looking out at the original Exhibit 83, there are no cars coming down the opposite direction, towards this direction?

A.    There don't appear to be any in that image, no.

Q.    And plus, obviously, if a car took 16 seconds to get down here, a car going in that entrance ramp to JGS that you exited out of, it would take them an additional 16 seconds to get back there?

A.    I just missed the first part of that.

Q.    So it is taking -- this is 16 seconds later than your screenshot that you started from?

A.    Right.

Q.    If a car was to get from here, coming from East Longmeadow, they would have to pass this spot?

A.    Yes.  That direction of Converse Street, that's right.  They would have to come by that spot.

Q.    They would have to travel an additional 16 seconds to get down to that spot where you and Agent McGonigle left from, correct?

A.    From this exact spot, if they were going the same speed as the officer, sure it would be approximately 16 seconds.

Q.    It would be exactly 16.  It's the same --

A.    Well, if they were going slower or faster, it would be different.

Q.   Of course, but 15 or 16 seconds.  So that's not factored into your drive time when you put that minute and 15, an extra 30 seconds or even more depending upon how far a car was coming?

A.   Well, the factor is the image was -- that was the last spot on the camera that was the location.  Since we didn't have any information about where the starting point was, we used that as the start point for the test.

Q.   I'll come back to my computer now.

You announced in the car that it's approximately 4:53.  When you leave, you take that right onto Converse Street?

A.   I think when we first got back in the car, I think that's right.

Q.   Putting up before you what's been marked as evidence, Exhibit 41, and do you see this page 12 of that exhibit?

A.   Yes, page 12 is the lower, right conner.

Q.   And you see this last entry here says, "knock, knock, knock"?

A.   Yes, I do.

Q.   And what time is that at?

A.   That is at 5 o'clock and 32 seconds a.m.

Q.   Going back to -- and then as you told us, go back to the same page as well, up here to get to this spot -- and El Paso Street may be -- well, how far from this point on

291?  Have you calculated that?

A.   I think it was about six-and-a-half minutes -- six or six-and-a-half minutes from that spot, the rest of the timed drive.  That's how long it took us to get to 90 El Paso.

Q.   So certainly someone saying "knock, knock, knock" in a phone call would be consistent with someone about to arrive in six minutes?

A.   I don't know what that means.

Q.   And to get to this point on this exhibit -- not exhibit, on the chalk, just going by what you announced down here where it says 00 you say 4:53 as you're turning just a couple seconds after that, adding 7 minutes and 12 seconds to 4:53 gets us to 5 o'clock, and 5 o'clock and 12 seconds?

A.   Right.  I think that's right.

Q.   We saw that "knock, knock, knock" at just about 5 o'clock followed by a phone call at 5:01:44?

A.   Right.  The phone call is where the cell data, you know, the cell location comes from.  The text message, it's not -- we don't have any location.

Q.   The point B spot there?

A.   Right.  Point B is the spot outside of the coverage area for that 5:01 a.m. phone call.

Q.   So on all of this if whoever left that gas can down

at JGS left on this route, they have a minute and 30 seconds, right? If they leave any more than a minute, 30 seconds later, right, it couldn't have been them?

A. I'm not quite following you.

Q. All right. I think you said 4:53 down here, right, at JGS when you leave?

A. Well, again, that's the time that we started the test. It wasn't the exact time of the officer's car. That was more for the traffic. So it wasn't the precise time up with when that camera image was.

Q. I'm using that as an example for my question.

A. Yeah, sure.

Q. 4:53 plus 7 minutes and 12 seconds, so just decide that's 5 o'clock?

A. Right. So it would be a minute and 32 seconds is what I think your question was.

Q. I'm sorry?

A. I think you asked it would be a minute, 32 seconds.

Q. Right.

A. Yes.

Q. So a minute and 40 seconds is too late. The person won't hit that particular spot, right?

A. A minute, 40 seconds, if they left at exactly that time?

Q. If they left -- instead of when you left, if they

left a minute and 40 seconds later, it would be too late?

A.    Yeah, based on our test, that would be after that point.

Q.    When you do the demonstration of putting the gas can next to the tree, the assumption is by that time, the person has decided exactly where they're going to put that gas can, right?

A.    I'm not sure I follow that.

Q.    Well, you stopped right there, pulled right into that, get right out, that's when you start the --

A.    You mean where we placed the car or where?

Q.    Where you placed the car --

A.    Yeah.

Q.    -- and started it.  You get right out, you walked there, walked by, do your thing by the tree, come back and take off?

A.    I mean, it really didn't factor into where we picked that spot.  It was just -- that was, again, was an attempt to establish some reasonable amount of time to that process.

Q.    The government did not play the round trip -- any of round trip video, but I'm going to put a little bit of that up before you.  This is going to be Exhibit 80.  I'm going to stop it here.

**(Video playing.)**

ATTORNEY BRESLOW:  Mr. Watkins, you want the sound?

ATTORNEY WATKINS:  No, I don't think we need the sound here.

Q.   (By Attorney Watkins) Again, what we're watching here is part the round trip back from 90 El Paso down to JGS?

A.   Right.  Is this before?  I think based on the time, it's actually on the way back.

Q.   Okay.  Let me see if you I can -- sounds like you've looked at it much more.  Do you happen to know when it is on the counter?

A.   It was total 30 minutes and 40 seconds.  So I want to say we arrived around 14 minutes, 13 minutes was when we arrived approximately.

**(Video playing.)**

Q.   (By Attorney Watkins) It's got that slow motion thing going.

You are now back here at JGS?

A.   Right.  This is the -- we're arriving now in that second round trip test.

Q.   Now, here it's showing that it's dark, right, or the sun is just starting to come up?  We'll see on the rest of this, but the sun is starting to come up.  Now, it's true you did this video on October 6th of 2020?

A.   Right.  That's right.

Q.    Not April 2nd of 2020?

A.    No, it was not April 2nd when we did the test.

Q.    And did you make any calculation for lighting, how the light was going to be at that particular time as you --

A.    No.  We picked the time as close more for the traffic conditions.  We did not factor in the light.  The light was -- just wasn't something we considered.

ATTORNEY WATKINS:  So, at this point I'm going to move to introduce -- maybe it should just be for the parties for the moment.

Q.    (By Attorney Watkins) Agent Mastroianni, do you see two different indications of dawn in Longmeadow, Massachusetts?

A.    I see that, yes.

Q.    In Longmeadow, Massachusetts, on October 6th, when you did this drive test it was at 6:25, right?

A.    According to that chart, yes.  I don't know where the chart comes from.  But, yes, according to this screen, it says 6:25 a.m.

ATTORNEY WATKINS:  Are you objecting to this?

ATTORNEY BRESLOW:  Continue, please.

THE COURT:  No objection.  Keep going.

ATTORNEY WATKINS:  Well, then I'll put it up on the screen.  I would move this into evidence as

Defendant's Exhibit 1.

CLERK RIVERA:  Is it admitted?

THE COURT:  Any objection to the introduction?

ATTORNEY BRESLOW:  Your Honor, could you give me one moment?  This is the first time we're seeing this. We'd just like one moment.

THE COURT:  Sure, okay.

ATTORNEY BRESLOW:  No objection.

THE COURT:  That will be admitted.

**(Defendant's Exhibit 1 admitted.)**

Q.   (By Attorney Watkins) So as you see up on the screen, I've put the dawn on the two different days, one for April 2nd, the day of the event, the other one on October 6th, which was when you did your drive test?

A.   Right.

Q.   And on April 2nd, dawn was 23 minutes earlier?

A.   Right.

Q.   So it would have been significantly lighter, if not full daylight, at the time you arrived?

A.   It would have been lighter.  I don't know how quickly the sun affects the daylight; but, yes, it would have been lighter.

Q.   And just to finish it out there, of course, somebody placing a fuel container out there would be much more visible at that period of time?

A.    I would expect it, yes.

Q.    At least someone getting out of the hatchback of a car and placing it there, right?

A.    Again, I'm not sure, but you would expect more light.

Q.    Now, you drove that route a number of times up and down Route 91 there?

A.    I'm not sure what you're referring to.

Q.    When you were doing this drive test, you drove once up there and then you did the round trip.  And I assume you did some dry runs also?

A.    We didn't do any dry runs actually.

Q.    You just did the one.  So at least those three times up and down 91 and then to 90 El Paso?

A.    It's what we described.  We only made the trips the times that we recorded it; so, yes, it was three.

Q.    When you made those drive tests, did you make a note of gas stations along the way?

A.    No, we did not.

Q.    So as you watched through the video, and you've looked at the video a number of times at this point?

A.    I've seen the video, yes.  I've watched it.

Q.    And have you made a note as you watched through the video of whether there are any gas stations along the route?

A.    Have I made a note or do I know that there are?

Q.    Well --

A.    I mean --

Q.    Let's start first, did you make a note from the video of any gas stations along the route?

A.    No, we didn't that I'm aware of.

Q.    Do you know of gas stations along the route?

A.    I know of at least one gas station along the route that we took, yes.

Q.    Now, I want to go particularly to this area here from when you get off of 91 to go over to Jewish Geriatric Services.  There are no gas stations along that route; is that correct?

A.    Along Route 5?  I don't think after you exit 91, I don't believe there are any.

Q.    That's right.

A.    On that route we took.

Q.    And the route you did, you get right onto 291 and then onto 91, no gas stations in the middle of the interstate.  You can get off?

A.    Right.  On Columbus, for example, there's gas stations right off of 91 that's along the same path.  It's just that's not the path we took.

Q.    There is one gas station on the route up in East Springfield between 90 El Paso and 291?

A.    On St. James, there's a gas station, right.

Q.   On St. James.  So someone with a one-third-full gas can would have to get gas up there and driven all the way down --

A.   I don't know where they would get gas for that from.

ATTORNEY BRESLOW:  Objection; calls for speculation.

ATTORNEY WATKINS:  I have nothing further, Your Honor.

THE COURT:  It does call for speculation.  The answer -- I'm going to overrule it.  The answer remains as the agent said how could he know that.  So all right.

Follow up?

ATTORNEY BRESLOW:  No, Your Honor.  Nothing.

THE COURT:  Thank you, Agent.

ATTORNEY DESROCHES:  Just for the day, there is one witness, and I don't expect her to take any time at all.

THE COURT:  All right.  Is everyone good?  Does anyone need a break?  Break?  All right.  Go ahead.

ATTORNEY DESROCHES:  Thank you.  The government calls Susan Goldsmith.

THE CLERK:  Could you please raise your right hand?

**Susan Goldsmith (sworn)**

ATTORNEY DESROCHES:  Madam clerk, can we have

the screens just for the -- actually, they can be for everyone in the courtroom.

CLERK RIVERA:  Sure.

A JUROR:  I can't see her.

THE COURT:  The testimony is very short.  You might -- maybe if you stand.

A JUROR:  I don't mind standing.

THE COURT:  I mean, I've been told the testimony is short.  I want you to be comfortable.

A JUROR:  That's fine.  I'm comfortable.

THE COURT:  All right.  Go ahead.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   Good afternoon.

Q.   Could you please introduce yourself to the jury and for the record spell your last name?

A.   My name is Susan Goldsmith, G-o-l-d-s-m-i-t-h.

Q.   In what city or town do you live?

A.   Longmeadow, Mass.

Q.   For how long have you lived there?

A.   Thirty years.

Q.   Are you employed?

A.   Yes, I am.

Q.   How are you employed?

A.   I am a business owner in Holyoke, a business called

Marcus Printing Company.

Q.   Do you do any service or volunteer work?

A.   Yes, I do, at JGS Lifecare and at Holyoke Community College.

Q.   And drawing your attention specifically to JGS Lifecare, what is your role there?

A.   I'm currently the chairman of the board.

Q.   And what responsibilities do you have as chairman of the board?

A.   I organize the activities of the board and act as a liaison between management and the board and the non-profit work that we do.

Q.   Now, briefly, what is JGS Lifecare?

A.   JGS Lifecare is a large, non-profit organization that serves -- whose mission is to provide services to the elderly in our community and to their families, and we do so guided by the Jewish values of our founding women.

Q.   What facilities or buildings make up the JGS campus?

A.   There's -- we have six entities.  I think there's six or seven buildings.  We have the JNH nursing home which is a long-term and short-term rehabilitation nursing home.  We have an assisted living facility called Ruth's House.  We have an adult daycare center called the Wernick Adult Daycare Center.  And we have Genesis Housing, which is HUD housing.  It's subsidized housing for people over the age

of 62.

Q.   You said you had JNH, what does that stand for?

A.   The Julian J. Levitt -- well, JNH is the Jewish Nursing Home.  Sorry.

Q.   So in terms of acreage, how big is this campus?

A.   Physical large?  It's about 25 acres.

Q.   Drawing your attention to April of 2020, approximately how many residents lived on the campus as a whole?

A.   In the entire campus, about 350.

Q.   And that includes all those facilities that you just described?

A.   Yes.

Q.   Where do those residents come from?

A.   Primary from the greater Springfield area, but they also come from outside the area as family members bring their elders to the community to be closer to them.

Q.   So they come from outside of the state?

A.   Yes.

Q.   Now, we've heard some testimony regarding the average age of residents at Genesis House.  What is the average age of the other facilities on JGS campus?

A.   From back in April of '20?

Q.   Yes.

A.   The average age in the nursing home was about 88.

And in Ruth's House, the assisted living, I think it was late 70s, early 80s.

Q.   Who manages the property at Genesis House?

A.   The property is managed by a company called Carr Property Management.

Q.   What are the responsibilities of Carr Property Management?

A.   They do the day-to-day managing operations.  They collect the rent.  They take care of the -- if the apartments need fixing or if the residents have an issue, like any apartment management.

Q.   Who manages the property on the campus outside of Genesis House?

A.   JGS.

ATTORNEY DESROCHES:  I'm going to ask that Exhibit PX-23 be displayed to the Court.

Q.   (By Attorney Desroches) Do you recognize what's depicted in this photograph?

A.   Yes.  It's the entrance to Ruth's House and our Wernick Adult Day Health Care.

Q.   So drawing your attention to just the area of the sidewalk, can you explain to the jury where JGS property ends in relation to that sidewalk?

A.   We end like almost to the road.  We take care -- I guess the sidewalk is ours as well.

Q.    So, specifically, I'm drawing your attention to the tree that appears just to the right of the sidewalk beyond this roadway, is that JGS property?

A.    Yes.

Q.    And who maintains the property in that area?

A.    JGS does.

Q.    And how did they maintain it in that area?

A.    We mow the lawn, plow that area, you know, take care of the shrubbery and make it look nice.

Q.    Now, may I have PX-7?

Do you recognize the area depicted in this photograph?

A.    Yes.  It's the area between that road that we just saw and actually the driveway that goes into the nursing home.

Q.    So do you see that yellow canister in this photograph?

A.    Yes, I do.

Q.    Is that yellow canister, based on your experience with JGS and its grounds, is that yellow canister on JGS property?

A.    Yes, it is.

ATTORNEY DESROCHES:  Thank you.  I have no further questions.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

**CROSS-EXAMINATION**

Q.    (By Attorney O'Neill-Greenberg) Afternoon.

A.    Hi.

Q.    So JGS, how big is the entire campus?  I'm not sure if Attorney Desroches asked you that.

A.    I think it's about 25 acres.

Q.    Okay.  So the campus, of the whole 25 acres, is called JGS Lifecare, right?

A.    That's the name of the entity.  That's our legal name, yes.

Q.    Okay.  And before that, it was JGS, Incorporated; is that right?

A.    It had a bunch names; but JGS, Inc. was, yes.

Q.    Then it rebranded in 2015 as JGS Lifecare?

A.    Correct.

Q.    And the founding people that started it, that was the Daughters of Zion?  Right?

A.    Correct.

Q.    That was like the original name?

A.    Very original.  It was a hundred and six or nine years ago.

Q.    Okay.  So in the JGS Lifecare, the entire campus, there -- you went through all the different entities that are on it.  Genesis House is on the side that is the most eastern side, I guess, or the most westernly side?

A.    The most what?

Q.    The most west side, westernly side?

A.    If we were looking at that picture, the most to the right.  My direction is not east or west.

Q.    I'll do it more simply.

Genesis House is on one edge of the campus?

A.    Correct.

Q.    And then there's a bunch of other different entities. There's one all the way in the back.  That's Ruth's House, right?

A.    Correct.

Q.    And then all the way on the other side, that's where the nursing home is, right?

A.    Correct.

Q.    What is the name of the nursing home?

A.    It's the Julian J. Levitt Family Nursing Home.

Q.    That's the first entrance.  How about if I use the map?  Maybe that's helpful?

A.    Okay.

ATTORNEY WATKINS:  Exhibit 104.

ATTORNEY O'NEILL-GREENBERG:  That's already in evidence.

Q.    (By Attorney O'Neill-Greenberg) Where the cursor is right here, that's where the nursing home is; is that right?

A.    Yes.

Q.    Okay.  And when I say the first to get to the nursing home, the first entrance, I mean this entrance here; is that correct?

A.    Well, that's really the delivery entrance, where people make deliveries and employee parking is.  So that's --

Q.    Okay.  So if I'm actually not an employee or delivering, then I come in through this main area through here?

A.    Correct.

Q.    Thank you.

Then if I am going to drive in to get to the Genesis House entrance, access Genesis House, I'm going to enter through this driveway right here; is that right?

A.    That's one of the two main entrances into Genesis, yes.

Q.    If I'm going to get to building A in Genesis House, I would enter that way; is that right?

A.    Honestly, I don't know which buildings are labeled which.  So I'm not sure.

Q.    You're not sure which Genesis House building has which label?

A.    Right.

Q.    No problem.

Genesis House is the only entity on that big campus that is not run by JGS, right?  I'll be more specific. It's not managed by JGS?

A.   It's one of them.  JGS has -- yes, that's correct.

Q.   So the daily functioning of Genesis House is not managed by JGS?  It's an outside contractor?

A.   Correct.

Q.   Carr Properties?

A.   Correct.

Q.   So in that way, Genesis House is distinct from all the other properties; is that right?

A.   Yes.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  That's it.

ATTORNEY DESROCHES:  No redirect, Your Honor. Thank you.

THE COURT:  All right.  Thank you, ma'am.

ATTORNEY BRESLOW:  Your Honor, we have no further witnesses for today.

THE COURT:  All right.  Thank you.

All right.  We're finished for the day.  I continue to anticipate -- I don't know how long, but tomorrow may be a shorter day.  It may not take as long, but I continue to believe that the evidence has a good chance of being finished tomorrow, which means your closing arguments, my

instructions, and your beginning deliberations would be -- that would take place starting Monday morning.  All right?

Is that a fair estimate?

ATTORNEY WATKINS:  I think that's right.

ATTORNEY DESROCHES:  I agree, Your Honor.

THE COURT:  Okay.  The same instructions apply: No talking to anyone else.  Do not access the internet, social media, anything; no investigating the case.  Don't talk to anyone about the case.  Thank you.  See you in the morning.

**(The jury left the courtroom at 4:14.)**

THE COURT:  See everyone in the morning.

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY BRESLOW:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

**(Court recessed at 4:15.)**

(The certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Alice Moran                          June 4, 2022

Alice Moran, RMR, RPR

Federal Official Court Reporter