UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America    )
                            )           20cr30018-MGM
    vs                      )
                            )           June 11, 2021
John Michael Rathbun        )
_____)


TRIAL HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:

On behalf of the government:  Neil L. Desroches, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105.

Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

INDEX

Witness:                                                    Page:

**Dan Marshall**

Direct examination by Attorney Desroches                       5

Cross-examination by Attorney Watkins                         33

Redirect examination by Attorney Desroches                    36


**Sheila Rathbun**

Direct examination by Attorney O'Neill-Greenberg              56

Cross-examination by Attorney Desroches                       82

Redirect examination by Attorney O'Neill-Greenberg           125


**John Rathbun**

Direct examination by Attorney Watkins                       129

Cross-examination by Attorney Breslow                        200


Exhibit No.            Description                           Page


142   Stipulations                                           40


2     Bank of America bank statement                        181

**(Court commenced at 9:12.)**

**(Defendant is present.)**

CLERK RIVERA:  Court resumes the jury trial in Criminal Case 20-30018, the United States of America versus John Michael Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY DESROCHES:  Good morning, Your Honor. Neil Desroches on behalf of the United States.

ATTORNEY BRESLOW:  And Steven Breslow for the United States.  Good morning, Your Honor.

ATTORNEY WATKINS:  Tim Watkins, Federal Defender Office, on behalf of John Rathbun who's here with us in court.  Good morning.

THE COURT:  Good morning, everyone.

ATTORNEY O'NEILL-GREENBERG:  Good morning. Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Good morning.

All right.  And good morning, Ms. McKenna.  We stopped with the Ms. McKenna good mornings.

ATTORNEY BRESLOW:  You know, I was almost going to say that Ms. McKenna has been with us the entire week and we haven't introduced her.  But thank you, Your Honor.

THE COURT:  No.  You have been saying good

morning for Ms. McKenna for the first couple of mornings and then it was like she doesn't matter.

ATTORNEY BRESLOW:  I appreciate you recognizing her.  We would be nowhere without her.

THE COURT:  Yes, true.  All set?

ATTORNEY DESROCHES:  Your Honor, just one thing real quick.  We have one witness this morning, then the government would ask -- I think the parties would ask Your Honor to read a series of agreed-upon stipulations and then the government would rest.

THE COURT:  All right.  So why don't you get those up to me?  All right.

All these stipulations, including these, are ready to be exhibits, correct?

ATTORNEY DESROCHES:  Correct.

THE COURT:  There was at least two before these?

ATTORNEY DESROCHES:  We read them.  They were from that statement document.

THE COURT:  All right.

CLERK RIVERA:  All rise for the jury.

**(The jury entered at 9:15.)**

THE COURT:  Good morning, everyone.  You can be seated.

THE JURY:  (Good morning.)

THE COURT:  All right.  Was everyone able to

comply with my instructions?  Mainly the instruction not to talk to each other or to talk anyone else but all of instructions including no internet searches, social media postings, bloggings, reading about this, access to media, investigation in any way?  Did you follow all the instructions?

THE JURY:  (Yes.)

THE COURT:  Perfect.  Affirmative responses from all of our jurors.  They remain fair and impartial and we're ready to go.

ATTORNEY DESROCHES:  Yes, Your Honor.  The government calls Dan Marshall.

CLERK RIVERA:  Mr. Marshall, please raise your right hand.

**Dan Marshall (sworn)**

ATTORNEY DESROCHES:  Thank you, Your Honor.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good morning.

A.   Good morning.

Q.   Could you please introduce yourself to the jury and for the record spell your last name?

A.   Sure.  Dan Marshall, M-a-r-s-h-a-l-l.

Q.   And what state do you live?

A.   I live in Ohio.

Q.   In traveling to Massachusetts, have you complied with

all of the COVID-protocal travel restrictions?

A.    I have.

Q.    So, Mr. Marshall, you indicated you live in Ohio. What do you do for a living in Ohio?

A.    I lead marketing business development strategy for a company called Scepter.

Q.    What does Scepter do?

A.    Scepter is the manufacturer of gas cans, ammunition containers, water containers, and a few other products.

Q.    What are your responsibilities at Scepter?

A.    I'm the leader of all the marketing business development and product development, and for three of my four years at Scepter I also lead our engineering teams.

Q.    You said you lead your engineer teams?

A.    Yes.

Q.    What is your educational background?

A.    My bachelor is in mechanical engineering.  I have a master's in business administration.

Q.    Where did you obtain those degrees from?

A.    My mechanical engineer degree was from Penn State. My MBA is from India.

Q.    Now I'd like to draw your attention specifically to your role in product development.  Can you describe what product development is?

A.    Sure.  My role in product development is to figure

out what consumers want, what marketplace issues they have before they know they have them.  What features you want on your next product, what problems you have, and then to safely create products that solve those problems and do so at an efficient price.

Q.   So you indicated that Scepter manufactures fuel canisters; is that correct?

A.   Correct.

Q.   Are there different types of fuel canisters?

A.   Yes.  So fuel containers can be kind of split into the type of fuel in the can:  Gas cans, dieseal cans, and kerosene cans are our primary products in fuel containers.

Q.   So what are the differences between those types of cans?

A.   From a consumer's standpoint the primary difference is the color and some of the warnings on the side. Mechanically, other than the pigment color in the cans, they're pretty identical mechanically.

Q.   So why are there different types of -- why are there difference colors for different types of cans?

A.   So there are a number of gasoline standards and requirements by law, and one of them in our 852 standard requires that containers be a different color based on the fuel, and that's so that consumers don't make a mistake. You don't want to pour gasoline into a dieseal piece of

equipment or vice versa.

Q.   What colors are associated with what types of fuel?

A.   So red is for gasoline; yellow is for dieseal; and blue is for kerosene.

Q.   When developing a product as you do, is it important to consider safety features?

A.   It's paramount for what Scepter does.  You are working with highly-combustible materials.  All of Scepter's  products including we do ammunition containers for the military, we do the original military fuel containers, but having products that are safe when handling dangerous materials is what we do best.

Q.   Do Scepter fuel containers have any other elements of safety that other companies do not?

A.   Yes.  So there are four or five different requirements by law, but within our particular products we include additional warnings on our products that other manufacturers necessarily do not.

Q.   Are those features helpful in determining the manufacturer of a particular container?

A.   They can be, yes.

Q.   So let's discuss those warnings and fuel containers. Why are they there?

          ATTORNEY WATKINS:  Your Honor, I'd make an objection at this point based on prior rulings of the

court and motions for the court.

THE COURT: Regarding? Well, why don't we be heard a little bit.

(Sidebar discussion.)

THE COURT: Go ahead. I'm just looking -- I'm trying to -- there's so much paperwork up here. Do you know what docket number we're referencing for the prior ruling? It's the prior ruling for this new trial that was filed?

ATTORNEY WATKINS: That's correct. My filing is Docket No. 231. Your ruling is 262. I'm simply renewing it for purposes of the trial.

THE COURT: Okay. Do you want to say anything more about it? So the question was just about markings on the containers.

ATTORNEY WATKINS: Yes, but I think it's going to start leading to other issues, particularly my question would be why the markings on a Scepter can as opposed to anything else are relevant. The government is suggesting that this differentiates it from other gas cans, but there's really no question about whether this is a Scepter gas can and whether this moved in interstate commerce. That's not disputed and so the testimony is not necessary.

THE COURT: All right.

ATTORNEY WATKINS: But then it is also going to

lead into, as the court has noted, additional information about Scepter's safety products.

THE COURT:  Okay.  I'm going to keep close attention to my rulings on this, noting -- now is a good time to highlight it.  The government has offered this witness as a lay witness.  I issued a ruling recognizing the boundaries of perhaps a lay witness but also kind of previewing possible expert testimony from this witness as well.  So those are some issues we can watch out for.  I think I've previewed how I was at least thinking at the time I ruled on the motion, but I'm happy to hear fresh any objections you have as new issues come up.  All right?

ATTORNEY WATKINS:  Thank you.

ATTORNEY DESROCHES:  Your Honor, I would just add that since that last trial the government has notified the defendant of Mr. Marshall's expert testimony.  The notice occurred on December 18, 2020, and indicated that we would be eliciting testimony from Mr. Marshall along these lines as well as the lines of his experience in product safety.

I think this is relevant to the elements of this offense, and so I would just note that that is a change in circumstances from that prior trial.

THE COURT:  So that's a good thing to make a record of.  I guess I was -- because that's one point you

were going to call another expert and then you withdrew your intention to call that other expert.  When you were going to call the other expert, this witness here from Scepter was going to be a lay witness.

ATTORNEY DESROCHES:  That's correct, Your Honor, so that has since changed and we have provided notice.  I would suggest that the government will limit this testimony solely to this witness's experience with Scepter cans and what he has seen can happen with them.

THE COURT:  Okay.  Well, I mean one good point is it is true they're really -- I mean the markings that it is a Scepter can is really not an issue, but I will let you have the questions.  We can probably move right through them quickly.

ATTORNEY WATKINS:  Judge, I just want to make the record clear.  Mr. Desroches is quite right about his December notification and was what generated my Docket No. 231 which I think was actually filed in January or February, and I believe as part of that filing I did reference that letter.  I think the court had that letter in mind, the government's expert letter, when it ruled on this.  I just wanted to make that clear that this December letter is not new since the court ruled on this motion.

THE COURT:  Okay.  I think I might have just confused the issue a little, but now I understand it as

I'm looking at document the dates.  So thank you for clarification that.

I am reviewing my ruling, document 262, and I am satisfied that it remains my view of the case.  But as I said, we can go along.  If there's new objections, just raise them.  Okay.

ATTORNEY DESROCHES:  Thank you, Your Honor.

(End of sidebar discussion.)

THE COURT:  Okay.  Overruled.  You can go ahead.

ATTORNEY DESROCHES:  Thank you.

Q.   (By Attorney Desroches) Mr. Marshall, I believed I asked you about why the warnings were on the side of a fuel canister?

A.   Yes.

Q.   And specific to Scepter, whether or not they help you in identifying the manufacturer of a particular gas can?

A.   Sure.  I mean, each can is marked uniquely for a whole bunch of reasons and having a warning that's not required by law would certainly indicate the manufacturer.

Q.   So which type of warnings appear on Scepter cans that do not appear on others?

A.   We have a -- and I have to look at the specific warning but I believe it's around no smoking not recommending around the can.

Q.   So that's not required by the federal government?

A.   It's not required by law, but it's just good advice.

Q.   Are there -- other than those warnings that you just described, are there any other safety features that are unique to Scepter?

A.   Scepter has its own Flame Mitigation Device in our products.  There are other manufacturers that have an FMD but they're all a little unique and not all of them have them yet.

Q.   So you're referring to a Flame Mitigation Device specifically as an FMD?

A.   Correct.  FMD stands for Flame Mitigation Device, correct.

Q.   What is a Flame Mitigation Device?

A.   So effectively imagine a mesh or plastic filter inside the can.  It would look something like a debris filter, something you might recognize as keeping grass out, but reality it's a highly-engineered piece of plastic that has holes of a certain size and shape such that fire can't jump inside the can, ignite with fumes, and turn the container into any type of weapon or explosive device or just an accidental incident.

Q.   In your role as a vice president at Scepter specifically in product development, was the FMD important to you?

A.    Very much so.  Scepter spent over ten years developing their --

THE COURT:  Can you hold on one second, sir?

Could I have a conference please?

(Sidebar discussion.)

THE COURT:  So unless the defense is not objecting and waiving the issue, the ruling on Docket 262, like the first trial, indicates that testimony from Marshall regarding development of the FMD, fire management nozzle, will be significantly limited.  The FMD has very limited relevance to the issue here because this development took place after the design date of the canister in this case.  And, in addition, the manufacturer spout had been removed from the canister and replaced with a generic spout.  So that was my ruling.

Does the defense not wish to raise the objection?

ATTORNEY WATKINS:  I do raise the objection and move to strike the last answer.

ATTORNEY DESROCHES:  Your Honor, if I may?  I was simply setting up the conditions that existed prior to the FMD with this question.  With this question I was not intending to get into the development or the cost associated with the development of the FMD.  I think the witness may just thrown that in there.  I will, if I am allowed, direct the witness to the conditions that led up

to the need for the FMD, which would be relevant to the canister in this case, PX-1.

THE COURT:  I think at best you can introduce a very small part of evidence on we saw a need to develop something with a nozzle to stop air flow, but that would be about it.

ATTORNEY DESROCHES:  Okay.  I think that was generally my intention, Your Honor.

THE COURT:  Okay.  Fine.

(End of sidebar discussion.)

THE COURT:  Ladies and gentlemen, for the last question, the last question and series of answers from this witness regarding something he was talking about a nozzle and talked about something called FMD, that is stricken.  All right?  Erase it off your notes and erase it from your consideration.  We may circle back around with different questions that might touch upon that issue, but those specific answers are stricken.  All right.

ATTORNEY DESROCHES:  Thank you, Your Honor.

Q.  (By Attorney Desroches) Now, Mr. Marshall, in your product development did it become important to you to prevent a source of ignition from entering a fuel can?

A.  It certainly is.

Q.  And why was it important to you to prevent -- to create a product that would not allow for a source of

ignition to enter the can?

A.   So just talking about a gas can for a second, so these are on a first appearance a basic plastic can. You'd think it's like a plastic jug of anything, right? But it's not.

We're designing products that have to meet a number of government regulations.  There's about five different requirements on the product.  The can itself is made of five layers of material, multiple spouts, warnings, labels.

We do so to make it safe so that any -- when used properly, our cans are safe.  But there are instances where it can be used improperly or accidentally that it might be a dangerous product.  So we are doing everything in our power to prevent that product from becoming even when misused safe.

THE COURT:  You said that you used five layers, can you explain that?

THE WITNESS:  Sure.  So we have a multi-injection, a multi-layer molding machine.  What ends up happening is if you were to slice the gas can in half and you were to look at the thin layer of walls, you'd would find resin.  You'd find adhesive.  You'd find  a barrier layer of more adhesive and you'd find more plastic of different types.  All those materials are designed such

to prevent your can from keeping all the vapors inside.

If you're at home in the wintertime and you see your gas can shrink up a little bit and you think why is it doing that? Well, it's because it's very much a -- it's a locked system. That barrier layer inside the can shrinks the can. Or in the summertime why does it expand out? It's because the vapors inside are started to expand and that can contains it.

ATTORNEY DESROCHES: May I proceed, Your Honor?

THE COURT: I have one more question.

Do all of the cans, blue, yellow, and red have that same multi-layer manufacturing system? Or does like, for example, the kerosene have a different layering barrier?

THE WITNESS: No, they're all constructed mechanically exactly the same. It's a color difference and a couple of markings on the outside of the can would be different.

THE COURT: Okay. Thank you.

ATTORNEY DESROCHES: Thank you, Your Honor.

Q.    (By Attorney Desroches)  Mr. Marshall, you explained that it was important to keep a source of ignition outside of a can.

Have you in your experience observed what happens if a source of ignition enters a can?

A.    Correct. I've seen situations both where accidental

misuse have caused explosions and we've also done testing on our devices. So I have videos, you know, in a safe environment and see how they react to flames introduced to the can.

Q.   And are you familiar with the term of jetting?

A.   I am.

Q.   What is that?

A.   So jetting is a situation in which under the right circumstances, under the right amount of fuel and air --

ATTORNEY WATKINS:  I'm going to object at this point, Your Honor.

THE COURT:  Can you give me an offer of proof?

ATTORNEY DESROCHES:  Yes, Your Honor.  I would expect -- sorry.

(End of sidebar discussion.)

ATTORNEY DESROCHES:  Your Honor, I expect that this witness will testify that, as he said, he has seen what happens in his experience as a product development engineer, what happens when a flame can enter or a source of ignition can enter a gas one.  Of those consequences is fuel jetting, which is fire jetting out of a fuel canister.  That he has observed it specifically and it is a potential consequence of a source of ignition entering a fuel can.

THE COURT:  So will he be testifying about this

concept of jetting?  How the flame enters the container? I know you said jetting means flames are coming out.

ATTORNEY DESROCHES:  Right.  So the jetting is the result of a source of ignition entering the canister.

THE COURT:  Somehow.

ATTORNEY DESROCHES:  Correct.

THE COURT:  Okay.  And your objection is that this is beyond his expertise?

ATTORNEY WATKINS:  Correct.  It's certainly beyond a lay witness expertise.  That was the court's ruling before.  So I have not prepared for this kind of what I believe is expert testimony where he's now relying on experiments and studies.  Here it's beyond the scope of what the court was anticipating here in its ruling.

THE COURT:  Okay.  Well, Docket 262 clearly does indicate that the court will not need to conduct a separate hearing regarding expertise issues to be testified if it was sought to testify as a pure expert with this witness.

I am completely satisfied from what I know about this witness from his direct and cross-examination at the last trial, the submissions in this case regarding him that he would be qualified to testify as to this jetting as was noted and just explained to me by Attorney Desroches.  So

objection overruled.

ATTORNEY DESROCHES:  Thank you, Your Honor.

(End of sidebar discussion.)

Q.    (By Attorney Desroches)  So, Mr. Marshall, I had asked you to describe what jetting is.

A.    Okay.  So jetting is the situation -- and it's one of two that we have tried to avoid at all costs, which is if the right amount of fuel and the right amount of air exist in a container at a certain time and a source of ignition is provided into that environment, the source of ignition, the flame can jet -- not jet.  It can propagate into the can and that can then effectively will allow the container to become in one of two situations, two nightmare scenarios:  One is jetting and one is explosion.

Jetting is when the fire then will ignite inside the can and then jet back out almost a little bit like a flamethrower coming out of a can and become very dangerous.

Say someone was nearby or someone is putting out a fire and it would shoot out and maybe burn someone across the way.  So it's an incredibly dangerous situation.

Q.    Mr. Marshall, now drawing your attention to Scepter canisters that were being manufactured in 2017 --

A.    Correct.

Q.    -- were there any special safety features at that

time?

A.   So in 2017 we had four different sets of standards that we were required to put as part of our containers. The first would be as related to our what's called F852 standard. That's having to do with structure of the can, how strong it is. When you drop it from out of your vehicle, in our case 6 feet, we drop a full five-gallon container and make sure it doesn't bust. How strong is it?

The second is 839, which gets around all the warnings and the markings and the colors that are involved in the containers. So those are two distinct set of both warnings and safety standards.

The third is around emissions. So in 2009 carb EPA initiated a number of standards that has to do with the multi-layer construction I talked about, spouts that also keep the vapors inside and keep a sealed system.

And the fourth is child safety. The CPSC, the Children's Burn Prevention Act, requires us to have both auto locking and auto shut off features. That's kind of the reason that for a long time people were a little bit frustrated with their gas cans because of the extra steps you have to go through to pour your gasoline. It's all mandated by law. We're getting better at designing products that keep those standards and make them easier to

use, but that's where those four standards are involved in.

Q.   So is it possible to bypass those safeguards that were on the cans in 2017?

A.   Not when used properly.  When used improperly, if you were to remove one of those devices, say remove the spout from the system or you would remove, you know, a child lock off the collar or remove any piece of that system, you wouldn't have a complete system.

Q.   So, Mr. Marshall, I'm going to draw your attention to the floor of the witness stand.  Do you see an item there?

A.   Yes, I do.

Q.   If you could please, if you want to use a glove?

A.   Yeah.

Q.   If it doesn't fit, you can maybe just --

So for the record on the witness stand now is what has been introduced and marked as PX-1.

Mr. Marshall, do you recognize what this item is?

A.   I do.

Q.   And what is that?

A.   It's a Scepter dieseal fuel container.

Q.   Now, how is it that you're able to identify that as a Scepter dieseal container?

A.   A number of markings on the particular product.  This one has a label on the front that identifies Scepter.

It's got molded in markings on the bottom that identifies Scepter. I, of course, recognize the shape of our product. It's got markings on the collar as well that say Scepter, the cap that is.

Q. You previously testified about warnings that were unique to Scepter. Do you see warnings on this can?

A. They are Spanish on one side and English on the other.

Q. Now are there warnings both required by law and that are offered by Scepter uniquely on this can?

A. Correct.

Q. Drawing your attention to the warning that begins with the word "vapors," do you see that?

A. Yes, sir.

Q. Can you read that?

A. "Vapors can explode when ignited by a spark or a flame."

Q. Is that one of the warnings required by the government or one that is offered by Scepter uniquely?

A. It's required by 839; it's required.

Q. What is an example of one of the warnings that is offered by Scepter uniquely?

A. So I think I mentioned this a little earlier, the one that says "do not smoke when using container" is not required by law, but it lines up with a source of ignition

and so it's just good advice.

Q.    Can you determine based on your review of this item where it was manufactured?

A.    I can.

Q.    Where was it manufactured?

A.    This was manufactured in Miami, Oklahoma.

Q.    How do you know that?

A.    Scepter manufacturers its products in two locations, one is Miami, Oklahoma and the other is in Scarborough, Toronto -- Scarborough, Ontario near Toronto.

I can tell from both the labeling, the marking on the bottom that says made in the U.S. and Scepter USA, and also the size of the can.  A lot of our cans in Canada are very similar sized, but we use a 20 litter in Canada and a -- which is 5.3 gallons and we use an 18.8 litter, a five gallon in the U.S.  So all markings suggest this was made in Oklahoma.

Q.    Now are there any items on PX-1 that are not original to it?

A.    Sure.  The spout on the end of it is not a Scepter spout.

Q.    Based on your training and experience are you able to identify that spout?

A.    I had looked at this a little bit earlier.  It's hard to read now but it says Rubbermaid on the side of it.

Q.    Rubbermaid, are you familiar Rubbermaid as having made components of fuel canisters?

A.    Rubbermaid more than ten years ago used to make gas cans as well.

Q.    Based on your review of the nozzle in this can, were you able to make any other conclusions about it?

A.    It's two things I guess.  Number one, it's broken. You can tell by the length of it and frays on the edge that this would have been a much larger spout to begin with.  I can also tell you it's from 2009 or earlier.

Q.    How do you know that is from 2009 or earlier?

A.    So in 2009 that's when the carb EPA emissions I discussed earlier came into play.  At the time the manufacturers removed two elements of the cans.  They got rid of the kind of simple spout that had no auto closing feature and we also got rid of a vent on the back of the can.

Q.    You indicated that it looked broken.  How long originally would that nozzle have been approximately?

A.    Six or seven or eight inches at least, probably out to about here would be your typical easy to pour length.

Q.    Does the length of that make that -- effect the safety of it at all?

A.    It should not.

Q.    Based on your review of this container, specifically

the collar, are you able to determine where the collar was manufactured?

A.   Yeah.  So I know these are Scepter products on the top and I know we've only ever manufactured the collar and the child safety ring, at least on this generation of products, in Scarborough, Ontario and they were shipped to U.S. to manufacturer.

Q.   You indicated previously that the misuse of a container could potentially affect the safety of that container; is that a fair and accurate --

A.   Yes.

Q.   -- representation of your testimony?

A.   Yes.

Q.   Does this canister as it sits in front of you represent proper use or misuse?

A.   It could represent potential misuse.

Q.   How is that?

A.   So what you don't have on this particular feature is the auto closing child safety features on the top.  So two of those safety standards are being defeated by this particular use of this spot.  The third one I told you about was emissions.  These cans and the reason they expand and contract has to do with those vapors.  The can in this position if it was full of fuel would have vapors wafting out of it.  It would be open and those fumes would

be coming out of it.

Think of -- this is hard for folks that don't get around gas and I like to educate when we're doing this because gas vapors are a lot like dry ice in terms of how heavy they are and they waft, but the only problem is they're invisible.  So while this would be standing open and full of fuel, just imagine vapors like your dry ice would be just wafting out the side and filling the ground and creating a condition where those vapors could be dangerous.

So if it's not -- if you're using a spout that's open like this, you're going to continue having those fumes coming out versus being locked in the can and shut off.

Additionally without the more current spout on there and the child safety features that CPSC mandates today, when you're done using your gas can it shuts.  This can would not shut.  It stays open, and so those two safety features are not present in the container in its current configuration.

Q.    So is there anything on this can that would prevent the introduction of a source of ignition into it?

A.    No.

Q.    Based on your examination of this device, is that container safe?

A.    I'm going to parse my words here a little bit because

I'm in the business of making gas cans, right?  Our cans are all safe when used properly but this could be misused.

Q.   Is that nozzle misuse?

ATTORNEY WATKINS:  Objection.

THE COURT:  Basis of the objection?

ATTORNEY WATKINS:  I think asked and answered here.

THE COURT:  As to the objection overruled.  Go ahead.

ATTORNEY DESROCHES:  I can rephrase the question.

THE COURT:  The same question.  Is the nozzle misused?

THE WITNESS:  This is not the proper safe nozzle on the can.  I don't know intent.  So misuse is intent sometimes and so I can't tell you it's being misused.  I can tell it's not as safe as it should be.

ATTORNEY DESROCHES:  I'm going to ask Ms. McKenna to place PX-9 which is in evidence so it may be published.

Q.   (By Attorney Desroches)  Is it on your screen?

A.   It is.  That's the picture of the can.

Q.   Do you recognize that picture of the -- do you recognize the can that's in this picture?

A.   It appears to be the same can that's on the desk

here.

Q.    Now do you see -- drawing your attention to the nozzle, can you describe whether or not this represents safe use of this can?

A.    There's certainly something in the side of the can that wouldn't prevent vapors from being contained and might -- I don't know, it's hard to tell exactly what that is.

Q.    So you're saying that would not prevent vapors from escaping?

A.    It absolutely not prevent vapors from escaping.

ATTORNEY DESROCHES:    Now I'm going to ask Ms. McKenna to go onto Exhibit No. 69.

Q.    (By Attorney Desroches)    Mr. Marshall, do you recognize the two cans that appear in Exhibit PX-69?

A.    I do.

Q.    And what are those cans?

A.    They appear to be a Midwest and a Blitz fuel container.

ATTORNEY DESROCHES:    Now may I have Exhibit No. 70?

Q.    (By Attorney Desroches)    Do you recognize the can that's depicted in Exhibit No. 70?

A.    I do not recognize it.  I recognize it's a gas can. I recognize that it's pre-2009, but I do not know -- I

can't tell from the image or the picture of the markings who would be the manufacturer.

Q.   You indicated it was pre-2009.  How do you know that?

A.   As I mentioned a little bit earlier, the two things that changed in 2009 were the elimination of an open spout and the air vent on the back of the can.  So that air vent on the back of the can, which you see the very far side there where the mouse is at, that's a little air vent that helps the cans flow a bit nicer.  That was eliminated in that generation of products.

Q.   And can you remind the jury what is the time period that the nozzle on this canister was made?

A.   This particular container would also be 2009 or earlier.

THE COURT:  Wait a minute.  When you said this nozzle, he was pointing to the Rubbermaid nozzle?

THE WITNESS:  There's no nozzle in that image.

THE COURT:  Can you straighten this out?

ATTORNEY DESROCHES:  I will.  Thank you, Your Honor.

Q.   (By Attorney Desroches)  So referring your attention to PX-1, which is the can on the witness stand, what is the time frame that that nozzle would have been manufactured?

A.   That Rubbermaid nozzle would have been in 2009 or

earlier.

Q.   So, Mr. Marshall, I'm just going --

          ATTORNEY DESROCHES:   May I approach the witness,
Your Honor?

          THE COURT:   Yes.

Q.   (By Attorney Desroches)   I'm going to hand you what's
been introduced as PX-2.  Do you recognize what that is?

A.   I do.

Q.   What is that?

A.   That is a Scepter carb EPA G-4 spout.

Q.   When did Scepter begin to manufacture that particular
spout?

A.   This specific generation of product would have been
roughly 2014, 2015.

Q.   Would that have been on a can like PX-1?

A.   It would be on a can like PX-1 but I can tell it
wasn't from PX-1.

Q.   And how can you tell that?

A.   A couple things.  Number one, the image of this label
on the front I know the generation of when this product
was made.  There's a different spout image on the front
and so a very similar performance.  It's very similar
function, the same child safety features.  It's just a
different design.

          ATTORNEY DESROCHES:   Now I'm going to ask Ms.

McKenna to place 61.  For the record PX-61 is now being displayed.

Q.  (By Attorney Desroches)  Mr. Marshall, do you recognize the gas can in this photograph?

A.  Sure.  PX-61 that container, not the red and clear spout on the end but that container is one of Scepter's containers but the spout is not.

Q.  So the spout that's laying on the ground with a number one next to it, is that the same item that's in front of you or does it appear to be the same?

A.  It appears to be the same.

Q.  Now, you said that that red can was a Scepter can, correct?

A.  Correct.

Q.  Would the yellow spout with number one fit on that can as well?

A.  It would and most likely does.

THE COURT:  Would or would not?

THE WITNESS:  It would fit.

Q.  (By Attorney Desroches) Would that nozzle also fit on PX-1?

A.  It would.

ATTORNEY DESROCHES:  Thank you.  No further questions.

ATTORNEY WATKINS:  May I please have my screen?

**CROSS-EXAMINATION**

Q.   (By Attorney Watkins) Starting with PX-61 -- oh, good morning, Mr. Marshall.

A.   Good morning.

Q.   Starting with PX-61 that Mr. Desroches just had on the screen and is up there now, looking -- you told us that that nozzle that's identified as number one is not sold with that can; is that correct?

A.   With?

Q.   That can, the one that's with you at the witness stand?

A.   The one labeled number one on this picture with Exhibit 1 over here?

Q.   Yes, they were sold together?

A.   They were not sold together.

Q.   Conversely, the nozzle that you see there would have been sold or could have been sold with that red can that was there?

A.   Yes.

Q.   And so, for example, well, it could have been sold with that red can?

THE COURT:   Could I ask for clarification of that?  If we're looking at PX-61 on the screen, you're saying the marker on the porch, number one next to the yellow nozzle, could have been sold with the red gas

container also on the porch that has the word gas written on it in Sharpie, those two things could have been sold together?

THE WITNESS:  That's a very likely scenario those two -- we sell that combination today.

THE COURT:  Okay.  So you previously said kerosene, dieseal, and gas are all distinguished by colors so you sell -- that doesn't apply to nozzles?

THE WITNESS:  It does not.

THE COURT:  A yellow nozzle could be used for gasoline, kerosene or --

THE WITNESS:  Correct.  The color mandate is for the body of the container, not for the spout color.

THE COURT:  All right.

Q.   (By Attorney Watkins)  And so just to reiterate, very likely this item number one sold with this gas can that is on the porch there?

A.   I would say so.

Q.   Just a moment.

Exhibit 70, PX-70 which I put there on the screen --

A.   Yes.

Q.   -- you identified item Number 12 in this screen as --you don't know what kind of gas can it is?

A.   I was presented this picture earlier and I was not in the industry back in 2009 so I don't have as much

familiarity.  I went and looked for this image.  I can't tell you who made this can.

Q.    You certainly can't tell us that it was Rubbermaid that made that can?

A.    I can't tell you.

Q.    You have no idea?

A.    No, and I tried to find out.  All I can tell you is it's 2009 and earlier and that's about all the information I get with it.

Q.    Now PX-1 that you have in front of you, that nozzle there you talked about it being broken off, right?

A.    Correct.

Q.    And not a clean cut?  Nobody took a hacksaw to it to try to lower it down?

A.    It doesn't appear so, but I can't tell you for sure.

Q.    And it's not fresh?  It's been that way for some time?

A.    There's abrasions on it; it looks that way.

Q.    I'm sorry?

A.    There seems to be abrasions and use and dirt.  Yeah, it looks like it's been that way for a while.

            ATTORNEY WATKINS:  That's all I have.

            ATTORNEY DESROCHES:  Just one question.

**REDIRECT EXAMINATION**

Q.    (By Attorney Desroches) It appears as though the whole thing is covered in a dust; isn't that right?

A.    It does.

Q.    Including the nozzle?

A.    Yes.

ATTORNEY DESROCHES:  No further questions.

THE COURT:  All right.  Thank you, sir.  Have a good trip back.

THE WITNESS:  Thank you.

ATTORNEY DESROCHES:  Your Honor, at this time I believe, with the agreement of the parties, we request that you read the stipulations that have been submitted to the court.

THE COURT:  All right.  Do these include -- am I going to be repeating the stipulations that have already been read?

ATTORNEY DESROCHES:  I think just to be --

THE COURT:  I just want to know if they are in here?

ATTORNEY DESROCHES:  They are in there, yes.

THE COURT:  Okay.  All right.

So to begin with we remember what stipulations are, agreements between the parties that you can accept as true.  They're not challenged by either side so you can

accept the stipulations.  How much weight you decide to give them in your factoring in the deliberations is up to you.  All right, but these stipulations are accepted by both sides as evidence.

"Stipulation Number 1:  Regina Ellis who lives near the location where the yellow fuel canister was placed first observed the canister at approximately 8:30 a.m. on April 2, 2020."

On April 2, 2020 -- this is Stipulation Number 2: "On April 2, 2020, officers from the Longmeadow Police Department recovered a yellow diesel fuel canister.  It's been marked PX-1 and a charred paper pamphlet marked PX-3 from 780 Converse Street in Longmeadow, Massachusetts. The fuel container -- the fuel canister contained an unidentified liquid."

Now continuing with two.  2A is, "An officer from the Longmeadow Fire Department emptied the unidentified liquid from the fuel container and stored it in a secure location.  On April 13, 2020, a sample of that liquid was brought to the Massachusetts State Police Crime Lab Trace, Arson and Explosives Unit for analysis."

Section B of the second stipulation is "The Mass. State Police Crime Lab examined the yellow fuel container for fingerprints.  No fingerprints were found on the container."

Continuing with stipulation 2, Section C.  "On April 3, 2020, Longmeadow Police Department officers brought the yellow fuel container and the charred paper pamphlet recovered from 780 Converse Street to the Mass. State Police Crime Lab for analysis.

"Analysts at the Mass. State Police Crime Lab tested two samples taken from reddish-brown stains found on the pamphlet and one sample taken from the reddish-brown stain on the handle of the fuel can.

"Analysts at the Mass. State Police Crime Lab determined that all three reddish-brown stains were human blood.  Analysts at the Mass. State Police Crime Lab then developed a DNA profile from the three bloodstains using the scientific techniques of DNA extraction, quantification, amplification, and detection."

Stipulation Number 2 Section D is "An analyst at the Mass. State Police Crime Lab swabbed the handle collar and spout of the fuel container.  Analysts then examined those swabs for the presence of DNA."

Stipulation Number 3:  "On April 15, 2020, a special agent from the Federal Bureau of Investigation took a buccal swab from the defendant John Michael Rathbun.  That swab was sent to the Massachusetts State Police Crime Laboratory which developed a DNA profile for the defendant from the swab using the scientific techniques of DNA

extraction, quantification, amplification, and detection."

Stipulation Number 4:  "Massachusetts does not produce crude oil or refine it.  Any gasoline used in Massachusetts was brought into Massachusetts from out of state."

Stipulation Number 5:  "Government Exhibits PX-74, PX-75, PX-76, PX-78, and PX-110 consist of cell phone records from Verizon wireless for telephone number 413-636-4047.  These records are authentic business records from Verizon Wireless that meet the admissibility, the admissibility requirements of the Federal Rules of Evidence Rule 803(6)."

Stipulation Number 6:  "Government and defense exhibits PX-45, 46, 49, 50, 52, and 109 consist of excerpts from a digital image of defendant's iPhone.  That digital image is an accurate copy of the data on defendant's iPhone."

Stipulation 7:  "Government's Exhibit PX-88 consists of excerpts from a digital image of a laptop that belongs to Sheila Rathbun.  That digital image is an accurate copy of the data on the laptop."

Stipulation Number 8:  "Government Exhibits PX-91, 92, PX-108 are synchronized recordings and transcriptions of portions of consensually recorded telephone conversations in which the defendant participated.  These

recordings are accurate copies of those consensually recorded telephone calls and the transcripts are accurate transcripts of those recordings."

Then it indicates "These stipulations may be read to the jury and introduced as evidence," and it's signed by the two defense counsel present in this case and the two assistant United States attorneys in this case. This will be introduced or already is. Is this already in evidence?

ATTORNEY DESROCHES: It is now, Your Honor, by agreement.

THE COURT: This is by agreement and is being introduced into evidence, PX-142. So you will have this in the jury room.

**(Exhibit PX-142 admitted.)**

ATTORNEY DESROCHES: Your Honor, the government rests.

THE COURT: I just want to maybe triple check at this point. There were -- I'm having a hard time remembering exactly what they were, but the other stipulations that we talked about during the trial, those are included on this piece of paper?

ATTORNEY DESROCHES: Yes, Your Honor.

THE COURT: Okay. Very good. The government rests.

ATTORNEY WATKINS: There will be a motion by the

defendant.

THE COURT:  All right.  Do you want to be heard on WhisperTech or would you like to be heard?

ATTORNEY WATKINS:  I leave it to the court how it wishes to proceed.  It could be five minutes or so.

THE COURT:  All right.  Why don't we take a break.

CLERK RIVERA:  All rise.

THE COURT:  So as you know by now five minutes in court speak could mean 15, 20.  Who knows?  So the same rule applies.  Don't talk amongst each other about this case and all the other rules apply.

**(The jury left the courtroom at 10:04.)**

THE COURT:  We'll be back in a couple of minutes, all right, and we'll do the argument.  All right? Everyone can take a five-minute break.

ATTORNEY BRESLOW:  Thank you.

**(A recess was taken at 10:05 until 10:15.)**

THE COURT:  Okay.  Attorney Watkins.

ATTORNEY WATKINS:  Your Honor, the defendant would make a motion for judgment of acquittal pursuant to Rule 29.  We have talked about these issues quite a bit at length so I'm going to be brief.

We believe the evidence has failed to support the conviction for the nature of the device, the fuel

canister, under either 18 U.S.C. 1844 or 18 U.S.C. 2325. The fuel canister as left there at Converse Street does not constitute an explosive device or an incendiary device as defined under either of those statutes. Again, we've gone at this at length. It would be the same arguments I made at the first trial and the court did deny it there.

Similarly, the second issue is that the government has not proved Mr. Rathbun's intent or really the intent of anybody to cause damage or property at the end of the -- damage, injury to property or persons or intimidation for that matter.

All that the government has shown is a fuel container with the wick and the nozzle at that location at JGS. That standing alone, we would submit, is insufficient to get them to what they need to do, which is the specific intent to cause specific injury and harm to inflict harm.

Third --

THE COURT: Well, adding to that analysis you said fuel container, wick, and nozzle, and the wick itself, I think it's important to say the wick was charred.

ATTORNEY WATKINS: That's what the evidence would show is the wick was charred. What was the court's question?

THE COURT: Nothing. I just thought it was

important to include in my consideration that the wick was charred.

ATTORNEY WATKINS:  That's true.  That is the evidence before the court.

Third and related, and this is new, where the government is arguing at trial now that Mr. Rathbun could be hallucinating or was out of his mind on drugs.  They have undermined that specifically as to Mr. Rathbun his specific intent to intimidate, injure, destroy property, all the things that the statute requires.

Indeed, if Mr. Rathbun was hallucinating, was out of his mind, then he was incapable of forming the specific intent required under the statute.  So for all of those reasons, Your Honor, I would ask that the court enter a judgment of acquittal as to both Counts 1 and 2.

THE COURT:  All right.  Thank you.

Government.

ATTORNEY BRESLOW:  Well, Your Honor, this has been extensively argued in the first trial so I'm not going to belabor the court's time.  But I do want to add just at the beginning the standard, which is the defendant has to show that the evidence presented at trial even when viewed in the light most favorable to the government did not suffice to prove the elements of the offense.

Secondly, the government has -- the judge, Your

Honor, must resolve all evidentiary issues in favor of the government, all credibility issues in favor of the government, and can consider circumstantial evidence.

With respect to the two arguments, the device not constituting an explosive device, Dan Marshall testified just now that the device could lead to two nightmare scenarios, the first being an explosion and the second being fuel jetting, which he described as incredibly dangerous.

With respect to intent --

THE COURT: I do note that the incendiary or explosive nature of the device and I agree that was Mr. Marshall's testimony, there is some level -- I guess it's up for argument as to how much level, but some level of common sense understanding regarding gasoline, gasoline vapor, flammability, the explosive nature of that as well.

ATTORNEY BRESLOW: Right. One doesn't have to be an engineer or vice president at Scepter to understand that if you introduce an ignition -- a source of ignition into a gasoline container with an open spout that something bad could happen. And, in fact, that's exactly what the dieseal fuel container warning labels say.

THE COURT: So moving onto the next, the next component of Attorney Watkins' argument.

ATTORNEY BRESLOW:  Right, intent.  So the first thing I'll note is that the intent can be inferred from the device itself.  So the device itself consisted of a dieseal fuel container filled one third with gasoline with a Christian religious pamphlet that as Your Honor noted was charred, stuck into an open nozzle, and placed outside a Jewish nursing home complex near to, as Chaim Kosofsky and other witnesses described, a heavily traveled sidewalk, a heavily traveled entrance route to the nursing home complex, and a heavily traveled road.

So I think from those circumstances alone one can infer the intent to damage property, injure people, or intimidate any other person.

The last argument or the last piece of that argument as I understand it is that the defendant was so intoxicated on the evening of April 2nd -- I'm sorry, the early morning hours of April 2nd that he could not have formed the specific intent to do those things that I just mentioned.

I don't know if the defense is conceding now that it was the defendant who placed this device but he just didn't have the proper intent to do so.  But as to that, the government's evidence, including the forensic activity of the cell phone and the interview that Special Agent McGonigle conducted of the defendant establishes, first,

that the defendant had a clear mind that morning.

He was texting in lucid sentences with a number of people.  He was operating a vehicle.  He was sending and receiving phone calls.  He drove apparently along a very busy route, including I-91 and I-291 in Springfield.  And the interview established that the defendant, although he may have used drugs around that period of time, was not so out of his mind that he couldn't have remembered placing the device.  That was I believe a specific question that Ryan McGonigle asked him and he said no.  And so by the defendant's own words, he was not so out of his mind that he could not have formed the intent to do so.

THE COURT:  All right.  As an aside note, the intent issue and the effect on intent of intoxication and the admissability and the testimony of the hotel and all the drugs that I took and I thought I saw people in my van, it's a little bit perplexing about the introduction of that evidence and what it's to be used for and the government wanted to use it to show intent and the defense tactically resisted even though it could have been developed as an intent that would have gone to a direct element, and so it's just interesting how I watched this.  It developed in an interesting and unique way.

It didn't really play out as much as I anticipated it would be given all the kind of build up, but at any rate

the motions brought by the defense under the applicable standard and rule are denied.

I think there certainly is sufficient incendiary and explosive device evidence from both Marshall and applying -- the witness Marshall and applying common sense.  There is a fuel canister not only with a wick but a charred wick, clearly an inference being that it was lit for a reason -- that reason to transport heat, a heat source, an ignition source inside a nozzle which was cut; a cut nozzle which had no blockage between the nozzle and the inside vapor or actual fuel.  It was a nozzle that went straight through to it, and this wick that was charred was pushed into that nozzle and lit to cause the charring, part of it.

On the issue of the intent, the transporting and receiving or attempting to transport or receive an explosive, the government must prove the defendant did so with knowledge or intent that what he was possessing was an explosive device and with knowledge or intent that it would be used to kill.

I do not think the evidence here, although we have evidence of prior drug use and prior hallucination, there was no evidence of there being a hallucinary -- a hallucinogenic type state that the defendant was in on this specific day, and that statute talks about knowledge

or, the word or intent.

And looking at the device, the placement of the device with a rolled up wick, rolled up -- a pamphlet rolled up in a way that would fit rounded inserted into a nozzle that was on that can, not the original nozzle from the can, but a nozzle that went straight through it.  It had an opening, and then lighting to show charring on the wick, you know, those actions themselves defy being in a hallucinogenic state or an unknowing because it's knowledge or intent.  You know, the lighting of that pamphlet placed the way it was as I just described in the light most favorable to the government defies a lack of knowledge or intent.

On the charge of damaging or destroying or attempted to damage or destroy buildings and real or personal property, it's the defendant maliciously attempted to damage or destroy.  So the question is if the defendant acted maliciously, which I take it to be for purposes of this standard acting in a deliberate way understanding harmfulness and, you know, kind of wrapping up all my previous comments and viewing this in the light most favorable to the government, the state of that charred wick and the placement, a busy street not only near homes but near a facility where a number of people work and live, the JGS facility, so the motions at this stage are

denied.

ATTORNEY WATKINS:  Your Honor, given both the government's comments here and the court's comments, I'm now moving to strike the bad act evidence that was admitted through Dana Graham and to a certain extent through Alfie Alschuler.

The government has now backtracked on its reason why that was -- the reason why it was allowed to be admitted. The idea was state of mind and intent.  The government is now arguing -- and specifically the out of the mind on drugs and specifically hallucinating when he uses drugs.

The government now is saying none of that actually occurred on the morning of April 2nd which brings to mind why did we admit that evidence?  So I am asking now for that evidence to be stricken and at a minimum that the jury be instructed that that was erroneously admitted and that the jury must put it out of its mind.  But, of course, that is one of those things that having come in, how does a juror undue what they heard?  And so for that reason I'd actually move for a mistrial at this point.

THE COURT:  Well, I do think my ruling -- Maggie, can I ask you for the number ruling on that?  Hang on one second.

I'm putting together rulings from the first trial and this trial starting with a ruling from the first trial.

It looks like in Docket 115 that says -- it references the reasons discussed in court, but indicates the government is allowed to introduce for context evidence of the defendant's heavy drug use, job loss, depression.

And the court has generally found that context, that is the state of defendant's life at or around -- in this case it's around the time of the crime -- would be relevant to his state of mind as that relates to the thought process required to commit this type of crime.

When you're talking about the thought process, you're not only talking about the thought process of do I have the intent and knowledge about what it means to put a pamphlet and light it -- and char it to try to light it and shove it in a gas nozzle, you're talking about the state of mind of where an individual might be in their lives to make such a bad decision, a decision so inconsistent with public safety.

But certainly I'm not missing what you're saying, Attorney Watkins. The build up, the monster build up leading up to this about all that prior activity just didn't pan out at trial, but I've given limiting instructions already when it came in and I'm going to give limiting instructions in the final version.

ATTORNEY WATKINS: Judge, I would direct the court to the court's order in 266 which was specific to

this trial.

THE COURT:  All right, 266.  Go ahead.

ATTORNEY WATKINS:  266 was the specific acts which were new to this trial.  Well, we objected to the context evidence at the first trial and the court ruled.  This was a different kettle of fish, if you will.  That we all agreed this was 404(b) evidence but we weren't talking about context anymore.  We were talking about specific acts of Mr. Rathbun.

THE COURT:  Fair enough.

ATTORNEY WATKINS:  That was the 404(b) analysis.  Well, the court can read its on rulings, but just reading through it now, none of it applies given what the government just said.

THE COURT:  Because you're saying 266 ruling was given what the government's showing was and the government's argument, 266 ruling was that -- we're talking about the incident at the motel, during the incident defendant was known to be using cocaine and Xanax and his observed behavior sheds light on the state of mind he can be in when under the influence.  Right.

ATTORNEY WATKINS:  That's right.

THE COURT:  And at this point we have no evidence that he was under the influence.

ATTORNEY WATKINS:  The government is no longer

arguing that.

THE COURT:  We have no evidence that he was under the influence, except we do have these text messages about him going to get drugs and using drugs in the days and perhaps morning of.

ATTORNEY WATKINS:  That is correct, but that is not the issue here.  It is the state of mind at the time.  The government can't have it both ways here to say that he was lucid enough for you to convict but he was not lucid enough that the jury can consider that he was in a hallucinogenic state at the time that this crime committed.  404(b) requires that special relevance to the crime here.  It's not context.

THE COURT:  Right.  I get you, good argument.  But the thing is, there is this evidence of looking for drugs on or around the time of this exact crime.  Inferences are allowed as to using drugs.  And when we're talking about intent, we're not only talking about I am so hallucinogenic that I just don't even know what I'm doing.  That's one thing.  That might go to a specific intent.

We're talking about my ability to make good decisions or completely preposterous decisions, short of being totally hallucinogenic just not making good decisions.

ATTORNEY WATKINS:  The difficulty here -- I don't want to keep beating a dead horse is now we're

talking about propensity, closer to propensity rather than a specific tie to the elements of the offense which is what 404(b) requires. It is context doesn't cover it. It has to be that special relevance to that particular time. I've made my argument.

THE COURT: Again, good argument. I really appreciate and I enjoy the intellectual legal argument back and forth. I really do.

So I'm viewing this as making the decision -- you know, looking at whether or not you're intentionally or knowingly doing something. It is relevant, your state of mind and what is going on in your mind. Whether it's -- whether it's stress, whether it's illness, whether it's mental illness, whether it's emotional trauma, whether it's alcohol intoxication, whether it's drug intoxication, all that is relevant in determining whether or not someone could have a state of mind to knowingly or intentionally do something.

Now, of course, within knowing and intentionally is the far extreme of I'm hallucinating; I have no idea what I'm doing. But, you know, when you back off, there is a much broader application of intent, intentionally and knowingly. An argument really well made and kind of developed throughout the litigation, but I'm not going to find that it's going to -- well, I should let the

government argue.  But so far I'm not convinced, Attorney Watkins, but I would like the government to make a record.

ATTORNEY BRESLOW:  Well, no, I think you're absolutely right.  And unless you have questions, I don't think anything further need be said.

THE COURT:  All right.  There we go.

ATTORNEY WATKINS:  Judge, we'll have to address this at the charge conference.  I now wonder what the instruction to the jury is about how they evaluate that evidence.

THE COURT:  Well, I think we already have a version.

I don't know, do you have it in court, Maggie?  We can actually read the draft we are working on?

CLERK SOLAS:  I don't think we are ready for that.

THE COURT:  We're working on a draft.

ATTORNEY WATKINS:  I know that you are.  Well, with that, Your Honor, those were the arguments that I'm making on that.

THE COURT:  I appreciate the arguments.  The motions are denied.  All right.

ATTORNEY WATKINS:  Your Honor, just one more thing before we call in the jury.  I know the court didn't

intend this, but the court asked me how long I was going to be arguing and I said I could do it in five minutes if the court wanted to do it in WhisperTech.

When the jury left, the court talked about court time.

THE COURT:  I'll the take the hit on the amount of time.

ATTORNEY WATKINS:  I'd appreciate it.

THE COURT:  No problem.

ATTORNEY WATKINS:  This is a time during trial where I think the jury is really getting ready to hear the case, and I don't want to be --

THE COURT:  Got it.  I understand.

ATTORNEY WATKINS:  Thank you.

THE COURT:  Okay. Let's bring them in.

**(The jury entered at 10:41.)**

THE COURT:  Ladies and gentlemen, during that break was everyone able to follow my instructions, specifically not talk to each other about this case and was everyone able to follow all the other instructions?

All right.  Affirmative answer by all the jurors. They remain fair and impartial.  Everyone can be seated.

All right.  So, listen, when we left, Attorney Watkins had indicated that maybe five minutes he would need and that really was all he needed.  I needed more

time.  Issues came up that I needed to do.  I needed to walk back to my chambers, get on the computer, print out things and so it was me that was eating up that time, not the attorneys.  I just wanted you to know that.

All right.  Very good.  So the government has rested. That means it has called all the witnesses that it is going to call in its case-in-chief.

Okay.  Now, of course, the defendant -- the government has the burden of proof.  The defendant does not have to call any witnesses.

I turn to the defense and ask the defense, defense, are you calling any witness?

ATTORNEY O'NEILL-GREENBERG:  Yes.  We're going to call Sheila Rathbun.

THE COURT:  All right.

CLERK RIVERA:  Ms. Rathbun, please raise your right hand.

**Sheila Rathbun (Sworn)**

**DIRECT EXAMINATION**

Q.   (By Attorney O'Neill-Greenberg) Ms. Rathbun, could you just introduce yourself to the jury and just spell your last name for the record?

A.   Sure.  My name is Sheila Rathbun, R-a-t-h-b-u-n.

Q.   And, Ms. Rathbun, where do you live?  What's your address?

A.    My address is 20 Lori Lane in East Longmeadow, Massachusetts.

Q.    What do you do for work?

A.    Accounting.

Q.    And who do you live with at 20 Lori Lane?  Are you married?  Do you have children?

A.    Yes, I'm married.  I live there with my husband, Jeff, and John my son, and my granddaughter, Natalie.

Q.    Is your son living with you right now?

A.    I'm sorry?

Q.    Is your son John -- is John seated next to me?  This is your son?

A.    He is not at the house now.

Q.    Where is he living now?

A.    He is in a rehab program.

Q.    Do you have any grandkids?

A.    I have one grandchild, Natalie.

Q.    I'm going to ask you some more questions about your family in minute.  First, I want to jump to the morning of April 2, 2020.  First of all, do you remember that morning?

A.    Yes.  I'll never forget it.

Q.    Tell me why.  What stands out?  Were you going to work that morning?  What stands out to you?

A.    Yes, it was a work morning and I had just gotten up

and the dog started barking.

Q.    Let me stop you.  I'm talking about April 2, 2020.

A.    Oh, April 2nd that was a work morning also and I was getting ready to go to work, yes.

Q.    And did you get to work on time?

A.    Yes.

Q.    Was there any issue about getting to work on time?

A.    Yes.  I didn't have my car.

Q.    And why not?  What happened?

A.    John had asked to borrow it.

Q.    And what time do you usually leave for work?

A.    I usually leave about 8:15.

Q.    So when you were getting ready to leave, was your car there?

A.    No.

Q.    And so how did you get to work that morning?

A.    My granddaughter, Natalie, has a car and we asked if we could use hers and so my husband drove me in her car to work.

Q.    When you say we asked, you mean your husband and you?

A.    Yes.

Q.    And that's because John and your car weren't home yet?

A.    Right.

Q.    What time did you finish work that day?

A.    Probably about five.  I usually finish 5:15, 5:30.

Q.    And so how did you get home that day?

A.    By my van -- I'm sorry, not my van.  My SUV.  It had been returned.

Q.    So your SUV came -- who drove the car to come get you?

A.    My husband.

Q.    And he picked you up?

A.    Yes.

Q.    Then where did you guys go?

A.    Home.

Q.    And what kind of car do you have?

A.    It's a Toyota Rav-4.

Q.    So when your husband came to grab you and bring you home that day, where did you sit in the car?

A.    I sat in the front in the passenger seat.

Q.    And was your husband driving?

A.    Yes.

Q.    And while you're in your car, did you make any observations?  Did there seem anything out of the ordinary about your car?

A.    Nothing in the front, but in the back there was some stuff.

Q.    When you say the back, what do you mean?

A.    The back of the van you can lift up.  It's a

hatchback.

Q. What was in the back?

A. There was a tire, two pieces of picket fence. I think it was two pieces. Just some kind of random junk.

Q. Besides the junk in the back, did you smell anything strange in the car?

A. No.

Q. Did you notice any stains in the car?

A. No.

Q. Did you notice any blood in the car?

A. No.

Q. Were there any pieces of paper or pamphlets that you had never seen before?

A. No.

Q. When you were driving home with your husband, do you think you would have noticed these things or not?

A. Well, if there was a smell, I would think I would notice that. I keep my car really clean so I would notice that.

Q. So you would notice if something was different or out of place?

A. Yes.

Q. Now you said when I asked you about your kids, you said your son John is in a rehab right now, right?

A. Yes.

Q.    Did he before that -- has he lived with you before?

A.    Yes.  He was living with us before.

Q.    Okay.  About how long has he lived with you?

A.    It was a few years.

Q.    Then obviously throughout his childhood he lived with you?

A.    Yes.

Q.    And teen years as a teenager?

A.    Yes.

Q.    In the time that John has lived with you, do you know whether your son has struggled with an addiction to drugs?

A.    Yes.

Q.    Do you know when that started?

A.    When he was a teenager.

Q.    And do you know whether that's something that he still struggles with today?

A.    Yes.

Q.    Now, rewinding back to April 2nd again, April 2, 2020 --

A.    Yes.

Q.    -- did you have any concerns he was struggling with his addiction at that point?  Or I'll say did you have any concerns that he was struggling with his addiction that spring of 2020?

A.    Yes.

Q.    What made you think that or what made you have those concerns?

A.    Probably behavior.

Q.    Like what?

A.    He seemed depressed, kind of not communitive; spent time in his room, a lot of time in his room.  I could just tell he was not doing well.

Q.    Was he working?

A.    Yes.  He worked until March.

Q.    And how was your relationship with him at that time? Were you guys getting along?  Were you fighting at all?

A.    It was up and down.

Q.    When you say --

A.    We were up and down.

Q.    When you say up and down, just describe that a little bit.

A.    We would try to communicate.  I'm trying to find out what would happen and he didn't want to talk about anything.  And, you know, we just said, you know, well, you need to get out and get going and do things.  We were just letting him know we were definitely very concerned about him.

Q.    This sort of behavior you're describing, is it something you've seen before?

A.    Yes.

Q.   And when he gets like this and sort of struggling and depressed, does he ask you for money or is he more irritated with you?

A.   He does get irritated.  He would ask for money.  Yeah, it would just make it very difficult at home.  It was hard.

Q.   And how did you handle that?

A.   Well, we would try to support and be helpful but we were very careful.  It's not a good thing to give someone that has a drug problem obviously cash.  So he would ask but we always would say no, that's not a good idea.  We would support him in other ways.  We gave him a place to live.  We would buy groceries for the whole house including him.  We'd get him gas cards, sometimes cigarettes, things like that.

Q.   You mentioned that he had been working and he lost his job?

A.   Yes.

Q.   Once he lost his job, was he doing any other kind of work at all?

A.   He would do side jobs.  He'd get jobs where, you know, small electrical jobs or cleaning, clean out jobs, picking up trash.  Things like that.

Q.   Okay.  Kind of odds and ends things?

A.   Yes.

Q.   Ms. Rathbun, do you have any memory in March of 2020 of him doing any specific clean out jobs?

A.   Yes.  There was one particular one that I remember that he did and it was a very large job.

Q.   What do you remember?

A.   Well, I remember it was a large job because when his van, his work van came home, it was stuffed to the brim. It was just full and --

Q.   When you say full?

A.   The whole back of the van was full of junk.

Q.   Of junk?

A.   Yes.

Q.   Did you -- how do you know that?

A.   Because it couldn't close.  It was so much of it, the back of the doors weren't shut fully.  That he had one of those bungie things on it and he had trouble, you know, so that it was partially open.

Q.   You mean trouble shutting it?

A.   Closing it.  You couldn't close it because there was so much stuff in there.

Q.   Did you look and see what any of it was?

A.   Yeah, I did see -- I saw like plaster, wood.  There was metal.  There was stairs, a lot of like household junk stuff.

Q.   Do you have any memory of how long all that trash

stuffed in his van stayed there?

A.    It had been there for awhile.  It was at least a week, and I know he opened the doors because they kind -- his front doors because it got steamy and so I think there was a smell.

Q.    And then after about a week, how do you know it was gone?  You didn't see it anymore?

A.    Yeah, he got rid of it.

Q.    Ms. Rathbun, now I want to jump to another date about two weeks after April 2nd, April 15, 2020; do you remember that morning?

A.    Yes, I do.

Q.    Okay.  And what were you doing that morning?

A.    I had just gotten up and I was getting ready for work.

Q.    And did you go to work that morning or?

A.    No, I did not.

Q.    What happened?  When I asked you what happened, just what you saw and what you experienced what happened.

A.    Okay.  Let's see.  I had gotten up and the dog was barking.  He was barking like crazy and I didn't know why so I started to go to the kitchen door, which is our side entrance, and I couldn't quite see what but there was something outside.  And then they opened the door and --

Q.    Let me stop you right there.

When you say they opened the door --

A.   I didn't know who they were.

Q.   Okay.

A.   I didn't know who it was but they had large guns, and there were it seemed like there were thousands of them but there weren't.  But there was a bunch of them, and they were pointing at the door and they told me to get out and then they said -- but they wanted me to leash Tucker because they were afraid.  That's the dog.  So I leashed Tucker and I went out and there was people everywhere and they were --

Q.   Let me just stop you right there.

So when you said there were people at the door, do you remember how many?

A.   I think there were four.

Q.   Were they men or women?

A.   I don't know because they were dressed in gear so I don't know.

Q.   What kind of gear were they in?

A.   They looked like military.

Q.   When you say they had guns, can you just describe -- I don't need you to say what kind, but what did it look like?

A.   I don't know what kind.  It just looked like a big, big gun.  Probably a military-type gun I guess.

Q.    When you came to the door, where were they pointing the guns?

A.    At me.

Q.    And then once you came outside, what did you see when you came outside?

A.    There were, there were people everywhere in those dressed like military and there were other people out there with guns and then --

Q.    Let me just stop you there.

The people -- those people with guns, do you have a memory of where they were specifically?

A.    I think some were on our deck and then some were around the house.

Q.    How were they holding those guns?

A.    In position.

Q.    Position at what?

A.    At the door.

Q.    Okay.  So the door you came out of?

A.    Yes.

Q.    Do you remember how many -- just an estimate of how many people were out there?

A.    I'm going to say 15 to 20 altogether.

Q.    Then once you were outside, where did you go?

A.    They told me to go down off the porch to the right so I did.  I went off the porch to the right.

Q.   Was there anyone else out there with you?

A.   Yes.  They already had my husband.  My husband was out there.

Q.   And how long did you and your husband stand in that spot?

A.   Quite awhile because they still didn't have John or Natalie and they wanted to search the house.

Q.   Do you remember that morning anyone offering you blankets?

A.   I don't recall that.

Q.   Now at some point that day those people there, those were FBI agents, right?  Did you learn that at your house?

A.   Yes.  Eventually we put things together, yes.

Q.   Did those agents ask you questions at some point?

A.   Yes.

Q.   Did they ever ask you who was driving which car at your house on April 2nd two weeks prior?

A.   No.

Q.   Did they show you pictures of a yellow fuel can?

A.   Yes.

Q.   And did you recognize that can?

A.   No.

Q.   Ms. Rathbun, now I sort of want to switch over to a different subject completely.

     I want to talk about church a little bit.  Do you go

to church?

A. Yes, I do.

Q. What church do you go to?

A. Heritage Baptist Church.

Q. Where is that?

A. It's on Plumtree Road in Springfield, Massachusetts.

Q. And how often do you go there?

A. I attend church on Sunday mornings there.

Q. And besides attending church, do you have any other involvement in that church?

A. Yes, I do. Because of my accounting skills, I do the church books. I also do secretarial work for our pastor and I'm a Sunday school teacher.

Q. How long have you been doing those roles?

A. Probably over 30 years.

Q. How often do you teach Sunday school?

A. We have a rotation and so now I'm doing it once every four weeks.

Q. You've been doing that for 30 years?

A. Yes.

Q. Are you familiar with an organization called the Billy Graham Evangelical Association?

A. Yes.

Q. Why are you familiar with them?

A. A couple of years ago they came to our area to do an

event and my pastor was working with them on that.

Q.    And do you remember where that event was?

A.    It was at the Big E grounds in West Springfield, Mass.

Q.    And you went to that?

A.    Yes, I did.

Q.    Do you remember who you went with?

A.    I went with my husband.

Q.    And when you went to that event with your husband, what did you guys do?

A.    Well, we listened to -- they had music and then Billy -- I'm sorry, Franklin Graham spoke and that's about it.

Q.    Did you get -- did you buy anything?  Did you get anything there?

A.    No, we didn't buy anything, but I did get a -- I really wanted to get a T-shirt and I was able to.  I was very excited to be able to get that T-shirt.

Q.    What was the T-shirt?

A.    It was just a T-shirt that had the event, like a picture and the event on it.

Q.    Did you get anything else at the event besides the free T-shirt?

A.    No, I did not.

Q.    Do you remember specifically getting any pamphlets or books?

A.    No, I did not.

Q.    Apart from going to the Billy Graham event and getting the free T-shirt, did you do any trainings or volunteer work before that Billy Graham event like to help prepare for that Billy Graham event?

A.    I wasn't a volunteer.  What was the other thing you said?

Q.    Were you a counselor?

A.    No, I was not a counselor.

Q.    Were you volunteering or counseling in any way at that Big E event?

A.    No, I did not.

Q.    Ms. Rathbun, have you ever heard of or seen a religious pamphlet called *Steps to Peace With God*?

A.    Not until it was first shown to me at my house when they came to our house, and that wasn't -- that was just some pages.

Q.    Okay.  So you mean when they came to your house, what do you mean by that?

A.    When the FBI came to our house on April 15th.

Q.    They showed you pages?

A.    They showed us torn pages.

Q.    Okay.  And did you recognize those pages?

A.    I didn't recognize those pages, but I was familiar with the content of them.

Q.   And why is that?

A.   Because there's a lot of tracts like that.

Q.   Okay.  When you say tracts like that, what do you mean?  What's similar?

A.   They're -- yes, there are other similar tracts that say the same type of information.

Q.   Okay.  But as for like the formatting and the lay out, a red pamphlet that's called *Steps to Peace With God*, you'd never seen that before?

A.   No, I had not seen that before.

Q.   Okay.  And you never had one of those before?

A.   No, I never had one of those before.

Q.   At the beginning when I asked you what you did for work, you said that you were an accountant I believe; is that right?

A.   Yes.

Q.   Where do you work?

A.   Carr Property Management.

Q.   And where is that?

A.   24 Deer Park Drive in East Longmeadow, Mass.

Q.   How long have you been their accountant?

A.   Well, I am retired.  I worked there for about ten years, and then a couple years ago I retired and they asked me to come back and so I work part time.

Q.   Besides accounting, did you have another title as

well or just accountant?

A.   Right now they give me special projects.  They call it special projects.  Before I was the comptroller.

Q.   And what does Carr do?

A.   Sorry?

Q.   What does Carr do?

A.   They're subsided housing for the elderly for anyone 62 or older.

Q.   For Carr Property Management?

A.   Yes.

Q.   But what do they manage?  What properties?

A.   Oh, they have properties in Springfield, Massachusetts, Connecticut, and New York.

Q.   Do you know how many?

A.   Probably about 18, 19.

Q.   And what, just briefly, as an accountant or comptroller what did you do for Carr?

A.   We were an administrative role so these sites would send us their bills and we would process the bills and pay the bills.  We did their budgets.  Because we were HUD funded, there was paperwork that you had to do for HUD that we would fill out for them.

Q.   So some of the properties were HUD funded; is that what you're saying?

A.   Yes.

Q.   Okay.  How many do you know?

A.   Actually most of them.  There might be one or two that are not, but most of them are HUD funded.

Q.   Okay.  And your office throughout this entire time, where was it?

A.   Where I worked was always at Carr Property Management at 24 Deer Park Drive.

Q.   Okay.  Was one of the properties that Carr managed a place called Genesis House?

A.   Yes.

Q.   Okay.  Did you ever physically work there?

A.   No.

Q.   Did you ever go there for work purposes, go there onsite for work purposes?

A.   Maybe once or twice.  We have annual meetings and a site that had a community room we would meet in that community room.

Q.   Did you talk to your -- when you would come home at night, would you talk to your family about your work and what you did?

A.   You know, you might say, you know, I had a bad day or, you know, things were tough today.  I didn't really talk specifically about anything.  You know, numbers are kind of boring.  It's not really something people want to talk about.  But I might talk about some of the people I

worked with, you know, kidding things, but not anything of any interest.

Q.    Okay.  Did they know what you did?

A.    Yes.

ATTORNEY DESROCHES:  Objection, Your Honor.

I'll withdraw the objection.

THE COURT:  All right.  Withdrawn.

Q.    (By Attorney O'Neill-Greenberg) Did you ever have any family that lived at any of the properties that Carr managed?

A.    Yes.

Q.    And who was that?

A.    My mother.

Q.    Where did she live?

A.    She first lived at Brown Stone Gardens and then she lived at Genesis House.

Q.    And how long ago was that if you remember?

A.    My mother passed away in June of 2010.

Q.    Do you remember about how many years she lived at Brown Stone?

A.    No, I can't remember exactly.  I know she was there for a few years.  I really don't remember to be honest.

Q.    That's okay.  Do you remember how, just approximately, how many years she lived at Genesis House?

A.    Yeah, I don't know.  I don't remember.  She was there

for a few years too.  I don't remember.

Q.    That's fine.

I don't know if I asked you, but where is Brown Stone Gardens?

A.    That is on Pleasant Street in East Longmeadow.

Q.    Okay.  So also in East Longmeadow?

A.    Yes.

Q.    And I think you said it before, but are both of those properties both elderly housing?

A.    Yes.

Q.    Okay.  Now, if you remember, when your mom lived at Genesis House, how often did you visit?

A.    I would visit regularly.  We -- yes, I would visit her regularly.  I have four other sisters.  So we kind of communicated and so we'd make sure that she was getting regular visits from one of us.

Q.    When you would visit her, did you ever take anyone from your family with you?

A.    Sometimes I would take Natalie.  She was very young then and so she would come with me.

Q.    And Natalie, did you raise Natalie?

A.    Yes, I did.

Q.    Okay.  And did you ever bring John with you on these visits to your mom?

A.    No.  John never came with me on a visit.

Q.   Did John visit at all?  Do you have any memory of John ever visiting his grandma?

A.   Yes.

Q.   Do you remember when that was?

A.   No, I don't remember.  It wasn't frequently though, very infrequently.  He was an adult.  He would have been working during the day and we didn't usually go over to her house in the evenings.

Q.   Do you remember the reasons -- it's okay if you don't -- why John would be visiting or what it was for?

A.    No.  Maybe she would have called and asked him, you know, like I need help with the air condition or something.  I don't know.

           ATTORNEY DESROCHES:  Objection, Your Honor. Move to strike.

           THE COURT:  Sustained.  It calls for speculation.  The answer is stricken.  It called for speculation.  Disregard the answer.

           ATTORNEY O'NEILL-GREENBERG:  Okay.

Q.   (By Attorney O'Neill-Greenberg) When your mom lived at Genesis House, what did you call that place?

A.   It was grandma's house, grandma's place.

Q.   That's how you referred to it?

A.   Yes.

           ATTORNEY O'NEILL-GREENBERG:  Can I have Exhibit

104-1 up?

Q.    (By Attorney O'Neill-Greenerg)  Ms. Rathbun, I just want to show you a map and see if you can point out a few things to us.  Okay?

A.    Okay.

Q.    Can you see it?

A.    Yes.

Q.    Okay.  Do you recognize what that is?

A.    Yes.

Q.    Okay.  What does it look like?

A.    It looks like a complex and I think that is -- is that Converse Street?

Q.    Yes.

        ATTORNEY DESROCHES:  Objection, Your Honor.  I don't think the witness is allowed to ask the attorney questions.

        THE WITNESS:  Sorry.

        THE COURT:  That would be unusual, yes.

Q.    (By Attorney O'Neill-Greenberg) I want to just if I can just move the cursor, can you see this cursor, Ms. Rathbun?

A.    Yes.

Q.    Do you recognize this brown grouping of buildings right here that my cursor is circling in the bottom right-hand corner?

A.   Yes.

Q.   I think it's one, two, three, four, five buildings; do you recognize that?

A.   Yes.

Q.   What is that?

A.   That's Genesis House.

Q.   Okay.  And what is this nice long street that starts from the bottom to the top that my cursor is going on?

A.   That's Converse Street.

Q.   Okay.  So can you just tell me when you would go to visit your mom, how would you access Genesis?  Where would you turn to go inside?

A.   I would be coming down Converse Street and I would take a right at the first entrance.

Q.   The first entrance that's right here on my cursor is circling?

A.   Yes.

Q.   Okay.  So that first entrance on the right at the bottom of the map; is that right?

A.   Yes.

Q.   Okay.  And then where would you park?

A.   Almost immediately when you take the right, I would park right there because she's in that first building.

Q.   Okay.  When you say that first building, which one do you mean?

A.    The first building on the left.

Q.    The one that my cursor is on?

A.    Yes.

Q.    Okay.  And from your parked car right there to that first building right there on the left, how would you get inside?

A.    In the back, there's a back door so we would just walk to her back door.

Q.    Okay.  And when you say in the back, do you mean closest to where the cars are parked?

A.    No.  It's on the other side.

Q.    Right here?  (Indicating)

A.    Yes.

Q.    Where my cursor is.

      Okay.  When your mom was living at Genesis, did you know anything about the greater organization it was connected to?

A.    Not until I started to work for Carr Property.

Q.    Can I just have you -- I think you're sort of past the mic.  Can you say that again?

A.    Not until I started to work for Carr Property.

Q.    Okay.  So I'm sorry, when did you start working for Carr Property again?

A.    Let's see, I think it was the end of 2007 or the beginning of 2008.

Q.   And was your mom living at Genesis House before you started working at Carr?

A.   Yes.

Q.   Okay.  When your mom was living at Genesis House, did you believe it was -- did you ever call Genesis House Ruth's House?

A.   No.

Q.   Or believe it was connected to a place called Ruth's House?

A.   No.

Q.   Did you ever believe it was connected to a Jewish nursing home?

A.   No.

ATTORNEY O'NEILL-GREENBERG:  Okay.  We can take 104-1 down.  Thank you.

Q.   (BY Attorney O'Neill-Greenberg) Ms. Rathbun, how old is your son?

A.   Thirty-seven.

Q.   In those 37 years, have you ever seen him act in a way that was intolerant or hateful of Jewish people?

ATTORNEY DESROCHES:  Objection, Your Honor.

THE WITNESS:  No.

THE COURT:  Overruled.

Q.   (By Attorney O'Neil-Greenberg)  Or speak or say anything that suggested he wanted to hurt or harm Jewish

people?

ATTORNEY DESROCHES:  The same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  No.

ATTORNEY O'NEILL-GREENBERG:  Thank you.  That's it.  I don't have any other questions.

THE WITNESS:  Okay.

ATTORNEY DESROCHES:  May I just have a moment to pull the lectern over?

**CROSS-EXAMINATION**

Q.   (By Attorney Desroches) Good morning.

A.   Good morning.

Q.   May I call you Mrs. Rathbun; is that how you prefer to be called?

A.   Sure.

Q.   Mrs. Rathbun, you testified that the defendant John Rathbun is your son, correct?

A.   Yes.

Q.   And you have another son; is that right?

A.   Yes.

Q.   And his name is Paul?

A.   Yes.

Q.   Is Paul older or younger than John?

A.   Younger.

Q.   Does Paul live at home?

A.   No.

Q.   Does he live in his own home in East Longmeadow?

A.   Yes.

Q.   John though does live at home, correct?

A.   Yes.

Q.   And he lives there with his 14 -- his now 19-year-old daughter, right?

A.   Yes.

Q.   And you played a very large role in Natalie his daughter's life; isn't that right?

A.   Yes.

Q.   You've really kind of raised her almost on your own?

A.   Yes.

Q.   And you've testified that John has had some struggles in life with addiction, correct?

A.   Correct.

Q.   And you've tried to do what you can to help him; is that right?

A.   Yes.

Q.   Including like you said letting him move back into your house?

A.   Yes.

Q.   And taking on his daughter almost as your own?

A.   Yes.

Q.    And buying groceries for like you said the household and that includes John; is that right?

A.    Yes.

Q.    And you let him live there rent free?

A.    Yes.

Q.    And the groceries that you bought included cigarettes too, correct?

A.    Yes.  Sometimes I would buy those.

Q.    And John -- those were for John?

A.    Right.

Q.    And during his struggles with addiction you have tried to help him overcome that; is that right?

A.    Yes.

Q.    You testified that you are a member of the Heritage Baptist Church?

A.    Yes.

Q.    And the pastor there is Curtis Rowe; is that right?

A.    Yes.

Q.    And you've asked Pastor Rowe to help you help John; isn't that right?

A.    I'm not sure if I specifically asked him to do that. I may have.  I honestly don't remember specifically asking him to do that.  I would ask him to pray for John.

Q.    You yourself turned to Pastor Rowe -- is it Raul or Rowe?

A.    Pastor Rowe.

Q.    So Pastor Rowe for help in your dealing with John's addiction; is that right?

A.    No, we never did ask Pastor for help with John with that.

Q.    Okay.  I think maybe I can make my question clearer.

A.    Okay.

Q.    You turned to Pastor Rowe for help for yourself, is that right, just spiritual help healing?

A.    I may have talked with him about John but not -- I don't think I understand what you're trying to say, but he knew about John's struggles.  We would talk to him about those struggles, yes.

Q.    And you've asked Pastor Rowe to pray for John?

A.    I have.

Q.    And that's because faith is important to you in your life, correct?

A.    Yes.

Q.    And you believe that faith can help you through difficult times, correct?

A.    Yes.

Q.    And you believe it can help others through difficult times as well?

A.    Yes.

Q.    And in these difficult times you've turned to your

faith to not only help yourself but to help John, right?

A.   I'm not sure what you're trying to say.  I'm sorry.

Q.   Did you ever try to talk to John about maybe returning to the church?

A.   Yes.  I would say that, you know, maybe if you went to church it might help you, yes.  I could say something like that, yes.

Q.   And did John go back to church?

A.   Sometimes he did.  It was sporadic on and off.

ATTORNEY O'NEILL-GREENBERG:  Your Honor, may we be seen at sidebar?

(Sidebar discussion.)

ATTORNEY O'NEILL-GREENBERG:  I'm just concerned that this is getting into what the court has already I believe ruled, something that we're not supposed to be getting into, which is the family's own religious practices with each other.

ATTORNEY DESROCHES:  Well, Your Honor, I don't necessarily agree that we are precluded from going into the relationship between witnesses and the role religion played in their life.  This will be go to several aspects.  First, bias of this witness that she's clearly trying to help her son through difficult times; that she has turned to religion to do so.  This will lead to potential strife between the defendant and his mother and would also go to

tying ultimately a connection to the wick.

THE COURT:  Yeah, I do not feel at this point the government is overstepping any of the previous rulings or overly probing without reason into the family's religious practices.  These questions were specific as to whether John went back or attended church, and if so have been very peripheral about the mother's own religious practices.  So far I think the government is fine and I see the relevance.  All right.

(End of sidebar discussion.)

Q.   (By Attorney Desroches) So, Mrs. Rathbun, you said that John would occasionally go back to church; is that right?

A.   Yes.

Q.   So there were times where he was more actively involved than others; is that right?

A.   Yes.

Q.   And in the times that he wasn't actively involved, did you ask him again to return?

A.   No.  Because if he was actively involved, he would have already been doing that.

Q.   I'm sorry, maybe I misspoke.

The times that he was not actively involved, did you ask him to return to church?

A.   I wouldn't ask him to return to church.  What I would

say to him is that, you know, maybe you should think about your faith.

Q. And how would John respond to that?

A. Sometimes, well, he'd say, yeah, you're right and other times he wouldn't respond well.

Q. And so he would resist your urging to return to church; is that right?

A. I wouldn't say that he was resisting. I think that he's a grown adult. He can make his own decisions and I respected that.

Q. But during that time John wasn't making the best decisions, right?

A. Say that again.

Q. During those times John was not making the best decisions for himself, was he?

A. No.

Q. You indicated that you go to church on Sundays; is that right?

A. Yes.

Q. And that you also volunteer to teach Sunday school?

A. Yes, on Sundays.

Q. And these are children who you're teaching or are they adults?

A. Children.

Q. What's the age group?

A.    Anywhere between from kindergarten to sixth grade.

Q.    And you've done this for a long time?

A.    Yes.

Q.    I imagine that in order to be a good teacher to kindergartners, you have to be able to teach the lesson very simply; is that right?

A.    Yes.

Q.    So it's important for yourself to know how to put kind of these big concepts into simple terms?

A.    Yes.

Q.    And it must be difficult because the Bible is written so long ago to translate that into something that a kindergartner can understand?

A.    No, it wasn't difficult.  I don't find it difficult. I enjoy it.

Q.    And you've turned to a lot of other sources to educate yourself as well, correct?

A.    We have curriculum.

Q.    And you also -- but you go beyond the curriculum for your own personal education, correct?

A.    The only thing I go beyond my curriculum is I would read my Bible.

Q.    And you also read tracts, correct?

A.    Yes, I do read tracts.

Q.    And you pass out tracts?

A.    Yes, I do pass out tracts.

Q.    You also make your own tracts?

A.    Yes.  My husband and I do that.

Q.    And you base those tracts on the things that you have read in the Bible and other tracts that you've read, correct?

A.    Yes, we base it on the Bible.

Q.    And the purpose of those tracts is to spread the good news, right?

A.    Yes.

Q.    And what does that mean to you to spread the good news?

A.    Telling others about Jesus and how he died on the cross for us and paid the price for our sins.

Q.    Is that important to you, to spread the good news?

A.    It is important to me that anyone that would like to know about that can have that opportunity to get that information.

Q.    And so you would have a conversation with people in addition to handing out those tracts; is that right?

A.    No.  I don't normally get to speak to someone.  When I give them the tract, I just give it to them and say here, this is something you may like to read.  But it doesn't usually go further than that unless the person initiates something.

Q.   Right.  So let's be clear about this.  You would hand these tracts out to people you didn't know, correct?

A.   Yes.

Q.   And they may or may not want to talk to you what you just handed them; is that right?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE WITNESS:  Yes.

THE COURT:  Sustained.

ATTORNEY DESROCHES:  Your Honor, may I ask for the basis of the objection?

THE COURT:  I'll tell you the basis for the ruling is the relevance.  This probing into Mrs. Rathbun's religion I don't see the relevant connection.

ATTORNEY DESROCHES:  I'll move on, Your Honor.

THE COURT:  All right.

Q.   (By Attorney Desroches) You were also actively in volunteering for the church; is that right?

A.   Yes, as the bookkeeper and doing the secretarial work.

Q.   And as the bookkeeper, would you actually collect money or would you hold money, collection envelops, such, things like that?

A.   No, I did not do that.

Q.   Did you have collection envelopes in your vehicle on April 15, 2020?

A.    Yes, those were old envelopes that we were destroying.  The empty envelopes, they were old and we were destroying.  I do record the -- they give me the envelopes after they've taken the money and I record them for tithing, and then I would do statements at the end of the year to give to the people of the church.

Q.    So that was part of your accounting responsibilities; is that right?

A.    That's part my what?

Q.    Accounting responsibilities within the church.

A.    Yes.

Q.    And passing out tracts you frequently had them in your possession; is that right?

A.    One more time?

Q.    You said that you passed out tracts --

A.    Yes.

Q.    -- to strangers?

A.    Yes.

Q.    So you would frequently have them in your possession, right?

A.    Yes.  In my pocketbook, yes.

Q.    Because you would never know when you would come across someone who you would want to pass a tract out to?

        ATTORNEY O'NEILL-GREENBERG:  Objection; the same objection.

THE COURT:  Yes, I think you've made the point so move on, asked and answered type question.

Q.    (By Attorney Desroches) Now specifically you answered the questions about the Billy Graham Evangelical Association; is that right?

A.    Say that again.

Q.    The Billy Graham Evangelical Association, are you familiar with that group?

A.    Yes.

Q.    And you actually attended one of their events, correct?

A.    Yes.  I attended the one event in -- I don't remember.  It's been quite a while.  It's a few years now in West Springfield.

Q.    And you actually helped Pastor Rowe organize that; isn't that right?

A.    No, I did not help.  He was in charge.  He was the one in charge.  No, I did not help him organize.

Q.    And he never asked you to help him organize that?

A.    He did not help -- he did not ask me to help him organize that, no.

Q.    Well, weren't you mailing out flyers or going to meetings, organizational meetings at the church for this event?

A.    No, I never went to a meeting.  He gave me --

Q.   I'm sorry, that was a yes or no question.

So did you go to meetings regarding this event, organizing this event?

A.   No.

Q.   Did you send out flyers for this event?

A.   No.

Q.   Did you create a mailing list for Pastor Rowe to send out flyers for this event?

A.   No.

ATTORNEY DESROCHES:  Could I have PX-88 please for all?

Q.   (By Attorney Desroches) Mrs. Rathbun, can you see the screen in front of you?  Is it working?

A.   Yes.

Q.   So do you recognize -- this is marked as PX-88, do you recognize what that is?

A.   Yes.

Q.   What is that?

A.   It was a flyer for Billy Graham for a kick-off event.

Q.   So the record is clear, we are looking at page 1 of this.

Is this the event that you went to?

A.   No.

Q.   So you went to a different event than this?

A.   Yes.

ATTORNEY DESROCHES:  Can we scroll down now to page 2?

Q.   (By Attorney Desroches)  Mrs. Rathbun, do you recognize what this?  If you can just take a close look at it.

A.   No, I do not.

Q.   Do you recognize any of those people's names on there?

A.   I don't have my glasses on but I will try to.

Q.   If you'd like, I can read it or we can zoom in.

A.   Good.  Yes, thank you.

No, I do not recognize the names, but it looks like they're different churches in our area.

Q.   Are these also Baptist churches that you recognize?

A.   I do not know them to be Baptist or whatever they are.  They are just churches in the area.

ATTORNEY DESROCHES:  Can we zoom in on the entry that starts with --

ATTORNEY O'NEILL-GREENBERG:  Your Honor, I have an objection.  She said she didn't recognize it.

ATTORNEY DESROCHES:  I was just showing her a separate entry.

THE COURT:  Objection overruled.

Q.   (By Attorney Desroches)  So you said you didn't recognize whether or not these were Baptist churches.  I'm

now zooming in on a different section.  It says Bethany Assembly of God.  You recognize that as being a Baptist institution, don't you?

A.    That is not a Baptist church.

Q.    I'm sorry, an evangelical institution?

A.    Yes.

Q.    As in the other churches, do you recognize those in particular the Faith Bible Evangelical Free Church?

A.    I'm actually not familiar with them.  I am familiar with Bethany because it's a large church and I'm just familiar with them.

Q.    Have you ever been to the Bethany Assembly of God?

A.    I don't believe so.

ATTORNEY DESROCHES:  Can we scroll down?

I'm sorry, scroll down please.  And we can continue on to page 4.  Can we zoom in on the whole page?  All the text please.

Q.    (By Attorney Desroches)  Mrs. Rathbun, do you recognize any of these?  These have been identified as being files.  Do you recognize the file name, which is basically the third column over if you count those stars?

A.    I still can't see it.  It needs to be bigger.  I can't see it.

Q.    Does that help?

A.    What do you want to know?

Q.    If you can look at those names --

A.    Okay.

Q.    -- and see if you recognize any of those.

A.    Some of them are kind of vague so I'm not sure, but I see where you say there's a Graham flyer but I don't know if it's something I'm familiar with or not.

Q.    Okay.  So your husband Jeff, he didn't any accounting for the Heritage Baptist Church, did he?

A.    No.

Q.    John didn't do any accounting for the Heritage Baptist Church, did he?

A.    No.

Q.    Natalie didn't do accounting for the Heritage Baptist Church, did she?

A.    No.

Q.    And none of those people helped organize the Billy Graham event, correct?

A.    No.

Q.    What if I told you these files all came from your laptop computer, does that refresh your memory that you created these documents?

A.    They came from my laptop?

Q.    Does it refresh your memory, that's the only question?

A.    I did not know they came from my laptop.  I thought

they were --

Q.   Did you ever have that flyer, which is page 1, on your laptop?

A.   There was one flyer that was on my laptop.

Q.   Let me scroll up to that.

A.   That I had downloaded from church.

Q.   Is that this flyer?

A.   Yes.

Q.   And you didn't mail this out to anyone or help Pastor Rowe mail this out to anyone?

A.   No.  He just asked me to make copies of those for him and I gave them to him.

Q.   So you were helping him with this event?

A.   He asked me to make copies of this and I gave those to him.  What happened to them from there, that is what he did.

Q.   So you helped him with that though, correct?

A.   I did print these flyers, yes.

Q.   So you also went to the Billy Graham event, correct?

A.   I went to the one that was in West Springfield, yes.

Q.   And it was important -- at that event you went to learn; is that right?

A.   No, it was more of an entertainment thing.  It wasn't a learning thing.

Q.   But wasn't the mission of that to spread the word?

A.   For Franklin Graham, yes.

Q.   So I'm going to just now go back to that file list and ask for the entry labeled HBC.

Do you see that file title that says HBC meeting for Franklin Graham, 2-21-19?

A.   Yes.

Q.   Does that refresh your memory as to what you did in relation to that file and that mailing list?

A.   No.

Q.   HBC stands for Heritage Baptist Church, correct?

A.   Yes.

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.  She doesn't remember it.

THE COURT:  Overruled.

Q.   (By Attorney Desroches)  And that is your church, correct, HBC?

A.   Yes.

Q.   So we're saying that the Billy Graham event the purpose was for Franklin Graham to spread the good news, correct?

A.   Yes.

Q.   In many ways that you yourself have tried to do in your life?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.

Q.    (By Attorney Desroches) So you signed up for a free T-shirt there; is that right?

A.    No, I didn't sign up.  I just went up and someone that was where we were setting said they had the T-shirt and I asked where they got it and they said you can go up to that booth over there and get one, so I did.

Q.    But you had to sign up for something to order to get that T-shirt, right?

A.    Jeez, I don't remember if I signed anything to be honest.

Q.    Do you remember -- I'm sorry, I didn't mean to interrupt.

A.    I don't remember that.

Q.    Do you remember getting mailings from the Billy Graham Evangelical Association?

A.    Mailings at my house?

Q.    Correct.

A.    Yes, they would send me things occasionally, yes, in the mail.

Q.    So you started getting those things after you were at that event, correct?

A.    I never correlated that.  That's possible.  I don't know.

Q.    So I'm going to ask PX-85 be placed on the screen.
      Do you recognize what this first page is?

A.    No, I don't.

ATTORNEY DESROCHES:    May I approach the witness, Your Honor?

THE COURT:    Yes.

Q.    (By Attorney Desroches) Mrs. Rathbun, I'm going to hand you what's been marked as PX-85.

A.    Okay.

Q.    If you can just very quickly flip though that.    I don't expect you to read the full 200 or so pages that's there.

A.    Okay.

Q.    Do you recognize any of those things?

A.    Would it have all come at one time?

Q.    So just first, do you recognize that this is a Billy Graham -- this is associated with the Billy Graham Association?

A.    Yeah.    It says right on it Franklin Graham so, yes, you can tell that and it says Billy Graham up in the right-hand corner so I know that.

Q.    Okay.    So these are the types of things you got in the mail from them, aren't they?

A.    I do not recall receiving something that looked like this in the mail, no.

Q.    So maybe not something as big as that but maybe one at a time.    You don't remember getting any flyers from

Billy Graham?

A.   I never got flyers.  We would get envelopes telling of events coming and maybe asking for a donation.

Q.   Okay.  So you did get mailings from them?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor?  May we be heard?

THE COURT:  Sustained.  Yes, you can be heard.

(Sidebar discussion.)

ATTORNEY O'NEILL-GREENBERG:  So these are the emails and mailings that came to Ms. Rathbun and Mr. Rathbun after the Big E event.  I think it has marginal relevance at all which was why we were objecting to it earlier.  It's already in evidence.  There is nothing in there that is the *Steps to Peace With God* pamphlet that was in the nozzle.  There is no relevance to these other mailings and it has been asked a lot so it's incredibly cumulative.

THE COURT:  What do you say, Attorney Desroches?

ATTORNEY DESROCHES:  Your Honor, the wick was published by Billy Graham.  These records establish an ongoing connection with this witness to Billy Graham, and I think it's clearly relevant that the connection exists and furthermore these denials I think goes to her credibility.

THE COURT:  I think you've really exhausted this area at this point.  You're going to have to move on.  Objection sustained.

(End of sidebar discussion.)

Q.   (By Attorney Desroches)  So, Mrs. Rathbun, I'd like to move on from the Billy Graham Evangelical Association for a little while and just talk to you about last March of 2020 for just a few minutes.

You indicated that John had lost his job in March of 2020; is that right?

A.   Yes.

Q.   Prior to his losing his job he was working at a pretty good solar company, right?

A.   Yes.

Q.   And that was a job that had some stability to it for a little while, right?

A.   Yes.

Q.   But John was fired from that job, correct?

A.   Yes.

Q.   Do you know why John was fired from that job?

A.   I believe he was fired because of drugs.

Q.   And specifically do you know why the drugs caused him to get fired?

ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Sustained.

Q.    (By Attorney Desroches)  You've indicated that John has a drug problem or has had a drug problem?

A.    Yes.

Q.    Do you know what kind of drugs John was using?

A.    No.  There would be no way for us to know that.  He would not discuss that with us.

Q.    So then when you say that you knew he had a drug problem, you're just basing that on your observations of his behavior?

A.    Yes.  Yes.

Q.    So he's never told you that he using heroin during that time?  It's a yes or no question.

A.    Say it again.  I'm sorry.

Q.    Did John tell you that he was using heroin at any time?

A.    Yes.

Q.    Now drawing your attention to March, the time of March, did John tell you he was using heroin?

A.    I don't think so.  I don't remember him specifically saying he was using heroin.

Q.    So now did John tell you that he was smoking crack cocaine?

A.    No.

Q.    He never told you that?

A.    No.  We did not know that.

Q.    Did you John tell you that he was using cocaine in other ways other than smoking it?

A.    No.

Q.    Did John tell you he was using Xanex at any point?

A.    In the past but not in March, no.

Q.    So the only drug that you were aware of for sure that he was using in March was heroin, or were you not even sure about that?

A.    I'm not even sure of that.

Q.    But his behavior during that time led you to believe that he was using some drugs of some type again, correct?

A.    Yes.

Q.    That behavior included him kind of isolating himself in his room?

A.    He would spend a lot of time in his room.

Q.    Would he also drink in his room when he was in there.

A.    Sometimes he would have liquor, yes.

Q.    He would sneak out at night sometimes.  I shouldn't say sneak out.  He's an adult.  Sorry.

      He would leave the house at times without telling you, correct, at nighttime?

A.    He could have.  I could be in bed and he could have. I don't know.

Q.    And you wouldn't know if he took your car?

            ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Objection sustained.

Q.    (By Attorney Desroches) Let's focus this beginning in say February of 2020 until April 3, 2020.  Okay?  So just during that time frame.

A.    Okay.

Q.    John was leaving the house at night and coming back after you went to bed; is that fair to say?

A.    No, I don't know if I can accurately say that. Sometimes he did go out in the evenings for jobs.  There were jobs he was doing.  So, yes, sometimes.

Q.    Let me stop you right there.

THE COURT:  Hold on.  Let the witness finish.

THE WITNESS:  I don't really know.  He's an adult.

Q.    (By Attorney Desroches)  So you said you know that he's going out for jobs sometimes?

A.    Yes.

Q.    You would know that because he told you that?

A.    Yes.

Q.    So he told you he was going out at night to do jobs; is that correct?

A.    Yes.  Sometimes he did, yes.

Q.    And what time do you usually go to bed at night?

A.    Usually between eleven and twelve.

Q.    And there was times when John was not home when you

went to bed because he was at these jobs?

A.   No.  He was usually home by then.

Q.   There were times when you woke up in the morning and he was not home yet; is that right?

A.   Yeah, he would get up -- he was an early bird.  He was up early.

Q.   Was he up early or had he stayed up all night?

A.   I would have no idea of knowing that.

Q.   So your ability to know exactly what was going on in John's room was somewhat limited fair to say based on that, right?

A.   Of course.

Q.   And the morning of April 2nd he never asked you to use your car, did he?

A.   Yes, he did.  He asked me the night before.

Q.   Did he tell you why he was going to use your car?

A.   Yes.  He said that he had had a job that he was going to be looking at and he may do the job.

Q.   But you've learned that wasn't the case, right?

A.   Say that again.

Q.   You've learned that that's not why he used your car at all; isn't that right.

A.   I don't know.  I still don't know to this day.

Q.   Well, you have looked at all the evidence.

         ATTORNEY O'NEILL-GREENBERG:  Objection.

THE COURT:  Overruled.

Q.  (By Attorney Desroches) You have looked at all the evidence in this case, right?

A.  I don't know if I've looked at all the evidence, no.

Q.  Fair enough.

You've looked at some of the evidence in this case, right?

A.  Yes.

Q.  Including John's cell phone; isn't that right?

A.  No.  I do not have access to John's cell phone.

Q.  You've spoken to John about what he did that morning?

A.  I what?

Q.  You've spoken to John about what he did that morning, haven't you?

A.  One more time.  I'm having trouble understanding you. I'm sorry.

Q.  Let me move the mic closer then.

A.  Okay.

Q.  You've spoken to John about what he did that morning, haven't you?

A.  Yes.

Q.  And he, in fact, told you that he was buying drugs that morning, didn't he?

A.  Yes.

Q.  And not working a job?

A.    Yes, but that was --

Q.    So that's a yes or no question.

A.    Okay yes.

Q.    He didn't ask you for permission to use your car to go buy drugs, did he?

A.    He asked permission to go do a job, yes.

Q.    And he knew though that you had to work at 8:15 in the morning, didn't he?

ATTORNEY O'NEILL-GREENBERG:  Can I just ask that you put the mic a little bit closer to you?  There you go.

THE WITNESS:  Sorry.

Okay.  One more time?  I'm sorry.

Q.    (By Attorney Desroches)  He knew that you had to be at work at 8:15, didn't he?

A.    I had told him I had to go to work.

Q.    So you presumed that he was going to find this job and be able to return by 8:15 in the morning?

A.    Yes, because if he didn't have time to do it, he was going to -- a lot of times he does estimates and then --

Q.    I'm sorry, that was just a yes or no question.

A.    Oh, I'm sorry.  Ask it again.  I'm sorry.

Q.    Sure.  You presumed that he would have enough time to be back at home by 8:15 in the morning after having done this job?

A.   No.

Q.   You presumed that he was out looking at this job and would have been back at by 8:15 in the morning?

A.   Yes.

Q.   And that wasn't the case though, was it?

A.   No.

Q.   So if he hadn't returned by 8:15, you must have presumed it was taking longer to do this job; is that right?

ATTORNEY O'NEILL-GREENBERG:  Objection.  It calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I didn't know why he was late.

Q.   (By Attorney Desroches)  So, in fact, you were worried about where he was, weren't you?

A.   I wasn't worried about where he was.  I was worried that he wasn't going to get the car home so I could get to work.

ATTORNEY DESROCHES:  Can we have PX-45 please?  This is in evidence.  Can we play this for the court?

THE COURT:  Go right ahead.

Why don't you lay a foundation with a question for why you are playing this for this witness?

ATTORNEY DESROCHES:  Sure.

Q.   (By Attorney Desroches)  You indicated that you were

not worried at that point about John, correct?

A.   No, I wasn't worried about John.  I was worried about getting to work.

Q.   And can we -- isn't it true though that you told John that he had you concerned?  You were worried?

A.   Say that again.

Q.   You were worried about John's whereabouts, weren't you?

A.   I was worried why he wasn't getting home with the car.

Q.   And based on his history like you said using drugs, you were concerned about what he was doing, weren't you?

A.   No, actually I was not concerned.  I did not think that was what was going on.  I thought he was doing a job.

Q.   So you said you were not concerned.

ATTORNEY DESROCHES:  Can we now play 45?

ATTORNEY O'NEILL-GREENBERG:  Objection, Your Honor.

THE COURT:  What's the objection?

ATTORNEY O'NEILL-GREENBERG:  Can we be seen at sidebar?

(Sidebar discussion.)

ATTORNEY O'NEILL-GREENBERG:  She has agreed to what Attorney Desroches has asked her.  So impeaching her with something that she has agreed to is not what --

Attorney Desroches should not be allowed to impeach her when she has already agreed that she was worried.

ATTORNEY DESROCHES: Your Honor, I would suggest that there's several basis for this. First, it is in evidence. Second, the witness has indicated a reason for that concern which I think that this recording which is in evidence will undermine and so it goes to her credibility, and it also goes to the defendant's credibility as he had apparently lied to his mother about leaving the house or the reason for being out of the house that morning.

THE COURT: You mean whatever you're going to play goes to establishing she was worried that he was using drugs in contradiction of her saying that she was only worried about getting the car back?

ATTORNEY DESROCHES: To be clear, it tends to show that it -- she doesn't say explicitly that, but I would suggest the concern raised in this voice mail demonstrates that it's something beyond just concern for the car.

THE COURT: All right. I do think you need to lay a foundation. You have to ask her, you know, a series of questions like did you try to call him? When you called him, did you leave a voice mail? Did you tell him what your concerns were? Do you have a memory of that? See if you can refresh her memory. You're just out of the

blue looking to play something without a question so objection sustained.

ATTORNEY DESROCHES: Your Honor, this is in evidence all ready.

THE COURT: Well, right. I understand it's in evidence but, you know, a witness can't get on the stand and you can't just start playing and showing pieces of evidence without there being some type of rational connection to a question to the witness. So it seems simple enough for you to just build up some questioning to give what you're going to play some context.

ATTORNEY DESROCHES: Understood. Thank you, Your Honor.

ATTORNEY O'NEILL-GREENBERG: Can I just add that this is the call -- all Ms. Rathbun says in this call is home, something to that effect. We're worried. She has admitted she was worried, and so there is no value in using it for impeachment.

THE COURT: No. She says she's worried only to get to work. There is value in listening to the tone of her voice and the context of the entire conversation to make a determination about what she was worried about.

ATTORNEY DESROCHES: Thank you, Your Honor.

(End of sidebar discussion.)

Q.    (By Attorney Desroches) So, Mrs. Rathbun, that

114

morning you had called John to try to get your car back, right?

A.    Yes.

Q.    Because it was getting close to the time you had to leave for work and he hadn't been back yet, right?

A.    Yes.

Q.    And you also sent him text messages to do so?

A.    I believe I sent one, yes.

Q.    And the call -- you actually had to leave a voice mail because he didn't answer, right?

A.    Yes.

        ATTORNEY DESROCHES:  I would now move to play PX-45.

        THE COURT:  All right.  Go ahead.

(Audio recording playing.)

Q.    (By Attorney Desroches) You indicated that your husband Jeff had to drive Natalie your granddaughter's car to bring you to work that morning; is that right?

A.    Yes.

Q.    And by the time you returned home, your car had been returned, right?

A.    Yes.

Q.    Now, during that time you said that things were somewhat difficult with John?

A.    Yes.

Q.   Because he had lost his job relatively recently in March, right?

A.   Yes.

Q.   He and Natalie were not getting along during that time; is that right?

A.   Yes.

Q.   And, in fact, Natalie had stopped speaking to the defendant because the relationship had gone so wrongly, correct?

A.   Yes.  They had an argument.

Q.   And that argument though was about John not shoveling snow, right?

A.   No.

Q.   Do you recall an argument between John and Natalie where Natalie was upset with John because you were shoveling snow instead of him?

A.   No.

Q.   You moved John's bedroom to the first floor, correct?

A.   Yes.

Q.   And that was to get him away from Natalie?

A.   Yes.

Q.   Because their relationship had gone so wrong, correct?

A.   Yes.  They were struggling.

Q.   And John during that time in early 2020 into the

spring he was arguing with you too, right?

A.    Yes.

Q.    You always tried to keep calm during these arguments though, didn't you?

A.    Relatively, yes.

Q.    Even though John was swearing at you, you tried to keep your calm, right?

A.    Yes.  John would swear at me at times, yes.

Q.    And even though he would raise his right at you, you would still try to remain calm, correct?

A.    He didn't raise his voice but he did swear.

Q.    And he was swearing at you over things like you're not getting cigarettes for him; isn't that right?

A.    No.  Yes, I understand that's the way it's been taken but --

Q.    I'm sorry.  Did he swear at you because you didn't get him cigarettes at any time during this period?

A.    Yes.

Q.    And there were times where the groceries weren't to John's liking and so he would swear at you then too, wouldn't he?

A.    Yes.

        THE COURT:  All right.  Can I talk to the parties please?

(Sidebar discussion.)

THE COURT:  All right.  Attorney Desroches, when are we going to get back to the case against John Rathbun?

ATTORNEY DESROCHES:  Your Honor, we're just talking about the weeks including the date of this offense.

THE COURT:  Right.  But I mean, I just don't know the connection of what you're trying to do and establish with the elements that you have to prove for this case.  I don't understand what you could be trying to accomplish by your trying to impeach Ms. Rathbun relative to your obligation to prove certain elements.  So, I mean, that's a round about way of saying the relevance of this. What's the relevance of this whole line of questioning?

ATTORNEY DESROCHES:  I was actually just about to move on from this line and I will wrap it.  I don't expect to go much longer with this examination.

THE COURT:  Okay.

(End of sidebar discussion.)

ATTORNEY DESROCHES:  May I proceed?

THE COURT:  Yes.

Q.   (By Attorney Desroches) Mrs. Rathbun you've indicated that your mother used to live at Genesis House, correct?

A.   Yes.

Q.   And she passed away in 2010; is that right?

A.   Yes.

Q.    Prior to her passing, was she living at Genesis House?

A.    Say it again.

Q.    When she passed away, was she residing at Genesis House?

A.    Yes.

Q.    And she had signed leases regularly at Genesis House, correct?

A.    Yes.

Q.    So she had been there from 2003 when she signed her first lease until 2010; is that right?

A.    Yes.

Q.    And in 2003 how old was John approximately?

A.    He's got to be in his twenties.

Q.    Early twenties, right?

A.    Well, he was born in 1983.

Q.    So he would have been twenty?

A.    Okay.

Q.    Approximately, right?  We don't know when.

A.    Yes.

Q.    And you testified that you had never been to Genesis House with John to visit your mother?

A.    No.

Q.    Not once?

A.    Not that I can recall.  He had his own

transportation.  He wouldn't be -- it would be unusual for him to be coming in my car.  We would go there to pick her up and so I wouldn't have wanted him in the car too because I probably had Natalie.

Q.   He would have been in the car with you?

A.   No.  He would not be because he has his own transportation.

Q.   But John has said -- would it surprise you if John had said he used to go there a couple of times a year when your mother lived?

A.   Yeah, I never said he didn't go there.  He may have gone to visit her, but I don't believe he came with me.

Q.   Not even on those Christmases that you talked about?

A.   I think that was misunderstood.  We would pick her up.  She lived in a three-room apartment and we had over 20 people in our family.  We could not celebrate Christmas there.

Q.   So John never went to his grandmother's apartment to get gifts at Christmastime?

A.   That's not our usual.  What we usually did, we had Christmas on Christmas Eve at my sister Mary's and we would pick my mother up and go there.

Q.   Okay.  So these questions are going to be yes or no.  If you can't answer them in that way, just let me know and I will rephrase them.  Okay?

A. Okay.

Q. But you're saying that it's possible John would have visited even if you didn't know, yes or no?

ATTORNEY O'NEILL-GREENBERG: Objection. That has been asked and answered.

THE COURT: Sustained.

ATTORNEY DESROCHES: I'm just clarifying, Your Honor.

THE COURT: Sustained.

Q. (By Attorney Desroches) So you've talked to John about this case, correct?

A. I'm not sure what you mean by that, but he was in jail and obviously he'd get upset and he'd want to talk about things, but not in any little -- he might be stressed out about something about it and maybe talk to me as his mom.

Q. There's a yes then?

A. Say that again.

Q. You have spoken to John about this case while he was in jail, yes?

A. Yes.

Q. In fact, John admitted to you that he did in fact possess that yellow can that you saw when agents showed you a picture of it, right?

A. Say that again. He what?

Q.    John admitted to you that he did in fact possess the yellow can that the FBI showed you a picture of, correct?

A.    Yes.

Q.    And John admitted to you that he was on Converse Street between 4:30 and 8:30 a.m. on April 2nd, didn't he?

A.    That I don't remember for sure on that.

Q.    So would hearing that refresh your recollection as to whether or not he did in fact tell you?

A.    I don't understand what you're saying.  I'm sorry.

Q.    So if you heard the recorded conversation between yourself and John, would it refresh your recollection as to whether or not he told you he was on Converse Street on April 2nd between 4:30 and 8:30?

ATTORNEY O'NEILL-GREENBERG:  Your Honor, may we be seen?

(Sidebar discussion.)

ATTORNEY O'NEILL-GREENBERG:  If Attorney Desroches is going to refresh her recollection, then she has the chance to read that silently to herself.  He doesn't get to read that or play that before she gets to view it and see if she remembers or not.

THE COURT:  Yes, he does.  Go ahead.

ATTORNEY DESROCHES:  I'm sorry, I didn't hear that.

THE COURT:  You can play it.

(End of sidebar discussion.)

ATTORNEY DESROCHES:  I would ask that PX-96 be played.

May I just have one minute to cue it up?  For the record, we're going to be playing PX-96 from 1542 to 1651.

(Audio recording playing.)

ATTORNEY O'NEILL-GREENBERG:  Can we just get the date on that?

ATTORNEY DESROCHES:  That was May 14, 2020.

Q.    (By Attorney Desroches) Ms. Rathbun, that was your voice, correct?

A.    Correct.

ATTORNEY DESROCHES:  Thank you.  I have no further questions.

ATTORNEY O'NEILL-GREENBERG:  Just briefly.

THE COURT:  We need -- go on the audio please.

(Sidebar discussion.)

THE COURT:  Now, the objection was that she gets to listen to it first to see if it refreshes her memory and I said no, that's not the way it has to work because it was an audiotape and it had been introduced into evidence.  It was already a piece of evidence that the jury had heard but the question was regarding refreshing her recollection.

So the government didn't use it for that.  You just

didn't ask a question as to whether or not it refreshed her recollection. It seems like you just used it as an opportunity to play it again for no purpose and there was no question at the end.

ATTORNEY DESROCHES: Your Honor, may I?

THE COURT: Then you stopped asking questions. I don't see that was a proper use of playing that. I see that as just an opportunity to play it again --

ATTORNEY DESROCHES: May I redirect?

THE COURT: -- for the jury without a connection to the question, and now you can't go fix it because I told you about it.

What does the defense say?

ATTORNEY O'NEILL-GREENBERG: I mean, I would move to strike it. I don't want him to be able to redo it and then just play it again to the jury.

THE COURT: Right. No. He's not going to be able to play it again. I mean but I can't strike that.

ATTORNEY O'NEILL-GREENBERG: I don't know what the remedy is.

ATTORNEY DESROCHES: Your Honor, I would just ask permission to ask two follow-up questions that would close this.

ATTORNEY O'NEILL-GREENBERG: I guess I would ask the judge instruct the jury that she should have the

opportunity be asked if she remembers it or not and there should be no implication that she's been confronted with it because she's denying it because that's the implication right now.

THE COURT:  In other words, give her an opportunity to say does that refresh her memory and explain it in some way?

ATTORNEY O'NEILL-GREENBERG:  Sure.  But as far as like undoing maybe her denial if she's going to say now I remember it, I don't know how to fix that.

THE COURT:  Well, she may deny it, but I just didn't -- it wasn't appropriately done by the government. It was used as just a way to play it again without wrapping it in good faith into a question.  So, all right. I'm going to ask direct some comments to the jury and ask the witness some questions.

ATTORNEY O'NEILL-GREENBERG:  Thank you.
(End of sidebar discussion.)

THE COURT:  All right.  Ladies and gentlemen, that was just played to you.  That piece of audio was played to because of a question that was asked to the witness about do you remember, in other words, would it refresh your memory to listen to a phone call and then the phone call was just played and then the government stopped it questioning, which seems unfair because there was never

a follow-up question to the witness about whether or not that did refresh her memory or remember that phone call.

So, Ms. Rathbun, that audio that was just played, do you recall that conversation with your son?

THE WITNESS:  I do now, yes.

THE COURT:  Okay.  After having listened to it and after having that refresh your memory, does that affect your answer to the question that Attorney Desroches had asked you?

THE WITNESS:  I'm sorry, I don't remember what he asked me now.

THE COURT:  All right.  Attorney Desroches, can you reask the question?

ATTORNEY DESROCHES:  Yes.

Q.  (By Attorney Desroches) Mrs. Rathbun, the question was, did John Rathbun tell you that he was in fact on Converse Street at 4:30 to 8:30 a.m. on April 2, 2020?

A.  Yes.

ATTORNEY DESROCHES:  Thank you.  And I apologize for any confusion I may have created, Mrs. Rathbun.

**CROSS-EXAMINATION**

Q.  (By Attorney O'Neill-Greenberg) That call that you were just being asked about, that was May 14, 2020.  Do you remember that?

A.  I didn't remember it as May 14, 2020.

Q.    Okay.  Are you aware of that now?

A.    Yes.

Q.    Okay.  That's a month after -- over a month past April 2, 2020?

A.    Yes.

Q.    You were asked some questions by Attorney Desroches about John using your car on April 2nd.  Was it normal for John to use your car or was that strange?

A.    No, it was not strange.  He would use my car from time to time, yes.

Q.    And you were also asked some questions about the photocopies you made for Pastor Rowe with that flyer for that Hall of Frame event; do you remember those questions?

A.    Yes.

Q.    Okay.  Beside making those photocopies for Pastor Rowe, did you do anything else at all for him in relation to that Billy Graham event at the Big E?

A.    I don't believe so.  There may have been one other flyer he may have had me do for the main event.  No, actually I don't think so because I think they printed them and sent them to us so I guess I would say no.

Q.    Okay.  And with your involvement with the flyer and printing or photocopying and giving it to him in the months before the Billy Graham event at the Big E, did you ever see or get that red pamphlet called *Steps to Peace*

*With God*?

A.   No.

Q.   I believe at the beginning when Attorney Desroches started questioning you, he was asking you about your children and who lived at home.  I think you said that John lives at home but does he live at home right now?

A.   No.

Q.   Okay.  Where is he right now?

A.   He's in a rehab facility.

Q.   Okay.  When you say rehab, what kind of rehab?

A.   It's a drug rehab facility.

ATTORNEY O'NEILL-GREENBERG:  Okay.  Thank you. That's it.

THE COURT:  Any follow up?

ATTORNEY DESROCHES:  No follow up.  Thank you.

THE COURT:  Thank you, ma'am.

THE WITNESS:  Do you want me to give you these back?

THE COURT:  I need to take a break.  I hope it's a well placed break.  We're trying to figure out when lunch would be here so we'll that balance out.  I'll talk to the parties.  This may turn into the lunch break.  It may not.  I'm not quite sure.  Christina will come back and tell you.

My instructions apply.  Do not talk to each other

about this case at all and all the other instructions apply.  Thank you.

**(The jury left the courtroom at 12:17.)**

THE COURT:  Next witness?

ATTORNEY WATKINS:  Mr. Rathbun.

THE COURT:  Last witness?

ATTORNEY WATKINS:  That's the last witness.

THE COURT:  So I'm happy to start in five minutes.

ATTORNEY WATKINS:  Sorry?

THE COURT:  I'm happy to start with that in five minutes, and then we can go until about 1:15-ish.  Take a lunch at 1:15.  Would you like to do that?

ATTORNEY WATKINS:  That certainly make sense to me.

ATTORNEY BRESLOW:  Sure.

THE COURT:  This will be a short break.  All right.  Okay.

**(A recess was taken at 12:18 until 12:30.)**

ATTORNEY DESROCHES:  Before the jury comes in, I want to apologize to the court and defendant.  I didn't mean to create any sort of unfair impression.

THE COURT:  I didn't mean to blow it up like that, but I did feel it left an unfair note for the witness so we took care of it.

ATTORNEY DESROCHES:  Thank you.

THE COURT:  Nice of you to say that.  Thank you.

**(The jury entered at 12:31.)**

THE COURT:  Okay.  Everyone can be seated.

Was everyone able to follow all of my instructions specifically not talking to each other about the case, all the instructions?

Okay.  Affirmative answer from all the members of the jury.  They remain fair and impartial.

ATTORNEY WATKINS:  Your Honor, the defense calls John Rathbun.

THE CLERK:  Mr. Rathbun, raise your right hand.

**John Rathbun (sworn)**

**DIRECT EXAMINATION**

Q.   (By Attorney Watkins) Mr. Rathbun, can you please introduce yourself to the jury and spell your last name?

A.   Good morning.  My name is John Rathbun; last name R-a-t-h-b-u-n.

Q.   Mr. Rathbun, how old are you?

A.   I am 38.

Q.   Where do you currently live?

A.   Right now I'm at Opportunity House in Springfield.

Q.   What is Opportunity House?

A.   Opportunity House is a drug and alcohol

rehabilitation program, sort of like a halfway house.

Q.    Before you were at Opportunity House, were you in jail?

A.    I was for one year in jail.

Q.    I want to turn -- where were you born?

A.    I was born in Springfield, Massachusetts.

Q.    And where were you living?  Where was your family living when you were born?

A.    We were living in Springfield when I was born.

Q.    Did you move to East Longmeadow at some point?

A.    Yes, we did.  When I was in about the fifth or sixth grade, we moved to East Longmeadow.

Q.    Describe your childhood.

A.    I had a good childhood.  I was brought up right. Like my mom had stated, I was born on Saturday, in church on Sunday type of thing.  I was raised right and wrong.  I had a good upbringing.

Q.    Where did you start elementary school?

A.    I was -- first I went to a Christian school.  I went to I believe it was called Baptist Christian Academy.

Q.    And where was Baptist Christian Academy located?

A.    That was in East Longmeadow, Massachusetts.

Q.    And what grade do you attend the Christian school?

A.    Up until fifth grade I was in Christian school.

Q.    Where did you begin school when you left the Baptist

school?

A.    Well, we moved to East Longmeadow from Springfield so then I went to Birchland Park Middle School.

Q.    Were there difficulties in the transition?

A.    Yes.    There was very -- it was very difficult for me. In East Longmeadow by the sixth grade everybody has their clicks and their friends and I was the new guy so it was difficult for me to make friends.  It was difficult for me to find my place.

Q.    Did you nevertheless continue to practice Saturday/Sunday church going?

A.    When I was in Birchland, sixth grade you're saying?

Q.    I'm sorry?

A.    Are you asking when I was in Birchland --

Q.    Yes.

A.    -- when I was in sixth grade?

I was still involved in church but maybe not as much as I was earlier.  I'd go to Wednesday night youth group.

Q.    Where did you go to high school?

A.    I went to East Longmeadow High School.

Q.    And by then, what was your church life like?

A.    I pretty much have stopped going to church by then when I was in high school.

Q.    Why was that?

A.    I had started using drugs at that time and I just had

a real disinterest in going to church.  I felt bad that I was living the life that I was living and then trying to go to church and be this holly person when I wasn't.

Q.    I'm going to slow down a little bit there.

First when you went to high school, living at 20 Lori Lane?

A.    Yes.

Q.    And who was living there at that time?

A.    At that time it was me, my brother Paul, and my mom and my dad.

Q.    Did you consider yourself a Christian family?

A.    We did.

Q.    And that was all of you, your parents and your brother?

A.    Yes.

Q.    You were the -- were you older or younger than your brother Paul?

A.    I was the older brother.

Q.    We're starting to talk about school.  How was high school for you?

A.    High school was I mean difficult also.  I'm more of a learner by doing.  I don't really do well with books, booksmarts.  Plus it was also when I started my drug use.

Q.    What kind of student were you in high school?

A.    I was not a good student in high school.

Q.    Did you discover romance while you were in high school?

ATTORNEY BRESLOW:  Your Honor, may we be heard?
(Sidebar discussion.)

ATTORNEY BRESLOW:  So I'm not objecting to the question but in the last trial Mr. Watkins elicited testimony that a particular woman, Mary Diaz, the mother of Natalie Rathbun who was in court just the other day, had premarital teenage sex with the defendant and that she, like him, ended up addicted to heroin.

I'm asking the court to direct counsel not to elicit testimony concerning the name Mary Diaz and her drug addiction and even the fact that she and he engaged in premarital sex.  None of this is relevant and it's extremely unfair to her.

THE COURT:  Can you stay away from use of names?

ATTORNEY WATKINS:  Yes.

ATTORNEY BRESLOW:  Additionally there's no reason for him to elicit testimony that she herself had a heroin addiction.  It's just not relevant.

THE COURT:  Fair enough, but I mean you can ask general questions of were you hanging around with people who also used without mentioning her name.

ATTORNEY BRESLOW:  That's fine.

THE COURT:  Okay.

(End of sidebar discussion.)

Q.    (By Attorney Watkins) Did you discover romance while you were in high school?

A.    I did.

Q.    Did you also discover drugs while you were in high school?

A.    I did.

Q.    Let's talk about the drug issue first.

      When did you begin using illegal drugs?

A.    Probably about seventh or eighth grade.

Q.    And how did you come to start to using illegal drugs?

A.    I started to with marijuana when I was in seventh or eighth grade and alcohol.

Q.    Was there a point at which your substance abuse escalated, you found new drugs?

A.    Yes.

Q.    How old were you then?

A.    That was in high school.  I was probably 16 at the time.

Q.    And what happened then?  How did your drug use develop?

A.    Well, my father was prescribed oxycontin.  He had a severe back injury and over the years he had built up from, you know, 20s to 40s to 80 milligram pills, and I didn't know what they were at the time but I know he took

medication for pain so I starting taking them.

Q.   Were you taking them for pain?

A.   No, sir.

Q.   Why were you taking them?

A.   For pleasure.

Q.   How did they make you feel?

A.   Great.

Q.   Did your father know that you were using his pain medication?

A.   Eventually, yes.

Q.   When say eventually, tell us about that.  How did that come about?

A.   So at first he didn't notice because he was still taking the prescribed amount but as his habit grew too, he would take more than what was prescribed.  So plus what I was taking, he would run out of his prescription.  Every two weeks he would run out on that you know Monday or Tuesday.

Q.   So was it the case that you had both become addicted to pain medication?

A.   Yes, sir.

Q.   Did your father, for example, continue to take pain medications?

A.   He did.

Q.   And did the two of you discuss your addiction to pain

medication?

A.    We did.

Q.    Going to romance, did you develop a relationship in high school?

A.    I did.

Q.    And without saying the name of the person with whom you developed the relationship with, was sex involved?

A.    Yes, sir.

Q.    And we heard from Natalie, your daughter.  Is your daughter Natalie the result of this relationship you had in high school?

A.    Yes.  That's my beautiful daughter Natalie.

Q.    How old were you when Natalie was born?

A.    I believe I was 17.

Q.    And were you still in high school?

A.    By then I had dropped out.

Q.    What were you doing once you dropped out of high school?

A.    I went to work so I could provide for Natalie.

Q.    And at that point were you struggling with substance abuse issues?

A.    I was, yes, sir.

Q.    Which issue was it at that time when you were 17?

A.    I was still doing pills at that time.

Q.    And when you say dope, what are you referring to

specifically?

A.   Oxycontin, pills.

Q.   Oh, you said pills?  Oxycontin pills?

A.   Yes, I said that.  I was still on pills.

Q.   And how long when Natalie was born, how long had you been taking Oxycontins?

A.   From start to when she was born?  I mean, I think it was about three, four years.

Q.   And during that same time did you begin hanging out with a particular kind of crowd?

A.   I did.  Again when I was in Birchland in the eighth grade, I became friends with I guess you call them the "bad" crowd.  You know, the ones who'd skip school and did drugs.

Q.   Was Natalie's mother likewise in that circle of people that were with the bad crowd?

A.   She was.

Q.   Before you left school to go to work, how were you doing in school?

A.   Not good.

Q.   Did you leave voluntarily or were you asked to leave?

A.   I was asked to leave.

Q.   And how long before Natalie was born was that?

A.   That was right when Natalie was born.

Q.   Once Natalie was born, did you and her mother live

together?

A.    We did.  She moved in with me, yes.

Q.    And when you say she moved in with you, she actually moved into Lori lane?

A.    That is correct.

Q.    So who was living in Lori Lane at that time when Natalie was born?

A.    So it was me, my baby's mother, Natalie, my mother, my father, and Paul my brother.

Q.    What kind of work were you doing?

A.    I was doing at the time I started a tree working job.

Q.    Going back to your faith life, at that point were you involved with the church?

A.    No.  At this time I wasn't involved at all with church.

Q.    Why not?

A.    I mean the life I was living, I had a baby out of wedlock.  I was addicted to drugs.  I just felt like a hypocrite going to church.

Q.    Since your exit from the church back then, how often have you resumed your faith going to church?  Well, just more generally, what has your relationship with your faith and church been since then?

A.    My faith itself I do pray still but I would only go to church maybe Easter Sunday or very rarely when my mom

really wanted me to go there for a special event or something.

Q.   Were there periods of time when you started attending church more regularly ever in your life after that?

A.   There were a couple of times when I got sober for two or three years that I was involved with church more, yes.

Q.   And in those periods which church would you attend?

A.   Heritage Baptist Church.

Q.   When was the last time that you had that kind of period of sobriety where you regularly attended church?

A.   It's been a good 10, 15 years, maybe more.

Q.   So at age 20, how would you describe your substance abuse?

A.   That's when it got bad.  My father got off the pain medication and he got cleaned.  He went to Brattleboro Retreat but I was still using and that's when I was introduced to heroin.

Q.   Were you using both Oxycontin and heroin in your early 20s?

A.   At first a little bit but not really.  Pills are very expensive on the street.

Q.   Since that time in the early 20s, have you ever been able to concur your substance abuse issues?

A.   Like I said, the most I've had clean time from 20 to 38 now is probably two or three years.

Q. In recent years what are your drugs of choice?

A. So heroin, cocaine, crack cocaine, benzodiazepines, like Xanax and alcohol.

Q. How has your addiction impacted your overall physical health?

A. It's definitely done its damage. I was -- I started -- when I first used heroin, I was sniffing it but then eventually I started to use needles and it's caused severe problems with my veins. My health has definitely been affected.

Q. What about relationships over the years, how has your substance abuse impacted that?

A. I have ruined multiple relationships both with women and in jobs. I've just -- it's kind of an ongoing cycle.

Q. Natalie has always lived with you and your family?

A. Yeah. Yes, sir.

Q. There have been periods of time where -- long periods of time where you've moved out of 20 Lori Lane?

A. Yes.

Q. Did Natalie stay at 20 Lori Lane when you moved out?

A. Yes, that is correct. That's where she felt most comfortable and I didn't want to move her from that.

Q. What about her mother? Would she be spending time with her mother in her childhood?

A. She would. Her and her mom have had a tough

relationship though over the years.  It was -- she wouldn't go over there at all some times and then she would once in a while.

ATTORNEY BRESLOW:  May we be heard?

THE COURT:  Let's just move on from this.

Q.   (By Attorney Watkins) Do you think your substance abuse disorder has affected your relationship with your daughter?

A.   Unfortunately it has severely.

Q.   When you say that, what do you mean?

A.   I mean as a dad I, you know, I would be there for volleyball games and I would be there for her but I probably would be under the influence.  You know, I was more of a friend probably than a dad to her, you know, and it has hurt our relationship severely.

Q.   You talked about the program you're in.  Do you get counseling through that program?

A.   I have three different counselors that I get counseling from.

Q.   Do you also get medication for your substance abuse?

A.   I do.

Q.   And what medication do you get for your substance abuse?

A.   I'm on Methadone.

Q.   How long have you been on Methadone?

A.   I've been on Methadone now for about three years. I'm in the process of tapering down and getting off of it.

Q.   What is the purpose of taking Methadone?

A.   So taking Methadone it helps you to be able to get stable and not having to try to get drugs every day so that you're not sick.  Methadone just makes it so that you're able to still function and start to put your life back to together.

Q.   You described a lot of drugs that you've taken in recent years.  Does Methadone help you with the cravings for those drugs?

A.   It does, yes, sir.

Q.   Or is it more specifically to a particular drug?

A.   It's more designed specifically for heroin or pills withdrawal.  That's what it's designed for.

Q.   And when you take Methadone, does that work to stop your craving for heroin?

A.   Yes, it does.

Q.   Over the years that you've been taking Methadone, do you still do heroin?

A.   Sometimes, yes.  Yes, you still can.  I still fight the demeans of my addiction, yes.

Q.   So I want to move forward to 2017 about four years ago.

     Did you move into your -- back into your parents'

house at 20 Lori Lane?

A. Yes, I did.

Q. And was that the result of one of the relationships that had gone sour because of your substance abuse?

A. That is correct.

Q. So how old were you in 2017 when you moved back into your home?

A. I was probably in my late 20s.

Q. In 2017?

A. No, early 30s. I'm sorry, I'm not good with math.

Q. And this was in the home you grew up in?

A. 2017, yeah, I was in my 30s. I'm sorry, could you repeat the question?

Q. I was asking, so in your 30s you were moving back into the home that you had grown up in?

A. Unfortunately, yes.

Q. What were you doing during this period of time when you moved back into your parents' home in 2017?

A. I was still working. I had jobs that I would do and I still had a serious drug problem.

Q. Let's talk about the work you were doing first. Were you self-employed or employed by companies?

A. I have a self --

ATTORNEY BRESLOW: Your Honor, may we be heard?

(Sidebar discussion.)

ATTORNEY BRESLOW:  So this is the first objection that I'm going to be making.  It's been about maybe 25 --

ATTORNEY WATKINS:  Hold on.

Thank you.

ATTORNEY BRESLOW:  This is the first objection that I'm making formally based on relevance.  It been about 25 minutes or so and we've heard about his birth, his elementary, his middle school, his high school, and some of the background is appropriate but I think this exceeds that.  It's just too much biography.

I think frankly that Mr. Watkins is attempting to use the defendant's biography to establish some connection with the jury that's not relevant to this trial, and so I would just ask Mr. Watkins to move on.

ATTORNEY WATKINS:  I'm moving right along.

THE COURT:  All right.  You do need to start moving closer to the points.  I mean, I think you can -- it's fair to develop the historical information absolutely and you can develop a little more, but let's just keep going.

ATTORNEY WATKINS:  Thank you.

(End of sidebar discussion.)

Q.   (By Attorney Watkins) So moving back into your home, I think you were about to tell us the kind of jobs you

were working during that period?

A.    Yes, sir.  I've always had a business, JMR Construction, which I'm self-employed with to do side jobs and clean out jobs and stuff, but I've also worked for companies during that time also.

Q.    So what kind of skills do you have that you use in your work?

A.    I went to electrical school.  I did my four years for electrician.  I've probably been doing that for a good six, seven years.  I also have a carpentry background, a maintenance background.  Anything soup to nuts in a house I can pretty much do.

Q.    During this period of time, talking now 2017 up to recent times, were you also struggling with addiction?

A.    I was, absolutely.

Q.    And what drugs were you doing when you returned back to your parents' house in 2017?

A.    Not so much heroin, maybe once in a while heroin but more turned into a cocaine habit.

Q.    And were there other drugs of those drugs of choice you mentioned that you were doing?

A.    Yes, sir, the benzos, Xanax, alcohol.

Q.    While you were doing particularly heroin or Methadone, how were you able to work?

A.    I'm a functioning addict.  I try not to use too much

during the day.  I try to keep it on the lower side so I can still work.

Q.   Did you have long-term employment during any time during that period of 2017 to present?

A.   No.  The most permanent job I had was maybe a year.

Q.   I want to fast forward now to February of 2019 about two years ago.

Did you go to work installing solar panels?

A.   I did.  I worked for All Energy Solar in Chicopee.

Q.   And when did you start working for All Energy?

A.   I'd say early 2019.

Q.   And did you actually work for them for two discrete time periods?

A.   I did.  I worked for them for about eight or nine months, and then a friend of mine started an electrical business and I helped him get that started but it fell apart.  He was a very poor manager.  He was very bad with time management on the jobs so I went back to All Energy.

Q.   You were able to -- they took you back obviously at All Energy?

A.   Yes, they did.

Q.   When was that?

A.   That was early 2020.

Q.   Talk to us about your drug use during this period, the two times you were working for All Energy Solar and

then the break in between.

A.    My drug use was still pretty, pretty there.  I was starting to use crack cocaine a lot, alcohol, heroin once in a while.

Q.    Over the 18 years or more that you've struggled with substance abuse, is it a steady kind of abuse or does your abuse go up and down in some ways?

A.    It definitely goes up and down.  A lot of it depends on how much money I have, what's going on in my life at the time.

Q.    So if you have a good job, you're doing a lot of drugs?

A.    Yeah, but it depends.  So like I would work for All Energy and I would get paid every two weeks, so that weekend when I got paid Friday, Saturday, and Sunday, I would splurge.  I would go to the casino, blow a lot of money, buy a lot of drugs.

Q.    And what about during the week while you're working with All Energy Solar, would you do drugs during the week?

A.    I would.  I still would but not as much because financially it didn't work out and also I still had a conscience.  I mean, I was up on roofs.  I really didn't want to be too messed up on top of roofs.

Q.    Did you like the work -- describe the work you were doing for All Energy Solar.

A.    So I would be up on the roof installing the tracks and installing the panels and, yes, I enjoyed the work a lot.  I enjoyed it.

Q.    Did it pay pretty well?

A.    It paid pretty well, yes, sir.

Q.    Did you have any kind of remorse about your substance abuse during this period of time?

A.    I definitely had some depression.  You know, I mean it's just a never-ending cycle of, you know, continuing to use drugs, continuing to lose jobs, continuing to lose relationships, very depressed.

Q.    And did you try to get any kind of treatment during this period of time?

A.    No.

Q.    Why not?

A.    I still enjoyed using.  My addiction is very strong. It's very difficult to make the choice to get clean and stay clean and be into it and put time into it and do everything you can to stay clean.

Q.    How long have you been clean now?

A.    I've been clean over about 14 months now.  I feel good.

Q.    I want to turn now to a time early in 2020, around the time the pandemic started.

      Was there a change in the level of your drug use

during that period of time?

A.    I was -- yeah, I mean, again I was still using crack cocaine more frequently and not really as much heroin but alcohol.

Q.    Did your drug use begin to interfere with your work --

A.    It did.

Q.    -- at All Energy Solar?

A.    It absolutely did.  At All Energy it got more frequent.  I would take -- started taking Xanax too which is not good.  Every time I'd take Xanax, it leads to car accidents and not good stuff.

Q.    And so what happened at All Energy Solar that you ended up losing that job?

A.    So one day I had taken a couple of Xanax at work during the day and I had to drive the company truck home, and on the way home I was driving very erratically going up on curves, running red lights, and so I had a bunch of people call into the company and say that I was driving erratically.

Q.    When you got back to the All Energy Solar office, who did you see there?

A.    I saw the branch manger.  His name is Alfie.  He was here earlier.

Q.    And tell us about the discussion that you had with

him at the end of the day.

A.   So he came out and, first of all, he asked where I was because from the time of -- the job was only half an hour away and I was gone for three hours and so he asked where I had been.  I told him I had fallen asleep in my car and he said you look, you look like a mess.

Well, first he told me about the phone calls and then he said look a mess.  And I said, I'm fine.  There's nothing wrong.  You want to smell my breath?  That was about the exchange.

Q.   Did you deny that you had been using drugs?

A.   I did at that time.  I did not admit to him that I had used drugs.

Q.   And why was that?  Why did you deny that to him?

A.   I enjoyed the job.  It's an embarrassing thing.  It's not something you just come out and brag about or talk about or admit to something.  It's a hard thing to do.

Q.   Notwithstanding your denial that you were doing drugs, did you expect that you were going to keep that job?

A.   By the way Alfie talked to me that day, I did not think I was going to have a job anymore.

Q.   So as a result of that, what did you do that day?

A.   So as a result of that I took my tools out of the back of the truck, put them in my car, and was on my way.

Q.    What did you do that night?

A.    That night I rented a hotel room, got a good massive amount of drugs and invited Dana to come with me.

Q.    How did you know Dana Graham at that point?

A.    I met her through a mutual friend of mine.  His name is Glenn Miliken.

Q.    What kind of drugs were you using?

A.    That night I used heroin, powder cocaine, crack cocaine, alcohol, and benzos.

Q.    Why did you go to the hotel to start using drugs after you just lost your job?

A.    That's what I do, just to numb the pain.  I don't want to accept the reality of, you know, me messing up again; losing another job because of my substance abuse so I just wanted to get messed up as possible.

Q.    How long did you party for that night?

A.    All night.  From you know six, 7 o'clock on to the early morning.

Q.    We've heard and you heard testimony about the police being called.  Do you recall that?

A.    I do.

Q.    Is that accurate what happened?

A.    Yes, for the most part.  Yes, it is accurate.

Q.    What were you feeling while those events were going on?

A.    I'm sorry?

Q.    What were you experiencing?  What was going through your mind when you called the police?

A.    I thought there was somebody breaking into my car.

Q.    And did you go out and talk to the police?

A.    I did go out and talk to the police, yes.

Q.    When you went out there, how many police were there?

A.    There must have been six, seven cruisers.

Q.    And we heard the police officer.  Do you remember talking to him?

A.    I do remember talking to him, yes.

Q.    What did you do after the police -- you were done talking to the police?

A.    I just went back up to my room and continued to use.

Q.    Was Dana Graham still there?

A.    She was.

Q.    Did you go back to All Energy Solar at some point after that?

A.    I did.  The next day I went back in and talked to Alfie the branch manager and Chris Myerhoff.  He's my immediate supervisor, and I just laid it on the table and was honest with them and told them what happened.

Q.    Did you tell them that you had been using drugs?

A.    I did.  I told them that I was using -- I took a couple of benzos that day, Xanax, is what I told them.

Q.    Why did you think it was important to tell them that?

A.    They were very good to me.  It's just the right thing to do.  It was the -- you know, you got to admit to your wrongs when you do something wrong like that.

Q.    So you were living at 20 Lori Lane on March 3rd, right?

A.    Correct.

Q.    So after the partying, after you went to AES Solar, what were your plans as you were sitting at 20 Lori Lane?

A.    I really didn't have much plans.  I was very depressed.  Just like I said, the same cycle over and over again.

Q.    Were you contemplating suicide?

A.    I was not contemplating suicide, no.

Q.    Were you contemplating doing violence?

A.    No, absolutely not.

Q.    Did you consider getting help to address your drug addiction?

A.    I did not.

Q.    Were you particularly proud of where your life was at that point?

A.    I was far from proud.

Q.    Now, is this the first time in your life that you've been at this kind of situation where drugs had brought you so low?

A.    Absolutely not.

Q.    How many times over your course of 18 years that your drug use had gotten to this point?

A.    I can't even count.  A lot.

Q.    So this was not a particularly new experience you were feeling?

A.    No, sir.

Q.    We have heard about arguments with Natalie and your mother.  Were these specific to this period of time?  I'm talking about from March to April of 2020.

A.    They were.  I was very agitated.

Q.    More so than unusual?

A.    Yes, sir.

Q.    And why was that?

A.    Between my drug use, losing another job, where my life was at this point at 37 years old, still living at my parents' house.  My relationship with my daughter was not good.  I was unemployed.  It was very sad and depressing.

Q.    The pandemic was underway by the time you lost your job at All Energy?

A.    Yes, sir.  The pandemic was just kind of starting, yes.

Q.    Were you trying to look for work during that period of time?

A.    After my job at All Energy I did look for more work,

yes.

Q.   I'm sorry?

A.   After my job at All Energy when I got fired, I did look for work after, yes.

Q.   Talking about the arguments that you had, were these physical arguments you would have with your mother and your father or your daughter?

A.   No, never.

Q.   Would you make up afterwards after these arguments?

A.   We would.

Q.   Were you happy about seeing Natalie have to testify here in court?

A.   No.   That was very difficult for me.   The same thing with my mother, it broke my heart.

ATTORNEY BRESLOW:   Your Honor, objection; move to strike.

THE COURT:   Sustained; move strike   That is completely stricken, the answer and the question.

Q.   (By Attorney Watkins) Did you continue to use drugs during this period?

A.   I did.

Q.   You talked about some of the odd jobs you did.   Was there a longer term job that you did during this period of time?

A.   Kind of.   It was a couple weeks.   My buddy had a

place in Palmer he was renovating.  He gave me a little bit of electrical work and carpentry work.

Q.    And how long did that last for?

A.    Just a couple of weeks.  This is when the pandemic was getting bad.  We would listen to it during lunchtime on the news and stuff and that's pretty much he just called the job off.  Let's go home to our families and stuff.

Q.    The money you were making from that job, where would it go?

A.    To food, gas, and drugs.

Q.    What kinds of other activities were you doing during this time as the pandemic started to grow?

A.    I started -- I was doing clean out jobs, dumpster diving, stuff like that.

Q.    Let's talk about dumpster diving.

What do you mean in this context, dumpster diving?

A.    So say Home Depot or Costco or electronic stores, I would go dumpster diving for anything good that was in there, scrape metal, anything.

Q.    And what was the purpose of dumpster diving?

A.    Pretty much to make money and also when you use cocaine or crack, you're energetic.  It gives me something to do.

Q.    And you started to talk about clean outs.  Describe

what you mean by a clean out?

A.   So a clean out is I'd get in touch with a customer on one of my different apps or website and I ask them what they have.  They will take pictures of their back yard or whatever they have for trash that needs to be removed. I'll give them an estimate and they decide if they want it or not.

Q.   Were you able to get a fair amount of work doing clean outs?

A.   I did.

Q.   Over the course of your entire lifetime, how many clean out jobs have you gotten?

ATTORNEY BRESLOW:  Objection, Your Honor, to the preface over the course of the entire lifetime.

THE COURT:  Overruled.

THE WITNESS:  Twenty to 30 maybe.

Q.   (By Attorney Watkins) And how was it that you could be successful in getting a lot of these clean out jobs?

THE COURT:  We're going to take a break for lunch.  The lunch is here for jurors and then, Attorney Watkins, you're going to be directed to move into areas of more relevance to the crimes at bar here.  All right?

ATTORNEY WATKINS:  Yes.

THE CLERK:  All rise.

THE COURT:  All right.  Lunch is here.  Do not

discuss this case with each other and all the other instructions apply.  All right, everyone, thank you.

**(The jury left the courtroom at 1:11.)**

THE COURT:  All set.  So two o'clock.

**(A recess was taken at 1:12 until 2:02.)**

THE COURT:  Did everyone follow my instructions not to talk to each other or anyone about the case, as well as all the other instructions?  All right.

Affirmative answer by every juror; they remain fair and impartial.  Okay.  You can continue.

ATTORNEY WATKINS:  Thank you, Your Honor.

Q.   (By Attorney Watkins)  John, I want to talk about the early morning of April 2nd.  First, I want to start from the night before April 1st.

Were you using drugs starting on the night of April 1st?

A.   I was.

Q.   And what kind of drugs were you using?

A.   I was using crack --

THE CLERK:  Sorry.  The volume was off.

THE WITNESS:  Could you repeat the questions again?

Q.   (By Attorney Watkins) What drugs were you using on the night of April 1st?

A.   I was using cocaine, crack cocaine.

Q.   And any other drugs that night?

A.   I don't believe so.

Q.   What time do you start using cocaine, crack cocaine on April 1st?

A.   It was in the late evening.

Q.   And typically when you're using crack cocaine, how does it work?  Do you use it all at one time or is it a different method?

A.   I usually take a hit maybe every 20 minutes, half hour.

Q.   Do you ever save some crack cocaine for later or does it get consumed?

A.   It all gets consumed but like I said, I'll take a hit every half hour or so.

Q.   Where did you get that crack cocaine on April 1st?

A.   I believe Devin Austin.

Q.   And how much did you have?

A.   That night I probably had a 40 piece.

Q.   I want to go to what's been previously admitted as Exhibit 52.  I'm going to go through -- I'm going to blow this up so we can see it a little bit.

     Are you able to see Exhibit 52 up on your screen?

A.   No.

Q.   Now what do you recognize --

     THE CLERK:  There it is.

THE WITNESS:  Now I can.

ATTORNEY WATKINS:  I'm sorry.

THE CLERK:  Is it for everyone?

ATTORNEY WATKINS:  Yes.

Q.   (By Attorney Watkins) John, what do you recognize this to be?

A.   I believe that's my outgoing calls on April 2nd in the late evening.

Q.   Does it also -- well, we're talking about April 2nd now.  Do you see the time here?

A.   I do see the time, April 2nd, 12:08 a.m.

Q.   Does this also include some web searching activities you did?

A.   There is some, yep.  Yes, sir.  There's some cookies there, log entries, call logs, searched items.

Q.   So what were you doing during this period of time while you're on your phone?

A.   So I was high on crack cocaine and I was searching through my phone playing with stuff.

Q.   When you say searching through your phone, what kinds of things were you doing on your phone?

A.   I look at -- I play on Facebook.  I look on HomeDepot app; look at tools.  I search for jobs.

Q.   Were you doing -- and where were you while you're doing all of this?

A.    I was at home.

Q.    When you say at home, were you in your living room or someplace else?

A.    I was in my bedroom at 20 Lori Lane.

Q.    I see here a searched item for HomeDepot.  What are you doing searching for a HomeDepot in the middle of the night?

A.    Again, when you're high on crack cocaine, you're very go, go, busy so I'm looking at tools.  I'm looking at prices of materials for maybe a job coming up.  Just, you know, staying busy.

Q.    There are entries here now for PeopleReady from the web history.  I'm looking now at line 23.  What is PeopleReady?

A.    PeopleReady is a temp agency that I've done some work for.

Q.    And what was your purpose of searching on PeopleReady?

A.    Again I'm looking for jobs, small jobs, big -- I mean, permanent job, any kind of work.

Q.    Open skilled trade positions, what is that search for?

A.    Again that's through PeopleReady.  They have a department called the skills trades department where they have a lot of construction jobs, electrical jobs, solar

jobs.

Q.   And again what is your purpose for this particular site, this skills trade position?

A.   Again, I'm looking for jobs.  I mean, we're getting to one o'clock in the morning.  I'm high on crack cocaine.  I'm very go, go, go.

Q.   Here is a web search -- your web history for apprentice electrician needed in Springfield, Massachusetts.  Do you recall what that was for?

A.   Yep, again that's just for more work.  That was probably a Craig's list ad possibly or on PeopleReady, one of the two, something like that.

Q.   Let's move forward a little bit here.

     Directing your attention here to line 351, what time in the morning?  Can you see there?

A.   That was 1:15 or 1:14:34 a.m.

Q.   And what does that indicate now that you've had a chance to look through these records?  Does that indicate an outgoing instant message?

A.   That is correct.

Q.   And what is the instant message?

A.   It's supposed to say dude but it says "Did, my man I'm loaded with" it says shut but it's supposed be "shit" -- pardon my French -- "and just need a 40 of hard.  Give you 60.  Now I'm killing it out here."

Q.    First, do you know who this instant message was directed to?

A.    Yes, I do.

Q.    Who was it directed to?

A.    That was to Devin Austin.

Q.    And who was Devin Austin?  How do you know Devin Austin?

A.    He's a friend of mine/dealer.

Q.    Do you get drugs from Devin Austin?

A.    I do.

Q.    What does it mean to get a 40 hard and give you 60 now?

A.    I probably owed him money.  So I'd probably give him 60 bucks, 20 towards what I owe him and then 40 for the hard.

Q.    What did you owe him money for do you think?

A.    Past drugs.

Q.    You also write that now "I'm killing it out here?"

A.    Yes, sir.

Q.    Where were you writing from when you were sending that message?

A.    I was probably out doing dumpster diving I'm guessing.

Q.    I'm talking now we're at 1:14 in the morning.  When you say "I'm killing it out here," are you actually

outside or are you at your home?

A.    No, I was still at home at this time, I'm sorry.  I read that wrong.  Yes, at 1:14 I was still at home so that was --

Q.    Why are you telling him "I'm killing it out here?"

A.    Just to make him think that I'm, you know, doing stuff to get money; just to like sound good.

Q.    Have you and Devin had disagreements about how much owed for your drugs?

A.    We have.

Q.    Are there times when he will refuse to sell drugs to you because you don't have the money?

A.    There have been times.

Q.    You've looked through these records and are there -- were you at some point also searching for pornography?

A.    Yes, I was.

Q.    Were you searching through Craigslist for jobs?

A.    Yes, I was.

Q.    Were there other temporary job sites that you were looking for?

A.    Yes.

Q.    Were you searching at all that night about Jewish Geriatric Services?

A.    Absolutely not.

Q.    Was there anything in there about how to make a bomb?

A.    Absolutely not.

Q.    You were talking about doing crack cocaine on that night, on April 2nd in the early morning hours of April 2nd?

A.    Yes, sir.

Q.    We heard the testimony about Chicopee, were you only doing crack cocaine in Chicopee?

A.    No.  Chicopee I used a couple different substances.

Q.    Looking through those text messages now, does that give you -- does that remind you about that particular morning on April 2nd?

A.    It does.

Q.    And is that how you're able to know now that you were doing crack cocaine?

A.    That's correct.

Q.    How were you -- given what you can see on the text messages, how were you feeling that morning?

A.    I mean, I was high on crack and I must have ran out at some point.

Q.    Were you angry at the world --

A.    No.

Q.    -- the morning of April 2nd?

A.    No, I was not.

Q.    Going back to Exhibit 52 again.  Fast forward here to -- there it is -- line 457 here.  What is the time on that

particular instant message?

A.   4:32:59 a.m.

Q.   This is at line 457 of Exhibit 32.  This is another --

ATTORNEY BRESLOW:  52, Your Honor.

ATTORNEY WATKINS:  What did I say?  I'm sorry. This is Exhibit 52, line 457.

THE COURT:  Thank you.

Q.   (By Attorney Watkins) And what is that message? Well, first who's that message to?

A.   This is me and Devin Austin.

Q.   And what are saying here?

A.   I said "Dude, I got a hundred in cash sitting in front of me.  Does it last time I said if you want to do it, it's fine.  If not, whatever.  All I need is a 40 piece.  I'm right around the corner from you.  If you don't want to do it, that's fine but another hour or two it ain't going to matter.  But you should do it because I got licks I'm trying to do but nobody wants to do them with me."

Q.   I want to break all of that down, but first what was it that you were trying to get across to Devin Austin in this message?

A.   Pretty much that I needed drugs, needed more crack.

Q.   So the first part is "Dude, I got a hundred dollars

in cash sitting in front of me."  Was that true?

A.    That was not true.  It was in the form of a check.

Q.    And why were you saying, "Dude, I got a hundred dollars in cash sitting in front of me" if it wasn't true?

A.    I mean, it pretty was true to me.  I had a check that I could cash when the bank opened in the morning.

Q.    When you said, "I'm right around the corner from you so if you don't" -- I'm right around the corner from you," were you indeed right around the corner from him at that point in time?

A.    I don't believe so, no.

Q.    Why did you tell him that?

A.    Just to put pressure on him to, you know, sell me drugs.

Q.    Then you go to say, "In another hour or two but it ain't going to matter."  What was the point of sending that to Devin Austin?

A.    I meant that I would go somewhere else or to somebody else to get drugs.

Q.    Did it mean you were going to go do something to end the world or commit suicide?

A.    No, sir.

Q.    Did you get a response from Devin Austin?

A.    I don't believe so, no.

Q.    Going down to line 462 of Exhibit 52, another text

message.  Who is this to?

A.   Again this is to Devin.

Q.   And you write -- what do you write in that message to him?

A.   I said, "Do you just put it in your mailbox.  I'll be".

Q.   Why did you write him put it in the mailbox?  What's the point of that?

A.   I was just trying to make it easier for him, just to throw it in his mailbox and I'll grab it out of the mailbox.

Q.   What kind of procedure, if any, does he have on selling drugs and people coming over to his house to buy drugs?

A.   Most people can't.  I can because I deal with him a lot but it was 4:38 in the morning.  I was just trying to make it easy on him so I just had him throw it in his mailbox.

Q.   Did you get a response to this message from Devin Austin immediately?

A.   No.

Q.   Did you leave your house to go up to 90 El Paso Street?

A.   Yes, I did.

Q.   When you left to go up to 90 El Paso Street, had you

gotten any kind of response from Devin at all?

A.    I did not.

Q.    So why were you going up there if he hadn't responded to any of your texts about drugs?

A.    Because I knew that either he would respond or that there's somewhere else in that area in the projects that I could get crack elsewhere.

Q.    So you took your mother's car?

A.    I did.

Q.    Why did you take your mother's car?

A.    My van is big and bulky and it eats a lot of gas and I don't like driving it around the hood.  It's very big and bulky.

Q.    Had you told your mom you were going to be taking the car?

A.    I did.

Q.    How did you know you were going to take that car that morning?

A.    I knew that I would run out of crack eventually and need to go out the night before.

Q.    When you talked about a check that you had, that was money that had been deposited in the Bank of America?

A.    That's correct.

Q.    So what was it your hope about that money that had been deposited in the Bank of America?

A.    It was supposed to clear that morning.

Q.    So had you really kind of planned all along that you were going to be going to get drugs that morning?

A.    Correct, and I would be in that area for a while.

Q.    How did you drive to 90 El Paso Street?

A.    What route did I take?  You want me to explain the route I took?

      Okay.  So I left my house in East Longmeadow, Lori Lane.  I drove down Converse Street; got to Route 5; took a right, and got on 91 north.

Q.    On the way to 90 El Paso Street before 5 o'clock in the morning, did you stop at the Jewish Geriatric Services?

A.    I absolutely did not.

Q.    Did you get out of your car and put a fuel container there?

A.    I absolutely did not.

Q.    Did you try to light it on fire once it was there?

A.    No, sir, I did not.

Q.    I want to go next to 5 o'clock in the morning.  This is going to be line -- you know what, we can go to the other exhibit at this point.

      I'm showing you page 12 of Government's Exhibit 41 and highlighted a particular line from your phone that says "knock, knock, knock."  Did you send that text

message?

A.    I did.

Q.    And do you recognize the number that's going to?

A.    That's Devin Austin's number.

Q.    So why where you sending this message?

A.    To let him know that I was close by.

Q.    And where do you think you sent that message from?

A.    I believe it's as I got off the exit, the St. James exit on 291.

Q.    How do you know that for sure?

A.    It's something that I normally do when I get in contact with him because that's the route I always take. I usually get in contact with him as I'm getting off the exit.

Q.    Let me go to the next page of Exhibit 41.  This is actually the previous page I guess, page 13 of Exhibit 41.

      Have you seen this before?

A.    I have.

Q.    And we now know -- you know what this depicts, right?

A.    Yes, sir.

Q.    I want to -- before I start asking you questions about it, I want to find out from you -- you've talked already about your whereabouts and things you were doing on a particular occasion in the early morning of April 2nd.  How are you able to talk about a time now over a

year ago?

A.    Well, for one I've been off drugs for awhile now so my memory is starting to get a lot clearer.  Number two, I was able to look at phone calls and text messages of what I was doing that night and it helps me out remember what happened.

Q.    But to be clear, can you say for certainty where you were every minute of that morning?

A.    For the most part I can.

Q.    The exact spot or what you were doing at any given moment?

A.    For the most part, yeah.

Q.    So I want to -- well, looking at this map and having looked at it and the title here is pretty broad, it's from 5:05 a.m. until 8:25 a.m.

      Having looked at this, reviewed the places your phone and therefore you were at, what is your conclusion about what it is that you were doing up there?

A.    So during the time of 5:05 a.m. to 8:25 a.m. I was in the area of Devin's house, which is in the blue square that says 90, in that whole area that whole time.

Q.    And is this consistent with other times that you've gone seeking drugs?

A.    Yes, sir.

Q.    And how is it?  Tell us about what happens when

you're looking for drugs.

A.   It's the same thing.  If I can't get a hold of Devin, I'll go over to the projects, see if anybody is out or awake.  I have other people too in that same area that I can call also to get drugs.

Q.   Do you know people in other parts of the city that also deal drugs?

A.   I do, yes.

Q.   So why is it this particular part of the city that you're on this morning on April 2nd?

A.   There's a few reasons.  Number one, it's very convenient and easy to get drugs there.  Number two, I was waiting for the Bank of America to open so I could get my hundred bucks.

Q.   And again looking at this and knowing what area you are in and having seen the calls and texts you made, what is it that you're trying to do?  What is it that you're up here this morning on April 2nd to do?

A.   I am up there trying to find drugs, period.

Q.   I'm going to go back to Exhibit 52 and look at line 484.

     I'm going to try to -- do you see this text message that starts, "yeah, I've been sitting."

A.   Yes, sir.

Q.   Do you see what the time associated with that is?

A.    5:34:39 a.m.

Q.    And what does that -- first, who's that message to?

A.    Again, this is Devin.  I think it was a Facebook message.

Q.    And so what does that message say?

A.    It says, "Yeah, I've been sitting at your house since 5:15.  Please come to the door as soon as possible.  I just need a 40 and I'll be on my way.  You will get plenty of bread later.  I got licks, lots of licks today.  I'm not trying to bother you.  I just need a 40.  I'll trust me please.  I'll go away.  Just put it in the mailbox.  Yeah, I got cash I'll put it in right."

Q.    Let's break that one down again.

      When you talk about trusting me, "I just need a 40 and I'll be on my way," why are you saying all those things?

A.    I'm trying to get him to give me drugs.

Q.    Were you actually right in front of his house?

A.    At this time I think I was around the corner.

Q.    And why were you around the corner rather than in front of his house?

A.    I didn't want to be sitting right in front of his house to do a drug deal at this hour of the morning.

Q.    Now again, how do you remember so clearly now exactly what you were doing on April 2nd in the morning?

A.    Again, after going over these call logs, going over text messages, having some clean time, getting out of the fog of drugs, I can remember and I can match the text messages and calls I made and Facebook messages I did that morning.

Q.    Do you think having looked at this did you get drugs from Devin Austin that morning?

A.    I believe at some point, yes, I did.

Q.    Are you a hundred percent sure that you got it from Devin as opposed to someone else?

A.    I'm not 100 percent sure but I did get drugs.  I just don't know from who.

Q.    I'm looking at next line 491.  This is an outgoing phone call and what time is this at?

A.    This is at 6:04:52 a.m.

Q.    That phone number has a person's name associated with it?

A.    That is correct.

Q.    And whose name is that?

A.    That is Gabe.

Q.    Who is Gabe?

A.    Gabe is a friend of mine; somebody else I get drugs off of also.

Q.    I'm sorry, he's what?

A.    He's a friend of mine and somebody who I get drugs

off of also.

Q.   Why are you -- what does it mean that you're trying to call Gabe at 6:04 in the morning?

A.   It means I'm looking for more drugs.  Even if I was able to get drugs from Devin or somebody else over there, it wouldn't have been much so I'm looking for more drugs still.

Q.   At line 493 at 6:09 in the morning, who are you trying to call there?

A.   Again, that's Devin Austin.

Q.   So you're talking to both Gabe and Devin at the same time at 6:09?

A.   That is correct.

Q.   Now, there is a gap in your calling records here up until 7:06.  Did you go down to Longmeadow to the Jewish Geriatric Services during that period of time?

A.   No, I did not.

Q.   How can you be so sure?

A.   I would have absolutely no reason.  I was completely focused on getting drugs.  I had absolutely no reason to turn around and go to Longmeadow at all.  There's zero reason.  I was looking for drugs.  I wanted more drugs.

Q.   Well, you may have already gotten drugs that morning I think you told us.

A.   It's not enough.  There's never enough.

Q.    The next entry is 494.  Do you see this call?

A.    I do.

Q.    What time is that at?

A.    6:51:32 a.m.

Q.    And let's see.  Let's go with the next line, which is 495 also that same time, correct?

A.    Correct.

Q.    What does this entry indicate?

A.    This is either a Facebook message or a Facebook phone call from me or to Devin Austin or vice versa.  I'm not sure.

Q.    So Devin calls you three times here but you don't answer the phone?

A.    That's correct.

Q.    You were trying to get drugs from Devin Austin.  Why aren't you answering phone?

A.    I think I had already got drugs from him and he was either looking for money or wanted to know when I was going to pay him what I owe him or something so I just ignored them.

Q.    Do you know for sure that that's what was going on that morning or are you simply thinking about it in your ordinary relationship with him?

A.    I mean, that's my -- that's definitely what I think. I mean, that's my educated guess because I would have

already gotten drugs from him by then.  I mean, I'd have no reason to ignore him.

Q.   So jumping ahead here to 7:06, you make a call back to Devin Austin?

A.   Yes, sir.

Q.   And he doesn't pick up?

A.   Correct.

Q.   Between that time that you were talking with Devin about drugs, trying to get Gabe's attention about drugs, and coming back here to get Devin's attention about drugs again, did you go down to Longmeadow, the Jewish Geriatric Services?

A.   No, sir, I did not.

Q.   Was Devin Austin in some kind of conspiracy with you to place a fuel container at Jewish Geriatric Services?

A.   Absolutely not.

Q.   Looking at Government's Exhibit 41 again.  Do you see calls here to about 7:25 in the morning?  Do you see those?

A.   Yes, sir.

Q.   And then here, 7:45 here?

A.   Yes, sir.

Q.   At 8:10, maybe a little further away from Devin's house, 8:10 in the morning here, what were you doing during these periods of time when your cell phone is going

off cell towers in the East Springfield area?

A.   Again, I'm looking for drugs.  I could be dumpster diving because I was high on crack, but the main purpose to going to this area is drugs.

Q.   You talked about a hundred dollar check that you had and going to the Bank of America.  Did you eventually get a hundred dollars from the Bank of America?

A.   I did.

ATTORNEY WATKINS:  This is a brand new exhibit but agreed upon by the government.  And it's not that one.

Q.   (By Attorney Watkins)  Showing you what's been marked as Defendant's Exhibit 2, this is -- what is this?

A.   This looks like a bank statement from Bank of America.

Q.   Does it have your name and address on it?

A.   It does.

Q.   What does it -- does it indicate a deposit here?

A.   It does.  It indicates a deposit of a hundred dollars and then a withdrawal of a hundred dollars.

Q.   And does this exhibit also indicate when the cash withdrawal was made?

A.   On April 2, 2020.

Q.   And going back to Exhibit 52, you were doing searches for Bank of America all of that morning on April 2nd; is that correct?

A.   That is correct.  I wanted to know what time it opened or the closest one, which I knew was in that area.

Q.   Based upon that, the things you saw there, do you think you bought more drugs down in the East Springfield area?

A.   Absolutely, yes.

Q.   Can you say here with certainty today who it was that you bought the drugs from while you were there?

A.   I can't one hundred percent say for sure but it could have been multiple people.  I know a lot of people down there.

Q.   I'm going to go back to Exhibit 41 one more time here.  Actually I'm not.

There is another text message to Gabe saying, "It's been a fricken crazy day."  What did you mean when you were sending that text message to Gabe saying it's been a fricken crazy day?

A.   That's kind of just -- I mean, I was high on crack. It's something that I normally say.  It's nothing special.

ATTORNEY WATKINS:  Your Honor, I realize just now that I did not formally introduce --

THE CLERK:  Exhibit 2.

ATTORNEY WATKINS:  -- Exhibit 2.

ATTORNEY BRESLOW:  No objection.

THE COURT:  No objection, that's admitted.

ATTORNEY WATKINS:  I apologize.

**(Defendant's Exhibit 2 was admitted.)**

Q.   (By Attorney Watkins) When did you get back home to 20 Lori Lane?

A.   I want to say mid-morning, eleven, twelve-ish maybe.

Q.   Had you received some messages and texts from your mother?

A.   I did.

Q.   Why didn't you respond?  Why didn't you go back home?

A.   I was seeking drugs.  My main focus was getting drugs.

Q.   Were people annoyed with you when you got back that morning?

A.   Definitely.  My dad was upset with me, yes.

Q.   Did you tell your parents, listen, I was just out buying drugs all morning?

A.   No, I did not.

Q.   Why didn't you tell your parents you were out buying drugs that morning and that's why you were late?

A.   Again, I don't want to be honest about my drug addiction.  It's embarrassing.  I don't want my parents to worry more about me.

Q.   So just as a chalk, not as an exhibit here, I'm putting up on the screen a calendar of April where you see April 2nd, when you testified you were out searching for

drugs?

A.    That is correct.

Q.    And then on April 15th, what happened?

A.    On April 15th my house was raided by the Joint Terrorism Task Force of the FBI.

Q.    And in the intervening time here, the time between when you're out searching for drugs, did your ability and effort to obtain drugs stay the same or how did that go in the coming two weeks?  Did you continue to seek drugs?

A.    It was -- this was during the pandemic.  I did try to get drugs.  I didn't really have much money.  People weren't really coming out so in that two weeks, I mean, I might have used once or twice.

Q.    To use once or twice, did you have to go out to someone to get it or was there some other manner by which you would get drugs?

A.    I do have somebody that will drop off.

Q.    We saw your bank account there.  It looked like a hundred dollars came in and a hundred dollars went out. Did you have a lot of money at that time?

A.    I did not.

Q.    Going to September -- April 15th, what was the first thing that you woke up to in the morning on April 15th?

A.    I woke up in my underwear to a gun, an AR-15, in my face.

Q.   And what happened after that?

A.   I was pulled out of the house.  I was thrown up against the side of my house on the outside with a gun pointed at the back of my head.

Q.   After you went outside, what -- well, what were you observing going on outside?

A.   Like my mom had stated earlier, there was probably 20 agents, multiple vehicles everywhere.  They had a big huge like FBI truck in my driveway.  And then after they pulled me out, they pulled my daughter out and she was thrown up against the house next to me and the look on her face I'll never forget it.

Q.   And what were you thinking?

A.   I couldn't -- I had no idea.  I was thinking maybe it had something to do with my drug use with one of the people I see or something.  That was the only thing I could come up with that morning what was going on.

Q.   So once you were escorted outside of the house, did you immediately start talking with agents or did something else happen?

A.   No, not at first.  I kept asking like what's going on?  Why are you here?  And they wouldn't answer the question.  First, they did Mirandize me.

Q.   I want to go even before that.  Was there -- were you kept away from everyone else for a period of time?

A.    Correct.  Once they cleared the house, my daughter and my family went to the front yard and I was brought into the back yard.

Q.    Was there somebody with you in the back yard?

A.    There was somebody with me at all times.

Q.    Was it either Agent McGonigle or Detective Chaplin at that point?

A.    At that point, no.

Q.    Who was it, somebody you know?

A.    No.

Q.    What were they doing while they were with you?

A.    They were just standing over me.  I was in the back. I was allowed to sit down on my back deck and he was just standing next to me.

Q.    And did that person have a weapon?

A.    Oh, yes, absolutely.

Q.    And what was that person doing with the weapon?

A.    By then it was just sitting on their -- across their arms.

Q.    So describe just generally the scene over the next three or four hours while you were there at your house.

A.    I was freaking out.  I was scared.  It was very emotional.  I was confused.  It was a day I'll never forget.

Q.    Sergeant McGonigle was the one asking most of the

questions?

A. Correct.

Q. Was Detective Chaplin also asking questions sometimes?

A. Correct.

Q. One of the questions that was asked was about your knowledge of the area?

A. Correct.

Q. Tell us that conversation.

A. They asked me if on Converse Street if I was familiar with Jewish places and I said, yes, I was familiar with the Yeshiva School there right on Converse Street. But other than that, I mean I drive down that every day. I'm focused on driving. I'm not really looking at every sign on the side of the road.

Q. And did they start at some point asking you about a specific location?

A. Correct.

Q. What was the specific location?

A. They were referring to it as Ruth's House.

Q. Did they also refer to it as a nursing home?

A. Sometimes.

Q. And did you know where either of those things were?

A. At the time that morning I was still -- remember I'm very confused. I'm extremely upset and agitated. I could

not remember, no.

Q. Did you understand that Genesis House was also part of Ruth's House when they asked you about Ruth's House?

A. I did not know that, no.

Q. Agent McGonigle showed you the map. Was that helpful at all to you to figure out what it was they were talking about?

A. No.

Q. When you saw this map, what did you say to them? What did you ask them?

A. I mean, I didn't do much of the talking. They did more of the talking but I asked like what the X was about and what the heck is Ruth's House Road or whatever that is. I didn't know anything about that.

Q. Did there come a time when you understood that they were actually talking about Genesis House rather than Ruth's House?

A. No.

Q. Not during the meeting now but -- or not during the interview and the search there, but later on did you discover actually what they meant to say was Genesis House?

A. Correct, yes.

Q. How did you learn about that?

A. Through talking with you guys going over all the

paperwork, all the summons and everything.

Q. And did at some point you realize that was where your grandmother lived?

A. Yes.

Q. But did you know that? Did you know that Genesis House was associated with Ruth's House and therefore your grandmother lived there?

A. I did not, no. We always called it grandma's house.

Q. When was the last time that you went over to your grandmother's house?

A. 2007 maybe.

Q. So 13 years ago?

A. Yeah, at least.

Q. And what would it be that you would go over to her house for?

A. Like sometimes she needed help once in a while with moving something or we would go there to pick her up to bring her to go over my mom's sister Mary's house for Christmas.

Q. Agent McGonigle asked you where you were on April 2nd of 2020?

A. He did.

Q. And what was your response to that question?

A. I believe I told him I was home.

Q. Did he show you any kind of calendar like this?

A.    No, sir.

Q.    So when you were trying to scan your mind, how was it you were thinking -- how were you trying to answer that question?

A.    So I remember they came on the 15th and I mean the first of the month, so I figured two weeks.  You know what I mean?

Q.    And this particular -- when you went to search for drugs on April 2nd, that was within the first couple of days of April?

A.    Correct.

Q.    Why didn't you tell, yeah, I was out on April 2nd?

A.    That morning was extremely stressful.  It was extremely emotional.  It was -- I'll never -- I mean, I still have trauma from it.  I mean, I could not put things together that morning.  I was just trying to figure out why they were there and how to get myself out of whatever was going on.

Q.    Did they allow you to look through your cell phone to take a look at what your activities had been for the previous two weeks?

A.    No.

Q.    Were you completely open with them about your drug and substance abuse problems?

A.    So at first I wasn't, no.  Again, it's embarrassing.

It's not something I want to broadcast or talk to people about.

Q.   When you were questioned -- when Agent McGonigle questioned about where were you on April 2nd or did you leave the house on April 2nd and your answer I haven't been out of the house in two weeks, was it your intention to mislead him?

A.   Absolutely not, and what I did say was about two weeks.

Q.   If you had those cell phone records that you have now, would you answer that question differently?

A.   A hundred percent, yes.

Q.   You were asked about the yellow gas can.  What did you answer about the yellow gas can?

A.   On the morning when they interviewed me?

Q.   Yes.

A.   I told them that I'd have no reason to have a yellow gas can because it's dieseal and I've never had a yellow gas can.

Q.   Did you -- what was the first question?  How was the question phrased to you?

A.   Have you ever had a yellow gas can?

Q.   Did they ask you first whether you owned a yellow gas can?

A.   Yes.

Q.    Then later asked if you ever touched a yellow gas can?

A.    Yes.

Q.    So you did have a yellow gas can for a little while, is that true?

A.    It is true.

        ATTORNEY BRESLOW:  Your Honor, I've been relatively patient but I'm going to object to the leading.

        THE COURT:  Okay.  They are leading, so.

        ATTORNEY WATKINS:  Sorry?

        THE COURT:  Leading questions.

        ATTORNEY WATKINS:  I was just trying to change the subject.

Q.    (By Attorney Watkins) So tell us how was it that you came in contact with a yellow fuel canister?

A.    So during my -- I did a clean out job for a couple in Chicopee and they had a whole bunch of trash and stuff in their back yard.  They had flashing, aluminum siding, deck stuff, fence stuff, fencing, tires, all kinds of stuff.

Q.    And how did you get this particular job?

A.    From one of my apps in my phone.

Q.    So did you go out there once or twice?  How many time did you go over to the home?

A.    This was a two-day job.

Q.    Did you go out at a different time -- you may have told me this.  Did you see the trash by a picture or did you have to go out there?

A.    They took pictures of what they had in their back yard.

Q.    Once you and the homeowners had agreed on a price for it, did you go out there to do the job?

A.    I did.

Q.    And did you enlist somebody else to do the job with you.

A.    I did.  My friend got me in contact with somebody else that helped me, yes.

Q.    And what is his name?

A.    I can't remember his name off hand, I'm sorry.

Q.    Let's see.

A.    Hold on.

Q.    I can put up something in a minute.  Well, so you contacted somebody.  This person that helps you there, how did you meet up with him?  How did you get his name?

A.    Like I said, I met him through a friend of mine Glenn.  I really didn't know him that well.  This was the only time I've used it to help me do this job.

Q.    And when you arrived, what did you see?

A.    So I arrived at the job.  I backed my truck in the driveway.  I opened up the gates and they had a back yard

full of trash.

Q.   And you're being a contractor yourself, could you generally get an idea of what the trash came from?

A.   Yeah, it looked like they had maybe a pool at one point that had a deck around it.  They had a lot of pressure treated wood that was old and really wet.  They had a staircase.  They had flashing that looked like from when the deck was up against the house.  Like I said, they had tires, all kinds of just household debris.

Q.   Was there also metal items in there?

A.   Yes, there was.

Q.   Describe the metal items.

A.   Like I said, there was flashing which goes up against the house between the deck.  There was fence posts.  There was fencing.  There was tires with the rims still in them. I think there was a metal tricycle bike thing.

Q.   Was there also a yellow fuel container?

A.   There was.

Q.   At some point did you cut yourself up at this site?

A.   I did, yes.

Q.   And what happened that you ended up being cut?

A.   The metal flashing -- I had gloves on actually at the time.  The metal flashing cut right through my glove and cut my hand, sliced my hand.

Q.   Now, do you generally struggle with your hands?  Do

you have problems with your hands?

A.   Yeah, I have eczema cirrhosis, plaque cirrhosis. When I work, my hands become extremely dry, extremely cracked, and very bad.

Q.   So would it have necessarily been this piece of metal causing the blood or do you sometimes have other bleeding?

A.   It also due to dry skin.  It wouldn't take much to puncture and cause a cut.

Q.   Were you wearing gloves while you were doing that clean out?

A.   Yes.

Q.   So how was it that this piece metal cut through your gloves?

A.   It was just with a piece of flashing.  It's like razor sharp flashing against the house.  It's silver in color.

Q.   So what did you do with the trash that you took from this location?

A.   So the trash that I took from this location I illegally dumped in it a dumpster on Converse Street.

Q.   I'm sorry, you loaded up the van with the trash, did you say?

A.   Correct.  I loaded up the van with the trash and I dumped it at a dumpster on Converse Street.

Q.   Did you immediately dump it that day or was it in

your van?

A.   No, I left it my van for awhile.  Again, this was kind of during the pandemic so I really didn't want to go out too much; go out as little as possible.

Q.   The partner, the person that you had taken, the helper that you had with you, did he talk about taking some of the items?

A.   Yes.  Yes, he did.  He asked me if he could have -- I think there were a couple plastic sleds and he took the bike thing, the little scooter bike.

          THE COURT:  Hold on one second.

          A JUROR:  Can I have a break?

          THE COURT:  Sure.  We're going to take a ten-minute break.

          THE CLERK:  All rise.

          THE COURT:  Do not discuss the case during this short break and follow all the other instructions that I have given you consistently.  Thank you.

          ATTORNEY BRESLOW:  Your Honor, how long?

          THE COURT:  I imagine ten minutes.

**(A recess was taken at 2:57 until 3:09.)**

          THE COURT:  You can be seated.  Was everyone able to follow my instructions, including not talking to each other about the case?  Did you follow all the other instructions I always give?

Thank you.  Affirmative answers from all the jurors. They remain fair and impartial.  All right.

ATTORNEY WATKINS:  Madam clerk, I have one exhibit that should go to the parties and the witness.

Q.   (By Attorney Watkins)  Mr. Rathbun, when we were talking about the clean out, before the clean out -- before we broke, you were having difficulty remembering the name of the person who was helping there.

A.   That is correct.

Q.   Is there -- do you think there are any documents -- had you reviewed a document about this person?

A.   I have.

Q.   Would seeing a document help to refresh your recollection who that was?

A.   It would.

Q.   Okay.  I'm putting up on the screen then --

ATTORNEY DESROCHES:  This shouldn't be displayed.

ATTORNEY WATKINS:  I'm sorry.  It should go off.

Q.   (By Attorney Watkins)  Did that refresh your recollection about --

A.   Yes.

Q.   And who was it that helped you with the clean out?

A.   Chris Murray.

THE COURT:  Can we go on the WisperTech?

(Sidebar discussion.)

THE COURT:  Attorney Desroches, you noticed right away that went up.  Are you requesting that I give the jury any type of instruction if they saw anything or read anything and that it was not intended to be displayed to them?  That it should be completely disregard?  How do you want to handle that?

(Attorney Breslow entered the courtroom.)

ATTORNEY DESROCHES:  I think it's appropriate to include that it was intended to be shown just to the defendant to refresh his recollection, and that they should draw no inference from anything they may have seen.

THE COURT:  All right.  So that document is not coming into evidence?

ATTORNEY DESROCHES:  It is not.

THE COURT:  Thank you.

(End of sidebar discussion.)

THE COURT:  Ladies and gentlemen, as you just saw, a document was displayed on the screen accidentally.  As you know, during the trial we have been careful trying to display documents to the jury or just for the attorneys.

What exactly was displayed now should not have been.

If you saw anything in that document, if you started to read it, if you got through a sentence or two or picked up words, if it was momentarily long enough to maybe read a little bit of it, completely disregard what you might have seen. Completely and totally disregard anything you might have seen. Draw no inference from anything you might have seen or anything about the circumstances under which you saw it.

You know very well that there are many documents that have been displayed for attorneys and court only that you have not been able to see and you can't draw any inference for any of those documents throughout the trial as to why am I seeing this one and not that one. No inference, one way or another, about a document that hasn't been shown to you. Disregard anything and any thoughts about it.

ATTORNEY WATKINS: Thank you.

Q. (By Attorney Watkins) So that does refresh your recollection of who it was that helped you with the clean up?

A. Yes.

Q. What's his name?

A. Chris Murray.

Q. Now the two of you, were you able to get all of the trash inside the truck? Was there other trash? You got all the trash inside the truck?

A.   It took two days but, yes.

Q.   All inside of the truck or were there things on top as well?

A.   There were things on top as well.

Q.   These items that you collected from this house, where did they go first?

A.   The stuff on top of the roof, there was fencing and a couple of mattresses.  Probably within a block of where we did the job, there was a parking lot and the stuff on my roof wasn't tied down or anything and I kind of just did a bunch of turns in the parking lot and that's where most of the stuff came off on my roof.

     The other stuff I kept at my house in my car for about a week like I said and somewhere on -- there's a house on Converse Street that was being remodeled and I dumped the rest of the stuff in there.

Q.   Were these legal dumping sites either of those?

A.   No, they're not.

Q.   Why are you dumping illegally?

A.   It's the only way to make real good enough money to make it worthwhile.

Q.   Is that the reason you're able to get contracts for doing clean up?

A.   Yes.

Q.   Are you proud of that, the way that you're getting

contracts to do clean outs?

A.   No.  I'm not proud of it at all.

Q.   On April 15th Agent McGonigle asked you to think about all the places you had been.  How come you didn't think of this?  How come you didn't tell him about this?

A.   That morning I was extremely stressed out.  I was extremely scared.  I was -- I just couldn't focus that morning.  I couldn't get beyond that the Joint Terrorism Task Force was at my house and I was being accused of what I was being accused of.  I couldn't -- I just couldn't put it together that morning.

I mean, also realize I was in a drug haze pretty much so my memory wasn't that great but I just couldn't figure it out that morning.  I couldn't.

Q.   Putting up in front of you Government Exhibit 7, I'm going to ask you, did you have something against Jewish Geriatric Services?

A.   No, I do not.

Q.   Anything against Ruth's House?

A.   No, I do not.

Q.   Genesis House?  Somebody you didn't like there?

A.   Absolutely not.

Q.   Anybody on Converse Street?

A.   No, sir.

Q.   Did you want to inflict harm on people on April 2nd?

A.    No, I don't want to harm anyone.

Q.    Were you angry at the world on April 2nd?

A.    No, I was not.

Q.    Did you want to destroy property?

A.    No, I did not.

Q.    Were you trying to intimidate anybody?

A.    Absolutely not.

Q.    The morning of April 2nd did you stop at Jewish Geriatric Services, get out of your car, put a fuel container with gas in it --

A.    I absolutely --

Q.    -- put a wick in the spout and try to light it on fire?

A.    I absolutely did not.  No, sir.

        ATTORNEY WATKINS:  That's all I have, Your Honor.

        THE COURT:  All right.  Thank you.

**CROSS-EXAMINATION**

Q.    (By Attorney Breslow)  Good afternoon, Mr. Rathbun.

A.    Good afternoon, sir.

Q.    I'm going to ask you yes or no questions.  Do you understand that?

A.    I do.

Q.    First let's talk about the canister.  Actually -- well, let's talk about the canister first.

ATTORNEY BRESLOW:  Can we display PX-14 to the entire courtroom?

Q.   (By Attorney Breslow)  When this canister was discovered, your blood was on it, right?

A.   Yes.

Q.   When the LPD found this outside the Jewish nursing home complex, your blood was on the handle, yes?

A.   Yes.

Q.   And your blood was on this canister because you handled it, correct?

A.   Yes.

Q.   Now on April 15, 2020 just 13 days later Special Agent McGonigle asked you about this canister, didn't he?

A.   He did.

Q.   He asked you first if you had ever had a yellow gas canister, correct?

A.   Correct.

Q.   And then he asked you if you had ever -- first he asked you had ever -- do you currently have a gas canister and you said no, correct?

A.   Can you be more specific?

Q.   Sure.  He first asked you do you currently have a yellow gas canister?

A.   He did ask me that.

Q.   And you said no?

A.    No.

Q.    Then he asked you, well, have you ever had a yellow gas canister?

A.    That's correct.

Q.    And you said no?

A.    No.

Q.    Then he asked you have you ever seen a yellow gas canister and when he did, he showed you these pictures, PX-72 pages 3 and 4, correct?

A.    Yes, he did.

Q.    And again for the third time now you said no?

A.    Correct.

Q.    But that was false, correct?

A.    Yes.

ATTORNEY BRESLOW:  I like to play PX-93 from 5:13 to 5:29.

THE COURT:  And what is that?

ATTORNEY BRESLOW:  It's one of the recorded calls concerning the defendant's possession of the yellow gas canister.

THE COURT:  What's the question?  There needs to be a question preceding.

ATTORNEY BRESLOW:  I'm going to play the call and then pose the question.

THE COURT:  Is there an objection to that?

ATTORNEY WATKINS:  Yes, Your Honor.  There needs to be question.

THE COURT:  I think it needs to be in the reverse.

ATTORNEY BRESLOW:  Okay.

Q.  (By Attorney Breslow)  So the question is, the question is, twelve days later -- twelve days after you three times denied having anything to do with a yellow gas canister and that gas canister in particular you spoke with your mother, right?

A.  Are we going to play the tape first?

Q.  I think the judge wants me to ask you a question or two about it.

A.  Okay.

Q.  Did you hear the question?

A.  Can you repeat it again, please?

Q.  Sure.

So twelve days after April 15th, on April 27th, you had a conversation with your mother concerning the very gas canister that you three times denied any knowledge of?

A.  That's correct.

Q.  And you stated "just them knowing, I mean the FBI doesn't know yet but maybe they will eventually.  Just them knowing that I had possession of the yellow -- I

don't care, I'm saying on this phone -- that I had possession of that yellow gas container is very big.  Do you understand?  That's very big and very bad."  Did you say those words?

A.   I did.

Q.   So you admitted to your mother twelve days after denying to Special Agent McGonigle that you actually had possessed that gas canister?

A.   At that point I had seen paperwork.

Q.   That was just a question, yes or no.

A.   Yes, I did.

Q.   And not only that, you acknowledged to your mother that it would be very big and very bad when the FBI found out, correct?

A.   That's what I said.

ATTORNEY BRESLOW:  I'd like to display PX-l1 to the courtroom and request permission to provide PX-1, the canister to the defendant?

THE COURT:  Okay.  So what's PX-11?  Okay.  That's PX-11 on the screen, and there's a gas canister.

ATTORNEY BRESLOW:  May I approach?

THE COURT:  Yes.

Q.   (By Attorney Breslow) This gas canister in front of you, the one that is depicted in PX-11, that's the gas canister that you possessed?

A.    That is correct.

Q.    That's the gas canister with your blood on the handle, correct?

A.    That is correct.

Q.    And the gas canister has warnings on its side, doesn't it?

A.    I believe so.

Q.    Well, take a look.  It's right in front of you.  I think I've positioned the warnings so you can see it.

A.    Yep.

Q.    Okay.  So the first warning says "Petroleum fuel, extremely flammable," doesn't it?

A.    It does.

Q.    The second warning says "dieseal fuel, danger," correct?

A.    That is correct.

Q.    The third warning of the canister that you had in your hands says harmful -- well, the fourth warning I'll say "vapors may cause flash fire," correct?

A.    It says, "vapors can explode when ignited."

Q.    Yeah, that's another one.

        ATTORNEY BRESLOW:  If we can just blow this up, Ms McKenna, so we can see it all clearly?  Thank you.

Q.    (By Attorney Breslow)  So one warning says "vapors may cause flash fire," correct?

A.    Yes.

Q.    And it says, "Do not use this container for gasoline or other flammable liquids," right?

A.    Yes, sir.

Q.    And then I think you were reading the next warning. Can you read that out loud?

A.    "Vapors can exploded when ignited."

Q.    "By a spark or flame source many feet away?"

A.    That's correct.

Q.    And the warnings continue, correct?

A.    Correct.

Q.    Now Special Agent McGonigle asked you how your blood could have ended up on this gas canister, right?

A.    Yes, he did.

Q.    And you stated it was not possible, correct?

A.    I could not recall that.

Q.    That's not my question.

A.    No, I could not.

Q.    My question is --

        ATTORNEY WATKINS:  He should be allowed to answer.

        THE COURT:  Is there a need -- any further inspection of the gas can?

        ATTORNEY BRESLOW:  No.  I'll take it down.

        THE COURT:  Okay.

Q.   (By Attorney Breslow)  Mr. Rathbun, you understand that I'm asking yes or no questions, right?

A.   I understand.

Q.   And you understand that Mr. Watkins will be able to ask you on redirect questions that explain your answers on cross, right?

ATTORNEY WATKINS:  I'm going to object, Your Honor.

THE COURT:  Sustained.  Go ahead and ask the question.

ATTORNEY BRESLOW:  Sure.

Q.   (By Attorney Breslow) You told Special Agent McGonigle that it was not possible, correct?

A.   That morning that's what I said, yes.

Q.   And Special Agent McGonigle even asked you is it possible that your blood could have gotten on this canister when working at somebody else's house, right?

A.   Again, I could not recall.  That is correct.

ATTORNEY BRESLOW:  Your Honor, I'm just asking a simple yes or no question.

THE COURT:  All right.

Can you answer yes or no?

THE WITNESS:  Yes.

Q.   (By Attorney Breslow) You again told him it was impossible, correct?

A.   I did.

Q.   All right.  Now let's talk about tracts.

Your mother keeps tracts in your house, correct?

A.   Yes, she does.

Q.   You know what tracts are?

A.   I do.

Q.   You know that she keeps those tracts in her purse?

A.   Yes, sir.

Q.   You know that she keeps them in the cup holder of her car?

A.   I don't know that.

Q.   You don't know that?

A.   Not offhand, no.

Q.   So your testimony is you don't know that your mother keeps tracts in the cup holder of her car?

A.   I should have said she does not always keep them in the cup holder of her car.

Q.   Okay.  So you know your mother does?

A.   Sometimes, yes.

Q.   Okay.  And you drove that same car, your mother's car, on April 2nd, correct?

A.   That is correct.

Q.   Now let's talk about the tract that was part of the device on April 2nd.

ATTORNEY BRESLOW:  Your Honor, may I provide

PX-3 to the defendant?

THE COURT:  Yes.  Any objection?

ATTORNEY WATKINS:  No.

Q.  (By Attorney Breslow)  When this device was discovered on April 2nd, it had your blood not just on the canister but on a tract that was stuffed inside it, correct?

A.  Correct.

Q.  And your blood was not just on one page of the canister, was it?

A.  I don't know, was it?

THE COURT:  One page of the canister or tract?

ATTORNEY BRESLOW:  The tract.

THE COURT:  Okay.

Q.  (By Attorney Breslow)  So I'd like to display PX-16. If we can zoom in on the middle?

So your blood was on these two pages, right?

A.  It's on one page I believe, sir.

Q.  Okay.  And a little bit on the left do you not see it?  Shall we zoom it in?

A.  Sure.

THE COURT:  Is this piece of evidence in the plastic envelope that you handed up?

ATTORNEY BRESLOW:  Your Honor, the testimony concerning PX-3 was that it was sent to the lab that they

cut out --

ATTORNEY WATKINS:  I'm going to object.

ATTORNEY BRESLOW:  Well, I'm asking --

THE COURT:  No, I was just asking is what is on the screen in the plastic folded envelope on the witness stand?

ATTORNEY BRESLOW:  So what's on the screen are -- this is --

THE COURT:  We're going to have to go on WisperTech.

(Sidebar discussion.)

ATTORNEY BRESLOW:  So what's on the screen and what will be on the screen are the pages of this tract that is in PX-3 as they were found on April 2nd.  And so Your Honor may recall that the Longmeadow Police provided the pages of the pamphlet to the State Police where they cut out the portions of the blood and tested it.

THE COURT:  What's in front of the witness is not exactly what's in the photograph?

ATTORNEY BRESLOW:  With the cut outs, correct.

THE COURT:  Okay.  I just didn't understand that.  Very good.  Okay.

(End sidebar discussion.)

Q.    (By Attorney Breslow) So, Mr. Rathbun, your blood was on both of these pages, correct?

A.    I only see it on the right side, sir.

Q.    Okay.

A.    I can clearly see blood on the right side.

Q.    Okay.  So let's turn to PX-18 and zoom in on the center in the middle.  Your blood is on the right page there?

A.    That's what it appears.

Q.    And let's zoom to PX-19 and zoom in just in the area below the 3.  That's your blood too?

A.    Yes, sir.

Q.    And on PX-20 your blood was on two different spots there by Pray and there near the purple gloved hand at the bottom, correct?

A.    I see, yes.

Q.    Now, Mr. Watkins asked you a lot of questions about your faith and church, correct?

A.    He did.

Q.    I'm only going to ask you a few.  It just sounds like from your testimony when you're sober and clean you can embrace your faith, right?

A.    I also do when I'm using though.  I'm still praying. I always pray.

Q.    Okay.  So for approximately how many years have you been getting drugs in the Springfield area?

A.    Fifteen.

Q.    And about -- I think you testified that about three of those years you were traveling to Springfield to get Methadone?

A.    No, that's just this time on Methadone.  I've been on Methadone for three years this time.  I've been on Methadone and Suboxone before also.

Q.    That's fine.  So it sounds like you've traveled from your house down Converse Street frequently throughout 15 years either to buy drugs or to get Methadone and other treatment?

A.    Correct.

Q.    Okay.  So let's talk about where the device was placed.  I'd like to display PX-9.

    So this device was placed just a few feet from the sidewalk off of Converse Street, right?

A.    That's what I've been told.

Q.    Well, you see it there, right?

A.    That's what the picture depicts.

Q.    Okay.  And it was placed just a few yards from Converse Street according to the photograph, right?

A.    According to the photograph.

Q.    Right.  And so you drove back and forth past this spot every time you went from your home to Springfield to buy drugs, correct?

A.    Correct.

Q.    And you drove back and forth past this spot every time you went to get treatment, right?

A.    Correct.

Q.    In fact, you drove back and forth past this spot any time you wanted to get to I-91, right?

A.    Yeah.  There's another way I go sometimes too.

Q.    Okay.  But primarily this is the way right past this spot?

A.    The most part, yes.

Q.    Now your house is only a mile and a half away from this spot, right?

A.    If that's what you -- if that's what the measurement is, yes.

Q.    I mean, we're talking approximately.  It's not that far away, right?

A.    It's not, no.

Q.    And you could drive it in about five minutes?  Again, I don't want to be specific about the actual minute time from your house to this spot but that's about it, right?

A.    Yeah.  I guess, yeah.

Q.    Okay.  And I'd like to display PX-26 to the entire courtroom.

      So this spot is also visible to you as you drive up and down Converse Street, right?

A.    When I'm driving down Converse Street, sir, I'm

focused on driving.

Q.    Right.  I understand that and that's great.  But it's also visible to you, isn't it, as you drive back and forth?

A.    There's lots of things visible, sir.

Q.    Right.  Including this spot?

A.    Sure.  Yes.

Q.    And the closest building to the device is that white building there, right?  (Indicating)

A.    I mean, by this picture that's all I can see, yeah.

Q.    Okay.  And that is actually part of your grandma's complex, right?

A.    I guess it is, yes.

Q.    And you visited your grandmother when she lived at these buildings, right?

A.    Yes.  Fourteen years ago, yes.

Q.    Fourteen years ago but nonetheless you did, right?

A.    Fourteen years ago, yes, sir.

Q.    Yes.  But not just 14 years ago, you visited her for several years while she was there, right?

A.    I did not go there that often.  I'd say in a year I went there two or three times.

Q.    Okay.  And she lived there -- so you went there two or three times in a year and she lived there -- if she lived there say four times, (sic) that would be 8 to 12

times, right?

A.    I was also in my drug days during that time so I mean it could have been less one year.

Q.    Okay.  So if it's less one year, we're still talking about seven or eleven times, right?

A.    Correct.  Fourteen years ago, yes.

Q.    Right.  That's a fair estimate of the number of times that you actually drove onto this campus and saw your grandma?

A.    Correct.

Q.    And this road, Ruth's House Road, is one way to access the apartments, right?

A.    It is, but I would do a U-turn.

Q.    You would do a U-turn?

A.    Correct.

Q.    Every time you would do a U-turn?

A.    Every time.

Q.    Okay.  I want to show you PX-23.

      Every time you drove back and forth from I-91 you passed this very spot, correct?  (Indicating)

A.    That is correct.

Q.    And I realize that you're doing the right thing by keeping your eyes on the road, but that sign clearly says Ruth's House, doesn't it?

A.    That's what the sign says, yes.

Q.   It says it on that part and it also says it on the opposite side of the sign too, right?

A.   I don't know if it says it on the other side, sir.  I can't see that.

ATTORNEY BRESLOW:  One moment.  Can we zoom in?

Q.   (By Attorney Breslow) I'm showing you PX-27.  Do you see that the other side also says in just the same way Ruth's House?

A.   Yes, sir, it does.

Q.   Now on the morning of April 2nd -- if we can put up PX-23 again?  -- on the morning of April 2nd you drove right past this spot, didn't you?

A.   Yes, I did, sir.

Q.   On the morning of April 2nd you drove your mother's car right past this spot, didn't you?

A.   That is correct, sir.

Q.   So let's focus on this period of time when the device was placed.

There was a lot of questions between you and Mr. Watkins about this period of time leading up to April 2nd, right?

A.   Yes, sir.

Q.   So I'd like to focus on the month from March 3rd to April 2nd.  Okay?

A.   Sure.

Q.    Now, you testified on direct examination that you were even more agitated than usual during this period of time, right?

A.    I was.

Q.    And you were in part because you were using a lot of crack and powder cocaine, right?

A.    Amongst other things, yes.

Q.    Right.  And those other things they make you agitated, right?

A.    Correct.

Q.    Especially crack, right?

A.    Sure.

Q.    Makes you go, go, go, right?

A.    Yes.

Q.    And when you got that go, go, go feeling, you have to do something, right?

A.    No.  I have to keep moving; keep going, yes.

Q.    So my point is did you not testify on direct examination that when you're using crack you get so much energy you have to do something?

A.    I have to, correct, yes.  Absolutely.  That's why I dumpster dive.

Q.    So I'm just asking simply yes or no questions, Mr. Rathbun.  And what I'd like you to do if you can't answer them, just ask me to rephrase the question.

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.

Q.    (By Attorney Breslow) I want to talk about two specific windows of time between 4:51 a.m. and 8:30 a.m., okay?

A.    Sure.

Q.    So the first window of time is between 4:51 and 5:01 a.m.  That's a ten-minute window of time, right?

A.    Yes.

Q.    Okay.  So at 4:34 a.m. you called Devin Austin from around the vicinity of your home, correct?

A.    Yes, sir.

Q.    And at 5:01 a.m. you called Devin Austin again, right?

A.    I believe so.  Yes, sir.

Q.    But between 4:34 a.m. and 5:01 a.m. you had left your house and driven down Converse Street to get on I-91, right?

A.    That is correct, sir.

Q.    So at some point before 5:01 a.m. you drove right by where the device was placed, right?

A.    That is correct.  Yes, sir.

Q.    And by 5:01 you were somewhere on I-91, somewhere in that cell coverage area that we looked at driving to Devin Austin's house?

A.    That's correct.  Yes, sir.

Q.    Now the second window of time is between 6:09 and 7:06 a.m., right?

A.    Okay.

Q.    At 6:09 you called Devin Austin, correct?

A.    I believe so.

Q.    You called him -- and you had called him and messaged him repeatedly before then, right?

A.    I believe so, yes.

Q.    Even when you were at your house, right?

A.    Yes, sir.

Q.    And you testified on direct that you were repeatedly contacting him because you had run out of crack cocaine, right?

A.    Yes, sir.

Q.    You had been using crack cocaine from some point on the night of April 1st through midnight and ultimately you were running out, correct?

A.    Yes, sir.

Q.    And, in fact, I think you testified on direct that you knew you were going to run out of crack cocaine, right?

A.    I always do.

Q.    Right.  You always do.

      Nobody in the throes of that kind of an addition can

feel like they can get enough, right?

A.   Yeah.  Yes, sir.

Q.   So getting back to April 1st, you knew before bedtime that you were going to need to get into a car and go up to Springfield, right?

A.   That is correct, sir.

Q.   And you borrowed your mother's car, right?

A.   Yes, sir.

Q.   You asked her for permission?

A.   Yes, sir.

Q.   And you told her that you wanted to borrow her car because you had a job that morning, right?

A.   That is correct.

Q.   And that was completely false, correct?

A.   It wasn't.  I still had things I was doing.  I mean, dumpster diving is still a job.

Q.   Okay.

A.   I wasn't completely honest with her.

Q.   Okay.

A.   But, yes, I was dumpster diving.

Q.   I want to ask you to take a look at your testimony. Let me ask you a few questions first.

On November 19, 2020, Mr. Rathbun, did you provide sworn testimony concerning this case?

A.   I couldn't hear you.

Q.    I'm sorry.  Let me push this up here.

On November 19, 2020, did you provide sworn testimony concerning this case or this subject matter?

A.    I don't understand what you're -- I don't understand.

Q.    I'll ask it again.

On November 19, 2020 -- so we're in June now.  Just last November, did you provide sworn testimony concerning the general subject matter that you've been testifying about all day today?

A.    At the last trial I did, yes.

Q.    Okay.

ATTORNEY BRESLOW:  So, Your Honor, may we go to WisperTech for just a moment?

THE COURT:  Sure.

(Sidebar discussion.)

ATTORNEY BRESLOW:  I'm not sure what to do.

THE COURT:  So, Attorney Watkins, are you telling me you didn't instruct your client not to mention that?  Is it as big a surprise to you?

ATTORNEY WATKINS:  It is a surprise to me.  I didn't think that that would be the way this would be set up.

THE COURT:  Okay.

ATTORNEY WATKINS:  It really was a surprise.

THE COURT:  I'm not -- I'm just a little

surprised and so I'm asking if you're surprised as well because now we need -- you know, I'm going to give an instruction but -- I'm going to give an instruction.  So do you have any suggestions?

ATTORNEY BRESLOW:  Well, I'd like a moment to think about the instruction before I speak again because this, as Your Honor saw, I took pains to ask simple questions.

THE COURT:  Right, and I did notice members of the jurors start to look around and then look at me.

ATTORNEY BRESLOW:  Right.  Let me consult with Mr. Desroches.

THE COURT:  Okay.

ATTORNEY WATKINS:  I'll think about it.

THE COURT:  Attorney Watkins, also I don't know if you might find -- maybe if I say we are taking a break, perhaps you can speak to your client for a moment as well.

ATTORNEY WATKINS:  If that is agreeable with the government, I certainly can.

THE COURT:  What do you think?

ATTORNEY BRESLOW:  That's fine so long as Mr. Watkins just discusses this issue and not anything else.

THE COURT:  Of course, it goes without saying.  Attorney Watkins knows that.  I don't even need to say it.

ATTORNEY BRESLOW:  Okay.

THE COURT:  All right.

ATTORNEY BRESLOW:  So maybe five or ten minutes.

THE COURT:  Yeah.  Let me check with my clerk here.

(End of sidebar discussion.)

THE COURT:  I apologize, I need to get you out to have a discussion with the attorneys.  We are going to -- this is not going to be long.  Okay.  So five minutes.

The same instructions apply as always apply.  Do not talk to each other about anything to do with this case.

**(The jury left the courtroom at 3:45.)**

THE COURT:  Mr. Rathbun, can you please step down?

THE WITNESS:  Yes, sir.

THE COURT:  Attorney Watkins, I'll allow you to enter a private conference room.

Do you have anything else to say?  We can say disregard making any inferences one way or another, or get into more details saying oftentimes trials start but they don't finish and there needs to be a new trial.  There's a whole lot of things you can potentially be thinking about.

ATTORNEY WATKINS:  Yes.  I think probably more generic is better.  I don't think anything of getting

granular about it.

THE COURT:  Okay.  Fair enough.

Government agree, generic?

ATTORNEY BRESLOW:  I agree.

(Short pause in the proceeding.)

THE COURT:  All right.  Let the record reflect that I have allowed the attorney defense team -- actually I want to make a record, the defense team I allowed a private moment to speak with Mr. Rathbun about not mentioning -- that we're going to take pains not to mention that the prior -- we can refer to it as a prior proceeding.

ATTORNEY WATKINS:  That's what I thought we were going to -- the question was -- I don't think Mr. Breslow meant it to be, but the question he was trying to load it up with a lot of sworn testimony and things of that nature and I think it just went over Mr. Rathbun's head.  But if we can just agree on the signal that you've touched upon previously.

THE COURT:  Prior proceeding.  Prior proceeding.

THE DEFENDANT:  Prior proceeding?

THE COURT:  Prior proceeding.  Everyone get that?  Prior proceeding means testified at the prior trial.

ATTORNEY BRESLOW:  Right.

THE DEFENDANT:  Yes, sir.

**(The jury entered at 3:49.)**

THE COURT:  You can be seated.

Was everyone able to follow my instructions?  That was a very short break, but was everyone able to follow my instructions?

Affirmative answers from all jurors.  They remain fair and impartial.

Okay.  Ladies and gentlemen, you heard right before I let you go, let you take that short break that the witness, Mr. Rathbun, mentioned the word "trial" in one of his answers.

You should completely disregard that reference and the use of that term.  Completely disregard it.  You should not speculate as to what he meant; what proceeding he was talking about or referring to.

You shouldn't speculate one way or the other about what it might mean.  You should just wipe it out of your mind.  You shouldn't even think for one second about what it meant or what he meant or what he was talking about.  Understand?

Affirmative answers from everyone.  All right.

ATTORNEY BRESLOW:  Thank you, Your Honor.  I think I'd just like to back up a moment so we can reorient ourselves.

Q.    (By Attorney Breslow)  So, Mr. Rathbun, on April 1st, the night of April 1st, you asked your mother to borrow her car, right?

A.    Yes, sir.

Q.    And you asked your mother to borrow her car because you said to her that you needed it for a job, right?

A.    That is correct, sir.

Q.    And, in fact, on the night of April 1st you had crack cocaine in your room, right?

A.    Yes, sir.

Q.    And you knew that you were going to run out of crack cocaine even before April 1st left, correct?

A.    Correct, sir.

Q.    So you knew that you were going to need her car to go to Springfield to find drugs, right?

A.    Yes, sir.

Q.    So you didn't have a job to do that morning, right?

A.    I mean, I called dumpster diving -- I was dumpster diving.  So I mean, it's not really a job but, yeah.

Q.    Well, let's be clear.  From 5:05 to 8:25 in the morning you weren't dumpster diving, were you?

A.    I was, yeah.

Q.    You were?

A.    I did do some dumpster diving in there, yes.

Q.    So you weren't solely trying to get crack, to

purchase crack from somebody?

A.   That's what I do.  After I smoke crack, I go dumpster diving.

Q.   But it's very a specific question.

What were you doing from 5:05 to 8:25 in the morning?

A.   Getting drugs, dumpster diving.

Q.   And dumpster diving?

A.   Yes, sir.

Q.   So do you remember providing sworn testimony in a prior proceeding on November 19, 2020?

A.   I do.

Q.   And before testifying then did you take an oath to tell the truth, just like you did this morning?

A.   I did.

Q.   And before testifying -- or I should say after you started testifying did Mr. Watkins ask you, "So what were you doing up there at all these different times from 5:05 to 8:25 in the morning?"

And did you not say "solely trying to get crack, purchase crack from somebody?"

A.   Yeah, that's what I said.

Q.   Okay.  So that's different from what you testified to just a moment ago, correct?

A.   That is correct.

Q.   Right.

So getting back to this statement that you made to your mother, you told your mother that you wanted to borrow her car because you had a job to do that morning, right?

A.    That is correct.  Yes, sir.

Q.    And really, really you used her car solely to try to get drugs, right?

A.    Yes, but I also did dumpster dive.

Q.    That's it.  Mr. Watkins will have an opportunity to redirect you and have you explain yourself.

I want to focus again on something you said earlier to the jury about the morning of April 15th.  Did you tell the jury that on the morning of April 15th you woke up to an AR-15?  You woke up to a gun pointing in your face?

A.    Yes.

Q.    And then did you testify to this jury that you were walked outside into the back yard and an agent kept a gun pointed at the back of your head?

A.    That is not what I said.  I was pulled outside and I was placed up against my house on the porch with a gun placed at the back of my head.

Q.    Okay.  Right.  So that's clear.  That's your testimony today, right?

A.    Yes, sir.

Q.    So I want to focus again on your testimony in the

prior proceeding.  And did Mr. Watkins ask you what was the first thing you noticed when the FBI came to your house?

And did you answer, "It was about 7:30 in the morning.  I was in bed sleeping and I heard rustling in the front door, so I opened up my door.  I came out and there was a man with a rifle in front of me and an FBI vest on and he told me to come out?"

A.    Yes, sir.

Q.    Were you asked that question and did you give that answer?

A.    It's the same thing, yes, sir.

Q.    Were you asked that question and did you give that answer?

A.    Yes, sir.

Q.    Okay.  I'd like to focus on the second window of time and display PX-41 page 13.

So do you remember being shown this document --

A.    Yes, sir.

Q.    -- on direct testimony?

A.    Yes, sir.

Q.    If we could focus on this period of time from 6:09 to 7:06 a.m.

So at 6:09 you called Devin Austin, right?

A.    I believe so.  That's what it says.

Q.   And you called Devin Austin because you were looking for drugs from him, right?

A.   Correct.

Q.   Now, you had called him repeatedly, right --

A.   Yes, sir.

Q.   -- the night beforehand?

A.   Yes.

Q.   And you had messaged him repeatedly, correct?

A.   That is correct, sir.

Q.   And from 6:09 to 7:06 your cell phone had completely no activity at all, correct?

A.   That is correct.

Q.   So you weren't texting with anybody, right?

A.   No, I was not.

Q.   You weren't calling anybody, right?

A.   That's not what -- that's correct.

Q.   Right.  You actually received three calls from Devin Austin replying to you concerning your call about drugs, right?

A.   I don't know what he was calling me about but, yeah, I can speculate.

Q.   Let's think about that, Mr. Rathbun.  He's not your friend, is he?

A.   Yes, he is actually.

Q.   He is your friend?

A.   He is.

Q.   So do you get together with him for coffee in the morning?

A.   We don't get together for coffee, but we do things other than drugs together, yes.

Q.   Okay.  But we're talking 6:09 a.m.

A.   Correct.

Q.   You've been texting him since -- you've been texting or calling him since 4:34 in the morning?

A.   That is correct, sir.

Q.   And you hadn't been calling him to talk about the weather, right?

A.   Obviously not, sir.

Q.   You're not catching up, right?

A.   No.

Q.   No.  You're calling him because you need drugs?

A.   That is correct, sir.

Q.   And that's why he's calling you after you left this last call at 6:09, right?

A.   Yes, sir.

Q.   Okay.  So did you return his call or pick it up in the first place when he first called at approximately 6:52 a.m.?

     That's not on the screen.  Let me put it up for you so that there's no confusion.

So if we can go to I think it's page 14 and focus on the bottom?

So, Mr. Rathbun, you spent the morning trying to get drugs from Devin Austin, correct?

A. Yes, sir.

Q. Now by 6:09 you hadn't gotten drugs from him and so you left another phone call, correct?

A. I guess so, yeah. I'm not quite sure a hundred percent but I believe so.

Q. You don't remember now?

A. Well, I do not remember specifically if I had gotten drugs from him yet or not, no.

Q. Do you remember when Mr. Watkins asked you -- I think he asked you, you don't remember every moment of this period of time, do you?

A. I do not remember every single minute, no.

Q. But I'm just asking you, do you remember him asking you that question --

A. I believe so.

Q. -- on direct examination?

A. I believe so.

Q. He said, do you remember or you don't remember every moment of that morning, and do you remember your answer?

A. I don't.

Q. You don't even remember your answer to him?

A.    I have a very bad memory, sir.

Q.    Okay.  Okay.  You answered for the most part and then Mr. Watkins asked you another question very similar.  He said, do you remember where you were for this period of time and you said?

A.    Absolutely I do.

Q.    Absolutely.  You said, I think for the most part but now your answer is absolutely I do?

A.    I do.

Q.    Even though you just testified that you have a bad memory?

A.    Correct, but I knew the area that I was in.

Q.    Okay.

A.    Very clear.

Q.    So you know generally the area that you were in, but sitting here you don't really have a memory of the specific blocks you went to?

A.    I don't understand the specific.

Q.    Well, you don't even know who you got drugs from that morning?

A.    Correct.  It could have been a handful people.  I could have gotten drugs from all of them.

Q.    Right.  Right.  Or one of them?

A.    Correct.

Q.    Or two of them?

A.    Absolutely.  Yes, sir.

Q.    You have no memory sitting here of who you got drugs from, if it were one person or two, or even when?

A.    No, it was definitely two people I got drugs from.

Q.    So now it's two people?

A.    Yes, sir.

Q.    And now you remember their names?

A.    I do.

Q.    So you just testified a moment ago that you don't remember who you got drugs from but now you're testifying that you do?

A.    Yes, sir.

Q.    So in the space of the minute and a half that we have been talking, your memory has come back?

A.    Yes, sir.

Q.    Okay.  These three audio calls that you received from Devin Austin at 6:52 a.m., you didn't pick up, did you?

A.    No, I did not.

Q.    And so after the first audio call that you missed, you didn't call him back, correct?

A.    I did not.

Q.    And Devin left another audio call for you or he attempted to call you and you didn't pick up then either, did you?

A.    No, I did not.

Q.   But your testimony was, I think, that as of 6:09 you really, really needed crack cocaine from Devin Austin, right?

A.   I believe so, yes, sir.

Q.   Well -- and yet you didn't call him back after the first missed audio call or the second, right?

A.   That's correct.

Q.   And then Devin Austin left a third one, correct?

A.   Yes, he did.

Q.   And you didn't pick that up either?

A.   No, I did not.

Q.   Right.  Now, you have no memory whatsoever of why you missed those calls?  What you were doing?  Or even where you were?

A.   That's not true.

Q.   That's not true?

A.   No, sir.  It's not.

Q.   Your memory has just come back to you?

A.   My memory for that event I remember, yes.

Q.   For which event?

A.   For the event you're talking about, what I was doing during these three calls.

Q.   And I'd like to focus on PX-52 now.  Mr. Watkins asked you about this.

          THE COURT:  Hang on one second, please.

Go ahead.

ATTORNEY BRESLOW: If we can focus on PX-52 page 38, line 590? If we can focus on the entry to -- the text message to Gabe? I might not be on the right page.

If we can focus on the text to Gabe in which the defendant states that he had had a fricken crazy day.

Q. (By Attorney Breslow) Okay. So by this point we are out of that second window of time, aren't we, Mr. Rathbun?

A. I don't understand. What second window of time?

Q. Let me make it clear. I'm sorry, if I wasn't perhaps.

From 6:09 to 7:06 your cell phone had absolutely no activity, correct?

A. That is correct.

Q. So from 6:09 to 7:06 there's no digital record of what you were doing, correct?

A. Correct.

Q. And there's no digital record of where you were, correct?

A. Yes, sir.

Q. And you hadn't sent text messages or emails, right?

A. Correct.

Q. And your testimony now is as of your last contact at 6:09 a.m. you still hadn't gotten drugs from Devin Austin; is that right?

A.    Correct.

Q.    Okay.  And so from 6:09 to 7:06 that's the second window of time that I'm discussing.

A.    Okay.

Q.    Right?

A.    Okay.

Q.    Okay.  So my question is shortly after that you sent a text message to Gabe and you said "fricken crazy day," correct?

A.    Yes, sir.  Something I commonly say.

Q.    Something you commonly say?

A.    Yeah.

Q.    What are licks?

A.    Licks could be dumpster diving, going through dumpsters.

Q.    What else?

A.    That's it.

Q.    Okay.  When you say likes could be dumpster diving, what really you mean to say is licks are dumpster diving --

A.    Correct.

Q.    -- and nothing else?

A.    Correct.

Q.    Nothing else at all?

A.    No.  I believe so.

Q.   So your mind is very clear today, correct?

A.   It's clearer than it usually is, yes.

Q.   Okay.  And I'll just ask you one final time, licks has no other meaning to you, correct?

A.   I don't believe so.  I might have testified last time something else, sir.

Q.   Yeah.  Let's go there.

Did you testify that licks could also mean breaking into cars?

A.   If that's what I said, then that's what I said, yes.

Q.   I don't want you to -- I really don't want you to guess so let me just give you your testimony.

A.   I'm not guessing.  If that's what you told me I said, so that's what I said, sir.

THE COURT:  You can examine the transcript for yourself to read it in full context to make sure that you're comfortable.  All right, sir?

THE WITNESS:  Sure.

ATTORNEY BRESLOW:  Exactly.  That's what I want you to do.

THE COURT:  Go ahead.

ATTORNEY BRESLOW:  What I'd like to do is display it to only the court, counsel, and the witness, Your Honor, so not to the jury.

THE CLERK:  Yeah.

Q.   (By Attorney Breslow)  So we're looking at your sworn under oath testimony from your prior proceeding.

THE COURT:  Read that to yourself, sir.

THE WITNESS:  I am.  Thank you, sir.

Okay.

THE COURT:  You can take it down.

ATTORNEY BRESLOW:  So -- no, I just need to ask him a question from it.

THE COURT:  All right.

Q.   (By Attorney Breslow) So the first question is -- I'm not asking you this question, Mr. Watkins is, right?

A.   I don't know who asked this question, sir.  It doesn't say on there anywhere.

Q.   I can find another place.  Let's just move up.

Do you see that this is part of your direct examination where Mr. Watkins is asking these questions?

A.   I do now, yes.

Q.   So did Mr. Watkins ask you this question:  "You mentioned about getting licks.  What are licks?"

A.   Licks could be --

Q.   No.  Did he ask you that question?

A.   Yes.

Q.   And did you answer, "Licks could be a couple things. Going dumpster diving and getting stuff out of there, possibly stealing, going into people's cars possibly."

Did you say that?

A.    Yes, I did.

Q.    Okay.  Mr. Rathbun, I want to ask you some questions about the state of your life in the weeks leading up to April 2nd.

A.    Sure.

THE COURT:  Let me just tell the parties and for the jury's benefit, I've been notified that there is a matter that I'm going to have to attend to at 4:15 or thereabouts, which means we're going to have to stop this proceeding for me to handle what developed this afternoon and is coming into the court.  Okay?

ATTORNEY BRESLOW:  Well, 4:15, that's in a few minutes.

THE COURT:  We might be able to push it to 4:20, but that's going to be about it.

ATTORNEY BRESLOW:  I'm about to start a completely new topic.  Maybe it makes sense to end?

THE COURT:  Yeah, I think so.  Okay.

THE CLERK:  All rise.

THE COURT:  All right.  Ladies and gentlemen, now obviously I had told you that I thought we were going to be completely finished by this afternoon.  That's clearly not true.  I think we're very close, but I certainly don't want any party to feel that they're

rushed.

So we will be back Monday.  All right?  During the weekend, did not talk to each other.  Do not talk to anyone about the case; no access to media; no social media; no internet; no research about the case.  All the same instructions apply.  All right.  See you Monday morning.

**(The jury left the courtroom at 4:12.)**

THE COURT:  Christina, can we have identification by juror number and name just to talk about an issue for next week?

ATTORNEY BRESLOW:  Should we leave?

THE COURT:  No.  Stay.

(Sidebar discussion.)

THE COURT:  I am at sidebar with Ms. XXX.  Juror number?

THE CLERK:  Six.

THE COURT:  Juror No. 6, seat?  Can someone help me out?

A JUROR:  Six, seat four.

THE COURT:  Thank you.  This juror has informed me, and I want to let the parties know, that her daughter has a graduation scheduled for Tuesday morning and so she's bringing that to my attention.  Although she will think about it this weekend, she may ask to be attending

the graduation which I think is a valid reason for not continuing the jury service. She informs me that she will tell me of her decision about whether or not to remain or to go to the graduation on Monday. All right.

ATTORNEY DESROCHES: Yes, thank you.

THE COURT: I'll see you Monday.

**(The juror left sidebar discussion.)**

THE COURT: So anything else?

ATTORNEY DESROCHES: I would like the record to be clear that cross-examination has begun and sequestration would preclude counsel from speaking to the defendant about his testimony.

THE COURT: Well, I mean that's an interesting area. Certainly it doesn't prohibit counsel from talking to his client about the case.

I mean, counsel can't review what's been testified to as a way to come back and then correct things I understand, but it doesn't prohibit counsel from consulting with his client over the weekend. But I do agree the sequestration order limits, to some extent, what can be talked about.

Attorney Watkins, can you check your comfort level with the sequestration order and your interactions with your client over the weekend?

ATTORNEY WATKINS: It's difficult obviously. We

can talk with him about the case, but I think the court is quite correct that the difference is whether we are trying to correct testimony here or not.

I will tell the court I think it's appropriate that I might suggest to Mr. Rathbun that he review his prior testimony in the prior trial.

ATTORNEY BRESLOW:  Well, if that's the limit of the conference, there's no objection to that.  He certainly should do that.

THE COURT:  And I think that's a fair thing for Attorney Watkins to say and provide the transcript.  I also do think it's fair for Attorney Watkins to be able to discuss with his client other areas of this case but not things that have been asked to correct testimony.

It's a very gray area and it's one in which I am entirely comfortable relying upon the good faith and ethical obligations of Attorney Watkins.

ATTORNEY BRESLOW:  Well, so I have known Mr. Watkins a long time and am very confident that Mr. Watkins will do the right thing.

The difficulty, Your Honor, is that it's hard for me to conceive when we are at this point in the trial in the middle of the defendant's cross-examination where all the witness testimony has been given in the government's direct case and this is the final witness, it's hard to

imagine what Mr. Watkins could talk to Mr. Rathbun about that wouldn't affect in some way his testimony, even if Mr. Watkins intends for it not to be so.

So it strikes me that there should be just a very clear line and that line is -- Mr. Watkins has actually made a very prudent suggestion that he review his prior trial testimony. I think that's appropriate and I don't think there should be any more conversation about the case. He can say how he's doing, that's fine. But concerning the case, it's hard to imagine any part of the case that would not impact in some way his testimony.

THE COURT: Do you want to be heard?

ATTORNEY WATKINS: I think as the court has identified, we are all trying to get around what are the limits. Certainly on redirect if Mr. Rathbun's testimony were to change significantly, I think Breslow would be right to cross-examine him vigorously or maybe recross at that point.

THE COURT: Well, you certainly could expect a question about the over weekend did you speak with your attorney about the case? It's also a tactical consideration to try to stay away from that, although there's an instruction that says you expect an attorney to talk to his client.

ATTORNEY WATKINS: At some level, Your Honor,

the case is what it is.  We are on the homestretch here.  Mr. Rathbun has testified.

THE COURT:  Well, there is a sequestration order and I will reluctantly instruct you, Attorney Watkins, not to speak to your client about any matters that could be -- that are affected or that would be generated by his direct or cross-examination of the testimony given so far.  All right?

ATTORNEY WATKINS:  Yes.

THE COURT:  Okay.

ATTORNEY DESROCHES:  Thank you, Your Honor.

ATTORNEY BRESLOW:  Good afternoon, Your Honor.

THE COURT:  That instruction applies to the defense team.

ATTORNEY O'NEILL-GREENBERG:  Yes.

ATTORNEY BRESLOW:  Your Honor, just for the record, Special Agent McGonigle, our case agent, has continued to be sequestered even though the government's case has closed.

THE COURT:  It's quite a different situation.  All right.  We'll see you on Monday.

**(Court concluded at 4:21.)**

---------------

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )



          I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)



/s/ Alice Moran                        May 30, 2022
Alice Moran, RMR, RPR
Federal Official Court Reporter