1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )              20cr30018-MGM
     vs                   )
                          )              June 14, 2021
John Michael Rathbun      )
_____)


TRIAL HELD BEFORE THE HONORABLE MARK G. MASTROIANNI


APPEARANCES:


On behalf of the government: Steven H. Breslow, Assistant
United States Attorney, 300 State Street, Suite 230,
Springfield, MA 01105-2926.

Neil L. Desroches, Assistant United States Attorney,
300 State Street, Suite 230, Springfield, MA 01105-2926.


On behalf of the defendant: Timothy G. Watkins, Esq., 51
Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor,
Boston, MA 02210.

                    Alice Moran, CSR, RPR, RMR
                  Official Federal Court Reporter
                     United States Courthouse
                    300 State Street, Room 303D
                      Springfield, MA 01105
                         (413)731-0086
                     alice.moran@verizon.net

INDEX

Witness:                                                    Page:

**John Rathbun**

Cont'd cross-examination by Attorney Breslow            17

Redirect examination by Attorney Watkins              105

Recross-examination by Attorney Breslow               127


**Rebuttal witness:**


**Horace Williamson**


Direct examination by Attorney Desroches              146

Cross-examination by Attorney Watkins                 162

Redirect examination by Attorney Desroches            170



Exhibit No.            Description                      Page


PX-132    March 22nd email                              67

PX-109    Photograph                                    83

Closing argument by Attorney Breslow                  179

Closing argument by Attorney O'Neill-Greenberg        198

Rebuttal closing argument by Attorney Desroches       225

**(Court commenced at 9:13.)**

**(The defendant is present.)**

THE CLERK:  Court is now in session.  The matter before the court is criminal case 20-30018, the United States of America versus John Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY BRESLOW:  Steven Breslow for the United States.  Good morning, Your Honor.

THE COURT:  Good morning.

ATTORNEY DESROCHES:  Good morning.  Neil Desroches for the United States.  We will be joined by Megan McKenna.

THE COURT:  Okay.

ATTORNEY WATKINS:  Good morning, Your Honor.  Tim Watkins, Federal Defender Office, on behalf of John Rathbun who is with us today in court.

ATTORNEY O'NEILL-GREENBERG:  Good morning, Your Honor.  Forest O'Neill-Greenberg also for Mr. Rathbun.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  Okay.  Very good.

I'm just asking that the juror who had the graduation issue come in.  I am told that she's resolved it but we need to make a record.

ATTORNEY BRESLOW:  Okay.  Your Honor, while we

have a moment or two, there are just two issues --

(The juror entered the courtroom.)

THE COURT:  Spoke too soon.

Okay.  Good morning.  How are you doing?

A JUROR:  I'm doing good.

THE COURT:  Okay.

(Discussion held off the record.)

THE COURT:  The weather has postponed the graduation so it's not an issue.  All right.  Thank you.

(The juror left the courtroom.)

THE COURT:  All right.  Go ahead, Attorney Breslow.

ATTORNEY BRESLOW:  So the first issue is in the cross-examination I've just informed Mr. Watkins that we will be playing one paragraph basically of a transcript.  It's one of those transcripts that we did not jointly present to you earlier in the first trial when you were considering the completeness arguments, and so this is just a simple paragraph.  It's just the defendant speaking.

I think Your Honor has the paper copies of the entire transcript.  It's PX-91-2 and I can direct Your Honor to the particular lines, and with Your Honor's permission we will play PX-91.

THE COURT:  Is there a dispute somewhere about

this?

ATTORNEY BRESLOW:  Mr. Watkins is going to object.

THE COURT:  On completeness grounds?

ATTORNEY BRESLOW:  I don't know.  If it's completeness grounds, we can work it out.

THE COURT:  I have PX-91-2 in front of me.  What pages are you talking about?

ATTORNEY BRESLOW:  So it's page 4, line 17 to 23.

THE COURT:  Page 17?

ATTORNEY BRESLOW:  Yeah, page 4 lines 17 to 23.  It starts "I'd like, I'd actually like you to."

THE COURT:  I'm sorry, PX-92-2 --

ATTORNEY BRESLOW:  PX-91-2.  I believe it's on April 21st.  We can play the recording.

THE COURT:  Okay.  Work with me here.  PX-91-2 page 4 line 17 for me starts "has a dumpster in front of it.  I'd actually like to go."

ATTORNEY BRESLOW:  That's where we'd start actually.

THE COURT:  What is this call?  Is this his mother?

ATTORNEY BRESLOW:  All of these calls are the defendant and his mother.

THE COURT:  All right.  Okay.

ATTORNEY BRESLOW:  This is relevant to two points.  The defendant testified on Friday, he testified that he had dropped the -- he had taken the trash from that trashout back home to his house, kept it in his house for a week, and then dumped it somewhere on Converse Street and so this is relevant to that.

It's also relevant to his familiarity with the place where the device was actually placed, which is Ruth's House, that Ruth's House entrance.

THE COURT:  All right.

ATTORNEY WATKINS:  Judge, the problem here is the confusion of the issue that's going to happen if this goes in.

Just to place this in context, this call was on April 21st.  I'll back up.  The court will remember a couple of things.  One is that Judge Robertson initially released Mr. Rathbun when he was brought in before her.  That was on April 15th on that Wednesday.  The government objected and so Mr. Rathbun was out of custody essentially for three days from Wednesday until Friday.  That's when the court revoked the release order and put him in jail and we're hearing a conversation now from the following Tuesday about these different things.

My concern --

THE COURT: So he's in jail obviously?

ATTORNEY WATKINS: He was in jail at this point.

THE COURT: At this call. All right.

ATTORNEY WATKINS: For this call he's in jail. He has been in jail for --

THE COURT: Okay.

ATTORNEY WATKINS: -- five days, four or five days at that point.

So the gist of the entire call is to try to -- having discussed at some length in the initial proceedings talking about what the government's allegation was here and my speaking with Mr. Rathbun about what the allegations were and hearing in court on really some pretty ferocious litigation within those first few days. We had a long probable cause hearing before Magistrate Judge Robertson and then the proceedings in here.

Now to bring up a full flavor of all of that, I would have to go through a fairly intensive cross-examination -- I'm sorry, redirect of Mr. Rathbun.

The difficulty here also is that I've been prohibited. I can't talk to Mr. Rathbun obviously about this particular issue and anything that I might ask him and so I would be caught at trying to flounder around a little bit on here. But I think without the context and being able to talk to the jury, there was a period of time

when Mr. Rathbun was out of custody and that's what you don't understand that when he's talking to his mother about things that they've already discussed while he was out of custody and it gets incredibly confusing.

THE COURT:  How does his being out of custody affect the limited portion that the government wants to play though about where the dumpster was?  The familiarity with Converse Street?  The familiarity with Ruth's House? How does his being in custody affect that?

ATTORNEY WATKINS:  How does being in custody -- it's not being in custody, it's being out of custody right on April 15th he learns exactly what the allegations are. He goes down there and as we heard that is his way of getting home.

He does, I'm sure as any of us would do, some self-help down there and go down there and try to figure out exactly what it is that the government is saying that he did here.

THE COURT:  Okay.  So he's doing his own -- this little visit was from his own investigation --

ATTORNEY WATKINS:  Correct.

THE COURT:  -- to kind of put it roughly?

ATTORNEY WATKINS:  Correct.  It's not on the tape that that's true, but I certainly would have to bring that out, and it's clear that what's going on.

If the court reads the entire transcript, that brings it much more into focus and that's another reason why this is going to spin out of control with other kinds of issues as he's going through the transcript talking with his mother about exactly what happened.

It is clear, it is clear that they've already spoken in the past about these issues and that they're following up on things that happened, talked about them before, his self-help and his mother's efforts to assist him.

So how to get all this out in front of the jury without explaining to them that for a portion of time Mr. Rathbun was out of custody but then he was in custody opens up a whole different number of issues and the jury has got to speculate, well, gee, he was out of custody. Did he do something else that got him back into custody? And, of course, we know that that's not the case.

So it's fraught with all kinds of extraneous issues here for a very, very minor point that the government is trying to make here.

THE COURT:  Okay.

ATTORNEY WATKINS:  And indeed it's a point that they hope to expound upon and use I think as somewhat of a misleading manner here; that Mr. Rathbun knew that area much better on April 15th when he visited than he actually did.

ATTORNEY BRESLOW:  May I respond, Your Honor?

THE COURT:  Of course.

ATTORNEY BRESLOW:  Okay.  So, first of all, I think Mr. Watkins did a very good job in a very short period of time explaining what is actually quite simple. That Mr. Rathbun gained the knowledge that he's talking about in this paragraph from a visit that he made prior to April 21st.

I think he's -- I don't really see the need for him to coach his client on this where he's already discussed in open court with his client what the actual explanation is.  But if Your Honor wants, if Mr. Watkins feels that it's appropriate to sit down with him for five minutes or so, we don't have a problem with breaking the sequestration for that limited purpose.

THE COURT:  So you agree essentially this was during this period where he was released where he visited or where he was talking about -- he was back incarcerated when he made this phone call obviously.

ATTORNEY BRESLOW:  Right.

THE COURT:  But is reflecting back on a time before he became incarcerated?

ATTORNEY BRESLOW:  Right.  So, well, I don't agree but clearly that's what Mr. Rathbun will testify to and it's perfectly appropriate.  We are going to offer it

for that purpose and Mr. Watkins can easily redirect as he just explained to Your Honor. I don't think it's confusing at all.

Secondly, in terms of the in and out of custody, I want to be really clear about this, throughout our entire case-in-chief we avoided any notion that the defendant was in custody.

THE COURT: Right.

ATTORNEY BRESLOW: We referred to these as recorded calls. We redacted anything relating to jail, and for reasons I guess only known to the defense they elected to introduce the notion that Mr. Rathbun had been in jail and had been in jail for a significant period of time.

What they didn't introduce and what is not clear to the jury is when the defendant was in custody, and so there is no need for Mr. Watkins to introduce on redirect that he had been locked up on April 15th and then released and then locked up again some time prior to April 21st. That's not relevant. That's not relevant and so the jury doesn't know when he was locked up. We are not intending to -- initially.

They don't know about a release and so Mr. Watkins can easily say on redirect if the defendant is testifying about this point that at some point prior to April 21st,

between April 15th and April 21st, he visited the location and his knowledge of the location is based on that and not a prior knowledge as the government would be arguing. It's actually a pretty simple point and I think Mr. Watkins and Mr. Rathbun will be able to explain it perfectly well without confusing the jury.

THE COURT:  What about the rest of this for context where he talks about, yeah, "Ruth's House.  I wouldn't dump there.  I would never dump there.  It's right in front.  Everyone would see it.  Someone else could have taken the gas can and put it there."  That kind of thing for completeness?

ATTORNEY BRESLOW:  Right.  So that's the second issue.  Assuming it's admissible, and it clearly is, the defense has the opportunity to review the transcript and identify portions that it wants to introduce on redirect and I doubt the government will have much objection to that.

THE COURT:  Have you considered an alternative B, which is a completeness reading?

ATTORNEY WATKINS:  Yes, Your Honor, but then as the court will see there's little pieces of it that shouldn't come in that are not having anything to do with anything.  There's comments, you know, there's swears. There's all kinds of things that are best left out of here

and therein lies the problem.  I would have to now work through the call myself to try to figure out what needs to be redacted and what didn't.

We are very close to end of the trial.  If the court -- if the government really thinks that they need this one last piece there, then I will certainly try to go through both the transcript and the phone call with Mr. Rathbun to try to do the best we can to redact.  Let's bring in those other completeness matters.  But, boy, in the scheme of things, one wonders whether life is too short at the end of this trial to be going down this particular rabbit hole.

ATTORNEY BRESLOW:  Well, it's 30 seconds of conversation, Your Honor, and it's directly related to issues that have been raised by the defense in Mr. Rathbun's direct examination.

THE COURT:  I mean, there's gold nuggets in here for the defense.

ATTORNEY WATKINS:  It's true, and part of me just says let's play the whole phone call and just throw the thing up there, but.

THE COURT:  There's also some talk on page 7 about, you know, the dumpster he went to and it's between new houses.  That's the last dumpster.  He doesn't think he went to the dumpster at Ruth's House.  I swear -- and

then he's talking about another dumpster, and then he says "I swear that's the last place I went to dump.  I think that's where I threw the gas container."

ATTORNEY WATKINS:  So I guess that's where we are.  We'll play the whole phone call and let the chips falls.

THE COURT:  What's the whole phone call?

ATTORNEY BRESLOW:  Your Honor, what we'd like to do, assuming Your Honor believes that this is relevant and admissible, we'd like to sit down with Mr. Watkins and determine what the scope of completeness is as far as he's concerned and then we will make a decision about that.

THE COURT:  I think it's -- I mean, I can see some relevance.  Okay.  So you've convinced me I do see some relevance.  Attorney Watkins has convinced me that putting it into context of in jail/out of jail, things like that, frankly may be more prejudicial and outweigh the degree of relevance that I find.

Just looking at this from a potential benefit and I don't know if I -- I don't want to overstep what I'm supposed to be doing, but looking at this for usefulness to both parties, there seems be useful portions for both parties if this was played.

ATTORNEY BRESLOW:  I believe again I wasn't present for the first trial, but I believe that's -- I

can't recall exactly why ultimately the government didn't offer this and it may have been on an inability to agree on completeness.

THE COURT:  Maybe.  So do you want -- I mean, I can give you -- I can tell you right now, I'm inclined not to allow it if the defendant is standing by its objection of it's too complicated and prejudicial to explain the in jail/out of jail and too complicated to put it into context.

Although I think it's relevant, Attorney Breslow.  I don't think it's such a big deal that the government hasn't been able to address this from different angles.  I don't think you're extremely harmed by that so that would be my ruling.

I'll give the parties a second if you want to talk about an agreement.  But if defense, if you're not going to agree as to some type of completeness playing, I'm going to deny the government's request.  If you want to reconsider and talk to them for five minutes, you have five minutes.

ATTORNEY WATKINS:  Thank you, Your Honor.

THE COURT:  You're going to take the five minutes?

ATTORNEY WATKINS:  Yeah, I think so.

THE COURT:  Okay.

(Short pause in the proceeding.)

ATTORNEY BRESLOW:  I think it's likely clear we don't want to delay further.  We will just -- I think it's going to be likely we are not going to be able to agree so we will just proceed.

THE COURT:  All right.

**(The jury entered at 9:32.)**

THE CLERK:  All rise for the jury.

THE COURT:  You can be seated.

Good morning.  I hope you enjoyed your drive in in the thunder and lightning.

All right.  So over the weekend was everyone able to follow my instructions not to talk to anyone about this case including each other if you happened to see each other or, I don't know, bump into each other?  Not to talk to anyone including each other?  Not to investigate this case?  Not to allow yourself to be exposed to any media, if there were any?  To do no research on the case? Nothing to do with the internet or social media, blogging, actively blogging, saying things or reading anything about the case?  Was everyone able to follow all those instructions.

THE JURY:  (Yes.)

THE COURT:  Okay.  Affirmative response from every juror.  They remain fair and impartial and we will

continue with the cross-examine.  All right.  Very good.

ATTORNEY BRESLOW:  Thank you, Your Honor.

**John Rathbun**

**CONT'D CROSS-EXAMINATION**

Q.   (By Attorney Breslow) Good morning, Mr. Rathbun.

A.   Good morning.

Good morning.

Q.   Once again, just like on Friday I'm going to ask you yes or no questions.  Okay?

A.   Yes, sir.

Q.   And you'll have an opportunity to explain your answers.

ATTORNEY WATKINS:  Objection, Your Honor.

THE COURT:  Sustained.  I don't think we need the instructions again.  We've had them.  Mr. Rathbun has had them.

ATTORNEY BRESLOW:  Does he need to be re-sworn?

THE CLERK:  He remains under oath.

THE COURT:  Generally when there's a weekend break we reissue the oath.

THE CLERK:  Okay.  We can do that.

Mr. Rathbun.

**John Rathbun (Sworn)**

THE COURT:  Ladies and gentlemen, generally when there's a weekend break, whoever happens to be the witness

on the stand, we reissue the oath because of the weekend. If it's just day to day, we don't reissue the oath.

One other thing I wanted to tell you, when you were back in the hallway waiting to come in just now, or if at any time when you're waiting to come in, if you happen to hear through the doors any of the discussions that I'm having with the lawyers in here, you should -- I don't know, can you hear it?

You can't. Okay. I was going to tell you if you heard anything, to completely disregard and don't speculate what you might be hearing but if you couldn't really hear it, then fine. All right.

ATTORNEY BRESLOW: Okay. Great.

Q. (By Attorney Breslow) So when we left off on Friday, do you remember we talked about two windows of time on April 2nd?

A. Yes.

Q. And the first one was between two telephone calls to Devin Austin; do you remember that?

A. I do.

Q. The first at 4:34 a.m. from the area around your home and the second was at 5:01 a.m. when you were traveling on I-91; do you remember that?

A. I do.

Q. Okay. And the second window was a 57-minute window

of time from 6:09 to 7:06 a.m.; do you remember that?

A.   Yes, sir.

Q.   Okay.  So I want to give you a preview of where we are going to be going this morning.  This morning I'll be asking you a fair amount of questions about some of the statements that you've made concerning this case.  Okay?

A.   Yes, sir.

Q.   But before we go there, please tell the jury on November 23, 2020 were you convicted in federal court?

A.   I don't believe so.  Could you broaden that a little?

Q.   I'm sorry?

A.   Could you broaden that a little?  I don't quite understand.

Q.   After a prior proceeding --

A.   Yes.

Q.   -- were you convicted in federal court?

            THE COURT:  Please name the exact charge.

            THE WITNESS:  Yeah, I don't understand.

            ATTORNEY BRESLOW:  Okay.  That will be easier.

Q.   (By Attorney Breslow) Was that conviction for knowingly and willfully making a materially false, fictitious, and fraudulent statement to a federal official?

A.   Yes.

Q.   Okay.  Now let's talk about some of the other

statements you've made.

First, do you remember your testimony on Friday about your mom keeping tracts in the front seat cup holder of her car?

A.   I believe so.

Q.   So, first, do you remember I asked you does your mom keep tracts in the cup holder of her car and do you remember your answer?

A.   I don't recall my answer.

Q.   You said, "no."  Do you remember that?

A.   I do now, yes.

Q.   Okay.  And then you testified that your mom sometimes keeps tracts in the cup holder, right?

A.   That's correct.

Q.   But you said not always, right?

A.   Correct.

Q.   So is that still your testimony?

A.   Yes.  She sometimes keeps tracts in the cup holder of the car, yes.

ATTORNEY BRESLOW:  So I'd like to display for the court, counsel, and the witness only PX-123 page 144 lines 14 to 20.

I don't think it's on counsel's monitor yet.

THE CLERK:  It's not.  What are you using?

MS. McKENNA:  HDMI-1.

THE CLERK:  There it is.

ATTORNEY BRESLOW:  If we can just expand this screen to cover 14 to 20?

Thank you.

Q.   (By Attorney Breslow)  Mr. Rathbun, in a prior proceeding when you were sworn under oath, just like you the oath you took now, were you asked this question and did you give these answers?

A.   Yes, sir.

Q.   "And you heard that Natalie said your mom always keeps one in the front seat cup holder."  Do you remember her testifying to that?

A.   That's what she testified to.

Q.   No.  No.  I'm sorry.  What I'm going to do is just -- what I'm going to do is I'm just going to read the whole question and answer and then I'm going to ask you a final question at the end.

So just to be clear, these are not my questions. These are the questions that I'm reading from what's in front of you on the screen.  Okay?

A.   Sure.

Q.   Is that clear?

All right.  So in the prior proceeding were you asked "And you heard that Natalie said your mom always keeps one in the front seat cup holder; do you remember her

testifying to that?

"Answer:  I do remember that.

"Question:  That's true, right, she does keep one in the cup holder?

"Answer:  She does."

Mr. Rathbun, the question I have for you is did I read that right?

A.    Yes, you did.

Q.    Okay.  Now do you remember Mr. Watkins asking you about how you lost your job at All Energy Solar?

A.    I do.

Q.    You testified I believe that there were two meetings with your bosses; is that right?

A.    Yeah, I think so, yeah.

Q.    And the first meeting took place on March 3rd, correct?

A.    Correct.

Q.    All right.  And I think you stated that one of your bosses was Alfie?

A.    He's the general manager and then Chris is my manager, but, yes.

Q.    Chris Meyerhoff?

A.    Correct.

Q.    And this meeting was with both of them, right?

A.    Correct.

Q.    So before then on March 3rd your drug use had caused you to drive dangerously in a company truck; is that right?

A.    That's correct.

Q.    And you drove so dangerously that Alfie and Chris received many complaints about your driving, right?

A.    That's correct.

Q.    And they called you and they told you to come in right away, right?

A.    Yes, sir.

Q.    I think you said you were about half an hour away; is that right?

A.    Correct.

Q.    You came in like three hours late, right?

A.    Correct.

Q.    And that's in part because you were still using drugs, right?

A.    Correct.

Q.    So when you finally showed up, Alfie asked you were you under the influence?  Were you intoxicated, right?

A.    That's correct.

Q.    And you said no?

A.    Yes, I did.

Q.    And then Alfie asked you were you driving dangerously, right?

A.    I don't recall that question, no.

Q.    He asked you about the complaints?  That's why he called you in, right?

A.    Yes.

Q.    And the complaints were for you driving dangerously?

A.    Correct.

Q.    So he asked you about these complaints, yes?

A.    No.  I do not recall him asking me about that, no. He said there was complaints that were called in.  That was it.

Q.    Okay.  And you told him that you had not driven dangerously?

A.    Correct.

Q.    I'm sorry?

A.    Yes.

Q.    And that was false too, right?

A.    Correct.

Q.    Now, you didn't tell Alfie and Chris the truth because you liked your job, right, and you wanted to keep it?

A.    Yes.  I'm ashamed of my drug use.  It's not something I like to be honest about.

Q.    Mr. Rathbun, that's not the question I asked.

        ATTORNEY WATKINS:  Objection.

        THE COURT:  Sustained.  Next question please.

ATTORNEY BRESLOW:  I'd like to display for the entire courtroom PX-52 page 28 line 457.  If you can just focus on line 457.

Q.  (By Attorney Breslow)  Take a look at that, Mr. Rathbun.  Just read it to yourself.

A.  I've read this many times.

Q.  Okay.  Do you remember Mr. Watkins asking you several questions about this very text message?

A.  I believe he did, yes.

Q.  This is a text message that you sent to Devin Austin on April 2nd at 4:32 a.m., right?

A.  Correct.

ATTORNEY BRESLOW:  So if we can just blow up -- if we can zoom back out and then blow up the message?

Q.  (By Attorney Breslow)  All right.  You texted "Dude, I got a hundred in cash sitting in front of me," right?

A.  That's correct.

Q.  But you did not have a hundred in cash sitting in front of you, right?

A.  That is correct.  I did not.

Q.  You did not tell Devin the truth because you wanted him to give you drugs, right?

A.  Correct.  I didn't tell him the truth, correct.  What did you say?  I'm sorry, can you repeat what you said?

THE COURT:  He said because you wanted him to

give you drugs; is that right?

THE WITNESS:  Correct, yes.

ATTORNEY BRESLOW Right.

Q.   (By Attorney Breslow)  And in that same text you said "I'm right around the corner from you," right?

A.   I did say that, yes.

Q.   That was also false, right?

A.   That is correct.

Q.   Because you were still at your home in Longmeadow, right?

A.   Yes, I believe so.

Q.   And you did not tell Devin the truth here also because I believe you testified on Friday when Mr. Watkins asked you questions about this that you wanted to pressure him into giving you drugs, correct?

A.   Right.

Q.   And that was false too?

A.   That I wanted to pressure him into giving me drugs?

Q.   No, that's true.  I understand that you're saying that's true.  The statement why you said it?

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.

ATTORNEY BRESLOW:  I think I should ask a better question, Your Honor.

THE COURT:  Sure.

Q. (By Attorney Breslow) So the statement that you were right around the corner from him at 90 El Paso Street, that was false also?

A. Correct.

ATTORNEY BRESLOW: Now, if we can display PX-52 page 30, line 44 to the entire courtroom?

Q. (By Attorney Breslow) Do you remember Mr. Watkins asking you on direct examination --

ATTORNEY BRESLOW: Oh, I'm sorry, we need the jury monitors. Thank you.

Q. (By Attorney Breslow) Do you remember Mr. Watkins asking you questions on direct examination on Friday about this text also?

A. Yes.

Q. Okay. So if we can just -- this was sent on April 2nd a little later at 5:34 a.m., right?

A. That is correct.

Q. Okay. At some point on the fourth line you said "trust me please and I'll go away." Right? Do you see that there? "I just need" --

A. I'm just reading prior to it.

Q. Yeah, read the whole thing and tell us when you're done.

A. Yes, I did say that.

Q. Okay.

A.    I said, "trust me please and I'll go away."

Q.    Right.  So you and Devin had known each other for awhile, right?

A.    That is correct.

Q.    You testified that he was one of your drug suppliers?

A.    Slash friend, yes.

Q.    Right.  And you also testified that he was a friend?

A.    Yes.

Q.    And here you're telling him trust me please, correct?

A.    Correct.

Q.    It's fair to say that Devin didn't always trust you, right?

A.    Yeah.  Yeah.

Q.    Now let's focus on a new topic.

      I want to focus on your life and your mental state in the period leading up to April 2nd.  Okay?

A.    Sure.

Q.    So we're shifting topics to that.

      Your marriage had ended in divorce, right?

A.    Yes.

Q.    And I think you testified in part your relationships, including with women, failed because of drug use; is that right?

A.    Amongst other things, yes.

Q.    Right.  And so you had to move back out of your house

into your childhood home, right?

A.   I did.

Q.   And you were living with your mom and dad, right?

A.   Yes, I was and my daughter and my dog.

Q.   Right.  And your teenage daughter Natalie and your dog, right?

A.   That's correct.

Q.   So in January you got into such a big argument with your daughter that she had stopped talking to you entirely, right?

A.   I don't think it was just that argument.  It was, you know, little arguments leading up to that.  It wasn't just a one, you know, big huge argument, but arguments leading up to that that made it so I had to give her some space, yes.

Q.   Okay.  And you upset your daughter so badly through these --

          ATTORNEY WATKINS:  Objection.

          THE COURT:  Sustained.

Q.   (By Attorney Breslow)  Okay.  Well, you talked about giving your daughter some space, right?

A.   Uh-huh.  Yes.  Sorry.

Q.   She didn't want to talk with you anymore and you were living right next to each other on that second floor?

A.   She needed some space from me, yes.

Q.   Right.  And so your mother moved you out of your bedroom down to the first floor, right?

A.   It was a mutual agreement.

Q.   Okay.  It's a mutual agreement between you and your mother?

A.   Correct.

Q.   But that's what your mother wanted you to do, right?

A.   And also I thought it was best for Natalie also.

Q.   Okay.  So you weren't just fighting with your daughter though, right?

A.   I'd have small arguments with my mother too sometimes, yes.  I was using drugs at this time.

Q.   Right.  I'm not asking about the drugs.  I'm just asking right now about the arguments.  Okay.  Okay?

A.   Sure.

Q.   So you were fighting with your mother a lot, right?

A.   Once or twice a week.

Q.   Right.  And in those fights you swore at her, right?

A.   I would sometimes, yes, swear at her.

Q.   And you would shout and scream at her, right?

A.   Yeah, I would say so.

Q.   And for your mom's part, she didn't swear back at you?  She tried to keep her calm, right?

A.   That is correct.

Q.   But you week after week would shout and scream and

swear at her?

A.   Again, I was using drugs but, yes.

Q.   And these arguments sometimes they had to do with your mom just forgetting to get you cigarettes, right?

A.   Yes, sir.

Q.   And sometimes all it took was your mom forgetting to bring back a grocery or two that you wanted, right?

A.   Absolutely.  I was very agitated at that time, yes.

Q.   Yeah.  Yeah.  You testified that on direct that during this period of time you were getting more and more agitated, right?

A.   That's correct.

Q.   And you were getting so agitated that little things like cigarettes or a missed grocery would set you off, right?

A.   I wouldn't say set me off.  But, yes, they would cause an argument.

Q.   Not just an argument though, but like a screaming, shouting, swearing argument?

A.   It was an argument.

Q.   Right?

A.   Correct, an argument.

Q.   That was the kind of argument?

A.   I said, yes.  It was an argument, yes.

Q.   Okay.  And I think you testified when Mr. Watkins

asked you you were not seeking any treatment at all, right?

A.   I was on Methadone.  I was getting counseling at the Methadone clinic but other than that, no, I did not receive any treatment.

Q.   Okay.  You were abusing a wide range of drugs it's fair to say?

A.   That's fair to say.

Q.   And that included heroin?

A.   Yes.

Q.   Crack?

A.   Yes.

Q.   Powder cocaine?

A.   Yes.

Q.   Benzos?

A.   Yes.

Q.   Xanax?

A.   The same thing.

Q.   Okay.  Alcohol?

A.   Yes.

Q.   And sometimes you were taking many of these drugs together, right?

A.   Correct.

Q.   Now, one month before April 2nd -- I want to return to March 3rd -- you had gotten so high on drugs that in

your own words you were out of your mind, right?

A.    That's what I said, yes.

Q.    Well, that was true, right?  Your description of yourself?

A.    I had used a lot of drugs that night, yes.

Q.    And this was at the Quality Inn with Dana Graham?

A.    Correct.

Q.    You had gotten so high you thought people were breaking into your van?

A.    I had used a lot of drugs that night, yes.

Q.    And you became so suspicious that you actually went downstairs to check out the people in the van, right?

A.    That is correct.

Q.    And Dana told you there was nobody in the van, right?

A.    She did.

Q.    But you were certain that there were people in your van?

A.    That's what I thought at the time, sir.

Q.    Right.  And you were so certain you decided to call the police?

A.    That's what I did.

Q.    Even though you and Dana were high, right?

A.    Right.

Q.    And even though the room was filled with drugs, right?

A.    Yes.

Q.    And all those drugs that we just talked about they were all there in that room?  You were using heroin, right?

A.    Correct.

Q.    Crack?

A.    Yes.

Q.    There was powder?

A.    Yes.

Q.    And benzos for you?

A.    Yes.

Q.    And alcohol?

A.    Yes.

Q.    So Dana told you don't call the police because they might come to the room and find all these drugs, right?

A.    Yes.

Q.    But you decided, you decided to call the police anyway?

A.    Yes, I did.

Q.    Because you were so convinced there were people in your van?

A.    That is correct.

Q.    And that was a conscious decision you made, wasn't it?

A.    Correct.

Q.   You called the police and you told the police there were two or three people in your van, right?

A.   That's what I said.

Q.   You told them they were stealing something.  They were moving around.  They were screwdriving something. You could see them very clearly, right?

A.   That's what I said.

Q.   And I think you testified on Friday that in response to your call of a van break in in the parking lot of the Quality Inn in Chicopee, six or seven police cars showed up?

A.   Correct.

Q.   And is that still your testimony that six or seven police cars showed up for your call?

A.   Yes.

Q.   Okay.  When the police came to the motel, you got out on your balcony and you shouted down to the officer there's people in the van, right?

A.   I don't recall if I did that, sir.

Q.   You don't remember?

A.   I don't remember doing that exact thing that you're saying.

Q.   Okay.  Well, let's break it down.

     Do you remember the police arriving?

A.   Yes.

Q.   Do you remember you coming out onto that balcony or sort of outdoor space outside your hotel room that was overlooking the parking lot?

A.   It was a window.

Q.   A window.  Okay.

Do you remember leaning out the window and talking to the police?

A.   I do.  I do.

Q.   Do you remember telling them there's people in the car?

A.   I might have said that.  I don't recall right now.

Q.   Okay.  Do you remember the officer telling you that there was no one in the van?

A.   Eventually when I came down, yes.

Q.   All right.  So eventually you came down to the parking lot, right?

A.   Yes, sir.

Q.   You were only in your boxers, right?

A.   That's correct.

Q.   The officer was about 10 or 15 feet away from you, right?

A.   Yes.

Q.   And your van wasn't that far away either?

A.   Correct.

Q.   And you told the officer there's people in the van,

right?

A.    That's what I said.  Yes, sir.

Q.    And the officer -- it was just one officer, right?

A.    There was a couple.  There was one talking to me but there were a couple next to him.

Q.    Okay.  And the officer was talking with you and he told you there was no one in the van, right?

A.    That's what he told me.

Q.    But you were convinced even then that there were?

A.    At that time, yes.  I had used a lot of drugs that night, correct.

Q.    So can you tell the jury now were there or were there not people in your van?

A.    There was not anybody in my van.  I was very high.  I used a lot of drugs that night.

Q.    And March 3rd it's fair to say was not the only time you had gotten so high like that, right?

A.    That night is very rare.  I mean, it happens.  But that night especially after being fired from my job, I really was in a bad down place.

Q.    Right.  Right.  You were -- I mean, it's fair to say you were -- your life was basically spiraling down at that point, right?

            ATTORNEY WATKINS:  Objection.

            THE COURT:  Overruled.

THE WITNESS:  Yeah, I'd say so.

Q.  (By Attorney Breslow) And it's fair to say also by this point that things were going out of control with you, right?

A.  I don't know if I'd use out of control.  I mean, I was still coherent.  I was still able to drive.  I was still able to go on my phone looking for jobs I mean.

Q.  Okay.  Actually let's just focus on that for a moment.

That night all those things applied, right?  You were coherent?  You could use your phone?  You could call 911?  You could talk back and forth with the police, right?

A.  I mean for the most part, yeah.

Q.  I mean, you were seeing people who weren't in your van but, otherwise, you knew what you were doing that night, right?

A.  For the most part.  I mean, again I was under the influence so.

Q.  Right.  But you knew when you picked up the phone for example that you were picking up the phone, right?

A.  Correct.

Q.  You knew when you called 911, that you were calling 911?

A.  I did.

Q.  And you knew that when you were talking to the

police, you were actually talking to the police, right?

A.   Oh, yes.

Q.   You made the decision, good or not, to call the police and come to your hotel room even though there were drugs all over it, right?

A.   Yes.  At that time I wasn't worried about the drugs. I thought somebody was breaking into my car.

Q.   You were so suspicious about the people in your car that you made the conscience decision to weigh those risks and decide I'm going call the police about these people in my car and not worry at the time about the drugs in my room?

A.   Correct.

         ATTORNEY BRESLOW:  Okay.  Can we put up solely for the court, counsel, and the witness PX-94 page 5, line 16 to 22?

Q.   (By Attorney Breslow)  I'm just going to ask you very plainly once again, Mr. Rathbun, at this point in your life things were going out of control with you, weren't they?

A.   Yes.

Q.   On March 3rd all the way up through when the FBI came to your door on April 15th, right?

A.   No, because with the COVID going on, I mean I used for -- I didn't use for like a week and then I used

and then I didn't use so I was.

Q.   You were on and off for you?

A.   Yes.

Q.   Okay.  Now I'd like to focus now on three other statements that you've made in this case to Special Agent Ryan McGonigle of the FBI on April 15th.  Okay?

A.   Sure.

Q.   All right.  So the first concerns the canister, have you possessed or seen the gas canister?  The second that I want to cover with you is where you were on April 2nd; and the third is if you were familiar with the crime scene, that place outside the Ruth's House -- that place on Ruth's House road.  Okay?

A.   Sure.

Q.   All right.  So before we get into these statements, I want to focus a little bit on the background.

     You agreed to talk to Special Agent McGonigle and another police officer, right, Pam Chaplin?

A.   I did.

Q.   And before the interview they provided *Miranda* warnings to you, right?

A.   They did.

Q.   That was both orally -- they read them aloud and then they gave you a form to sign, right?

A.   They did.

Q.   And you understood your rights?

A.   I did.

Q.   And you agreed to waive them?

A.   I did.

Q.   You signed the *Miranda* form?

A.   I did.

Q.   And you agreed to speak with the officers?

A.   Correct.  The FBI was at my house.  I wanted to figure out what was going on, sir.

Q.   Okay.  That wasn't my question.

My question was, you agreed to speak with the officers, right?

A.   To figure out what was going on, sir, yes.

Q.   Again, I'm just asking you a yes or no question.

ATTORNEY WATKINS:  Objection.

THE COURT:  Objection sustained.

Q.   (By Attorney Breslow)  Special Agent McGonigle asked you about your drug use, right?

A.   He did.

Q.   He asked you when you last used drugs, yes?

A.   Yes.

Q.   And you told him about a month ago, correct?

A.   I did.

Q.   And that was false?

A.   Correct.  Again, drug use is embarrassing.  It's not

something I want to divulge very often.  It's just not something I like talking about.

THE COURT:  Mr. Rathbun, Attorney Breslow is trying to ask you questions that only require a yes or no answer.  All right?  That does not give you the room to try to go into a longer explanation on every question.

I mean, once in a while I understand you need to explain a little.  But for the most part when you're being asked yes or no questions, try to just keep it to yes or no.

THE WITNESS:  I apologize, Your Honor.

THE COURT:  Okay.

Q.   (By Attorney Breslow)  Let's follow up on that.  So it sounds like what you're saying is if I'm embarrassed about something like my drug use, I'm going to lie about it, right?

A.   I'm going to withhold, yes.  Absolutely.

Q.   Well, not just withhold, let me not use the word lie. You will say something that you know to be false?

A.   Yes.

Q.   So in this case Special Agent McGonigle specifically asked you when the last time you used drugs was, right?

A.   He did.

Q.   And you didn't just withhold; you affirmatively told him something that was untrue?

A.    I did.

Q.    And that was untrue because you knew you had used drugs more recently than a month ago, right?

A.    Correct.

Q.    And you told him a false statement because you were embarrassed?

A.    Absolutely.

Q.    Is that your testimony?

A.    Yes, sir.

Q.    And you next told him when this topic came up that you used drugs about two weeks ago, right?

A.    I did.

Q.    And two weeks ago -- about two weeks ago, that was April 2nd, wasn't it?

A.    Correct.

Q.    And that was the night that you started using drugs on April 1st.  You knew you were going to run out.  You asked to borrow your mom's car and you left in the early morning to go to Springfield to find Devin Austin?

A.    Correct.

Q.    And you had remembered that at that time you were talking to Special Agent McGonigle, right?

A.    Yes.

Q.    But you didn't tell him about that when he asked you the first time?

A.    Correct.

Q.    And this statement also was false, correct?

A.    Correct.

Q.    Because you knew you had used drugs more recently than that?

A.    That is correct.

Q.    In fact, you had used drugs just the night prior, right, on April 14th going into the 15th?

A.    That is correct.

Q.    And you finally admitted this, right?

A.    I did.

Q.    But only when Special Agent McGonigle told you or asked you if you would take a drug test, right?

A.    Correct.

Q.    And it was only then when you were confronted with an actual test of your honesty did you say, look, I'm going to test positive, right?

A.    Yes.

Q.    Now do you remember Mr. Watkins asking you about your mental state during your interview on April 15th?

A.    Yes.

Q.    This was just on Friday?

A.    Okay.

Q.    And I think you testified to this jury that you were in a drug haze that morning; is that right?

A.    The morning I was interviewed, sir?

Q.    Right.  I realize we're talking about some different times frames so let me be really clear about it.

I'm not focusing you on your testimony on Friday when Mr. Watkins was asking you questions.

A.    Okay.

Q.    And he was asking you questions about the morning of April 15th.  Okay?

A.    Okay.

Q.    And you told this jury that on the morning of April 15th you were in a drug haze, right?

A.    If that's what I said.

Q.    Well, did you say if that's what I said?

A.    Yes.

Q.    So you testified just on Friday -- that's what I'm asking you about.

A.    Okay.

Q.    Do you not remember or do you remember what you said on Friday?

A.    I did say I was in a drug haze.

Q.    Okay.  So you told Special Agent McGonigle when he asked about your level of impairment that you were not impaired; isn't that right?

A.    That is what I said.

Q.    Okay.  So I just want to be clear because we are

talking about two different time frames.

On April 15th you told Special Agent McGonigle, no, I'm not impaired, right?

A.    That is correct.

Q.    And then just on Friday you testified to this jury that in fact you were impaired?

A.    That is correct what I said.

Q.    Okay.  And you also testified on Friday that that morning you felt confused or you were confused; is that right?

A.    I was under extreme stress that morning.

Q.    That's not my question.

A.    It was hard to recall things.

Q.    That was not my question.  I'll ask it again.

You testified on Friday with this jury that you were confused, correct?

A.    Absolutely.

Q.    And did you tell Special Agent McGonigle that you were confused at any point?

A.    I don't recall.

Q.    Well, think about it for a minute because it would be natural to do so if you were confused, so just think about it and --

A.    I don't recall.

Q.    You don't remember?

A.    No.

Q.    In fact, you never told him you were confused, right?

A.    I don't recall.

        ATTORNEY BRESLOW:  Okay.  I'm going to ask that we display PX-123 page 152, lines 23 to 34 only to the court, counsel, and the witness at this point.

Q.    (By Attorney Breslow)  Can you read those lines? It's line 23 to 34?

A.    I do.

Q.    All right.  I mean, 23 to 24 sorry.

        So does that help you remember that you never said you were confused?

A.    I guess I didn't, correct.

Q.    You also testified -- just to be clear, and it's probably my question and not your answers, you never told Special Agent McGonigle on April 15th that you were confused, right?

A.    Correct.

Q.    So you could have obviously?

A.    Been confused?

Q.    No.  No.  You could have told him you were confused?

A.    Yeah, I could have told him.

Q.    But you didn't?

A.    Correct.

Q.    And you could have told him you were in a drug haze?

A.    Say the question again.

Q.    Sure.  I'll slow it down.

You could have told him you were in a drug haze, right?

A.    Correct.

Q.    But instead you told him you were not impaired?

A.    That is correct.

Q.    All right.  And now you also testified to this jury that you were freaking out, right?

A.    Correct.

Q.    And in part were you freaking out because the agents had woken you up at gunpoint with a gun pointed at your head?

A.    Absolutely.

Q.    Okay.  And then they marched you out of your home at gunpoint from your bedroom?

A.    That's correct.

ATTORNEY BRESLOW:  May I have a moment, Your Honor?

Q.    (By Attorney Breslow)  I'll display once again only to you, your counsel, and the court.

THE COURT:  We don't have it.

THE CLERK:  Here it goes.

THE COURT:  There we go.

ATTORNEY BRESLOW:  Okay.

Q.   (By Attorney Breslow) All right.  So I'd like to focus on lines 17 to 23.

A.   Yes.

Q.   So take a moment to read it and then I'm going to ask you a pretty simple question.

A.   Go ahead.

Q.   Okay.  So just let me read this and then I'm going to ask you the question.

     Were you asked in a prior proceeding when you swore the same oath that you did today, "when was the first" -- "what was the first thing you noticed when the FBI came to your house?"  Was that question asked of you?

A.   Correct.

Q.   Did you give this answer:  "It was about 7:30 in the morning.  I was in bed sleeping and I heard rustling in the front door.  So I opened up my door.  I came out and there was a man with a rifle in front of me and an FBI vest on and he told me to come out?"

A.   That is correct.

Q.   Okay.  Now, we can take that down.

     You did not tell Special Agent McGonigle you were freaking out, right?

A.   I think it was pretty obvious.

Q.   Okay.  But that's not my question.  I'll ask it again.

You did not tell Special Agent McGonigle that you were freaking out?

A.    I didn't.

Q.    You didn't, right?

A.    I did not.

Q.    And you did not ask for time to calm down?

A.    I had time.  There was breaks in between his questioning.  He was making a phone calls --

Q.    Okay.

A.    -- and such.

Q.    Right.  So he gave you breaks?

A.    There was breaks, yes.

Q.    But it's not like you were asking for breaks.  He was doing other things.  He was allowing you some time, right?

A.    Yes.

Q.    Okay.  And during those breaks you kicked around a soccer ball?

A.    That's correct.

Q.    Spent some time with your dog Tucker?

A.    Yes, I did.

Q.    Smoked cigarettes?

A.    Correct.

Q.    And wandered around the back yard?

      And the interview it took place over like a three or four hour period of time, right?

A.    Correct.

Q.    And throughout that period of time there were breaks that allowed you to sort of just be with yourself?

A.    Yes.

Q.    Okay.  And you testified to this jury that you were scared during the interview; is that right?

A.    It was an extremely stressful morning, yes.  I was scared, yes.

Q.    Okay.  But you didn't tell Special Agent McGonigle that you were stressed or scared, did you?

A.    That's kind of embarrassing.  It's not something I wanted to say as a man.  You don't really tell people that you're scared; you're embarrassed.

Q.    But you understood that Special Agent McGonigle wanted to make sure that you were aware enough to be able to answer his questions truthfully, right?

A.    Correct.

        ATTORNEY WATKINS:  Objection.

        THE WITNESS:  I'm sorry.

        THE COURT:  Overruled.

Q.    (By Attorney Breslow)  Your answer was correct?

A.    Correct.

Q.    And you even joked around for a little bit with Pat Carnahan, the agent who came and testified last week?

A.    I did.

Q.   And you joked around with Pam Chaplin, right, also?

A.   I believe so, yes.

Q.   Now did you also testify to this jury that your mind was not clear because of what you were accused of?

A.   I don't understand the question.  My mind was?

Q.   Sure.  I guess on Friday didn't you tell the jury that one of the reasons you were in an unsettled state of mind was because of what you were accused of?

A.   Yeah.  Yes.

Q.   Do you remember that testimony on Friday?

A.   I do.

Q.   Okay.  But this was a three or four hour on and off interview, right?

A.   Yes.

Q.   And Special Agent McGonigle didn't accuse you of anything until the very end; isn't that right?

A.   I believe so, yes.

Q.   Right.  You wanted to know why they were there, correct?

A.   I did.

Q.   You asked them why they were there, right?

A.   Multiple times.

Q.   And Special Agent McGonigle said we'll get to it but I have these questions that I want to go over first, right?

A.    That is correct.

Q.    And so not in the first hour, not in the second hour, really not until the interview pretty much ended did Special Agent McGonigle tell you why they were there, right?

A.    It wasn't at the very end but, yes, it was within the last hour, yes.

Q.    Right.  Well, you only realized what the crime was when Special Agent McGonigle showed you the pamphlet, that religious tract that had your blood on it, right?

A.    Yes.

Q.    And you only realized that they were there for that -- let me put it this way.

      Special Agent McGonigle didn't tell you what you were accused of until he showed you those pamphlet pages, right?

A.    I believe he showed me the gas can first.

Q.    The gas can first.  But he didn't tell you what the gas can was at that point?

A.    No.  He just said that my blood was on this gas can.

Q.    Exactly.  Right.

      And so later towards the very end of the interview when he showed you the tract and said your blood was on it and told you that that tract was part of a firebomb outside the Jewish nursing home, that was the first time

you -- that Special Agent McGonigle told you what the crime was, correct?

A.    Correct.

Q.    So when you testified to this jury that your mind was not clear because of what you were being accused of, that doesn't apply until the very end of the interview, right?

A.    It wasn't the very end but it was within the last hour.

Q.    Okay.  So let's focus on these three interview topics that we talked about just a little while ago.  Remember I said there were three we were going to talk about?

A.    Yes.

Q.    So the first topic that I want to talk about is your possession of the gas canister.

So Special Agent McGonigle asked you had you ever had a yellow canister, right?

A.    Yes, he did.

Q.    And your answer was?

A.    No.

Q.    And then he asked you, well, have you ever seen a yellow container and your answer was?

A.    No.

Q.    And then Special Agent McGonigle said, well, your blood had gotten on a yellow container.  How could that be possible, right?

A.   I could not recall that morning what was going on; that is correct.

Q.   So actually that answer is nonresponsive.  I'm just going to move to strike it.

I only asked you --

THE COURT:  So who made the objection?  It's your objection?

ATTORNEY BRESLOW:  Yes.

THE COURT:  Okay.  Overruled.  Just move on.

ATTORNEY BRESLOW:  Okay.

Q.   (By Attorney Breslow)  You told Special Agent McGonigle there was no possible way that your blood could have gotten on a yellow fuel container?

A.   That's what I told him that morning, yes.

Q.   All of my questions are going to be about this morning, that morning.  Okay?

A.   Got it.

Q.   Got it.

So Special Agent McGonigle asked you specifically could your blood have gotten on this yellow container when you were working at someone's home, right?

A.   Yes, he did.

Q.   Now, you had done a job you testified just a few weeks earlier at somebody else's home?

A.   That is correct, sir.

Q.   And Special Agent McGonigle said to you is it possible that your blood could have gotten on the yellow gas container in that fashion, right?

A.   He did ask me and again I could not recall that morning, sir.

Q.   Okay.  But that's not what you said to Special Agent McGonigle, right?  You didn't say you couldn't recall?

A.   Correct.

Q.   You said it was not possible, right?

A.   That is what is said.

Q.   Now you testified with Mr. Watkins and I think just now that you didn't remember -- you didn't recall possessing the gas canister on April 15th; is that right?

A.   It was an extremely stressful morning, sir.  I could not put together how my blood got on that that morning, no.

Q.   Okay.  So we understand your testimony that it was an extremely stressful morning, Mr. Rathbun.

     The question that I'm asking you is you never told Special Agent McGonigle that you couldn't remember, right?

A.   I did not.

Q.   And you never told him, look, it was -- this is an extremely stressful morning.  I need time to think about it, right?

A.   I didn't think I needed to.  It was very obvious how I was.  I was shaking.

Q.   I'm just asking you a simple question.

A.   And I'm trying to answer it, sir.

Q.   Well, I'll ask it again.

     Did you tell Special Agent McGonigle that you were experiencing such a stressful morning?  No, right?

A.   I didn't need to, sir.

Q.   That's not my question.

A.   It was obvious.

Q.   Did you tell Special Agent McGonigle that you were stressed?

A.   No, I did not.

Q.   Did you tell him you were confused?

A.   I did not.

Q.   Did you tell him you couldn't remember?

A.   I didn't need to, sir.

Q.   Did you tell him you couldn't remember?

A.   I did not.

Q.   Did you tell him that you were in a drug haze?

A.   I did not.

Q.   Okay.  So I want to focus now on what you told the jury with Mr. Watkins about you -- about how you got your blood on that yellow canister.

     You testified on Friday that it involved a trash out

in Chicopee?

A.   That's correct, sir.

Q.   And it sounded like you had a pretty good memory of that job, right?

A.   I remember the job, yes.

Q.   Right.  I mean you remember it pretty well, right?

A.   I remember the job, yes.

Q.   Okay.  Well, you remembered it was at a house in Chicopee, right?

A.   That is correct.

Q.   You testified that the clients were a couple, right?

A.   It was a couple, correct.

Q.   Not just one person but a man and a woman, right?

A.   Yes.

Q.   And you testified that you did the job with a man named Chris Murray?

A.   That is correct.

Q.   And I think you testified that you didn't know Chris Murray directly but somebody had introduced you?

A.   Correct.  A friend of my introduced me to him.

Q.   It's fair to say that you didn't have any lengthy dealings with him until this trash out?

A.   That is correct.

Q.   All right.  And you had a pretty good memory about what the trash included, didn't you?

A.    Yes.

Q.    You said metal?

A.    There was a bunch of stuff, yes.

Q.    You said it involved metal?

A.    It involved metal.

Q.    It involved a pool deck?

A.    It did.

Q.    There were some sleds I think you testified?

A.    There were some sleds.

Q.    And, of course, you testified that there was a yellow container?

A.    There was a yellow container.

Q.    And you testified that you cut your hand on the metal, right?

A.    That is correct.

Q.    And the cut was so deep that it penetrated your glove, right?

A.    That is correct.

Q.    And that's how, you told this jury, your blood got on the container?

A.    That is exactly how my blood got on that container absolutely.

Q.    And that happened at the couple's house, right?

A.    That is correct.

Q.    When you were handling the metal?

A.    That is correct.

Q.    And it's fair to say that that took all day, that job?

A.    No, it didn't take all day.  It took a couple hours.

Q.    Okay.  You filled your van both inside and on the top you said?

A.    I did.

Q.    You even remember that some trash was spilling over in a parking lot, right?

A.    I, yeah, purposefully did that, yes.

Q.    And I think you testified to the jury that you thought it was a two-day job, right?

A.    It was a two-day job.

Q.    And you remember then that you didn't come back that second day?

A.    I did come back the second day.  I don't understand.

Q.    Do you have a specific memory of coming back that second day?

A.    Yes.

Q.    The Chicopee job was at the middle or the end of March, right?

A.    Correct.

Q.    And do you remember the exact date?

A.    I do not.

Q.    Okay.  And that's fair.  It was a long time ago.

And is it fair to say that this job stands out for you because you didn't have a lot of other work around that period of time?

A.   No, sir.  It stands out for me because I'm on trial for the gas can I touched.

Q.   Uh-huh.  It's fair to say that you didn't have another job like this with Chris Murray at a couple's house where there was sleds and pool decking?

A.   That is correct.

Q.   So this was really a unique job in that way, right?

A.   No.  I do clean outs all the time.  It was my first time working with Chris.  That's about the only thing unique to it.

Q.   Right.  What was unique about this -- that's what I was asking.

     What was unique about this was you were working with Chris in Chicopee at a house that involved pool decking and metal and sleds, right?

A.   That's correct.

Q.   There's no other job that you did with Chris in Chicopee that involved that material, right?

A.   That is correct.

Q.   And you testified that you don't remember the exact date of the job, do you?

A.   Not the exact date, no.

Q.    That's okay.

I'm going to display PX-142 to only the court, counsel, and the witness.

Mr. Rathbun I'm just going to ask you to take a look at this.  Don't testify; don't say anything.  There's no question, but I want you to focus on -- if we can blow up the first line?

I'd like you -- the second line.

I'd like you to focus on your call log and who you were calling on the first line and then your instant message and who you were instant messaging with or calling with on line 2.  Do you see that?

A.    Yes, sir.

Q.    Okay.  And the date there is March 22nd, right?

A.    That is correct, sir.

Q.    And then I'd like to zoom back out of this and just focus on the other entries on March 22nd that involve Home Advisor.  Do you see those?

A.    I do.

Q.    Okay.  And does that help you remember that the job was around March 22nd or you first got involved in talking about the job on March 22nd?

A.    I could have done it sooner.  I could have talked to Chris after the job.  It doesn't really tell me for sure that I did the job around then, no.

Q.   Okay.  Well, take a look --

ATTORNEY BRESLOW:  If we can display that one more time just for the court, counsel, and the witness? Is there a second page on that?  And a third page?  And if you can continue, and a fourth?

Q.   (By Attorney Breslow)  Do you see those entries, Mr. Rathbun?

A.   Yes, sir.

Q.   Can we continue?

And I'd like to focus you on page 55 and 56 -- I mean, item 55 and 56 of page -- let me get the page from Ms. McKenna for the record.

Okay.  We'll clarify that after.

Can you look at the email that you sent on page 55 and the instant message that you received on page 56?

A.   I see that, yes.

Q.   Okay.  Can we just blow up the last two columns for Mr. Rathbun and the court and counsel?

Does that help you remember that this job was around March 22nd or so?

A.   Yes, I guess.  Yes.

Q.   Okay.  Does this help you remember that the homeowner had that email address MTAY3553@gmail.com?

ATTORNEY WATKINS:  Objection, Your Honor.

THE COURT:  The objection?

ATTORNEY WATKINS:  May we be heard at sidebar?

THE COURT:  All right.

(Sidebar conference.)

ATTORNEY WATKINS:  Thank you, Your Honor.

THE COURT:  Your client's participation at sidebars -- he doesn't have a headset.  He usually does.  Do you know if he's waiving listening to this portion?

ATTORNEY WATKINS:  I would like him to listen to it if possible.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Your Honor, if you can just speak up a little?  I can't hear all that well.

THE COURT:  Okay.

ATTORNEY BRESLOW:  Thanks.

THE COURT:  Okay.  Go ahead, Attorney Watkins.

ATTORNEY WATKINS:  Your Honor, Mr. Breslow characterized his question as this being a text from the homeowner.  As we've heard testimony before, this is actually one of Mr. Rathbun's drug suppliers that is sending here and so he has set up a false premise for this particular question.  This text was not actually from the homeowner.  It's from one of his drug dealers.

THE COURT:  Okay.

ATTORNEY BRESLOW:  If the court reporter could read back the question, what I was asking about was the

email, not the text.  I know who Gabe is and I'm virtually certain that I was asking question about the email and not the text.

ATTORNEY WATKINS:  You've got both things up on the screen.

ATTORNEY BRESLOW:  I'll take that down and just focus on --

THE COURT:  Fair enough.  Objection sustained and I'll tell the jury to disregard it.  You can certainly go here but let's put the correct --

ATTORNEY BRESLOW:  If we can get the question read back?

THE COURT:  Okay.

(End of sidebar discussion.)

(Question read aloud.)

THE COURT:  Okay.  The objection is overruled.  The question is only regarding the email.

Can you answer that question?

THE WITNESS:  Yes, sir.  I do not recall whose email this is, sir.

Q.   (By Attorney Breslow)  Okay.  Maybe I missed something, but did you answer the question that I had asked previously before we had the sidebar?

A.   No.

Q.   Let me just display something else to you.  All

right?

So you remember that the trash out took place around this period of time, right?

A.    I believe so, yes.

Q.    So let's take a look at PX-132 now just to the court, counsel, and the witness.

So can you read it to yourself?  Just read that to yourself and let me know when you're done.

A.    Yes.

Q.    So this is an email from John Rathbun at Johnrathbun78@gmail.com, right?

A.    That is correct.

Q.    And that's your email address?

A.    Yes, sir.

Q.    And it's dated March 22nd, right?

A.    Yes, it is.

Q.    And the subject is job?

A.    Yes.

Q.    And this is the email that's referenced -- well, the email is sent by you to MTAY3553@gmail.com, right?

A.    Yes.

Q.    So if you can just read the text to yourself and let me know when you're done.

A.    I'm good, sir.

Q.    Okay.  So does this help you remember that that's the

homeowner?

A.   I did do a job, correct, yes.

Q.   Right.  But what I'm asking is, is this the email --
does this help you remember now that you've seen it that
this is the email concerning the trash out?

A.   This is the email concerning one of my trash jobs,
yes.

Q.   But I'm asking about the Chicopee one in particular.

A.   I don't know for sure if this is in regards to the
Chicopee one, sir.

Q.   Okay.  I'm going to -- but it is an email concerning
a trash out that you did around this period of time?

A.   It is, yes, sir.

Q.   Okay.  All right.

          ATTORNEY BRESLOW:  So I'd like to offer this
into evidence now.

          ATTORNEY WATKINS:  No objection.

          THE COURT:  No objection, that will be
allowed.

          THE CLERK:  What's the number?

          ATTORNEY BRESLOW:  132.

          THE CLERK:  PX-132.

**(Exhibit PX-132 admitted.)**

Q.   (By Attorney Breslow)  Mr. Rathbun, do you remember
--

ATTORNEY BRESLOW:  We can publish it to the entire jury.

THE CLERK:  Okay.

Q.   (By Attorney Breslow)  So, Mr. Rathbun, you weren't fully licensed, were you, on March 22, 2020?

A.   A license how, sir?  I don't understand.

Q.   Sorry?

A.   Licensed how?

Q.   I thought you testified -- maybe I'm misremembering, but I thought you testified with Mr. Watkins that you had various licenses at some point, no?

ATTORNEY WATKINS:  Objection.

ATTORNEY BRESLOW:  I'll withdraw the question if I'm not remembering it right.

Q.   (By Attorney Breslow) So let me ask you this.  To do trash outs you don't have to be licensed?

A.   No, you do not.

Q.   Right.  And on March 22nd at this point in your life you weren't licensed as a home contractor, were you?

A.   No, sir.

Q.   All right.  And your business, it was more like what we would call a D/B/A, doing business as?

A.   Yes.

Q.   It wasn't incorporated or anything like that?

A.   Correct.

Q.   And your business didn't have a license either, right?

A.   Correct.

Q.   So when you said you're fully licensed, that's not true, is it?

A.   That is correct.

Q.   Okay.  And it's fair to say that you made that untrue statement to the homeowner because you wanted to get the job, right?

A.   Absolutely.

ATTORNEY BRESLOW:  Okay.  Your Honor, may I have a moment?

THE COURT:  Sure.

Q.   (By Attorney Breslow)  All right.  Mr. Rathbun, you testified on direct and I think on cross-examination about this period from April 2nd to April 15th, right?

A.   Uh-huh.

Q.   And so --

A.   Yes.

Q.   I don't want to mischaracterize your testimony and so I think I'll just ask you in this one instance this open-ended question about your drug use during this period of time.  What do you remember about using drugs from April 2nd to April 15th?

A.   It was not my normal drug use.  This was during the

pandemic again so I might have used once or twice.

Q.    Okay.  And by use, are you referring to heroin?

A.    Like I said, I did scrape the bag -- no, that was April 1st.  I could have used heroin during that time, yes.

Q.    Okay.  But you don't remember using any other drugs from April 2nd to April 15th?

A.    There might have been some crack cocaine in there too.  I'm not a hundred percent sure, but those are the drugs I usually use.

Q.    Right.  Heroin or crack.  But what I'm asking you is do you have a specific memory of using crack from April 2nd to April 15th?

A.    I don't.  I just know it was during the pandemic and I was at home and I wasn't able to get drugs.

Q.    Right.  Okay.  But with respect to scraping the bottom of the bag, do you remember telling Special Agent McGonigle finally that when he asked you about the drug test you said you might have scraped the bottom of the bag and you would test positive?

A.    I did.

Q.    And just so it's clear to the jury, when you say scrape the bottom of the bag, are you referring to heroin?

A.    Correct.

Q.    Okay.  So you had heroin during that period of time,

April 2nd to April 15th?

A.    I believe that was April 1st.

Q.    So again, let's clarify.

      Do you remember Special Agent McGonigle asking you about your drug use?

A.    I do.

Q.    And you remember first saying a month ago?

A.    Yes.

Q.    Then two weeks ago?

A.    Correct.

Q.    And then do you remember him offering for you to take a drug test?

A.    Yes.

Q.    And you said to him, do you remember, I'm going to test positive?  I scraped the bottom of the bag last night?

A.    Correct.

Q.    Okay.  So that phrase, that refers to April 15th the night before, correct?

A.    Correct.

Q.    Okay.  And so you clearly had heroin during that period of time?

A.    Correct.

Q.    Did you have any crack?

A.    I can't recall for sure.  I might have done a push on

my stem possibly.

Q.    I'm sorry?

A.    I might have done a push.  It's when you scrape the crack pipe kind of.

Q.    So just so that's clear, is that when you're trying to get the residue out of a crack pipe?

A.    Yes.

Q.    And do you re-smoke it or something like that?

A.    Correct.

Q.    And that's called a push?

A.    Correct.

Q.    But other than that, you didn't have any crack during that period of time?

A.    Correct.

        ATTORNEY BRESLOW:  Okay.  One moment, Your Honor.

        THE COURT:  Uh-huh.

Q.    (By Attorney Breslow)  As compared to the period from April 2nd to April 15th where you just had that residue, on April 1st you had crack, right?

A.    Correct.

Q.    A decent amount of it because you smoked it all the way through?

A.    Yes.

Q.    And that was what you were going to look for on April

2nd, right?

A.    Correct.

Q.    And I think you testified with Mr. Watkins that you have eczema psoriasis; is that right?

A.    I'm sorry, I couldn't hear you.

Q.    Sure.  I think you testified to Mr. Watkins that you have eczema psoriasis?

A.    Correct.

Q.    And could you just tell the jury a little bit about that and how it affects your hands?

A.    So when I work, only when I'm working my hands get very dry and very cracked and the psoriasis makes it even worse.

Q.    Okay.  So is it fair to say that your hands, your fingers, they're going to be more vulnerable to cuts than like an ordinary person's hands who doesn't have that condition?

A.    I mean, there's a lot of calluses too so actually the skin is kind of hard and thick and so it would take something serious to cut it.

Q.    Depending upon where the calluses are?

A.    Yeah.

Q.    Right.  Okay.

      But otherwise if there aren't calluses, it would be more vulnerable to, you know, a cut or a scrape, right?

A.    It would.

Q.    Okay.  You might bleed a little more easily?

A.    Right like now, yes.

Q.    Okay.  Did you say like now?

A.    Yes, because I haven't worked in awhile so my hands are pretty soft and smooth.

Q.    Okay.  You weren't working every day in that period from March 3rd to April 2nd, right?

A.    From March?

Q.    From March 3rd when you got fired --

A.    Yes.

Q.    -- to April 2nd when you went out looking for drugs the night -- this is the night that we are all talking about.

A.    I was working.

Q.    No, but you weren't working all that much?  You weren't working every day?

A.    No.

Q.    You were spending a lot of time at home?

A.    I was spending some time at home, yes.

Q.    In your room?

A.    Yes.

Q.    By yourself?

A.    Yes.

        ATTORNEY BRESLOW:  Okay.  I'd like to display

PX-14 side by side with PX-71 page 3.  If we can zoom in on Mr. Rathbun's thumb?  Okay.

Actually if we can just take that down for a moment?

Q.   (By Attorney Breslow)  Mr. Rathbun, again if you can just explain to us a little bit more about using crack.  So there's a pipe, right?

A.   Yes.

Q.   You have a pipe and you have a lighter, right?

A.   Yes.

Q.   And could you just tell the jury -- if it's not too difficult for you given that you're in recovery -- could you tell the jury a little bit about like what you actually do to smoke crack?

A.   You just put crack in the pipe and smoke it.

Q.   Okay.  So you put the crack in a pipe and then you just light it with your lighter?

A.   Correct.

Q.   And approximately how often do you have to -- like is the crack like a cigarette where it just stays burned and you can just smoke it or do you have to keep lighting it?

A.   It's not like a cigarette but you don't have to light it that much, usually once or twice.

Q.   Once or twice?

A.   Yes.

Q.   Do you have to refill the pipe?

A.   Yeah, every half hour or so.

Q.   Okay.  So just so I'm clear, let's say you have enough crack to last like four or five hours.  You are lighting it once or twice every half hour or so?

A.   Yeah.

Q.   Okay.  And do you remember how -- withdrawn.

I want to display PX-14 side by side with PX-71 and we can zoom in on the thumb.

Mr. Rathbun, that's the condition of your thumb on the morning the agents showed up, right, on April 15th?

A.   That is correct.

Q.   Do you see there's that circle-like scab on your thumb?

A.   It's -- yeah, that's --

Q.   I'm just asking can you see it?

A.   Yes.

Q.   Do you see it?

A.   I see it.

Q.   Okay.  And do you see there's a little blood coming off to the right like some older blood?

A.   That's from me picking it, yes.

Q.   So you were picking that scab?

A.   Yes.

Q.   Okay.  And so that's -- I want to focus back on April

1st to April 2nd.  You were using crack that night, right?

A.   Yes.

Q.   And actually you used so much of it that you ran out by the morning, by like the early morning hours, right?

A.   Yes.

Q.   So around 4:30 you ran out?

A.   Correct.

Q.   And that's when you started calling and texting Devin?

A.   Correct.

Q.   Okay.  When did you start using crack that night? Was it --

A.   Probably about 12:10.

Q.   Midnight?

A.   Yeah.

Q.   So you were using crack pretty much from midnight until 4:30?

A.   Pretty much.

Q.   And tell the jury what hand do you use when you light up your crack pipe?

A.   Well, I have a blow torch.  It's one of those little pop -- you know, your pop lighters.

Q.   What hand do you use?

A.   Right hand.

ATTORNEY BRESLOW:  Okay.  Can I display -- Your

Honor, may I have a moment?  Thanks.

If we can take down the monitors?

Thanks.

Q.   (By Attorney Breslow)  You use a lighter, don't you, Mr. Rathbun, to smoke crack?

A.   It's a blow torch, sir.

Q.   A blow torch and not a lighter?

A.   No.  It's a little pop lighter, yes.

Q.   Sorry?

A.   Yes.  It's a pop, like you push the button.

Q.   Okay.  So a blow torch and not a lighter?

A.   Correct.

Q.   I'm going to display -- I'd like to display PX-123 page 181, lines 21 to 23.

Before we do that, I'm going to show you PX-109 just for counsel and the witness please.

Mr. Rathbun, do you recognize the items there?

A.   I do.

Q.   And does one of them include a lighter?

A.   There is a lighter there, sir.

Q.   And a chapstick there as well?

A.   There is a chapstick.

Q.   And there is little packages of -- well, to the right there's Xanax, those three pills?

A.   Yes.

Q.   And in the middle there's a lighter -- not a lighter, a crack pipe?

A.   That's correct.

Q.   And then you recognize the items in the bag, right, the little baggies that are wrapped up with rubber bands?

A.   Yes.

Q.   And what are they?

A.   That's heroin.

Q.   That's heroin.  Okay.

     And you recognize the chapstick, right?

A.   Yes.

Q.   And you recognize the table?

A.   I do.

Q.   So you sent that text message -- you sent that picture to Dana Graham on April 3rd, right?

A.   I believe so.

     ATTORNEY BRESLOW:  Okay.  I'm going to offer this into evidence at this point.

     ATTORNEY WATKINS:  Objection, Your Honor.

(Sidebar conference.)

     THE COURT:  Go ahead.

     ATTORNEY WATKINS:  Objection on relevance and also prejudice.

     ATTORNEY BRESLOW:  I'll take the prejudice first.  Mr. Rathbun testified I believe on direct --

THE COURT:  Prejudice isn't going to do it right now after all the testimony about the drug use.

ATTORNEY WATKINS:  This is on April 3rd after the event.

ATTORNEY BRESLOW:  It's on April 3rd.  He testified that he recognizes all the items in the picture, including the table.  These are all the -- these are some of the drugs that he uses.  He sent this he acknowledges on April 3rd to Dana Graham and this is relevant to the device that he uses to smoke crack.

THE COURT:  So the government is arguing that he got the blister on his thumb from using the lighter and that's what's making his thumb bleed?

ATTORNEY BRESLOW:  Exactly, and there's prior testimony on this, Your Honor, that I will be using to impeach him with later, but this is directly relevant to what he's just testified that he used a blow torch and not a lighter, a blow torch and not a lighter.

THE COURT:  I mean, the blow torch may be somewhere else.  It doesn't necessarily have to be there.

ATTORNEY BRESLOW:  He can explain it.

THE COURT:  What do you say, Attorney Watkins?

ATTORNEY WATKINS:  That's correct, that would be the answer to it and why this is misleading and unduly prejudicial.

ATTORNEY BRESLOW:  He can clarify that on redirect.

Your Honor, let me impeach him first and then return to this.

THE COURT:  Well, I think this theory regarding the blister on his hand being caused by a lighter because he smokes so much crack, I understand.

If the defense is going to object -- I mean, again we're back in a situation where here's more information about drug use all day all along so much you got blisters from lighters.  I mean, this goes directly to his mental state but the defense is objecting.  The objection is sustained.

ATTORNEY BRESLOW:  Your Honor, I'd like to revisit this after I impeach him.

THE COURT:  No.  You're going to move on.  Okay?

ATTORNEY BRESLOW:  Okay.

(End of sidebar conference.)

Q.  (By Attorney Breslow)  Mr. Rathbun, please take a look at PX-123 page 181, lines 21 to 23 which I'm displaying only to the court, counsel, and the witness.

Actually can we back up to the prior page and just the prior page for a moment?

Okay.  So, Mr. Rathbun, just take a look at this page for a moment and tell me when you're done reading.

A.    Okay.

Q.    So this page refers to your activities smoking crack on April 2nd, right, April 1st to 2nd?

A.    Correct.

Q.    If we can go forward and to the third page 181?

Okay.  If we can blow up lines 21 through lines 23?

In a prior proceeding when you were sworn under oath, just as you are now, were you asked this question "Can I ask you when you were smoking crack what hand were you using your lighter in?"

Were you asked that question?

A.    I was.

Q.    Did you give this answer:  "What hand do I use my lighter in?  My right hand."

A.    I was.

Q.    Okay.  So, Mr. Rathbun, you were using your lighter to smoke crack on April 1st through the early morning hours of April 2nd, right?

A.    I call the blow torch a lighter too.

ATTORNEY BRESLOW:  Okay.  Your Honor, I renew my offer.

THE COURT:  Attorney Watkins?

ATTORNEY WATKINS:  I still object, Your Honor.

THE COURT:  All right.  I will reverse my decision.  The photograph is admitted.

**(Exhibit PX-109 admitted.)**

Q.   (By Attorney Breslow) I'd like to display this now to the entire courtroom including the jury.

Mr. Rathbun, you took that picture, correct?

A.   Yes.

Q.   You sent it on April 3rd to Dana Graham, correct?

A.   Yes.

Q.   That picture depicts your crack pipe, correct?

A.   It does.

Q.   Your Xanax?

A.   It does.

Q.   Your heroin?

A.   It does.

Q.   And, Mr. Rathbun, your lighter?

A.   That is a lighter I use, correct.

Q.   Okay.  And that is your lighter?

A.   That is a lighter that I use.

Q.   To smoke crack?

A.   No.  That's not the lighter I use to smoke crack, sir.

Q.   Okay.  Is your testimony now that you do not use a lighter to smoke crack?  Is that what you're testifying to this jury?

A.   Sometimes I use both, but most of the time I use a blow torch, which I call a lighter.

Q.   Okay.  So just so we're clear, this is not a blow torch, right?

A.   It's not.

Q.   This object in green?

A.   My blow torch is not in the picture, no.

Q.   Right.  So this green lighter, that's a regular spark lighter where you have to run your finger along rough metal edges, a circular disk with rough metal edges, right, to spark the lighter?

A.   I wouldn't call them rough metal edges.  There's a safety on it.  It's not that rough.

Q.   So your testimony now is that this lighter is somehow different from the lighters that are commonly available?

A.   No.  It's the same as any other.

Q.   Is this a common lighter, Mr. Rathbun?

A.   Yeah.

Q.   Okay.  And this is your lighter, right?

A.   That is a lighter, one of them that I use.  Correct.

Q.   And this lighter is about three inches from your crack pipe; is that correct?

A.   It's also two inches from my marijuana that I use.

Q.   Okay.  But I'm asking you is it about three inches from your crack pipe?

A.   It is.

Q.   All right.  We'll move on.

Let's talk about a second topic in the interview which is where you were on April 2nd.

A.    Yes, sir.

Q.    Now, Special Agent McGonigle asked you where you were on April 2nd, correct?

A.    He did.

Q.    He didn't tell you why at that point, right?

A.    I don't believe so, no.

Q.    Right.  So in terms of the accusation that you testified he made to you later, he didn't tell you the significance of April 2nd at the time he asked you this question, right?

A.    I don't believe so, no.

Q.    And you told him you had not left the house in, according to your words on direct exam, about two weeks, right?

A.    Correct.

Q.    And two weeks before April 15th is April 1st?

A.    That is correct.

Q.    Okay.  And you were out of the house on April 2nd, right?

A.    I was.

Q.    So you were out of the house two weeks before April 15th, right?

A.    Correct.

Q.    And you had left the house sometime after 4:34 in the morning, right?

A.    I did.

Q.    And you're in your mother's car and you drove right down Converse Street soon after that, right?

A.    That's the direction to get to the highway, yes.

Q.    And you did not tell Special Agent McGonigle you were out of the house on April 2nd, did you?

A.    I could not recall that morning, sir.

Q.    It's just --

A.    No.

Q.    Sir, I'm just asking you a simple question.

ATTORNEY WATKINS:  Objection.

THE COURT:  Overruled.

ATTORNEY BRESLOW:  I'll ask it again.

Q.    (By Attorney Breslow)  You did not tell Special Agent McGonigle that you were out of the house on April 2nd, did you?

A.    I did not.

Q.    You did not tell Special Agent McGonigle that you were driving your mother's car on April 2nd, did you?

A.    He didn't ask, sir.

Q.    Right.  He didn't ask you if you were driving your mother's car, that's correct.  He did ask you, however, which car you drive, right?

A.    He did not ask me which car I drove.  No, he did not.

Q.    Your testimony is he did not ask you which car you drove?

A.    No.  That morning on April 2nd he did not.

Q.    No, forgive me.  Let me make sure the question is clear.

When Special Agent McGonigle interviewed you on April 15th, he asked you which car was yours?  Which car you drove, right?

A.    Correct.

Q.    Not on April 2nd but which car you drove?

A.    Yes, in general, yes, which car is mine that I use, yes.

Q.    And you said I use the van?

A.    That's correct.

Q.    That's my car; that's the one I drive?

A.    That's the one that I use, yes.

Q.    That was false, right?

A.    I use my car.  It is the car that I use.  He didn't ask me about April 2nd.

Q.    No, I'm not talking about April 2nd.  Let me be clear.

You don't just use the van, do you?

A.    No.

Q.    In fact, you used your mother's car on April 2nd,

right?

A.    That's what I did, yes.

Q.    And not just on April 2nd, you used your mother's car a lot, right?

A.    I wouldn't say a lot but, yeah, I use her car more than mine for gas mileage.

Q.    Right.  You use her car more than yours?

A.    I wouldn't say that, no.

Q.    No?  About even?

A.    Yeah.

Q.    About even.

So when Special Agent McGonigle asked you which car do you use, which car do you drive, you told him part of the story, right?  It was true that you use your van?

A.    It is.

Q.    But you left out the other half of the story which is your mother's car, right?

A.    I didn't believe it was necessary.  He didn't -- no, correct.

Q.    Well, the FBI agent is asking you a pretty specific question, right?

A.    Which car I use, correct.

Q.    Right.  Just so it's clear and I'm going to move on after this.

You told him about the car that you use half the

time, your van, and you didn't tell him about the car you use the other half of the time, your mother's car, right?

A.    I believe his question was which car was mine and I told him that the van was mine.

Q.    Okay.  So now your testimony is which car was mine?

A.    Which is the blue van.

Q.    Okay.  And I'd like to display PX-102-2, page 6.

Before we do, your car was towed -- your van was towed by the FBI that day, right?

A.    That is correct.

Q.    They didn't tow your mother's car, right?

A.    That is correct.

ATTORNEY BRESLOW:  And if we can display PX-102-2, the transcript, page 6 and focus on lines 8 to 16 to the entire courtroom.  It's already in evidence.

Q.    (By Attorney Breslow)  So just so we are clear, the female is your mother, right?

A.    That is correct.

Q.    And John is you, right?

A.    Yes, sir.

Q.    And so when she says "I suspect if they gave the van back, there was nothing there," she's referring to your van, right?

A.    That is correct.

Q.    And the "they" is the FBI, right?

A.   That is correct.

Q.   And given it back is the return of your vehicle after it was forensically searched, right?

A.   Correct.

Q.   And you said no, there's nothing, right?

A.   That is what I said.

Q.   On April 2nd you didn't drive your van, right?

A.   I did not on April 2nd.

Q.   Okay.  And then you said "because these idiots they didn't know, they didn't know I didn't even take the van." That's what you said, right?

A.   That's correct.  That's a true statement they did not know.

Q.   What's that?

A.   They didn't know.

Q.   Okay.  Was it your testimony -- was it your testimony or is it now that you never left the house at night between April 2nd and April 15, 2020?

A.   No.

Q.   You did leave the house between April 2nd and April 15, 2020 at night?

A.   Yes.  I believe I could have, yes.

Q.   Okay.  Do you have a memory of it?

A.   I can't recall.

     ATTORNEY BRESLOW:  Okay.  So I'd like to show

PX-53 to -- can I confirm, madam clerk, is this in evidence PX-53?  I believe it is.  I just want to confirm before we display it to the jury.

THE CLERK:  Yes.

ATTORNEY BRESLOW:  Okay.  So if we can just display PX-53?

Q.   (By Attorney Breslow)  Mr. Rathbun, you sent these text messages to Glenn Miliken, right?

A.   It looks like it, yes.

Q.   You're the texter in red?

A.   I am the texter in red.

Q.   And shortly after midnight on April 3rd you texted "call me to meet?"

A.   Yes.

Q.   And Mr. Miliken responded "where?"

A.   It looks like that, yes.

Q.   And you texted "few spots?"

A.   That is what I said.

Q.   Then you said "Been doin it alone past three night. I'm leaving soon?"

A.   That is what I said to him.

Q.   So you were leaving your house soon, right, on April 3rd after midnight?

A.   This particular text was a lie.  No, I was lying to him when I said that.

Q.   Okay.  So you were lying to your friend Glenn Miliken?

A.   Yes.  I was trying to sound better and cooler than, you know, just trying to sound good.

Q.   I'm just going to use your phrase lie.

Your testimony is that you were lying to your friend just to sound cooler?

A.   Yes.

Q.   Okay.  Let's focus on the third topic of your interview on April 15th.

Special Agent McGonigle asked you whether you were familiar with the Jewish nursing home on Converse Street, right?

A.   He did.

Q.   And you said you were not, right?

A.   I was not.

ATTORNEY BRESLOW:  If we can display PX-134 page 1 -- actually 135, please.

No, I think it's probably --

THE DEFENDANT:  Your Honor, could we take a break, sir?

ATTORNEY BRESLOW:  Absolutely.

THE COURT:  You need a break?

THE DEFENDANT:  Yeah.

THE COURT:  Sure.  It's a good time.  All right.

So do not discuss this case.  The same instructions apply.  Every single instruction that I've given you still applies.  Do not discuss the case with each other or anyone else.  Don't try to access on the internet or social media information about this case.

This will be our morning break so we will do about 15 minutes or so.  I don't know if there's coffee or not.

**(The jury left the courtroom at 11:05.)**

THE COURT:  Okay.

ATTORNEY BRESLOW:  I have very few questions left.

THE COURT:  Okay.  Fifteen minutes or so for the break and then we'll see how long recross is.  I expect we are going to be going right into the closings.  Okay?  I mean, unless the recross is another hour or so and then we might have to take another break.

ATTORNEY WATKINS:  Are you talking about redirect?

THE COURT:  I'm sorry, yes.

ATTORNEY WATKINS:  I anticipate just a half an hour at most.

THE COURT:  We will see how it is, but we might just move right into closings we might.  If we need a break, we need a break.

ATTORNEY WATKINS:  Thank you.

**(A recess was taken at 11:06 until 11:27.)**

THE COURT:  Everyone can be seated.

THE COURT:  All right.  I understand there was no coffee for this break, right?  So if there is a revolt, I don't know, I think I might have to support it.

(Laughter.)

THE COURT:  So was everyone able to follow my instructions not to talk to each other about the case and not to violate the instructions in any of the other ways?

All right.  I see affirmative answers from everyone. The jury remains fair and impartial.

While we're talking, sometimes we get an odor in the courtroom that smells a little bit like gas.  Has anyone noticed that?  I see someone shaking their head.  You have your mask on but I see at least one juror noticed it.

If any point you're uncomfortable or it makes you feel sick in any way, just tell me.  We have been in touch with maintenance.  So when that smell comes in the building, it happens from time to time, they flush and run -- do something with the fresh air intake and so we are in contact with the building maintenance right now and we'll let you know.

If it becomes an issue where you just don't like the odor, just tell me and we will take a break.  Okay? That's happened before.

Q.    (By Attorney Breslow)  All right.  Good morning again, Mr. Rathbun.

A.    Good morning, Mr. Breslow.

Q.    So we're almost done.  I have just a few topics to cover and then we should be done.

A.    Hold you to it.

Q.    Sorry?

A.    Hold you to it.

(Laughter)

Q.    (By Attorney Breslow) I want to focus you again on the three topics that Special Agent McGonigle talked to you about, the canister, April 2nd, and the location of Ruth's House Road and Converse Street.

A.    Sure.

Q.    So with respect to the location, Special Agent McGonigle asked you if you were familiar with the Jewish nursing home on Converse Street, right?

A.    He did.

Q.    And you said you were not, right?

A.    That is what I said.

        ATTORNEY BRESLOW:  And so if we can put up PX-134 -- 133 rather to the entire courtroom and focus on the description of stop 3.

Q.    (By Attorney Breslow)  So as you've driven back and forth -- could we have it on the witness table too?

A.    I don't have it either.

There we go.

Q.    Okay.  So as you've driven back and forth on Converse Street you've noticed the city buses, haven't you?

A.    Yeah.  Yes.

Q.    And you know the city buses they have those marques that are kind of like digital lighting on their sides and front and back?

A.    Yes.

Q.    And they say the stops that are coming up, right?

A.    I believe so, sir.

Q.    And the city bus marque for the nursing home says Jewish home, right?

A.    I don't know personally, but I believe that's what it says.

Q.    Right.  I mean, I'm asking about your personal knowledge, not to just read from the screen.

You've seen these buses all the time on Converse Street as you've driven, right?

A.    Not all the time.  I've seen buses though, yes.

Q.    Okay.  So when you're behind a bus, you can see what it says on the marque in the rear, right?

A.    There isn't one in the rear, no, not that I can recall.

Q.    Okay.  So when you're on the side of the bus, you can

see what it says on the side, right?

A.    Very rarely on the side of the bus.   There's only one lane on Converse Street.

                ATTORNEY BRESLOW:   Okay.   If we can display 104-1?

Q.    (By Attorney Breslow)   So in all of your time driving up and down Converse Street, you've noticed this campus, this huge campus on the right, right?

A.    I mean, it's hard to see from Converse Street because there's a lot of trees.   So I mean, no, I did not know it was as big as it was.

Q.    Well, you've been there before?

A.    I have been to where my grandmother lived.

Q.    Right.

A.    Down at Brownstone.   I have not been to the rest.

Q.    Right.   But you've driven by the rest, correct?

A.    Again, it's hard to see from the street with all the trees.   I did not know how big a campus it was until this trial, sir.

                ATTORNEY BRESLOW:   May we blow up the circular entranceway?

Q.    (By Attorney Breslow)   So are you seeing what I'm seeing now, Mr. Rathbun?

A.    I am.

Q.    There are no trees by that entranceway, are there?

A.    Correct.

Q.    In fact, all the trees have cleared out, don't they?

A.    For that little entrance, yes.

Q.    Well, you call it a little entrance.  It's a two-lane horseshoe, isn't it.  It's a full horseshoe, isn't it?

A.    I believe it's single lane; one lane going in.  I'm not positive, but.

Q.    No, I described that poorly.

It's a full horseshoe going back approximately one block into the nursing home area, right?

A.    I don't know if it's a block but, yes, it is a horseshoe.

Q.    Okay.  And so it's not just a small entrance; it's a dual entrance, right?

A.    That I don't know.

Q.    Well, when I say dual, I mean there's two entrances that join in a horseshoe.

A.    I'm not sure if it's a one way or two entrances, sir. I see two entrances, but I don't know if it's a one way or not.  I don't recall.

Q.    But we're describing -- we're talking about the same thing, right?  A horseshoe-shaped road with two open spots on Converse Street?

A.    That is correct.

Q.    And the clearing -- the trees have all been cleared

out, right?

A.   In that area, yes, sir.

Q.   And behind it there's a relatively large parking lot, right?

A.   In the picture, sir, behind where?

Q.   So if you go back towards the nursing home building itself away from Converse Street, there's actually four parking areas, like four separate lanes, right?

A.   There is.

Q.   Okay.  And then behind that is a pretty enormous building, right?

A.   I mean, it's a building.

Q.   Well, it's much larger than a residence, right?

          ATTORNEY WATKINS:  I'm going to object, Your Honor?

          THE COURT:  Overruled.

          THE WITNESS:  Yes.  It's bigger than a residential house, correct.

          ATTORNEY BRESLOW:  So if you can zoom in on that building?

Q.   (By Attorney Breslow)  Is it your testimony here that that's not a large building?

A.   I said it is larger than a residential property, sir.

Q.   Right.  It's larger than a house.  I mean, it's --

A.   I don't think it's funny.

Q.    You can probably fit 50 houses in there, right?

ATTORNEY WATKINS:  Objection.

THE COURT:  Sustained.  We can move on.

ATTORNEY BRESLOW:  Okay.  Moving on.

If we can move on PX-23?

Q.    (By Attorney Breslow)  Now Special Agent McGonigle specifically asked you about Ruth's House, right?

A.    Yes.

Q.    And he showed you a map that corresponded to this picture, right?

A.    Yeah, it was a map.

Q.    We've seen the map and that map corresponds to this intersection where the X is drawn, right?

A.    That is correct.

Q.    And you've driven back and forth on Converse Street countless times, right?

A.    I have.

Q.    Past this sign, right?

A.    Correct.

Q.    And is it your testimony that you have never read this sign in all of your drivings?

A.    No.  Again, I'm focused on driving.  I wouldn't say that I never read it.  But again I'm focused on driving when I am driving, but I probably have seen the sign.
Yes.

Q.    Okay.  Let's go back to --

ATTORNEY BRESLOW:  This is the last topic, Your Honor.  Just a few more questions.  I want to go back to the canister for a moment.  If we can put up PX-14 and I think if we can put up the full photograph of the canister, maybe PX-11?  Right.

Q.    (By Attorney Breslow)  So Special Agent McGonigle asked you several questions about this canister and you denied possessing it, right?

A.    I did at the time, yes.

Q.    Okay.  And then just a short while later you had a conversation with your mother about this very canister, didn't you?

A.    Along with my attorneys, yes.

Q.    Okay.  So I want to be really clear.  I'm focusing on your conversation with your mother, not your attorneys, and I don't want you to say anything in court about your conversation with your attorneys because they're privileged.  Okay?

A.    Sure.

Q.    Okay.  So just focusing on your conversation with your mother, you had a conversation with your mother about this very canister that you denied possessing to Special Agent McGonigle, right?

A.    Yes.

Q.    Okay.  So this is the last exhibit that I'll play.
Hold on one moment.

ATTORNEY BRESLOW:  Your Honor, I just need one moment to orient to the actual video -- the audio.

Your Honor, this is my oversight, not Ms. Mckenna's. We just need a moment.

THE COURT:  All right.  Understood.

Ladies and gentlemen, it feels like -- well, I sense that that odor is gone.  I don't know if you can feel the air, the cold air kind of it's become colder in here and you actually feel it.  They are moving the air out of the courtroom and venting it out the roof so that's what's going on.

ATTORNEY BRESLOW:  We are almost there.

A JUROR:  Is this is for all of us?  If not, the screen should be turned around.

ATTORNEY BRESLOW:  This is already in evidence but I'll turn it around.

THE COURT:  Thank you.  You might have a future in this.

Q.    (By Attorney Breslow) All right.  Mr. Rathbun, I just want to play a short audio and then ask you one or two questions about it.

A.    Yes, sir.  Absolutely.

(Audio playing.)

Q.    (By Attorney Breslow)  Okay.  That's your voice, right?

A.    Yes, sir.

Q.    You told your mother what you didn't tell Special Agent McGonigle and that is that you had possession of the yellow gas container?

A.    That is correct.  That was some time after my interview with Agent McGonigle.

Q.    Right.  That was actually on April 27, 2020.  I'm just displaying the cover page to the courtroom and to you.

A.    Correct.  That was after I spoke with my attorney and been going through paperwork.

Q.    I'm just asking you the date.  You can explain on redirect.  Okay?

        THE COURT:  Is there a question?

Q.    (By Attorney Breslow)  Yeah.  That was on April 27th, right?

A.    That's what I'm being told.  I don't know.

Q.    That's just --

A.    Oh, okay.  I'm sorry, yes.

Q.    That was just 12 days after your interview, right?

A.    That's correct.

Q.    And I really don't want you to say anything at least on cross-examination about your conversation with the

attorney, but let me ask you these questions.  Your testimony is that your memory got better over time because you had an opportunity to review the messages in your phone, right, the data on your phone?

A.    Correct.

Q.    And based on that, you remember -- you remembered on April 27th that you were possessing the gas container?

A.    That is correct.

Q.    Okay.  And your testimony is that unless or before you had an opportunity to review the data in your phone, you didn't remember it, right?

A.    That is correct, sir.

Q.    And because you reviewed the data in your phone, you suddenly remembered that you possessed the gas container?

A.    Not suddenly.  I remembered, yes.

Q.    Well, not suddenly.  I mean that was the reason, right?

A.    Correct.

Q.    Data on your phone somehow caused you to remember that you possessed this yellow gas container?

A.    Along with coming out of my drugs.  I didn't use drugs for quite a few weeks there so that also helped.

          ATTORNEY BRESLOW:  All right.  I have no further questions.

          THE COURT:  Attorney Watkins.

ATTORNEY WATKINS:  May I get my computer screens?

THE CLERK:  HDMI-1?

ATTORNEY WATKINS:  That's correct.

**REDIRECT EXAMINATION**

Q.   (By Attorney Watkins) John, I want to talk first about when the agents came to search your house on April 15th.  What did you think the agents were there for?

A.   I thought it had something to do with my drug interactions; yeah, had to do with my drug issue.

Q.   Now why did you think that?

A.   Because it was the only thing I could think of why the FBI would be at my house at that time.

Q.   And when the agents came to get you out of your bedroom, how long had you been asleep that night?

A.   I don't know, maybe eight hours or so.

Q.   And the night before you had done some amount of drugs?

A.   I did.

Q.   I want to talk a little bit about that period of time.  Your drug use diminished I think is what you told us, right?

A.   Correct.

Q.   Now on prior occasions in your life you've tapered off drugs and even stopped drugs, right?

A.    That is correct.

Q.    And what is that process?  What is that process like for you as you start to taper off or finish drugs?  What is your mind feeling like?

A.    It's difficult but my mind is saying, you know, sick and tired of doing this; sick and tired of losing relationships, jobs.  It's time to get it together.  I'm almost 40 years old.

Q.    When you stopped doing drugs or diminish doing drugs, is it like a switch?  Are you all of a sudden clear?

A.    No.

Q.    So tell us a little bit more about that, what is it like as you're tapering off your drug use?

A.    It takes time to become clear again, to remember things.  You know, I've been using for 15 years on and off.  It's not just going to go away like that.  It takes time.

Q.    Does it take hours to get a clearer head?

A.    No.

Q.    Does it take days to get a clearer head?

A.    It takes more than days.

Q.    Weeks to get a clearer head?

A.    Yes, sir.

Q.    As you continue to be sober, does indeed your mind become clearer?

A.    It does.

Q.    So when you talked about being hazy and confused when the agents showed up that morning, what were some of the things that were making you hazed and confused?

A.    Number one, I just had woken up.  Again, I had a gun in my face.  It was, it was a morning to remember.

Q.    Now, what was your feeling throughout these three or four hours in the morning?  Was it a happy exchange back and forth between you and the agents?

A.    Not the whole time.  No, definitely not.

Q.    Was there ever a point where you feel relaxed and under control?

A.    I did.  There was a point I did.

Q.    But the agents were there --

A.    They were.

Q.    -- during the entire time?

A.    Correct.

Q.    Were you always talking with them during this three and four hours?

A.    Not the whole time, no, sir.

Q.    So what would happen?  What would break up those three and four hours that you were talking with the agents?

A.    He'd have to go make a phone call; maybe check on some evidence that they had taken out of my house; talk to

his colleagues.

Q.    And so when those things would happen, then the agents would come back and pick up the conversation again?

A.    Correct.

Q.    Did they tell you everything right at the beginning or what is it a longer drawn out process?

A.    No, it was very drawn out.  It was very long.

Q.    You talked about -- well, you didn't tell Agent McGonigle and Detective Chaplin about your drug use immediately?

A.    I did not, no.

Q.    And I think what you've told us is that you didn't really like to talk about it, right?

A.    Yes, sir.  It's embarrassing.  It just makes me feel like crap.  It's not something I like to talk about.

Q.    And is that just to the agents or is that a general feeling you have?

A.    That's a general feeling I have.

Q.    Have you lied about your drug use before to people?

A.    I absolutely have.

Q.    Have you lied to relatives before?

A.    I absolutely have.

Q.    Have you lied to loved ones before?

A.    Unfortunately I have, yes.

Q.    Have you lied to employers before about your drug

use?

A.    I have.

Q.    Have you minimized your drug use to those people who know about your drug use?

A.    I have.

Q.    To loved ones?

A.    Yes.

Q.    To people?  To employers?

A.    Yes.

Q.    You've testified in some detail today about your drug use in the past and on Friday.  Are you holding anything back from the jurors today?

A.    No, I am not.

Q.    Why are you so forthright to the jurors when you didn't want to talk to Agent McGonigle about your drug use?

A.    Because this is the truth.  That morning with Agent McGonigle, I just didn't completely remember everything that was going on and now with how long it's been, going over so much paperwork, talking with my lawyers, again Facebook messages, text messages, phone, I put it together.

Q.    I'm putting up before you and this can go to everybody, this is a chalk.  It's not evidence.

      Putting up this calendar of April that points out

when the event was and then the later search was.  Do you see that there?

A.    Yes, sir.

Q.    So on the 15th, which is in red, what was the question that Agent McGonigle asked you about April 2nd?

A.    Can you be more exact?

Q.    What was the question -- when he asked you the question, what was the question he posed to you?  Was it where were you on April 2nd?

A.    Yes.

Q.    And what was your answer to that question?

A.    I believe I told him I was at home.

Q.    And did you talk about how long you had been at home?

A.    I did not, no.  Well, I might have.  I might have said that I was home all night.

Q.    To the question where were you on April 2nd, did you describe how long you had been at your home?

A.    No.

Q.    To the question of where you were on April 2nd, did you describe a number of weeks that you had been at home?

A.    Yes.

Q.    And what was your answer?  Your exact answer to Agent McGonigle when he asked about where were you on April 2nd?

A.    I told him that I had been home for the past two weeks about.

Q.   And did you say exactly two weeks?

A.   I said about two weeks.

Q.   Did he have a calendar like this in front of you as you were doing that?

A.   No, sir.

Q.   And did he go through the phone with you, your phone to see if you can reconstruct where you were on April 2nd?

A.   No, sir.

Q.   Did you intend to mislead Agent McGonigle when you told him that you hadn't been out of the house in a couple of weeks?

A.   Absolutely not.  I wanted to come to the conclusion and find out what was going on and why they were there.

Q.   Now we've heard that you were convicted.  You were found guilty of lying to him about that?

A.   I was.

Q.   And is that something that you intend to appeal?

        ATTORNEY BRESLOW:  Your Honor, may we approach or approach via WispherTech?

        THE COURT:  Yes.

(Sidebar conference.)

        ATTORNEY BRESLOW:  Your Honor, I just want to be clear.  We did not elicit any testimony on cross-examination about the false statement for which he was convicted that took place on April 15th or was

directed to Special Agent McGonigle.  Mr. Watkins has now established that, but I just want to be clear we discussed this conviction very generally so as to avoid that exact inference.

THE COURT:  Okay.  That's correct.  That's a correct statement.

ATTORNEY BRESLOW:  Okay.

THE COURT:  You don't need to respond, Attorney Watkins, but anything you want to put on the record?

ATTORNEY WATKINS:  No.

THE COURT:  Okay.

(End of sidebar conference.)

THE CLERK:  Just for the record, it seems as if the defendant is having issues with WhisperTech.  I'm just giving him a new set of headsets.

THE COURT:  Thanks.

THE DEFENDANT:  Thank you.

THE CLERK:  You're welcome.

Q.   (By Attorney Watkins) And do you intend to appeal and have that decision reviewed?

A.   I'm sorry, can you?

Q.   You were found guilty?

A.   Yes.

Q.   And is that a decision you intend to appeal and have reviewed?

A.    Yes.

Q.    Mr. Breslow showed you the bus schedule from -- he showed you a bus schedule?

A.    He did.

Q.    Have you ever taken that bus that ends at the Jewish nursing home?

A.    I've never taken that bus, sir.  No.

Q.    Have you ever gotten off at the Jewish home?

A.    No, sir.

Q.    Do you see that particular bus or any bus?  Do you know the bus routes of the busses that go down Converse Street?

A.    I do not.

Q.    Do you know if there are any other busses besides this Jewish home bus that goes down Converse Street?

A.    I do not.

Q.    I want to talk about the yellow fuel canister that we've been talking about all through this trial.

      You obtained that from the clean out, right?

A.    That is correct.

Q.    And who was with you doing the clean out?

A.    Chris Murray.

Q.    And you testified I think that you touched the fuel canister there, right?

A.    That is correct.

Q.    Now, there are a couple of times actually that you touched the fuel canister.  It was not just at the site of the clean out, correct?

A.    Correct.

Q.    What other times would you have touched that fuel canister?

A.    When I was throwing it out in the dumpster.

Q.    And how long after this as best you can remember did you get rid of the junk in your van?

A.    It was probably about a week.

Q.    We've been shown that handle where your bloodstain appears.  Are you sure that it had to have been at the clean out rather than when you put it into a dumpster later?

A.    No, it could have been either one.

Q.    You were wearing gloves while you were doing the clean out?

A.    I was.

Q.    Were you wearing gloves when you put the --

ATTORNEY BRESLOW:  Objection to the leading.

THE COURT:  Sustained.

Q.    (By Attorney Watkins)  What, if anything, did you wear on your hands when you were taking the items to a dumpster?

A.    I did not have gloves on.

Q.    How do you know you did not have gloves on?

A.    It's not something I normally do when I'm throwing stuff out.  I'm trying to be quick and just throw it out and go.  I'm not thinking about putting on gloves.

Q.    When you did the clean out, did you have discussions with Chris Murray about that yellow fuel container?

A.    I did.

Q.    Did he want the yellow fuel container?

A.    Yes.  He asked me if he could keep it.  He was interested in keeping it because he said it was in such good shape and his boss at his job just had theirs stolen and so he wanted to keep it.

ATTORNEY BRESLOW:  Your Honor, just a hearsay objection.

THE COURT:  Well, do you want to be heard on this?

ATTORNEY WATKINS:  No.

THE COURT:  Sustained.  It's hearsay.

Do you want to rephrase?  That's stricken.  The answer is stricken.  The complete answer is stricken; erased your memory, from your notes.

Attorney Watkins, if you want to rephrase on this issue to work within the hearsay rules, go right ahead.

ATTORNEY WATKINS:  Thank you.

Q.    (By Attorney Watkins) My question was did you have

discussions, without saying exactly the nature of the discussions, did you have discussions with Chris Murray about that gas container?

A.   Yes, I did.

Q.   Did he take the gas container?

A.   No, he did not.

Q.   While on this subject I want to address Mr. Breslow's termed effort about lighters, can you tell us how many lighters that you own?

A.   Five or six.

Q.   And do you have different lighters for different things?

A.   I do.

Q.   What kind of lighter do you use when you're smoking crack cocaine?

A.   I use both the blow torch and the hand lighter.

Q.   What lighter do you use when you're smoking marijuana?

A.   That I only use the regular lighter.

Q.   What do you use when you smoke cigarettes?

A.   I use both the blow torch and the regular lighter.

Q.   So it's true you use a regular lighter all the time no question about that, right?

A.   Correct.

Q.   We heard phone calls with your mother a little bit

but I want to back up and ask you in the days following your arrest by the FBI, did you start making efforts to figure out where that gas can might have been?

A.    I absolutely did.

Q.    And is that something that -- and who helped you with that?

A.    My attorneys did and my mother.

Q.    Why were you enlisting your mother to help you?

A.    Maybe she had a better memory of it than I was and plus I was in jail and she was out.  She could do more than I could.

Q.    So some of these conversations we heard you're talking with your mother about the evidence, right?

A.    Correct, sir.

Q.    You were put in jail at the beginning of this case; is that true?

A.    This is true, sir.

Q.    And we heard a number of phone calls with your mother and those are between you and her while you're at the jail?

A.    That is correct, sir.

Q.    During that period of time that we heard both right after between April 15th and April 22nd -- 27th and on into the summer, what was going on in regard to your case?

A.    I had many, many hearings.  I had many lawyer

meetings.  I had many talks with my mom.  I had a lot of, a lot of stuff going on.

Q.  Without talking specifically about what you and I talked about, were you learning what it was the government was saying about this incident?

A.  Yes.  I had a lot of paperwork that was mailed to me in court -- in jail I mean.  I'm sorry.

Q.  And were there also conversations -- did we have conversations?

A.  Yes, sir, we did.

Q.  You knew those calls were being recorded with your mother?

A.  I did.

Q.  Why did you discuss the case with your mother on the phone?

A.  To help me to help solve the case to figure out how the hell my blood got on that.

Q.  During that time, those initial weeks while you were in jail, how were you feeling about the case?

A.  I was extremely anxious.  I was worried.  I was scared I was going to wind up going to jail for something I had nothing to do with.

Q.  And in regard to the very big and very bad comment that you made about the fuel canister, was that true?  Was it very big and very bad?

A.   It was.  It's true.

Q.   In that same conversation did you tell your mother I'm innocent of this but I'm going to be found guilty just --

ATTORNEY BRESLOW:  Objection, Your Honor.

THE WITNESS:  Yes.

THE COURT:  Sustained.

ATTORNEY BRESLOW:  Move to strike.

THE COURT:  Sustained.  That's stricken, the form of the question, that's stricken.

Q.   (By Attorney Watkins)  Did you tell your --

ATTORNEY BRESLOW:  I'm sorry, Your Honor.  May we be heard?

THE COURT:  Yes.

(Sidebar conference.)

ATTORNEY BRESLOW:  That objection is concerning on several different levels.  First, it's leading.  But more importantly, and I want to be really clear about this, these recordings were offered into evidence only after a lengthy rule of completeness discussions with Mr. Watkins, and for Mr. Watkins to exceed that ruling is extremely improper.

I want to have this sidebar conversation because I want Mr. Watkins to know that if he's going to be asking -- that he should not be asking any more questions like

that beyond the scope of what the parties have agreed to be introduced in these recordings.

THE COURT:  So let me just understand this.  The portions of the tapes that were played that would have included that last reference by Attorney Watkins, those were all subject to what would be admissible, an agreement between the parties; is that what you're telling me?

ATTORNEY BRESLOW:  Yes.  The government offers --

THE COURT:   Okay.

ATTORNEY BRESLOW:  -- the particular sections, those particular portions, they were all negotiated with through with defense counsel, Mr. Watkins in particular, and there was another -- there was an argument or an appearance before the court where you made certain rulings, but exactly that's right.  Nothing beyond those portions is in evidence --

THE COURT:  Okay.

ATTORNEY BRESLOW:  -- and Mr. Watkins knows it.

THE COURT:  I'm just trying to make clear that that was an agreement between the parties as to how much of those tapes is played and how much -- and what isn't played; is that correct?

ATTORNEY WATKINS:  At the last trial we did go

through the transcripts and we agreed what could be played and what could be excised on the direct examination when the government put them in, that's correct.

ATTORNEY BRESLOW:  No.

THE COURT:  Because, because -- yeah, well, the issue would be I mean there may have been a completeness argument when it was introduced by the government but it wasn't made at that time.  So it seems like Attorney Breslow is raising the issue of what he believes is a breach of the agreement between the defense and the prosecution regarding this area.

ATTORNEY BRESLOW:  That's exactly right.  I want to be clear.  I'm not asking for sanctions.  I'm not asking for any relief.  I just want it to be very clear that Mr. Watkins should not do that again.

THE COURT:  So what's the story with this, Attorney Watkins?  Where are we going and what do you want to put on the record about this?

ATTORNEY WATKINS:  I'm all done, Your Honor.  That was the only question I'm going to ask.  That particular statement appears the minute before he talks about the very big and very bad.

ATTORNEY BRESLOW:  Right.  And if Mr. Watkins --

THE COURT:  I sustained the ruling on leading questions.  Now, there's a whole another -- there's like a

Pandora's box here.  That's all sorts of completeness arguments and other arguments to make, but if you agreed with Attorney Breslow that this was subject to a previous agreement, that ends it right there.

ATTORNEY BRESLOW:  It was, Your Honor.  This was all carefully negotiated with defense counsel and the only portions of the recordings that we agreed the jury would hear are the ones that were presented at the first trial and to a lesser extent here now.

THE COURT:  Is that -- do you agree with that, Mr. Watkins?

ATTORNEY WATKINS:  But the tenor and the subject of cross-examination changed that as Mr. Breslow starts talking about consciousness of guilt.

ATTORNEY BRESLOW:  Those arguments were made at the first trial as well, Your Honor.

THE COURT:  I agree.  The spirit was the same, essentially the tone and these issues are very similar at the trial.  Based upon -- I'm not hearing any claim that there was not such an agreement so there clearly was an agreement between the parties.  I ruled that -- I sustained the government's objection.  I instructed the jury to disregard it.  I'm going to leave it at that.

ATTORNEY BRESLOW:  We're not asking for anything further, Your Honor.

THE COURT:  Okay.

(End of sidebar conference.)

Q.   (By Attorney Watkins)  Mr. Rathbun, we also heard a telephone call between you and your mother about the search of your van versus the search of your mother's car.

A.   Yes, sir.

Q.   When you called the FBI idiots, were you crowing that you put one over on them?

A.   Could you say that again?

ATTORNEY BRESLOW:  Objection to leading, Your Honor.

THE COURT:  It is leading.  I'll overrule that and allow the question to stand.  I don't think Mr. Rathbun -- I think he needs it re-asked.

Q.   (By Attorney Watkins) When you were calling the FBI idiots, were you trying to cover up the crime?

A.   Absolutely not.  No, sir.

Q.   Why did you call the FBI agents idiots in that call?

A.   I mean, we didn't have the greatest relationship so, you know, again this is during the time trying to figure out stuff; very agitated.  I was out of line by saying that, but we don't have the greatest relationship I'll say.

Q.   When you say we don't have the greatest relationship, who are you talking about?

A.    The FBI, sir.

Q.    I'm going to go next to the time on the morning of April 2nd.  You've seen the exhibit on quite a number of occasions during trial?

A.    Yes.

Q.    This is Exhibit 41, page 13.

      You testified on direct examination and also on cross-examination about what you were doing in this area from the period of time 5:05 to 8:25; do you recall that?

A.    I do.

Q.    One of the things that came up was talking about licks.  Can you explain one more time what licks are?

A.    Licks could be dumpster diving, breaking into cars.

Q.    Could it be other things?

A.    Not really.  I mean, anything having to do with stealing I guess is a lick.

Q.    So the other day when you said it was just dumpster diving, what were you thinking?

A.    I misremembered and again I'm trying to sound better than I really am, but it's just the truth.  The truth is licks are breaking into cars or dumpster diving or some type of stealing.

Q.    In previous testimony have you also told the jury that you were dumpster diving that morning?

A.    I did.

Q.    Were you dumpster diving that morning?

A.    I was.

Q.    Again, do you know what you were doing every single moment of that morning?

A.    I do not.

Q.    Mr. Breslow asked that you exact question.  Why did you answer it differently when Mr. Breslow asked you if you knew what you were doing every single minute of the morning?

A.    Every single minute of the morning, I can't recall every single minute, no.

Q.    And what has helped you to recall generally and sometimes more specifically what it is you were doing that morning?

A.    Again my call logs, my text messages, my Facebook messages, Facebook calls.  I've gone over numerous, numerous papers having to do with this what I've been accused of.

Q.    From Exhibit 52, and this is line 457 -- let me get the time again on this.  This is the text message I believe, instant message to Devin Austin.  Do you see that before you?

A.    I do.

Q.    And what is the time on that?

A.    4:32:59 a.m.

Q.    When you were sending that message to Devin Austin, were you simultaneously putting together a firebomb?

A.    No, sir, I was not.

Q.    Were you thinking about getting back at JGS somehow?

A.    Absolutely not.

ATTORNEY BRESLOW:  Your Honor, just objection to the leading.

THE COURT:  Overruled on this point.

Q.    (By Attorney Watkins) At the time you were sending this message to Devin Austin, were you doing anything to prepare for leaving a fuel container at JGS?

A.    I was not.  My sole purpose that morning was to get more drugs.  That's it.

Q.    When you sent this text message at 4:32 in the morning, were you angry at the world?

ATTORNEY BRESLOW:  Asked and answered on direct, Your Honor, and leading.

THE COURT:  Overruled.

THE WITNESS:  I was not mad at the world, no.

ATTORNEY WATKINS:  I have nothing further, Your Honor.

ATTORNEY BRESLOW:  If we can keep that up on the screen?

**RECROSS-EXAMINATION**

Q.   (By Attorney Breslow)  Just a few questions, Mr. Rathbun.

You just testified that your sole purpose was to get drugs that morning?

A.   Yes.

Q.   And you were so intent on getting drugs that if you got the drugs, you were going to use at least some of them up in Springfield, right?

A.   I can't hear you.  Say that again.

Q.   I'm sorry.  You were so intent on using drugs that if you got the drugs, you were going to use at least some of them up in Springfield, right?

A.   Correct.

Q.   And you were looking for crack in particular, right?

A.   Correct.

Q.   So you brought your lighter or your blow torch with you, correct?

A.   Yes.

ATTORNEY BRESLOW:  Okay.  No further questions.

THE COURT:  Anything?

ATTORNEY WATKINS:  No, Your Honor.

THE COURT:  Okay.  You can step down, sir.

Defense?

ATTORNEY WATKINS:  The defense rests.

THE COURT:  The defense rests.  All right.  Rebuttal?

ATTORNEY DESROCHES:  Yes, Your Honor.  The government does have one witness to rebut.

THE COURT:  So, ladies and gentlemen, as you have seen, the prosecution called their witnesses and rested.  The defense called their witnesses and rested.  Now there is allowed what's called a rebuttal case where the government and I'm going to hear them on this because if I determine they can call a rebuttal witness or witnesses to rebut things that came up during the defense case, that moves into what's called a rebuttal case.  I'm telling you the obvious, but I just want to make sure you understand what we are doing.

Can I hear the basis of the government's request to call a witness?

(Sidebar discussion.)

ATTORNEY DESROCHES:  May I proceed, Your Honor?

Your Honor, at this point the government would like to call Horace Williamson as a rebuttal witness.  Mr. Williamson is the homeowner of the home in Chicopee at which the defendant did the trashout.

The defendant testified that he removed some very specific items from this trashout.  He cut his hand from that trashout and actually at that point recovered the

yellow can.  That was the origin story of the defendant's defense.  It is a central point to his defense.  However, Mr. Williamson will testify very specifically that the yellow can was nowhere at his home, neither was any of the tract used as the wick in this.

So I would suggest, Your Honor, that Mr. Williamson would offer relevant testimony that goes to the defendant's case.  Furthermore, to one last point, Mr. Williamson would testify that the defendant did not cut his hand and was not bleeding at his home.

THE COURT:  How does he know that?

ATTORNEY DESROCHES:  He watched the defendant the entire time that he was doing the trash removal.  He paid the defendant in cash and put the cash in the defendant's hand.

THE COURT:  All right.  Does the government want to make a record?  I'm sorry.  Defendant, do you want to make a record or say anything?

ATTORNEY WATKINS:  Yes, Your Honor.  We had just been supplied brand new Jencks Act material.  We'd ask for a continuance in order to take a look at them.

THE COURT:  Been supplied what?

ATTORNEY WATKINS:  We were just given just this moment Jencks Act materials that are brand new of interviews of these two witnesses.

THE COURT:  I see.  You said you were just given Jencks Act material?

ATTORNEY WATKINS:  Correct.

THE COURT:  So under the rule or local rule -- well, there's a local rule and then there's the Federal Rule of Criminal Procedure which requires you to be provided federal rule -- please correct me if I misstating -- the federal rule requires you to be provided the information directly before the testimony.  The local rule may be different, but what's the story?  What's the government's position on compliance with, number one, what rule applies and the government's compliance with the rule?

ATTORNEY DESROCHES:  Yes, Your Honor.  I believe the local rules require Jencks Act to be provided 21 days prior to a trial.  This case, however, Your Honor, I would suggest does not fall within that rule.

Mr. Williamson would not offer relevant testimony and was not a witness until the defendant took the stand and established that the defendant cleaned out the trash from Mr. Williamson's home.  He became a witness at that point as rebuttal and as a rebuttal witness that 21-day rule does not apply.

THE COURT:  Was he on the witness list that I read?

ATTORNEY DESROCHES:  He was, Your Honor, yes. He was -- I'd like to also just clarify what was provided. First, the defendant sent investigators to speak to Mr. Williamson well before the government was even aware of Mr. Williamson and so he should be entirely aware of the testimony.  The --

THE COURT:  I'm sorry to interrupt you. Interruption over WisperTech is especially difficult to do.  You're telling me the local rule does not apply the disclosure of Jencks material 21 days ahead time when a rebuttal witness is at issue?

ATTORNEY DESROCHES:  That's correct.

THE COURT:  Is that specific?  I don't have the local rule in front of me.  I'm having it pulled.

ATTORNEY DESROCHES:  Yes, Your Honor, and I don't want to speak without having it in front of me. But, as I recall, it would require witnesses for the government's case in chief, and just to pick up Your Honor, as I said, the defendant is aware they spoke to this person well before the government did.

Now the government provided a 302 and a letter that I wrote.  The 302 governs an interview that occurred in January.  However, the letter I wrote details the interviews that occurred on Friday evening at 8 o'clock and yesterday morning at ten o'clock so these did not

exist until this morning.

THE COURT: So are you telling me the government had at least some type of summary of Mr. Williamson's what you just reviewed as his potential testimony? Had some type of summary of this information before today?

ATTORNEY DESROCHES: Yes, Your Honor. Actually I misspoke. The 302 was disclosed well before this trial. So with the new material for the defendant regards interviews that occurred Friday night and yesterday morning during the defendant's testimony -- after the testimony had started.

THE COURT: Attorney Watkins?

ATTORNEY WATKINS: Your Honor, I'm not alleging a local rules violation, although it's clear the government anticipated to put this witness on much earlier than just in the last five minutes here.

What I am asking is just a brief continuance to review these materials so that I'm not trying to cross-examine this particular witness blindly.

THE COURT: All right. Are you talking what, ten minutes? An hour? What?

ATTORNEY WATKINS: Somewhere in between those two times.

ATTORNEY DESROCHES: Your Honor, if I can --

THE COURT: Hang on one second.

Go ahead.

ATTORNEY DESROCHES:  Yes, Your Honor.  There's no objection to that.  I would request though that we go right to the witness and break before -- or not break for lunch before this witness.  He has to go to work at two o'clock.

THE COURT:  Okay.  So I can give you 15 minutes.  How does that sound, Attorney Watkins?

ATTORNEY WATKINS:  We will do our best.

THE COURT:  You said he has to be at work at one o'clock?

ATTORNEY DESROCHES:  Two o'clock.

THE COURT:  Two o'clock.  So I'll give you -- can you check in with the clerk after 15 minutes and tell me if you need more time.  If in good faith you need more time, I'm going to give it to you.  Okay?

ATTORNEY WATKINS:  Thank you, Your Honor.

THE COURT:  All right.

ATTORNEY DESROCHES:  Thank you, Your Honor.

(End of sidebar discussion.)

THE COURT:  Okay.  Ladies and gentlemen, an interesting -- well, an issue came up.  Some might find it interesting; some might not.  But an issue came up that's going to need a little bit of a break.  It's not the full lunch break but it's a little bit of a break.

I am well aware of what I told you about the length of this case and the attorneys represented, but I do think -- I'm certain we are going to get to closing arguments and instructions today.  It's just probably going to be after lunch, but we're not taking the lunch break yet.

Sometimes when I have these on and I'm hearing all these issues, I feel like a flight traffic controller and right now I'm landing planes on the wrong runways.  Okay.

So we need a little bit of a break.  I don't know how long it's going to be, probably in the 15, maybe a little longer range.  Okay.  If coffee was here, I'd feel a little better about having you take another break, but don't speak to me about that.

Okay.  All the instructions apply.  Please don't talk to each other about the case, and please you must adhere to all the other instructions that I give you every time you leave the courtroom.  Do not talk to each other about the case.  Thank you.

**(The jury left at 12:25.)**

THE COURT:  On the record still, so the parties have received a red lined or at least an underlined, I don't know if red was the color we used -- is it red?  -- of the jury instructions.

So there are some changes that are very minor where I've changed words, adjusted grammar.  There are other

changes where we added things to the limiting -- allowed in for limited purpose and consideration of intoxication. I think those are the major ones, but there you go. There are the instructions to look at and then we can discuss it.

ATTORNEY BRESLOW:  Not now but later?

THE COURT:  Not now.  We'll find a time later.

ATTORNEY BRESLOW:  Okay.  Thank you.

THE COURT:  So defense check in.

ATTORNEY WATKINS:  Fifteen minutes?

THE COURT:  Check in.  I'm going to give you the time you need.  I'm just kind of trying to adjust what I do with the jurors.  Okay.

ATTORNEY BRESLOW:  So, Your Honor, come back at 12:45?

THE COURT:  Yes.  I'm not going to be here. You're going to report to the clerk if you need more time.

**(A recess was taken at 12:27 until 12:53.)**

ATTORNEY WATKINS:  Before the jury comes in, can I just quickly?  We are ready to cross-examine this witness.  I do want to note that we object to the presentation of this witness.  There is a significant question of good faith on the government's part.  They do have a witness as we talked about the other day that corroborates Mr. Rathbun's testimony that indeed there was

this can picked up at this particular site.

Given that, the government cannot go forward now to present this particular testimony to the exclusion of that. The corroboration was quite detailed and talked about exactly what happened and how that can was found up there. There is a case, *United States v. Munyenyezi* which talks about the government's good faith and their ability where they have information on a particular topic to not ignore that.

THE COURT: Case cite please? The name of the case one more time?

ATTORNEY WATKINS: It's *Munyenyezi*. M-u-n -- sorry, Your Honor, I will have it in just a minute. I thought I had it with me here. I know I do have it with me.

ATTORNEY BRESLOW: M-u-g-n?

ATTORNEY WATKINS: M-u-n-y. It's a First Circuit case and it's out of the District of New Hampshire. It is 781 F.3d, 532. That is spelled -- now I lost it -- spelled M-u-n-y-e-n-y-e-z-i. It's a 2015 case.

ATTORNEY BRESLOW: Do you have a copy?

ATTORNEY WATKINS: I do not.

ATTORNEY BRESLOW: Your Honor, if madam clerk is printing out a copy for you, could we? Thank you.

THE COURT: It hasn't become apparent in the

first read how this case supports your position so I will let you --

ATTORNEY WATKINS:  I'm sorry, Your Honor?

THE COURT:  It has not become apparent to me how this case supports your position at least in the first read.  I see generally what it's about and so go ahead with your argument.

ATTORNEY WATKINS:  That is my argument.  What the case stands for is that the government cannot just get up and begin presenting evidence or asking cross-examination questions where it has a basis to believe that those questions are not supported by the evidence.

Here the government has the witness, has Chris Murray, on record to government agents saying that that did indeed occur.  That the gas can was -- the fuel container was found at this particular site and very detailed about the next steps that happened with it with him and Mr. Rathbun.

THE COURT:  Okay.  But isn't this the same witness that the government I think has already represented to me has made such differing statements that neither side believes the witness to be credible?

ATTORNEY WATKINS:  That's not correct, no.

THE COURT:  I heard that.  Where did I hear

that?

ATTORNEY BRESLOW:  Well, no, we did -- you may remember, Your Honor, that Mr. Watkins -- this came up when Mr. Watkins wanted to elicit testimony from Special Agent McGonigle and so we had that argument.

THE COURT:  Right.

ATTORNEY BRESLOW:  This concerns that witness Chris Murray.

THE COURT:  And the representation was I thought that this witness gives a little bit that either side could use but is kind of that witness that at least no one was finding they were comfortable calling?

ATTORNEY BRESLOW:  That's sort of the gist of what I was communicating.  I don't think I got into the details of what he said, but what I was communicating to the court was the government did not have confidence enough in his reliability to call him as a witness.  We elected not to and as I indicated to the court then, the defense was free to call him if they wanted to introduce corroborating testimony from him that Mr. Rathbun did in fact get this yellow gas canister from the Chicopee clean out.

There was another witness who contradicted that person's testimony and that is -- or that person's information.  That's why I was concerned about the use of

the word information because we didn't regard the information necessarily as accurate or reliable.

In any event, we had disclosed Mr. Murray to the defense I think well before the first trial and the defense has known about Mr. Murray. My understanding is that I believe they've even interviewed him and obviously they've elected not to call him to corroborate Mr. Rathbun.

They can't now be in the position of suggesting that this witness's testimony should be excluded because of the lack of corroboration or because neither party felt that this witness Mr. Murray was reliable enough to go forward.

THE COURT: So, Attorney Watkins, it's seeming to me like the government just -- it seems to me that the government is not believing or finding credible Murray's corroboration. It's not sounding like the government finds him credible and is trying to hide this because how could they hide it? You could seek to bring him in at the appropriate time.

I don't want to say you have the obligation of calling any witnesses, but when it goes to the analysis of good faith, so I would have to find very bad faith here on the part of the government. So what's the bad faith if the government just doesn't believe Murray on this issue?

ATTORNEY WATKINS: The bad faith is a detailed

explanation of how the can got there.  So the government is presenting the witness that it wants to while it does not call the one that actually corroborates it.  This is not just a vague reference to the fuel canister.

THE COURT:  I am not even close to understanding your argument.  I really -- you're telling me the government -- somehow the court and the defense can control the witnesses the government wants to call.  The government makes the determination who they believe, who they don't believe, who they want to call to make their case, as long as everything is disclosed and all the information is given to the defense about everyone's statement, et cetera, et cetera.

How does *Munyenyezi* support your contention that Chris Murray in this case under these circumstances can't be -- should have been called by the government and therefore the government is foreclosed from calling the homeowners who had the clean out done.

ATTORNEY WATKINS:  That's correct.  That's what my contention would be is with that statement in hand and the government knows that this particular witness is not reliable; doesn't have enough of a --

THE COURT:  They know which witness is not reliable?

ATTORNEY WATKINS:  The one that they're about to

call.

THE COURT:  The name is again?

ATTORNEY WATKINS:  I don't know who it is.

ATTORNEY DESROCHES:  Horace Williamson, Your Honor.

ATTORNEY WATKINS:  I'm sorry?

ATTORNEY DESROCHES:  Horace Williamson.

ATTORNEY WATKINS:  Right.

THE COURT:  But how can I -- what's the basis to support you saying the government knows this witness Horace insert last name --

ATTORNEY BRESLOW:  Williamson.

THE COURT:  -- Williamson is unreliable?

ATTORNEY WATKINS:  Because they have a statement as to that particular point, as to that particular point whether there was a fuel container at this address and whether it left with Mr. Rathbun and that other witness. They have a statement from another witness that tells them exactly how that happened.

ATTORNEY BRESLOW:  Your Honor, I think Mr. Watkins' concern is best raised in the context of a discovery motion.

So, for example, if we didn't disclose Mr. Murray's -- I'll put this in quotes -- "information", the information that the government received from Mr. Murray,

if we didn't disclose that to the defense, then I think the defense would have a proper argument to say, hey, you put on Horace Williamson but you failed to disclose to us a witness that would contradict Mr. Williamson's testimony and you should have.

In this case we did. And not only did we, the defense interviewed Mr. Murray as well. In fact, Mr. Williamson too was interviewed by the defense before we did.

So I understand Mr. Watkins' concern. I think the only way it comes up in any kind of an issue is in the context of a discovery violation, but that's completely not the case here.

THE COURT: Or in the context of the defense is saying the government is breaching good faith because you know Mr. Williamson is not credible.

ATTORNEY BRESLOW: So --

THE COURT: Or your belief is, that's their position.

ATTORNEY BRESLOW: Mr. Williamson and Mr. Murray provide potentially conflicting accounts concerning this trash out.

THE COURT: Has the government made a determination as to who they find credible?

ATTORNEY BRESLOW: Well, yes. I mean, to the

extent that -- let me say this.  As Your Honor recognized, the government has the right to call the witnesses it chooses and to not call the witnesses it doesn't choose.

And so, yes, reliability, credibility, potential cross-examination by the defense on criminal history and drug use, all of these things come into the decisions that the government makes concerning which witnesses to call. But again, if Mr. Watkins thinks that Mr. Murray is a reliable, credible witness who will corroborate Mr. Rathbun's account, then he should have called him.

In the course of this trial I invited Mr. Watkins to do so.  Mr. Watkins clearly knows what Mr. Murray has said to the government, has said to the defense, and what might he testify about at trial and he's made the decision, possibly for the same reasons we did, not to call him.

So Mr. Watkins can't be heard to complain now about our decision to choose a witness who may testify contradictorily to what Mr. Murray may have told both parties.

ATTORNEY WATKINS:  Of course, there are tactical reasons why neither side wants to call Mr. Murray.  We don't need to go in them, but the undisputed fact is as to that one issue about whether this fuel container left this trash out, he said it.  It's in his statement there and it is inconsistent and the government knows and it's

inconsistent with what this particular witness would say. So for those reasons, Your Honor, I don't think that the government should be permitted to call him.

ATTORNEY BRESLOW:  Your Honor, I just don't think there's any support in *Munyenyezi* or frankly any other case for that proposition.

So if Mr. Watkins is saying that the government cannot call any witness whom any other witness has contradicted on any point, the government really may not be calling many witnesses at all and no party could.

I think what Mr. Watkins's concern simply has no support in the particular case that he cited in the First Circuit, and I imagine that he hasn't mentioned any other case because none other exists.

THE COURT:  I certainly understand, Attorney Watkins, and you're a hundred percent correct neither side is calling this witness for tactical considerations.  I'm not finding that there's any support that the government is acting in bad faith.

The government has told me they're making a determination as to who they find credible and so I'm not finding *Munyenyezi* supports your position.  I'm not finding the proposition that you're asking me to adopt is supportable by case law or practice that I know of.  So I'm going to overrule your objection and will certainly

let you consider whether or not after the rebuttal case whether or not you want to reopen or put on your witnesses to rebut this new rebuttal witness.

I'm not going to tell you who that might be, whether or not you want to make a pitch to -- whether you're going to call Murray or you want make a pitch to call the agent and cross-examine the agent in some way, I guess we'll let that play out how it will.  So I'm going to overrule your objection about calling this witness and allow the government to call this witness.

ATTORNEY DESROCHES:  Thank you, Your Honor.

THE COURT:  All right.  Let's get the jury.

**(The jury entered at 1:17.)**

THE COURT:  All right.  Ladies and gentlemen, was everyone able to follow my instructions not to talk to each other about this case, and were you able to comply with all of my other instructions that I've given you routinely?

THE JURY:  (Yes.)

THE COURT:  All right.  Affirmative answer by everyone; the jury remains fair and impartial.

All right.  Government, please call the rebuttal witness.

ATTORNEY DESROCHES:  Yes.  Thank you, Your Honor.

The government calls Horace Williamson.

THE CLERK:  Sir, please raise your right hand.

**Horace Williamson (sworn)**

THE CLERK:  Thank you.  You can take off your mask.

ATTORNEY DESROCHES:  May I proceed now, Your Honor?

THE COURT:  Yes.

**DIRECT EXAMINATION**

Q.   (By Attorney Desroches) Good afternoon.

A.   How you doing?

Q.   Good.

Can you please introduce yourself to the jury and for the record spell your last name?

A.   Horace Williamson, W-i-l-l-i-a-m-s-o-n.

Q.   And, Mr. Williamson, where do you reside?  Where do you reside?  Where do you live?

A.   21 Dillon Street, Chicopee, Mass.

Q.   For how long have you lived there?

A.   Almost two years.

Q.   When did you move into that address?

A.   Before Christmas in 2019.

Q.   Before Christmas in 2019?

A.   Yes.

Q.   And did you know the owner of that house before you

moved into it?

A.    Yes.

Q.    Who was the owner?

A.    My boss.

Q.    Did you make an agreement with your boss when you moved into that house?

A.    Yes.

Q.    What was that agreement?

A.    Rent to own.

Q.    So you were going to rent the house from him until you eventually owned it?

A.    Yeah.

Q.    What was the condition of the house before you moved in?

A.    It was under construction.

Q.    Did you yourself become involved in that construction?

A.    Yes.

Q.    What types of things did you do?

A.    I helped remove rugs, floors, walls.

Q.    So I'm going to talk just about the condition of the house before you moved in.

      How many floors is this house?

A.    A basement, an upstairs, downstairs.

Q.    So it's a two-story with a basement?

A.    Yes.

Q.    So going from the top of the house down to the bottom, can you describe for the jury what the top of that house -- what was inside the rooms in the top of the house, the second floor?

A.    Well, the second floor had rugs and like a, like a stage that they had for kids so we had to tear that down, and then the ground floor was where the living room is and everything else.

Q.    I'm going to stop you so just the record is clear.

Just on that second floor you said there was a stage that the kids played on; is that right?

A.    Yes.

Q.    Were there any other belongings that the previous owner had left behind in the second floor?

A.    No.

Q.    So now you moved onto the first floor.  Can you describe the layout of the first floor?

A.    You got the living room and then the kitchen, then you got a hallway, then you got the two bedrooms and a back room and then you got a bathroom.

Q.    Now just drawing your attention to each particular room, what was the state of the kitchen before you moved in?

A.    A lot of appliances, the floors ripped up, the walls

were scraped down.

Q.    Were there any personal belongings of the previous owner in the kitchen?

A.    No.

Q.    So there --

A.    Just for his materials he used to work on the house.

Q.    So you said the tools and things like that?

A.    Yes.

Q.    Now going on to the bedrooms, were there any personal belongings in the bedrooms on the first floor?

A.    Yes.  His son used to live there until someone moved in and he was staying back in the back room.

Q.    What types of things were in that room?

A.    He had blankets, clothes.  That's it.

Q.    So were there any other personal items on the first floor of this house?

A.    No.

Q.    What was in the basement when you moved in?

A.    A lot of his father's old stuff and a lot of kids' stuff that they had.

Q.    So now just referring back to the second floor, were there any fuel cans on the second floor?

A.    No.

Q.    Were there any religious papers on the second floor?

A.    No.

Q.    On the first floor, were there any fuel cans on the first floor?

A.    No.

Q.    Were there any religious papers on the first floor?

A.    No.

Q.    Drawing your attention to the basement, were there papers of any sort in the basement?

A.    Yes.

Q.    What types of papers were in the basement?

A.    Kids' school stuff, books.

Q.    And what did you do with those items that you found in the basement?

A.    We threw them in the trash for when our trash people came.

Q.    Do did you put them out for curbside pickup?

A.    Yes.

Q.    And what did you do with the items in the basement that were not yours that belonged to the owner?

A.    I asked permission if he wanted them or not.  He said no, I could throw them out.  So whatever was heavy, I put outside to the pile that we already have outside from the pool, deck, and everything else.

Q.    We'll get to the outside.  But the things that you said were heavy, you put outside in a pile?

A.    Yes.

Q.    And what did you do with the items that were not heavy?

A.    What do you mean?

Q.    So if you didn't put them in the side yard, what did you do with them?

A.    We put them out to the trash.  We put them in trash bags and put them outside.

Q.    Did that include anything that could fit in a trash bag?

A.    Yes.

Q.    So now let's talk about the outside of the house. What was the condition of the yard when you moved in?

A.    A lot of messy yard, like a junk yard.

Q.    And did you become involved in cleaning that up?

A.    Yes.

Q.    What type of items specifically were in the back yard?

A.    Well, everything we threw from upstairs like the platform that they had in the kids' room, we threw all that out.  The rug we threw out the window and we moved all that to one side.  Then the decking and the pool, lining and everything else, we moved over there and that was it.

Q.    So there was decking and a pool that was back there?

A.    Yep.

Q.    And did you rip that up or had that been ripped up prior to your being there?

A.    They were already ripped down, but I just moved it over there out of the way.

Q.    So where did you move that stuff?  Where did you move that stuff to?

A.    On the like half driveway back patio looking --

Q.    Was there a pile of things there?

A.    Yes.

Q.    And who made that pile of things?

A.    Me and the old owner.

Q.    So were you aware of everything that was in that pile?

A.    Yes.

Q.    Was there a yellow gas can in that pile?

A.    No.

Q.    Were any religious papers in that pile?

A.    No.

Q.    Were there any papers of any sort in that pile?

A.    If it was, they were probably all wet.

Q.    Why was that?

A.    Because the snow, the snow and rain.

Q.    Were there any barrels in the yard?

A.    Yep.

Q.    What were in those barrels?

A.    Old leaves, a rake, broken rakes, broken toys, bats, whatever.

Q.    Did you have to do anything with those barrels when you moved in?

A.    No, just move them around where I could put more stuff in the area.

Q.    Was there any water in those barrels?

A.    Yes.

Q.    What did you do with the water?

A.    We popped holes in the bottom where they can drain out.

Q.    So you had to drain the barrels?

A.    Yes.

Q.    Was there any sort of smell that came from those barrels?

A.    Yes.

Q.    Can you describe that smell?

A.    Like wet grass and wet leaves, dog crap.

Q.    So is there a shed on your property?

A.    Yes.

Q.    And what was inside of the shed?

A.    Lawn materials, pool materials.

Q.    Were there any gas cans in there?

A.    Yes.

Q.    Were there any yellow gas cans?

A.   No.

Q.   And do you work with gas engines?

A.   Yes, I do.

Q.   And what type of work do you do with gas engines?

A.   A dieseal mechanic, automotive.

Q.   Would you have noticed if there were a yellow gas can in there?

A.   Yes.

Q.   Why is that?

A.   Because the gas can is something I would have used.

Q.   So you would have kept it?

A.   Yes.

Q.   So at some point did you make a decision to have this pile that you made removed?

A.   Yes.

Q.   And who do you live with at that house?

A.   My girlfriend, Melissa Taylor.

Q.   Melissa Taylor you said?

A.   Yes.

Q.   Do you have any children who live there with you as well?

A.   Yes, three sons.

Q.   I'm sorry?

A.   Her three sons.

Q.   What are their ages?

A.    Seven, 13 and 19.

Q.    So when you decided to move the junk, what did you and Melissa do first?

A.    Well, she posted ads.

Q.    Do you recall if she posted an ad on Home Advisor?

A.    Yes.

Q.    And did you yourself see any responses to that ad?

A.    Yes, when she let me know someone emailed her back.

Q.    And did you review the response?

A.    Not quite as like thorough but I quickly glimpsed at it.

Q.    What is Melissa's email address?

A.    MTAY3553@gmail.com.

        ATTORNEY DESROCHES:  If I can have PX-132?  It is in evidence.  I'm sorry, madam clerk, if our table can have that?

Q.    (By Attorney Desroches)  Mr. Williamson, is there anything displayed on your screen?

A.    Yes.

Q.    Do you recognize what that is?  Drawing your attention to the receiver of this email, do you see who that was to?

A.    Yeah, to my girlfriend.

Q.    So that's your girlfriend's email address?

A.    Yes.

Q.    Did you review this email as you were making decisions in who to hire to remove that pile of junk?

A.    I glimpsed at it.  I wouldn't like really pay attention.  I trust her to make a decision.

Q.    So at some point did you decide to hire somebody based on this email?

A.    Yes.

Q.    And can you describe what you did when you decided to hire that person?

A.    I asked him what the price was before I made a decision.

Q.    And did you agree upon a price?

A.    Yes.

Q.    Ultimately did you agree that that person who sent that email would come to your house and remove that pile?

A.    Yes.

Q.    Did that person show up at your house?

A.    Yes.

Q.    And when that person showed up, did you have an opportunity to see that person?

A.    Yes.

ATTORNEY DESROCHES:  Your Honor, at this point I think by agreement ask the defendant to lower his mask for the witness?

THE COURT:  Yes.

THE DEFENDANT:  (Indicating.)

Q.   (By Attorney Desroches) Mr. Williamson, do you recognize the person who showed up at your house in this courtroom today?

A.   Yes.

Q.   Can you please point to that person and describe something he's wearing for the record?

A.   He's wearing a pink shirt.

ATTORNEY DESROCHES:  Your Honor, may the record reflect he has identified the defendant?

THE COURT:  All right.  The record will reflect identification has been made of the defendant by a description and the direction where the witness looked when making the identification.

Q.   (By Attorney Desroches)  So approximately how long after that email did the defendant show up at your house?

A.   Within that week, by the weekend.

Q.   And was he with anybody when he showed up?

A.   He had a coworker, a partner.

Q.   What did that person look like?

A.   A short, skinny kid with a landscaping hat.

Q.   You said a landscaping hat?

A.   Yeah.

Q.   So at the time the defendant showed up at your home, what types of items were in that pile that you had

created?

A.   All the wood, all the pool stuff, lining, all the decking, a couple barrels, the little kids' skids and toys and stuff.

Q.   So you said little kids' skids, what do you mean by that?

A.   Like sleds and stuff.

Q.   Sleds you said?

A.   Little plastic stuff.

Q.   Did you speak to the defendant when he arrived at your house?

A.   Yes.

Q.   What did you tell him to do?

A.   I showed him where he had to take the stuff from and that was it.

Q.   Did you give him any special instructions regarding the shed?

A.   I didn't say nothing about the shed.

Q.   Did you ask him to remove anything from the shed?

A.   No.

Q.   So we're clear, did you see the defendant ever go into that shed?

A.   No.

Q.   He did not go into the shed?

A.   No.

Q.   So did the defendant and his coworker began removing trash from that pile?

A.   Yes.

Q.   Did you yourself help him do that?

A.   I helped move stuff to the pile.

Q.   Did you help the defendant move anything that was bulky from the pile?

A.   Not into his van, no.

Q.   What were you doing as they did this work?

A.   I was standing on my patio.

Q.   Were you watching them?

A.   Yes.

Q.   Why were you watching them?

A.   To make sure they take the right stuff.

Q.   The right stuff you said?

A.   Yes.

Q.   Were there items that he was not supposed to take?

A.   Yeah, I had a grill over there.

Q.   You said a grill?

A.   Yes.

Q.   And for how long were they working removing that pile?

A.   Almost four hours.

Q.   What were they doing with it when they moved it from the pile?  You said there was a van?

A.    Yep.

Q.    Where did they put it in the van?

A.    On the roof and inside the van.

Q.    At any point did you see them handle a yellow gas can?

A.    No.

Q.    At any time did you see them handle any papers?

A.    No.

Q.    At any point did you see them enter the shed?

A.    No.

Q.    Did you -- did they actually finish removing all the trash that day?

A.    No.

Q.    Did you talk to the defendant about this?

A.    Yes.

Q.    And what did you say to him?

A.    I asked him is he going to come back and finish and he said yes.

Q.    He said he was going to come back and finish?

A.    Yes.

Q.    Now, while the defendant was working did you ever observe him cut himself?

A.    No.

Q.    Did you ever observe blood on him?

A.    No.

Q.    You said that you had agreed upon a payment.  What were the -- how were you going to pay the defendant?

A.    Cash.

Q.    At some point at the end of the day, did you in fact pay him?

A.    Yes.

Q.    Can you describe what happened when you paid him? How did you go about paying him?

A.    I had my girlfriend go get the rest of the money and then once she got back, I gave him an envelope with the cash in it.

Q.    Did you put the cash in his hand?

A.    Yes.

Q.    When you did that, did you observe any blood on his hand?

A.    No.

ATTORNEY DESROCHES:  May I have PX-13 please?

Q.    (By Attorney Desroches)  Mr. Williamson, at any point at your time -- at your house while you were doing the work and cleaning it up, did you ever see a gas can like this?

A.    No.

ATTORNEY DESROCHES:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q.    (By Attorney Desroches)  Mr. Williamson, I'm just going to place PX-4 on the stand before you.

Do you recognize -- did you see anything like PX-4 at your house at any time when you were there?

A.    No.

Q.    Sorry, just so the record is clear, can you say that again?

A.    No.

Q.    And just one more question, when you gave the defendant that envelope of cash, do you remember what hand you put it in?

A.    No, I don't.

ATTORNEY DESROCHES:  Thank you.  No further questions.

THE COURT:  Attorney Watkins.

**CROSS-EXAMINATION**

Q.    (By Attorney Watkins) Good afternoon, Mr. Williamson.

A.    How you doing?

Q.    So you were first interviewed by the FBI on January 19th of 2021?

A.    I suppose, yes.

Q.    Sorry?

A.    I suppose.  I guess.

Q.    Was it January of this year?

A.    I'm not sure.

Q.   It was many months after the two men came to do the clean out?

A.   Yes.

Q.   You have to answer out loud.

A.   Yes.

Q.   And if I understand it was more than two years after you first moved into that house, right?

A.   Yes.

Q.   In December of 2019, did you move in right away or was there a lot of work that had to be done even before you could move in?

A.   I don't know.  I was helping fix everything in the house so we were in there by Christmas, so.

Q.   I'm sorry?

A.   We were in there by Christmas.

Q.   You were actually living there on an overnight basis?

A.   Yes.

Q.   But the house was under construction --

A.   Yes.

Q.   -- even then, right?

A.   Yes.

Q.   It was already kind of dilapidated, right?  It's an old house?

A.   Yes.

Q.   And even at that point there was a lot of waste as

whoever was your boss was trying to renovate even before you got in there, right?

A. Yes.

Q. So things were going out into the yard from the renovation he was doing, right?

A. Yes.

Q. And these are things that were already in the side yard from when your boss was trying to clean the place up, right?

A. Yes.

Q. And some of those items -- so some of the items that were in the side yard they might have been out there for a year and a half before April of 2020?

A. No, he had previous attenants. (sic)

Q. I'm sorry?

A. He had a previous attenants. (sic)

Q. Previous tenants?

A. Yep.

Q. But as I think you're saying is those tenants had moved out by December of 2019?

A. No, they were out before probably October. I'm not sure of the right date.

Q. So the house had set empty for a couple of months before you went in there, right?

A. Yes.

Q.   And that was the time when your boss at least started to take trash and items out of there, right?

A.   Yes.

Q.   And again things would go into the side yard and that's where they would stay until they were disposed of, right?

A.   Not really because he was bringing stuff to our job to dump them in our dumpster.

Q.   Part of the items that were there were a deck and a pool, right?

A.   Yes.

Q.   The remnants from a deck and a pool, right?  I mean, this had already been destroyed at that point by the time you moved in?

A.   It was knocked down.  I just helped move it into a pile.

Q.   So it was all in pieces, right?

A.   Yes.

Q.   This deck and pool it actually had been attached to the house at some point, right?

A.   No, it was on the other side of the house.

Q.   But it actually had a connection to the house.  You could actually -- not a connection.  It was up against the house, this pool?

A.   No.  It was on other side towards the shed.

Q.   So this was a standalone pool and deck --

A.   Yes.

Q.   -- that had steps up to it, right?

A.   Yes.

Q.   And so that was part of the -- a lot of the trash that ended up in the side yard that you needed people to remove, right?

A.   Yes.

Q.   And so lots of wood but also lots of flashing involved with the pool itself, right?

A.   Yes.

Q.   You have to answer out loud.

A.   I said yes.

Q.   Okay.  And so this is plastic but there are also metal pieces involved with the pool itself?

A.   Yes.

Q.   And so those were the things that were out in the side yard that you needed to get rid of, right?

A.   Yes.

Q.   By April or March of 2020 that pile had been sitting out there for already some eight months, right?

A.   Probably.

Q.   And you talked about it had been all there and snowed on during the winter and lots of mud, everything.  It had been sitting there for quite awhile, right?

A.   Yes.

Q.   And it wasn't organized in any particular way, right? In other words, it wasn't boxes stacked up and lumber stacked up?  It was all just a big mesh, a big pile there, right?

A.   Yeah.

Q.   And in addition to the wood and the pool pieces, there were sleds and scooters there as well?

A.   Yes.

Q.   Children's toys, things of that nature?

A.   Yes.

Q.   And all kinds of -- and actually boxes full of other things?  Just closed up boxes were sitting out there, right?

A.   Yeah, boxes full of broken plates.

Q.   Broken items, right?  And there were many boxes again not stacked up but they're just out there along with the rest of the trash, right?

A.   Yes.

Q.   In your January 19, 2021 interview you described the folks coming up there in a white painter's van?

A.   I don't remember the color but you're probably right.

Q.   I'm sorry?

A.   I don't remember the color but you're probably right. It could have been white.

Q.   Would it help if you took a look at something to remind you whether you described it as a white painter's van?

A.   If you have something, sure.

Q.   I'm sorry?

A.   If you have something, sure.

ATTORNEY WATKINS:  May I share this with just the witness please?

THE COURT:  Yes.

Q.   (By Attorney Watkins) I want you to read to yourself just this third paragraph starting with Williamson's girlfriend and moving just about halfway down if you can tell me what it says about the van that they came in?

A.   Read where?

ATTORNEY BRESLOW:  Objection, Your Honor.

ATTORNEY WATKINS:  I'm sorry?

ATTORNEY BRESLOW:  I think Mr. Watkins has asked the witness to read the report.

ATTORNEY WATKINS:  Yes.

THE COURT:  To refresh his memory.

ATTORNEY WATKINS:  Yes.

Q.   (By Attorney Watkins)  Read it to yourself and see if you can identify what color the van that the folks showed up in.

A.   Okay.

Q.   Do you now know?  Does that help you remember what you told the FBI back in January?

A.   Sure.  It sounds right I guess.  I'm not definitely sure.  It's been a while.

Q.   What did you tell the FBI about the color of the van that the --

A.   It had been a while since.

Q.   I'm sorry?

A.   It had been awhile.

Q.   No, I understand that.  But what color did you tell the FBI?

A.   Right there it says white.

Q.   A white painter's van?

A.   Okay.

Q.   What price did you agree on to have the trash removed?

A.   I don't remember.

Q.   Again the interview would have been nine months after the actual clean out was done, right?

A.   Yes, sir.

Q.   And then you were re-interviewed this past week, right?  You continued to be interviewed?

A.   Yes, sir.

          ATTORNEY WATKINS:  That's all I have.

          ATTORNEY DESROCHES:  I just have two questions,

Your Honor.

**REDIRECT EXAMINATION**

Q.    (By Attorney Desroches)  Mr. Williamson, are you color blind in anyway?

A.    No.

Q.    Did you see the defendant carry or his coworker carry a gas can of any color whatsoever?

ATTORNEY WATKINS:  I'm going to object, Your Honor.  It's beyond the scope.

THE COURT:  Sustained.

ATTORNEY DESROCHES:  No further questions.

THE COURT:  All right.  Thank you, sir.  You're all set.  You can step down.  Thank you very much.

ATTORNEY DESROCHES:  Your Honor, the government rests.

THE COURT:  All right.  The government rests its rebuttal case.

All right.  Defense?

ATTORNEY WATKINS:  No more witnesses.  Thank you.

THE COURT:  No more witnesses.

I want to go on WisperTech for a moment please.

(Sidebar conference.)

THE COURT:  Okay.  I just want to make it clear to the defense that I would consider giving you time if

you want to consider calling any other witnesses on that.

With that knowledge, I think you already had that knowledge, but I just want to make clear that you understood that and you are resting; is that correct?

ATTORNEY WATKINS:  We do not intend to call any witnesses, no.

THE COURT:  All right.

(End of sidebar conference.)

THE COURT:  Ladies and gentlemen, both sides have rested their case, their respective cases.  The evidence is closed.  So we have been back and forth with your lunch.  It is -- are you satisfied your lunch is finished or do you want to take ten minutes now and go back?

You do not -- does anyone want to go back and finish their lunch so you don't feel rushed?  No.

A JUROR:  Not unless there's coffee there.

THE COURT:  I thought they brought coffee.

A JUROR:  They did one canister.

THE COURT:  It's gone.

A JUROR:  We can wait though.

THE COURT:  You can wait, which means somebody better order another pot I guess.  All right.

So closing arguments are next.  Are the parties prepared to do their closings?

ATTORNEY BRESLOW:  We can go forward.  We have not had lunch but that's fine.

THE COURT:  You're absolutely right.  That's a good point.  Why don't we just go back on this?  We want to decide the best way to proceed because closing arguments can take between an hour and an hour and twenty minutes for both sides, and then there is jury instructions.  The jury instructions take under an hour but in the range of 45 minutes to 50 minutes.  I think they're under an hour.  So we're going to need to take a break at some point in between.

So let me talk to the parities and see what the parties are most comfortable with.

(Sidebar conference.)

ATTORNEY BRESLOW:  Your Honor, I'd at least like to take a break before the jury instructions.

THE COURT:  Of course.  Of course.

Now, let me just say, have the parties had a chance to look at the jury instructions, the red lined version that I sent back to you?

ATTORNEY O'NEILL-GREENBERG:  We haven't.

THE COURT:  You have not?

ATTORNEY O'NEILL-GREENBERG:  No.

THE COURT:  Has the government?

ATTORNEY BRESLOW:  I did.  I don't know if Mr.

Desroches has.

THE COURT:  I was asking to see if the parties were going to place any objections on the record.  Is it too early to ask you that question?

ATTORNEY O'NEILL-GREENBERG:  Yes.

ATTORNEY BRESLOW:  Yes.

THE COURT:  All right.  So we will go -- does the defense want to take, you know, a 20-minute lunch break?

ATTORNEY O'NEILL-GREENBERG:  If I just could have five?

THE COURT:  I don't want to feel that I'm pushing you especially if no one has eaten.  I don't want you to feel that you're able to do your best here.

ATTORNEY O'NEILL-GREENBERG:  I would just ask for five minutes to use the restroom; otherwise, whatever everyone wants.

THE COURT:  Okay.

ATTORNEY BRESLOW:  One moment.

Your Honor, we'd request that we take this break now.

THE COURT:  All right.  How about if I give you -- you think 20 minutes?

ATTORNEY BRESLOW:  Say half an hour?

THE COURT:  Sure.

(End of sidebar conference.)

THE COURT:    This is a good point, the attorneys haven't had their break.  We are going to take in the range of 20 to 30 minutes and then we're just going to go through.  We're going to go as far as we can.  If anyone needs to take a break, we will take a stretch break and then we're going to go through including my instructions.

CLERK RIVERA:  All rise.

THE COURT:  All my instructions apply.  Do not talk to each other about the case at all, and please follow all my instructions that I've given you.

**(The jury left the courtroom at 1:48.)**

THE COURT:  The parties are going to during this time be looking at the instructions.  There's not many changes to the instructions, so.

ATTORNEY DESROCHES:  Thank you, Your Honor.

**(A recess was taken at 1:49 until 2:20.)**

THE COURT:  Everyone can be seated.  So for the jury instructions, we want to prepare that we can show it simultaneously on the screens as I'm reading it.

Government, did you have any comments or requests?

ATTORNEY BRESLOW:  No, Your Honor.

THE COURT:  Okay.  The government is satisfied with the jury instructions.

Defense?

ATTORNEY WATKINS:  Your Honor, other than a couple of objections to whether the aiding and abetting and the consciousness of guilt instruction should be given, aside from those objections the instructions as drafted are fine.

THE COURT:  Okay.  Consciousness of guilt, yeah, that objection is noted but I'm not going to recognize it.  I think it's perfectly appropriate.

What's the aiding and abetting argument?

ATTORNEY WATKINS:  It's just there's no theory before the jury whatsoever.  It's confusing.  It simply doesn't make sense in this context for them to be instructed on a theory that there's no evidentiary support for whatsoever.

ATTORNEY BRESLOW:  Well, I'll state that the defense -- one of the defenses is that the defendant didn't stop at this place and yet his blood was still on the pamphlet and the canister, and so it was charged in particular to address that defense.  That if the defendant didn't place this device, he was involved in the assembly of it because his blood was on both components.

The only other thing I'll add, Your Honor, is with respect to the voluntary intoxication, we think it's a correct statement of the law.  We think it would be appropriate if the defense makes that argument, if that's

part of the defense.  But if it's not, then we're requesting that it be removed.  If it's not part of the defense, it's not applicable here.

THE COURT:  Well, as to the aiding and abetting I think there is slight but some reason to have it.  The defense is I was with somebody when we found it but it wasn't me who put it there but there's blood on it and there's blood on the pamphlet.  And given this case as a whole considering all the evidence I think there's as I said slight, slight, but nonetheless enough for aiding and abetting.

Okay.  I would note that the only other thing that the court came across was on the first indictment the statutory language is -- please correct me, I'm looking at my clerk if I'm wrong on the language -- that the language is with the knowledge or intent to cause and then the statute goes on, but the jury instruction that was agreed upon between the parties and there's an older case -- like 1977 First Circuit case -- that says when you're giving the instructions it's knowledge "and" instead of "or." It's knowledge and, and so that's what's in the instructions.

I think it's a little confusing.  I think there's perhaps some room there to examine why the "and" instead of the "or," but that was the agreed upon instruction.

The only other issue is under aiding and abetting the unanimity instruction as to when an aiding and abetting is involved it does -- there is no objection to that instruction.  It does seem to be the correct state of the law in the circuit.

In other words, under aiding and abetting the unanimity -- there is no unanimity requirement as to aiding and abetting or principal.  It's just unanimity that one of the theories is satisfied.  All right.

I mean, no one is objecting or telling me I'm applying the wrong case law.

ATTORNEY WATKINS:  Judge, I frankly haven't done the law on it.  As I say, I think aiding and abetting is going to be a nothing to the jury in any case.

THE COURT:  Okay.  So we're ready to go.

ATTORNEY WATKINS:  I'll just note right now the screens are on my computer.

ATTORNEY BRESLOW:  Yeah, if we can switch that?

THE COURT:  Is everyone keeping their own time, or do you want a minute warning or a two-minute warning?

ATTORNEY BRESLOW:  So it's 30 minutes, Your Honor?

THE COURT:  The government has thirty and then you have another ten.

ATTORNEY BRESLOW:  If you can give me a five and

a one?

THE COURT:  A five and a one?

ATTORNEY BRESLOW:  Yes.

THE COURT:  All right.  On the issue, just so we finish this, on the issue of the voluntary intoxication, I don't -- I feel that it's part of the case.  If the defendant chooses to raise it, it's theirs to raise but it's part of the case anyway because it seems to me the evidence supports a finding that the defendant was under the influence with enough regularity that the jury could consider that.

So if they choose to argue it in their closing, that's fine.  If they don't, I think that's fine also. The jury could still hear that in the instructions.

ATTORNEY WATKINS:  That's correct, Your Honor, and the court's comment has just reminded me that I should renew my judgment of acquittal argument at the end of the government's rebuttal case as well.  And I would add on that matter, the government's case was further undermined as to that when it extensively crossed Mr. Rathbun about whether he was out of his mind on drugs.

THE COURT:  Well, your motion is denied, but you're right as far as the issue coming up and the issue being a live issue I think it's there.  So I don't think I need to have a commitment from the defense that they're

going to raise it in the closing to allow that portion to stay in the jury instructions. Okay. Let's go.

THE CLERK: All rise for the jury.

**(The jury entered at 2:27.)**

THE COURT: Everyone can be seated.

Was everyone able to follow my instructions not to talk to each other about the case? Did everyone follow all my other instructions that I routinely give?

Affirmative answers from every member of the jury. They remain fair and impartial.

The government goes first. Now, ladies and gentlemen, the closing is set up under the rules that the government goes first, then the defendant, and then the government, if they want to, can give another small statement to you in closing.

It's set up that way because there is a burden of proof. The defendant is presumed to be innocent; presumed to be innocent throughout this proceeding including right now. That presumption still applies and the government has the burden of proof. All right.

ATTORNEY BRESLOW: Thank you, Your Honor.

**CLOSING ARGUMENT BY ATTORNEY BRESLOW**

ATTORNEY BRESLOW: First thank you, members of the jury, for your hard work over this past week. It's not easy to sit there, sit still, and just listen

especially with these masks.  So on behalf of the government, and I'm sure the defense, all of them, thank you so much.

On the morning of April 2, 2020, the defendant, John Rathbun, lit a firebomb outside a Jewish nursing home. The defendant's firebomb was simple.  It had three parts: A fuel canister, pages from a Christian tract, and highly flammable gasoline.

The defendant's crime was dangerous.  He placed the bomb at the entrance to a nursing home during the pandemic in a state of emergency just a few feet from a busy sidewalk on a main street in Longmeadow, that's Converse Street.  And when he did all that, he lit it on fire.

The defendant's simple, dangerous act was also completely senseless.  The defendant's life was falling apart.  He was abusing drugs, pills, and alcohol often at the same time.  As he testified again and again he was growing more and more agitated and paranoid.  He was spiraling out of control.  That is what this trial proved.

I'm going to talk with you about two main things. The first is evidence, the government's evidence, and in fact all of the evidence that you've heard and that will take up most of my time.  And, secondly, and more quickly, we will talk about the law.  I'm not going to spend as much time on the law because Your Honor will be

instructing the jury at length about the law.

So let's start with the evidence. Here is what the government's evidence proved. On April 2nd at some point between 8:30 -- I'm sorry -- between 4:52 a.m. and 8:30 a.m. this defendant drove to the Jewish nursing home. He stuffed that Christian tract into the fuel container and he lit it on fire.

Now fortunately for everyone that tract sputtered out. Unfortunately for the defendant -- and may we have the -- okay. Can everybody see the monitors? Okay. Great.

Unfortunately for the defendant he left his blood on the canister and not just on the canister, the defendant also left his blood on the tract that he used as a wick. And not just on one page of the tract, the defendant left his blood on multiple pages. Here and there and here and there. (Indicating)

Now, a neighbor spotted the device at approximately 8:30 a.m. and made a 911 call. The police and the firefighters arrived.

Now firefighter Nothe, that experienced firefighter, he told you how he reacted to the device. He saw that the canister appeared to have liquid in it and a charred wick. He said -- do you remember what he said? He said his suspicions increased exponentially and he recommended

calling the bomb squad.

Now the police recovered that device. They photographed it and they sent it to the State Police Crime Lab for analysis and the Crime Lab determined that that blood that you just saw, that was the defendant's blood on both the canister and the tract.

The police called the FBI and Special Agent Ryan McGonigle got to work. Now, I've used the phrase Special Agent McGonigle a lot. I'm not going to do it here. It's kind of wordy and so I'm just going to call him Ryan if that's okay with you.

Based upon the blood match, Ryan obtained search warrants for the defendant's home, his cars, and his person for another DNA sample. And on April 15th, less than two weeks after the defendant placed this device, he executed those search warrants at the defendant's home.

The defendant waived his *Miranda* rights and agreed to speak to Ryan. And before the interview even started, Ryan saw what he fully expected to find, blood on the defendant's hands. The defendant's hands were cracked and cut and importantly his right thumb had a bloody wound on it. And so the FBI took another DNA sample from the defendant and it turned out to be a one in an octillion match. That's a big number. That number is so big that it's billions of times the population of everyone on

earth.

At the house Ryan had some key questions for the defendant. How did your blood get on the canister? Where were you on April 2nd? Are you familiar with that location where the device was placed? And how did your blood get on the tract?

Now, you heard a lot of testimony from the government and in particular about the defendant about the canister, but you heard nothing about the tract. I want to pause for a moment and say as the judge just reminded you the government has the burden of proof. We have that from the moment you walked in and we carry that through your decision.

The defendants have no burden whatsoever. They don't have to put on evidence and certainly the defendant doesn't have to testify, but in this case they did put on witnesses and the defendant did testify.

I want to highlight at this very early part in my summation the defendant gave you an explanation about the canister. What did he say about the tract? What did he say? Nothing. So Ryan wanted to know how was your blood on the canister? How did your blood get there? And how did your blood get on the tract? Let's take these one by one.

Ryan wanted to know how the defendant's blood got on

the canister and so he asked the defendant, have you ever possessed a yellow canister?  And the defendant answered no.  Then Ryan showed the defendant these photographs of the yellow gas canister that was part of the firebomb.

Madam clerk, we don't have the screen here.

Okay.  Great.  Thank you.

So Ryan showed the defendant these two pictures and he said have you ever seen -- not ever possessed -- have you ever seen this canister and the defendant said no.

Finally, Ryan told the defendant your blood was on that canister and he asked the defendant how is it possible that your blood could be on the canister if you never possessed it and you never even saw it?  And the defendant said, it's not possible.  It's just not possible.

So Ryan even offered an innocent explanation for how the defendant got his blood on that canister.  He said, is it possible that you were working at someone else's house and you cut your hand and your blood got on the can?  And do you remember what the defendant said to Ryan?  That was not possible either.  But only 12 days after the interview, the defendant admitted to his mother what he did not tell the agent.  He did possess the can and when the FBI eventually would find out, it would be very big and very bad.

Are we having some technical difficulties?

We are having technical difficulties.  Okay.

You've heard the audio.  I think it was played two or three times for you.

Finally, Ryan told the defendant that his blood was on the canister.  And then he asked the defendant, how is it possible that your blood could be on the canister if you've never even possessed it?  Forgive me, I had said that already.

Are we going to have any audio or video or pictures?

Yes?  Okay.

So Ryan also asked where the defendant was on April 2nd, the date the device was placed, and the defendant said I haven't left my house in two weeks.  The defendant testified that he said about two weeks, but nonetheless April 15th is more than -- April 2nd is 13 days -- 14 days from April 15th.

As the FBI later discovered, that statement that he had not been out of the house in two weeks was flat out false.  The defendant had left his house and in particular he had left his house on the very morning of April 2nd, the very morning the device was placed.  And not only that, he drove his mother's car right past that location; and not only that, his mother's car has religious tracts in the cup holder; and not only that, as the defendant

admitted on recross-examination, he drove in that car with that cup holder right up to Springfield right past the nursing home with either a lighter or a blow torch.

(Audio recording playing.)

ATTORNEY BRESLOW:  That's the defendant's mother worrying that her son is out with her car in the early morning hours of April 2nd.

And not just that, as the defendant later admitted to his mother, he drove his mother's car -- and you'll hear these words -- down Ruth's, down Converse Street, down Ruth's, down Converse Street.  And you will recall that Ruth's House Road, if you drive up it, you go to Ruth's House.  If you drive down it, you get to Converse Street. Let's hear that.

(Audio recording playing.)

ATTORNEY BRESLOW:  That's the defendant again telling his mother what he did not tell Ryan that between 4:30 and 8:30 in the morning he drove down Ruth's, down Converse right past JGS in his mother's car during the time period when the device was placed.

Now Ryan also wanted to know if the defendant was familiar with the location where the device was placed. He asked the defendant, are you familiar with Jewish institutions on Converse Street?  And he specifically asked the defendant if he was familiar with the Jewish

nursing home and he said he was not, even though the Jewish nursing home is right in the middle of Converse Street less than a mile and a half from the defendant's house less than a five-minute drive from the defendant's house.

And you heard Natalie Rathbun's testimony, even she recognized the location and she was so much younger than the defendant when he visited.  He said he wasn't familiar with the Jewish nursing home even though it takes up 20 acers of space on Converse Street and consists of multiple buildings and has multiple signs, even though the campus is plainly obvious to drivers and is even marked on the city's buses as Jewish home.

So Ryan tried again and he said, are you familiar with Ruth's House where the device was actually placed? And the defendant again said, no, I'm not even though the defendant regularly drives past that sign.

Only much later did the FBI discover the truth.  The defendant had two familial connections to this Jewish nursing home campus.  His grandmother lived there and as he testified he visited every year several times a year. And, secondly, that's the building there in the background.  The device was placed just by that tree and the closest building is the building of Genesis House, part of the very complex where his grandmother lived.

Do you remember numerous witnesses testified that you could enter to access Genesis House from this entrance or the other one which was marked Genesis House but the only way out was down this road, down Ruth's. And do you remember the defendant's testimony when I asked him about this? He said I always take a U-turn. It was 14 years ago but he remembered exactly that he always took a U-turn every time he came out of Ruth's House.

So the defendant provided three false answers to the three key questions that Ryan was asking about. He denied possessing or even seeing the container, which was a key part of the device. He said he was at home on April 2nd, the day of the crime; and he denied any familiarity with the crime scene, which is in plain sight. And remember, Ryan had not told the defendant anything yet about the significance of the date, the location, or the device.

Now the judge will instruct you -- what is really common sense -- when someone gives a false statement in order to divert suspicion away from themselves, you may infer that the defendant believed he was guilty. That's called consciousness of guilt.

And finally, when Ryan told him a Christian tract had been stuffed into the canister to make a firebomb at the Jewish nursing home complex, he showed him these pages of the tract and he told him that his blood was on the wick

also. And when the defendant was confronted with this overwhelming evidence, his demeanor changed completely.

Before he had been engaged with the agents wanting to talk to them, wanting to know more. He was joking with Pat Carnahan; he was joking with Pam Chaplin. But after he saw that his blood was not just on the canister but on the tract that was used as a wick, he became very quiet. He sat down on the porch. He put his head in his hands and he said that he felt like he was going to cry, and a short while later he didn't want to answer anymore questions and Ryan stopped the interview.

So the defendant's blood was on both of the two main pieces of this firebomb, on the handle of the canister and on multiple pages of the tract. The only reasonable conclusion is that the defendant assembled this device.

Now when? The trial also proved that there were two windows of time when the defendant could have placed the device. As we talk about these windows, remember the defendant's firebomb is really simple. It's crude. It consisted of a container with gasoline and a tract that he put inside and lit on fire. It doesn't take much time to assemble. It's not a complex thing.

All he had to do was park nearby, go to the device spot, put it down, light the wick, go back to his car, and drive away, and the trial proved that the defendant could

have done this in two distinct windows of time.  The FBI simulated this in their timed drives.

In the first simulation they parked by that evergreen tree just up Ruth's right there.  And in their second simulation they parked farther away at the Genesis House building in one of those parking spots.

The first simulation it took them only a minute and fifteen seconds to exit their car, walk outside, place the device, simulate lighting it and walk, not run, back to the car.  And in the second simulation it took only about two minutes.  So let's look at those two windows of time.

The first window of time was about 4:52 a.m. to 5:02 a.m.  Shortly before 4:52 a.m., Officer Dabrae drove down Ruth's to get on to Converse Street and the device was not visible and so we know it was placed at some point after that.

Now about ten minutes later the defendant placed a telephone call at about 5:02 when he was connected to a cell tower along I-91.

The FBI's timed drive established that the defendant could have placed the device after Officer Dabrae left and have more than enough time to be inside that cell coverage area to make his 5:02 call.

The time between 4:52 and 5:02 is ten minutes, and according to the FBI's timed drive -- and remember they

weren't speeding. They weren't speeding away from a firebomb. They weren't running to their car. They were walking and driving at the speed limit -- it took less than four and a half minutes to drive to the closest point of cell coverage. And to go beyond, beyond the farthest point of cell coverage, it only took a little more than seven minutes. And the second timed window was even larger, nearly 57 minutes from 6:09 to 7:06 a.m.

Now by 6:09 the defendant had already been in Springfield for nearly an hour seeking drugs from Devin Austin, but at 6:09 a strange thing happened. Do you remember what that was at 6:09? The defendant stopped using his cell phone entirely.

Now the defendant's testimony you'll remember was all over the map about this period of time, but he did say these two things. First, he had not gotten drugs from Devin Austin at 6:09; and, second, all he wanted to do that morning, his sole purpose he said, was get drugs, but between 6:09 and 7:06 there was no activity.

Devin, his drug dealer, his supplier, called him three separate times within this time window, 6:52, 6:53, and 6:58 and the defendant never answered. If he was so single-mindedly focused on getting drugs from Devin Austin, why didn't he answer any of these three calls? And until 7:06 he didn't use his cell phone at all. No

calls; no texts; no web searches, and so that's the second window of time, 57 minutes.

The FBI's second timed drive established that it took only 31 minutes to drive from Devin's house to the device location, walk from that parking lot farther away, light the device and drive back to Devin's house.  Fifty-seven minutes minus 31 minutes leaves 26 minutes to spare, more than enough time for the defendant to go from Devin's house back to the nursing home complex and place the device.

Now Judge Mastroianni I said will instruct you about the law and I expect he'll tell this:  To prove Count 1 the government must prove three elements:  One, the defendant transported or received in interstate commerce an explosive with the knowledge and intent that the explosive would be used to harm or intimidate any person, or damage or destroy any property, including real property, like a sidewalk or a lawn.

The interstate commerce element is really not disputed at all.  The canister was made in Oklahoma; the tract was printed in South Carolina, and no gas is made in Massachusetts.

Now to prove Count 2, the government also has to prove three elements.  The first is that the defendant maliciously attempted to use fire or explosives and so I

want to pause there.

The first count only talks about explosives but the second count is broader. It includes the use of fire or explosives to damage or destroy property -- that's similar to the first count -- that was used in interstate commerce.

The interstate commerce for Count 2 is met because the property, the overall property was employed for a commercial purpose, apartment rentals, and I believe Mary Sherry testified that residents used that space right by the Ruth's House entrance.

Now as to the elements for fire and explosion, keep these simple things in mind.

If we can zoom in?

The canister warnings say "Vapors may cause flash fire. Vapors can explode when ignited by a spark or a flame source many feet away." Fire, explosion right there on the warning label of the canister that the defendant admitted finally possessing.

Dan Marshall of Sceptor testified basically the same. His company made this canister and he testified that -- and if we can show the spout --

THE COURT: Five minutes.

ATTORNEY BRESLOW: Thank you.

He testified that when you put gasoline into this

container with an open spout like that near a spark or a flame, two nightmare scenarios could happen. First, the vapors could explode or, second, fire could jet out like a flame thrower.

Lastly, you will note when the judge instructs you on the law on these elements that neither of the counts require motive. That means the government does not have to prove why the defendant did what he did. Just that he did it with the intent to do so with the right intent.

And as to the mental state for both of these crimes, the intent to cause injury to property, to harm or intimidate any person, it's obviously. It's just common sense that when someone lights a firebomb on the property of a nursing home by a sidewalk 50 yards from its nearest building, they are intending to harm or at the very least intimidate people or damage property like the grounds where the residents walk. So you can convict the defendant even if you have no idea why the defendant did what he did. It's simply not required. It's not an element of the statutes.

Here though, the overall trial does provide a little bit of insight into why. The defendant's life was falling apart. He had been fired from his job. He was forced to live with his parents. That alone is really difficult. His daughter had also stopped talking to him, his only

daughter. He had to be moved from his bedroom to another floor of the house. He was screaming and swearing at his mother over stupid things like cigarettes and groceries.

He was growing -- he was abusing drugs, pills, and alcohol often all at the same time. And as he testified again and again during this period of time he was growing more and more agitated. In fact, he was paranoid and spiraling out of control. And remember all of this was taking place in a house that was rooted in evangelical Christianity where the primary purpose is to spread the good news and where the defendant felt like a hypocrite even if he went to church.

And so only the defendant knows exactly why on April 2nd he decided to go to a Jewish nursing home where his grandmother used to live and take a Christian religious tract and put it into a container with gasoline and set it on fire, but this trial provides some clues.

Now I want to talk about the defense case. As I told you, they have absolutely no burden at all, but since they did put on a case it's important to assess the evidence including the defendant as to whether he told the truth.

First, he's already been convicted in federal court for knowingly and intentionally making a false statement to a federal official.

Second, his stories to Special Agent McGonigle were

demonstrably false as he later admitted to his mom.

Third, he's provided false statements to his own mother, his boss at All Energy, his friend and drug dealer Devin, his friend Glenn Miliken.

And finally you heard Horace Williamson testify about the defendant's story that he got that can at his trashout. There was no yellow can at the trashout. There was no tract and the defendant did not cut his hand.

THE COURT: One minute.

ATTORNEY BRESLOW: Thank you, Your Honor.

And as you assess his reliability remember this, the defendant really couldn't remember much about April 2nd. He couldn't even remember what he had testified about 20 minutes ago. And when he insisted on a memory from 14 years ago like driving back doing that U-turn at Genesis House, you can use your common sense and assess whether he really remembered or was tailoring his testimony to a particular defense.

So remember that on the morning of April 2nd -- may I have one minute, Your Honor?

THE COURT: Yes.

ATTORNEY BRESLOW: Thanks. -- the defendant was smoking crack in the early morning of April 2nd from midnight until 4:30. Two to three times every half hour he was using a lighter we submit. His thumbs bleed easily

from his eczema and importantly the defendant had a lighter or his blowtorch in his mother's car as he drove directly past the Jewish nursing home complex, and less than two weeks later the defendant's right thumb still had a bloody scab just where it would be if you were lighting that crack pipe.

These all are not coincidences. This is overwhelming circumstantial evidence of the defendant's guilt. In fact, the only reasonable conclusion that you can make from all of the evidence this: On April 2nd sometime between 8 -- 4:30 in the morning and 8:30 in the morning -- 4:52 and 8:30 in the morning, the defendant drove in his car to the Jewish nursing home campus placed this device at that tree and attempted to light it on fire and that's why you must find him guilty of both counts. Thank you.

THE COURT: Thank you, Attorney Breslow.

Attorney O'Neill-Greenberg, whenever you're ready. You can take your time to set up.

ATTORNEY O'NEILL-GREENBERG: Thank you.

ATTORNEY WATKINS: Can we switch over the screens?

THE COURT: Why don't we just ask, does anyone want to stand and stretch? No? Okay.

**CLOSING ARGUMENT BY ATTORNEY O'NEILL-GREENBERG**

ATTORNEY O'NEILL-GREENBERG:  Does being a drug addict like John make you wake up one morning and then out of the blue do a 180 from everything you ever were in your life and decide, wait, you want to build a firebomb and put it at JGS and that's all because you suddenly have some specific driving intent and purpose to hurt Jewish people or the folks at JGS or their property?  No.

Does getting depressed or arguing with mom about groceries and cigarettes and the car or being a derelict dad or getting fired from a job do any of that?  Of course not.

Does being completely overwhelmed when the FBI storms your house and points an AK-47 at your face and you get thrown up against the side of your house, you're in your underwear, you're interrogated for hours, you're separated from your family, does that make your heart race?  Does it make it hard to think?  Of course it does.

But does having memory problems or being flustered and scared when you are stressed does that mean that you are actually hiding the fact that you are a hateful, violent person with the specific intent with the specific purpose that you want to hurt Jewish Geriatric Services and the folks that live there?  No.

Now, John as we can see is far, far from a perfect

person but that's not what this trial is about.  He's a drug addict, but he is one without a racist or bigoted bone in his body who would never do anything to hurt people because of the religion they practice or the group they belong to.

On April 2nd he was trying to do one thing and one thing only that people in the throws of addiction do.  Get drugs, find drugs, use drugs, get more drugs.  And in the midst of this drug seeking, he could not within these tight windows of time that the government believes one of which he could have shot down and placed this can at JGS that he would have suddenly diverted everything he wanted to do, sneak onto JGS somehow undetected, try to set a firebomb and get away all again with that specific intent of wanting to hurt JGS or the Jewish people or the folks that live there.  John couldn't and wouldn't do these things, these horrible acts and I want to go through the couldn'ts and the woudln'ts to show that he is not guilty.

Now the first big couldn't is the implausibility and impossibility that John could fit into these tight windows of time on April 2nd that the government has identified.

And this first window of time that is when John is leaving his house in the morning and he's going up to East Springfield to his drug dealer at 90 El Paso.  And that morning it's a long this route, going up to 90 El Paso,

that that is when this first window of time happens.

So I want to go through this early morning window of time first, sort of go through with you to see what the calculation is and then I want to talk to you about all the problems with it.

All right.  So to figure out this window of time, we start with Detective Dabrae's dashcam video because she early on that morning was leaving JGS because there had been a death there and there was a hearse there.  If you remember when she's leaving, that hearse is still there. The people that were saying good-bye to the body were still there.  And she's leaving and she is about to turn left on Converse Street and when she does that, when she's right there, we see at 4:51:44 we can see on the right-hand side that that's where the tree is where the can was and there's no can there.

But this time-stamp of 4:51:44 that's not the earliest point that the can could have been put there. Because as Detective Dabrae takes a left on Converse, she then drives an extra 16 seconds down Converse Street and she's about to take a right on Redfern and there is a shot there.  And that shot where she drives the extra 16 seconds, that brings us to 4:52 in the morning.

And we can see when she -- from her dashcam video that as she has driven this additional 16 seconds, that we

can look further down Converse Street in the direction when she's about to take a right onto Redfern, we can look down Converse Street further and in the direction that a car would be coming from John's house there are no headlights and Agent Mastroianni testified to that.  When Attorney Watkins asked him, he said there are no headlights.  You can't see any cars coming.

So that means that at 4:52 there's still no car coming in the direction from John's house.  And this is important because it means at 4:52 if John was driving to the spot where the can was, he wouldn't have been any closer than around the bend where we can't see when we're looking down Converse Street where the dashcam is.

So I just want to be really clear on this bit.  The time it takes to drive that little piece between the left on Converse and then the right on Redfern, see that little green arrow, it's 16 seconds.

So if Detective Dabrae is taking a right on Redfern and it's 4:52, because she had to drive the additional 16 seconds, any car that would be coming from John's direction to where the can is they would have to drive an additional 16 seconds to get to the spot where the can is, and that would be only if let's say that car coming from John's direction was parallel to Detective Dabrae's car so they had to drive that additional 16 seconds to get to the

spot of the can.

So an additional 16 seconds is 4:52:16. This is important because it's the absolute earliest that John would have been able to put the can at the spot or get to the spot, excuse me, closest to where the can was found.

I'm just going to put a pin here because in fact we know that there's no car parallel to Detective Dabrae so they actually had to drive more than 16 seconds, but for now we're just going to say an additional 16 seconds. Okay.

Now, as you recall Agents Mastroianni and McGonigle they made this timed guess how long would it take to get out of the car, which is right next to where the can was found, park it right next to that spot, get out, put the can, light the can on fire, get back? They timed that and they estimated that to be 47 seconds.

So on the government's own evidence here if we add 47 seconds, now were at 4:53:03. So, 4:53:03 in the morning. That's the absolute earliest that someone could be hitting the gas after putting that can, hitting the gas and driving away down Converse Street.

Now I want to talk about the outer limit here, and to do that I'm going to talk about Ryan Burke's cell site information that he gave us.

So we know as -- we actually know on the morning of

April 2nd as John is driving to get up to East Springfield to see his drug dealer, Devin Austin, he is on I-91. That's up in that gray blob, and he's about to get off the exhibit for 291 and he calls Devin Austin and he calls him and we know that it's up at the top of the gray blob and not at the bottom because at 5 o'clock John sends a text to Devin Austin before he calls.

He sends a text "knock, knock, knock." Knock, knock, knock, hey, I'm about to get off the exit for your house. I'm on I-91, and then we can see it's corroborated by the call at 5:01 a.m. from the CSLI, that first ping on I-91 getting off the exhibit to 291.

Now, we have to figure out the question of how long it's going to take to drive from JGS up to that point where the cell phone is pinging. Okay. Agents Mastroianni and McGonigle they actually did an actual timed drive. Like they timed their drive from JGS up to where that cell phone was pinging and that was seven minutes and twelve seconds.

So if we take 4:53:03, which is the time, the earliest time it could be that someone had parked their car right next to where the can was, closest to where the can was found, put the can, done all the stuff to light it on fire, get back and be hitting the gas to drive away that's 4:53:03. We add that seven minutes and twelve

seconds to drive from JGS up to where the cell phone is pinging and we get 5 a.m. and 15 seconds.

So if we take 5 a.m. and 15 seconds and we take 5:01:44 when John is pinging up on that cell phone up on I-91 to get off 291, that gives us a minute and 29 seconds. What that minute and 29 seconds is is the buffer, the margin of error that John would have had to have done all this.

If he had gone one minute and 30 seconds, there is no way he would be able to be pinning off that tower up on I-91. Anything over a minute and 29 seconds it's not possible.

So one minute 29 seconds is plenty of time to get this done? Right? Absolutely not. On its own it would require olympian-level precision and timing and stealth and preplanning at like pit-stop crew speed, but there are more problems than that and here's why.

The first problem is what I talked about previously that whatever car is coming from the direction of East Longmeadow the way John would travel, it's going to take more than 16 seconds, which is what we added on, to get from that point where Dabrae's dashcam was to the point where the can was and that's because we can't see a car. So we know they are around the bend or we know they're further.

So unless the car is literally right around the bend and about to just come into that frame and be right there, if it's going to take another 10, 15, 20, 30 seconds, if it takes more than that, then there's a problem. We are over that minute and 29 seconds.

If John is coming from his house, that's a five-minute drive, that's way too much time. You're outside the buffer zone. It's over. It's not possible. If he's halfway between his house and JGS, that's still minutes. We're outside the buffer zone. He couldn't have done it. It's not possible.

Then there's the question of if he somehow, John, somehow pulled into any of the parking spots, those other parking spots on JGS and he parked and he was hiding his car, so let's say he can see Dabrea's blue lights and the hearse that's still there and he's waiting for those things to leave before he tries to sneak out and put that can there, then we're talking minutes again and we're outside that minute and 29 buffer zone. It's not possible. He can't do it.

And if he had to park his car somewhere else let's say and then walk over or park his car somewhere else and then drive over, again we're talking minutes and we are so far outside that minute and 29 buffer zone. It's not possible. He couldn't do it.

Now I want to talk for a second about the 47 seconds that the agents estimated as the time it would take to get out of the car, put the can, light the can, and get back in the car.  They estimated that at 47 seconds, and the problem with this is that they guessed on every single measure to get to the 47 seconds.

So they guessed on the fact that the can was in the passenger seat and they wouldn't have had to go around to the trunk of the Rav4 to get out the can, close the trunk, and we're talking about an open can with gasoline sloshing around with gas fumes coming out of it.

They guessed that, oh, this was just in the passenger seat and they can just take it and go right out to the tree.

They guessed on the fact that the person placing the can had just walked right up to the tree and didn't have to park somewhere else and walk and then walk back.

They guessed on the time it took to place the can. That whoever did it just didn't get out and pause and look around, think about where they're going to put it.  That they had in their mind the spot, the spot by the tree which, by the way, does that make any sense?

If you have a problem with Jewish Geriatric Services or Genesis House or Ruth's House or whatever the government is alleging, wouldn't you put that by a

building entrance or by a sign?  Why the tree?  But these agents guessed that whoever put that can knew exactly where they were going.  They didn't stop and look around or look for different spots.

They guessed on the amount of time it would take to put the wick pamphlet into the can.  Whether it was already in the can or whether someone would have to crumple it up and put it in the can, they guessed about that.  And they guessed about the amount of time it would take to light it.  That somebody didn't have to stoop down and try to light it a few times or try to block the wind with their body and light it.  They guessed on that too.

What I'm saying is that this 47 seconds is created on pure speculation and it's assuming that the person who did it knew right where they were going to park, the location they wanted to put the can and what they wanted to do.  Because hesitation in the moment, taking time to figure out any of those things that I just went through, that takes additional time that puts us outside that buffer zone John couldn't do it.

I just want to state that the level of pre-planning and forethought that John would have had to have to be this master of stealth and execution to get this done in this tight time frame it's impossible, especially because if he was able to do that, he probably wouldn't have used

things that had his blood all over them.

Now, if any of these things that I just went through took additional time and we know some of them had to have and if some combination of them took time, we are way past the minute and 29 seconds and it's done. John couldn't have done this.

Now there's also the second window of time and I want to talk about that now. So the government itself is pretty dubious about this early window of time I just went through because if they were so confident that John could have placed it in that tight little window of time I've been talking about to light this firebomb and then somehow get away, they're not going to be offering this second possibility of this second window of time from 6:07 in the morning to about 7 a.m. in the morning as some alternate way that maybe John could have done it. And let's go through how this second window of time is also ludicrous.

As Mastroianni told us, on April 2nd 6 a.m. the sun is up. It's a busy commuter morning. It's a Thursday workday morning, and as the Longmeadow police and Agent Mastroianni and Mr. Kosofsky told us it's really busy. It's 6 a.m.; traffic is really picking up and people are driving around, and then by 7 a.m. traffic is very heavy. There's walkers, there's joggers, bicyclists, people exercising, dog walkers all out on Converse Street as Mr.

Kosofsky told us because he can see that across the street.

So there's no way that John in the middle of his drug seeking and his goal of getting high up there in East Springfield on 90 El Paso is going to say, oh, hang on, wait.  I'm just going to press pause here on my attempts to get high and get drugs.  I'm going to drive all the way back down to JGS and then I'm going to somehow drive into JGS when commuters are driving back and forth, people are going to work, and park somewhere, somehow not be seen, and then somehow stealthily sneak back to this tree, place the can there, light the can, sneak back to the car, drive away, and then make it back to 90 El Paso to ping off that tower at 7:06 because we know he's back up in that same spot at 7:06 at 90 El Paso pinging on that tower.

Setting aside the absurdity and the lack of evidence as to why he would ever have the desire do this, he again would have to be some master of stealth and execution to pull that off with no one seeing him on such a busy commuter morning.  It could not have happened and think about this.

He's driving around all morning with this open gas can filled with gas sloshing around in this RAV4, and remember we heard that Detective Chaplin had to hold it when they took it from the scene.  She had to hold it

because otherwise it was going to slosh all over the place, and so John is driving around with this open sloshing gas of gasoline stinking up the car with fumes?

Not only does that make no sense we know that Sheila, John's mom, was in her RAV4 later that day on April 2nd and she didn't smell any gasoline. There were no stains of liquid or gasoline. There was no blood either. There was nothing to indicate that gasoline had been sloshing all over the place. It couldn't have happened and that's all a not guilty.

Now what is he doing between 6:07 and 7:06? The CSLI, the cell phone information data from Ryan Burke, it gives us the answer. Both those times when he's pinging off towers at 6:07 and 7:06 up at 90 El Paso, those are both calls to his drug dealer Devin Austin by the way. He hits the exact same tower. Why? Because his phone and he are in the exact same spot up there at 90 El Paso. They never left.

Now the second piece of evidence that shows us that John could not have planted this can, it's the DNA and the fingerprint evidence from the can and the pamphlet.

Now, I'm just going to say as to Mr. Williamson's testimony about him not recalling that this can came from that clean out, he's talking about something that happened a year and three months ago.

When he first talked to the FBI about this, it was January 2021. He didn't remember the color of the van. He got that wrong. He said a white painter's van. We remember that John's van, his work van, is blue. He can't say with any certainty that what was out there in that trash that had been sitting in boxes was trash from his boss's house that had been out there months. And memories are fallible and that's okay. We don't expect everyone to remember everything, especially mundane things that you wouldn't pay attention to or huge piles of trash that you don't even own that you've just taken out of your car -- or taken out of your basement.

But John's memory is that he got it at this Chicopee clean out. It, meaning the yellow gas can. That the yellow gas can was part of that trash he cleaned out and he threw it in his van. That trash sat in his van for about a week and his mom told us she remembers and she told us that it sat in the van for about a week and then it was gone. We know that it was gone because John took it and he dumped it in the dumpster on Converse Street.

And what do we know about his hands? He bleeds. He's got plaque psoriasis. He has cuts and at that Chicopee clean out he remembers cutting his thumb, and then he's told us he was also handling that stuff without his gloves on and that's obvious because we can see that

it's a bloody thumbprint or a fingerprint that's on the can and bloody prints on the pamphlet.  So obviously he's touching that stuff.  He's bare handed.

And what do we learn from Alana Darby?  She was the DNA expert from the lab.  That blood's DNA, like the dried blood of John's that was on the pamphlet and the can, that can stay on a surface for days, weeks, months, a year, and there's no way to infer from when the blood DNA was deposited how long it's been there.  There's no way to know that.

But we know John's dried, bloody prints are on the pamphlet so, yes, he touched it.  They're on the can.  He touched it and frankly he at some point had them both because he touched it.  Really who cares where they came from?  He had them.  Did he get it from the clean out?  Did he get it somewhere else?  He had them.  He touched them.  He told you that; we told you that right at the beginning of this case.  But he was touching it and he was holding it when his hands were bare because that's how his bloody fingerprints got on it.

We also know that this pamphlet and the can were dusted for fingerprints and no fingerprints were found.  That's the stipulation that both parties agreed to that's in evidence.  And so even though John is touching this stuff with his bare hands, there's no fingerprints on it.

His fingerprints aren't on it.  So what does what mean?

It means that the last person to touch the handle -- touch the can and touch the pamphlet, whoever touched it last, they were being very careful and very precise because they wiped it down for prints leaving no trace of their own and obviously wiping away John's too because we know he was touching all that with his bare hands but where are his prints?

Of course, whoever is wiping it down would leave dried blood smudges that they know aren't theirs.  They don't care about that.  They're just wiping off things that would -- their own prints and, of course, that wipes off John's as well.

So what this means, that's evidence that John was not the last person to handle or touch these things and it couldn't have been him who left that can and pamphlet at JGS on April 2nd.

Now, beyond these couldn'ts, that the reasons John couldn't have committed this offense, there are many wouldn'ts as well.  John wouldn't have done this because he is simply not that guy.

Not only did we hear from John's family, his mom, his daughter, himself, about who he is, good and bad, we have a direct window into his psyche and that direct window is called his internet searches, his texts, his messages,

everything on his phone.

Whether we like it or not, our phones, our internet searches they reveal what we're thinking, what we're planning, what we want to do, and what we've done.  And what did we learn from all of the searches and online life and internet uses that John has in his Facebook?  In his messaging?

There is not even a shred of suggestion that he was searching for how to make explosives, how to build bombs; Googling for images of JGS, or that he had an interest in bomb making or making explosions.

There is nothing in this whole online life to suggest he has racist or bigoted or antireligious problems and leanings, or that he had any interest in harming any person because of their religious beliefs or because of the group they belong to.

And from the witnesses in this case we learned, yeah, he has a serious drug addiction.  But this drug addiction, which he has suffered from since he was a teen, never once in the decades of his life throughout the ups and the downs has he ever been interested in bombs and explosives or hateful or intolerant thoughts or behaviors against Jews or other groups of people.  That is simply not him.

And as his mother and his daughter told you, his depression, his agitation, unfortunately it's nothing new.

It's a low place but he's been there many times before. But if we want evidence, if we need evidence of what happens to John when he's using drugs, when he's getting really paranoid and agitated, when he's at a low of low, we don't have to look any further than the government's own evidence about that Chicopee event, that event in March about a month earlier than when the can was found at JGS on April 2nd.

The government called Dana Graham. She was the woman in the Chicopee hotel who was with John doing the drug binge with John in March of 2020, a serious drug binge. They're both doing all the drugs all the time for hours and they were drinking. John had told her he had just been fired from his job at All Energy Solar. Things were probably as bad as they could get and he was using all the drugs and probably was as high as he could get.

And what did John do? He started to see people in his car that he thought were breaking into his car and stealing things. He was paranoid. He was agitated. He was seeing things that weren't there, and in this moment how does he act? He calls the police and asks for help.

He thinks people are trying to get things from him, steal things from him. He is agitated and paranoid. He does the legal thing; he calls the police asking them to come over. They come over. He talks to them and then he

goes upstairs and he goes to sleep.  That is evidence of how John gets when he is deep in a drug binge and he's agitated and paranoid.  That's what he does.

Now, another reason we know John wouldn't do this, he has no festering hatred of JGS or some deep underlying vendetta against them.  He has no deep meaningful family connections underlying all of this.  The guy had no reason to care about JGS or have any familiarity with it, and no one on April 2nd seemed to have any actual knowledge or real familiarity with the buildings that were closest to where this can was found.

Everybody was confused about the location.  The Longmeadow police were calling it Ruth's House and the Jewish nursing home.  That's not the name of the building that was closest to where the can was found.  That building is called Genesis House.  We know Ruth's House is way in the back.  The Jewish nursing home is a complex in a building with a different entrance and exit to the left if I'm looking at where the can was found.  It's that first entrance in the building.

The Longmeadow police, Agent McGonigle, they're calling it the Jewish nursing home.  They're calling it Ruth's House.  They're confused.  They worked there; the drive up and down Converse Street; they're there investigating this crime and they're getting it wrong.

For weeks afterward we know Agent Ryan McGonigle was putting these incorrect addresses into the affidavits that he was submitting to the court. Not because he's lying or trying to do something wrong but because he's mistaken. He didn't even know what these places were called.

And as Susan Goldsmith told us when she was testifying and I asked her what the buildings at Genesis House were labeled, she couldn't remember them. We don't remember all of the signs -- she had been on the board there at JGS and had been volunteering there for 25 years. So if someone knows the JGS campus intimately, I think it's probably Susan Goldsmith and she can't remember, and that's because we don't pay attention to every sign that we drive past all the time no matter how much time we spend there.

And if you have any question about it, pull up Dabrae's dashcam video or watch that drive test with Ryan McGonigle and Mastroianni. They're both taken at night but the streets are really well lit. Watch the entire drive. There's not once a sign that jumps out at you that says anything glaring or in bright lights or with a Star of David that says Ruth's House or that says Jewish nursing home. There's nothing.

And John's familial connections that that should have somehow clued him in on April 2nd, what were those? That

his mom, Sheila Rathbun, was the accountant for that property management company, Carr Properties, that manages 19 properties and she's the accountant for them. She doesn't work anywhere near JGS, and one of those properties was Genesis House. She doesn't talk about her work at home. She doesn't work onsite there.

That over a decade ago John's grandmother, who he rarely visited when he was in his 20s, she lived at Genesis House for about five years. Why would anyone remember that specifically especially when his family referred to it as going to Grandma's house.

You heard that Natalie also called it Genesis House. No one called it Ruth's House. No one called it the Jewish nursing home. Those were the names that Ryan McGonigle was asking John to remember on April 2nd. No one said those names. His family didn't call Genesis House that.

And if you remember Mary Sherry testified, she said that the Genesis signs they don't say -- they say Genesis House. They don't say Ruth's House because it's not. They don't say Jewish nursing home because it's not.

Another way we know that John would not have committed this crime is he doesn't have some deep set anger issues at the world or problems with religion.

His mother and his dad go to church. They're

religious. That's where it stops. You heard that Natalie had stopped going to church about five years ago. No big deal there. That John had stopped going to church some time ago, and what did his mother say about that? I respect that decision. He's an adult. He can do that.

And as the online searches and internet history of John have revealed, he has no problem, no anger, no desire to hurt people who practice different religions or people who have no religion at all. He has no animosity towards different religious groups. He's not online searching for anti-semitic things. It's a complete nonstarter.

This alleged connection between John's family, his mom, and the pamphlet that red *Steps to Peace With God* pamphlet that was found in the container, what did we learn about that red *Steps to Peace* pamphlet?

The Billy Graham witnesses who came at the beginning of the week they told us that red *Steps to Peace With God* pamphlet had been given out in preparation for that Big E event which was almost a year before April 2nd, so in May of 2019. It had not -- this pamphlet, the red pamphlet, it had not been given out at the Big E event, which is the only event that Sheila and her husband went to as attendees.

The only time that that *Steps to Peace With God* pamphlet had been given out was at a preparation event for

volunteers and counselors who were instructed not to bring the pamphlet to the Big E event, not to use it. Attendees at the Big E event were not given the red *Steps to Peace With God*, and I would think it was Bob Hill who told us explicitly Sheila and Jeff Rathbun were not counselors or volunteers there. They would not have received the red *Steps to Peace With God* pamphlet. They would not have been given it in the mailing.

Then there's the fact that everyone in John Rathbun's family no one has ever seen this pamphlet. It was not found in anyone's car. It wasn't in their house.

What we know is that in prep for that Big E event in May 2019 there are hundreds and hundreds of these pamphlets floating around the West Springfield area. And after May 2019 through the present churches could still order them from the bookstore. People can still order them from the bookstore.

We heard that a church in Agawam, Bethany Assembly of God, which has nothing to do with John's family, was still ordering of them after the event.

ATTORNEY WATKINS: Just a couple minutes.

THE COURT: Yeah, you got about four minutes.

ATTORNEY O'NEILL-GREENBERG: Thank you.

So this pamphlet -- my point is this pamphlet could have come from anywhere. Whether it came from the

Chicopee event in some trash in a box, whether it came other trash that then got into John's van and he touched, it doesn't matter, but there's no sort of nefarious connection between John's family and this pamphlet.

Now when John told Agent McGonigle that he hadn't left his house in about two weeks, he was trying the best he could. He remembered he had gone on a dump run. He remembered that, oh, wait, he had gone to get his Methadone, and as he was trying to remember this, he wasn't allowed to check his phone or his calendar to remember where he was specifically on that date two weeks ago. He didn't have any intent to deceive.

And another reason we know John wouldn't have committed this heinous crime is how he acted with the agents on April 15th. If he knew in his head when Ryan McGonigle was talking to him I'm guilty of putting this can, then why on earth would he voluntarily let them take pictures of his hands? To have asked the agents on his own if he could take a lie detector test? He told the agents, yes, I will voluntarily speak to you.

Why would he voluntarily speak to them for hours? Why would he tell him he wanted to figure it out? Why would he tell them he drives down Converse Street every day or identified the Jewish school that he knew on the street?

When Agent McGonigle offered him that innocent explanation, hey, maybe you touched the can when you were working, if John really was guilty and knew that he was just trying to hide that, why wouldn't he have taken that out right there and said, oh, yes, yes, that's exactly what I was doing?  It does not serve John at all to have not been able to remember that in the moment and told Agent McGonigle, no, there's no way.  That's someone innocent who just has no memory.

That's not someone who is lying and trying to hide and looking for an out and then, of course, John testified.  He didn't have to do that.  He took the stand and he was honest.  Did he get flustered?  Did he have memory problems?  Yes, he did but he told you who he was, good, bad, and ugly.  An addict?  Yes.  But a bigoted bomb builder trying to hurt others is something that he could not and would not do, and each could not and would not that's a reasonable doubt.  That's a not guilty for John.  Any one of them you can stop right there.

THE COURT:  About a minute.

ATTORNEY O'NEILL-GREENBERG:  John is somebody who lived his life out in the open, his online life.  He is not hiding his illegal behavior from anyone.  Look at all of his texts and messages.  He's texting and calling about buying illegal drugs, about using illegal drugs,

about dumpster diving, about internet searches for porn. He is not careful. He's not trying sanitize his life or his behavior when he's planning on doing something. When he wants to do something, we see it from the illegal to the benign. Texting Devin Austin for drugs to searching the Bank of America website on April 2nd to look for when the bank is opened so he can cash his check.

The suggestion that he somehow just for this event with the can concocted this plan to build and plant this firebomb and hurt Jewish Geriatric Services, executed it but then never breathed a word of it to anyone? Never did any internet searches? No messages. He went completely dark and has kept it completely secret? That's absurd when you look at the careless and open way he functions in his online and text life and his real life.

This is the guy who when high calls the police when he has a hotel room full of drugs and asks them to come over. Dumb and naive? Maybe. But calculating, evasive, and cautious? Absolutely not.

THE COURT:  You'll have to wrap up.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

THE COURT:  A few more seconds.  Go ahead.

ATTORNEY O'NEILL-GREENBERG:  In order to find John guilty, you would have to first close your eyes to every reason why John could not have committed this

offense.  The implausibility and impossibility that he fit into one of those windows; the blood DNA, the lack of fingerprints, and you would have to turn your back to all the reasons John would not have committed this offense.

That in 38 years of life up until the minutes before and after that can was found there is no evidence that John ever harbored any religious or racial animus or any violent or desire to hurt Jews or JGS or people who practice religion or identify with certain groups.  He's not Googling information about that.

He's not angry at JGS or the world or religion.  That's just not him, and you would have to just be fine with the fact that there is no why.  There is no evidence of his specific intent to want to put that can at JGS with the specific purpose and desire in his mind to harm JGS, to harm Jewish people, and to harm the folks that live there.  And there is no why and you can't get to specific intent here without the why.

Why -- where is the evidence that John would ever want to hurt or harm property of people who live at JGS or Jewish people or the folks that live there?  It's simply not there because that's not him.  He could not and would not do this.  He did not do this.  He's not guilty.  Thank you.

THE COURT:  All right.  Thank you, Attorney

O'Neill-Greenberg.

Do you need a minute to set up?

ATTORNEY DESROCHES:  No.  I think I'm good.  May I start?

THE COURT:  Yes.

**REBUTTAL CLOSING ARGUMENT BY ATTORNEY DESROCHES**

ATTORNEY DESROCHES:  So when Attorney O'Neill-Greenberg opened up her remarks, she asked a question that I will answer.  She asked does being a drug addict make you do something that's 180 degrees different from what's in your personality?  The answer is no.

This case has never been about John's drug addiction and the problem for the defense is that this was not something that was 180 degrees different from what the defendant had become in April of 2020.

You heard testimony from all different sources about what was going on for the defendant at that time in his life.  His own words were that he was more agitated than he's ever been during that period.

This was simply a progression of the anger that was festering inside of him, an anger that was fueled by his fight with his daughter that led to her not talking to him; an anger that was fueled by his mother's pleading with him to return to the church that made him feel like a hypocrite; an anger that was fueled by losing his job

living at home; an anger that was leading him to scream and swear at his mother because she didn't get him cigarettes.  This was not 180 degrees.  This was the next step for the defendant.

Now Attorney O'Neill-Greenberg also talked about a series of things that were implausible, if not impossible, and so I'd like to pick up that theme.

As you heard several times, the defendant does not have to testify.  He has the absolute right to remain silent but he did testify and as jurors it is your job to assess his credibility, and there are a number of very alarming red flags in the defendant's testimony.

So let's quickly review his version of things.  That he did a trashout in Chicopee.  He cut his hand during this trashout.  He recovered a yellow fuel canister during this trashout; that he then threw it in a dumpster a week later on Converse Street.

So let's draw this then to its logical conclusions. That means somebody else found the blood canister with the defendant's blood on it; found a pamphlet with the defendant's blood on it; made a bomb out of the pamphlet with the defendant's blood on it and the canister with the defendant's blood on it; dropped that bomb at the residence of defendant's grandmother where she used to live which was five minutes from the defendant's home at a

time when the defendant just happened to be out in the very early morning hours driving a car with a tract which very likely had a wick or a pamphlet just like he used as a wick and had a lighter.

That's not improbable?  That's not implausible?  No, that is overwhelming circumstantial evidence that this defendant created that bomb with his bloody hands and placed it at the entrance of JGS and he lit it on fire.

Is it probable or possible that this other third party also wiped the can down for prints, the same person who went dumpster diving apparently to get the can that the defendant threw out and then wiped it down for prints leaving the blood in that spot because this was the criminal mastermind?

The whole point, this was not the act of a criminal mastermind.  Look at the pictures of the scene.  This is not the Italian job, something that was scoped out and planned for months.  This was not the result of research.  This is the lashing out of someone who is more agitated than ever.

This also ignores what I would suggest to you is credible evidence that we heard.  The defendant's story about how he came across this can in the first place was flatly contradicted by Horace Williamson.

Attorney O'Neill-Greenberg characterized that

testimony as Mr. Williamson not recalling whether there was a can there. No. Your memory controls, but Mr. Williamson, as I remember it, testified there was not a can there. That is different.

Mr. Williamson who cleaned up every piece of trash from that house made the pile that the defendant cleaned out said there was no can there. He also said there was no wick there. There no paper pamphlets. He looked right at the *Steps to Peace With God* pamphlet and said not at my house.

Why does this matter? I know Attorney O'Neill-Greenberg wants you to gloss over that. I think she said something like it didn't matter pretty much where it came from. It does matter because it's the defendant's story.

So if he's not right about where he got it, he's not right about where he got rid of it. The story of throwing it in a dumpster I would suggest to you is not credible. Instead he got rid of it by placing it on Converse Street with a wick in it and lighting that wick on fire.

The defendant said nothing about this wick. Why? Let me offer some answers. The gas can is an impersonal item. Just like most other dieseal cans, maybe it's the first time you've come across a dieseal can, but it's not a personal thing.

The defendant openly said, yep, I got this gas can, not a problem. The wick though is different. The wick is very personal especially to the defendant. This religious pamphlet, just like the one his mother had or uses, she passes out, published by people who the defendant's mother and father were supporting and trying to help organize their events and advocating a position that his mother spreads throughout to strangers.

Not only did he say nothing about it today or on Friday, when Agent McGonigle asked about the wick that's when his demeanor changed. That's when he went from joking to crying. That tells you something.

Although Attorney O'Neill-Greenberg said there were hundreds of wicks in the area at the time, only one had his blood on his on it. Only one was stuffed in a can that had his blood on it. Look at the stains. You will have them back there. You have photographs.

I would suggest to you that the defendant's blood got on that piece of paper when he was used his bloody thumb to stuff it into the nozzle of that can and that's why it matters. It does matter.

Now, Attorney O'Neill-Greenberg also talked a little bit about the windows of time in which the defendant could have left it there. So let's be clear about this.

The 4:52 a.m. when Detective Dabrae left JGS is

captured in a still shot. You will also have the video. Watch the video yourself when you're back there. You'll see lights and trees and you can determine for yourself whether or not you can see what may be head lights on Converse Street off on the left-hand side of this video.

I would suggest to you it's just not clear whether there is or isn't, but you make that call. It really doesn't matter though because the defendant in describing the first window of opportunity is trying to get you to look through a straw at this.

They really want you to only focus on the 7 minutes and 12 seconds and completely ignored, just like they ignored the wick, the fact that this area of coverage is much bigger than that seven/twelve.

Remember Agent Mastroianni told you it took just four minutes and 20 seconds, 25 seconds to get to the earliest part of that coverage zone.

So add three more minutes to whatever Attorney O'Neill-Greenberg told you about because she completely ignored that fact. That is important. As jurors, you should consider all the facts. Challenge the government's evidence surely, but look at it all. Don't just accept this representation because it is not supported by the evidence we heard.

THE COURT: About a minute.

ATTORNEY DESROCHES:  Thank you.

The same is true of the second window of opportunity. The defendant had plenty of time to return to JGS and go back to get his drugs.  His story about what he did during that time would suggest to you is a illogical lapsed detail and is not credible.

His cell phone went completely radio silent during that time after it had been blowing up all morning.  The only other period that it wasn't like that was when he was driving from his home to Springfield.

Now, ladies and gentlemen, I will wrap up right here. The defendant gave false statements to his mom, his friend the drug dealer Devin, his friend Glenn, Horace Williamson, Alfie Alschuler, and Special Agent McGonigle.

Now he wants you to believe that during that time in Springfield he did not place this firebomb.  I would suggest to you, you can use your common sense to see through his story, rely on the evidence, and find the defendant guilty.  Thank you.

THE COURT:  Thank you, Attorney Desroches.

All right.  Ladies and gentlemen, the next section is me instructing you, and I as said these instructions are 45 minutes, plus or minus.  I think they're under an hour but it's not short, and this is not an endurance test.  I don't want it to feel like it's an endurance test.  So I

can instruct you this afternoon or I can instruct you in the morning.

I need a break right now and so I'm presuming everyone needs a few minutes. By a show of hands, who would like to have their instructions this -- to stay here, which is no problem, do the instructions this afternoon or to start off in the morning with the instructions?

The first question: Who would rather start off in the morning with the instructions? Raise your hand.

We'll do that. As I said, it's been a long day and this is not meant to be an endurance test in any way. Okay.

So we will -- do the attorneys want to make a record about anything on WispherTech?

ATTORNEY WATKINS: Were you going to charge the jury in the morning?

THE COURT: I'll charge the jury in the morning, yes.

ATTORNEY WATKINS: No, then there's nothing.

THE COURT: The defense is fine with that.

ATTORNEY BRESLOW: No. I think the jury has been heard and it makes sense.

THE COURT: Yes. Okay. Very good.

All right. The same instructions apply. Do not talk

to anyone about this; do not talk to each other about this; do not research this case, investigate, post on social media.  All the instructions apply.

As always, be here at nine o'clock.  We will be in here around 9:10 and do the instructions and the case will be yours.  All right.

**(The jury left the courtroom at 3:56.)**

THE COURT:  Look, this has been a long day.  I mean I was watching the jurors.  The reason I said that I was watching the jurors, there were some jurors who were really trying.  You can just tell they were trying really hard to pay attention, but it's late in the day and so that's why I suggested the alternative.

I want to make a record.  Does the government object?

ATTORNEY BRESLOW:  Honestly jury instructions from my perspective are about the hardest thing for a jury.  It's really hard and so I agree.

THE COURT:  All right.

ATTORNEY WATKINS:  I have no objection.

THE COURT:  Very good.  All right.  See you in the morning.

**(Court concluded at 3:58.)**

----------------

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     )


         I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.


(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)


/s/ Alice Moran                        May 30, 2022
Alice Moran, RMR, RPR
Federal Official Court Reporter