UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America  )
                          )          20cr30018-MGM
      vs                  )
                          )          February 15, 2022
John Michael Rathbun      )
_____)


SENTENCING HEARING HELD BEFORE THE

HONORABLE JUDGE MARK G. MASTROIANNI.


APPEARANCES:

On behalf of the government:  Steven H. Breslow, Assistant United States Attorney, 300 State Street, Suite 230, Springfield, MA 01105-2926.

On behalf of the defendant: Timothy G. Watkins, Esq., 51 Sleeper Street, 5th Floor, Boston, MA 02210.

Forest J. O'Neill-Greenberg, 51 Sleeper Street, 5th Floor, Boston, MA 02210.


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

**(Hearing commenced at 11:05.)**

**(The defendant is present.)**

CLERK RIVERA:  Your Honor, the matter before the court is criminal case 20-30018, the United States of America versus John Michael Rathbun.

Counsel, can you please identify yourself for the record starting with the government?

ATTORNEY BRESLOW:  Steven Breslow for the United States.  Good morning, Your Honor, and with me at counsel table is Megan McKenna.

THE COURT:  All right.

ATTORNEY O'NEILL-GREENBERG:  Good morning, Your Honor.  Forest O'Neill-Greenberg for Mr. Rathbun.

THE DEFENDANT:  Good morning.

ATTORNEY O'NEILL-GREENBERG:  With me is Attorney Watkins also for Mr. Rathbun.

THE COURT:  Very good.

CLERK RIVERA:  We have our court reporter appearing remotely, judge.

THE COURT:  All right.  Mr. Rathbun, I need to ask you and your attorneys, have you reviewed the presentence report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Have your attorneys explained it to you and answered all the questions you might have

had about it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it or are you confused about it in any way, including the guideline calculation or the historical information about your life or the explanation and description of the charges?

THE DEFENDANT:  No, I understand, sir.

THE COURT:  Now there are objections, correct? Defense filed objections, Attorney Watkins, of the presentence report?

ATTORNEY O'NEILL-GREENBERG:  We did.

THE COURT:  Who's going to argue them?

ATTORNEY O'NEILL-GREENBERG:  I am, Your Honor.

THE COURT:  All right.

The government filed no objections?

ATTORNEY BRESLOW:  Correct.  There was an addendum, but no objections.  That's at page 45.

THE COURT:  All right.  So we will talk about the objections in a minute.  I've reviewed the presentence report.  Of course, I have a very good memory of the trial and the proceedings, and I also reviewed the docket history.

As I said, I've reviewed the presentence report, the guideline calculations, the historical information.  I

reviewed the paperwork submitted for objections and the addendum from the government.

I reviewed the government's sentencing memorandum. I reviewed the defendant's sentencing memorandum as well as the attachments by way of letters. I'm just looking to make sure I have all the letters attached here. They are all family letters other than the one from Deborah Goldfarb.

ATTORNEY O'NEILL-GREENBERG: And also from the substance use counselor at Opportunity House.

THE COURT: That is Ms. Potee was her name?

ATTORNEY O'NEILL-GREENBERG: Desiree Pelletier.

THE COURT: Pelletier.

ATTORNEY O'NEILL-GREENBERG: Exhibit C.

ATTORNEY BRESLOW: And I believe a friend.

THE COURT: Excuse me?

ATTORNEY BRESLOW: And I believe a friend.

THE COURT: All right. I have Jeff Rathbun which I've reviewed. Oh, yes, Desiree Pelletier. I did review Ms. Pelletier, Ms. Goldfarb, the social worker; Daniel Fagan, Curtis Rowe, Sheila Rathbun. All right. Why don't we start with the objection.

ATTORNEY O'NEILL-GREENBERG: The PSR references that he was convicted of a second statement. We object to that and that's in paragraphs 13, 21 and 22, and 32

referencing the statement that he's unfamiliar with the location on Converse Street where the fuel can was located, as he was only convicted of statement two, that he had not left his house in the past two weeks because of the pandemic.

THE COURT:  All right.  So this reference in the presentence report doesn't affect the guideline calculation?

ATTORNEY O'NEILL-GREENBERG:  No, it does not.

THE COURT:  It's just a factual correction that you'd like to be clear about?

ATTORNEY O'NEILL-GREENBERG:  That's right.

THE COURT:  All right.  So as a technical matter, I'm going to overrule it as an objection because it's not changing the guideline calculations, but it does serve the purpose of notifying the court of your issue with the facts and getting the facts accurate and clear for the court's purpose of sentencing.

All right.  Objection No. 2?

ATTORNEY O'NEILL-GREENBERG:  Objection No. 2 is our objection that does affect the guideline calculation.

THE COURT:  Right.

ATTORNEY O'NEILL-GREENBERG:  And that's whether to do the base offense level of 2K1.4(a)(1) or Subsection A or Subsection B which gives a base offense level of 24.

Our objection is that he more appropriately is in 2K1.4(a)(1)B.  Because, to begin, Subsection A requires actual knowledge of serious bodily injury or death, and the actual knowledge is defined as being practically a defendant's objective state of mind.  That he or she is practically -- that the results are practically certain to result from the conduct.

In Mr. Rathbun's case the facts simply don't support that finding, that his subjective state of mind at the moment the risk was created was such that he would have been aware that it was practically certain for death or serious bodily injury to occur.

In all the cases that find an enhancement is appropriate under the subsection, they involve three -- I'll categorize them as three markers, factual markers that indicate that there's no other way that someone would be able to not be aware that this was going to be result in a massive disaster of serious bodily injury or death; and that is very large amounts of gasoline or explosive; explosive or gasoline that is placed inside a building or inside -- or inside a building that is adjacent to residences where people are living and sleeping; or that there's some other exacerbating circumstances happening, such as someone has specific knowledge that their conduct would create this practical certainty of risk.

In the example I'm talking about here is when there's a firefighter who sets two fires or forest fires, that's *U.S. v. Sprouse*, and not only do they have the unique knowledge being a firefighter but they set it in these exacerbating conditions that heighten the risk of fire which was that there was a serious draught conditions happening.

So there are no external physical conditions that would exacerbate the risk. Mr. Rathbun doesn't have any specialized knowledge of fire or explosives. He has no education or training in fire or explosives or gasoline or their flammability. He never had a job working in that field.

This can was placed in the early morning hours during the pandemic next to the wooded curtilage outside in a well ventilated area, a small amount of fuel. Not in any residence or in any sort of -- any building that was next to a residence. So it doesn't have any of these exacerbating factors that the courts have found fit it appropriately into Subsection A.

And then for Subsection B, again there's no evidence here that there was -- he had the intent to destroy a place of public use.

THE COURT: So in that case the presentence report was talking about the placement on a sidewalk.

ATTORNEY O'NEILL-GREENBERG:  That's correct, and in the PSR it states that the can was placed on the sidewalk which is factually incorrect.  It wasn't placed on the sidewalk.  It was placed on the wooded curtilage.

The placement of the can suggests the intent -- to the extent we can infer an intent to destroy anything from where it was placed, it wasn't placed on the sidewalk; it wasn't placed in any place of public use.  It was again in the woods or on the curtilage of the woods.  The commentary to the guidelines don't define what destruction is but just using the common --

THE COURT:  It was near the sidewalk, but you're correct in how you're characterizing where he placed it. I don't think -- I'm not giving much consideration to that second argument.

ATTORNEY O'NEILL-GREENBERG:  Okay.  If he had had intent to destroy the sidewalk, he would have put it on the sidewalk.

THE COURT:  I don't think that argument carries it.  So let's talk about the first prong that perhaps I think requires more discussion.

So you're saying in order to satisfy this enhancement, number one, you needed more gas, not just the amount that was in a container that you can just carry. You say the case law says you need more?

ATTORNEY O'NEILL-GREENBERG:  That's correct.  In all the cases I cite in our sentencing memorandum they include or they involve large, very large amounts of either gasoline or some sort of explosive.  Large, very large amounts, gallons.

THE COURT:  And your second argument is closer to the building, because we can argue about placement but it wasn't outside the front door there.

ATTORNEY O'NEILL-GREENBERG:  No.  Again, in all the case I reviewed and cited, they're either in a building, such as a bank that is sharing a structural wall with a residence or condos, or they're in the basement of place where people are living, or they're in a vehicle that is right next to the place where people are living.

In contrast to that, there's a case where there was a fire set in a church in the early morning hours when the church was closed and no one was there, and the court found that there was no subjective awareness that was practically certain that death or serious bodily injury would occur because this was placed not near -- not in a building where people were living or adjacent to a place where people were living or involving such a massive amount of explosive that it could somehow affect where people were residing.

THE COURT:  About what time -- we have early

morning hour placement, right?

ATTORNEY O'NEILL-GREENBERG:  That's right.  In the case of the church, it was early in the morning when people were not at services.

THE COURT:  Well, in this case I'm remembering the facts.  It seemed to be an early morning time where there was not a lot of -- I mean, that's an area where there was a lot people.  It's a neighborhood.  Not only are there these buildings associated with the facility that was at issue here, but it's a neighborhood and it's a public sidewalk and a lot of people I think use that area to walk, but it didn't seem like the timing of the placement was at a time when it was getting much use from the public.

ATTORNEY O'NEILL-GREENBERG:  In our case, Your Honor or?

THE COURT:  Your case.

ATTORNEY O'NEILL-GREENBERG:  Yes.  I believe and my memory of the testimony was that around seven or eight that's when traffic was picking up.  People were coming into work, and we know that this was placed much earlier in the morning.

In the video we were watching where we sort of narrowed down the very narrow time period it could be placed, it's dark out.  There's no one there.  And to the

extent it also happening in that unique period of time, when it's the pandemic, when the town had issued a stay at home order for people I think that reduces the risk.  To the extent there was a risk at all, it reduces the risk even more.

But I think, most importantly also, for Mr. Rathbun -- for this subsection to apply, Mr. Rathbun would have to have the -- he himself would have to have the actual awareness in that moment the subjective intent, the awareness that he was creating -- that it was practically certain that he was creating this very dangerous risk, And we know that Mr. Rathbun at that moment was in the throngs of incredibly serious substance use disorder.  He was using multiple substances.  He was as deep in the throng of his drug use as I think he's ever been, and that also would I think incredibly cloud any subjective intent he would have.

First, I'm saying I don't think he had it from all the facts.  But then since we have to look at his subjective intent, there's no way he could have formed that given the fact that he is under the influence of drugs.  He's deep in his substance use disorder and his behavior is erratic.  He would not be contemplating the risks of anything at that time.

THE COURT:  Well, it's kind of a hard argument

to make that you're not contemplating the risks of trying to ignite a gas can.

I mean, I understand your argument that he was under the influence and that he had a serious drug addiction, absolutely.  But, you know, he has the wherewithal of twisting up a wick and putting it in a gas container, placing it and trying to ignite it.

I don't think you need any particularized special training regarding gasoline and containers to know danger -- the dangers, the common sense danger associated with gasoline and its vapors, flammability, issues like that. Those things are all common knowledge.

I mean, I'm hearing you on some of your arguments. I'm just saying some of your arguments are stronger than others.  I understand the cases that talk about you need generally there's more gas; generally they're closer to buildings; generally someone with just a common understanding of gasoline would look at the amount of gas and the placement and think this is -- how is this not going to create that substantial risk of death or bodily injury?  I understand your argument.

I guess I'm just telling you the weaker part of your argument, as I look at it, is I don't think you need any specialized training to know what -- for him to have known what he was doing or what could happen by igniting that

container.  But I understand your argument.

ATTORNEY O'NEILL-GREENBERG:  And I'll just add that I think that the standard of he should have known and any rational person in their regular life would see the warning on the gas can and know these basic things or that he should have had the awareness, that's not -- that's doesn't rise to the standard for this subsection.

THE COURT:  Right.

ATTORNEY O'NEILL-GREENBERG:  And I believe that's what we're talking about when we say lighting a wick on fire and putting it in an open can, you should have known.  There was a warning.  You should have known that's not enough for this.  And then on top of that --

THE COURT:  But can I infer that he did know?  Can I infer that, number one, a person with common life experience would know about the danger involved with gasoline, but let's switch directly to Mr. Rathbun.  We know from his work, his work about him being a contractor, you know, doing things like that, clean out work, multiple gas cans at his home in the shed, power equipment, things like that.

There was testimony about mixtures of straight gasoline for some types of engines and a mixture of oil and gasoline for other engines and keeping them in separate containers.  Things like familiarity with gas and

storage of gas and gas tanks, gas storage tanks that he had. He specifically had. Not just every person who has a lawnmower should know this, right? But that he had. There was evidence regarding that, his use regularly because of his work with gas.

ATTORNEY O'NEILL-GREENBERG: I see his work with gas and his interaction with the flammability of dieseal or gas as more just sort of a layperson's interactions with it.

I don't think it's -- it doesn't rise to that technical specialized knowledge where we could then take the leap into his subjective state of mind and infer that from his actions there is a practical -- he knew he had an awareness at that moment of a practical certainty of death or serious bodily injury.

I think that his substance use disorder stops any subjective finding that he was thinking. To the extent he could think rationally, I certainly don't think he was. He wouldn't have been able -- even if we were to say it was involving a huge amount gasoline, I don't think he would have had the subjective state of mind at that moment because we know he was under the influence and he was completely off the rails with his substance use disorder at that moment. And because we're required to find this subjective state of mind, we have to actually try to go

into what he was thinking, and I don't think the external facts support it and I think because of his drug use that finding is impossible.

I think that's why the guidelines have that lower offense level of 20, which is still an enhancement but it's a step down from the most extreme situations where it's so much gasoline and so much explosives, there's just no way anyone no matter what was going on would not be able to know this was going to be a huge disaster.  So it's still an enhancement but it's a little bit less, and I think that's most appropriately where Mr. Rathbun fits.

THE COURT:  Okay.  Thank you.

Attorney Breslow.

ATTORNEY BRESLOW:  Yes.  So there's been some discussion regarding the standard.  I just want to start by pulling back and saying that at sentencing the standard for any enhancement, any guidelines calculation is a preponderance of the evidence.  That's simply more likely than not.  That's the standard that the court should be keeping in mind here.

With respect to what Ms. Greenberg just said regarding the difference between the two enhancements, the difference there between Subsection (a)(1)(A) and (a)(2)(A) is simply that the risk was created knowingly.

And that Your Honor recognized is the weakest part of Ms. Greenberg's argument.

I'd like to state that, factually speaking, the device was left at the driveway entrance just feet from a sidewalk that the testimony established at trial was heavily trafficked, both the sidewalk and the road and Chaim Kosofsky, the neighbor who lived directly across the street from the location where the device was placed, testified that there was traffic in and out of that driveway at all hours of the day and night.  And that makes sense because it was a very large nursing home complex where people were getting sick and/or dying.

In fact on this very night, Your Honor may recall, at approximately 4:30 in the morning, a police officer drove down that driveway shortly before -- at some point before the device was placed because somebody had died that night.  And so by a preponderance of the evidence, I think the court can find that there was very clearly a substantial risk of death or serious bodily injury to any person who may have been walking on that sidewalk or driving in a car down that driveway.

I'll note that with respect to that the risk was created knowingly, again that's the phrase that distinguishes between the two enhancements.  Your Honor indicated that this was Ms. Greenberg's weakest argument.

I think Your Honor is absolutely right there.

I don't think that there is any need for specialized training or education to understand that gas and in particular gas vapors, not the liquid, but the vapors are extremely flammable. That they can explode and cause a flash fire.

I'll note that what I just said was printed in bold letters and stamped on the very canister that Mr. Rathbun handled. So the canister said very clearly, "vapors can explode when ignited by a spark or flame source many feet away. Petroleum fuel extremely flammable. Vapors may cause flash fire."

So I agree, Your Honor, that it's a matter of simple common sense. Anybody knows don't put a flame source near an open container of gasoline. But to the extent that there was any doubt as to what common sense may yield, the warnings are stamped very clearly on the container itself.

With respect to the defendant's state of mind, and again this is the clause that risk was created knowingly, the defendant, at least in his testimony in both trials, was extremely clear to the court and to the jury.

He knew exactly what he was doing that night. He had a clear state of mind. He was job searching. He was texting. He was driving and he had a clear intent, and that was to seek drugs. He was not under the influence of

drugs. He testified that the drugs had worn off and that he was in an extreme state of desire for more drugs, but he wasn't under the influence of drugs where he didn't understand where he was doing.

I'll submit that Your Honor was completely correct in stating that he had the presence of mind to drive to that location, get out of his car, place a container that was partially filled with highly flammable gasoline on that spot, take a wick, crumple it up, put it into an open nozzle and light it on fire. And I'll suggest that doing all of that, the defendant knew very well, or at least the court can find by a preponderance of the evidence, that the defendant knew very well that he was creating that substantial risk.

THE COURT: Thank you for the arguments.

I'm going to find that -- I'm going to overrule the objection and find that the facts do support a substantial risk, and I am satisfied by the applicable standard that the facts do support a substantial risk of death or serious bodily injury has been established. So that objection will not affect the guidelines as they were calculated.

Objection No. 3?

ATTORNEY O'NEILL-GREENBERG: Our Objection No. 3 just relates to the criminal history that is included that

doesn't result in convictions. I believe all of Mr. Rathbun's prior criminal history, he has one conviction from Connecticut. Everything else in Massachusetts is not a conviction. But to the extent they are included in the PSR and they are not convictions, it's just an objection to that. I can rest on the argument we put in our objections to the PSR.

THE COURT: All right. I understand probation's inclusion of this to give me as whole a picture as they can, but any information that we could not corroborate or that couldn't be corroborated and it is not an official conviction, I'll allow this objection and just inform the parties that I wouldn't consider any nonconviction materials in my sentencing.

There's an Objection No. 4. I'm not sure that requires argument. You're simply stating that there are factors that could warrant a downward departure.

ATTORNEY O'NEILL-GREENBERG: That's right.

THE COURT: So as a technical objection I'm overrule it, but you're correct. You can make that argument.

The government by addendum did file an objection. Is there any reason you want to be heard on that?

ATTORNEY BRESLOW: No, Your Honor. Like I said, it's not a formal objection. It was simply an

amplification of an argument in response to the defendant's objection regarding the enhancement.

THE COURT:  Right.  It appears as an objection in the presentence report.  First of all, as a technical matter I won't recognize it as one.

ATTORNEY BRESLOW:  Yes.  You don't have to.

THE COURT:  I will overrule it to the extent it is an objection, but absolutely wide open.  You've delivered the message.  You've conveyed your point by drafting it.

After having gone through the objections, the presentence report assigned a total offense level of 26, a criminal history category of three.  That is a guideline range of 78 to 97 months, and I will find that is technically correct in its calculation to reach that number.  I will adopt it noting the objection placed, which would have affected that guideline and made it lower.  I note the objection.  The objection was overruled.

ATTORNEY O'NEILL-GREENBERG:  Thank you.

THE COURT:  Now also we have on Count 2, Count 2 is a minimum of 60 months, and so that's also a fairly significant factor to consider at sentencing.  We have that minimum sentence in Count 2.  All right.

Mr. Rathbun, you will have an opportunity to speak if

you want to.  You don't have to say anything.  I won't hold it against you if you don't want to make any comment, but if you wanted to make any type of statement to the court for me to consider in imposing a sentence, you will have that right.  I will let you know when you need to make that decision.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Okay.  Attorney Breslow, I'll hear from you first.

THE COURT:  Yes, Your Honor.

Your Honor, we are recommending a sentence of 78 months in prison.  I want to underscore that that is the absolute bottom of the advisory guidelines range that Your Honor just calculated, and so it's the flat minimum of what the guidelines are recommending.

We are also recommending that the defendant -- that Your Honor recommend that the defendant receive the benefit of the residential drug abuse treatment program that is offered by the Bureau of Prisons to the extent that he can because we feel that rehabilitation must, particularly in this case, be an element of the defendant's sentence.

We are asking for 36 months of supervised release again with special conditions that require that he participate both in substance abuse and mental health

treatment for that reason.  That the sentence be fashioned to encourage his rehabilitation.

We're not asking for any fine, and we're not asking for any restitution or forfeiture, just a $300 special assessment as is required by the law.

The sentence that the government is asking is warranted by application of all of the Section 3553(a) factors, but most particularly here the seriousness of the offense, which Your Honor is very familiar with based on having presided over not one but two trials.

Secondly, general deterrence which we feel is particularly important in this current climate of extreme political and religious polarization.

Third, to protect the public from further crimes of the defendant.  It seems very clear that he is highly likely to recidivate if he returns to drug abuse.

And lastly to promote respect for the law and we feel that this element, this statutory element is particularly salient here where the defendant repeatedly lied after committing his most serious offense, the gravaman of the case, the arson; where he repeated lied to the investigating federal agent, and then even worse under oath in not just one but two separate federal trials in this very courtroom.

And lastly, we feel that this sentence is warranted

by the importance of rehabilitating the defendant, to the extent that he can be rehabilitated particularly through drug treatment both in prison and on supervised release.

I don't want to belabor the seriousness of the offense, Your Honor.  I think it's beyond doubt now that in spite of the defendant's repeated denials under oath at trial that in the early morning of April 2, 2020, at the height of the pandemic, as the pandemic was raging through nursing homes, in a state of emergency, the defendant placed and attempted to light a homemade firebomb at the driveway of the Jewish Geriatric Services Nursing Home complex in Longmeadow.  And that less than two weeks later when federal agents executed a search warrant at his house, the defendant chose to commit further crimes by repeatedly lying to a special agent with the FBI.

Now, Ms. Greenberg is correct that the defendant was convicted -- he was charged with three separate lies, one of which the court severed because it was not related to the two arsons.  The defendant was convicted at the first trial of one of those lies but not the second.  But nonetheless, the court presided over the trial both times and I think the court should find that he lied repeatedly to the special agent concerning both statements that were charged.  The first, that he was not familiar with the location on Converse Street where the device had been

placed; the second, that he had not left his house during the past two weeks including on April 2nd, which was the specific inquiry that Special Agent McGonigle made of the defendant less than two weeks later on April 15th at his home.

And thirdly, that he lied by stating, although this was not charged, that he had never even seen the yellow fuel container much less handled it with his bloody hands when he placed it outside the Jewish Nursing Home complex.

And further, I think even more seriously the defendant lied again and demonstrated further disrespect for the rule of law when he chose to testify under oath in two separate trials to a jury in this court. He lied by claiming that his blood had gotten on the fuel container when he cut his hand while doing a trashout in Chicopee.

Now, he also lied by denying flatly that he had placed the device. Instead he insisted that he drove right by JGS; did not stop to place the device; did not place the device, but instead drove through Converse Street past JGS simply to seek drugs.

Notably at both trials, even though the defendant had the opportunity to fully explain his side of the story and why his blood had gotten not on just the container but also the pamphlet, he did not explain how his blood had gotten on the pamphlet, many pages of the pamphlet that

had been stuffed into the container as the wick.

Now, in the second trial the government flatly refuted the defendant's claim that he had gotten his blood on that container by doing the trashout by calling the homeowner, the person whose home the defendant claimed to have cleaned out. And that homeowner testified that there was no yellow fuel container and the defendant had not cut his hand. The homeowner knew this because the defendant paid -- the defendant was paid by the homeowner by receiving cash in his very hands.

So what this case establishes is not just that the defendant committed a momentary act of arson, but that two weeks later he essentially doubled down on that crime by obstructing the investigation and lying to the FBI, and then months and months later, in not one but two trials, lying under oath by denying that he committed the crime at all.

Looking to the defendant's personal history and characteristics, which is another important statutory factor, from the government's perspective the most salient features of the defendant's personal history are his persistent substance abuse which I don't think is in dispute by anybody here in court; his criminal history that resulted from the drug abuse in part, and what the government considers to be his intrenched dishonesty,

including denials of responsibility for the crimes for which he was convicted which apparently persists to this day.

Now I read the defense sentencing papers fairly carefully and there appear to have been statements in which the defendant has expressed regret, regret for his situation. But nowhere in the defendant's sentencing papers did I see any expression of remorse, contrition, or apology to the victims, the primary victims of the arson, which were the staff and residents of Jewish Geriatric Services, the target of the homemade firebomb. I may have missed it, but I didn't see anything that remotely resembled an about face from the defendant's position at trial, which was that he did not commit any of the charged offenses.

Turning to the defendant's criminal history, the defendant has, by my Count 13, prior convictions. I will accept that most, if not all of these, are likely tied to the defendant's longstanding drug abuse. But the current federal convictions are a serious escalation from that and what they demonstrate, from the government's perspective, is that despite his many convictions, he remains or has remained unable to control his behavior, a fact that the defendant's mother conceded in a post-arrest telephone call to the defendant in which both she and he agreed that

he was better off in jail because he needed a timeout because he was out of control.

Turning to the defendant's drug abuse, it's very, very clear that the defendant suffers from a horrible history of drug abuse.  And that is why the government is strongly recommending that treatment, both in prison and on supervised release, be an essential component to whatever sentence Your Honor must fashion.

So I'll just end by where I started by emphasizing that the government is recommending a guideline sentence but a sentence at the very bottom of the guidelines, and that is based on the entire circumstances of the defendant's life and the defendant's offenses as we explained in our sentencing memo and I've summarized now. And also to reflect that although the defendant's crime seems inextricably intertwined with religion, meaning the target of the offense was the Jewish Geriatric Services campus and the device consisted of a religious pamphlet stuffed into a gasoline fuel container and lit on fire, there appears to be, in spite of the government's exhaustive investigation, no other anti-Semitic or white supremacist inclination.

And so only the defendant really knows why he committed the crimes that he did commit on the early morning hours of April 2nd, but the absence of any other

aggravating evidence warrants a sentence at the bottom of the guidelines, as does the defendant's long time and very unfortunate history of drug abuse.  As does the fact that even though this was an extremely dangerous crime, no one ultimately was harmed fortunately.  So for those three reasons, Your Honor, we are recommending a guideline sentence but a sentence at the very bottom of the guidelines.

THE COURT:  All right.  Thank you.

ATTORNEY O'NEILL-GREENBERG:  Going off what the government just said, I think it's incredibly important to say that nothing about this crime was motivated by anti-Semitic animus or any kind of racial or cultural animus whatsoever.

I agree with the government when they say only -- when you're looking at this and after we've had two trials, when the government says only John Rathbun knows why he did this it's because it doesn't make any sense. And that is because it is the result of erratic, impulsive, nonsensical behavior of somebody who was in the deepest throngs of a substance use disorder, still using crack cocaine, using heroin, seeking more drugs, and in this perfect storm of the worst drug use you could imagine, this event happened.

We are not here sentencing somebody who has religious

animus or hatred toward Jews or had some bone to pick or vendetta against JGS or anyone who worked there or lived there.

This wasn't some meticulously planned, long drawn out idea to do this.  This was just the perfect storm of someone who is acting erratically because of the deepness of his substance use disorder, and that's very important when we're thinking about what is the appropriate sentence to give him that is going to meet all the goals of sentencing and for Mr. Rathbun 60 months we're requesting, which is the minimum mandatory, coupled by three years of supervised release, with the special conditions that he get substance use treatment, intensive substance use treatment along with mental health treatment both through RDAP, which I believe he qualifies for, and after while he's on special supervised release.

That is going to be -- that is the key to his rehabilitation.  That is also the key to deterrence for him because his recidivism risk is intricately linked to his sobriety.

And as terrible as Mr. Rathbun substance use disorder has been, he has never had all the boxes ticked with the many issues he has dealt with in his life.  I know the court is intimately familiar with his substance use disorder and how serious it is and that it's

poly-substance use disorder and then he has his mental health issues in addition to that, but he's never gotten long-term treatment for all of those things at the same time.  That is shocking to me but that is what he needs long term to ensure that he remains the sober, helpful, friendly, productive, kind John Rathbun that can go back out into the community and be a successful member of society for himself, for his family, and for his community.  I say that in our sentencing memo and when you hear from Mr. Rathbun, he certainly has those three goals: To become sober and to be a productive member of society for himself one, for his family, and most importantly for his daughter, two, and for his community.

This incident happened in the community he was born and raised in; that his family lives in; that his daughter lives in.  This is his own back yard.  This is a place that he cares about, and the only way to make -- to the extent he can make whole what happened, that is intricately linked to his rehabilitation, his sobriety, and his treatment.

For Mr. Rathbun, he doesn't have 13 convictions.  He has a criminal history that I would say is reflective of someone struggling with a substance use disorder.  One old conviction from Connecticut.  The longest prison sentence he ever served before now is a year.  So the requested

sentence we're asking for is four times that, which is very significant and I think reflects the seriousness of the crime in relation to him.  And then three years of supervised release after that, which again is a much longer term of supervised release in the community that he's ever received.

I think there's no doubt that the extent of the supervised release and what is going to require of him is going to be much more intense than anything he's ever received, and that's really where the rubber hits the road for Mr. Rathbun is when he is out on supervised release.

By the time he returns back to the community, he's going to have five years of sobriety.  He's right now almost at the two-year mark since this incident happened.  So two years of sobriety is basically the longest period of sobriety he's ever had in his entire adult life since he started drug use as a young teenager.  By the time he is finished, he will have five years.  He will be starting out on his period of community release with that sobriety behind him, and I think primed with the mental heath treatment and the substance use treatment to be able to chart a different path for himself for his family and for his community.

If we're talking about the difference between a year, we're requesting five years, they're requesting six and a

half years, a year and a half certainly would exist to incapacitate to him longer, but I don't -- at what cost?

I say that because we have all the research and social science that says punishment, the certainty of punishment has a deterrent effect but the length of the sentence doesn't. An extra year and a half doesn't have any greater deterrent effect.

What Mr. Rathbun needs, besides the RDAP program and the treatment he's going to do in the Bureau of Prisons, he needs to be back out into the community with those restrictions from probation doing his mental health treatment, doing his substance use treatment, so that he can reintegrate back into the community and essentially pay back the community for what he has done. And that is by being someone who is productive and law abiding and assuming the roles of his family and his daughter that he wants to do.

I think it's important to note that his confinement from the time this incident started until now has been much harsher than it would have been otherwise. It's been a harder time for him to do, and that is because of the pandemic and the time that he was incarcerated on this case.

He was incarcerated both at Hampden County and at Wyatt at a time when he was subjected to serious

lockdowns, no programming, no visits, unable to use the phone.  Locked down 23 hours a day.  That is a much more onerous period of confinement than he would have otherwise had had he been -- had this case happened at a different time.

Not only that but he contracted COVID-19.  He went through that.  Being sick is difficult in itself but being sick in a prison when you're on lockdown for 23 hours a day in a tiny cell is an incredibly difficult thing to go through.  I think that also has a significant deterrent effect, because he knows the period of incarceration he's had throughout this case is only because of his actions, but I think that drives the deterrence home in a way that it wouldn't otherwise.

Mr. Rathbun has also -- when he transferred to Wyatt in June, he was taken off the medically-assisted treatment he had been on, the Suboxone, at Hampden County.  He was just taken off it.  He was forced to go through withdrawal at Wyatt, and he has been without that medically-assisted treatment since June.  That is a denial of basic medical care.  It is a violation of the Americans with Disabilities Act.  It is something that has made his time since June much harsher, and I think our requested sentence reflects that.

I will say that Bureau of Prisons is now doing two

things for people who have opiate use disorders.  If they have -- if they enter the Bureau of Prisons while they are still on medically-assisted treatment, then there's maintenance; the Bureau of Prisons continues them.

If there is somebody who needs to be placed on it and has been placed on it in the past, then they'll do what's called induction.  They're doing that because they recognize now to not do so would be a serious violation of the Americans with Disabilities Act because a substance use disorder is a categorized disability, but it's denying essential medical care.  It would be the same as if someone came in with serious diabetes and they just said, sorry, we're not going to give you insulin.

In the time that Mr. Rathbun has had to be without his medication for his opiate disorder, his risk of death or overdose skyrockets, in addition to the physical hell that he has to go through when he had to withdrawal without any sort of help and he's been without that medical treatment.

One of the requests we're making of Your Honor is that you designate -- that he be placed in -- that he be evaluated for his substance use disorder and placed on medicine for opiate use disorder in the Bureau of Prisons, in addition to RDAP, because Mr. Rathbun recognizes that he needs to be back on that medicine as soon as possible

and stay on it for the long term.

So I think I'll end just by saying for Mr. Rathbun, the test for him really will be the period of supervised release. You'll hear from him in a minute but he realizes -- when you're at the lowest of the low, that's when you can -- when you really hit rock bottom, that's when you sometimes will have an epitome and realize things have to be done differently, and that's exactly what happened for Mr. Rathbun throughout this case and it's where he is now.

He also -- I'll share with the court -- applied to be part of the Restorative Justice Program which is being run at Wyatt. He made it to the preliminary list and unfortunately there were more applicants than could be on it. Depending on how long he stays at Wyatt, he may actually be able to participate but that's something he wanted to do.

At Wyatt during the pandemic he's had no ability to do any kind of programming, not just mental health stuff but nothing. But he has wanted to do something to be able to take some very serious steps to work on his own rehabilitation and to figure out a way to make what is wrong right, and he wanted to be a part of that program. He's very interested in it. I don't know if he's going to be able to apply, but I think his interest in it, his application, his being put on preliminary list shows how

genuine he is about change and that this has been the hugest wake up call for him and he's ready to change and he has the capacity to change.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Rathbun.

THE DEFENDANT:  Yes, Your Honor.

Hello.  My name is John Rathbun.  I would like to thank the court for this opportunity to speak.

I have struggled with drugs and alcohol my entire life.  Since I was 15, I have put myself and my family through hell.  I have tried getting clean many times but have failed every time.

I have been clean now for about two years.  It feels great.  But the question I ask myself is, what's going to be different this time when I get out?  How am I going to stay clean?  The answer is NA and counseling.  I have tried NA in jail and found it to be very helpful.  This is just one of many tools I will need to stay clean.  I also need to find a sponsor and a group of people to surround myself with that will help me stay clean.

I ask the court that I be put at a facility where I can participate in the RDAP program.  The person I was when I was on drugs is somebody that I am really ashamed of.  The person I want to be in the future is a sober, responsible, normal citizen.

I plan to make the most of my time while I am incarcerated and use all of the programs to help me.  I take full responsibility for the crime that I have been found guilty of.  I ask the court for leniency on my sentencing.  I apologize to my family and this court for my actions.  Thank you for your time.

THE COURT:  All right.  Thank you.

All right.  Considering the 3553(a) factors, I am going to impose a sentence that I think provides just punishment that will reflect the seriousness of the crime and deter any criminal conduct in the future by Mr. Rathbun or the general public who would observe the sentencing for a crime under this fact pattern.

I've considered the nature and circumstances of the offense and the history and characteristics of Mr. Rathbun, including his drug addiction and how that drug addiction started at a very young age with prescription medication in the family home.

When assessing the key component under 3553(a) of a sentence that is sufficient, sufficient but not greater than necessary, I think it's very important for the court to consider what this sentence is going to be and what it would be.  And both parties have talked about the motivation, like what was behind this.

Was there animus towards this Jewish facility or

Jewish people generally or some type of anti-semitic, as Mr. Breslow pointed out, anti-semitic, political-related messaging or violent activity related to some similar motive?  And there was none, and the government has conceded it.  Although the government thought there was and investigated it, the government has conceded there was no evidence of that.  That certainly would have increased -- been a factor that weighed towards increasing a sentence.

Nonetheless even without -- I mean, how do you talk about a motive?  What world would motivate someone to do this, to try to ignite a gas can anywhere in public? Never mind at the corner of a facility that cares for people in the middle of a neighborhood, it's outrageous.

I don't know, I don't know what was going on in Mr. Rathbun's mind.  I know he was really under the grips of a terrible, terrible drug addiction.  I know he had some family history with that facility regarding his grandmother and knowing that that facility has been part of his family.

I don't know what was going on in his mind with his thoughts about his own religion and his family's efforts to use religion to try to help him with his drug addiction.  I don't know how that all interplays or is thrown into the mix.

But whatever happened, Mr. Rathbun was a disaster and that played out in this scenario which was just very dangerous behavior; very, very dangerous behavior that cannot be tolerated.

So also considering under 3553(a) the desire to promote rehabilitation, there is every indication that Mr. Rathbun would be amenable to very rigorous rehabilitation efforts. He didn't have much rehabilitation efforts that worked. He never really bought into it or wanted it, but he was never really given rigorous rehabilitation and this will give him the opportunity. His being sentenced to incarceration will give him the opportunity to rehabilitate himself, and there's every indication that he would be amenable to that and that that would work.

I agree with you a hundred percent, Attorney O'Neill-Greenberg, that the difference between you and the government's recommendation in the big picture is not that different because Mr. Rathbun is going to be back out in the community. And unless Mr. Rathbun is back out in the community as a rehabilitated individual not using drugs, then -- if he's not rehabilitated, there's going to be a problem whether he stays in jail an extra year or not. So the rehabilitation here is absolutely key.

I'm going to impose a sentence of 60 months, so a five-year sentence of incarceration, which I really do

think is significant and I also think that it's sufficient. I think it's sufficient but not greater than necessary.

I think the government's recommendation is absolutely well thought out and fair in their role and their citations to the reasoning behind it, but I think anything beyond the 60 months is greater than necessary because I don't really know what it accomplishes other than just pure incarceration for incarceration's sake.

So I think a sentence of 60 months is sufficient but not greater than necessary and will accomplish all the other goals of sentencing. I will absolutely make it part of the sentencing that he be designated to a facility with a residential drug treatment program.

I also think it would be important for him to be at a facility that also utilizes medication, including Suboxone and other medications, to try to help individuals with serious drug addictions deal with that. I don't know what facilities use that. Does probation know?

I would imagine a facility that offers the residential drug treatment program would be more informed on medical treatments and may have that available. Does the defense know?

ATTORNEY O'NEILL-GREENBERG: It's my understanding in talking to the point person at the Bureau

41

of Prisons who's overseeing this that there aren't specific facilities that are doing it.  It seems like all facilities have the capacity to do it in the same way or -- the way it was told me, in the same way as if someone came in and needed insulin or some other medicine every day.

THE COURT:  All right.  And the nearest drug treatment, is that Devens?

PROBATION OFFICER:  I believe it's back down to Fort Dix.  Devens doesn't have the RDAP.

THE COURT:  They don't have the RDAP?

PROBATION OFFICER:  I don't believe so.

THE COURT:  All right.  Well, I would recommend that a facility, number one, the first consideration is a facility with the RDAP program.  The next facility is -- the next recommendation would be a facility that's closest to his home with the RDAP program.

The RDAP program is really the very important component, and I would make a recommendation that the facility that he goes to be one that supports the use of medical assistance with drug treatment issues.  I just find it hard to believe that anyone who does the RDAP program wouldn't be informed about that so I think that's one in the same.

Probation, the length of supervised release?

PROBATION OFFICER:  One to three years.

THE COURT:  Three is the max?

PROBATION OFFICER:  Yes, sir.

THE COURT:  So it's three years' supervised release.  No fine.  No restitution.  There's $300 due and payable as a special assessment.

The conditions of supervised release are the standard conditions of not committing any state, federal, or local crime; not using or possessing any controlled substance; being subjected to not more than 104 random tests per year to make sure you are not using any substances.  You will have to submit to one drug test within 15 days of your release from prison.  You will have to cooperate in the collection of a DNA sample.

The special conditions will include your successful treatment -- enrollment and successful treatment of any programming to deal with your substance abuse issues, any programming that the probation department enrolls you in.

Also you need to successfully complete any mental health or emotional health treatment that the probation department enrolls you and directs you in.

You are prohibited from consuming any alcoholic beverages at all, and obviously you're prohibited from using any illegal substances.

All right.  So drug treatment, mental health

counseling.  At the discretion of probation any job training or educational endeavors that could be useful to Mr. Rathbun, programming that you can get him into.

PROBATION OFFICER:  The only other thing was the victim in this matter.  I didn't know if there should be a prohibition against his frequenting the grounds of the nursing home.

THE COURT:  Well, I will order him to stay away from -- to the extent that I want him to stay away from the facility, I'm not going to prohibit him from using the public road, the very public road in that town that kind of intersects and drives back and forth.  But there will be no reason at all for you to ever enter upon that campus.  There is never a reason to take a left or a right into any of those parking lots.

THE DEFENDANT:  Yes, sir.

THE COURT:  If you think there ever is a reason or something develops because a family member is at the facility being cared for or something, you have to talk to your probation officer.  All right?

All right.  Attorney Breslow, I take it that you spoke for the victim or victims of JGS?

ATTORNEY BRESLOW:  Yes.  I've consulted with them.  They are aware of our recommendation, and they have -- they just want this matter put behind them.

THE COURT:  But there was no letter or statement?

ATTORNEY BRESLOW:  No, for the reasons that I just explained.

THE COURT:  All right.  Thank you.

All right.  Mr. Rathbun, you do have the right to appeal.  Do you understand that?  You can discuss your rights and options to appeal with your attorneys.  Do you understand?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  Anything else from probation?

PROBATION OFFICER:  No, sir.

THE COURT:  From the government?

ATTORNEY BRESLOW:  Yes, Your Honor.  We move to dismiss the third charge, false statement in count -- in the 1001 count.

THE COURT:  That motion to dismiss is allowed that third count in the indictment.  All right.

ATTORNEY O'NEILL-GREENBERG:  Nothing else from us, Your Honor.

THE COURT:  Okay.  All right.  Remanded.

**(Hearing concluded at 12:14.)**

----------------------

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    )

          I certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter to the best of my skill and ability.

(The certification of this transcript does not apply to
any reproduction of this transcript, unless under the
direct control and/or supervision of the certifying
reporter.  I assume no responsibility for the accuracy of
any reproduced copies not made under my control or
direction.)

/s/ Alice Moran                        June 4, 2022
Alice Moran, RMR, RPR
Federal Official Court Reporter