# United States Court of Appeals
## For the First Circuit

---

No. 22-1192

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN MICHAEL RATHBUN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

---

Before

Kayatta, Lynch, and Thompson,
Circuit Judges.

---

Judith Mizner, Assistant Federal Public Defender, for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom Rachael S. Rollins, United States Attorney, was on brief, for appellee.

---

April 5, 2024

---

THOMPSON, **Circuit Judge**.  In today's appeal, John Michael Rathbun ("Rathbun") seeks to undo his conviction related to his creation of a homemade firebomb that he placed near a Jewish living facility in Longmeadow, Massachusetts.  Following two separate trials arising out of the bomb's discovery, federal juries found Rathbun guilty of:  (1) attempting to transport and receive an explosive device; (2) attempting to damage and destroy buildings, vehicles, and real and personal property by fire and explosion; and (3) making false statements during an interview.  The success of Rathbun's appeal primarily depends upon whether we side with him in his vigorous protestations that the district court erred in admitting irrelevant, biased, and prejudicial testimonial evidence, and in allowing repeated references to inappropriate and highly charged religious topics -- all of which, according to Rathbun, robbed him of a fair trial.  For the reasons outlined below, we affirm.

## A. BACKGROUND

At the outset, "[w]e note that our recitation of the factual background is, of course, done in the light most complimentary to the jury verdict."  United States v. Belanger, 890 F.3d 13, 17 (1st Cir. 2018) (citing United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015)).

- 2 -

**I. The Crime**

Converse Street, located in Longmeadow, Massachusetts, is not just any ordinary street -- rather, it's a major thoroughfare for town traffic and notably, it is the location of the Jewish Geriatric Services Inc.'s ("JGS") campus, a 25-acre living community that houses 350 people. Guided by Jewish values, JGS is a non-profit corporation that provides housing and nursing services to elderly individuals and their families. Its campus consists of several buildings, including: Genesis House, a subsidized housing complex; Ruth's House, a nursing home; an adult day care center; and a rehabilitation center.

On the morning of April 2, 2020, a suspicious item was spotted on Converse Street by a neighborhood resident near the entrance to the JGS. After receiving a 911 call about the peculiar package, law enforcement agents responded and discovered a five-gallon yellow fuel can containing both gasoline and a charred paper wick. In their examination of the item, they observed what appeared (and was later confirmed) to be blood on both the fuel container and wick. Follow-up investigation revealed that the paper wick was made of pages from a religious tract, published by the Billy Graham Evangelistic Association (the "BGEA"), entitled

- 3 -

*Steps to Peace With God*.[1]  Rathbun became a suspect in the planting of the device when the Massachusetts state lab identified the blood on the device as belonging to him.[2]

Before we go any further, it would be helpful to discuss Rathbun himself.  In 2020, Rathbun was a thirty-six-year-old man living with his parents, Sheila and Jeffrey Rathbun,[3] and his teenage daughter.  During this time, Rathbun was experiencing a fair amount of personal and professional strife.  For one, he had recently been fired from his job.  For another, he, according to his family, often displayed a concerning demeanor -- agitation, defensiveness, and edginess.  And arguments with his mother and daughter occurred frequently.  Rathbun was also experiencing substance use disorder, a condition he had developed during his teenage years.

---

[1] The parties use "pamphlet" and "tract" interchangeably to refer to the *Steps to Peace With God* literature and we follow their lead.

[2] The record is silent as to why Rathbun's DNA was held in a state police data bank.  Nonetheless, during an interview police conducted with Rathbun pursuant to their ongoing investigation, law enforcement took a cheek swab from him which was sent to the Massachusetts State Police testing facility where the blood from the device and tract were stored.  Testing revealed a DNA match.

[3] At times this opinion will refer to Rathbun's parents by their first names.  This is to avoid confusion, and not intended to be disrespectful.

## II. The Investigation

Following a successful DNA identification of Rathbun's blood on the device, FBI Special Agent Ryan McGonigle ("Agent McGonigle") obtained a warrant to search the Rathbun family's home and vehicles. In their execution of the warrant, agents came across and seized red gas canisters, two of which contained gasoline. Also located and removed were yellow and red nozzles, but no other seemingly germane evidence of bomb-making or bomb-making substances was unearthed. A cell phone belonging to Rathbun and a computer belonging to Sheila were seized for later forensic analysis. Of note, agents also found various religious pamphlets and tracts throughout the home and in Sheila's car, though they did not locate another copy of the particular pamphlet, *Steps to Peace With God*. Relevant to this search of Rathbun's home and family vehicles, and to Rathbun's challenges here, it's important to note that at this point in the investigation, the concatenation of accumulated evidence had caused the government to suspect that Rathbun's actions were motivated by anti-Semitism.[4] That said, no

---

[4] A portion of the affidavit issued in support of the search warrant was captioned "The Discovery of a White Supremacist Organization on Two Social Media Platforms and the Targeting of Ruth's House in Longmeadow, Massachusetts." That portion of the affidavit described the FBI's discovery of a user of two social media platforms promoting mass killings against religious minorities and specifying Ruth's House as a target. Further, the affidavit described that users of the platform designated April 3, 2020 as "jew killing day." Rathbun was never tied to any of these platforms.

anti-Semitic or white supremacist materials were unearthed during the search.[5]

Circling back to the search scene, Rathbun, at the time, consented to a voluntary interview with Agent McGonigle and Longmeadow Police Officer Chaplin ("Officer Chaplin") and, pursuant to that questioning, Rathbun signed a Miranda[6] waiver. Over the course of a three-hour inquisition, which included several breaks,[7] Rathbun insisted that he was home on the morning of April 2, the day the device was located, and that he had not left his home in over two weeks. Rathbun also told investigators that he knew Converse Street well because he drove it frequently, but he denied knowing much about Jewish landmarks on the street, including Ruth's House or about the area where the fuel container was discovered. Similarly, Rathbun denied ever seeing the *Steps to Peace With God* tract but acknowledged that his parents were very religious and sometimes distributed religious tracts and

---

[5] After further and routine evidentiary examination occurred, the religious bias theory was eventually discarded. On November 9, 2020, the date of Rathbun's first trial, the district court granted the government's motion to strike the request for a special finding of a religious motive after the government noted that it was unable to find any evidence linking Rathbun to anti-Semitism or white supremacy.

[6] See generally Miranda v. Arizona, 384 U.S. 436 (1966).

[7] The record reflects that the interview had a casual atmosphere as Rathbun took several breaks to smoke cigarettes, kick a soccer ball, and play with the family dog.

pamphlets.   When shown a picture of the yellow fuel container, Rathbun denied ever seeing or possessing it.   When informed that his blood was found on the container, Rathbun told investigators that he had no idea how that could possibly be.[8]   But after Rathbun was confronted with the factual reality that his blood was found on the wick and container, according to Agent McGonigle, Rathbun's demeanor changed and he terminated the interview.   Feeling armed with more than enough probable cause, agents placed Rathbun under arrest.

Further investigation continued.   It revealed that Rathbun had made several false statements during his interview. For example, forensic analysis of his cell phone showed that Rathbun was not home on the morning of April 2, as he claimed, but was instead about four to five miles away from the house driving around in his mother's car.   Further, during a recorded phone conversation from jail with his mom, Rathbun acknowledged that he had driven down Converse Street on April 2, during the timeframe the fuel container was placed near the JGS campus.   In yet another call with Sheila, Rathbun admitted that he did in fact possess the

---

[8] At trial, Agent McGonigle testified that he looked at Rathbun's hands for anything that might explain the presence of his blood on the fuel container.   Agent McGonigle testified that he observed an open cut on Rathbun's thumb, which Rathbun attributed to dry hands.

yellow fuel container found on Converse Street, despite his repeated assertions to investigators that he did not.

Subsequent police work also established familial connections between Rathbun and Genesis House, undermining his assertion that he was unfamiliar with the area where the fuel container was found or with the JGS complex. Specifically, investigators learned that Rathbun's grandmother had lived at Genesis House for seven years prior to her death, and that Rathbun had visited her there on many occasions. Additionally, it was determined that Sheila had previously worked as a comptroller for Carr Properties, the management company that oversees Genesis House.

The evidence implicating Rathbun continued to mount when detectives learned that the BGEA toured the Northeast in 2019, and hosted a large event on May 25, 2019, which Jeffrey and Sheila had attended. It was also determined that Curtis Rowe ("Rowe"), Pastor of Heritage Baptist Church where Sheila and Jeffrey were congregants, was hired as a contractor to promote the event. Notably, copies of the *Steps to Peace With God* tract were given to all active participants who assisted with the preparation of the events. Further, the forensic examination of Sheila's computer yielded documents and files related to the tour. In their investigative efforts to try and piece together the logistics of how Rathbun could have committed the crime, police reviewed

- 8 -

Rathbun's phone logs, which revealed a couple of pertinent facts: First, Rathbun had actively used his phone during the morning of April 2; and second, the cell phone was not active during two crucial periods -- (1) from 4:38 a.m. to close to 5:00 a.m. and (2) from 6:09 a.m. to 7:06 a.m. -- the two windows in which the fuel container would likely have been placed at the JGS campus. In putting it all together, detectives theorized that Rathbun had traveled to the targeted area where the device was placed while he was driving home from his admitted drug dealer's crib after copping and ingesting crack and cocaine. Retrieved cell phone data supported the government's theory.

### III. Procedural Background

Ultimately, a superseding indictment issued charging Rathbun with: (1) Count One, attempting to transport and receive an explosive, in violation of 18 U.S.C. § 844(d);[9] (2) Count Two, attempting to damage and destroy buildings, vehicles, and real and personal property by fire and explosive, in violation of 18 U.S.C.

---

[9] In relevant part, section 844(d) provides that:

[w]hoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined under this title, or both . . . .

- 9 -

§ 844(i);[10] and (3) Count Three, making false statements during his interview with Agent McGonigle, in violation of 18 U.S.C. § 1001(a)(2).[11]

Following extensive preliminary proceedings, trial got underway in November 2020 and a jury eventually convicted Rathbun on Count Three, making false statements. However, it deadlocked on Counts One and Two, causing the court to declare a mistrial as to them. The case went to trial a second time in June 2021 and

---

[10] In relevant part, section 844(i) states that:

> [w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . .

Notably, the indictment also included a request for a special finding that the object of the crime was selected based on actual or perceived race, religion, or national origin. As previously noted, this request was subsequently dismissed by the government.

[11] And section 1001(a)(2) provides, in pertinent part, that:

> [e]xcept as otherwise provided in this section, whoever, in any manner within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation shall be fined under this title, [or] imprisoned not more than 5 years . . . .

Rathbun was found guilty on both Counts.[12]  Unhappy with the goings-on below, Rathbun timely appealed and here we are.[13]

## B. DISCUSSION

As best we can understand and capture Rathbun's grievances, he raises several claims as to the conduct of trial, which, reduced to their core essence, seem to boil down to one broad, overall gripe.  Here's how Rathbun, in his own words, articulates his overarching appellate contention:  "The Government's Presentation of Evidence Relating or Alluding to the Christian and Jewish Religions and its Repeated Contrasting/Juxtaposition of the Christian Religious Tract Used as Wick in the Fuel Container and the Jewish Nursing Home as the Site Where the Container Was Found Was Erroneous and Denied Mr. Rathbun a Fair Trial."  Then, to expatiate this generalized claim of trial error, he points to four specific blunders which he asks us to review and reverse.  First, he says the district court made evidentiary mistakes by admitting the testimony of several of the government's witnesses.  Second, he accuses the government of engaging in objectionable conduct at a few key moments during the trial wherein irrelevant religious themes got improperly injected into the proceeding, the cumulative effect of which prejudicially

---

[12] In due course, the district court handed down a sentence of 60 months' immurement and three years' supervised release.

[13] Rathbun does not appeal the Count Three conviction.

- 11 -

denied him a fair trial. Third, he says the district court erred in allowing into evidence, to his detriment, inadmissible propensity evidence. And fourth, he advances a catch-all cumulative error challenge contending the total cabal of trial mistakes necessitates reversal. In our careful consideration of Rathbun's claims, we conclude none has merit. To explain our reasoning, we begin our analysis with his challenges to the district court's evidentiary calls.

### I. Alleged Evidentiary Bungles and Cumulative Effects

Rathbun contends that the district court abused its discretion when it admitted, over his various objections, testimonial evidence from three government witnesses: (1) Rabbi Chaim Kosofsky ("Rabbi Kosofsky"), (2) Robert Hill ("Hill"), and (3) Steven Rhoads ("Rhoads"). As Rathbun tells it, the testimonies of these witnesses were inadmissible because they were irrelevant to the elements of the offense or to any defense, and, in the case of Rabbi Kosofsky, cumulative. Alternatively, even if this testimonial evidence may have had some marginal relevance, it should have been excluded, says Rathbun, because its probative value did not outweigh the prejudicial impact of admitting it.

We have held that, when preserved, "a district court's determination as to the admissibility of witness testimony is reviewed for abuse of discretion." United States v. Occhiuto, 784 F.3d 862, 867 (1st Cir. 2015). This standard, applicable here,

- 12 -

governs all aspects of Rathbun's evidentiary challenges.  United States v. Dudley, 804 F.3d 506, 515 (1st Cir. 2015); Occhiuto, 784 F.3d at 867.

### a. Rabbi Kosofsky

We'll start with Rathbun's beef with Rabbi Kosofsky's testimony.  And in doing so, we set forth a good bit of procedural history surrounding Rabbi Kosofsky's testimony so that the curious reader can better understand how hotly contested the admissibility of this evidence was below.

Prior to Rathbun's first trial, the government informed him of its intention to present several JGS residents who would testify about their reaction to the discovery of the fuel container.  Though they had not personally observed the contraption, they had heard about it and had reactions to what had purportedly transpired.  This reaction testimony, the government argued, went to an element of the charged offense, to wit, that Rathbun knew or should have known about the foreseeable damage his conduct would cause and thus it proved he had acted "with the knowledge or intent that [the firebomb would] be used to kill, injure, or intimidate any individual" under § 844(d).[14]  In urging

---

[14] "The actual recipient's reaction to the [firebomb] shows that the recipient did perceive the [firebomb] as a threat.  This reaction is probative of whether one who makes such a [device] might reasonably foresee that such a [device] would be taken as a threat."  United States v. Fulmer, 108 F.3d 1486, 1500 (1st Cir. 1997) (discussing reactions to a threatening statement).

- 13 -

its admissibility (over Rathbun's objection), the government noted that this court has on prior occasions found victim reaction testimony relevant to the nature of a threat and thus allowable. See United States v. Fulmer, 108 F.3d 1486, 1500 (1st Cir. 1997). Unconvinced and concerned about the evidence's potential for unfair prejudice and confusion, the district court excluded the testimony of those witnesses who had heard about but had not witnessed the mechanism.

Following mistrial on Rathbun's deadlocked counts, the government, prior to the second trial, again sought to introduce reaction testimony to establish § 844(d)'s intimidation element. This time, the government more specifically sought to elicit the testimony of Rabbi Kosofsky, a longtime Converse Street resident whom the government learned about following Rathbun's first trial. According to the government's proffer, Kosofsky, who had heard about the device the very day it was found, would testify "that he felt threatened and vulnerable by the discovery of the device." The government argued that Kosofsky's testimony was different from the testimony of the other reaction witnesses it had previously sought to call because Kosofsky had learned about the device virtually contemporaneously with its discovery by local police, and therefore his "reaction was untainted by the subsequent allegations of white supremacy or anti-Semitism and the corresponding media coverage of the case" -- information that may

- 14 -

have, according to the government, improperly colored the testimony of other proposed reaction witnesses.

Rathbun, contending that Rabbi Kosofsky's testimony would fall squarely within the ambit of the court's prior exclusionary ruling, objected to it, questioning the relevance of the testimony and urging that the very presence of a religious cleric at trial would interject unwarranted religious bias into the case. Consistent with its prior position, the court ruled that Kosofsky could not testify about the discovery of the device because he had not personally witnessed it. And continuing, while his testimony might have had some degree of relevance, its potential for prejudice and confusion outweighed its probative value.[15] Further addressing the government's importuning that Kosofsky's testimony was vital to its ability to meet its evidentiary burden, the court observed that the government, contrary to its assertions, was not prejudiced by the court's exclusionary ruling because the government could establish

---

[15] More specifically, the court stated that:

Mr. Kosovsky [sic] was close to the scene, but did not see the container and formed his reaction indirectly based not on the container itself, but rather the response to its discovery. His personal feelings regarding the incident and concerns about anti-Semitism are understandable, but as the prosecution theory of the case does not include anti-Semitic motivations, the risk of prejudice from Mr. Kosovsky's [sic] testimony is too great.

- 15 -

§ 844(d)'s intimidation element through other relevant evidence, such as the area's population density, the proximity of homes to the fuel container, and the characteristics of the fuel container.

Undeterred and before the second trial got underway, the government gave notice to Rathbun that it still intended to call Rabbi Kosofsky as a witness, apparently steadfast in its determination that Kosofsky had relevant testimony to offer which had not been precluded by the court's prior order. After learning of the government's plan, Rathbun filed another motion in limine seeking to bar Kosofsky's testimony, contending that the court's previous order "left nothing for the government to elicit from Rabbi Kosofsky" and whatever quanta of relevant testimony he might offer that was not covered by the order was not worth the overwhelming confusion and prejudice that would flow from the appearance at the trial of a religious clergyman. Such prejudice was particularly acute, said Rathbun, since the government had abandoned its hate crime motivation theory.

In considering Rathbun's motion and the government's additional proffer, the court held that Rabbi Kosofsky's testimony would be permitted but it would be limited in scope. He could touch upon areas such as the neighborhood characteristics "including population density and proximity of homes to the container. Kosofsky [could] also testify about the level of pedestrian traffic in the area." What the Rabbi could not speak

- 16 -

of was "the religious beliefs or practices of pedestrians or the presence of other Jewish institutions located on Converse Street," because, as the court concluded, such evidence would be unfairly prejudicial since the government had jettisoned its theory that Rathbun was motivated by anti-Semitic sentiments.

Following that ruling and once the second trial got underway, Rathbun, undaunted, again moved to exclude Kosofsky's testimony for reasons already pressed. He further urged that even Kosofsky's limited testimony, which the district court had deemed relevant, would be cumulative and therefore a waste of time because the government had several other neutral and less controversial witnesses -- such as members of the police and fire departments -- who could identically testify about the characteristics of Converse Street. The court denied Rathbun's motion.[16] Then, when Rabbi Kosofsky was called to the stand, the district court reaffirmed its limiting instruction and, employing a belt-and-suspenders approach, directed him to testify in accordance with its ruling, which he did.[17] And, mindful of the

---

[16] The court stated that "[t]he balancing is -- I have to be really careful. But Rabbi Kosofsky lives in the neighborhood, and I'm not going to prohibit him from testifying. So with that having been said, he can identity certain buildings in the area in a generic sense."

[17] To precisely pin down government counsel's understanding of the permissible boundaries of the court's in limine ruling, the court at sidebar asked the prosecutor to briefly summarize the

- 17 -

religious bias debate that had preceded his testimony, the parties and court referred to the Rabbi as Mr. Kosofsky when he took the stand.

Aside from the objections Rathbun had lodged ahead of trial, the sole relevant objection before us occurred when Rathbun objected to Rabbi Kosofsky's trial testimony describing his

---

contours of Rabbi Kosofsky's anticipated testimony as the Rabbi understood them to be, which he did:

> Okay. Very briefly, he will say where he lives; what is located directly across the street, which is the Jewish nursing home complex. He'll say he's familiar with it because he, as part of his position, does work there from time to time; that he provides pastoral care there; that he brings children there from time to time on certain holidays; and that he delivers newspapers to people in Genesis House and I believe Ruth's House.
>
> He will describe the campus and the buildings that they contain. He'll talk about the foot traffic and vehicle traffic on the road directly across the street from his house, which is the driveway entrance to Ruth's House and Genesis House.
>
> He'll talk about the vehicular traffic on Converse Street, the foot traffic on the sidewalk. He will talk about the traffic coming in and out of the driveway. He will talk about the busses that pass on the street, as well, that's part of the vehicular traffic and the fact that they bear signs that say "Jewish Home" on their marquees. He will say that on the morning in question he was home along with a large group of his family members who were living with him. That's it.

In response, the court said, "All right," and the jury was called to the courtroom. And Rabbi Kosofsky mostly stuck to this script.

- 18 -

observations of pedestrian traffic on Converse Street. Here's what happened. The government asked Kosofsky, "So, generally, without regard to anything religious, what have you seen people do on [the Converse Street] sidewalk?" Rathbun's counsel objected and, at side bar, moved for a mistrial, arguing that the government's very question -- specifically the "without-regard-to-anything-religious" phraseology -- violated the court's limiting instruction as it improperly suggested to the jury that people actually partook of religious activities on Converse Street, the exact inference the court had sought to avoid given its potential risk of prejudice. Despite labeling the government's question "unnecessary" and perhaps "gratuitous," the district court denied Rathbun's motion for mistrial, concluding that the statement was "not quite as problematic" as defense counsel argued it to be. And the trial continued.

Before us, Rathbun reiterates the same evidentiary protestations to Rabbi Kosofsky's testimony that he made below and says the district court abused its discretion in allowing it.[18]

---

[18] One exchange in particular screams unfairness, according to Rathbun. In response to a general background question which laid the foundation for why Rabbi Kosofsky was often present at the JGS campus, Kosofsky testified, without objection, that he was a rabbi and regularly visited residents of JGS. Rathbun contends that permitting the Rabbi to offer this evidence about his pastoral duties at the JGS campus after the court had excluded evidence imputing religious bias increased the likelihood of the jury making an improper, unsupported, and prejudicial inference of religious bias. But because Rathbun failed to object, we would review this

According to Rathbun, the government's conduct in soliciting what Rathbun characterizes as religious-tinged testimony appeared to have been an attempt to increase an unsupported theme of religious bias because "[c]alling a rabbi who lived across the street from the area where the container was found to describe neighborhood characteristics and pedestrian traffic was cumulative, unnecessary, and suggested religious targeting - a theme irrelevant to the charges and unsupported by any evidence."

Alternatively, argues Rathbun, even if the testimony may have had some marginal relevance, Rabbi Kosofsky's testimony should have been excluded under Rule 403. That is so, he says, because given the factual realities of this case, with its attendant religious overtones, the probative value of his testimony was substantially outweighed by the risk of unfair prejudice, meaning it was far too prejudicial to justify its usefulness.

The government counters, advancing its previous arguments, and emphasizing that Rathbun's claim that the government could have obtained equivalent, relevant testimony from less prejudicial witnesses lacks merit. Focusing on Kosofsky's

---

asseveration for plain error. See United States v. Medina, 427 F.3d 88, 91 (1st Cir. 2005). However, Rathbun does not acknowledge the application of plain error here or offer a plain error analysis as to the evidence he now takes exception to, so his claim is waived. See United States v. Rodriguez-Monserrate, 22 F.4th 35, 40 (1st Cir. 2021).

- 20 -

testimony about the Converse Street neighborhood, the government argues that while other witnesses testified generally about the area, Rabbi Kosofsky offered greater detail about the neighborhood's distinguishing features based on his eleven years of living and working on the street. Further, he described the area from a civilian perspective as opposed to that of a governmental first responder. That is important, says the government, because it has the right to "prove its case by evidence of its own choice," and it was not obligated to prove its case by the barest evidence or most anodyne witness. Finally, the government stresses that Rathbun cites no precedent to support his notion that the district court should have declined to admit Rabbi Kosofsky's testimony simply "because of the witness's [rabbinical] position or background."

Before we tackle the arguments, a discussion of evidentiary fundamentals will be useful.

On the topic of relevance, we have said that "[r]elevancy is a very low threshold" that only requires the tendered evidence to "move the inquiry forward to some degree." United States v. Cruz-Ramos, 987 F.3d 27, 42 (1st Cir. 2021) (citing Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010)). Rule 401 defines relevancy broadly as evidence having any tendency to make the existence of any fact that is of consequence more or less probable. Fed. R. Evid. 401. We have also held that to be

relevant, the evidence need not definitively resolve a key issue in the case, see, e.g., United States v. Rivera Calderón, 578 F.3d 78, 96-97 (1st Cir. 2009), it need only move the inquiry forward to some degree, Bielunas, 621 F.3d at 76 (citing 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 401.04[2][b] (Joseph M. McLaughlin ed., 2d ed. 2010)).  Given that relevancy is a quintessential judgment call, Morales Feliciano v. Rullan, 378 F.3d 42, 57 (1st Cir. 2004), we "give trial judges considerable leeway in deciding whether the contested evidence satisfies this not-too-difficult-to-meet standard, reversing only on a showing of abuse of discretion," Bielunas, 621 F.3d at 76.

Regarding evidence thought prejudicial, Rule 403 permits a trial judge to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.  "Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'"  United States v. DiRosa, 761 F.3d 144, 153 (1st Cir. 2014) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)).  As we've often stated, there is no debate that the trial court judge possesses "considerable latitude in Rule 403 rulings."  United States v. King, 827 F.2d 864, 867 (1st Cir. 1987); see also United States v. Maldonado-Peña, 4 F.4th

- 22 -

1, 37 (1st Cir. 2021). Given such latitude, we have previously held that "[t]he balancing act that the rule demands 'is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such factbound assessments.'" United States v. Mare, 668 F.3d 35, 39 (1st Cir. 2012) (quoting Udemba v. Nicoli, 237 F.3d 8, 15-16 (1st Cir. 2001)). In the past, we have upheld as an appropriate discretionary call under Rule 403 the exclusion of evidence that might present a danger of "certain pitfalls, including . . . 'needlessly presenting cumulative evidence.'" United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting Fed. R. Evid. 403). As for evidence said to be cumulative, we have noted that "[e]vidence is cumulative if repetitive, and . . . 'the small increment of probability it adds may not warrant the time spent in introducing it.'" Elwood v. Pina, 815 F.2d 173, 178 (1st Cir. 1987) (quoting 1 Weinstein's Evidence ¶ 401[07] at 401-47-48 (1985)). In reviewing these evidentiary calls, "[w]e afford deference to the district court's weighing of probative value versus unfair effect, only in 'extraordinarily compelling circumstances' reversing that 'on-the-spot judgment' from 'the vista of a cold appellate record.'" DiRosa, 761 F.3d at 154 (quoting United States v. Doe, 741 F.3d 217, 219 (1st Cir. 2013)). Such deference acknowledges that the trial judge is better positioned to "assess the admissibility of the evidence in the context of the particular case before it."

- 23 -

Mehanna, 735 F.3d at 59 (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008)).

With guiding principles in place, this is our take. Upon our review of the record, we find that Rabbi Kosofsky's testimony survives Rathbun's relevance and cumulative error arguments. Indeed, we reject any implication flowing from Rathbun's argument that it was error to admit the evidence of a relevant prosecution witness, here the Rabbi, because of the religion of that witness. As for Rathbun's grumbles about cumulativeness, the record before us belies his assertions. While several witnesses, specifically law enforcement and firefighters, testified generally about their familiarity with Converse Street, the record shows that Rabbi Kosofsky, a long-term resident of the neighborhood, provided new and pertinent factual detail, based upon his direct personal knowledge of the setting, that other testifying witnesses did not offer, all of which was germane to the intimidation component of the government's case. Kosofsky described his home's proximity to the JGS campus and expounded upon the pedestrian and vehicular traffic on Converse Street. He furnished many more particularities about the characteristics of the community and the specific areas where the fuel container was found. Rabbi Kosofsky's detailed recitation allowed the jury to garner greater insight into the targeted area and to gain a greater understanding of the foreseeable dangers posed by the fuel container, had it, indeed,

- 24 -

exploded in this highly trafficked neighborhood, all of which assisted the government in meeting its evidentiary burden of proving the charged offenses.  And although Rathbun can point to some duplicative testimony about the Converse Street neighborhood, the record clearly shows that Rabbi Kosofsky's testimony presented expanded details which allowed the government to "tell[] a colorful story with descriptive richness" and "not just to prove a fact but to establish its human significance." Old Chief, 519 U.S. at 187; United States v. Munoz-Franco, 487 F.3d 25, 67 (1st Cir. 2007) (finding that, "[a]lthough appellants can point to instances in which the same story was told more than once, such repetition often encompassed new and relevant details, and was not unduly frequent given the complexity of the violations alleged and the length of the trial").[19]

As for Rathbun's remonstrations about unfair prejudice, we believe the district court's rationale for admitting Rabbi Kosofsky's testimony, as we previously discussed, fairly balanced the parties' competing evidentiary interests.  As the government rightly notes in response to Rathbun's suggestion that Kosofsky's

---

[19] With respect to Kosofsky's snippet of testimony regarding his pastoral visits at the JGS campus which Rathbun says improperly injected inflammatory religious rhetoric into the trial, as the government points out, its introduction provided the jury with context as to why he was routinely in the area where the contrivance was found.  Regardless, we deem any challenge to this evidence waived.

testimony was too religiously tinged to avoid prejudice, Rathbun fails to cite to any precedent (and we have found none) suggesting that a district court should exclude a witness's relevant testimony because of the testifier's background, position, or religious affiliation.   To be clear, Rathbun's postulation that the government could not use such a witness because he was Jewish or because the jury may have necessarily known him to be a Rabbi is simply wrong.   Further, we reject Rathbun's argument, murky at best, that the use of this witness injected religious bias into this case or was suggestive of an anti-Semitic motive.

Aside from our rebuff of Rathbun's misguided religious animus approach, his argument fails to sufficiently credit the precautionary measures the district court thoughtfully undertook to carry out what it viewed as its Rule 403 balancing responsibilities.   Those precautions limited Rabbi Kosofsky's testimony to avoid as much as possible any perceived unfair inference that Rathbun's actions were motivated by religious bias or anti-Semitism.[20]   That said, even with those carefully crafted evidentiary limitations, the parties and the district court acknowledged that religious threads were unavoidably woven

---

[20] As noted, the district court excluded evidence about the religious practices or beliefs of pedestrians on Converse Street or the presence of other Jewish institutions on Converse Street. Additionally, as previously mentioned, at trial, the parties and the court simply referred to Rabbi Kosofsky as Mr. Kosofsky to avoid any potential suggestion of religious bias to the jury.

throughout the basic fabric of the case's tapestry.  But as we have been wont to repeatedly point out in addressing Rathbun's challenges, such were the nature and circumstances of this case.  On appeal, we see no reason to disrupt the district court's evidentiary determination.  See United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (noting that the district court's rulings on Rule 403 determinations are given great deference); United States v. Hadfield, 918 F.2d 987, 995 (1st Cir. 1990).[21] Accordingly, we conclude that the district court did not abuse its discretion in admitting Rabbi Kosofsky's testimony.

### b. BGEA Officers

Again, we first lay out the relevant procedural history associated with the BGEA officers' testimonies before turning to Rathbun's arguments.  Prior to the start of the first trial, the government filed a motion in limine seeking to introduce the testimony of two BGEA officers -- Hill, the Director of Data

---

[21] Furthermore, even if we were to assume arguendo that the district court abused its discretion in admitting Rabbi Kosofsky's testimony (and to be clear, we do not believe it did), there is no indication that Rabbi Kosofsky's disputed testimony affected the outcome of the trial in any way in light of the strength of the incriminating evidence pointing to Rathbun's culpability (think DNA evidence on the device).  See Munoz-Franco, 487 F.3d at 67 (concluding that there was "no indication" that "the arguably cumulative nature of the evidence affected the outcome of the trial in any way"); see also Maldonado-Peña, 4 F.4th at 37 (also concluding that the appellant failed to show prejudice resulting from arguably cumulative testimony when the appellant failed to show that the cumulative evidence affected the outcome of his trial).

Management and Analysis at BGEA; and Rhoads, the Vice President of Church Ministry at BGEA. The gist of its reasoning was that the BGEA officers' testimony was probative of whether Rathbun had indeed committed the crime because it would help explain how pages of the *Steps to Peace With God* tract, bearing Rathbun's blood, became a wick in the fuel container.[22] Rathbun, responding with his own in limine motion objecting to the government's proffer, stressed and opined that the evidence lacked relevance, was unduly time consuming, risked confusion, and was unfairly prejudicial to him.

The district court ruled that it would allow evidence about the origin and distribution of the *Steps to Peace With God* tract, including evidence explaining the role the *Steps to Peace With God* tract played in the BGEA Northeast Tour. However, in order to avoid confusion and possible prejudice, the court excluded evidence of the tract's religious purpose and of the BGEA's doctrinal mission. Prior to Rathbun's second trial, the court reaffirmed the parameters of its ruling.

When called to the stand, Hill gave testimony consistent with the court's ruling and, of note here, further addressed the organization's data collection and mailing practices. Hill explained to the jury that, as evidenced by their completion of a

---

[22] At this point in the proceeding, the government had not yet abandoned its religious motivation theory.

BGEA information form, company records showed that Rathbun's parents had attended the BGEA's 2019 Decision America Northeast Tour.[23]

Then Rhoads took the witness stand.  Upon being questioned, he delved into BGEA's Massachusetts events, including specifics of the 2019 Decision America Northeast Tour, the support needed to organize the events, the background story behind the *Steps to Peace With God* tract, and how it was used during the tour. Rhoads further explained that the BGEA hired Rowe, the pastor of Heritage Baptist Church where Rathbun's parents were active members, to help organize the main event of the Decision America Northeast Tour, the "big event."  He pointed out that the *Steps to Peace With God* tract was given to "volunteers, counselors, [planning] attendees, or some collection of that" and that Rowe would have received two copies of the tract as a contractor. However, as Rathbun emphasizes in his opening and reply briefs, and as relevant to his appellate contentions, neither BGEA witness gave testimony directly addressing how Rathbun's parents may have come into possession of the tract.

On appeal, Rathbun argues that the district court abused its discretion when it admitted Hill's and Rhoads' testimonies,

---

[23] Hill further testified that the BGEA prints its tracts in South Carolina.  The government introduced testimony about the tract's origin to establish 18 U.S.C. § 844(d)'s interstate commerce connection.  See 18 U.S.C. § 844(d).

- 29 -

repeating the mantra that it was irrelevant and unfairly prejudicial under Rules 401 and 403, respectively. Specifically, Rathbun maintains that their testimonies about "the content of the tract" and its proselytizing purpose as it related to the BGEA Northeast Tour was irrelevant because it was immaterial to the charges against him. Their testimonies, he contends, (1) did nothing to identify Rathbun as the perpetrator, (2) did not go to motive, and (3) did not provide relevant background or context evidence. In Rathbun's view, and as consistent with his take on Rabbi Kosofsky's testimony, the government called Hill and Rhoads for the sole purpose of inserting a theme of religious bias into the trial by suggesting that Rathbun was motivated by prejudice, even though the government had no evidence connecting him to any anti-Semitic or white supremacist views or organizations.

Not so, says the government. It argues that the district court's evidentiary determinations were correct and should be affirmed because Hill's and Rhoads' foundational testimonies credibly revealed how the religious tract landed in New England in the first place, thereby, and along with other evidence (such as Sheila's computer files), explaining, circumstantially, how Rathbun may have gotten hold of the tract via his parents' involvement with planning and attending the tour. Moreover, Hill's and Rhoads' testimonies, says the government, were also admissible because they significantly undermined one of Rathbun's adroit

- 30 -

defense theories which -- by the way -- the jury clearly didn't buy.[24]

To remind, we review Rathbun's preserved challenges relative to the BGEA officers' testimonies for abuse of discretion, Occhiuto, 784 F.3d at 867, and given the deference we afford the district court's ruling "only rarely and in extraordinarily compelling circumstances will we . . . reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect," Nicoli, 237 F.3d at 16.

As previously noted, the Federal Rules of Evidence establish a low bar for relevance and that is our starting point.[25]

---

[24] The theory went something like this: When opting to testify, in his own defense, Rathbun eventually acknowledged that he had earlier and likely found the yellow canister used to make the bomb at a job "cleanout" in Chicopee, Massachusetts. At that job site, he had cut his hand on a metal shard, which explains the presence of his blood on the container. He contended that he (and an acquaintance) had illegally dumped the cleanout debris at a dumpster on Converse Street some days before the bomb was found. As for the bloody tract, he theorized that blood from his cut must have somehow transferred to a pamphlet he speculates his mother must have had in her car's cup holder, and that the pamphlet must have gotten jettisoned to the dumpster along with the fuel canister and other random debris. Continuing, he postulates some random third person -- someone very careful not to leave fingerprints, but crafty enough to leave incriminating blood evidence -- must have come along and fished the canister and the pamphlet out of the dumpster and used it to craft the destructive firebomb at the heart of this prosecution. As we said, this alternative explanation was seemingly a non-starter for the jury.

[25] See, e.g., Cruz-Ramos, 987 F.3d at 42. And we have previously held that "[a] relevancy-based argument is usually a tough sell." Bielunas, 621 F.3d at 76; see also Cruz-Ramos, 987 F.3d at 42. As noted above, Rule 401 defines relevancy broadly as

- 31 -

From our record review, it is clear that the evidence offered by Hill and Rhoads was relevant and probative "on the government's proof of identity" burden because, as the government contends, their testimonies constituted circumstantial evidence demonstrating Rathbun's potential access to the *Steps to Peace With God* tract through his parents' involvement with the BGEA. And it further helped explain how Rathbun could have committed the crime as a reasonable jury could have concluded that Rathbun had crafted the crude incendiary device using everyday items he had gathered in his personal environment (his home and his mom's car), to wit, the yellow fuel can and the tract.[26]

As we held in United States v. Charles, "[e]vidence that pertains 'to a chain of events forming the context . . . and set-

---

evidence having any tendency to make the existence of any fact that is of consequence more or less probable. Fed. R. Evid. 401.

[26] In other words, a jury could reasonably infer that because Rathbun's parents had close proximity to the pamphlet or to people who had access to the pamphlet, and because they, more probably than not, brought the pamphlet home, and because Rathbun must have found the *Steps to Peace With God* pamphlet somewhere in his personal vicinity, it reasonably followed that Rathbun had taken and used the tract in putting together his homemade explosive device (as evidenced by his DNA being found on the tract and canister). And although Sheila testified she had never seen the pamphlet before the government's investigation began, the jury was not required to accept that rendition, particularly in the face of contradictory evidence. See United States v. Alfonzo-Reyes, 592 F.3d 280, 291 (1st Cir. 2010) ("Direct evidence is not required to find [a defendant] guilty, and juries are entitled to draw reasonable inferences at trial based on circumstantial evidence.").

up of the crime, helping it to complete the crime on trial . . . [is admissible in appropriate cases] . . . where it possesse[s] contextual significance.'"  456 F.3d 249, 256 (1st Cir. 2006) (alteration in original) (citations omitted).  As in Charles, the information here provided by Hill and Rhoads was relevant to the chain of events in this case because it explains why Rathbun's tenable access to the tract made him a culpable suspect in the commission of the crime.  See id.

We further conclude that evidence regarding the *Steps to Peace With God* tract did not unfairly prejudice Rathbun, in spite of his Rule 403 objection asserting that the tract's introduction inserted confusion and a theme of religious animus into the trial and appealed to the jury's emotion.  In the instant case, we necessarily reiterate:  The facts are what they are -- there is no denying that the tract itself, an objective piece of direct evidence against Rathbun given his blood on the document, was a proselytizing piece of literature distributed by the BGEA.  But as the jury undoubtedly concluded, it is Rathbun who chose the tract as his weapon of choice for arming the explosive device.  Moreover, the district court, ever sensitive to the evidence's inescapable religious overtones, and ever mindful of the need (at least as the district court sussed out the issues) to avoid infusing religious bias into the trial, clearly and appropriately balanced the probative value of Hill's and Rhoads' testimonies against the risk

of unfair prejudice in admitting this evidence.  And to eschew any hypothetical prejudice flowing to Rathbun from its admission, the district court took reasonable steps to adequately limit the information provided to the jury about the *Steps to Peace With God* tract to testimony confining the scope of the evidence to its relationship to the BGEA Northeast Tour.  See United States v. Benitez-Avila, 570 F.3d 364, 369 (1st Cir. 2009).  Then, once both Hill and Rhoads had concluded their testimonies, it immediately provided an unobjected to, focused, limiting instruction explaining to the jury that the testimonies related strictly to the tract's possible availability to Rathbun, not to its content. Specifically, in its limiting instruction, the court stated:

> Ladies and gentlemen, relative to the testimony that you have heard regarding what has been called tract-type materials, the purpose of these materials, the reason why they -- there's been talk about them and they have been introduced.  The purpose is for you to know where these materials came from, any individual's access or potential access to these materials, the availability when, where, or how to these types of materials, that's what they're admissible for.
>
> There's really no relevance or admissibility for the content when you read them.  The religious message that's being delivered, that's not an issue right here.  So anything that's written inside of them is not really the issue as I said.  It's the availability. Who had access to them, where were they, how would someone get them is why these are being talked about here.  All right?  I just want to make sure that that's understood.  All right. Thank you.

- 34 -

Accordingly, we fail to see how Hill's and Rhoads' probative testimonies about the tract used as a wick should be reasonably viewed as unfairly prejudicing Rathbun, and therefore see no abuse of discretion in the district court's decision to admit it. See United States v. Vest, 842 F.2d 1319, 1327 (1st Cir. 1988) (concluding that the district court properly limited any prejudicial effect of the evidence in question when it issued a limiting instruction).

### c. The Cumulative Effect of the Testimonies and the Government's Opening and Closing Arguments

Next, Rathbun advances what appears to be an amorphous, standalone protestation, targeting the cumulative effect of the admittance of several pieces of contested evidence in combination with statements made by the prosecutor. This is how Rathbun frames his argument in his opening brief:

> While Rathbun maintains that the probative value of the testimony of Rabbi Kasofsky [sic] and the BGEA witnesses, considered individually, was substantially outweighed by the risk of unfair prejudice, he submits that the risk of unfair prejudice from the religious themes was heightened by the combination of those three witnesses and exacerbated by the government's repeated contrast of the "Christian religious tract" and the "Jewish nursing home" [(in its opening and closing arguments)] -- notwithstanding its concession that it had no evidence of an anti-Semitic motive.

At the outset, we note that Rathbun and the government are ships passing in the night when it comes to a common understanding of what Rathbun is challenging here. The government does not seem to understand that Rathbun is making a cumulative effect argument and thus does not address it as such in its briefing. Instead, given the emphasis Rathbun, in his opening brief, places on statements made by the government during its opening and closing remarks, the government interprets Rathbun as solely advancing a prosecutorial misconduct claim of error. Therefore, the government addresses only that understanding of Rathbun's argument and, consistent with that interpretation, denies that it ever engaged in prosecutorial misconduct.

In retort, Rathbun's reply brief makes clear that the government's understanding of his argument totally misses the mark. He says:

> Mr. Rathbun argued that the government's juxtaposition of the Christian tract and the Jewish nursing home in its opening and closing arguments illustrated and heightened the potential for unfair prejudice from the government's presentation of Kasofsky [sic] and the BGEA witnesses. Yet, the government's response . . . focuses on an argument not made -- that prosecutorial misconduct in closing argument required a new trial — and argues that Mr. Rathbun has not shown that the prosecutor's argument was plainly erroneous. However, the issue is whether the testimony of Chaim Kasofsky [sic] and the BGEA witnesses was unfairly prejudicial and requires a new trial . . . . The totality of the religious

> motivation evidence and argument produced the
> unfair prejudice requiring a new trial.

Ships passing . . .[27]

All that said, we can dispose of Rathbun's claim of error with easy dispatch.[28] Our review of the record makes clear that Rathbun did not make this cumulative effect argument in the district court pursuant to a Rule 29 motion for judgment of acquittal or new trial. What's more, Rathbun's briefing does not spell out what standard of review he wants us to apply to his challenge here, and that is so in spite of his legal obligation to so advise.[29] See Fed. R. App. P. 28(a)(8)(B) (instructing that, for each issue, the argument must contain a concise statement of

---

[27] As for our parsing of Rathbun's argument, we believe, for what it's worth, that it boils down to this. Highlighting the testimonies of Rabbi Kosofsky and the BGEA officers, Rathbun maintains that the questioning of these witnesses is indicative of the impermissible theme of anti-Semitism which he says permeated the government's case. In his view then, it is the cumulative effect of the religiously charged testimonial language which Rathbun claims drew excessive attention to unsupported religious themes, coupled with certain religiously tinged statements the government made during its opening and closing remarks, that unfairly prejudiced him, thereby depriving him of a fair trial. Regardless of our understanding, the argument is waived.

[28] To be clear, the claim of error we'll tackle here is Rathbun's cumulative effect argument, not the prosecutorial misconduct argument the government understood him to be making -- an argument which Rathbun explicitly says in his reply brief is "an argument not made."

[29] It is telling to us that while Rathbun's opening brief is clear that abuse of discretion analysis guides our review of his other appellate challenges, it is dead-silent on what standard of review should apply to his cumulative effect argument.

- 37 -

the applicable standard of review).  In view of the procedural and substantive confusion with which we are confronted in our efforts to understand Rathbun's appellate challenge, at best, we would review his cumulative effects argument for plain error.  See United States v. Pérez-Vásquez, 6 F.4th 180, 201 (1st Cir. 2021). However, cutting to the chase, because Rathbun does not acknowledge his failure to preserve his objection below or provide us with a plain error analysis of his cumulative effect argument in his opening brief, the argument is waived, and we need say no more. See Rodriguez-Monserrate, 22 F.4th at 40 (reasoning that a defendant's failure to address the four-part plain error standard in seeking review of an unpreserved argument violates the rules of procedure, waiving the argument); see also United States v. Vázquez-Rosario, 45 F.4th 565, 571 (1st Cir. 2022) (concluding an appellant's claim was waived when the appellant did not address the applicable standard of review); United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) ("Pabon has waived these challenges because he has not even attempted to meet his four-part burden for forfeited claims . . . .").  And to the extent more is needed here (which it isn't), we'd note that even if Rathbun's failure to map his arguments onto the demanding plain error rubric wasn't enough, we would deem the argument he's trying to make here too "confusingly constructed and thus waived."  See Págan-Lisboa v.

- 38 -

<u>Soc. Sec. Admin.</u>, 996 F.3d 1, 7 (1st Cir. 2021) (quotation marks omitted).

In wrapping up our discussion of Rathbun's first set of protestations over prosecutorial witnesses, we make clear that our careful treatment of Rathbun's objection to "religious" evidence does not suggest that the issue is a close one.  A facility prominently associated with the Jewish faith was the target of a firebombing attempt by a bomber who left behind a Christian religious tract.  Given such a crime, calling as a witness the local rabbi to testify about relevant facts, or providing evidence of Rathbun's potential access to the tract used as a fuse, hardly begins to qualify as unfairly prejudicial.

## II. Evidence of Rathbun's Drug Use in the Motel

Next, we address Rathbun's arguments relative to his Rule 404 propensity objection.  Prior to trial, the government filed a motion in limine seeking to introduce newly developed evidence about Rathbun's mental state during the timeframe leading up to the crime.  Specifically, the government sought to introduce evidence about Rathbun's then-recent job termination and about a drug binge which occurred at a Quality Inn motel in Chicopee, Massachusetts (the "Motel") on March 3, 2020, about a month before the fuel container was found outside the JGS campus.  The government sought to do so to provide the jury with a more accurate and complete picture of Rathbun's life circumstances and state of

- 39 -

mind leading up to the crime (we'll get to the discussion of this information in just a moment).  Over Rathbun's opposition, the district court partially granted the government's motion, concluding that testimony about Rathbun's drug binge at the Motel was admissible because it would shed light on his state of mind while under the influence of drugs.[30]

At trial, over Rathbun's objections, the government introduced the testimonies of Chicopee Police Officer Peter Szufa ("Officer Szufa") and Dana Graham ("Graham"), who both interacted with Rathbun at the Motel on March 3, 2020.  Officer Szufa testified that he was on duty that evening when he responded to a larceny-in-progress call at the Motel.  When he arrived at the scene, he observed a van matching the description of the one in the dispatch call but did not see anyone in it or observe any signs of forced entry.  Instead, he noticed Rathbun shouting from the second floor of the Motel that someone was in the front seat of his van.  Officer Szufa further testified that Rathbun came downstairs to speak with him wearing only shorts, which he found peculiar given the evening's cold temperature.  He explained that Rathbun could not provide a logical account of his claim -- that

---

[30] The court denied the government's motion with respect to testimony about Rathbun's job loss, reasoning that the specific examples of his poor work performance were cumulative bad acts and character evidence with slight probative value in determining Rathbun's motive or intent in placing the gas container at the JGS campus.

the burglar had entered his van, left, and came back again -- and that he found no corroborating evidence to support Rathbun's assertion.

Next, Graham, Rathbun's friend and a former substance abuser, testified that she was with Rathbun at the Motel on the evening of March 3, 2020. She told the jury that they both binged drugs that evening, taking a combination of alcohol, cocaine, heroin, crack cocaine, and Xanax that left Rathbun erratic, jumpy, and suspicious. She said she did not see anyone enter Rathbun's van. Following Graham's testimony, the district court instructed the jury that it could consider the evidence related to Rathbun's behavior at the Motel only for the limited purpose of understanding Rathbun's life around the time of the alleged incident, including his personal life, employment status, state of mind, and general well-being.

On appeal, Rathbun argues that the district court abused its discretion when it admitted evidence of his behavior during his drug binge at the Motel, a month before the incident, as relevant to his state of mind on April 1, 2020, the night before the crime, when he also took drugs. More specifically, Rathbun contends that the evidence was rank propensity evidence improperly suggesting that because he acted erratically at the Motel after taking drugs, he also acted erratically on April 1, the night before the crime, when he took crack cocaine. Rule 404 should

have precluded its admissibility, Rathbun says. Rathbun further argues that the evidence lacked special relevance under Rule 404 because (1) there was no evidence that he ingested the same drugs on April 1, 2020, as he did at the Quality Inn on March 3, 2020; and (2) the Motel incident failed to provide any relevant context to the jury because his drug use and addiction were uncontested at trial. Moreover, he maintains that the evidence should have been excluded because even if of some relevance, its probative value was substantially outweighed by the risk of unfair prejudice.

Unsurprisingly, the government disagrees. The government first argues that the evidence was likely admissible as "intrinsic evidence" (a concept we'll explain momentarily) because the Motel incident was referenced during testimony provided by Sheila and John Rathbun and Rathbun's teenage daughter and it was relevant to show "Rathbun's mental state in the period leading up to and continuing through the night of April 2d [sic]." Regardless, the government maintains that the evidence was admissible under Rule 404(b) because it provided a motive for Rathbun's crime, to wit, "that, during this time period and especially when using drugs, Rathbun might have acted out based on his agitation and frustration with his life circumstances" and behaved in unpredictable ways, all of which negated Rathbun's assertion that he did not possess any intent to commit the crime because he harbored no animus against the target. Second, the

- 42 -

government contends that the district court properly balanced Rule 403 when it admitted the evidence because the probative value of Officer Szufa's and Grahams' testimonies substantially outweighed the risk of unfair prejudice. The government also asserts that the risk of unfair prejudice was low because it never argued during the trial that Rathbun acted similarly to his behavior at the Motel when he took drugs on April 1, 2020.

Before we tackle the necessary analysis and the lens through which we'll address Rathbun's arguments, we start with first principles of Rule 404.

Rule 404 prohibits evidence of a defendant's other crimes, wrongs, or acts to show a defendant's propensity to act in a particular way. Fed. R. Evid. 404(b)(1). However, such evidence may be admitted for another purpose, such as showing "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We have held that this list is illustrative, not exhaustive. See United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011). As such, the rule is one of inclusion, since one purpose is prohibited, and many others are permitted. See United States v. Rodríguez-Soler, 773 F.3d 289, 297 (1st Cir. 2014); see also United States v. Zeuli, 725 F.2d 813, 816 (1st Cir. 1984). "Extrinsic" and "intrinsic" evidence are concepts associated with Rule 404. Rodríguez-Soler, 773 F.3d at 297; United States v. Green, 698 F.3d

- 43 -

48, 55 (1st Cir. 2012).  We have held that, "[b]y covering only evidence of a person's 'other crimes, wrongs, or acts,' the rule draws a line between prior acts that are part of the charged crime [intrinsic evidence] and those that are not [extrinsic evidence]." Rodríguez-Soler, 773 F.3d at 297 (emphasis in original); see also United States v. Bowie, 232 F.3d 923, 927 (D.C. Cir. 2000); United States v. Shea, 159 F.3d 37, 39 (1st Cir. 1998).[31]

Because Rathbun objected to the admission of the prior-bad-acts evidence at trial, we would ordinarily ask whether the district court's ruling was an abuse of discretion.  See United States v. Gemma, 818 F.3d 23, 35 (1st Cir. 2016); see also United States v. Henry, 848 F.3d 1, 8 (1st Cir. 2017).  However, an answer to this question does not complete our inquiry.  For purposes of our analysis, we further ask -- even if we assume arguendo that the admitted evidence might possibly be viewed as impermissible propensity evidence (and to be clear, we do not believe it was propensity evidence) -- whether it was harmless.   That is so because if admission of the challenged evidence was harmless, we do not reverse.  United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019) (noting "[a]n [evidentiary] error will be treated as harmless only if it is 'highly probable' that the error did not contribute to the verdict" (quoting Fulmer, 108 F.3d at 1498));

---

[31] The government's alternative argument suggesting that this evidence may be intrinsic is one we need not reach.

- 44 -

United States v. Landrón-Class, 696 F.3d 62, 68 (1st Cir. 2012) ("[E]ven if [an evidentiary] error occurred, it would not serve to overturn a conviction if it ultimately proved harmless."); United States v. Pridgen, 518 F.3d 87, 91 (1st Cir. 2008) (noting that a defendant's verdict will not be overturned if "it is highly probable that the [evidentiary] error did not affect the verdict"). To analyze whether an error was harmless, we must analyze from "the record as a whole . . . the probable impact of the improper evidence upon the jury." Fulmer, 108 F.3d at 1498. In doing so, we consider factors such as "the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, [and] the relative strengths of the parties' cases." Kilmartin, 944 F.3d at 338 (quoting United States v. Piper, 298 F.3d 47, 57 (1st Cir. 2002)). In a criminal case, the crucial factor is typically "the strength or weakness of the government's evidence of guilt" less the improperly admitted evidence. Id.; see also United States v. García-Sierra, 994 F.3d 17, 35 (1st Cir. 2021).

The government maintains that any error in admitting the Motel evidence was harmless because it presented a solid, robust case against Rathbun. On the other hand, Rathbun says admission of the evidence was clearly not harmless and as proof he contrasts the outcome of the first trial where the Motel evidence was not offered -- a hung jury on Counts One and Two -- with the outcome

of the second trial where the Motel evidence was allowed -- a guilty finding on both counts. Urges Rathbun, given that the government's evidence in both trials remained substantially the same, save, primarily, for the introduction of this prior drug use at the Motel, "it cannot be said it was highly probable the errors did not contribute to the verdict."

After our review of the record, we conclude the government has the better argument -- that is, even if the admission of the prior-bad-acts evidence may have been error, it was harmless. Contrary to Rathbun's protestations, the record shows that abundant evidence incriminated him, making the government's case against Rathbun quite strong. The government presented evidence, inter alia, about the fuel container itself and the recorded incriminating statements Rathbun made to his mother acknowledging his possession of it, Rathbun's cell phone location data on the date of the incident, Rathbun's DNA evidence from the fuel container and wick, and Rathbun's inculpatory admissions to investigators. The government also presented circumstantial evidence demonstrating Rathbun's access to the *Steps to Peace with God* tract and evidence that contradicted multiple statements Rathbun made during his interview with Agent McGonigle. Therefore, taking "the strength . . . of the government's evidence of guilt" less the evidence of Rathbun's behavior at the Motel, we conclude that the admission of the

- 46 -

evidence, even if error, was harmless.  Kilmartin, 944 F.3d at 338.

We also note that the evidence of Rathbun's behavior at the Motel was not central to the government's case or, as we've discussed in the past, an especially unique piece against Rathbun. Id. (noting that courts consider the centrality of the tainted materials, and the uniqueness of those materials, amongst other factors).  Presentation of this evidence was brief and factual, the government advanced no overt propensity argument relative to it, the government made no mention of it during its opening and closing statements, and the court's limiting instruction (Motel evidence admitted only to facilitate an understanding of Rathbun's life and state of mind around the time of the alleged incident) cabined how the jury could consider it.  In our viewing of the record as a whole, we cannot conclude that the Motel evidence was a game-changer favoring guilt.  In other words, we conclude that it is highly probable that the admission of evidence pertaining to Rathbun's behavior at the Motel in March 2020 was not a determinative factor in the jury's guilty verdict.  See García-Sierra, 994 F.3d at 35-36 (concluding that the district court's admission of a defendant's prior-bad-acts evidence was harmless because the government's case was strong, and that it was "highly probable" that the admission of the prior-bad-acts evidence was not a determinative factor in the jury's guilty verdict).  Nor is

- 47 -

it true that the only difference between the two trials was the admission of this evidence, as Rathbun alleges. In addition to the challenged Motel evidence, we note the second trial, unlike the first, premiered Rabbi Kosofsky's testimony which we've already addressed and deemed appropriate. Another example, at the second trial, Horace Williamson, the owner of the home at which Rathbun cleared out trash sometime in the weeks before the day of the bombing, testified as a rebuttal witness that he never owned nor threw out a yellow gas canister or biblical tract, and that he did not see Rathbun cut his hand or bleed at his home. Williamson's testimony thus undercut Rathbun's theory as to how his DNA ended up on those objects.

### III. Cumulative Error

Finally, Rathbun makes a separate and distinct, last-ditch, kitchen sink, cumulative error argument. Contending that in addition to the evidentiary missteps with Rabbi Kosofsky and the BGEA witnesses, and the inappropriate injection of religious bias throughout the trial (and especially during the government's opening and closing statements), if one then throws into that concoction the wrongly admitted propensity evidence, what you get is a series of errors that, in sum, constitute a bridge way too far, necessitating reversal and new trial. We have previously accepted "that the cumulative prejudicial effect of independently innocuous trial errors may warrant a new trial." Id. at 36; see

- 48 -

also, e.g., United States v. Peña-Santo, 809 F.3d 686, 702 (1st Cir. 2015) ("[I]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."). However, we find each of the alleged evidentiary errors to either not be errors at all or, if so, harmless ones; we also find that they collectively do not warrant a new trial. García-Sierra, 994 F.3d at 35-36 (concluding that a new trial was not warranted because each of the defendant's individual evidentiary errors were harmless and therefore collectively, they were also harmless).

## C. FINAL WORDS

For the foregoing reasons, we **affirm**.